**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOHNNIE LEE SAVORY, | ) | |
| | ) | Case No.     C |
| *Plaintiff,* | ) | |
| | ) | |
| *v.* | ) | |
| | ) | |
| CHARLES CANNON, MARCELLA | ) | |
| BROWN TEPLITZ, RUSSELL BUCK, | ) | |
| JOHN FIERS, CHARLES EDWARD | ) | |
| BOWERS, JOHN STENSON, GEORGE | ) | |
| PINKNEY, E. HAYNES, WALTER | ) | |
| JATKOWSKI, GLEN PERKINS, ALLEN | ) | |
| ANDREWS, HAROLD MARTENESS, | ) | |
| MARY ANN DUNLAVEY, CARL TIARKS, | ) | |
| PETER GERONTES, JOHN TIMMES, | ) | |
| UNKNOWN OFFICERS OF THE PEORIA | ) | |
| POLICE DEPARTMENT, DENNIS | ) | |
| JENKINS, and the CITY OF PEORIA, | ) | |
| Illinois, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| *Defendants.* | ) | |

**COMPLAINT**

NOW COMES Plaintiff, JOHNNIE LEE SAVORY, by his attorneys the PEOPLE'S

LAW OFFICE, the RODERICK & SOLANGE MACARTHUR JUSTICE CENTER, and

LOEVY & LOEVY, and complaining of Defendants CHARLES CANNON, MARCELLA

BROWN TEPLITZ, RUSSELL BUCK, JOHN FIERS, CHARLES EDWARD BOWERS, JOHN

STENSON, GEORGE PINKNEY, E. HAYNES, WALTER JATKOWSKI, GLEN PERKINS,

ALLEN ANDREWS, HAROLD MARTENESS, MARY ANN DUNLAVEY, CARL TIARKS,

PETER GERONTES, JOHN TIMMES, UNKNOWN OFFICERS OF THE PEORIA POLICE

DEPARTMENT, DENNIS JENKINS, and the CITY OF PEORIA, Illinois, states as follows:

## INTRODUCTION

1.      Plaintiff Johnnie Lee Savory was just 14 years old when he was wrongly arrested in January 1977 for the rape and murder of Connie Cooper and the murder of James Robinson. He was tried as an adult for capital murder and was convicted first in 1977 and again in 1981. A jury spared him the death penalty in 1977.

2.      Plaintiff did not commit the crime. At all times during the nearly 40 years since he was wrongly convicted, Plaintiff has steadfastly maintained his innocence.

3.      Though there was ample physical evidence left at the crime scene, not one piece of that evidence has ever connected Plaintiff to the rape and murder of Connie Cooper or to the murder of James Robinson. On the contrary, all DNA and other forensic testing of physical evidence recovered from the crime scene excludes Plaintiff as the perpetrator.

4.      Moreover, there has never been a single eyewitness who has implicated Plaintiff in the crime. Nor has there ever been any other witness who has credibly connected Plaintiff to the murders.

5.      Plaintiff's arrest, indictment, prosecution, and conviction were based entirely on false evidence fabricated by Defendants. Included among that evidence was an involuntary and false confession attributed to Plaintiff, which was concocted and coerced by Defendants after 31 hours of abusive and illegal interrogation of a 14-year-old child. In addition, Defendants manufactured and fabricated statements from witnesses who said falsely that they had interacted with Plaintiff close in time to the crime and had heard him implicate himself in the murders.

6.      In order to secure Plaintiff's wrongful prosecution and conviction, the Defendants also suppressed and destroyed evidence that would have shown Plaintiff was innocent, as well as

evidence that could have been used to undermine the testimony of State's witnesses, including the testimony of Defendants themselves.

7.      At the same time, the Defendants disregarded and intentionally undermined the ample evidence that indicated someone else had committed the rape and murder of Connie Cooper and the murder of James Robinson. To this day, because of Defendants' misconduct, the real perpetrator of this heinous crime has never been brought to justice.

8.      When Plaintiff was released from prison, he had served 30 years for a crime he did not commit. On January 12, 2015, the Governor of Illinois pardoned Plaintiff.

9.      Plaintiff now seeks justice for the harm that the Defendants have caused and redress for the loss of liberty and the terrible hardship that he has endured and continues to suffer as a result of the Defendants' misconduct.

**JURISDICTION AND VENUE**

10.      This action is brought pursuant to 42 U.S.C. § 1983 *et seq.* and Illinois law to redress the Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution.

11.      This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims pursuant to 28 U.S.C. § 1367.

12.      Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district. In addition, Plaintiff's criminal case was investigated, tried, and appealed in part in this judicial district, such that a substantial part of the events and omissions giving rise to Plaintiff's claims occurred within this judicial district. In particular, Plaintiff was tried in 1981 in the Circuit Court of Lake County, Illinois, which is located in Waukegan, Illinois. Evidence collected and processed during the investigation and at issue in this case was tested and stored

within this district. Moreover, many of the witnesses in the case reside in this district. Moreover and/or in the alternative, while not all of the Defendants reside in the State of Illinois, the Defendants are subject to the personal jurisdiction of the courts in this judicial district.

