# Exhibit 1

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3   JOHNNIE LEE SAVORY,            )
                                    )
 4                  Plaintiff,      )
                                    )
 5           vs.                    )    No. 17-cv-00204
                                    )
 6   WILLIAM CANNON, as            )
     Administrator for the         )
 7   Estate of CHARLES CANNON,     )
     et al.,                       )
 8                                  )
                    Defendants.     )
 9

10           The video-recorded deposition of JOHNNIE

11   LEE SAVORY, taken pursuant to the Federal Rules of

12   Civil Procedure, before Nick D. Bowen, Certified

13   Shorthand Reporter No. 084-001661, at 141 West

14   Jackson Boulevard, Suite 1240A, Chicago, Illinois,

15   on Wednesday, June 15, 2022, commencing at 10:31 a.m.

16   pursuant to subpoena and notice.

17

18

19

20

21

22

23

24
```

JOHNNIE LEE SAVORY, 06/15/2022                    Page 2..5

---

**Page 2**

```
 1  APPEARANCES:
 2        PEOPLE'S LAW OFFICE, by
          MR. G. FLINT TAYLOR, JR. and
 3        MR. BRAD THOMSON
          (1180 North Milwaukee Avenue
 4        Chicago, Illinois 60622
          773.235.0070
 5        flint.taylor10@gmail.com
          brad@peopleslawoffice.com)
 6          - and -
          LOEVY & LOEVY, by
 7        MR. LOCKE E. BOWMAN, III
          MR. STEVEN E. ART (via Zoom)
 8        MS. LINDSAY HAGY
          (311 North Aberdeen Street, Third Floor
 9        Chicago, Illinois 60607
          312.243.5900
10        locke@loevy.com
          steve@loevy.com
11        lindsay@loevy.com)
            appeared on behalf of the plaintiff;
12
          THE SOTOS LAW FIRM, by
13        MS. SARA J. SCHROEDER
          MR. KYLE CHRISTIE and
14        MS. SAMANTHA J. PALLINI (via Zoom)
          (141 West Jackson Boulevard, Suite 1240A
15        Chicago, Illinois 60604
          312.494.1000
16        sschroeder@jsotoslaw.com
          kchristie@jsotoslaw.com
17        spallini@jsotoslaw.com)
            appeared on behalf of the defendants.
18
      ALSO PRESENT:
19
          Ms. Emani Miles (via Zoom)
20        Mr. Mark Smolens (via Zoom)
          Ms. Tayleece Paul (via Zoom)
21        Ms. Marcella Teplitz (via Zoom)
          Mr. Rob Zellner, Videographer
22
                 * * * * * * *
23
24
```

**Page 3**

```
 1              I N D E X
 2
    Witness:                          Page
 3
       JOHNNIE LEE SAVORY
 4
          Examination by:
 5
          Ms. Schroeder................    6
 6
 7
 8
              E X H I B I T S
 9
10  No.  Description          Marked/Referenced
11   1  Plaintiff's Response to Defendant
        Marcella Brown Teplitz's First Set of
12      Interrogatories to Plaintiff........... 15
     2  Prisoner Review Board Documents........ 44
13   3  11/22/1976 Report of Teresa
        Hulslander............................ 212
14   4  Peoria Police Department
        Supplementary Report - Continuation
15      Sheet................................. 369
16
          (Exhibits attached/scanned.)
17
              - - -
18
19
20
21
22
23
24
```

**Page 4**

 1    THE VIDEOGRAPHER:  And good morning.  This
 2  is the beginning of media unit 1, and we are on the
 3  video record at 10:31 a.m. Central Time.
 4         This is the video deposition of
 5  Johnnie Lee Savory, taking place at the Sotos Law
 6  Firm at 141 West Jackson Boulevard, Suite 1240,
 7  Chicago, Illinois 60604, on June 15th, 2022.
 8         This matter is being taken on behalf
 9  of the defendants in the matter of Johnnie Lee
10  Savory versus William Cannon, et al., bearing case
11  number 17-cv-00204 filed in the United States
12  District Court for the Northern District of
13  Illinois, Eastern Division.
14         My name is Robert Zellner, legal
15  videographer, representing Urlaub Bowen &
16  Associates with offices at 20 North Clark Street,
17  Suite 600, Chicago, Illinois.
18         And the court reporter today is Nick
19  Bowen, also with Urlaub Bowen & Associates.
20         And, Counsel, would you please
21  identify yourselves for the record and the parties
22  you represent.
23     MS. SCHROEDER:  Sara Schroeder, and I am
24  representing the defendants in this case.

**Page 5**

 1    MR. CHRISTIE:  Kyle Christie on behalf of the
 2  defendants as well.
 3     MR. TAYLOR:  Flint, F-l-i-n-t, Taylor on
 4  behalf of Mr. Savory.
 5     MR. BOWMAN:  And Locke Bowman, also on behalf
 6  of Johnnie Lee Savory.
 7     MS. HAGY:  Lindsay Hagy, Lindsay with an "a,"
 8  H-a-g-y, also on behalf of Mr. Savory.
 9     MR. THOMSON:  Brad Thomson also on behalf of
10  behalf of Mr. Savory.
11     MR. ART:  And Steve Art on the phone, also on
12  behalf of Mr. Savory.
13     MS. PALLINI:  Good morning.  Samantha Pallini
14  on behalf of defendants.
15     MS. TEPLITZ:  Marcella Teplitz, defendant.
16     MS. SCHROEDER:  Is that everybody on Zoom?
17     MS. MILES:  Hi.  Emani Miles.  I'm an intern
18  on behalf of Mr. Savory.
19     MS. PAUL:  Tayleece Paul, T-a-y-l-e-e-c-e.
20  I'm an intern on behalf of Mr. Savory.
21     THE VIDEOGRAPHER:  Thank you.
22         And will the court reporter please
23  swear in the witness?
24             (Witness affirmed.)

Page 6

1    MS. SCHROEDER: Mr. Savory, I'm just going
2 to start. I do need to read like a little formal
3 introduction onto the record, and then we'll begin.
4         So let the record reflect that this
5 is the deposition of Johnnie Lee Savory taken
6 pursuant to subpoena in accordance with all local
7 court rules, Federal Rules of Evidence, and Federal
8 Rules of Civil Procedure.
9             JOHNNIE LEE SAVORY
10 called as a witness herein, having been first duly
11 affirmed, was examined and testified as follows:
12             EXAMINATION
13 BY MS. SCHROEDER:
14    Q.    And for the record, can you state your
15 name and spell it, please?
16    A.    My name is Johnnie, J-o-h-n-n-i-e, last
17 name Savory, S-a-v-o-r-y.
18    Q.    Okay. And I just introduced myself.
19 I'm Sara Schroeder. So I'm here for the defendants.
20 And I appreciate your patience. I was a little
21 behind today, but I am ready, and hopefully everybody
22 else has probably been waiting on me. So I do
23 appreciate that.
24         I'm going to go over the rules of

Page 7

1 the deposition with you so that you understand sort
2 of what your ability is here during the deposition
3 and what to expect from everybody else around the
4 table.
5         So we do have the court reporter
6 that's taking everything down. We have a
7 videographer that's also videotaping the deposition.
8         And then I will be asking the
9 questions on behalf of defendants, and then one
10 of your attorneys will have the ability to object
11 to any questions that I ask that they find
12 objectionable.
13         But unless they actually inform you
14 to not answer, instruct you not to answer, then
15 you still must go ahead and answer the question.
16 Because what your attorneys are doing is they're
17 just making a record of the objection of the
18 question I'm asking so that if later down the road
19 the judge needs to make a determination, he'll be
20 able to do that. It's a little different than
21 court where you would have a decision made right
22 there.
23         If you -- if I ask a question and
24 you don't understand it or you don't understand a

Page 8

1 word I'm using, please tell me. Tell me what it
2 is you don't understand or ask me to repeat the
3 question, whatever it is. And then I'll do my best
4 to rephrase it so that you do understand.
5         But if you do answer my question,
6 then I will assume that you did understand what I
7 was asking you. Okay?
8    A.    Yes, ma'am.
9    Q.    Okay. You can take a break whenever
10 you want. So whenever you need a break, you let
11 me know. I also think we should probably plan for
12 a lunch break today. So maybe in a couple hours
13 we'll do that, because we have a lot to get through.
14 But that's okay. So we'll plan for a lunch break.
15 But even beyond that, you can take a break whenever
16 you need. Okay?
17         The only thing I ask is that if
18 I have asked you a question, that you answer it
19 before you go on your break. Okay?
20         Let me think. I think that that
21 might be -- I think that that's it.
22    A.    If I may. I just want to take 60
23 seconds and just share something with you that's
24 always -- I carry it with me. It's pertaining to

Page 9

1 the case itself, but, you know, I just -- if I may.
2    Q.    Feel free.
3    A.    Okay. As a young teenager, one of
4 the things that always striked me was the former
5 prosecutor, Michael Mims, and now he's a sitting
6 federal judge, and I remember him saying that there
7 was no evidence to tie Savory to the case or to the
8 scene of the crime. It's no longer a question will
9 he be released, the question is when. And I always
10 thought, Well, how did I end up here? But that's
11 all I want to say.
12         (Brief interruption.)
13    Q.    Okay. All right. So I'm going to ask
14 you a couple questions, and then we'll kind of see --
15 'cause I'm going to get these out of the way in the
16 beginning because I think then that might free up
17 some stuff or cross out some things on my list here.
18    A.    Okay.
19    Q.    Okay.
20         Who is calling you a child rapist?
21    A.    Who?
22    Q.    Yeah.
23 MR. TAYLOR: Objection to form.
24 MS. SCHROEDER: You can answer.

JOHNNIE LEE SAVORY, 06/15/2022                                    Page 10..13

Page 10

1    MR. TAYLOR:  You may answer.
2    THE WITNESS:  Say what now?
3    MR. TAYLOR:  Yeah, you can answer.
4    MR. BOWMAN:  If there's a question for you,
5  Johnnie, your job in this deposition is to answer
6  each question that's propounded.
7    THE WITNESS:  Okay, okay.
8    MR. BOWMAN:  So the question that you've been
9  asked is, Who is calling you a child rapist?  You
10  answer that question and wait for the next
11  question.  Do you understand?
12    THE WITNESS:  I'm not familiar with no one
13  calling me a child rapist.
14  BY MS. SCHROEDER:
15    **Q.   Why would you put that in your**
16  **complaint, that you have been branded a child**
17  **rapist, if no one is calling you a child rapist?**
18    MR. BOWMAN:  Foundation.
19    MR. TAYLOR:  Objection.
20    MR. BOWMAN:  Foundation.
21    MR. TAYLOR:  Form.
22    THE WITNESS:  I heard it in the media.
23  That's about it.
24

Page 11

1  BY MS. SCHROEDER:
2    **Q.   Who in the media called you this?**
3    MR. TAYLOR:  Same objection.
4    THE WITNESS:  I don't remember the reporter.
5  BY MS. SCHROEDER:
6    **Q.   Okay.  Did any police officer that**
7  **you're suing today ever call you a child rapist?**
8    A.   Not to my knowledge.
9    **Q.   Okay.  And aside from media -- and**
10  **explain to me what you mean when you say "the**
11  **media" has called you a child rapist.**
12    MR. TAYLOR:  Same objection; form.
13    THE WITNESS:  I don't remember.  It was
14  at some press conference.  And also, I'm just
15  recollecting, I forgot that it was Illinois State
16  Police also, the crime lab.
17  BY MS. SCHROEDER:
18    **Q.   The Illinois State Police crime lab --**
19    A.   Yes.
20    **Q.   -- has called you a child rapist?**
21    A.   Yes.
22    **Q.   When?**
23    A.   2000 when we filed for Freedom of
24  Information Act for the lawsuit that was filed

Page 12

1  against the Illinois State Police to receive the
2  evidence -- to retrieve the evidence that was in
3  the case.
4    **Q.   Okay.  And what was your response to**
5  **that?**
6    A.   They got the wrong person.
7    **Q.   Because you are not a child rapist?**
8    A.   No.  I couldn't understand why they was
9  calling me that.
10    **Q.   Okay.  Had anybody called you a child**
11  **rapist prior to this Illinois State Police --**
12    A.   Not that I'm aware of.
13    **Q.   Okay.  Has anyone else besides the**
14  **Illinois State Police and the media called you a**
15  **child rapist?**
16    A.   Not that I'm aware of.
17    **Q.   Okay.  When was the last time you were**
18  **called a child rapist?**
19    A.   I don't remember the date and time.
20  I can't recall the date of --
21    **Q.   Was it last week?**
22    A.   No.
23    **Q.   Okay.  Was it last month?**
24    A.   No.  Every time you go on YouTube maybe.

Page 13

1    **Q.   Where on YouTube are you -- is someone**
2  **calling you a child rapist?**
3    A.   You would have to put my name in to see
4  what news station it is because I do not remember
5  which news station it was.
6    **Q.   Is that how you found a news station**
7  **calling you a child rapist?**
8    A.   And I've seen it on the news.
9    **Q.   You've seen it on the news.**
10    **Do you remember when you saw it on**
11  **the news?**
12    A.   I do not.
13    **Q.   Okay.  Did you tell your lawyers that**
14  **people are calling you a child rapist?**
15    MR. TAYLOR:  Objection.  You don't have to
16  answer that.  That -- in fact, don't answer that.
17  That's lawyer-client privilege.
18  BY MS. SCHROEDER:
19    **Q.   Why do you think, in your complaint**
20  **that you filed with the federal court, you have**
21  **stated that you are branded a child rapist because**
22  **of the defendants' actions?**
23    A.   I do not know.
24    **Q.   Okay.  Do you believe that any -- so --**

JOHNNIE LEE SAVORY, 06/15/2022                                          Page 14..17

Page 14

1 strike that.
2       Do you believe that you were
3 convicted of rape?
4    MR. TAYLOR:  Objection to form.
5    THE WITNESS:  I'm not -- I'm not aware of --
6 I'm not aware of what conviction, what they got.
7 I don't know where it came from or how except for
8 the Illinois State Police.  I don't know how they
9 derived it.
10 BY MS. SCHROEDER:
11   Q.   Do you -- were you convicted of rape?
12   A.   No.
13   Q.   Were you charged with rape?
14   A.   No.
15   Q.   Why is it on your website, on the
16 Savory Innocence Tour that you were charged with
17 rape?
18   MR. TAYLOR:  Objection; form, foundation.
19   THE WITNESS:  It's a news report.
20 BY MS. SCHROEDER:
21   Q.   Why would you promote that someone is
22 accusing you of rape if it's not true?
23   A.   They --
24   MR. TAYLOR:  Same objection.

Page 15

1    THE WITNESS:  They accused me of murder, and
2 that's not true either.
3 BY MS. SCHROEDER:
4    Q.   But you were convicted of murder,
5 correct?
6    A.   Yes.
7    Q.   Okay.  Why would you continue to say
8 that you were charged with the rape of Connie
9 Cooper if you were not charged with that rape?
10   MR. TAYLOR:  Objection --
11   THE WITNESS:  I did not say that.
12   MR. TAYLOR:  -- form and foundation.
13 BY MS. SCHROEDER:
14   Q.   You did not say that?
15   A.   I did not say that, no.
16   Q.   Okay.  So I'm going to -- this is
17 going to be Exhibit 1.  And it's going to be your
18 answers to Marcella Brown Teplitz's first set of
19 interrogatories.  And I'm going to give you this.
20 And we'll be doing this throughout the deposition
21 where I'm going to be showing documents, and then
22 you'll be able to take a look at them, and then
23 we'll look at them together.
24       So first of all, I'll give you a

Page 16

1 minute to take a look at the document.
2    MR. TAYLOR:  Do you have another copy of it?
3       (Brief pause.)
4 BY MS. SCHROEDER:
5    Q.   Okay.  So this is Exhibit 1, and it is
6 plaintiff, who -- that is you.  It's your response
7 to defendant Marcella Brown Teplitz's first set of
8 interrogatories to you.  And what I would like you
9 to do, sir, is if you flip to the last two pages --
10 maybe the page prior to the last, the second to
11 last.  One more.
12       Okay.  And do you see a signature
13 there and a date?
14   A.   Yes.
15   Q.   Do you see where it says Respectfully
16 Submitted --
17   A.   Yes.
18   Q.   -- Johnnie Lee Savory?
19   A.   Yes.
20   Q.   And it says By Megan Pierce, One of
21 Plaintiff's Attorneys?
22   A.   Um-hmm.
23   Q.   Are you familiar with Megan Pierce?
24   A.   Yes.

Page 17

1    Q.   Okay.  And did you see this document
2 prior to Megan affixing her signature to this?
3    MR. TAYLOR:  Objection.
4       Johnnie, if you saw this document in
5 the presence of Megan, don't -- you don't -- that's
6 lawyer-client.  You don't need to answer that.
7 BY MS. SCHROEDER:
8    Q.   So did you, Johnnie, approve this
9 document to be submitted to defendants in response
10 to their interrogatories?
11   A.   Can I read the -- can I read this in
12 its entirety?
13   Q.   Sure.  So what I'm -- I'll show you
14 exactly what I'm looking for, is if you flip to the
15 second page, and you'll see the interrogatory.
16       Are you familiar with the
17 interrogatories the defendants have been issuing
18 to you?
19   A.   Yes.  It's just been a while.
20   Q.   Okay.
21   A.   So ...
22       Just let me read it and familiarize
23 myself with it right quick.  (Reviewing document.)
24   Q.   Do you want to read it together?

JOHNNIE LEE SAVORY, 06/15/2022                    Page 18..21

Page 18

1    A.   I'm fine.
2    Q.   Then that way we can get the -- your
3  answer on the record.
4    A.   (Reviewing document.)
5    Q.   Mr. Savory, have you come across
6  yet your answer where you're stating that the
7  defendants' misconduct accused you of the rape and
8  murder of Connie Cooper?
9    MR. TAYLOR:  Objection; form.
10 BY MS. SCHROEDER:
11   Q.   So I see what page you're on now,
12 Mr. Savory.  You're on interrogatory 2.  And I'm
13 really just concerned with the first interrogatory.
14 So it appears that you've finished reading the
15 answer to the first interrogatory.
16   A.   Yeah.  But you had me to go back to the
17 back page just a second -- I just wanted to --
18   Q.   That's for the signature.
19   A.   I'd just like to read the entire thing
20 to familiarize myself with it because it's been a
21 while since I seen these interrogatories if that's
22 okay.
23   Q.   So do you believe that you're putting
24 your signature on documents that you wouldn't have

Page 19

1  already reviewed?
2    MR. TAYLOR:  Objection.  That's -- there's
3  no evidence that he did put his signature on this
4  document.
5  BY MS. SCHROEDER:
6    Q.   So, Mr. Savory, I'm just wanting to ask
7  you about the first interrogatory.  We don't need
8  to go over the remaining docu- -- the remaining
9  interrogatories.
10   A.   So I'm not -- I'm not allowed to read
11 it in its entirety?
12   Q.   It's not -- the questions that I'm
13 asking you pertain to the pages that I've just seen
14 you read.
15   MR. TAYLOR:  So just at this point focus on
16 the first interrogatory.
17   THE WITNESS:  Okay.  It's this one right
18 here?
19 BY MS. SCHROEDER:
20   Q.   Yeah.
21       So the first interrogatory, if you
22 look -- so that's where it says Interrogatories,
23 and it says, "Identify every action taken by
24 Defendant Teplitz which you contend for the

Page 20

1  purposes of this lawsuit is a basis for your claim
2  of injury, and identify the date of the occurrence,
3  the nature of the occurrence, any witnesses to the
4  occurrence, all documents referring, reflecting, or
5  otherwise relating to the occurrence."
6       And then as you continue on
7  because -- and then this response is your answer
8  to that interrogatory from the defendants.  And
9  you begin with your objections about how this
10 interrogatory is premature, and we have all these
11 objections there.  But then you could start, if you
12 look at -- it's the second to last sentence where
13 the words begin "subject to and without waiving
14 those objections."  Do you see that?  That'll be
15 like right here (indicating), second to last
16 sentence halfway -- keep going down.  Keep going
17 down.  Right there.  Now go over, and it'll start
18 "subject to."
19       So it says, "Subject to and without
20 waiving those objections and plaintiff's general
21 objections, plaintiff responds that he has prepared
22 an extensive complaint that alleges in detail how
23 each of the defendants," and then you list every
24 defendant in this case, "acted individually and in

Page 21

1  conspiracy with one another to conceal and withhold
2  exculpatory evidence from plaintiff, his defense
3  counsel, state's attorney's office, and to extract
4  statements from plaintiff involuntarily which they
5  used to prosecute him, to fabricate false evidence
6  against plaintiff implicating him in a crime he had
7  not committed, and to prosecute plaintiff without
8  any probable cause to believe that he had committed
9  the murder of James Robinson or the rape and murder
10 of Connie Cooper."
11       If you continue down three more
12 sentences, you continue your answer, and you state
13 that plaintiff specifically alleges that the
14 investigative team, these defendants, acting in
15 conspiracy with one another, and others still
16 unknown to plaintiff collected evidence from the
17 crime scene, all of which showed that plaintiff
18 could not have been in the murder -- involved in
19 the murders of James Robinson and Connie Cooper or
20 the rape of Connie Cooper.
21       Then if you continue down a few
22 more sentences, you continue your answer, and you
23 are stating that the defendants here interrogated
24 plaintiff, a child, for extended periods, failed to

JOHNNIE LEE SAVORY, 06/15/2022                    Page 22..25

Page 22

1  give him effective Miranda, polygraphed him,
2  lied to him about the results, physically and
3  psychologically abused him, deprived him of
4  adequate food and sleep, continued questioning him
5  when he invoked his right to remain silent, and
6  lied to him about evidence, and in so doing
7  extracted statements from plaintiff that he did not
8  give voluntarily, which were used to implicate him
9  in James Robinson's murder and Connie Cooper's rape
10  and murder.
11        Why do you continue to say that
12  the defendants implicated you in a rape of Connie
13  Cooper?
14     MR. TAYLOR:  Objection; form, foundation,
15  narrative question.
16     THE WITNESS:  I stand by this statement then.
17  It's true.
18  BY MS. SCHROEDER:
19     Q.  So you were charged with rape?
20     MR. TAYLOR:  Objection.  Misstates his
21  testimony.
22  BY MS. SCHROEDER:
23     Q.  So I'll ask a different question.
24        How is this true?

Page 23

1     MR. TAYLOR:  Same objection; form, foundation.
2     THE WITNESS:  The response in here is
3  accurate according to the records that they have.
4  BY MS. SCHROEDER:
5     Q.  What record?
6     A.  Police records, what took place, court
7  records to the best of my knowledge.
8     Q.  What records are you referring to?
9     A.  Police records.  Laboratory records.
10  I cannot give you the exact number or name.  You
11  have to look at the records yourself.
12     Q.  Do you believe you charged with
13  rape?
14     A.  Yes, I believe I was accused and
15  charged with that rape.
16     Q.  Okay.  Were you convicted of rape?
17     MR. TAYLOR:  I'm going to object.  Excuse me.
18  Asked and answered.
19     THE WITNESS:  No.
20  BY MS. SCHROEDER:
21     Q.  Okay.  Who told you that you were being
22  charged with rape in 1977?
23     MR. TAYLOR:  Objection.  Are you asking --
24  strike that.  Objection.

Page 24

1        If you were told that by an
2  attorney, you don't need to answer that.
3     THE WITNESS:  The attorneys.
4  BY MS. SCHROEDER:
5     Q.  I'm sorry?
6     A.  I stick by the reports that was written
7  and the laboratory reports and police reports.
8     Q.  And you believe laboratory reports and
9  police reports --
10     A.  That was used at the trial -- both
11  trials.
12     Q.  That were used -- that were used at
13  both trials show that you were charged with rape?
14     MR. BOWMAN:  Johnnie, I'm going to just step
15  in and say that --
16     MS. SCHROEDER:  I'm not sure that I want --
17  I don't know where you're going with this.  But
18  if --
19     MR. BOWMAN:  I want to clarify --
20     MS. SCHROEDER:  -- it's a speaking objection
21  or if you're coaching, I don't know what you're doing
22  here, Locke.
23     MR. BOWMAN:  Certainly not coaching.
24     MS. SCHROEDER:  Okay.

Page 25

1     MR. BOWMAN:  What I'm concerned about is
2  an issue of privilege, and I want Mr. Savory to
3  understand that to the extent he would have to
4  reveal conversations that he had with a lawyer who
5  represented him as to what his understandings were
6  or were not, he should not answer the question.
7        I just wanted to state that again
8  for his benefit as he considers whether he's free
9  to answer the question.
10     MS. SCHROEDER:  So do you -- are you implying
11  that it's attorney-client privilege on why he has
12  an understanding that he's putting it on his
13  website that he's been charged with rape?
14     MR. BOWMAN:  Yes.
15     MS. SCHROEDER:  Are you also implying that
16  it's attorney-client privilege of why he says it at
17  news conferences that he's been charged with rape?
18     MR. BOWMAN:  That's not the question that you
19  asked.
20     MS. SCHROEDER:  Okay.  But he responded
21  that --
22     MR. BOWMAN:  If you want to ask --
23     MS. SCHROEDER:  He responded that he is
24  relying on police reports and lab reports.  And I

Page 26

1 don't know how either of those are privileged.

2     MR. BOWMAN:  I don't know whether they are

3 or not except to the extent that his understanding

4 with respect to those documents may have derived

5 from a conversation with a lawyer.

6         You asked him a question about way

7 back in the day.  If you want to ask him a question

8 about his website, that's a different question.

9 We're just going to deal with it question by

10 question.  That was my counsel to Mr. Savory.  I'm

11 done talking.

12     MS. SCHROEDER:  Okay.

13     MR. BOWMAN:  Over to you.

14 BY MS. SCHROEDER:

15     Q.   So, Mr. Savory, I had thought that I

16 was asking you what you're relying -- what you were

17 relying on in this 2020 answer to an interrogatory

18 that caused you to believe that you were charged

19 with the rape of Connie Cooper.

20     MR. BOWMAN:  Same instruction to you,

21 Mr. Savory.  If your answer to that question would

22 require disclosure of a conversation with a lawyer,

23 don't answer it.  If you can answer it without

24 disclosing a conversation with a lawyer, you're

Page 27

1 free to answer.

2     THE WITNESS:  Yes.  It don't look like I can

3 answer that then.

4 BY MS. SCHROEDER:

5     Q.   So -- okay.  So you're stating that

6 it's your lawyers -- or if I'm understanding this

7 from your attorney in these objections that it's

8 your lawyers who are telling you you've been

9 charged with rape --

10     MR. BOWMAN:  And don't answer --

11 BY MS. SCHROEDER:

12     Q.   -- and it's your lawyers that are

13 putting this information in the interrogatory

14 answer and the complaint.

15     MR. BOWMAN:  Don't answer that question.

16 BY MS. SCHROEDER:

17     Q.   So I'm going to ask each individual

18 question.

19         Mr. Savory, can you tell me how --

20 no, strike that.

21         Can you tell me what you're relying

22 on to say that the defendants in this case have

23 created a conspiracy and misconduct to accuse you

24 of the rape of Connie Cooper?

Page 28

1     A.   Again, according --

2     MR. TAYLOR:  Objection.  Hold on a moment.

3 Objection.

4         You don't need to answer that

5 question and should not answer that question if,

6 in fact, the answer to it implicates a conversation

7 that you had with any of your lawyers.  If it

8 didn't, you can answer it.

9     THE WITNESS:  Attorney-client privilege.

10 BY MS. SCHROEDER:

11     Q.   Okay.  Mr. Savory, what information

12 were you relying on in your answer to the

13 interrogatory to state that evidence collected from

14 the crime scene plaintiffs [sic] suppressed in

15 order for you to be framed for the rape of Connie

16 Cooper?

17     MR. TAYLOR:  Johnnie -- same objection.

18         Again, if the answer implicates a

19 conversation with any of your lawyers, then you

20 should not answer it.

21     THE WITNESS:  Attorney-client privilege.

22 BY MS. SCHROEDER:

23     Q.   Okay.  Mr. Savory, what evidence are

24 you relying on here to say that the defendants used

Page 29

1 physical and psychological coercion in order to

2 implicate you in the rape of Connie Cooper?

3     MR. TAYLOR:  If that evidence -- if the

4 answer with regard to that evidence implicates a

5 conversation that you had with any of your attorneys,

6 then you should assert the attorney-client privilege.

7 If that evidence did not come from or in any way be

8 connected to your attorneys, then you may answer.

9     THE WITNESS:  I was taken against my will

10 into a bathroom.  I was stripped naked, my hair was

11 plucked from my body, from my head, both sides of

12 the head, back, all my clothes taken on the

13 morning of the 26th.  Cold and alone in that

14 washroom.  Didn't know why they were taking my hair

15 samples, clothes, and later on took my blood at a

16 hospital.  I didn't really know what was going on

17 with me with that.

18 BY MS. SCHROEDER:

19     Q.   So you didn't know why they were doing

20 that?

21     A.   I know what they were -- what they were

22 saying.  They said all kind of things to me.

23     Q.   What did they say?

24     A.   Calling me a liar, murderer, all those

JOHNNIE LEE SAVORY, 06/15/2022                                    Page 30..33

Page 30

1  things.

2  **Q.   Did they call you anything else?**

3  A.   They called me quite a few things.

4  **Q.   What?**

5  A.   And some things I can remember.  Some

6  things I can't.  But it was just -- it was a moment

7  in time 45 years ago that I still tremble and shake

8  and try to suppress.  Never -- it's a nightmare

9  that I still -- plague me to this day.  I don't

10  know and I didn't understand everything that I was

11  going through.  And we're talking about nearly 50

12  years ago.  So that's -- this is -- but I know that

13  they treated me like I was the worst human being on

14  this planet.

15  **Q.   How is that evidence to implicate you**

16  **in rape?**

17  MR. TAYLOR:  Objection; form, foundation.

18  BY MS. SCHROEDER:

19  **Q.   I'm asking, Mr. Savory, what evidence**

20  **you're relying on to say that the defendants**

21  **fabricated evidence in order to frame you for the**

22  **rape of Connie Cooper.  And you just explained to**

23  **me how your hairs were taken and clothes were taken**

24  **from you in response to that answer.  So I'm asking**

Page 31

1  **for you to please explain it a little bit further**

2  **about how you're relying on that incident to say**

3  **that the defendants are framing you for Connie**

4  **Cooper's rape.**

5  MR. TAYLOR:  You may answer that if it

6  isn't -- doesn't implicate conversations with

7  your attorneys --

8  THE WITNESS:  We're fine.

9  MR. TAYLOR:  -- in analyzing the evidence.

10  THE WITNESS:  Okay.

11  MS. SCHROEDER:  What -- how is that -- how

12  is that an attorney-client objection?  He -- I'm

13  asking for his personal knowledge, and he just

14  told me --

15  MR. TAYLOR:  That wasn't what you --

16  MS. SCHROEDER:  -- about a personal

17  experience that --

18  MR. TAYLOR:  That wasn't what you asked.

19  MS. SCHROEDER:  I did.  I asked him what

20  information he's relying on to say that he is being

21  charged -- or the defendants framed him for, rape,

22  and he is saying in response an experience that he

23  had with the defendants, that that was his answer

24  to my question.

Page 32

1  And now I'm asking him to explain to

2  me why that experience is what he is relying on for

3  this answer.  And you're telling me the analysis of

4  it is attorney-client privilege.

5  MR. TAYLOR:  Certainly.  If that evidence was

6  taken to an attorney and that attorney interpreted

7  it to be a rape -- or a charge of rape or an

8  implication of rape and put it in a pleading that

9  that attorney signed, that would be attorney-client

10  privilege, and you know that.  You've just pulled

11  this out to play games.

12  Let's get to the questions and

13  answers that are concerned with this case and quit

14  playing with the word, "rape."  Okay?  We know what

15  you're doing.  We've given you about half an hour

16  to do it.  It's time to move on to your stack of

17  documents.

18  BY MS. SCHROEDER:

19  **Q.   Mr. Savory, aside from the experience**

20  **that you just explained in the bathroom with your**

21  **hairs and your clothes being taken, is there any**

22  **other evidence that you're using to rely on the**

23  **fact that the defendants are framing you for the**

24  **rape of Connie Cooper?**

Page 33

1  MR. TAYLOR:  Same instruction, Johnnie.  If

2  you can answer it, answer it.  But don't answer

3  it if it implicates your conversations with your

4  attorney.

5  THE WITNESS:  The fabrication of the blood

6  on the pants, the fabrication of the blood on

7  the knife, the fabrication of everything that you

8  see here, and those lab reports that you read,

9  everything that you told the jury, everything you

10  told the courts, everything you told the public

11  all was a lie.  And we know that now through DNA

12  testing.  Everything you implicated, implied is

13  right there in front of us all.  And in none of it,

14  none of it has my name, my DNA nowhere in the

15  blood, in the clothes, anything, hair samples,

16  nothing.  And it's so sad.  So sad.  Because we had

17  a piece of evidence from Connie's hands and James'

18  hands, the hairs in it, even back then clearly were

19  not mine.  But that didn't stop them from telling

20  the jury -- two juries they were mine.  And all of

21  the things they said to me, I cannot remember.

22  But I can tell you this.  All the

23  things they done to me was all a lie.  And the rest

24  is attorney-client privilege.

JOHNNIE LEE SAVORY, 06/15/2022                               Page 34..37

Page 34

1        I hope I've answered your question.
2 But I ... the trauma sometimes is --
3 BY MS. SCHROEDER:
4    Q.   Mr. Savory, do you believe you've been
5 found innocent of this crime?
6    A.   Yes.
7    Q.   Okay.  And when I say "this crime," I'm
8 going to go through the three crimes that you're --
9 have alleged in your complaint and then also in
10 your answers to interrogatories.
11       So do you believe that you've been
12 found innocent of the murder of your friend Scopey?
13    MR. TAYLOR:  Objection to the form.
14       You may answer.
15    THE WITNESS:  Yes.
16 BY MS. SCHROEDER:
17    Q.   Why?
18    A.   DNA.
19    Q.   Which DNA?
20    A.   The DNA that was taken from the crime
21 scene and from me.  DNA.  My blood.  Their blood.
22    Q.   Who's "their" blood?
23    A.   The victims.  None of that is on me.
24 Although the state said it was on me.  And said I

Page 35

1 wore clothes that I did not wear that was ten --
2 five, six times bigger than I am.  But they said
3 that I walked around with the victims' blood on
4 me and the victims' blood was on the knife.  The
5 victims' blood everywhere.  But none of that
6 belongs to Johnnie Savory.
7    Q.   So I'm going to see if I understand
8 this.  You're saying that you were found innocent
9 because none of the victims' blood was found on
10 you?
11    MR. TAYLOR:  Objection; mischaracterizes and
12 incompletely summarizes his answer.
13    MS. SCHROEDER:  Yeah.  I mean --
14    MR. TAYLOR:  Objection to the form.
15 BY MS. SCHROEDER:
16    Q.   Please, Mr. Savory, explain that to me.
17    A.   Explain what?
18    MR. TAYLOR:  Explain what?
19    THE WITNESS:  What you asking?
20 BY MS. SCHROEDER:
21    Q.   Your answer how the DNA -- how the lack
22 of the victims' DNA on you has --
23    A.   Lack of.
24    Q.   -- proven you innocent.

Page 36

1    A.   Lack of.  None.  None.  And it proves --
2    Q.   I don't know what you mean when you say
3 "none."
4    A.   Let me say this here.  In the blood
5 lies the truth.  Indeed?  Indeed, right?
6    Q.   So let's -- let's think about this more
7 succinctly.
8        So which specific DNA test are
9 you relying on to say that you have been proven
10 innocent of the murder of Scopey?
11    MR. TAYLOR:  I object to the form.  The kind
12 of predicate that you put in your question, "let's
13 think about this more distinctly."  This man has
14 been thinking about this distinctly --
15    MS. SCHROEDER:  Are you --
16    MR. TAYLOR:  -- for 45 years.
17    MS. SCHROEDER:  The speaking objections are
18 going to stop, Flint.  The speaking objections are
19 going to stop.
20    MR. TAYLOR:  My ob- -- no.
21    MS. SCHROEDER:  Yes.
22    MR. TAYLOR:  I'm going to make my objections,
23 and -- you're not telling me what's going to stop
24 and what's not going to stop.

Page 37

1    MS. SCHROEDER:  The speaking objections will
2 stop.
3    MR. TAYLOR:  Oh, thank you.  Well, your
4 questions that are objectionable will stop.  Okay?
5    MS. SCHROEDER:  No.
6    MR. TAYLOR:  Now we're even.
7    MS. SCHROEDER:  You can object.  I'm not
8 saying --
9    MR. TAYLOR:  Objection to the form.
10    MS. SCHROEDER:  -- you can't object.
11 BY MS. SCHROEDER:
12    Q.   Perfect.
13        Mr. Savory, please tell me which DNA
14 test you are relying on to say that you have been
15 found innocent of the murder of James Robinson.
16    A.   You have to rely on the state laboratory
17 reports that you have in your possession.
18    Q.   Do you know which specific test that --
19    A.   No, I do not.
20    Q.   -- you are relying on?
21    A.   No, I do not.
22    Q.   Okay.  Is there any other evidence that
23 you're relying on to say that you have been found
24 innocent of this crime, of the murder of James

Page 38

1 Robinson?

2    A.   I'm going to just -- attorney-client

3 privilege with that.  I gave you what I had.

4    Q.   So only the -- I just want to make sure

5 it's clear.  So the other evidence that you are

6 relying on to say that you are innocent of the murder

7 of James Robinson is protected by attorney-client

8 privilege?

9    A.   Yes.

10    Q.   Okay.  What evidence are you relying --

11 well, strike that.

12        Do you believe you've been found

13 innocent of the murder of Connie Cooper?

14    A.   Yes.

15    Q.   What evidence are you relying on to

16 form your belief that you have been found innocent

17 of Connie Cooper's murder?

18    A.   State laboratory reports.

19    Q.   Do you know which specific state

20 laboratory reports you're relying on?

21    A.   Unless you have them in the file,

22 I don't have them in front of me.

23    Q.   I'm asking you which reports you're

24 relying on.

Page 39

1    A.   I cannot --

2    MR. TAYLOR:  Objection; asked and answered.

3    THE WITNESS:  -- remember the exact report.

4 We're talking about 2013.

5 BY MS. SCHROEDER:

6    Q.   Okay.  Were there specific DNA tests

7 that were done that you believe the results proved

8 your innocence of Connie Cooper's murder?

9    A.   Yes.

10    Q.   Which DNA test?

11    A.   Don't know the test.  But I can quote

12 you what it said in the test to the best of my

13 ability.  And that is that semen was found inside

14 of Connie Cooper, and it did not match Johnnie

15 Savory.

16    Q.   And that's because?

17    A.   I don't know the because.

18    Q.   Okay.  Is there any other evidence that

19 you're relying on to form your belief that you've

20 been found innocent of Connie Cooper's murder?

21    A.   That is also attorney-client privilege.

22    Q.   Okay.  What evidence are you relying

23 on -- nope.  Strike that.

24        Do you believe you've been found

Page 40

1 innocent of the rape of Connie Cooper?

2    MR. TAYLOR:  Objection; form, foundation.

3    THE WITNESS:  Yes.

4 BY MS. SCHROEDER:

5    Q.   What evidence are you relying on to

6 form your belief that you've been found innocent of

7 the rape of Connie Cooper?

8    A.   The same laboratory report I just

9 mentioned to you with the semen and testing, the

10 DNA laboratory reports that either you possess or

11 the courts possess from the postconviction hearing.

12    Q.   Are there any other tests besides the

13 one that you've mentioned about the semen that

14 you're relying on to form this belief?

15    A.   I'm not aware of it at this moment,

16 but ...

17    Q.   Okay.  Is there any other evidence at

18 all that you're relying on to form the belief that

19 you've been found innocent of the rape of Connie

20 Cooper?

21    MR. TAYLOR:  Objection --

22    THE WITNESS:  That's the attorney-client

23 privilege.

24    MR. TAYLOR:  -- form and foundation.

Page 41

1 BY MS. SCHROEDER:

2    Q.   Okay.  And you said yes, there is, but

3 it's attorney-client privilege?

4    A.   No.  I said it's attorney-client

5 privilege.

6    Q.   So you can't tell me what --

7    A.   No.

8    Q.   -- other evidence -- okay.

9    A.   No.

10    Q.   Because it's protected by attorney-

11 client privilege?

12    A.   Yes, ma'am.

13    Q.   Okay.  Do you believe -- well, strike

14 that.

15        If you've been found innocent of the

16 murder of James Robinson, why were you petitioning

17 the governor for a pardon based on innocence in

18 20- -- I think that it was 2016?

19    MR. TAYLOR:  Objection; form and foundation.

20    THE WITNESS:  Attorney-client privilege.

21 BY MS. SCHROEDER:

22    Q.   Okay.  Has a court ever announced that

23 you have been found innocent of the murder of James

24 Robinson?

Page 42

1    A.   No.
2    Q.   Has a court ever announced that you
3 have been found innocent of the murder of Connie
4 Cooper?
5    A.   No.
6    Q.   Has a court ever announced that you
7 have been found innocent of the rape of Connie
8 Cooper?
9    A.   Say that again.
10   Q.   Has a court ever announced that you
11 have been found innocent of the rape of Connie
12 Cooper?
13   A.   No.
14   Q.   Okay.  Has the governor of Illinois
15 ever proclaimed that you are innocent of the murder
16 of Connie Cooper?
17      MR. TAYLOR:  Objection; form, foundation.
18      THE WITNESS:  Attorney-client privilege.
19 BY MS. SCHROEDER:
20   Q.   Has the governor ever proclaimed that
21 you have been found innocent of the murder of James
22 Robinson?
23   A.   I was granted a full pardon by the
24 governor.  Yes.

Page 43

1    Q.   What do you understand that full pardon
2 to mean?
3    A.   I know --
4      MR. TAYLOR:  Objection; form, foundation,
5 calls for a legal conclusion.
6      You may answer.
7      THE WITNESS:  My entire criminal history has
8 been expunged, and I am a free and legal citizen of
9 the United States again with all the rights and
10 privileges that every other citizen of the United
11 States have.
12 BY MS. SCHROEDER:
13   Q.   Do you have the right to own a gun?
14   A.   I don't desire to own one.
15   Q.   I'm sorry?
16   A.   I don't desire to own one.
17   Q.   That's not -- my question is do you
18 have the right to own a gun?
19      MR. TAYLOR:  Objection; asked and answered.
20      THE WITNESS:  That's my answer.
21 BY MS. SCHROEDER:
22   Q.   Are you not answering this question?
23      MR. TAYLOR:  You may answer.  If you know.
24      THE WITNESS:  Attorney-client privilege.

Page 44

1 BY MS. SCHROEDER:
2    Q.   Okay.  Do you believe the pardon
3 that -- well, strike that.
4      When did you receive your pardon
5 from the governor?
6    A.   January 2015, I assume.  I'm not sure.
7    Q.   But around there, around 2015?
8    A.   Something like that, yeah.
9    Q.   Okay.  And do you believe that this
10 pardon proclaimed you innocent of the crimes that
11 you had been convicted of?
12      MR. TAYLOR:  Objection; form and foundation.
13      THE WITNESS:  Yes.
14 BY MS. SCHROEDER:
15   Q.   Okay.  This is Exhibit 2.
16      Okay.  So actually, Mr. Savory, I
17 think I'm going to do this as a Group Exhibit 2
18 because I need to have both these together.
19      Here you go, Mr. Savory.  I'm going
20 to do that one also.  And we're going to make this
21 a group exhibit.
22      And I -- for the record, this is --
23 the one exhibit is Savory-LL-4980 through --
24 sorry -- 5019.

Page 45

1      And then the other exhibit is --
2 I believe we actually received from plaintiff,
3 but there's no Bates stamp on it.  But it's a
4 January 11th, 2019 letter from the Prisoner Review
5 Board addressed to Christopher Tompkins regarding
6 Johnnie Savory.
7      Mr. Savory --
8    A.   Before you ask something, can I use the
9 washroom right quick?
10   Q.   Can you what?
11   A.   Use the washroom right quick.
12   Q.   Yes.
13   A.   Thank you.
14      THE VIDEOGRAPHER:  Going off the record at
15 11:21 a.m.
16         (Recess taken.)
17      THE VIDEOGRAPHER:  We are back on the record
18 at 11:30 a.m.
19      MR. TAYLOR:  For the record, just so it's
20 clear, is Defendant Teplitz still on the Zoom?
21      MS. TEPLITZ:  Yes, we both are.
22      MR. TAYLOR:  Thank you.
23      MS. SCHROEDER:  All good?
24      THE VIDEOGRAPHER:  We're set.

Page 46

1 BY MS. SCHROEDER:

2    Q.   Okay, good.

3         Okay.  Mr. Savory, so I handed you
4 what is Group Exhibit 2, and the -- I think I would
5 like you to look at the thicker document first.
6 And let's look at the front page and I --
7 because I just want to see if you're familiar with
8 this document.

9         So do you see here that the
10 signature is from a Christopher Tompkins?

11   A.   Yes.

12   Q.   And it's on Jenner & Block letterhead?

13   A.   Yes.

14   Q.   Are you familiar with this person?

15   A.   Yes, ma'am.

16   Q.   Who is this person to you?

17   A.   Was one of my attorneys.

18   Q.   Okay.  And do you see the date where it
19 says July 25th, 2016 --

20   A.   Yes.

21   Q.   -- at the top?

22        Okay.  And then do you see where
23 it says the address at the top is to the Illinois
24 Prisoner Review Board?

Page 47

1    A.   Yes, ma'am.

2    Q.   And then it's regarding Johnnie L.
3 Savory supplemental petition for executive
4 clemency?

5    A.   Yes, ma'am.

6    Q.   Okay.  And if we flip -- well, we can
7 just even flip to the second page, and, again, the
8 title says it's a Supplemental Petition for
9 Executive Clemency, and it's signed.

10        Are you -- do you remember filing
11 this supplemental petition for executive clemency
12 in 2016?

13   MR. TAYLOR:  Objection to form.

14   THE WITNESS:  Yes, I remember it.

15 BY MS. SCHROEDER:

16   Q.   Okay.  And so if we now flip to -- all
17 the way where it says the Introduction.  So it's
18 really like after the Table of Contents, maybe four
19 pages in.  Okay.

20        And do you see here at the top, it
21 says Introduction, it says, "The purpose of this
22 supplemental petition is narrow, but important.
23 Mr. Savory was already pardoned by Governor Quinn
24 on January 12th, 2015."

Page 48

1         Do you see that sentence?

2    A.   Yes, ma'am.

3    Q.   Okay.  And then if you continue, it
4 says, "However, that pardon was issued without the
5 benefit of recent DNA testing of physical evidence
6 in Mr. Savory's case that indicates that someone
7 else, and not Mr. Savory, committed the crime,
8 and therefore did not specifically recognize
9 Mr. Savory's innocence as contemplated by 735 ILCS
10 5/2-702(h)."

11        Do you see that sentence there?

12   A.   Yes.

13   Q.   Okay.  What do you understand then that
14 sentence to mean?

15   MR. TAYLOR:  Objection to the form; calls for
16 a legal conclusion.

17   THE WITNESS:  I guess Christopher Tompkins
18 would be the best person to answer that.

19   MS. SCHROEDER:  Okay.

20   THE WITNESS:  Yes, ma'am.

21 BY MS. SCHROEDER:

22   Q.   Okay.  Do you understand, though, as
23 you read this sentence that the pardon that was
24 issued by Governor Quinn on January 12, 2015 did

Page 49

1 not specifically recognize your innocence as
2 contemplated by an Illinois statute?

3    MR. TAYLOR:  Objection; form.

4    THE WITNESS:  I'm not.

5 BY MS. SCHROEDER:

6    Q.   If you flip to page 3, Mr. Savory, and
7 you look at the paragraph that is at the top.  And
8 do you see where it starts, "The results of this
9 new DNA testing ..."?

10   A.   Yes.

11   Q.   Okay.  "The results of this new DNA
12 testing, when combined with the recantations of
13 each of the witnesses who testified Mr. Savory made
14 admissions concerning the murders, should remove
15 any lingering question that Mr. Savory committed
16 these horrible crimes for which he spent 30 years,
17 and most of his adult life, in prison."

18        Do you see that sentence?

19   A.   Yes.

20   Q.   Do you know what lingering questions
21 are remaining that this sentence is referring to?

22   MR. TAYLOR:  Objection; form, foundation.

23   THE WITNESS:  I would refer to Christopher
24 Tompkins.

JOHNNIE LEE SAVORY, 06/15/2022                                        Page 50..53

Page 50

1 BY MS. SCHROEDER:
2    Q.   Okay.  So you don't know?
3    A.   No, ma'am.
4    Q.   Okay.  And then the last sentence there
5 says, "Accordingly, Mr. Savory respectfully asks
6 the governor to use his power of executive clemency
7 to correct errors made by police, prosecutors, the
8 courts, and unwittingly the jury, and recognize
9 Mr. Savory's innocence."
10        Do you see that?
11   A.   Yes.
12   Q.   Okay.  What do you understand that
13 sentence to be requesting of this governor?
14       MR. TAYLOR:  Objection; form --
15       THE WITNESS:  I'm not sure.
16       MR. TAYLOR:  -- foundation.
17       THE WITNESS:  I think Mr. Tompkins --
18       MR. TAYLOR:  Let me finish my objection.
19       THE WITNESS:  Oh, I'm sorry.
20       MR. TAYLOR:  Form, foundation.
21           Go right ahead and finish.
22       THE WITNESS:  I will refer this to
23 Christopher Tompkins again.
24

Page 51

1 BY MS. SCHROEDER:
2    Q.   Are you referring to him because you
3 don't know?
4    A.   No, I don't.
5    Q.   Okay.  Is there any other reason you
6 would be referring me to Mr. Tompkins for the
7 answer?
8    A.   No.  He drafted this up, you know.
9 Once the governor pardoned me, I believe
10 wholeheartedly that he did it based on my
11 innocence.
12   Q.   Okay.
13   A.   Yes, ma'am.
14   Q.   And what information was given to you
15 that you believe the governor granted the pardon
16 based on innocence?
17       MR. TAYLOR:  Objection.
18           Johnnie, if that information came
19 from any attorney, then that's covered by lawyer-
20 client privilege.
21       THE WITNESS:  Mr. Christopher Tompkins I'll
22 refer.
23 BY MS. SCHROEDER:
24   Q.   He told you that the pardon was based

Page 52

1 on innocence?
2    MR. TAYLOR:  Objection.
3    THE WITNESS:  I'm saying you could refer to
4 him.
5    MR. TAYLOR:  Johnnie, hold on.  Hold on.
6 I will advise you that that conversation with
7 Mr. Tompkins is privileged, and you do not have to,
8 nor should you, answer that question if it
9 implicates a conversation you had with him.
10       THE WITNESS:  I'm going to refer it back to
11 Christopher Tompkins.
12 BY MS. SCHROEDER:
13   Q.   Okay.  Is there any information aside
14 from what Mr. Tompkins has told you that you are
15 relying on for your belief that the governor's
16 pardon proclaimed you innocent of these crimes?
17       MR. TAYLOR:  Again, Johnnie, if it's a
18 conversation with any attorney, you should assert
19 your privilege.  If it's -- if you're relying on
20 something else other than what attorneys have told
21 you, then go right ahead and answer the question.
22       THE WITNESS:  I'm going to go back to
23 Christopher Tompkins as -- for this petition.
24

Page 53

1 BY MS. SCHROEDER:
2    Q.   Okay.  Is there any non-privileged
3 information that you are relying on to say that
4 the governor's pardon was based on innocence?
5    A.   No.
6    Q.   Okay.  Are you aware of what the result
7 was of this 2016 petition for executive clemency?
8    A.   Yes.
9    Q.   And what was that result?
10   A.   It was denied.
11   Q.   Okay.  Do you know why it was denied?
12   A.   No.
13   Q.   Do you have any non-privileged
14 information on why this petition was denied?
15   A.   No.
16   Q.   Okay.  Did you ever seek to find out
17 why it was denied?
18   A.   I refer back to Christopher Tompkins.
19   Q.   Okay.  And are you referring to me --
20 him to me because your answer is privileged?
21   A.   Between, yes, he and I.
22   Q.   Okay.  And is there any non-privileged
23 information that you can share with me to
24 demonstrate what you did to find out why your

JOHNNIE LEE SAVORY, 06/15/2022                                    Page 54..57

Page 54

1 petition was denied?

2  A.  No, ma'am.

3  Q.  Okay.  Do you have any thoughts on why

4 it was denied?

5  MR. TAYLOR:  Objection to the form.

6  THE WITNESS:  No, ma'am.

7 BY MS. SCHROEDER:

8  Q.  Okay.  Do you currently have another

9 petition before the governor asking for executive

10 clemency?

11  A.  Not that I'm aware of.

12  Q.  Okay.  Do you have any petitions in any

13 court that are seeking to proclaim you innocent of

14 the murder of James Robinson?

15  A.  Not that I'm aware of.

16  Q.  Okay.  And do you have any petition

17 currently before the court seeking that court to

18 proclaim you innocent of the murder of Connie

19 Cooper?

20  A.  Not that I'm aware of.

21  Q.  Okay.  And is there anything that you

22 would need in order for you to provide an answer

23 that is more definitive than not that you're aware

24 of?

Page 55

1  A.  My attorneys --

2  MR. TAYLOR:  Objection.  It's asked and

3 answered.

4  THE WITNESS:  I refer to my attorneys.  They

5 would know.

6 BY MS. SCHROEDER:

7  Q.  Your attorneys will know if you have

8 current petitions pending requesting your --

9  A.  Yes, ma'am.

10  Q.  -- the courts to proclaim you innocent?

11  A.  Yes, ma'am.

12  Q.  Okay.  And I just want to clarify that

13 when you say not that you're aware of, what does

14 that mean?  That you have no knowledge of any

15 petition that's been filed -- currently filed with

16 the court?

17  A.  I'm aware of this.

18  Q.  Okay.  And when you say "this," do you

19 mean this --

20  A.  The civil --

21  Q.  The civil --

22  A.  The civil suit.

23  Q.  -- lawsuit that we're in right now --

24  A.  Yes.  Yes, ma'am.

Page 56

1  Q.  -- correct?

2  A.  Yes, ma'am.

3  Q.  Okay.  And do you believe that this

4 lawsuit is going to proclaim you a finding of

5 innocence?

6  A.  I believe it's going to -- it has to

7 to -- yes, I believe it will.

8  Q.  Okay.  And is there any other -- aside

9 from this lawsuit, is there any other document

10 that's filed with any court where you're seeking

11 that court to proclaim you innocent?

12  A.  I refer that back to my attorneys.

13  Q.  Okay.  And are you referring me to your

14 attorneys because the information is privileged?

15  A.  Because they would know.

16  Q.  And explain to me that answer.  Meaning

17 you don't know?

18  A.  Not that I'm aware of.

19  MR. TAYLOR:  Objection to form.

20 BY MS. SCHROEDER:

21  Q.  Okay.  Okay.  Would you expect your

22 attorneys to inform you if they were petitioning a

23 court for a legal proclamation of your innocence?

24  MR. TAYLOR:  Objection.

Page 57

1  THE WITNESS:  Attorney-client privilege.

2 BY MS. SCHROEDER:

3  Q.  Okay.  Okay.  Do you recall that you

4 had a -- you were pursuing additional DNA testing

5 in the Peoria County Court?

6  MR. TAYLOR:  Objection.  At what time are you

7 talking about?

8  MS. SCHROEDER:  Yeah.  That would be -- let

9 me see here.

10 BY MS. SCHROEDER:

11  Q.  Mr. Savory, were you ever pursuing

12 a certificate of innocence in Peoria County?

13  A.  Yes.

14  Q.  Okay.  Do you know what a certificate

15 of innocence is?

16  A.  Yes.

17  Q.  Okay.  Can you tell me what a

18 certificate of innocence is?

19  MR. TAYLOR:  Objection; calls for a legal

20 conclusion.

21  You may answer.

22  THE WITNESS:  A certificate that allows you

23 to get compensation from the state.

24

JOHNNIE LEE SAVORY, 06/15/2022 Page 58..61

Page 58

1 BY MS. SCHROEDER:
2    Q.   Okay.  Are you currently pursuing that
3 certificate of innocence?
4    A.   Yeah, within this document, but I'm not
5 aware of any other documents.
6    Q.   Okay.  Did your -- did you stop
7 pursuing the certificate of innocence with the
8 Peoria County Court?
9    A.   I'm going to refer that to Josh Tepfer,
10 who I believe -- my attorney, Josh, I think
11 that's -- he would be the best one to answer for
12 that.
13    Q.   Okay.  And why is he the best one to
14 answer that?
15    MR. TAYLOR:  Objection.  If that implicates
16 any conversations you had with Josh, then you need
17 not and should not answer it.
18    THE WITNESS:  It would be attorney-client
19 privilege with Josh Tepfer.  I think he would be
20 the best person to answer those questions.
21 BY MS. SCHROEDER:
22    Q.   And are you telling me to ask him that
23 question?
24    MR. TAYLOR:  Objection.

Page 59

1    THE WITNESS:  I'm just referring to the
2 person that was my attorney at that time.
3 BY MS. SCHROEDER:
4    Q.   Okay.  So when you're referring me to
5 go to an attorney to get that information, are you
6 instructing me to get that information from that
7 attorney?
8    MR. TAYLOR:  Objection.  You know that he
9 can't instruct you to do anything.  He's here as
10 a witness and that he's here to answer your
11 questions.
12    MS. SCHROEDER:  He's not -- he is here as a
13 party.  He is here as the plaintiff, not a witness.
14    MR. TAYLOR:  Okay.  He's a witness and a
15 plaintiff.  Fine.  That's a distinction without a
16 difference --
17    MS. SCHROEDER:  And I'm --
18    MR. TAYLOR:  -- for purposes of your
19 question.  He's not here to instruct you, nor can
20 he instruct you, nor need you or should you ask him
21 whether he's instructing you to do anything.
22    MS. SCHROEDER:  Why, as a grown man, can he
23 not instruct me where I should go get the answer to
24 the question I'm asking?

Page 60

1    MR. TAYLOR:  Objection to the form of the
2 question.
3    MS. SCHROEDER:  I'm not asking him.  I'm
4 asking you.
5    MR. TAYLOR:  I'm not a witness here either.
6    MS. SCHROEDER:  Okay.  Well, you're certainly
7 talking enough that you're providing enough
8 information and instruction to me.  So I'm trying
9 to clarify.  I always thought that the client held
10 the attorney-client privilege.
11 BY MS. SCHROEDER:
12    Q.   Mr. Savory, when you --
13    A.   Yes.
14    Q.   -- say Josh Tepfer is the best person
15 to answer that question, what do you mean by that?
16    A.   I mean he was my attorney at
17 Northwestern, and he's the person that I rely on
18 for this situation.
19    Q.   Okay.  And so are you saying to me that
20 the information is privileged as to why you stopped
21 pursuing a certificate of information -- or
22 innocence?  Excuse me.
23    A.   Yes.
24    Q.   It is privileged?

Page 61

1    A.   Yes.
2    Q.   Okay.
3    A.   Yes, ma'am.
4    Q.   Okay.  And then do you recall that
5 after you filed -- do you remember when you filed
6 the current lawsuit that we're in right now?
7    A.   I believe it was -- I believe it was
8 January 2017.
9    Q.   That's right.  Yeah.
10    And do you recall that even after
11 that time that you had filed this document, you
12 were still pursuing additional DNA testing on other
13 evidence down in Peoria County; is that correct?
14    A.   Josh Tepfer would be the best one to
15 answer that.
16    Q.   So you're not aware of it, or are you
17 telling me that your knowledge of it --
18    A.   Attorney-client --
19    Q.   -- is privileged?
20    A.   -- privilege, yes.
21    Q.   Your knowledge of it?
22    A.   Yes.
23    Q.   Okay.  Okay.  You do know that court
24 appearances are public, correct?

JOHNNIE LEE SAVORY, 06/15/2022                              Page 62..65

Page 62

1    A.   Yes.
2        Q.   Okay.  And so court appearances and
3   things that you say in court during court
4   appearances are public; is that correct?
5    A.   Yes, ma'am.
6        Q.   Okay.  And so are you telling me
7   that you cannot tell me that you were pursuing
8   an additional DNA testing in Peoria County courts
9   because that's privileged information?
10   A.   I'm telling you that that's
11  confidential between me and Josh Tepfer.
12       Q.   Okay.  Mr. Savory --
13   A.   Yes, ma'am.
14       Q.   -- did you eventually stop seeking --
15  or I guess -- strike that.
16           Did you eventually stop pursuing the
17  additional DNA testing on other evidence?
18   A.   That is another question for Josh
19  Tepfer; attorney privilege.
20       Q.   And are you referring me to Mr. Tepfer
21  because your answer is --
22   A.   Privileged between --
23       Q.   -- based on privileged information?
24   A.   Yes, ma'am.

Page 63

1        Q.   Okay.  And is there any other
2   information that you can share with me to explain
3   why you stopped the DNA testing that would not be
4   privileged?
5    MR. TAYLOR: Objection.
6    THE WITNESS: I cannot.
7    MR. TAYLOR: It assumes a fact not in evidence.
8    THE WITNESS: I cannot.
9   BY MS. SCHROEDER:
10       Q.   Okay.  So Mr. Taylor brings up a good
11  point.  Did you, in fact, stop pursuing additional
12  DNA testing in Peoria County?
13   A.   Josh Tepfer would appear to be the best
14  one; privileged between he and I.
15       Q.   So the fact of whether you
16  were -- are or are not pursuing DNA testing is
17  privileged information; is that correct?
18   A.   Yes, ma'am.
19       Q.   Okay.  Okay.  So, Mr. Savory, I just
20  want to confirm before I continue down these
21  questions.  Are you maintaining that you were
22  charged with rape in this case, in the underlying
23  case of Connie Cooper?
24   A.   I gave you my description in my answer,

Page 64

1   and I stick by what I gave you.
2        Q.   Okay.
3    A.   Yes, ma'am.
4        Q.   And I just need to clarify because --
5   and my understanding is that you are saying that
6   defendants' misconduct framed you and implicated
7   you in the rape of Connie Cooper; is that correct?
8    A.   I am going to stick by what I -- what
9   you asked me and what I shared with you that's
10  being recorded.
11       Q.   Okay.
12   A.   I'm going to stick to that.  And I
13  can't go back and verbatim and go over all that
14  and nor do I have a desire to go over it because I
15  don't want to relive what I went through in that
16  bathroom and no parts of the interrogation or what
17  took place.  I gave you the best answer I could
18  give you when you asked me that.
19       Q.   Okay.
20   A.   Yes, ma'am.
21       Q.   Okay.  Mr. Savory, how old were you
22  when you had your first sexual experience?
23   MR. TAYLOR: Objection.  I'm going to object
24  in terms of form, in terms of foundation, and also

Page 65

1   in terms of relevance.
2    THE WITNESS: I don't even know what -- how
3   to even answer that.  Why is it relevant?  I don't
4   understand what you're asking me.  When was the
5   first time?
6    MS. SCHROEDER: Yes.
7    THE WITNESS: I don't remember.
8   BY MS. SCHROEDER:
9        Q.   Was it before you were arrested for the
10  murder of James Robinson and Connie Cooper?
11   MR. TAYLOR: Same objection.
12   THE WITNESS: I would say after my release
13  from prison.
14  BY MS. SCHROEDER:
15       Q.   Okay.  And what was that experience
16  that you're referencing?
17   MR. TAYLOR: Objection.  Can you tell us how
18  this has any arguable relevance to this case?
19   MS. SCHROEDER: Certainly.  He is maintaining
20  that he has been charged and framed and implicated
21  in the rape of Connie Cooper.  And in your
22  pleadings and in many of the things that the
23  lawyers have filed over the years, they proclaim
24  that Johnnie Savory was a 14-year-old boy who would

JOHNNIE LEE SAVORY, 06/15/2022                          Page 66..69

Page 66

1 be unable to do that sort of sexual act on a woman.
2     MR. TAYLOR: Point -- do you want to point to
3 a point where we've made that allegation that he'd
4 be unable to do that?
5     MS. SCHROEDER: Well, I'm going to continue
6 my ques- --
7     MR. TAYLOR: Let's see that.
8     MS. SCHROEDER: No. I'm going to continue --
9     MR. TAYLOR: Hang on. You're relying on --
10 you're pulling that one out of your hat.
11     MS. SCHROEDER: So are you telling me, Flint,
12 that you have not maintained and filed federal
13 court documents saying that the defendants'
14 misconduct implicated and framed Johnnie Savory for
15 rape?
16     MR. TAYLOR: No. You've just -- you showed
17 us the documents --
18     MS. SCHROEDER: Correct.
19     MR. TAYLOR: -- that make that allegation.
20     MS. SCHROEDER: And now I'm exploring it.
21     MR. TAYLOR: But the leap that you're making
22 now is --
23     MS. SCHROEDER: No. I'm exploring it. I'm
24 exploring it. I want to understand it because I

Page 67

1 want to understand what these defendants could have
2 known back in 1977 that would have framed this man
3 for rape. So I need to explore that. If he was
4 sexually active, I need to explore it.
5     MR. TAYLOR: I may be slow, but I really
6 can't understand your rationale, your explanation
7 in any manner that how you get to a question of
8 asking him about, quote -- and what was the term
9 that she used?
10     MR. BOWMAN: Sexual experience.
11     MR. TAYLOR: Sexual experience. Whatever
12 that means. I could ask everybody in this room
13 what that means, and we'd get ten different
14 answers, I would assume.
15     MS. SCHROEDER: And that's why I asked --
16     MR. TAYLOR: So now we're delving --
17     MS. SCHROEDER: -- him to define it.
18     MR. TAYLOR: -- into an area that has no
19 relevance, is harassing, and I strongly urge you
20 to forego this line of questioning. Because at
21 some point very soon it becomes harassing, if not
22 already.
23         Is there a question pending?
24     MS. SCHROEDER: Yeah. I asked him to tell me

Page 68

1 what the experiences that he said he had after he
2 was released from prison.
3     THE WITNESS: Okay. Could you be specific
4 about the sexual experience that you want me to
5 share with you?
6 BY MS. SCHROEDER:
7     Q.  Okay.  So if that's -- certainly.
8         Mr. Savory, how old were you when
9 you had sexual intercourse, your first sexual
10 intercourse?
11     A.  Okay. I want to say 4- -- 44.
12     Q.  44.
13     A.  Yes.
14     Q.  Okay.  And was that after you were
15 released from incarceration?
16     A.  Yes, ma'am.
17     Q.  Okay.  And --
18     MR. BOWMAN: Just so it's clear, I have a --
19 we have an objection to this line of questioning
20 and to its form and foundation and relevance.
21 BY MS. SCHROEDER:
22     Q.  Prior to your arrest for the murder of
23 Connie Cooper and James Robinson, had you had any
24 sexual experience with another person?

Page 69

1     MR. TAYLOR: Objection in terms of form,
2 foundation, vagueness of the question.
3     THE WITNESS: No.
4 BY MS. SCHROEDER:
5     Q.  Okay.  Had you -- prior to your arrest
6 on January 25th, had you ever experienced sexual
7 abuse?
8     A.  No.
9     Q.  Okay.  Prior to your arrest on
10 January 25th, had you ever looked at a pornographic
11 magazine?
12     A.  No, ma'am.
13     Q.  Okay.
14     MR. BOWMAN: Are you kidding?
15 BY MS. SCHROEDER:
16     Q.  Had -- prior to January 25th --
17     MR. BOWMAN: Seriously. Are you kidding?
18 BY MS. SCHROEDER:
19     Q.  -- your arrest --
20     MR. TAYLOR: Hold on. Calm down.
21     MS. SCHROEDER: No.
22     MR. BOWMAN: Objection. I think you may
23 have crossed a line. Okay? I really -- you know,
24 seriously. Can you articulate the relevance of

JOHNNIE LEE SAVORY, 06/15/2022                           Page 70..73

Page 70

1 that?

2     MS. SCHROEDER:  Are you maintaining that the

3 defendants' misconduct framed him for rape?

4     MR. BOWMAN:  My point is about --

5     MS. SCHROEDER:  That's -- no.  I'm asking you

6 because that is the basis for this questioning.

7     MR. BOWMAN:  Well, since you've asked me the

8 question, I'll respond.  Thank you for giving me

9 the opportunity to respond.

10     MS. SCHROEDER:  Oh, sure.  This is turning

11 into the plaintiff's attorneys' deposition.

12     MR. BOWMAN:  No.

13     MR. TAYLOR:  No.

14     MR. BOWMAN:  You offered me an opportunity.

15 I have not said anything.  But under the rules, now

16 that you have asked me to clarify the reason for my

17 objection, I will respond to your question if you

18 desire me to do so.  If you tell me you don't want

19 me to respond, I will not respond.  But the rules

20 entitle me to tell you what I think in response to

21 your question if you wish an answer.  Over to you.

22     MS. SCHROEDER:  So my question is, are you

23 maintaining that the defendants' misconduct framed

24 and implicated him for the rape of Connie Cooper?

Page 71

1     MR. BOWMAN:  I will answer your question.

2 The problem that -- the answer to your question

3 is yes, because Connie Cooper was raped.  She was

4 very clearly raped.  The features of the crime were

5 indicative without question of a sexual assault.

6 This man, as a 14-year-old boy, was framed for a

7 crime that included obviously a rape, a sexual

8 assault.

9         So the answer to your question is

10 yes, as alleged in the complaint.

11 MS. SCHROEDER:  Okay.

12     MR. BOWMAN:  Now then, having said that --

13 MS. SCHROEDER:  So I think that's it now.

14     MR. BOWMAN:  -- can you explain to me what

15 on earth his -- his viewing pornography at any time

16 has to do with this case?

17     MS. SCHROEDER:  I will tell you what, I'm

18 going to change my question now based on your

19 earlier question.

20 BY MS. SCHROEDER:

21     Q.   Mr. Savory, so your attorney here has

22 just explained to me his thoughts on why the

23 defendants' misconduct has implicated and framed

24 you for the rape of Connie Cooper, which I believe

Page 72

1 has waived the attorney-client privilege, and you

2 are now able to answer me on --

3     MR. BOWMAN:  No.

4 BY MS. SCHROEDER:

5     Q.   -- the evidence that you're relying on

6 to say that the defendants' misconduct has framed

7 you for the rape of Connie Cooper.

8     A.   I can help you --

9     MR. BOWMAN:  No.  There's been no waiver of

10 the privilege.  Don't answer the question.

11     MS. SCHROEDER:  How is there no waiver?  You

12 just literally sat here and explained to me your

13 position.  So you're claiming there's no waiver?

14     MR. BOWMAN:  I'm claiming there's no waiver.

15     THE WITNESS:  I can -- I can -- I can answer

16 that.  I'm going to answer that for you.

17     MR. BOWMAN:  No.  Don't.

18     MS. SCHROEDER:  Yeah.

19     MR. BOWMAN:  Don't answer it, Johnnie.

20     THE WITNESS:  If you let me --

21     MR. BOWMAN:  Don't answer it.  Don't waive

22 your privilege.  Don't answer it.

23     MR. TAYLOR:  Don't answer that --

24     MR. BOWMAN:  She wants to know about your

Page 73

1 conversations with us.  Do not answer it.

2     THE WITNESS:  No.  This is not -- this is not

3 even pertaining to the lawyers at all.

4     MR. BOWMAN:  Okay.  Then you can answer.

5     THE WITNESS:  This is pertaining to the

6 courtroom.  In the courtroom I don't know if it was

7 Dr. Immesoete or what state witness it was, he gave

8 a description of the crime itself.  And in it, he

9 stated that it had all the details of a rape, very

10 violent crime.

11         And I'm going to refer you back

12 to the second trial, and in your records you

13 have that testimony from a state witness, either

14 Dr. Immesoete or some other criminal psychologist

15 in there for the state.  Testimony -- don't

16 remember what page, but I can tell you it's in

17 the second transcripts.  In his description, he

18 described me -- he described this crime scene as

19 one that Mr. Bowman, Locke Bowman, just described.

20 If you go to your tes- -- your trial transcript for

21 the second trial, you will see that.

22         I -- through you all's conversation,

23 it just made me remember what that man said on that

24 witness stand as it related to this crime itself.

JOHNNIE LEE SAVORY, 06/15/2022                    Page 74..77

Page 74

1 BY MS. SCHROEDER:
2    Q.   And is that information that you're
3 relying on to say that the defendants' --
4    A.   Yes.
5    Q.   -- misconduct --
6    A.   Yes.
7    Q.   Wait a minute.  Let me finish so it's
8 for the record.
9         -- (continuing) that the defendants'
10 misconduct framed and implicated you for the rape
11 of Connie Cooper?
12   A.   Yes.
13   Q.   Okay.  Is Dr. Immesoete a defendant in
14 this case?
15   A.   I'm not sure.
16   Q.   Are you not sure who you're suing?
17   A.   There's 25 or 26 defendants in there.
18   Q.   There's 26 defendants?
19   A.   However many.  It's on that page.
20   Q.   Okay.  Do you know who it is?
21   A.   I'm not sure if it's Dr. Immesoete.
22 I'm just giving you the person that I -- it could
23 be another name.  But in that trial testimony, you
24 could ask my lawyers or you all can just research

Page 75

1 it and find out which one gave that testimony.
2 Because I don't remember 40-plus years everybody's
3 names.  But I do remember him giving his horrific
4 details about the crime.
5    Q.   Is there any other information that
6 you remember that you are relying on aside from
7 privileged conversations --
8         MR. TAYLOR:  Objection.
9 BY MS. SCHROEDER:
10   Q.   -- to support your -- to support your
11 belief that the defendants' misconduct is framing
12 and implicating you in the rape of Connie Cooper?
13        MR. TAYLOR:  Objection, because he has given
14 other evidence already prior in his testimony.
15 BY MS. SCHROEDER:
16   Q.   Yeah.  I mean anything that he's
17 given -- I'm looking -- that's fine.  I'm looking
18 from beyond.
19        Is there anything else?  I want to
20 make sure we exhaust it.
21   A.   I'm going to refer that back to
22 attorney-client privilege.
23   Q.   Okay.  So there's nothing else outside
24 attorney-client privilege?

Page 76

1    A.   No.
2    Q.   Okay.  Very good.
3         Do you remember Connie Cooper?
4    A.   Yes.
5    Q.   Describe her for me.
6    A.   I guess five foot six or seven
7 something, something like that.  Maybe 120 pounds.
8 I mean, I don't know exactly.  But -- I mean, just
9 based on what I remember.
10   Q.   Is there anything else about her
11 appearance that you remember?
12   A.   No.  I don't -- I only met her one time.
13   Q.   When did you meet her?
14   A.   On the 17th.
15   Q.   Okay.  And that was --
16   A.   January.
17   Q.   -- the one and only time you had ever
18 met her?
19   A.   The only time I've ever seen her in my
20 life.
21   Q.   Okay.  Do you remember the color of her
22 hair?
23   A.   No, ma'am.
24   Q.   Okay.  Do you remember the shape of her

Page 77

1 face?
2    A.   No, ma'am.
3    Q.   Okay.  Do you remember the shape of her
4 body?
5    A.   No, ma'am.
6    Q.   Okay.  And in that one and only time
7 that you met Connie on the 17th, how many hours
8 were you with her?
9    A.   I was --
10        MR. TAYLOR:  Objection; form.
11        THE WITNESS:  I never was with her for no
12 hours.  Maybe -- I was never actually with her.
13 I was with James.
14        MS. SCHROEDER:  Okay.
15        THE WITNESS:  I saw her in the living room.
16 That's it.
17 BY MS. SCHROEDER:
18   Q.   Okay.  So -- and that's on the 17th?
19   A.   That's on January 17th.
20   Q.   And just for the record, we're talking
21 about January 17th --
22   A.   Yes, ma'am.
23   Q.   -- 1977; is --
24   A.   Yes, ma'am.

JOHNNIE LEE SAVORY, 06/15/2022                                    Page 78..81

Page 78

1    Q.   -- that correct?
2    A.   Yes, ma'am.
3    Q.   Okay.  Did you talk to her when you
4  were at the house on the 17th?
5    A.   No, ma'am.
6    Q.   Okay.  And you stated, I think, in your
7  answer that she was in the living room and you were
8  not; is that correct?
9    A.   Yes, ma'am.
10   Q.   Okay.  And tell me anything else that
11 you can remember about your seeing Connie that
12 night on the 17th.
13   A.   I mean, I just gave it to you.  My
14 interaction was with James.  It wasn't with the
15 rest of the family, you know.  That's the only
16 answer I can give you.
17   Q.   Okay.  And there's nothing else aside
18 from just seeing Connie in the living room that
19 you can remember from the night of the 17th --
20   A.   No, ma'am.
21   Q.   -- pertaining to Connie?
22   A.   No, ma'am.
23   Q.   Okay.  Did Connie speak to you on the
24 17th?

Page 79

1    A.   They all spoke.
2    Q.   And what did she say?
3    A.   They said hello.
4    Q.   And did she say anything else?
5    A.   No, ma'am.
6    Q.   Okay.  Did you say anything back to
7  her?
8    A.   Hello.
9    Q.   And what did you say?
10   A.   Hello.
11   Q.   Okay.  And did you say anything back to
12 her?
13   A.   No, ma'am.
14   Q.   Okay.  And were those the only two
15 words that you shared between you and Connie?
16   A.   Yes, ma'am.
17   Q.   Okay.  Did you know anything about
18 Connie's personal life?
19   A.   No, ma'am.
20   Q.   Okay.  Did you think Connie was
21 attractive?
22   A.   I didn't think of it one way or
23 another.
24   Q.   I'm sorry.  I didn't hear you.

Page 80

1    A.   I didn't have no thoughts about it one
2  way or another.
3    Q.   Okay.  And why not?
4    A.   Why would I?  Just -- she was just
5  another person.  I mean, just -- I mean, like I was
6  introduced to the family from James.  And I just --
7  you know, I come from a very respectful, you know,
8  family.  So you are taught to be hospitable, and
9  that's it.  I mean, that's all I got.  I know she
10 was older than I.
11   Q.   How did you know that?
12   A.   Because she looked older than I.
13   Q.   Did someone tell you she was older?
14   A.   No need.  I mean, I have a judgment of
15 my own, just like mother and father, they're older
16 than I am, you know.  I mean, she looks like an
17 adult.
18   Q.   Is there anything else that you can
19 remember about her?
20   A.   No, ma'am.
21   Q.   Did you know that she had a child?
22   A.   I did not.
23   Q.   Okay.  When you were at the -- Connie
24 and James' house on the 17th, did you see a baby

Page 81

1  there?
2    A.   Yes.
3    Q.   Okay.  And did you learn whose baby
4  that was?
5    A.   Not at that moment.
6    Q.   Okay.  Where did you see the baby on
7  the 17th?
8    A.   Running around playing in the living
9  room.
10   Q.   Did you learn the baby's name?
11   A.   No.
12   Q.   Okay.  Did you interact with the baby?
13   A.   No, ma'am.
14   Q.   Okay.  Did James tell you whose baby
15 that was?
16   A.   No.  And I didn't ask, you know.
17   Q.   Okay.  So I'm going to ask you a little
18 bit about your damages.
19        Do you know what I mean when I say I
20 want to learn about your damages in this lawsuit?
21   A.   If you don't mind, I would like you to
22 explain it to me, yeah.  Then I could have ...
23   Q.   Are you familiar with your complaint
24 that was filed in this lawsuit that outlines why

Page 82

1  you believe that you were -- the defendants'
2  conduct caused you to be convicted for the murders
3  of James Robinson and Connie Cooper and apparently
4  the rape of Connie Cooper?
5     A.  Yes, ma'am.
6     Q.  Okay.  And are you aware that you have
7  a section in here that you talk about the damages
8  that you suffered due to that misconduct?
9     A.  Yes, ma'am.
10    Q.  Okay.  And so if I say I want to talk
11 about and learn about those damages from you, do
12 you now understand what I mean when I say that?
13    A.  Yes, ma'am.
14    Q.  Okay.  Okay.  So I am interested in
15 learning about -- I think first one of the things
16 that you alleged in here is that part of your
17 damages are that you suffered from harsh and
18 dangerous conditions in prison.
19    A.  Yes.
20    Q.  Can you explain to me what you mean
21 by -- first of all, do you believe that the words
22 "harsh" and "dangerous" are interchangeable and the
23 same thing?
24    A.  Yes.

Page 83

1     Q.  Okay.  So then can you explain to me
2  or give me some examples of what the harsh and
3  dangerous conditions were that you suffered while
4  in prison?
5     A.  Being in one of the nation's worst
6  prisons in this country, which was Stateville
7  Correctional Center and Pontiac Correctional
8  Center, where assaults and death go on every day.
9  Only through the grace of God can you make it out
10 of there without being stabbed, beat up, robbed,
11 raped.  And you have no liberty to interact with
12 your family except for visits.  You have -- I --
13 I lost all of my teens.  No high school, no proms,
14 no nothing.  All of my 20s.  All of my 30s.  Half
15 of my 40s for a crime.
16         And I had to watch my grandmother
17 pass away during my first trial.  I had to live
18 with the fact that my dad passed away on my
19 birthday, July 25th, 1986.  I watched my family
20 being torn apart.  I could do nothing.
21         And my marriage of ten years to my
22 wife while I was in prison, not knowing when I
23 would ever come home.
24         And the fact that I actually --

Page 84

1  I felt like a slave through no freedom or liberty
2  and knowing that I had done nothing wrong.  And I
3  could never understand why I had to be subjected
4  to that.  And I never did not believe that the
5  defendants did not know that I was innocent.
6         And to be in prison -- and nobody
7  here at this table know what it's like to be a
8  slave, but I do, because I had to work in there.
9  Either you work or you stayed locked up.  And
10 locked up means you be in your cell 23 hours a day.
11 Being in solitary confinement.
12    Q.  How often were you in solitary
13 confinement?
14    A.  Off and on.  Maybe four or five times.
15    Q.  And for how many days per time?
16    A.  A couple weeks sometime.  30 days
17 sometime.  90 days sometime.  And sometimes when
18 they have lockdowns, that becomes solitary
19 confinement because you cannot move, you cannot buy
20 nothing to eat, you cannot -- you don't have no
21 visits.  You don't have anything.  You don't have
22 no phone calls.  You have nothing.
23    Q.  I'm sorry --
24    A.  And that can be as long as a year --

Page 85

1     Q.  Okay.
2     A.  -- you know, that --
3     MR. BOWMAN:  I'm not sure he's finished his
4  answer.
5     MS. SCHROEDER:  That's fine.  I didn't mean
6  to interrupt him.
7     THE WITNESS:  It can be as long as a year.
8  Well, I've been on so many lockdowns, because of
9  assaults that take place.  Three months, six
10 months.  I know it's well documented in the media
11 about those prisons that I was in.  And I lost
12 everything.
13 BY MS. SCHROEDER:
14    Q.  Were you ever sent to solitary aside
15 from a prison-wide lockdown?
16    A.  Yes.
17    Q.  Okay.  Tell me about those times.  Tell
18 me -- first of all, how many times did that occur
19 to you?
20    MR. TAYLOR:  Objection; asked and answered.
21    THE WITNESS:  I don't remember exactly how
22 many, but I -- you know, it's been quite a few.
23 And one of the main reasons that I was sent to
24 solitary confinement because I was an advocate for

Page 86

1 those inside of the prison system. And sometimes
2 the administration did not want you to interfere
3 with that. So I've been in administrative seg.
4 I've been what they call the circuit, meaning they
5 transfer you every three, four weeks to different
6 prisons because they -- you're just not supposed to
7 care about another human being in there.
8         And I -- my attorney at the time,
9 Ted Gottfried, who was a state public defender of
10 the state public defender's office, he -- he's like
11 my guardian angel because many times that I got
12 involved in things that did not concern me, he was
13 there to help me through it, meaning that -- when
14 Hurricane Katrina happened, some prisoners got
15 together and raised money for those people, Red
16 Cross. And some of it's accepted and some of it's
17 not by the administration or the department of
18 corrections itself.
19         Saving somebody from -- I was on a
20 crisis team in prison. When people tried to commit
21 suicide and things like that, they would send me to
22 help them.
23 BY MS. SCHROEDER:
24     **Q.   So you were put into solitary**

Page 87

1 **confinement because of the Red Cross and Hurricane**
2 **Katrina?**
3     A.   That's not what I --
4     **Q.   -- and the crisis?**
5     A.   That's not what I said. I said --
6     **Q.   Okay. That's the question I'm asking.**
7     MR. TAYLOR:  Objection.
8     THE WITNESS:  What I'm saying is -- what I'm
9 saying to you is --
10     MS. SCHROEDER:  Well, I just had to clarify
11 that that answer was not directed to you.
12     THE WITNESS:  I was put in pris- -- I was put
13 in solitary confinement for helping other inmates
14 with legal situations and --
15 BY MS. SCHROEDER:
16     **Q.   Okay. Can you explain to me what that**
17 **was?**
18     A.   Yes. You had a grievance against
19 officers or you had a grievance against the
20 administration, I was in the law library, and I
21 became your advocate, whether it's to write your
22 grievances and your complaints. At the time I was
23 in prison, you had very limited -- you had very
24 limited access to the court system, outside

Page 88

1 advocates.
2         And as I think back in juvenile now,
3 we were protesting about the treatment of some of
4 the officers, and they came and got me in IYC
5 Joliet and stripped me down to my underwear and put
6 me in a cold cell with no blanket. So I had to rip
7 open the mattress and get inside the mattress in
8 order to protect me from the cold. They left me
9 there seven days.
10     **Q.   And why were you -- I didn't**
11 **understand. Why were you placed in there?**
12     A.   We had a protest against the off- --
13     **Q.   Or what do you -- yeah. Tell me what**
14 **you learned on why you were put there.**
15     A.   Because we protested the treatment that
16 we was receiving --
17     **Q.   Okay.**
18     A.   -- by some of the officers.
19     **Q.   Okay. And what year did this happen?**
20 **You were at Joliet, you said?**
21     A.   IYC Joliet. That's a --
22     **Q.   What is it?**
23     A.   That's a maximum security for
24 juveniles.

Page 89

1     **Q.   Okay. Okay. Do you remember the year?**
2     A.   '77 or '78.
3     **Q.   Okay. And then are there any other**
4 **times that you can recall that you were placed in**
5 **solitary confinement? Yeah.**
6     A.   It's been a lot of times. Quite a few
7 times.
8     **Q.   Okay. Can you remember any specifics**
9 **about any of these other times?**
10     A.   If I do, I'll recall it as we go along.
11 Not at this moment.
12     **Q.   Okay. Okay. Just let me know if you**
13 **remember anything.**
14     A.   Yes, ma'am.
15     **Q.   Okay.**
16     MR. TAYLOR:  Excuse me. But he was in the
17 middle of describing -- you had asked him about his
18 damages, and he was --
19     MS. SCHROEDER:  No.
20     MR. TAYLOR:  -- he was describing it, and
21 then you interrupted him in the middle.
22     MS. SCHROEDER:  Oh, my gosh, Flint. No.
23 I asked him about --
24     MR. TAYLOR:  I want to -- I just want to find

Page 90

1 out if he was finished with his answer.  I don't
2 want the record to look like he stopped telling
3 you --
4       MS. SCHROEDER:  I can promise you I'm not
5 done.
6       MR. TAYLOR:  -- in response to your question
7 about it.
8       MS. SCHROEDER:  I'm not done, Flint.  And I
9 specifically said I wanted to talk about the harsh
10 and dangerous con- -- harsh and dangerous
11 conditions.
12       MR. TAYLOR:  And he hadn't finished that
13 answer yet as far as I could tell.
14       MS. SCHROEDER:  I could tell that he had
15 moved on because I asked him, and he said no,
16 that's not what he was referencing.
17 BY MS. SCHROEDER:
18    **Q.   So, Mr. Savory, we're going to continue**
19 **on, and we're going to talk about all the damages**
20 **you list in here.  So there should be no concern**
21 **that I'm not going to let you have the opportunity**
22 **to put on the record what you had to endure in**
23 **prison.  Okay?**
24 **        And if there is something that**

Page 91

1 **somehow we don't get to, you just let me know, and**
2 **you'll be able to put it on the record.  Okay?**
3    A.   Yes, ma'am.
4    **Q.   Okay.  So -- so just moving on, making**
5 **sure I've got everything, is everything that you've**
6 **just told us in these last answers cover the**
7 **specific harsh and dangerous -- dangerous**
8 **conditions that you endured in prison?**
9 **            And I'm going to get to all the**
10 **other stuff.  So I'm just looking for this specific**
11 **thing that you allege in your complaint.**
12    A.   I can't echo enough that being in
13 Stateville and Pontiac Correctional Centers was the
14 most dangerous prisons in this -- in this entire
15 country.  And facing with constant shooting from
16 the guards to protect other inmates, watching
17 people get shot and stabbed on a daily basis,
18 watching people -- hearing screams of people being
19 raped or abused, I have interceded on quite a few
20 people's behalf to stop it.  And not ever being a
21 part of a gang no time in my life, I didn't even
22 understand how I was able to do it.  All I know is
23 that I would not allow prison to desensitize me
24 from caring because it was so -- it was so brutal

Page 92

1 that there's really no words to describe other than
2 what I described.
3        And I had to be in that environment.
4 And it was never pretty.  I had to be denied.  I
5 had an incident -- my father came to see, me and
6 he's -- he's older.  He's like late 60s.  And I
7 went up to the visiting room.  And he wear glasses.
8 So he went in the wrong bathroom.  He went in the
9 ladies' bathroom because he couldn't see.  And
10 there was a group of white officers standing around
11 laughing.  And I didn't know what they was laughing
12 at until I walked over.  And they was laughing
13 about an old black man that went in the women's
14 bathroom.
15        And I leaned down and I whispered
16 to the officer, Stop laughing at my dad.  He felt
17 threatened.  So they called security.  Security
18 came and let me continue my visit.  And then after
19 the visit, they took me to jail, segregation inside
20 of it.
21        And I went before the judiciary
22 committee -- the disciplinary committee.  And they
23 asked me did I threaten the officer.  I told them
24 not to laugh at my dad.  I said, They could have

Page 93

1 just got up and showed him that he went in the
2 wrong bathroom.  Why would you stand around
3 belittling him?
4        And the disciplinary committee threw
5 out the ticket and let me go.  And I had the
6 officer removed from the visiting room.
7        But they subjected your family
8 members to some just uncaring behavior.  Over
9 excessive with strip searching your mom.  My
10 godmother, she had never had nobody touch on her.
11 And it's a lot.  It's very intrusive.  It's
12 intrusive for your family.  It's intrusive for you.
13        It's -- but it didn't have to happen
14 because I shouldn't have never been there in the
15 first place to be subjected to all that and more.
16 But when they don't consider you a human being,
17 I guess treat you any kind of way.
18    **Q.   Did you get in trouble for ripping that**
19 **mattress up so that you could crawl into it?**
20    A.   No.
21    **Q.   Okay.  Is there anything else --**
22 **because I feel like even if I ask specifically,**
23 **we're kind of going over all the things that you've**
24 **endured all while you were imprisoned.**

Page 94

1    So is there anything else about your
2 experiences in prison that you have not shared with
3 us yet?
4    A.   No.  Only thing I ever said that when
5 it come to damages, the loudest voices that will
6 ever speak in this case will be those people who
7 love me who are now gone.  And I never got a
8 chance to fulfill our relationships; meaning my
9 grandmother, my dad, my sister -- my two sisters
10 are gone.  And that time can never be -- it's
11 probably to me is the most horrific thing that I
12 had to go through is knowing that I would never be
13 able to do that again.  So yes.
14    Q.   Okay.  You said here that you, while
15 in prison, interceded on people's behalf who were
16 being maybe -- I'm not really sure what they were
17 doing, if they were being hurt or attacked.  Maybe
18 you can explain to me what you meant by interceding
19 on other people's behalf.
20    A.   Well, since you already have some
21 of the IDOC records, it was a young man who I'd
22 helped get out of the gang.  I was in, I believe,
23 Galesburg Correctional Center.  And I had just got
24 married.  I think it was maybe two years after I

Page 95

1 got married.  And I was on a visit.  And the gang
2 had let him out because he was in school.  His
3 grandmother was confined to a wheelchair.  His
4 sister was murdered.
5    And while I was on a visit, a
6 Latino, Hispanic gang dragged him in the cell and
7 beat him up and held him in his cell.
8    When I came off a visit, I -- they
9 told me what happened, and I went up to the cell to
10 get him.  And they told me, This is none of your
11 affair.  I asked them again to let me -- let me
12 have him.  Let me -- so they finally let me have
13 him.  And some other inmates took him to the
14 bath- -- washroom, was washing him up.  And then
15 they turned around and stabbed him.
16    Well, that resulted in an all-out
17 fight because we believed that they had killed him.
18 But he survived.
19    And later on that night, they came
20 and got me, took me to segregation.  Told me that
21 they had to ship me because I was an administrative
22 threat.
23    So then after that, I had to go to
24 the parole board.  And the parole board ask me,

Page 96

1 they say, Johnnie, Mr. Savory, why didn't you go
2 get the police?  I thought about it for a minute.
3 And I asked each and every one of the parole board
4 members, If someone broke through that door right
5 now and began to hurt you, do you want me to go get
6 the police, or do you want me to stop it from
7 taking place?
8    Q.   What did they say to you?
9    A.   They wanted me to stop it.
10    Q.   Do you remember which one -- when this
11 was?
12    A.   1994, '95, somewhere like that.
13    But some things you have to do
14 regardless if it -- you have to put yourself in
15 harm's way.  And throughout my prison stay, I've
16 put myself in harm's way plenty of times.
17    Q.   Are you doing that to -- for other
18 people, to protect other people?
19    A.   My nature.
20    Q.   Okay.
21    A.   If someone came in here right now, and
22 we see all kind of violence, I wouldn't let nobody
23 hurt you or no one in this room.  And I would hope,
24 I would hope that the people at this table feel the

Page 97

1 same way and not let nobody hurt me.  So yeah.
2    Q.   Did you have to protect yourself while
3 you were in prison?
4    A.   Oh, most definitely.
5    Q.   Okay.  Can you tell me what sorts of
6 threats were coming at you in prison that you had
7 to protect yourself from?
8    A.   Oh.  I guess when I first arrived to
9 Joliet State- -- Joliet Correctional Center, and we
10 were going to breakfast one morning, and one of the
11 inmates was making some sexual comments.  We got
12 back to the cell house.  Because he was in a gang,
13 I guess he thought that that would be intimidating
14 enough, but ...  So he tried.  They took me to
15 jail, and they took him to the hospital.  And I
16 explained to the committee why.  After that, no
17 more.
18    Q.   Were -- did anything else -- like did
19 that, you feel, helped protect you from other
20 similar threats then when you were in Joliet?
21    A.   Yes.  You have to send a clear message
22 to other prisoners that you're not going to be no
23 victim.  Be a survivor.
24    Q.   Yeah.

JOHNNIE LEE SAVORY, 06/15/2022                    Page 98..101

Page 98

1     A.   And surviving is putting a person in
2  situations where they would have never been had
3  not, once again, they put me in a situation like
4  that.
5     Q.   Okay.  Were there any other threats
6  that you can think of that you had to protect
7  yourself from while you were in prison?
8     A.   Always have to protect yourself during
9  riots.  Always stayed out of harm's way.
10    Q.   Okay.
11    A.   You know, for the most part.
12    Q.   Um-hmm.
13    A.   Yeah.
14    Q.   Why were you ever physically harmed
15 when you were in prison?
16    A.   No.
17    Q.   Okay.  Okay.  Good.
18         So the other area that you talk
19 about in your complaint here about damages are
20 extreme physical and psychological damages.  So I
21 kind of want to separate those two out.  And just
22 let's talk first about the psychological damages
23 that you feel you suffer from the defendants'
24 misconduct.

Page 99

1              (Brief interruption.)
2        THE VIDEOGRAPHER:  Ending media 1 of the
3  deposition of Johnnie Lee Savory.
4          Off the record at 12:35 p.m.
5              (Recess taken.)
6        THE VIDEOGRAPHER:  Beginning media number 2
7  of the deposition of Johnnie Lee Savory.
8          Back on the record at 12:37 p.m.
9  BY MS. SCHROEDER:
10    Q.   Okay.  Mr. Savory, so before our break
11 there, I was just going to say I wanted to talk now
12 about the psychological damages that you say the
13 defendants' misconduct has caused you.
14    A.   Okay.
15    Q.   And you've listed out a few things in
16 here that I can -- I can like read off one, and
17 then you can tell me -- and that might be best.
18 So I'll tell you what you've alleged here in the
19 complaint, and then you can tell me what you mean
20 by that.
21         So in your allegations here, you say
22 that, you know, it continues to this day.  So I'm
23 curious about things that you're still suffering
24 from today.  And with regards to psychological

Page 100

1  pain, so you say you suffer from psychological
2  fear.
3          So can you explain to me, as you
4  sit here today in current times, what sort of
5  psychological fear you're suffering from due to the
6  defendants' misconduct?
7     A.   I live with the nightmares of what
8  happened to me, every single thing.  And it does
9  not go away, and it invokes -- because I know that
10 I'm innocent -- I give you this example.  Going to
11 the parole board, seeing the people that put you
12 there sitting on the parole board, and they deny
13 you time and time again and they tell you time and
14 time again, You don't show no remorse.  We're doing
15 this to you -- we're going to give you a two-year
16 set, a three-year set.  Those sets are because you
17 will not conform to what they want you to say and
18 do.  So that made me feel like I was back in
19 interrogation all over again every single 26 times
20 that I been to the -- to the board and knowing
21 Defendant Stenson, knowing Defendant Bowers,
22 knowing defendants -- a few others in the early
23 years that were placed there to keep me there.
24         I remember writing to Stenson.  I

Page 101

1  remember talking to him when he was -- when I was
2  in the county jail, his son was there, and his son
3  called him and he let me talk to him.  And I say,
4  You know I'm not guilty.  Why won't you help me?
5          Well, what he did was his son was
6  removed from the jail, took him to the -- over to
7  the courthouse where he was beat up at allegedly by
8  his dad.
9          But I carry many nightmares with me
10 about people who tried to help me.  And I have to
11 listen that they've been harassed or -- even the
12 Ivys, they are more of a victim than I would ever
13 be.  And I have no hatred, ill will, but I have to
14 live with all those things knowing that I've done
15 nothing wrong.  I will never escape that.
16         That's like asking the survivors of
17 the Holocaust, What's it like to go in the gas --
18 why would you ask?  Why would they even ask the
19 question?  They already know.  It's beyond any
20 words that we conceive.
21         When you hear the word "slave," you
22 know it that comes with terror, you know it comes
23 with pain, you know it comes with being damaged.
24 And I was always afraid of how damaged am I.  What

Page 102

1 would I do when I release? How would this affect
2 me how I communicate with people? Thank God that
3 I did not allow it to just become cancerous within
4 me.
5          So I chose to love opposed to hate.
6 You want me to say I did not hate them for what
7 they did to me, because I'd be lying to you. I
8 hated everything they done to me. They took things
9 from me I never can get back. I can't get my -- I
10 can't get no justice. How I'mma get justice? I'm
11 already injured. You can't reverse what you did to
12 me.
13          And then you lie in my face. You
14 tell me that you didn't do it. You tell me that
15 you didn't break my will. You talk to me like I'm
16 stupid. How the hell can I describe what it's done
17 to me? I can't describe it. It's -- it is
18 incomprehensible, and I wouldn't want my worst
19 enemy to go through it. And that's what they don't
20 understand about me. They wanted me to hate. They
21 wanted me to be vengeful. They wanted me to do
22 those things. That's why you did it to me.
23 Because you have no reason as a human being to take
24 me as a child and act like I wasn't a child. You

Page 103

1 treated me worse than you treated some adults.
2          And you say to me now you never even
3 apologized to me. And I've never seen a police
4 officer or a prosecutor after all these wrongful
5 conviction cases ever say, I'm sorry. Why? Why
6 can't you tell me you're sorry?
7          Have you been numb? I know they see
8 a lot of things on the job. I know you have a
9 tough job here doing what you're doing. I believe
10 people here at this table have families. Ain't no
11 way in the world we can look at the documents we
12 look at and see nothing other than -- I come out an
13 era in time, so we might as well be truthful.
14          I was born before civil rights
15 became a federal law in this country. And I'm not
16 giving you no racism. I'm not -- I'm telling you I
17 don't care if you black or white, if you're wrong,
18 you're wrong. And there were black involved in my
19 case who did not do their job. And in those
20 reports, you can see how I responded to them.
21          But my damage goes beyond anything
22 anyone here can imagine. Because I don't have my
23 two sisters no more. I don't have my dad no more.
24 I don't have my grandmother no more. It's their

Page 104

1 voices that speak.
2          I'm here to protect my daughter,
3 who's six years old, so she will know what her
4 daddy went through. And as long as I draw breath,
5 they will never do that to my daughter, no other
6 child nowhere. That's why I became an advocate.
7 That's why I put my story out there. But I don't
8 even tell my story. I tell other people's stories
9 because mine is too painful for me to do.
10          All right. There is no, you know,
11 number. They can't reverse what took place with
12 me. No one can. Only God can continue to heal me
13 and allow me to do the things that I do on a daily
14 basis to help other children. That's why I help.
15 Because that's therapy for me, to put myself in
16 harm way for others, to be a voice for others. And
17 I will do that all the days of my life because it's
18 the best therapy I've ever had.
19          I done spoke at all the high
20 schools, colleges. And I tell all the children to
21 keep your faith and let love -- and there's no set
22 of circumstances, whether it's rape, whether it's
23 cancer, whatever it is, if you don't keep your
24 faith, you can go through it. I've counseled men

Page 105

1 and women and children. Because if I sit up and
2 think about what you did to me, I can't accept it.
3 And I don't know no survivors that accept being
4 misused, abused, lied on, tortured. No one will
5 accept that unless they just totally strip you of
6 all your will in life.
7          Now that I've regained my will, this
8 day is about me regaining my will to stand up for
9 me and to stand up for my daughter. And that's
10 what I'm going to do.
11    Q.   Okay.
12    A.   Excuse me.
13    Q.   That's okay. I'll wait for you.
14          Let me know when you're ready. Do
15 you want to take your break now?
16    A.   No.
17    Q.   Okay. The one area I do want to talk
18 about is that you say that you suffer from rage as
19 a result of the misconduct. And so I'm curious to
20 know what you mean by that.
21    A.   Rage is something that's out of control.
22    Q.   Um-hmm.
23    A.   Through the grace of God, I control
24 what I say and do. I'm saying to you is when I

Page 106

1 think about what happened to me, the only way you
2 can express it is you have to have faith and love
3 that would allow you -- many people in my situation
4 cannot explain. I use and channel all of my
5 energy, and I'm going to say again, in love and
6 helping others. That's what you will see. That's
7 what I have done both inside and out.
8          Has it been a challenge? Yes.
9 Going to a job and being denied it? Problem.
10 Going -- and people know you and see you and they
11 put a news flash on, and people don't know what to
12 think. It's been a challenge.
13          I think I've done well for what
14 I've -- for what I've been through.
15    **Q.   Did you have episodes of rage in those**
16 **instances that you just described?**
17    A.   I have never been out of control of
18 myself.
19    **Q.   Okay.**
20    A.   When I get to a point, I know how to go
21 within myself and talk to the God that loves me.
22    **Q.   Okay. So I just want to ask then why**
23 **are you saying that you suffer from rage?**
24    A.   I'm saying I suffer from pain.

Page 107

1    **Q.   You have the word "rage." You say**
2 **specifically you suffer from rage.**
3    A.   Pain.
4    **Q.   No. The word is "rage" in your**
5 **complaint.**
6    A.   Well, you probably -- I don't --
7 I channel all of my energy with positive energy.
8 I am overwhelmed at times. I'm overwhelmed sitting
9 here. While you may hear thunder in my voice, you
10 don't feel the rattling of the thunder, but you do
11 hear and see the pain.
12          Now, if you talking about something
13 that's out of control, that's not me, and nor have
14 I displayed any attributes of being out of control,
15 hurting anyone. You do not see that, and it's not
16 written anywhere.
17    **Q.   Okay.**
18    A.   I just want to be clear. But I'm not
19 saying to you I do not get angry when I think about
20 it. Then I wouldn't be human. I'm not saying --
21 but I'm not going out making new victims. I work
22 with police officers. I work with probation
23 officers since I've been home. I never thought in
24 my life that I'd be working with the police

Page 108

1 officers, but I have. I'm a licensed security
2 officer for the state of Illinois. And we have
3 found each other when I come -- came -- travel, I
4 have learned how to befriend people despite what
5 others have done. And I do that better than most.
6          But do I cry when I'm alone? Yes.
7 Do I cry when I see my daughter thinking that she
8 might go through -- of course I do. I'm watching
9 this stuff go on every day. So are all of you.
10 You see both the pain of children being murdered by
11 parents, by strangers, stray bullets. You see
12 corruption from both politicians, police officers,
13 what have you. It's the society we live in.
14          I choose to be -- use everything
15 that I went through, all the pain, all the anger,
16 all the everything, I'm going to say again, to help
17 people. And if that rage is channelled like that,
18 that's how it's channelled. It's channelled
19 through love and through hope and help. That's my
20 rage. It's not nothing that damages another human
21 being or myself.
22    **Q.   Okay. So it's -- I get this feeling**
23 **from you that you are the type of person that has**
24 **always wanted to help others in need. Is that a**

Page 109

1 fair assessment --
2    A.   Yes.
3    **Q.   -- of you?**
4    A.   Yes.
5    **Q.   Okay. And is that even like -- was**
6 **that kind of part of your personality even before**
7 **you were arrested --**
8    A.   Yes.
9    **Q.   -- on January 25th? Okay.**
10    A.   Yes.
11    **Q.   And is it something that you would**
12 **like -- I guess maybe what I would like to know**
13 **from you is if you saw somebody in need, how would**
14 **you -- explain to me what you were seeing and how**
15 **you would help that person. And I'm specifically**
16 **talking about before you were arrested on**
17 **January 25th.**
18    A.   Well, I'll start at home.
19    **Q.   Okay.**
20    A.   Since it's going to come up anyway.
21    **Q.   Okay.**
22    A.   And I remember seeing Governor
23 Pritzker's ad, and he said how his mother was an
24 alcoholic and suffered from that disease. Well, my

Page 110

1 dad also suffered from that disease. And sometime
2 I would have to take their money. He would become
3 upset. But I would take the money and give it to
4 my school teacher, Mrs. Worthem. Little bitty
5 school teacher. She about four feet eleven. But
6 she had such an overwhelming personality.
7        And he would come up to the school
8 angry, upset. She would tell him, Go back home,
9 sleep it off. And she would give me the money
10 back, and I would take it back.
11       And sometime he would probably call
12 the police on me, say I stole the money. But I
13 would always have my school teacher, Ms. Maxine
14 Worthem, Dr. Maxine Worthem, and -- because my
15 sister, she was mentally handicapped, and when he
16 would go to work, I would have to take care of her.
17 Mind you, I'm very small. My sister was probably
18 twice as big as I was. But she was always sweet.
19       So I had to learn how to -- he
20 taught me how to braid her hair, he taught me how
21 to cook. And I would have to put her on the bus
22 before I went to school and then get back home and
23 catch that bus.
24       So I know my dad was born in 1919.

Page 111

1 And he carried a lot of pain. And I -- we don't
2 have to really revisit 1919. We know what this
3 country has been through, and thank God it has
4 changed drastically compared to that year.
5        But, yes, it started at home.
6  **Q.  Okay.**
7  A.  Me caring for my sister and my dad.
8  **Q.  Okay. So I think before we go down**
9  **that topic and -- you know, it's definitely**
10 **something we'll explore a little bit because then**
11 **it's going to get into your time before you were**
12 **arrested. It's probably a good time for us to take**
13 **a break then if that's good for everybody?**
14 THE VIDEOGRAPHER: Going off the record at
15 12:57 p.m.
16       (Recess taken.)
17 THE VIDEOGRAPHER: And we are back on the
18 record at 2:12 p.m.
19 MS. SCHROEDER: Okay. So I was just asking,
20 before we came on the record, plaintiff's counsel
21 to, one, have one --
22 MR. TAYLOR: Before you do that, can we have
23 on the record who's present in terms of the Zoom?
24 THE VIDEOGRAPHER: Will those on Zoom please

Page 112

1 state their appearances?
2 MR. ART: Same as earlier. Steve Art for the
3 plaintiff.
4 MS. PALLINI: Same as earlier for us as well.
5 MR. TAYLOR: Okay.
6 MS. PAUL: Tayleece Paul for the plaintiff.
7 MS. MILES: Emani Miles for the plaintiff.
8 MS. SCHROEDER: Okay. So, one, I'm
9 requesting that just one attorney from plaintiff's
10 team object throughout the remaining of the
11 deposition. And I'm sure that that will -- that
12 will go forward.
13       The other question I had was if
14 you're -- if plaintiff's counsel was going to
15 maintain their privilege assertions or instructions
16 telling Mr. Savory not to answer certain questions
17 due to attorney-client privilege, because if they
18 are going to maintain those privilege assertions,
19 I am going to be looking at those questions and
20 determining if we're going to do some sort of
21 motion to have Savory -- Mr. Savory answer those
22 questions and possibly have to bring him back to do
23 the deposition to have him answer those questions.
24       On the other hand, if you feel like,

Page 113

1 okay, no, we will instruct him to answer those
2 questions, then that's fine. We can go ahead and
3 get those answers on the record. But they will not
4 be taken out from the remainder of the time because
5 I will feel like we've already lost time in
6 the beginning with him asserting the privilege.
7 And now with the waiver, I don't feel like we
8 should -- the defense counsel should be punished
9 for that. So that's just our position right now.
10 MR. BOWMAN: I appreciate the heads-up. And
11 thank you for that. We took and will maintain the
12 position that to the extent a question that you
13 asked, such as -- such as, you know, relating to
14 the formulation of an interrogatory answer, to the
15 extent those questions would have called upon
16 Mr. Savory to express what was discussed in
17 conversations with his counsel as those answers
18 were formulated or to the extent the questions
19 called upon Mr. Savory to express his understanding
20 as to the status of various legal matters affecting
21 his criminal prosecution, his postconviction
22 proceedings, clemency and COI proceedings, and the
23 like, to the extent formulating those answers,
24 again, would call upon him to reveal conversations

Page 114

1 that he had with present or former counsel, it's
2 privileged.
3          And to be clear, what we asked --
4 instructed Mr. Savory was to do his best to answer
5 the questions parsing out what he could tell you
6 outside of what he'd learned in conversations with
7 lawyers.  And that's what he tried to do.
8          I told you before we went on the
9 record that if there is a specific question or even
10 a specific area from the questioning this morning
11 as to which you think we would be advised to
12 reconsider our position, I'm more than happy to
13 reconsider it.  But if it's just a general
14 proposition, Are you standing on the instructions
15 that you gave to Mr. Savory? I am confident in the
16 correctness of the instruction and will stand on it.
17          So I'm happy to discuss it further,
18 but that's our position based on what you've said
19 so far.
20     MS. SCHROEDER:  Okay.  So I think that this
21 morning I was pretty clear in a lot of the
22 questions I was asking Mr. Savory and asking for
23 information and asking whether he had anything that
24 was not privileged that he could share with us, and

Page 115

1 several dozens of questions the answers were
2 specific to attorney-client privilege.
3          I don't believe that you would want
4 to pause right now for us to review the record and
5 go through question by question to determine if you
6 will or will not waive the privilege or instruct
7 Mr. Savory to answer.  If that is not something
8 that you want to do, and -- certainly, you know, I
9 feel like I was pretty clear this morning, and I
10 don't think that it was so long ago that you don't
11 remember what I was asking.
12          So I think you're kind of in your
13 position and where you're standing, and from what
14 I got from you, Locke, is that you feel pretty
15 confident in the answers that came from Mr. Savory
16 and you feel pretty confident in your instructions
17 to him, and that you would only be persuaded if I
18 could come up with some sort of argument to
19 overcome your confidence.
20          And so I feel fairly confident that
21 I asked several, several questions that required
22 a -- or could have been answered with non-privileged
23 information.  And to the extent that they couldn't,
24 then that means we're going to have to review it,

Page 116

1 and then we're going to have to see if, you know,
2 we have to file a motion to get those answers.
3          So I feel like we're at an impasse,
4 and we're going to take a look at that after
5 today's deposition at the transcript, and then
6 we'll move from there.
7     MR. TAYLOR:  That's your prerogative.  I
8 assume that -- that's your prerogative.  And we are
9 confident in what we asserted.  And we -- at this
10 point, I would think we agree we want to proceed
11 with the deposition.
12     MR. BOWMAN:  Oh, yeah.  We definitely -- I
13 mean, you know, you're using your deposition time
14 as we sit here.  So, you know, however you want to
15 use the time.
16     MS. SCHROEDER:  Oh, I'm not -- I was going to
17 ask how much time has been used.  I'm going to tack
18 this on to the end, I believe, for this discussion
19 because I wanted to do this off the record and you
20 asked for it to be on the record.
21          So how much time has elapsed since
22 we just came on?
23     THE VIDEOGRAPHER:  Started the deposition?
24     MS. SCHROEDER:  Yeah.  Just now from lunch.

Page 117

1     THE VIDEOGRAPHER:  We went on 2:12, so --
2     MS. SCHROEDER:  Okay.  And what time is it
3 right now?  It is 2:20.  So 18 minutes.  Okay.
4     MR. BOWMAN:  I think -- I think the
5 arithmetic --
6     MS. SCHROEDER:  Oh, I'm sorry.
7     MR. BOWMAN:  -- reveals eight.
8     MR. TAYLOR:  Your math --
9     MS. SCHROEDER:  I just showed my math skills
10 there.
11          Okay.  So everybody ready?
12 Mr. Savory?
13     THE WITNESS:  Oh, yes.  I'm getting --
14     MS. SCHROEDER:  I'll wait for you now that
15 the lawyers have gotten their little -- their
16 procedural stuff out of the way.
17     THE WITNESS:  Okay.
18 BY MS. SCHROEDER:
19     Q.   Okay.  So let me flip here.
20          Mr. Savory, prior to January 26,
21 1977, did you know Marcella Teplitz?
22          And let me preface she went by the
23 name Marcella Brown.  She was Officer Marcella
24 Brown Teplitz.

JOHNNIE LEE SAVORY, 06/15/2022                    Page 118..121

Page 118

1    A.   I can't recall at this minute.  But, I
2  mean, is there something you have that can probably
3  jar my memory for that?  I can't recall at this
4  particular moment.
5    **Q.   Do you know who I'm talking about --**
6    A.   Yes.
7    **Q.   -- when I'm asking you?**
8    A.   Yes.
9    **Q.   Okay.**
10   A.   Yes.
11   **Q.   And who do you -- who do you believe**
12  **that I'm asking you about?**
13   A.   Marcella Teplitz.
14   **Q.   Um-hmm.  And so who do you know her as**
15  **when --**
16   A.   Marcella Teplitz.
17   **Q.   Okay.  And who is she to you?**
18   A.   She's a police officer.
19   **Q.   And do you know anything else about her?**
20   A.   Other than she's tried to write me and
21  come see me in prison.
22   **Q.   Okay.  And when was that?**
23   A.   Juvenile and -- I have some letters,
24  but I don't have the dates of them.  I turned them

Page 119

1  over to my attorney.  I think she was -- she wrote
2  me when she was a private investigator and she
3  wrote me -- I'm not sure as a councilwoman.  I
4  mean, she'll never write me on her official -- I
5  know -- I don't have those letters.  But I know who
6  we're talking about.  I just don't remember her
7  prior to 1977.
8    **Q.   Okay.**
9    A.   That's all.
10   **Q.   Okay.  So --**
11   A.   I'm not saying it didn't happen.
12  I'm just -- I just can recall it at this minute.
13   **Q.   Okay.  So I'm just going to ask you**
14  **about a couple things you just said.**
15       So you said you gave some letters to
16  **your attorneys --**
17   A.   Yes.
18   **Q.   -- that Marcella wrote you?**
19   A.   Yes.
20   **Q.   How many letters?**
21   A.   Three, four.  I don't remember exactly.
22   **Q.   Okay.**
23   A.   More than two.
24   **Q.   She wrote you more than two letters,**

Page 120

1  **and you gave those -- all of those letters to your**
2  **attorneys?**
3    A.   Yes.
4    **Q.   Okay.  Do you remember when she wrote**
5  **you?**
6    A.   Not exactly.
7    **Q.   Okay.**
8    A.   I would be -- I would be guessing.
9  I don't want to guess.  If I had the letters here
10  in front of me, then I could -- I would remember
11  exact date and time.  I just don't remember that.
12  You know what I mean?  And I'm -- forgive me, but
13  I'm still a little just -- little bit out of it
14  after our last -- whatever.
15       But I'm -- I can -- as we go along
16  and I remember, I will definitely let you know I
17  remember.  If I could -- if you can give me some
18  kind of situation, maybe I --
19   **Q.   Well, I guess the situation --**
20   A.   -- could, I don't know.
21   **Q.   -- I'm thinking of is you know who she**
22  **is on January 26, 1977; is that correct?**
23   A.   Of course.  I can't forget that.
24   **Q.   Okay.  Did you know her prior to that**

Page 121

1  **day?**
2    A.   That's what I'm saying.  I don't
3  remember meeting her prior to that day.  I'm not
4  gonna say it didn't happen.  I'm saying I don't
5  have no recollection of it.
6    **Q.   Okay.  Okay.  Did you ever write her**
7  **when you were in prison?**
8    A.   I don't remember.  I could have.
9    **Q.   Okay.**
10   A.   I could have responded to one of her
11  letters.
12   **Q.   Okay.  So you think you responded to**
13  **her?**
14   A.   Oh, ain't no doubt.  I probably wrote a
15  letter back saying whatever I said.
16   **Q.   Okay.  Did you ever just write to her**
17  **on your own --**
18   A.   No.
19   **Q.   -- unprompted?**
20   A.   No.
21   **Q.   Okay.  And do you know how many times**
22  **you wrote her?**
23   A.   I do not.
24   **Q.   Okay.  Do you think you wrote her more**

JOHNNIE LEE SAVORY, 06/15/2022                                    Page 122..125

Page 122

1  than once?
2     A.   I could have.
3     Q.   Okay.  Do you think you wrote her more
4  than twice?
5     A.   I mean, I could have based on the
6  letters that she wrote me.
7     Q.   Okay.
8     A.   The last time I seen Marcella Teplitz
9  was, I believe, on an interview with Phil Rogers in
10  1998, Channel 5.
11     Q.   I'm sorry.  On a what interview?
12     A.   On a TV interview.
13     Q.   Oh, a TV interview.  I just didn't hear
14  the --
15     A.   Yeah.
16     Q.   I didn't hear.  And what --
17     A.   Phil Rogers.
18     Q.   Phil Rogers.  Is that the reporter?
19     A.   Yeah.
20     Q.   Okay.  And what year was this?
21     A.   I believe 1998.
22     Q.   So was this just an interview you saw
23  on TV; it wasn't something you participated in?
24     A.   No.  It had something to do with my

Page 123

1  parole hearing, though.
2     Q.   It did.  Okay.
3     A.   Yes.
4     Q.   Okay.  Were you -- did you see her in
5  person in relation to this interview, or no, you
6  just --
7     A.   I don't --
8     Q.   -- saw her on television?
9     A.   I don't -- yes.
10     Q.   Okay.  Do you remember what she said on
11  that television news program?
12     A.   No.  No, I don't.
13     Q.   Okay.  Do you remember if this was
14  before or after you had exchanged letters?
15     A.   After.
16     Q.   It was after.
17     A.   I believe.
18     Q.   Okay.  And then I think you said that
19  you thought that she had tried to visit you in
20  prison; is that correct?
21     A.   Yes.
22     Q.   Okay.  When was this?
23     A.   I believe while I was in juvenile.
24     Q.   Okay.  And did she visit you?

Page 124

1     A.   No.
2     Q.   No.
3          How do you know that she tried to
4  visit you then?
5     A.   I think my counselor told me that she
6  was trying to visit me, but I didn't want to --
7  I didn't want to see her.
8     Q.   Who's your counselor?
9     A.   Oh, God, I don't remember.  In juvy,
10  juvenile.
11     Q.   When you say "in juvenile," where do
12  you mean physically?
13     A.   I mean IYC Joliet.
14     Q.   Okay.  And you had a counselor there?
15     A.   Several.
16     Q.   Several.
17          And one of your counselors told you
18  that Marcella Teplitz was trying to visit you?
19     A.   Yes.
20     Q.   Okay.
21     A.   Because you had to go through the
22  counselors to have visits.
23     Q.   And what did you say to your counselor?
24     A.   I don't want to see her.

Page 125

1     Q.   And why not?
2     A.   Why not is the fact that when I was in
3  the station being questioned with two and three
4  officers at a time, none of them seemed to care.
5  None of them really seemed to want the truth.  And
6  every time I would say something, they would tell
7  me that I was wrong, and would I -- could it be
8  something else.  Could it be this?  Could it be
9  that?
10          And I was never equipped to sit down
11  and talk to three -- two and three people at the
12  same time.  And she was one of those people.  And I
13  did not -- I could not understand why adults would
14  be sitting there, and they say Officer Friendly
15  would help you.  Officer Friendly would not lie to
16  you or hurt you or do any of that.  And I feel like
17  they did not want the truth, and I feel like I
18  became -- as my will slowly left me, it's like I
19  had no -- no voice, no one who was listening to me.
20          And she was one of those people.
21  And I just felt overwhelmed by their questioning.
22  It made it hard for me to remember things.  It made
23  it hard for me to answer.  I just couldn't -- I
24  didn't know how.  I just didn't know how.

JOHNNIE LEE SAVORY, 06/15/2022                    Page 126..129

Page 126

1    I didn't know -- like everything
2 changed when they told me that first that, This may
3 be something you can help us with. Maybe you can
4 help us remember what you saw or what you heard
5 that day. But that went from me helping them to
6 them hurting me. And I didn't understand why. If
7 that makes sense, you know.
8        So I began to reach a point where I
9 didn't want to talk to any of them. And I began to
10 express that. And that didn't make them happy.
11 That made them angry with me or telling me I was
12 backtracking, I was -- you sure you're not
13 confused? And I didn't understand. And to this
14 day I really don't understand. When I say
15 "understand," why, because it seemed like I became
16 from someone to help to someone that was a suspect.
17 I don't get that. I don't understand it.
18        And a lot of things that went on,
19 I just like -- it's hard to believe that adults,
20 I say again, were not targeting anyone but the people
21 that questioned me. Why me?
22    Q.   So this is the reason why you didn't
23 want to see her at Joliet; is that correct?
24    A.   Yes.

Page 127

1    Q.   Okay. What changed for you to start
2 writing her letters?
3    A.   No, nothing changed. Because when she
4 wrote me letters, I wrote her back, and I said,
5 Well, you know I'm innocent. Why don't you help
6 me?
7        Same way I wrote to Captain Stenson.
8 He was Lieutenant Stenson. Same flavor. I wrote
9 him letters. I'm sure you -- you may have a copy,
10 may not have a copy. But I'm sure my attorneys
11 will provide it.
12        I have did something most people in
13 my situation would never do. I sit down. I tried
14 to read the police reports and understand them, but
15 I couldn't. But I would call people try to
16 understand what happened to me. And I asked them
17 personally, Why won't you help me? I am not guilty.
18        I also wrote to the victims' mother
19 and told her, I did not take your children's life.
20    Q.   Why did you write her?
21    A.   What you mean why?
22    Q.   I'm asking you.
23    A.   That's what I'm saying. I'm innocent,
24 and I need help. So I was never afraid to ask for

Page 128

1 help. And I asked for help from the people that
2 was involved in this case with me. Because I
3 couldn't believe they thought that I was guilty.
4 I don't even know how they even drew the
5 inclination that I was guilty of taking two
6 people's lives as though I was some kind of
7 magician.
8    Q.   So you have no idea why they thought
9 this?
10    A.   No. How could I? I was five feet
11 tall, 110 pounds. And you got me killing an adult
12 and another teenager. How? When did I become so
13 skilled, so strong that I could overpower two human
14 beings and not have a scratch, not leave a
15 fingerprint, not leave an ounce of blood, nothing.
16 I just want to know how. And I just want somebody
17 here to tell me just how do you do that.
18    Q.   So -- so let's think, right, the true
19 killer, was there -- there was no fingerprints of
20 anybody that could have been the true killer; is
21 that right?
22    A.   I wouldn't --
23    Q.   So didn't that person also not leave
24 any fingerprints?

Page 129

1    A.   I wouldn't know. I don't know what
2 they found in the home. But what I read that they
3 found, oh, I'm sure they had a lot of things they
4 could have turned to if now that's what you want to
5 know. I can remember some of the police reports
6 that I read that truly indicated that someone else
7 committed this crime.
8    Q.   What was it that you read that you
9 believe indicated someone else committed the crime?
10    A.   Okay. The police say when they showed
11 up at the house, the stepfather was there. They
12 said that they couldn't enter the house because the
13 dog wouldn't let them in. But the stepfather could
14 enter the house, and he could come in. He had
15 scratches and welts under his eyes, and I -- if I'm
16 not mistaken -- I don't remember who the officer's
17 name was. He said he asked him about the marks and
18 the weps -- welts under his eye as well as the
19 mother did. And they just totally ignored that.
20        There's the Schwartz family; white
21 mother with two children who identified the
22 perpetrator coming out of the house, five foot
23 eleven, 200-some pounds. Each child identified
24 something that belonged there. I would never be

Page 130

1 five foot eleven, 200 pounds.
2      So I feel like the police had a lot
3 of other people they could have turned to --
4      **Q.   Do you have a belief that the police**
5 **officers did not investigate anyone else?**
6      A.   I believe --
7      MR. TAYLOR:  Objection.  I think we're
8 going -- going into his belief?
9      MS. SCHROEDER:  Um-hmm.
10     MR. TAYLOR:  Seems to me that we want to
11 deal -- that's an objectionable question in terms
12 of form.
13     But you may answer.
14     THE WITNESS:  I believe that our police
15 department had more than enough knowledge,
16 scientific people to find the real perpetrator
17 that did this.  Yes, I believe that.
18 BY MS. SCHROEDER:
19     **Q.   Do you have a thought on who you**
20 **believe is the real killer of James Robinson and**
21 **Connie Cooper?**
22     MR. TAYLOR:  Objection; form.  Excuse me.
23 Form.  Foundation.
24     THE WITNESS:  I knew what was said in our

Page 131

1 community.  I know that.  I knew when I
2 read the police reports for myself how the victims'
3 stepfather was heavily involved in -- and I -- I --
4 all I could do was base it off of what I was able
5 to read.  And then I wondered why he was never
6 interrogated like they interrogated me.  I wondered
7 why they didn't take his blood samples and --
8 things they done to me why you didn't do that to
9 him when he was probably the original suspect in
10 this case.
11 BY MS. SCHROEDER:
12     **Q.   Would it surprise you to learn that**
13 **he -- they did do that to the stepfather?**
14     A.   Did what to him?
15     **Q.   They took hair samples and blood**
16 **samples.**
17     A.   I have no -- I have no knowledge.
18 Didn't never read that a day in my life that they
19 took those things from him.
20     **Q.   Okay.  So you're not -- so because you**
21 **were just expressing your knowledge that they did**
22 **not, so --**
23     A.   I said based on what I read.
24     **Q.   Based on what you read.**

Page 132

1      A.   What they provided.  Only thing they
2 provided me was that.  They never provided us with
3 any of that evidence.  I've never read it from no
4 file that they have ever given me.
5      Now, if it was left out, then that
6 would have probably gave me another outlook.  But I
7 have no -- unless you could show me right now where
8 they did that, then my thoughts remain the same.
9      **Q.   Okay.  Did you know that there were DNA**
10 **tests that excluded the stepfather?**
11     MR. TAYLOR:  Objection.  It seems like
12 we're -- you're using him to argue the case, and
13 you're going back and forth.
14     MS. SCHROEDER:  Why are you doing these
15 speaking objections, Flint?
16     MR. TAYLOR:  Because I think it's appropriate
17 in terms of the questions that you're asking at
18 this point.  And I think that it's -- that it's
19 an inappropriate way to deal with questioning a
20 witness --
21     MS. SCHROEDER:  He's the plaintiff.
22     MR. TAYLOR:  -- on the facts in the case.
23     MS. SCHROEDER:  He's the plaintiff in the
24 case bringing the lawsuit, making the allegations

Page 133

1 in a how-many-page complaint of which several of
2 these questions that I'm asking are in this
3 complaint.  Specifically then talk about the true
4 killer being the stepfather.  It talks about in
5 this complaint that the DNA evidence has indicated
6 that Mr. Savory is innocent and that the stepfather
7 is allegedly the true killer or points to him.  And
8 these are things that I am asking the person who's
9 bringing the lawsuit.
10     MR. TAYLOR:  You know, let's take a break.
11 We'll discuss your approach to this case, we'll
12 collectively.  And we'll be back in a few minutes.
13     THE VIDEOGRAPHER:  We're going off the record
14 at 2:38 p.m.
15     MS. SCHROEDER:  So I'm just going to say I do
16 have a question pending, so I would -- I'm asking
17 you not to discuss the answer to that question
18 during this time.
19     MR. BOWMAN:  That's fine.
20     MS. SCHROEDER:  Thank you.
21     MR. BOWMAN:  We won't do that.
22     (Recess taken.)
23     THE VIDEOGRAPHER:  We are back on the record
24 at 2:48 p.m.

Page 134

1    MS. SCHROEDER: Okay. Thank you.
2    Mr. Court Reporter, can you read me
3 back my last question, please?
4              (The record was read as follows:
5              Q. Did you know that there were
               DNA tests that excluded the
6              stepfather?)
7    THE WITNESS: Yes.
8 BY MS. SCHROEDER:
9    **Q.   And what were your thoughts about that**
10 **when you learned that those tests excluded the**
11 **stepfather?**
12   MR. TAYLOR: Objection; form, foundation.
13   THE WITNESS: I just left it alone. I
14 don't -- I'm not an investigator. I'm not a police
15 officer. I took what I -- what was provided with
16 me and to me, and I tried to figure out what
17 happened to me. And that's about the best way I
18 can sum it up.
19         And now I'm through with it. I just
20 don't -- there's nothing else I can do with it. If
21 DNA excluded them, I'm not the person to argue
22 against.
23 BY MS. SCHROEDER:
24   **Q.   But are you the person that has been**

Page 135

1 **saying that the stepfather is the true killer?**
2    A.   I'm the person that they provided
3 information for to do it.
4    **Q.   I'm sorry?**
5    A.   I'm the person that echoed what was
6 provided to me that I --
7    **Q.   And who provided you this information?**
8    A.   The records, the transcripts, the
9 police reports, and things of that nature.
10   **Q.   And from that information you**
11 **determined that the stepfather was the true killer?**
12   A.   Yes.
13   **Q.   Okay. Is there anything else besides**
14 **what we've just talked about that you are relying**
15 **on to support your belief that the stepfather is**
16 **the true killer?**
17   A.   No, ma'am.
18   **Q.   Okay. Mr. Savory, can you please tell**
19 **me everything you remember doing on January 17th,**
20 **1977? And trust me, we'll end up looking at**
21 **reports, but I would like to know what your memory**
22 **is right now without those reports.**
23   A.   I remember getting up.
24   **Q.   What time did you get up, sir?**

Page 136

1    A.   I don't -- I don't remember --
2    **Q.   You don't remember?**
3    A.   -- what time I got up at this point.
4    **Q.   Did you have a usual time that you**
5 **would wake up in the mornings in that timeframe?**
6    A.   No, ma'am, because school didn't start
7 till 3:30.
8    **Q.   Okay.**
9    A.   So --
10   **Q.   Did you usually wake up on your own, or**
11 **did -- did someone have to wake you up?**
12   A.   No. I could wake up on my own.
13   **Q.   You would wake up on your own?**
14   A.   Yes, ma'am.
15        I know I --
16   MR. TAYLOR: Johnnie, there's no question
17 pending right now.
18   THE WITNESS: Oh, I thought it was.
19 BY MS. SCHROEDER:
20   **Q.   Do you have a best guess as to what**
21 **time you may have woken up on that morning of**
22 **January 17th?**
23   MR. TAYLOR: Objection. I don't think we
24 should be in the business of guessing. Objection;

Page 137

1 form, foundation.
2    THE WITNESS: I don't -- to be honest, I
3 don't remember what time I actually woke up --
4    MS. SCHROEDER: Okay.
5    THE WITNESS: -- to be honest with you.
6 BY MS. SCHROEDER:
7    **Q.   Was anybody in your home when you woke**
8 **up that day?**
9    A.   My dad.
10   **Q.   Okay. Anyone else?**
11   A.   No, ma'am.
12   **Q.   Where was your sister?**
13   A.   I don't remember. I don't know if she
14 was with -- I don't -- I just don't remember where
15 she was at that point.
16   **Q.   Was she living with you then?**
17   A.   Yes.
18   **Q.   Okay. But you remember that on the**
19 **17th she was not at your house?**
20   A.   No, I'm not saying that. She could
21 have been to school. My dad could have put her on
22 the school bus or whatever. She went to the school
23 in the morningtime. So when I woke up -- you asked
24 me about when I woke up.

JOHNNIE LEE SAVORY, 06/15/2022                    Page 138..141

Page 138

1    Q.   Correct.
2    A.   She was gone. So I don't know exactly
3  where she at, but I assume she was in school.
4    Q.   Got it. Okay.
5         So it's not that she wasn't living
6  there with you, she just wasn't in the home --
7    A.   Exactly.
8    Q.   -- when you woke up?
9    A.   She -- yes.
10   Q.   Okay. What time did she go to school
11 in the morning?
12   A.   Normally -- kind of early, like 7:30,
13 8:00 o'clock, something like that.
14   Q.   And how did she get to school?
15   A.   Bus came and picked her up.
16   Q.   Okay. And where was the bus at? Was
17 it a private -- excuse me. Sorry about that.
18        Was it a private bus that would pick
19 her up?
20   A.   Peoria Association for Retarded
21 Citizens.
22   Q.   Okay. Did she go to school every day?
23   A.   Yes.
24   Q.   Okay. And how long did she -- was her

Page 139

1  school day?
2    A.   From 8:00 to 3:00 or 4:00 when the bus
3  come back.
4    Q.   Okay. Did she have a usual time when
5  she would come home from school?
6    A.   Yeah. That's what I just said, 3:00 or
7  4:00.
8    Q.   3:00 or 4:00.
9    A.   Yeah.
10   Q.   Okay. And would someone have to pick
11 her up from the bus stop at the end of the school
12 day?
13   A.   Yes.
14   Q.   Okay. And who would do that?
15   A.   Either my dad most of the time because
16 I went to school at 3:30.
17   Q.   Okay. Was your grandmother living with
18 you at this time?
19   A.   Off and on.
20   Q.   Okay. And this grandmother that was
21 living with you, was she your dad's mom or your
22 mom's mom?
23   A.   My dad's mom.
24   Q.   Okay. And I heard you earlier say you

Page 140

1  had another sister; is that correct?
2    A.   Yes.
3    Q.   Okay. Can you tell me her name,
4  please?
5    A.   Mavis.
6    Q.   And what is her last name?
7    A.   Jackson.
8    Q.   In the birth range -- is she also
9  your -- your sister Louisa, is she a sister to
10 her as well?
11   A.   We have the same mother, different
12 fathers.
13   Q.   Okay. And did Mavis live with you?
14   A.   No.
15   Q.   Okay. Where did Mavis live?
16   A.   Mississippi.
17   Q.   Was she living in Mississippi in 1977?
18   A.   Yes, ma'am.
19   Q.   Okay. And she's -- and, I'm sorry,
20 I can't re- -- is she still living now?
21   A.   No.
22   Q.   She passed. Okay.
23        Did she ever live in Illinois?
24   A.   Not to my knowledge.

Page 141

1    Q.   Okay. Did you ever live with Mavis?
2    A.   No.
3    Q.   Okay. Did you keep in touch with her,
4  though, as you were growing up?
5    A.   Yes.
6    Q.   Okay. How did you keep in touch with
7  her?
8    A.   Visit.
9    Q.   I'm sorry?
10   A.   Visit.
11   Q.   A visit. When would you visit her?
12   A.   I don't remember the exact time and
13 date. But when we would go down south, we would
14 visit each other.
15   Q.   And who would you go down south with?
16   A.   Other family members.
17   Q.   Which other family members?
18   A.   Aunt. Uncle.
19   Q.   Are these your aunt and uncle on your
20 mom's side?
21   A.   Dad.
22   Q.   Your dad's side.
23        Were your aunt and uncle -- when you
24 say "aunt and uncle," are they a married couple?

JOHNNIE LEE SAVORY, 06/15/2022                    Page 142..145

Page 142

1    A.   Yes.
2    Q.   Okay.  And what are their names?
3    A.   My aunt name is Martha Williams.
4  That's my dad's sister.  My uncle name, I don't
5  remember.
6    Q.   Okay.  Did they live in Peoria?
7    A.   Yes.
8    Q.   Okay.  Did they live with you?
9    A.   No.
10    Q.   Okay.  Okay.  So -- so you wake up,
11  and your dad's there.  Tell me what else you can
12  remember.
13    A.   I ate something.  And I got my clothes
14  ready for school.
15    Q.   Did you eat at your house?
16    A.   Yes.
17    Q.   Okay.  And who made you the meal?
18    A.   My dad.
19    Q.   What was it?
20    A.   I don't remember.
21    Q.   And then you said you got ready for
22  school; is that correct?
23    A.   Yes.
24    Q.   What does that mean?

Page 143

1    A.   My clothes.
2    Q.   So like did you -- you changed your
3  clothes, is that what you're saying?
4    A.   No.  I went and got the clothes that I
5  was going to wear.
6    Q.   Okay.  And what else did you do?
7    A.   Waited for the time to get on the bus
8  and head out.
9    Q.   Okay.  What time did you catch the bus?
10    A.   I believe around about 3:00 o'clock.
11  Between 2:45 and 3:00 o'clock.  Sometime 2:30.
12  Depend on when the bus got there.  Didn't arrive
13  all the time at the same time.
14    Q.   What was the -- do you remember the bus
15  stop?
16    A.   No.  No.  It's on the corner of my home
17  at that time.
18    Q.   And --
19    A.   The corner of the block.
20    Q.   Can you tell me what the corner is?
21    A.   My address was 1011, I believe, West
22  Hurlburt Street or West or South Hurlburt Street,
23  one of them.  It was only like a couple of houses
24  down, the bus stop.

Page 144

1    Q.   Okay.  Did you do anything else prior
2  to going to school on the 17th that you can
3  remember?
4    A.   No, ma'am.
5    Q.   Okay.  Do you remember that you just
6  stayed at your house all morning and afternoon
7  until you caught the bus?  Is that your memory
8  right now?
9    A.   Yes.
10    Q.   Okay.  Did you do anything else to get
11  ready for school other than getting clothes on?
12    A.   Not that I recall.
13    Q.   Any homework?
14    A.   I don't remember doing homework.
15    Q.   Okay.  And can you tell me the name of
16  your school that you were attending at this time?
17    A.   Late Afternoon High School.
18    Q.   Okay.  And you said what time did you
19  start?
20    A.   3:30.
21    Q.   Until what time does it end?
22    A.   About 6:15, 6:30.
23    Q.   Okay.  And is this an alternative
24  school --

Page 145

1    A.   Yes.
2    Q.   -- for children?
3    A.   Yes.
4    Q.   Okay.  And can you tell me how long
5  had you been going to this school at this time in
6  January 1977?
7    A.   I don't remember at this moment.  I
8  don't remember the exact -- how long I went there.
9  I want to say a little less than a year.
10    Q.   Okay.
11    A.   You know, something like that.
12    Q.   Okay.  And do you know why you were
13  attending that school?
14    A.   Yes.
15    Q.   Why?
16    A.   I was expelled from Loucks Elementary
17  School.
18    Q.   Okay.
19    A.   Or middle school, rather.
20    Q.   Okay.  Why were you expelled?
21    A.   I refused to let the principal
22  discipline me with a paddle.
23    Q.   Okay.  So tell me about that incident.
24    A.   From what I remember, he called me to

JOHNNIE LEE SAVORY, 06/15/2022                    Page 146..149

Page 146

1 the office. I don't remember what reason he wanted
2 to discipline me. But he became, because I didn't
3 allow him to discipline me, became very angry. So
4 I ran off from school, and I ran to get my dad, who
5 was working at a hospital.
6     Q.   And then the school expelled you for
7 leaving the premises?
8     A.   Yeah. They called the truant officer.
9 He met me and my dad at the hospital.
10    Q.   Okay.
11    A.   And we came back with the truant
12 officer to the school.
13    Q.   Okay. Do you remember who the officer
14 was?
15    A.   No.
16    Q.   Okay. Was it a man?
17    A.   Yes.
18    Q.   Okay. Was it a Peoria police officer?
19    A.   I don't think so.
20    Q.   Okay. Okay. So then you're expelled.
21 And then do you have go to Late Afternoon School;
22 is that correct?
23    A.   Yes. Yes.
24    Q.   Had you been expelled prior to that

Page 147

1 before --
2     A.   No.
3     Q.   -- like at any other school?
4     A.   Not that I recall.
5     Q.   Okay. So this incident was the first
6 time you remember being expelled?
7     A.   Yes.
8     Q.   Okay. And is that all you can remember
9 about that incident?
10    A.   Yes.
11    Q.   Okay. So did you catch the bus that
12 day to go to school then on the 17th?
13    A.   Yes, ma'am.
14    Q.   Okay. So take me from there then. Did
15 you catch the bus alone?
16    A.   Yes.
17    Q.   Okay. And where did you go?
18    A.   To school.
19    Q.   And do you remember where your school
20 was located?
21    A.   On Washington Street.
22    Q.   Okay. And did you go straight to
23 school?
24    A.   Yes.

Page 148

1     Q.   Okay. You didn't stop to see anybody
2 else?
3     A.   Not to -- not that I remember or
4 recall.
5     Q.   Okay. And then -- and then what do you
6 remember next?
7     A.   Went to class. Joking around with some
8 other students before we went to class inside the
9 school. I went to class.
10    Q.   Do you remember the names of those
11 students?
12    A.   No, ma'am.
13    Q.   Okay. So you went to class. And then
14 what?
15    A.   Did my assignment, my homework and
16 everything inside the school and had a lunch break.
17    Q.   Do you remember who you ate lunch with?
18    A.   No.
19    Q.   Okay. Did you pack your lunch?
20    A.   No.
21    Q.   Okay. Did they provide lunch for you?
22    A.   Cafeteria.
23    Q.   Got it. Okay. So then after lunch,
24 you go back to classes; is that right?

Page 149

1     A.   Yes.
2     Q.   Okay. And what -- and then what
3 happens? What time does school get out?
4     A.   I think I said 6:15, 6:30, something
5 like that.
6     Q.   Okay. So then in between that time of
7 lunch and getting out of school, are you just in
8 class, that you can remember, on the 17th?
9     A.   Yes.
10    Q.   Okay. So then what happens after you
11 are done with school?
12    A.   I boarded the bus.
13    Q.   Okay. Were you with anyone?
14    A.   Yes.
15    Q.   Who were you with?
16    A.   James Robinson, Jr.
17    Q.   Okay. And was this the first time that
18 you and he had rode the bus together?
19    A.   Yes.
20    Q.   Okay. And why -- is there a reason
21 this day that you ended up riding the bus together?
22    A.   He asked me to come to his home.
23    Q.   Okay. And had he ever asked you to
24 come to his home before?

Page 150

1    A.   No.
2    Q.   Okay.  Were you friends with James
3 Robinson?
4    A.   Yes.
5    Q.   Okay.  How long had you been friends
6 with him?
7    A.   We first met in third grade.
8    Q.   And what school was that?
9    A.   I believe McKinley.
10    Q.   And were you in the same class?
11    A.   That, I don't remember.
12    Q.   I'm sorry?
13    A.   I don't remember.
14    Q.   Okay.  You just remember that you knew
15 him --
16    A.   Shooting -- all I remember is shooting
17 marbles and playing.
18    Q.   Okay.  And did you live near each other
19 at that timeframe?
20    A.   We probably did.  But I had never been
21 over his home.
22    Q.   Okay.  Did you play together --
23    A.   Yes.
24    Q.   -- in that timeframe?

Page 151

1    A.   Yes.
2    Q.   Okay.  And from third grade until --
3 what grade are you in now in January 1977?
4    A.   I think that's eighth.
5    Q.   You were in eighth grade.
6         So from third grade to eighth grade,
7 had you maintained a friendship with James
8 Robinson?
9    A.   We were on opposite sides of town, so
10 we did not see each other since third grade until
11 we went to Loucks School.  Then in Loucks School,
12 we was in there, that was sixth grade.
13    Q.   Okay.  So then you reconnect in sixth
14 grade?
15    A.   There we go.
16    Q.   Okay.
17    A.   Yes.
18    Q.   And are you living near each other at
19 this timeframe?
20    A.   I was in the district.  I don't think
21 we lived close to each other.
22    Q.   Okay.
23    A.   But I was in the district.
24    Q.   So did you see him outside of Loucks

Page 152

1 School?
2    A.   No.
3    Q.   Okay.  And prior to this incident when
4 you and he were on the bus on the 17th going to his
5 house, had you done anything else with James
6 Robinson after school hours?
7    A.   No, ma'am.
8    Q.   Okay.  So is the only time that --
9 prior to January 17th, 1977, is the only time you
10 had ever seen James Robinson would have been during
11 school hours?
12    A.   Yes.
13    Q.   Okay.  And is the only time from your
14 not -- your knowing James, right, from third grade
15 until January 17th, 1977, is the only time that you
16 and he interacted would have been during school
17 hours?
18    A.   Yes.
19    Q.   Okay.  And had you -- and can you --
20 other than this January 17th day after school
21 you've led out and you're on the bus going to his
22 house, can you remember any other time that you and
23 he might have gotten together after school hours?
24    A.   No, ma'am.

Page 153

1    Q.   Okay.  And are you telling me no, you
2 don't remember, or no, you know that you never --
3    A.   No.  I know I did not.  We didn't have
4 no interactions other than at school at that time.
5    Q.   Okay.  Okay.  So what changed that for
6 this night on January 17th?
7    A.   Well, we -- we just kind of like just
8 hit it off, and it just -- you know, talking about
9 sports and things like that.  I was very active in
10 sports and calisthenics and things like that.  And
11 just had a conversation.  He asked me to come to
12 his house for this first time.  Nothing -- I don't
13 remember nothing else about that.  But I know I
14 went on and we went together on that bus.
15    Q.   I didn't understand that last part.
16    A.   I said this the only time we went
17 together on that bus.
18    Q.   Okay.  So what -- you said you were
19 interested in sports and calisthenics?
20    A.   Um-hmm.
21    Q.   Like what sports and calisthenics?
22    A.   Mine was football.  And calisthenics
23 was pushups, sit-ups, and all the things I still do
24 today.

Page 154

1    Q.   Okay.  Did you play on a football team,
2 or was it just more of like a neighbored playing?
3    A.   Just some sandlot football.  We just --
4 you know, some boys get together play football.
5    Q.   Um-hmm.
6    A.   You know.
7    Q.   Did you have other friends then in the
8 neighborhood that you would play football with?
9    A.   In my neighborhood?
10   Q.   Yeah.
11   A.   Yes.
12   Q.   And do you remember the names of those
13 people?
14   A.   No.
15   Q.   Okay.  Do you remember the names of
16 any friends that you had during this timeframe of
17 January 1977?
18   A.   Oh, lot of them.  A lot of them.
19   Q.   Oh, you do.  Okay.  So can you tell me
20 the names of some of your friends?
21   A.   Perry Green.  Richard Gear.  Kimberly.
22   Q.   What was that last one?
23   A.   Kimberly.
24   Q.   Kimberly?

Page 155

1    A.   I don't remember some of the last names.
2    Q.   Okay.
3    A.   So ...
4         Oh, God.  Smalleys family.  Wendy.
5 Frankie.
6    Q.   Frankie Ivy?
7    A.   Yes, ma'am.
8    Q.   Okay.
9    A.   God.  Paulette.  It was quite a few.
10   Q.   Okay.  And what kinds of things would
11 you do with these individuals that you just named
12 off in the neighborhood?
13   A.   Ride bikes.
14   Q.   Um-hmm.
15   A.   Race.  Played basketball, baseball.
16 I was on a little league team, so ...  Those things
17 like that.
18   Q.   Okay.  And was -- did James Robinson
19 ever play in the neighborhood with you?
20   A.   We lived on opposite sides of the --
21 of the community.  He lived one area, and I lived
22 in another one.
23   Q.   Okay.  So he was never with you --
24   A.   No.

Page 156

1    Q.   -- playing in the neighborhood?
2    A.   No.
3    Q.   Okay.  Okay.  Where do you go -- now
4 you're on the bus together.  And where are you
5 headed at this time?
6    A.   To his home.
7    Q.   Okay.  And did you guys talk on the
8 bus?  Did you have any conversations that you can
9 remember?
10   A.   Just laughed and joked.  But no, I
11 can't actually remember what we laughed and joked
12 about or nothing.  I can't remember that.  I know
13 we -- we enjoyed each other company.  That's all
14 I -- yeah.
15   Q.   Okay.  So -- and then you took the bus
16 to his bus stop; is that correct?  Or did you just
17 take the bus --
18   A.   The bus let off in the front of his
19 home.
20   Q.   It did.  Okay.  Okay.  So I guess
21 that's maybe -- I was trying to get a roundabout
22 way.  I was just wondering if you had stopped
23 anywhere on the way to his home.  You just took the
24 bus straight to his house?

Page 157

1    A.   It would stop and let other children
2 off the bus.
3    Q.   Right.  But you stayed on the bus until
4 it was time --
5    A.   Exactly.
6    Q.   -- for you to get off to go to his
7 home?
8    A.   Exactly.
9    Q.   Okay.  So you get off the bus.  And
10 then do the two of you go straight to his home?
11   A.   Yes.
12   Q.   Okay.  And then -- and then tell me
13 about that.  Was there, you know, a door that
14 you --
15        MR. TAYLOR:  Objection to form.
16 BY MS. SCHROEDER:
17   Q.   That's fine.  Fair.
18        Tell me -- tell -- just tell me what
19 you did after you got off the bus.
20   A.   He opened the door.  But he had to go
21 in first because there was a dog inside, and I was
22 afraid of the dog.  And he put the dog up in his
23 garage.
24   Q.   How did you know that's what he

Page 158

1 did?
2    A.   Because the dog was barking.
3    Q.   Um-hmm.
4    A.   And then he told me to wait until he
5 went in.  Because they had a German shepherd dog,
6 very huge.
7    Q.   Okay.  And do you remember how you got
8 into the house?
9    A.   What you mean?
10   Q.   Well, you said that he went into the
11 house --
12   A.   I said -- I said he told me to wait.
13   Q.   Okay.  Do you --
14   A.   Came back after he put the dog up and
15 let me in the house.
16   Q.   Do you remember how he got into the
17 house?
18   A.   Yeah.  He took a key from under the
19 mat.
20   Q.   Okay.  Okay.  So then what happened?
21 So the dog -- he puts the dog in the garage; is
22 that right?
23   A.   Yes.
24   Q.   Okay.  And then what happens?  Are you

Page 159

1 waiting on the front stoop at this time?
2    A.   There's no -- there's no stoop.
3    Q.   No?
4    A.   Just standing in the front door.
5    Q.   Front door.  Okay.
6    A.   Yeah.  He came back immediately after
7 putting the dog up.  We went inside.
8    Q.   Was there anyone home?
9    A.   No.
10   Q.   Okay.  And how did you know there was
11 no one home?
12   A.   'Cause wasn't nobody in there but me
13 and him and the dog.
14   Q.   But did you go to all the rooms?  Like
15 how would you know that those rooms were empty?
16   A.   Because wasn't nobody else there.  I
17 don't know, 'cause I went to just the kitchen and
18 his room.  But there's no voices, no people in the
19 home.
20   Q.   Okay.  Okay.
21   A.   That I could hear.
22   Q.   Um-hmm.
23   A.   Yeah.
24   Q.   Okay.  Do you remember, as you're

Page 160

1 sitting here today, what his house looked like?
2    A.   Not really.  I remember the living
3 room, his room, the kitchen.
4    Q.   Okay.  What did the house look like
5 when you walked in?
6    MR. TAYLOR:  Objection; form.
7    THE WITNESS:  A couch, a chair, a television,
8 carpet, kitchen table, refrigerator, stove, lamps.
9 That's what I remember.
10 BY MS. SCHROEDER:
11   Q.   Okay.  Was it clean?
12   A.   Yes.
13   Q.   Okay.  Everything in place?
14   A.   What do you mean by --
15   Q.   So like, I mean, it didn't -- like
16 there was no mess, things weren't turned over.
17 It was -- you walked in and it was a clean home?
18   A.   It was neat.
19   Q.   Okay.  Okay.  So tell me what you do
20 now.  You're in the house with James.  And tell me
21 what you remember next.
22   A.   We were hungry.
23   Q.   Um-hmm.
24   A.   So he went to the refrigerator, and we

Page 161

1 had some hot dogs and corn.  And we ate that, but
2 that was not enough.  And we played around for a
3 little bit; wrestle, play.
4        And then I called a friend, and I
5 asked her could I have $4.  And we left and went to
6 a fast-food restaurant, Church's Chicken, Chad's
7 Chicken, somebody's chicken somewhere.
8    Q.   Okay.  So I heard you say you made corn
9 and hot dogs, but that wasn't enough.
10   A.   No.
11   MR. TAYLOR:  Objection; form.  I don't think
12 he said they made it.  I think he said they got it.
13   THE WITNESS:  No.  I said made.
14   MR. TAYLOR:  Oh, thank you.
15   THE WITNESS:  We did.
16   MR. TAYLOR:  Withdraw that particular
17 objection.
18 BY MS. SCHROEDER:
19   Q.   Okay.  So you made your corn and hot
20 dogs.
21   A.   Right.
22   Q.   Okay.  But then what did you say after
23 that if I misunderstood you?  I had thought you
24 said that it wasn't enough.  I thought you were

JOHNNIE LEE SAVORY, 06/15/2022                    Page 162..165

Page 162

1 saying that that did not -- I interpreted it as you
2 saying that you were still hungry.
3     A.   It was only a couple hot dogs --
4     Q.   Okay.
5     A.   -- and one can of corn.
6     Q.   Okay.  Okay.  Who -- who made the corn
7 and hot dogs?
8     A.   I believe he made it.
9     Q.   He did?
10    A.   Um-hmm.
11    Q.   Okay.  Do you remember him making it?
12    A.   Kinda sorta.
13    Q.   Okay.  Is your memory like enough
14 that -- I mean, do you think you could possibly
15 have helped make the corn and hot dogs?
16    A.   I might have opened the can.  I don't
17 know exactly.  So, you know, we just -- I'm just
18 trying to remember to the best of my recollection.
19    Q.   Okay.  Do you recollect cutting up the
20 hot dogs and putting them with the corn?
21    A.   Not at this moment.
22    Q.   Okay.  Is it something that could be in
23 the realm of possibility that you did?
24    MR. TAYLOR:  Objection; form.

Page 163

1    THE WITNESS:  I mean, anything is possible --
2    MS. SCHROEDER:  Um-hmm.
3    THE WITNESS:  -- you know.  But I'm giving
4 you the best that I can --
5    MS. SCHROEDER:  Right.
6    THE WITNESS:  -- recollect from 45 years ago.
7 BY MS. SCHROEDER:
8    Q.   Okay.  Because it is -- I understand
9 it's been --
10    A.   Long time.
11    Q.   -- a long time.  I get it.  And
12 memories fade.
13        Okay.  So you make the corn and hot
14 dogs.  And then tell me what you did next, because
15 I don't want to -- I don't want to misstate it.
16    A.   I thought I said -- what did -- did
17 I -- oh, can I ask him to read it back?
18    Q.   You can ask him to read it back, sure.
19    A.   Okay.
20        (Record read as requested.)
21    Q.   Okay.  Okay.  So you said then you
22 wrestled and played around after you ate your corn
23 and hot dogs.
24    A.   Yes.  Yes.

Page 164

1    Q.   Okay.  Tell me what you remember about
2 that.
3    A.   Just that we just wrestled and played.
4 It was nothing truly physical.  It was just -- I
5 mean, it was just playing.  Maybe like horseplaying.
6    Q.   Okay.
7    A.   Wrestling.  You know what I mean?  Not
8 just -- not nothing to either one of us were hurt
9 or injured or anything of that nature.
10    Q.   Okay.  And -- and it was playful then?
11    A.   Very playful.
12    Q.   Okay.  What room were you doing this in?
13    A.   The living room.
14    Q.   And did you move any furniture around?
15    A.   Yes.  We moved the television.
16    Q.   Okay.  So tell me about that.
17    A.   Moved the television.
18    Q.   How did you move it?
19    A.   We turned it around so we wouldn't
20 accidently bump into it.
21    Q.   Is that all you did to it?
22    A.   Yes.
23    Q.   Okay.  Did you move any other furniture?
24    A.   No.

Page 165

1    Q.   Okay.  When you were wrestling around,
2 were you playing with any other -- I think we've,
3 you know, talked about -- did you play with any
4 nunchucks or --
5    A.   No, ma'am.
6    Q.   Okay.  Did you play with any
7 nightsticks?
8    A.   No, ma'am.
9    Q.   Okay.  When -- can you explain to me
10 so that I'm not imparting it on you -- when you say
11 "wrestling around," can you just explain to me what
12 you mean when you're saying that?
13    A.   Playing like wrestling like little
14 boys do.  Just holding and rolling, playing.  Just
15 playing.
16    Q.   Um-hmm.
17    A.   You know what I mean?  Not no -- you
18 know, not like the WWC wrestling.  But like just
19 playing.  Just like little boys play.  But nothing
20 that was harmful.
21    Q.   Okay.  And then where was the dog
22 during this whole time?
23    A.   In the garage.
24    Q.   Okay.  The whole time?

JOHNNIE LEE SAVORY, 06/15/2022                    Page 166..169

Page 166

1    A.    Yes.

2    Q.    Okay.  And do you know how long --

3    A.    It wasn't long.

4    Q.    Well, you know what?  Yeah.  Let me ask

5 a different question.

6          So you said the next thing you did

7 was you called a friend.

8    A.    Yes.

9    Q.    Okay.  Who was that friend?

10    A.    Marva.

11    Q.    Okay.  And what did you say to Marva?

12    A.    Could I get $4.

13    Q.    Okay.  And what did she say to you?

14    A.    Yes.

15    Q.    And did you say anything else to her?

16    A.    No.  But thank you.  And we went to --

17 we left and proceeded to her home.

18    Q.    Okay.  And where did Marva live in

19 relation to Scopey's house?

20    A.    Maybe about two, three -- two, three

21 blocks maybe, something like that.

22    Q.    Okay.  What time did you leave Scopey's

23 house?

24    A.    Oh, God.  Let me see.  Maybe like 7:45,

Page 167

1 something like that.  7:30, something -- something

2 like that.

3    Q.    How did -- I meant to ask you how did

4 Scopey know to put the dog in the garage for you?

5    A.    I told him I was afraid of dogs.

6    Q.    Okay.  Okay.  Okay.  So then you --

7 do -- you get to Marva's house.  And are -- is

8 Scopey with you?

9    A.    Yes.

10    Q.    Okay.  And did Marva know Scopey?

11    A.    No.

12    Q.    All right.  How long had you -- how

13 long had you known Marva?

14    A.    I don't remember exactly when I

15 actually met her, but it was some years.

16    Q.    Okay.  Do you remember how you met her?

17    A.    Not really.

18    Q.    Okay.  Was she a friend of your dad's?

19    A.    No.

20    Q.    Okay.  Was she a friend of your -- I

21 know your mom passed away when you were young; is

22 that correct?

23    A.    She passed away when I was six months

24 old.

Page 168

1    Q.    Okay.  Was Marva a friend of your

2 mother's?

3    A.    No.

4    Q.    Okay.  Would you regularly see Marva?

5    A.    No.  It would be like every so often.

6    Q.    Okay.  And is every so of--

7    A.    She had a little daughter like I was --

8 that was like a little sister to me.

9    Q.    Okay.  Did you know her daughter first,

10 and that's how you met Marva?

11    A.    No.

12    Q.    Okay.  Did Marva typically give you

13 money?

14    A.    I never typically asked for it.

15    Q.    Okay.  Was this unusual that you asked

16 for money tonight?

17    A.    Well, it's not unusual.  But I'm saying

18 it wasn't like, you know, you ask for money every

19 day.  So no.  I mean, I asked her for it because I

20 thought that would be the person close enough to us

21 so we could get it and go get something to eat.

22    Q.    And is that the reason why you asked

23 for the money --

24    A.    Yes.

Page 169

1    Q.    -- so you could eat?

2    A.    Yes, ma'am.

3    Q.    Okay.  And is that because you had the

4 corn and the hot dogs at the house, but you were

5 still hungry; is that correct?

6    A.    That's -- yes, you're correct.

7    Q.    Okay.  Did you go inside Marva's house

8 when you got -- when you arrived?

9    A.    I don't believe so.  I think I met her

10 at the door, got the money, and we went on to the

11 restaurant.

12    Q.    Okay.  Did you introduce her to Scopey?

13    A.    I may have.

14    Q.    Okay.  But you knew for sure that they

15 had not met before; is that correct?

16    A.    I didn't -- they don't know each other.

17    Q.    They didn't know each other.

18    A.    So I would assume they didn't.

19    Q.    Okay.  Did you have to do anything for

20 this $4?

21    A.    What you mean?

22    Q.    I mean, did she just give it to you,

23 or did she say, Yes, I'll give you this $4, but in

24 return I need you to do something for me?

JOHNNIE LEE SAVORY, 06/15/2022                          Page 170..173

Page 170

1    A.   No.
2    Q.   Okay.  And so you took the $4, and you
3  and Scopey went to eat chicken.
4         And then do you know about what time
5  this is now that you're eating chicken?
6    A.   I can't remember the time at the time.
7    Q.   Okay.  And then you -- what do you do
8  after you eat chicken?
9    A.   We left and went back to his house.
10   Q.   Okay.  And did you go straight from the
11  restaurant back to Scopey's?
12   A.   Yes.
13   Q.   Okay.  Did you inter- -- interact with
14  anyone between the chicken place and the -- and
15  Scopey's?
16   A.   I don't recall.  I don't recall
17  interacting with nobody.
18   Q.   You don't recall?
19   A.   (Shaking head.)
20   Q.   Do you remember what you and Scopey
21  were talking about while you were eating dinner at
22  the chicken restaurant?
23   A.   Yeah.  Boy talk, meaning it could have
24  been anything.  Sports or nothing -- I can't

Page 171

1  remember actually what conversation we had on the
2  way there or the way back.  All I know is that we
3  were happy that we were together.
4    Q.   Okay.  And the same question for when
5  you're walking to Marva's, do you remember any
6  conversations you and Scopey may have had while you
7  were walking to Marva's?
8    A.   No.  We was having fun, though.  We
9  were laughing and joking and playing.
10   Q.   Okay.  And then how about from Marva's
11  to the restaurant, any --
12   A.   Same -- same --
13   Q.   -- conversations you remember?
14   A.   We had plenty of them, but don't know
15  what we talked about.
16        (Discussion off the record.)
17  BY MS. SCHROEDER:
18   Q.   Okay.  So from the restaurant to
19  Scopey's -- you walked straight from the restaurant
20  to Scopey's; is that correct?
21   A.   Yes, ma'am.
22   Q.   Okay.  Do you -- and then did you go
23  into Scopey's house when you got there?
24   A.   Yes, ma'am.

Page 172

1    Q.   Do you remember what time that was?
2    A.   No, ma'am.  I can't remember the exact
3  time.
4    Q.   Okay.
5    A.   I believe it was like somewhere like
6  maybe 9:00 or something like that.
7    Q.   Around 9:00?
8    A.   Something.  9:00, 8:00, or something.
9  I don't --
10   Q.   Okay.
11   A.   I don't remember exactly.
12   Q.   Because it's just been too long?
13   A.   Yes.
14   Q.   Okay.  So did you go inside when you
15  arrived at the house?
16   A.   Yes, we went inside.
17   Q.   Okay.  And did Scopey have to do the
18  same thing where he went in first and took care of
19  the dog?
20   A.   No.  The family was there.
21   Q.   Okay.  What door did you go in?
22   A.   The front door.
23   Q.   Okay.  And when you went in, then what
24  happened?

Page 173

1    A.   He introduced me to his family.  And we
2  went to the kitchen and started drawing.
3    Q.   What family was -- were you introduced
4  to?
5    A.   His mother, stepdad, sister.
6    Q.   And where was the dog at this time?
7    A.   In the garage.
8    Q.   Okay.  So did you have any conversation
9  with the mom?
10   A.   No.  We had -- we didn't -- we did not.
11   Q.   Okay.  Did you have any conversation
12  with the stepdad?
13   A.   No.
14   Q.   Okay.  And I think we talked earlier --
15  did you have any conversation with Connie?
16   A.   No.
17   Q.   Okay.  So you go into the kitchen and
18  you're drawing pictures; is that correct?
19   A.   Yes.  Yes.
20   Q.   What type of pictures?
21   A.   Doodling.  Art.  Just artwork.
22   Q.   Okay.
23   A.   And we would then get up and ask his
24  parents, you know, which one you think is best.

JOHNNIE LEE SAVORY, 06/15/2022                    Page 174..177

Page 174

1 And then we'd go back to drawing again.
2    Q.   Okay.  And did you do anything else
3 while you were -- while you were there at the
4 house?
5    A.   Not that I recall.  And that -- you
6 know, not that I -- at this moment I can't --
7    Q.   Okay.
8    A.   -- remember nothing else that we did.
9    Q.   Did you stay in the kitchen the whole
10 time?
11   A.   Yes.  I stayed at the kitchen table.
12   Q.   Okay.  Now, earlier I had forgotten to
13 ask you, you said that when you were there in the
14 house alone, I thought you had said that you had
15 gone into Scopey's bedroom; is that correct?
16   A.   Yes.
17   Q.   Okay.  Tell me why you went into his
18 bedroom.
19   A.   He invited me into his bedroom.
20   Q.   And what did you do in the bedroom?
21   A.   We just talked, and that's it.
22   Q.   Okay.  Do you remember where his
23 bedroom was located in the house?
24   A.   In the kitchen.

Page 175

1    Q.   I'm sorry?
2    A.   In the kitchen.  Off from the kitchen.
3    Q.   Did you have to walk through the
4 kitchen to go into his bedroom?
5    A.   Yes.
6    Q.   Okay.  And can you remember what his
7 bedroom looked like?
8    A.   No.  He had pictures and stuff like
9 that.  But I can't remember exactly what it looked
10 like.  It was a boy's room, though.
11   Q.   Okay.  And how many beds were in the
12 room?
13   A.   One.  One.
14   Q.   One.  Okay.
15        And was there any furniture in that
16 room?
17   A.   I don't remember exactly all the stuff
18 that was in his room.
19   Q.   Okay.  Did he have a window to his
20 room?
21   A.   I don't remember that either.
22   Q.   Did he have a closet in his room?
23   A.   I don't know if he had a closet or not
24 have one.

Page 176

1    Q.   Okay.
2    A.   I don't remember.
3    Q.   Okay.  Do you remember where the garage
4 door was that the dog was let out of?
5    A.   Not right at this point.  I know it was
6 somewhere in the back of the house, but I don't
7 know where.  I don't remember exactly.  I don't
8 know if it was off of his room or whatever.  I
9 don't remember.
10   Q.   Okay.  Okay.  Did you ever -- in the
11 times that you were at James' house, did you ever
12 see the dog?
13   A.   I could hear it.  I ain't -- I don't
14 recall seeing it.
15   Q.   Okay.  How did you know it was a German
16 shepherd?
17   A.   Because that's what he said he had.
18   Q.   Okay.  How did you know how big it was?
19   A.   Oh, he -- he sounded big.  He sound--
20 I never got a chance, but he sounded very, very
21 big.
22   Q.   Okay.
23   A.   I mean, he was -- just to say a German
24 shepherd, I naturally assumed it was a big dog.

Page 177

1    Q.   Okay.  Is there anything else -- okay.
2 So wait.  So let's -- I don't think we finished the
3 night.
4        What do you do after you're drawing
5 pictures?
6    A.   We did that for a little while.  And
7 then I said I had to get home because it was
8 getting late.
9    Q.   Okay.  What was the family doing this
10 whole time while you were drawing photos -- or
11 drawing pictures?
12   A.   Sitting in the living room talking,
13 watching television.
14   Q.   Okay.  Do you remember what television
15 show they were watching?
16   A.   No, ma'am.  No, ma'am.
17   Q.   Was the -- was Connie in the room with
18 that -- with the parents?
19   A.   From the times I saw them, yes.
20   Q.   Okay.  And were both the stepfather and
21 the mother in the living room watching TV this
22 whole time?
23   A.   I believe they was sitting on the
24 couch.

JOHNNIE LEE SAVORY, 06/15/2022                                Page 178..181

Page 178

1    Q.   Okay.  So earlier when you had told me
2 that you took the -- or you turned the TV, right,
3 to protect it from when you were wrestling --
4    A.   Um-hmm.
5    Q.   -- did you -- did you or Scopey turn it
6 back before you left?
7    A.   Yes.
8    Q.   Okay.  Did you clean up from your meal
9 of the corn and hot dogs?
10    A.   We put the dishes in the sink.  Is that
11 what you mean?
12    Q.   Well, that's what I'm asking you.  Did
13 you clean up?
14    A.   Put the dishes in the sink.
15    Q.   Okay.  Did you wash the dishes?
16    A.   No.
17    Q.   Okay.  Okay.  So what time do you think
18 you left the house?
19    A.   I don't know.  We might have been there
20 30 or 45 minutes.  I said something to you like
21 that.  Do you remember what I said?
22    Q.   Well, I'm just -- I'm asking you.
23    A.   No.  I'm saying, you know, 'cause you
24 asked me, and I know I said it.

Page 179

1    Q.   Um-hmm.
2    A.   So I don't -- I remember it's no more
3 than 30 or 45 minutes, something like that.  So --
4    Q.   Okay.  So --
5    A.   I said around 7:30, 7:45, something
6 like that.  I believe that's what I said.
7    Q.   So do you think that it's actually 30
8 or 45 minutes from the time you got back to James'
9 house after the restaurant?
10    MR. TAYLOR:  Wait a minute.
11    THE WITNESS:  That's two different --
12    MR. TAYLOR:  Yeah.  I'm confused.  You're
13 talking the first time he left or the second time?
14    MS. SCHROEDER:  Oh, I'm sorry.  I'm talking
15 about the second time.  Sorry.
16    THE WITNESS:  The second time?
17    MS. SCHROEDER:  Um-hmm.
18    THE WITNESS:  What do you mean?
19 BY MS. SCHROEDER:
20    Q.   Because you -- you went to James' house
21 twice --
22    A.   Right.
23    Q.   -- on the 17th, correct?
24    A.   Right.

Page 180

1    Q.   So I'm asking you what time did you
2 leave that night after your second visit to the
3 house?
4    A.   Oh, yeah.  It was getting late.  Maybe
5 about -- I want to say something after 10:00.
6    Q.   Okay.  Okay.
7    A.   That's about as close as I can get you.
8    Q.   Okay.
9    A.   Yes.
10    Q.   Okay.  And were the parents still up
11 and awake when you left?
12    A.   Yes, ma'am.
13    Q.   Okay.  And did you say anything to them
14 when you left the house?
15    A.   Yeah.  Goodbye.
16    Q.   Okay.  And how about Connie, was she in
17 the living room when you left the house?
18    A.   I don't remember.
19    Q.   Okay.  And what did you say to James
20 when you were leaving?
21    A.   Goodbye.  See you at school tomorrow.
22    Q.   Okay.  Was that the last time you spoke
23 to James?
24    A.   Yes.

Page 181

1    Q.   Okay.  Did you -- was that the last
2 time you saw him?
3    A.   Yes.
4    Q.   What did you do after you left his
5 house?
6    A.   Walked home in the dead of winter.
7    Q.   Did you go straight home?
8    A.   Yes.
9    Q.   Was anyone home when you got there?
10    A.   Yeah, my dad.
11    Q.   Why do you say that in that tone?
12    A.   He was a little upset that I was that
13 late coming home.
14    Q.   Okay.  So what time did you arrive
15 home?
16    A.   After 11:00, almost 12:00, something
17 like that.
18    Q.   Okay.  And how did you know your dad
19 was upset?
20    A.   How did I know he was upset?
21    Q.   Um-hmm.
22    A.   He was upset.  I mean, I had been gone
23 since school was out at 6:30.  So I'm like, what,
24 four, five hours late or something.  Yeah, he was

Page 182

1 upset. Worried. Didn't know where I was at.
2    Q.   He was worried?
3    A.   Of course, yeah.
4    Q.   Did he tell you he was worried?
5    A.   Yes.
6    Q.   Okay. And did he tell you he was
7 upset?
8    A.   Yes.
9    Q.   Okay. And did he yell?
10   A.   Kinda sorta.
11   Q.   Okay. And did he do anything else,
12 anything physical to you to show --
13   A.   No.
14   Q.   -- you he was upset?
15   A.   He let me know he didn't want me to do
16 that no more.
17   Q.   Okay. Did you have a curfew with your
18 dad that you had to be home by?
19   A.   I had to come home after school.
20   Q.   So you had to come home right after
21 school?
22   A.   Yes.
23   Q.   Okay.
24   A.   I rode the bus to a whole nother side

Page 183

1 of town.
2    Q.   Was that the usual rule that you had
3 with your dad?
4    A.   Yes.
5    Q.   And did you typically abide by that
6 rule?
7    A.   Yes.
8    Q.   Okay. Was this the first time that you
9 broke that rule?
10   A.   Yes.
11   Q.   Okay. And usually you're saying that
12 you would go home after school every day?
13   A.   Yes.
14   Q.   Okay.
15   A.   I had to help with my sister.
16   Q.   Okay. And what time would you
17 typically get home from school?
18   A.   Well, the school had buses that take
19 you home. And also when the bus didn't go on that
20 route, they would give you bus passes, and you
21 could catch the bus after you left school and go
22 home.
23   Q.   Okay. So does that mean there were two
24 different times that you could have arrived home

Page 184

1 after school, depending on the bus route?
2    A.   No. It would still be round about
3 7:00, 7:45, or something like -- I mean, we got out
4 of school at 6:30, 6:45, or 7:00 o'clock.
5    Q.   Okay.
6    A.   Should make it home. Depending on the
7 bus. Depending on what -- how the schedule is
8 running.
9    Q.   Okay. So typically you would be
10 home --
11   A.   By 7:00.
12   Q.   -- around 7:00?
13   A.   Yes.
14   Q.   Okay. Okay. And this time you were
15 not, obviously.
16   A.   Obviously, yes.
17   Q.   Okay. Were you like grounded by your
18 dad because of this? I don't -- I mean, do you --
19   A.   No.
20   Q.   Okay. Did he give you any punishment
21 for -- for coming home so late this day?
22   A.   Yeah. Told me don't do that no more --
23   Q.   Okay.
24   A.   -- or I would be.

Page 185

1    Q.   Got it. So a warning, he gave you a
2 fair warning?
3    A.   Gave me a warning. He gave me a fair
4 warning.
5    Q.   Gotcha. Okay.
6         Is there any other information that
7 you can think of that you did after -- after you
8 got home?
9    A.   Not that I recall.
10   Q.   Did you -- did you go straight to bed?
11   A.   Yes.
12   Q.   Okay. Did you talk to your -- do you
13 remember -- aside from your and your dad having
14 this interaction about you coming home late, was
15 there anything else that you and your dad
16 discussed?
17   A.   No, ma'am.
18   Q.   Okay. Was anybody else home at the
19 house when you arrived home?
20   A.   My dad and my sister.
21   Q.   Okay. Was your grandma home?
22   A.   I don't recall. She might have been
23 with her -- his sister, my aunt. She would go --
24   Q.   And who is that?

JOHNNIE LEE SAVORY, 06/15/2022                    Page 186..189

Page 186

1    A.   Martha Williams.
2    Q.   Your aunt, Martha Williams. Okay.
3    A.   That's her daughter.
4    Q.   Got it. Okay.
5         Was there anything else that you
6 and James discussed before you left his house that
7 night?
8    A.   Not -- not that I recall.
9    Q.   Okay. Did you -- did you make plans to
10 see James the next day?
11   A.   At school.
12   Q.   Okay. And is that the only plan that
13 you made to see him?
14   A.   That's the only one I recall.
15   Q.   That's the only one you recall as you
16 sit here today?
17   A.   Yes.
18   Q.   Okay.
19   A.   But as we go along, if I remember
20 something, I will definitely share it with you.
21   Q.   Oh, okay.
22   A.   Okay.
23   Q.   Okay. Had you ever invited Scopey to
24 your house?

Page 187

1    A.   No. No. We had just reconnected.
2 So, you know, we didn't get an opportunity to.
3    Q.   Okay. Do you know how long -- how long
4 before this January 17th night did you reconnect?
5    A.   I don't remember exactly because,
6 remember, we both were expelled from the same
7 school, but I don't remember how long we were
8 at that -- at the school right at this point.
9    Q.   Okay.
10   A.   But we went to school together.
11   Q.   Did you get expelled together?
12   A.   No.
13   Q.   Okay. Was he expelled before you?
14   A.   I don't recall him being expelled.
15   Q.   Oh, okay. I mis- -- I thought you had
16 said you were both expelled from the same school.
17   A.   I'm talking about Loucks School.
18   Q.   Correct. So you and he were expelled
19 from Loucks?
20   A.   Yes, ma'am.
21   Q.   Okay. And then was he expelled before
22 you from Loucks?
23   A.   Do not know.
24   Q.   Okay. Do you know why he was expelled

Page 188

1 from Loucks?
2    A.   I do not know that either.
3    Q.   Okay. Were you acquaintances at -- or
4 friends at Loucks?
5    A.   Yes.
6    Q.   Okay. And then one of you was
7 expelled, you don't remember which one first;
8 is that correct?
9    A.   Yes, ma'am.
10   Q.   Okay. And so in my understanding then,
11 one person was going to Loucks and one person was
12 going to Late Afternoon School, and so you --
13 during that time you were not seeing each other; is
14 that correct?
15   A.   Yes.
16   Q.   Okay. And then whenever the last
17 person was expelled from Loucks and went to Late
18 Afternoon School, is that what you're referencing
19 when you say you're reconnecting?
20   A.   Yes.
21   Q.   Got it. Okay.
22        In this timeframe -- so in January
23 1977, you were 14 are years old; is that correct?
24   A.   Yes.

Page 189

1    Q.   Okay. And so in this timeframe, let's
2 say, 13 to 14 years old, would you spend the night
3 at friends' homes?
4    A.   No.
5    Q.   Okay. And is that because your dad
6 would not allow it or -- I guess maybe just tell me
7 what the reason is that you wouldn't do that?
8    A.   Well, he didn't allow it. I spent the
9 nights at family members' house, but he didn't
10 allow me to spend no nights at no one else's home.
11   Q.   Okay. And do you know the reason why
12 he wouldn't allow that?
13   A.   No. I didn't question him.
14   Q.   Okay. Did your dad run a pretty tight
15 ship at your house?
16   A.   Yeah, he was very disciplined, you
17 know. Weekends we had to do laundry and stuff like
18 that, yeah.
19   Q.   Okay. And your -- your answer here
20 that you said you would just -- you know, when your
21 dad said you're not spending the night, and you
22 wouldn't question him; is that correct?
23   A.   Yes.
24   Q.   Okay. And is that because you just

JOHNNIE LEE SAVORY, 06/15/2022                    Page 190..193

Page 190

1  would obey your father?
2    A.  Yeah.  I was taught to respect --
3    Q.  Got it.
4    A.  -- my dad's decision, whatever he made.
5    Q.  Okay.  And is -- and was that typically
6  how you -- what do I want to say? -- interacted
7  with your dad, that you would just obey what he
8  asked of you?
9    A.  To the best of my ability.
10   Q.  Okay.  Okay.  When you were in this
11 timeframe, this 13-, 14-year-old timeframe, on the
12 weekends, would you go out with your friends?
13   A.  Sometime.
14   Q.  Okay.  Which friends would you go out
15 with, if you can remember?
16   A.  Frankie, Paulette, Wendy, Marchelle.
17 It would be different people.  It was never the
18 same people.
19   Q.  Did you hang out with James Ivy?
20   A.  No.
21   Q.  Okay.  Why not?
22   A.  I don't know.  Just we didn't hang out.
23 I hung out with Frankie.
24   Q.  Okay.  Would you not consider James a

Page 191

1  friend of yours?
2    A.  He wasn't no enemy.  But, you know, he
3  was just somebody in they family that I knew.
4    Q.  Okay.  Are you -- was there any other
5  member of the Ivy family that you would hang out
6  with?
7    A.  No.
8    Q.  Okay.  Is Frankie the only person of
9  the Ivy family that you would consider your friend?
10   A.  Yes.
11   Q.  Okay.  How about a person named Ray
12 Mason, does that strike a memory for you?
13   A.  Yes.
14   Q.  And can you tell me who that person is?
15   A.  Someone I knew from the neighborhood.
16 Liked to play music.
17   Q.  Do you mean on a record player or in a
18 band?
19   A.  I think he played some kind of
20 instrument.  I just don't remember which one it
21 was.
22   Q.  Okay.  Was he older than you?
23   A.  Oh, yeah.
24   Q.  Okay.  Did he have a car?

Page 192

1    A.  I'm not sure.
2    Q.  Did you ever go anywhere with him in a
3  car?
4    A.  Not that I recall.
5    Q.  In this timeframe, this 13-, 14-year-old
6  timeframe, did you ever drink alcohol?
7    A.  Not that I recall.  No, ma'am.
8    Q.  You don't recall, or you did not?
9    A.  No.
10   Q.  Okay.  In this timeframe, this 13-,
11 14-year-old timeframe, did you ever smoke weed?
12   A.  No.
13   Q.  Okay.  Did Scopey ever meet your friend
14 Ray Mason?
15   A.  No, ma'am.
16   Q.  Okay.  And is there a reason why those
17 two didn't meet?
18   A.  I just reconnected with him, so wasn't
19 no need for him to ever meet him.  We didn't even
20 get a chance to enjoy each other long enough for
21 him to meet anyone other than the people we had at
22 school.
23   Q.  Okay.  Did Tina Ivy go to your school?
24   A.  She ended up there.  Her first day was

Page 193

1  January 18th.
2    Q.  Okay.  So she did not meet Scopey;
3  is that a safe assumption?  Is that what you're
4  telling me?
5    A.  That's a safe assumption.
6    Q.  Okay.  Did you and Scopey ever get in
7  fights in the neighborhood?
8    A.  No.
9    Q.  Okay.  Did you ever get into any fights
10 in the neighborhood?
11   A.  No.
12   Q.  Never?
13   A.  Not that I remember.
14   Q.  Do you remember a person in the
15 neighborhood named Mark Burks?
16   A.  Oh, yeah.
17   Q.  What do you remember?
18   A.  I remember him.  What do I remember
19 about Mr. Burks?  Well, I used to be on a paper
20 route with him.
21   Q.  Okay.
22   A.  While on the paper route, he had a
23 girlfriend.  He was taking the paper route money,
24 giving it to his girlfriend, and made his

Page 194

1  grandmother think that I was taking the money
2  myself.  And the grandmother became angry at me.
3  And she sent Mark and his brother to beat me up.
4        And they subsequently one day
5  surrounded me and hit me in the head with a brick
6  and knocked me out on a street corner.  Yeah.  And
7  I went to the hospital.
8        And when I saw him again, we got
9  into another altercation, but this time it wasn't
10 nobody but me and him.
11    Q.   It was what?
12    A.   Me and him.
13    Q.   Okay.
14    A.   Yeah.  That's about the size of it.
15    Q.   Okay.  Do you remember when this
16 happened that you were beat up by Mark and his
17 brother?
18    A.   I don't remember the day.
19    Q.   Okay.  Did you ever go to the police
20 about that?
21    A.   No.
22    Q.   Okay.  So do you know if any police
23 report was ever made about that fight?
24    A.   I didn't make one.

Page 195

1     Q.   Okay.  Did you ever talk to any police
2  officers about that incident?
3     A.   No, not to my knowledge.
4     Q.   Okay.  And then you said the next time
5  you ran into him it was just the two of you.
6     A.   Yes.
7     Q.   Did you get into a fight with him --
8     A.   Yes.
9     Q.   -- then at this time?
10    A.   Yes.
11    Q.   Okay.  And was that in just sort of
12 like retaliation because of what he and his brother
13 had done to you, or was there another reason that
14 sparked this new fight?
15    A.   You know, wasn't no new set of
16 circumstances.  It was just from the old
17 circumstances that, You lied on me, and then
18 you all tried to hurt me.
19    Q.   Okay.  Do you remember when that
20 happened?
21    A.   I don't remember the day or where it
22 took place.  But it did take place.
23    Q.   Okay.  Do you know timing-wise when
24 that would have happened in relation to your arrest

Page 196

1  on January 25th?  Like was it a year before or just
2  the summer before?  Do you have any clue?
3     A.   Maybe 1975, 1976, one of them.
4     Q.   Okay.  And tell me about the fight
5  between you and Mark.  Was it just the two of you?
6     A.   Yes.
7     Q.   Okay.  And was it a fistfight?
8     A.   Yes.
9     Q.   Okay.  And did anyone have a knife?
10    A.   No.
11    Q.   Did you ever own a knife at this
12 timeframe?
13    A.   No.
14    Q.   Okay.  Did you ever own a knife at all
15 prior to your arrest on January 25th?
16    A.   No, ma'am.
17    Q.   Okay.  Did your father own a knife?
18    A.   Yes.
19    Q.   Okay.  Did you carry your father's
20 knife?
21    A.   No.
22    Q.   Did you ever carry anyone's knife at
23 all prior to your arrest on January 25th, 1977?
24    A.   No, ma'am.

Page 197

1     Q.   Okay.  Did you ever borrow anyone's
2  knife in this timeframe of -- leading up to
3  January 25th, 1997 -- or 1977?
4     A.   No, ma'am.
5     Q.   Okay.  Would there be any possibility
6  that a person could be truthfully making a
7  statement that they saw you with a knife in 1975?
8     MR. TAYLOR:  Objection to form.
9     THE WITNESS:  No.  They'd be -- they'd be
10 lying.
11    MS. SCHROEDER:  Okay.
12    THE WITNESS:  So the answer is no.
13 BY MS. SCHROEDER:
14    Q.   Okay.  And would that be your same
15 response regarding if anyone said they saw you with
16 a knife during like the span of 1976?
17    A.   Yes.
18    MR. TAYLOR:  Same objection.
19 BY MS. SCHROEDER:
20    Q.   Okay.  And then although it was a very
21 short timeframe in 1977, it was just that first
22 part of January --
23    A.   Um-hmm.
24    Q.   -- but would that be your same response

Page 198

1  to anyone who would have made a statement that
2  they saw you with a knife in that January 1977
3  timeframe?
4      A.   Same answer.  No.
5      Q.   Okay.  No.
6           And the answer is that they would be
7  lying --
8      A.   Yes.
9      Q.   -- is that correct?
10          Okay.
11     THE VIDEOGRAPHER:  Ending media number 2 of
12  the deposition of Johnnie Lee Savory.
13          Off the record at 3:58 p.m.
14          (Recess taken.)
15     THE VIDEOGRAPHER:  Beginning media number 3
16  of the deposition of Johnnie Lee Savory.
17          Back on the record at 4:14 p.m.
18  BY MS. SCHROEDER:
19     Q.   Okay, Mr. Savory.  So I think we've
20  finished the -- your memory on the 17th, right?
21  Because we ended with you going to bed at your
22  house, correct?
23     A.   Yes, ma'am.
24     Q.   Okay.  And then did you stay at your

Page 199

1  home that -- that whole night --
2      A.   Yes, ma'am.
3      Q.   -- until you woke up the next day?
4      A.   Yes, ma'am.
5      Q.   Okay.  Do you remember what time you
6  woke up the next day?
7      A.   Maybe between 8:00 and 8:30 or
8  something like that.
9      Q.   Okay.  And do you remember how you woke
10  up?  Like did you do it on your own?  Did someone
11  wake you up?
12     A.   Yeah, I did it on my own.
13     Q.   Was it an alarm clock?
14     A.   No, no.  I did it on my own.
15     Q.   Okay.  So prior to being arrested for
16  the murders of Scopey and Connie, did you have a
17  juvenile record?
18     A.   Yes.
19     Q.   Okay.  Can you tell me what you
20  remember about your juvenile record, what sort
21  of incidences were on that?
22     MR. TAYLOR:  Objection to the relevance.
23          But you may answer.
24     THE WITNESS:  It wasn't much.  But I know

Page 200

1  truant from school.  I was accused of a burglary
2  that never happened.  And then Mark Burks incident
3  probably.
4      MS. SCHROEDER:  Okay.
5      THE WITNESS:  That's all I can recall at this
6  moment, you know.
7  BY MS. SCHROEDER:
8      Q.   Do you recall any offenses involving
9  theft?
10     A.   Not at this moment.  But if I think of
11  it, you know, I'll make sure I share that with you
12  before we leave, you know.  I mean, once it come
13  into memory.
14     Q.   Okay.
15     A.   I don't have nothing in my memory about
16  a theft at this moment.
17     Q.   Okay.  And so -- and you've given me
18  that type of answer a couple times today --
19     A.   Yes.
20     Q.   -- and I want to make sure that I
21  understand what you mean.  And what you mean
22  is you can't definitively tell me --
23     A.   No.
24     Q.   -- no; you're saying you just don't

Page 201

1  remember at this point --
2      A.   Right.
3      Q.   -- is that correct?
4      A.   Yes.
5      Q.   Okay.
6      A.   Certain things just jog my memory.
7  Just like when you all were talking when you asked
8  me did I -- did anyone ever -- them accuse me of
9  rape.  Well, I didn't remember that until I thought
10  about the person that testified for the state on
11  that witness stand.
12     Q.   Okay.
13     A.   But I -- you know, so that's -- it's
14  just something -- it just -- yeah.  If it come to
15  me, yes.
16     Q.   Okay.
17     A.   I can --
18     Q.   Okay.
19     A.   -- tell you.
20     Q.   Okay.  And I'll just put on the record
21  that if for some reason your memories to some of
22  the questions I've asked you come to you after you
23  leave this deposition --
24     A.   Yes.

JOHNNIE LEE SAVORY, 06/15/2022                    Page 202..205

Page 202

1    Q.   -- then I ask you that you supplement
2 your discovery responses --
3    A.   Yes, ma'am.
4    Q.   -- that we have issued to you that
5 are -- are touching on the subjects of your
6 memories.  Right?
7    A.   Yes, ma'am.  Yes, ma'am.
8    Q.   So if you remember something about your
9 juvenile record --
10   A.   Yes, ma'am.
11   Q.   -- that happens after the deposition,
12 then I ask that you work with your attorneys to
13 supplement your discovery responses.
14   A.   Will do.
15   Q.   Okay.
16   MR. THOMSON:  Johnnie, as a reminder, for the
17 benefit of the court reporter, wait till Sara
18 finishes her questions before you answer.  You're
19 saying "yes, ma'am" a couple of times in the middle
20 of her statement.
21   THE WITNESS:  Okay.
22   MR. THOMSON:  Okay.  Thanks.
23   MS. SCHROEDER:  That's -- I do the same where
24 it becomes more of a conversation.  So it becomes

Page 203

1 a little bit stunted in this type of deposition.
2 BY MS. SCHROEDER:
3    Q.   Do you remember any offenses of
4 shoplifting?
5    A.   Yes.
6    Q.   Tell me what you remember, please.
7    A.   I was in Woolworth department store.
8 And I went to the back to take one of those photo
9 IDs.  And I was sitting down at the counter, and
10 there was a basket of ink pens there.  And I picked
11 one of them up to begin to write with ink pen at
12 the counter.  And the lady called the police saying
13 I stole a 19-cent Bic pen.  And I never left the
14 counter.
15   Q.   And do you remember when this was?
16   A.   Oh, maybe '73, '74, something like that
17 nature.  Maybe '75.
18   Q.   Okay.
19   A.   All I know is it didn't make no sense.
20   Q.   Okay.
21   A.   But I was charged with stealing a
22 19-cent Bic pen at Woolworth's or whatever that
23 store is.  And they took me to jail for that.
24   Q.   Did the police come and arrest you?

Page 204

1    A.   Yes.
2    Q.   Okay.  Do you remember who the
3 police --
4    A.   No, ma'am.
5    Q.   -- officer was?
6    A.   No.
7    Q.   Do you remember if it was a woman?
8    A.   No.
9    Q.   Okay.  Do you remember anything about
10 your interactions with the police concerning that
11 specific arrest?
12   A.   Couldn't believe it.  I never left the
13 store.  I was sitting at the counter.  I mean, I
14 was just writing with it.  So I thought it was a
15 basket of pens, I thought I could write with the
16 pen.  I didn't know I couldn't write with the pen.
17   Q.   Okay.
18   A.   So that's what I remember about it.
19   Q.   Do you remember anything specific to
20 the police officers that came and arrested you?
21   A.   It was a white male.
22   Q.   And did they handcuff you?
23   A.   No.
24   Q.   Okay.  Did they put you in the police

Page 205

1 car?
2    A.   I believe so.
3    Q.   And where did they take you?
4    A.   That, I don't remember.  But I know
5 where -- I didn't stay long.  You know, my dad came
6 and got me.  So it wasn't like they kept me in no
7 detention center or nothing.
8    Q.   And do you remember what your dad said
9 to you when he came and got you?
10   A.   He didn't say nothing.  He asked me
11 what I did.  I told him I was writing with a pen
12 sitting in Woolworth's, and I didn't realize -- if
13 I had an incident of racism, that was probably it.
14 I didn't realize that's what it was, but -- I mean,
15 we talking about Peoria in the early '70s.
16   Q.   Well, what do you mean by that?
17   A.   Well, they still had signs in Pekin on
18 the bridge said no -- no black people after dark.
19 And there's only certain places you can go in
20 Peoria where it wasn't nothing but 5 percent or
21 2 percent black, or whatever it was.  A lot of
22 people.
23   Q.   How old were you at this time?
24   A.   Well, if I was 14 in '77.  '76, 13.

Urlaub Bowen & Associates, Inc.    312-781-9586

JOHNNIE LEE SAVORY, 06/15/2022                                 Page 206..209

Page 206

1 '75, 12. 11, 10 -- 11, somewhere around in there.
2    Q.   Okay.  And you were sort of out in the
3 world enough to understand the percentage of the
4 racial makeup of Peoria?
5    A.   Well, Peor- --
6    MR. TAYLOR:  Objection.  That's -- that
7 misstates his testimony.
8    MS. SCHROEDER:  Okay.
9    THE WITNESS:  Peoria was all predominantly
10 white and small percentage of black people.
11   MS. SCHROEDER:  Okay.
12   THE WITNESS:  I'm just giving you percents
13 how because I understand percent.  Back then the
14 majority of people, 80, 90 percent of the people
15 were white.  I didn't really have any run-ins
16 with whites, so I'd have no -- I didn't really
17 understand racism.  But I knew that particular
18 incident just left the same bad taste in my mouth
19 as it did then, because I did not steal the pen.
20 I was just writing with the pen.
21        But I'm sure they made a police
22 report out about it.  But I was writing with a pen.
23 That's all I'm saying.  Wasn't no need for the
24 person to call the police about me writing with a

Page 207

1 pen.
2 BY MS. SCHROEDER:
3    Q.   Um-hmm.  Okay.  Do you remember any
4 other shoplifting offenses?
5    A.   Not at this time.
6    Q.   Okay.  How about any damage to property
7 offenses?
8    A.   Not at this time.
9    Q.   How about any trespassing?
10   A.   Not at this time.
11   Q.   Okay.
12   MR. CHRISTIE:  Could we move the Tylenol
13 bottle out of the view of the camera?
14   MS. SCHROEDER:  Oh, yeah.  That's probably ...
15   THE WITNESS:  Anything else?
16   MS. SCHROEDER:  Is everything --
17   THE VIDEOGRAPHER:  The water and soda.
18   THE WITNESS:  Okay.
19 BY MS. SCHROEDER:
20   Q.   Okay.  How about any assault charges?
21   A.   Other than Mark Burks?
22   Q.   Um-hmm.
23   A.   No, not that I recall.
24   Q.   Okay.  Do you remember getting in a

Page 208

1 fight with Mark Burks in order to protect Frankie
2 Ivy?
3    A.   It could have happened, but I just
4 can't simply recall it at this moment.  But it's
5 very well possible.
6    Q.   Does that go in line with what we
7 talked about earlier where you would jump in to
8 maybe protect somebody that you thought needed
9 protection?
10   A.   It does.
11   MR. TAYLOR:  Objection; form.
12   THE WITNESS:  Most of the time if I saw
13 somebody being harmed, I would try to intervene
14 and stop it, you know.  And Frankie was somebody
15 that was very -- to me he was very kindhearted,
16 so ...  And Mark Burks was a bully.  Call it what
17 it is.
18   MS. SCHROEDER:  Yeah.  That's the sense I'm
19 getting.
20   THE WITNESS:  You know.  And since then I've
21 seen him at Stateville Correctional Center.  Just
22 seem to understand.
23 BY MS. SCHROEDER:
24   Q.   Did you have any run-ins with him

Page 209

1 there?
2    A.   Oh, no.
3    Q.   Okay.  Where did you learn the ability
4 to be able to protect those people you see getting
5 hurt and beat up?
6    A.   Oh, just natural instincts.  It's like
7 any child, you -- once you get the first punch in
8 the stomach, get the butterflies flowing, then I
9 guess it's -- you learn how to protect yourself.
10 Trial and error.
11   Q.   Okay.  And is that something that you
12 wanted -- let me strike that.
13        Is that something that you felt that
14 Frankie Ivy was lacking, that he didn't have the
15 ability to protect himself, and so you had to step
16 in to help him?
17   A.   It wasn't -- he just didn't have it.
18   Q.   I didn't hear you.
19   A.   He just didn't have it.  He just wasn't
20 that kind of kid.  I mean, he -- he would rather
21 run than -- I mean, I understood him.  I liked him.
22   Q.   Um-hmm.
23   A.   So he was a friend of mine, so that was
24 enough for me to not let somebody take advantage of

Page 210

1 him or hurt him if I was there to, you know, to
2 stop it.
3       Q.   Okay.  And were there other things that
4 you did for people that you felt needed your help?
5       A.   Yeah.  Groceries for the mothers in my
6 community.
7       Q.   Um-hmm.
8       A.   Whenever somebody needed help, I -- we
9 were taught, because our community was so small, we
10 would do the cup of flour, cup of sugar, or an egg,
11 meaning that you knew your neighbors and you shared
12 in that capacity, you know.
13       Q.   Okay.  Is there anything else that --
14 any other examples you can share with us that --
15 of your actions in helping others -- and now I'm
16 talking in the 1977 timeframe -- helping others
17 that you felt needed your help?
18       A.   I can't --
19       MR. TAYLOR:  Just a moment.  Just a
20 clarification.  By "1977 timeframe," are you saying
21 before he was arrested, or are you saying a time --
22 BY MS. SCHROEDER:
23       Q.   Yes.  And that is a short timeframe.
24           So I'm going to say 1976, 1977; it's

Page 211

1 the timeframe before you were arrested in -- on
2 January 25th.
3       A.   I cannot sit here and literally tell
4 you all the people that I've helped and that have
5 helped me, as it's impossible for me to recount
6 that.  You know, I mean, most of it I forgot.
7       Q.   If somebody were to ask you for help,
8 though, is that something that you would --
9       A.   Yes.
10       Q.   -- freely give?
11           Okay.  And if a friend asked you for
12 your help in, you know, any issue they might have
13 been having, is that something that you would do as
14 well?
15       A.   You didn't even have to ask.  If I
16 have, you know, the wherewithal to see you in
17 trouble, then I would help you.
18       Q.   Okay.  If a -- in your -- in that sort
19 of -- in this neighborhood you had, like with your
20 friends that you had you were talking about and
21 telling me about, if they were coming to you for
22 help -- so let's say Frank Ivy's got this issue
23 with this bully, Mark Burks, right, it's -- and
24 they are coming because they are having an issue

Page 212

1 with this bully, is that something that you're
2 going to -- you feel that you should take on on
3 your own, or would you go talk to a parent about
4 Frank needing help?
5       MR. TAYLOR:  Objection; form.
6       THE WITNESS:  It all depends on the
7 situation.  And that -- the situations you keep
8 talking about with Frankie, that was probably at
9 the spur of a moment, it was something that was in
10 my face.  I mean, I'm not no -- I can't -- I can't
11 sit up here and tell you --
12       MS. SCHROEDER:  I know.  I see that fly also.
13       THE WITNESS:  But anyway ...  I mean, it
14 was not nothing planned.  It was just something
15 reactionary.
16       MS. SCHROEDER:  It was --
17       THE WITNESS:  Best way I can say it.
18       MS. SCHROEDER:  Okay.  Okay.  So are we on
19 Exhibit 3?
20       MR. TAYLOR:  Yes.
21 BY MS. SCHROEDER:
22       Q.   Okay.  So we'll do Exhibit 3.  I'm just
23 making sure I have all the pages I need, because I
24 don't need this whole thing.  I'll do that.  Okay.

Page 213

1           So Mr. Savory, I'm going to hand
2 you a document that -- it's going to be Exhibit 3.
3 And I will tell you because we printed on two-sided
4 paper, I'm not needing us to review all of the
5 sides.  So I'll tell you the Bates numbers.  It's
6 really just these individual pages right here.  But
7 because it's printed on two sides, I'm going to
8 have to give you this whole document.
9           So I'll read into the record.  It's
10 going to be Peoria Savory 25541 through 25546 are
11 the documents that I'm handing Mr. Savory.  But
12 we're actually going to be reviewing Peoria Savory
13 25542 through 25545.
14       A.   Could you mark --
15       MR. TAYLOR:  Do you have more of these?
16       MS. SCHROEDER:  I do.  I'm going to -- I'm
17 just doing this for the record.
18       THE WITNESS:  Could you mark -- could you
19 mark that with your highlighter what you want me to
20 read, so I --
21       MS. SCHROEDER:  I'll have you do it.  I
22 don't -- because this is your exhibit --
23       THE WITNESS:  No problem.
24       MS. SCHROEDER:  -- so I don't want to mark up

Page 214

1 your exhibit, so ...
2     THE WITNESS: My exhibit. Oh, that's mine?
3     MS. SCHROEDER: Yes. I mean, you'll turn
4 it there --
5     MR. TAYLOR: You don't get to take it home.
6     (Discussion off the record.)
7     MR. TAYLOR: And what pages were you saying
8 you'd like us to look specifically at?
9     MS. SCHROEDER: Sure. I'll tell you right
10 now. So we're going to look specifically at 25542
11 through 25545.
12     MR. TAYLOR: Okay.
13     THE WITNESS: Where you at?
14     MS. SCHROEDER: Let me know when you're
15 ready, Mr. Savory.
16     THE WITNESS: What -- where are you -- where
17 are you at?
18     MS. SCHROEDER: I think you're good. So
19 we're just going to start right there. And we're
20 going to start on that page that's on your
21 left-hand side there.
22     THE WITNESS: Right.
23 BY MS. SCHROEDER:
24     Q.   Yep. And so we're going to look at the

Page 215

1 top. And you see this document, it's called Social
2 History?
3     A.   Um-hmm.
4     Q.   Okay. And then do you see underneath
5 the Identifying Data AND it has Johnnie L. Savory,
6 and then -- is that your birth date underneath your
7 name?
8     A.   Yes.
9     Q.   Okay. And is that your address that
10 you were living in in the 1976 and 1977 timeframe?
11     A.   Yes.
12     Q.   Okay. And that's your father's name,
13 Y.T. Savory; is that correct?
14     A.   Yes.
15     Q.   Okay. And then if you continue on, do
16 you see where it says Date of Hearing, and it has a
17 date October 11th, 1976?
18     A.   Um-hmm.
19     Q.   And then Petition, Delinquent. And
20 then the petitioner is a Lieutenant Marteness of
21 the Peoria Department?
22     A.   Um-hmm.
23     Q.   Do you remember Lieutenant Marteness?
24     A.   No.

Page 216

1     Q.   Okay. Do you remember any interactions
2 with this person?
3     A.   No, ma'am.
4     Q.   Okay. Okay. So do you ever remember
5 having a social history report done on you in -- in
6 or around October 11th, 1976?
7     A.   No, ma'am. This is the first time I
8 ever seen this.
9     Q.   Okay. Okay. So we'll review this
10 then.
11          And do you see there it has the
12 investigator's name, Teresa Hulslander?
13     A.   Um-hmm.
14     Q.   And then -- I'm just going to have you
15 flip so you can see it. If you flip to Peoria
16 Savory 25545. I think you can flip one more time.
17 Yep. And it'll be on the left-hand side at the
18 bottom.
19     A.   This is right hand --
20     Q.   Right-hand side. You're right. Sorry.
21          And then you see the signature where
22 it says, Respectfully Submitted, Teresa Hulslander,
23 Investigator?
24     A.   Yes, ma'am.

Page 217

1     Q.   Okay. So just I wanted you to have
2 that sort of parameters as we're walking through
3 this then.
4          So do you -- underneath the Present
5 Problem, it says here that you were made a
6 delinquent ward of the court after admitting in
7 court to your involvement in the offense of theft
8 occurring on or about October 4th, 1976.
9          And if you go down, it says, "The
10 petition states that, 'he did exert unauthorized
11 control over property of Doris Packman, being one
12 Ward's ten-speed." Do you remember --
13     A.   Where -- where are you?
14     MS. SCHROEDER: I'm at -- can you help him?
15     MR. TAYLOR: I'll highlight it for you. This
16 is the wrong page.
17     THE WITNESS: Yeah, that's what I thought.
18     MR. TAYLOR: She's all the way up on 442.
19 Right?
20     MS. SCHROEDER: I am. Yep.
21     MR. TAYLOR: Okay. She's pointing --
22     MS. SCHROEDER: Just under Present Problem,
23 yeah.
24     MR. TAYLOR: -- to this here.

JOHNNIE LEE SAVORY, 06/15/2022                    Page 218..221

Page 218

1    THE WITNESS:  You gave me the wrong page.
2    MS. SCHROEDER:  Well, I'm trying.  I'm
3 trying.  Luckily you have your attorneys --
4    THE WITNESS:  Yeah.  'Cause I --
5    MS. SCHROEDER:  -- to catch me.
6    THE WITNESS:  Where were we?
7    MR. TAYLOR:  Right under Present Problem.
8    THE WITNESS:  Okay.
9 BY MS. SCHROEDER:
10    Q.   Under Present Problem.  And so it just
11 says -- and I'll repeat it, that, "Johnnie was made
12 a delinquent ward of the court after admitting in
13 court to his involvement in the offense of theft
14 occurring on or about October 4th, 1976."  And then
15 it explains that, "The petition states that, 'he
16 exerted unauthorized control over property of Doris
17 Packman, being one Ward's ten-speed blue girl's
18 bike.'"
19         Do you remember that incident,
20 Mr. Savory?
21    A.   Not at this moment I don't.
22    Q.   Okay.  Do you remember ever being
23 accused of stealing a ten-speed bike?
24    A.   Un-uhn.

Page 219

1    Q.   Okay.  Do you remember ever admitting
2 to stealing a ten-speed bike?
3    A.   No, ma'am.
4    Q.   Okay.  So if we continue on, it says
5 that, "The police reports state that Mr. Y.T.
6 Savory reported to police that Johnnie had stolen a
7 bicycle."
8         Do you recall your father ever
9 calling the police on you to report a theft?
10    A.   I do not.
11    Q.   Okay.  Do you remember your father ever
12 calling the police on you for any reason?
13    A.   Yes.
14    Q.   Okay.  What reasons would he have
15 called the police on you?
16    A.   What I stated earlier when he would be
17 intoxicated, I would take the money and give it to
18 my schoolteacher.
19    Q.   Okay.  And is that the only time he
20 would have called the police on you?
21    A.   That's what I remember.  You know, I'm
22 not saying he did not do this.  I'm saying I don't
23 remember him doing it.  And that's all I remember
24 about it.  I don't remember him doing it.

Page 220

1    Q.   How many times did he call the police
2 on you for giving the money to your teacher?
3    A.   I don't know.  Maybe a couple times or
4 something maybe.
5    Q.   Um-hmm.  How many times did you have to
6 take the money and give it to your teacher?
7    A.   Whenever he was intoxicated.
8    Q.   And how often was that?
9    A.   He mainly drank on the weekend.  But
10 that was -- I mean, probably after payday or
11 something of that nature.  I don't -- I don't
12 actually remember the thing.  I know I -- I know I
13 did it.  I did that.  That was the only way for me
14 to help him so he -- we could still pay the rent
15 and do what we needed to do.
16    Q.   Okay.  Is that an example of you doing
17 an action that you knew you had to do in order to
18 help somebody in need?
19    A.   That was to help us.
20    Q.   Um-hmm.  Was it to help your sister?
21    A.   Yes.  Help all of us.  I mean --
22    Q.   Help you?
23    A.   Yes.
24    Q.   And help your dad?

Page 221

1    A.   Yes.
2    Q.   Okay.  Do you remember how much money
3 you would have to take to your teacher to hold?
4    A.   Man, I probably took all of it and gave
5 it to the teacher, because I didn't know -- you
6 know, I knew the rent had to be paid.  I know
7 groceries had to be bought.  So I would just take
8 it.  Once he go to sleep, I'd take it and give it
9 to her.  And then he would -- she had a way of
10 calming him down.  And then he would -- after he
11 would sober up, he wouldn't -- he wouldn't be
12 angry.
13    Q.   Okay.
14    A.   So ...
15    Q.   Do you know what kind of alcohol your
16 dad would drink?
17    A.   Whatever he bought.
18    Q.   Okay.
19    A.   You know.
20    Q.   And was he drinking at the home and
21 getting drunk?
22    A.   He would go out and drink.
23    Q.   Do you know where --
24    A.   He drank sometime at home, but, you

Page 222

1 know -- friend's house or whatever.
2    Q.   Would he go to any bars?
3    A.   I didn't really seen him at no bars.
4 You know, maybe friends' houses, people he knew in
5 the community.
6    Q.   Do you know any of the friends' names
7 whose homes he would go to?
8    A.   Not at this moment.  But --
9    Q.   Okay.
10    A.   -- give it a minute and let me think
11 about it.
12    Q.   And why -- is there a reason you
13 wouldn't have relied on your grandma to help you
14 out in this type of situation?
15    A.   Yeah, because she was always sound,
16 good judgment.
17    Q.   What does that mean?
18    A.   That means that she was stable.  And
19 that was an unstable.  It was a stable environment
20 to some degree.  You know, when he was sober, he
21 was the most wonderful person on the planet.  You
22 know what I mean?  I'm not gonna sit here and try
23 to describe an alcohol disease because everybody
24 got somebody in their family that, you know,

Page 223

1 probably going through that, whether it's drugs
2 and other things.  So I'm just giving you the best
3 account that I can at this moment.
4       But she was a wonderful grandma.
5    Q.   And you didn't want to trouble her with
6 this -- these issues, is that what you're telling
7 me?
8    A.   I think she knew her own son.  She knew
9 her son --
10    Q.   Okay.
11    A.   -- long before I knew him --
12    Q.   Okay.
13    A.   -- you know.  So I never -- I never
14 really got in trouble for it.  I mean, he would --
15 after a period of time, he would appreciate me
16 taking it --
17    Q.   Um-hmm.
18    A.   -- you know.  But when he wanted it and
19 he woke up and I wasn't there, then he became -- he
20 became angry.  He wanted to know where I was.
21       But after he seen that I was just
22 taking it and putting it up and giving it to
23 someone that, when it was all said and done, that
24 we'd still have a place to live and have food and

Page 224

1 stuff there.
2    Q.   Okay.  Is there a reason you didn't
3 give your grandma the money to hold?
4    A.   She wasn't always there.
5    Q.   Okay.
6    A.   You know, she split up between houses,
7 her son, her daughter; son, daughter, so ...
8    Q.   Okay.  And what school did this teacher
9 teach at where you would give the money?
10    A.   Ooh wee.  Linc- -- Lincoln Middle
11 School?  I mean, she taught fourth or fifth -- she
12 taught fifth grade.  So it would be Lincoln Middle
13 School.
14    Q.   Okay.  Okay.  Do you ever remember
15 being interviewed by any investigator from the
16 court system in relation to any of the juvenile
17 offenses that you told us about today?
18    A.   I just can't recall at this moment.
19 I may have spoke with someone.  I'm not going to
20 say I didn't.  But I -- I just do not remember.
21 I don't remember.  I may have talked to them.
22 I just don't remember at this moment.
23    Q.   Okay.  All right.  So let's continue
24 reading.  So we're continuing on that third

Page 225

1 paragraph where it says, The police reports state
2 that Mr. Y.T. Savory reported to police that
3 Johnnie stole a bike, and Johnnie was arrested and
4 taken to Peoria County Juvenile Detention Center.
5       Okay.  Had you ever been -- do you
6 remember being at the juvenile -- at the Peoria
7 County Juvenile Detention Center?
8    A.   Yes.  I was -- I remember being there
9 one time before this incident.
10    Q.   Okay.  And is that -- is that the same
11 thing as the Gift Home?
12    A.   Yes.
13    Q.   It is.  Okay.  And you remember being
14 there.
15       And do you remember how long you
16 were at that detention center?
17    A.   Not long.
18    Q.   Okay.  Were you there overnight?
19    A.   Maybe a day or two.
20    Q.   Okay.  And do you remember how close in
21 time it was before this January arrest?
22    A.   No.  No, I don't.
23    Q.   Okay.  Do you remember how -- or for
24 what reason you were at the detention center?

Page 226

1    A.   Not at this moment.
2    Q.   Okay.  And do you remember if -- who
3  took you to the detention center?
4    A.   I don't remember.  But I know this --
5  it could have happened.  That's what I'm saying.
6  But I just don't remember right at this moment.
7    Q.   Okay.  So we'll continue.  It says,
8  "Johnnie told police that he stole the bike because
9  he wanted to be arrested.  He said he feels as
10  though he is a burden to his father and by taking
11  the bike and being arrested he would be out of the
12  house."
13          Does this bring up a memory that --
14  of you ever feeling this way where you did
15  something in order to be arrested to be taken out
16  of the home?
17    A.   I just don't recall that at this
18  moment.
19    Q.   Okay.
20    A.   I'm not going to say I didn't say it.
21  I just don't -- I don't remember it --
22    Q.   Okay.
23    A.   -- at this moment.
24    Q.   Do you remember ever having that

Page 227

1  feeling, that maybe you were a burden to your dad
2  and wanted to leave the home?
3    A.   No.  But I had the feeling that
4  sometime it just felt helpless.  You know, I
5  just needed someone else to lean on.  So ...
6    Q.   And is that because your dad wasn't
7  there for you to lean on?
8    A.   No.  It was that he had his own pain.
9  And it took me a long time to understand the pain
10  of his life and what he had to go through.
11          And I hate to bring this up because
12  I never have used racism for any excuse of me.  But
13  they made it difficult for him to be a black dad
14  trying to raise two children.
15    Q.   Who's "they"?
16    A.   The system itself.  They were not in
17  favor of him being uneducated.  The system we know
18  that has been through the changes, we don't have to
19  pretend, you know.  It just -- it's just what it
20  is.  He tried to do his best.
21          He -- I remember him giving me his
22  fourth grade education, that's as far as he went,
23  and he took time out to teach me my ABCs and how to
24  count, how to tell time.  And he just -- being born

Page 228

1  in 1919, which is -- it was just overwhelming
2  coming from the cotton fields and just Jim Crowe
3  and all the rest of the things.
4          And so my dad had a -- and he had
5  some serious problem with police officers, mainly
6  black police officers.  He couldn't get along with
7  them.  And until I got older, I didn't understand
8  why.
9    Q.   Okay.  So I'm trying to understand that
10  answer from you.  So I think what I -- so I think
11  what I was asking was if your father wasn't a
12  person you could lean on.  And then that was your
13  answer is you were explaining to me the pain your
14  father was carrying; is that correct?
15    A.   Yes.  Yes.
16    Q.   Okay.  And is that pain, did that
17  prevent him from being the type of person or adult
18  that you could lean on?
19    A.   Well, I could lean on him in most
20  cases.
21    Q.   Okay.
22    A.   But in some things it just did not --
23  it didn't work.
24    Q.   Um-hmm.

Page 229

1    A.   But for the most part, yes.  I mean,
2  he took -- I believe he did the best job he could
3  with me and my sister.  And regardless of his
4  disease with alcohol, regardless of how he
5  addressed his own pain, I realize now we all
6  address our pains differently.
7    Q.   How did he address his pain besides
8  alcohol?
9    A.   That's enough right there.  Alcohol.
10    Q.   Oh, okay.
11    A.   That's -- getting lost in that hinders
12  your ability to rationalize situations out.
13    Q.   Did he neglect you and your sister?
14    A.   No.
15    Q.   Did he provide food for you and your
16  sister?
17    A.   Yes.
18    Q.   Did he provide a bed for you?
19    A.   Yes.
20    Q.   Did he provide furniture for the
21  apartment?
22    A.   Yes.
23    Q.   Or I guess I should ask you.  I don't
24  even know.  Was it an apartment you were living in?

Page 230

1    A.   Yes.
2    Q.   Okay.  Did he provide clothing for you?
3    A.   Yes.
4    Q.   Okay.  And your sister?
5    A.   Yes.
6    Q.   Did he provide medical care for you?
7    A.   Yes.
8    Q.   And -- any special care your sister
9 needed?
10   A.   Yes.
11   Q.   Okay.  Do you remember your father
12 bringing prostitutes to your house?
13   A.   No.
14   Q.   Do you remember gambling going on in
15 your home?
16   A.   No.
17   Q.   Do you remember your father having
18 drinking buddies in his home while you were there?
19   A.   Un-uhn.
20   Q.   Did your father ever make any
21 inappropriate suggestions to his friends about
22 your sister?
23   MR. TAYLOR:  Objection to the form.
24   THE WITNESS:  I don't understand what you're

Page 231

1 saying.
2 BY MS. SCHROEDER:
3    Q.   Well, what I'm saying --
4    A.   I mean, just tell me -- just tell me
5 what you mean.
6    Q.   So did your father ever offer your
7 sister up to his friends --
8    A.   No.
9    Q.   Let me finish.
10   MR. TAYLOR:  Let her finish.
11   THE WITNESS:  Oh.
12 BY MS. SCHROEDER:
13   Q.   That's okay.  I know -- I know you're
14 ready to answer.  But I just have to get on record.
15   Q.   Did your father ever -- to your
16 knowledge, did your father ever offer your sister
17 up to his friends for their use in exchange for
18 alcohol?
19   MR. TAYLOR:  Objection to the form,
20 foundation.
21   THE WITNESS:  No.
22 BY MS. SCHROEDER:
23   Q.   Okay.  Would you have been aware of
24 that when you were incarcerated?

Page 232

1    A.   No.
2    MR. TAYLOR:  Objection.
3    THE WITNESS:  I don't understand what you
4 mean.
5 BY MS. SCHROEDER:
6    Q.   I mean --
7    MR. TAYLOR:  Form and foundation.
8 BY MS. SCHROEDER:
9    Q.   Okay.  Would you have been aware if
10 your father did this action if you weren't living
11 in the house with him?
12   A.   Yes.  And I realize what you're asking
13 now.
14   Q.   Okay.
15   A.   Because he was convicted of that when I
16 was on trial.  Falsely.  And I think you know that
17 too.  Because the Illinois Supreme Court reversed
18 his case and sent him home.  Because that same
19 person the police used to make that statement
20 offered nothing of proof that it took place.  And
21 how shameful they did that to remove him from the
22 situation because, as I stated now, my dad was very
23 protective over me and my sister.  And two of your
24 defendants know that all so well.

Page 233

1    Q.   Who is that?
2    A.   Lieutenant Stenson and Charles Cannon.
3    Q.   And how do they know that?
4    A.   Because he had physical altercations
5 with both of them.
6    Q.   And when did that occur?
7    A.   1974 I believe one time.  And I can't
8 remember the exact date for Cannon.
9    Q.   So the 1974 was with Lieutenant Stenson?
10   A.   Oh, yes.
11   Q.   Or Defendant Stenson, I should say.
12        And then you -- there was another
13 altercation with Charles Cannon, but you don't
14 remember when?
15   A.   No.
16   Q.   And how do you know that these
17 occurred?
18   A.   I was there.
19   Q.   Okay.  And what was the -- tell me
20 about the one with Defendant Stenson.
21   A.   My dad went around the corner to one of
22 his friend's house, and me and my sister was at
23 home.  One of the neighbors called the police, and
24 they came to the home.

Page 234

1    Q.   Do you know why they were called?
2    A.   They called 'cause I guess it was -- we
3 were there in the home.
4    Q.   And what year was this?
5    A.   I don't remember the exact year, but I
6 know it was in the '70s somewheres.
7    Q.   Okay.
8    A.   '73. '74. I don't -- one of those
9 years.
10   Q.   And how old is your sister in 1973?
11   A.   My sister's probably two years older
12 than me.
13   Q.   Okay. I'm just trying to figure out --
14 as you may have learned earlier, my math is not
15 very good.
16        So in '73, you are ten; is that
17 right? About ten?
18   A.   Something like that.
19   Q.   Okay. And then your sister's twelve?
20   A.   Um-hmm.
21   Q.   And at this time is she still disabled?
22 Was she born disabled?
23   A.   I don't know that answer.
24   Q.   Okay. Okay. But at this time she is

Page 235

1 disabled?
2    A.   Yes, ma'am.
3    Q.   Okay. So the police arrive at your
4 house. And who arrives at your house, from your
5 memory?
6    A.   I remember Stenson.
7    Q.   And do you remember anyone else?
8    A.   No.
9    Q.   Did he come alone?
10   A.   I don't know. I don't remember that.
11   Q.   Okay.
12   A.   I just remember them because of what
13 took place.
14   Q.   Um-hmm. And so he arrives. And then
15 what happened?
16   A.   I ran around him because I knew my dad
17 was around the corner. And I ran and got my dad,
18 and we came back.
19   Q.   Um-hmm. And then what happened.
20   A.   They tried to take us, and he wouldn't
21 let them take us.
22   Q.   Why did they want to take you?
23   A.   That is --
24   Q.   Did they tell you why --

Page 236

1    A.   That's what I was --
2    Q.   -- they wanted to take you?
3    A.   That's what I was saying was 'cause he
4 left us at home for that short period of time. It
5 wasn't -- it wasn't even a long time. It may not
6 have been no more than 20 or 30 minutes, if that.
7 He wasn't gone -- he had just walked around the
8 corner. So they -- they say he left -- left us
9 unattended or whatever the situation may be.
10   Q.   Okay.
11   A.   I don't remember what the charges was,
12 but I know what they ended up being.
13   Q.   Were you removed from the home?
14   A.   Yes.
15   Q.   Okay. And for how long?
16   A.   I think I was -- six months, seven
17 months. I was in what I believe is temporary
18 foster care.
19   Q.   And then eventually you went back --
20   A.   Yes.
21   Q.   -- to your dad?
22   A.   Yes.
23   Q.   Okay. And were you ever told why it
24 took that long for you to be returned to your

Page 237

1 father?
2    A.   He was in the county jail for assault
3 charges on Stenson.
4    Q.   Okay. Did you ever learn if there were
5 any other reasons why you were removed from the
6 home at that time?
7    A.   No. I never.
8    Q.   Okay. And you and your sister
9 then were returned to your father after he was
10 released --
11   A.   Yes.
12   Q.   -- from jail; is that right?
13   A.   Yes.
14   Q.   Okay. And did anything ever come from
15 that assault charge, if you remember, against your
16 father?
17   A.   He did seven months in the county jail.
18   Q.   So he was convicted, and that was his
19 sentence?
20   A.   I assume he was convicted. I wasn't at
21 his --
22   Q.   Okay.
23   A.   -- trial, arraignment, or nothing else.
24   Q.   Okay. Did you have any other -- are

Page 238

1 there any other interactions with Defendant Stenson
2 that you can remember prior to your arrest?
3     A.   Not that I remember.
4     Q.   Okay.  And then you said there was
5 another incident with Defendant Cannon; is that
6 correct?
7     A.   Yes.
8     Q.   Okay.  And do you remember that
9 incident?
10     A.   I mean, I remember my dad telling me
11 he pulled a pistol on him, so ...  But I don't know
12 what became of the circumstances, don't know any
13 of that.  So I'm sure maybe somewheres in Peoria's
14 files or whatever.  I don't -- I'm not sure.
15     Q.   Okay.  And that -- that is not
16 something that you witnessed?
17     A.   No.
18     Q.   Okay.  That is something your father
19 told you; is that correct?
20     A.   Yes, yes.
21     Q.   Okay.  And did he tell you anything
22 else about the circumstances surrounding that
23 incident?
24     A.   No, ma'am.

Page 239

1     Q.   Okay.  And is there anything else about
2 that incident that you can recall to share with us?
3     A.   No.  As I've stated earlier, if I'm not
4 confused, that my dad had very little respect for
5 black police officers because of how he grew up.
6 And when black police officers entered the force,
7 they were not allowed to police no one but the
8 black community, period.  That's it.  And they were
9 very -- they were more abusive than some of their
10 white counterparts.
11     Q.   How do you know that?
12     A.   What you mean?  I watched it.  I
13 watched it growing up.  I grew up black.  And I
14 seen how our police officers treated our people in
15 our community.
16     Q.   Give me an example.
17     A.   For example, Charles Cannon's brother
18 sold drugs in our community and was never arrested.
19 He ran lounges and places like that and grocery
20 stores.
21     Q.   And how did you know he sold drugs in
22 the community?
23     A.   We all know each other.  We all live in
24 the same neighborhood.  Everybody know what you do.

Page 240

1 I'm sure when you go and -- if you go and
2 investigate his brother's history, you will
3 see just what I'm saying to you.
4     Q.   So is this something you knew --
5     A.   We knew --
6     Q.   -- before you were arrested --
7     A.   Yes.
8     Q.   -- on January 25th?
9     A.   Of course.
10     Q.   So this is information you knew when
11 you were 13?
12     A.   12.  13.  10.  We all lived in
13 basically the same community.
14     Q.   And you knew --
15     A.   Knew his brother --
16     Q.   -- he was selling drugs?
17     A.   Know his brother selling -- of course.
18     Q.   Why do you say "of course"?
19     A.   What I'm saying is I just showed you
20 that in our community, it was a very small
21 community, period.  So if you were gambling, if you
22 were drinking, you were doing whatever, everybody
23 gets a chance to see you.  It's not like you can go
24 to the North Side, go to the East Side; you were

Page 241

1 only permitted to live in your community, and
2 that's it.
3     Q.   Okay.  I want to look here at the --
4     A.   Okay.
5     Q.   I'm just going to look -- you know
6 what?  Let's go to the 25543.
7     A.   25- --
8     Q.   So it's probably -- I don't -- I can't
9 tell what page you're on.
10     A.   25543.
11     Q.   So do you see -- it's really hard to
12 see on the bottom --
13     A.   2- -- 255- --
14     MS. SCHROEDER:  Flint, can you see what page
15 he's on for me?
16     MR. TAYLOR:  Let me take a look for you,
17 Johnnie.  25543.
18     MS. SCHROEDER:  Yeah.  The Bates is bad.
19 It starts on the top 6/8/75, robbery, strong arm.
20     MR. BOWMAN:  What are you going to ask, the
21 child's history or --
22     MR. TAYLOR:  What's the title of --
23     MS. SCHROEDER:  It's -- right here.  It says
24 6/8/75, Robbery, Strong Arm.

JOHNNIE LEE SAVORY, 06/15/2022                    Page 242..245

Page 242

1      MR. TAYLOR: Oh, okay. Yeah. We got the
2  page. Right at the top, Johnnie.
3  BY MS. SCHROEDER:
4      **Q.   Okay. So do you see three lines down**
5  **from the top, Mr. Savory, it says, "Also there are**
6  **16 runaway reports on Johnnie"?**
7      A.   Um-hmm.
8      **Q.   Do you remember running away from your**
9  **home 16 times --**
10     A.   Sure, I do.
11     **Q.   -- in October 1976?**
12     A.   Sure.
13     **Q.   Okay. Why --**
14     A.   Oh.
15     **Q.   You're shrinking.**
16     A.   What happened here?
17     MS. SCHROEDER: Can we go off the record for
18  a minute.
19     THE VIDEOGRAPHER: Off the record at 5:02 p.m.
20           (Brief pause.)
21     THE VIDEOGRAPHER: We're back on the record
22  at 5:03 p.m.
23  BY MS. SCHROEDER:
24     **Q.   Okay. So we were just looking at the**

Page 243

1  **document, and three lines from the top it says you**
2  **had 16 runaway reports, and you said yes, you do**
3  **recall running away from the home multiple times;**
4  **is that correct?**
5      A.   Yes.
6      **Q.   Okay. Can you tell me -- can you tell**
7  **me -- you know, was there specific reasons that you**
8  **ran away so many multiple times?**
9      A.   I mean, I would -- I would get tired.
10  I would only be in the community, so, you know, I
11  would -- that's why I had like 20 mamas, mothers.
12  So I wouldn't -- it wouldn't never really be like
13  actually I was running away. I would just go to
14  other people's home and just -- just get tired.
15  It was overwhelming trying to be there for my dad
16  and sister.
17          I never really had a childhood. It
18  was just -- I spent most of my time trying to care
19  for them and care for myself at the same time,
20  so ... That's best way I can explain it.
21     **Q.   And you said you had like 20 mamas in**
22  **the neighborhood. Are these women whose homes you**
23  **would go to --**
24     A.   Oh, yes.

Page 244

1      **Q.   -- and they would feed you or take care**
2  **of you, that sort of thing?**
3      A.   Well, they would -- I pretty much was
4  self-sufficient. I mean, I would go there and act
5  like I was a part of their children.
6      **Q.   Um-hmm.**
7      A.   And I would do whatever, you know, take
8  out the garbage, whatever, go grocery shopping with
9  them or whatever. They knew where I was, and he
10  knew where I was too.
11     **Q.   Um-hmm. Okay.**
12     A.   Um-hmm.
13     **Q.   Very good.**
14         **If he knew where you were, why are**
15  **there runaway reports in your file?**
16     A.   I -- I couldn't tell you. He had to
17  call the police as far as I'm concerned.
18     **Q.   And why did he have to call the police?**
19     A.   I don't have no idea.
20     MR. TAYLOR: Objection to form.
21          I'm sorry. That's all right. You
22  answered. That's fine.
23  BY MS. SCHROEDER:
24     **Q.   What?**

Page 245

1      A.   I don't have -- I don't have no idea
2  why or what his mindset is. And I cannot tell you
3  that 'cause I don't -- I don't know.
4      **Q.   Okay.**
5      A.   I don't know what he was thinking.
6      **Q.   And would you run away to different**
7  **homes? Is that what you were saying to me?**
8      A.   Yes. In the neighborhood.
9      **Q.   Okay. And would you run away for**
10  **multiple nights?**
11     A.   Well, in some instances.
12     **Q.   Okay. Do you recall the longest amount**
13  **of nights you ran away from home before you**
14  **returned?**
15     A.   Maybe a couple of days. I don't recall
16  being gone longer than that.
17     **Q.   Did the police have to come find you to**
18  **bring you home?**
19     A.   Never.
20     **Q.   So how do you know that your father**
21  **called the police on you?**
22     A.   I mean, you have it right here. Who
23  called them?
24     **Q.   Okay.**

Page 246

1    A.   I'm assuming.
2    Q.   And so -- and each one of these runaway
3 reports you're saying you returned home on your
4 own?
5    A.   On my own.
6    Q.   Okay.  And who was taking care of your
7 sister when you ran away?
8    A.   I guess him and maybe my grandmother.
9    Q.   Okay.  Do you see -- Mr. Savory,
10 we're going to go to this page here where it says
11 Previous Problems.  So it's the page previous to
12 you that you -- we've already looked at.  The one
13 where it says Social History at the top.
14    A.   Social History.  Social History.
15 Summary Evaluation.  Social History.
16    Q.   Um-hmm.
17    MR. TAYLOR:  You got it?
18    THE WITNESS:  Yes, sir.
19 BY MS. SCHROEDER:
20    Q.   Okay.  So if you see down it says,
21 Previous Problems, and it says, "Johnnie has been
22 arrested for the following offenses."  And then
23 we see a shoplifting, Woolworth's, which I think
24 you had told us about the pen.

Page 247

1    A.   Right.
2    Q.   And then there's a burglary, but it
3 says "no force."  And then another burglary, and
4 it says, "This offense was subject of a delinquent
5 petition signed by the Peoria Police Department."
6        And then in December of '75, it
7 says, "Investigation, other investigation."  And
8 it says, "Johnnie was arrested for carrying seven
9 shirts from Sears and two guns from Murray's."
10        Do you remember that?
11    A.   Yes.
12    Q.   Can you explain why you were arrested
13 for carrying two guns from Murray's?
14    A.   That's just not true, though.
15    Q.   Okay.  So tell me why it's not true.
16    A.   Because I had an older cousin, and he
17 was also arrested with me.  We were both walking
18 down the street with BB guns and a shirt -- some
19 shirts.
20    Q.   So the guns that they're referencing
21 here are BB guns?
22    A.   Of course.
23    Q.   Okay.  And did you purchase those guns?
24    A.   No, ma'am.

Page 248

1    Q.   Okay.  So you did steal two guns from a
2 store; is that correct?
3    A.   I didn't --
4    MR. TAYLOR:  Hold on.  Hold on.  Objection;
5 form, assumes facts not in evidence.
6        You may answer.
7    THE WITNESS:  I'm saying that my older cousin
8 and I, we took those items from a store.
9 BY MS. SCHROEDER:
10    Q.   And did what?
11    A.   Did nothing.  Because the police came
12 and took them back.
13    Q.   Where -- where were you when the police
14 came to take them back?
15    A.   Walking -- walking down the street.
16 We never got nowhere from the store.  They came and
17 saw us walking down the street with some BB guns
18 and some shirts.
19    Q.   Had you left the store premises --
20    A.   Yes.
21    Q.   -- at that time?
22    A.   Yes.
23    Q.   Okay.  And you did not pay for these
24 items --

Page 249

1    A.   No.
2    Q.   -- is that correct?
3    A.   No.
4    Q.   Okay.  Did you eventually own -- like
5 purchase a BB gun that you had for yourself?
6    A.   No.
7    Q.   Did you ever own a BB gun?
8    A.   Yes.
9    Q.   You did.  Did you own it at the time
10 that you -- like in January 1977 timeframe?
11    A.   No, ma'am.  No, ma'am.
12    Q.   When did you have a BB gun?
13    A.   I don't know.  My dad had bought it for
14 me one Christmas or something.
15    Q.   And then what happened to it?
16    A.   I don't know.  I don't know what
17 happened to it, you know.  I don't know, it broke
18 or whatever.  I mean, you asking me to remember
19 something that I don't -- I don't remember at this
20 moment.
21    Q.   Okay.  But you do remember your dad
22 buying you a BB gun --
23    A.   Yes.
24    Q.   -- you just don't remember --

JOHNNIE LEE SAVORY, 06/15/2022                    Page 250..253

Page 250

1    A.  Yes.
2    Q.  -- if you ever --
3    A.  I don't know what happened to it.
4    Q.  -- got rid of it?
5    A.  Right.
6    Q.  Okay.  Okay.  And then I'm just going
7  to go down a couple more where it says, Johnnie was
8  a suspect in the following offenses.  And then if
9  we look at 5/13/76, it says, "Aggravated assault.
10  Johnnie was involved in fight with Mark Burks."
11  Does that sound right as to the fight that you're
12  remembering about Mark Burks?
13    A.  Yes.
14    Q.  Okay.  And is that the only -- do you
15  remember having the police being called on you with
16  regards to the fight you had with Mark Burks?
17    A.  No.
18    Q.  Okay.  Do you remember the police ever
19  being called on you regarding a fight that might
20  not have been just you and Mark Burks, but where
21  Mark Burks was involved?
22    A.  Not at this moment.
23    Q.  Okay.  Is that something that possibly
24  your memory might -- it might come to you later?

Page 251

1    MR. TAYLOR:  Objection.
2    THE WITNESS:  If I remember --
3    MR. TAYLOR:  Objection to form.
4  BY MS. SCHROEDER:
5    Q.  I'm sorry?
6    A.  I said if I remember it, yeah, I'll
7  share it with you.
8    Q.  Okay.  And then do you see the March --
9  it says, "3/7/76, Battery Simple, Johnnie admitted
10  to hitting Michael Wright"?
11    A.  I don't remember that.
12    Q.  Do you know who Michael Wright is?
13    A.  No.
14    Q.  Okay.  And then if we just drop down to
15  8/3/75, it says, "Theft, stole $185 from his
16  father."  Is that in reference to the money --
17    A.  Yes.
18    Q.  -- that you're talking about -- hang on
19  one second, Mr. Savory.
20         Is that in reference to the money
21  you're talking about that you would take from your
22  home and give to your teacher to hold?
23    A.  Yes.
24    Q.  Okay.  And this would be an example of

Page 252

1  when your father would have had to call the police
2  because you had taken the money?
3    A.  Yes.
4    Q.  Okay.  Mr. Savory, do you ever remember
5  being placed on probation for any of these offenses
6  that we reviewed?  I'm sorry.  I didn't realize ...
7    A.  Yes.
8    Q.  Okay.  And did you have a specific
9  probation officer assigned to you?
10    A.  No.
11    Q.  Do you know why -- what offense caused
12  you to be placed on probation?
13    A.  No.
14    Q.  Do you remember the terms of the
15  probation that you were placed on?
16    A.  No.
17    Q.  Okay.  And do you remember the
18  timeframe of when you were placed on probation?
19    A.  No, ma'am, not at this time.
20    Q.  Okay.  Do you re- -- do you recall
21  if you were on probation when you were arrested
22  January 25th?
23    A.  Yes.
24    Q.  Okay.  And do you recall that Percy

Page 253

1  Baker was your probation officer?
2    A.  Yes.
3    Q.  Do you recall if sometime prior to that
4  that you were actually deemed a ward of the state?
5    A.  If it did, I didn't understand it.
6    Q.  Okay.  So do you remember somebody
7  telling you sometime prior to January 25th that you
8  were a ward of the state?
9    A.  No, not at this time.  I don't
10  remember.
11    Q.  Okay.  You don't remember now at this
12  time?
13    A.  I don't remember, right.
14    Q.  Okay.  And do you remember that at the
15  time of January 25th that you had been granted a
16  legal guardian in a court hearing?
17    MR. TAYLOR:  Objection; form.
18    THE WITNESS:  I don't -- I don't remember
19  that.  I don't remember being -- nobody else being
20  my guardian.
21  BY MS. SCHROEDER:
22    Q.  Okay.  And do you remember at the time
23  of January 25th that there was a court order where
24  you would be going to a boys home in February of

JOHNNIE LEE SAVORY, 06/15/2022                    Page 254..257

Page 254

1 1977?  Do you recall that?

2      A.  I do remember going to a boys home, but

3 I don't know -- I don't remember the circumstances

4 surrounding it.

5      Q.  When did you go to the boys home?

6      A.  I don't remember the date and hour I

7 went to the boys home.  I just remember I went.

8      Q.  You just remember -- do you remember

9 how long you were there for?

10     A.  Maybe a couple days.  Maybe.

11     Q.  Do you know why you went?

12     A.  I just said I didn't know.

13     Q.  Do you recall an Officer George

14 Pinkney?

15     A.  Yeah.  He came to the school on the

16 25th.  That's the only time I remember Pinkney.

17     Q.  Had you ever met that person before?

18     A.  Not to my knowledge.

19     Q.  Okay.  Do you recall a police officer

20 working with the Catholic Social Services to have

21 you placed in a -- like a work program for a boys

22 home?

23     A.  I don't remember none of the

24 circumstances surrounding that.  Or --

Page 255

1      Q.  Do you recall working with the Catholic

2 Social Services with regards to a program that they

3 would be able to provide you?

4      A.  No, ma'am.  I didn't -- I don't recall

5 if it was Catholic, Baptist, or whatever.  All I

6 know I went to that -- whatever that boys home is.

7 But I don't remember how it took place.

8      Q.  Okay.  And do you remember, was a

9 police officer involved in that with your father?

10     A.  I don't understand.  What you mean?

11     Q.  So do you remember a time ever of

12 your -- of your father and you having to go to

13 meetings regarding your placement in a -- in some

14 sort of program that was going to help you?

15     MR. TAYLOR:  Objection; form.

16     THE WITNESS:  I can't recall.

17 BY MS. SCHROEDER:

18     Q.  Okay.  Oh, I have the name here.  Do

19 you recall if the -- what we're discussing where

20 you were at was called Victory Hall School for the

21 Boys?

22     A.  Vaguely.

23     Q.  Okay.  Do you recall anything about

24 what Victory Hall School for the Boys was?

Page 256

1      A.  All I remember is they played the

2 Beatles.

3      Q.  That they what?  Oh, played the

4 Beatles?

5      A.  Yeah.  "It's been a hard day's night."

6      Q.  Okay.  Mr. Savory, do you know what an

7 alibi is?

8      MR. TAYLOR:  Are you done with this exhibit?

9      MS. SCHROEDER:  Oh, I am for now, yes.  Thank

10 you.

11     THE WITNESS:  Yes.

12 BY MS. SCHROEDER:

13     Q.  Can you explain to me what you believe

14 an alibi is?

15     MR. TAYLOR:  Objection; form.

16     THE WITNESS:  It's an account of things that

17 you have done or say or -- it's your account what

18 took place.

19 BY MS. SCHROEDER:

20     Q.  Do you believe an alibi is used in

21 order to show that a person was at one place when

22 a crime was committed at another place?

23     MR. TAYLOR:  Objection; form.

24     THE WITNESS:  Be a little bit more specific

Page 257

1 if you can.

2 BY MS. SCHROEDER:

3      Q.  Do you believe an alibi is evidence

4 that you present to a police officer to show that

5 you were not present when a crime was committed?

6      MR. TAYLOR:  Same objection in terms of his

7 belief.

8      THE WITNESS:  Yes.

9 BY MS. SCHROEDER:

10     Q.  Okay.  And do you know what the word

11 "verifiable" means?

12     A.  Yes.

13     Q.  Okay.  Tell me what "verifiable" means

14 to you.

15     MR. TAYLOR:  Same objections.

16     THE WITNESS:  I guess if I say I was at the

17 store and you say I was at the baseball game,

18 somebody at the store will remember me or the

19 cameras would support it or whatever.

20 BY MS. SCHROEDER:

21     Q.  So it's something then -- would you

22 agree that it's something that -- information that

23 a person would have to provide in order for an

24 individual like a police officer to be able to

Page 258

1 check and demonstrate something to be true; is that
2 right?
3       MR. TAYLOR: Objection. Excuse me.
4 Objection; form, foundation.
5       THE WITNESS: As long as it's truthful.
6 BY MS. SCHROEDER:
7       Q. Um-hmm. Okay. Then would you say that
8 an alibi has to be true in order for it to be
9 verified?
10      A. Completely.
11      Q. Okay. And can you give me some
12 examples of how an alibi can be verified?
13      MR. TAYLOR: Objection; form, foundation.
14      THE WITNESS: I'm sitting here with Flint,
15 and all of you all see me sitting here with
16 Mr. Taylor.
17 BY MS. SCHROEDER:
18      Q. And so what would you tell someone in
19 order to verify that -- if somebody else needed to
20 check out your account that you were here in this
21 room with these people, what would you tell that
22 other person to do in order to verify that alibi
23 that you were here with all these people?
24      MR. TAYLOR: Objection; form, foundation.

Page 259

1       THE WITNESS: I would try to remember who
2 was present, and I would use them as a reference
3 or witnesses that I'm telling the truth.
4 BY MS. SCHROEDER:
5       Q. Okay. So give the names of the people
6 that were here with you?
7       A. That if you remember or a description
8 or whatever you can do.
9       Q. Okay. And like you said, if there was
10 video or camera work, you would provide that --
11      A. Yes, ma'am.
12      Q. -- or if they go grab that?
13      A. Yes, ma'am.
14      Q. Okay. And then is it -- is there
15 anything else that you can think of that you
16 believe a person could do in order to verify an
17 alibi?
18      A. That's it right now.
19      Q. I'm sorry?
20      A. That's as far as I'm ...
21      Q. Okay. There's nothing else that you
22 can think of right now?
23      A. I mean, there might be a laundry list
24 of things you could phrase in a different manner,

Page 260

1 but I'm -- I'm not -- I don't necessarily know what
2 all those is. But all I know is just be truthful
3 as you can --
4       Q. Okay.
5       A. -- based on your memory.
6       Q. Okay. And then would it be fair to say
7 that if an alibi isn't true, then it would be not
8 be able to be verified --
9       MR. TAYLOR: Objection.
10 BY MS. SCHROEDER:
11      Q. -- is that correct?
12      MR. TAYLOR: Objection; form and foundation.
13 That's a double whammy question. Double -- seems
14 like a double negative.
15      THE WITNESS: That depends on who's giving --
16 doing the investigating or doing the inquiry.
17 BY MS. SCHROEDER:
18      Q. So do you think that -- so then let's
19 figure this out. So if an alibi is not true -- so
20 the person giving the alibi is giving a false
21 alibi. If that alibi is not true, is it not able
22 to be verified?
23      MR. TAYLOR: Objection; form.
24      THE WITNESS: I mean, it just -- every

Page 261

1 circumstance is different. I mean, if you one on
2 one with an officer, the officer or the person he
3 interviewing, one of them could be lying. But you
4 have to dig and find out which one it is. So I
5 don't know the exact answer to that because it all
6 depends on the two people that's in the situation
7 and what the circumstances are.
8 BY MS. SCHROEDER:
9       Q. So let's say -- we're going to use the
10 same example that you used earlier about a person
11 being in this room. Right?
12      A. Um-hmm.
13      Q. So let's say I am saying that I was
14 sitting in this room with all these -- all of you
15 individuals --
16      A. Right.
17      Q. -- right, at this timeframe.
18      A. Um-hmm.
19      Q. And that's what I tell my boss so I
20 don't get in trouble.
21      A. Um-hmm.
22      Q. But the truth of the matter is I wasn't
23 in this room. I was actually down on the riverboat.
24 How -- what I'm trying to say is since that alibi

JOHNNIE LEE SAVORY, 06/15/2022                    Page 262..265

Page 262

1 that I told my boss is false, how would you be able
2 to verify that alibi?
3      MR. TAYLOR: Objection; form, confusing --
4 BY MS. SCHROEDER:
5      Q.   You wouldn't because it's false, correct?
6      MR. TAYLOR: -- confusing question.  I don't
7 see how it can be answered.
8      THE WITNESS:  Yes, but some -- one of your
9 coworkers could be in here and corroborate what you
10 just said.
11 BY MS. SCHROEDER:
12     Q.   So you could have somebody lie for you?
13     A.   Oh, yeah.  They -- they do it.
14     Q.   Okay.
15     A.   Yeah.
16     Q.   Okay.  So that would be one way to have
17 a false alibi verified, is by having somebody lie
18 for you; is that correct?
19     A.   Or you, yes.
20     Q.   Okay.  And is there any other examples
21 that you can think of where you could have a false
22 alibi verified?
23     MR. TAYLOR:  Objection; form.
24     THE WITNESS:  Not at this moment.

Page 263

1 BY MS. SCHROEDER:
2      Q.   Okay.  So do you believe you have a
3 verifiable alibi for January 18th, 1977?
4      MR. TAYLOR:  Objection; form, foundation --
5      THE WITNESS:  Yes, ma'am.
6      MR. TAYLOR:  -- calls for a conclusion.
7          Johnnie, let me finish my objection.
8      THE WITNESS:  Oh, my bad.  I apologize.
9      MR. TAYLOR:  Okay, man.
10         Go ahead on.  Did you finish your
11 answer?
12     THE WITNESS:  Yeah, I'm finished.
13 BY MS. SCHROEDER:
14     Q.   Can you just repeat it since it was --
15 to make sure we get it on the record and the video?
16     A.   Go ahead and say it again.
17     Q.   I said do you believe you have a
18 verifiable alibi for January 18th, 1977?
19     A.   Yes.
20     Q.   Okay.  What is that alibi?  Do you know
21 it?  I mean, can you sit here and recite to me what
22 your alibi is for the day of January 18th, 1977
23 that --
24     MR. TAYLOR:  Objection.

Page 264

1 BY MS. SCHROEDER:
2      Q.   -- shows you were not at Scopey's home
3 when he and his sister were murdered?
4      MR. TAYLOR:  Objection; form and foundation.
5      THE WITNESS:  Yes.
6 BY MS. SCHROEDER:
7      Q.   Okay.  Please tell me.
8      A.   On the morning of the 18th --
9      Q.   I'm sorry?
10     A.   On the morning of the 18th --
11     Q.   Okay.
12     A.   -- I woke up between 8:00 and 8:30.
13     Q.   Okay.
14     A.   I went down to the Smalleys' home.
15     Q.   Who was at your house --
16     A.   George -- George --
17     Q.   -- between 8:00 and 8:30?
18     A.   My dad.
19     Q.   Okay.  Did your dad see you?
20     A.   Yes.
21     Q.   Did you speak to your dad?
22     A.   Yes.
23     Q.   What did you say?
24     A.   Good morning.

Page 265

1      Q.   Did your dad feed you?
2      A.   No.
3      Q.   Who woke you up at 8:00 or 8:30?
4      A.   Woke myself up.
5      Q.   Okay.  Was your sister there?
6      A.   She probably was gone already.  I
7 didn't see her.
8      Q.   Okay.  Was your grandma there?
9      A.   No.
10     Q.   Anybody else in the house?
11     A.   No.
12     Q.   Okay.  8:30 you're awake.  What happens
13 next?
14     A.   I walk down the alley to the Smalleys'
15 home.
16     Q.   Yeah.  How long did it take you to get
17 there?
18     A.   Three to five minutes.
19     Q.   So what time did you arrive?
20     A.   I don't know the exact time.  But maybe
21 8:40 or whatever, something -- something after
22 getting up.
23     Q.   8:40?
24     A.   Somewhere in that neighborhood.

Page 266

1    Q.    Give or take five minutes?
2    A.    Give or take five minutes.
3    Q.    Okay.  And what did you do when you
4  arrived?
5    A.    Entered the home.
6    Q.    Did you just walk in?
7    A.    They opened the door.
8          No.  Knocked on door.  They opened
9  the door.
10   Q.    Who answered?
11   A.    Probably one of the kids.  I don't know
12  exactly who opened the door.
13   Q.    What kids were there?
14   A.    Oh, God.  Plenty.  By name, I cannot
15  name actually all of them.  But like maybe like --
16  oh, they were the younger kids.  God, I can't
17  remember all their little names.  I can't remember
18  all their names at this moment -- at this point.
19  They had a lot of children.
20   Q.    Oh.  Did you speak to any of these
21  children when you were at the house?
22   A.    Yes.
23   Q.    And what were their names?
24   A.    I don't know their names, not at this

Page 267

1  moment.
2    Q.    Were they female or male?
3    A.    They were both.
4    Q.    How many were there?
5    A.    I do not know exactly.
6    Q.    Was it a female or a male that answered
7  the door?
8    A.    I don't remember exactly who opened the
9  door.
10   Q.    Do you remember if it was a child?
11   A.    I just don't remember at this moment.
12   Q.    Do you --
13   A.    But if I recall, I'll make sure I let
14  you know.
15   Q.    But don't remember right now?
16   A.    That's what I'm trying to tell you.
17   Q.    How long have you been thinking about
18  this activities that you did on January 18th, 1977?
19   A.    Ever since they accused me of the
20  crime.
21   Q.    Okay.  So every day; is that right?
22   A.    No.
23         MR. TAYLOR:  Objection.
24

Page 268

1  BY MS. SCHROEDER:
2    Q.    Okay.  So you said ever since they
3  accused --
4          MR. TAYLOR:  Hold on.  Slow down.
5  BY MS. SCHROEDER:
6    Q.    -- you of the crime --
7          MR. TAYLOR:  Slow down.  I'd like to get my
8  objection in.  Objection; form and foundation.  And
9  he hadn't got one answer out until you're asking
10  the next.
11         MS. SCHROEDER:  Okay.
12         MR. TAYLOR:  Please let him answer, and
13  please let us object.  Thank you.
14  BY MS. SCHROEDER:
15   Q.    Okay.  So you said you've been thinking
16  about this day and your activities since the day
17  you were accused.  Did I -- did I hear that
18  correctly?
19   A.    Yes.
20   Q.    Okay.  And that was since 1977; is that
21  correct?
22   A.    Yes.
23   Q.    Okay.  And you have -- I asked you if
24  you thought about this every day.

Page 269

1    A.    No.
2    Q.    Okay.  Every week?
3    A.    I can't put no timeframe on it.
4    Q.    Okay.  But consistently over the years?
5    A.    No.
6    Q.    No?  Oh, so no, it's -- so no, you have
7  not thought about it consistently since you were
8  accused?
9    A.    Every day, no.
10   Q.    Okay.  So has your memory faded over
11  the years?
12   A.    Somewhat.
13   Q.    Okay.  So now part of the memory fade
14  is you can't remember who opened the door at the
15  Smalleys'; is that correct?
16   A.    Yes, ma'am.
17   Q.    Okay.  So somebody opens the door, and
18  you -- you're there.
19         How can you be positive about the
20  time you arrived at the Smalleys'?
21         MR. TAYLOR:  Objection.  He never said he was
22  positive.  Objection; form.
23  BY MS. SCHROEDER:
24   Q.    Okay.  No, you answer.

JOHNNIE LEE SAVORY, 06/15/2022                    Page 270..273

Page 270

1    A.   I already answered it.
2    Q.   What -- I've asked you --
3    A.   I answered.  I told you I didn't know
4 exactly what time.
5    Q.   Okay.  Do you believe that you were
6 there at 8:40 in the morning?
7    A.   And I answered that too.  You said
8 about five -- three to five minutes walking down
9 there.  Yes.
10   Q.   Okay.  So do you believe that you were
11 there between 8:35 and 8:45 in the morning on the
12 18th?
13   A.   I mean --
14   MR. TAYLOR:  Objection.  Objection to the
15 form of the question.
16   THE WITNESS:  I can't be specific with you
17 because I do not actually remember the actual time.
18 I knew it wasn't that long to walk down from my
19 house to their house down the alley.
20 BY MS. SCHROEDER:
21   Q.   Okay.  Do you remember that it was the
22 morning?
23   A.   Yes.
24   Q.   Okay.  But not -- but you don't

Page 271

1 remember the time?
2    A.   Not exact --
3    MR. TAYLOR:  Objection; mischaracterizes his
4 testimony.
5    THE WITNESS:  I don't know -- remember the
6 exact time.  I know it was shortly after I got up
7 that morning.
8 BY MS. SCHROEDER:
9    Q.   Okay.  And so the time that you woke up
10 is the time that you are sure of?
11   MR. TAYLOR:  I'm sorry.  I didn't hear that
12 question.
13 BY MS. SCHROEDER:
14   Q.   I said is the time that you woke up the
15 time that you are sure of?
16   A.   Between 8:00 and 8:30, yes.
17   Q.   Okay.  When you wake up in the morning,
18 how much time expanded between before you left the
19 house to go to the Smalleys'?
20   MR. TAYLOR:  Hold on.  You said "when you
21 wake up."  You mean now today when he wakes up
22 or -- objection; form.
23   MS. SCHROEDER:  Is he going to the Smalleys'
24 today?

Page 272

1    MR. TAYLOR:  No.
2    MS. SCHROEDER:  Okay.
3    MR. TAYLOR:  But on the other hand, you used
4 the present tense.  So that's why I'm objecting.
5 It's confusing.
6 BY MS. SCHROEDER:
7    Q.   Did you understand my question, or do
8 you need me to repeat it in a different way?
9    A.   You can repeat it a different way.
10   Q.   Okay.  So when you woke up in the
11 morning on January 18th, 1977, from the time you
12 woke up until you left the house to go to the
13 Smalleys', how much time passed?
14   A.   I don't know exactly, but it wasn't
15 much.
16   Q.   Would it have been 30 minutes?
17   A.   No.
18   Q.   Would it have been 15 minutes?
19   A.   I don't think so.
20   Q.   Would it have been ten minutes?
21   A.   Maybe so.
22   Q.   Okay.  So ten minutes after you woke
23 up, you got up and you walked out to go to the
24 Smalleys'; is that correct?

Page 273

1    A.   No.  Actually I washed my face and
2 stuff before I left out.  Brushed my teeth.  That
3 didn't take long, though.
4    Q.   Okay.  Did that take place in that ten
5 minutes before you left after you woke up?
6    A.   I'm sure it did.
7    Q.   Okay.  So -- and what you're saying here
8 is you could have woken up as early as 8:00 a.m. or
9 as late as 8:30; is that correct?
10   A.   Yes.
11   Q.   Okay.  And so now, depending on that,
12 we're getting to the Smalleys' house, and the
13 Smalleys' was just a three- to five-minute walk;
14 is that correct?
15   A.   Yes.
16   Q.   Okay.  So you go inside the Smalleys'
17 house.  Is there a reason you went to the Smalleys'
18 this Tuesday morning on the 18th?
19   A.   Not really.  I just enjoy being there.
20 It was just one of the places that I enjoyed going.
21 And plus she usually cooking early in the morning
22 breakfast.
23   Q.   Okay.  So you walk in.  And you --
24 and tell me everyone you remember seeing when you

Urlaub Bowen & Associates, Inc.  312-781-9586

Page 274

1 walked in.

2     A.   I can't.  All I can tell you is

3 Ms. Smalley asked me did I have breakfast, and

4 I said no.  And she invited me to table to eat

5 breakfast.

6     Q.   Okay.  Did you talk to anybody when you

7 were in the house?

8     MR. TAYLOR:  Other than how he's -- what he's

9 already said?

10    MS. SCHROEDER:  Yes.

11    MR. TAYLOR:  Objection; form.

12    THE WITNESS:  Her husband.

13 BY MS. SCHROEDER:

14    Q.   Okay.  Was he there when you arrived?

15    A.   Yes.

16    Q.   Okay.  And so we know Mrs. Smalley was

17 there when you arrived.  We know Mr. Smalley was

18 there when you arrived.

19         And is there anybody else with

20 certainty that you can remember was there when you

21 arrived?

22    A.   Not at this time.

23    Q.   Okay.  And what did you say to

24 Mr. Smalley?

Page 275

1     A.   Good morning.

2     Q.   Did you eat breakfast with him?

3     A.   No.  I think they might have had

4 breakfast.  I ate breakfast by myself.

5     Q.   Okay.  At the kitchen table?

6     A.   Yes.

7     Q.   Okay.  And can you remember where all

8 the other kids were at this time?

9     A.   No.

10    Q.   Okay.  Did anyone go to school?

11    A.   I believe most of them are either gone

12 or getting ready to go.

13    Q.   Okay.  Do you remember the names of any

14 of Mr. and Mrs. Smalley's children?

15    A.   Yes.  I mean, there was Annette,

16 Darlene, Selma, Maymane.  That's about it.  I can't

17 remember the rest of them.

18    Q.   Okay.  Did you remember seeing Annette

19 at the house that morning?

20    A.   I can't recall at this time.

21    Q.   Do you remember seeing Darlene at the

22 house this morning?

23    MR. TAYLOR:  Objection to form.

24    THE WITNESS:  I just can't remember seeing

Page 276

1 them that morning right now.  You know, I'm not

2 saying later on -- I can't -- I'm not saying that

3 they wasn't there.  But I'm just saying I don't

4 remember them being there at that -- at this moment

5 and juncture of this conversation.

6 BY MS. SCHROEDER:

7     Q.   Do you not believe that your alibi for

8 the morning of the day that James Robinson and

9 Connie Cooper would be extremely important for you

10 to remember today?

11    MR. TAYLOR:  Excuse me.  Objection; form,

12 foundation.  Double negative question.

13    THE WITNESS:  It was unimportant because I

14 don't keep track of where I go and mostly what I

15 see.  I mean, it just happened, the day happened.

16 I didn't get up looking for no alibi.  I didn't get

17 up looking for -- to have to prove where I was at.

18 I got up to go down to some friends' house, and

19 that's it.

20 BY MS. SCHROEDER:

21    Q.   So what do you mean by you don't keep

22 track of what -- of where you're -- what you're

23 doing?

24    MR. TAYLOR:  Objection; form.

Page 277

1     THE WITNESS:  I was a 14-year-old kid.  And

2 I don't know no 14-year-old kid keep track of what

3 he or she is doing in the course of a day.

4 BY MS. SCHROEDER:

5     Q.   Okay.  So you eat breakfast with the

6 Smalleys.

7     A.   Yes, ma'am.

8     Q.   Okay.  And then what happens after that?

9     A.   Mr. Smalley asked me would I take a

10 ride with him.  He wanted to go look at some

11 vehicle or something.  And we left together.  And

12 he went and -- some guy's something.  I guess maybe

13 the car wasn't right or whatever.  Then we came

14 back to the house.

15    Q.   Okay.  Do you remember what time you

16 left the house to go with Mr. Smalley?

17    A.   It could have been a little after 9:00.

18 I'm not sure.  Something like that.

19    Q.   Do you remember -- did you have enough

20 time to eat your breakfast --

21    A.   Yes, I --

22    Q.   -- before you left?

23    A.   Yes, I did.

24    Q.   Okay.  And then do you remember if

Page 278

1  there was a lot of time that you were sitting at
2  the house after you were done with breakfast before
3  you left?
4      MR. TAYLOR:  Objection to form.
5      THE WITNESS:  Not in my recollection.  It
6  wasn't that long.
7  BY MS. SCHROEDER:
8      Q.  Okay.  And do you remember how long it
9  took you to eat breakfast when you arrived?
10     A.  No, I do not.
11     Q.  Okay.  Is it your best recollection
12  right now that -- I think you said maybe a little
13  after 9:00.  Is that what you said?
14     A.  Yes, ma'am.
15     Q.  Okay.  Did anyone else go with you?
16     A.  I said Mr. Smalley.
17     Q.  Yeah.  That was poorly phrased.
18         Did anyone besides Mr. Smalley go
19  with you --
20     A.  No.
21     Q.  -- in the car with the two of you?
22     A.  No.
23     Q.  Okay.  And do you remember who was left
24  at the house when you and Mr. Smalley left?

Page 279

1      A.  No, ma'am.
2      Q.  Okay.  Did you say -- do you remember
3  saying goodbye to anyone when you and Mr. Smalley
4  left?
5      A.  No, ma'am.
6      Q.  Okay.  Do you remember Mr. Smalley
7  saying anything to you about this -- this errand
8  he wanted you to do with him?
9      A.  He just asked me to go and ride with
10  him.  That's it.
11     Q.  Okay.  And is that something that
12  you've done before with Mr. Smalley?
13     A.  Yes.  I'd rode with him before.
14     Q.  Okay.  How long were you driving around
15  with Mr. Smalley before you returned?
16     A.  It wasn't long.  Maybe an hour.
17     Q.  At most -- like at most an hour?
18     A.  I think so.
19     Q.  Could it have been less than an hour?
20     MR. TAYLOR:  Objection; form.
21     THE WITNESS:  I'm not sure.  I know we made
22  it back around 10:00.
23     MS. SCHROEDER:  At 10:00.  Okay.
24     THE WITNESS:  So it might not even been an

Page 280

1  hour.  It might have been 45 minutes or whatever.
2  BY MS. SCHROEDER:
3      Q.  But the one thing that you can
4  remember is that you were back at the Smalleys'
5  at 10:00 a.m.?
6      A.  10:00-something.  Not exactly 10:00.
7  Maybe 10:00, 10:05, 10:10.  It wasn't long, though.
8  I know it wasn't long.
9      Q.  Okay.  Were you back before 10:30?
10     A.  Yes.
11     Q.  Okay.  And what did you do after you
12  returned?
13     A.  I came back.  I went to the --
14  Mrs. Williams' house.
15     Q.  Okay.  And where does Mrs. Williams
16  live?
17     A.  About two or three blocks around from
18  the Smalleys' home.
19     Q.  Okay.  So how long did it take you to
20  walk to Mrs. Williams'?
21     A.  Maybe five to seven minutes, something
22  like that.
23     Q.  Is this --
24     A.  Maybe.  Maybe.

Page 281

1      Q.  Okay.  And is Mrs. Williams -- is her
2  first name Lillie?
3      A.  Yes.
4      Q.  And is she the woman that testified at
5  one of your criminal trials?
6      A.  I believe she did.
7      Q.  Okay.  So about five or seven minutes
8  after you return with Mr. Smalley, you are now at
9  Mrs. Williams' house; is that correct?
10     A.  Yes, ma'am.
11     Q.  Okay.  And why did you go to
12  Ms. Williams' house?
13     A.  She had two -- she had a foster care,
14  and she had two young children.  I used to babysit.
15     Q.  Were you going there to babysit?
16     A.  No.  I was just going there to see them
17  because they had been taken from their -- their
18  parents.
19     Q.  The foster children?
20     A.  Yes.
21     Q.  Do you remember the -- how old the two
22  foster children were?
23     A.  Maybe like five, six, or seven, eight;
24  somewhere between five and eight years old.

JOHNNIE LEE SAVORY, 06/15/2022                    Page 282..285

Page 282

1    Q.   And what did you do when you arrived at
2 Ms. Williams' house?
3    A.   Knocked on the door, went in, and told
4 her I was here to see Eric Taylor.  And I can't
5 remember the other -- the young child's name.
6    Q.   Okay.  So tell me -- you said you were
7 there to see Eric Taylor?
8    A.   Taylor, yes.
9    Q.   And Eric Taylor was one of the foster
10 children?
11   A.   Yes.
12   Q.   And then what did you want to see Eric
13 Taylor for?
14   A.   I used to babysit him.
15   Q.   And so were you just going to check --
16   A.   Check on him, yes.
17   Q.   When did you babysit him?
18   A.   I don't remember.  It's -- I don't
19 remember the year.  But I know it was maybe like
20 '75, '76 like.
21   Q.   Was he -- was this child with
22 Ms. Williams when you babysat?
23   A.   No.
24   Q.   Okay.

Page 283

1    A.   No.
2    Q.   Who was he with?
3    A.   Their parents.
4    Q.   So you knew the child's parents?
5    A.   Yes.
6    Q.   Okay.  And who were the child's
7 parents?
8    A.   The dad name is Taylor, but I don't
9 remember -- Roy Taylor.  I don't remember what
10 the mother's name is.
11   Q.   Were you friends with Roy Taylor?
12   A.   I was friends with the children.  He
13 was just somebody that my dad knew.
14   Q.   So Roy Taylor was friends with your
15 dad?
16   A.   Friends or acquaintance or whatever you
17 call it.
18   Q.   Did you have any other interactions
19 with Roy Taylor that you remember other than the
20 babysitting and the fact that he was a friend of
21 your father's or acquaintance?
22   A.   I can't recall at this moment.  But if
23 I think of something, I'll tell you.
24   Q.   Is this person, Roy Taylor, somebody

Page 284

1 that you would rely on for any sort of help if you
2 needed it?
3    A.   No.
4    Q.   Okay.  Is there any reason why you
5 would seek out Roy Taylor for anything?
6    A.   No.
7    Q.   Okay.  So now you're at Ms. Williams',
8 and you're with the foster child.  Is the other
9 child there too?
10   A.   Yes.
11   Q.   Okay.  So you're with two children?
12   A.   Yes.
13   Q.   And what do you do there?
14   A.   I played with them.
15   Q.   Okay.  And what did you do when you say
16 "played with them"?
17   A.   Played with them.
18   Q.   Like what were you playing?
19   A.   Toys, just -- I mean, I don't remember
20 the exact -- I don't remember exact how we played,
21 whether with toys or laughing and joking or
22 whatever, tickling them or whatever.
23   Q.   Okay.  And did you -- was there anyone
24 else there besides Ms. Williams and these two

Page 285

1 children?
2    A.   A bunch of other children.
3    Q.   How many?
4    A.   I don't remember.
5    Q.   And were these other children younger,
6 or were they all older?
7    A.   I assume -- I assume they was all
8 around the same age.
9    Q.   And were these all foster children of
10 Ms. Williams?
11   A.   To my -- to my knowledge.
12   Q.   Okay.  And did you have any
13 conversations with Ms. Williams?
14   A.   I mean, she was a nice lady.  I mean,
15 I -- I don't remember.  I mean, I was cordial.  She
16 was always cordial to me.
17   Q.   Um-hmm.  And is this another example of
18 you -- of this babysitting or, you know, something
19 that you would do to help out people that needed
20 your help, or was this a job that -- where you were
21 earning money?
22   A.   No, it's --
23   MR. TAYLOR:  Objection; form.
24   THE WITNESS:  No.  I was just checking on

JOHNNIE LEE SAVORY, 06/15/2022                    Page 286..289

Page 286

1 them because I missed seeing them and interacting
2 with them.
3 BY MS. SCHROEDER:
4      Q.    Okay.  Okay.  So how long were you with
5 Ms. Williams' house -- or at Ms. Williams' house?
6      A.    Maybe 45 minutes to an hour, something
7 like that.
8      Q.    Okay.  And where did you go after
9 Ms. Williams' house?
10     A.    Walked around the corner to the Ivys'
11 home.
12     Q.    Okay.  And so do you know what time you
13 arrived at the Ivys' home?
14     A.    It was about -- it was about after
15 11:00, almost 12:00.
16     Q.    And did you go into the home, the Ivy
17 home?
18     A.    Yes.
19     Q.    Okay.  And did you walk in, or did you
20 have to knock on the door and --
21     A.    Knocked on the door.
22     Q.    -- be let in?
23           And who let you in?
24     A.    Tina.  To my -- best of my recollection.

Page 287

1      Q.    Was there anyone else at the Ivy home
2 when you entered?
3      A.    I remember her parents being there.
4      Q.    What do you remember about the parents
5 being there?
6      A.    That they were there.
7      Q.    Do you remember seeing them?
8      A.    Yes.
9      Q.    Okay.  Where were they?
10     A.    I don't remember.
11     Q.    Okay.  Did you talk to them?
12     A.    I spoke to them.
13     Q.    What did you say?
14     A.    Hello.
15     Q.    Did you say anything else?
16     A.    Not to my knowledge.
17     Q.    Did they say anything to you?
18     A.    No.  Also I asked where were Frankie,
19 but he was in school.
20     Q.    And why did you go over to the Ivys'
21 house?
22     A.    To see Frankie.
23     Q.    Did you have plans to see him that day?
24     A.    No.

Page 288

1      Q.    Okay.  Did you have a reason to believe
2 that he wouldn't be at school that day?
3      A.    No.  I just took a chance.
4      Q.    Okay.  Did you stay at the Ivys' house?
5      A.    No.
6      Q.    Okay.  How long were you at the Ivys'
7 house before you left?
8      A.    Not long.
9      Q.    15 minutes?
10     A.    Five minutes.
11     Q.    Five minutes.  Did you talk --
12     A.    Maybe seven.
13     Q.    Five to seven minutes.
14           Did you talk with Tina?
15     A.    Yes.
16     Q.    And what did you say?
17     A.    I told her I was getting ready to go
18 get ready for school.
19     Q.    Anything else that you discussed?
20     A.    She asked me where I went to school,
21 and I told her Late Afternoon High.  And she say,
22 I'm starting down there today, but I don't know how
23 to get there.
24           So I told her that I had two passes

Page 289

1 and if she meet me in front of my house on the
2 corner, we can catch the bus and I'd show her how
3 to get there between 2:00 and 2:30.
4      Q.    Okay.  So any other discussions --
5      A.    No, ma'am.
6      Q.    -- with Tina?
7      A.    No, ma'am.
8      Q.    Okay.  And then you -- did you leave
9 after this conversation with Tina?
10     A.    Yes, ma'am.
11     Q.    And where did you go?
12     A.    Home.
13     Q.    Okay.  And how long did it take you to
14 get home?
15     A.    Two, three minutes or less.
16     Q.    And what did you do when you got home?
17     A.    Just went in and sit down, looked at a
18 little television, started getting my stuff ready
19 for school.
20     Q.    What did you watch on the television?
21     A.    I have no idea.
22     Q.    Do you remember what time this was when
23 you got home?
24     A.    I mean, it was -- I don't remember

JOHNNIE LEE SAVORY, 06/15/2022                          Page 290..293

Page 290

1  exact time.  But I know I only stayed at their
2  house for five minutes, and it took me two or three
3  minutes to walk up to my home or less.  So I ain't
4  keep track of no time, what the exact time is.
5      Q.   Okay.  How long were you at your house?
6      A.   Until 2:00 o'clock.
7      Q.   Was anyone --
8      A.   2:30.
9      Q.   I'm sorry?
10     A.   2:00 o'clock, you know.
11     Q.   Was anyone at the house with you when
12  you -- wait.  Was anyone at the house with you when
13  you arrived after leaving the Ivys' house?
14     A.   No, ma'am.
15     Q.   Did anyone come home during the time
16  that you were there from leaving the Ivys' house
17  until you left again at 2:00 o'clock?
18     A.   No, ma'am.
19     Q.   Do you -- did you have a telephone at
20  this time in your house?
21     A.   No, ma'am.
22     Q.   Okay.  Do you know where your father
23  was?
24     A.   No, ma'am.

Page 291

1      Q.   Okay.  Did you do anything else at your
2  house during this timeframe that you did not tell
3  us?
4      A.   No, ma'am.
5      Q.   Okay.  You left your house at 2:00
6  o'clock?
7      A.   About that.  Maybe a little after, not
8  too much.
9      Q.   Okay.  And then where did you go after
10  that?
11     A.   Walked to the corner to wait for Tina
12  to come so we can get on the bus.
13     Q.   Tina met you at the corner?
14     A.   Yes.
15     Q.   Okay.  And how did she know what time
16  to meet you at the bus?
17     A.   I shared that with her when we left --
18  before I left her house.
19     Q.   And what time did you tell her to meet
20  you?
21     A.   Between 2:00 and 2:30, because I didn't
22  know when exactly when the bus was coming.
23     Q.   And did Tina meet you?
24     A.   Yes.

Page 292

1      Q.   Okay.  And did you catch the bus?
2      A.   Yes.
3      Q.   Okay.  And did you stay at the bus stop
4  with her the whole time?
5      A.   Yes.
6      Q.   Did you ever leave to go back to your
7  house while she was waiting for the bus?
8      A.   Not that I recall.
9      Q.   So that's something that you don't
10  remember if you did or did not?
11     A.   Not that I can recall at this moment.
12     Q.   And is -- I'm just clarifying.  When
13  you say, "I can't recall at this moment," does that
14  mean you can't remember whether you did or did not
15  leave the bus stop while waiting for the bus?
16     A.   I cannot recall at this moment.  But if
17  I do recall it, I'll let you know.
18     Q.   Okay.  You get on the bus?
19     A.   Yes, ma'am.
20     Q.   And do you know what time you got on
21  the bus?
22     A.   It was in between that time.  I don't
23  know exactly what time the bus came.
24     Q.   You and Tina got on the bus?

Page 293

1      A.   Yes.
2      Q.   Okay.  And then where did you go after
3  that?
4      A.   The bus took us downtown.
5      Q.   Okay.  And?
6      A.   When we got near the school, I pointed
7  to her to go walk down that way, she'll find the
8  school.  And I continued on the bus.  I continued
9  on on the bus.
10     Q.   And how further down on the bus route
11  did you go?
12     A.   To the courthouse.
13     Q.   And did you get out at the courthouse?
14     A.   Yes.
15     Q.   And why did you get out at the
16  courthouse?
17     A.   To see my probation officer.
18     Q.   Why were you going to see your
19  probation officer?
20     A.   Because I was supposed to go down
21  there, I guess, and see him.  I probably didn't see
22  him in a time, but I wasn't --
23     Q.   I can't -- I'm sorry.  I couldn't hear
24  you.

JOHNNIE LEE SAVORY, 06/15/2022                    Page 294..297

Page 294

1    A.   I said I went down there to see him
2 because I think either he called and asked me to
3 come or something. Something, you know. I knew I
4 had to go see him. I didn't see him -- hadn't seen
5 him in a while I don't think.
6    Q.   Were you supposed to see him regularly?
7    A.   Not really. I mean, I would go every
8 other day or something like that. It wasn't no
9 real set time. But I guess he wanted to see me to
10 know how I was doing, something like that.
11    Q.   How did you know he wanted to see you?
12    A.   I don't recall it at this -- but I
13 remember something. I don't know -- I don't
14 remember at this moment.
15    Q.   Do you -- so do you -- get off the bus.
16 Did you go directly to your probation officer?
17    A.   Yes, ma'am.
18    Q.   Okay. And who was that?
19    A.   I saw Percy Baker and Sherman Jones.
20    Q.   Okay. Do you remember what time you
21 arrived at his office?
22    A.   Before 3:30.
23    Q.   Okay. And then how long were you there?
24    A.   Not long.

Page 295

1    Q.   15 minutes?
2    A.   Maybe five.
3    Q.   Okay. And what did you discuss when
4 you arrived?
5    A.   Just told him -- he asked me how I was
6 doing. I told him okay.
7    Q.   And then where did you go from there?
8    A.   I left with Sherman Jones and walked
9 to Cilco because he had to pay a light bill or
10 something.
11    Q.   And then from there?
12    A.   Went to school.
13    Q.   And who did you see at the school?
14    A.   My classroom.
15    Q.   Okay.
16    A.   And classmates.
17    Q.   Is that where you went first? You went
18 straight to your classroom?
19    A.   Yes.
20    Q.   Okay. And then what time did you
21 arrive at your classroom?
22    A.   I think I arrived on time. 3:30.
23    Q.   You arrived at 3:30?
24    A.   Or little bit before. Something.

Page 296

1    Q.   Before 3:30?
2    A.   Something. I'm just guessing.
3    Q.   You're guessing?
4    A.   Yes.
5    Q.   Okay. And then did you stay in your
6 classroom for how long?
7    A.   I don't actually remember how long it
8 was. I can't remember how long I stayed in there.
9 I just don't remember the exact time how long I
10 stayed in there.
11    Q.   Um-hmm. When did you learn Scopey was
12 killed?
13    A.   9:00-something at night.
14    Q.   How?
15    A.   The news.
16    Q.   And where were you watching the news?
17    A.   At the Ivys'.
18    Q.   And who was there with you?
19    A.   The entire family.
20    Q.   Can you name them?
21    A.   Not all of them. The mother, the
22 father, Frankie, James. I'm not sure about Tina
23 and Ella, but, I mean -- or Lula. But Ruby. And
24 that's all I can remember at this moment.

Page 297

1    Q.   What did you learn?
2    A.   I learned that they had been murdered.
3    Q.   Anything else?
4    A.   Yeah, I sit there in disbelief.
5    Q.   Do you remember the news channel?
6    A.   No.
7    Q.   Do you remember the newscaster?
8    A.   No.
9    Q.   Do you remember what they said?
10    A.   Not -- not word for word.
11    Q.   Do you remember what you saw on the TV
12 screen?
13    A.   No. I can't -- I can't remember what I
14 saw on there.
15    Q.   Where were you sitting?
16    A.   In the living room.
17    Q.   With who?
18    A.   With the family.
19    Q.   Where?
20    A.   Don't remember.
21    Q.   What did you do after you learned that
22 your friend Scopey had been murdered?
23    A.   I left and went home.
24    Q.   Did you say anything to the Ivys?

JOHNNIE LEE SAVORY, 06/15/2022                    Page 298..301

Page 298

1    A.   I said something to James; that I
2 couldn't believe it 'cause I was just with him.
3    Q.   Did you say anything else?
4    A.   That's it.
5    Q.   Did you say anything to Ella?
6    A.   No.
7    Q.   Did you say anything to Tina?
8    A.   No.
9    Q.   Did you say anything to Frankie?
10   A.   I just said Frankie.
11   Q.   I thought you said James.
12   A.   Frankie.
13   Q.   Did you say anything to James?
14   A.   No.
15   Q.   Did you say anything to the dad?
16   A.   No.
17   Q.   Okay.  Did you spend the night at the
18 Ivys'?
19   A.   No.
20   Q.   Did you ever spend the night at the
21 Ivys'?
22   A.   No.
23   Q.   Once in your life?
24   A.   No time in my life.

Page 299

1    Q.   Okay.  So you walked home?
2    A.   Yes.
3    Q.   From the Ivys'?
4    A.   Yes.
5    Q.   Okay.  Did you go straight home?
6    A.   Yes.
7    Q.   Okay.  And who was at your house when
8 you arrived home?
9    A.   My dad.
10   Q.   And what time did you arrive home?
11   A.   I'm not sure.  Maybe 9:45, 10:00,
12 something like that.  Maybe, you know.  It
13 wasn't -- wasn't long.  I can't judge the minutes
14 right now.
15   Q.   And was anyone else at the house with
16 you and your dad at this time?
17   A.   My sister.
18   Q.   Your sister?
19   A.   Yes.
20   Q.   Anyone else?
21   A.   No, ma'am.
22   Q.   Okay.  Did you tell your dad your
23 friend had been murdered?
24   A.   I don't know if I did or didn't.  I

Page 300

1 can't remember at this moment.
2    Q.   Is there a reason you wouldn't have
3 told him?
4    MR. TAYLOR:  Objection; form.
5    THE WITNESS:  I just don't remember if I told
6 him or if I did not tell him.  I don't recall.
7 BY MS. SCHROEDER:
8    Q.   Doesn't it seem like that would have
9 been a shocking thing that you would have wanted to
10 tell your dad?
11   MR. TAYLOR:  Objection; form.
12   THE WITNESS:  It was already shocking.  I
13 just couldn't believe it.  So, you know, I may have
14 said something to him, and I may not have said
15 something to him.  I'm just letting you know right
16 now I don't remember if I did or if I didn't.
17 BY MS. SCHROEDER:
18   Q.   But you remember saying something to
19 the Ivys; is that right?
20   A.   I remember saying something to Frankie.
21   Q.   Okay.  So now you're at home.  Do you
22 stay at your house the whole night?
23   A.   Yes.
24   Q.   Okay.  Do you go to bed, or do you stay

Page 301

1 up?
2    A.   Stayed up a little while.
3    Q.   And what did you do?
4    A.   I don't remember.
5    Q.   You don't remember?
6    A.   No.  Not at this moment.
7    Q.   Did you sleep in your bed?
8    A.   Yes.
9    Q.   The whole night?
10   A.   Yes.
11   Q.   What did you do the next morning?
12   A.   I don't remember.
13   Q.   What time did you wake up?
14   A.   I don't remember what time I woke up.
15   Q.   What did you do after you woke up on
16 the 19th?
17   A.   I don't remember.
18   Q.   Do you remember if your dad was home?
19   A.   Yes, he was home.
20   Q.   So you remember your dad being home?
21   A.   Yeah.
22   Q.   Okay.  What else do you remember about
23 the 19th?
24   A.   Very little right now sitting here

Urlaub Bowen & Associates, Inc.   312-781-9586

Page 302

1  talking to you.
2      Q.    Why?
3      A.    I just can't -- 45 years ago.
4      Q.    Okay.  So as the time has passed and
5  your memory is fading?
6      MR. TAYLOR:  Objection; form.
7      THE WITNESS:  I guess you can call it that.
8  BY MS. SCHROEDER:
9      Q.    You -- I am just trying to -- you told
10  me it's been 45 years, so I'm asking you is the
11  fact that it's been 45 years the reason you can't
12  remember?
13     A.    And it's -- I expressed to you that --
14  some things I can recall as they are.  Some things
15  I cannot recall at this time.  And I said to you
16  that if and when I can recall them, because you
17  asked me to please let you know, let your attorneys
18  know, and I'm trying to do that for you, you know,
19  so you can have the information you need.  And I
20  don't tell you something that I don't remember at
21  that moment -- at this moment.
22     Q.    Okay.
23     A.    Yes, ma'am.
24     Q.    Is it fair to say, though, that because

Page 303

1  it's been 45 years, it's human nature that memory
2  is not going to be as clear as it would have been
3  that day?
4      A.    Correct.
5      MR. TAYLOR:  Objection -- hold on.  Objection
6  to the form, particularly to the asking him about
7  human nature.
8          You may answer if you know.
9      THE WITNESS:  I think all human beings forget
10  some point in their life.  Some people forget what
11  they did yesterday.  So I'm not no expert on the
12  human mind or human nature.  But I know you cannot
13  go through life remembering every single thing you
14  ever did in your entire life, let alone any period
15  of time or trauma or whatever that's been involved
16  in your life.
17  BY MS. SCHROEDER:
18     Q.    Okay.  Okay.  At school, you said you
19  were in the classroom.  Did you stay at school
20  until 6:00 o'clock --
21     MR. TAYLOR:  Objection.
22  BY MS. SCHROEDER:
23     Q.    -- on the 18th?
24     MR. TAYLOR:  Oh, okay.  Thank you.

Page 304

1      THE WITNESS:  I think me and another
2  classmate were playing and -- I believe the
3  teacher sent me to the principal's office.
4  BY MS. SCHROEDER:
5      Q.    Because you were playing?
6      A.    Yeah, with another student.
7      Q.    And what were you doing in this play
8  that would send you to the principal's office?
9      A.    I believe it was like throwing paper or
10  a book or something like that.
11     Q.    And why did you throw a book?
12     A.    I just -- we was in there horseplaying.
13     Q.    Who was the friend?
14     A.    I didn't say it was a friend.
15     Q.    Who was the person?
16     A.    I don't remember.  It was just another
17  classmate, somebody that we was acting silly in the
18  classroom.
19     Q.    And then where did you go?  To the
20  principal's office?
21     A.    Yes, ma'am.
22     Q.    Who was the principal?
23     A.    I do not remember his name.
24     Q.    And what happened there?

Page 305

1      A.    I believe he gave me a suspension for
2  a couple of days.
3      Q.    And then what did you do?
4      A.    Took a bus.
5      Q.    To where?
6      A.    Going -- took a bus going down to see
7  Scopey to find out why he wasn't at school.
8      Q.    When you were at the principal's
9  office, was there any radio playing?
10     A.    Not to my knowledge.
11     Q.    Okay.  Was there a television playing?
12     A.    Not to my knowledge.
13     Q.    Okay.  So you're taking a bus because
14  you want to go find out why Scopey's not in school.
15         Were you and Scopey in the same
16  classroom?
17     A.    I don't believe so.
18     Q.    So how would you know that he was not
19  at school?
20     A.    Because we always greet each other when
21  we're at school.
22     Q.    Where do you greet each other?
23     A.    Cafeteria.
24     Q.    And when do you greet other?

Page 306

1    A.   Whenever we see one another, whether
2 it's coming into the school, at the cafeteria.
3 Whenever we see each other, that's when we greet
4 each other.
5    Q.   And do you see each other every day of
6 school at the beginning of school?
7    A.   Yeah, depending on the class.
8    Q.   And depending on what class?  What does
9 that mean?
10   A.   That means math, science, or whatever
11 classroom studies that you're in at the time.
12   Q.   So are there some classes where you
13 would not see him at the beginning of school?
14   A.   I mean, yes.  If we in two different
15 classes, yeah.  If he in math class and I'm in
16 science class, how I'm gonna see him?
17   Q.   Okay.  So how did you know he wasn't at
18 school?
19   MR. TAYLOR:  Objection; asked and answered.
20   THE WITNESS:  I didn't see him.  Nobody --
21 you know, I just didn't see him.  And I know the
22 following day I told him that when we get to school
23 we was supposed to meet up there.  And I didn't see
24 him.

Page 307

1 BY MS. SCHROEDER:
2    Q.   So you did make a plan to meet up with
3 Scopey the next day?
4    A.   At school.
5    Q.   Why?
6    A.   What do you mean "why"?  I don't
7 understand what you're saying.
8    Q.   I'm asking you why would you have made
9 a plan to meet up with Scopey at school?
10   A.   I think that's what most --
11   MR. TAYLOR:  Objection to the form, "meet up
12 at school."  I think she's -- are you trying to ask
13 him that they made the plan at school, or they made
14 the plan to meet up at school?
15   MS. SCHROEDER:  I'm asking him his answer
16 what he means and why he did that.
17   THE WITNESS:  I give you --
18   MR. TAYLOR:  Objection; form.
19       Go ahead on.
20   THE WITNESS:  I'll give you the same answer
21 I gave to you before.  Before I left his home, we
22 agreed to meet up at school, on the 17th.
23   MS. SCHROEDER:  Okay.
24   THE WITNESS:  That's the same answer that you

Page 308

1 asking me now.
2 BY MS. SCHROEDER:
3    Q.   And where were you going to meet?
4    A.   At school.
5    Q.   In the cafeteria?
6    A.   Wherever.  That's what I'm saying.
7 There's no specific place.
8    Q.   Okay.  How long were you at school
9 before you were expelled?
10   A.   I don't remember the exact time.
11 Maybe -- I don't know.  30 minutes.  40 minutes.
12 I don't know how long it was.
13   Q.   And when you arrived at school, did you
14 have to go straight to your classroom?
15   A.   Yes.
16   Q.   Okay.  And then right from that
17 classroom, did you have to go straight to the
18 principal's office because of the horseplay?
19   A.   Yes.
20   Q.   Okay.  And right when that principal
21 said you're being -- did he suspend you or expel
22 you?
23   A.   I believe he suspended me.
24   Q.   Okay.  All right.  So right when he

Page 309

1 suspended you, did he tell you you had to leave the
2 school grounds?
3    A.   Yes.
4    Q.   Okay.  Did someone have to walk you out
5 of the school?
6    A.   No.
7    Q.   Did he watch you walk out of the
8 school?
9    A.   I'm not sure.
10   Q.   Did you leave immediately after he told
11 you you were suspended?
12   A.   I believe I did.
13   Q.   Okay.  How did you know that Scopey
14 wasn't in one of the classrooms when you were only
15 at the school for 30 minutes?
16   A.   I don't recall at this moment.
17   Q.   Okay.  But somehow you knew he was not
18 at school; is that correct?
19   A.   I did not see him.
20   Q.   And you assumed, because you did not
21 see him, he was not at school?
22   A.   Yes.
23   Q.   And you did not think he might have
24 been in his classroom?

JOHNNIE LEE SAVORY, 06/15/2022                    Page 310..313

Page 310

1    A.   I did not.
2    Q.   Okay.  And why not?
3    A.   I just didn't.
4    Q.   So you decide to get on a bus and go to
5  his house?
6    A.   Yes.
7    Q.   Okay.  And what was your intention of
8  doing that with -- what were your plan -- what were
9  you going to plan to do when you got to Scopey's
10 house?
11   MR. TAYLOR:  Objection; form.
12   THE WITNESS:  Just see him.  Talk to him.  We
13 can go play around or whatever.
14 BY MS. SCHROEDER:
15   Q.   And it didn't occur to you that he
16 could have been in school for another two hours?
17   MR. TAYLOR:  Objection; asked and answered.
18   THE WITNESS:  Same answer I gave you.
19   MS. SCHROEDER:  Okay.
20   THE WITNESS:  I just assumed because I didn't
21 see him.
22 BY MS. SCHROEDER:
23   Q.   Something was telling you that he
24 wasn't at school?

Page 311

1    A.   Yes.
2    Q.   Okay.  What did you do when you got to
3  Scopey's house?
4    A.   I didn't go directly to his house.
5    Q.   Why not?
6    A.   The bus stopped at where Marva lives
7  first.
8    Q.   And then what did you do?
9    A.   Knocked on her door and went in and sit
10 down for a few minutes.
11   Q.   And why did you do that?
12   A.   Because that's what I wanted to do, I
13 guess, you know.  Say hello to her and -- and her
14 daughter.
15   Q.   Did you just change your mind from
16 wanting to go --
17   A.   No.
18   Q.   -- straight to Scopey's and check on
19 him?
20   A.   No.
21   MR. BOWMAN:  Objection.
22   THE WITNESS:  No.
23       May I take a break?
24   MS. SCHROEDER:  I'm sorry?

Page 312

1    THE WITNESS:  May I take a break?  I been
2  trying to raise my hand for the longest.  Can I
3  take a break?
4    MS. SCHROEDER:  How much time do we have on
5  the record?
6    THE VIDEOGRAPHER:  Five hours 52 minutes.
7    MS. SCHROEDER:  Okay.
8    THE WITNESS:  Thank you.
9    THE VIDEOGRAPHER:  Ending media 3 of the
10 deposition of Johnnie Lee Savory.
11       Off the record at 6:13 p.m.
12       (Recess taken.)
13   THE VIDEOGRAPHER:  And beginning media number
14 4 of the deposition of Johnnie Lee Savory.
15       We're back on the record at 6:31 p.m.
16 BY MS. SCHROEDER:
17   Q.   Johnnie, you were eventually -- on
18 January 25th, two officers came to speak to you at
19 Late Afternoon School; is that correct?
20   A.   Yes, ma'am.
21   Q.   Okay.  And do you remember those
22 officers coming to speak to you?
23   A.   Yes, ma'am.
24   Q.   Okay.  And do you remember their names?

Page 313

1    A.   (No response.)
2    Q.   Do you remember what they -- if you --
3  do -- if you don't remember, it's -- it's fine.
4  If you have a description, you could give me a
5  description.
6    A.   They were two while males.
7    Q.   Okay.  And do you recall if you had
8  ever seen these individuals before?
9    A.   I don't recall ever seeing them before.
10   Q.   Okay.  And do you remember the
11 circumstances of you speaking with them on
12 January 25th?
13   A.   I don't remember everything was said.
14 I remember them coming, and I re- -- oh, boy.  I
15 believe they asked me did I know Scopey.
16   Q.   Okay.  Do you remember where you met
17 them?
18   A.   The principal's lounge, teachers'
19 lounge, somewhere like that.
20   Q.   Okay.  And was anyone else present
21 besides just the two officers?
22   A.   I don't believe so.
23   Q.   How did you know to speak with these
24 two officers?

JOHNNIE LEE SAVORY, 06/15/2022

Page 314

1    A.   The principal.

2    Q.   Okay.  Was the principal still there
3  when you were -- began speaking with these two
4  officers?

5    A.   No.

6    Q.   Okay.  And do you -- you said that
7  you recall they wanted to ask you questions about
8  Scopey; is that correct?

9    A.   Yes.

10   Q.   Okay.  Because this has been -- this is
11  January 25th, and Scopey was killed on January 18th;
12  is that correct?

13   A.   Yes.

14   Q.   Okay.  And do you remember anything
15  else about this interview with these two officers
16  and yourself about Scopey?

17   A.   I believe I said that I did not want to
18  talk to them or something like that.

19   Q.   Do you remember specifically what they
20  asked you?

21   A.   I don't remember the specific questions
22  that they asked me.

23   Q.   Do you remember why you said you didn't
24  want to talk to them?

Page 315

1    A.   Not at this moment I don't.

2    Q.   Do you feel like you've ever known why
3  you didn't want to talk to them?

4    MR. TAYLOR:  Objection to the form.

5    THE WITNESS:  I don't believe I even remember
6  the -- I just don't remember at this -- at this
7  point I just don't -- I can't recall it, I guess.

8  BY MS. SCHROEDER:

9    Q.   Did you know -- you knew that they
10  wanted to ask you about your friend Scopey, right?

11   A.   Yes.

12   Q.   Okay.  And at this time did you -- had
13  a -- had a killer been found of your friend?

14   MR. TAYLOR:  I'm sorry.  A what?

15   MS. SCHROEDER:  A killer.

16   MR. TAYLOR:  Oh.

17   THE WITNESS:  Not to my knowledge.

18  BY MS. SCHROEDER:

19   Q.   Okay.  And were you aware of any
20  investigation that was going on for his murder?

21   A.   Not really.

22   Q.   Okay.  What were you aware of?

23   MR. TAYLOR:  Objection; form.  Excuse me.

24

Page 316

1  BY MS. SCHROEDER:

2    Q.   I guess I should say what were you
3  aware of about your friend's murder?

4    A.   Very little.

5    Q.   Okay.  Did you know he was dead?  Is
6  that correct?

7    A.   Yes, ma'am.

8    Q.   Okay.  Did you, at this time on
9  January 25th, even have the knowledge that his
10  sister had been killed?

11   A.   Yes.

12   Q.   Okay.  And had you gone to the funeral?

13   A.   Yes.

14   Q.   Okay.  Who did you go to the funeral
15  with?

16   A.   Some other children in the neighborhood.

17   Q.   Which children?

18   A.   At this -- right now I don't remember
19  which ones it was.

20   Q.   Okay.  And --

21   A.   I just know it was some other people my
22  age.

23   Q.   Were you upset when you were at the
24  funeral?

Page 317

1    A.   Yes.

2    Q.   And did you stay at the funeral for a
3  long time?

4    A.   I don't believe so.

5    Q.   Did you come and go multiple times to
6  the funeral?

7    A.   I don't recall doing that.

8    Q.   Do you believe that you only went once
9  and stayed there?

10   A.   I can't --

11   MR. TAYLOR:  Objection; form.

12   THE WITNESS:  I can't say for sure.

13  BY MS. SCHROEDER:

14   Q.   Did you ask friends to go to the
15  funeral with you?

16   A.   Yes.

17   Q.   Why?

18   A.   I don't recall my reasoning at this
19  point.

20   Q.   Did you talk to Scopey's mom?

21   A.   No.

22   Q.   Did you talk to Scopey's stepdad at the
23  funeral?

24   A.   No.

Page 318

1    Q.    Did you talk to any of Scopey's family
2 at the funeral?
3    A.    No.
4    Q.    Did you offer your condolences to the
5 family at any time?
6    MR. TAYLOR:  Objection to form.
7    THE WITNESS:  Not that I recall.
8 BY MS. SCHROEDER:
9    Q.    Did you go over to Scopey's house at
10 any time between the day of his death and the
11 funeral?
12    A.    No, ma'am.
13    Q.    Okay.  Is there a reason why you didn't
14 go?
15    MR. TAYLOR:  Objection.  Are you -- are you
16 excluding the day of the murder in that question?
17    MS. SCHROEDER:  I did say between the murder
18 and the funeral.
19    MR. TAYLOR:  Right.  But --
20    MS. SCHROEDER:  So yes, I'm excluding it.
21 So the 19th -- whenever the -- I don't know what
22 day the funeral was.  I'm not including the 18th.
23    MR. TAYLOR:  Okay.  Thank you.
24    THE WITNESS:  No.  Because I did not really

Page 319

1 know his mother and father.  I did not know his
2 family like I would know somebody that I lived next
3 door to or whatever.  I did not know them.  So
4 chances are I just didn't feel comfortable --
5    MS. SCHROEDER:  Okay.
6    THE WITNESS:  -- doing that.
7 BY MS. SCHROEDER:
8    Q.    You did end up going back to his house
9 on the 18th, though; isn't that correct?
10    A.    Like what point you talking about?
11    Q.    I'm talking about the 18th.  You did go
12 to Scopey's house on the 18th?
13    A.    Yes, I did.
14    Q.    Okay.  What time did you go?
15    A.    A little after 5:00, somewhere around
16 there.
17    Q.    And how long were you there for?
18    A.    I stood outside for, God, maybe till
19 the last bus came.
20    Q.    Okay.  And at that time police officers
21 were there; is that correct?
22    A.    Yes, ma'am.
23    Q.    Okay.  And did you talk to police
24 officers?

Page 320

1    A.    No, ma'am.
2    Q.    Okay.  And did you talk to news
3 reporters?
4    A.    No, ma'am.
5    Q.    Okay.  Did you talk to anyone?
6    A.    I don't recall talking to anyone.
7    Q.    Where did you -- where were you when
8 you were at Scopey's house?
9    A.    In the crowd with everybody else.
10    Q.    Okay.  And what time did the last bus
11 come?
12    A.    Shortly before 7:00 o'clock I believe
13 that's when the last bus runs.
14    Q.    Okay.
15    A.    If I'm not mistaken.
16    Q.    Okay.  Do you -- and then we've already
17 discussed where you were after that.  You ended up
18 at home around -- do you remember -- I forget -- I
19 don't want to misquote you.  But I thought you said
20 around 10:00 or 11:00.  I don't know, though.  I
21 don't want to --
22    MR. TAYLOR:  Objection; form.
23 BY MS. SCHROEDER:
24    Q.    So I -- yeah.  Whatever you had said

Page 321

1 previously --
2    A.    Yeah.
3    Q.    -- is when you arrived at home.
4         Do you remember anything from the
5 day after January 19th, where you stayed from
6 January 19th until January 25th?
7    A.    I was at home.
8    Q.    Did you stay at home every night?
9    A.    Yes.
10    Q.    Okay.  And you were suspended, though;
11 isn't that correct?
12    A.    Yes, ma'am.
13    Q.    Do you remember what you did during the
14 daytime on those days?
15    MR. TAYLOR:  Objection.  He said he was
16 suspended for a day or two, and you're talking
17 about a broader -- you're talking about from the
18 19th to the 25th.  So --
19    MS. SCHROEDER:  I was -- my understanding, it
20 was longer than that.
21    MR. TAYLOR:  Okay.  Well, my objection is to
22 form.
23 BY MS. SCHROEDER:
24    Q.    Okay.  Very good.

JOHNNIE LEE SAVORY, 06/15/2022                    Page 322..325

Page 322

1     Do you remember what you were doing
2 during the days when you weren't at school?
3     A.   No, ma'am.
4     Q.   Or the evenings, I should say, because
5 your school starts later.
6     A.   Seem like nothing.
7     Q.   Okay.  But as you're sitting here
8 today, you're confident that you were at home every
9 night between January 19th and January 25th?
10    A.   Yes, ma'am.
11    Q.   Okay.  Did you see your dad every
12 night?
13    A.   Yes, ma'am.
14    Q.   Okay.  Did you spend the night there
15 every night?
16    A.   Yes, ma'am.
17    Q.   Did you wake up in the morning at your
18 house every morning?
19    A.   I woke up at some point.
20    Q.   And was your dad there?
21    A.   Yes.
22    MR. TAYLOR:  Objection; asked and answered.
23 BY MS. SCHROEDER:
24    Q.   Okay.  So now we're back to

Page 323

1 January 25th, and you're at the school with the two
2 officers.  And you've told them you don't want to
3 talk about Scopey.
4     A.   No, ma'am.
5     Q.   Okay.  But you change your mind; is
6 that correct?
7     MR. TAYLOR:  Objection; form.
8     THE WITNESS:  I did not tell them that I
9 didn't want to talk to them about Scopey.  I told
10 them I did not want to talk to them.
11 BY MS. SCHROEDER:
12    Q.   Didn't they ask you that the reason
13 they wanted to speak to you was about Scopey?
14    A.   Yes.
15    Q.   And so what you're saying is you don't
16 mind speaking about Scopey, you just don't want to
17 talk to the police officers?
18    MR. TAYLOR:  Wait.  Objection.  That's --
19 that assumes -- objection; form.
20    MS. SCHROEDER:  Okay.
21    THE WITNESS:  I didn't know them.
22 BY MS. SCHROEDER:
23    Q.   You didn't know them?
24    A.   No.  I didn't know -- I didn't want to

Page 324

1 talk to them.
2     Q.   So you do know the reason why you
3 didn't want to talk to them?
4     A.   I just said I don't -- I do know why I
5 don't want to talk -- I just didn't want to talk to
6 them maybe because they were police officers.  I
7 don't know why -- what the reasoning really was.
8 But I just didn't want to talk to them.  I didn't
9 feel like talking to anyone, period.
10    Q.   Why?
11    A.   'Cause I just didn't want to.  I don't
12 understand the reasoning.  And I don't really
13 recall.  I just didn't feel like talking to anyone.
14 I didn't feel like doing nothing.  I just wanted to
15 just -- I don't know what I was going through at
16 that moment.
17    Q.   Okay.  But you did end up talking to
18 them, correct?
19    A.   Yes.
20    Q.   Okay.  And do you remember what you
21 talked to them about?
22    A.   It was very brief.  I don't remember
23 what I actually talked to them about there.  But
24 when we got to the station, I think they was

Page 325

1 telling me that it was -- if there was something I
2 could remember, it might be helpful, what have you.
3 Something along the lines you -- they wanted me to
4 search my mind and see if I saw something, heard
5 something, or did I notice what ...
6     Q.   Um-hmm.  And did you tell them that you
7 were with Scopey on the 17th at his house?
8     A.   I'm know not sure.  I may have, though.
9     Q.   Okay.  And so -- and so if you did tell
10 them that you -- if you were there on the 17th,
11 then that would be indicative of you being one of
12 the last people to see your friend Scopey before he
13 was killed the next morning; is that correct?
14    MR. TAYLOR:  Objection; form.  Makes
15 assumptions not in evidence.
16    THE WITNESS:  Maybe outside their family,
17 yes --
18    MS. SCHROEDER:  Um-hmm.
19    THE WITNESS:  -- I mean, I was ...
20 BY MS. SCHROEDER:
21    Q.   Yep.  Okay.
22         And so would that be understandable
23 then why the officers would want you to think about
24 if there's anything you could remember that might

Page 326

1 help them in their investigation?

2     MR. TAYLOR: Objection; form.

3     THE WITNESS: In my forethought now today,
4 it makes sense. But it didn't make too much sense
5 back then because I just didn't understand what
6 they was asking me to see or didn't see. And I
7 tried to remember anything I could, but I just ...

8 BY MS. SCHROEDER:

9     Q.   And so did you tell them -- strike
10 that.

11         Did you answer their questions then
12 with the best of your ability with memory? Is that
13 correct?

14     MR. TAYLOR: Excuse me. Objection. Are you
15 reading from a report?

16     MS. SCHROEDER: No, I'm not. I just put it
17 right there. But I'm not reading it.

18     MR. TAYLOR: Okay. Can you show him the
19 report so we know what you're talking about?

20     MS. SCHROEDER: No, because I'm not talking
21 about a report. I'm asking him about the best of
22 his memory.

23     MR. TAYLOR: Okay. Go -- do it as you may.
24 But the objection stands in terms of the form and

Page 327

1 the nature of the question.

2     THE WITNESS: I believe I shared with them
3 the best of my understanding.

4 BY MS. SCHROEDER:

5     Q.   And at this point with these two
6 officers, are you being truthful?

7     A.   Yes.

8     Q.   Okay. And at this point with these two
9 officers, are you providing them all the information
10 that you have in response to their questions?

11     A.   All that I understand to the best of my
12 recollection.

13     Q.   Okay. And do you remember the type of
14 room you were sitting in when you were having this
15 conversation at the school?

16     A.   I think I was -- I think --

17     MR. TAYLOR: I'm confused. I thought you
18 were talking about a conversation he had at the
19 station.

20     MS. SCHROEDER: Nope.

21     MR. TAYLOR: Okay. Well, did you understand
22 she's talking about the conversation at the school
23 rather than when they took you to the station?
24 Because you said that it was a brief conversation

Page 328

1 at the school.

2     THE WITNESS: It is --

3     MS. SCHROEDER: That's right. And we're
4 talking about the conversation at the school.

5     MR. TAYLOR: Do you understand that?

6     THE WITNESS: Now I do. But no, I didn't --
7 it was -- it was brief. That wasn't a real -- they
8 really questioned me when we got back to the police
9 station.

10 BY MS. SCHROEDER:

11     Q.   So you also were being truthful at the
12 police station then is what you're telling me?

13     A.   To the best of my ability.

14     Q.   To the best of your ability.

15     A.   What I understood about what they were
16 saying.

17     Q.   Got it. Okay.

18         So let's start at the school,
19 though. We're going to jump back there. Okay?

20         So at the school you're being
21 questioned by two officers; is that correct?

22     A.   Yes.

23     Q.   Okay. And you told those two officers
24 initially you didn't want to speak; is that

Page 329

1 correct?

2     A.   Yes, ma'am.

3     Q.   Okay. And you -- sitting here today,
4 you're saying you don't really know why you didn't
5 want to talk to them, you just didn't want to?

6     A.   I can't recall at this moment.

7     Q.   Got it.

8         But you eventually did speak with
9 them, correct?

10     A.   Yes.

11     Q.   Okay. And what I'm asking you is
12 those questions those two officers asked you at the
13 school, were you being truthful in your answers to
14 them?

15     A.   To the best of my recollection and
16 understanding from that day.

17     Q.   Okay. So when you say to the best of
18 your recollection, does that mean your recollection
19 as you sit here today you're trying -- to best of
20 your recollection, you believe you were being
21 truthful, or are you talking about your recollection
22 on January 25th, 1977 as you were answering?

23     A.   As of January 25th --

24     Q.   Okay.

Page 330

1   A.   -- 1977.
2   Q.   Got it.
3        Do you recall, as you sit here today,
4   whether there was anything that was preventing you
5   from having an accurate recollection of events that
6   happened on January 17th -- or January 18th at this
7   time when you were answering these questions to
8   these two officers in the school?
9   A.   I mean, they were asking me what I
10  remember about the night of the 17th. And I shared
11  with them that I really didn't remember too much.
12  They was asking me did I hear anything, did I see
13  anything, did I -- they were asking me about what
14  was the atmosphere, what was going on in the
15  atmosphere.
16       And to the best of my recollection,
17  I believe I answered their questions as best I could.
18  Q.   Okay. Did there come a time when you
19  left the school with these two officers?
20  A.   Yes, ma'am.
21  Q.   Okay. Did they ask you to go with them?
22  A.   Yes, ma'am.
23  Q.   Okay. And what was your response?
24  A.   I was reluctant, but I went.

Page 331

1   Q.   Okay. And why were you reluctant?
2   A.   I ain't never left -- police ain't
3   never took me from no school before or asked me
4   anything. So I didn't realize why you were taking
5   me now if I was just -- you was trying to ask me
6   did I remember something, and I don't remember,
7   what reason would you have to take me?
8   Q.   Did you ask them?
9   A.   No. I did not ask them.
10  Q.   Did they explain it to you?
11  A.   Not that I recall.
12  Q.   So you don't remember?
13  A.   I don't recall what they said to me to
14  leave.
15  Q.   Okay. Okay. So you do agree to leave
16  with them, and you go -- do you remember -- did you
17  go into a car with them?
18  MR. TAYLOR: Objection to form. The first
19  part of the question, I don't think it's accurate
20  to say that he, quote, "agreed" to go with them.
21  It implies more than his testimony --
22  MS. SCHROEDER: Oh, my gosh, Flint, the
23  speaking objections.
24

Page 332

1 BY MS. SCHROEDER:
2   Q.   Okay. Mr. Savory, did you get into a
3   car with the two officers?
4   A.   Yes. They convinced me to go with them.
5   Q.   They convinced you. How?
6   A.   By telling me that I could possibly be
7   helpful to them.
8   Q.   Okay. Did you not believe them?
9   A.   I guess kinda sorta, but not really.
10  Q.   Why?
11  A.   I mean, I didn't know anything to
12  help them. That's why. I didn't believe that
13  I knew anything or saw anything about that night
14  that would help them with the case now. I just
15  didn't -- and I still don't remember nothing that
16  could have helped them. That's about the size of it.
17  Q.   So you get into the car with the two
18  officers; is that correct?
19  A.   Yes, ma'am.
20  Q.   Okay. Were you handcuffed?
21  A.   No, ma'am.
22  Q.   Okay. And where did you sit in the car?
23  A.   In the back.
24  Q.   Okay. Did you have any conversations

Page 333

1 when you were walking from the school to the car?
2   A.   Not that I remember.
3   Q.   Okay. And did you walk in front of the
4   officers or behind the officers?
5   A.   I don't remember that.
6   Q.   Okay. And you get in the car. And
7   then what do you do once you're in the car?
8   A.   Sit down.
9   Q.   Okay. And then do you go -- do you
10  drive -- do they drive somewhere?
11  A.   Yes.
12  Q.   Where do you go?
13  A.   To the best of my recollection, it was
14  to the police station.
15  Q.   Okay. Did you ever stop at your house?
16  A.   I don't remember stopping there.
17  Q.   You don't remember?
18  A.   I can't recall stopping there.
19  Q.   You don't recall stopping?
20  A.   No.
21  Q.   Okay. Do you remember telling the
22  officers that you had a knife similar to Scopey's
23  and you could get it from your home?
24  A.   I don't recall telling that --

Page 334

1 I don't -- not at this moment as we're talking,
2 I don't recall saying that to them.
3      Q.  Okay.  Do you remember stopping at your
4 house and you getting out of the police car to go
5 see if you could get the knife?
6      A.  I don't recall it.
7      Q.  Okay.  Do you remember stopping at the
8 house and the police officers letting you out, but
9 you could not get into your home because your door
10 was locked and your dad was not home?
11     A.  Not right now.  I don't remember that.
12     Q.  Did you have a knife that was similar
13 to a knife that Scopey owned?
14     A.  Never.
15     Q.  Never.
16          Okay.  Did you ever tell anybody
17 that you and Scopey bought similar knives from
18 Murray's?
19     A.  I do not recall it at this time.
20     Q.  Okay.  Okay.  So you arrive at the
21 police station; is that right?
22     A.  Yes.
23     Q.  Okay.  Tell me about that.  Did you
24 walk into the station?

Page 335

1      A.  Yes.
2      Q.  Okay.  Did you walk in with the two
3 police officers?
4      A.  Yes.
5      Q.  Did you walk in front of them or behind
6 them?
7      A.  I do not remember.
8      Q.  Okay.  Did you have handcuffs on?
9      A.  No, ma'am.
10     Q.  Okay.  Did they -- had you ever been to
11 the police station before?
12     A.  Yes.
13     Q.  How many times?
14     A.  I don't recall.
15     Q.  Too many to recall?
16     A.  I just don't recall.
17     Q.  More than one?
18     A.  Maybe.
19     Q.  More than five?
20     A.  I just don't recall at this point.
21 It could be one, two.  I just don't recall at this
22 moment.
23     Q.  So multiple times, but you don't
24 remember how many times?

Page 336

1      MR. TAYLOR:  Objection; form.  One is not
2 multiple.
3      MS. SCHROEDER:  More than one is.
4      MR. TAYLOR:  He said one, two.
5      MS. SCHROEDER:  Correct.
6      THE WITNESS:  I do not recall --
7      MS. SCHROEDER:  Okay.
8      THE WITNESS:  -- how many times.  But it
9 wasn't no lot of times, though.
10     MS. SCHROEDER:  Okay.
11     THE WITNESS:  I don't know.  I don't know
12 right now.
13 BY MS. SCHROEDER:
14     Q.  Did you ever go to the police station
15 by yourself?
16     A.  No.
17     Q.  Did you ever go to the police station
18 on your own and ask to speak to an officer?
19     A.  No.
20     Q.  Did you ever go to the police station
21 on your own and ask to speak to Officer Marcella
22 Teplitz?
23     A.  Not that I remember.  I don't recall
24 ever going to the police station by myself and

Page 337

1 asking to speak to anyone.
2      Q.  Okay.  Had you -- in these times you
3 remember that you had been to the police station,
4 what do you remember -- who were you with when you
5 went to the police station?
6      A.  I don't recall that either.
7      Q.  Okay.  Was it because you were
8 arrested?  Is that what you're recalling?
9      A.  I only remember being arrested for that
10 19-cent Bic pen.  I don't -- or also the -- the --
11 with my cousin, so ...
12     Q.  What's your cousin's name?
13     A.  Lewis.
14     Q.  Lewis what?
15     A.  Donley.
16     Q.  Lewis Donnelley?
17     A.  Donley.
18     Q.  Is he in Peoria?
19     A.  Yes.
20     Q.  Is he still in Peoria?
21     A.  I have no idea.
22     Q.  Okay.  So you walk into the police
23 station.  You've been there before.  Where do you go?
24     A.  They took me to a room.

JOHNNIE LEE SAVORY, 06/15/2022                          Page 338..341

Page 338

1    Q.   Do you -- had you ever been in this
2 room before?
3    A.   Not to my knowledge.
4    Q.   You don't remember?
5    A.   I don't remember.
6    Q.   Okay.  So you could have been, you just
7 don't remember --
8    A.   Yeah.
9    Q.   -- right now?
10   A.   Yeah.
11   Q.   Okay.  And who was in the room when you
12 went in there?
13   A.   The two officers that brought me.
14   Q.   Okay.  Anybody else?
15   A.   Not to my knowledge.
16   Q.   Okay.  And then what happened next?
17   A.   They sat down and began to ask me
18 questions again.
19   Q.   The two officers that brought you?
20   A.   Yes.
21   Q.   Was there anybody else in the room with
22 you when these questions began?
23   A.   No, ma'am.
24   Q.   Okay.  And where were you sitting?

Page 339

1    A.   I believe across the table from them or
2 something like that.
3    Q.   Okay.  Was the door open or closed?
4    A.   Closed.
5    Q.   Okay.  And were there any windows?
6    A.   Possibly.  I can't remember.
7    Q.   Okay.
8    A.   But I think possibly there might have
9 been a window or something.  I'm not sure.
10   Q.   All righty.  And do you remember now
11 these two officers that brought you from the school
12 and are now questioning you, do you remember what
13 they were asking you?
14   A.   They were asking me all kind of
15 questions.  I just -- I don't remember exactly
16 what it was.
17   Q.   But the questions had to deal with
18 Scopey?
19   A.   It had something to do with him --
20   Q.   Okay.
21   A.   -- the case itself.
22   Q.   And did it have to deal with your
23 friendship with Scopey?
24   A.   Somewhat.

Page 340

1    Q.   Okay.  And do you remember if it had to
2 deal with you being at Scopey's house on the 17th?
3    A.   I believe so, yes.
4    Q.   Okay.  And is this the conversation
5 that earlier Flint had said was perhaps confusing,
6 is this the conversation that you had referenced
7 earlier where you said you were truthful in your
8 answers to these officers' questions?
9    A.   To the best of my recollection.
10   Q.   You were truthful?
11   A.   Yes.
12   Q.   Okay.  And would there have been any
13 reason for you to not be truthful to these officers
14 when you answering their questions?
15   A.   No, ma'am.
16   Q.   Okay.  And -- I mean, really did you --
17 did you feel like you were trying to help the
18 officers find out who killed your friend?
19   A.   Yes.
20   Q.   Okay.  And that kind of goes in line
21 with this personality that we've learned about you
22 that you are willing to take that extra step to
23 help a person in need; is that correct?
24   MR. TAYLOR:  Objection; form.

Page 341

1    THE WITNESS:  Yes.
2 BY MS. SCHROEDER:
3    Q.   Okay.  And your friend Scopey had been
4 murdered.  So certainly he's a person in need, and
5 you are helping by offering what information you
6 had that may assist in the investigation; is that
7 correct?
8    MR. TAYLOR:  Objection; form.
9    THE WITNESS:  I'm trying to remember anything
10 that could help.
11 BY MS. SCHROEDER:
12   Q.   Okay.  Okay.  And so knowing that,
13 being truthful to the officers is going to be
14 the best way for you to help them in their
15 investigation; is that correct?
16   MR. TAYLOR:  Objection; form.
17   THE WITNESS:  So I believed.
18 BY MS. SCHROEDER:
19   Q.   Okay.  Okay.  Did you ever tell these
20 officers that you called Scopey on the 17th after
21 you had left his home?
22   A.   I don't recall at this time.
23   Q.   Okay.
24   A.   You know, I just don't remember telling

JOHNNIE LEE SAVORY, 06/15/2022                    Page 342..345

Page 342

1 them that day.  We talking about we was there for
2 some hours.  I cannot remember everything that I
3 said or they asked me.
4      Q.   Okay.
5      A.   I just don't -- I just don't recall it
6 at this moment.
7      Q.   Do you remember ever telling anyone
8 that you called Scopey late at night on the 17th
9 after you had left his house?
10     A.   Not at this moment.
11     Q.   Okay.  Do you remember ever learning
12 from Scopey that he was having trouble with some
13 big dude and needed help learning to defend
14 himself?
15     A.   No.
16     Q.   Okay.  Did you ever tell anybody that
17 you were going to be practicing karate with Scopey?
18     A.   Not that I remember.
19     Q.   You don't remember?
20     A.   Un-uhn.
21     Q.   Okay.  You don't remember now if you
22 told somebody that, is that what you're saying?
23     A.   I don't remember at all.  I just don't
24 remember having that conversation with someone.

Page 343

1      Q.   Okay.  And did you and Scopey ever
2 practice karate?
3      A.   No.
4      Q.   And did you ever tell anybody that you
5 were -- you and Scopey were practicing karate and
6 how to defend against a knife?
7      A.   Not that I recall.  I don't think so.
8 I doubt it.  I can't remember telling anyone that.
9      Q.   Okay.  Did you tell Ella Ivy that?
10     A.   I don't remember telling anyone that.
11     Q.   Okay.  Is it true?
12     A.   Was what true?
13     Q.   Did you and Scopey ever practice karate
14 and how to defend against a knife fight?
15     A.   No.
16     Q.   Okay.  And so why do you believe that
17 some people are saying that you have said that?
18     MR. TAYLOR:  Objection.  Hold on, hold on.
19 I object that -- vague.  That misstates the record.
20 And -- the form and a foundation.
21 BY MS. SCHROEDER:
22     Q.   Okay.  Do you want me to ask the
23 question again?
24     A.   Yes, ma'am.

Page 344

1      Q.   Okay.  Why do you believe more than one
2 person is saying that you told them that you and
3 Scopey were practicing karate and how to defend
4 against a knife?
5      MR. TAYLOR:  Same objections.
6           You may answer.
7      THE WITNESS:  I have no idea.
8 BY MS. SCHROEDER:
9      Q.   Okay.  And is -- this is something that
10 you are saying you never said?
11     A.   I don't recall ever saying that.
12     Q.   You don't remember saying it?
13     A.   I don't recall at this point ever
14 saying that.
15     Q.   Okay.  Is there any reason -- any
16 reason you can think of that you might have said
17 that?
18     MR. TAYLOR:  Objection; form.
19     THE WITNESS:  I can't think of any.
20 BY MS. SCHROEDER:
21     Q.   Okay.  Do you recall telling the
22 officers that you learned that Scopey was dead when
23 you heard about it on a radio in your principal's
24 office when you were suspended?

Page 345

1      MR. TAYLOR:  Objection; form.
2      THE WITNESS:  I can't recall saying that to
3 them or to anyone.
4 BY MS. SCHROEDER:
5      Q.   Is it true that you did hear it on a
6 radio station in your principal's office?
7      A.   No.
8      Q.   Okay.  So do you know why somebody
9 would have said that that's what you told them?
10     MR. TAYLOR:  Objection; form.
11     THE WITNESS:  I don't have the mindset of
12 understanding any human being saying whatever they
13 say.  I can't -- I can't figure out why a person
14 would make the statement they made or -- I mean,
15 I'm not no psychic.  All I can do is answer for me.
16 BY MS. SCHROEDER:
17     Q.   But these are -- people are saying
18 these are your answers to their questions.
19     A.   That's the point.  That's what they're
20 saying.  That's not what I said -- remember saying
21 to them.  Now, where they derive from that, I guess
22 you would have to ask them other than myself 'cause
23 I don't know.
24     Q.   But you did at some point say you did

JOHNNIE LEE SAVORY, 06/15/2022                    Page 346..349

Page 346

1 kill Scopey, right?

2    A.   Yes.

3    Q.   And you did at some point say you

4 killed Connie; is that correct?

5    MR. TAYLOR:  Objection.

6    THE WITNESS:  After Bowers just decimated me

7 in that polygraph room.  In the middle of the

8 polygraph examination, he just got up, called me a

9 liar, murderer, everything he could think of.  And

10 he broke my will because it left me with no choice.

11 They wasn't listening to me.  They wasn't honoring

12 what I said.  Didn't want to talk to you.  I'm

13 tired of talking to you.

14        And I couldn't understand how I

15 became from helping to becoming a suspect in

16 something that I had nothing to do with.  So it

17 broke my will to make me say something that I did

18 not mean.  And you gave me the words to say in my

19 mouth because when I said I didn't do something,

20 they said I did.

21    Q.   Okay.

22    A.   When I say I didn't want to talk to

23 you, even after all that, you didn't stop.

24    Q.   Let's talk about that.  So you brought

Page 347

1 up Mr. Bowers.  So you're -- this is the polygraph

2 that you're talking about on January 26th; is that

3 correct?

4    A.   Yes, ma'am.

5    Q.   Okay.  And you're at the polygraph

6 office; is that correct?

7    A.   Yes, ma'am.

8    Q.   Okay.  And that's not at the police

9 station; is that right?

10    A.   Yes, ma'am.

11    Q.   Okay.  And do you remember who was with

12 you at the polygraph office at this time?

13    MR. BOWMAN:  At which time?

14    MS. SCHROEDER:  At the time I'm talking about

15 when he's at the polygraph office for Mr. Bowers.

16    MR. BOWMAN:  So during the polygraph with

17 Bowers, is that what you're asking?

18 BY MS. SCHROEDER:

19    Q.   No.  I asked him who was at like the

20 office.  Who -- not administering the polygraph.

21 Who is all there at the office with you?

22    A.   I believe several of the officers.

23    Q.   Do you remember specifically any of

24 them?

Page 348

1    A.   Marcella Teplitz.  I can't think of the

2 other officers that was there.

3    Q.   Okay.  Was Percy --

4    A.   But I know that -- I don't remember him

5 being there.

6    Q.   You don't remember Percy Baker being

7 there?

8    A.   I can't recall him being there.

9    Q.   And you remember Officer Teplitz being

10 there?

11    A.   Yes.

12    Q.   And do you believe there was another

13 officer there?

14    A.   I believe there was a couple more

15 officers there -- that brought -- brought me there

16 that was --

17    Q.   Okay.

18    A.   -- there in that -- not in that room,

19 but --

20    Q.   Right.  In the -- walking into the

21 office in the --

22    A.   Yeah.

23    Q.   -- whatever, the waiting room -- or

24 yeah.

Page 349

1    A.   The foyer room or whatever.

2    Q.   And then Mr. Bowers -- you eventually

3 go to do a polygraph; is that correct?

4    A.   Yes, ma'am.

5    Q.   Okay.  This is your second polygraph?

6    A.   Yes, ma'am.

7    Q.   So you know what to expect?

8    A.   No, ma'am.

9    Q.   You gave a polygraph the night before?

10    A.   Yes, ma'am.

11    Q.   And you then knew what was

12 going to be required of you in order for them to

13 administer a polygraph to you on the 26th --

14    MR. TAYLOR:  Objection.

15 BY MS. SCHROEDER:

16    Q.   -- is that correct?

17    MR. TAYLOR:  Objection to form.

18    THE WITNESS:  No, ma'am.  I knew they were

19 gonna hook me up to this machine.  But Mr. Jenkins

20 was nice.  He wasn't -- he was respectful.  He did

21 not badger me or yell at me or -- he didn't do any

22 of that.  So actually I thought I was going back to

23 see Mr. Jenkins again.

24

Page 350

1 BY MS. SCHROEDER:

2    Q.   Okay.  So do you -- are you taken into
3 a room for this polygraph?

4    A.   Yes, ma'am.

5    Q.   Okay.  And who takes you back there?

6    A.   I don't remember who actually escorted
7 me.  It could have been Bowers himself, but I'm not
8 sure.

9    Q.   Okay.  And can you describe for me what
10 happens to you when you go into the room?

11    A.   He sit me down in the chair.

12    Q.   Um-hmm.

13    A.   Put this thing around both -- this
14 thing -- he put this thing around my chest and put
15 something on my -- I believe on my fingers.

16    Q.   Um-hmm.

17    A.   And asked me to state my name and a few
18 other, I guess, personal questions, you know,
19 How old are you?  Something -- something like that.

20    Q.   Okay.

21    A.   I don't -- you know.

22    Q.   Nothing about the case or the --

23    A.   Not yet.

24    Q.   -- investigation?

Page 351

1             Okay.  And then is it just you and
2 Mr. Bowers in the room?

3    A.   Yes, ma'am.

4    Q.   Is the door closed?

5    A.   Yes, ma'am.

6    Q.   Okay.  And are you facing him or turned
7 away from him?

8    A.   He's sitting in front of me.

9    Q.   So you're looking at him?

10    A.   Yes, ma'am.

11    Q.   And can you describe the -- like is it
12 a table, a desk?  How -- where are you sitting, and
13 where is he sitting?

14    A.   I don't remember exactly.  I know he
15 was in front of me.  I was sitting in a chair and
16 with the polygraph machine either left or right.
17 I don't remember which one.

18    Q.   Okay.

19    A.   And he -- that's what I remember.

20    Q.   Okay.  Was he standing or sitting?

21    A.   I believe he was sitting.

22    Q.   Okay.  Did the room have windows?

23    A.   Yes.

24    Q.   Okay.  And so he asked you these

Page 352

1 personal non, you know, investigative --

2    A.   Yes.

3    Q.   -- questions?

4             Okay.  And then what does he tell you?

5    A.   He started asking me different
6 questions.  I don't remember exactly what it was,
7 but he wasn't pleased with my answers.

8    Q.   And how did you know he wasn't pleased?

9    A.   Because he got in my face, and he start
10 yelling, You a murderer, you a liar.  And the
11 polygraph ended.

12    Q.   How many -- how long after the
13 polygraph began before he started yelling this
14 at you?

15    A.   I want to say maybe 10, 15 minutes.
16 I'm not sure, but it wasn't -- it doesn't feel like
17 it was long.

18    Q.   Okay.  Is this the first time someone
19 has yelled at you like this since you had been
20 being interviewed by the police officers regarding
21 this case?

22    A.   Yes.

23    Q.   Okay.  And is this the first time
24 somebody had raised their voice to you in this

Page 353

1 manner during the time of this investigation while
2 you were there at the police station January 25th
3 to the 26th?

4    A.   Yes, ma'am.

5    Q.   Okay.  Had anybody like called you a
6 murderer before this moment?

7    A.   No, ma'am.

8    Q.   Okay.  And going into the second
9 polygraph, you said you thought it was going to be
10 Jenkins and he was respectful; is that correct?

11    A.   Yes, ma'am.

12    Q.   Okay.  And did you understand why you
13 were being asked to give a second polygraph?

14    A.   I think they explained me it was some
15 inconsistencies in the original one.

16    Q.   I'm sorry?

17    A.   There was some inconsistencies in the
18 rest -- in the first one.

19    Q.   In the first polygraph?

20    A.   Yes, ma'am.

21    Q.   Okay.  Did they say anything about
22 inconsistencies in your alibis that you had been
23 giving to the police officers?

24    A.   Yeah.  I think they -- the biggest

JOHNNIE LEE SAVORY, 06/15/2022                    Page 354..357

Page 354

1 discrepancy they had, they said something about,
2 You didn't -- you and Scopey did not prepare the
3 food, that the mother prepared the food.  But I'm
4 telling them that's not true.
5    Q.   Okay.  What about the incident of
6 telling an officer that you woke up at 10:00 and
7 went to go visit your grandma in the hospital on
8 January 18th?
9    A.   I don't -- I don't recall that.
10    Q.   You don't recall that?
11    A.   No, ma'am.
12    Q.   Okay.  What about telling an officer
13 that you had made plans to see Scopey the morning
14 of the 18th at his house?
15    A.   I have no recollection of that.
16    Q.   Did you and Scopey make a plan to meet
17 up at his house on the morning of the 18th?
18    A.   I don't believe so.
19    Q.   Okay.  Did you ever tell anybody that
20 you had made that plan but you forgot?
21    A.   No.  I think I shared with you that we
22 made plans to meet at school.
23    Q.   Okay.  So prior to Mr. Bowers screaming
24 at you and, you know, being in this manner towards

Page 355

1 you, had any other police officer, you know,
2 threatened you during their interviews of you on
3 January 25th or January 26th?
4    MR. TAYLOR:  Object to the form.  Vague
5 question in terms of threat.
6    THE WITNESS:  There was other officers
7 frustrated with my answers.  And they made me feel
8 as though like I wasn't trying to do my best and
9 answer their questions.  They didn't particularly
10 like that, and that -- that was in -- displayed
11 when they would say, You're -- you're not being
12 truthful with us.  You're not -- you backtracking,
13 or whatever terminology they used.
14    MS. SCHROEDER:  Okay.
15    THE WITNESS:  And that didn't do nothing but
16 further frustrate me too at the same time.
17    MS. SCHROEDER:  Um-hmm.
18    THE WITNESS:  'Cause I was trying to do the
19 best I could to remember whatever they needed me to
20 remember.
21 BY MS. SCHROEDER:
22    Q.   Were you having a hard time remembering
23 things?
24    A.   Yes, 'cause I was completely

Page 356

1 overwhelmed by the whole set of circumstance.
2    Q.   Okay.  So were you possibly telling
3 one officer one thing and another officer something
4 else because you were having a hard time
5 remembering?
6    MR. TAYLOR:  Objection to the form.
7    THE WITNESS:  I think the reason we had so
8 much confusion is you had two officers asking me
9 different questions at the same time.  And I'm
10 trying to answer something that I don't -- so, you
11 know, I mean, I -- to the best of my recollection,
12 it was always chaotic and confusing.
13 BY MS. SCHROEDER:
14    Q.   Um-hmm.  Did you ever ask to just speak
15 with Marcella Teplitz one on one?
16    A.   At the polygraph examiner office after
17 he did what he did, I just wanted it to stop.  I
18 wanted somebody to come in and stop him from what
19 he was doing.  I just wanted somebody to -- and
20 that's the only person I could think of that was
21 out there.
22    Q.   Okay.  Did you ever ask to speak with
23 her one on one when you were at the police station
24 before the polygraph?

Page 357

1    A.   Not that I recall.
2    Q.   Okay.  So do you remember speaking with
3 her one on one ever --
4    A.   I don't --
5    Q.   -- prior -- excuse me -- prior to the
6 polygraph evening?
7    A.   The day of the 26th, you mean?
8    Q.   No.  That was a poor question.
9    A.   I'm sorry.
10    Q.   So -- that's my fault.
11    Q.   Do you remember ever speaking with
12 Marcella Teplitz one on one while you were at the
13 police station on January 26th?
14    A.   No.  I don't remember speaking with no
15 officer one on one --
16    Q.   Okay.
17    A.   -- on the 26th.
18    Q.   Do you remember asking for Marcella so
19 that you could speak with her only at the police
20 station on January 26th?
21    MR. TAYLOR:  Objection; asked and answered.
22    THE WITNESS:  Yeah, I just answered it.  I
23 don't recall speaking to any officer one on one --
24    MS. SCHROEDER:  Okay.

JOHNNIE LEE SAVORY, 06/15/2022                    Page 358..361

Page 358

1    THE WITNESS: -- on the 26th at the police
2  station.
3    MS. SCHROEDER: Okay.
4    THE WITNESS: It was always two officers
5  there that I recall.
6    MS. SCHROEDER: Okay.
7    THE WITNESS: Yeah.
8  BY MS. SCHROEDER:
9    Q.   Okay. So Mr. Bowers is now yelling at
10  you. Do you know what it was that spurred this --
11  this yelling and accusations towards you?
12    A.   Not really, except for he just didn't
13  like my answers that I was giving him.
14    Q.   Do you remember what your answers were?
15    A.   No. I don't.
16    Q.   Do you remember what the questions were
17  that he was asking you?
18    A.   I just can't recall them at this time.
19  Maybe if I had something to read I could be able to
20  look at it and see if it was something that I said
21  or something why I did. I can't think of anything
22  at this point why he would be the one and only
23  person that's completely lose it and just -- but
24  he's the one that broke my will.

Page 359

1    Q.   Okay. Prior to Mr. Bowers, did
2  anyone -- any officer, during January 25th or
3  January 26th, give you information that they
4  wanted you to say in response to questions?
5    MR. TAYLOR: Objection to the form.
6    THE WITNESS: I don't understand what you --
7  I don't understand what you mean.
8  BY MS. SCHROEDER:
9    Q.   So you're -- you have said that there
10  are some officers that put words in your mouth; is
11  that correct?
12    A.   Yes.
13    Q.   Because they were telling you that you
14  need to say this or you need to say that; is that
15  correct?
16    A.   Yes, ma'am.
17    Q.   Okay. So what I'm asking you is did
18  that occur where an officer was specifically
19  telling you, You need to say this, or, You need to
20  say that, at any time when you were at the police
21  station on January 25th or January 26th?
22    MR. TAYLOR: 27th, did you say?
23    MS. SCHROEDER: I said 6th.
24    THE WITNESS: Yes, they did. When I would

Page 360

1  say -- I mean, the best example I can give you is
2  when I say that we cooked the food, they told me
3  I was just flat-out lying, that, We know that the
4  mother cooked the food. But the mother's leftovers
5  we did not touch.
6    So while I was telling the truth,
7  they told me I was flat-out lying and that wasn't
8  true, you know. So whatever -- I guess that's the
9  best example I can give. Because that's what
10  happened on the 17th.
11    So when I tell them that we were
12  wrestling and playing, and I tell them we was just
13  playing and stuff, they -- they took the wrestling
14  and playing and put it on the day of the 18th. So
15  they were always telling me what I did, and it
16  wasn't on that day, it was on another day.
17    So, I mean -- and after I become so
18  fed up with it, I just be like, Hey, I don't want
19  to talk to you. Can I go home?
20  BY MS. SCHROEDER:
21    Q.   Who did you ask to go home?
22    A.   As much all of them that questioned me.
23  I just wanted to go home, wanted to see my dad.
24  This finally allowed me to see my dad.

Page 361

1    Q.   Um-hmm. And what happened then?
2    A.   I don't know what truly happened. But
3  I know for the first time I could not -- we cannot
4  communicate with each other because he was so
5  angry. I don't know what the police said to him.
6  I don't know what was done. But we could not
7  communicate whatsoever.
8    Q.   What did he say to you?
9    A.   I don't -- I don't really remember what
10  he said. All I know is that it was some yelling.
11  He just -- I don't know what -- what they -- I
12  don't know what he understood or what he didn't
13  understand 'cause we couldn't communicate.
14    Q.   Okay. So Mr. Bowers is yelling at you.
15  He's called you a murderer. Did he call you
16  anything else?
17    A.   A liar.
18    Q.   A liar. Anything else?
19    A.   I don't know what all he said, but
20  those two came through.
21    Q.   Those two came through.
22    A.   Um-hmm.
23    Q.   So what did you do in response to that?
24    A.   I said I didn't want to talk to him

JOHNNIE LEE SAVORY, 06/15/2022                          Page 362..365

Page 362

1 anymore.

2 **Q. Okay. So you -- you specifically**
3 **looked at him and said, I don't want to talk to**
4 **you?**

5 A. And he unhooked me. And I went over to
6 the window of the office, and I began -- tears be
7 coming. I just felt just empty inside after he had
8 done that. So I was standing at the window crying.

9 **Q. Okay. Did -- you said he broke your**
10 **will; is that correct?**

11 A. Yeah.

12 **Q. Okay. And did you confess to him?**

13 A. No.

14 **Q. No. What did you say to him?**

15 A. I ain't say nothing after that.

16 **Q. So then how did --**

17 A. Evident --

18 **Q. -- that break your will?**

19 A. What do you mean?

20 **Q. Well, I mean, you say you -- my**
21 **understanding is your will was broke, which means**
22 **you were going to confess to these --**

23 A. I was willing to tell anything that
24 they wanted me to say, do anything they wanted me

Page 363

1 to do for it to stop. Since they didn't want to
2 honor my didn't want to talk to you, don't want to
3 continue to talk to you, so you just continue to
4 bombard me with questions, and I'm not trying to
5 talk to you. I'm not trying to -- I see I
6 cannot -- nothing I say matters. So they made me
7 feel all you want me to say is, Just say you did
8 it, and we'll be through, and you go home.

9 **Q. Did someone tell you that?**

10 A. That's how they made me feel. That's
11 how they made -- that's how they -- when they
12 were -- I just feel like I didn't have a voice.

13 **Q. Okay.**

14 A. He wasn't listening to me.

15 **Q. Okay.**

16 A. So when they convinced me to sit
17 down and talk to Marcella Teplitz, she began just
18 telling me about the crime and telling about, Well,
19 you know, you don't have to, I guess, feel this way
20 or whatever she was saying to me. But it didn't
21 make much sense. But it -- it -- it's like they
22 telling me, you know, We believe you did it, and we
23 want you to tell us that.

24 **Q. When you told Mr. Bowers you didn't**

Page 364

1 **want to talk to him anymore --**

2 A. Right.

3 **Q. -- he stopped?**

4 A. Yes.

5 **Q. He unhooked you?**

6 A. Yes.

7 **Q. He left you?**

8 A. Yes.

9 **Q. You were in the room alone?**

10 A. Yes.

11 **Q. You asked to speak to Marcella; is that**
12 **correct?**

13 A. Yes.

14 **Q. Okay. And was there a reason why you**
15 **asked for Marcella?**

16 A. Just wanted it to stop.

17 **Q. Okay.**

18 A. I wanted somebody, anybody, and that's
19 the only person that was with the group that I
20 believe -- 'cause I didn't know Bowers was a police
21 officer. I thought he was just an ordinary person.
22 He didn't dress like a police officer. He didn't
23 do any of that.

24 **Q. Um-hmm.**

Page 365

1 A. So I thought he was just like Jenkins.
2 Jenkins is not a police officer. So --

3 **Q. Um --**

4 MR. BOWMAN: You interrupted his answer.

5 MS. SCHROEDER: Oh, sorry.

6 MR. BOWMAN: He's not finished.

7 THE WITNESS: So I had no knowledge of him
8 being an officer, you know. So I wanted somebody
9 in authority to come and make him quit.

10 MS. SCHROEDER: Um-hmm.

11 THE WITNESS: 'Cause he didn't identify
12 hisself as a police officer.

13 MS. SCHROEDER: Um-hmm.

14 THE WITNESS: He identified hisself as a
15 polygraph examiner. And I assumed that he was just
16 like Jenkins. But he was so far from Jenkins, it's
17 night and day.

18 BY MS. SCHROEDER:

19 **Q. And what makes you believe he was a**
20 **police officer?**

21 A. What you mean, what makes me believe he
22 was a police officer?

23 **Q. Officer -- or Mr. Bowers is not a**
24 **police officer when he was administering the**

JOHNNIE LEE SAVORY, 06/15/2022                    Page 366..369

Page 366

1 polygraph examination to you.  Did you know that?
2      MR. TAYLOR:  But he was for many years before.
3      MS. SCHROEDER:  That is such a terrible
4 speaking objection.  And --
5      MR. TAYLOR:  No, because you're misleading
6 him --
7      MS. SCHROEDER:  I am not misleading him.  I
8 a hundred percent am not misleading him.
9      MR. TAYLOR:  Yes, you are.
10      MS. SCHROEDER:  No, I am not.
11      THE WITNESS:  I learned later on that he
12 was a police officer.  He was not forthright like
13 Jenkins.
14          Let's be clear.  I just gave you the
15 greatest analogy I can.  The difference between him
16 and Jenkins was night and day.  It was almost like
17 he was the good guy and he's the bad guy.
18      MS. SCHROEDER:  Okay.
19      THE WITNESS:  So, I mean, the way he -- what
20 he did in there violated every essence of being a
21 human being.  Not to know me, not to have -- you
22 got some crystal ball to say that, You a liar.  You
23 a murderer.
24          What gave him the right to do that?

Page 367

1 What happened?  What did I say to invoke him to do
2 that?
3          And no, no one has ever talked to me
4 in that particular manner telling me that I killed
5 my friend and his sister.  What you have?  I'm just
6 curious.
7 BY MS. SCHROEDER:
8      Q.   So how long were you in the room alone
9 before Marcella came in?
10      A.   I don't know.  Five, ten minutes,
11 whatever, something like that.  I don't -- I don't
12 really recall.
13      Q.   Okay.
14      A.   Don't seem like that long, but it's
15 somewhere like that.
16      Q.   Okay.  And was there a reason why you
17 didn't ask for Percy Baker?
18      A.   I didn't even realize Percy Baker was
19 there.
20      Q.   You --
21      A.   I don't remember.  As I stated earlier,
22 I didn't -- I don't recall him being there.
23      Q.   Okay.  But you were reaching out for
24 someone, and so you reached out to Marcella --

Page 368

1      A.   Yes.
2      Q.   -- is that correct?
3      A.   Yes.
4      Q.   Okay.  And Marcella comes in the room?
5      A.   Yes.
6      Q.   And is it just the two of you in there?
7      A.   Yes, ma'am.
8      Q.   Okay.  And tell me what happens then.
9      A.   She asked me to sit down.
10      Q.   Yeah.
11      A.   And --
12      MR. TAYLOR:  Wait.  Don't -- wait till she --
13      MS. SCHROEDER:  Go ahead.  I'm listening.
14 That's fine.  I'm a mom.  I can do three things at
15 once.
16      THE WITNESS:  She asked me to sit down and
17 talk to her, tell her what happened.  I said, I
18 don't know what happened.  But then she began to
19 tell me what happened; you know, your friends were
20 murdered and they were stabbed and so on, so on.
21          And I didn't know what to tell her,
22 you know.  She -- so she start making suggestions
23 that, Could you have possibly done this?  Or --
24 just questions that didn't make no sense to me.

Page 369

1 But I tried to just comply and just do what she
2 asked me 'cause I'm still asking her, When can I go
3 home?
4 BY MS. SCHROEDER:
5      Q.   Do you remember what you told her about
6 the murders?
7      A.   Vaguely.  But I do remember some things.
8      Q.   Okay.  So I'm going to give you this.
9 This is Exhibit 4 I believe we are on.  And even
10 though there's several documents on here, we're
11 just going to be looking at Peoria Savory 788,
12 and -- if we get through it, to 791.  But we're
13 going to start with 788.  There you are.  Okay.  I
14 don't know where the other one is.  I'm sorry,
15 guys.  Maybe I have it.  Okay.
16      MR. BOWMAN:  Is this the ground report?  What
17 is -- I don't understand.  This is --
18      MS. SCHROEDER:  That's fine.  I can tell you
19 what it is.
20      MR. BOWMAN:  The exhibit is the ground report
21 starting at 785, correct?
22      MS. SCHROEDER:  Correct.  But we're going to
23 be honing in on 788.
24      MR. BOWMAN:  I just want it to be clear.

Page 370

1 You're identifying the entire report as an exhibit?
2      MS. SCHROEDER: I can, yes. So since he has
3 it in his hand, I will so that it's a complete
4 exhibit. So it's Peoria Savory 785 through Peoria
5 Savory 792. But the page I turned to you, sir, is
6 the page that we're going to be looking at.
7      MR. TAYLOR: And this is -- you said Exhibit
8 4, but it's actually Exhibit 5.
9      MS. SCHROEDER: Oh, it is? Thank you.
10      MR. TAYLOR: I have an Exhibit 4 here.
11          (Discussion off the record.)
12 BY MS. SCHROEDER:
13      Q.    So, Mr. Savory, this is -- if you
14 look -- you know, the first page, this is a report
15 that was created by Marcella Teplitz. And on this
16 page 788, it is memorializing you and hers
17 interactions at the polygraph office. Okay? And
18 what I want to do is read through this, and you can
19 tell me if this sounds accurate to you and if it
20 refreshes your recollection.
21          So if you look at the -- if you look
22 at the paragraph right there, it says, "1800 hours,
23 1/16/77." I think that's a typo because we all
24 know this occurred on January 26th.

Page 371

1          It says, "This officer, Officer
2 Fiers, and Probation Officer Percy Baker
3 transported the arrested to Dennis Jenkins'
4 polygraph office, and the arrested was administered
5 a polygraph examination by Eddie Bowers," which
6 know that to be accurate from your testimony today.
7          "At 1975 hours, Bowers exited the
8 polygraph room and informed this officer," who is
9 Marcella, "that the arrested was requesting to talk
10 about the two murders in this case and wanted to
11 specifically talk with this officer," who is
12 Marcella. And from what you just told us, that is
13 correct also.
14      MR. TAYLOR: No.
15      THE WITNESS: No.
16      MR. TAYLOR: That's not true. Objection.
17      THE WITNESS: No.
18 BY MS. SCHROEDER:
19      Q.    You did not want to -- I thought you
20 just --
21      A.    No. You just --
22      Q.    -- testified that you specifically
23 asked to speak with Marcella.
24      A.    No. But you just asked me two

Page 372

1 questions in one. He's ask- -- you read to me that
2 he -- the arrested requested to talk about the
3 murders in the -- in the case --
4      Q.    Um-hmm.
5      A.    -- and wanted to specifically talk to
6 officer -- this officer.
7          I never told him that I wanted to
8 talk to her about no murders in the case.
9      Q.    So what did you tell him?
10      A.    I would like to speak to Marcella.
11      Q.    And that's it?
12      A.    And that's it.
13      Q.    And he -- and he -- and he obliged you?
14      A.    He obliged me.
15      Q.    Okay.
16      A.    And also that I didn't want to talk him
17 anymore.
18      Q.    Okay. And he obliged that as well?
19      A.    Exactly.
20      Q.    Okay. And was that on your first
21 request to stop talking to him?
22      A.    Yes.
23      Q.    Okay. And was his stopping the
24 polygraph on your first request to stop the

Page 373

1 polygraph?
2      MR. TAYLOR: Objection to form. I don't
3 think he's ever said there was more than one
4 request to stop the polygraph.
5      THE WITNESS: Yeah, there was only one.
6 BY MS. SCHROEDER:
7      Q.    Okay. Very good. So it's just one and
8 he stopped --
9      A.    Yes, ma'am.
10      Q.    -- is that right?
11      A.    Yes, ma'am.
12      Q.    Okay. Very good.
13          So the next line is, "Bowers also
14 stated that the arrested had told him that he had
15 killed the two victims in this case." Is that
16 accurate?
17      A.    Completely wrong.
18      Q.    Okay. Did you ever tell Mr. Bowers
19 that you killed James Robinson and Connie Cooper?
20      A.    No, ma'am.
21      Q.    Okay. "At 1935 hours this date, this
22 officer entered the polygraph examination room and
23 asked the arrested what it was he wanted to tell
24 this officer." Is that correct?

Page 374

1    A.   Say that again.

2    Q.   Did Marcella walk into the room and ask
3  you what it was that you wanted to tell her?

4    A.   I don't remember.  She could have.  She
5  may have said that.

6    Q.   Okay.

7    A.   I'm not going to say she didn't.

8    Q.   Okay.  And she says, "The arrested
9  stated the following:  We were practicing karate
10  and Scopey turned the TV to the wall.  He was
11  punching me with his finger, and he raised his
12  hands.  The arrested held his hands up with his
13  elbows bent in a position similar to the one victim
14  James had assumed.  The arrested had the knife and
15  stuck him.  He fell.  My mind went blank.  I tried
16  to get him up.  She came in and looked and came at
17  me.  I lost control.  I cut her.  I don't know how
18  I did it.  I ran home and I got drunk.  I stayed
19  drunk for four days and did not come home at all."
20         Did you say those words to Marcella
21  Teplitz?

22    MR. TAYLOR:  Excuse me.  Objection.

23         There's -- this is a whole paragraph
24  of different things that this report purports to

Page 375

1  Mr. Savory.  To ask him what -- to ask him one
2  broad question, I object to the form in terms of
3  asking him one broad question --

4    MS. SCHROEDER:  Okay.

5    MR. TAYLOR:  -- as to all these different
6  points that she's chosen to put in her report.

7  BY MS. SCHROEDER:

8    Q.   Okay.  Did you tell Marcella that you
9  were practicing karate and Scopey turned the TV to
10  the wall?

11    A.   What I remember is that this is -- this
12  is not how this conversation, remember, as I recall
13  it.  We were sitting down, and she was asking me
14  about the crime scene and asking me questions like,
15  Did you do it?  I said, Yes, I did it.  She went on
16  to say, Well, where did you do it?  I said, In the
17  living room.  She say, No, it should have been --
18  you sure it wasn't another room?  She said, Where
19  did you stab him?  I would point to some area on my
20  body, and she'll say, No.  You sure it wasn't that?
21  She would give me, You sure it wasn't this area of
22  the body?  So point to me where you think -- so she
23  was asking me these questions, and because I didn't
24  know the answer, I just made up something to give

Page 376

1  her because I didn't know what she was -- I didn't
2  know how the victims were killed.  I didn't know
3  where they were stabbed or nothing else.

4         And -- but what I -- but what I
5  recollect that's not here, you don't have any of
6  her questions about -- that led me into making a
7  statement to her.  So you don't get to see what
8  she said to me in order to derive at this.  But I
9  do remember some of this and telling her some of
10  this here based on how she questioned me and -- but
11  once again, it was -- it was -- I was just sitting
12  there guessing.  And she really -- she really
13  didn't -- she didn't really, I guess, appreciate me
14  guessing or something.  You know what I mean?

15         So she would keep asking me these
16  questions.  And I -- I may have said some of these
17  things.

18    Q.   Um-hmm.

19    A.   I'm not going to deny it.  But what
20  I'm saying is she gave me the answers to her own
21  questions, and I may have given them back to her in
22  this form.  So I'm not gonna say I didn't say any
23  of this here.  But she --

24    Q.   So this is --

Page 377

1    MR. TAYLOR:  He hasn't -- are you finished,
2  Johnnie?

3    THE WITNESS:  Yeah, because I'm -- I'm done.
4  Go ahead.  Go ahead.

5  BY MS. SCHROEDER:

6    Q.   Okay.  So -- so do you believe at the
7  polygraph office --

8    A.   Um-hmm.

9    Q.   -- when she walked in --

10    A.   Yes.

11    Q.   -- that that is the place that she said
12  to you about maybe it wasn't the living room, maybe
13  it was the bedroom?

14    A.   Yes.

15    Q.   Okay.  And you believe that it's here
16  at the polygraph office that she is suggesting
17  to you other pieces of this crime that you're
18  confessing to that you're getting wrong, and she's
19  trying to give you information that would line up
20  to what you believe was the correct crime scene;
21  is that right?

22    A.   What she believed -- yeah, 'cause I
23  didn't know --

24    Q.   Okay.

Page 378

1    A.  -- what the crime scene was.
2    Q.  Okay. Okay.
3    MR. TAYLOR:  While you're pausing, what --
4 can we get a time read, please?
5    THE VIDEOGRAPHER:  Seven hours and three
6 minutes.
7    MS. SCHROEDER:  Oh, okay.
8    MR. TAYLOR:  I'm sorry?
9    THE VIDEOGRAPHER:  Seven hours and three
10 minutes.
11   MR. TAYLOR:  Oh, so you're in -- what do they
12 call it in soccer? -- extra time.  She's in extra
13 time.
14 BY MS. SCHROEDER:
15   Q.  Okay.  So do you believe in the
16 polygraph office then that -- it's your contention
17 that you did not offer a statement to Marcella
18 without any prompting from her?
19   A.  No.  I just didn't volunteer and make
20 no statements about the death of James and Connie
21 without Bowers' madness and what she's -- how she
22 phrased her questions and guided me along.  I --
23 everything I did that they asked me I got wrong.
24   Q.  Okay.

Page 379

1    A.  So they gave me what they wanted me
2 to say, and I gave them what they wanted to hear
3 because I wanted it to end and stop.
4    Q.  So she told you where to point on your
5 body where you stabbed Connie?
6    MR. TAYLOR:  Objection.
7    THE WITNESS:  She told me to --
8    MR. TAYLOR:  Hold on, Johnnie.
9       Objection; form, foundation.
10 BY MS. SCHROEDER:
11   Q.  Go ahead.
12   A.  When I answered her questions, I didn't
13 get it right.  She prompt me and guided me to
14 where, You may have forgot, you don't remember.
15   Q.  Are these the things she was saying to
16 you?
17   A.  Yes.
18   Q.  Okay.  And where did you point on your
19 body that you stabbed Connie where she told you
20 that was not right?
21   A.  I don't remember exactly, but maybe --
22 I don't know.  She has her arms -- something --
23 something.  I don't remember exactly.
24   Q.  And where did she tell you was

Page 380

1 the correct place --
2    A.  You sure it couldn't have been her
3 stomach?  You sure it couldn't have been this
4 or that?  I don't -- I remember some of this
5 conversation.  I don't remember all of it.  But
6 I do remember some of it.  And I just don't -- it
7 was never just voluntarily.  It was -- I was guided
8 along.  But I didn't understand.  All I wanted was
9 to -- for it to end.  And no one respected when I
10 invoked not to talk to you or -- I just wanted to
11 quit and just go home.
12      I believed I was going home because
13 I knew I had did nothing wrong.  I had all --
14 everything in my mind to believe that day I don't
15 even know why I'm here.  But I don't know how I
16 became a suspect in such a short time.
17   Q.  So is there any --
18   A.  MR. TAYLOR:  Were you finished, Johnnie?
19 BY MS. SCHROEDER:
20   Q.  -- information that you told --
21   MR. TAYLOR:  You cut him off again, Sara.
22 BY MS. SCHROEDER:
23   Q.  Okay.  Is there any information --
24   MR. TAYLOR:  Can he -- can he finish?

Page 381

1      Were you finished?
2    THE WITNESS:  No.  I -- go on.  Go ahead.
3 BY MS. SCHROEDER:
4    Q.  Okay.  Is there any information that
5 you told Marcella in the polygraph room that is
6 truthful?
7    A.  No.
8    Q.  Okay.
9    A.  Because I know I didn't kill my friend
10 or his sister.
11   Q.  Okay.  And is this the only falsehoods
12 that you told a police officer during January 25th
13 and January 26th?
14   A.  To the best of my recollection.  That's
15 a lot of recollection.  There was a lot of two-day
16 interrogation, no sleep, no food.
17   Q.  Um-hmm.
18   A.  No nothing.  I had a candy bar and a
19 pop and a hamburger.  And I ain't had no sleep.
20   Q.  At the Gift Home?
21   A.  I had very little.  Went to bed about
22 1:30, come and got me at 8:00.  And the whole day
23 just bombardment, just -- I didn't even have time
24 to think.

Page 382

1    Q.   Um-hmm.  Can you remember any other
2 falsities that you told the police during
3 January 25th and 26th?
4    A.   I don't have no recollection of what
5 that possibly could be at this moment or time.
6 You know, putting this report here brought back
7 some memory, but -- I mean, I'm doing the best
8 I can to -- you know, to answer your questions
9 truthfully.  And -- but my will was just destroyed.
10 I just wanted to go home.  I didn't want to do
11 nothing else.  I just wanted to go back, be with my
12 dad.  I didn't want to be here, didn't want to be
13 there.  Didn't understand what was taking place
14 with me at that moment in time in my life.
15        But I know even to this day, and as
16 God as my witness, he know I've never taken a human
17 being life nowhere on this planet.  And anyone that
18 know me, anyone I grew up with, I never -- except
19 for that with Mark Burks and fighting, but they
20 knocked me out on the corner with a brick.  But he
21 was never charged, though.  I find that odd.
22    Q.   What about the guy you beat up in
23 prison and sent to the hospital?
24    MR. TAYLOR:  Objection; form.

Page 383

1    MR. BOWMAN:  Actually we're at the time
2 limit.  So the deposition is over.
3    MS. SCHROEDER:  Okay.  Thank you, Mr. Savory.
4    THE WITNESS:  Yes, ma'am.
5    MS. SCHROEDER:  Do you want to waive or
6 reserve?
7    MR. BOWMAN:  No.  He'll read it.
8    MS. SCHROEDER:  Okay.
9    THE VIDEOGRAPHER:  This concludes today's
10 deposition of Johnnie Lee Savory.
11        We're off the record at 7:47 p.m.
12        (The deposition concluded at
13        7:47 p.m.)
14
15
16
17
18
19
20
21
22
23
24

Page 384

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION
3 JOHNNIE LEE SAVORY,          )
                               )
4          Plaintiff,          )
                               )
5      vs.                     )  No. 17-cv-00204
                               )
6 WILLIAM CANNON, as           )
  Administrator for the        )
7 Estate of CHARLES CANNON,    )
  et al.,                      )
8                              )
            Defendants.        )
9
10        This is to certify that I have read my
   deposition taken on Wednesday, June 15, 2022,
11 in the foregoing cause and that the foregoing
   transcript accurately states the questions asked
12 and the answers given by me, with the changes or
   corrections, if any, made on the Errata Sheet
13 attached hereto.
14
15
16   _____
          JOHNNIE LEE SAVORY
17
18 No errata sheets submitted (Please initial)
   Number of errata sheets submitted _____ pages
19
   Subscribed and sworn to
20 before me this _____ day
   of _____ 2022.
21
22 _____
       Notary Public
23
24

Page 385

1        REPORTER'S CERTIFICATE
2    I, Nick D. Bowen, do hereby certify that
  JOHNNIE LEE SAVORY was duly sworn by me to testify
3 the whole truth, that the foregoing deposition was
  recorded stenographically by me and was reduced to
4 computerized transcript under my direction, and
  that said deposition constitutes a true record of
5 the testimony given by said witness.
6    I further certify that the reading and
  signing of the deposition was not waived, and the
7 deposition was submitted to Mr. Locke E. Bowman,
  III, plaintiff's counsel, for signature.  Pursuant
8 to Rule 30(e) of the Federal Rules of Civil
  Procedure, if deponent does not appear or read and
9 sign the deposition within 30 days, the deposition
  may be used as fully as though signed, and this
10 certificate will then evidence such failure to
  appear as the reason for signature not being
11 obtained.
12    I further certify that I am not a relative
  or employee or attorney or counsel of any of the
13 parties, or a relative or employee of such attorney
  or counsel, or financially interested directly or
14 indirectly in this action.
15    IN WITNESS WHEREOF, I have hereunto set my
  hand and affixed my seal of office at Chicago,
16 Illinois, this 27th day of June 2022.
17
18
19   Illinois CSR No. 084-001661
20
21
22
23
24

JOHNNIE LEE SAVORY, 06/15/2022          Page 386

```
                                              Page 386
 1   Errata Sheet

 2

 3   NAME OF CASE: JOHNNIE LEE SAVORY vs WILLIAM CANNON, et al.

 4   DATE OF DEPOSITION: 06/15/2022

 5   NAME OF WITNESS: Johnnie Lee Savory

 6   Reason Codes:

 7        1. To clarify the record.

 8        2. To conform to the facts.

 9        3. To correct transcription errors.

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   Page _____ Line _____ Reason _____

23   From _____ to _____

24

25                    _____
```

JOHNNIE LEE SAVORY, 06/15/2022

**Exhibits**

**1 Savory 061522-1** 15:17 16:5

**2 Savory 061522-2** 44:15,17 46:4

**3 Savory 061522-3** 212:19,22 213:2

**4 Savory 061522-4** 369:9 370:7, 8,10

**$**

**$185** 251:15

**$4** 161:5 166:12 169:20,23 170:2

**1**

**1** 4:2 15:17 16:5 99:2

**1/16/77** 370:23

**10** 206:1 240:12 352:15

**1011** 143:21

**10:00** 180:5 279:22,23 280:5,6,7 299:11 320:20 354:6

**10:00-something** 280:6

**10:05** 280:7

**10:10** 280:7

**10:30** 280:9

**10:31** 4:3

**11** 206:1

**110** 128:11

**11:00** 181:16 286:15 320:20

**11:21** 45:15

**11:30** 45:18

**11th** 45:4 215:17 216:6

**12** 48:24 206:1 240:12

**120** 76:7

**1240** 4:6

**12:00** 181:16 286:15

**12:35** 99:4

**12:37** 99:8

**12:57** 111:15

**12th** 47:24

**13** 189:2 205:24 240:11,12

**13-** 190:11 192:5,10

**14** 188:23 189:2 205:24

**14-year-old** 65:24 71:6 190:11 192:5,11 277:1,2

**141** 4:6

**15** 272:18 288:9 295:1 352:15

**15th** 4:7

**16** 242:6,9 243:2

**17-cv-00204** 4:11

**17th** 76:14 77:7,18,19,21 78:4,12, 19,24 80:24 81:7 135:19 136:22 137:19 144:2 147:12 149:8 152:4, 9,15,20 153:6 179:23 187:4 198:20 307:22 325:7,10 330:6,10 340:2 341:20 342:8 360:10

**18** 117:3

**1800** 370:22

**18th** 193:1 263:3,18,22 264:8,10 267:18 270:12 272:11 273:18 303:23 314:11 318:22 319:9,11,12 330:6 354:8,14,17 360:14

**19-cent** 203:13,22 337:10

**1919** 110:24 111:2 228:1

**1935** 373:21

**1973** 234:10

**1974** 233:7,9

**1975** 196:3 197:7 371:7

**1976** 196:3 197:16 210:24 215:10, 17 216:6 217:8 218:14 242:11

**1977** 23:22 67:2 77:23 117:21 119:7 120:22 135:20 140:17 145:6 151:3 152:9,15 154:17 188:23 196:23 197:3,21 198:2 210:16,20, 24 215:10 249:10 254:1 263:3,18, 22 267:18 268:20 272:11 329:22 330:1

**1986** 83:19

**1994** 96:12

**1997** 197:3

**1998** 122:10,21

**19th** 301:16,23 318:21 321:5,6,18 322:9

**1:30** 381:22

**2**

**2** 18:12 44:15,17 46:4 99:6 198:11 205:21

**2-** 241:13

**20** 4:16 236:6 243:11,21

**20-** 41:18

**200** 130:1

**200-some** 129:23

**2000** 11:23

**2013** 39:4

**2015** 44:6,7 47:24 48:24

**2016** 41:18 46:19 47:12 53:7

**2017** 61:8

**2019** 45:4

**2020** 26:17

**2022** 4:7

**20s** 83:14

**23** 84:10

**25** 74:17

**25-** 241:7

**255-** 241:13

**25541** 213:10

**25542** 213:13 214:10

**25543** 241:6,10,17

**25545** 213:13 214:11 216:16

**25546** 213:10

**25th** 46:19 69:6,10,16 83:19 109:9, 17 196:1,15,23 197:3 211:2 240:8 252:22 253:7,15,23 254:16 312:18 313:12 314:11 316:9 321:6,18 322:9 323:1 329:22,23 353:2 355:3 359:2,21 381:12 382:3

**26** 74:17,18 100:19 117:20 120:22

**26th** 29:13 347:2 349:13 353:3 355:3 357:7,13,17,20 358:1 359:3, 21 370:24 381:13 382:3

**27th** 359:22

**2:00** 289:3 290:6,10,17 291:5,21

JOHNNIE LEE SAVORY, 06/15/2022

**2:12** 111:18 117:1

**2:20** 117:3

**2:30** 143:11 289:3 290:8 291:21

**2:38** 133:14

**2:45** 143:11

**2:48** 133:24

---

**3**

**3** 49:6 198:15 212:19,22 213:2 312:9

**3/7/76** 251:9

**30** 49:16 84:16 178:20 179:3,7 236:6 272:16 308:11 309:15

**30s** 83:14

**3:00** 139:2,6,8 143:10,11

**3:30** 136:7 139:16 144:20 294:22 295:22,23 296:1

**3:58** 198:13

---

**4**

**4** 312:14 369:9 370:8,10

**4-** 68:11

**40** 308:11

**40-plus** 75:2

**40s** 83:15

**44** 68:11,12

**442** 217:18

**45** 30:7 36:16 163:6 178:20 179:3,8 280:1 286:6 302:3,10,11 303:1

**4:00** 139:2,7,8

**4:14** 198:17

**4th** 217:8 218:14

---

**5**

**5** 122:10 205:20 370:8

**5/13/76** 250:9

**5/2-702(h)** 48:10

**50** 30:11

**5019** 44:24

**52** 312:6

**5:00** 319:15

**5:02** 242:19

**5:03** 242:22

---

**6**

**6/8/75** 241:19,24

**60** 8:22

**600** 4:17

**60604** 4:7

**60s** 92:6

**6:00** 303:20

**6:13** 312:11

**6:15** 144:22 149:4

**6:30** 144:22 149:4 181:23 184:4

**6:31** 312:15

**6:45** 184:4

**6th** 359:23

---

**7**

**70s** 205:15 234:6

**73** 203:16 234:8,16

**735** 48:9

**74** 203:16 234:8

**75** 203:17 206:1 247:6 282:20

**76** 205:24 282:20

**77** 89:2 205:24

**78** 89:2

**785** 369:21 370:4

**788** 369:11,13,23 370:16

**791** 369:12

**792** 370:5

**7:00** 184:3,4,11,12 320:12

**7:30** 138:12 167:1 179:5

**7:45** 166:24 179:5 184:3

**7:47** 383:11,13

---

**8**

**8/3/75** 251:15

**80** 206:14

**8:00** 138:13 139:2 172:8 199:7 264:12,17 265:3 271:16 273:8 381:22

**8:30** 199:7 264:12,17 265:3,12 271:16 273:9

**8:35** 270:11

**8:40** 265:21,23 270:6

**8:45** 270:11

---

**9**

**90** 84:17 206:14

**95** 96:12

**9:00** 172:6,7,8 277:17 278:13

**9:00-something** 296:13

**9:45** 299:11

---

**A**

**a.m.** 4:3 45:15,18 273:8 280:5

**ABCS** 227:23

**abide** 183:5

**ability** 7:2,10 39:13 190:9 209:3,15 229:12 326:12 328:13,14

**abuse** 69:7

**abused** 22:3 91:19 105:4

**abusive** 239:9

**accept** 105:2,3,5

**accepted** 86:16

**access** 87:24

**accidently** 164:20

**accordance** 6:6

**account** 223:3 256:16,17 258:20

**accurate** 23:3 330:5 331:19 370:19 371:6 373:16

**accusations** 358:11

**accuse** 27:23 201:8

JOHNNIE LEE SAVORY, 06/15/2022

**accused** 15:1 18:7 23:14 200:1 218:23 267:19 268:3,17 269:8

**accusing** 14:22

**acquaintance** 283:16,21

**acquaintances** 188:3

**act** 11:24 66:1 102:24 244:4

**acted** 20:24

**acting** 21:14 304:17

**action** 19:23 220:17 232:10

**actions** 13:22 210:15

**active** 67:4 153:9

**activities** 267:18 268:16

**actual** 270:17

**ad** 109:23

**additional** 57:4 61:12 62:8,17 63:11

**address** 46:23 143:21 215:9 229:6,7

**addressed** 45:5 229:5

**adequate** 22:4

**administer** 349:13

**administered** 371:4

**administering** 347:20 365:24

**administration** 86:2,17 87:20

**administrative** 86:3 95:21

**admissions** 49:14

**admitted** 251:9

**admitting** 217:6 218:12 219:1

**adult** 49:17 80:17 128:11 228:17

**adults** 103:1 125:13 126:19

**advantage** 209:24

**advise** 52:6

**advised** 114:11

**advocate** 85:24 87:21 104:6

**advocates** 88:1

**affair** 95:11

**affect** 102:1

**affecting** 113:20

**affirmed** 5:24 6:11

**affixing** 17:2

**afraid** 101:24 127:24 157:22 167:5

**afternoon** 144:6,17 146:21 188:12,18 288:21 312:19

**age** 285:8 316:22

**Aggravated** 250:9

**agree** 116:10 257:22 331:15

**agreed** 307:22 331:20

**ahead** 7:15 50:21 52:21 113:2 263:10,16 307:19 368:13 377:4 379:11 381:2

**alarm** 199:13

**alcohol** 192:6 221:15 222:23 229:4,8,9 231:18

**alcoholic** 109:24

**alibi** 256:7,14,20 257:3 258:8,12, 22 259:17 260:7,19,20,21 261:24 262:2,17,22 263:3,18,20,22 276:7, 16

**alibis** 353:22

**all's** 73:22

**all-out** 95:16

**allegation** 66:3,19

**allegations** 99:21 132:24

**allege** 91:11

**alleged** 34:9 71:10 82:16 99:18

**allegedly** 101:7 133:7

**alleges** 20:22 21:13

**alley** 265:14 270:19

**allowed** 19:10 239:7 360:24

**altercation** 194:9 233:13

**altercations** 233:4

**alternative** 144:23

**amount** 245:12

**analogy** 366:15

**analysis** 32:3

**analyzing** 31:9

**angel** 86:11

**anger** 108:15

**angry** 107:19 110:8 126:11 146:3 194:2 221:12 223:20 361:5

**Annette** 275:15,18

**announced** 41:22 42:2,6,10

**answering** 43:22 329:22 330:7 340:14

**answers** 15:18 32:13 34:10 67:14 91:6 113:3,17,23 115:1,15 116:2 329:13 340:8 345:18 352:7 355:7 358:13,14 376:20

**anymore** 362:1 364:1 372:17

**anyone's** 196:22 197:1

**apartment** 229:21,24

**apologize** 263:8

**apologized** 103:3

**apparently** 82:3

**appearance** 76:11

**appearances** 61:24 62:2,4 112:1

**appears** 18:14

**approach** 133:11

**approve** 17:8

**area** 67:18 98:18 105:17 114:10 155:21 375:19,21

**arguable** 65:18

**argue** 132:12 134:21

**argument** 115:18

**arithmetic** 117:5

**arm** 241:19,24

**arms** 379:22

**arraignment** 237:23

**arrest** 68:22 69:5,9,19 195:24 196:15,23 203:24 204:11 225:21 238:2

**arrested** 65:9 109:7,16 111:12 199:15 204:20 210:21 211:1 225:3 226:9,11,15 239:18 240:6 246:22 247:8,12,17 252:21 337:8,9 371:3, 4,9 372:2 373:14,23 374:8,12,14

**arrive** 143:12 181:14 235:3 265:19 295:21 299:10 334:20

**arrived** 97:8 169:8 172:15 183:24 185:19 266:4 269:20 274:14,17,18, 21 278:9 282:1 286:13 290:13 294:21 295:4,23,23 299:8 308:13 321:3

JOHNNIE LEE SAVORY, 06/15/2022

**arrives** 235:4,14

**Art** 5:11 112:2 173:21

**articulate** 69:24

**artwork** 173:21

**ask-** 372:1

**asks** 50:5

**assault** 71:5,8 207:20 237:2,15 250:9

**assaults** 83:8 85:9

**assert** 29:6 52:18

**asserted** 116:9

**asserting** 113:6

**assertions** 112:15,18

**assessment** 109:1

**assigned** 252:9

**assignment** 148:15

**assist** 341:6

**Associates** 4:16,19

**Association** 138:20

**assume** 8:6 44:6 67:14 116:8 138:3 169:18 237:20 285:7

**assumed** 176:24 309:20 310:20 365:15 374:14

**assumes** 63:7 248:5 323:19

**assuming** 246:1

**assumption** 193:3,5

**assumptions** 325:15

**ate** 142:13 148:17 161:1 163:22 275:4

**atmosphere** 330:14,15

**attacked** 94:17

**attending** 144:16 145:13

**attorney** 24:2 27:7 32:6,9 33:4 51:19 52:18 58:10 59:2,5,7 60:16 62:19 71:21 86:8 112:9 119:1

**attorney's** 21:3

**attorney-** 41:10

**attorney-client** 25:11,16 28:9,21 29:6 31:12 32:4,9 33:24 38:2,7 39:21 40:22 41:3,4,20 42:18 43:24 57:1 58:18 60:10 61:18 72:1 75:22, 24 112:17 115:2

**attorneys** 7:10,16 16:21 24:3 29:5,8 31:7 46:17 52:20 55:1,4,7 56:12,14,22 119:16 120:2 127:10 202:12 218:3 302:17

**attorneys'** 70:11

**attractive** 79:21

**attributes** 107:14

**aunt** 141:18,19,23,24 142:3 185:23 186:2

**authority** 365:9

**awake** 180:11 265:12

**aware** 12:12,16 14:5,6 40:15 53:6 54:11,15,20,23 55:13,17 56:18 58:5 61:16 82:6 231:23 232:9 315:19,22 316:3

**B**

**baby** 80:24 81:3,6,12,14

**baby's** 81:10

**babysat** 282:22

**babysit** 281:14,15 282:14,17

**babysitting** 283:20 285:18

**back** 18:16,17 26:7 29:12 33:18 45:17 52:10,22 53:18 56:12 64:13 67:2 73:11 75:21 79:6,11 88:2 97:12 99:8 100:18 102:9 110:8,10, 22 111:17 112:22 121:15 127:4 132:13 133:12,23 134:3 139:3 146:11 148:24 158:14 159:6 163:17,18 170:9,11 171:2 174:1 176:6 178:6 179:8 198:17 203:8 206:13 235:18 236:19 242:21 248:12,14 277:14 279:22 280:4,9, 13 292:6 312:15 319:8 322:24 326:5 328:8,19 332:23 349:22 350:5 376:21 382:6,11

**backtracking** 126:12 355:12

**bad** 206:18 241:18 263:8 366:17

**badger** 349:21

**Baker** 253:1 294:19 348:6 367:17, 18 371:2

**ball** 366:22

**band** 191:18

**Baptist** 255:5

**bar** 381:18

**barking** 158:2

**bars** 222:2,3

**base** 131:4

**baseball** 155:15 257:17

**based** 41:17 51:10,16,24 53:4 62:23 71:18 76:9 114:18 122:5 131:23,24 260:5 376:10

**basically** 240:13

**basis** 20:1 70:6 91:17 104:14

**basket** 203:10 204:15

**basketball** 155:15

**Bates** 45:3 213:5 241:18

**bath-** 95:14

**bathroom** 29:10 32:20 64:16 92:8, 9,14 93:2

**Battery** 251:9

**BB** 247:18,21 248:17 249:5,7,12,22

**bearing** 4:10

**beat** 83:10 95:7 101:7 194:3,16 209:5 382:22

**Beatles** 256:2,4

**bed** 185:10 198:21 229:18 300:24 301:7 381:21

**bedroom** 174:15,18,19,20,23 175:4,7 377:13

**beds** 175:11

**befriend** 108:4

**began** 96:5 126:8,9 314:3 338:17, 22 352:13 362:6 363:17 368:18

**begin** 6:3 20:9,13 203:11

**beginning** 4:2 9:16 99:6 113:6 198:15 306:6,13 312:13

**behalf** 4:8 5:1,4,5,8,9,10,12,14,18, 20 7:9 91:20 94:15,19

**behavior** 93:8

**beings** 128:14 303:9

**belief** 38:16 39:19 40:6,14,18 52:15 75:11 130:4,8 135:15 257:7

**believed** 95:17 341:17 377:22 380:12

**belittling** 93:3

**belonged** 129:24

JOHNNIE LEE SAVORY, 06/15/2022

**belongs** 35:6

**benefit** 25:8 48:5 202:17

**bent** 374:13

**Bic** 203:13,22 337:10

**bicycle** 219:7

**big** 110:18 176:18,19,21,24 342:13

**bigger** 35:2

**biggest** 353:24

**bike** 218:23 219:2 225:3 226:8,11

**bike.'** 218:18

**bikes** 155:13

**bill** 295:9

**birth** 140:8 215:6

**birthday** 83:19

**bit** 31:1 81:18 111:10 120:13 161:3
203:1 256:24 295:24

**bitty** 110:4

**black** 92:13 103:17,18 205:18,21
206:10 227:13 228:6 239:5,6,8,13

**blank** 374:15

**blanket** 88:6

**block** 46:12 143:19

**blocks** 166:21 280:17

**blood** 29:15 33:5,6,15 34:21,22
35:3,4,5,9 36:4 128:15 131:7,15

**blue** 218:17

**board** 45:5 46:24 95:24 96:3
100:11,12,20

**boarded** 149:12

**body** 29:11 77:4 375:20,22 379:5,
19

**bombard** 363:4

**bombardment** 381:23

**book** 304:10,11

**born** 103:14 110:24 227:24 234:22

**borrow** 197:1

**boss** 261:19 262:1

**bottle** 207:13

**bottom** 216:18 241:12

**bought** 221:7,17 249:13 334:17

**Boulevard** 4:6

**Bowen** 4:15,19

**Bowers** 100:21 346:6 347:1,15,17
349:2 350:7 351:2 354:23 358:9
359:1 361:14 363:24 364:20
365:23 371:5,7 373:13,18

**Bowers'** 378:21

**Bowman** 5:5 10:4,8,18,20 24:14,
19,23 25:1,14,18,22 26:2,13,20
27:10,15 67:10 68:18 69:14,17,22
70:4,7,12,14 71:1,12,14 72:3,9,14,
17,19,21,24 73:4,19 85:3 113:10
116:12 117:4,7 133:19,21 241:20
311:21 347:13,16 365:4,6 369:16,
20,24 383:1,7

**boy** 65:24 71:6 170:23 313:14

**boy's** 175:10

**boys** 154:4 165:14,19 253:24
254:2,5,7,21 255:6,21,24

**Brad** 5:9

**braid** 110:20

**branded** 10:16 13:21

**break** 8:9,10,12,14,15,19 99:10
102:15 105:15 111:13 133:10
148:16 311:23 312:1,3 362:18

**breakfast** 97:10 273:22 274:3,5
275:2,4 277:5,20 278:2,9

**breath** 104:4

**brick** 194:5 382:20

**bridge** 205:18

**bring** 112:22 226:13 227:11
245:18

**bringing** 132:24 133:9 230:12

**brings** 63:10

**broad** 375:2,3

**broader** 321:17

**broke** 96:4 183:9 249:17 346:10,
17 358:24 362:9,21

**brother** 194:3,17 195:12 239:17
240:15,17

**brother's** 240:2

**brought** 338:13,19 339:11 346:24
348:15 382:6

**Brown** 15:18 16:7 117:23,24

**Brushed** 273:2

**brutal** 91:24

**buddies** 230:18

**bullets** 108:11

**bully** 208:16 211:23 212:1

**bump** 164:20

**bunch** 285:2

**burden** 226:10 227:1

**burglary** 200:1 247:2,3

**Burks** 193:15,19 200:2 207:21
208:1,16 211:23 250:10,12,16,20,
21 382:19

**bus** 110:21,23 137:22 138:15,16,
18 139:2,11 143:7,9,12,14,24
144:7 147:11,15 149:12,18,21
152:4,21 153:14,17 156:4,8,15,16,
17,18,24 157:2,3,9,19 182:24
183:19,20,21 184:1,7 289:2
291:12,16,22 292:1,3,7,15,18,21,
23,24 293:4,8,9,10 294:15 305:4,6,
13 310:4 311:6 319:19 320:10,13

**buses** 183:18

**business** 136:24

**butterflies** 209:8

**buy** 84:19

**buying** 249:22

---

**C**

**cafeteria** 148:22 305:23 306:2
308:5

**calisthenics** 153:10,19,21,22

**call** 11:7 30:2 86:4 110:11 113:24
127:15 206:24 208:16 220:1
244:17,18 252:1 283:17 302:7
361:15 378:12

**called** 6:10 11:2,11,20 12:10,14,18
30:3 92:17 101:3 113:15,19 145:24
146:8 161:4 166:7 203:12 215:1
219:15,20 233:23 234:1,2 245:21,
23 250:15,19 255:20 294:2 341:20
342:8 346:8 353:5 361:15

**calling** 9:20 10:9,13,17 12:9 13:2,
7,14 29:24 219:9,12

**calls** 43:5 48:15 57:19 84:22 263:6

**Calm** 69:20

JOHNNIE LEE SAVORY, 06/15/2022

**calming** 221:10

**camera** 207:13 259:10

**cameras** 257:19

**cancer** 104:23

**cancerous** 102:3

**candy** 381:18

**Cannon** 4:10 233:2,8,13 238:5

**Cannon's** 239:17

**capacity** 210:12

**Captain** 127:7

**car** 191:24 192:3 205:1 277:13 278:21 331:17 332:3,17,22 333:1, 6,7 334:4

**care** 86:7 103:17 110:16 125:4 172:18 230:6,8 236:18 243:18,19 244:1 246:6 281:13

**caring** 91:24 111:7

**carpet** 160:8

**carried** 111:1

**carry** 8:24 101:9 196:19,22

**carrying** 228:14 247:8,13

**case** 4:10,24 9:1,7 12:3 20:24 27:22 32:13 48:6 63:22,23 65:18 71:16 74:14 94:6 103:19 128:2 131:10 132:12,22,24 133:11 232:18 332:14 339:21 350:22 352:21 371:10 372:3,8 373:15

**cases** 103:5 228:20

**catch** 110:23 143:9 147:11,15 183:21 218:5 289:2 292:1

**Catholic** 254:20 255:1,5

**caught** 144:7

**caused** 26:18 82:2 99:13 252:11

**cell** 84:10 88:6 95:6,7,9 97:12

**center** 83:7,8 94:23 97:9 205:7 208:21 225:4,7,16,24 226:3

**Centers** 91:13

**Central** 4:3

**certainty** 274:20

**certificate** 57:12,14,18,22 58:3,7 60:21

**Chad's** 161:6

**chair** 160:7 350:11 351:15

**challenge** 106:8,12

**chance** 94:8 176:20 192:20 240:23 288:3

**chances** 319:4

**change** 71:18 311:15 323:5

**changed** 111:4 126:2 127:1,3 143:2 153:5

**channel** 106:4 107:7 122:10 297:5

**channelled** 108:17,18

**chaotic** 356:12

**charge** 32:7 237:15

**charged** 14:13,16 15:8,9 22:19 23:12,15,22 24:13 25:13,17 26:18 27:9 31:21 63:22 65:20 203:21 382:21

**charges** 207:20 236:11 237:3

**Charles** 233:2,13 239:17

**check** 258:1,20 282:15,16 311:18

**checking** 285:24

**chest** 350:14

**Chicago** 4:7,17

**chicken** 161:6,7 170:3,5,8,14,22

**child** 9:20 10:9,13,16,17 11:7,11, 20 12:7,10,15,18 13:2,7,14,21 21:24 80:21 102:24 104:6 129:23 209:7 267:10 282:21 284:8,9

**child's** 241:21 282:5 283:4,6

**childhood** 243:17

**children** 104:14,20 105:1 108:10 129:21 145:2 157:1 227:14 244:5 266:19,21 275:14 281:14,19,22 282:10 283:12 284:11 285:1,2,5,9 316:16,17

**children's** 127:19

**choice** 346:10

**choose** 108:14

**chose** 102:5

**chosen** 375:6

**Christie** 5:1 207:12

**Christmas** 249:14

**Christopher** 45:5 46:10 48:17 49:23 50:23 51:21 52:11,23 53:18

**Church's** 161:6

**Cilco** 295:9

**circuit** 86:4

**circumstance** 261:1 356:1

**circumstances** 104:22 195:16,17 238:12,22 254:3,24 261:7 313:11

**citizen** 43:8,10

**Citizens** 138:21

**civil** 6:8 55:20,21,22 103:14

**claim** 20:1

**claiming** 72:13,14

**clarification** 210:20

**clarify** 24:19 55:12 60:9 64:4 70:16 87:10

**clarifying** 292:12

**Clark** 4:16

**class** 148:7,8,9,13 149:8 150:10 306:7,8,15,16

**classes** 148:24 306:12,15

**classmate** 304:2,17

**classmates** 295:16

**classroom** 295:14,18,21 296:6 303:19 304:18 305:16 306:11 308:14,17 309:24

**classrooms** 309:14

**clean** 160:11,17 178:8,13

**clear** 38:5 45:20 68:18 97:21 107:18 114:3,21 115:9 303:2 366:14 369:24

**clemency** 47:4,9,11 50:6 53:7 54:10 113:22

**client** 41:11 51:20 60:9

**clock** 199:13

**close** 151:21 168:20 180:7 225:20

**closed** 339:3,4 351:4

**closet** 175:22,23

**clothes** 29:12,15 30:23 32:21 33:15 35:1 142:13 143:1,3,4 144:11

**clothing** 230:2

**clue** 196:2

JOHNNIE LEE SAVORY, 06/15/2022

coaching 24:21,23

coercion 29:1

COI 113:22

cold 29:13 88:6,8

collected 21:16 28:13

collectively 133:12

colleges 104:20

color 76:21

combined 49:12

comfortable 319:4

comments 97:11

commit 86:20

committed 21:7,8 48:7 49:15
129:7,9 256:22 257:5

committee 92:22 93:4 97:16

communicate 102:2 361:4,7,13

community 131:1 155:21 210:6,9
222:5 239:8,15,18,22 240:13,20,21
241:1 243:10

company 156:13

compared 111:4

compensation 57:23

complaint 10:16 13:19 20:22
27:14 34:9 71:10 81:23 91:11
98:19 99:19 107:5 133:1,3,5

complaints 87:22

complete 370:3

completely 258:10 355:24 358:23
373:17

comply 369:1

con- 90:10

conceal 21:1

conceive 101:20

concern 86:12 90:20

concerned 18:13 25:1 32:13
244:17

concluded 383:12

concludes 383:9

conclusion 43:5 48:16 57:20
263:6

conditions 82:18 83:3 90:11 91:8

condolences 318:4

conduct 82:2

conference 11:14

conferences 25:17

confess 362:12,22

confessing 377:18

confidence 115:19

confident 114:15 115:15,16,20
116:9 322:8

confidential 62:11

confined 95:3

confinement 84:11,13,19 85:24
87:1,13 89:5

confirm 63:20

conform 100:17

confused 126:13 179:12 239:4
327:17

confusing 262:3,6 272:5 340:5
356:12

confusion 356:8

connected 29:8

Connie 15:8 18:8 21:10,19,20
22:9,12 26:19 27:24 28:15 29:2
30:22 31:3 32:24 38:13,17 39:8,14,
20 40:1,7,19 42:3,7,11,16 54:18
63:23 64:7 65:10,21 68:23 70:24
71:3,24 72:7 74:11 75:12 76:3 77:7
78:11,18,21,23 79:15,20 80:23
82:3,4 130:21 173:15 177:17
180:16 199:16 276:9 346:4 373:19
378:20 379:5,19

Connie's 33:17 79:18

considers 25:8

consistently 269:4,7

conspiracy 21:1,15 27:23

constant 91:15

contemplated 48:9 49:2

contend 19:24

contention 378:16

Contents 47:18

continue 15:7 20:6 21:11,12,21,22
22:11 48:3 63:20 66:5,8 90:18
92:18 104:12 215:15 219:4 224:23
226:7 363:3

continued 22:4 293:8

continues 99:22

continuing 74:9 224:24

control 105:21,23 106:17 107:13,
14 217:11 218:16 374:17

conversation 26:5,22,24 28:6,19
29:5 52:6,9,18 73:22 153:11 171:1
173:8,11,15 202:24 276:5 289:9
327:15,18,22,24 328:4 340:4,6
342:24 375:12 380:5

conversations 25:4 31:6 33:3
58:16 73:1 75:7 113:17,24 114:6
156:8 171:6,13 285:13 332:24

convicted 14:3,11 15:4 23:16
44:11 82:2 232:15 237:18,20

conviction 14:6 103:5

convinced 332:4,5 363:16

cook 110:21

cooked 360:2,4

cooking 273:21

Cooper 15:9 18:8 21:10,19,20
22:13 26:19 27:24 28:16 29:2
30:22 32:24 38:13 39:14 40:1,7,20
42:4,8,12,16 54:19 63:23 64:7
65:10,21 68:23 70:24 71:3,24 72:7
74:11 75:12 76:3 82:3,4 130:21
276:9 373:19

Cooper's 22:9 31:4 38:17 39:8,20

copy 16:2 127:9,10

cordial 285:15,16

corn 161:1,8,19 162:5,6,15,20
163:13,22 169:4 178:9

corner 143:16,19,20 194:6 233:21
235:17 236:8 286:10 289:2 291:11,
13 382:20

correct 15:5 50:7 56:1 61:13,24
62:4 63:17 64:7 66:18 78:1,8
120:22 123:20 126:23 138:1 140:1
142:22 146:22 156:16 167:22
169:5,6,15 171:20 173:18 174:15
179:23 187:18 188:8,14,23 189:22
198:9,22 201:3 215:13 228:14
238:6,19 243:4 248:2 249:2 260:11
262:5,18 268:21 269:15 272:24
273:9,14 281:9 303:4 309:18
312:19 314:8,12 316:6 319:9,21
321:11 323:6 324:18 325:13
326:13 328:21 329:1,9 332:18

JOHNNIE LEE SAVORY, 06/15/2022

336:5 340:23 341:7,15 346:4
347:3,6 349:3,16 353:10 359:11,15
362:10 364:12 368:2 369:21,22
371:13 373:24 377:20 380:1

**Correctional** 83:7 91:13 94:23
97:9 208:21

**corrections** 86:18

**correctly** 268:18

**correctness** 114:16

**corroborate** 262:9

**corruption** 108:12

**cotton** 228:2

**couch** 160:7 177:24

**councilwoman** 119:3

**counsel** 4:20 21:3 26:10 111:20
112:14 113:8,17 114:1

**counseled** 104:24

**counselor** 124:5,8,14,23

**counselors** 124:17,22

**count** 227:24

**counter** 203:9,12,14 204:13

**counterparts** 239:10

**country** 83:6 91:15 103:15 111:3

**county** 57:5,12 58:8 61:13 62:8
63:12 101:2 225:4,7 237:2,17

**couple** 8:12 9:14 84:16 119:14
141:24 143:23 162:3 200:18
202:19 220:3 245:15 250:7 254:10
305:2 348:14

**court** 4:12,18 5:22 6:7 7:5,21
13:20 23:6 41:22 42:2,6,10 54:13,
17 55:16 56:10,11,23 57:5 58:8
61:23 62:2,3 66:13 87:24 134:2
202:17 217:6,7 218:12,13 224:16
232:17 253:16,23

**courthouse** 101:7 293:12,13,16

**courtroom** 73:6

**courts** 33:10 40:11 50:8 55:10
62:8

**cousin** 247:16 248:7 337:11

**cousin's** 337:12

**cover** 91:6

**covered** 51:19

**coworkers** 262:9

**crawl** 93:19

**created** 27:23 370:15

**crime** 9:8 11:16,18 21:6,17 28:14
34:5,7,20 37:24 48:7 71:4,7 73:8,
10,18,24 75:4 83:15 129:7,9
256:22 257:5 267:20 268:6 363:18
375:14 377:17,20 378:1

**crimes** 34:8 44:10 49:16 52:16

**criminal** 43:7 73:14 113:21 281:5

**crisis** 86:20 87:4

**cross** 9:17 86:16 87:1

**crossed** 69:23

**crowd** 320:9

**Crowe** 228:2

**cry** 108:6,7

**crying** 362:8

**crystal** 366:22

**cup** 210:10

**curfew** 182:17

**curious** 99:23 105:19 367:6

**current** 55:8 61:6 100:4

**cut** 374:17 380:21

**cutting** 162:19

---

**D**

**dad** 83:18 92:16,24 94:9 101:8
103:23 110:1,24 111:7 137:9,21
139:15 141:21 142:18 146:4,9
181:10,18 182:18 183:3 184:18
185:13,15,20 189:5,14,21 190:7
205:5,8 220:24 221:16 227:1,6,13
228:4 232:22 233:21 235:16,17
236:21 238:10 239:4 243:15
249:13,21 264:18,19,21 265:1
283:8,13,15 298:15 299:9,16,22
300:10 301:18,20 322:11,20
334:10 360:23,24 382:12

**dad's** 139:21,23 141:22 142:4,11
167:18 190:4

**daddy** 104:4

**daily** 91:17 104:13

**damage** 103:21 207:6

**damaged** 101:23,24

**damages** 81:18,20 82:7,11,17
89:18 90:19 94:5 98:19,20,22
99:12 108:20

**dangerous** 82:18,22 83:3 90:10
91:7,14

**dark** 205:18

**Darlene** 275:16,21

**Data** 215:5

**date** 12:19,20 16:13 20:2 46:18
120:11 141:13 215:6,16,17 233:8
254:6 373:21

**dates** 118:24

**daughter** 104:2,5 105:9 108:7
168:7,9 186:3 224:7 311:14

**day** 26:7 30:9 83:8 84:10 99:22
105:8 108:9 121:1,3 126:5,14
131:18 137:8 138:22 139:1,12
147:12 149:21 152:20 168:19
183:12 184:21 186:10 192:24
194:4,18 195:21 199:3,6 225:19
263:22 267:21 268:16,24 269:9
276:8,15 277:3 287:23 288:2 294:8
303:3 306:5,22 307:3 318:10,16,22
321:5,16 329:16 342:1 357:7
360:14,16 365:17 366:16 380:14
381:22 382:15

**day's** 256:5

**days** 84:15,16,17 88:9 104:17
245:15 254:10 305:2 321:14 322:2
374:19

**daytime** 321:14

**dead** 181:6 316:5 344:22

**deal** 26:9 130:11 132:19 339:17,22
340:2

**death** 83:8 318:10 378:20

**December** 247:6

**decide** 310:4

**decimated** 346:6

**decision** 7:21 190:4

**deemed** 253:4

**defend** 342:13 343:6,14 344:3

**defendant** 5:15 16:7 19:24 20:24
45:20 74:13 100:21 233:11,20
238:1,5

JOHNNIE LEE SAVORY, 06/15/2022

**defendants** 4:9,24 5:2,14 6:19 7:9 17:9,17 20:8,23 21:14,23 22:12 27:22 28:24 30:20 31:3,21,23 32:23 67:1 74:17,18 84:5 100:22 232:24

**defendants'** 13:22 18:7 64:6 66:13 70:3,23 71:23 72:6 74:3,9 75:11 82:1 98:23 99:13 100:6

**defender** 86:9

**defender's** 86:10

**defense** 21:2 113:8

**define** 67:17

**definitive** 54:23

**definitively** 200:22

**degree** 222:20

**delinquent** 215:19 217:6 218:12 247:4

**delving** 67:16

**demonstrate** 53:24 258:1

**denied** 53:10,11,14,17 54:1,4 92:4 106:9

**Dennis** 371:3

**deny** 100:12 376:19

**department** 86:17 130:15 203:7 215:21 247:5

**Depend** 143:12

**depending** 184:1,6,7 273:11 306:7,8

**depends** 212:6 260:15 261:6

**deposition** 4:4 6:5 7:1,2,7 10:5 15:20 70:1 99:3,7 112:11,23 116:5,11,13,23 198:12,16 201:23 202:11 203:1 312:10,14 383:2,10, 12

**deprived** 22:3

**derive** 345:21 376:8

**derived** 14:9 26:4

**describe** 76:5 92:1 102:16,17 222:23 350:9 351:11

**describing** 89:17,20

**description** 63:24 73:8,17 259:7 313:4,5

**desensitize** 91:23

**desire** 43:14,16 64:14 70:18

**desk** 351:12

**destroyed** 382:9

**detail** 20:22

**details** 73:9 75:4

**detention** 205:7 225:4,7,16,24 226:3

**determination** 7:19

**determine** 115:5

**determined** 135:11

**determining** 112:20

**difference** 59:16 366:15

**differently** 229:6

**difficult** 227:13

**dig** 261:4

**dinner** 170:21

**directed** 87:11

**directly** 294:16 311:4

**disabled** 234:21,22 235:1

**disbelief** 297:4

**disciplinary** 92:22 93:4

**discipline** 145:22 146:2,3

**disciplined** 189:16

**disclosing** 26:24

**disclosure** 26:22

**discovery** 202:2,13

**discrepancy** 354:1

**discuss** 114:17 133:11,17 295:3

**discussed** 113:16 185:16 186:6 288:19 320:17

**discussing** 255:19

**discussion** 116:18 171:16 214:6 370:11

**discussions** 289:4

**disease** 109:24 110:1 222:23 229:4

**dishes** 178:10,14,15

**displayed** 107:14 355:10

**distinction** 59:15

**distinctly** 36:13,14

**district** 4:12 151:20,23

**Division** 4:13

**DNA** 33:11,14 34:18,19,20,21 35:21,22 36:8 37:13 39:6,10 40:10 48:5 49:9,11 57:4 61:12 62:8,17 63:3,12,16 132:9 133:5 134:5,21

**docu-** 19:8

**document** 16:1 17:1,4,9,23 18:4 19:4 46:5,8 56:9 58:4 61:11 213:2, 8 215:1 243:1

**documented** 85:10

**documents** 15:21 18:24 20:4 26:4 32:17 58:5 66:13,17 103:11 213:11 369:10

**dog** 129:13 157:21,22 158:2,5,14, 21 159:7,13 165:21 167:4 172:19 173:6 176:4,12,24

**dogs** 161:1,9,20 162:3,7,15,20 163:14,23 167:5 169:4 178:9

**Donley** 337:15,17

**Donnelley** 337:16

**Doodling** 173:21

**door** 96:4 157:13,20 159:4,5 169:10 172:21,22 176:4 266:7,8,9, 12 267:7,9 269:14,17 282:3 286:20,21 311:9 319:3 334:9 339:3 351:4

**Doris** 217:11 218:16

**double** 260:13,14 276:12

**doubt** 121:14 343:8

**downtown** 293:4

**dozens** 115:1

**drafted** 51:8

**dragged** 95:6

**drank** 220:9 221:24

**drastically** 111:4

**draw** 104:4

**drawing** 173:2,18 174:1 177:4,10, 11

**dress** 364:22

**drew** 128:4

**drink** 192:6 221:16,22

JOHNNIE LEE SAVORY, 06/15/2022

**drinking** 221:20 230:18 240:22

**drive** 333:10

**driving** 279:14

**drop** 251:14

**drugs** 223:1 239:18,21 240:16

**drunk** 221:21 374:18,19

**dude** 342:13

**due** 82:8 100:5 112:17

**duly** 6:10

---

**E**

**earlier** 71:19 112:2,4 139:24 173:14 174:12 178:1 208:7 219:16 234:14 239:3 261:10 340:5,7 367:21

**early** 100:22 138:12 205:15 273:8, 21

**earning** 285:21

**earth** 71:15

**East** 240:24

**Eastern** 4:13

**eat** 84:20 142:15 168:21 169:1 170:3,8 274:4 275:2 277:5,20 278:9

**eating** 170:5,21

**echo** 91:12

**echoed** 135:5

**Eddie** 371:5

**education** 227:22

**effective** 22:1

**egg** 210:10

**eighth** 151:4,5,6

**elapsed** 116:21

**elbows** 374:13

**Elementary** 145:16

**eleven** 110:5 129:23 130:1

**Ella** 296:23 298:5 343:9

**else's** 189:10

**Emani** 5:17 112:7

**empty** 159:15 362:7

**end** 9:10 116:18 135:20 139:11 144:21 319:8 324:17 379:3 380:9

**ended** 149:21 192:24 198:21 236:12 320:17 352:11

**Ending** 99:2 198:11 312:9

**endure** 90:22

**endured** 91:8 93:24

**enemy** 102:19 191:2

**energy** 106:5 107:7

**enjoy** 192:20 273:19

**enjoyed** 156:13 273:20

**enter** 129:12,14

**entered** 239:6 266:5 287:2 373:22

**entire** 18:19 43:7 91:14 296:19 303:14 370:1

**entirety** 17:12 19:11

**entitle** 70:20

**environment** 92:3 222:19

**episodes** 106:15

**equipped** 125:10

**era** 103:13

**Eric** 282:4,7,9,12

**errand** 279:7

**error** 209:10

**errors** 50:7

**escape** 101:15

**escorted** 350:6

**essence** 366:20

**et al** 4:10

**Evaluation** 246:15

**evening** 357:6

**evenings** 322:4

**events** 330:5

**eventually** 62:14,16 236:19 249:4 312:17 329:8 349:2

**everybody's** 75:2

**evidence** 6:7 9:7 12:2 19:3 21:2,5, 16 22:6 28:13,23 29:3,4,7 30:15, 19,21 31:9 32:5,22 33:17 37:22 38:5,10,15 39:18,22 40:5,17 41:8 48:5 61:13 62:17 63:7 72:5 75:14

132:3 133:5 248:5 257:3 325:15

**Evident** 362:17

**exact** 23:10 39:3 120:11 141:12 145:8 172:2 233:8 234:5 261:5 265:20 271:2,6 284:20 290:1,4 296:9 308:10

**examination** 6:12 346:8 366:1 371:5 373:22

**examined** 6:11

**examiner** 356:16 365:15

**examples** 83:2 210:14 258:12 262:20

**excessive** 93:9

**exchange** 231:17

**exchanged** 123:14

**excluded** 132:10 134:5,10,21

**excluding** 318:16,20

**exculpatory** 21:2

**excuse** 23:17 60:22 89:16 105:12 130:22 138:17 227:12 258:3 276:11 315:23 326:14 357:5 374:22

**executive** 47:3,9,11 50:6 53:7 54:9

**exert** 217:10

**exerted** 218:16

**exhaust** 75:20

**exhibit** 15:17 16:5 44:15,17,21,23 45:1 46:4 212:19,22 213:2,22 214:1,2 256:8 369:9,20 370:1,4,7, 8,10

**exited** 371:7

**expanded** 271:18

**expect** 7:3 56:21 349:7

**expel** 308:21

**expelled** 145:16,20 146:6,20,24 147:6 187:6,11,13,14,16,18,21,24 188:7,17 308:9

**experience** 31:17,22 32:2,19 64:22 65:15 67:10,11 68:4,24

**experienced** 69:6

**experiences** 68:1 94:2

**expert** 303:11

JOHNNIE LEE SAVORY, 06/15/2022

**explain** 11:10 31:1 32:1 35:16,17, 18 56:16 63:2 71:14 81:22 82:20 83:1 87:16 94:18 100:3 106:4 109:14 165:9,11 243:20 247:12 256:13 331:10

**explained** 30:22 32:20 71:22 72:12 97:16 353:14

**explaining** 228:13

**explains** 218:15

**explanation** 67:6

**explore** 67:3,4 111:10

**exploring** 66:20,23,24

**express** 106:2 113:16,19 126:10

**expressed** 302:13

**expressing** 131:21

**expunged** 43:8

**extended** 21:24

**extensive** 20:22

**extent** 25:3 26:3 113:12,15,18,23 115:23

**extra** 340:22 378:12

**extract** 21:3

**extracted** 22:7

**extreme** 98:20

**extremely** 276:9

**eye** 129:18

**eyes** 129:15

---

**F**

**F-L-I-N-T** 5:3

**fabricate** 21:5

**fabricated** 30:21

**fabrication** 33:5,6,7

**face** 77:1 102:13 212:10 273:1 352:9

**facing** 91:15 351:6

**fact** 13:16 28:6 32:23 63:7,11,15 83:18,24 125:2 283:20 302:11

**facts** 132:22 248:5

**fade** 163:12 269:13

**faded** 269:10

**fading** 302:5

**failed** 21:24

**fair** 109:1 157:17 185:2,3 260:6 302:24

**fairly** 115:20

**faith** 104:21,24 106:2

**false** 21:5 260:20 262:1,5,17,21

**Falsely** 232:16

**falsities** 382:2

**familiar** 10:12 16:23 17:16 46:7,14 81:23

**familiarize** 17:22 18:20

**families** 103:10

**family** 78:15 80:6,8 83:12,19 93:7, 12 129:20 141:16,17 155:4 172:20 173:1,3 177:9 189:9 191:3,5,9 222:24 296:19 297:18 318:1,5 319:2 325:16

**fast-food** 161:6

**father** 80:15 92:5 190:1 196:17 219:8,11 226:10 228:11,14 230:11, 17,20 231:6,15,16 232:10 237:1,9, 16 238:18 245:20 251:16 252:1 255:9,12 290:22 296:22 319:1

**father's** 196:19 215:12 283:21

**fathers** 140:12

**fault** 357:10

**favor** 227:17

**fear** 100:2,5

**features** 71:4

**February** 253:24

**fed** 360:18

**federal** 6:7 9:6 13:20 66:12 103:15

**feed** 244:1 265:1

**feel** 9:2 93:22 96:24 97:19 98:23 100:18 107:10 112:24 113:5,7 115:9,14,16,20 116:3 125:16,17 130:2 212:2 315:2 319:4 324:9,13, 14 340:17 352:16 355:7 363:7,10, 12,19

**feeling** 108:22 226:14 227:1,3

**feels** 226:9

**feet** 110:5 128:10

**fell** 374:15

**felt** 84:1 92:16 125:21 209:13 210:4,17 227:4 362:7

**female** 267:2,6

**fields** 228:2

**Fiers** 371:2

**fight** 95:17 194:23 195:7,14 196:4 208:1 250:10,11,16,19 343:14

**fighting** 382:19

**fights** 193:7,9

**figure** 134:16 234:13 260:19 345:13

**file** 38:21 116:2 132:4 244:15

**filed** 4:11 11:23,24 13:20 55:15 56:10 61:5,11 65:23 66:12 81:24

**files** 238:14

**filing** 47:10

**finally** 95:12 360:24

**find** 7:11 53:16,24 75:1 89:24 130:16 245:17 261:4 293:7 305:7, 14 340:18 382:21

**finding** 56:4

**fine** 18:1 31:8 59:15 75:17 85:5 113:2 133:19 157:17 244:22 313:3 368:14 369:18

**finger** 374:11

**fingerprint** 128:15

**fingerprints** 128:19,24

**fingers** 350:15

**finish** 50:18,21 74:7 231:9,10 263:7,10 380:24

**finished** 18:14 85:3 90:1,12 177:2 198:20 263:12 365:6 377:1 380:18 381:1

**finishes** 202:18

**Firm** 4:6

**fistfight** 196:7

**five-minute** 273:13

**flash** 106:11

**flat-out** 360:3,7

JOHNNIE LEE SAVORY, 06/15/2022

**flavor** 127:8

**Flint** 5:3 36:18 66:11 89:22 90:8 132:15 241:14 258:14 331:22 340:5

**flip** 16:9 17:14 47:6,7,16 49:6 117:19 216:15,16

**flour** 210:10

**flowing** 209:8

**fly** 212:12

**focus** 19:15

**food** 22:4 223:24 229:15 354:3 360:2,4 381:16

**foot** 76:6 129:22 130:1

**football** 153:22 154:1,3,4,8

**force** 239:6 247:3

**forego** 67:20

**forethought** 326:3

**forget** 120:23 303:9,10 320:18

**forgive** 120:12

**forgot** 11:15 211:6 354:20 379:14

**forgotten** 174:12

**form** 9:23 10:21 11:12 14:4,18 15:12 18:9 22:14 23:1 30:17 34:13 35:14 36:11 37:9 38:16 39:19 40:2, 6,14,18,24 41:19 42:17 43:4 44:12 47:13 48:15 49:3,22 50:14,20 54:5 56:19 60:1 64:24 68:20 69:1 77:10 130:12,22,23 134:12 137:1 157:15 160:6 161:11 162:24 197:8 208:11 212:5 230:23 231:19 232:7 244:20 248:5 251:3 253:17 255:15 256:15, 23 258:4,13,24 260:12,23 262:3,23 263:4 264:4 268:8 269:22 270:15 271:22 274:11 275:23 276:11,24 278:4 279:20 285:23 300:4,11 302:6 303:6 307:11,18 310:11 315:4,23 317:11 318:6 320:22 321:22 323:7,19 325:14 326:2,24 331:18 336:1 340:24 341:8,16 343:20 344:18 345:1,10 349:17 355:4 356:6 359:5 373:2 375:2 376:22 379:9 382:24

**formal** 6:2

**formulated** 113:18

**formulating** 113:23

**formulation** 113:14

**forthright** 366:12

**forward** 112:12

**foster** 236:18 281:13,19,22 282:9 284:8 285:9

**found** 13:6 34:5,12 35:8,9 37:15, 23 38:12,16 39:13,20,24 40:6,19 41:15,23 42:3,7,11,21 108:3 129:2, 3 315:13

**foundation** 10:18,20 14:18 15:12 22:14 23:1 30:17 40:2,24 41:19 42:17 43:4 44:12 49:22 50:16,20 64:24 68:20 69:2 130:23 134:12 137:1 231:20 232:7 258:4,13,24 260:12 263:4 264:4 268:8 276:12 343:20 379:9

**fourth** 224:11 227:22

**foyer** 349:1

**frame** 30:21

**framed** 28:15 31:21 64:6 65:20 66:14 67:2 70:3,23 71:6,23 72:6 74:10

**framing** 31:3 32:23 75:11

**Frank** 211:22 212:4

**Frankie** 155:5,6 190:16,23 191:8 208:1,14 209:14 212:8 287:18,22 296:22 298:9,10,12 300:20

**free** 9:2,16 25:8 27:1 43:8

**freedom** 11:23 84:1

**freely** 211:10

**friend** 34:12 161:4 166:7,9 167:18, 20 168:1 191:1,9 192:13 209:23 211:11 283:20 297:22 299:23 304:13,14 315:10,13 325:12 340:18 341:3 367:5 381:9

**friend's** 222:1 233:22 316:3

**Friendly** 125:14,15

**friends** 150:2,5 154:7,16,20 188:4 190:12,14 211:20 230:21 231:7,17 283:11,12,14,16 317:14 368:19

**friends'** 189:3 222:4,6 276:18

**friendship** 151:7 339:23

**front** 29:12 33:13 38:22 46:6 120:10 156:18 159:1,4,5 172:22 289:1 333:3 335:5 351:8,15

**frustrate** 355:16

**frustrated** 355:7

**fulfill** 94:8

**full** 42:23 43:1

**fun** 171:8

**funeral** 316:12,14,24 317:2,6,15, 23 318:2,11,18,22

**furniture** 164:14,23 175:15 229:20

### G

**Galesburg** 94:23

**gambling** 230:14 240:21

**game** 257:17

**games** 32:11

**gang** 91:21 94:22 95:1,6 97:12

**garage** 157:23 158:21 165:23 167:4 173:7 176:3

**garbage** 244:8

**gas** 101:17

**gave** 38:3 63:24 64:1,17 73:7 75:1 78:13 114:15 119:15 120:1 132:6 185:1,3 218:1 221:4 305:1 307:21 310:18 346:18 349:9 366:14,24 376:20 379:1,2

**Gear** 154:21

**general** 20:20 114:13

**George** 254:13 264:16

**German** 158:5 176:15,23

**get along** 228:6

**Gift** 225:11 381:20

**girl's** 218:17

**girlfriend** 193:23,24

**give** 15:19,24 22:1,8 23:10 64:18 78:16 83:2 100:10,15 110:3,9 120:17 168:12 169:22,23 183:20 184:20 211:10 213:8 219:17 220:6 221:8 222:10 224:3,9 239:16 251:22 258:11 259:5 266:1,2 307:17,20 313:4 353:13 359:3 360:1,9 369:8 375:21,24 377:19

**giving** 70:8 74:22 75:3 103:16 163:3 193:24 206:12 220:2 223:2, 22 227:21 260:15,20 353:23 358:13

JOHNNIE LEE SAVORY, 06/15/2022

**glasses** 92:7

**God** 83:9 102:2 104:12 105:23 106:21 111:3 124:9 155:4,9 166:24 266:14,16 319:18 382:16

**godmother** 93:10

**good** 4:1 5:13 45:23 46:2 63:10 76:2 98:17 111:12,13 214:18 222:16 234:15 244:13 264:24 275:1 321:24 366:17 373:7,12

**goodbye** 180:15,21 279:3

**gosh** 89:22 331:22

**Gotcha** 185:5

**Gottfried** 86:9

**governor** 41:17 42:14,20,24 44:5 47:23 48:24 50:6,13 51:9,15 54:9 109:22

**governor's** 52:15 53:4

**grab** 259:12

**grace** 83:9 105:23

**grade** 150:7 151:2,3,5,6,10,12,14 152:14 224:12 227:22

**grandma** 185:21 222:13 223:4 224:3 265:8 354:7

**grandmother** 83:16 94:9 95:3 103:24 139:17,20 194:1,2 246:8

**granted** 42:23 51:15 253:15

**greatest** 366:15

**Green** 154:21

**greet** 305:20,22,24 306:3

**grew** 239:5,13 382:18

**grievance** 87:18,19

**grievances** 87:22

**groceries** 210:5 221:7

**grocery** 239:19 244:8

**ground** 369:16,20

**grounded** 184:17

**grounds** 309:2

**group** 44:17,21 46:4 92:10 364:19

**growing** 141:4 239:13

**grown** 59:22

**guardian** 86:11 253:16,20

**guards** 91:16

**guess** 48:17 62:15 76:6 93:17 97:8,13 109:12 120:9,19 136:20 156:20 189:6 209:9 229:23 234:2 246:8 257:16 277:12 293:21 294:9 302:7 311:13 315:7 316:2 332:9 345:21 350:18 360:8 363:19 376:13

**guessing** 120:8 136:24 296:2,3 376:12,14

**guided** 378:22 379:13 380:7

**guilty** 101:4 127:17 128:3,5

**gun** 43:13,18 249:5,7,12,22

**guns** 247:9,13,18,20,21,23 248:1, 17

**guy** 366:17 382:22

**guy's** 277:12

**guys** 156:7 369:15

## H

**H-A-G-Y** 5:8

**Hagy** 5:7

**hair** 29:10,14 33:15 76:22 110:20 131:15

**hairs** 30:23 32:21 33:18

**half** 32:15 83:14

**halfway** 20:16

**Hall** 255:20,24

**hamburger** 381:19

**hand** 112:24 213:1 216:19 272:3 312:2 370:3

**handcuff** 204:22

**handcuffed** 332:20

**handcuffs** 335:8

**handed** 46:3

**handicapped** 110:15

**handing** 213:11

**hands** 33:17,18 374:12

**hang** 66:9 190:19,22 191:5 251:18

**happen** 88:19 93:13 119:11 121:4

**happened** 86:14 95:9 100:8 106:1 127:16 134:17 158:20 172:24

194:16 195:20,24 200:2 208:3 226:5 235:15,19 242:16 249:15,17 250:3 276:15 304:24 330:6 338:16 360:10 361:1,2 367:1 368:17,18,19

**happy** 114:12,17 126:10 171:3

**harassed** 101:11

**harassing** 67:19,21

**hard** 125:22,23 126:19 241:11 256:5 355:22 356:4

**harm** 104:16

**harm's** 96:15,16 98:9

**harmed** 98:14 208:13

**harmful** 165:20

**harsh** 82:17,22 83:2 90:9,10 91:7

**hat** 66:10

**hate** 102:5,6,20 227:11

**hated** 102:8

**hatred** 101:13

**he'll** 7:19 383:7

**head** 29:11,12 143:8 170:19 194:5

**headed** 156:5

**heads-up** 113:10

**heal** 104:12

**hear** 79:24 101:21 107:9,11 122:13,16 159:21 176:13 209:18 268:17 271:11 293:23 330:12 345:5 379:2

**heard** 10:22 126:4 139:24 161:8 325:4 344:23

**hearing** 40:11 91:18 123:1 215:16 253:16

**heavily** 131:3

**held** 60:9 95:7 374:12

**hell** 102:16

**helped** 94:22 97:19 162:15 211:4,5 332:16

**helpful** 325:2 332:7

**helping** 87:13 106:6 126:5 210:15, 16 341:5 346:15

**helpless** 227:4

**Hey** 360:18

**high** 83:13 104:19 144:17 288:21

JOHNNIE LEE SAVORY, 06/15/2022

**highlight** 217:15

**highlighter** 213:19

**hinders** 229:11

**Hispanic** 95:6

**hisself** 365:12,14

**history** 43:7 215:2 216:5 240:2 241:21 246:13,14,15

**hit** 153:8 194:5

**hitting** 251:10

**hold** 28:2 52:5 69:20 221:3 224:3 248:4 251:22 268:4 271:20 303:5 343:18 379:8

**holding** 165:14

**Holocaust** 101:17

**home** 83:23 107:23 109:18 110:8, 22 111:5 129:2 137:7 138:6 139:5 143:16 149:22,24 150:21 156:6,19, 23 157:7,10 159:8,11,19 160:17 166:17 177:7 181:6,7,9,13,15 182:18,19,20 183:12,17,19,22,24 184:6,10,21 185:8,14,18,19,21 189:10 199:1 214:5 221:20,24 225:11 226:16 227:2 230:15,18 232:18 233:23,24 234:3 236:4,13 237:6 242:9 243:3,14 245:13,18 246:3 251:22 253:24 254:2,5,7,22 255:6 264:2,14 265:15 266:5 280:18 286:11,13,16,17 287:1 289:12,14,16,23 290:3,15 297:23 299:1,5,8,10 300:21 301:18,19,20 307:21 320:18 321:3,7,8 322:8 333:23 334:9,10 341:21 360:19,21, 23 363:8 369:3 374:18,19 380:11, 12 381:20 382:10

**homes** 189:3 222:7 243:22 245:7

**homework** 144:13,14 148:15

**honest** 137:2,5

**honing** 369:23

**honor** 363:2

**honoring** 346:11

**hook** 349:19

**hope** 34:1 96:23,24 108:19

**horrible** 49:16

**horrific** 75:3 94:11

**horseplay** 308:18

**horseplaying** 164:5 304:12

**hospitable** 80:8

**hospital** 29:16 97:15 146:5,9 194:7 354:7 382:23

**hot** 161:1,9,19 162:3,7,15,20 163:13,23 169:4 178:9

**hour** 32:15 254:6 279:16,17,19 280:1 286:6

**hours** 8:12 77:7,12 84:10 152:6, 11,17,23 181:24 310:16 312:6 342:2 370:22 371:7 373:21 378:5,9

**house** 78:4 80:24 97:12 129:11,12, 14,22 137:19 142:15 144:6 152:5, 22 153:12 156:24 158:8,11,15,17 160:1,4,20 166:19,23 167:7 169:4, 7 170:9 171:23 172:15 174:4,14,23 176:6,11 178:18 179:9,20 180:3, 14,17 181:5 185:19 186:6,24 189:9,15 198:22 222:1 226:12 230:12 232:11 233:22 235:4 264:15 265:10 266:21 270:19 271:19 272:12 273:12,17 274:7 275:19,22 276:18 277:14,16 278:2, 24 280:14 281:9,12 282:2 286:5,9 287:21 288:4,7 289:1 290:2,5,11, 12,13,16,20 291:2,5,18 292:7 299:7,15 300:22 310:5,10 311:3,4 318:9 319:8,12 320:8 322:18 325:7 333:15 334:4,8 340:2 342:9 354:14,17

**houses** 143:23 222:4 224:6

**how-many-page** 133:1

**huge** 158:6

**Hulslander** 216:12,22

**human** 30:13 86:7 93:16 102:23 107:20 108:20 128:13 303:1,7,9,12 345:12 366:21 382:16

**hundred** 366:8

**hung** 190:23

**hungry** 160:22 162:2 169:5

**Hurlburt** 143:22

**Hurricane** 86:14 87:1

**hurt** 94:17 96:5,23 97:1 125:16 164:8 195:18 209:5 210:1

**hurting** 107:15 126:6

**husband** 274:12

**I**

**I'MMA** 102:10

**idea** 128:8 244:19 245:1 289:21 337:21 344:7

**identified** 129:21,23 365:14

**identify** 4:21 19:23 20:2 365:11

**identifying** 215:5 370:1

**IDOC** 94:21

**IDS** 203:9

**ILCS** 48:9

**ill** 101:13

**Illinois** 4:7,13,17 11:15,18 12:1,11, 14 14:8 42:14 46:23 49:2 108:2 140:23 232:17

**imagine** 103:22

**immediately** 159:6 309:10

**Immesoete** 73:7,14 74:13,21

**imparting** 165:10

**impasse** 116:3

**implicate** 22:8 29:2 30:15 31:6

**implicated** 22:12 33:12 64:6 65:20 66:14 70:24 71:23 74:10

**implicates** 28:6,18 29:4 33:3 52:9 58:15

**implicating** 21:6 75:12

**implication** 32:8

**implied** 33:12

**implies** 331:21

**implying** 25:10,15

**important** 47:22 276:9

**impossible** 211:5

**imprisoned** 93:24

**inappropriate** 132:19 230:21

**incarcerated** 231:24

**incarceration** 68:15

**incidences** 199:21

**incident** 31:2 92:5 145:23 147:5,9 152:3 195:2 200:2 205:13 206:18 218:19 225:9 238:5,9,23 239:2 354:5

JOHNNIE LEE SAVORY, 06/15/2022

**inclination** 128:5

**included** 71:7

**including** 318:22

**incompletely** 35:12

**incomprehensible** 102:18

**inconsistencies** 353:15,17,22

**indicating** 20:15

**indicative** 71:5 325:11

**individual** 27:17 213:6 257:24

**individually** 20:24

**individuals** 155:11 261:15 313:8

**inform** 7:13 56:22

**information** 11:24 27:13 28:11 31:20 51:14,18 52:13 53:3,14,23 56:14 59:5,6 60:8,20,21 62:9,23 63:2,17 74:2 75:5 114:23 115:23 135:3,7,10 185:6 240:10 257:22 302:19 327:9 341:5 359:3 377:19 380:20,23 381:4

**informed** 371:8

**initially** 328:24

**injured** 102:11 164:9

**injury** 20:2

**ink** 203:10,11

**inmates** 87:13 91:16 95:13 97:11

**innocence** 14:16 39:8 41:17 48:9 49:1 50:9 51:11,16 52:1 53:4 56:5, 23 57:12,15,18 58:3,7 60:22

**innocent** 34:5,12 35:8,24 36:10 37:15,24 38:6,13,16 39:20 40:1,6, 19 41:15,23 42:3,7,11,15,21 44:10 52:16 54:13,18 55:10 56:11 84:5 100:10 127:5,23 133:6

**inquiry** 260:16

**inside** 39:13 86:1 88:7 92:19 106:7 148:8,16 157:21 159:7 169:7 172:14,16 273:16 362:7

**instances** 106:16 245:11

**instincts** 209:6

**instruct** 7:14 59:9,19,20,23 113:1 115:6

**instructed** 114:4

**instructing** 59:6,21

**instruction** 26:20 33:1 60:8 114:16

**instructions** 112:15 114:14 115:16

**instrument** 191:20

**intention** 310:7

**inter-** 170:13

**interact** 81:12 83:11 170:13

**interacted** 152:16 190:6

**interacting** 170:17 286:1

**interaction** 78:14 185:14

**interactions** 153:4 204:10 216:1 238:1 283:18 370:17

**interceded** 91:19 94:15

**interceding** 94:18

**interchangeable** 82:22

**intercourse** 68:9,10

**interested** 82:14 153:19

**interfere** 86:2

**intern** 5:17,20

**interpreted** 32:6 162:1

**interrogated** 21:23 131:6

**interrogation** 64:16 100:19 381:16

**interrogatories** 15:19 16:8 17:10, 17 18:21 19:9,22 34:10

**interrogatory** 17:15 18:12,13,15 19:7,16,21 20:8,10 26:17 27:13 28:13 113:14

**interrupt** 85:6

**interrupted** 89:21 365:4

**interruption** 9:12 99:1

**intervene** 208:13

**interview** 122:9,11,12,13,22 123:5 314:15

**interviewed** 224:15 352:20

**interviewing** 261:3

**interviews** 355:2

**intimidating** 97:13

**intoxicated** 219:17 220:7

**introduce** 169:12

**introduced** 6:18 80:6 173:1,3

**introduction** 6:3 47:17,21

**intrusive** 93:11,12

**investigate** 130:5 240:2

**investigating** 260:16

**investigation** 247:7 315:20 326:1 341:6,15 350:24 353:1

**investigative** 21:14 352:1

**investigator** 119:2 134:14 216:23 224:15

**investigator's** 216:12

**invited** 174:19 186:23 274:4

**invoke** 367:1

**invoked** 22:5 380:10

**invokes** 100:9

**involuntarily** 21:4

**involved** 21:18 86:12 103:18 128:2 131:3 250:10,21 255:9 303:15

**involvement** 217:7 218:13

**involving** 200:8

**issue** 25:2 211:12,22,24

**issued** 48:4,24 202:4

**issues** 223:6

**issuing** 17:17

**items** 248:8,24

**Ivy** 155:6 190:19 191:5,9 192:23 208:2 209:14 286:16 287:1 343:9

**Ivy's** 211:22

**Ivys** 101:12 297:24 300:19

**Ivys'** 286:10,13 287:20 288:4,6 290:13,16 296:17 298:18,21 299:3

**IYC** 88:4,21 124:13

## J

**J-O-H-N-N-I-E** 6:16

**Jackson** 4:6 140:7

**jail** 92:19 97:15 101:2,6 203:23 237:2,12,17

**James** 21:9,19 22:9 37:15,24 38:7 41:16,23 42:21 54:14 65:10 68:23

JOHNNIE LEE SAVORY, 06/15/2022

77:13 78:14 80:6 81:14 82:3 130:20 149:16 150:2 151:7 152:5, 10,14 155:18 160:20 180:19,23 186:6,10 190:19,24 276:8 296:22 298:1,11,13 373:19 374:14 378:20

**James'** 33:17 80:24 176:11 179:8, 20

**January** 44:6 45:4 47:24 48:24 61:8 69:6,10,16 76:16 77:19,21 109:9,17 117:20 120:22 135:19 136:22 145:6 151:3 152:9,15,20 153:6 154:17 187:4 188:22 193:1 196:1,15,23 197:3,22 198:2 211:2 225:21 240:8 249:10 252:22 253:7, 15,23 263:3,18,22 267:18 272:11 312:18 313:12 314:11 316:9 321:5, 6 322:9 323:1 329:22,23 330:6 347:2 353:2 354:8 355:3 357:13,20 359:2,3,21 370:24 381:12,13 382:3

**jar** 118:3

**Jenkins** 349:19,23 353:10 365:1, 2,16 366:13,16

**Jenkins'** 371:3

**Jenner** 46:12

**Jim** 228:2

**job** 10:5 103:8,9,19 106:9 229:2 285:20

**jog** 201:6

**Johnnie** 4:5,9 5:6 6:5,9,16 10:5 16:18 17:4,8 24:14 28:17 33:1 35:6 39:14 45:6 47:2 51:18 52:5,17 65:24 66:14 72:19 96:1 99:3,7 136:16 198:12,16 202:16 215:5 218:11 219:6 225:3 226:8 241:17 242:2,6 246:21 247:8 250:7,10 251:9 263:7 312:10,14,17 377:2 379:8 380:18 383:10

**joked** 156:10,11

**joking** 148:7 171:9 284:21

**Joliet** 88:5,20,21 97:9,20 124:13 126:23

**Jones** 294:19 295:8

**Josh** 58:9,10,16,19 60:14 61:14 62:11,18 63:13

**Jr** 149:16

**judge** 7:19 9:6 299:13

**judgment** 80:14 222:16

**judiciary** 92:21

**July** 46:19 83:19

**jump** 208:7 328:19

**juncture** 276:5

**June** 4:7

**juries** 33:20

**jury** 33:9,20 50:8

**justice** 102:10

**juvenile** 88:2 118:23 123:23 124:10,11 199:17,20 202:9 224:16 225:4,6,7

**juveniles** 88:24

**juvy** 124:9

## K

**karate** 342:17 343:2,5,13 344:3 374:9 375:9

**Katrina** 86:14 87:2

**key** 158:18

**kid** 209:20 277:1,2

**kidding** 69:14,17

**kids** 266:11,13,16 275:8

**kill** 346:1 381:9

**killed** 95:17 296:12 314:11 316:10 325:13 340:18 346:4 367:4 373:15, 19 376:2

**killer** 128:19,20 130:20 133:4,7 135:1,11,16 315:13,15

**killing** 128:11

**Kimberly** 154:21,23,24

**kind** 9:14 29:22 36:11 93:17,23 96:22 98:21 109:6 115:12 120:18 128:6 138:12 153:7 191:19 209:20 221:15 339:14 340:20

**kinda** 162:12 182:10 332:9

**kindhearted** 208:15

**kinds** 155:10

**kitchen** 159:17 160:3,8 173:2,17 174:9,11,24 175:2,4 275:5

**knew** 130:24 131:1 150:14 169:14 191:3,15 206:17 210:11 220:17 221:6 222:4 223:8,11 235:16

240:4,5,10,14,15 244:9,10,14 270:18 283:4,13 294:3 309:17 315:9 332:13 349:11,18 380:13

**knife** 33:7 35:4 196:9,11,14,17,20, 22 197:2,7,16 198:2 333:22 334:5, 12,13 343:6,14 344:4 374:14

**knives** 334:17

**knock** 286:20

**knocked** 194:6 266:8 282:3 286:21 311:9 382:20

**knowing** 83:22 84:2 94:12 100:20, 21,22 101:14 152:14 341:12

**knowledge** 11:8 23:7 31:13 55:14 61:17,21 130:15 131:17,21 140:24 195:3 231:16 254:18 285:11 287:16 305:10,12 315:17 316:9 338:3,15 365:7

**Kyle** 5:1

## L

**lab** 11:16,18 25:24 33:8

**laboratory** 23:9 24:7,8 37:16 38:18,20 40:8,10

**lack** 35:21,23 36:1

**lacking** 209:14

**ladies'** 92:9

**lady** 203:12 285:14

**lamps** 160:8

**late** 92:6 144:17 146:21 177:8 180:4 181:13,24 184:21 185:14 188:12,17 273:9 288:21 312:19 342:8

**Latino** 95:6

**laugh** 92:24

**laughed** 156:10,11

**laughing** 92:11,12,16 171:9 284:21

**laundry** 189:17 259:23

**law** 4:5 87:20 103:15

**lawsuit** 11:24 20:1 55:23 56:4,9 61:6 81:20,24 132:24 133:9

**lawyer** 25:4 26:5,22,24

**lawyer-** 51:19

JOHNNIE LEE SAVORY, 06/15/2022

**lawyer-client** 13:17 17:6

**lawyers** 13:13 27:6,8,12 28:7,19 65:23 73:3 74:24 114:7 117:15

**leading** 197:2

**league** 155:16

**lean** 227:5,7 228:12,18,19

**leaned** 92:15

**leap** 66:21

**learn** 81:3,10,20 82:11 110:19 131:12 209:3,9 237:4 296:1 297:1

**learned** 88:14 108:4 114:6 134:10 234:14 297:2,21 340:21 344:22 366:11

**learning** 82:15 342:11,13

**leave** 128:14,15,23 166:22 180:2 200:12 201:23 227:2 289:8 292:6, 15 309:1,10 331:14,15

**leaving** 146:7 180:20 290:13,16

**led** 152:21 376:6

**Lee** 4:5,9 5:6 6:5,9 16:18 99:3,7 198:12,16 312:10,14 383:10

**left** 88:8 125:18 132:5 134:13 161:5 166:17 170:9 178:6,18 179:13 180:11,14,17 181:4 183:21 186:6 203:13 204:12 206:18 236:4, 8 248:19 271:18 272:12 273:2,5 277:11,16,22 278:3,23,24 279:4 288:7 290:17 291:5,17,18 295:8 297:23 307:21 330:19 331:2 341:21 342:9 346:10 351:16 364:7

**left-hand** 214:21 216:17

**leftovers** 360:4

**legal** 4:14 43:5,8 48:16 56:23 57:19 87:14 113:20 253:16

**let alone** 303:14

**letter** 45:4 121:15

**letterhead** 46:12

**letters** 118:23 119:5,15,20,24 120:1,9 121:11 122:6 123:14 127:2,4,9

**letting** 300:15 334:8

**Lewis** 337:13,14,16

**liar** 29:24 346:9 352:10 361:17,18 366:22

**liberty** 83:11 84:1

**library** 87:20

**licensed** 108:1

**lie** 33:11,23 102:13 125:15 262:12, 17

**lied** 22:2,6 105:4 195:17

**lies** 36:5

**Lieutenant** 127:8 215:20,23 233:2,9

**life** 49:17 76:20 79:18 91:21 104:17 105:6 107:24 127:19 131:18 227:10 298:23,24 303:10,13,14,16 382:14,17

**light** 295:9

**Lillie** 281:2

**limit** 383:2

**limited** 87:23,24

**Linc-** 224:10

**Lincoln** 224:10,12

**Lindsay** 5:7

**lines** 242:4 243:1 325:3

**lingering** 49:15,20

**list** 9:17 20:23 90:20 259:23

**listed** 99:15

**listen** 101:11

**listening** 125:19 346:11 363:14 368:13

**literally** 72:12 211:3

**live** 83:17 100:7 101:14 108:13 140:13,15,23 141:1 142:6,8 150:18 166:18 223:24 239:23 241:1 280:16

**lived** 151:21 155:20,21 240:12 319:2

**lives** 128:6 311:6

**living** 77:15 78:7,18 81:8 137:16 138:5 139:17,21 140:17,20 151:18 160:2 164:13 177:12,21 180:17 215:10 229:24 232:10 297:16 375:17 377:12

**local** 6:6

**located** 147:20 174:23

**lockdown** 85:15

**lockdowns** 84:18 85:8

**Locke** 5:5 24:22 73:19 115:14

**locked** 84:9,10 334:10

**long** 84:24 85:7 104:4 115:10 138:24 145:4,8 150:5 163:10,11 166:2,3 167:12,13 172:12 187:3,7 192:20 205:5 223:11 225:15,17 227:9 236:5,15,24 254:9 258:5 265:16 267:17 270:18 273:3 278:6, 8 279:14,16 280:7,8,19 286:4 288:6,8 289:13 290:5 294:23,24 296:6,7,8,9 299:13 308:8,12 317:3 319:17 352:12,17 367:8,14

**longer** 9:8 245:16 321:20

**longest** 245:12 312:2

**looked** 69:10 80:12 160:1 175:7,9 246:12 289:17 362:3 374:16

**lose** 358:23

**lost** 83:13 85:11 113:5 229:11 374:17

**lot** 8:13 89:6 93:11 103:8 111:1 114:21 126:18 129:3 130:2 154:18 205:21 266:19 278:1 336:9 381:15

**Loucks** 145:16 151:11,24 187:17, 19,22 188:1,4,11,17

**loudest** 94:5

**Louisa** 140:9

**lounge** 313:18,19

**lounges** 239:19

**love** 94:7 102:5 104:21 106:2,5 108:19

**loves** 106:21

**Luckily** 218:3

**Lula** 296:23

**lunch** 8:12,14 116:24 148:16,17, 19,21,23 149:7

**lying** 102:7 197:10 198:7 261:3 360:3,7

---

**M**

**machine** 349:19 351:16

**made** 7:21 49:13 50:7 66:3 73:23 100:18 125:22 126:11 142:17 161:8,12,13,19 162:6,8 186:13 190:4 193:24 194:23 198:1 206:21

JOHNNIE LEE SAVORY, 06/15/2022

217:5 218:11 227:13 279:21 307:8, 13 345:14 354:13,20,22 355:7 363:6,10,11 375:24

**madness** 378:21

**magazine** 69:11

**magician** 128:7

**main** 85:23

**maintain** 112:15,18 113:11

**maintained** 66:12 151:7

**maintaining** 63:21 65:19 70:2,23

**majority** 206:14

**make** 7:19 36:22 38:4 44:20 66:19 75:20 83:9 126:10 162:15 163:13 184:6 186:9 194:24 200:11,20 203:19 230:20 232:19 263:15 267:13 307:2 326:4 345:14 346:17 354:16 363:21 365:9 368:24 378:19

**makes** 126:7 325:14 326:4 365:19, 21

**makeup** 206:4

**making** 7:17 66:21 91:4 97:11 107:21 132:24 162:11 197:6 212:23 368:22 376:6

**male** 204:21 267:2,6

**males** 313:6

**mamas** 243:11,21

**man** 36:13 59:22 67:2 71:6 73:23 92:13 94:21 146:16 221:4 263:9

**manner** 67:7 259:24 353:1 354:24 367:4

**marbles** 150:17

**Marcella** 5:15 15:18 16:7 117:21, 23 118:13,16 119:18 122:8 124:18 336:21 348:1 356:15 357:12,18 363:17 364:11,15 367:9,24 368:4 370:15 371:9,12,23 372:10 374:2, 20 375:8 378:17 381:5

**March** 251:8

**Marchelle** 190:16

**mark** 193:15 194:3,16 196:5 200:2 207:21 208:1,16 211:23 213:14,18, 19,24 250:10,12,16,20,21 382:19

**marks** 129:17

**marriage** 83:21

**married** 94:24 95:1 141:24

**Marteness** 215:20,23

**Martha** 142:3 186:1,2

**Marva** 166:10,11,18 167:10,13 168:1,4,10,12 311:6

**Marva's** 167:7 169:7 171:5,7,10

**Mason** 191:12 192:14

**mat** 158:19

**match** 39:14

**math** 117:8,9 234:14 306:10,15

**matter** 4:8,9 261:22

**matters** 113:20 363:6

**mattress** 88:7 93:19

**Mavis** 140:5,13,15 141:1

**maximum** 88:23

**Maxine** 110:13,14

**Maymane** 275:16

**Mckinley** 150:9

**meal** 142:17 178:8

**meaning** 56:16 86:4,13 94:8 170:23 210:11

**means** 67:12,13 84:10 115:24 222:18 257:11,13 306:10 307:16 362:21

**meant** 94:18 167:3

**media** 4:2 10:22 11:2,9,11 12:14 85:10 99:2,6 198:11,15 312:9,13

**medical** 230:6

**meet** 76:13 192:13,17,19,21 193:2 289:1 291:16,19,23 306:23 307:2, 9,11,14,22 308:3 354:16,22

**meeting** 121:3

**meetings** 255:13

**Megan** 16:20,23 17:2,5

**member** 191:5

**members** 93:8 96:4 141:16,17

**members'** 189:9

**memorializing** 370:16

**memories** 163:12 201:21 202:6

**memory** 118:3 135:21 144:7 162:13 191:12 198:20 200:13,15

201:6 226:13 235:5 250:24 260:5 269:10,13 302:5 303:1 326:12,22 382:7

**men** 104:24

**mentally** 110:15

**mentioned** 40:9,13

**mess** 160:16

**message** 97:21

**met** 76:12,18 77:7 146:9 150:7 167:15,16 168:10 169:9,15 254:17 291:13 313:16

**Michael** 9:5 251:10,12

**middle** 89:17,21 145:19 202:19 224:10,12 346:7

**Miles** 5:17 112:7

**Mims** 9:5

**mind** 81:21 110:17 303:12 311:15 323:5,16 325:4 374:15 380:14

**mindset** 245:2 345:11

**mine** 33:19,20 104:9 153:22 209:23 214:2

**minute** 16:1 74:7 96:2 118:1 119:12 179:10 222:10 242:18

**minutes** 117:3 133:12 178:20 179:3,8 236:6 265:18 266:1,2 270:8 272:16,18,20,22 273:5 280:1,21 281:7 286:6 288:9,10,11, 13 289:15 290:2,3 295:1 299:13 308:11 309:15 311:10 312:6 352:15 367:10 378:6,10

**Miranda** 22:1

**mis-** 187:15

**mischaracterizes** 35:11 271:3

**misconduct** 18:7 27:23 64:6 66:14 70:3,23 71:23 72:6 74:5,10 75:11 82:8 98:24 99:13 100:6 105:19

**misleading** 366:5,7,8

**misquote** 320:19

**missed** 286:1

**Mississippi** 140:16,17

**misstate** 163:15

**misstates** 22:20 206:7 343:19

**mistaken** 129:16 320:15

JOHNNIE LEE SAVORY, 06/15/2022

**misunderstood** 161:23

**misused** 105:4

**mom** 93:9 139:21,22,23 167:21 173:9 317:20 368:14

**mom's** 139:22 141:20

**moment** 28:2 30:6 40:15 81:5 89:11 118:4 145:7 162:21 174:6 200:6,10,16 208:4 210:19 212:9 218:21 222:8 223:3 224:18,22 226:1,6,18,23 249:20 250:22 262:24 266:18 267:1,11 276:4 283:22 292:11,13,16 294:14 296:24 300:1 301:6 302:21 309:16 315:1 324:16 329:6 334:1 335:22 342:6,10 353:6 382:5,14

**money** 86:15 110:2,3,9,12 168:13, 16,18,23 169:10 193:23 194:1 219:17 220:2,6 221:2 224:3,9 251:16,20 252:2 285:21

**month** 12:23

**months** 85:9,10 167:23 236:16,17 237:17

**morning** 4:1 5:13 29:13 97:10 114:10,21 115:9 136:21 138:11 144:6 264:8,10,24 270:6,11,22 271:7,17 272:11 273:18,21 275:1, 19,22 276:1,8 301:11 322:17,18 325:13 354:13,17

**mornings** 136:5

**morningtime** 137:23

**mother** 80:15 109:23 127:18 129:19,21 140:11 173:5 177:21 296:21 319:1 354:3 360:4

**mother's** 168:2 283:10 360:4

**mothers** 210:5 243:11

**motion** 112:21 116:2

**mouth** 206:18 346:19 359:10

**move** 32:16 84:19 116:6 164:14, 18,23 207:12

**moved** 90:15 164:15,17

**moving** 91:4

**multiple** 243:3,8 245:10 317:5 335:23 336:2

**murder** 15:1,4 18:8 21:9,18 22:9, 10 34:12 36:10 37:15,24 38:6,13, 17 39:8,20 41:16,23 42:3,15,21 54:14,18 65:10 68:22 315:20 316:3

318:16,17

**murdered** 95:4 108:10 264:3 297:2,22 299:23 341:4 368:20

**murderer** 29:24 346:9 352:10 353:6 361:15 366:23

**murders** 21:19 49:14 82:2 199:16 369:6 371:10 372:3,8

**Murray's** 247:9,13 334:18

**music** 191:16

## N

**naked** 29:10

**named** 155:11 191:11 193:15

**names** 75:3 142:2 148:10 154:12, 15,20 155:1 222:6 259:5 266:17, 18,23,24 275:13 312:24

**narrative** 22:15

**narrow** 47:22

**nation's** 83:5

**natural** 209:6

**naturally** 176:24

**nature** 20:3 96:19 135:9 164:9 203:17 220:11 303:1,7,12 327:1

**neat** 160:18

**necessarily** 260:1

**needed** 208:8 210:4,8,17 220:15 227:5 230:9 258:19 284:2 285:19 342:13 355:19

**needing** 212:4 213:4

**negative** 260:14 276:12

**neglect** 229:13

**neighbored** 154:2

**neighborhood** 154:8,9 155:12,19 156:1 191:15 193:7,10,15 211:19 239:24 243:22 245:8 265:24 316:16

**neighbors** 210:11 233:23

**news** 13:4,5,6,8,9,11 14:19 25:17 106:11 123:11 296:15,16 297:5 320:2

**newscaster** 297:7

**nice** 285:14 349:20

**Nick** 4:18

**night** 78:12,19 95:19 153:6 177:3 180:2 186:7 187:4 189:2,21 199:1 256:5 296:13 298:17,20 300:22 301:9 321:8 322:9,12,14,15 330:10 332:13 342:8 349:9 365:17 366:16

**nightmare** 30:8

**nightmares** 100:7 101:9

**nights** 189:9,10 245:10,13

**nightsticks** 165:7

**non-privileged** 53:2,13,22 115:22

**North** 4:16 240:24

**Northern** 4:12

**Northwestern** 60:17

**nother** 182:24

**notice** 325:5

**numb** 103:7

**number** 4:11 23:10 99:6 104:11 198:11,15 312:13

**numbers** 213:5

**nunchucks** 165:4

## O

**ob-** 36:20

**obey** 190:1,7

**object** 7:10 23:17 36:11 37:7,10 64:23 112:10 268:13 343:19 355:4 375:2

**objecting** 272:4

**objection** 7:17 9:23 10:19 11:3,12 13:15 14:4,18,24 15:10 17:3 18:9 19:2 22:14,20 23:1,23,24 24:20 28:2,3,17 30:17 31:12 34:13 35:11, 14 37:9 39:2 40:2,21 41:19 42:17 43:4,19 44:12 47:13 48:15 49:3,22 50:14,18 51:17 52:2 54:5 55:2 56:19,24 57:6,19 58:15,24 59:8 60:1 63:5 64:23 65:11,17 68:19 69:1,22 70:17 75:8,13 77:10 85:20 87:7 130:7,22 132:11 134:12 136:23,24 157:15 160:6 161:11,17 162:24 197:8,18 199:22 206:6 208:11 212:5 230:23 231:19 232:2 244:20 248:4 251:1,3 253:17 255:15 256:15,23 257:6 258:3,4, 13,24 260:9,12,23 262:3,23 263:4,

JOHNNIE LEE SAVORY, 06/15/2022

7,24 264:4 267:23 268:8 269:21,22
270:14 271:3,22 274:11 275:23
276:11,24 278:4 279:20 285:23
300:4,11 302:6 303:5,21 306:19
307:11,18 310:11,17 311:21 315:4,
23 317:11 318:6,15 320:22 321:15,
21 322:22 323:7,18,19 325:14
326:2,14,24 331:18 336:1 340:24
341:8,16 343:18 344:18 345:1,10
346:5 349:14,17 356:6 357:21
359:5 366:4 371:16 373:2 374:22
379:6,9 382:24

**objectionable** 7:12 37:4 130:11

**objections** 20:9,11,14,20,21 27:7
36:17,18,22 37:1 132:15 257:15
331:23 344:5

**obliged** 372:13,14,18

**occur** 85:18 233:6 310:15 359:18

**occurred** 233:17 370:24

**occurrence** 20:2,3,4,5

**occurring** 217:8 218:14

**October** 215:17 216:6 217:8
218:14 242:11

**odd** 382:21

**of-** 168:6

**off-** 88:12

**offense** 217:7 218:13 247:4
252:11

**offenses** 200:8 203:3 207:4,7
224:17 246:22 250:8 252:5

**offer** 231:6,16 318:4 378:17

**offered** 70:14 232:20

**offering** 341:5

**office** 21:3 86:10 146:1 294:21
304:3,8,20 305:9 308:18 344:24
345:6 347:6,12,15,20,21 348:21
356:16 362:6 370:17 371:4 377:7,
16 378:16

**officer** 11:6 92:16,23 93:6 103:4
108:2 117:23 118:18 125:14,15
134:15 146:8,12,13,18 204:5 252:9
253:1 254:13,19 255:9 257:4,24
261:2 293:17,19 294:16 336:18,21
348:9,13 354:6,12 355:1 356:3
357:15,23 359:2,18 364:21,22
365:2,8,12,20,22,23,24 366:12
371:1,2,8,11 372:6 373:22,24
381:12

**officer's** 129:16

**officers** 87:19 88:4,18 92:10
107:22,23 108:1,12 125:4 130:5
195:2 204:20 228:5,6 239:5,6,14
312:18,22 313:21,24 314:4,15
319:20,24 323:2,17 324:6 325:23
327:6,9 328:21,23 329:12 330:8,19
332:3,18 333:4,22 334:8 335:3
338:13,19 339:11 340:13,18
341:13,20 344:22 347:22 348:2,15
352:20 353:23 355:6 356:8 358:4
359:10

**officers'** 340:8

**offices** 4:16

**official** 119:4

**older** 80:10,12,13,15 92:6 191:22
228:7 234:11 247:16 248:7 285:6

**Ooh** 224:10

**open** 88:7 339:3

**opened** 157:20 162:16 266:7,8,12
267:8 269:14

**opens** 269:17

**opportunity** 70:9,14 90:21 187:2

**opposed** 102:5

**opposite** 151:9 155:20

**order** 28:15 29:1 30:21 54:22 88:8
208:1 220:17 226:15 253:23
256:21 257:23 258:8,19,22 259:16
349:12 376:8

**ordinary** 364:21

**original** 131:9 353:15

**ounce** 128:15

**outlines** 81:24

**outlook** 132:6

**overcome** 115:19

**overnight** 225:18

**overpower** 128:13

**overwhelmed** 107:8 125:21 356:1

**overwhelming** 110:6 228:1
243:15

**owned** 334:13

---

**P**

---

**p.m.** 99:4,8 111:15,18 133:14,24

198:13,17 242:19,22 312:11,15
383:11,13

**pack** 148:19

**Packman** 217:11 218:17

**paddle** 145:22

**pages** 16:9 19:13 47:19 212:23
213:6 214:7

**paid** 221:6

**pain** 100:1 101:23 106:24 107:3,11
108:10,15 111:1 227:8,9 228:13,16
229:5,7

**painful** 104:9

**pains** 229:6

**Pallini** 5:13 112:4

**pants** 33:6

**paper** 193:19,22,23 213:4 304:9

**paragraph** 49:7 225:1 370:22
374:23

**parameters** 217:2

**pardon** 41:17 42:23 43:1 44:2,4,10
48:4,23 51:15,24 52:16 53:4

**pardoned** 47:23 51:9

**parent** 212:3

**parents** 108:11 173:24 177:18
180:10 281:18 283:3,4,7 287:3,4

**parole** 95:24 96:3 100:11,12 123:1

**parsing** 114:5

**part** 82:16 91:21 98:11 109:6
153:15 197:22 229:1 244:5 269:13
331:19

**participated** 122:23

**parties** 4:21

**parts** 64:16

**party** 59:13

**pass** 83:17

**passed** 83:18 140:22 167:21,23
272:13 302:4

**passes** 183:20 288:24

**patience** 6:20

**Paul** 5:19 112:6

**Paulette** 155:9 190:16

JOHNNIE LEE SAVORY, 06/15/2022

**pause** 16:3 115:4 242:20

**pausing** 378:3

**pay** 220:14 248:23 295:9

**payday** 220:10

**Pekin** 205:17

**pen** 203:11,13,22 204:16 205:11 206:19,20,22 207:1 246:24 337:10

**pending** 55:8 67:23 133:16 136:17

**pens** 203:10 204:15

**people** 13:14 86:15,20 91:17,18 94:6 96:18,24 100:11 101:10 102:2 103:10 106:3,10,11 108:4,17 125:11,12,20 126:20 127:12,15 128:1 130:3,16 154:13 159:18 190:17,18 192:21 205:18,22 206:10,14 209:4 210:4 211:4 222:4 239:14 258:21,23 259:5 261:6 285:19 303:10 316:21 325:12 343:17 345:17

**people's** 91:20 94:15,19 104:8 128:6 243:14

**Peor-** 206:5

**Peoria** 57:5,12 58:8 61:13 62:8 63:12 138:20 142:6 146:18 205:15, 20 206:4,9 213:10,12 215:21 216:15 225:4,6 247:5 337:18,20 369:11 370:4

**Peoria's** 238:13

**percent** 205:20,21 206:13,14 366:8

**percentage** 206:3,10

**percents** 206:12

**Percy** 252:24 294:19 348:3,6 367:17,18 371:2

**Perfect** 37:12

**period** 223:15 236:4 239:8 240:21 303:14 324:9

**periods** 21:24

**permitted** 241:1

**perpetrator** 129:22 130:16

**Perry** 154:21

**person** 12:6 46:14,16 48:18 58:20 59:2 60:14,17 68:24 74:22 80:5 98:1 108:23 109:15 123:5 128:23 133:8 134:21,24 135:2,5 168:20 188:11,17 191:8,11,14 193:14

197:6 201:10 206:24 216:2 222:21 228:12,17 232:19 254:17 256:21 257:23 258:22 259:16 260:20 261:2,10 283:24 304:15 340:23 341:4 344:2 345:13 356:20 358:23 364:19,21

**personal** 31:13,16 79:18 350:18 352:1

**personality** 109:6 110:6 340:21

**personally** 127:17

**persuaded** 115:17

**pertain** 19:13

**pertaining** 8:24 73:3,5 78:21

**petition** 47:3,8,11,22 52:23 53:7, 14 54:1,9,16 55:15 215:19 217:10 218:15 247:5

**petitioner** 215:20

**petitioning** 41:16 56:22

**petitions** 54:12 55:8

**Phil** 122:9,17,18

**phone** 5:11 84:22

**photo** 203:8

**photos** 177:10

**phrase** 259:24

**phrased** 278:17 378:22

**physical** 29:1 48:5 98:20 164:4 182:12 233:4

**physically** 22:2 98:14 124:12

**pick** 138:18 139:10

**picked** 138:15 203:10

**pictures** 173:18,20 175:8 177:5,11

**piece** 33:17

**pieces** 377:17

**Pierce** 16:20,23

**Pinkney** 254:14,16

**pistol** 238:11

**place** 4:5 23:6 64:17 85:9 93:15 96:7 104:11 160:13 170:14 195:22 223:24 232:20 235:13 255:7 256:18,21,22 273:4 308:7 377:11 380:1 382:13

**placement** 255:13

**places** 205:19 239:19 273:20

**plague** 30:9

**plaintiff** 16:6 20:21 21:2,4,6,7,13, 16,17,24 22:7 45:2 59:13,15 112:3, 6,7 132:21,23

**plaintiff's** 16:21 20:20 70:11 111:20 112:9,14

**plaintiffs** 28:14

**plan** 8:11,14 186:12 307:2,9,13,14 310:8,9 354:16,20

**planet** 30:14 222:21 382:17

**planned** 212:14

**plans** 186:9 287:23 354:13,22

**play** 32:11 150:22 154:1,4,8 155:19 161:3 165:3,6,19 191:16 304:7 310:13

**played** 155:15 161:2 163:22 164:3 191:19 256:1,3 284:14,16,17,20

**player** 191:17

**playful** 164:10,11

**playing** 32:14 81:8 150:17 154:2 156:1 164:5 165:2,13,14,15,19 171:9 284:18 304:2,5 305:9,11 360:12,13,14

**pleading** 32:8

**pleadings** 65:22

**pleased** 352:7,8

**plenty** 96:16 171:14 266:14

**plucked** 29:11

**point** 19:15 63:11 66:2,3 67:21 70:4 106:20 116:10 126:8 132:18 136:3 137:15 176:5 187:8 201:1 266:18 303:10 315:7 317:19 319:10 322:19 327:5,8 335:20 344:13 345:19,24 346:3 358:22 375:19,22 379:4,18

**pointed** 293:6

**pointing** 217:21

**points** 133:7 375:6

**police** 11:6,16,18 12:1,11,14 14:8 23:6,9 24:7,9 25:24 50:7 96:2,6 103:3 107:22,24 108:12 110:12 118:18 127:14 129:5,10 130:2,4,14 131:2 134:14 135:9 146:18 194:19, 22 195:1 203:12,24 204:3,10,20,24 206:21,24 219:5,6,9,12,15,20

220:1 225:1,2 226:8 228:5,6
232:19 233:23 235:3 239:5,6,7,14
244:17,18 245:17,21 247:5 248:11,
13 250:15,18 252:1 254:19 255:9
257:4,24 319:20,23 323:17 324:6
328:8,12 331:2 333:14 334:4,8,21
335:3,11 336:14,17,20,24 337:3,5,
22 347:8 352:20 353:2,23 355:1
356:23 357:13,19 358:1 359:20
361:5 364:20,22 365:2,12,20,22,24
366:12 381:12 382:2

politicians 108:12

polygraph 346:7,8 347:1,5,12,15,
16,20 349:3,5,9,13 350:3 351:16
352:11,13 353:9,13,19 356:16,24
357:6 365:15 366:1 370:17 371:4,
5,8 372:24 373:1,4,22 377:7,16
378:16 381:5

polygraphed 22:1

Pontiac 83:7 91:13

poor 357:8

poorly 278:17

pop 381:19

pornographic 69:10

pornography 71:15

position 72:13 113:9,12 114:12,18
115:13 374:13

positive 107:7 269:19,22

possess 40:10,11

possession 37:17

possibility 162:23 197:5

possibly 112:22 162:14 250:23
332:6 339:6,8 356:2 368:23 382:5

postconviction 40:11 113:21

pounds 76:7 128:11 129:23 130:1

power 50:6

practice 343:2,13

practicing 342:17 343:5 344:3
374:9 375:9

predicate 36:12

predominantly 206:9

preface 117:22

premature 20:10

premises 146:7 248:19

prepare 354:2

prepared 20:21 354:3

prerogative 116:7,8

presence 17:5

present 111:23 114:1 217:4,22
218:7,10 257:4,5 259:2 272:4
313:20

press 11:14

pretend 227:19

pretty 92:4 114:21 115:9,14,16
189:14 244:3

prevent 228:17

preventing 330:4

previous 246:11,21

previously 321:1

principal 145:21 304:22 308:20
314:1,2

principal's 304:3,8,20 305:8
308:18 313:18 344:23 345:6

printed 213:3,7

prior 12:11 16:10 17:2 68:22 69:5,
9,16 75:14 117:20 119:7 120:24
121:3 144:1 146:24 152:3,9
196:15,23 199:15 238:2 253:3,7
354:23 357:5 359:1

pris- 87:12

prison 49:17 65:13 68:2 82:18
83:4,22 84:6 86:1,20 87:23 90:23
91:8,23 94:2,15 96:15 97:3,6 98:7,
15 118:21 121:7 123:20 382:23

prison-wide 85:15

Prisoner 45:4 46:24

prisoners 86:14 97:22

prisons 83:6 85:11 86:6 91:14

Pritzker's 109:23

private 119:2 138:17,18

privilege 13:17 25:2,11,16 28:9,21
29:6 32:4,10 33:24 38:3,8 39:21
40:23 41:3,5,11,20 42:18 43:24
51:20 52:19 57:1 58:19 60:10
61:20 62:19 72:1,10,22 75:22,24
112:15,17,18 113:6 115:2,6

privileged 26:1 52:7 53:20 56:14
60:20,24 61:19 62:9,22,23 63:4,14,
17 75:7 114:2,24

privileges 43:10

probable 21:8

probation 107:22 252:5,9,12,15,
18,21 253:1 293:17,19 294:16
371:2

problem 71:2 106:9 213:23 217:5,
22 218:7,10 228:5

Problems 246:11,21

procedural 117:16

Procedure 6:8

proceed 116:10

proceeded 166:17

proceedings 113:22

proclaim 54:13,18 55:10 56:4,11
65:23

proclaimed 42:15,20 44:10 52:16

proclamation 56:23

program 123:11 254:21 255:2,14

promise 90:4

promote 14:21

prompt 379:13

prompting 378:18

proms 83:13

proof 232:20

property 207:6 217:11 218:16

proposition 114:14

propounded 10:6

prosecute 21:5,7

prosecution 113:21

prosecutor 9:5 103:4

prosecutors 50:7

prostitutes 230:12

protect 88:8 91:16 96:18 97:2,7,19
98:6,8 104:2 178:3 208:1,8 209:4,
9,15

protected 38:7 41:10

protection 208:9

protective 232:23

protest 88:12

protested 88:15

JOHNNIE LEE SAVORY, 06/15/2022

protesting 88:3

prove 276:17

proved 39:7

proven 35:24 36:9

proves 36:1

provide 54:22 127:11 148:21 229:15,18,20 230:2,6 255:3 257:23 259:10

provided 132:1,2 134:15 135:2,6,7

providing 60:7 327:9

psychic 345:15

psychological 29:1 98:20,22 99:12,24 100:1,5

psychologically 22:3

psychologist 73:14

public 33:10 61:24 62:4 86:9,10

pulled 32:10 238:11

pulling 66:10

punch 209:7

punching 374:11

punished 113:8

punishment 184:20

purchase 247:23 249:5

purports 374:24

purpose 47:21

purposes 20:1 59:18

pursuant 6:6

pursuing 57:4,11 58:2,7 60:21 61:12 62:7,16 63:11,16

pushups 153:23

put 10:15 13:3 19:3 32:8 36:12 86:24 87:12 88:5,14 90:22 91:2 96:14,16 98:3 100:11 104:7,15 106:11 110:21 137:21 157:22 158:14 167:4 178:10,14 201:20 204:24 269:3 326:16 350:13,14 359:10 360:14 375:6

puts 158:21

putting 18:23 25:12 27:13 98:1 159:7 162:20 223:22 382:6

## Q

ques- 66:6

question 7:15,18,23 8:3,5,18 9:8,9 10:4,6,8,10,11 22:15,23 25:6,9,18 26:6,7,8,9,10,21 27:15,18 28:5 31:24 34:1 36:12 43:17,22 49:15 52:8,21 58:23 59:19,24 60:2,15 62:18 67:7,23 69:2 70:8,17,21,22 71:1,2,5,9,18,19 72:10 87:6,11 90:6 101:19 112:13 113:12 114:9 115:5 130:11 133:16,17 134:3 136:16 166:5 171:4 189:13,22 260:13 262:6 270:15 271:12 272:7 276:12 318:16 327:1 331:19 343:23 355:5 357:8 375:2,3

questioned 125:3 126:21 328:8, 21 360:22 376:10

questioning 22:4 67:20 68:19 70:6 114:10 125:21 132:19 339:12

questions 7:9,11 9:14 19:12 32:12 37:4 49:20 58:20 59:11 63:21 112:16,19,22,23 113:2,15,18 114:5,22 115:1,21 132:17 133:2 201:22 202:18 314:7,21 326:11 327:10 329:12 330:7,17 338:18,22 339:15,17 340:8,14 345:18 350:18 352:3,6 355:9 356:9 358:16 359:4 363:4 368:24 372:1 375:14,23 376:6,16,21 378:22 379:12 382:8

quick 17:23 45:9,11

Quinn 47:23 48:24

quit 32:13 365:9 380:11

quote 39:11 67:8 331:20

## R

Race 155:15

racial 206:4

racism 103:16 205:13 206:17 227:12

radio 305:9 344:23 345:6

rage 105:18,21 106:15,23 107:1,2, 4 108:17,20

raise 227:14 312:2

raised 86:15 352:24 374:11

ran 146:4 195:5 235:16,17 239:19 243:8 245:13 246:7 374:18

range 140:8

rape 14:3,11,13,17,22 15:8,9 18:7 21:9,20 22:9,12,19 23:13,15,16,22 24:13 25:13,17 26:19 27:9,24 28:15 29:2 30:16,22 31:4,21 32:7, 8,14,24 40:1,7,19 42:7,11 63:22 64:7 65:21 66:15 67:3 70:3,24 71:7,24 72:7 73:9 74:10 75:12 82:4 104:22 201:9

raped 71:3,4 83:11 91:19

rapist 9:20 10:9,13,17 11:7,11,20 12:7,11,15,18 13:2,7,14,21

rationale 67:6

rationalize 229:12

rattling 107:10

Ray 191:11 192:14

re- 140:20 252:20 313:14

reach 126:8

reached 367:24

reaching 367:23

reactionary 212:15

read 6:2 17:11,22,24 18:19 19:10, 14 33:8 48:23 99:16 127:14 129:2, 6,8 131:2,5,18,23,24 132:3 134:2,4 163:17,18,20 213:9,20 358:19 370:18 372:1 378:4 383:7

reading 18:14 224:24 326:15,17

ready 6:21 105:14 117:11 142:14, 21 144:11 214:15 231:14 275:12 288:17,18 289:18

real 130:16,20 294:9 328:7

realize 205:12,14 229:5 232:12 252:6 331:4 367:18

realm 162:23

reason 51:5 70:16 102:23 126:22 146:1 149:20 168:22 189:7,11 192:16 195:13 201:21 219:12 222:12 224:2 225:24 273:17 284:4 288:1 300:2 302:11 318:13 323:12 324:2 331:7 340:13 344:15,16 356:7 364:14 367:16

reasoning 317:18 324:7,12

reasons 85:23 219:14 237:5 243:7

recall 12:20 57:3 61:4,10 89:4,10 118:1,3 119:12 144:12 147:4 148:4 170:16,18 174:5 176:14 185:9,22

JOHNNIE LEE SAVORY, 06/15/2022

186:8,14,15 187:14 192:4,7,8 200:5,8 207:23 208:4 219:8 224:18 226:17 239:2 243:3 245:12,15 252:20,24 253:3 254:1,13,19 255:1,4,16,19,23 267:13 275:20 283:22 292:8,11,13,16,17 294:12 300:6 302:14,15,16 309:16 313:7,9 314:7 315:7 317:7,18 318:7 320:6 324:13 329:6 330:3 331:11,13 333:18,19,24 334:2,6,19 335:14, 15,16,20,21 336:6,23 337:6 341:22 342:5 343:7 344:11,13,21 345:2 348:8 354:9,10 357:1,23 358:5,18 367:12,22 375:12

**recalling** 337:8

**recantations** 49:12

**receive** 12:1 44:4

**received** 45:2

**receiving** 88:16

**recent** 48:5

**recess** 45:16 99:5 111:16 133:22 198:14 312:12

**recite** 263:21

**recognize** 48:8 49:1 50:8

**recollect** 162:19 163:6 376:5

**recollecting** 11:15

**recollection** 121:5 162:18 278:5, 11 286:24 327:12 329:15,18,20,21 330:5,16 333:13 340:9 354:15 356:11 370:20 381:14,15 382:4

**reconnect** 151:13 187:4

**reconnected** 187:1 192:18

**reconnecting** 188:19

**reconsider** 114:12,13

**record** 4:3,21 6:3,4,14 7:17 18:3 23:5 44:22 45:14,17,19 74:8 77:20 90:2,22 91:2 99:4,8 111:14,18,20, 23 113:3 114:9 115:4 116:19,20 133:13,23 134:4 163:20 171:16 191:17 198:13,17 199:17,20 201:20 202:9 213:9,17 214:6 231:14 242:17,19,21 263:15 312:5, 11,15 343:19 370:11 383:11

**recorded** 64:10

**records** 23:3,6,7,8,9,11 73:12 94:21 135:8

**recount** 211:5

**Red** 86:15 87:1

**refer** 49:23 50:22 51:22 52:3,10 53:18 55:4 56:12 58:9 73:11 75:21

**reference** 251:16,20 259:2

**referenced** 340:6

**referencing** 65:16 90:16 188:18 247:20

**referring** 20:4 23:8 49:21 51:2,6 53:19 56:13 59:1,4 62:20

**reflect** 6:4

**reflecting** 20:4

**refreshes** 370:20

**refrigerator** 160:8,24

**refused** 145:21

**regained** 105:7

**regaining** 105:8

**regard** 29:4

**regularly** 168:4 294:6

**related** 73:24

**relating** 20:5 113:13

**relation** 123:5 166:19 195:24 224:16

**relationships** 94:8

**release** 65:12 102:1

**released** 9:9 68:2,15 237:10

**relevance** 65:1,18 67:19 68:20 69:24 199:22

**relevant** 65:3

**relied** 222:13

**relive** 64:15

**reluctant** 330:24 331:1

**rely** 32:22 37:16 60:17 284:1

**relying** 25:24 26:16,17 27:21 28:12,24 30:20 31:2,20 32:2 36:9 37:14,20,23 38:6,10,15,20,24 39:19,22 40:5,14,18 52:15,19 53:3 66:9 72:5 74:3 75:6 135:14

**remain** 22:5 132:8

**remainder** 113:4

**remaining** 19:8 49:21 112:10

**remember** 9:6 11:4,13 12:19 13:4, 10 30:5 33:21 39:3 47:10,14 61:5

65:7 73:16,23 75:2,3,6 76:3,9,11, 21,24 77:3 78:11,19 80:19 85:21 89:1,8,13 96:10 100:24 101:1 109:22 115:11 119:6,21 120:4,10, 11,16,17 121:3,8 123:10,13 124:9 125:22 126:4 129:5,16 135:19,23 136:1,2 137:3,13,14,18 141:12 142:5,12,20 143:14 144:3,5,14 145:7,8,24 146:1,13 147:6,8,19 148:3,6,10,17 149:8 150:11,13,14, 16 152:22 153:2,13 154:12,15 155:1 156:9,11,12 158:7,16 159:24 160:2,9,21 162:11,18 164:1 167:14,16 170:6,20 171:1,5,13 172:1,2,11 174:8,22 175:6,9,17,21 176:2,3,7,9 177:14 178:21 179:2 180:18 185:13 186:19 187:5,6,7 188:7 190:15 191:20 193:13,14,17, 18 194:15,18 195:19,21 199:5,9,20 201:1,9 202:8 203:3,6,15 204:2,7, 9,18,19 205:4,8 207:3,24 215:23 216:1,4 217:12 218:19,22 219:1, 11,21,23,24 220:12 221:2 224:14, 20,21,22 225:6,8,13,15,20,23 226:2,4,6,21,24 227:21 230:11,14, 17 233:8,14 234:5 235:6,7,10,12 236:11 237:15 238:2,3,8,10 242:8 247:10 249:18,19,21,24 250:15,18 251:2,6,11 252:4,14,17 253:6,10, 11,13,14,18,19,22 254:2,3,6,7,8, 16,23 255:7,8,11 256:1 257:18 259:1,7 266:17 267:8,10,11,15 269:14 270:17,21 271:1,5 273:24 274:20 275:7,13,17,18,21,24 276:4,10 277:15,19,24 278:8,23 279:2,6 280:4 281:21 282:5,18,19 283:9,19 284:19,20 285:4,15 287:3,4,7,10 289:22,24 292:10,14 294:13,14,20 296:7,8,9,24 297:5,7, 9,11,13,20 300:1,5,16,18,20 301:4, 5,12,14,17,18,20,22 302:12,20 304:16,23 308:10 312:21,24 313:2, 3,10,13,14,16 314:14,19,21,23 315:5,6 316:18 320:18 321:4,13 322:1 324:20,22 325:2,24 326:7 327:13 330:10,11 331:6,12,16 332:15 333:2,5,16,17,21 334:3,7, 11 335:7,24 336:23 337:3,4,9 338:4,5,7 339:6,10,12,15 340:1 341:9,24 342:2,7,11,18,19,21,23, 24 343:8,10 344:12 345:20 347:11, 23 348:4,6,9 350:6 351:14,17,19 352:6 355:19,20 357:2,11,14,18 358:14,16 361:9 367:21 369:5,7 374:4 375:11,12 376:9 379:14,21, 23 380:4,5,6 382:1

**remembering** 250:12 303:13

JOHNNIE LEE SAVORY, 06/15/2022

355:22 356:5

**reminder** 202:16

**remorse** 100:14

**remove** 49:14 232:21

**removed** 93:6 101:6 236:13 237:5

**rent** 220:14 221:6

**repeat** 8:2 218:11 263:14 272:8,9

**rephrase** 8:4

**report** 14:19 39:3 40:8 194:23 206:22 216:5 219:9 326:15,19,21 369:16,20 370:1,14 374:24 375:6 382:6

**reported** 219:6 225:2

**reporter** 4:18 5:22 7:5 11:4 122:18 134:2 202:17

**reporters** 320:3

**reports** 24:6,7,8,9 25:24 33:8 37:17 38:18,20,23 40:10 103:20 127:14 129:5 131:2 135:9,21,22 219:5 225:1 242:6 243:2 244:15 246:3

**represent** 4:22

**represented** 25:5

**representing** 4:15,24

**request** 372:21,24 373:4

**requested** 163:20 372:2

**requesting** 50:13 55:8 112:9 371:9

**require** 26:22

**required** 115:21 349:12

**research** 74:24

**reserve** 383:6

**respect** 26:4 190:2 239:4

**respected** 380:9

**respectful** 80:7 349:20 353:10

**respectfully** 16:15 50:5 216:22

**respond** 70:8,9,17,19

**responded** 25:20,23 103:20 121:10,12

**responds** 20:21

**response** 12:4 16:6 17:9 20:7 23:2 30:24 31:22 70:20 90:6 197:15,24

313:1 327:10 330:23 359:4 361:23

**responses** 202:2,13

**rest** 33:23 78:15 228:3 275:17 353:18

**restaurant** 161:6 169:11 170:11, 22 171:11,18,19 179:9

**result** 53:6,9 105:19

**resulted** 95:16

**results** 22:2 39:7 49:8,11

**retaliation** 195:12

**Retarded** 138:20

**retrieve** 12:2

**return** 169:24 281:8

**returned** 236:24 237:9 245:14 246:3 279:15 280:12

**reveal** 25:4 113:24

**reveals** 117:7

**reverse** 102:11 104:11

**reversed** 232:17

**review** 45:4 46:24 115:4,24 213:4 216:9

**reviewed** 19:1 252:6

**reviewing** 17:23 18:4 213:12

**revisit** 111:2

**Richard** 154:21

**rid** 250:4

**ride** 155:13 277:10 279:9

**riding** 149:21

**Right-hand** 216:20

**rights** 43:9 103:14

**righty** 339:10

**riots** 98:9

**rip** 88:6

**ripping** 93:18

**riverboat** 261:23

**road** 7:18

**robbed** 83:10

**robbery** 241:19,24

**Robert** 4:14

**Robinson** 21:9,19 37:15 38:1,7 41:16,24 42:22 54:14 65:10 68:23 82:3 130:20 149:16 150:3 151:8 152:6,10 155:18 276:8 373:19

**Robinson's** 22:9

**rode** 149:18 182:24 279:13

**Rogers** 122:9,17,18

**rolling** 165:14

**room** 67:12 77:15 78:7,18 81:9 92:7 93:6 96:23 159:18 160:3 164:12,13 175:10,12,16,18,20,22 176:8 177:12,17,21 180:17 258:21 261:11,14,23 297:16 327:14 337:24 338:2,11,21 346:7 348:18, 23 349:1 350:3,10 351:2,22 364:9 367:8 368:4 371:8 373:22 374:2 375:17,18 377:12 381:5

**rooms** 159:14,15

**round** 184:2

**roundabout** 156:21

**route** 183:20 184:1 193:20,22,23 293:10

**Roy** 283:9,11,14,19,24 284:5

**Ruby** 296:23

**rule** 183:2,6,9

**rules** 6:7,8,24 70:15,19

**run** 189:14 209:21 245:6,9

**run-ins** 206:15 208:24

**runaway** 242:6 243:2 244:15 246:2

**running** 81:8 184:8 242:8 243:3,13

**runs** 320:13

**S**

**S-A-V-O-R-Y** 6:17

**sad** 33:16

**safe** 193:3,5

**Samantha** 5:13

**samples** 29:15 33:15 131:7,15,16

**sandlot** 154:3

**Sara** 4:23 6:19 202:17 380:21

**sat** 72:12 338:17

JOHNNIE LEE SAVORY, 06/15/2022

**Saving**  86:19

**Savory**  4:5,10 5:4,6,8,10,12,18,20 6:1,5,9,17 9:7 14:16 16:18 18:5,12 19:6 25:2 26:10,15,21 27:19 28:11, 23 30:19 32:19 34:4 35:6,16 37:13 39:15 44:16,19 45:6,7 46:3 47:3,23 48:7 49:6,13,15 50:5 57:11 60:12 62:12 63:19 64:21 65:24 66:14 68:8 71:21 90:18 96:1 99:3,7,10 112:16,21 113:16,19 114:4,15,22 115:7,15 117:12,20 133:6 135:18 198:12,16,19 213:1,10,11,12 214:15 215:5,13 216:16 218:20 219:6 225:2 242:5 246:9 251:19 252:4 256:6 312:10,14 332:2 369:11 370:4,5,13 375:1 383:3,10

**Savory's**  48:6,9 50:9

**Savory-II-4980**  44:23

**scene**  9:8 21:17 28:14 34:21 73:18 375:14 377:20 378:1

**schedule**  184:7

**school**  83:13 95:2 110:4,5,7,13,22 136:6 137:21,22 138:3,10,14,22 139:1,5,11,16 142:14,22 144:2,11, 16,17,24 145:5,13,17,19 146:4,6, 12,21 147:3,12,18,19,23 148:9,16 149:3,7,11 150:8 151:11 152:1,6, 11,16,20,23 153:4 180:21 181:23 182:19,21 183:12,17,18,21 184:1,4 186:11 187:7,8,10,16,17 188:12,18 192:22,23 200:1 224:8,11,13 254:15 255:20,24 275:10 287:19 288:2,18,20 289:19 293:6,8 295:12,13 303:18,19 305:7,14,19, 21 306:2,6,13,18,22 307:4,9,12,13, 14,22 308:4,8,13 309:2,5,8,15,18, 21 310:16,24 312:19 322:2,5 323:1 327:15,22 328:1,4,18,20 329:13 330:8,19 331:3 333:1 339:11 354:22

**schools**  104:20

**schoolteacher**  219:18

**Schroeder**  4:23 5:16 6:1,13,19 9:24 10:14 11:1,5,17 13:18 14:10, 20 15:3,13 16:4 17:7 18:10 19:5,19 22:18,22 23:4,20 24:4,16,20,24 25:10,15,20,23 26:12,14 27:4,11, 16 28:10,22 29:18 30:18 31:11,16, 19 32:18 34:3,16 35:13,15,20 36:15,17,21 37:1,5,7,10,11 39:5 40:4 41:1,21 42:19 43:12,21 44:1, 14 45:23 46:1 47:15 48:19,21 49:5 50:1 51:1,23 52:12 53:1 54:7 55:6

56:20 57:2,8,10 58:1,21 59:3,12, 17,22 60:3,6,11 63:9 65:6,8,14,19 66:5,8,11,18,20,23 67:15,17,24 68:6,21 69:4,15,18,21 70:2,5,10,22 71:11,13,17,20 72:4,11,18 74:1 75:9,15 77:14,17 85:5,13 86:23 87:10,15 89:19,22 90:4,8,14,17 99:9 111:19 112:8 114:20 116:16, 24 117:2,6,9,14,18 130:9,18 131:11 132:14,21,23 133:15,20 134:1,8,23 136:19 137:4,6 157:16 160:10 161:18 163:2,5,7 171:17 179:14,17,19 197:11,13,19 198:18 200:4,7 202:23 203:2 206:8,11 207:2,14,16,19 208:18,23 210:22 212:12,16,18,21 213:16,21,24 214:3,9,14,18,23 217:14,20,22 218:2,5,9 231:2,12,22 232:5,8 241:14,18,23 242:3,17,23 244:23 246:19 248:9 251:4 253:21 255:17 256:9,12,19 257:2,9,20 258:6,17 259:4 260:10,17 261:8 262:4,11 263:1,13 264:1,6 268:1,5,11,14 269:23 270:20 271:8,13,23 272:2,6 274:10,13 276:6,20 277:4 278:7 279:23 280:2 286:3 300:7,17 302:8 303:17,22 304:4 307:1,15,23 308:2 310:14,19,22 311:24 312:4,7,16 315:8,15,18 316:1 317:13 318:8, 17,20 319:5,7 320:23 321:19,23 322:23 323:11,20,22 325:18,20 326:8,16,20 327:4,20 328:3,10 331:22 332:1 336:3,5,7,10,13 341:2,11,18 343:21 344:8,20 345:4,16 347:14,18 349:15 350:1 355:14,17,21 356:13 357:24 358:3, 6,8 359:8,23 360:20 365:5,10,13, 18 366:3,7,10,18 367:7 368:13 369:4,18,22 370:2,9,12 371:18 373:6 375:4,7 377:5 378:7,14 379:10 380:19,22 381:3 383:3,5,8

**Schwartz**  129:20

**science**  306:10,16

**scientific**  130:16

**Scopey**  34:12 36:10 167:4,8,10 169:12 170:3,20 171:6 172:17 178:5 186:23 192:13 193:2,6 199:16 296:11 297:22 305:7,15 307:3,9 309:13 313:15 314:8,11,16 315:10 323:3,9,13,16 325:7,12 334:13,17 339:18,23 341:3,20 342:8,12,17 343:1,5,13 344:3,22 346:1 354:2,13,16 374:10 375:9

**Scopey's**  166:19,22 170:11,15 171:19,20,23 174:15 264:2 305:14

310:9 311:3,18 317:20,22 318:1,9 319:12 320:8 333:22 340:2

**scratch**  128:14

**scratches**  129:15

**screaming**  354:23

**screams**  91:18

**screen**  297:12

**search**  325:4

**searching**  93:9

**Sears**  247:9

**seconds**  8:23

**section**  82:7

**security**  88:23 92:17 108:1

**seek**  53:16 284:5

**seeking**  54:13,17 56:10 62:14

**seg**  86:3

**segregation**  92:19 95:20

**self-sufficient**  244:4

**selling**  240:16,17

**Selma**  275:16

**semen**  39:13 40:9,13

**send**  86:21 97:21 304:8

**sense**  126:7 203:19 208:18 326:4 363:21 368:24

**sentence**  20:12,16 48:1,11,14,23 49:18,21 50:4,13 237:19

**sentences**  21:12,22

**separate**  98:21

**Services**  254:20 255:2

**set**  15:18 16:7 45:24 100:16 104:21 195:15 294:9 356:1

**sets**  100:16

**sexual**  64:22 66:1 67:10,11 68:4,9, 24 69:6 71:5,7 97:11

**sexually**  67:4

**shake**  30:7

**shaking**  170:19

**shameful**  232:21

**shape**  76:24 77:3

**share**  8:23 53:23 63:2 68:5 114:24

JOHNNIE LEE SAVORY, 06/15/2022

186:20 200:11 210:14 239:2 251:7

**shared** 64:9 79:15 94:2 210:11 291:17 327:2 330:10 354:21

**she'll** 119:4 293:7 375:20

**shepherd** 158:5 176:16,24

**Sherman** 294:19 295:8

**ship** 95:21 189:15

**shirt** 247:18

**shirts** 247:9,19 248:18

**shocking** 300:9,12

**shooting** 91:15 150:16

**shoplifting** 203:4 207:4 246:23

**shopping** 244:8

**short** 197:21 210:23 236:4 380:16

**shortly** 271:6 320:12

**shot** 91:17

**show** 17:13 24:13 100:14 132:7 177:15 182:12 256:21 257:4 289:2 326:18

**showed** 21:17 66:16 93:1 117:9 129:10 240:19

**showing** 15:21

**shows** 264:2

**shrinking** 242:15

**sic** 28:14

**side** 141:20,22 182:24 214:21 216:17,20 240:24

**sides** 29:11 151:9 155:20 213:5,7

**signature** 16:12 17:2 18:18,24 19:3 46:10 216:21

**signed** 32:9 47:9 247:5

**signs** 205:17

**silent** 22:5

**silly** 304:17

**similar** 97:20 333:22 334:12,17 374:13

**Simple** 251:9

**simply** 208:4

**single** 100:8,19 303:13

**sink** 178:10,14

**sir** 16:9 135:24 246:18 370:5

**sister** 94:9 95:4 110:15,17 111:7 137:12 140:1,9 142:4 168:8 173:5 183:15 185:20,23 220:20 229:3,13, 16 230:4,8,22 231:7,16 232:23 233:22 234:10 237:8 243:16 246:7 264:3 265:5 299:17,18 316:10 367:5 381:10

**sister's** 234:11,19

**sisters** 94:9 103:23

**sit** 100:4 105:1 116:14 125:10 127:13 186:16 211:3 212:11 222:22 263:21 289:17 297:4 311:9 329:19 330:3 332:22 333:8 350:11 363:16 368:9,16

**sit-ups** 153:23

**sitting** 9:5 100:12 107:8 125:14 160:1 177:12,23 203:9 204:13 205:12 258:14,15 261:14 278:1 297:15 301:24 322:7 327:14 329:3 338:24 351:8,12,13,15,20,21 375:13 376:11

**situation** 60:18 98:3 106:3 120:18, 19 127:13 212:7 222:14 232:22 236:9 261:6

**situations** 87:14 98:2 212:7 229:12

**sixth** 151:12,13

**size** 194:14 332:16

**skilled** 128:13

**skills** 117:9

**slave** 84:1,8 101:21

**sleep** 22:4 110:9 221:8 301:7 381:16,19

**slow** 67:5 268:4,7

**slowly** 125:18

**small** 110:17 206:10 210:9 240:20

**Smalley** 274:3,16,17,24 277:9,16 278:16,18,24 279:3,6,12,15 281:8

**Smalley's** 275:14

**Smalleys** 155:4 277:6

**Smalleys'** 264:14 265:14 269:15, 20 271:19,23 272:13,24 273:12,13, 16,17 280:4,18

**smoke** 192:11

**sober** 221:11 222:20

**soccer** 378:12

**social** 215:1 216:5 246:13,14,15 254:20 255:2

**society** 108:13

**soda** 207:17

**sold** 239:18,21

**solitary** 84:11,12,18 85:14,24 86:24 87:13 89:5

**somebody's** 161:7

**somewheres** 234:6 238:13

**son** 101:2,5 223:8,9 224:7

**sort** 7:1 66:1 100:4 112:20 115:18 195:11 199:20 206:2 211:18 217:2 244:2 255:14 284:1

**sorta** 162:12 182:10 332:9

**sorts** 97:5

**Sotos** 4:5

**sound** 222:15 250:11

**sound-** 176:19

**sounded** 176:19,20

**sounds** 370:19

**south** 141:13,15 143:22

**span** 197:16

**sparked** 195:14

**speak** 78:23 94:6 104:1 264:21 266:20 312:18,22 313:23 323:13 328:24 329:8 336:18,21 337:1 356:14,22 357:19 364:11 371:23 372:10

**speaking** 24:20 36:17,18 37:1 132:15 313:11 314:3 323:16 331:23 357:2,11,14,23 366:4

**special** 230:8

**specific** 36:8 37:18 38:19 39:6 68:3 91:7,10 114:9,10 115:2 204:11,19 243:7 252:8 256:24 270:16 308:7 314:21

**specifically** 21:13 48:8 49:1 90:9 93:22 107:2 109:15 133:3 214:8,10 314:19 347:23 359:18 362:2 371:11,22 372:5

**specifics** 89:8

JOHNNIE LEE SAVORY, 06/15/2022

**spell** 6:15

**spend** 189:2,10 298:17,20 322:14

**spending** 189:21

**spent** 49:16 189:8 243:18

**split** 224:6

**spoke** 79:1 104:19 180:22 224:19 287:12

**sports** 153:9,10,19,21 170:24

**spur** 212:9

**spurred** 358:10

**stab** 375:19

**stabbed** 83:10 91:17 95:15 368:20 376:3 379:5,19

**stable** 222:18,19

**stack** 32:16

**stamp** 45:3

**stand** 22:16 73:24 93:2 105:8,9 114:16 201:11

**standing** 92:10 114:14 115:13 159:4 351:20 362:8

**stands** 326:24

**start** 6:2 20:11,17 109:18 127:1 136:6 144:19 214:19,20 328:18 352:9 368:22 369:13

**started** 111:5 116:23 173:2 289:18 352:5,13

**starting** 288:22 369:21

**starts** 49:8 241:19 322:5

**state** 6:14 11:15,18 12:1,11,14 14:8 21:12 25:7 28:13 34:24 37:16 38:18,19 57:23 73:7,13,15 86:9,10 108:2 112:1 201:10 219:5 225:1 253:4,8 350:17

**state's** 21:3

**State-** 97:9

**stated** 13:21 73:9 78:6 219:16 232:22 239:3 367:21 373:14 374:9

**statement** 22:16 197:7 198:1 202:20 232:19 345:14 376:7 378:17

**statements** 21:4 22:7 378:20

**states** 4:11 43:9,11 217:10 218:15

**Stateville** 83:6 91:13 208:21

**stating** 18:6 21:23 27:5

**station** 13:4,5,6 125:3 324:24 327:19,23 328:9,12 333:14 334:21, 24 335:11 336:14,17,20,24 337:3, 5,23 345:6 347:9 353:2 356:23 357:13,20 358:2 359:21

**status** 113:20

**statute** 49:2

**stay** 96:15 174:9 198:24 205:5 288:4 292:3 296:5 300:22,24 303:19 317:2 321:8

**stayed** 84:9 98:9 144:6 157:3 174:11 290:1 296:8,10 301:2 317:9 321:5 374:18

**steal** 206:19 248:1

**stealing** 203:21 218:23 219:2

**Stenson** 100:21,24 127:7,8 233:2, 9,11,20 235:6 237:3 238:1

**step** 24:14 209:15 340:22

**stepdad** 173:5,12 317:22

**stepfather** 129:11,13 131:3,13 132:10 133:4,6 134:6,11 135:1,11, 15 177:20

**Steve** 5:11 112:2

**stick** 24:6 64:1,8,12

**stole** 110:12 203:13 225:3 226:8 251:15

**stolen** 219:6

**stomach** 209:8 380:3

**stood** 319:18

**stoop** 159:1,2

**stop** 33:19 36:18,19,23,24 37:2,4 58:6 62:14,16 63:11 91:20 92:16 96:6,9 139:11 143:15,24 148:1 156:16 157:1 208:14 210:2 292:3, 15 333:15 346:23 356:17,18 363:1 364:16 372:21,24 373:4 379:3

**stopped** 60:20 63:3 90:2 156:22 311:6 364:3 373:8

**stopping** 333:16,18,19 334:3,7 372:23

**store** 203:7,23 204:13 248:2,8,16, 19 257:17,18

**stores** 239:20

**stories** 104:8

**story** 104:7,8

**stove** 160:8

**straight** 147:22 156:24 157:10 170:10 171:19 181:7 185:10 295:18 299:5 308:14,17 311:18

**strangers** 108:11

**stray** 108:11

**street** 4:16 143:22 147:21 194:6 247:18 248:15,17

**strike** 14:1 23:24 27:20 38:11 39:23 41:13 44:3 62:15 191:12 209:12 326:9

**striked** 9:4

**strip** 93:9 105:5

**stripped** 29:10 88:5

**strong** 128:13 241:19,24

**strongly** 67:19

**stuck** 374:15

**student** 304:6

**students** 148:8,11

**studies** 306:11

**stuff** 9:17 91:10 108:9 117:16 175:8,17 189:17 224:1 273:2 289:18 360:13

**stunted** 203:1

**stupid** 102:16

**subject** 20:13,18,19 247:4

**subjected** 84:3 93:7,15

**subjects** 202:5

**submitted** 16:16 17:9 216:22

**subpoena** 6:6

**subsequently** 194:4

**succinctly** 36:7

**suffer** 98:23 100:1 105:18 106:23, 24 107:2

**suffered** 82:8,17 83:3 109:24 110:1

**suffering** 99:23 100:5

**sugar** 210:10

**suggesting** 377:16

**suggestions** 230:21 368:22

JOHNNIE LEE SAVORY, 06/15/2022

**suicide** 86:21

**suing** 11:7 74:16

**suit** 55:22

**Suite** 4:6,17

**sum** 134:18

**summarizes** 35:12

**Summary** 246:15

**summer** 196:2

**supplement** 202:1,13

**supplemental** 47:3,8,11,22

**support** 75:10 135:15 257:19

**supposed** 86:6 293:20 294:6
  306:23

**suppress** 30:8

**suppressed** 28:14

**Supreme** 232:17

**surprise** 131:12

**surrounded** 194:5

**surrounding** 238:22 254:4,24

**survived** 95:18

**surviving** 98:1

**survivor** 97:23

**survivors** 101:16 105:3

**suspect** 126:16 131:9 250:8
  346:15 380:16

**suspend** 308:21

**suspended** 308:23 309:1,11
  321:10,16 344:24

**suspension** 305:1

**swear** 5:23

**sweet** 110:18

**system** 86:1 87:24 224:16 227:16,
  17

---

**T**

---

**T-A-Y-L-E-E-C-E** 5:19

**table** 7:4 47:18 84:7 96:24 103:10
  160:8 174:11 274:4 275:5 339:1
  351:12

**tack** 116:17

**takes** 350:5

**taking** 4:5 7:6 29:14 96:7 128:5
  193:23 194:1 223:16,22 226:10
  246:6 305:13 331:4 382:13

**talk** 78:3 82:7,10 90:9,19 98:18,22
  99:11 101:3 102:15 105:17 106:21
  125:11 126:9 133:3 156:7 170:23
  185:12 195:1 212:3 274:6 287:11
  288:11,14 310:12 314:18,24 315:3
  317:20,22 318:1 319:23 320:2,5
  323:3,9,10,17 324:1,3,5,8 329:5
  346:12,22,24 360:19 361:24 362:3
  363:2,3,5,17 364:1 368:17 371:9,
  11 372:2,5,8,16 380:10

**talked** 135:14 165:3 171:15 173:14
  174:21 208:7 224:21 324:21,23
  367:3

**talking** 26:11 30:11 39:4 57:7 60:7
  77:20 101:1 107:12 109:16 118:5
  119:6 153:8 170:21 177:12 179:13,
  14 187:17 201:7 205:15 210:16
  211:20 212:8 251:18,21 302:1
  319:10,11 320:6 321:16,17 324:9,
  13,17 326:19,20 327:18,22 328:4
  329:21 334:1 342:1 346:13 347:2,
  14 372:21

**talks** 133:4

**tall** 128:11

**targeting** 126:20

**taste** 206:18

**taught** 80:8 110:20 190:2 210:9
  224:11,12

**Tayleece** 5:19 112:6

**Taylor** 5:3 9:23 10:1,3,19,21 11:3,
  12 13:15 14:4,18,24 15:10,12 16:2
  17:3 18:9 19:2,15 22:14,20 23:1,
  17,23 28:2,17 29:3 30:17 31:5,9,
  15,18 32:5 33:1 34:13 35:11,14,18
  36:11,16,20,22 37:3,6,9 39:2 40:2,
  21,24 41:19 42:17 43:4,19,23
  44:12 45:19,22 47:13 48:15 49:3,
  22 50:14,16,18,20 51:17 52:2,5,17
  54:5 55:2 56:19,24 57:6,19 58:15,
  24 59:8,14,18 60:1,5 63:5,7,10
  64:23 65:11,17 66:2,7,9,16,19,21
  67:5,11,16,18 69:1,20 70:13 72:23
  75:8,13 77:10 85:20 87:7 89:16,20,
  24 90:6,12 111:22 112:5 116:7
  117:8 130:7,10,22 132:11,16,22
  133:10 134:12 136:16,23 157:15
  160:6 161:11,14,16 162:24 179:10,
  12 197:8,18 199:22 206:6 208:11
  210:19 212:5,20 213:15 214:5,7,12
  217:15,18,21,24 218:7 230:23
  231:10,19 232:2,7 241:16,22 242:1
  244:20 246:17 248:4 251:1,3
  253:17 255:15 256:8,15,23 257:6,
  15 258:3,13,16,24 260:9,12,23
  262:3,6,23 263:4,6,9,24 264:4
  267:23 268:4,7,12 269:21 270:14
  271:3,11,20 272:1,3 274:8,11
  275:23 276:11,24 278:4 279:20
  282:4,7,8,9,13 283:8,9,11,14,19,24
  284:5 285:23 300:4,11 302:6
  303:5,21,24 306:19 307:11,18
  310:11,17 315:4,14,16,23 317:11
  318:6,15,19,23 320:22 321:15,21
  322:22 323:7,18 325:14 326:2,14,
  18,23 327:17,21 328:5 331:18
  336:1,4 340:24 341:8,16 343:18
  344:5,18 345:1,10 346:5 349:14,17
  355:4 356:6 357:21 359:5,22
  366:2,5,9 368:12 370:7,10 371:14,
  16 373:2 374:22 375:5 377:1
  378:3,8,11 379:6,8 380:18,21,24
  382:24

**teach** 224:9 227:23

**teacher** 110:4,5,13 220:2,6 221:3,
  5 224:8 251:22 304:3

**teachers'** 313:18

**team** 21:14 86:20 112:10 154:1
  155:16

**tears** 362:6

**Ted** 86:9

**teenager** 9:3 128:12

**teens** 83:13

**teeth** 273:2

**telephone** 290:19

**television** 123:8,11 160:7 164:15,
  17 177:13,14 289:18,20 305:11

**telling** 27:8 32:3 33:19 36:23 58:22
  61:17 62:6,10 66:11 90:2 103:16
  112:16 126:11 153:1 193:4 211:21
  223:6 238:10 253:7 259:3 310:23
  325:1 328:12 332:6 333:21,24
  341:24 342:7 343:8,10 344:21
  354:4,6,12 356:2 359:13,19 360:6,
  15 363:18,22 367:4 376:9

**temporary** 236:17

**ten** 35:1 67:13 83:21 234:16,17
  272:20,22 273:4 367:10

JOHNNIE LEE SAVORY, 06/15/2022

**ten-speed** 217:12 218:17,23 219:2

**tense** 272:4

**Tepfer** 58:9,19 60:14 61:14 62:11, 19,20 63:13

**Teplitz** 5:15 19:24 45:20,21 117:21,24 118:13,16 122:8 124:18 336:22 348:1,9 356:15 357:12 363:17 370:15 374:21

**Teplitz's** 15:18 16:7

**Teresa** 216:12,22

**term** 67:8

**terminology** 355:13

**terms** 64:24 65:1 69:1 111:23 130:11 132:17 252:14 257:6 326:24 355:5 375:2

**terrible** 366:3

**terror** 101:22

**tes-** 73:20

**test** 36:8 37:14,18 39:10,11,12

**testified** 6:11 49:13 201:10 281:4 371:22

**testimony** 22:21 73:13,15 74:23 75:1,14 206:7 271:4 331:21 371:6

**testing** 33:12 40:9 48:5 49:9,12 57:4 61:12 62:8,17 63:3,12,16

**tests** 39:6 40:12 132:10 134:5,10

**That'll** 20:14

**theft** 200:9,16 217:7 218:13 219:9 251:15

**therapy** 104:15,18

**thicker** 46:5

**thing** 8:17 18:19 82:23 91:11 94:4, 11 100:8 132:1 166:6 172:18 212:24 220:12 225:11 244:2 280:3 300:9 303:13 350:13,14 356:3

**things** 9:4,17 29:22 30:1,3,5,6 33:21,23 62:3 65:22 82:15 86:12, 21 93:23 96:13 99:15,23 101:14 102:8,22 103:8 104:13 119:14 125:22 126:18 129:3 131:8,19 133:8 135:9 153:9,10,23 155:10,16 160:16 201:6 210:3 223:2 228:3,22 256:16 259:24 302:14 355:23 368:14 369:7 374:24 376:17 379:15

**thinking** 36:14 108:7 120:21 245:5 267:17 268:15

**Thomson** 5:9 202:16,22

**thought** 9:10 26:15 60:9 96:2 97:13 107:23 123:19 128:3,8 130:19 136:18 161:23,24 163:16 168:20 174:14 187:15 201:9 204:14,15 208:8 217:17 268:24 269:7 298:11 320:19 327:17 349:22 353:9 364:21 365:1 371:19

**thoughts** 54:3 71:22 80:1 132:8 134:9

**threat** 95:22 355:5

**threaten** 92:23

**threatened** 92:17 355:2

**threats** 97:6,20 98:5

**three-** 273:13

**three-year** 100:16

**threw** 93:4

**throw** 304:11

**throwing** 304:9

**thunder** 107:9,10

**ticket** 93:5

**tickling** 284:22

**tie** 9:7

**tight** 189:14

**till** 136:7 202:17 319:18 368:12

**time** 4:3 12:17,19,24 30:7 32:16 57:6 59:2 61:11 65:5 71:15 76:12, 17,19 77:6 84:15 86:8 87:22 91:21 94:10 100:13,14 103:13 111:11,12 113:4,5 116:13,15,17,21 117:2 120:11 122:8 125:4,6,12 133:18 135:24 136:3,4,21 137:3 138:10 139:4,15,18 141:12 143:7,9,13,17 144:16,18,21 145:5 147:6 149:3,6, 17 152:8,9,13,15,22 153:4,12,16 156:5 157:4 159:1 163:10,11 165:22,24 166:22 170:4,6 172:1,3 173:6 174:10 177:10,22 178:17 179:8,13,15,16 180:1,22 181:2,14 183:8,16 184:14 188:13 194:9 195:4,9 199:5 205:23 207:5,8,10 208:12 210:21 216:7,16 219:19 223:15 225:9,21 227:9,23,24 233:7 234:21,24 236:4,5 237:6 243:18,19 248:21 249:9 252:19 253:9,12,15, 22 254:16 255:11 265:19,20

269:20 270:4,17 271:1,6,9,10,14, 15,18 272:11,13 274:22 275:8,20 277:15,20 278:1 286:12 289:22 290:1,4,15,20 291:15,19 292:4,20, 22,23 293:22 294:9,20 295:20,22 296:9 298:24 299:10,16 301:13,14 302:4,15 303:15 306:11 308:10 312:4 315:12 316:8 317:3 318:5,10 319:14,20 320:10 330:7,18 334:19 341:22 347:12,13,14 352:18,23 353:1 355:16,22 356:4,9 358:18 359:20 361:3 378:4,12,13 380:16 381:23 382:5,14 383:1

**timeframe** 136:5 150:19,24 151:19 154:16 188:22 189:1 190:11 192:5,6,10,11 196:12 197:2,21 198:3 210:16,20,23 211:1 215:10 249:10 252:18 261:17 269:3 291:2

**times** 35:2 84:14 85:17,18 86:11 89:4,6,7,9 96:16 100:4,19 107:8 121:21 176:11 177:19 183:24 200:18 202:19 220:1,3,5 242:9 243:3,8 317:5 335:13,23,24 336:8, 9 337:2

**timing-wise** 195:23

**Tina** 192:23 286:24 288:14 289:6,9 291:11,13,23 292:24 296:22 298:7

**tired** 243:9,14 346:13

**title** 47:8 241:22

**today** 4:18 6:21 8:12 11:7 99:24 100:4 153:24 160:1 186:16 200:18 224:17 271:21,24 276:10 288:22 322:8 326:3 329:3,19 330:3 371:6

**today's** 116:5 383:9

**told** 23:21 24:1 31:14 33:9,10 51:24 52:14,20 91:6 92:23 95:9,10, 20 114:8 124:5,17 126:2 127:19 158:4,12 167:5 178:1 184:22 205:11 224:17 226:8 236:23 238:19 246:24 262:1 270:3 282:3 288:17,21,24 295:5,6 300:3,5 302:9 306:22 309:10 323:2,9 328:23 342:22 344:2 345:9 360:2,7 363:24 369:5 371:12 372:7 373:14 379:4,7,19 380:20 381:5,12 382:2

**tomorrow** 180:21

**Tompkins** 45:5 46:10 48:17 49:24 50:17,23 51:6,21 52:7,11,14,23 53:18

**tone** 181:11

JOHNNIE LEE SAVORY, 06/15/2022

tonight 168:16

top 46:21,23 47:20 49:7 215:1 241:19 242:2,5 243:1 246:13

topic 111:9

torn 83:20

tortured 105:4

totally 105:5 129:19

touch 93:10 141:3,6 360:5

touching 202:5

tough 103:9

Tour 14:16

town 151:9 183:1

toys 284:19,21

track 276:14,22 277:2 290:4

transcript 73:20 116:5

transcripts 73:17 135:8

transfer 86:5

transported 371:3

trauma 34:2 303:15

travel 108:3

treat 93:17

treated 30:13 103:1 239:14

treatment 88:3,15

tremble 30:7

trespassing 207:9

trial 24:10 73:12,20,21 74:23 83:17 209:10 232:16 237:23

trials 24:11,13 281:5

trouble 93:18 211:17 223:5,14 261:20 342:12

truant 146:8,11 200:1

true 14:22 15:2 22:17,24 128:18,20 133:3,7 135:1,11,16 247:14,15 258:1,8 260:7,19,21 343:11,12 345:5 354:4 360:8 371:16

trust 135:20

truth 36:5 125:5,17 259:3 261:22 360:6

truthful 103:13 258:5 260:2 327:6 328:11 329:13,21 340:7,10,13 341:13 355:12 381:6

truthfully 197:6 382:9

Tuesday 273:18

turn 178:5 214:3

turned 95:15 118:24 129:4 130:3 160:16 164:19 178:2 351:6 370:5 374:10 375:9

turning 70:10

TV 122:12,13,23 177:21 178:2 297:11 374:10 375:9

twelve 234:19

two-day 381:15

two-sided 213:3

two-year 100:15

Tylenol 207:12

type 108:23 173:20 200:18 203:1 222:14 228:17 327:13

typically 168:12,14 183:5,17 184:9 190:5

typo 370:23

U

Um-hmm 16:22 98:12 105:22 118:14 130:9 153:20 154:5 155:14 158:3 159:22 160:23 162:10 163:2 165:16 178:4 179:1,17 181:21 197:23 207:3,22 209:22 210:7 215:3,18,22 216:13 220:5,20 223:17 228:24 234:20 235:14,19 242:7 244:6,11,12 246:16 258:7 261:12,18,21 285:17 296:11 325:6, 18 350:12,16 355:17 356:14 361:1, 22 364:24 365:10,13 372:4 376:18 377:8 381:17 382:1

Un-uhn 218:24 230:19 342:20

unable 66:1,4

unattended 236:9

unauthorized 217:10 218:16

uncaring 93:8

uncle 141:18,19,23,24 142:4

underlying 63:22

underneath 215:4,6 217:4

understand 7:1,24 8:2,4,6 10:11 12:8 25:3 30:10 35:7 43:1 48:13,22 50:12 65:4 66:24 67:1,6 82:12 84:3 88:11 91:22 102:20 125:13 126:6,

13,14,15,17 127:14,16 153:15 163:8 200:21 206:3,13,17 208:22 227:9 228:7,9 230:24 232:3 253:5 255:10 272:7 307:7 324:12 326:5 327:11,21 328:5 346:14 353:12 359:6,7 361:13 369:17 380:8 382:13

understandable 325:22

understanding 25:12 26:3 27:6 64:5 113:19 188:10 321:19 327:3 329:16 345:12 362:21

understandings 25:5

understood 209:21 328:15 361:12

underwear 88:5

uneducated 227:17

unhooked 362:5 364:5

unimportant 276:13

unit 4:2

United 4:11 43:9,10

unknown 21:16

unprompted 121:19

unstable 222:19

unusual 168:15,17

unwittingly 50:8

upset 110:3,8 181:12,19,20,22 182:1,7,14 316:23

urge 67:19

Urlaub 4:15,19

usual 136:4 139:4 183:2

V

vague 343:19 355:4

Vaguely 255:22 369:7

vagueness 69:2

vehicle 277:11

vengeful 102:21

verbatim 64:13

verifiable 257:11,13 263:3,18

verified 258:9,12 260:8,22 262:17, 22

JOHNNIE LEE SAVORY, 06/15/2022

**verify** 258:19,22 259:16 262:2

**versus** 4:10

**victim** 97:23 101:12 374:13

**victims** 34:23 107:21 373:15 376:2

**victims'** 35:3,4,5,9,22 127:18 131:2

**Victory** 255:20,24

**video** 4:3,4 259:10 263:15

**view** 207:13

**viewing** 71:15

**violated** 366:20

**violence** 96:22

**violent** 73:10

**visit** 92:18,19 95:1,5,8 123:19,24 124:4,6,18 141:8,10,11,14 180:2 354:7

**visiting** 92:7 93:6

**visits** 83:12 84:21 124:22

**voice** 104:16 107:9 125:19 352:24 363:12

**voices** 94:5 104:1 159:18

**voluntarily** 22:8 380:7

**volunteer** 378:19

---

**W**

**wait** 10:10 74:7 105:13 117:14 158:4,12 177:2 179:10 202:17 290:12 291:11 323:18 368:12

**Waited** 143:7

**waiting** 6:22 159:1 292:7,15 348:23

**waive** 72:21 115:6 383:5

**waived** 72:1

**waiver** 72:9,11,13,14 113:7

**waiving** 20:13,20

**wake** 136:5,10,11,12,13 142:10 199:11 271:17,21 301:13 322:17

**wakes** 271:21

**walk** 175:3 265:14 266:6 270:18 273:13,23 280:20 286:19 290:3 293:7 309:4,7 333:3 334:24 335:2, 5 337:22 374:2

**walked** 35:3 92:12 160:5,17 171:19 181:6 236:7 272:23 274:1 286:10 291:11 295:8 299:1 377:9

**walking** 171:5,7 217:2 247:17 248:15,17 270:8 333:1 348:20

**wall** 374:10 375:10

**wanted** 18:17 25:7 90:9 96:9 99:11 102:20,21 108:24 116:19 146:1 209:12 217:1 223:18,20 226:9 227:2 236:2 277:10 279:8 294:9,11 300:9 311:12 314:7 315:10 323:13 324:14 325:3 356:17,18,19 359:4 360:23 362:24 364:16,18 365:8 371:10 372:5,7 373:23 374:3 379:1,2,3 380:8,10 382:10,11

**wanting** 19:6 311:16

**ward** 217:6 218:12 253:4,8

**Ward's** 217:12 218:17

**warning** 185:1,2,3,4

**wash** 178:15

**washed** 273:1

**washing** 95:14

**Washington** 147:21

**washroom** 29:14 45:9,11 95:14

**watch** 83:16 289:20 309:7

**watched** 83:19 239:12,13

**watching** 91:16,18 108:8 177:13, 15,21 296:16

**water** 207:17

**wear** 35:1 92:7 143:5

**website** 14:15 25:13 26:8

**wee** 224:10

**weed** 192:11

**week** 12:21 269:2

**weekend** 220:9

**weekends** 189:17 190:12

**weeks** 84:16 86:5

**welts** 129:15,18

**Wendy** 155:4 190:16

**weps** 129:18

**West** 4:6 143:21,22

**whammy** 260:13

**whatsoever** 361:7

**wheelchair** 95:3

**wherewithal** 211:16

**whispered** 92:15

**white** 92:10 103:17 129:20 204:21 206:10,15 239:10

**whites** 206:16

**wholeheartedly** 51:10

**wife** 83:22

**William** 4:10

**Williams** 142:3 186:1,2 280:15 281:1 282:22 284:24 285:10,13

**Williams'** 280:14,20 281:9,12 282:2 284:7 286:5,9

**window** 175:19 339:9 362:6,8

**windows** 339:5 351:22

**winter** 181:6

**Withdraw** 161:16

**withhold** 21:1

**witnessed** 238:16

**witnesses** 20:3 49:13 259:3

**woke** 137:3,7,23,24 138:8 199:3,6, 9 223:19 264:12 265:3,4 271:9,14 272:10,12,22 273:5 301:14,15 322:19 354:6

**woken** 136:21 273:8

**woman** 66:1 204:7 281:4

**women** 105:1 243:22

**women's** 92:13

**wondered** 131:5,6

**wonderful** 222:21 223:4

**wondering** 156:22

**Woolworth** 203:7

**Woolworth's** 203:22 205:12 246:23

**word** 8:1 32:14 101:21 107:1,4 257:10 297:10

**words** 20:13 79:15 82:21 92:1 101:20 346:18 359:10 374:20

**wore** 35:1

**work** 84:8,9 107:21,22 110:16 202:12 228:23 254:21 259:10

JOHNNIE LEE SAVORY, 06/15/2022

**working** 107:24 146:5 254:20
   255:1

**world** 103:11 206:3

**worried** 182:1,2,4

**worse** 103:1

**worst** 30:13 83:5 102:18

**Worthem** 110:4,14

**wrestle** 161:3

**wrestled** 163:22 164:3

**wrestling** 164:7 165:1,11,13,18
   178:3 360:12,13

**Wright** 251:10,12

**write** 87:21 118:20 119:4 121:6,16
   127:20 203:11 204:15,16

**writing** 100:24 127:2 204:14
   205:11 206:20,22,24

**written** 24:6 107:16

**wrong** 12:6 84:2 92:8 93:2 101:15
   103:17,18 125:7 217:16 218:1
   373:17 377:18 378:23 380:13

**wrongful** 103:4

**wrote** 119:1,3,18,24 120:4 121:14,
   22,24 122:3,6 127:4,7,8,18

**WWC** 165:18

_____

Y

**Y.T.** 215:13 219:5 225:2

**year** 84:24 85:7 88:19 89:1 111:4
   122:20 145:9 196:1 234:4,5 282:19

**years** 30:7,12 36:16 49:16 65:23
   75:2 83:21 94:24 100:23 104:3
   163:6 167:15 188:23 189:2 234:9,
   11 269:4,11 281:24 302:3,10,11
   303:1 366:2

**yell** 182:9 349:21

**yelled** 352:19

**yelling** 352:10,13 358:9,11 361:10,
   14

**yesterday** 303:11

**young** 9:3 94:21 167:21 281:14
   282:5

**younger** 266:16 285:5

**Youtube** 12:24 13:1

_____

Z

_____

**Zellner** 4:14

**Zoom** 5:16 45:20 111:23,24

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JOHNNIE LEE SAVORY, | ) | |
| | ) | No. 17 C 204 |
| *Plaintiff,* | ) | |
| | ) | Hon. Gary Feinerman, |
| v. | ) | District Judge |
| | ) | |
| CHARLES CANNON, *et al.,* | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendants. | ) | |

### PLAINTIFF'S RESPONSE TO DEFENDANT MARCELLA BROWN TEPLITZ'S
### FIRST SET OF INTERROGATORIES TO PLAINTIFF

Plaintiff Johnnie Lee Savory, by his undersigned attorneys, pursuant to Rule 33 of the

Federal Rules of Civil Procedure, responds as follows to Defendant Marcella Brown Teplitz's

First Set of Interrogatories to Plaintiff.

Plaintiff objects to each of the interrogatories below to the extent that it uses vague and

ambiguous terms that are undefined and to the extent that it is not limited temporally to the time

frame relevant to this lawsuit. Plaintiff further objects to these interrogatories to the extent they

seek information protected by the attorney-client privilege, the work-product doctrine, or any

other common law or statutory privileges. Moreover, Plaintiff objects to these interrogatories

because the information needed to answer them is principally in the possession, custody, and

control of the Defendants. Plaintiff also objects because Defendants have propounded these

interrogatories before they have sat for their depositions and before they have provided any of

the documents in their possession, custody, and control. In addition, Plaintiff objects to each

interrogatory that references Defendants' instructions to the extent those instructions depart from

the requirements of the Federal Rules of Civil Procedure on the ground that Defendants'



EXHIBIT # 1
WIT: SAVORY
DATE: 6-15-22
Nick D. Bowen, CSR

instructions impose an undue burden on Plaintiff. In addition, Plaintiff objects to Defendants'

definitions to the extent that they do not accurately reflect the law or rules governing this case.

Plaintiff reserves his right to supplement these interrogatory responses as investigation continues.

Subject to and without waiving the foregoing objections and reservations, Plaintiff states as

follows:

## INTERROGATORIES

1.      Identify every action taken by Defendant Teplitz which you contend for the

purposes of this lawsuit is a basis for your claim of injury, and for each identify: (a) the date

of the occurrence; (b) the nature of the occurrence; (c) any witnesses to the occurrence; and,

(d) all documents referring, reflecting or otherwise relating to the occurrence.

**RESPONSE:** Plaintiff objects to this Request as premature because this interrogatory

is being propounded at the beginning of discovery, and so Plaintiff has not had the

opportunity to conduct depositions and anticipates the production of substantial additional

documents. Plaintiff further objects because the information relevant to this inquiry is

principally in the possession, custody, or control of the Defendants. In addition, Plaintiff

objects because the interrogatory is overly broad and unduly burdensome. Plaintiff also

objects to the terms "injury" and "occurrence" as used in these interrogatories because they

are vague and ambiguous and to the extent the call for a legal conclusion or otherwise are

defined in a manner that is unsupported by the law and is irrelevant to the legal claims in this

case. Plaintiff objects further to the extent that this interrogatory seeks information protected

from disclosure by the attorney-client privilege, the work-product doctrine, or any other

statutory or common-law privilege. Subject to and without waiving those objections and

Plaintiff's general objections. Plaintiff responds that he has prepared an extensive complaint

that alleges in detail how each of the Defendants, including Defendants Charles Cannon,

Marcella Brown Teplitz, Russell Buck, John Fiers, Charles Edward Bowers, John Stenson,

George Pinkney, E. Haynes, Walter Jatkowski, Glen Perkins, Allen Andrews, Harold

Marteness, Mary Ann Dunlavey, Carl Tiarks, Peter Gerontes, and John Timmes, acted

individually and in conspiracy with one another to conceal and withhold exculpatory

evidence from Plaintiff, his defense counsel, and the State's Attorney's Office, to extract

statements from Plaintiff involuntarily which they used to prosecute him, to fabricate false

evidence against Plaintiff implicating him in a crime he had not committed, and to prosecute

Plaintiff without any probable cause to believe that he had committed the murder of James

Robinson or the rape and murder of Connie Cooper. See Complaint ¶¶ 5-8, 23-24, 28-29,

31-76, 89-92. Plaintiff specifically alleges that, as part of the investigative team, these

Defendants, acting in conspiracy with one another, and others still unknown to Plaintiff,

collected evidence from the crime scene, all of which showed that Plaintiff could not have

been involved in the murders of James Robinson and Connie Cooper or the rape of Connie

Cooper, and suppressed that they collected evidence that pointed instead to other suspects;

interrogated Plaintiff, a child, for extended periods, failed to give him effective *Miranda*

warnings, polygraphed him and lied to him about the results, physically and psychologically

abused him, deprived him of adequate food and sleep, continued questioning him when he

invoked his right to remain silent, and lied to him about evidence, and, in so doing, extracted

statements from Plaintiff that he did not give voluntarily, which they used to implicate him

in James Robinson's murder and Connie Cooper's rape and murder; fabricated evidence in

order to connect Plaintiff to the crimes, including false statements attributed to Plaintiff, false

evidence suggesting that Connie Cooper's blood was on Plaintiff's pants and false police

reports and witness statements regarding Plaintiff's purported connection to the crimes;

manufactured false witness testimony that was used to implicate Plaintiff; interviewed

witnesses who informed them of problems between Connie Cooper and potential

perpetrators, including an ex-boyfriend who had choked and punched her and a former

stepfather who had made sexual advances toward her, and then suppressed that information

during criminal proceedings; covered up their misconduct and destroyed or suppressed

additional evidence that would have exculpated Plaintiff, including physical evidence from

the crime scene and witness statements pointing to other suspects, hiding that information

from Plaintiff, his attorneys, and state prosecutors; presented false evidence to state

prosecutors and judicial authorities in order to secure and continue charges against Plaintiff;

and provided false reports, statements and testimony in order to implicate Plaintiff in a crime

he had not committed. Answering further, Plaintiff states that Defendants engaged in this

misconduct even though there was absolutely no evidence (forensic, eyewitness,

circumstantial, character, or otherwise), apart from that evidence fabricated by the

Defendants, that connected Plaintiff to the murders of James Robinson and Connie Cooper

or the rape of Connie Cooper. On the contrary, there was ample evidence that the crimes

were committed by someone else, which Defendants suppressed, leaving the real killer or

killers free. Plaintiff states that to the best of his current knowledge, the Defendants were

present at the crime scene, interrogated Plaintiff, interviewed other witnesses, wrote police

reports, secured Plaintiff's arrest and charges against him, and testified during criminal

proceedings against him. In addition, Plaintiff directs Defendants to the documents he has

produced with his Rule 26(a)(1) disclosures and in response to Defendants' requests for

production. Plaintiff's investigation into this matter continues, and he reserves the right to

supplement or modify this answer as new information comes to light.

2.      With regard to any and all psychological or medical treatment specifically received for your claimed injuries, state:

(a) The name and address of each hospital or clinic attended;

(b) The name and address of each attending and/or primary physician, specialist, and/or health care professional;

(c) The name and address of each consulting or treating physician, and/or other health care professional;

(d) The name and address of each person and/or laboratory taking any X-ray, MRI, and/or other radiological tests of you;

(e) The date or inclusive dates on which each of them rendered you service and any diagnoses made;

(f) The amounts to date of their respective bills or services and whether the bills have been paid; and,

(g) Identify which, if any, of them has or will provide you a written report.

**RESPONSE:** Plaintiff objects to this interrogatory because it seeks information protected from disclosure by the psychotherapist-patient privilege, as well as other common-law and statutory privileges. Plaintiff further objects to the request to the extent it is asking him to make expert disclosures prior to the deadline set by the Court for such disclosures. Plaintiff also objects to this interrogatory because it contains multiple subparts, and Plaintiff will treat it as multiple interrogatories. Finally, Plaintiff objects to providing a response to this interrogatory before an appropriate protective order has been entered in this case.

3.      In addition to the treatment disclosed above, state any psychological or

medical treatment received by you at any time prior to January 25, 1977 through the present, and state:

    (a) The name and address of each hospital or clinic attended;

    (b) The name and address of each attending and/or primary physician, specialist, and/or health care professional;

    (c) The name and address of each consulting or treating physician, and/or health care professional;

    (d) The name and address of each person and/or laboratory taking X-ray, MRI, and/or other radiological tests of you;

    (e) The date or inclusive dates on which each of them rendered you service and any diagnoses made;

    (f) The amounts to date of their respective bills for services and whether the bills have been paid; and.

    (g) Identify which, if any, of them has or will provide you a written report.

**RESPONSE:** Plaintiff objects to this interrogatory because it seeks information protected from disclosure by the psychotherapist-patient privilege, as well as other common-law and statutory privileges. Plaintiff further objects to the request as overly broad and unduly burdensome and disproportionate to the needs of the case, as it seeks details relating to any and all medical or psychological care that Plaintiff received over the course of his entire life. Plaintiff further objects to this request to the extent it is asking him to make expert disclosures prior to the deadline set by the Court for such disclosures. Plaintiff also objects to this interrogatory because it contains multiple subparts, and Plaintiff will treat it as multiple interrogatories. Finally, Plaintiff objects to providing a response to this interrogatory before

an appropriate protective order has been entered in this case.

     4.     Prior to January 25, 1977, had you ever interacted with Defendant Teplitz? If so, please state: (a) how long you had known her; (b) the nature of your relationship; (c) how you met her; (d) the last time you saw her prior to January 25; (e) whether she had ever arrested you; 3 and, (f) whether she had ever interviewed you in connection with any investigations of the Peoria Police Department.

     **RESPONSE:** Plaintiff objects to the interrogatory because it seeks irrelevant information. Subject to that objection and Plaintiff's general objections above, Plaintiff states that he may have had one prior contact with Defendant Teplitz relating to school attendance. Plaintiff's investigation into this matter continues and he reserves the right to supplement or modify this answer as new information comes to light.

Dated: October 16, 2020          RESPECTFULLY SUBMITTED,

                        **JOHNNIE LEE SAVORY**

                      BY:    /s/Megan Pierce
                               *One of Plaintiff's Attorneys*

Arthur Loevy                    Flint Taylor
Jon Loevy                      John Stainthorp
Steven Art                   PEOPLE'S LAW OFFICE
Julia Rickert                1180 N. Milwaukee Ave.
Megan Pierce               Chicago, Illinois 60642
LOEVY & LOEVY           (773) 235-0070
311 N. Aberdeen St., 3rd Floor
Chicago, Illinois 60607        Locke Bowman
(312) 243-5900               Alexa Van Brunt
                      MACARTHUR JUSTICE CENTER
                      375 E. Chicago Ave., 8th Floor
                      Chicago, Illinois 60611
                      (312) 503-1271

## CERTIFICATE OF SERVICE

I hereby certify that the undersigned, an attorney, caused a copy of the foregoing

Response to Defendant Marcella Brown Teplitz's First Set of Interrogatories to Plaintiff to be

served upon the counsel of record via email on October 16, 2020.

/s/ Megan Pierce
*One of Plaintiff's Attorneys*

STATE OF ILLINOIS
BRUCE RAUNER, GOVERNOR
## PRISONER REVIEW BOARD
Craig Findley, Chairman

January 11, 2019

Christopher Tompkins
Attorney at Law
353 N Clark Street
Chicago, IL 60654

RE:   Johnny Savory
      E.C. Docket 33581, 10/2016

Dear Mr. Tompkins:

Please be advised that on January 8, 2019, Governor Rauner denied the above-named petition for executive clemency. Should your client still wish to seek clemency in this matter, they may file a new petition at any time after January 8, 2020. If they choose to reapply, they may add new details about themselves and their life, including changes or events that have occurred since the date that their last petition that was heard in 10/2016.

Although the Board and the Governor do not disclose the reasoning behind a decision to grant or deny clemency, please know that we did not make the decision lightly. We spent considerable time reviewing and discussing your client's petition.

Please contact us if you have any questions.

Sincerely,

Craig Findley
Chairman

CF:nd

Cc:   File
      State's Attorney – Knox; Peoria

EXHIBIT # 2
WIT: SAVORY
DATE: 6-15-22
Nick D. Bowes, CSR

319 E. MADISON STREET, SUITE A / SPRINGFIELD, ILLINOIS 62701 / (217) 782-7273  Fax: (217) 524-0012
Web Page: www.Illinois.gov/prb

353 NORTH CLARK STREET CHICAGO ILLINOIS 60654-3456     **JENNER&BLOCK** LLP

July 25, 2016

Christopher Tompkins
Tel  +1 312 840 8686
ctompkins@jenner.com

**VIA OVERNIGHT COURIER**

Illinois Prisoner Review Board
319 E. Madison, Suite A
Springfield, Illinois 62701

Re:    Johnnie L. Savory Supplemental Petition for Executive Clemency

To Illinois Prisoner Review Board:

Enclosed please find Johnnie L. Savory's Supplemental Petition For Executive Clemency and accompanying appendix.

If there are any questions please feel free to contact me.

Best regards,

Christopher Tompkins

cc:    The Honorable Stephen A. Kouri, Chief Judge, Tenth Judicial Circuit, Peoria County
       Jerry Brady, Peoria County State's Attorney
       Joshua Tepfer (via email)
       Steven Drizin (via email)

PARDON DOCKET NO. _____

OCTOBER 2016

BEFORE THE ILLINOIS PRISONER REVIEW BOARD

ADVISING THE HONORABLE BRUCE RAUNER, GOVERNOR

IN THE MATTER OF JOHNNIE L. SAVORY

---

**SUPPLEMENTAL PETITION FOR EXECUTIVE CLEMENCY**

---

Christopher Tompkins
JENNER & BLOCK LLP
353 N. Clark St.
Chicago, Illinois 60654
312/840-8686

*Counsel for Johnnie L. Savory*

Dated: July 25, 2016

SAVORY-LL-004981

# TABLE OF CONTENTS

Table of Contents ................................................................................................ i

Introduction ..................................................................................................... 1

Required Information & Background .................................................................. 3

I.    Biographical Information. ........................................................................... 3

      A.    Johnnie Savory's Childhood. ............................................................... 3

      B.    Johnnie Savory's Life In Prison. .......................................................... 4

      C.    Johnnie Savory's Life After His December 2006 Parole. ..................... 5

II.   Conviction For Which Executive Clemency Is Sought. ............................... 5

III.  Other Required Information. ....................................................................... 10

      A.    Identification Information. .................................................................. 10

      B.    Petitioner's Current Address. .............................................................. 10

      C.    Criminal History. ............................................................................... 10

      D.    Conviction Information. ...................................................................... 11

      E.    Military Service. ................................................................................. 11

      F.    Pending Appeals or Post-Conviction Proceedings. ............................. 11

      G.    Prior Clemency Petitions. ................................................................... 11

      H.    Public Hearing. ................................................................................... 11

Reasons For Executive Clemency ...................................................................... 12

I.    New Evidence From DNA Testing Excludes Mr. Savory And Points To Another
      Assailant. ................................................................................................... 12

      A.    Seminal Fluid Collected From Connie Cooper Did Not Come From Mr.
            Savory. ............................................................................................... 14

      B.    Bloodstains On Bathroom Light Switch Plate Was Left By An
            Unidentified Perpetrator Other Than Mr. Savory. .............................. 16

II.   The Evidence Presented At Mr. Savory's Second Trial Was And Is Insufficient To
      Establish Mr. Savory's Guilt. ..................................................................... 17

SAVORY-LL-004982

A.   The Testimony Of The Ivy Siblings Is Not Credible Evidence Of Mr. Savory's Guilt And Has Been Repeatedly Recanted. ............................................. 18

    1.   Frank Ivy. .......................................................................................... 20

    2.   Tina Ivy. ............................................................................................ 25

    3.   Ella Ivy. ............................................................................................. 27

B.   The Physical Evidence Does Not Establish Mr. Savory's Guilt. ............................ 28

    1.   The Blue Pants. ................................................................................. 29

    2.   Hairs Found In Bathroom Sink. ...................................................... 31

    3.   The Pocket Knife. ............................................................................ 31

    4.   Other Physical Evidence Establishes Innocence. ........................... 32

C.   The Prosecution Improperly Introduced Other Alleged Inconsistent Statements And Claimed Mr. Savory's Exercise of His Right To Silence Was Evidence Of Guilt. ............................................................................................ 32

Conclusion ............................................................................................................................. 34

SAVORY-LL-004983

## INTRODUCTION

The purpose of this supplemental petition is narrow, but important. Mr. Savory was already pardoned by Governor Quinn on January 12, 2015. However, that pardon was issued without the benefit of recent DNA testing of physical evidence in Mr. Savory's case that indicates that someone else – and not Mr. Savory – committed the crime, and therefore did not specifically recognize Mr. Savory's innocence as contemplated by 735 ILCS 5/2-702(h). Those new DNA testing results were unsealed by the Circuit Court in Peoria County on January 21, 2015, just days after the issuance of the pardon. Accordingly, in light of the new DNA testing results, and an additional witness recantation that has occurred since Mr. Savory's 2003 clemency petition, this supplemental petition respectfully requests formal recognition of Mr. Savory's innocence as contemplated by 735 ILCS 5/2-702(h).

This petition concerns a crime for which Mr. Savory was wrongfully imprisoned for thirty years. In 1977, at the age of 14, Mr. Savory was arrested for two murders for which he has steadfastly denied involvement. He was subsequently tried twice for those murders. The Illinois Appellate Court reversed the first conviction after it determined that police interrogation tactics resulted in an involuntary confession and violated Mr. Savory's constitutional rights. Despite the State's public acknowledgements following the reversal that there was no evidence of guilt other than the coerced and inadmissible confession, in 1981 Mr. Savory was again tried and convicted. That conviction rested largely on the testimony of three of Mr. Savory's acquaintances (Frank, Tina, and Ella Ivy) who testified at trial that Mr. Savory made admissions to them on the day of the crime – testimony that was not presented at the first trial because, according to a former member of the prosecution team, it was not viewed as credible – along with very rudimentary testing of several items of physical evidence that would not pass muster in an Illinois courtroom today.

SAVORY-LL-004984

The minimal evidence presented at the 1981 trial should not have been sufficient then, and has not withstood the test of time. Each of Mr. Savory's acquaintances have recanted their testimony that Mr. Savory admitted committing the crime – two on multiple occasions – stating that they were pressured by the State to testify at Mr. Savory's 1981 trial based on confused and incomplete recollections of events that had occurred more than four years earlier. Moreover, the rudimentary testing of physical evidence used in Mr. Savory's 1981 trial – such as visual microscopic comparison of hair samples to see if they look "similar" – has been thoroughly discredited.

After seeking DNA testing of physical evidence for more than a decade, Mr. Savory's request was finally granted by the Circuit Court in Peoria County in August 2013, over the continued vigorous objection of the State. Unfortunately, after testing was ordered it was discovered that some evidence of potentially great probative value had been lost by the State and could not be tested – despite being listed in inventories of material supposedly preserved following the murders. Specifically, the State could not locate hairs – potentially from the murderer – that had been clutched in the hands of both victims, or a piece of fabric cut from a pair of pants that the State has long alleged belonged to Mr. Savory and contained a small bloodstain of the same blood-type as victim Connie Cooper.

Crucially, testing on two other items that were located indicates that some other still-unidentified individual – and not Mr. Savory – committed these murders. In particular, testing of vaginal swabs from Connie Cooper reflects the presence of seminal fluid from an unidentified male and definitively *excludes* Mr. Savory as the source. Moreover, a bloodstain on a bathroom lightswitch wall plate – that the State has long claimed was deposited by the murderer while cleaning up after the crime – has been determined to have come from victim James Robinson and

2

another unidentified person, but *not* Mr. Savory or any other member of the Cooper-Robinson household.

The results of this new DNA testing, when combined with the recantations of each of the witnesses who testified Mr. Savory made admissions concerning the murders should remove any lingering question that Mr. Savory committed these horrible crimes for which he spent 30 years – and most of his adult life – in prison. Accordingly, Mr. Savory respectfully asks the Governor to use his power of executive clemency to correct errors made by police, prosecutors, the courts, and unwittingly, the jury, and recognize Mr. Savory's innocence as contemplated by 735 ILCS 5/2-702(h).

**REQUIRED INFORMATION & BACKGROUND**

## I.  Biographical Information.

### A.  Johnnie Savory's Childhood.

Johnnie Savory was born on July 25, 1962 in Peoria Illinois. Mr. Savory's mother, Claudeen Savory, died in 1963 when Mr. Savory was just 8 months old. Following his mother's death, Mr. Savory lived in Peoria with his father, Y.T. Savory, sister Louise, and grandmother Martha Alexander.

Mr. Savory did not grow up in a model household. Mr. Savory's principal caregiver, his father, had a history of alcohol abuse and spent time in the Illinois Department of Corrections.[1] Mr. Savory's family barely scraped by and often lacked food and other necessities. While attending elementary school, Mr. Savory worked odd jobs to raise money to help support his family. With nobody to rely on, Mr. Savory became creative in caring for his family. For example, in an effort to prevent his father from spending the family's money before paying for

---

[1] Mr. Savory's father's conviction was eventually reversed. *People v. Savory*, 379 N.E.2d 372 (3rd Dist. 1978).

necessities, Mr. Savory sometimes took the family's rent money and gave it to a teacher at school to safeguard and distribute as needed. Mr. Savory also assisted his father in the care of his disabled sister, Louise Savory. At the time of his arrest, Mr. Savory was 14 years old and was attending late afternoon junior high school in Peoria.

### B.    Johnnie Savory's Life In Prison.

Mr. Savory was arrested at the age of 14, and spent the next 30 years imprisoned by the Illinois Department of Corrections. Like many other inmates, Mr. Savory initially had a period of adjustment after he was sent to prison, but matured to become a model prisoner. During his 30 years in prison, Mr. Savory earned his GED and four vocational certificates for auto body repair, electronics repair, paralegal studies, and music dynamics. He completed computer science courses offered through Danville Community College and earned six college credits through Lincoln College. He also participated in many personal development programs and seminars offered in prison.

While in prison, Mr. Savory worked with prison officials to make the institutions safer for both staff and inmates. From 1991-1995, Mr. Savory was an informal member of the Hill Correctional Center's crisis team, which sought to stabilize prisoners suffering from severe depression. In one instance, correctional officers asked Mr. Savory to counsel a fellow prisoner who had attempted suicide. Furthermore, not only did Mr. Savory never join a gang, he counseled many young prisoners new to the correctional system to avoid prison gangs. While at Hill Correctional Center, Mr. Savory intervened to help a young prisoner who had been beaten by prison gang members. He took the young man under his wing and convinced him that, despite the threat from the gang, the young man would never benefit from joining the prison gang.

SAVORY-LL-004987

4

Other examples of Mr. Savory's willingness to be a positive influence within the correctional system include his participation in the Peoria Jaycees and the Lifers Club, a charitable organization whose membership includes prison inmates serving at least 20 years. For three years, he served as vice president of the Peoria Jaycees. He was vice president of the Lifers Club for two years. In both positions, he worked to mobilize fellow prisoners and persons in the outside community to gather money and food for the homeless and to help fund a park in Peoria. In addition, Mr. Savory volunteered to help paint the Hill Correctional Center, and served as a personal fitness trainer for many correctional officers.

### C.    Johnnie Savory's Life After His December 2006 Parole.

Mr. Savory was paroled in December 2006, and the remainder of his sentence was commuted by Governor Quinn on December 6, 2011. Since his release from prison, Mr. Savory has lived in Chicago and has been a law-abiding and productive member of the community. He works full-time at the Rainbow PUSH coalition. Mr. Savory volunteers with the Northwestern University School of Law Center on Wrongful Convictions, where he serves as a mentor for recently released exonerees transiting to a life of freedom. Mr. Savory also continues to work tirelessly on his own case to gain recognition of his innocence and wrongful conviction. Several months ago, Mr. Savory welcomed the birth of his daughter.

### II.    Conviction For Which Executive Clemency Is Sought.

This clemency petition concerns Mr. Savory's conviction for the January 18, 1977 murder of James Robinson and Connie Cooper. Robinson, age 14, and Cooper, age 18, were found murdered in their Peoria home, by their mother, Noyalee Robinson, and her ex-husband, William "Peter" Douglas.

Police believe that Robinson and Cooper were murdered sometime between 8:30 and 9:30 on the morning of January 18, 1977. (Ex 3, R.1582.) The bodies were discovered in Cooper's bedroom, the victims of multiple stab wounds. Cooper was found dressed with her nightgown pulled up to her waist, and white panties with a tear in the crotch area. (Ex 16; Ex 2, R.1398.) Cooper was found on the floor of her room, not far from her bed, and had sustained multiple stab wounds and other injuries. (*Id.*) Cooper's bed and bedding were soaked with her blood, suggesting that is where she was killed. (Ex. 2, R.1417; Ex. 16; Ex. 38 (Items 9-13).)

Cooper was stabbed repeatedly in her abdomen, genital area, upper thigh, back, and buttocks. (Ex. 3, R.1583-86; Ex. 15; Ex. 34.) A wound on Cooper's left back pierced a major vein and is thought to have been the cause of death. (Ex. 3, R.1585-86; Ex. 34.) Cooper sustained a bruise on the left side of her face consistent with being punched. (Ex. 3, R.1583-84; Ex. 34.) Cooper also suffered defensive wounds to both sides of her hands, and the tip of a finger on her right hand had been sliced off, suggesting she had fought back against her attacker. (Ex. 3, R.1584-85; Ex. 34.) Finally, Cooper also suffered a slicing wound across her forehead and right cheek that resulted in only a small amount of blood, and thus was likely inflicted post-mortem. (Ex. 3, R.1583; Ex. 14 ¶ 22.) Vaginal swabs taken during Cooper's autopsy contained seminal material, but in 1977 the source was never identified. (Ex. 38 (Item 1A); Ex. 34; Ex. 36.)

James Robinson was discovered fully clothed in a T-shirt and blue jeans nearer to the door to the bedroom. (Ex. 2, R.1397; Ex. 16.) Robinson also died from multiple stab wounds, including two stab wounds to his chest and two stab wounds to his abdomen. (Ex. 3, R.1581; Ex. 35.) Robinson also had relatively blood-less wounds to his face, indicating they were likely inflicted post-mortem. (Ex. 4, R.1581; Ex. 14 ¶ 22; Ex. 35.) Unlike Cooper, Robinson did not

6

have any defensive wounds. Robinson's clothing was stained both with his own blood, and blood determined to be the same type as Cooper. (Ex. 38, 3/17/1977 (Items 5-7).)

The initial police investigation focused on a romantic or sexual motive. Police interviewed family members and other witnesses to identify Cooper's boyfriends and sexual partners. (Ex. 17.) In the days after the crime, the police questioned a number of Cooper's love interests, such as Charles Watts, an ex-boyfriend who had previously been physically violent toward Cooper. (Ex. 17; Ex. 25.) In addition, the Police focused on Kenneth Parker, another man with whom Cooper had been having a relationship. (Ex. 20; Ex. 23; Ex. 24; Ex. 26.) The police inquired about Curtis Spence, the father of Connie's son. (Ex. 19.) The police also explored whether the murder could have been committed by Cooper's stepfather, William "Peter" Douglas. (Ex. 18; Ex. 21; Ex. 22.) Police considered each of these individuals suspects, and none were ever definitively ruled out as the perpetrator.

On January 25, 1977, a week after the murders, the police investigation abruptly turned its focus to Johnnie Savory – a friend of James Robinson who had coincidentally been at the Robinson house the day before the murders. Police located Mr. Savory at the late afternoon junior high school he was attending. *People v. Savory*, 82 Ill.App.3d 767, 769 (3rd Dist. 1980) ("*Savory I*"). The police then proceeded to interrogate him almost continuously for the next day and a half – not stopping until Mr. Savory allegedly confessed to the crime, but soon after he refused to affirm the alleged confession. *Id.*

The nearly continuous questioning of 14-year-old Mr. Savory began at 3:30 p.m. at his school, at which time Mr. Savory gave police an account of his activities on January 18. *Id.* at 769. Mr. Savory was then transferred to the police station and interrogated for another eight hours, during which he steadfastly denied any involvement in the deaths of James Robinson or

7

Connie Cooper. *Id.* at 769-70. During this period, Mr. Savory was interrogated first by the police and then later, at approximately 10:00 p.m., by a polygraph examiner. *Id.* at 770. It was not until the end of this session that Mr. Savory's father was informed that Mr. Savory was being questioned by the police. *Id.* After the polygraph examination, Mr. Savory was placed under arrest and read his *Miranda* warnings for the first time. *Id.* At that point, Mr. Savory indicated that he did not wish to continue speaking with the police. *Id.*

The police resumed their interrogation at 10:30 a.m. the following morning and continued that session until 8:00 p.m. that night. *Id.* at 770-71. It was at the end of this marathon session that 14-year-old Mr. Savory – after being continuously badgered by the police and given a second polygraph examination – allegedly confessed. *Id.* at 771. Soon after, Mr. Savory refused to reaffirm his alleged confession, again explaining to police that he was not involved in the murders – a position he has maintained to this day. *Id.*

Mr. Savory was tried for the murders in June of 1977 before a Peoria County jury. The prosecution's case was based almost exclusively on his alleged confession, which the court had refused to suppress despite the circumstances of the interrogation, and a limited amount of physical evidence. After a two-day trial, Mr. Savory was convicted and sentenced to two concurrent terms of 50 to 100 years.

In 1980 the Third District Illinois Appellate Court reversed the conviction, finding that the alleged confession was involuntary and that the Peoria police improperly failed to "scrupulously honor" Mr. Savory's statement that he did not want to talk to police in violation of the *Miranda* rule. *Savory I*, 82 Ill.App.3d at 774-75. The court determined that the police's failure to observe *Miranda,* and the circumstances of Mr. Savory's marathon interrogation, made

8

Mr. Savory's alleged confession was involuntary. *Id.* Noting that special care is required in cases involving suspects as young as Mr. Savory, the Court stated:

> [W]e do have a period of approximately eight hours, interrupted by a meal, of questioning on January 25 and then an additional period of questioning, interrupted by meals, commencing at about 10:30 in the morning of January 26 and continuing until about 8 p.m. when the inculpatory statements were made. We also observe that thereafter the defendant did not reaffirm his inculpatory statements but in fact recanted them shortly after they were made. Without deciding that the length of the questioning would of itself justify suppression of the statements as not voluntary, we do believe that the cumulative effect of all of the circumstances does compel the conclusion the prosecution did not sustain its burden of establishing the voluntariness of the statements. We believe the error in admitting the statements requires a new trial because we can not say beyond a reasonable doubt that it did not contributed to the verdict of the jury under the authority of *Chapman v. California* (1967), 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d. 705.

*Id.* at 775.

Given that the alleged confession was inadmissible because of the impropriety of the interrogation, it appeared that Mr. Savory would not stand trial a second time. Prosecutors publicly stated that Mr. Savory would not be retried because of the lack of any evidence connecting Mr. Savory to the crime other than the alleged confession. (Ex. 45, 46.) The prosecution, however, turned to three witnesses – not called to testify in the first trial because of questions of reliability – who testified that Mr. Savory allegedly made incriminating statements to them regarding the crime. In addition, the State relied on several pieces of physical evidence they claimed linked Mr. Savory to the crime: (1) evidence that hair found in a bathroom sink was "similar" to Mr. Savory's hair; (2) evidence that Mr. Savory or his father may have owned a pocket knife that may have had trace amounts of blood; and (3) evidence that a pair of blue pants way to large for Mr. Savory had a small bloodstain near the pocket that was the same blood type

as Connie Cooper, Type A.[2]  Based on this evidence, Mr. Savory was convicted a second time and sentenced to two concurrent sentences of 40 to 80 years.

## III.  Other Required Information.

### A.  Identification Information.

Name:  Johnnie L. Savory

Social Security No.:  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

Former IDOC No.:  L-12206

### B.  Petitioner's Current Address.

Petitioner's current mailing address is:

> Johnnie L. Savory
> PO Box 53311
> Chicago, Illinois 60653

Correspondence regarding this petition should be sent to Mr. Savory's attorney:

> Christopher Tompkins
> Jenner & Block LLP
> 353 N. Clark St
> Chicago, Illinois 60654
> ctompkins@jenner.com

### C.  Criminal History.

Largely due to inadequate parental supervision and guidance, Mr. Savory entered Peoria County's juvenile system at the age of 12 or 13 and was on temporary probation for truancy and running away from home at the time of this conviction.

---

[2] At the second trial, the State also improperly introduced several statements Mr. Savory allegedly made to police about "collateral facts" and improperly commented on Mr. Savory's exercise of his right to remain silent, both of which have been found to violate Mr. Savory's constitutional rights although were also determined to be harmless in light of the other evidence introduced at trial – the new discredited physical evidence and recanted testimony of the Ivys. *Illinois v. Savory,* 105 Ill.App.3d 1023, 1030 (1982); *Savory v. Lane,* 832 F.2d 1011, 1016 (7th Cir. 1987).

D. **Conviction Information.**

   1. Mr. Savory was sentenced to 40 – 80 years following his conviction for two counts of murder, Peoria County Case No. 77 CF 565. This sentence was imposed on June 12, 1981.

   2. Mr. Savory was also sentenced to 2 years for a conviction for possession of contraband in a Penal Institution in 1993 Knox County Case No. 93 CF 122.

   3. Mr. Savory was paroled on December 19, 2006.

E. **Military Service.**

   Mr. Savory has not served in the military.

F. **Pending Appeals or Post-Conviction Proceedings.**

   On December 22, 2014, Mr. Savory filed a Petition for Relief from Judgment and Motion for a New Trial pursuant to 735 ILCS 5/2-1401 in the Circuit Court of the Tenth Judicial Circuit for Peoria County. That petition was denied by an order issued on May 4, 2016. On June 2, 2016 Mr. Savory filed a motion for reconsideration of the May 4, 2016 order. That motion remains pending as of the time of this petition.

G. **Prior Clemency Petitions.**

   Mr. Savory previously filed petitions for executive clemency for his murder conviction in February 1995, and on November 21, 2003 (Pardon Docket No. 24750). On December 6, 2011, Governor Quinn commuted Mr. Savory's sentence. On January 12, 2016, Governor Quinn granted Mr. Savory a pardon, with expungement of his conviction.

H. **Public Hearing.**

   In an effort to expedite this matter and consideration by the Governor, Mr. Savory is willing to forgo a public hearing in connection with this petition. However, if the Board believes a hearing would be useful, Mr. Savory's representatives are happy to make a presentation at the hearings scheduled for October 2016.

11

SAVORY-LL-004994

## REASONS FOR EXECUTIVE CLEMENCY

As discussed, Mr. Savory has already been pardoned. The sole focus of this petition is recognition that Mr. Savory is innocent, as contemplated by 735 ILCS 5/2-702(h). Mr. Savory is entitled to official recognition of his wrongful conviction for two reasons. *First*, new DNA testing unsealed just days after Governor Quinn's January 2015 pardon definitively excludes Mr. Savory and points to some other unidentified individual as the perpertrator. *Second*, as detailed in Mr. Savory's prior clemency petition, the other evidence of Mr. Savory's guilt presented at his second trial has been discredited, including most notably the testimony of Mr. Savory's three acquaintances, each of whom have recanted their trial testimony.

## I.    New Evidence From DNA Testing Excludes Mr. Savory And Points To Another Assailant.

Mr. Savory has long sought DNA testing of the physical evidence introduced at his 1981 trial and other evidence collected from the murder scene. In 1998 Mr. Savory was one of the first defendants to attempt to take advantage of a new provision of the Code of Criminal Procedure permitting post-conviction DNA testing not available at the time of trial (725 ILCS 5/116-3). That request was vigorously opposed by the State, and denied by the Illinois courts. *People v. Savory,* 197 Ill.2d 203 (2001). In 2005, Mr. Savory also sought DNA testing through a federal civil rights action under 28 U.S.C. § 1983, but relief in that case was determined to be barred by the statute of limitations. *Savory v. Lyons,* 469 F.3d 667 (7th Cir. 2006).

Undeterred by repeated refusals to test key evidence in his case, in November 2012 Mr. Savory returned to court, again seeking DNA testing, based on technological advances in testing since his initial motion in 1998, and the additional recantation of Ella Ivy. On August 6, 2013 the Circuit Court of Peoria County granted the request for testing, finding that there was "limited direct evidence of the identification of the perpetrator and the prosecution used forensic evidence

SAVORY-LL-004995

at trial to connect the Defendant to the crime." (Ex. 48 at 11.) With respect to the physical evidence introduced at trial, the Circuit Court stated "Can it be imagined that such rudimentary 'scientific' evidence would be presented and argued to a jury in a courtroom today, particularly in a double homicide trial?" (*Id.* at 9, n. 14.)

Unfortunately, some of the testing sought by Mr. Savory proved to be impossible. At some point the State lost key physical evidence, including most notably hairs collected from both victims' hands as well as the alleged blood stain on the blue pants on which the State relied heavily at the 1981 trial. (Ex. 41 (Items 31, 59, 69); Ex. 7 at 28-29, 40-42.)[3] Moreover, some of the evidence appears to have degraded over time due to age and the conditions under which it was stored. No interpretable results were obtained from DNA testing on the knife alleged by the state to be the murder weapon, other stains identified on the blue pants, or fingernail scrapings from Connie Cooper. (Ex. 42 (Items 21A to 22A1, 44A to 44B1, 59B to 59E1); Ex. 43 (Items 21A1, 22A1, 59A1 to 59E1); Ex. 7 at 38-42, 153-54, 162-66.)

Significantly, however, DNA testing of other items did result in significant new evidence that someone else other than Mr. Savory committed these murders. Testing of a vaginal swab from Connie Cooper – which had previously tested positive for seminal fluid – excluded Mr. Savory as the source of the seminal fluid. (Ex. 43 (Item 1A1); Ex. 7 at 30-31, 153-56.) Moreover, testing of blood stains on a bathroom light switch that the State has long asserted was deposited by the killer when cleaning up after the murders, was determined to contain blood from two contributors, a major contributor who was determined to be James Robinson, and another still unidentified minor contributor. (Ex. 43 (Item 15A1); Ex 44 (Item 15A1); Ex. 7 at

---

[3] Indeed, the Peoria Police department represented that they had possession of that evidence as recently as 2005 in disclosures provided in Mr. Savory's 42 U.S.C. § 1983 action seeking DNA testing. (Ex. 49.)

32-38, 153-54, 156-62.)  Mr. Savory and other members of the Robinson-Cooper household were excluded as the minor contributor.  (Ex. 43 (Item 15A1); Ex. 7 at 159-60.)

### A.    Seminal Fluid Collected From Connie Cooper Did Not Come From Mr. Savory.

The first piece of new evidence are DNA test results on seminal fluid taken from Connie Cooper that excludes Mr. Savory.  At the time of the autopsy the Peoria County Corner collected vaginal swabs from Connie Cooper.  (Ex. 34.)  Analysis in 1977 by the State of Illinois Bureau of Identification revealed the presence of seminal material, but given then-existing technology further analysis could not be undertaken to determine its source.  (Ex. 38 (Item 1A).)  In recent testing, the Illinois State Police laboratory was able to extract a male DNA profile from the vaginal swabs using Y-STR testing, which is capable of isolating the Y chromosome in a mixed sample.  Through those tests, the Illinois State Police laboratory was able to definitively exclude Mr. Savory and Cooper's step-father, Peter Douglas, as the source of the seminal fluid.  (Ex. 43 (Item 1A1); Ex. 7 at 30-31, 153-56.)  Unfortunately, given limitations of the Y-STR testing method, the State Police were not able to compare the profile to the CODIS database to identify the potential source.  (Ex. 7 at 148-51.)

The significance of this new evidence cannot be understated.  From the start of the investigation of these murders the police focused on a sexual motive.  Cooper was found partially clad, with her nightgown pulled up and her panties ripped.  Cooper's bed and bedding were covered in her own blood, indicating that she was likely initially stabbed on her bed.  Moreover, Cooper sustained multiple stab sounds to her lower body, including multiple wounds targeted at her pubic area.  Given the condition of the scene, at the start of the investigation the police rightly focused on a boyfriend or love interest of Ms. Cooper.  They interviewed several

14

individuals purported to be Cooper's boyfriends, and explored whether there may have been a

sexual relationship of some kind between Cooper and her stepfather, Peter Douglas.

Moreover, other evidence indicates that the seminal material was likely from sexual

activity the morning of the crime. Connie Cooper spent the evening before at home with her

family, and indeed shared a bedroom with her mother the night before the crime, and was alone

but awake in her bedroom when her mother left for work the next morning. (Ex. 2, R.1245,

R.1251-52, 1256-59.) Cooper's purported boyfriend, Kenneth Parker, stated that he had not had

intercourse with Cooper since the prior Thursday, January 13th. (Ex. 23.) Accordingly,

evidence that this was a sexually motivated crime, combined with the presence of seminal

material from some other individual, strongly indicates that someone else other than Savory

committed these murders.

Indeed, experienced FBI investigator and crime scene expert Gregg McCrary[4] has

examined evidence in this case and concluded that the crime likely had a sexual component and

that the seminal fluid was left by the killer. (Ex. 14 ¶ 24; Ex. 7 at 71-104.) Mr. McCrary

believes that a sexual component is indicated because of the state of Cooper's clothing, and

because she was likely initially stabbed in her bed. (Ex. 14 ¶ 15.) Moreover, Mr. McCrary

believes a sexual motive is indicated by the multiple, targeted stab wounds to Cooper's genital

area, which often indicates personal animus or rage. (*Id.*) Moreover, the fact that there was no

sign of forced entry, Cooper was awake at the time her mother left the house, and Cooper's son

was placed in another bedroom suggests that the murder was someone known to Cooper,

someone she voluntarily let in the house. (*Id.* ¶¶ 17-18.) Accordingly, Mr. McCrary believes

---

[4] Mr. McCrary has over 40 years investigating violent crimes for the FBI. (Ex. 14 ¶ 2.)
Mr. McCrary was an FBI field agent for 17 years and then served as a Supervisory Special Agent
at the FBI's National Center for the Analysis of Violent Crime where he provided expertise on
investigative techniques and crime scene analysis. (*Id.* ¶ 3.)

SAVORY-LL-004998

15

that there is a significant possibility that the unknown male DNA found in Cooper's vaginal swab belongs to her killer.  (Ex. 14, ¶¶ 23-24; Ex. 7 at 71-104.)

### B.    Bloodstains On Bathroom Light Switch Plate Was Left By An Unidentified Perpetrator Other Than Mr. Savory.

New DNA testing results on a bloodstain on a light switch plate in the bathroom of the Robinson residence also indicates that someone else other than Mr. Savory was the perpetrator. At the time of the crime, the police found blood stains on a light switch plate and in other locations in the bathroom of the residence.  In 1977 these stains were tested for blood-type and determined to be Type O blood, the same blood type as James Robinson.  (Ex. 2, R.1467; Ex. 38 (Item 15).)  However, further testing could not be conducted.  At trial, the State claimed that this bloodstain was left by the killer when they cleaned-up after the murder in the bathroom.  (Ex. 5, R.1802 (State's closing argument: "And then he went in the bathroom and cleaned up.  Turned on the light.  There was blood, as you will recall on the light switch plate.").)

Recent DNA testing of the stain identified two separate contributors of DNA material. The major contributor was determined to have a DNA profile consistent with James Robinson. (Ex. 43 (Item 15A1); Ex 44 (Item 15A1); Ex. 7 at 32-38, 153-54, 156-62.)  However, testing also identified the profile of another minor contributor.  This profile also did not belong to Connie Cooper or the other two individuals in the home, Noyalee Robinson and Peter Douglas.  (*Id.*) More significant is that the profile also did not belong to Mr. Savory.  (*Id.*)  Again given the nature of the sample, it could not be uploaded to the CODIS database and compared to other profiles and given that a different method of testing was used to develop the profile of the DNA left on the light switch plate, it could not be compared to the profile extracted from Cooper's vaginal swab.  (Ex. 7 at 148-51, 158.)

16

Again these results are substantial evidence of Mr. Savory's innocence. There is no reason to doubt the State's theory that the stain was placed there when the killer cleaned up following the murders. And the fact that other family members were excluded makes it very unlikely that the minor contributor's profile was left at some other time. Indeed, Mr. McCrary believes it is highly likely that – given the number of stab wounds and Connie Cooper's defensive wounds – the killer would have been injured in the attack, and left his own DNA on the bathroom light switch plate along with Robinson's. (Ex. 14 ¶¶ 26-27.) Accordingly, as with testing of the vaginal swab, this new DNA testing excludes Mr. Savory as the perpetrator and points to another still unidentified person as the murder.

## II. The Evidence Presented At Mr. Savory's Second Trial Was And Is Insufficient To Establish Mr. Savory's Guilt.

Beyond this strong new evidence excluding Mr. Savory as the murderer, however, the other evidence relied on by the State at his 1981 trial – which was weak even then – simply has not stood the test of time. The State's evidence that Johnnie Savory was involved was extremely thin. There were no known witnesses to the crime who could provide evidence and the prosecution's entire case linking Mr. Savory to Robinson home on January 18, 1977 consisted of: (1) the testimony of three of Mr. Savory's friends – Frank, Tina, and Ella Ivy – that Mr. Savory allegedly made inculpatory statements to them; (2) evidence that during his interrogation Mr. Savory exercised his right to remain silent and other statements to police; (3) evidence that hair found at the scene was "similar" to Mr. Savory's hair; (4) evidence that Mr. Savory or his father may have owned a pocket knife that may have had trace amounts of blood; and (5) evidence that a pair of blue pants allegedly worn by Mr. Savory had a small bloodstain determined to be the same blood type as Connie Cooper.

Yet, as discussed below, at the time of his conviction and today none of this evidence connects Johnnie Savory to this crime. The Ivys were not credible when they testified at Mr. Savory's 1981 trial, and their testimony has been repeatedly recanted and contradicted by other evidence. The physical evidence has limited value and has been undermined by the new DNA testing discussed above. For all of these reasons, the evidence presented against Mr. Savory does not establish his involvement in this crime.

### A.    The Testimony Of The Ivy Siblings Is Not Credible Evidence Of Mr. Savory's Guilt And Has Been Repeatedly Recanted.

The centerpiece of the State's case has long been the testimony of three witnesses – Frank, Tina, and Ella Ivy – that Mr. Savory allegedly made incriminating admissions to them on the day of the crime. The Ivys, who were only interviewed by police for the first time three weeks after the murders and who did not testify at Mr. Savory's first trial, surfaced less than a month prior to the second trial as the State desperately searched for new evidence to present to convict Mr Savory. But the testimony of the Ivy siblings has never provided credible evidence of Mr. Savory's guilt, and in fact has been disavowed by the Ivys themselves.

Police did not interview the Ivy family until February 7, 1977 – some three weeks after the January 18, 1977 murders and nearly two weeks after Mr. Savory's arrest on January 26, 1977. (Ex. 30.) The police report of that interview does not reflect the specific alleged damaging admissions by Mr. Savory about which the Ivys later testified as the State desperately sought evidence for a retrial, and in fact reflects only that Mr. Savory may have had some knowledge about the murders that was widely reported by media outlets. (*Id.*) Indeed, the Ivys were not called to testify at the first trial because – according to the testimony of former Assistant State's Attorney Joseph Gibson at a post-trial hearing on a motion for a new trial – the

prosecution deemed their testimony "too shaky" and potentially influenced by media coverage of the murders. (Ex. 6, R.1867-70.)

After the first conviction was overturned it appeared that Mr. Savory would not stand trial a second time. John Barra, then the Peoria County State's Attorney, was quoted in a *Peoria Journal Star* news article in January 1981 stating that it was likely that Mr. Savory would not be retried because the alleged confession was the only "substantial evidence to tie Savory to the crime or the scene of the crime." (Ex. 46.) Barra continued, "I don't know how it would be possible to try him without it." (*Id.*) Michael Mihm – the State's Attorney at the time of the first trial – agreed, stating that that it would be nearly impossible to prosecute Mr. Savory without his alleged confession. (*Id.*)

Yet, just a few weeks before the second trial, the police re-interviewed the Ivys, who became the State's star witnesses. The Ivys' eventual trial testimony, even if true, provided no evidence of guilt. Taking issue with an Illinois Appellate Court decision upholding Mr. Savory's conviction based on the Ivys' testimony, the United States Court of Appeals for the Seventh Circuit has stated:

> In sum, the record does not support the assertion that defendant admitted to three witnesses that he had stabbed the victims and they were dead before the bodies had been discovered, or that he gave detailed descriptions of the wounds before that discovery. Neither do they support the statement that he admitted his presence and complicity in the killings. The testimony of the Ivys thus had significantly less probative force than the Appellate Court's summary suggests. Accordingly, we cannot accord a presumption of correctness to that court's findings.

*United States ex. rel. Savory v. Lane*, 832 F.2d 1011, 1019 (7th Cir. 1987). Beyond these general concerns, however, the testimony of Frank, Tina and Ella Ivy at the second trial: (1) has largely been recanted by the each of Ivys; (2) is not consistent with statements made to police close to the time of the crime; (3) is contradicted by later statements; (4) is contradicted by other

evidence in the possession of the police and prosecution at the time of the second trial; and (5) lacks sufficient detail to be credible.

### 1.    Frank Ivy.

The testimony of Frank Ivy was, on its face, pure conjecture. The testimony is further contradicted by both Frank Ivy's own statements to police in 1977 and statements he has made following the trial recanting his testimony. Finally, Frank Ivy's testimony is contradicted by other evidence in the case – Johnnie Savory simply could not have been at the Ivy household on January 18th at all of the times that Frank Ivy testified he was there.

In his testimony, Frank Ivy testified that Mr. Savory first came to his house at 5:30 p.m. on January 18, 2003. (Ex. 3, R.1494.) Frank Ivy further testified that Mr. Savory left the house but returned later that evening after 8:00 p.m. (Ex. 3, R.1495.) Frank Ivy testified that it was at that time Mr. Savory allegedly made incriminating statements:

> Q:    Did you have occasion to have a conversation with him concerning the incident concerning Scopie later that evening?
>
> A.    Yes.
>
> Q.    Where did that take place?
>
> A.    In my room.
>
> Q:    Your bedroom?
>
> A.    Yes.
>
> Q:    Who was present?
>
> A.    Nobody but me and him.
>
> Q.    What did he say?
>
> A.    "We was practicing Karate."
>
> A.    Who was practicing Karate?

A.    Scopie and him. And he accidentally stabbed him.

Q.    Did he say anything concerning Scopie's sister at all?

A.    She came in the room and he stabbed her, *I guess.*

> MR. VIELEY: I am going to object to that and move to strike that. That is guess and conjecture.

> THE COURT: Overruled. It goes to the weight, not the admissibility. Did the Jury hear that answer? Go ahead. I think you are hearing the answers a little bit better than I am over here. Go ahead, Mr. Gaubas.

> MR. GAUBAS: Thank you, your Honor.

Q.    Frank, do you recall any other particulars of the conversation at that time?

A.    No.

(Ex. 3, R.1495-96 (emphasis added).) On its face, this testimony of Frank Ivy was nothing more than a "guess." At trial, Frank Ivy posited only that he "guessed" that Mr. Savory accidentally stabbed Scopie and his sister. Frank Ivy's testimony does not recount the exact words allegedly used by Mr. Savory and fails to credibly establish that Mr. Savory admitted his culpability.

There is more, however. A string of evidence contradicts Frank Ivy's trial testimony. The most important of which is that Frank Ivy himself says his testimony at trial was incorrect, and has done so on at least three separate occasions:

- Less than one week *before* the second trial, Frank Ivy told investigator Charles Peters that he was not sure who had made the statements he attributed to Mr. Savory and that it may have been someone else. During this conversation with Peters, which was recorded on tape and transcribed for the record during the second trial,[5] Frank Ivy stated:

---

[5] For some inexplicable reason, Mr. Savory's attorney failed to lay the necessary foundation to play this tape for the jury or call investigator Charles Peters to testify even after being given an opportunity to do so by the court. Because of this inexcusable error, the jury

Q.    O. K. Did Johnnie make any remarks that you can recall concerning that, the two kids that got killed?

A.    No, he didn't say anything.  He said 'huh', something like that.

Q.    Who else was present, do you recall, watching that TV program?

A.    The whole family.

Q:    Do you recall him making any reference to having been over to Scopie's house?

A.    No.

Q:    You don't recall that?

A.    No.

Q.    Do you recall his mentioning anything about doing Karate?

A.    Yes.

Q.    Or anything like that?

A.    Yes, uh huh.

Q.    What was that about?

A.    They was playing, doing Karate.  And he had—after they picked up the knife.

Q.    Pardon?

A.    After they had picked up the knife.  That's about all he had told me.

Q.    What was that again?

A.    They picked up the knife while they were doing Karate.

---

*never learned* that Frank Ivy has contradicted his sworn trial testimony in a statement made less than a week prior to his testimony at trial.

SAVORY-LL-005005

22

Q.   Prior to this recorded interview I had a little chat with you for a while?

A.   Uh huh.

Q:   And you indicated that you thought that somebody else said that they may have been playing around with the knife.

A.   Something like that, yeah.

Q.   And you indicated to me that you didn't remember actually hearing Johnnie say that?

A.   No.

A.   Is that correct?

A.   That's correct.

Q.   O.K. So what is the story on it, then?

A.   As I said, somebody said that.  He could have said it.  I really don't remember.

....

Q.   You say that you don't remember any other conversations with Johnnie concerning this?

A.   Huh uh[.]

(Ex 3, R.1603-1605.)

- Two years later, Frank Ivy signed a statement stating that his statements to police and trial testimony were "wrong."  (Ex. 10 ¶ 7 & Ex. B.)  In the statement, Frank Ivy stated that his testimony was based on information he had heard on the street and that he felt pressured into testifying by Detective Cannon of the Peoria Police Department.  (*Id.*)

- In May 2003, Frank Ivy again affirmed that Mr. Savory never told him that he had stabbed James Robinson and Connie Cooper and was pressured to testify at the second trial and told the police what they wanted to hear based on rumors.  (Ex. 10 ¶ 6.)

23

SAVORY-LL-005006

What's more, Frank Ivy's statements to police close to the time of the crime in 1977 contained no mention of the alleged admission about which Frank Ivy later testified about in 1981. In particular, the sole police report recounting police interviews of the Ivy family in 1977 does not contain any statement by any of the Ivys that Mr. Savory admitted stabbing James Robinson or Connie Cooper. (Ex. 30.) Rather, the police report recounts only that the Ivys claimed Mr. Savory had made statements that reflected that Connie Cooper and James Robinson had been murdered. It was not until prosecutors were seeking to retry Mr. Savory a second time in 1981 (without the coerced confession), that police reports reflect Mr. Savory's alleged admission to Frank Ivy. (Ex. 31.) If Frank Ivy had in fact stated that Mr. Savory admitted involvement, surely this would have been recorded in police reports filed in 1977. This report indicated that the police did not re-interview Frank Ivy until early April 1981, less than a month before trial the 1981 trial and almost two months after the case was remanded by the Illinois Appellate Court. (*Id.*)

Finally, Frank Ivy's trial testimony regarding when Mr. Savory was present at the Ivys' home is further contradicted by Peoria police themselves, and Frank Ivy's father Willie Ivy. Indeed, Peoria police officer Glenn Perkins testified that he saw Mr. Savory in a crowd of people outside of the Robinson residence between 5 and 6 p.m. on January 18th. (Ex. 2, R.1390.) Perkins recorded this recollection in a police report he filed on January 27, 1977. (Ex. 28.) Police reports filed by police officer Marcella Brown indicates that a film crew for the local news filmed Mr. Savory at the scene at 6:20 p.m., and that a cameraman had observed Mr. Savory board a bus and leave the scene at 7:00 p.m. (Ex. 29.) Mr. Savory simply could not have been at the Ivy home at 5:30 p.m., as Frank Ivy testified, and at the crime scene at the same time. Frank Ivy's assertion that Mr. Savory was at the Ivys' home at 8:00 p.m. was also contradicted by his

24

father, Willie Ivy, who stated that Mr. Savory did not return to the house until 10:30 p.m. (Exhibit 30.)

In light of this evidence it cannot be said that there is any credible evidence that Mr. Savory confessed to Frank Ivy. Joe Gibson and the Seventh Circuit are correct – Frank Ivy's testimony was simply not credible.

### 2. Tina Ivy.

Tina Ivy's testimony also does not establish Mr. Savory's guilt. At trial, Tina Ivy testified that she had seen Johnnie Savory at quarter or ten till 7:00 p.m. on January 18th at the Ivys' house. (Ex. 3, R.1515.) Tina testified that it was at that time that Johnnie Savory allegedly made incriminating statements:

> Q. What, if anything, was said at that time?
>
> A. That two kids had got killed
>
> Q. What, if anything, else did he tell you?
>
> A. That him and Scopie had been together earlier that day doing Karate. And that he had accidentally cut Scopie.

(Ex. 3, R.1515.)

Yet, Tina's testimony is no more reliable than that of Frank Ivy. Like her brother, Tina Ivy has recanted her testimony on several occasions:

- In 1983, Tina Ivy signed two statements stating that Mr. Savory did not tell her that he had stabbed James Robinson and Connie Cooper as she has testified and that she had not seen Johnnie Savory at 7:00 p.m. on January 18, 2003. Tina Ivy stated that her testimony was based on rumors she had heard in the street. (Ex. 9 ¶ 6 & Exs. B and C.)

- At a post-conviction hearing two years after the trial, Tina Ivy testified that Mr. Savory had never admitted he killed James Robinson and his sister. (Ex. 9 ¶ 6 & Ex. D. at

SAVORY-LL-005008

R.1970.) Tina Ivy testified that she had pending criminal charges on her mind at the time she testified in 1981. (Ex. 9 ¶ 6 & Ex. D. at R.1972.) At the time she testified at the second trial, Tina Ivy was on probation for a forgery charge and had been enrolled in a drug rehabilitation program. (Ex. 9 ¶ 6 & Ex. D. at R.1967-68.)

- In May 2003, Tina Ivy again signed an affidavit confirming that her testimony at Mr. Savory's second trial was not accurate. (Ex. 9 ¶ 4.)

- In July 2012, Tina Ivy reiterated her post-trial recantation to representatives of Mr. Savory. (Ex. 12.)

Like the testimony of her brother, Tina Ivy's testimony is also not consistent with what she told the police in her initial interview in February of 1977. The police report of that interview contains no mention of any admission by Mr. Savory that he had committed the crimes. Indeed, the police report does not even reflect that Tina spoke with Mr. Savory around 7:00 p.m. on January 18th. (Ex. 30.)

Tina Ivy's testimony is also contrary to the testimony and statements of other witnesses. As noted above, the police and other witnesses have claimed that they saw Johnnie Savory outside of the crime scene between 5:00 p.m. and 7:00 p.m. (Ex. 2, R.1390; Ex. 28; Ex 29.) Mr. Savory could not possibly have been at the Ivys' house making incriminating statements to Tina Ivy at the same time he was also at the crime scene. This is further confirmed by the 1977 statement of Willie Ivy, Tina Ivy's father, who stated that Savory did not return to the Ivys' house until 10:30 p.m. (Ex. 30.) As Tina Ivy's later statements confirm, the only time she saw Mr. Savory on January 18th was earlier in the day, when they rode the bus to school together around 3:00 p.m. (Ex. 9 ¶ 6 & Exs. B and C.)

In light of her later statements, and the other evidence contradicting her statement, Tina Ivy's testimony fails to establish Mr. Savory's guilt.

### 3. Ella Ivy.

Finally, the testimony of Ella Ivy has also been recanted and does not establish Mr. Savory's guilt. Ella testified that she saw Johnnie Savory sometime before 3:00 p.m. and again around 4:00 p.m. at the Ivy's house. (Ex 3, R.1483-84.) Ella testified that Mr. Savory allegedly stated (1) he had accidentally cut James Robinson, (2) that James Robinson and Connie Cooper were dead, and (3) that Cooper's baby was in the oven, a statement he later retracted and told Ella that the baby was in the bedroom. (Ex. 3, R.1480-87.) Ella Ivy also testified she had attempted to watch the news and purchase a newspaper to confirm Mr. Savory's alleged story but was unable to do so, and that a black knife fell out of Savory's pockets during one of their conversations. (*Id.*)

Yet Ella Ivy has recanted much of her testimony at trial. In particular, Ella Ivy has signed an affidavit stating that (1) she never heard Savory make any comments about how the victims were killed, (2) she never heard Savory say anything about the baby being in the oven, (3) she never saw Savory with a knife and one did not drop out of his pocket, and (4) she doesn't recall going to purchase a newspaper on the day of the murders. (Ex. 11.) Ella Ivy explains that she "was confused about different facts of this case" because of hearing rumors, being interviewed by police numerous times, and feeling pressured to testify that Mr. Savory was responsible. (*Id.*)

Moreover, Ella Ivy's testimony is at odds with the evidence of Johnnie Savory's movements on January 18th. In particular, Ella testified that her conversations with Mr. Savory occurred around 3:00 p.m. and again around 4:00 p.m. (Ex 3, R.1483-84.) Yet, as Tina Ivy

27

testified at trial, she and Mr. Savory left the Ivy home around 2:30 p.m. to catch a bus to go to their late afternoon school.  (Ex 3, R.1513-14.)  Mr. Savory's movements after he boarded the bus with Tina are accounted for.  Mr. Savory's probation officer Percy Baker testified at the first trial that he saw Mr. Savory in his office from 3:00 p.m. until 3:30 p.m. on the afternoon of the 18th.  (Ex. 1, R. 952-53.)  The principal at the late afternoon school Mr. Savory was attending told police in 1981 that Mr. Savory arrived at the school around 4:00 p.m. and stayed until almost 5:00 p.m.  (Ex. 32; Ex. 3, R. 1569-71.).  As discussed above, Mr. Savory was next seen at the crime scene by police and reporters.  Further, Ella's brother, Frank Ivy testified that that he arrived at home from school around 3:45 p.m. and Mr. Savory was not at the residence when he got home.  (Ex. 3, R.1493-94.)  Mr. Savory could not have been at the Ivy home making incriminating statements to Ella Ivy at the same time he was at school.

Like her two siblings, the sole police report recounting an interview with Ella Ivy close to the time of the crime in 1977 contains no mention of the admissions that Ella Ivy later testified to in her 1981 trial testimony.  (Ex. 30.)  Indeed, on cross examination at the second trial, Ella Ivy had initially told police that she "wasn't for sure" she remembered anything about the case and that she discussed her testimony with Officer Cannon and prosecutors no fewer than four of five times before her testimony at trial.  (Ex 3, R.1487-88.)

### B.    The Physical Evidence Does Not Establish Mr. Savory's Guilt.

In addition to the Ivys' testimony, the State presented a limited amount of physical evidence alleged to connect Mr. Savory to the crime.  In particular, the prosecution claimed that (1) a bloodstain on a pair of blue pants linked Mr. Savory to the crime scene; (2) hair found at the scene was "similar" to Mr. Savory's hair; and (3) Mr. Savory or his father owned a knife that "might" have had trace amounts of blood.  None of this evidence demonstrates that Mr. Savory is

28

connected to these murders, and in fact – as discussed above – other physical evidence demonstrates that someone else is responsible for the murders.

### 1.    The Blue Pants.

At both trials, the prosecution claimed that Connie Cooper's blood was found on a pair of pants Mr. Savory allegedly wore while committing the crime. However, substantial evidence exists that, not only did the pants not belong to Mr. Savory, the blood allegedly found on the pants was not from Connie Cooper but Mr. Savory's father.

In the first instance, the pants did not even belong to Johnnie Savory. Rather, as Mr. Savory's father, Y.T. Savory, testified at both trials, the pants belonged to him and not Mr. Savory. (Ex. 1, R.867-70, Ex. 4, R.1710, R.1715-17.) Indeed, contrary to the later claims at trial, the police officers initially investigating the case thought it improbable that Mr. Savory wore the pair of blue pants while committing the crime. As a January 26, 1977 police report filed by Officer John Fiers states, "In the opinion of these officers, it is not probable that Mr. Savory would be wearing his father's pants due to the considerable size difference." (Ex. 27.) Officers Fiers and Jatowski both testified at trial that the size of the pants were for a full-grown man, and not a 14 year old boy. (Ex. 2, R.1407-08; Ex. 2, R.1442-43.)

Regardless of who the pants belong to, there is also substantial doubt about the source of the bloodstain. As Mr. Savory's father told police at the time they collected the pants at his house, the source of the blood on the pants was a cut on his leg that Mr. Savory's father had sustained two weeks earlier. (Ex 27.) At both trials, Y.T. Savory testified that that injury had been the source of the bloodstain on the blue pants. (Ex. 1, R.868-70; Ex. 4, R.1715-16.)

Testing conducted at the time of trial to determine whose blood was on the pants was inconclusive. Both Y.T. Savory and Connie Cooper had Type A blood. (Ex. 1, R.682-683,

R.975; Ex. 38 (Item 23); Ex. 40.) Likewise, the blood on the pants was identified as Type A blood. (Ex. 38 (Item 59); Ex. 1, R.689; Ex. 2, R.1469-70.) At a 2002 deposition, the criminalist who performed the original analysis in this case, Robert Gonsowski, testified that the testing he conducted on the bloodstain would include *both* Y.T. Savory and Connie Cooper as potential sources of the blood but could not exclude either as the source. (Ex. 8 at 44-45.)[6] At the first trial, Gonsowski testified that he did not conduct further testing in an attempt to identify the subgroup of the blood on the pants. (Ex. 1, R.719.) At his deposition, Gonsowski expanded on this testimony stating that in 1977 there was no reliable test he was trained to perform to eliminate either Mr. Savory's father or Connie Cooper as the source of the stain. (Ex. 8 at 22-24; 27-28; 43-45.)

As discussed above, the blue pants were among the pieces of evidence subject to DNA testing by the August 2013 order of the Circuit Court in Peoria. However, when the pants were examined for testing, the alleged bloodstain that was the basis for testimony at the 1981 trial had apparently been cut out of the pants and could not be located for testing. More significantly, however, was that this recent testing did not identify the presence of blood in the area of the pants were the stain had alleged to have been located, and testing on other stains did not find the presence of blood. (Ex. 42 (Items 59A to 59E1); Ex. 43 (Item 59A1 to 59E1); Ex. 7 at 38-42, 153-54, 162-66.) This is also significant given the amount of blood at the crime-scene. If Mr. Savory had been wearing those pants as the state has theorized, they would have had significantly more blood than just the small stain that can no longer be analyzed.

---

[6] Gonsowski's deposition was taken in the context of litigation brought by Johnnie Savory against the Illinois State Police under the Freedom of Information Act to obtain the original laboratory worksheets that recorded the tests conducted on the blue pants. After conceding that there was no valid basis to withhold the worksheets, the Illinois State Police were unable to locate the original worksheet of the testing performed by Mr. Gonsowski on the blue pants.

SAVORY-LL-005013

### 2.    Hairs Found In Bathroom Sink.

The second item of physical evidence that the prosecution claimed linked Mr. Savory to the crime scene was hairs found in the sink and bathtub at the Robinson home. As Robert Gonsowski testified, the extent of his examination of those hairs in 1977 would have been a side-by-side microscopic comparison of the samples found at the scene and samples taken from Johnnie Savory. (Ex. 8. at 35; Ex. 1, R.691-92.) These tests purportedly allowed Gonsowski to make a visual comparison and determine only that the hair samples were "similar," but he could not definitively testify that they could have only come from Mr. Savory or that the hairs were "identical" to Mr. Savory. (Ex. 2, R.1474-75; Ex. 1, R.705-06.) The validity of this type of microscopic examination has long been questioned and, in 2009, the National Academy of Sciences determined it was unreliable. (Ex. 47 at 171 ("The committee found no scientific support for the use of hair comparisons for individualization in the absence of nuclear DNA).)

### 3.    The Pocket Knife.

The prosecution also paraded a pocket knife obtained from Y.T. Savory around the courtroom claiming that it was the murder weapon. Yet, the tests performed on the knife indicated only the possibility that that it had trace amounts of blood, and could not definitively determine that blood was actually on the knife. (Ex. 2, R.1476; Ex. 1, R.706.) No testing could be performed to determine with certainty that that it actually was blood, that it was human blood, or to determine the blood type. (Ex. 8; Ex. 38 (Item 44).) Furthermore, Mr. Savory's father, Y.T. Savory, testified that he had used that very knife to cut the stitches he received for his leg wound. (Ex. 1, R.872-73.) Most recently, testing on the knife did not find the presence or blood or yield any interpretable DNA profiles. (Ex. 42 (Items 44A, 44A1, 44B, 44B1); Ex. 43 (Items 44A1, 44B1); Ex. 7 at 38-42, 153-54, 162-66.)

### 4.    Other Physical Evidence Establishes Innocence.

Other physical evidence collected in 1977 also excludes Mr. Savory.  As noted, Mr.

Savory sought to test hairs found in the hands of both victims that may have come from the

murderer.  While the State has lost that crucial evidence, analysis in 1977 determined that those

hairs did not come from Mr. Savory.  (Ex. 38 (Items 31, 69); Ex. 39 (Items 75-83).)  Moreover,

at least one hair found on Connie Cooper's bed sheets was determined in 1977 not to have come

from either victim or Mr. Savory.  (Ex. 38 (Item 9); Ex. 39 (Items 75-83).)  This is yet further

evidence that someone else other than Mr. Savory committed this crime.

### C.    The Prosecution Improperly Introduced Other Alleged Inconsistent Statements And Claimed Mr. Savory's Exercise Of His Right To Silence Was Evidence Of Guilt.

The final evidence of Mr. Savory's guilt offered by prosecutors were statements Mr.

Savory allegedly made to the police that the State claimed showed knowledge of the crime as

well as claims that Mr. Savory's refusal to talk to police at various points during his interrogation

were in and of themselves evidence of guilt.

Regardless of the content of the allegedly inconsistent statements made by Mr. Savory,

the Second District Appellate Court ruled that such statements were unreliable and introduced in

violation of *Miranda v. Arizona. People v. Savory,* 105 Ill.App.3d 1023, 1029 (2nd Dist. 1982).

The Illinois Appellate court also ruled that use of Mr. Savory's exercise of his right to remain

silent as evidence of his guilt was also improper.  *Id.* at 1031-32.  However, both the Illinois

Appellate Court, and later the Seventh Circuit, determined these errors were harmless in light of

the testimony of the Ivys and other physical evidence described above, both of which have been

discredited.  *People v. Savory,* 105 Ill.App.3d 1029; *United States ex rel. Savory v. Lane*, 832

F.2d 1011 (7th Cir. 1987).

Irrespective of the constitutional issues, however, there are also serious questions about whether any of the alleged statements – even if actually made by Mr. Savory – actually reflect any incriminating knowledge of the crime scene. The State has long claimed guilt because Mr. Savory supposedly told police that he and James Robinson had eaten corn the night prior to the murders, while at the second trial Peoria Coroner's physician, Dr. Phillip Immesoete testified that the victims had eaten corn that morning because the stomach contents of both victims included kernels of corn. (Ex. 3, R.1590.) However, the stomach contents – testified to for the first time by Dr. Immesoete at the second trial in 1981 – are not reflected anywhere in the autopsy reports for either victim (Exs. 33-35), the accompanying toxicology reports (Exs. 35-36), and were not noted in Dr. Immesoete's testimony at a 1977 Coroner's inquest (Ex. 15). This raises serious questions about this testimony. Indeed, the Chief Medical Examiner of Macomb and St. Clair Counties in Michigan, Dr. Daniel J. Sptiz, has reviewed records and testimony in this case and opined that it would be standard to document such findings in any autopsy report, and it raises serious questions about whether Dr. Immesoete's opinions were "influenced by others or based on factors other than the autopsies that he conducted in this matter." (Ex. 13 ¶¶ 22, 25.) Accordingly, not only was evidence of Mr. Savory's alleged statements improperly admitted, but they simply does not constitute evidence of guilt.

33

## CONCLUSION

Mr. Savory served 30 years in prison, innocent of the crime charged for which he was convicted. For all of these reasons described in this petition, Johnnie Savory respectfully requests that the Governor exercise his power of executive clemency and grant Johnnie Savory a pardon that recognizes his innocence as contemplated by 735 ILCS 5/2-702(h).

Respectfully Submitted,

Johnnie L. Savory

By _____
     One of His Attorneys

Christopher Tompkins
JENNER & BLOCK  LLP
353 N. Clark St.
Chicago, Illinois 60654
312/840-8686 (v)

Dated:  July 25, 2016.

SAVORY-LL-005017

### PETITIONER'S DECLARATION

I declare under penalty of perjury that all of these assertions made in this petition are complete, truthful and accurate.

_____
Johnnie L. Savory

Subscribed and sworn to before me
this 25th day of _July_, 2016

_____
Notary Public

OFFICIAL SEAL
KRISTY M. WILSON
Notary Public - State of Illinois
My Commission Expires 12/21/2019

SAVORY-LL-005018

**AFFIDAVIT OF SERVICE**

I, Christopher Tompkins, an attorney, under penalty of perjury certify that on July 22, 2016 I sent an original copy of the foregoing Supplemental Petition for Executive Clemency on Behalf Of Johnnie L. Savory and Appendix via United Parcel Service overnight courier for filing with:

> The Illinois Prisoner Review Board
> 319 E. Madison
> Suite A
> Springfield, Illinois 62701

and served copies on the following persons by United Parcel Service overnight courier:

> The Honorable Stephen A. Kouri
> Chief Judge
> Circuit Court for the Tenth Circuit, Peoria County
> Peoria County Courthouse
> 324 N. Main Street, Room 215
> Peoria, Illinois 61602

> Jerry Brady
> State's Attorney, Peoria County
> Peoria County Courthouse
> 324 N. Main Street, Room 111
> Peoria, Illinois 61062

Christopher Tompkins

Subscribed and sworn to before me
this 25ᵗ day of July , 2016

Notary Public

> OFFICIAL SEAL
> KRISTY M. WILSON
> Notary Public - State of Illinois
> My Commission Expires 12/21/2019

SAVORY-LL-005019

FLEMING-POTTER CO.

1500 5275 6-76

**IN THE CIRCUIT COURT OF THE TENTH JUDICIAL CIRCUIT OF ILLINOIS**

PEORIA COUNTY

# FILED

JUVENILE DIVISION

NOV 1 2 1976

LESTER C. GERBER
Clerk Of The Circuit Court
Peoria County, Illinois

IN THE INTEREST OF

JOHNNY SAVORY

CASE NO. 76J 2542

a minor

## CONTINUANCE ORDER

Date of Hearing: **November 8, 1976**

Respondents and Parties Present: **None present**

Attorneys Present:

People of State of Illinois — **Joseph M. Gibson**

Attorney for Minor —

Attorney for Respondent

Attorney for Respondent

Caseworker or Probation Officer Present:

The above-named parties, respondents and attorneys being present in the Peoria County Juvenile Court

on this date, and these persons having been served with a copy of the Juvenile Petition of _____

_____ **October 7, 1976** _____, and the parties and respondents having been advised of their rights in

this matter as per Section 1-20 of the Illinois Juvenile Court Act by the Court,

IT IS HEREBY ORDERED that the Juvenile Petition of _____ **October 7, 1976** _____ is

continued _____ **by agreement of all parties** _____ to

_____ **November 22, 1976 @ 10:30 a.m.** _____ for the purpose of: _____

☐ Reviewing the Petition and all previous orders

☐ Possible dismissal of the Petition if all parties continue to cooperate with the counseling agency.

☐ Having an adjudicatory hearing on the Petition.

☒ Having a dispositional hearing on the Petition.

☐ Accomplishing legal notice on all parties and/or getting an answer from all parties so that a final order
may be entered.

☐ Allowing the counseling agency assigned to this case an opportunity to further intake or investigate this
matter.

☐ Other: _____

Date Entered: _____ **11/12/76** _____

_____

JUDGE OF THE TENTH JUDICIAL CIRCUIT COURT

Received by: _____

EXHIBIT # 3
WIT: SAVORY
DATE: 6-15-22
Nick D. Bowen, CSR

CONFIDENTIAL -
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 17-CV-204

**PEORIA_SAVORY 25541**

SOCIAL HISTORY

IDENTIFYING DATA:

Name:  Johnnie L. Savory
Birthdate:  July 25, 1962  Age 14
Address:  1011 W. Hurlburt Peoria, Illinois
Court Number:  76 J 2542
Natural Mother:  Deceased
Natural Father:  Y.T. Savory
Step Parents:  NONE
Date of Hearing:  October 11, 1976
Petition:  Delinquent
Petitioner:  Lt. Marteness Peoria Police Department
Investigator:  Teresa Hulslander

PRESENT PROBLEM:

Johnnie was made a Delinquent Ward of the Court after admitting in Court to his
involvement in the offense of Theft occurring on or about October 4, 1976.

The petition states that, "he did exert unauthorized control over property of Doris
Packman, being one Wards 10-speed, blue girls' bike, having a total value of
less than $150.00, with the intent to deprive said Doris Packman permanently
of the use and benefit of said property."

The police reports state that Mr. Y.T. Savory reported to police that Johnnie
had stolen a bicycle.  Johnnie was arrested and taken to Peoria County Juvenile
Detention Center.

Johnnie told police that he stole the bike because he wanted to be arrested.  He
said he feels as though he is a burden to his father and by taking the bike and
being arrested he would be out of the house.

PREVIOUS PROBLEMS:

Johnnie has been arrested for the follwoing offenses:

10/2/76 Theft - Shoplifting (Woolworths)
5/9/76 Burglary (no force)
1/29/76 Burglary This offense was subject of a Delinquent petition signed by
        the Peoria Police Department
12/10/75 Investigation other Investigation

        Johnnie was arrested for carrying 7 shirts from Sears and 2 guns from
        Murray's.

Johnnie has been a Suspect for the following offenses

6/2/76 Theft from a building

5/13/76 Aggravated Assault Johnnie was involved in fight with Mark Burks.

3/22/76 Theft (stereo)

3/7/76 Battery Simple Johnnie admitted to hitting Michael Wright.

1/29/76 Burglary  Residence - No force

10/24/75 Shoplifting (Woolworths) Johnnie was caught stealing candy

8/13/75 Burglary Johnnie reportedly broke into Burk's home.

8/3/75 Theft Stole $185.00 from his father.

7/2/75 Burglary

7/11/75 Criminal Damage to Property

CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 3 CV 204

PEORIA SAVORY 25542

2

6/8/75 Robbery - Strong Arm

4/10/75 Attempted Theft - Shoplifting (Del Farm) caught stealing candy

Also there are 16 Runaway reports on Johnnie.

## THE FAMILY:

Father: Mr. Y.T. Savory age 57 was born on January 13, 1919 in Mississippi. Reportedly, he has a fourth grade education, doesn't have a police record, and has not served in the military services. Johnnie related to worker that Mr. Savory has a serious drinking problem. Currtnely he is unemployed but stated he is looking for a job.

Mother: Johnnie's mother has been deceased since Johnnie was 8 months old.

Siblings: Johnnie has one sister, Louise. She is 15 years old, severely retarded, and epileptic. She currently attends Allied Agency during the day. Worker recently was informed by the State's Attorney office that Louise is a possible rape victim. If further details are desired contact the state's attorney office.

## MARITAL HISTORY OF PARENTS:

Reportedly, Mr. and Mrs. Savory were married for 6 years before she died.

## FAMILY INTERACTION:

Johnnie reported to worker that he cares a great deal for his sister Louise but seems to have mixed feelings about his father. Johnnie feels that his father drinks too much and isn't home enough with him and Louise. It is worker's opinion that there is basically little or no positive interaction between Johnnie and his father. Reportedly there have been no social activities shared by father and son.

## RESIDENCE:

The Savory family lives in a 5 room home which they rent.

## FINANCIAL STATEMENT:

The Savory's financial situation is poor. Reportedly, the family income include 70.00 a week unemployment compensation and 260.00 monthly paid for Louise. The only reported expense is $135.00 monthly rent payments.

## RELIGION:

NONE.

## CHILD'S HISTORY:

Education: Johnnie's academic achievement is very poor. Grade school records reveal a few C's and the rest all D's and F's. In February 1976, Johnnie was release from Roosevelt Grade School. Johnnie's current grade results from Late Afternoon High School will be forthcoming. They will subsequently be attached to this report. Reportedly his attendance is very poor.

On February 10, 1975 the Wechsler Intelligence Scale for Children - Revised (WISC - R) was given to Johnnie. Results found Johnnie to be functioning within the "Dull NOrmal" range of intelligence. Results: Verbal IQ 81, Performance IQ 86, and Full scale IQ of 82.

C-17

CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 17 CV 104 1

PEORIA SAVORY 26543

3

Reportedly the primary problems involve Johnnie's attitude and behavior. Constant aggressive and disruptive behavior's have presented extreme problems in the classroom. School authorities feel that many of his misbehaviors appear to be attention seeking devices.

INTERESTS AND ACTIVITIES:

Johnnie reports that he enjoys football, baseball, running, boxing, go carts, motor bikes and bicycling.

HEALTH:

Physical: Johnnie appears to be in good health. However, he recently has been into a fight involving a black male, Mark Burks age 14. Johnnie's injuries consisted of a badly bruised wrist, shoulder, and ear. The following day he was back to report he had been in another fight with the same boy. Reportedly, Johnnie was hit in the head with a brick in which Johnnie was taken by ambulance to Methodist Hospital. Reportedly, ther have been no complications suffered from these injuries.

The most recent health report (10/4/73) reveals normal findings. There were no restrictions placed on any activities at school.

Emotional: On October 12, 1976 after a number of unkept appointments, Johnnie attempted to take the MMPI. Johnnie had a very hard time reading and comprehending the easiest questions. Therefore, Johnnie was told that he didn't have to finish it.

On November 5, 1976, an appointment was made with Dr. Anthony Perino for November 12 at 2:00p.m. Johnnie was contacted about his appointment and was even given an appointment card as a reminder. On the 12th Johnnie did not call or show up for his appointment. There has been no cooperation from Johnnie concerning any testing or keeping any of his appointments. He has proved to worker to be a very irresponsible, young man.

RESOURCES:

NONE.

INDIVIDUALS AND AGENCIES CONTACTED:

Dr. Phillip Lawless
Late Afternoon High School
Dr. Anthony Perino
Peoria Police Department
Mr. Elton Bryson
Y.T. Svaory
Johnnie Savory

CONTACTS:

Dr. Phillip Lawless October 12
Late Afternoon High School October 13, 15
                              November 10, 12
Dr. Anthony Perino November 5,12
Peoria Police Department October 15
Mr. Elton Bryson October 12, 13
Y.T. Savory October 11, 12, 20 November 17
Johnnie Savory October 11, 12, 13, 20
                November 10, 17, 18

C-13

CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER
ENTERED IN CCV-284

PEORIA-SAVORY 25544

4

SUMMARY AND EVALUATION:

Johnnie is a normally developed 14 year old black male. He resides with his natural father and one sister. His father reportedly is an alcoholic and is not in the home much of the time. Therefore, worker believes that this environment has been a very bad influence on Johnnie and his behavior. (See past police contacts). It is the belief of this worker that Johnnie pretty well does as he pleases, as he has not had any strict rules placed on him.

Johnnie recently has had problems with fighting with 14 year old Mark Burks and 15 year old Wayne Burks. Johnnie was hospitalized for a severly bruised arm, shoulder, and ear. Reportedly, he was knocked unconscious with a brick which was thrown by Mark. After many lies about the incident, Johnnie admitted to starting the fight. Mark Burks and his grandmother recently has related that Johnnie is continuing to try to pick fights with Mark and Wayne by following and teasing them.

The major problem areas in Johnnie are: his tendency to constantly fight, his lack of proper supervision, his negative attitude, poor grades, attendance, behavior in school, and reluctance to keep probation appointments. (When he has shown up, its been of his own choosing).

It therefore is the opinion of this worker that constant supervision is mandatory for Johnnie if probation has any chance of providing successful intervention.

RECOMMENDATION:

Johnnie should be given a chance at probation under the guardianship of Juvenile Court Services. He should at the present time remain in the home and placed under the supervision of the Intensive Contact Unit.

One of the first goals of the Probation Unit should be insistence in his keeping arranged probation appointments. If he fails to cooperate, he should be made to face some punitive consequence. For example: 1 or 2 nights stay at Peoria County Juvenile Detention Center.

Johnnie should be seen at least twice a week. Encourage him to raise his grades and attend school regularly.

Psychological testing is necessary and should be iniated as soon as possible. Referral should be made to Mental Health Clinic for psychological testing and theraputic intervention.

Possibly work with him and the Burk's brothers on talking out their problems. Make them realize the seriousness of these fights.

Respectfully Submitted,
Teresa Hulslander
Investigator

TH:sc
11/22/76

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

PEORIA SAVORY 26545

11-1 76

Johnnie is a
very poor student,
uncooperative &
does very little
work.

Reported from
Nate Afternoon High
-School.

PURSUANT TO PROTECTIVE ORDER
ENTERED IN 17 CV 264

PEORIA_SAVORY 25546

**SUPPLEMENTARY REPORT -/ / PEORIA POLICE DEPARTMENT**
**CONTINUATION SHEET**

77-01588

| Page 3 of 7 Pages | 0112 | 1-26-77 | | | 77-01588 |

Murder B

| 1 | C/V | James Robison | 3033 W. Garden St. |
| 2 | A O S | Savory, Johnny Lee | 1011 N. Hurlburt |

CONTINUATION SHEET ONLY ☐  NARRATIVE  1-26-77
1250 hrs.

This officer was advised by Percy Baker, probation officer for the above arrested, that the arrested was requesting to talk with this officer in the office of the Juvenile Lt. Percy Baker stated that the arrested had told him that he was willing to tell this officer everything about this case. He further stated that the arrested requested to talk with this officer alone.

When this officer entered the office, the arrested stated that he wanted this officer to write everything down that he said as he told his story. This officer agreed to do so and listened to the following story: The arrested stated that on Sunday, 1-16-77, he went to the Krogers Store in Madison Park Shopping Center with Ray Mason and Rosemary (no last name given) at approximately 2030 hrs. After arriving at the store, they all observed the two victims in this case shopping at the store. An agreement was made for the arrested and his friends to give the two victims a ride to their home. On the way to the victims home, Ray Mason was showing off his driving skills to impress victim Connie. Connie sat next to the arrested in the back seat on the way home. The two victims were dropped off at their house where they met at the door by the mother and step-father. The arrested and the other two parties then proceeded to Rosemary's house to get some bowls for a party. Tye then went to Rays house for a party. The arrested stated that he left the party at approximately midnight.

On Monday, 1-17-77, the arrested got up at home and did the usual things. He went to Georgie's house (no last name given but it is a female who lives on Second Street) and visited her. He then went to Tina's house about 0900 hrs. and she told him to come back. He then left and went downtown with Georgie's daughter, Darlene Harris. He left her downtown and went to see his probation officer, Percy Baker. The arrested left his probation officers office at approximately 1530 hrs. and went to school. The arrested saw victim James at school break at approximately 1700 hrs. and again at 1830 hrs. when school was over. They sat together on the bus and victim James asked the arrested to come to his house. The arrested

| | | | M. Brown | 697 | Juv: | 1-C-84 | | 153 |

Officer M. Brown

718

PEORIA_SAVORY 785  616

EXHIBIT # 4
WIT: SAVORY
DATE: 6-15-22
Nick D. Bowes, CSR

| Page 2 of 7 Pages | NARRATIVE: | FIELD COMMUNICATIONS | HRS. |
|---|---|---|---|

ATTACH PROPERTY TAG HERE

FIELD COMMUNICATIONS: ☐ Flash Message ☐ LEADS/NCIC Inquiry ☐ LEADS/NCIC Entry ☐ License Inquiry ☐ Inter-Dept. Requests ☐ Other Communication ☐ Cancellation Mess.

agreed to do so and they arrived at approximately 1900 hrs.

Victim James took a house key out of the mail box and opened the front door. The arrested stated that this was a dumb place to keep a key. Victim James and the arrested then had something to eat and drink. They then placed a bet on card drawing and Victim James won $2. They then started wrestling in a friendly bout and They bet $4 on who was the better wrestler. Victim James threw the arrested three times and then the arrested got the victim in a bear hug. They then played with some sticks used in karate for a while. The arrested then called Marva Jones and told her he knew where her husband was but he stated that he just made this up to play a trick on her. The arrested and victim James then went to a chicken place across from Madison Park shopping center and they each carried a weapon-victim James carried a black nightstick and the arrested carried a metal pole. While at the chicken place, they observed a boy named Melvin who lives next door to Marva. They thought he called them some names so they called him some names also and chased him to his house. They hit on Melvins door with their clubs. They then left and returned to James's house. Victim Connie was home as were her parents. The boys wanted the parents to judge who was better at drawing cards for a while. While they were wrestling around again, the arrested hit the victim James in the chest with his hand and the victim kicked the arrested in the rear end. The arrested stated that he left the victims house at approximately 2300 hrs. He then went to Ray Masons house for a while and arrived home at approximately midnight. He then went to bed and woke up at approximately 0830 hrs. on Tuesday 1-18-77.

The arrested then went to Darlene Harris's house for a while and then to Ella Mae Ivy's house at 1103 W. First Street. He then left there in a green Mustang with Roy Brown and got a ride to Ray Masons house and arrived there at approximately 1000 or 1100 hrs. While there, he got his hair braided by Bobbie Mason, Roy's sister. He then went to Tina Ivy's house and at approximately 1330 hrs. when he arrived, he took her to school. When they got down town, it was approximately 1500 hrs. The arrested left Tina and went to his probation officer's office until about 1600 hrs. He left there and went to school and got kicked out for throwing a book across the room at approximately 1630 hrs. The school them contacted Sherman Jones, another of his probation officers, and made arrangements for the arrested to come to the office the next day. The arrested then went to Marva Jones's house at approximately 1700 hrs. by bus. He then left to go get victim James and when he got near the house, he observed the police cars there. He asked what had happened of several of the officers and no one would tell him. He then took the bus and went to Georgie's house because he wanted to hear the news. However, he did not stay there and went to Tina's house and heard the news. that his friend and his sister had been killed.

The arrested then stated that he went home Tuesday night. On Wednesday, he did not go see his probation officer as he was supposed to. On Thursday, he did go to see his probation officer and on Friday he tried to find out information as to who the murderer was. He heard various stories and went and got drunk.

At the conclusion of this narrative, this officer asked the arrested questions about his story in the presence of his probation officer, Percy Baker. The arrested stated in answer to this officers question that Ray had left on Wednesday after the murder and went to Chicago. The arrested also stated that when he was at Rays house on Tuesday that Ray was wearing blue jeans, black shoes and no shirt. The arrested stated that he had no conversation with Ray while he was at the house on Tues.

This officer asked the arrested what he thought of the victim, Connie. He stated that she was a very attractive girl and that he saw no sense to someone killing her. He stated that he was scared totalk with her because of his poor past relationships with girls. He stated that on Monday before the murders, he wanted to wait around the house for Connie to come home so he could rap with her but he and victim James want to get some chicken instead. He also stated that he could swear that it was not Connie in the coffin at the funeral because she looked about 100 years old. When the arrested and the victim James returned to James's house on Monday night after eating, Connie was home but he did not rap with her then because her parents were there. The arrested stated that of all the girls he had gone out with in the past, he would not tell any of them that he loved them but he would have liked to tell Connie that he loved her. He also stated that he was turned on by her rear end and that when he first saw her on Sunday night at the store, he thought that she was only 14 or 15 years old.

PEORIA_SAVORY 786     617

PEO_SAV 786

**SUPPLEMENTARY REPORT — / PEORIA POLICE DEPARTMENT**
**CONTINUATION SHEET**

| Page | of | 7 Pages | | 77-01588 |

| Murder B | | 0112 | 1-26-77 | |

| 1 | | | Robison, James | | 3033 W. Garden St. | |
| 2 | A O 5 M/M | | Savory, Johnny Lee | | 1011 W. Marlburt | |

CONTINUATION SHEET ONLY ☐ ·   NARRATIVE

He also asked James on Monday who the little baby belonged to at his house and when James told him it was Connie's baby, he was surprised because he thought it might be a sister of hers.

This officer asked the arrested if he had made a phone call to Ray's house on Tuesday morning. He stated that he was at Darlene Harris's house between 0900-0930 hrs. and called Ray's house. Ray answered the phone and the arrested said hi, let me talk to your sister. At this point, the arrested said that Ray asked him who that time girl was that they had taken home on Sunday night and what was her phone number. The arrested stated that he did not know and told this officer that he would not have given Ray the phone number even if he know what it was. The arrested then talked with Ray's sister on the phone and told her that he would be over about 1030 hrs. so she could braid his hair and she agreed to this. When the sister hung up the phone, the mother was listening on the extension and asked the arrested to bring her $10 if he had it so she could pay a bill. The arrested stated that he would do this because she buys him clothes sometimes.

This officer then asked the arrested if he had gone to the victims house on Tuesday and took the key from the mailbox and let himself in. The arrested denied this. This officer asked the arrested what trousers he had on Tuesday, the day of the murders. He stated that he was wearing blue trousers and that htey were at home either on the dresser or behind the bed.

This officer was advised by Percy Baker that the arrested had told him that he had agreed to go visit victim James on the morning of the murders but that the arrested had neglected to tell that to this officer for some reason. This officer asked the arrested what he was supposed to do if he went there on Tuesday morning. The arrested stated that he was going to visit victim James and also planned to rap with Connie if he got a chance.

During questioning, this officer had the arrested remove a blue hat he was wearing. When this officer took the hat from him (because he was playing with it during the questioning) there were several small spots of a reddish substance on the hat. This officer turned the hat over to Officer Jatkowski of the lab when Officer Jatkowski collected the other clothes and shoes from the arrested. During the latter part of the questioning of the arrested, this officer was joined by Officer Fiers in the

| | | | M. Brown | 697 | Juv. | 1C-84 | R. Piaske | 153 |
| | | Officer M. Brown | | | | | | |

PEORIA_SAVORY 787   618

PEO_SAV 787

| Page | of 7 Pages | NARRATIVE: | FIELD COMMUNICATIONS | HRS. |
|---|---|---|---|---|

ATTACH PROPERTY TAG HERE

☐ Flash Message
☐ LEADS/NCIC Inquiry
☐ LEADS/NCIC Entry
☐ License Inquiry
☐ Inter-Dept. Requests
☐ Other Communication
☐ Constitution Made

office for part of the questioning. These officers advised the arrested that we did not believe he was telling the complete truth in regard to this case. The arrested denied that he had not told the truth despite the fact that discrepancies in his stories were pointed up to him such as that the Mason family denied that the arrested was at their house on Tuesday at any time.

During the above questioning, the arrested was allowed to go to the bathroom, smoke, and eat meals.

1800 hrs.
1-16-77

This officer, Officer Fiers and Probation officer Percy B.ker transported the arrested to Dennis Jenkins polygraph office and the arrested was administered a polygraph examination by Mr Eddie Bowers. At 1975 hrs. Bowers exited the polygraph room and informed this officer that the arrested was requesting to talk about the two murders in this case and wanted specifically to talk with this officer. Bowers also stated that the arrested had told him that he had killed the two victims in this case.

At 1935 hrs. this date, this officer entered the polygraph examination room and asked the arrested what it was he wanted to tell this officer. The arrested stated the following: "We were practicing karate and Scoopie turned the TV to the wall. He was punching me with his finger and then he raised his hands. (The arrested held his hands up with his elbows bent in a position similar to the one victim James had assumed. The arrested had the knife and stuck him. He fell. My mind went blank. I tried to get him up. She came in and looked and came at me. Then I lost control. I cut her. I don't know how I did it. I ran home and I got drunk. I stayed drunk for four days and did not come home at all."

This officer then asked the following questions and received the following answers from the arrested:

1. Was it your knife?
A. Yes.

2. Q. Do the police have the knife?
A. Yes.

Q. Where did you cut her?
A. I started at the chest and her vagina (arrested points between his legs) and around her mid-section (arrested makes a cutting motion across his abdomen horizontally.

Q. What clothes did you have on?
A. Blue pants that are at home now, unknown shirt, sweatshirt that was taken by the lab officer today and the blue jacket taken by the lab officer also." This blue jacket was removed after entering the victims house and was not put back on until the arrested left the house.

Q. Why did you do it?
A. We started off playing and he wanted me to practice with a knife. I did not mean to do it.

Q. Did Scoopie have a knife?
A. No.

How did you get in the house?
A. Scoopie let me in.

PEORIA_SAVORY 788

619

## SUPPLEMENTARY REPORT / CONTINUATION SHEET / PEORIA POLICE DEPARTMENT

77-01588

Page 5 of 7 Pages

Murder B    0112    1-26-77

| | | | | | |
|--|--|--|--|--|--|
| 1 | C-V | Robison, James | 3033 W. Garden St. | | |
| 2 | A O S N-B | Savory, Johnny Lee | 1011 W. Hurlburt | | |

**CONTINUATION SHEET ONLY**    **NARRATIVE:**

At this point the arrested stated that he did not want to stay at the polygraph office and talk so he was immediately returned to the Juvenile Bureau by this officer, Officer Fiers and Percy Baker.

Upon arriving at the Juvenile bureau, the arrested was taken into the Lt. office and questioning resumed in regard to this case. The arrested was questioned by this officer and Percy Baker. At first the arrested stated that he did not kill the two victims in this case and he did not know why he had told this officer and Mr. Bowers that he had done the murders. The arrested was advised that this officer and Percy Baker believed that he was trying to backtrack and change his story. The arrested was informed that some details would have to be clarified in regard to the statements he made to this officer in the polygraph office.

The arrested then agreed to answer questions truthfully regarding the details of this incident. The arrested stated that he went to the victims house at approximately 0930 hrs. on the date of this murder. He had been at his home on Hurlburt prior to going to the victims house. When he arrived at the victims house, Scoopie answered the door and let him in. The arrested and Scoopie started a friendly match that consisted of wrestling and karate. Prior to starting this, Scoopie moved the television. Scoopie was wearing dark trousers but the arrested did not recall what kind of top he was wearing. The arrested stated that they wrestled and practiced karate in the living room and in the kitchen. The arrested stated that he did not see anyone else in the house at that time. The victim and the arrested were wrestling and laughing and having a good time while they were doing this. The arrested stated that victim James was standing with his back to the wall in the living room and suddenly threw his hands up as he had demonstrated to this officer earlier and had the middle finger of his right hand pointed out as if to jab the arrested with it. The arrested stated that if the victim had hit him with that finger in the neck for instance, it would have cut off his air and made him fall on the floor. The arrested stated that at that time he had the knife in his hand (right). The arrested stated that the reason for victim he had the knife was that the victim wanted to teach him about self-defense via karate against a knife. The arrested stated that he swung his hand in toward the

M. Brown    487    Juv.    1-6-99    153
Officer M. Brown

PEORIA_SAVORY 789    620
PEO_SAV 789

| Page 6 of 7 Pages | NARRATIVE: | FIELD COMMUNICATIONS | HRS. |
| --- | --- | --- | --- |



PEORIA_SAVORY 791

PEO_SAV 791



| Page | of | Pages | NARRATIVE: | FIELD COMMUNICATIONS | HRS. |
|---|---|---|---|---|---|
| | | | | ☐ Flash Message | |
| ATTACH PROPERTY TAG HERE | | | | ☐ LEADS/NCIC Inquiry | |
| | | | | ☐ LEADS/NCIC Entry | |
| | | | | ☐ License Inquiry | |
| | | | | ☐ Inter-Dept. Request | |
| | | | | ☐ Other Communication | |
| | | | | ☐ Cancellation Made | |

PEORIA_SAVORY 792

622