## PARTIES

13.    Plaintiff Johnnie Lee Savory is an African-American man who spent 30 years wrongly incarcerated and nearly 40 years fighting false charges related to a heinous rape and double-murder that he did not commit.

14.    Defendants Charles Cannon, Marcella Brown Teplitz, Russell Buck, John Fiers, Charles Edward Bowers, John Stenson, George Pinkney, E. Haynes, Walter Jatkowski, Glen Perkins, Allen Andrews, Harold Marteness, Mary Ann Dunlavey, Carl Tiarks, Peter Gerontes, and John Timmes are current or former officers and employees of the Peoria Police Department and the City of Peoria. At all times relevant to the events described in this Complaint, Defendants Andrews, Marteness, Dunlavey, Tiarks, Gerontes, and Timmes were supervisors in the Peoria Police Department and in that capacity directed, approved, and ratified the decisions of the other Defendants named in this Complaint.

15.    Defendants Unknown Officers of the Peoria Police Department participated in the misconduct alleged in this Complaint.

16.    The City of Peoria is an Illinois municipal corporation that is or was the employer of the above-named Defendants. In addition, each of the Defendants named in this Complaint acted during their investigation of the Cooper and Robinson murders as agents or employees of the City of Peoria. The City of Peoria is liable for all torts committed by the Defendants pursuant to the doctrine of *respondeat superior*. Additionally, the City of Peoria is additionally responsible for the policies and practices of the Peoria Police Department.

17.     Defendant Dennis Jenkins was the principal of Dennis K. Jenkins & Associates and is successor in interest to Dennis K. Jenkins & Associates, which was a for-profit business located at 405 Main Street in Peoria, Illinois. At all times relevant to the events described in this Complaint, Jenkins & Associates reached agreements to provide the Peoria Police Department with polygraph services, as well as advice and consultation in connection with the interrogation of individuals suspected of criminal activity. Jenkins & Associates routinely provided advice and consultation pursuant to those agreements.

18.     In addition, Jenkins & Associates and its employees and agents conducted, participated in, collaborated with, and encouraged the interrogation of individuals suspected of criminal activity by the Peoria Police Department, including the interrogation of Plaintiff at issue in this Complaint. Defendant Jenkins was employed by Jenkins & Associates and acted as an agent of Defendant City of Peoria and the other individual Defendants named in this Complaint. Defendant Jenkins directed, conducted, and participated in the interrogation of Plaintiff and at all times was acting under color of law and within the scope of his employment with Jenkins & Associates and within the scope of his agency with Defendant City of Peoria.

19.     Each and every individual Defendant, known and unknown, acted under color of law and within the scope of his or her employment at all times relevant to this lawsuit. Each of the individual Defendants is sued in his or her individual capacity unless otherwise noted.

## FACTS

### The Crime

20.     On the morning of January 18, 1977, Noyalee Robinson and her ex-husband William Peter Douglas left their home in Peoria for work. At the time they left, Noyalee's 19-year-old daughter, Connie Cooper, and her 14-year-old son, James Robinson, were at home.

Connie's two-year-old son, William Cooper, was also there. So was the family's aggressive German Shepherd named Trouble Man.

21.     When Noyalee and Douglas returned to the house around 4:30 p.m. that afternoon, Connie and James were dead on the floor of a bedroom. Both had been stabbed multiple times. Connie had been raped, and she had suffered a number of defensive wounds during the attack. Two-year-old William was alive and unharmed in a separate bedroom, and Trouble Man was loose in the house. It was a dreadful and high-profile crime that shocked the community and drew widespread media attention in Peoria and beyond.

22.     Defendants investigated the crime. They quickly secured the house and began to gather the physical evidence left at the scene. Among other things, Defendants collected hairs from the hands of both victims, vaginal swabs from Connie, blood-stained clothing and bedsheets, fingerprints from throughout the house, and blood smeared on a bathroom light switch. The Defendants also recovered unusual objects from the crime scene, including a nightstick that belonged to a man named Kenny Parker. None of the physical evidence discovered at the scene suggested that Plaintiff was in any way connected to the crime.

23.     On the day of the crime and in the days following, Defendants investigated a number of leads and questioned suspects. Given the sexual violence involved in the crime and other factors, the Defendants considered suspects who had a connection to Connie and some conceivable motive to kill her.

24.     They looked into Kenny Parker, who had been having a secret sexual affair with Connie and who had no explanation for how his nightstick ended up at the crime scene. The Defendants also investigated Charles Watts, an ex-boyfriend of Connie's who had once choked Connie and punched her in the face. In addition, the Defendants interviewed or searched for

Curtis Spence, the father of Connie's son William, and an ex-boyfriend named Greg, among others. Moreover, the Defendants questioned William Peter Douglas—Noyalee's ex-husband and Connie's step-father—about whether he had been involved in the crime, and they developed evidence that Douglas had made sexual advances toward Connie in the past. On the day of the murders, welts appeared under Douglas's eye.

25.     The Defendants claimed that these efforts did not lead to evidence suggesting that the above-named suspects killed Connie and James.

26.     To this day, the crime remains unsolved. By focusing on the wrong man, the Defendants have permitted the real killer to remain at large for four decades.

**Johnnie Lee Savory**

27.     At the time of his arrest in January 1977, Plaintiff Johnnie Lee Savory was a 14-year-old child. He lived in Peoria with his father, Y.T. Savory, his sister, Louise Savory, and his grandmother, Martha Alexander. At the time of his arrest, Plaintiff was attending junior high school. Plaintiff had been close friends with James Robinson.

28.     On the day that Connie and James were killed, Plaintiff had a verifiable alibi for each moment of the day. There was not a time in the day where it would have been possible for Plaintiff to commit a bloody double-murder, nor did Plaintiff have any motivation to do so. Plaintiff provided Defendants with detailed information about his alibi repeatedly during their investigation.

29.     Despite Plaintiff's alibi, the lack of physical evidence connecting him to the crime, and the much more likely perpetrators, approximately a week after the crime occurred, the Defendants suddenly and inexplicably began to focus on Plaintiff as a suspect.

30.     Because Plaintiff was friends with James, he had been at James's house on the evening before the murders, but there was absolutely nothing to suggest he had returned to the house the next day to brutally murder his friend and his friend's sister.

### Fabrication of a False Confession

31.     The Defendants took Plaintiff into custody and began to interrogate him on or about the afternoon of January 25, 1977.

32.     The Defendants' interrogation of Plaintiff lasted for approximately 31 hours over two days. It was an extreme and alarming abuse of police power, and a wholly illegal effort to secure a confession from Plaintiff, in violation of his constitutional rights, by means of physical and psychological coercion.

33.     Plaintiff was a child, barely into his teenage years, at the time of his interrogation. Defendants knew this, and they knew that his youth rendered him particularly vulnerable to coercive interrogation techniques. Like all children, Plaintiff had cognitive and emotional limitations caused by his young age, which left him susceptible to confessing falsely. These limitations were obvious to the Defendants at all times during their interrogation of Plaintiff.

34.     Throughout the course of their interrogation, the Defendants had ample opportunity to observe the consequences that their coercive questioning had on Plaintiff. Nonetheless, the Defendants took no steps to limit or to adapt their questioning of Plaintiff in response to his obvious vulnerabilities. Instead, they did the opposite: they agreed amongst themselves and acted jointly to exploit Plaintiff's vulnerabilities in order to secure a confession regardless of whether it was true or false.

35.     Plaintiff had little opportunity to sleep as the interrogation progressed. As of the evening of January 26, 1977, Plaintiff had hardly slept since being taken into the Defendants'

custody. This sleep deprivation heightened the already impermissibly coercive nature of the interrogation.

36.    In addition, Plaintiff was deprived of food during his interrogation. He was fed only candy and soda pop—and no substantial food—until a day into his interrogation.

37.    In addition, in an effort to exhaust and disorient Plaintiff, the interrogation took place in multiple locations at different facilities, and the Defendants employed a substantial team of interrogators, who interrogated Plaintiff in tag teams. They divided their time between the interrogation rooms of the Peoria Police Department, the offices of Dennis K. Jenkins & Associates, police vehicles, and other police facilities.

38.    At Dennis K. Jenkins & Associates, Plaintiff was interrogated by the Defendants, subjected to multiple polygraph tests, questioned, and was repeatedly accused of committing the murders of James and Connie. As part of their plan to coerce Plaintiff into incriminating himself, the Defendants lied to Plaintiff and told him that the polygraph exams he had taken implicated him in the crime.

39.    At the offices of Dennis K. Jenkins & Associates and in the interrogation rooms of the Peoria Police Department, the Defendants acted in violation of the Constitution in their effort to implicate Plaintiff in a crime that he had not committed. In addition to their unjustified decision to question Plaintiff over 31 hours, to exploit Plaintiff's intellectual and emotional deficiencies caused by his youth, and to deprive Plaintiff of sleep, the Defendants used additional abusive techniques.

40.    Plaintiff never had a parent or any other adult at the interrogation to advocate on his behalf. He was never provided with an attorney or a youth officer.

41.     The rooms in which the interrogation took place were closed, and the Defendants made clear to Plaintiff that he was not allowed to leave at any point.

42.     The Defendants repeatedly accused Plaintiff of murdering Connie and James over the course of the interrogation, despite Plaintiff's consistent denials of any involvement in the crime. The Defendants screamed at Plaintiff and threatened him.

43.     To make Plaintiff's false confession possible and more credible, the Defendants improperly fed him facts of the crime and showed him pictures of the crime scene, which were unknown and unavailable to Plaintiff and to the general public. They attributed these facts to Plaintiff as evidence he knew things about the crime that only the real killer could have known.

44.     The Defendants laid hands on Plaintiff, and, at one point during the course of the interrogation, they stripped him naked and plucked hairs from all over his body.

45.     The Defendants made false promises to Plaintiff to induce him to implicate himself falsely. Among other things, they told Plaintiff that he would be allowed to leave if he admitted his involvement in the crime.

46.     The Defendants also failed to give Plaintiff complete, comprehensible, or effective *Miranda* warnings. Further ensuring that Plaintiff's constitutional rights were violated, the Defendants engaged in coercive, deceptive, and diversionary tactics that would have deprived *Miranda* warnings of any force, even if effective warnings had been given. At no point did Plaintiff knowingly or voluntarily waive his right to remain silent.

47.     In fact, the opposite is true: Plaintiff repeatedly invoked his right to remain silent, only to be ignored by the Defendants. Repeatedly, Plaintiff asked the Defendants to stop their questioning and false accusations. Plaintiff persisted in his requests to remain silent during the days-long interrogation, but his requests were ignored.

48.     During the interrogation, while obviously in extreme distress, Plaintiff broke down crying. The Defendants simply ignored Plaintiff's plain distress and continued their interrogation.

49.     At no point did the Defendants heed Plaintiff's request and stop their physically and psychologically abusive questioning. At no point did the Defendants permit Plaintiff to terminate the questioning. The Defendants' uninterrupted accusations and questioning continued as if Plaintiff had said nothing at all.

50.     In the face of the extreme physical and psychological abuse and coercion described above, Plaintiff steadfastly maintained his innocence. Plaintiff told the Defendants over and over that he had no connection to the murders of Connie and James. The Defendants ignored Plaintiff and disregarded evidence that corroborated Plaintiff's claims of innocence.

51.     According to the Defendants, after many hours of interrogation, Plaintiff suddenly confessed falsely to multiple Defendants that he had killed Connie and James.

52.     The Defendants wrote police reports recounting Plaintiff's false confession. In addition, the Defendants unsuccessfully attempted to have Plaintiff sign a false statement implicating himself in the murders of Connie and James. They also wrote reports falsely reporting the circumstances of Plaintiff's interrogation and confession.

53.     Plaintiff's purported oral confession was facially implausible. Among other things, it contained no explanation whatsoever for the fact that Connie had been raped.

54.     Immediately after the purported confession, at the very next moment that Plaintiff had the opportunity to talk with a police officer, he made painstakingly clear, again, that he was innocent of the crime.

55.    In committing the misconduct described above, the Defendants made an agreement with one another, and with others currently unknown to Plaintiff, to individually, jointly, and/or in conspiracy secure a false and involuntary confession from Plaintiff and to use that confession to initiate and perpetuate false criminal charges against Plaintiff.

### Additional Steps to Frame Plaintiff

56.    In addition to the misconduct that led Plaintiff to falsely implicate himself in the murders of Connie and James, the Defendants repeatedly and deliberately withheld and destroyed evidence that further demonstrated Plaintiff's innocence. Furthermore, the Defendants manufactured false evidence in an effort to frame Plaintiff for murder, all while concealing the fact that their manufactured evidence was false.

57.    The Defendants also improperly coerced, encouraged, and manipulated witnesses to falsely implicate Plaintiff in the crime, without disclosing anything about their efforts to procure this false testimony. Moreover, the Defendants destroyed exculpatory evidence that could have been used to demonstrate Plaintiff's innocence. Defendants conspired with one another and with others currently unknown to Plaintiff in committing these acts, and in reaching agreements to fabricate, manufacture, suppress, and destroy evidence and to secure the wrongful conviction of Plaintiff by other unlawful means. Defendants continued this misconduct throughout Plaintiff's prosecution and wrongful incarceration, and it persists to the present day.

58.    As state prosecutors have acknowledged publicly, the only purportedly "reliable" evidence that connected Plaintiff to the murders of Connie and James was Plaintiff's false confession. In an attempt to solve that problem, the Defendants procured false statements from three siblings—Frank Ivy, Tina Ivy, and Ella Ivy—who were Plaintiff's friends. After they were pressured and fed facts by the Defendants, the Ivy siblings gave statements and later testimony

implicating Plaintiff in the murders of Connie and James. According to the story fabricated by the Defendants and the Ivys, Plaintiff saw Frank Ivy, Tina Ivy, and Ella Ivy on the day of the crime and made statements to them confessing that he had committed the murders.

59.     The Ivys' statements about what Plaintiff had purportedly said were false. Indeed, since their false testimony at Plaintiff's second criminal trial, the Ivys have stated unambiguously on multiple occasions that their testimony implicating Plaintiff was a lie. They have admitted their lies against Plaintiff under oath and on recordings. They have stated that the Defendants pressured them and fed them facts in order to secure their false statements and testimony against Plaintiff. One of the Ivy siblings has even made it known that the Defendants were willing to make a deal with him if he testified against Plaintiff.

60.     The Defendants procured false statements and testimony from the Ivys even though state prosecutors acknowledged that the Ivys' initial statements to police were of no evidentiary value in the case against Plaintiff. The Defendants pressed the Ivys to provide false testimony knowing full well that the testimony was false.

61.     If Plaintiff had been given access to the information that the Defendants had about the Ivys, it would have been powerful evidence of his innocence and material evidence by which he could have impeached both the Ivys, who testified falsely against him at the second trial, and also the Defendants, who testified at Plaintiff's trials that the evidence they had gathered in their investigation pointed toward Plaintiff.

62.     The Defendants also procured additional false statements from other witnesses, which were used to implicate Plaintiff in the murders of Connie Cooper and James Robinson.

63.     In addition, the Defendants fabricated false physical evidence that was used in the prosecution of Plaintiff. Part of this fabricated evidence concerned a pair of blue pants, which the

Defendants claimed connected Plaintiff to the crime. According to the Defendants, Plaintiff had been wearing the blue pants at the time of the crime, and the pants were stained with Connie Cooper's blood. The pants were not Plaintiff's, and Connie's blood was nowhere on them.

64.    The Defendants' misconduct relating to the blue pants continued during Plaintiff's wrongful imprisonment. Specifically, after Plaintiff's conviction, the Defendants destroyed the purported stain of Connie's blood that had supposedly been cut from the blue pants. The destruction of this evidence prevented Plaintiff from subjecting the evidence to DNA testing, which would have shown conclusively that the blue pants never connected Plaintiff to the crime.

65.    The Defendants not only destroyed the alleged bloodstain from the blue pants, but they also destroyed the hairs found in the hands of Connie Cooper and James Robinson at the crime scene. Evidence presented by the State at Plaintiff's criminal trial suggested that hairs from the crime scene had characteristics "similar" to Plaintiff's hair. The hairs found in the hands of the victims were not Plaintiff's, and the Defendants' destruction of those hairs prevented Plaintiff from performing DNA testing to conclusively establish that fact.

66.    The Defendants similarly destroyed fingernail clippings from the victims. Those fingernail clippings contained physical evidence left by the true perpetrator of the crime. If they had been preserved, the clippings could have been subject to forensic testing, which would have further shown that someone other than Plaintiff had raped and killed Connie Cooper and had killed James Robinson.

67.    Also in the aftermath of the crime, the Defendants conducted interviews and investigations of suspects, as described above, some of whom provided information suggesting that they were involved in the crime. Reports of those investigations and statements made by those suspects were suppressed. Similarly, the Defendants withheld tips, leads, and information

14

given to them by individuals with direct knowledge of the crime, which pointed away from Plaintiff and showed that Plaintiff had not committed the murders of Connie and James.

68.     After Plaintiff was forced to implicate himself in the murders of James and Connie, the Defendants produced a series of false and fraudulent police reports and related memoranda, which they inserted into their case file. These documents, which were evidence used to show Plaintiff's purported connection to the crime, contained statements and described events that were fabricated, manufactured, and that the Defendants knew to be false. The Defendants signed these reports, both as investigators and as supervisors, despite their knowledge that the information contained in those reports was false.

69.     The Defendants concealed the misconduct described above from Plaintiff, his criminal defense attorneys, and the prosecutors involved in his criminal case. Indeed, the Defendants continue to this day to conceal evidence in their possession demonstrating Plaintiff's innocence; and they continue to hide their own fabrication of evidence and their improper manipulation of witnesses.

70.     In addition, on information and belief, the Defendants suppressed and destroyed additional evidence still unknown to Plaintiff, which would also have shown Plaintiff's innocence.

71.     Supervisors of the Defendants were aware of the Defendants' misconduct and their fabrication of a case against Plaintiff. These supervisors nevertheless intentionally ignored the Defendants' misconduct, and decided to make Plaintiff liable for a crime he did not commit, rather than directing the officers to find the person who had actually committed the crime. In addition, the supervisors of the Defendants explicitly authorized their investigative conduct.

**Plaintiff's Innocence**

72.     In the midst of the misconduct described in this Complaint, the Defendants, individually, jointly, and/or in conspiracy, willfully ignored and acted to undermine evidence that showed conclusively that Plaintiff had nothing to do with the murders of James and Connie.

73.     As discussed above, Plaintiff had a verifiable alibi. The Defendants ignored Plaintiff's alibi and instead worked to create false evidence to undermine that alibi.

74.     In addition, the Defendants disregarded the fact that investigators had collected ample physical evidence from the crime scene and that none of it connected Plaintiff to the killings. The only reasonable conclusion that could have been drawn from the physical evidence discovered at the scene and tested by the Defendants is that Plaintiff could not have committed the crime. In addition, none of the evidence that the Defendants confiscated from Plaintiff once he became a suspect provided a connection between Plaintiff and the crime.

75.     In fact, recent DNA testing conducted on the physical evidence that was recovered from the crime scene and preserved excludes Plaintiff as a suspect. The vaginal swabs taken from Connie revealed the presence of seminal fluid and a DNA profile that definitively excludes Plaintiff as the person who raped Connie. Similarly, testing of blood left on the bathroom light switch revealed the presence of victim James Robinson's DNA and the DNA profile of an unidentified person who is not Plaintiff.

**Plaintiff's Wrongful Conviction and Imprisonment**

76.     In 1977, as a result of the Defendants' misconduct and based on the false evidence described in this Complaint, Plaintiff was arrested, indicted, prosecuted, and convicted of two counts of murder. A jury spared Plaintiff the death penalty, and he was sentenced to decades in prison.

77.     Without Plaintiff's false confession, and without Defendants' fabrication, manufacture, suppression, and destruction of evidence, Plaintiff never would have been arrested, indicted, prosecuted, or convicted. At no point in time between 1977 and the present day has there been any credible evidence giving rise to probable cause to suspect Plaintiff of the rape and murder of Connie Cooper or the murder of James Robinson.

78.     Plaintiff was 14 years old when he was wrongly arrested. He spent the next 30 years of his life imprisoned for a crime he did not commit. Following his release on parole in 2006, Plaintiff spent an additional decade continuing to fight the false charges against him.

79.     Plaintiff's whole life was turned upside down without any warning. His childhood and young adulthood were consumed by the horror of his wrongful imprisonment.

80.     Because of the Defendants' misconduct, Plaintiff was taken away from, and missed out on, the lives of his family and his friends. He returned home to relationships changed or lost by decades away. While in prison, Plaintiff's father and grandmother died. His sister died shortly after his release.

81.     Plaintiff was robbed of his childhood, his young adulthood, and his formative years; he was deprived of opportunities to gain an education, to engage in meaningful labor, to develop a career, and to pursue his interests and passions; and he was forced to delay starting a family of his own. Plaintiff has been deprived of all of the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

82.     During his 30 years of wrongful imprisonment, Plaintiff was detained in harsh and dangerous conditions in maximum-security prisons. Numerous times he was detained in solitary confinement.

83.     Despite the brutality of prison and the injustice that Plaintiff was detained for something he had not done, Plaintiff was a model prisoner. He never joined a gang in prison, and he devoted his time to urging other inmates to avoid prison gangs. In addition, Plaintiff was relied upon by prison administrators to counsel prisoners in crisis.

84.     Because Plaintiff was sentenced to a term of years potentially longer than the human life span, Plaintiff feared that he might die inside the prison walls.

85.     In addition to the severe trauma of wrongful imprisonment and Plaintiff's loss of liberty, the Defendants' misconduct continues to cause Plaintiff extreme physical and psychological pain and suffering, humiliation, constant fear, nightmares, anxiety, depression, despair, rage, and other physical and psychological effects. Plaintiff has been branded a double-murderer and child rapist. He has suffered profound reputational harm as a result.

### Plaintiff's Pardon

86.     On January 12, 2015, Illinois Governor Pat Quinn pardoned Plaintiff, acquitting him of his wrongful conviction.

87.     At the time of his exoneration, Plaintiff had been fighting the false charges against him for three quarters of his life.

### COUNT I

### 42 U.S.C. § 1983 – Coerced and False Confession
### (Fifth Amendment through the Fourteenth Amendment)

88.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

89.     In the manner described more fully above, the Defendants, individually, jointly, and/or in conspiracy with one another, as well as under color of law and within the scope of their employment, forced Plaintiff to incriminate himself involuntarily, falsely, and against his will, in violation of his rights secured by the Fifth and Fourteenth Amendments.

90.    As described more fully above, the Defendants participated in, encouraged, and ordered an unconstitutional interrogation of Plaintiff, which caused Plaintiff to make involuntary statements implicating himself in the murders of Connie Cooper and James Robinson.

91.    The false statements written by the Defendants and attributed to Plaintiff were used against Plaintiff to his detriment throughout his criminal case. These statements were the reason that Plaintiff was prosecuted and convicted of the Cooper and Robinson murders.

92.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally.

93.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT II

### 42 U.S.C. § 1983 – Coerced Confession
### (Fourteenth Amendment)

94.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

95.    In the manner described more fully above, the Defendants, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, forced Plaintiff to incriminate himself falsely and against his will in a crime he had not committed, in violation of his right to due process secured by the Fourteenth Amendment.

96.    As described in detail above, the misconduct described in this Count was done using psychological and physical coercion. This misconduct was so severe as to shock the conscience, it was designed to injure Plaintiff, and it was not supported by any conceivable governmental interest.

97.    The misconduct described in this Count was objectively unreasonable, and was undertaken and effected intentionally.

98.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### COUNT III

### 42 U.S.C. § 1983 – Federal Malicious Prosecution
### (Deprivation of Liberty without Probable Cause)
### (Fourth and Fourteenth Amendments)[1]

99.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

100.    In the manner described above, the Defendants, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

101.    In so doing, these Defendants caused Plaintiff to be deprived of his liberty without probable cause and subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

102.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and with malice.

---

[1] Plaintiff recognizes that this Circuit currently holds that a so-called federal malicious prosecution claim is not actionable under 42 U.S.C. § 1983. Plaintiff pleads the claim here under the Fourth and Fourteenth Amendments to preserve the issue pending the Supreme Court's decision in *Manuel v. City of Joliet*, No. 14-9496.

103.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT IV

### 42 U.S.C. § 1983 – Due Process, Wrongful Conviction & Illegal Confinement
### (Thirteenth and Fourteenth Amendments)

104.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

105.    As described in detail above, the Defendants, while acting individually, jointly, and/or in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial, his right not to be wrongfully convicted, and his right to be free of involuntary confinement and servitude.

106.    In the manner described more fully above, the Defendants deliberately withheld exculpatory evidence from Plaintiff and from state prosecutors, among others, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

107.    The Defendants also fabricated and manufactured evidence and solicited false evidence—including a fabricated confession, witness statements, and witness testimony that they knew to be false and perjured—fabricated police reports falsely implicating Plaintiff in the crime, obtained Plaintiff's conviction using that false evidence, and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff during his criminal case.

108.    The Defendants also destroyed physical evidence that, if subjected to forensic testing, would have demonstrated Plaintiff's innocence. The Defendants destroyed this physical evidence knowing that it had exculpatory value. In the alternative, the Defendants destroyed this potentially exculpatory evidence in bad faith.

109.    In addition, based upon information and belief, the Defendants concealed, fabricated, and destroyed additional evidence that is not yet known to Plaintiff.

110.    The Defendants' misconduct directly resulted in the unjust and wrongful criminal prosecution and conviction of Plaintiff and the deprivation of Plaintiff's liberty, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not have and would not have been pursued.

111.    In addition, the Defendants' misconduct directly resulted in the undue conviction of Plaintiff and resulted in years of involuntary servitude, thereby denying Plaintiff his constitutional rights guaranteed by the Thirteenth Amendment.

112.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

113.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, forced and involuntary prison labor, and other grievous and continuing injuries and damages as set forth above.

## COUNT V

### 42 U.S.C. § 1983 – Failure to Intervene

114.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

115.    In the manner described above, during the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the duty and the opportunity to do so.

116.    As a result of the Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered pain and injury, as well as emotional distress.

These Defendants had ample, reasonable opportunities as well as the duty to prevent this harm but failed to do so.

117.    The misconduct described in this Count was objectively unreasonable, was undertaken and committed intentionally.

118.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

<b>COUNT VI</b>

**42 U.S.C. § 1983 – Policy, Practice & Custom Claim Against the City of Peoria**

119.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

120.    Plaintiff's injuries were caused by the policies, practices, and customs of the City of Peoria, as well as by the actions of policy-making officials for the City of Peoria.

121.    At all times relevant to the events described in this Complaint and for a period of time prior and subsequent thereto, the City of Peoria failed to promulgate proper or adequate rules, regulations, policies, and procedures for: the conduct of interrogations and questioning of criminal suspects, including juvenile suspects and witnesses, by officers and agents of the Peoria Police Department and the City of Peoria; the collection, documentation, preservation, testing, and disclosure of evidence; writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; and maintenance of investigative files and disclosure of those files in criminal proceedings. In addition or alternatively, the City of Peoria failed to promulgate proper and adequate rules, regulations, policies, and procedures for the training and supervision of officers and agents of the Peoria Police Department and the City of Peoria, with

respect to the conduct of interrogations and the techniques to be used when questioning criminal suspects, including juvenile suspects and witnesses.

122.    These failures to promulgate proper or adequate rules, regulations, policies, and procedures were committed by officers and agents of the Peoria Police Department and the City of Peoria, including the Defendants.

123.    In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Peoria had notice of a widespread practice and custom by officers and agents of the Peoria Police Department and the City of Peoria under which individuals suspected of criminal activity, such as Plaintiff, were routinely coerced against their will to involuntarily implicate themselves in crimes that they had not committed. It was common that suspects, including juvenile suspects, interrogated in connection with investigations within the jurisdiction of the Peoria Police Department and the City of Peoria falsely confessed, under extreme duress and after suffering abuse, to committing crimes to which they had no connection.

124.    Specifically, at all relevant times and for a period of time prior thereto, there existed a widespread practice and custom among officers, employees, and agents of the City of Peoria, under which criminal suspects, including juvenile suspects, were coerced to involuntarily implicate themselves by various means, including but not limited to one or more of the following: (1) individuals were subjected to unreasonably long and uninterrupted interrogations, often lasting for many hours and even days; (2) individuals were subjected to actual and threatened physical or psychological violence; (3) individuals were interrogated at length without proper protection of their constitutional right to remain silent; (4) individuals were forced to sign or asset to oral and written statements fabricated by the police; (5) officers and employees were permitted to lead or participate in interrogations without proper training and without knowledge

of the safeguards necessary to ensure that individuals were not subjected to abusive conditions and did not confess involuntarily and/or falsely; and (6) supervisors with knowledge of permissible and impermissible interrogation techniques did not properly supervise or discipline police officers and employees such that the coercive interrogations continued unchecked.

125.    In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Peoria had notice of widespread practices by officers and agents of the Peoria Police Department and the City of Peoria, which included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, and/or did not disclose investigative materials to prosecutors and criminal defendants; (2) officers falsified statements and testimony of witnesses; (3) officers fabricated false evidence implicating criminal defendants in criminal conduct; (4) officers failed to maintain and/or preserve evidence and/or destroyed evidence; and/or (5) pursued wrongful convictions through profoundly flawed investigations.

126.    These widespread practices, individually and/or together, were allowed to flourish because the leaders, supervisors, and policymakers of the City of Peoria directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees on proper interrogation techniques and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Plaintiff.

127.    The above widespread practices and customs, so well settled as to constitute *de facto* policies of the City of Peoria, were able to exist and thrive, individually and/or together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

128.    As a result of the policies and practices of the City of Peoria, numerous individuals have been wrongly convicted of crimes that they did not commit, including but not limited to (A) Christopher Coleman and Anthony Brooks, who were wrongly convicted of home invasion and sexual assault as a result of a flawed Peoria Police Department investigation, which included witness manipulation and a coerced confession, as described in pleadings in the civil lawsuit *Coleman v. Peoria, et al.*, No. 15 C 1100 (C.D. Ill.); (B) Clarence Price, who was wrongly convicted of murder as a result of a flawed Peoria Police Department investigation, which included coercing an involuntary and incriminating statement from Mr. Price, as described in *People v. Price*, 179 N.E.2d 685 (1962), and the public record of that criminal case; (C) Steven Cole, who was wrongly convicted of predatory criminal sexual assault of a minor as a result of a flawed Peoria Police Department investigation, which included fabrication of evidence and suppression of exculpatory evidence, as alleged in the civil lawsuit *Cole v. Meeks, et al.*, 15 C 1292 (C.D. Ill.), and as described in *People v. Cole*, 2015 IL App (3d) 120992-U, as well as the public record of that criminal case; and (D) Daniel Jackson, who was wrongly convicted of murder as a result of a flawed Peoria Police Department investigation, which included witness manipulation, confinement without probable cause, and coercing an involuntary and incriminating statement from Mr. Jackson (in part by using threats that racial bias in the community would ensure that he would never get a fair trial), as described in *People v. Jackson*, 2014 Ill. App. (3d) 120239, and the public record in that criminal case.

129.    In addition, the misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Peoria in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final

policymaking authority for the City of Peoria or were actually committed by persons with such final policymaking authority.

130.    Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the City of Peoria, including but not limited to the individually named Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

**COUNT VII**

**State Law Claim – Malicious Prosecution**

131.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

132.    In the manner described above, the Defendants, individually, jointly, and/or in conspiracy with one another, as well as within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so.

133.    In so doing, the Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

134.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and in total disregard of the truth and Plaintiff's clear innocence.

135.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VIII

### State Law Claim – Intentional Infliction of Emotional Distress

136.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

137.    The actions, omissions, and conduct of the Defendants as set forth above were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

138.    As a direct and proximate result of the Defendants' actions, Plaintiff suffered and continues to suffer emotional distress and other grievous and continuing injuries and damages as set forth above.

## COUNT IX

### State Law Claim – Civil Conspiracy

139.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

140.    As described more fully in the preceding paragraphs, the Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose and/or to achieve a lawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

141.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

142.    The violations of Illinois law described in this complaint, including Defendants'

malicious prosecution of Plaintiff and their intentional infliction of emotional distress, were

accomplished by Defendants' conspiracy.

143.    The misconduct described in this Count was objectively unreasonable, was

undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

144.    As a result of the Defendants' misconduct described in this Count, Plaintiff

suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional

pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT X

### State Law Claim – *Respondeat Superior*

145.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

146.    While committing the misconduct alleged in the preceding paragraphs, the

Defendants were employees, members, and agents of the City of Peoria, acting at all relevant

times within the scope of their employment.

147.    Defendant City of Peoria is liable as principal for all torts committed by its

agents.

## COUNT XI

### State Law Claim – Indemnification Pursuant to 745 ILCS 10/9-102

148.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

149.    Illinois statute (745 ILCS 10/9-102) provides that public entities are directed to

pay any tort judgment for compensatory damages for which employees are liable within the

scope of their employment activities.

150.    The Defendants were employees, members, and agents of the City of Peoria, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

151.    The City of Peoria is responsible to pay any judgment entered against the Defendants. Plaintiff therefore demands judgment against Defendant City of Peoria, in the amounts awarded to Plaintiff against the individual Defendants as damages, attorneys' fees, costs and interest.

WHEREFORE, Plaintiff JOHNNIE LEE SAVORY, respectfully requests that this Court enter a judgment in his favor and against Defendants CHARLES CANNON, MARCELLA BROWN TEPLITZ, RUSSELL BUCK, JOHN FIERS, CHARLES EDWARD BOWERS, JOHN STENSON, GEORGE PINKNEY, E. HAYNES, WALTER JATKOWSKI, GLEN PERKINS, ALLEN ANDREWS, HAROLD MARTENESS, MARY ANN DUNLAVEY, CARL TIARKS, PETER GERONTES, JOHN TIMMES, UNKNOWN OFFICERS OF THE PEORIA POLICE DEPARTMENT, DENNIS JENKINS, the CITY OF PEORIA, Illinois, awarding compensatory damages, attorneys' fees and costs against each Defendant, and, because they acted willfully, wantonly, and/or maliciously, punitive damages against each of the individual Defendants, and any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff, JOHNNIE LEE SAVORY, hereby demands a trial by jury pursuant to Federal

Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

**JOHNNIE LEE SAVORY**

BY: /s/ Steven Art
*One of Plaintiff's Attorneys*

Flint Taylor
John Stainthorp
PEOPLE'S LAW OFFICE
1180 N. Milwaukee Ave.
Chicago, Illinois 60642
(773) 235-0070

Locke Bowman
Alexa Van Brunt
MACARTHUR JUSTICE CENTER
375 E. Chicago Ave., 8th Floor
Chicago, Illinois 60611
(312) 503-1271

Jon Loevy
Steven Art
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
steve@loevy.com