# Exhibit S

**Page 1**

```
 1           IN THE UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF ILLINOIS
 3                   EASTERN DIVISION
 4   JOHNNIE LEE SAVORY,        )
 5             Plaintiff,       )
 6     vs.                      )  No. 17-CV-00204
 7   WILLIAM CANNON, as         )
 8   Administrator for the      )
 9   Estate of CHARLES          )
10   CANNON,                    )
11             Defendants.      )
12        The videotaped deposition of JOHNNIE LEE
13   SAVORY, called for examination pursuant to the
14   Rules of Civil Procedure for the United States
15   District Courts pertaining to the taking of
16   depositions, taken before MARY ELLYN D'ANDREA,
17   taken at 141 West Jackson Boulevard, Chicago,
18   Illinois on February 17, 2023, at the hour of
19   1:00 p.m.
20
21
22
23   REPORTED BY:  MARY ELLYN D'ANDREA, CSR
24   LICENSE NO:   084-002318
```

**Page 2**

```
 1   APPEARANCES:
 2        LOEVY & LOEVY
 3        BY:  MR. LOCKE E. BOWMAN, III
 4        BY:  MS. LINDSAY HAGY
 5        BY:  MR. STEVEN ART (via zoom)
 6        311 NORTH ABERDEEN
 7        3rd FLOOR
 8        CHICAGO, IL, 60607
 9        312-243-5900
10        Locke@loevy.com
11        Lindsay@loevy.com
12        Sart@loevy.com
13
14             And
15
16        PEOPLE'S LAW OFFICES
17        BY:  MR. G. FLINT TAYLOR, JR.
18        BY:  MR. BRAD THOMSEN
19        1180 NORTH MILWAUKEE AVENUE
20        CHICAGO, IL, 60622
21        773.235-0070
22        Flint.taylor10@gmail.com
23        Brad@peopleslawoffice.com
24             Representing the Plaintiff;
```

**Page 3**

```
 1   APPEARANCES:
 2        THE SOTOS LAW FIRM
 3        BY:  MR. JAMES G. SOTOS
 4        BY:  MR. KYLE CHRISTIE
 5        141 WEST JACKSON BOULEVARD
 6        SUITE 1240-A
 7        CHICAGO, IL, 60604
 8        630-735-3300
 9        Jsotos@jsotoslaw.com
10        Kchristie@jsotoslaw.com
11             Representing the Defendant.
12
13   ***ALSO PRESENT:  JOHN D'ANDREA, VIDEOGRAPHER***
14
15
16
17
18
19
20
21
22
23
24
```

**Page 4**

```
 1                  I N D E X.
 2   WITNESS                          EXAMINATION
 3   JOHNNIE LEE SAVORY
 4     BY MR. SOTOS                        7
 5
 6
 7
 8
 9
10               E X H I B I T S
11   NUMBER                       MARKED FOR ID
12   SAVORY Deposition Exhibit
13     (Exhibits 1-26 pre-marked and retained)
14
15   Exhibit No. 27                       89
16   Exhibit No. 28                      194
17   Exhibit No. 29                      202
18     (Exhibits 27-29 marked and retained)
19
20
21
22
23
24
```



1        THE VIDEOGRAPHER:  Good afternoon.  My
2    name is John D'Andrea, Legal Video Specialist
3    with McCorkle Litigation Services located in
4    Chicago, Illinois.
5        I am the videographer on Friday,
6    February 17, 2023 for the recording of the
7    deposition of Johnnie Lee Savory being taken at
8    141 West Jackson Boulevard in Chicago, Illinois.
9    at the time of 13:11 in the matter of Johnnie
10   Lee Savory versus William Cannon et al., filed
11   in the United States District Court for the
12   Northern District of Illinois, Eastern Division,
13   Case No. 17 CV 00204.
14       Will Counsel please identify themselves
15   for the record beginning with Plaintiff's
16   Counsel, and the court reporter, Mea D'Andrea
17   will swear in the witness.
18       MR. TAYLOR:  Flint Taylor.  That's
19   F-l-i-n-t, Taylor for Mr. Savory.
20       MR. BOWMAN:  Locke, L-o-c-k-e, Bowman
21   on behalf of Savory.
22       MS. HAGY:  Lindsay, L-i-n-d-s-a-y,
23   Hagy, H-a-g-y, on behalf of Mr. Savory.
24       MR. THOMSEN:  Brad Thomsen on behalf of

5

1    Mr. Savory.
2        MR. SOTOS:  Jim Sotos on behalf of the
3    Defendant.
4        MR. CHRISTIE:  Kyle Christie on behalf
5    of the Defendants.
6             (Whereupon, the witness was duly
7                  sworn.)
8        MR. TAYLOR:  One brief thing, Jim, as
9    I'm sure you're aware this is the continued
10   deposition of Johnnie Savory pursuant to Court
11   Order, and the Judge has delineated the topics,
12   and I'm sure you're familiar with the topics, as
13   we are, and we hopefully will just proceed in
14   that manner.
15       MR. SOTOS:  That's the plan.
16       MR. TAYLOR:  Okay.  Good.
17       MR. SOTOS:  Let the record reflect this
18   is the deposition, the continued deposition of
19   the Plaintiff, Johnnie Savory, taken pursuant to
20   notice and in accordance with all applicable
21   rules.
22
23
24

6

1        JOHNNIE LEE SAVORY,
2    having been first duly sworn, was examined and
3    testified as follows:
4             EXAMINATION
5    BY MR. SOTOS:
6    Q.   Mr. Savory, thank you for being here.
7        This is your second go around for your
8    deposition, correct?
9    A.   Yes, sir.
10   Q.   Do you recall last time being kind of
11   given all the ground rules by Ms. Schroeder?
12   A.   Somewhat, yes.
13   Q.   Do you need me to repeat all those?
14   A.   Yes, I would like you to.
15   Q.   All right.  Well, you know, this is a
16   question and answer session, so you should
17   understand that I'll be asking questions, let me
18   finish my questions, and then you give your
19   answer.  I will try and let you finish your
20   answer before I ask another question.
21       If you don't understand any of my
22   questions, let me know.  If you do answer the
23   question, I'll assume you understood it.
24       If you want to take a break, just let

7

1    me know, I'm just going to ask you not to take a
2    break while there is a question pending.
3        Try to make your answers verbal.  We
4    will all have a tendency to shrug our shoulders,
5    or say you uh-huh, ugh-ugh when we communicate,
6    but if you do that here, the court reporter
7    won't be able to take it down.
8        So, you know, it will probably happen
9    once in awhile anyway, but just try to be as
10   verbal as you can.
11   A.   Yes, sir.
12   Q.   Okay.  All right.
13       So, I have -- I have a stack of
14   exhibits there that I asked your Counsel to
15   place in front of you.  We are going to try and
16   just run through those in the time that's
17   allotted.  We've got a four hour window here,
18   and we are going to try and go through those as
19   best we can.  All right.
20       MR. SOTOS:  So, if you could take the
21   -- if you could just give him the first one,
22   Deposition Exhibit No. 1.
23       You can even put the stack in front of
24   him, or give them to him one at a time, it's up

8

1  to you.
2          MR. TAYLOR:  We will share them.
3  BY MR. SOTOS:
4      Q.  Mr. Savory, do you have an injury, or
5  --
6      A.  -- no, I need my glasses to be able to
7  see it.
8      Q.  I brought mine, too.
9          MR. BOWMAN:  I think that there are
10  some folks on zoom, so maybe just identify this
11  for the record so the folks can now follow.
12          MR. SOTOS:  Sure.
13  BY MR. SOTOS:
14      Q.  So, while you're getting your glasses
15  ready, let me state, your lawyer, your Counsel
16  has placed in front of you a document that has
17  been marked Exhibit No. 1 for your second
18  deposition.  It's Bates stamped Savory 5763
19  through 5766.  It's January 25, 1977 report of
20  Defendant, Cannon.
21          So, are you able to see that okay?
22      A.  Yes.
23      Q.  So, I'll, just -- let me just tell you
24  this is a report that purports to summarize your
                                              9

1  first interview at the Peoria Police Department
2  when you were brought into the Department by
3  Defendants, Pinkney and Haynes and then
4  interviewed by Defendants Cannon and Fiers; do
5  you remember that?
6          MR. BOWMAN:  Object to the form of the
7  question.
8  BY MR. SOTOS:
9      Q.  Yeah, there may have been other
10  officers there.  So, do you remember your first
11  interview at the Peoria Police Department on
12  January 25?
13      A.  Somewhat yes.
14      Q.  All right.  I just want to ask you some
15  questions sir about that particular interview.
16      A.  Yes, sir.
17      Q.  Okay.  According to the report, you
18  told the officers who were interviewing you, and
19  this is in the first paragraph that you had
20  known Scopey all of his life.
21          Is that -- as far as you know today a
22  generally accurate statement of what you said?
23          MR. TAYLOR:  Objection to form.
24
                                              10

1  BY MR. SOTOS:
2      Q.  You can answer.
3      A.  Okay.  In my last deposition I think I
4  said I known him since third grade.
5      Q.  Since third grade.  All right.
6      A.  Yes, sir.
7      Q.  And according to the report you stated
8  that you had also known Connie and said that she
9  had changed your diapers?
10          MR. TAYLOR:  Same objection.
11  BY MR. SOTOS:
12      Q.  Do you recall stating that to the
13  officers?
14      A.  No.
15      Q.  Okay.  Is it that you don't recall
16  saying it, or are you saying that you did not
17  say that?
18      A.  I did not say that.  I did not know
19  Connie.
20      Q.  Okay.  So, do you have any idea where
21  the officers may have gotten that information
22  from to include it in the report?
23      A.  No, sir.
24          MR. BOWMAN:  Objection on form.
                                              11

1          MR. TAYLOR:  Objection --
2          MR. SOTOS:  -- there must have been
3  something wrong for the question for them both
4  to object at the same time.
5          MR. TAYLOR:  Different grounds.
6  BY MR. SOTOS:
7      Q.  As far as you know, do you know of any
8  place where the officers would have gotten that
9  information other than through their
10  conversation with you?
11      A.  No, sir.
12          MR. BOWMAN:  Objection, foundation.
13  BY MR. SOTOS:
14      Q.  All right.
15          MR. BOWMAN:  Johnnie, will you wait for
16  just a minute so I get an objection out.  Thank
17  you.
18  BY MR. SOTOS:
19      Q.  So, I'm still on the first paragraph of
20  the report right now.
21          The next line says, Johnnie states that
22  he has been to Scopey's house on numerous
23  occasions including the house on Garden along
24  with the residence on Rice Street.
                                              12



1        Did you tell the officers something
2   along those lines during the interview?
3        MR. TAYLOR:  Objection to the form.
4   BY MR. SOTOS:
5        Q.   You can answer.
6        A.   Would you repeat that again?
7        Q.   Sure.  According to the report, the
8   report says that Johnnie states that Scopey
9   was -- yeah, that Scopey -- I'm reading the
10  wrong line.
11       The report states that Johnnie states
12  that he has been to Scopey's house on numerous
13  occasions including the house on Garden along
14  with the residence on Rice Street.
15       Did you state that to the officers that
16  day?
17       A.   No, sir.
18       Q.   Okay.  Did you know that Johnnie Lee --
19  excuse me, that Scopey lived at one point in his
20  life on Rice Street?
21       A.   No.
22       Q.   Had you ever been to his house on Rice
23  Street?
24       A.   No.

13

1        Q.   Had you ever been to his house on
2   Garden prior to January 17th, 1977?
3        A.   No.
4        Q.   So, just to be clear, it's your
5   testimony that you did not tell that to the
6   officer?
7        A.   Yes, sir.
8        Q.   According to the report you said that
9   Scopey was your best friend.
10       Did you tell the officer that?
11       A.   Yes.
12       Q.   Did you tell the officer that you
13  attended school with Scopey at Loucks,
14  L-o-u-c-k's School?
15       A.   Yes.
16       Q.   And did you tell them that you were
17  attending the late afternoon high school with
18  Scopey?
19       A.   Yes.
20       Q.   Did you tell them that you arrived at
21  the school on Monday January 17th at around 3:30
22  and met with Scopey?
23       MR. TAYLOR:  Objection to form.
24       THE WITNESS:  What day did you say?

14

1   BY MR. SOTOS:
2        Q.   January 17th, the day before they were
3   killed.
4        A.   Yes.
5        Q.   Okay.  And did you tell them that you
6   attended school and were released at 6:30 at
7   which time you walked to Jefferson Street and
8   boarded the bus with Scopey?
9        MR. TAYLOR:  I'm going to object to the
10  form, because it has multiple pieces to that
11  question.
12  BY MR. SOTOS:
13       Q.   Did you understand the question okay?
14       I am referring to the second to last
15  sentence in the first paragraph where it says
16  Johnnie states they attended school and was
17  released at 6:30 when they walked to Jefferson
18  Street and boarded the bus?
19       A.   I know we boarded the school bus, yes.
20       Q.   Okay.  Were you released from school at
21  6:30?
22       A.   Yes.
23       Q.   And did you tell the officers that?
24       A.   Yes.

15

1        Q.   Okay.  And did you tell the officers
2   that you then took the bus to 3033 West Garden
3   Street where Scopey lived?
4        A.   Yes.
5        Q.   All right.  Did you tell the officers
6   that when you arrived at the house, that you saw
7   Scopey reach into the mailbox to pull out a key?
8        A.   I don't recall that.
9        Q.   You don't remember, or you didn't say
10  that?
11       A.   I don't -- I don't recall.
12       Q.   Do you remember arriving at the house
13  and reaching in the mail and seeing Scopey take
14  the key of the mailbox?
15       A.   No.
16       Q.   You don't remember that happening?
17       A.   No, I don't.  No, I did not see him or
18  say that.
19       Q.   Okay.  I just want to make sure I'm
20  clear.  You don't remember if you saw that now,
21  or you're saying that didn't happen?
22       A.   I did not see him reach in no mailbox.
23       Q.   Do you remember, as you sit here today,
24  how he got into the house?

16

1     A.   I believe -- I believe it was a
2  doormat.
3     Q.   He got the key under the doormat?
4     A.   I believe that's where he got the key.
5     Q.   And you think -- do you believe, as you
6  sit here today, that that's what you told the
7  officers?
8     A.   About what I just said?
9     Q.   Yeah, about where he got the key from?
10    A.   Yes.
11    Q.   All right.  Can you turn to the second
12 page, because you'll be pleased to hear that
13 we're not going to go line by line through the
14 entire report.  We'll cover a good deal of it.
15         In the first full paragraph on the
16 second page it states, that after entering the
17 house that you and Scopey went into the living
18 room, and Scopey moved the coffee table to on
19 top of the chair located on the north wall --
20         MR. TAYLOR:  -- objection, form.
21 BY MR. SOTOS:
22    Q.   Do you see where it states that, the
23 first sentence in that first full paragraph?
24    A.   No.

17

1     Q.   You're saying no, you didn't say that?
2     A.   I did not say that.
3     Q.   But you see where the report says that?
4     A.   I see where it says that.
5     Q.   Did you say anything to the officers in
6  regard to anyone moving the coffee table after
7  you entered the house?
8         MR. TAYLOR:  Objection.  Just for
9  clarification, Jim, you're talking about any
10 officer, or just this officer at this time
11 that's reflected in the report?
12         MR. SOTOS:  Right now I'm asking about
13 this -- when he talked to the first officer the
14 first time you went to the police station.
15 BY MR. SOTOS:
16    Q.   Did you make any statement about anyone
17 moving the coffee table?
18    A.   46 years ago -- can you give me a
19 minute?  It's 46 years, almost 50 years ago.
20    Q.   If you don't remember, you can say
21 that.  I understand it's been awhile.
22    A.   Yes, but not --
23    Q.   -- go ahead.  I didn't mean to cut you
24 off there.

18

1     A.   Yes, but I don't remember what officers
2  I was talking to at the time.
3     Q.   Okay.  At some point you made a comment
4  -- a statement to some officer about the coffee
5  table --
6     A.   -- yes --
7     Q.   -- you just don't remember exactly when
8  or who?
9     A.   Yes.
10    Q.   Okay.  What do you remember saying to
11 some officer about the coffee table?
12    A.   We moved it because we were playing and
13 wrestling, and we just didn't want to
14 accidentally bump into the table.
15    Q.   Right.
16    A.   The same as in my last deposition.
17    Q.   Okay.  And then the next sentence says
18 that you told the officers that Scopey took the
19 portable TV set off of the table and placed it
20 on the floor so that it wouldn't be broken.
21         MR. TAYLOR:  Objection, form.
22 BY MR. SOTOS:
23    Q.   Do you recall telling the officers
24 that?

19

1     A.   No.
2     Q.   Okay.  Now, you never told any officer
3  that at any time?
4         MR. TAYLOR:  Objection, form.
5         THE WITNESS:  No.
6  BY MR. SOTOS:
7     Q.   Did you ever make a statement to any
8  police officers about the movement of the
9  television set after you entered the house?
10    A.   Are you asking -- well, could you say
11 that question again?
12    Q.   Did you ever say anything to any
13 officer about the TV set being moved anywhere
14 after you went to the house with Scopey on
15 January 17th?
16    A.   As I stated, we did not physically
17 remove the television from the stand, so no.
18    Q.   Okay.  You didn't take -- did you move
19 the stand with the TV set on it?
20    A.   The stand had wheels on it, so just
21 pushed it to the side, that's about it, we
22 didn't pick it up or --
23    Q.   -- you just pushed it aside?
24    A.   There you go.

20

Johnnie Lee Savory 02/17/2023

1    Q.   Okay.  And did you turn it around so
2 that it faced the wall?
3    A.   I'm not sure.
4    Q.   Where did you push it from?
5    A.   Just a few inches in the living room
6 just, you know, we were playing in the middle of
7 the living room.
8    Q.   So, you just moved it a couple inches?
9    A.   It seemed like it.  I couldn't imagine,
10 I don't know exactly, it wasn't that far.
11    Q.   Okay.  So, why did you move it at all?
12    A.   Because we were playing and wrestling,
13 you know, just like little boys do.
14    Q.   So, did you move it far enough that it
15 wouldn't be in the way when you were wrestling?
16    A.   I mean, it's a small house, so we
17 didn't bump into it; let me just say that.
18    Q.   According to the report in the next
19 sentence you said that, according the report,
20 the officer wrote that you said that Scopey then
21 went to his bedroom and got a black nightstick
22 and karate sticks which were attached by a
23 chain; do you see that?
24        MR. TAYLOR:  Objection, form -- you

21

1 didn't ask the question --
2        MR. SOTOS:  I'm just asking -- you're
3 getting ahead of yourself.
4        MR. TAYLOR:  Yeah, you got it.
5 BY MR. SOTOS:
6    Q.   Do you see that statement in there?
7    A.   Yes, I see the statement.
8    Q.   Is that what you told the officers?
9    A.   No.
10        MR. TAYLOR:  Let me get my objection
11 in.  That was an objection to form.
12 BY MR. SOTOS:
13    Q.   Did you tell the officers anything
14 about Scopey at any point getting a nightstick
15 and karate sticks when he was in the house?
16    A.   No.
17    Q.   Did Scopey ever have a nightstick or a
18 karate stick when you were with him on January
19 17th?
20    A.   I believe, to the best of my knowledge,
21 that I seen those sticks when Officer Cannon
22 showed me pictures of the home and the crime
23 scene.
24    Q.   That's the first time you ever saw

22

1 those sticks?
2    A.   To the best of my knowledge, yes.
3    Q.   So, you didn't -- you didn't see them
4 while you were wrestling -- play wrestling with
5 him then, right?
6    A.   No, we were just playing.
7    Q.   How about when you went to Marva Jones'
8 house that evening, did you bring any sticks
9 with you?
10    A.   No, sir.
11    Q.   Did Scopey have any sticks with him?
12    A.   No, sir.
13    Q.   Okay.  Did anyone have -- did you tell
14 the officers that either you or -- not you --
15 did you tell the officers that Scopey had a
16 knife at the house on January 17th?
17        MR. TAYLOR:  Objection as to form.
18        Are you referring to at any time, or
19 from the report?
20 BY MR. SOTOS:
21    Q.   At any point in time did you ever tell
22 an officer that Johnnie -- not Johnnie -- that
23 Scopey had a knife on January 17th?
24    A.   Not to my recollection.

23

1    Q.   Did you know Scopey to occasionally
2 carry a knife prior to January 17th?
3        MR. TAYLOR:  Objection, form.
4 BY MR. SOTOS:
5    Q.   Had you ever seen Scopey carry a knife
6 during all the years that you knew him?
7    A.   No.
8    Q.   And you were close friends, right?
9        MR. TAYLOR:  Objection to form.
10        THE WITNESS:  I considered us to be.
11 BY MR. SOTOS:
12    Q.   Okay.  So, did you ever tell these
13 officers, or any officers, that you and Scopey
14 had identical knives that you had purchased at
15 Murray's for a dollar 49?
16    A.   No.
17    Q.   You never said anything to any officer
18 about you or Scopey having a knife, or buying a
19 knife?
20    A.   No.
21    Q.   The next paragraph it says that after
22 practicing, Johnnie went to the bathroom where
23 he combed his hair.
24        Do you remember telling the officers,

24

1  any officer that at any time?
2        MR. TAYLOR:  Objection to form.
3        THE WITNESS:  No.
4  BY MR. SOTOS:
5     Q.  Do you remember ever having a
6  conversation with any officer in regards to
7  combing your hair at Scopey's residence on
8  January 17th?
9     A.  Not to my recollection.
10    Q.  You're not saying that that didn't
11 happen, you just don't remember it as you're
12 sitting here today?
13    A.  I'm saying --
14       MR. BOWMAN:  -- objection, form.
15 BY MR. SOTOS:
16    Q.  Is that correct?
17    A.  I'm saying I don't remember.
18    Q.  All right.  You remember telling the
19 officers that you and Scopey left at one point
20 and went to Marva Jones' house, apartment?
21    A.  Yes.
22    Q.  Okay.  And that did happen, correct?
23    A.  Yes.
24    Q.  Okay.  And when you got to her house,

25

1  neither one of you was holding any kind of an
2  stick or anything of that nature?
3        MR. TAYLOR:  Objection to the form.
4        THE WITNESS:  No, sir, neither one of
5  us.
6  BY MR. SOTOS:
7     Q.  Then you went for chicken with
8  Johnnie -- with Scopey?  Sorry.
9     A.  Yes.
10    Q.  All right.  And did you tell the
11 officers that after getting the chicken you
12 chased somebody named Melvin Hoskins home?
13    A.  No, sir.
14    Q.  Okay.  Are you saying that that didn't
15 happen, or you don't recall telling the officers
16 that?
17    A.  It didn't happen.
18    Q.  Didn't happen.  Did you know a Melvin
19 Hoskins?
20    A.  No, sir.
21    Q.  You don't recognize that name at all?
22    A.  No, sir.
23    Q.  Did you know anybody named Melvin?
24    A.  No, sir.

26

1        MR. TAYLOR:  Objection to form.
2  BY MR. SOTOS:
3     Q.  Do you remember at the time knowing
4  anybody named Melvin?
5     A.  No, sir.
6     Q.  So, you don't have any idea where the
7  officers got that information from?
8        MR. BOWMAN:  Objection, foundation.
9  BY MR. SOTOS:
10    Q.  Is that true; you don't have any idea
11 where the officer got that name from?
12       MR. BOWMAN:  Objection, foundation.
13       THE WITNESS:  No.
14       MR. BOWMAN:  Johnnie, you've got to let
15 me get my objection in.
16       MR. SOTOS:  And then you have to answer
17 it.
18       MR. BOWMAN:  He answered; he said no.
19       MR. SOTOS:  Okay.
20 BY MR. SOTOS:
21    Q.  Do you remember telling the officers
22 that night that Scopey told you he was seeing a
23 25 year old white female?
24    A.  No, sir.

27

1     Q.  Do you remember Scopey ever telling you
2  that?
3     A.  No, sir.
4     Q.  Is it fair to say that Scopey never did
5  tell you that, or you don't remember?
6     A.  I never heard him say that.
7     Q.  Okay.  You got back to Scopey's house
8  around 10:00 or so, correct?
9        MR. BOWMAN:  Objection.  Is this -- are
10 you asking about the report, or are you asking
11 about --
12       MR. SOTOS:  -- I'm just trying to set
13 the stage to move on, so, you know --
14       MR. BOWMAN:  -- okay.  Objection to the
15 form of the question.
16 BY MR. SOTOS:
17    Q.  Okay.  Is that right; did you get back
18 to Scopey's about 10:00 or so?
19    A.  I assume that was about right.
20    Q.  All right.  And you told the officers
21 that?
22    A.  Yes, sir.
23    Q.  All right.  Do you recall telling them
24 that -- well, and Scopey's family was present

28

1  when you got back to the house?
2          MR. TAYLOR:  Objection, form.
3  BY MR. SOTOS:
4      Q.   The -- Scopey's family was present when
5  you got back to the house?
6      A.   Yes.
7      Q.   Okay.  And do you recall what you told
8  the officers you did when you got back to the
9  house?
10     A.   Yes, I believe so.
11     Q.   What do you remember telling them?
12     A.   That we came in, and his mother, step
13 -- his mother, stepfather, he introduced me to
14 them and his sister, and his little -- her
15 little child, his nephew I guess, and we
16 proceeded into the kitchen where we began to do
17 a little artwork.
18     Q.   And that's what you told the officers?
19     A.   Yes, sir.
20     Q.   You said that you told them that
21 Johnnie introduced you to his sister?
22          MR. TAYLOR:  Objection, form.
23 BY MR. SOTOS:
24     Q.   Did you say that -- maybe I misheard

                                          29

1  you, did you say --
2          MR. BOWMAN:  -- objection to the form
3  of the question.
4  BY MR. SOTOS:
5      Q.   Do you remember telling the officers
6  that Johnnie -- excuse me, Scopey introduced you
7  to his sister when you got back to the house
8  that night?
9          MR. TAYLOR:  Same objection.
10         THE WITNESS:  I'm gonna say he
11 introduced me to his entire family that was
12 sitting in the living room.
13 BY MR. SOTOS:
14     Q.   Is that the first time you met his
15 sister?
16     A.   That was the first time I ever met the
17 entire family.
18     Q.   You didn't meet her at -- you didn't
19 see her at a Kroger store a day or two before --
20         MR. TAYLOR:  -- objection.
21         MR. SOTOS:  -- the 17th?
22         MR. TAYLOR:  Didn't mean to interrupt
23 you.  Form, and foundation.
24

                                          30

1  BY MR. SOTOS:
2      Q.   You didn't meet Scopey's sister at a
3  Kroger food store a day or two before the 17th?
4      A.   No, sir.
5      Q.   You weren't there with Ray Mason, and
6  his sister Rosemary?
7          MR. TAYLOR:  Form and foundation.
8          THE WITNESS:  No, sir.
9  BY MR. SOTOS:
10     Q.   Okay.  So, you -- I think you said you
11 were drawing at the house when you went back,
12 and his family was there, correct?
13     A.   Yes, sir.
14     Q.   Okay.  Did you wrestle again?
15     A.   No, sir.
16     Q.   Not at all, not even play wrestling?
17     A.   No, sir.
18     Q.   You left about 11:00, is that right?
19     A.   I believe so.
20     Q.   You told the officers that, correct?
21     A.   I don't remember exactly what time it
22 was, but yes, it was somewhere around there.
23     Q.   Did you go straight home?
24     A.   Yes, sir.

                                          31

1      Q.   And you told the officers that, too,
2  correct?
3      A.   Yes, sir.
4      Q.   Okay.  You didn't -- and when you got
5  home, did you call Scopey again?
6      A.   No, sir.
7      Q.   You didn't?
8      A.   No, sir.
9      Q.   Did you tell the officers that you did
10 call Scopey?
11     A.   No, sir, I don't have no recollection
12 of telling them that.
13     Q.   And that's fine, if you don't recall
14 that's fine.  I'm trying to, you know, draw a
15 distinction between things that you know didn't
16 happen, or things you just don't remember.
17     A.   Okay.
18     Q.   So, for this particular question, is it
19 that you don't recall telling the officers that
20 you called Scopey when you got home that night,
21 or you know that you didn't do that?
22     A.   I know I didn't do it.
23     Q.   You know that you didn't.  So, you
24 didn't tell the officers that you and Scopey had

                                          32



1  made plans for you to return to his house on the
2  morning of the 18th at 8:00?
3       MR. TAYLOR:  Objection to form.
4       THE WITNESS:  No, I have no
5  recollection of that.
6  BY MR. SOTOS:
7       Q.   And beyond not having a recollection of
8  it, is it your testimony that that did not
9  happen?
10      A.   To the best of my knowledge, yes, sir.
11      Q.   Are you entirely sure?  I'm only
12  asking, because you're qualifying it a little.
13      A.   I'm doing the best I can after almost
14  50 years.
15      Q.   No, I get that.
16      A.   Yes, sir.
17      Q.   So -- all right.  In any event, going
18  to the bottom of that page, do you recall
19  telling the officers that you woke up on the
20  morning of the 18th at about 10:00 in the
21  morning?
22      A.   No, sir.
23      Q.   And is it your testimony you didn't say
24  that?

33

1       A.   Yes, sir.
2       Q.   Did you tell them what time you got up
3  in the morning?
4       A.   I believe in my deposition I said I got
5  up at 8 or 8:30.
6       Q.   Right.  And is it your testimony that
7  that's what you told the officers at the police
8  station on January 25th when they interviewed
9  you?
10      MR. TAYLOR:  Objection to form.
11      MR. BOWMAN:  So, this is confusing, now
12  are we talking about the first session?
13      MR. SOTOS:  That's a fair point.
14  BY MR. SOTOS:
15      Q.   During your first conversation with the
16  officers at the Peoria Police Department on
17  January 25th, did you tell them that you woke up
18  at 10:00, or did you tell them that you woke up
19  earlier than that as you had just testified?
20      A.   I testified here under oath that I woke
21  up at 8, 8:30, to the best of my knowledge, from
22  that, that's what I remember.
23      Q.   And is that what you remember telling
24  the officers as well on January 25th during that

34

1  first interview with the Police Department?
2       A.   Yes, sir.
3       Q.   Okay.  And did you tell them that you
4  went to Methodist Hospital to visit your
5  grandmother when you did wake up?
6       MR. TAYLOR:  Objection, form, and
7  foundation.
8       THE WITNESS:  No.
9  BY MR. SOTOS:
10      Q.   You didn't say that?
11      A.   No.
12      Q.   Was your grandmother in the Methodist
13  Hospital on the morning of January 18th?
14      A.   I don't believe so, but I don't know.
15      Q.   Had she have ever -- had she been in
16  the Methodist Hospital at any time near January
17  18th around that timeframe?
18      MR. TAYLOR:  Objection to form.
19      THE WITNESS:  I can't remember her
20  being in there around that time.
21  BY MR. SOTOS:
22      Q.   So, you definitely didn't tell the
23  police officers that she was in there, and you
24  went to visit her on the 18th of January?

35

1       A.   Never, did not.
2       Q.   Moving on to later that afternoon, do
3  you remember telling the officers -- when I say
4  that afternoon, I mean now when you're
5  discussing with the officers the afternoon of
6  the 18th, the day of the murders, do you
7  remember telling the officers that you went to
8  school, and you got kicked out of school for
9  reading a magazine in class?
10      MR. TAYLOR:  Jim, objection.  Just so
11  we're clear, as Locke pointed out before, you're
12  focusing now on this one conversation with
13  Cannon and whomever else?
14  BY MR. SOTOS:
15      Q.   That's -- right now I'm asking you
16  about your first interview with the police
17  officers on January 25th after you left the
18  school and you were at the Peoria Police
19  Department, according to this report on the top
20  of the third page it says that you stated that
21  on Tuesday you got kicked out of school for
22  reading a magazine in class; and I'm asking
23  whether you did tell the officers that?
24      A.   Yes.

36

1      Q.   Okay.  And then you said that you were
2  sent to the principal's office?
3      A.   Yes.
4      Q.   And did you say that while you were in
5  the principal's office, you heard something on
6  the radio about an accident on Garden Street?
7           MR. TAYLOR:  Objection as to form and
8  foundation.
9           THE WITNESS:  No.
10 BY MR. SOTOS:
11     Q.   All right.  And you're certain you
12 never said that?
13     A.   Yes.
14     Q.   Did you then state that you left the
15 principal's office at around 4:30 and caught the
16 bus at Harrison and Jefferson Street?
17     A.   Yes.
18     Q.   And then went to Marva Jones'
19 apartment?
20     A.   Yes.
21     Q.   Okay.  And that's true?
22     A.   Yes.
23     Q.   All right.  Did you tell them that
24 while you were at Marva's house until about

37

1  6:00 p.m. you saw the news on television and
2  recognized the fence that runs along Scopey's
3  house?
4           MR. TAYLOR:  Objection as to form.
5           THE WITNESS:  No.
6  BY MR. SOTOS:
7      Q.   You didn't say that?
8      A.   No.
9      Q.   Okay.  Did you say anything like that?
10          MR. TAYLOR:  Objection as to form.
11          THE WITNESS:  No.
12 BY MR. SOTOS:
13     Q.   Okay.  Did you tell them that from
14 Marva's house you then went to Scopey's house?
15     A.   Yes.
16     Q.   Did you say anything to the officers at
17 that time about why you went to Scopey's house?
18     A.   Yes.
19     Q.   And what did you tell them?
20     A.   That I didn't see him in school, so I
21 wanted to know why he wasn't at school.
22     Q.   Okay.  And you told the officers that,
23 too?
24     A.   Yes.

38

1      Q.   All right.  Did you tell them that when
2  you got to Scopey's house, you saw a number of
3  police officers there -- a number of police cars
4  there, and then you talked to a police officer?
5           MR. TAYLOR:  Objection as to form.
6           THE WITNESS:  Yes.
7  BY MR. SOTOS:
8      Q.   Okay.  Do you remember at some point
9  during this conversation the officer started
10 saying that you were making inconsistent
11 statements; did they confront you with
12 statements that they were claiming you made that
13 were inconsistent with what they knew?
14          MR. TAYLOR:  Objection as to form.
15          THE WITNESS:  Yes.
16 BY MR. SOTOS:
17     Q.   All right.  Do you remember them saying
18 to you that they had checked, and they had
19 determined that you didn't make a call to Scopey
20 when you got home that night?
21          MR. TAYLOR:  Same objection.
22          THE WITNESS:  I don't remember, because
23 it always was two and three officers asking me
24 questions at the same time, so it was so

39

1  confusing.
2  BY MR. SOTOS:
3      Q.   Do you remember any officer saying, you
4  know, we checked --
5           MR. BOWMAN:  -- it seemed like he was
6  still talking.
7           MR. SOTOS:  What, guys --
8           MR. TAYLOR:  -- yeah, we are saying the
9  same thing.
10          MR. SOTOS:  All right.
11          THE WITNESS:  Like I was saying, it was
12 so chaotic and confusing, they said quite a few
13 things to me, you know, inconsistent
14 statement -- just I didn't understand much of
15 what they were doing, but all I know is I wasn't
16 there on the 18th, that's all I know.
17 BY MR. SOTOS:
18     Q.   Do you remember one of those things
19 that they were saying being, you know, we
20 checked, and we don't think you called Scopey
21 when you got home that night; do you remember
22 them saying that to you?
23     A.   They could have, but I don't know.
24     Q.   Did you tell them that I never said

40

1    that I did call him when I got home?
2         MR. BOWMAN:  Objection, foundation and
3    form.
4         THE WITNESS:  I cannot remember all the
5    things, but I know that I couldn't have told
6    them that, because I didn't -- we didn't have a
7    phone, so it just don't make no sense to me, so
8    I don't pretty much know where they got it from,
9    and after being told you're inconsistent and
10   calling me liars and things like that, I really
11   just didn't know what was going on.
12   BY MR. SOTOS:
13        Q.  They asked you to take a polygraph
14   after this conversation, correct?
15        MR. TAYLOR:  Objection, form.
16        THE WITNESS:  Yes.
17   BY MR. SOTOS:
18        Q.  Okay.  Did you agree to take the
19   polygraph examination?
20        MR. TAYLOR:  Objection as to the form.
21        THE WITNESS:  I asked them when can I
22   go home, and they said that I could go home if I
23   take the polygraph test.
24

                                              41

1    only there to see if I could help them, I was
2    not a suspect, and nothing, so they said I might
3    have saw something -- remember something, so I
4    don't know what was going on and didn't know why
5    I had to take the polygraph test, but all I
6    wanted to go home, because I had been there --
7    oh, God for three something -- and I was hungry,
8    just yeah.
9         Q.  Do you remember which officer told you
10   you could go home?
11        A.  No.
12        Q.  All right.  So, you went to the
13   polygraph, correct?
14        A.  Yes.
15        Q.  All right.  And, you know, before that
16   you had mentioned seeing some photos, correct?
17        A.  Yes, sir.
18        Q.  I'm going to show you, or ask you to
19   look at Exhibit No. 3 which is a series of
20   photos.
21        MR. SOTOS:  Could you place that in
22   front of him, please?
23        MR. TAYLOR:  Do you want the court
24   reporter to mark those?

                                              43

1    BY MR. SOTOS:
2         Q.  That was -- because I don't want to
3    confuse you --
4         MR. TAYLOR:  -- I don't think -- I
5    don't know, but I don't think he finished his
6    answer yet.  Have you finished?
7         THE WITNESS:  And then I was going to
8    ask you which polygraph test are you referring
9    to?
10   BY MR. SOTOS:
11        Q.  That's what I was going to say.  I
12   don't want to confuse you, so I want to make
13   sure you understand it.
14        Now, I'm talking about the first
15   polygraph the night of the 25th with Jenkins,
16   not the one on the 26th with Bowers.
17        A.  Okay.
18        Q.  So, for the one on the 25th, did you
19   agree to take that polygraph?
20        A.  Yes, once they said I could go home.
21        Q.  Okay.  And so it was on the 25th where
22   you asked one of the officers if you could go
23   home, and what did they say?
24        A.  They told me I could go home, but I was

                                              42

1         MR. SOTOS:  I marked them.
2         MR. TAYLOR:  Are you okay with that.
3         THE COURT REPORTER:  Yes.
4    BY MR. SOTOS:
5         Q.  Deposition Exhibit No. 3, Peoria-Savory
6    28595 through 28597.
7         So, do those look like the photos that
8    they showed you on the evening of January 25?
9         MR. TAYLOR:  Objection, form.
10        MR. BOWMAN:  Form and foundation.
11   BY MR. SOTOS:
12        Q.  Do those look like photos that you saw
13   on the evening of January 25th?
14        MR. TAYLOR:  Same objections.
15        THE WITNESS:  I don't remember all the
16   photos they showed me.  Officer Detective Cannon
17   showed me tons of them, and -- but these could
18   be some of the same ones, you know.
19        MR. TAYLOR:  Jim, could I ask for
20   clarification a bit on this exhibit?
21        It looks like the first page, is that
22   six pictures in one picture?  I mean, and the
23   second page --
24        MR. SOTOS:  -- they look to me like six

                                              44



1  separate Polaroid pictures and the backs of them
2  on Page 2, and --
3  MR. TAYLOR:  -- okay.
4  MR. SOTOS:  And the third page looks to
5  be bigger version of one of the pictures on the
6  first page with the TV set in it.
7  MR. TAYLOR:  Okay.  Thank you.
8  MR. SOTOS:  And did you put Exhibit 2
9  in front of him, please?
10  MR. TAYLOR:  2.
11  BY MR. SOTOS:
12  Q.  I'm also going to have you look at
13  those pictures in conjunction with the report
14  that your Counsel is going to hand you which is
15  Exhibit No. 2, Savory 5948-5949.
16  MR. BOWMAN:  And this is a report dated
17  in February of '77 by an officer named Haynes.
18  MR. SOTOS:  Haynes, correct.
19  MR. TAYLOR:  I'm not finding that in
20  this stack.
21  MR. BOWMAN:  I have it.
22  MR. TAYLOR:  You got it?
23  MR. SOTOS:  He took it from you.
24  MR. BOWMAN:  I have it.  Would you give

45

1  it to Johnnie?
2  MR. TAYLOR:  Yes.
3  MR. SOTOS:  There should be another
4  one.
5  MR. BOWMAN:  You should give him that
6  one from your stack, and this is our stack here.
7  MR. TAYLOR:  Is this 2?  This is 6.
8  MR. BOWMAN:  That's 6.  Here, Johnnie,
9  go ahead and take this.
10  MR. TAYLOR:  That's 1 -- I don't know
11  where that one is.
12  MR. BOWMAN:  Do you have another stack
13  over there?  Why don't you just hand me that?
14  We're good, Jim.
15  MR. SOTOS:  Okay.
16  BY MR. SOTOS:
17  Q.  So, if you look at that report, Mr.
18  Savory, in the -- this report purports to
19  describe the officer's questions to you about
20  those pictures that are in Exhibit No. 3, and he
21  says that you confirmed that the television set
22  in the picture in the top left-hand corner was
23  the same one that you had mentioned that Scopey
24  had set on the floor on January 17th; do you

46

1  recall doing that?
2  MR. TAYLOR:  Objection, form and
3  foundation.
4  THE WITNESS:  No, I didn't tell them
5  that.
6  BY MR. SOTOS:
7  Q.  All right.  Did you tell him that the
8  rod that's pictured it looks like the bottom row
9  in the middle was -- you thought that it was
10  brown or tan in color, and then you confirmed
11  that that was an object you had seen?
12  MR. TAYLOR:  Objection, form, and
13  foundation.
14  BY MR. SOTOS:
15  Q.  Did you do that?
16  A.  No.
17  Q.  Did you tell him that you recognized
18  the beer can in the picture in the bottom
19  left-hand corner?
20  MR. TAYLOR:  Same objection.
21  THE WITNESS:  No.
22  BY MR. SOTOS:
23  Q.  All right.  So, is it fair to say you
24  didn't confirm to this officers that you

47

1  recognized any of the objects depicted in those
2  photos?
3  MR. TAYLOR:  Objection, form and
4  foundation.
5  THE WITNESS:  No, I didn't, sir.
6  BY MR. SOTOS:
7  Q.  You did not do that?
8  A.  No, sir.
9  Q.  All right.  At the polygraph on the
10  25th that you took with Mr. Jenkins, I think you
11  said during your last deposition he didn't yell
12  at you, correct?
13  A.  Yes, sir.
14  Q.  Okay.  Do you remember how long that
15  polygraph lasted?
16  A.  I don't remember exactly how long time
17  it took.
18  Q.  15, 20 minutes sound right, or do you
19  not remember?
20  MR. BOWMAN:  Objection to the form of
21  the question.
22  THE WITNESS:  It could have been -- I
23  don't know, 30 maybe, I'm not sure.
24

48



1 BY MR. SOTOS:
2    Q.   All right.  That's fine.
3         Do you remember having any problems
4 with Mr. Jenkins during the polygraph as you
5 were interacting with him in terms of how he
6 treated you or talked to you?
7         MR. TAYLOR:  Objection as to the form.
8         THE WITNESS:  No.
9 BY MR. SOTOS:
10    Q.   If you look at Page 2 -- I'm sorry, I'm
11 going to ask your Counsel to place in front of
12 you Exhibit No. 4, and that is a -- purports to
13 be a report of the polygraph, the Bates numbered
14 I can't read on my copy.
15         MR. CHRISTIE:  Do you want me to state
16 it for the record?
17         MR. SOTOS:  Yes.
18         MR. CHRISTIE:  Savory LL005893 to 5895.
19 BY MR. SOTOS:
20    Q.   Okay.  And when you were in this
21 polygraph with Mr. Jenkins, was it just the two
22 of you who were present?
23    A.   Yes.
24    Q.   Okay.

49

1 that?
2    A.   Yes, to the best of my knowledge, no, I
3 don't remember saying that.
4    Q.   Looking at the next sentence, did you
5 tell him that the television set was placed
6 against the wall?
7    A.   No.
8    Q.   Did you tell him that you moved the
9 television set on its rolling table -- or not
10 you, that Scopey moved it on its rolling table?
11    A.   That's what I remember.
12    Q.   All right.  So, you do remember saying
13 that, you just don't -- you just didn't say that
14 it was placed against the wall?
15    A.   Yes, sir.
16    Q.   All right.  Did you tell Jenkins that
17 you had lied to the police when you had told
18 them that the television set was placed on the
19 floor?
20         MR. TAYLOR:  Objection, form,
21 foundation.
22 BY MR. SOTOS:
23    Q.   As reflected in the report?
24    A.   I never told the police officer that it

51

1    A.   Excuse me.
2    Q.   Do you need to get up?
3    A.   Fixing the chair.  It shrunk on me a
4 little bit.
5    Q.   If you need a break at some point, say
6 so.
7    A.   Okay.  No, no, no.  Let's continue.
8    Q.   Okay.  So, it was just the two of you
9 who were present?
10    A.   Yes.
11    Q.   All right.  If you turn to the top of
12 Page 2 of that report, do you recall telling Mr.
13 Jenkins that you and Scopey practice martial
14 arts using karate weapons and acting as though
15 you were fighting?
16         MR. TAYLOR:  Objection as to the form
17 and foundation.
18 BY MR. SOTOS:
19    Q.   Do you recall if you told him -- you
20 see that up at the top of that paragraph, right?
21    A.   Yes.
22    Q.   All right.  Do you recall saying that?
23    A.   No.
24    Q.   And are you saying that you did not say

50

1 was placed on the floor.
2    Q.   So, you would have had no reason to
3 tell Jenkins that you were lying?
4    A.   No, sir.
5    Q.   All right.  Looking at the next
6 paragraph, did you tell Jenkins about chasing a
7 boy named Melvin home from Chad's Chicken?
8    A.   No, sir, I didn't tell him that.
9    Q.   Okay.  Did you tell him that you and
10 Scopey did make arrangements to see each other
11 the following morning, because you were going to
12 contact the girl named Tina who lived in
13 Harrison Homes?
14         MR. TAYLOR:  Objection, form,
15 foundation.
16         THE WITNESS:  No, sir.
17 BY MR. SOTOS:
18    Q.   All right.  Did you know a girl named
19 Tina who lived in the Harrison Homes?
20    A.   No, sir.
21    Q.   Did you tell Mr. Jenkins that you were
22 going to contact Tina because you guys were
23 going to become players, and that when he asked
24 what you meant by players, you said that you

52

1  were going to become pimps?
2          MR. TAYLOR:  Objection, form,
3  foundation.
4          THE WITNESS:  No, sir.
5  BY MR. SOTOS:
6      Q.   You didn't say anything like that?
7      A.   No, sir.
8      Q.   At the time did you have any kind of a
9  plan to become a pimp?
10     A.   No, sir.
11     Q.   Okay.  Was Ray Mason a pimp?
12     A.   I don't know what he was.
13     Q.   Did you ever remember thinking that at
14  the time?
15     A.   No, sir.
16     Q.   Okay.  Did you tell Jenkins that you
17  went to Ray Mason's house on the 17th after
18  leaving Scopey's house?
19     A.   No, sir.
20     Q.   You never said that?
21     A.   No, sir.
22     Q.   Okay.  And did you tell Mr. Jenkins
23  that you were supposed to be at Scopey's house
24  the next morning at 8:00 but ended up sleeping

53

1      Q.   When you went to Scopey's house on the
2  18th, you didn't know they had been killed?
3      A.   No, sir.
4      Q.   Even when you left there, you didn't
5  know they had been killed?
6      A.   No, sir.
7      Q.   There were a lot of police cars there,
8  right?
9      A.   Yes.
10     Q.   Did you know whether they had been hurt
11  or --
12     A.   -- I didn't know anything.  I didn't
13  know what had happened, and didn't nobody
14  explain or say nothing to me about what
15  happened.
16     Q.   And you testified earlier that you went
17  there because he wasn't in school?
18     A.   Exactly.
19     Q.   And I think that was covered in your
20  last deposition --
21     A.   -- yes --
22     Q.   So, I won't do that again.
23     A.   Yes, sir.
24     Q.   So, when you look at the last, this

55

1  in until 10, and then visiting your grandmother
2  in the hospital?
3          MR. TAYLOR:  Objection as to the form.
4          THE WITNESS:  No, sir.
5  BY MR. SOTOS:
6      Q.   Moving on to the next paragraph, did
7  you tell Jenkins that you didn't become aware of
8  the killing until you heard about it on the
9  news, and that you went there and talked to a
10 policeman?
11         MR. TAYLOR:  Objection, form.
12         THE WITNESS:  No.
13 BY MR. SOTOS:
14     Q.   When did you hear about the killing?
15     A.   On the news of the night of the 17th.
16     Q.   You mean the 18th?
17     A.   At 9:00 -- 18th, right.
18     Q.   You meant the 18th, right?
19     A.   Yes.
20     Q.   9:00, and that was when you were at
21 who's house?
22     A.   The Ivy's.
23     Q.   Ivy's house?
24     A.   Yes, sir.

54

1  paragraph we just talked about where it says he
2  did not become aware of the killing until he
3  heard about it on the news; that part is true,
4  correct?
5          MR. TAYLOR:  Objection, form.
6  BY MR. SOTOS:
7      Q.   You did tell Jenkins that, right?
8      A.   Yes.
9          MR. TAYLOR:  Same objection.
10 BY MR. SOTOS:
11     Q.   Okay.  And then when it says and that
12 he went there and talked to a policeman, it's
13 your testimony that you didn't tell him you went
14 there after you heard about it, you went there
15 before you heard about it?
16         MR. TAYLOR:  Form objection.
17         THE WITNESS:  Yes, sir.
18 BY MR. SOTOS:
19     Q.   Fair to say?
20     A.   Yes, sir.
21     Q.   All right.  And when you were there on
22 the scene, did you ask -- there were newspaper
23 reporters there, too, it wasn't just the police?
24     A.   Yes.

56



1    Q.   Okay. Did you talk to any of the
2  police reporters -- excuse me, the, you know,
3  the TV reporters or journalists about what was
4  going on there?
5        MR. TAYLOR: Objection, form.
6        THE WITNESS: No, sir.
7  BY MR. SOTOS:
8    Q.   Okay. And you didn't talk to the
9  police about what was going on there?
10   A.   I asked, but I didn't get no answer, so
11 you know, I mean I just stood around in the
12 crowd like the other people were standing in the
13 crowd.
14   Q.   You asked the police?
15   A.   Yes.
16       MR. TAYLOR: Objection, form.
17 BY MR. SOTOS:
18   Q.   But you didn't ask a journalist, you
19 didn't have any conversation with a journalist?
20   A.   Really didn't know who was journalist
21 who was in there to be truthful, so no.
22   Q.   Okay. Well, the people you asked, did
23 they have police uniforms on?
24   A.   Yes, only one officer though.

57

1    Q.   You just asked one officer?
2    A.   Yeah, I didn't ask.
3    Q.   Okay. So, you didn't ask more than one
4  person about what was going on there at the
5  house?
6    A.   No, sir.
7    Q.   And you were there for how long?
8    A.   It wasn't long, because I had to catch
9  a bus and get back to my side of town, so I
10 don't know, maybe -- I don't know, 30 minutes,
11 40 minutes. It wasn't long.
12       I think the last bus run -- I can't
13 remember exact time, but it wasn't long.
14   Q.   All right. And then you got on a bus
15 and you went where?
16   A.   Went home.
17   Q.   Went home. So, when you got back home,
18 what did you do then on the 17th?
19       MR. BOWMAN: Are we on documents now --
20       MR. SOTOS: -- memory -- okay. I mean
21 we can do that that way, I understand.
22       MR. BOWMAN: I mean, you know, it is
23 what it is. The Judge made that distinction,
24 and I realize it's a little hard, but it does

58

1  feel like you're now going over something that
2  he testified to.
3        MR. SOTOS: I get it. I get it. We
4  will come back to that.
5        Let's go back to the -- I didn't want
6  to jump around, but I think I have to because of
7  some of these issues you're pointing out.
8  BY MR. SOTOS:
9    Q.   Let's go back to when you're
10 interviewed by the officers on the 25th, we
11 talked about the polygraph, you left the
12 polygraph, and what do you recall happening
13 after you left the polygraph, did you go to the
14 police station after that?
15       MR. TAYLOR: Objection. Are we are
16 talking about the first polygraph?
17       MR. SOTOS: Right.
18 BY MR. SOTOS:
19   Q.   After the first polygraph -- you ended
20 up spending the night in the detention home,
21 correct?
22   A.   Yes.
23   Q.   Okay. Were you read your Miranda
24 rights before you were taken there?

59

1    A.   Yes.
2    Q.   All right. And I think you testified
3  in your last deposition that you slept there
4  from about 1:30 until 8:00 in the morning?
5    A.   Yes.
6    Q.   All right. And then when did you first
7  talk to the police that next morning?
8    A.   God, as soon as we got to the station.
9    Q.   Okay. So, I'm going to ask you about a
10 report in a minute that reflects an interview
11 between you and Officer Fiers and Officer Haynes
12 at around 10:15, 10:30 in the morning on the
13 26th, but I don't have any report of any
14 interview before that.
15       Were you talked to by the police before
16 10:15, 10:30 in the morning on the 26th?
17   A.   I don't remember exactly what time it
18 was, but I know it was still early. I hadn't
19 ate no breakfast, no nothing, given nothing, and
20 it seemed like they started in as soon as I --
21 we got to the station. As I said it was always
22 two or three people in there, and they never
23 really let me answer the questions; they was
24 always asking me questions before I could even

60

1  answer them, and just I couldn't process.  I
2  mean I was 14 years old, I couldn't process all
3  that was going on at that time.
4      Q.  I understand.  But I'm asking --
5          MR. TAYLOR:  -- he was still --
6          MR. SOTOS:  -- that's not what I'm
7  asking.
8  BY MR. SOTOS:
9      Q.  I'm not even on the interview yet.
10 When we get to the interview, you can definitely
11 explain it.
12         Now I'm just trying to find out if you
13 remember if you started talking with the police
14 prior to 10:23 in the morning, which is what my
15 report reflects?
16         MR. TAYLOR:  I just want to make it
17 clear, Jim, that I continue to object for your
18 not allowing him to finish his answer.
19         MR. SOTOS:  All right.
20         THE WITNESS:  It seemed as though as
21 soon as we got to the station, questioning
22 began.
23 BY MR. SOTOS:
24     Q.  And do you remember what time you got
                                                    61

1  to the station?
2      A.  When we left the Gift Avenue Detention
3  Center.
4      Q.  All right.  And you didn't have
5  breakfast at the Gift -- all right -- you could
6  have, right, they had breakfast there?
7      A.  No, sir.
8      Q.  They didn't have breakfast available?
9      A.  They had breakfast, they never gave me
10 a chance to get it.
11     Q.  How about the night before, did you eat
12 something the night before?
13         MR. TAYLOR:  Objection, form.
14         THE WITNESS:  They gave me a Snickers
15 and a Dr. Pepper pop.
16 BY MR. SOTOS:
17     Q.  All right.  So, now we're at -- you're
18 at the police station on the 26th, and you said
19 you recall talking to police officers as soon as
20 you got the to the station?
21     A.  Yes, sir.
22     Q.  You can't remember exactly what time,
23 it was 40 something years later?
24     A.  No, sir.
                                                    62

1      Q.  Makes sense.  Okay.
2          Do you remember who the officers were
3  that interviewed you on the morning of the 26th?
4      A.  No.
5      Q.  All right.  Do you remember the officer
6  reading you your Miranda rights before the
7  interview that morning?
8          MR. TAYLOR:  Objection, form.
9  BY MR. SOTOS:
10     Q.  You knew what Miranda rights were at
11 the time, right?
12     A.  Somewhat, yes.
13     Q.  You had a general idea what they were?
14     A.  Yes, sir.
15     Q.  All right.  Do you remember the
16 officers reading them to you on the morning of
17 the 26th?
18     A.  Yes, sir.
19     Q.  All right.  I'm going to ask your
20 counsel to place in front of you Exhibit 6 which
21 is a police report signed by Defendant Fiers,
22 F-i-e-r-s, Savory 5848 through 5850.
23         I'm going to ask you some questions
24 about the report.  Okay.
                                                    63

1          According to the report it says that
2  after an officer read you your Miranda rights
3  that you said you understood them, and you did
4  wish to talk to the officers, is that accurate?
5      A.  No.
6      Q.  Okay.  Do you remember what you said
7  after you were read the Miranda rights?
8      A.  Yes, can I go home.
9      Q.  That's what --
10     A.  -- when am I going home?
11     Q.  Okay.  And did they respond?
12     A.  No.
13     Q.  Okay.  Did you ever say that you
14 understood the rights and you did wish to talk
15 to the officers?
16     A.  No.
17     Q.  Okay.  Can you turn to Page 2 of this
18 report?  Do you see the first full paragraph
19 that starts out with this officer?
20     A.  Um-hm.
21         THE COURT REPORTER:  Yes?
22         THE WITNESS:  Yes.
23 BY MR. SOTOS:
24     Q.  So, I'll just read this into the
                                                    64

Johnnie Lee Savory 02/17/2023

1  record.  According to the report the officer
2  asked you if you had made any statements to
3  Marva Jones, and that you initially denied
4  making any statements to her.
5          Do you remember having a discussion
6  with the officers that morning about any
7  statements you may have made to Marva Jones?
8          MR. TAYLOR:  Objection as to form.
9          THE WITNESS:  It's possible he could
10 have asked me that, and I told him no.
11 BY MR. SOTOS:
12     Q.   Do you remember him -- do you remember
13 the officer telling you that other officers had
14 interviewed Marva Jones earlier that day, more
15 like in the middle of the night between the 25th
16 and the 26th?
17     A.   They could have.
18     Q.   You just don't remember?
19     A.   No, sir.
20     Q.   Do you remember an officer quoting you
21 a statement from Marva Jones where she -- where
22 they claim that she said you told her that he
23 split her stomach wide open, Marva, you should
24 have seen it.  Do you remember the officers

65

1  telling you that that's what Marva Jones told
2  him?
3          MR. TAYLOR:  Objection as to form and
4  foundation.
5          THE WITNESS:  No, sir.
6          MR. SOTOS:  All right.
7          MR. BOWMAN:  Could I have that question
8  back, please?
9               (Whereupon, the record was read
10                 as requested.)
11         MR. BOWMAN:  Thank you.
12 BY MR. SOTOS:
13     Q.   Do you remember that?
14     A.   No.
15     Q.   So, did you ever tell the officers that
16 you did, in fact, say to Marva at some point, he
17 split her stomach wide open, Marva, you should
18 have seen it, you just don't know?
19         MR. TAYLOR:  Objection.  Go ahead.
20         MR. BOWMAN:  Form of the question.
21         MR. SOTOS:  You guys have the same
22 objections, just one if you can do it.
23         MR. TAYLOR:  We want to make sure.
24         MR. SOTOS:  It's confirmatory, it

66

1  suggests there might be an issues there, but
2  beyond that.
3  BY MR. SOTOS:
4      Q.   Do you remember, or did you tell the
5  officers that you did tell Marva he split her
6  stomach wide open, Marva, you should have seen
7  it, you just don't know?
8          MR. TAYLOR:  Same objection.
9          THE WITNESS:  I never made such a
10 statement to anyone.
11 BY MR. SOTOS:
12     Q.   You never said that, and never told the
13 officer you said that?
14     A.   No, sir.
15         MR. BOWMAN:  Objection, compound.
16 BY MR. SOTOS:
17     Q.   All right.  Have you seen this report
18 before today where according to the officer you
19 confirmed that you did make that statement to
20 Marva Jones?
21     A.   I don't remember seeing this report.
22     Q.   Is this the first time -- is this like
23 the first time you remember hearing, other than
24 through conversations with your lawyers, that

67

1  the officers claimed that you admitted saying
2  that to Marva Jones?
3          MR. TAYLOR:  I'm going to object to the
4  form and foundation of that.
5          MR. SOTOS:  It's all right.  We can
6  move beyond it.
7  BY MR. SOTOS:
8      Q.   Go ahead.  Do you want to say
9  something?
10     A.   I just want to make it clear I ain't
11 never made no statement like that to any officer
12 or anyone --
13     Q.   -- right --
14     A.   -- ever.
15     Q.   And you never talked to Marva Jones
16 about that at any time -- I mean did you ever
17 talk to Marva Jones about the -- about Scopey
18 and Connie having been killed at any time?
19     A.   That answer is no.
20     Q.   So you never had a conversation --
21     A.   -- never had a conversation with her or
22 anyone else regarding --
23     Q.   -- okay --
24     A.   -- this case.

68



Johnnie Lee Savory 02/17/2023

1    Q.   Okay.  How about Ray Mason, did you
2  ever talk to Ray Mason about Connie and Scopey
3  being killed?
4    A.   No, sir.
5    Q.   Okay.  Did you finally get something to
6  eat about noon; does that sound right to you, or
7  do you remember?
8         MR. TAYLOR:  Objection, form.
9         THE WITNESS:  It was probably somewhere
10 around that time.
11 BY MR. SOTOS:
12   Q.   Okay.  Steak and Shake hamburger, and
13 if not --
14   A.   -- something like that.
15   Q.   Okay.  All right.  And did you get
16 about a 30 minute break or so in between talking
17 to the first officers in the morning, and then
18 talking to the officers again in the afternoon
19 for lunch -- strike that.  That was a long way
20 of just asking, was the lunch break about
21 30 minutes or so?
22   A.   Don't know how long it was, but let me
23 give my clarification of that.  I can't
24 remember, I know it's not the question, but they

69

1  allowed me to see my dad as I explained in my
2  last deposition, don't know what time, but I'm
3  sure it was before they gave me something to
4  eat, and don't know, as I explained before, what
5  they said to him, but it become so chaotic
6  again, and also they -- after seeing my dad, and
7  they took me back in for questioning, and then
8  they decided to scrub me naked.
9    Q.   We're going to get to that.
10   A.   I'm just saying -- I know you're
11 speeding it up, but a lot of things happened in
12 between lunch and -- I mean I was -- I
13 just didn't --
14   Q.   -- here's why I'm doing that, because I
15 got exactly four hours --
16   A.   -- okay, go ahead.
17   Q.   So, if like I would have asked you
18 about what happened with your dad like you just
19 told me, these guys would have started objecting
20 and saying that was covered last time and --
21   A.   -- okay --
22   Q.   -- and you can't do that, that's the
23 reason I'm trying to move through this and just
24 ask you specific questions about the

70

1  different aspect.
2    A.   Okay.
3    Q.   They didn't object when you started
4  doing it though.
5         MR. TAYLOR:  Objection to you saying
6  what we would have done.
7  BY MR. SOTOS:
8    Q.   Okay.  So, anyway, so yeah, you did
9  cover that in your last deposition about your
10 dad being there, and you weren't able to
11 communicate with him I think you said.
12        So, then you did talk with the officers
13 again after lunch, correct?
14   A.   Yes.
15   Q.   Now, you remember Percy Baker being
16 there when you talked to the officers on the
17 26th at all?
18        MR. TAYLOR:  Objection, form.
19 BY MR. SOTOS:
20   Q.   At any point do you remember Percy
21 Baker being there on the 26th?
22   A.   I can remember him being there, I just
23 don't remember when and where.
24        I don't recall him sitting in on no

71

1  sessions that we had.
2    Q.   At all?
3    A.   Not to my memory.
4    Q.   All right.  So, that's something that
5  you don't remember it; you're are not saying he
6  never did, you just don't remember?
7    A.   I'm saying I ain't never seen him in
8  the police -- in the interrogation room, or
9  whatever kind of room you want to call it, while
10 we were while -- while they was engaging in
11 conversation with me.
12   Q.   So, you're saying he was not there, not
13 just that you don't remember it; you're saying
14 he wasn't there at all?
15   A.   I'm saying he was there, but he was in
16 the present in the interrogation room.
17   Q.   At any point?
18   A.   To my knowledge, at any point.
19   Q.   When you say to my knowledge, I'm not
20 -- if you're saying you don't remember, I
21 understand that, but if you're saying you know
22 that he wasn't there, I'm just trying to figure
23 out which one it is.
24        MR. TAYLOR:  Objection, asked and

72

1  answered.
2  BY MR. SOTOS:
3       Q.   So, you can -- can you clear that up
4  for me?
5       A.   He was never present --
6       Q.   -- all right --
7       A.   -- during any interrogation.
8       Q.   Okay.  And did you see him on the 25th
9  at all, the night before?
10      A.   Yes.
11      Q.   Okay.  In what capacity did you see him
12  then, describe for me how you saw him on the
13  25th?
14           MR. TAYLOR:  Objection to form.
15           THE WITNESS:  He came in right before
16  we were taken into the interrogation -- I mean
17  to the polygraph exam.
18  BY MR. SOTOS:
19      Q.   Before the polygraph?
20      A.   Yes.
21      Q.   Did you have a conversation with him at
22  that point?
23      A.   Briefly he asked me would I go and take
24  a polygraph, and I agreed to go take the

73

1  polygraph test if I could go home.
2       Q.   Okay.  And that was the only
3  interaction you remember with Percy Baker on the
4  25th?
5       A.   Yes.
6       Q.   Okay.  You knew Percy Baker at that
7  time, right?
8       A.   Yes.
9       Q.   What was your relationship with him?
10      A.   He was my -- I was on temporary
11  probation for truancy, so he was my probation
12  officer.
13      Q.   Okay.  Did you feel like you had a good
14  relationship with him, a mutual relationship, or
15  a bad relationship?
16           MR. TAYLOR:  Objection, form.
17  BY MR. SOTOS:
18      Q.   Or how would you describe your
19  relationship with him?
20      A.   He was okay.
21      Q.   Okay.  So, this brief conversation
22  about the polygraph, is that the only
23  interaction you remember having with him on the
24  25th, the first day you were brought in?

74

1       A.   Yes.
2       Q.   Okay.  And then how about the 26th if
3  he wasn't present in the interview or
4  interrogation room at any point, what do -- how
5  do you remember interacting with him on the
6  26th?
7       A.   I believe that he had accompanied us to
8  the second polygraph test, I believe.
9       Q.   On the 26th?
10      A.   Yes.
11      Q.   Is that the first time you remember
12  interacting with him on the 26th?
13      A.   Yes.
14      Q.   Okay.  So, do you remember some time
15  after lunch telling the -- telling whatever
16  officers present that you would tell everything
17  but only to Marcella Brown?
18           MR. TAYLOR:  Objection, form and
19  foundation.
20  BY MR. SOTOS:
21      Q.   Okay.  So, if you look at that report
22  that I've got, the paragraph that starts out at
23  the approximately 12:00; do you see that?  In
24  the fourth line, just read that sentence,

75

1  because -- go ahead.  I'll wait for you.
2       A.   You mean the second paragraph?
3       Q.   Yeah.
4       A.   And what line from the second
5  paragraph?
6       Q.   The fourth line that says, after a
7  short time Johnnie made the statement that he
8  would tell everything, but he would only tell it
9  to Officer Marcella Brown.
10      A.   No, I never made that statement.
11           MR. TAYLOR:  Did you have a question?
12           MR. SOTOS:  That was the question.
13           MR. TAYLOR:  All right.  Objection.
14  BY MR. SOTOS:
15      Q.   So, you didn't make that statement?
16      A.   No, sir.
17      Q.   Okay.  Do you remember saying anything
18  to the officers who were present about talking
19  to Marcella Brown?
20      A.   No.
21           MR. BOWMAN:  Could I hear that back?
22                (whereupon, the record was read
23                 as requested.)
24           MR. BOWMAN:  Thank you.

76



1      THE WITNESS:  No, sir.
2  BY MR. SOTOS:
3      Q.   And you don't remember Percy Baker
4  being present when you said something along the
5  lines of wanting to talk to Marcella Brown?
6      MR. TAYLOR:  Objection, form, and
7  foundation.
8      MR. SOTOS:  I'm not talking about the
9  polygraph now, I'm talking about after lunch on
10 the 26th.
11     THE WITNESS:  As I stated before, Percy
12 Baker was never present during no interrogation.
13 BY MR. SOTOS:
14     Q.   Well, Marcella Brown did come in the
15 room at some point, right?
16     A.   Along with three other officers -- two
17 other officers.  It was always two and three
18 officers, so yes, I remember her coming into the
19 room.
20     Q.   And at some point Marcella Brown was
21 one of them?
22     A.   Yes, sir.
23     Q.   Okay.  And you had not asked for her?
24     A.   No, sir.

77

1      Q.   Did you know her when she entered the
2  room?
3      A.   Yes, sir.
4      Q.   Okay.  From prior contacts you had had
5  with her?
6      MR. TAYLOR:  Objection, form.  I think
7  this was covered in the first depression, Jim.
8      MR. SOTOS:  All right.
9  BY MR. SOTOS:
10     Q.   You knew her anyway?
11     A.   I knew of her, yes.
12     Q.   Okay.  But you weren't expecting her to
13 come in when she did, it was like the first time
14 -- when you saw her, you hadn't asked for her,
15 or weren't expecting her, she just kind of -- as
16 far as you knew, she was just showing up on her
17 own?
18     A.   Yes, sir.
19     Q.   All right.  And then you talked to
20 Marcella Brown and other officers about the same
21 events, correct?
22     MR. TAYLOR:  Objection, form.
23     THE WITNESS:  I just remember a bunch
24 of chaotic conversations, yes, it was -- I was

78

1  pretty much giving up anyway.
2      I mean I don't know what all took
3  place, it was just so confusing because of
4  everything that took place that morning, it was
5  just --
6  BY MR. SOTOS:
7      Q.   -- by that point you were already
8  thinking about giving up when you were talking
9  to Marcella Brown in the afternoon of the 26th?
10     MR. BOWMAN:  Objection --
11     MR. TAYLOR:  -- objection, form.
12 BY MR. SOTOS:
13     Q.   I want to make sure we get the times
14 when this was happening.
15     A.   Yes, as I explained why yes, in the
16 last deposition; it was, you know, people have
17 to understand that I didn't know if I was going
18 or coming because what had all took place.
19     I went through hell for the first few
20 hours, if that makes any sense.
21     Q.   The first few hours on the 26th?
22     A.   Yes, sir.
23     Q.   Okay.  By that point had any officers
24 yelled at you?

79

1      MR. TAYLOR:  Objection.  I think this
2  was all gone over in the prior dep.  Am I right,
3  Locke, or should --
4      MR. BOWMAN:  -- how about we take just
5  a little break.  It's been over an hour, and
6  just 10 minutes.
7      MR. SOTOS:  Sure.  That's fine.
8      THE VIDEOGRAPHER:  The time is 14:27,
9  and we are off the record.
10         (whereupon, a short recess was
11          taken.)
12     THE VIDEOGRAPHER:  We are back on the
13 record, and the time is 14:40.
14     MR. TAYLOR:  Jim, we talked it over,
15 Locke and I, and he corrected me in terms of
16 thinking that you were -- that you could go into
17 that area that I objected to you going into in
18 terms of what was and wasn't kosher, so --
19     MR. SOTOS:  -- right, right, because
20 otherwise I would get there still, it would have
21 to be a roundabout way, but it's all, I think
22 we're going to get there.
23     You know, one of the things that the
24 Court addressed was any place where he said the

80



1  Defendants lied, and so --
2      MR. TAYLOR:  -- okay.
3  BY MR. SOTOS:
4      Q.  Okay.  So when we were back on the
5  record, and Mr. Savory, when we broke I was
6  asking you -- we were starting to talk about the
7  afternoon of the 26th.  You said by this point
8  you were getting to the point you were starting
9  to give up.
10         So, then I asked you whether or not by
11  that point any officer had yelled at you.
12     A.  No.
13     Q.  Okay.  And nobody had physically abused
14  you in any way at that point?
15     MR. TAYLOR:  Objection as to form.
16  BY MR. SOTOS:
17     Q.  Is that true?
18     A.  No, it's not.
19     Q.  You had been physically abused by that
20  point?
21     A.  Yes.
22     Q.  In what way?
23     A.  After being questioned by a couple of
24  the officers and Officer Brown; I believe it was

81

1     Q.  Okay.
2     A.  No, and then after that, I was still
3  naked and gave me an oversized jumpsuit, jail
4  jumpsuit and --
5     Q.  -- you had your underwear on though?
6     A.  He took everything.
7     Q.  Okay.
8     MR. TAYLOR:  He shook his head no.
9     MR. SOTOS:  I understand.  I mean he
10  said it, he said they took everything.  I
11  understand.
12  BY MR. SOTOS:
13     Q.  Okay.  So, when you mentioned Officer
14  Brown wanting your hat, how do you describe that
15  as physical abuse?
16     MR. TAYLOR:  Objection, form.
17     THE WITNESS:  That's what I'm
18  describing as physical -- I'm describing going
19  in the bathroom being scrubbed naked and having
20  hairs plucked from your body and not knowing
21  why.
22         I mean nothing about it felt good,
23  nothing about it -- I just felt violated.  I
24  mean this is my extent of my physical abuse, but

83

1  Officer Brown who suggested that I was wearing a
2  hat or something, and she said that -- she was
3  going to take my hat, and then soon thereafter
4  another officer came in that I did not see, and
5  they told me that I had to go to washroom with
6  this officer and give him my clothes.
7         And after I went in, that officer told
8  me that I had to scrub naked, and at that point
9  he took out some tweezer, and I asked him what
10  he's doing, and he said he had to take hairs
11  from every place on my body.
12     Q.  How many hairs were pulled?
13     A.  He plucked hairs from the top of my
14  head to my pubic area.
15     Q.  Could you give me an idea how many?
16     A.  I don't know.  All I know he took it
17  from my head, and I think different sides of my
18  head, and my private parts, and I had never been
19  naked or had that happen to me -- I didn't know
20  why it was happening then, and then --
21     Q.  -- you didn't do any of those yourself;
22  you didn't use the tweezers to pull any of them
23  yourself?
24     A.  No.

82

1  at that moment, but it didn't get better after
2  that moment.
3  BY MR. SOTOS:
4     Q.  But you took your own clothes off,
5  right?
6     A.  Yes.
7     Q.  Okay.  And they gave you clothes to put
8  on?
9     A.  Later.
10     Q.  How long after you took your clothes
11  off was it before you got clothes to replace
12  them with?
13     A.  I don't remember.
14     Q.  Okay.  Can you estimate for me?
15     A.  It was -- it was before we went to the
16  second polygraph test, so somewhere in there,
17  afternoon, something, you know.
18     Q.  Okay.  And it was somewhere in the
19  afternoon when they took your clothes, too,
20  right?
21     A.  I'm not sure about that time, but
22  somewhere after that interrogation you were
23  talking about with Teplitz and other officers,
24  whatever time that was.

84



Johnnie Lee Savory 02/17/2023

1    Q.   It was after that?
2    A.   Yes.
3    Q.   Okay.  So, after the interrogation by
4  Teplitz and other officers, and before you went
5  to the polygraph, it was in that period where
6  they had you take your clothes off, and plucked
7  the hairs from you, and then gave you clothes to
8  replace your clothes with?
9         MR. TAYLOR:  Objection, form.
10        THE WITNESS:  They went out and got
11  some clothes from somewhere.  I mean they didn't
12  have none on location, because I was so small I
13  guess, I don't know.
14  BY MR. SOTOS:
15    Q.   But it was -- this all happened between
16  the end of the interrogation by Marcella Teplitz
17  and others, and before you were taken to the
18  polygraph, that's the timeframe?
19        MR. TAYLOR:  Same objection.
20        THE WITNESS:  The jumpsuit and the
21  hairs happened while in -- being interrogated,
22  but I think they stopped it, and they came took
23  me immediately during that time.
24
                                                    85

1  BY MR. SOTOS:
2    Q.   Okay.
3    A.   You know what I'm saying.
4    Q.   Yeah, I'm just trying to get the
5  timeframe.
6         So, like when they took the hairs, I'm
7  assuming, correct me if I'm wrong, I'm not
8  trying to put words in your mouth, I'm trying to
9  understand it.
10        So, when they took hairs was after they
11  took your clothes, right, because that's when
12  you didn't have any clothes on?
13    A.   Yes, sir, right.
14    Q.   And so was that after Officer Teplitz
15  and the other officers were done questioning
16  you, or did they then bring you back in and
17  question you again before going to the
18  polygraph, do you remember?
19    A.   I believe they brought me back into
20  interrogation room and again interrogated me
21  again.
22    Q.   Okay.  And so -- and you said there was
23  always more than one officer in there?
24    A.   Yes.
                                                    86

1    Q.   During the interrogation?
2    A.   Yes.
3    Q.   They were confusing you?
4    A.   To say the least, yes.
5    Q.   Okay.  They weren't yelling at you?
6    A.   No.
7    Q.   Okay.  Were they doing anything other
8  than what you've described so far that you
9  can -- beyond what you've already said, that you
10  construe as being abusive?
11    A.   Yeah --
12        MR. TAYLOR:  -- objection, form.
13        THE WITNESS:  They kept telling me that
14  my recollection was not correct as I was making
15  inconsistent statement; when I was telling them
16  the truth, they was telling me I was lying, and
17  it just never was going -- it was just too hard
18  for me to comprehend what they were -- they
19  never asked me just one single question, they
20  was always asking me a question, and then
21  another officer asking me another question, and
22  another one, and then they really never -- I
23  never got a chance to really say anything, but
24  when I did try to tell them the truth, they
                                                    87

1  didn't -- they didn't want to hear it.  It's
2  just like everything I was saying was not true,
3  and I didn't understand it.
4  BY MR. SOTOS:
5    Q.   Did you ever admit to the officers on
6  the 26th that you had lied to officers
7  previously about anything?
8         MR. TAYLOR:  Objection, form,
9  foundation.
10        THE WITNESS:  I have no memory about
11  that.
12  BY MR. SOTOS:
13    Q.   You don't remember ever saying I lied
14  about something?
15    A.   No.
16    Q.   Okay.  You testified that the
17  television stand -- that the television was on a
18  stand that had wheels on it, and it was
19  rolled -- it was rolled out of the way so you
20  guys could wrestle, is that right?
21        MR. TAYLOR:  Objection, form.
22        THE WITNESS:  I think that's my
23  remembrance.
24
                                                    88

BY MR. SOTOS:

2  Q.  Okay.  Well, I'm asking are you certain
3  that there was a stand in that room on wheels?
4  A.  Yes, to the best of my understanding,
5  what I remember, yes.
6  Q.  Okay.
7  A.  It had to be sitting on something.
8  MR. SOTOS:  Could I see that picture of
9  the coffee table.
10  Okay.  I'm going to ask you to mark --
11  can you mark this as Exhibit No. 27.  Thank you.
12  (Whereupon, SAVORY Deposition
13  Exhibit No. 27 was marked for
14  identification.)
15  BY MR. SOTOS:
16  Q.  Mr. Savory, I'm going to place in front
17  of you a document that's been marked as Exhibit
18  No. 27.  It's Peoria Savory 12824 and 12825.
19  And does that look like the living room
20  that you were in on January 17th, 1977?
21  MR. TAYLOR:  Objection, form and
22  foundation.
23  THE WITNESS:  It could be, because I
24  don't remember exactly what their house -- I

89

1  only been there one time, so I don't got a true
2  recollection of everything that's in there.
3  BY MR. SOTOS:
4  Q.  Okay.  Do you see the coffee table up
5  against the wall there?
6  A.  I do.
7  Q.  And is it your testimony that the TV
8  set was not on that coffee table when you went
9  into the house?
10  A.  I'm not sure, because I don't know if
11  someone rearranged this or not.  I'm not sure,
12  that's not what I remember.
13  Q.  Would you agree with me that that table
14  doesn't have wheels on it?
15  A.  Yes.
16  Q.  Okay.  And if I told you that Scopey's
17  mother testified that the television set was
18  sitting on that coffee table, would that cause
19  you to rethink your statement that the
20  television set was on a stand with wheels that
21  was moved?
22  MR. TAYLOR:  Are you finished?
23  Objection, form and foundation.
24  THE WITNESS:  This is -- I don't

90

1  remember this coffee table.  I'm just, you know.
2  BY MR. SOTOS:
3  Q.  And you specifically remember a stand
4  with wheels on it?
5  A.  That's what I remember.
6  Q.  You have never seen a photo of a stand
7  with wheels on it throughout the 45 years or so
8  that this matter has been pending in one fashion
9  or another, correct?
10  MR. BOWMAN:  Objection, form,
11  foundation.
12  THE WITNESS:  In 46 years I've only
13  seen the photos in this case in 1977 during my
14  -- in there with officer Cannon, and then he
15  showed me a bunch of photos, so I don't remember
16  them.
17  BY MR. SOTOS:
18  Q.  And you don't remember ever seeing a
19  photo of a stand with wheels on it, do you?
20  MR. TAYLOR:  Objection, foundation and
21  form.
22  THE WITNESS:  As I stated to you, I
23  don't remember seeing -- I don't remember all
24  the photos that they showed me.  There were a

91

1  lot of photos.  I don't know, it could be -- it
2  could have been hundreds of them, or what have
3  you.
4  BY MR. SOTOS:
5  Q.  But you don't remember seeing one that
6  showed a stand with wheels on it, correct?
7  A.  I can't say I did or I didn't.
8  Q.  Okay.  Can you look at --
9  MR. SOTOS:  -- can you put in front of
10  him Exhibit 9?
11  MR. TAYLOR:  9?
12  MR. SOTOS:  Yeah, it's a report dated
13  January 26th from Charles Cannon.
14  BY MR. SOTOS:
15  Q.  Mr. Savory, your Counsel has just
16  placed in front of you Defendant's Exhibit
17  No. 9, Bates stamped Savory 5838 through 5842,
18  and I want to first ask you a question about the
19  first paragraph.
20  You indicated that you had a brief
21  exchange with Percy Baker on the 25th in regards
22  to the polygraph, correct?
23  A.  Yes.
24  Q.  Do you see in the first paragraph of

92

1  this report that's dated the 26th, on top it
2  says in the first paragraph at approximately
3  2100 hours, so that's 9:00 on Tuesday the 25th
4  this officer being Cannon talked to Percy Baker
5  in the detective division, Baker had been called
6  to the police station regarding Johnnie Savory
7  who is a ward of the Court.
8         After Baker was briefed about Johnnie's
9  possible involvement in this case, he stated he
10  had learned that Johnnie had spent Monday night,
11  January 17th, at the home of Ray Mason who lives
12  on Kettle Street?
13         Baker stated that Johnnie told him that
14  Mason knew something about the murders that
15  happened on Garden Street; do you see that
16  paragraph?
17     A.  Yes.
18     Q.  Okay.  Do you remember talking to Percy
19  Baker on the 25th and telling him that you spent
20  the night of the 17th at Ray Mason's house?
21         MR. TAYLOR:  Objection.
22         MR. BOWMAN:  Foundation.
23         THE WITNESS:  No, I did not.
24

93

1  BY MR. SOTOS:
2     Q.  You did not tell him that?
3     A.  No.
4     Q.  Okay.  Did you tell anybody -- have you
5  ever told anybody that you spent the night of
6  January 17th at Ray Mason's house?
7         MR. TAYLOR:  Objection, foundation.
8         THE WITNESS:  No, sir.
9  BY MR. SOTOS:
10     Q.  Were you at Ray Mason's house at any
11  point on January 17th from the time you woke up
12  until the time you went to bed?
13         MR. TAYLOR:  Same objection.
14         THE WITNESS:  No, sir.
15  BY MR. SOTOS:
16     Q.  And did you tell Percy Baker that Ray
17  Mason knew something about the murders that
18  happened on Garden Street?
19         MR. TAYLOR:  Same objection.
20         THE WITNESS:  No, sir.
21  BY MR. SOTOS:
22     Q.  Did you ever tell anybody that?
23     A.  No, sir.
24     Q.  Did you ever think that Ray Mason had

94

1  anything to do with the murders that happened on
2  Garden Street?
3         MR. TAYLOR:  Objection, form and
4  foundation.
5         THE WITNESS:  No, sir.
6  BY MR. SOTOS:
7     Q.  Can you go down to the third paragraph
8  on that -- bottom paragraph on that first page
9  which essentially states that the officers --
10  well, if you look at the second paragraph, you
11  will see that according to the report Defendants
12  Cannon and Haynes interviewed Ray Mason at
13  1:30 in the morning on the 26th; do you see
14  that?
15     A.  Yes.
16     Q.  Okay.  And that they asked -- the
17  officers asked Mason if, in fact, he knew
18  anything about the murders, and that according
19  to the report Mason said that you were telling a
20  lie about him knowing -- you know what -- strike
21  that.  Let's -- let me move beyond that.
22         Do you see where three lines from the
23  bottom where Ray Mason, according to the report
24  anyway, told the officers that you had been at

95

1  his home at about 5:00 in the afternoon on the
2  17th?
3     A.  I see it.
4     Q.  Okay.  That's not true?
5         MR. TAYLOR:  Objection.
6  BY MR. SOTOS:
7     Q.  You weren't there?
8         MR. TAYLOR:  Form, foundation.
9         THE WITNESS:  No, I was in school.
10  BY MR. SOTOS:
11     Q.  At 5:00?
12     A.  Yeah.
13     Q.  Okay.  If you go to the next page, and
14  if you look at the third full paragraph that
15  starts out Mason stated on January 15th; do you
16  see that?
17     A.  Um-hm.
18     Q.  Okay.  According to this paragraph,
19  Mason told the officers that you and he were at
20  a Kroger, he said on the 15th, other documents
21  say the 16th, and that you were there with -- at
22  the Kroger with Mason and his sister-in-law,
23  Rosemary Hamilton when you ran into Connie and
24  Scopey and then gave them a ride home; do you

96

1  see that?
2      A.  I see it.
3      Q.  Okay.  Did that happen?
4          MR. TAYLOR:  Objection, form,
5  foundation.
6          THE WITNESS:  No.
7  BY MR. SOTOS:
8      Q.  Okay.  Do you have any -- let me ask it
9  this way.  Aside from the date, were you ever at
10  a Kroger with Ray Mason and his sister-in-law,
11  Rosemary Hamilton, where you ran into anybody
12  and gave them a ride home?
13         MR. TAYLOR:  Objection, form,
14  foundation.
15         THE WITNESS:  No, not to my
16  understanding, not to my recollection that ain't
17  never took place.
18  BY MR. SOTOS:
19     Q.  So, if I ask you to assume that this
20  paragraph that the officers accurately
21  recounting what Mason said, do you know of any
22  reason why Mason would make up that whole story?
23         MR. TAYLOR:  Objection, form and
24  foundation.
                                                    97

1          THE WITNESS:  I don't even want to
2  assume.  I just -- I know that it didn't happen,
3  and I wasn't with him.
4  BY MR. SOTOS:
5      Q.  And you don't know of any reason why he
6  would say that if it wasn't true?
7          MR. TAYLOR:  Same objection.
8          THE WITNESS:  I cannot speculate or
9  assume why this statement was made by him.
10  BY MR. SOTOS:
11     Q.  Okay.  Can you look at the next page.
12  The bottom paragraph according to this report,
13  Mason told Cannon and -- well, he told to
14  Cannon anyway that on the morning of the 18th,
15  the morning of the murders, that you called at
16  some point and said something sad just happened,
17  and he asked you what, and you said that some of
18  your friends got killed.
19         You have to look at the bottom of the
20  page and then go on to the top of the next page.
21     A.  Okay.  What is your question?
22     Q.  Did you ever make that call?
23         MR. TAYLOR:  Objection to form and
24  foundation.
                                                    98

1          THE WITNESS:  No.
2  BY MR. SOTOS:
3      Q.  Okay.  Not on the 18th or any other
4  day?
5      A.  Not on any day.
6      Q.  Okay.  Okay.  And you don't ever
7  remember being on a phone call where Mason's
8  mother, Jessie, Ms. Jessie was on the phone when
9  she said it's a sin the way people are killing
10  each other; did that ever happen?
11         MR. TAYLOR:  Objection, form,
12  foundation.
13         THE WITNESS:  No.
14  BY MR. SOTOS:
15     Q.  Okay.  And just -- and if I already
16  asked this, I apologize, I just want to make
17  sure that I did.
18         Is it your testimony that you never
19  talked to Marva Jones about the murders in any
20  respect at any time?
21         MR. TAYLOR:  Objection, form,
22  foundation.
23         THE WITNESS:  No.
24
                                                    99

1  BY MR. SOTOS:
2      Q.  It's correct that you did not do that?
3      A.  Yes, sir.
4      Q.  I want to ask you some questions about
5  your conversation with the officers
6  interrogation on the afternoon of the 26th when
7  Marcella Teplitz was there.  Okay.  She did a
8  report of that.
9          MR. SOTOS:  So, I'm going to ask your
10  Counsel to place Exhibit 10 in front of you.
11         MR. BOWMAN:  Did you take this --
12         MR. TAYLOR:  Yes, I think I did.
13         MR. SOTOS:  So, for the record, your
14  Counsel has placed in front of you Exhibit 10
15  which is Savory LL 005827 through 00593, and
16  this as a report that Marcella Brown, who later
17  back Teplitz did according to the date on report
18  on January 26th, 1977.
19  BY MR. SOTOS:
20     Q.  So, I'm going to ask you some questions
21  about this report for awhile now.
22     A.  Yes, sir.
23     Q.  In the first paragraph Ms. Brown states
24  that Percy Baker told her that you had asked to
                                                    100

Johnnie Lee Savory 02/17/2023

1    talk to her and that you were willing to tell
2    her everything about the case, and that you
3    wanted to talk to her alone.
4            Did any of that actually take place?
5            MR. TAYLOR:  Objection, form and
6    foundation.
7            THE WITNESS:  No.
8    BY MR. SOTOS:
9        Q.   Okay.  So, you never told Percy Baker
10   that you'd like to talk to Marcella Brown,
11   correct?
12       A.   Yes.
13           MR. TAYLOR:  Same objection.
14   BY MR. SOTOS:
15       Q.   You never told him that you were
16   willing to tell Marcella Brown everything about
17   the case, correct?
18           MR. TAYLOR:  Objection, form,
19   foundation.
20           THE WITNESS:  Correct.
21   BY MR. SOTOS:
22       Q.   And you didn't tell Baker that you
23   wanted to talk to her alone?
24           MR. TAYLOR:  Same objection.

101

1            THE WITNESS:  Correct.
2    BY MR. SOTOS:
3        Q.   Okay.  And I think you testified you
4    don't remember talking to her alone, there were
5    always other officers present?
6        A.   Yes.
7        Q.   Okay.  So, according to this report, if
8    you look at the second paragraph, you said that
9    you wanted Officer Brown to write everything
10   down that you said as you told your story; do
11   you remember saying that to her?
12           MR. TAYLOR:  Same objection; form and
13   foundation.
14           THE WITNESS:  No.
15   BY MR. SOTOS:
16       Q.   And is it the case that you did not say
17   that to her?
18           MR. TAYLOR:  Same objection.
19           THE WITNESS:  Correct.
20   BY MR. SOTOS:
21       Q.   Okay.  You'll see she goes on in that
22   paragraph to describe the same thing that we had
23   just talked where Ray Mason said that he, and
24   you, and Rosemary ran into Connie and Scopey at

102

1    the Kroger and gave them a ride home; except
2    according to this report that happened on
3    January 16th not the 15th; do you see that in
4    that second paragraph?
5        A.   Yes.
6        Q.   Okay.  Did you tell Marcella Brown if
7    that occurred?
8            MR. TAYLOR:  Objection, form,
9    foundation.
10           THE WITNESS:  No.
11   BY MR. SOTOS:
12       Q.   Okay.  In the next paragraph you
13   describe -- I'm sorry, she describes you
14   explaining what you did on the 17th of January
15   the day before the murders, and that you said
16   when you got up you went to Georgie's house; did
17   you tell her that?
18           MR. TAYLOR:  Objection, form,
19   foundation.
20           THE WITNESS:  Yes.
21   BY MR. SOTOS:
22       Q.   Who is Georgie?
23       A.   She is a wonderful mother and
24   grandmother of a lot of children.

103

1        Q.   So is that Georgia Smolley?
2        A.   Yes, sir.
3        Q.   So, you did tell Marcella Teplitz --
4    excuse me, Brown at the time that you went to
5    Georgie's house on the morning of the 17th, the
6    day before the murders?
7        A.   Yes.
8        Q.   Okay.  And that you then went to,
9    according to the report, that you then went to
10   Tina's house about 9:00; did you tell her that?
11           MR. TAYLOR:  Objection, form,
12   foundation.
13           THE WITNESS:  No, no, no.
14   BY MR. SOTOS:
15       Q.   Here it's in the second line of that
16   have bottom paragraph, it says he then went to
17   Tina's house about 9:00?
18       A.   No, I didn't -- what's wrong this is
19   the date that's not -- that's not correct for
20   the date.  The date is wrong going to Georgia's
21   house.
22       Q.   What date should be there?
23       A.   I believe the 18th.
24       Q.   Okay.

104

1     A.   The morning of the 18th.
2     Q.   So, it's your testimony that you did
3  tell Marcella these things, but you said they
4  happened on the 18th not the 17th?
5          MR. TAYLOR:  Objection to the form and
6  foundation of that question.
7  BY MR. SOTOS:
8     Q.   Is that correct?
9     A.   Yes, sir.
10    Q.   Okay.  So, you did tell her you went to
11 Georgie's house in the morning, right?
12    A.   The 18th.
13    Q.   Of the 18th.  Okay.
14         And then you did tell her you went to
15 Tina's house about 9:00 a.m.?
16    A.   Did not.
17    Q.   You didn't tell her that?
18    A.   No.
19    Q.   Did you tell her you went to Tina's
20 house at all?
21    A.   I think I can remember answering --
22 this question was asked of me before, I will
23 give you what I said before.
24    Q.   As far as the 18th goes?

105

1     A.   Yes, I mean in the deposition, yes.
2     Q.   I understand.  And you did go to Tina's
3  house at some point on the 18th for sure, right?
4     A.   Yes.
5     Q.   And that was Tina Ivy, correct?
6     A.   Yes.
7     Q.   And what time did you go there?
8     A.   I went to -- when I left the Smolley's
9  home, I went to Mrs. Williams' home -- all of us
10 live in the same area, and she had some foster
11 children there, a couple of boys that I used to
12 babysit, and I stayed there with them for
13 awhile, and it could have been like, I don't
14 know, around 10:30, 11:00, something of that
15 nature.
16    Q.   If you look at the next line it says
17 that you left and went down with Georgie's
18 daughter, Darlene Harris.
19         Did you tell Marcella that you did that
20 either on the 17th or the 18th?
21         MR. TAYLOR:  Objection, form and
22 foundation.
23 BY MR. SOTOS:
24    Q.   Or on any day?

106

1     A.   I don't remember that.  I don't
2  remember telling her that.
3     Q.   Okay.  And when it states that you went
4  downtown to see your probation officer, Percy
5  Baker in the next sentence, did you tell
6  Marcella that you did that?
7     A.   Yes.
8     Q.   Was that the 17th, or the 18th, or
9  both?
10    A.   That's the 18th.
11    Q.   The 18th?
12    A.   Yes.
13    Q.   Okay.  Now, the report then goes on to
14 say that you went to school, and then left after
15 school with Scopey; is that true?
16    A.   Well --
17         MR. TAYLOR:  -- hold on, objection.
18 BY MR. SOTOS:
19    Q.   Now, we're talking about the 17th.
20    A.   Yes, this is, you know --
21         MR. BOWMAN:  -- again, are you asking
22 about what happened or --
23         MR. SOTOS:  -- I'm asking if it's
24 accurate where the report says referring to the

107

1  17th that you and Scopey left school together,
2  and Scopey asked you to come to his house.
3          THE WITNESS:  Yes.
4  BY MR. SOTOS:
5     Q.   All right.  Okay.  And if you go on to
6  the next page, in the top paragraph it states
7  that you then placed a bet on a card drawing;
8  you and Scopey, and Scopey won $2; do you see
9  that?
10    A.   Where did you say?
11    Q.   Fourth line down from the top; they
12 then placed a bet on card drawing and victim
13 James won $2; do you remember that?
14    A.   No.
15    Q.   You said that didn't happen?
16         MR. TAYLOR:  Object, form, foundation.
17         THE WITNESS:  No, I don't remember
18 telling her that.
19 BY MR. SOTOS:
20    Q.   Okay.  Are you saying you didn't tell
21 her that, or you just don't remember?
22    A.   I didn't tell her that.
23    Q.   Right before that she writes that you
24 told her that Scopey took the key out of the

108

1  mailbox.
2          I think you testified before it was
3  under a mat; is that what you told her as well?
4          MR. TAYLOR:  Objection, form.
5          THE WITNESS:  It's as I told you
6  before, I don't remember seeing him take no key
7  from the mailbox; he took it from under the mat.
8  BY MR. SOTOS:
9      Q.  So, you wouldn't have told her that
10  then?
11     A.  No.
12     Q.  All right.  If you look down a line or
13  two from where you are, according to the report,
14  it says you and Scopey then played with some
15  sticks used in karate for awhile; did you tell
16  her that?
17         MR. TAYLOR:  Objection, form,
18  foundation.
19         THE WITNESS:  No.
20  BY MR. SOTOS:
21     Q.  Going down a few lines, when you went
22  to see Marva to get money for the chicken, it
23  says that James carried a black nightstick, and
24  you had a metal pole; did you tell Officer
                                              109

1  Teplitz that?
2          MR. TAYLOR:  Same objection; form and
3  foundation.
4          THE WITNESS:  No.
5  BY MR. SOTOS:
6      Q.  Okay.  And I take it you didn't say
7  anything to her about chasing a boy named
8  Melvin?
9      A.  No.
10     Q.  Okay.  When you returned to the house a
11  few lines down still in that same paragraph, Ms.
12  Brown writes that you and Scopey were wrestling
13  around again; did you tell her that?
14         MR. TAYLOR:  Objection, form and
15  foundation.
16         THE WITNESS:  No.
17  BY MR. SOTOS:
18     Q.  And that's because you weren't
19  wrestling around when you went back to the
20  house?
21     A.  No.
22     Q.  So, when you were back at the house,
23  did Scopey's mother ever tell you and Scopey to
24  stop wrestling that you were -- it looks like
                                              110

1  you were getting a little too rough?
2      A.  No.
3          MR. TAYLOR:  Form and foundation.
4          THE WITNESS:  No.
5  BY MR. SOTOS:
6      Q.  That never happened?
7      A.  No.
8          MR. BOWMAN:  I think that, you know,
9  the questions stray from time to time from the
10  documents to the memory of those days.
11         The events of those days were clearly
12  covered before.  You know, I am trying not to --
13         MR. SOTOS:  -- yeah, I understand.
14         MR. BOWMAN:  The policemen --
15         MR. SOTOS:  -- the Court said what it
16  said; I get it.  So, I will stay within the
17  confines of that.
18         Sometimes it just facilitates easier
19  questions, but it's -- I understand.
20  BY MR. SOTOS:
21     Q.  So, at the bottom of that paragraph Ms.
22  Brown writes that you said you went away to
23  Mason's house after leaving Scopey's house that
24  night sometime around 11:00; did you say that to
                                              111

1  Marcella Teplitz?
2          MR. TAYLOR:  Objection.
3          MR. SOTOS:  Marcella Brown?
4          MR. TAYLOR:  Form and foundation, just
5  so we are abundantly clear about what date this
6  is written about.
7          MR. SOTOS:  That's fair.
8  BY MR. SOTOS:
9      Q.  Did you say to Marcella Teplitz that on
10  any night you left Scopey's home and then went
11  to Ray Mason's house before going home yourself?
12         MR. TAYLOR:  Objection, form and
13  foundation.
14         THE WITNESS:  The answer is no.
15  BY MR. SOTOS:
16     Q.  Okay.  According to the report, the
17  last sentence of that paragraph you did you tell
18  Ms. Brown that you -- Officer Brown, that you
19  woke up at 8:30 the morning of the 18th, the
20  morning of the murders, correct?
21         MR. TAYLOR:  Are you asking whether the
22  report says that or --
23         MR. SOTOS:  -- I'm just saying
24  according to the report the last line it states
                                              112

Johnnie Lee Savory  02/17/2023

---

**Page 113**

1  that you told Ms. -- Officer Brown that you woke
2  up at approximately 8:30 in the morning on
3  Tuesday January 18th; do you see that?
4          That top paragraph right here, do you
5  see where I'm pointing?  I'm sorry, there is a
6  lot of words on the page.
7          THE WITNESS:  I believe I said between
8  8 and 8:30, something like that on the 18th.
9  BY MR. SOTOS:
10      Q.   And did you tell Ms. Brown that you
11  then went to Darlene Harris' house?
12          MR. TAYLOR:  Objection, form and
13  foundation.
14          THE WITNESS:  I want to be clear, this
15  is the Smolley's home, and she just one of the
16  children, but yes.
17  BY MR. SOTOS:
18      Q.   Darlene Harris is the daughter.
19      A.   She's the daughter.
20      Q.   So, you think of it as the Smolley's
21  home?
22      A.   Yeah, mother and father, yeah.
23      Q.   Gotcha.  Gotcha.  And did you tell her
24  that you then went to Ella Mae Ivy's house later

---

**Page 114**

1  on?
2          MR. TAYLOR:  Objection, form.
3          THE WITNESS:  No.
4  BY MR. SOTOS:
5      Q.   Moving down into the next paragraph,
6  the one that starts out which said the arrested
7  then went to Darlene Harris' house -- it says
8  that you told Officer Teplitz that you went to
9  school and got kicked out for throwing a book
10  across the room at approximately 4:30; did you
11  say that?
12          MR. TAYLOR:  Objection, form and
13  foundation.
14  BY MR. SOTOS:
15      Q.   It's in the middle of this paragraph.
16      A.   Okay.  Now what date are we on again?
17      Q.   The 18th.
18      A.   And what time again; what are we
19  talking about?
20      Q.   According to the report it said that
21  you went to school and got kicked out for
22  throwing a book across the room at approximately
23  4:30 in the afternoon?
24      A.   Yes, that took place.

---

**Page 115**

1      Q.   Okay.  And did you tell Marcella Brown
2  that took place?
3      A.   Yes, that took place.
4      Q.   Okay.  And did you tell her that you
5  then went to -- that you left the school and
6  went to Marva Jones' house at about 5:00 in the
7  afternoon?
8      A.   The 18th?
9      Q.   Yes.
10      A.   Yes, sir.
11      Q.   Okay.  And did you tell her that you
12  then left to get Scopey, and when you got near
13  the house, you saw the police cars?
14      A.   Yes.
15      Q.   And that you asked what happened of
16  several officers, and no one would tell you?
17          MR. TAYLOR:  Objection, form,
18  foundation.
19          THE WITNESS:  No, I asked one officer.
20  BY MR. SOTOS:
21      Q.   And you didn't -- so you didn't tell
22  Officer Brown that you asked several people?
23      A.   No, sir.
24      Q.   Did you tell her that you then took the

---

**Page 116**

1  bus and went to Georgie's house because you
2  wanted to hear the news?
3          MR. TAYLOR:  Objection, form and
4  foundation.
5          THE WITNESS:  No, sir, I went home.
6  BY MR. SOTOS:
7      Q.   Did you ever tell an officer at any
8  point that you heard the news about the murders
9  on the radio at the late afternoon school?
10          MR. TAYLOR:  Objection, form and
11  foundation.
12          THE WITNESS:  No.
13  BY MR. SOTOS:
14      Q.   You didn't tell Marcella -- Officer
15  Teplitz that you went to Georgie's house after
16  leaving Scopey's house on the 18th?
17      A.   No, definitely no.
18      Q.   Okay.  Did you tell her you went to
19  Tina's house?
20          MR. TAYLOR:  Same objection.
21          THE WITNESS:  I don't know they keep
22  saying Tina and Ella; Frankie was the one that I
23  was friends with.
24

---



BY MR. SOTOS:
2    Q.   Let's call it the Ivy's --
3    A.   -- the siblings, this is siblings, and
4    they got quite a few.
5    Q.   Let's call it the Ivy house.
6    A.   Yes.
7    Q.   Okay.  You did tell her that?
8    A.   Yes.
9    Q.   And that's where you heard the news?
10   A.   Yes.
11   Q.   Okay.  And did you tell her that you
12   went home after leaving the Ivy's house?
13   A.   Yes.
14   Q.   Okay.  Did you tell anybody that you
15   stayed overnight at the Ivy's house?
16        MR. TAYLOR:  Objection, form and
17   foundation.
18        THE WITNESS:  No.
19   BY MR. SOTOS:
20   Q.   Going down to the last paragraph, did
21   you have any -- did you make any statements to
22   Marcella Teplitz about Connie about stating that
23   on the Monday before the murders you wanted to
24   wait around the house for her to come home so

117

1    you could rap with her, but then instead you and
2    James went to get some chicken?
3         MR. TAYLOR:  Objection, form and
4    foundation.
5         THE WITNESS:  No.
6    BY MR. SOTOS:
7    Q.   Nothing like that at all?
8    A.   No.
9    Q.   Did you tell her that when you were at
10   the funeral that you couldn't believe it was
11   her, because she looked like she was 100 years
12   old in the coffin?
13        MR. TAYLOR:  Same objection.
14        THE WITNESS:  I can't remember having a
15   conversation with her about the funeral.
16   BY MR. SOTOS:
17   Q.   Did you remember thinking that when you
18   saw Connie at the funeral home?
19        MR. TAYLOR:  Same objection.
20        THE WITNESS:  I don't know what I
21   thought.
22   BY MR. SOTOS:
23   Q.   Did you tell Officer Teplitz that you
24   were turned on by Connie's rear-end?

118

1         MR. TAYLOR:  Objection, form and
2    foundation.
3         THE WITNESS:  No.
4    BY MR. SOTOS:
5    Q.   Nothing at all like that?
6    A.   No.  I think for the record, if you
7    don't mind, I only met her one time, the 17th.
8    Q.   So, you never told any officer that she
9    changed your diapers when you were little?
10        MR. TAYLOR:  Same objection.
11        THE WITNESS:  I don't know too many
12   babies changing other baby's diapers, but no, I
13   didn't even know her.
14   BY MR. SOTOS:
15   Q.   No idea where a police officer came up
16   with that?
17   A.   Don't know where they came up with
18   that.
19   Q.   Did you ever -- if you go to the next
20   page, 5829, if you look at the second to last
21   paragraph it starts out, this officer was
22   advised by Percy Baker that the arrested had
23   told him that he had agreed to go visit victim
24   James on the morning of the murders, but that

119

1    the arrested had neglected to tell that to the
2    officer for some reason.
3         Do you recall ever saying to Percy
4    Baker or in the presence of Percy Baker that you
5    had agreed to go to Scopey's house on the
6    morning of the murders?
7         MR. TAYLOR:  Objection, form and
8    foundation.
9         THE WITNESS:  No, I have no memory of
10   talking to Percy Baker about the crime itself,
11   period.
12   BY MR. SOTOS:
13   Q.   And are you saying you didn't talk to
14   him about the crime?
15   A.   I did not.
16   Q.   On the 25th when you were talking to
17   him about the polygraph, it never came up?
18   A.   It was about going home, taking the
19   polygraph test, would I agree with that.  They
20   called him in at the last minute I believe, and
21   he had accompanied us to the polygraph
22   examination, you know.
23   Q.   You talked about the polygraph at the
24   last deposition, and what happened there.

120



1        If you go to the next page --
2        MR. TAYLOR:  -- are we talking about
3    which polygraph now?
4        MR. SOTOS:  Good point.
5    BY MR. SOTOS:
6        Q.   You talked during the last deposition
7    about the polygraph on the 26t with Ed Bowers?
8        A.   Yes.
9        Q.   So, I'm not going to ask you about that
10   again.
11       If you go to the next page, do you see
12   where it states on page -- first full paragraph
13   under 1/16/77, right here at states 19:75 which
14   is 19 -- 19:75, I don't know, sometime in the
15   evening Bowers exhibited the polygraph room and
16   informed this officer that the arrested was
17   requesting to talk about the murders in the case
18   and wanted specifically to talk with this
19   officer, that being Marcella Brown.
20       Did you tell Bowers that you wanted to
21   talk to Marcella Brown?
22       MR. TAYLOR:  Objection, form and
23   foundation.
24       THE WITNESS:  I wanted -- what I was
                                                    121

1    going to do to end, and what he had just sent me
2    through, he called me liars and murderers, and
3    all that, and I asked -- I did ask to speak to
4    her, but I didn't ask to speak to her to talk
5    about the case; I asked to stop talking to me,
6    and it was over with, the polygraph was never
7    even completed, because in the middle of that I
8    was -- I remember her coming in, but I was
9    standing at the window crying, that's what I
10   remember, because I -- what he did was just --
11   yeah, I just wanted somebody to come in and stop
12   it.
13   BY MR. SOTOS:
14       Q.   Right.  This is when he was yelling at
15   you and calling you a murderer --
16       A.   -- a liar and all that.
17       Q.   And that's when you said to him that
18   you did it?
19       A.   I never said to him that I did it.
20       Q.   You didn't?
21       A.   No.
22       Q.   You didn't testify to that in your
23   first deposition?
24       A.   No.
                                                    122

1        MR. TAYLOR:  Objection.
2    BY MR. SOTOS:
3        Q.   Okay.  Well, how about when -- so you
4    with agree with this report that you did ask to
5    see Marcella, but you don't agree that you asked
6    to see her to talk about the case; you just
7    asked to see her, and your reason for doing that
8    was different, it was to get it to stop?
9        A.   Yes, to make him quit.
10       Q.   Okay.  But all you said to him was then
11   was I would like to see her, is that it?
12       A.   Yes, and he disconnected everything,
13   and then --
14       Q.   -- and then he stopped as soon as you
15   said that, right?
16       A.   Yeah, because it ended anyway, you know
17   what I mean, after he did all that, I mean I
18   just broke down in tears before I got out the
19   chair, you know it was over with, it was over
20   with.
21       Q.   But you're saying you did not say to
22   him that you did it?
23       A.   No, I did not say that to him.
24       Q.   Okay.  What did you say when Marcella
                                                    123

1    walked in the room?
2        A.   I didn't say anything.
3        Q.   You didn't tell her that you did it?
4        A.   I was --
5        MR. TAYLOR:  -- objection -- did we go
6    through this before?
7        MR. BOWMAN:  We did go through this
8    before.
9        MR. TAYLOR:  And we are not going over
10   the report anymore.
11       MR. SOTOS:  Do you want -- I could do
12   it a different way.  We could do it by the
13   report.
14   BY MR. SOTOS:
15       Q.   Marcella came in the room, correct?
16       A.   Yes.
17       Q.   Okay.  And did she ask you what it is
18   that you wanted to tell her?
19       A.   No, not at that moment.
20       Q.   Did she speak first, or did you speak
21   first?
22       A.   I don't remember.  I remember standing
23   at the window crying, and she might have said
24   come sit down and whatever, don't remember
                                                    124



Johnnie Lee Savory 02/17/2023

1 exactly the conversation, but I remember
2 standing at the -- over by the window.
3     Q.   According to her report, if you look on
4 Page 5830, you said, we were practicing karate,
5 and Scopey turned the TV to the wall; did you
6 tell her that?
7          MR. TAYLOR:  Objection, form, and
8 foundation.
9          THE WITNESS:  I do not remember ever
10 telling her that.
11 BY MR. SOTOS:
12     Q.   Are you saying you didn't tell her that
13 you, or you just don't remember?
14     A.   I will state this for like in my last
15 deposition, she asked me to come sit down, she
16 began to ask me what happened.  When I tried to
17 explain what happened, she told me no, and she
18 began to word me along about what had happened.
19 That's how our conversation began, and that's
20 how it ended, but it ended with a -- I just want
21 to go home.  I said repeatedly can I go home,
22 and she tried to tell me, well, if you tell me
23 what took place, and she -- everything that I
24 told her was wrong evidently to her, so she

125

1 began to tell me, well, did you -- did you have
2 an altercation here, or do something here, I
3 don't remember all of it; I know she worded me
4 along with what she wanted me to say, I do know
5 that, and I gave up and just said okay, I did
6 it, can I go home now?
7          MR. SOTOS:  Can you place Exhibit 21 in
8 front of the witness, please.
9 BY MR. SOTOS:
10     Q.   Mr. Savory, your Counsel placed in
11 front of you Exhibit No. 21, Peoria Savory 26879
12 through 26886, and this is an article entitled
13 Journey for Justice the Johnnie Lee Savory
14 Story; do you recognize this document?
15     A.   Somewhat, but I ain't never seen it
16 like this, but yeah.
17     Q.   But you've seen it in a different form
18 as part of a longer magazine, right?
19     A.   Yeah, something like that, yeah.
20     Q.   But do you remember in the fall of 2004
21 writing this article for the Justice and I
22 Magazine?
23     A.   I remember doing one, yeah, I do
24 remember somewhat.  It's been awhile.

126

1     Q.   No, I understand, the not as long as
2 this whole thing started, but it's definitely
3 been awhile.
4          I can represent to you that this
5 appeared in a magazine in the fall of 2004.
6     A.   Okay.
7     Q.   So, do you remember how it came about
8 that you wrote this article?
9     A.   No, I was writing lawyers, Judges,
10 anybody that could possibly help me to prove my
11 innocence, and I wrote so many, you know, from
12 the -- marshall to so many people -- just asking
13 for help, you know.
14     Q.   This says that it was by Johnnie Lee
15 Savory II.  It doesn't list any co-authors, so
16 were there any co-authors, or did you write it
17 yourself?
18          MR. TAYLOR:  Objection to the form, and
19 foundation.  It does indicate it's edited.
20          MR. SOTOS:  Yeah, I'll get to that.
21 BY MR. SOTOS:
22     Q.   Did you write it with anybody else?
23     A.   There was other staff, but I don't, you
24 know, remember how actually it was formulated.

127

1     Q.   It says, as your Counsel pointed out,
2 edited by Natalie Smith Parra; do you know who
3 she is, do you remember her?
4     A.   I couldn't tell you who she was in that
5 think -- all I did was make copies of my police
6 reports and everything and send them along with
7 the documents so people could see what, you
8 know, where the story was coming from and what
9 was in it.
10     Q.   All right.  And so these are your words
11 on these pages, this is your --
12     A.   -- I haven't read all of that.  Would
13 you like me to read it all?
14     Q.   No.  We will be for hours.  Let me do
15 this.  Let me bring you to certain pages.
16          So, if you go to page -- let's go to
17 the second page where it says Peoria-Savory
18 26880.
19          So, if you look at the second full
20 paragraph --
21     A.   -- okay.
22     Q.   It starts out with the interrogation
23 resumed at approximately 1:00 p.m.  Okay.  Do
24 you see that?

128



1    A.    Okay.
2    Q.    It says they ask you if you would be
3  willing to take another polygraph test, and you
4  said yes, if I can go home afterward, and they
5  said we'll see; do you remember writing that?
6    A.    I don't know if I wrote it in this
7  manner or this -- might have been edited from
8  the report, I don't remember which -- how, you
9  know what I'm saying?
10    Q.    Yeah.
11    A.    Some of my, this is my writing, but
12  some of it may be taken from the reports itself.
13    Q.    Well, do you remember that happening,
14  do you remember them asking you if you would be
15  willing to take another polygraph test and
16  saying yes, if you can go home, and then
17  responding we'll see?
18    A.    That was the second polygraph test --
19    Q.    -- yes.
20    A.    And I don't think I asked for that
21  polygraph test; I think they gave me that
22  polygraph test.  I didn't ask for any of them,
23  to be truthful.
24    Q.    Well, what it says they asked you, it

129

1  doesn't say you asked for it.  It says they
2  asked you if you would be willing to take
3  another polygraph test so, is that what
4  happened?
5    A.    Yes.
6    Q.    And did you say yes, if I can go home
7  afterward?
8    A.    Yes, sir.
9    Q.    And then they said we'll see?
10    A.    I don't know if they said we'll see or
11  didn't say anything at all, you know.
12    Q.    You don't remember which?
13    A.    No.
14    Q.    Okay.  And then it says that you were
15  taken to the polygraph examiner's office,
16  introduced to another polygraph examiner, and
17  that the examination lasted 10 or 15 minutes;
18  does that sound about how long you were in there
19  with him?
20    A.    It didn't last long.
21    Q.    So, did you write that it was 10 or
22  15 minutes?
23    MR. TAYLOR:  Objection to form.
24    THE WITNESS:  I don't recall if I wrote

130

1  it or it was taken from one of the reports, I
2  don't remember.
3  BY MR. SOTOS:
4    Q.    All right.
5    A.    I could have.
6    Q.    All right.  Then it says that Mr.
7  Bowers began calling you a liar and a murderer,
8  and that as the tears were rolling down your
9  face, you asked to see Officer Brown; is that
10  true?
11    A.    It sounds about right.
12    Q.    And it said that when she came in, I
13  turned to her and said okay, I did it?
14    A.    No.
15    MR. TAYLOR:  Are you asking him -- wait
16  until he asks you a question before you --
17  BY MR. SOTOS:
18    Q.    -- did you write that?
19    MR. TAYLOR:  Objection, form and
20  foundation.
21    THE WITNESS:  I don't remember if that
22  was what was written or was taken from the
23  report.
24    As I stated, I sent police reports and

131

1  things every time I wrote something, so they --
2  it could have been written in there, but I don't
3  remember saying that to her, period, until the
4  ends of her questioning into polygraph
5  examination.  I said in my last breath, okay, I
6  did it, can I go home, as I stated to you before
7  in the report.
8  BY MR. SOTOS:
9    Q.    Okay.  Are you saying that you didn't
10  write this where it states I asked to see
11  Officer Brown; when she came in, I turned to her
12  and said, okay, I did it.
13    A.    Okay.  Do you remember I said that I
14  asked for her; I did not say that I turned to
15  her and said I did it.  That's not what I did.
16  I told you I was standing at the -- I am
17  saying --
18    Q.    -- go ahead, go ahead.
19    A.    You're running both together, but I'm
20  saying I was standing at the window crying, then
21  came in, she asked me to sit down, and we began
22  to talk, and she questioned me about what
23  happened, and then she started telling me what
24  happened, and it just went on for whatever

132

1  length of time it did, and then as I couldn't
2  take it no more, I said okay, I did it, can I go
3  home.
4      Q.  Okay.  And I'm trying to avoid what
5  you're concerned about confusing the two, so
6  that's -- you just told me what happened.
7          What I'm asking now is did you write
8  that I asked to see Officer Brown; when she came
9  in, I turned to her and said, okay, I did it.
10         MR. TAYLOR:  Objection.
11         THE WITNESS:  No, I did not write --
12         MR. TAYLOR:  -- foundation.
13  BY MR. SOTOS:
14     Q.  You did not -- I didn't hear your
15  answer.
16     A.  I said no, I didn't write it.  They
17  could have edited from the reports that I sent
18  in with it.  I wrote -- I did write this
19  article, but I wasn't the only one who -- I
20  don't know who else they had to read over the
21  documents -- that's like make and put it
22  together.
23     Q.  All right.  Well, there's a reference
24  to an editor named -- a woman named Natalie
                                              133

1  Smith Parra says she edited this article, and I
2  don't -- at least on the article I don't see any
3  reference to others.
4          On the last page, if you go to
5  Page 26886, you list --
6      A.  -- wait a minute.  Okay.  Second to the
7  last page?
8      Q.  All the way to the last page.
9      A.  Okay.
10     Q.  The very last page where it says
11  Governor Rod Blagojevich at the top.
12     A.  Yes.
13     Q.  Yeah.  It says that you list your
14  attorneys with Jenner and Block, Chris Tompkins,
15  T-o-m-p-k-i-n-s, Matthew Neumeier,
16  N-e-i-m-e-i-e-r; do you see that?
17         MR. BOWMAN:  I object to the form of
18  the question.
19  BY MR. SOTOS:
20     Q.  Do you see that on the last page where
21  it lists those two lawyers Christopher Tompkins
22  and Matthew Neumeier?
23     A.  Yes.
24     Q.  Okay.  Those were lawyers of yours from
                                              134

1  Jenner and Block?
2      A.  Yes.
3      Q.  At the time, correct?
4      A.  Yes.
5      Q.  All right.  And because you were
6  seeking a Petition for Clemency before Governor
7  Blagojevich at the time, right?
8      A.  Yes.
9      Q.  Okay.  So, when this article was
10  written, did your lawyers review it before it
11  was submitted?
12         MR. TAYLOR:  Objection --
13         MR. BOWMAN:  -- Yeah, objection, I
14  don't think there is a foundation for the
15  question, and to the extent there is, I think
16  it's probably privileged.
17         So, I don't think I should permit him
18  to answer that question.
19         MR. SOTOS:  Okay.
20  BY MR. SOTOS:
21     Q.  Did you read the article before it was
22  published?
23     A.  No.
24     Q.  Have you ever read it before I just
                                              135

1  showed it to you today?
2      A.  I have seen it online.
3      Q.  And have you read it?
4      A.  Yes.
5      Q.  Okay.  Did you see the paragraph in
6  there where it says that when Officer Brown
7  entered the room, you turned to her and said
8  okay, I did it?
9      A.  Yes, I see it.
10     Q.  Okay.  When you saw that, did you feel
11  that that was not what you actually wrote?
12         MR. TAYLOR:  Objection, form.
13         THE WITNESS:  I feel they could have
14  took that from the report, or you know, however
15  they view it as I laid it out, I could see that
16  some things have been changed or, you know, they
17  took the report and took what I said and tried
18  to merge it and put a story together like all
19  reporters.
20  BY MR. SOTOS:
21     Q.  And nobody has told you that, right;
22  you are just trying to put two and two together,
23  is that right?
24         MR. TAYLOR:  Objection, form.
                                              136



1          THE WITNESS:  No, I have not had a
2     conversation with anyone about this article.
3     BY MR. SOTOS:
4          Q.   Okay.
5          A.   Until this day.
6          Q.   All right.  When you are saying they,
7     they could have done that, do you know any
8     actual person who could have done that like
9     anybody you were working with on the article?
10         A.   No.
11         Q.   No.  Okay.  In the next paragraph of
12    that same paragraph we just started talking
13    about, in the next sentence to that same
14    paragraph on Page 2, it says, Officer Brown
15    asked me how I did it, and I said I didn't know,
16    so she began to guide me with words to use; you
17    did write -- did you write that?
18         A.   Yes.
19              MR. TAYLOR:  Objection, form.
20              THE WITNESS:  Yes.
21    BY MR. SOTOS:
22         Q.   Okay.
23         A.   Probably not like that though, but
24    close to it.

                                              137

1          Q.   The substance is the same, right?
2          A.   Yes.
3          Q.   Not word for word?
4          A.   No, yeah, it's the same.
5              MR. BOWMAN:  Object to form of the
6     question.
7     BY MR. SOTOS:
8          Q.   And you wrote that you agreed with
9     whatever she said, correct?
10         A.   Yes, I did.
11         Q.   All right.  Okay.
12         A.   Excuse can we a --
13         Q.   -- yeah, you need a break?
14         A.   Yes, to use the washroom.
15              MR. SOTOS:  How long are we at?
16              THE VIDEOGRAPHER:  2 hours and 24
17    minutes.
18              The time is 15:47, and we are off the
19    record.
20              (Whereupon, a short recess was
21               taken.)
22              THE VIDEOGRAPHER:  We are back on the
23    record.  The time is 16:08.
24

                                              138

1     BY MR. SOTOS:
2          Q.   Mr. Savory, if we could return to
3     Exhibit 10 and ready to go.
4          A.   Yes, sir.
5          Q.   If you look at Page 5830 --
6              MR. TAYLOR:  -- not this one, Jim --
7              MR. SOTOS:  -- thank you for that.
8     BY MR. SOTOS:
9          Q.   Before we leave the article that was
10    Exhibit 21, is there anything that you can tell
11    me about that article that we haven't talked
12    about in terms of anybody else who worked on it,
13    reviewed it, other than lawyers who represent
14    you, is there anything else you know about that
15    beyond what we've already discussed?
16         A.   No, sir.
17         Q.   Okay.  Let's go back to Exhibit 10.  If
18    you could go to Page 5830 which is the one, two,
19    three -- fourth page of the exhibit.
20         A.   Which one is that?
21         Q.   It's that report, No. 10.
22         A.   Is this it?
23              MR. TAYLOR:  Let me look at it.
24              MR. SOTOS:  5830, 31.

                                              139

1              MR. TAYLOR:  Yes, this is it.
2              MR. SOTOS:  Okay.  Thanks.
3     BY MR. SOTOS:
4          Q.   So, if you go to the fourth page, it
5     says 5830 on the bottom in the left-hand corner.
6          A.   58 -- 5830, 5832, 5831 -- you said
7     5830.
8          Q.   Yeah.
9          A.   This is it.
10         Q.   Got it.
11         A.   Yes, sir.
12         Q.   So, in the middle of that page Marcella
13    Teplitz describes her discussion with you during
14    the polygraph, and she wrote -- writes that at
15    7:35 she entered the polygraph room and asked
16    you what it was that you wanted to tell her, did
17    she do that?
18              MR. TAYLOR:  Objection, form,
19    foundation.
20    BY MR. SOTOS:
21         Q.   Did you tell her, did you say that to
22    her?
23              MR. TAYLOR:  Objection.
24              MR. SOTOS:  Oh, I'm sorry.

                                              140



1  BY MR. SOTOS:
2      Q.  Did she ask you what it was you wanted
3  to tell her?
4          MR. TAYLOR:  Same objection.
5          THE WITNESS:  I don't recall that's how
6  she started the conversation, I don't recall
7  that.
8  BY MR. SOTOS:
9      Q.  Do you recall the conversation starting
10  a different way?
11      A.  I don't remember exactly.  It's has
12  been almost 50 years ago, 46 years ago, but I
13  know when we sat down, she started out -- she
14  asked me a bunch of questions, you know, and I
15  gave the best answer I could to those questions,
16  but she -- they wasn't the right answers
17  according to her, so she then began to, as I
18  stated before, began to tell me that no, it
19  didn't happen, then she asked me like where the
20  crime take place, and I said okay, the living
21  room, she would say no, you're wrong; so she
22  began to tell me, because I did not even know, I
23  didn't know what she was asking me.
24      Q.  At the polygraph office?

141

1      A.  Yes, at the polygraph office, yeah.
2  So, as she wrote along, all I did was I began to
3  agree with her, whatever she said I just agreed
4  to it, and once we were finished with our
5  conversation I said, can I go home, you know,
6  okay, I did -- can I go home.
7      Q.  What did she say?
8      A.  She said no.
9      Q.  She said no?
10      A.  I think she said no, and she still
11  tried to ask me some more questions.
12          Then she started to tell me that, you
13  know, she said a lot of things, and I just --
14      Q.  -- let me ask you about a couple that
15  she wrote on here.
16          She said that you said to her that you
17  and Scopey were practicing karate, and Scopey
18  turned the TV to the wall; did you tell her
19  that?
20          MR. TAYLOR:  Where is this, Jim?
21          MR. SOTOS:  It's right in the middle of
22  Page 5830, the discussion that Marcella had with
23  Mr. Savory in the polygraph examination.
24          MR. TAYLOR:  Okay.  Objection, form and

142

1  foundation.
2  BY MR. SOTOS:
3      Q.  Okay.  So did you say to her that you
4  and Scopey were practicing karate, and Scopey
5  turned the TV to the wall?
6      A.  I did not say that we were practicing
7  karate, because we were never practicing karate,
8  we was wrestling on the day of the 17th.  I did
9  nothing on the 18th, because I was never in
10  their home on the 18th.
11      Q.  So, is it your testimony that you never
12  confessed to killing Scopey and Connie on the
13  18th?
14          MR. TAYLOR:  Objection, form and
15  foundation.
16          THE WITNESS:  It is my answer to your
17  question I said whatever she -- I agreed to
18  whatever she asked me to do, and I did it up
19  until the point that I was just, you know, I
20  mean -- I just went through a barrage of
21  questioning and stuff like that.
22  BY MR. SOTOS:
23      Q.  Well, how about the next sentence where
24  it says he, Scopey, was punching me with his

143

1  finger, and then he raised his hands; did you
2  ever say that?
3          MR. TAYLOR:  Objection, form,
4  foundation.
5          THE WITNESS:  It was lots here, I did
6  my best to tell her what, you know, she wanted
7  to hear whatever so it could stop.  I just
8  wanted everything to end, you know.
9  BY MR. SOTOS:
10      Q.  Did you hold up your hands --
11          MR. TAYLOR:  -- Jim, it seems like
12  you're cutting him off a couple of times here,
13  and wait to make sure he finishes.  Just ask him
14  if he is finished, it seemed like he might be
15  not finished.
16          THE WITNESS:  I did the best and told
17  the truth to the best of my ability, and the
18  truth got me nowhere, so I agreed as she
19  continued to word me along just so it could
20  stop.
21          I just wanted it to stop, man, I don't
22  know how to express it any other way is but it
23  was too much.
24

144

BY MR. SOTOS:

Q.    Well, here's what I want to ask you.  I want to ask you whether or not you said these things that she wrote, and if you did, say I said that; if you didn't say it, tell me you didn't say it, and if you don't remember, say I don't remember if I said that.

But I understand what you're saying generally how everything went, but I'm just trying to find out which statements in here you're saying are untrue that you didn't say what she claims you said.

So, for instance, she says that you put up your hands with your elbows bent in a way to demonstrate what Scopey had done?

A.    I have no recollection of that, of telling her that, I don't remember putting up my hands for nothing.

Q.    Are you saying that you didn't do that?

MR. TAYLOR:  Objection, form, foundation.

THE WITNESS:  I'm saying I have no memory of me putting up my hands demonstrating anything to her.

145

BY MR. SOTOS:

Q.    According to the report you said that you had the knife, and you stuck Scopey; did you tell her that?

MR. TAYLOR:  Objection, form, foundation.

THE WITNESS:  I told her whatever she suggested to me, that's what I told her, that's what I agreed to.

I agreed to the things that she told me about it, because I knew nothing about the crime, nor was I there on the 18th and committed a crime against anyone.

BY MR. SOTOS:

Q.    Did you tell her my mind went blank?

A.    I don't -- I don't -- I can't remember that.  All I know is I said, eventually I said I did it so I could go home.  All I wanted to do was go home, that's the -- everything, the only thing I know that I kept saying and I didn't do anything, didn't harm anybody, and to this day I've never taken another human being's life or even remotely been in a position to have to do that.

146

Q.    So, you remember telling her I did it, but you told her that so you could go home?

A.    And you will see in every report you read I just wanted to go home, and they wouldn't let me go home, they wouldn't stop asking me questions, it was over, and over, and over.

I was only 14 years old, I just turned 14 years old, and that was almost 50 years ago almost.

Q.    Did you tell her you lost control?

MR. TAYLOR:  Objection, form, foundation.

THE WITNESS:  I don't remember all that was said, you know, and I don't know -- I can't remember everything that she worded me along to say.  All I know is it didn't last that long, our conversation, and whatever took place in that brief time, my mind said I didn't want to be here, and I wanted someone it to help me get out of here and go home.

BY MR. SOTOS:

Q.    So, I appreciate what you're saying --

A.    -- yes, sir.

Q.    Here's what I want you to understand.

147

I've got to have this all done in four hours, and so if we can get through these questions and answers, we will get it done in four hours, but at some point I'm going to ask you to just listen to the question I'm asking, and try and answer that question, because I understand what you're saying about everything that happened in there, but now I'm just trying ask some specific questions about some specific things, and it's fine for you to say I don't remember if I said that or not.

My only point is that's a little different from saying I definitely didn't say this, and if that's the case, I need to know that now.  Okay?

MR. BOWMAN:  I object to the form of the question.

BY MR. SOTOS:

Q.    All right.  Did you tell her that you cut Connie?

MR. TAYLOR:  Objection, form.

THE WITNESS:  Say again.

BY MR. SOTOS:

Q.    Did you tell Marcella that you cut

148

Connie?

A.   No, I did not remember telling that, but I agreed to whatever she told me to, that she suggested I did just that, and I made it clear I did what she suggested, whatever she suggested to me how it happened, and whatever took place, I just agreed to it, and I state to you again, all I kept saying, I know you're trying to get through this here --

Q.   -- I just don't want to have to go in and ask for more time again.  I really don't want to do it.

A.   Well, I really don't want to be interrogated like -- I really don't want to go through it either, because I have spent all my life in prison, lost my entire family and lost my life trying to prove my innocence and that nothing -- and to assist in trying to solve the case itself, so I don't want that.

I did not commit no crime, and nor did I understand what she was asking me.

Q.   I didn't ask you that.

A.   I understand, but you keep asking me the same question about --

149

Q.   -- all this is -- did you tell her you ran home and got drunk after what happened at Scopey's house?

A.   No.

Q.   Okay.  Did you say you stayed drunk for four days and didn't come home at all?

A.   No.

Q.   Okay.  According to this report she asked you whether or not it was your knife, and you said yes; did that happen?

A.   It could have, I don't know.

Q.   Okay.  She said that she asked you whether the police have the knife, and you said yes; do you remember if that happened?

MR. TAYLOR:  Objection, form and foundation.

THE WITNESS:  No.

BY MR. SOTOS:

Q.   Okay.  She said that -- she asked you where did you cut her, being Connie, and your answer was, I started at the chest and her vagina, and that you pointed between your legs and around her mid section, and that you made a cutting motion across your abdomen; did that

150

happen?

MR. TAYLOR:  Objection, form and foundation.

THE WITNESS:  No.

BY MR. SOTOS:

Q.   Okay.  She asked you, according to the report, she said -- she asked you why did you do it, and you said we started off playing, and he wanted me to practice with a knife, I did not mean to do it; did that happen?

MR. TAYLOR:  Objection, form and foundation.

THE WITNESS:  I think she may have suggested those things to me.

BY MR. SOTOS:

Q.   Okay.  By the way, in that same realm, and now I'm moving forward to 1981, do you remember before the second trial, have you seen the reports where different Peoria police officers interviewed some people who were at the -- who claim they were at the Gift Home with you; Tommy Thompson, Freddie Yarburaugh, William Poolle; do you remember seeing those reports at some point?

151

A.   I remember them mentioning that at trial, I don't remember seeing no reports.

Q.   Okay.  We will get to them.  I was just trying to short circuit.

You said it didn't last long when you were talking to Marcella in the polygraph?

A.   It didn't seem to.

Q.   Okay.  After that interview, where did you go then, what happened after that?

A.   I believe they took me back to the police station.

Q.   Okay.  According to the report, at the top of Page 5831, you said at some point that you didn't want to stay at the polygraph office so you were immediately returned to the Juvenile Bureau by Teplitz, Fiers, and Percy Baker; do you remember seeing Percy Baker after that second polygraph?

MR. TAYLOR:  Objection, form, foundation.

THE WITNESS:  I don't remember seeing him.  I know he was there, but I don't remember if he rode in the car or whatever.  I don't remember going back to the Juvenile Bureau.  I

152

1  remember going back to the police station.
2  BY MR. SOTOS:
3      Q.  Percy Baker sat with you during the
4  trial, right, not with you, but he was there for
5  the trial?
6          MR. TAYLOR:  Objection.
7  BY MR. SOTOS:
8      Q.  The first trial in 1977?
9          MR. TAYLOR:  Objection, form.
10         THE WITNESS:  I believe he was at the
11  trial, but he was there as a witness or
12  something, but he didn't sit with me.
13  BY MR. SOTOS:
14     Q.  Okay.  You just remember him being
15  present throughout the trial?
16     A.  I remember him testifying, if I'm not
17  mistaken.
18     Q.  Okay.  Do you remember his lawyer
19  telling the Court -- I'm sorry, your lawyer
20  telling the Court that Percy Baker was that we
21  know for sure he was there for some of your
22  statements?
23         MR. TAYLOR:  Objection, form and
24  foundation.
                                                    153

1          THE WITNESS:  No.
2  BY MR. SOTOS:
3      Q.  You don't remember that?
4      A.  No.
5      Q.  Okay.  After you left the polygraph,
6  you went back to the Peoria Police Department,
7  correct?
8      A.  That's what I remember.
9      Q.  Okay.  And then do you remember
10  Marcella Teplitz, Marcella Brown at the time,
11  questioning you again?
12     A.  Yeah, she tried to get me to sign some
13  statement.
14     Q.  Okay.  What do you mean when you say
15  she tried to get you to sign a statement?
16     A.  Well, she said she wanted me to sign a
17  statement, I didn't never seen no statement in
18  her hand or whatever, I don't know exactly what
19  was in there, but I guess -- I don't even know
20  what she meant, because she began to tell me
21  that I was backtracking, and I told her I hadn't
22  done anything to anyone, and she just -- she
23  wasn't happy.  That's the only time I notice her
24  voice change and her demeanor change.
                                                    154

1      Q.  If you go to Page 5831 --
2      A.  -- 5831.
3      Q.  That top paragraph, she says there that
4  you said that you did not kill the victims and
5  didn't know why you told her what you said, and
6  that she told you you were backtracking,
7  correct?
8      A.  Yes.
9      Q.  Okay.  So -- and that did happen,
10  right?
11     A.  Yes.
12     Q.  Okay.  Did you say to her as part of
13  that, that you don't know why you told her and
14  Mr. Bowers, why you had told them that you had
15  done the murders?
16         MR. TAYLOR:  Objection, form,
17  foundation.
18         THE WITNESS:  I did not say that I told
19  Mr. Bower that.
20  BY MR. SOTOS:
21     Q.  Okay.  Did you -- did you tell her that
22  you didn't know why you told her that you had
23  done the murders?
24         MR. TAYLOR:  Same objection.
                                                    155

1          THE WITNESS:  I could have said that.
2  BY MR. SOTOS:
3      Q.  Yeah, and she wrote that in this report
4  that you said that, right?
5          MR. TAYLOR:  Objection, the report
6  speaks for itself.
7          MR. SOTOS:  Okay.
8  BY MR. SOTOS:
9      Q.  And she told you that she thought you
10  were trying to backtrack?
11     A.  Yes.
12     Q.  And then she continued to ask you about
13  the case after that?
14     A.  No, she had -- she became upset when I
15  wouldn't sign the statement and when I said that
16  I had not harmed anyone.  It's like it was
17  unacceptable for me to --
18     Q.  -- okay.  After that, did she start
19  questioning you again about the case after she
20  told you you were backtracking, and you said you
21  weren't going to sign the statement?
22     A.  I'm sure she asked me something, I
23  don't know, it was too much after that, I don't
24  know what really took place.  I know she was not
                                                    156



Johnnie Lee Savory  02/17/2023

1  happy.
2      Q.   But she never raised her voice to you,
3  did she?
4          MR. TAYLOR:  Objection, form,
5  foundation.
6          THE WITNESS:  No, but she let me know
7  that she wasn't happy with it, and she was a
8  little upset, because I said I did not harm
9  anyone.
10         I don't know if she -- I don't know
11 what her thoughts was, let me put it that way.
12 I know that things were it seemed like it was me
13 against the world; that's the only way I could
14 explain it.
15 BY MR. SOTOS:
16     Q.   Now if you look at the top of Page 5832
17 in the fourth line down it says she, referring
18 to Connie, started screaming and was wearing a
19 blue nightgown, and according to Marcella Brown
20 that's what you said that Connie was screaming
21 and was wearing blue nightgown; did you say that
22 to her?
23         MR. TAYLOR:  Objection.  I'm a little
24 unclear, is this -- where is this supposed to

157

1      A.   Yes, sir.
2          MR. TAYLOR:  I was just -- objection to
3  the form.
4  BY MR. SOTOS:
5      Q.   So, did you know Jessie Mae Mason?
6      A.   Yes.
7      Q.   Yes?
8      A.   Yes.
9      Q.   And who was she?
10     A.   The mother of Ray Mason.
11     Q.   Ray Mason?
12     A.   Yes.
13         MR. TAYLOR:  Are you looking at a
14 particular exhibit?
15         MR. SOTOS:  Yeah, I'm looking at
16 Exhibit 12.
17         MR. TAYLOR:  Okay.
18         MR. SOTOS:  So, if you want him to take
19 a look at it.
20         MR. TAYLOR:  Do you want him to look at
21 it, or you just want --
22         MR. SOTOS:  -- in a minute.  You can
23 put it in front of him now.  If he wants to
24 start reading it, that's fine.

159

1  have happened?
2  BY MR. SOTOS:
3      Q.   This is back at the police station
4  after the polygraph, after she told you you were
5  backtracking, she wrote that one of the things
6  you said after that was that Connie started
7  screaming and was wearing a blue nightgown; did
8  you say that to Marcella?
9          MR. TAYLOR:  Objection, form, and
10 foundation.
11         THE WITNESS:  I have no recollection of
12 saying that to -- I'll repeat again; whatever
13 she said before, I just went along with whatever
14 she said.  I did not make -- I don't have no
15 recollection of making that statement to her.
16 BY MR. SOTOS:
17     Q.   So, if there's any reference to a -- so
18 if there is reference you see to the blue
19 nightgown, you wouldn't -- the only way that
20 would have happened is if she mentioned it
21 first --
22         MR. TAYLOR:  --objection --
23 BY MR. SOTOS:
24     Q.   -- is that what you're saying?

158

1          MR. TAYLOR:  I will wait for you to
2  tell him.
3          MR. SOTOS:  Go ahead, that's fine.
4  BY MR. SOTOS:
5      Q.   Mr. Savory, your Counsel has placed in
6  front you Exhibit 12 which is a report written
7  by an Officer Black about an interview that he
8  did with Jessie Mae Mason, it's Savory 5884
9  through 5888.
10         So, the first page purports to be an
11 interview that Officer Black did with Jessie Mae
12 Mason on January 28th, 1977, and in that report
13 Officer Black writes that you stayed at her
14 house on Saturday, January 15th; do you see that
15 about four, five lines down there in that first
16 pull paragraph?
17     A.   Yes.
18         MR. BOWMAN:  Object to the form of that
19 question.
20 BY MR. SOTOS:
21     Q.   Okay.  Do you see what I'm talking
22 about?
23     A.   Yes, sir.
24         MR. BOWMAN:  Same objection.

160



BY MR. SOTOS:
1
2      Q.   Okay.  Did you, in fact, stay at
3  Mason's house on the 15th?
4           MR. TAYLOR:  Objection to the form and
5  foundation for that question.
6           THE WITNESS:  I have absolutely no
7  memory of 45, 50 years what I did on the 15th of
8  January.
9  BY MR. SOTOS:
10     Q.   So, just to put it in context, that is
11  you know, three days -- two days before you
12  state you were at Scopey's house, and three days
13  before the murders, you don't know if you were
14  there or not that night?
15     A.   I haven't spent the night outside of my
16  home too many nights in my life, so I don't have
17  no memory of January 15th, 2000 -- I mean 1977.
18     Q.   Okay.  And according to the report,
19  Jessie Mae Mason said that you stayed overnight
20  the 15th, left the 16th, and then returned to
21  her house on the 17th when her daughter Barbara
22  was going to braid your hair, so that's on the
23  17th.
24           Were you at the Mason's house on the

161

1  17th?
2           MR. TAYLOR:  Objection, foundation and
3  form.
4           THE WITNESS:  No, sir, not to my
5  memory.
6  BY MR. SOTOS:
7      Q.   You don't remember, or that doesn't
8  refresh your recollection about Barbara was
9  going to braid your hair in the afternoon of the
10  17th?
11     A.   No, and I didn't have no braids in my
12  hair on the 17th or the 15th, or no time.
13     Q.   Okay.  If you look down at the next
14  sentence, it states that Savory left the
15  residence immediately after his hair was braided
16  and did not return until 1:00 on the 18th.
17           Were you at the Mason's house on the
18  18th?
19     A.   No, sir.
20     Q.   According to the report, on the 18th
21  you said something to the effect of they killed
22  my partner, they killed my best friend and his
23  sister.
24           Did you ever have a discussion with

162

1  Jessie Mae Mason or where she was present about
2  the murder of Connie and Scopey ever?
3           MR. TAYLOR:  Objection, form and
4  foundation.
5           THE WITNESS:  No.
6  BY MR. SOTOS:
7      Q.   Did you know a young lady named Ann
8  Cooper?
9           MR. TAYLOR:  Who?
10           MR. SOTOS:  Ann Cooper.
11           MR. TAYLOR:  Thank you.
12           THE WITNESS:  It's been a long time, I
13  don't know.
14  BY MR. SOTOS:
15     Q.   You don't recognize that name?
16     A.   I don't recognize it.
17     Q.   So, you didn't -- you weren't with Ann
18  Cooper on the 18th, January 18th, 1977?
19           MR. TAYLOR:  Form and foundation,
20  objection.
21           THE WITNESS:  No, sir.
22  BY MR. SOTOS:
23     Q.   Do you remember being with her any time
24  around that where you went with her to a Pepe's

163

1  Taco on Western Avenue, you bought some tacos
2  and went back to your apartment?
3      A.   No, sir.
4      Q.   Did you know where a Pepe's Taco was
5  back around this time?
6      A.   No, sir.
7      Q.   Okay.  Has Ann Cooper ever been to your
8  apartment?
9           MR. TAYLOR:  Objection, form and
10  foundation.
11           THE WITNESS:  I don't recall Ann
12  Cooper.
13  BY MR. SOTOS:
14     Q.   Okay.  So, you never -- you don't
15  recall her being at your -- where you lived
16  ever?
17     A.   I don't recall Ann Cooper, period.
18     Q.   Okay.  According to this report if you
19  look at Page 5887 --
20     A.   -- 87.
21     Q.   She says that on the 18th, if you look
22  about 10 lines from the bottom of that page,
23  that you tried to talk her into having sexual
24  intercourse with your father, but she declined

164



1   to do so.
2        A.   Where do you see --
3        Q.   -- it starts out by saying Cooper
4   stated that Johnnie Savory -- do you see it?
5        A.   I see it, but I don't --
6             MR. TAYLOR:  -- hold on, wait --
7             MR. BOWMAN:  --wait on --
8             MR. TAYLOR:  -- wait until the question
9   comes.
10  BY MR. SOTOS:
11       Q.   So, that never happened?
12            MR. TAYLOR:  Objection, form,
13  foundation.
14            THE WITNESS:  No.
15  BY MR. SOTOS:
16       Q.   And you don't -- well, you don't
17  remember her at all?
18       A.   No, sir.
19       Q.   All right.  I asked you some questions
20  about Ray Mason whether you were at his house
21  before the murders.
22            What about after the murders, like on
23  January 19th, the day after the murders, were
24  you at the Mason's house that day?

                                                    165

1        A.   Actually I just don't have no memory of
2   what the 19th of January was.
3        Q.   Yeah, and I think you -- the Judge has
4   said that I can't really ask you about your
5   memory.
6             MR. SOTOS:  So, can you put Exhibit 15
7   in front of the Plaintiff?
8             MR. TAYLOR:  One page?
9             MR. SOTOS:  Yes, it's a one page
10  report.
11            MR. TAYLOR:  I will put it at the top
12  of the document there, it's harder to find.
13            MR. SOTOS:  I don't know where they
14  marked it, mine's not marked.
15  BY MR. SOTOS:
16       Q.   So, Mr. Savory, what your Counsel has
17  placed in front of you is Exhibit No. 15, Bates
18  number Savory --
19            MR. TAYLOR:  -- one second.  Let us
20  find it here in our packet here, Jim.  It's at
21  the top, the marking is at the top.
22            MR. BOWMAN:  Exhibit 15.  Okay.
23  BY MR. SOTOS:
24       Q.   Savory 5856, this is a one page report

                                                    166

1   written by an Officer Hammer who says that he
2   talked to Jessie Mae Mason and on January 26th,
3   and she said that you were at her house the day
4   after the murders.  She believed that day to be
5   Wednesday, and that you said something bad had
6   happened to your friends, that they were cut up
7   and killed.
8             So, does that jog your memory about
9   whether you would have had that conversation
10  with at Jessie Mae Mason's house on the 19th?
11       A.   No, sir.
12            MR. TAYLOR:  Objection, form and
13  foundation.
14  BY MR. SOTOS:
15       Q.   Did that -- are you saying that that
16  did it not happen?
17            MR. TAYLOR:  Same objection.
18            THE WITNESS:  I have no memory of the
19  19th.  I don't have no recollection of talking
20  to Jessie Mason or anyone else on the 19th of
21  January.
22  BY MR. SOTOS:
23       Q.   Could you have talked to her on the
24  19th and told her that your friends were cut up

                                                    167

1   and killed, cut up bad and killed?
2             MR. BOWMAN:  Objection to the form of
3   the question.
4             THE WITNESS:  No, not to my -- I don't
5   remember having no conversation with Jessie,
6   period, at no time.
7   BY MR. SOTOS:
8        Q.   So, you don't remember if that
9   happened?
10       A.   I wouldn't have never told her nothing
11  like that.
12       Q.   Okay.
13       A.   I don't even know her -- I mean I know
14  of her, that's it.
15       Q.   Did you know a Marshall Thompson?
16       A.   Yeah, I believe we used to go to school
17  together, yeah.
18            MR. SOTOS:  Can you place Exhibit 16 in
19  front of the Plaintiff, please?
20            MR. TAYLOR:  Another one at the top.
21  All right.
22  BY MR. SOTOS:
23       Q.   Mr. Savory, your Counsel has placed in
24  front of you Exhibit No. 16, it's Savory

                                                    168



1 5932-33, and it's a report dated February 4th,
2 1977 authored by Officer Brown.  And it purports
3 to recount a conversation that Officers Brown
4 and Haynes had with Marshall Thompson in which
5 he says he was -- in which he states that you
6 told him that you were at the Mason's house from
7 Wednesday the 19th through Friday the 21st;
8 January 19 through the 21, and that you had been
9 at a party for three nights straight and had
10 been drunk for three nights; do you see that?
11     A.   I see it.
12     Q.   Okay.  Did that happen?
13          MR. TAYLOR:  Jim, correct me if I'm
14 wrong, but are you -- I didn't think he was
15 permitted to question the dates after the 18th
16 during that period from the 19th to the 25th.
17          MR. SOTOS:  No, the 19th I specifically
18 can, so I suppose technically you can say I
19 could ask him about the 19th and then cut it
20 off, but it's what Thompson is describes is the
21 19th through the 21st, so --
22          MR. TAYLOR:  -- all right.  Go right
23 ahead.
24
                                            169

1 BY MR. SOTOS:
2     Q.   So, did you ever have a conversation
3 with Marshall Thompson about being at Ray
4 Mason's house from January 19th through the
5 21st, and being drunk for three days?
6          MR. TAYLOR:  Objection, form and
7 foundation.
8          THE WITNESS:  No, I don't remember
9 having any conversation with anyone about
10 anything after the 19th, 20th, or no other time,
11 and for the record I've never been drunk even to
12 this day.
13 BY MR. SOTOS:
14     Q.   In your life?
15     A.   Period.
16     Q.   Okay.  So, if Marva Jones said you
17 showed up at her house one day, and you smelled
18 of alcohol, that's not --
19     A.   -- she would be lying.
20     Q.   From smelling of alcohol?
21          MR. TAYLOR:  Objection, form and
22 foundation.
23 BY MR. SOTOS:
24     Q.   Okay.  You had a good relationship with
                                            170

1 Marva Jones though, right?
2     A.   She was a good -- like a big sister.
3     Q.   You can't really think of any reason
4 why she would lie about you, right?
5          MR. BOWMAN:  Objection to the form of
6 the question.
7          THE WITNESS:  That's -- I don't believe
8 she even said it, to be honest.
9 BY MR. SOTOS:
10     Q.   Okay.  All right.  Do you see at the
11 bottom of the page where Thompson said that --
12 well, forget about that, forget about that.
13          MR. SOTOS:  Okay.  I kind of have to
14 jump around a little bit here because of the way
15 this Judge's Order is read, and I'm trying to
16 comply with it so we don't have to start doing
17 what we do.
18          So, I'm going to ask you to look at
19 Exhibit No. 17.
20          MR. TAYLOR:  It's a big one.
21          MR. SOTOS:  How much time do we have
22 left?
23          THE VIDEOGRAPHER:  57.
24          MR. SOTOS:  Okay.  All right.
                                            171

1 BY MR. SOTOS:
2     Q.   Your Counsel has placed in front of you
3 Exhibit No. 17, Savory 5858 through 5867, and
4 this purports to be a report prepared by
5 Officers Pinkney and Haynes about their
6 interview with you at the late afternoon school,
7 the first time you talked to any police officers
8 on the 25th; you remember them coming to the
9 school, right?
10     A.   Yes.
11     Q.   Okay.  And so if you go to Page 4 of
12 this document, Savory 5861, are you there?  I
13 don't mean to rush you.
14     A.   You said where, 5861.
15     Q.   61, yeah.
16     A.   Okay.
17     Q.   It says in the -- at 3:30 that you were
18 directed to the officers location by Mr.
19 Richardson, and that Officer Haynes said to you
20 we would like to talk to you about Scopey, and
21 that you immediately replied I don't want to
22 talk about it, I won't make any statements.
23          MR. BOWMAN:  Jim, we went through this
24 last time.
                                            172

Johnnie Lee Savory  02/17/2023

1    MR. TAYLOR:  Yeah.
2    MR. BOWMAN:  I have a pretty distinct
3  recollection going through this.
4    MR. SOTOS:  No, this is covered by
5  whether or not these officers made false
6  statements in the report, and that's all I'm
7  going to ask about.
8    MR. BOWMAN:  Well, I mean I want to
9  have peace in the realm of not, you know, argue,
10  but the Order I think it kind of ambiguous as to
11  whether it's Johnnie's false statements, or the
12  officers' false statements, or what exactly it
13  is, and I'm just saying we did definitely go
14  through this before.
15    MR. SOTOS:  Yeah, I know, and I read
16  the dep, he was asked about --
17    MR. BOWMAN:  -- yeah --
18    MR. SOTOS:  -- about the interview.  I
19  don't think he was asked what statements in
20  there were false.
21    MR. BOWMAN:  Okay.  If that's what
22  you're asking is whether it's an accurate
23  record, and then --
24    MR. SOTOS:  -- that's what I've asked.

173

1    MR. BOWMAN:  Whether it is an accurate
2  record, and that's all you're asking?
3    MR. SOTOS:  Yeah, that's all.
4    MR. BOWMAN:  Okay.  All right.  The
5  hour is late.
6    MR. SOTOS:  Right.  I've only got --
7  it's going to be 55 minutes, and we're going to
8  be done.
9  BY MR. SOTOS:
10    Q.  So, it says according to the report
11  that Officer Haynes asked -- told you that we'd
12  like to talk to you about Scopey, and that you
13  replied, I don't want to talk about it, I won't
14  make any statements.
15    Is that accurate in terms of what the
16  officers said to you, and what you said to them?
17    A.  It seemed to be.
18    Q.  Okay.  And then they shortly after that
19  persuaded you to talk to them, correct?
20    MR. TAYLOR:  Objection to the form.
21    THE WITNESS:  Yes, they told me that
22  maybe I saw something that would help them, or
23  maybe I heard something, or what have you.
24

174

1  BY MR. SOTOS:
2    Q.  Okay.  And at the very bottom of that
3  page there is a question and answer, it says,
4  now this is referring to for context, January
5  17th when you were at Scopey's house where it
6  says then what did you do, and the answer was we
7  went into the front room, put the TV on the
8  floor, the long table across the arm of the
9  chair and started wrestling.
10    Is that accurate in terms of what they
11  asked you and what you said to them?
12    MR. TAYLOR:  Objection, form and
13  foundation.
14    THE WITNESS:  No.
15  BY MR. SOTOS:
16    Q.  What's inaccurate about it?
17    A.  Sitting the TV on the floor.
18    Q.  Okay.  Did you tell them anything about
19  the TV?
20    A.  I don't recall.
21    Q.  So, you don't remember if you said what
22  you testified to here that the TV was on a stand
23  with wheels --
24    A.  -- that's what I recall.

175

1    Q.  You just don't recall if you told them
2  that during that first, very first discussion?
3    A.  It didn't last long at the school, so
4  no, I don't recall.
5    Q.  Okay.  They said in the next page if
6  you turn to 5862, that you went back -- I'm
7  sorry, to after the TV -- well, after that, what
8  did you do?  Answer; we went back into his
9  bedroom and started using the nightsticks, and
10  some word indicating he was using Chuga sticks
11  practicing karate; is that accurate in terms of
12  what they said to you, and what you said back?
13    MR. TAYLOR:  Objection, form and
14  foundation.
15    THE WITNESS:  No, I don't remember
16  having no conversations about that; that's not
17  accurate.
18  BY MR. SOTOS:
19    Q.  You didn't -- what part is inaccurate?
20    A.  The nightsticks and whatever you call
21  them chuks or chuga sticks, or whatever?
22    Q.  Could it have been -- did you say
23  anything about using nunchunks?
24    A.  Scopey and I never used any kind of

176

1   sticks, knives, or anything else, you know.
2       Q.   Okay.  So, then in the next question
3   where it says can you describe the nightstick?
4   Answer; black like the police used with a
5   string, you didn't say that?
6           MR. TAYLOR:  Objection, form and
7   foundation.
8           THE WITNESS:  I have no memory of
9   saying that to them.
10  BY MR. SOTOS:
11      Q.   You're saying that you didn't say that?
12      A.   I'm saying --
13          MR. TAYLOR:  -- he didn't say that --
14  BY MR. SOTOS:
15      Q.   I'm sorry, are you saying that you
16  didn't say that, or are you are saying you just
17  don't remember?
18      A.   I'm saying no, I don't remember saying
19  that to them.  I don't even recall them asking
20  me, whatever.
21      Q.   And the next page in the middle of the
22  page there is a question and answer.  Then what
23  did you do?  The answer is Melvin called us a
24  dirty name, so we chased him over the hill and
                                                    177

1   all the way home.  Is that accurate in terms of
2   your discussion with the officers?
3           MR. TAYLOR:  Objection, form and
4   foundation.
5           THE WITNESS:  No, sir, I don't know
6   Melvin.
7   BY MR. SOTOS:
8       Q.   Okay.  The bottom of that page the
9   question is; what did you do next?  The answer
10  in the next page is, we went into Scopey's room
11  and practiced Kung Fu and listened to music.
12      A.   where are you at?
13      Q.   Bottom of Page 5863, and the top of 64.
14  Is that accurate?
15          MR. TAYLOR:  Objection, form,
16  foundation.
17          THE WITNESS:  No, it's not accurate.
18  BY MR. SOTOS:
19      Q.   You never said anything about
20  practicing Kung Fu I take it?
21      A.   No.
22      Q.   Did you tell them you went to listen to
23  music?
24      A.   No.
                                                    178

1       Q.   You guys didn't listen to music?
2       A.   No, we sat at the kitchen table
3   drawing.
4       Q.   Okay.  Bottom of that same page,
5   Question; what did you do when you got home?
6   Answer; called Scopey's house.
7           Did you tell the officers that?
8           MR. TAYLOR:  Objection, form,
9   foundation.
10          THE WITNESS:  I don't recall telling
11  them that, because we don't have no phone.
12  BY MR. SOTOS:
13      Q.   Okay.  Going to the next page the
14  question is; what time was that?  Answer; as
15  soon as I got home 12:00 I used the neighbor's
16  phone downstairs; did you say that?
17          MR. TAYLOR:  Objection, form,
18  foundation.
19          THE WITNESS:  No.
20  BY MR. SOTOS:
21      Q.   Okay.  Did you have a neighbor's
22  phone -- that's all right.
23          Going down a little bit.  Did Scopey
24  say anything to you indicating that he was
                                                    179

1   having trouble with somebody, someone?  Answer;
2   he asked me to come over at 8:00 sharp.  He said
3   he had someone to deal with it and wanted my
4   help.
5           Did you have that discussion with the
6   officers?
7       A.   No.
8       Q.   Okay.
9           MR. TAYLOR:  I have an objection to
10  that; form and foundation.
11  BY MR. SOTOS:
12      Q.   Okay.  There is another series of
13  questions about Scopey carrying any kind of a
14  weapon or a knife, and according to the report
15  you stating that he carried a pocket knife.  You
16  last saw it on Monday; did any of that happen?
17          MR. TAYLOR:  Objection, form,
18  foundation.
19          THE WITNESS:  I never seen him with any
20  weapon.
21  BY MR. SOTOS:
22      Q.   And never told the police officers that
23  you did?
24      A.   Yeah, I don't have no memory of telling
                                                    180



1  the police that I saw him with a weapon.  I
2  never seen him with any weapon.
3      Q.  Okay.  Very last line, would you be
4  willing to go down to the station with us and
5  answer questions that other detectives might
6  want to ask you?  Answer; okay.  Is that right,
7  it says okay -- it looks like okay at the bottom
8  of the page.
9      MR. TAYLOR:  I think it does.
10  BY MR. SOTOS:
11      Q.  Do you recall telling the officers you
12  would be willing to go down to the station and
13  answer other questions they might have?
14      MR. TAYLOR:  Are you sure it doesn't
15  say no.
16      MR. SOTOS:  I think it says okay.
17      MR. TAYLOR:  I'm not 100 percent.
18  BY MR. SOTOS:
19      Q.  Do you remember telling the officers
20  you'd go down to the station with them and
21  answer questions?
22      A.  They did convince me to leave and go
23  with them.
24      Q.  Okay.  When you say they convinced you,

181

1  like what did they say to convince you?
2      A.  They said that I might have heard
3  something, saw something and that could possibly
4  help them solve the crime.
5      Q.  Okay.
6      MR. SOTOS:  How much time?
7      THE VIDEOGRAPHER:  We are at 3 hours
8  and 14 minutes.
9      MR. SOTOS:  Okay.
10      MR. TAYLOR:  46 minutes.
11      MR. SOTOS:  Let's talk about --
12      MR. BOWMAN:  That's an NBA game.
13  BY MR. SOTOS:
14      Q.  Let's talk about the Ivy's a little
15  bit.  So, you knew the Ivy family fairly well
16  back in 1977, true?
17      MR. TAYLOR:  Objection, form.
18      THE WITNESS:  No, they had just arrived
19  to from I guess somewhere, Chicago somewhere,
20  and I met Frankie, and later on he introduced me
21  to his family, but it was mainly Frankie and I,
22  you know.
23  BY MR. SOTOS:
24      Q.  He was your friend?

182

1      A.  Yeah, now he was -- yeah.
2      Q.  All right.  And on the day of the
3  murders, the 18th, you were at their house,
4  correct?
5      A.  Yes.
6      Q.  Okay.  Were you also there -- do you
7  remember if you were there the day before the
8  murders?
9      A.  I don't.
10      Q.  You don't know?
11      A.  I don't recall being there.
12      Q.  Okay.  What time did you get to their
13  house on the day of the murders?
14      A.  I think I answered that question.  Let
15  me see here, I think around some -- after I left
16  Mrs. Williams' house, because she lives around
17  the corner -- she takes care of the -- I would
18  say around 10:30, 11, something like that.  I
19  was looking for Frankie.
20      Q.  You were there looking for Frankie?
21      A.  Yeah.
22      Q.  And at some point you ended up talking
23  to Tina about showing her how to get to school,
24  right?

183

1      A.  Yeah, she asked me where did I go to
2  school, and I told her late afternoon, and I
3  think she said that she was starting down there.
4  So, I think I, if I remember correctly, she
5  didn't know how to get there.  So, I told her to
6  meet me at the bus stop in front -- well, it's
7  not in front of my house, but it's on the
8  corner, and I would give her one of my bus
9  passes, and we could go -- I would show her how
10  to get to school.
11      Q.  All right.  And after you told her
12  that, do you remember what time you had that
13  conversation with her?
14      A.  Yeah, I mean it was like, you know, I
15  didn't stay long at their house, so it was
16  between the time that I said I got there 10:30,
17  11:00, it didn't take long.  I have mean, I left
18  there and went home.
19      Q.  Okay.  Could it have been closer to
20  1:00 in the afternoon when you had the
21  conversation with her?
22      MR. TAYLOR:  Objection, form.
23      THE WITNESS:  I don't think so.
24

184

1  BY MR. SOTOS:
2      Q.   Okay.
3      A.   I don't know.
4      Q.   So, after talking to Tina about that,
5  what did you do?
6      A.   Went home.
7          MR. BOWMAN:  Jim, this is -- you know,
8  again --
9          MR. SOTOS:  -- this is probably the
10 last topic area, and it's specifically about the
11 alleged misconduct in the '81 investigation, so,
12 which I take it to mean that your view that the
13 police coerced, manipulated, fabricated the Ivy
14 statements, so in '81 when they were used, so
15 what I want to ask him about is like what
16 actually happened in '77 --
17         MR. BOWMAN:  -- sure, I get what your
18 purpose is; you want a predicate, but the
19 problem with that is he already testified about
20 his activities on the 18th, and Judge Feinerman
21 said that's covered, don't go there again.
22         So, it might be useful for you to go
23 there again, but he's already been through it.
24         MR. SOTOS:  Well, what I want to do is
                                                    185

1  show him the report.
2          MR. BOWMAN:  Yeah.
3          MR. SOTOS:  And ask him whether these
4  things that according to Marcella Brown the
5  Ivy's said they said so that he doesn't later
6  come to trial and say, I didn't say those
7  things, and they were used against me in the
8  trial.
9          I think that's what the Judge meant by
10 saying misconduct during the 1981
11 reinvestigation interviews specifically relating
12 to the Ivy's.
13         So, like I'm trying pretty hard to stay
14 with this --
15         MR. BOWMAN:  -- yeah --
16         MR. SOTOS:  -- and that's the last,
17 just about the last topic area.  I'm probably
18 going to run out of time with it, so, I mean --
19 you know, I think that that's exactly what the
20 Judge --
21         MR. TAYLOR:  -- well, what report are
22 you talking about?
23         MR. SOTOS:  The report of Marcella
24 Teplitz --
                                                    186

1          MR. TAYLOR:  2/7/77.
2          MR. SOTOS:  2/7/77.
3          MR. BOWMAN:  But that's not the
4  reinvestigation, that's 2/7/77, so --
5          MR. SOTOS:  -- right, but the
6  reinvestigation in 1981 Mr. Savory wasn't having
7  those conversations, so your claims at trial are
8  going to, I assume, relate to what information
9  she got from them in '77; that's what he can
10 talk about.  He's not really going to be able to
11 talk a lot about -- his interactions with them
12 on that day is what he's going to be able to
13 testify to --
14         MR. BOWMAN:  -- right.
15         MR. SOTOS:  So, I'm not actually going
16 to, because I didn't feel it was actually fair
17 to start asking him about things that Buck and
18 Cannon talked to the Ivy's about in '81 --
19         MR. BOWMAN:  -- right --
20         MR. SOTOS:  -- because that's not
21 his --
22         MR. BOWMAN:  -- yeah, I mean honestly I
23 read the part of Feinerman's Order that you are
24 referring to and was kind of scratching my head,
                                                    187

1  because it struck me that that wasn't a useful
2  topic for a deposition of Savory, but it still
3  remains the case that his activities including
4  his interactions with the Ivy's on the 18th were
5  covered in Sara's deposition, and Judge
6  Feinerman specifically said you can't go through
7  that again, because that was done.
8          That's -- so, I mean it seems like if
9  there's an interpretation to be made of
10 Feinerman's analysis that it's got to be that
11 whatever you talk with Johnnie about relating to
12 that misconduct has got to be something other
13 than, you know, what Johnnie did on the 18th,
14 because that's off limits.
15         I mean I'm glad I'm not in your shoes
16 having to figure that out, because I just don't
17 know what that could be, but it does seem to me
18 that what you're doing the Order says you can't
19 do.
20         MR. SOTOS:  Let's take 10 minutes.
21         MR. BOWMAN:  Let's do that.
22         MR. SOTOS:  Let me look at the dep, and
23 let me see if I agree with you that this was
24 thoroughly covered.  I've read it, but if it's
                                                    188

1  thoroughly covered then --
2      MR. BOWMAN:  -- I take that's a
3  sensible approach.  Thank you.
4      MR. SOTOS:  I gotcha.
5      THE VIDEOGRAPHER:  The time is 17:05,
6  and we are off the record.
7          (Whereupon, a short recess was
8          taken.)
9      THE VIDEOGRAPHER:  We are back on the
10  record, and the time is 17:23.
11  BY MR. SOTOS:
12      Q.  Ready?
13      A.  Yes.
14      Q.  Mr. Savory, during the break your
15  Counsel placed in front of you Exhibit No. 22
16  through 25, and actually we need one more, 26,
17  sorry.
18          And just to give the broad strokes,
19  these are reports of police officers and
20  individuals that concern statements that you
21  allegedly made to people at the Gift Home when
22  you were being detained there in 1977, so,
23  that's what I'm going to be asking you about.
24          First let me ask you, do you remember

189

1  being detained at the Gift Home in '77, correct?
2      A.  Yes, sir.
3      Q.  Do you remember a person named William
4  Poolle who was there as well?
5      A.  I don't remember, no.
6      Q.  How about Tommy Thompson?
7      A.  I don't remember him either.  I
8  remember him when my lawyer mentioned him, but I
9  don't --
10      Q.  -- you remember your lawyer talking to
11  you about it.  I don't get to ask you about
12  that.
13      A.  Okay.
14      Q.  And you remember -- and how about
15  Freddie Yarburaugh?
16      A.  That sounds familiar, but then again, I
17  don't really remember them.
18      Q.  But these aren't people, who you
19  sitting here independently, remember yourself?
20      A.  No, sir.
21      Q.  Okay.  So, did you ever when you were
22  at the Gift Home talk to anybody who was there
23  about the murders of Connie and Scopey?
24      MR. TAYLOR:  Objection, form and

190

1  foundation.
2      THE WITNESS:  No, sir.  For a large
3  part of that I was kept in solitary confinement,
4  I was not allowed to be around the other
5  residents until later on.
6          They would let me out for an hour a
7  day, but for the majority they kept me in
8  solitary confinement.
9  BY MR. SOTOS:
10      Q.  At the Gift Home you were in solitary
11  confinement?
12      A.  Yes, a room 15 feet high, 2 inch
13  Styrofoam mattress, and 12 inches of concrete.
14      Q.  How long were you held there?
15      A.  Until the trial was over, and I think
16  the Judge ordered them to let me out starting an
17  hour a day, and then eventually they let me out
18  where I could participate, and you know, but
19  everything else mostly was one on one whether I
20  was school or exercising.
21      Q.  Do you remember a lounge area in the
22  Gift Home?
23      A.  Yes.
24      Q.  Where you could sometimes, anyway,

191

1  watch TV with other youths who were there?
2      A.  Yeah.
3      Q.  Pool, there was a pool table?
4      A.  I don't remember.
5      Q.  Do you ever remember sitting around and
6  talking with other youths who were there either
7  in the lounge or while playing pool about
8  anything, forget about the case, about anything?
9      MR. TAYLOR:  Objection, form.
10      THE WITNESS:  Not really.
11  BY MR. SOTOS:
12      Q.  All right.  So then what about your
13  case; do you recall ever talking to anybody at
14  the Gift Home about your case?
15      A.  I don't remember talking to none of the
16  residents about my case or staff.
17      Q.  So, are you saying now that you didn't
18  talk to the residents about your case, or you
19  just don't remember?
20      MR. TAYLOR:  Objection.
21      THE WITNESS:  I did not.
22  BY MR. SOTOS:
23      Q.  Okay.  So, if any of them are saying
24  that you did, that would be incorrect?

192



1     A.   They would be lying.
2     Q.   Okay.  And do you know of any reason
3  why other than through discussions with your
4  lawyers, you know, because there's probably some
5  of that, I get that, but aside from anything
6  that you talked to with your lawyers, do you
7  personally know of any reason that those,
8  anybody who was detained there would have
9  something against you to cause them to make up
10  something that you said?
11     MR. BOWMAN:  Objection, foundation.
12     THE WITNESS:  I didn't have any
13  conflict with none of the residents, and I don't
14  want to assume why, but I guess they wanted to
15  go home, that's all I could think of.
16  BY MR. SOTOS:
17     Q.   You're speculating that maybe they made
18  some deal with somebody, or something like that?
19     A.   I'm saying that's only thing I could
20  think.  I couldn't think of anything else,
21  because I didn't know them and didn't interact
22  with them, so I don't know why.
23     MR. SOTOS:  Just for the record, those
24  documents in front of you are exhibits -- I
                                                    193

1  don't even know we need to -- I guess I have
2  already placed them in front of him, so, they
3  are Exhibit 22, which is Savory 6012, Exhibit 23
4  which is Savory 6013, Exhibit 24 which is Savory
5  6014, Exhibit 25 which is Savory 6016-17, and
6  Savory -- and Exhibit 26 which is Savory
7  6023-26.  I'm not going to ask you any more
8  questions about those specifically based on your
9  answers so far.
10     Okay.  So, what are we on, 28?
11     MR. BOWMAN:  27.
12     MR. CHRISTIE:  28.
13     MR. BOWMAN:  You just went through 26,
14  so I don't know what 27 is.
15     MR. SOTOS:  I may not have shown you
16  27.
17     (Whereupon, SAVORY Deposition
18      Exhibit No. 28 was marked for
19      identification.)
20  BY MR. SOTOS:
21     Q.   Okay.  Mr. Savory, I'm going to ask you
22  some questions about some reports that the
23  officers who you sued did in 1981 concerning
24  their interviews with the Ivy's just in advance
                                                    194

1  leading up to your second trial.
2     A.   Okay.
3     Q.   So, the first document there in front
4  of you is Exhibit 28?
5     A.   Okay.
6     Q.   Which is Savory 6025.
7     MR. BOWMAN:  6023.
8     MR. SOTOS:  It's a three page exhibit,
9  Pages 6025, 6027, and 6029.  So, we don't have
10  -- wait, wait, but it's on both pages, it's on
11  both sides, writing on both sides.  So, it's
12  Savory 6025 through 6029.
13     MR. BOWMAN:  All right.  So, it's more
14  than three pages.
15     MR. SOTOS:  I know, because I didn't
16  know there was writing on the back.  It's five
17  pages.  All right.
18  BY MR. SOTOS:
19     Q.   So, this purports to be a report that
20  Defendant Cannon did of an interview with Ella
21  Ivy --
22     MR. TAYLOR:  -- this seems like it's
23  Page 3 of a report.
24     MR. SOTOS:  6025?
                                                    195

1     MR. BOWMAN:  Yeah, I think it starts
2  with 6023.
3     MR. TAYLOR:  So, if you want to start
4  with 6023, not to help you out, but --
5     MR. SOTOS:  -- do they have that?
6     MR. BOWMAN:  Yeah, 6023, and it lists
7  Ella Ivy as one of the exhibits witnesses --
8     MR. SOTOS:  -- so, it's Pages 6023
9  through 6029?
10     MR. TAYLOR:  No, I think it's two
11  different reports.
12     MR. SOTOS:  Okay.  I think we got it
13  cleared up.  This is Exhibit No. 28, which is
14  Savory 6023 through 6029.
15     MR. TAYLOR:  Okay.
16  BY MR. SOTOS:
17     Q.   I'm going to refer you to Page 6025.
18     A.   I don't have it.
19     MR. TAYLOR:  Yeah, okay, let me help
20  you.  I will give you this copy here.  The court
21  reporter only marked the two page report.
22     MR. SOTOS:  Yeah.
23     MR. CHRISTIE:  Could we have that one
24  back?
                                                    196



1      MR. TAYLOR:  Yeah, we will keep this
2  one --
3      MR. SOTOS:  -- we need one to mark.
4  So, which one should she be marking to give to
5  him?
6      MR. CHRISTIE:  That one right there.
7      MR. SOTOS:  Do you have a stapler?
8      MR. TAYLOR:  This one becomes 28.
9      MR. SOTOS:  Yeah.
10     MR. TAYLOR:  He wants you to look at
11 the second page, I believe, right?
12     MR. SOTOS:  Right, it's Page 6024.
13 It's on the back.
14     MR. TAYLOR:  It's on the back side.
15 BY MR. SOTOS:
16     Q.   And this purports to be an interview
17 that Defendant Cannon did with Ella Ivy on
18 February 7th, 1981.  Okay.
19     A.   Yes, sir.
20     Q.   So, on Page 6024 in the middle of that
21 page you'll see that it states that she, being
22 Ella, stated that a short time later, and this
23 is referring to January 18th, Johnnie came back
24 to the residence, and she is certain that it was
                                              197

1  before 3:00.  She stated that it was at this
2  time that Johnnie told her that he had been to
3  his friend Scopey's house, and that they were
4  practicing karate.
5      Is that accurate what she said about
6  when you came back to her house?
7      MR. TAYLOR:  Objection, form and
8  foundation.
9  BY MR. SOTOS:
10     Q.   On the 18th did you go back to her
11 house before 3:00?
12     A.   We were on the bus, no.
13     Q.   Okay.  And did she tell you that day
14 that you were at Scopey's house, and that you
15 and he were practicing karate?
16     MR. TAYLOR:  Objection; you said did
17 she tell him?
18 BY MR. SOTOS:
19     Q.   Did she -- oh, did you, in fact, tell
20 Ella Mae that you were at Scopey's house and
21 that you were practicing karate?
22     MR. TAYLOR:  Objection, form,
23 foundation.
24     THE WITNESS:  No, sir.
                                              198

1  BY MR. SOTOS:
2      Q.   Did you ever tell her that?
3      A.   No, sir.
4      Q.   Okay.  And did you ever tell her that
5  Scopey was using some types of sticks, and that
6  he had a knife?
7      MR. TAYLOR:  Objection, form and
8  foundation.
9      THE WITNESS:  No, sir.
10 BY MR. SOTOS:
11     Q.   Your ex-wife gave a deposition, and she
12 testified that you had told her that you were
13 using nunchucks; did that ever happen?
14     MR. TAYLOR:  Objection, asked and
15 answered.
16     Are you asking did he ever tell his
17 wife that, or are you asking did it ever happen?
18     MR. SOTOS:  I'm asking him if he ever
19 told his wife that, because that's what she
20 testified to.
21     MR. TAYLOR:  Objection, form and
22 foundation.
23     THE WITNESS:  No, I don't remember -- I
24 know she read a lot of the reports because she
                                              199

1  was helping me with it, but no, I never told her
2  that.
3  BY MR. SOTOS:
4      Q.   Okay.  Did you ever -- looking at the
5  next line, did you ever tell Ella that you
6  accidently stabbed Scopey, but that he was okay
7  when you left?
8      MR. TAYLOR:  Objection, form and
9  foundation.
10     THE WITNESS:  No, sir.
11 BY MR. SOTOS:
12     Q.   Okay.  Did you ever say anything to
13 Ella Mae at any point about stabbing or being in
14 an altercation with Scopey?
15     MR. TAYLOR:  Same objection.
16     THE WITNESS:  No, sir, I never had any
17 real conversation with Ella, period, at all.
18 BY MR. SOTOS:
19     Q.   Okay.  Do you know why Ella would say
20 that you did say that?
21     MR. TAYLOR:  Objection, form and
22 foundation.
23 BY MR. SOTOS:
24     Q.   Do you have any idea why?
                                              200



1      A.   I have no -- I cannot -- I can assume
2   why she said it, but I know that the Ivy's had
3   their own run-ins with the law enforcement, so I
4   don't know.
5      Q.   You don't know?
6      A.   No, sir.
7      Q.   You testified earlier that you saw the
8   news about what happened to Scopey and Connie at
9   the Ivy's house when you were having -- when you
10   were watching the news, correct?
11      A.   Yes.
12      Q.   Okay.  And you said that was later at
13   night; did you say 9:00?  I don't want to put
14   words in your mouth, do you remember when?
15      A.   Somewhere like that.
16      Q.   Okay.  Did you tell Ella Mae on the
17   18th that Scopey had been all cut up, and that
18   the little baby was found in the oven?
19          MR. TAYLOR:  Objection, form and
20   foundation.
21          THE WITNESS:  No, sir.
22   BY MR. SOTOS:
23      Q.   And again, you don't know why she would
24   say that?

                                                201

1      A.   No, sir.
2      Q.   And you didn't tell her that the baby
3   was found in the -- in a bedroom with the dog?
4          MR. TAYLOR:  Objection, form and
5   foundation.
6          THE WITNESS:  No, sir, I didn't talk to
7   Ella at all.
8          MR. SOTOS:  Okay.  Can you mark this
9   No. 29?
10          (Whereupon, SAVORY Deposition
11              Exhibit No. 29 was marked for
12              identification.)
13          MR. BOWMAN:  Thank you.
14          THE WITNESS:  Thank you.
15   BY MR. SOTOS:
16      Q.   The court reporter has placed in front
17   of you what has been marked as Exhibit 29, and
18   this is a report that purports to recount an
19   interview that Detective Cannon had with Tina
20   Ivy on April 7th, 1981 in which he contends that
21   he asked her questions about her interactions
22   with you on January 18th.
23          And if you look at the back side of
24   that, it states that she -- that Tina states

                                                202

1   that you were present at Tina's residence along
2   with the rest of her family, and that when she
3   entered the house, her father informed her that
4   you had told him about two kids getting killed
5   and all sliced up.
6          Did you ever have that conversation
7   with their father Mr. Ivy?
8          MR. TAYLOR:  Objection, form and
9   foundation.
10          THE WITNESS:  No, sir.
11   BY MR. SOTOS:
12      Q.   Did you -- and I'm asking you now on
13   any occasion, did you ever discuss the murders
14   with the Ivy's on any occasion?
15          MR. TAYLOR:  Same objection.
16          THE WITNESS:  No, sir.
17          MR. BOWMAN:  Okay, sorry.
18          MR. SOTOS:  Okay.
19   BY MR. SOTOS:
20      Q.   What about when you saw it on the news
21   with them that night, did you talk about it with
22   them than?
23          MR. TAYLOR:  Objection, form and
24   foundation.

                                                203

1          THE WITNESS:  The only thing I remember
2   saying I just couldn't believe they were gone.
3   I just seen them yesterday -- the day -- you
4   know, the 17th, and I just couldn't believe they
5   were gone.
6   BY MR. SOTOS:
7      Q.   Do you remember anything that the Ivy's
8   said when you said that?
9      A.   I don't think they said anything,
10   because they didn't know who they were.
11      Q.   Oh, they didn't know them.  You only --
12   okay.  None of the Ivy's knew Scopey or Connie?
13      A.   No, no, not to my knowledge.
14      Q.   Okay.  And you don't remember saying
15   anything other than that?
16      A.   This was it.
17      Q.   Never talked to anybody in the Ivy
18   family about how they were killed?
19          MR. TAYLOR:  I think didn't we go into
20   this at the last deposition?
21          MR. SOTOS:  Well, I'm just -- otherwise
22   I will just keep going through each statement in
23   each one of the 1981 -- I'm trying to cut
24   through a lot of this.

                                                204

1    MR. TAYLOR:  All right.  But that
2  question was --
3    MR. SOTOS:  -- that question was asked?
4  All right.
5    MR. TAYLOR:  I think like your question
6  was about what actually happened or didn't
7  happen rather than what was said, that's the
8  distinction I'm making.
9    MR. SOTOS:  All right.
10 BY MR. SOTOS:
11    Q.  She, according to the report, it says
12 that you said that you were at Scopey's house on
13 the day of the murders, and that Scopey and his
14 sister were all right.  Did you say that to Tina
15 at any time?
16    MR. TAYLOR:  Objection, form and
17 foundation.
18    THE WITNESS:  No, sir.
19 BY MR. SOTOS:
20    Q.  Okay.  After watching it on the news,
21 did you say that you were just at their house
22 before you came to the Ivy's house?
23    MR. TAYLOR:  Objection to the form.
24    THE WITNESS:  No, sir.

205

1  any member of the Ivy family; you only made this
2  one statement on the 18th after seeing it on the
3  news?
4    A.  Yes, sir.
5    Q.  Okay.
6    MR. SOTOS:  Can you place Exhibit
7  No. 20 in front of him real quick?  It's the
8  Complaint.  All you need is the first page, but
9  I think we could put the whole Complaint there.
10 BY MR. SOTOS:
11    Q.  Mr. Savory, your lawyer has placed in
12 front of you Exhibit No. 20 which is the
13 Complaint you filed in this case.
14    You can see up at the top of the first
15 page it names a number of different Defendants,
16 you know, several of these you had personal
17 interactions with, so I think we understand what
18 your allegations are about them.
19    There is other ones who you didn't, and
20 so I just wanted to ask you; other than what
21 your lawyers may well have put together, if you
22 have anything personally, that you personally
23 know from firsthand information about the
24 misconduct of any of these people.

207

1 BY MR. SOTOS:
2    Q.  All you said was you can't believe --
3    A.  -- I couldn't believe they was gone.
4    Q.  Okay.  Going on to the next line, did
5  you ever tell Tina that you and Scopey were
6  practicing karate and playing around with a
7  knife, and you accidentally cut him, but that he
8  was okay when you left?
9    MR. TAYLOR:  Objection, form.
10    THE WITNESS:  No, sir.
11 BY MR. SOTOS:
12    Q.  Okay.  So, there is no other -- so you
13 had -- you were at their house on the 18th, had
14 this -- made this statement that I can't believe
15 they are done gone, or they're dead; is that the
16 only conversation you ever recall everything
17 with the Ivy's about Scopey and Connie, any
18 member of the Ivy family ever?
19    A.  Never that wasn't really a
20 conversation, that was just a statement I made.
21    Q.  Okay.  So, there was no
22 conversation with any --
23    A.  -- no, sir.
24    Q.  All right.  That answer would apply to

206

1    So, I know that Cannon interviewed you
2  personally, Teplitz did, Russell Buck.  Do you
3  have any personal firsthand knowledge about any
4  misconduct he committed in this case; do you
5  even know him?
6    MR. TAYLOR:  Objection to the form and
7  foundation, because he may know of something
8  happening but not know his name.
9    MR. SOTOS:  Right.
10 BY MR. SOTOS:
11    Q.  And other than than through
12 conversations of your lawyers, of course, I just
13 want to know as you sit here, is Russell Buck
14 somebody who you have had interactions with that
15 you know for any reason?
16    A.  I do not remember all the officers that
17 I came in contact with, and I assume what's here
18 is that, you know, my attorneys determined, you
19 know, what their involvement is.
20    I don't remember who all I was talking
21 to.  Sometimes it would be two and three people,
22 and I can't possibly --
23    Q.  -- all right.  And some of these people
24 are sued for reasons aside from your discussions

208



Johnnie Lee Savory  02/17/2023

1  with them, so I'm not asking you to guess about
2  that.
3       But you did mention I think in your
4  last deposition John Stenson, your father I
5  think had interactions with him?
6  A.  Yes.
7  Q.  Okay.  How about you personally, did
8  you have any prior interactions with John
9  Stenson that caused you to believe he committed
10  misconduct in this case?
11  A.  My contact with him was writing and
12  asking for help to solve the case, and he never
13  responded, and there was -- his son was in the
14  Peoria County Jail with me, and I asked him
15  could I speak with his father, and I asked him,
16  you know, to help solve the case as he was a
17  lieutenant or whatever, and that turned out
18  horribly wrong, because his -- Mr. Stenson got
19  mad at his son, and they took him over to the
20  County Jail and he was physically assaulted and
21  brought him back by his dad based on what he
22  told me.
23  Q.  He said his dad physically assaulted
24  him?

209

1  A.  Yes.
2  Q.  Was he any more specific than that?
3  A.  He got angry with him that he put me on
4  the phone with his dad.
5  Q.  Did he specifically what, you know -- I
6  take it he didn't use the word physically
7  assaulted?
8  A.  Oh, he did, he beat him up.
9  Q.  He beat him up, that's what he said?
10  A.  Yes.
11  Q.  Did he look like he had been beaten up?
12  A.  I believe him, I believe him, you know.
13  Q.  Okay.  How about Walter Jatkowski?
14  A.  He had me strip naked and plucked the
15  hair from my body, if I'm not mistaken.
16  Q.  He was the guy that plucked the hairs
17  from your body?
18  A.  Yes.
19  Q.  Okay.  Did he do anything to you other
20  than that?
21       MR. TAYLOR:  That you know?
22  BY MR. SOTOS:
23  Q.  That you know of?
24  A.  That was the most traumatic for me, I'm

210

1  not aware of what else he may have done or said.
2  Q.  Okay.  How about again Glen Perkins?
3  A.  I remember the name, but I just don't
4  remember him.
5  Q.  Chief Andrews?
6  A.  I remember the name, but I don't
7  remember what they did.
8  Q.  Is that the same for Harold Martinez,
9  Mary Ann Dunlavey, Carl Tiarks, Peter Gerontes,
10  and John Timmes?
11  A.  I remember my Godmother telling me
12  about John Timmes, I guess he was a sergeant,
13  and she told me that he had told her that he
14  knew I was innocent, but he was about to retire,
15  and he couldn't mess up his pension.
16  Q.  Okay.  So, your Godmother told you that
17  John Timmes told her that?
18  A.  Yes, Octavia Burchett.
19  Q.  Ms. Burchett?
20  A.  Yes.
21  Q.  Oh, she's your Godmother?
22  A.  Yes.
23  Q.  Was she always -- I mean when did she
24  become your Godmother?

211

1  A.  When this case happened.  In my
2  community mostly all of them came to my aide.
3  Q.  And she told you that John Timmes said
4  that he knew you were innocent, but he was close
5  to retiring did you say?
6  A.  Yes.
7  Q.  Okay.  And how about the other ones I
8  mentioned; Harold Martinez, Mary Ann Dunlavey,
9  Carl Tiarks, and Peter Gerontes?
10  A.  I wouldn't -- I can't remember them.
11  Q.  Okay.
12       MR. SOTOS:  Anything else?
13       That's it.  Thank you very much.  We
14  are done.
15       MR. TAYLOR:  We only have about two
16  hours here.
17       MR. SOTOS:  I didn't think about that.
18       MR. TAYLOR:  No question.
19       THE VIDEOGRAPHER:  The time is 17:52,
20  and we are off the record.
21       THE COURT REPORTER:  Counsel, are you
22  ordering?
23       MR. SOTOS:  Yes, I am.
24       THE COURT REPORTER:  Counsel, would you

212



```
 1  like a copy?
 2          MR. TAYLOR:  Locke?
 3          MR. BOWMAN:  Yes, we want a copy of
 4  this one.
 5       (Deposition concluded at 5:53 p.m.)
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
                                          213
```

```
 1  STATE OF ILLINOIS     )
 2                        )  SS:
 3  COUNTY OF C O O K      )
 4
 5     I MARY ELLYN D'ANDREA, being first duly sworn,
 6  on oath says that she is a court reporter doing
 7  business in the City of Chicago; and that she
 8  reported in shorthand the proceedings of said
 9  deposition, and that the foregoing is a true and
10  correct transcript of her shorthand notes so
11  taken as aforesaid, and contains the proceedings
12  given at said deposition.
13
14  _____
15       MARY ELLYN D'ANDREA, CSR
16       LICENSE NO. 084-0022317
17
18
19
20
21
22
23
24
                                          214
```

**$**

**$2**
108:8,13

**-**

**--objection**
158:22
**--wait**
165:7

**0**

**00204**
5:13
**005827**
100:15
**00593**
100:15

**1**

**1**
8:22 9:17 46:10
**1/16/77**
121:13
**10**
54:1 80:6 100:10,14
130:17,21 139:3,17,
21 164:22 188:20
**100**
118:11 181:17
**10:00**
28:8,18 33:20 34:18
**10:15**
60:12,16
**10:23**
61:14
**10:30**
60:12,16 106:14
183:18 184:16
**11**
183:18
**11:00**
31:18 106:14 111:24
184:17
**12**
159:16 160:6 191:13
**12824**
89:18
**12825**
89:18
**12:00**
75:23 179:15
**13:11**
5:9
**14**
61:2 147:7,8 182:8
**141**
5:8
**14:27**
80:8
**14:40**
80:13
**15**
48:18 130:17,22
166:6,17,22 191:12
**15:47**
138:18
**15th**
96:15,20 103:3
160:14 161:3,7,17,
20 162:12
**16**
168:18,24
**16:08**
138:23

**16th**
96:21 103:3 161:20
**17**
5:6,13 171:19 172:3
**17:05**
189:5
**17:23**
189:10
**17:52**
212:19
**17th**
14:2,21 15:2 20:15
22:19 23:16,23 24:2
25:8 30:21 31:3
46:24 53:17 54:15
58:18 89:20 93:11,
20 94:6,11 96:2
103:14 104:5 105:4
106:20 107:8,19
108:1 119:7 143:8
161:21,23 162:1,10,
12 175:5 204:4
**18th**
33:2,20 35:13,17,24
36:6 40:16 54:16,17,
18 55:2 98:14 99:3
104:23 105:1,4,12,
13,24 106:3,20
107:8,10,11 112:19
113:3,8 114:17
115:8 116:16 143:9,
10,13 146:12
162:16,18,20 163:18
164:21 169:15 183:3
185:20 188:4,13
197:23 198:10
201:17 202:22
206:13 207:2
**19**
121:14 169:8
**1977**
9:19 14:2 89:20
91:13 100:18 153:8
160:12 161:17
163:18 169:2 182:16
189:22
**1981**
151:17 186:10 187:6
194:23 197:18
202:20 204:23
**19:75**
121:13,14
**19th**
165:23 166:2
167:10,19,20,24
169:7,16,17,19,21
170:4,10
**1:00**
128:23 162:16
184:20
**1:30**
60:4 95:13

**2**

**2**
45:2,8,10,15 46:7
49:10 50:12 64:17
137:14 138:16
191:12
**2/7/77**
187:1,2,4
**20**
48:18 207:7,12
**2000**
161:17
**2004**
126:20 127:5
**2023**
5:6

**20th**
170:10
**21**
126:7,11 139:10
169:8
**2100**
93:3
**21st**
169:7,21 170:5
**22**
189:15 194:3
**23**
194:3
**24**
138:16 194:4
**25**
9:19 10:12 27:23
44:8 189:16 194:5
**25th**
34:8,17,24 36:17
42:15,18,21 44:13
48:10 59:10 65:15
73:8,13 74:4,24
92:21 93:3,19
120:16 169:16 172:8
**26**
189:16 194:6,13
**26879**
126:11
**26880**
128:18
**26886**
126:12 134:5
**26t**
121:7
**26th**
42:16 60:13,16
62:18 63:3,17 65:16
71:17,21 75:2,6,9,12
77:10 79:9,21 81:7
88:6 92:13 93:1
95:13 100:6,18
167:2
**27**
89:11,13,18 194:11,
14,16
**28**
194:10,12,18 195:4
196:13 197:8
**28595**
172:3
**28597**
44:6
**28th**
160:12
**29**
202:9,11,17

**3**

**3**
43:19 44:5 46:20
182:7 195:23
**30**
48:23 58:10 69:16,
21
**3033**
16:2
**31**
139:24
**3:00**
198:1,11
**3:30**
14:21 172:17

**4**

**4**
49:12 172:11

**40**
58:11 62:23
**45**
91:7 161:7
**46**
18:18,19 91:12
141:12 182:10
**49**
24:15
**4:30**
37:15 114:10,23
**4th**
169:1

**5**

**50**
18:19 33:14 141:12
147:8 161:7
**55**
174:7
**57**
171:23
**5763**
9:18
**5766**
9:19
**58**
140:6
**5829**
119:20
**5830**
125:4 139:5,18,24
140:5,6,7 142:22
**5831**
140:6 152:13 155:1,
2
**5832**
140:6 157:16
**5838**
92:17
**5842**
92:17
**5848**
63:22
**5850**
63:22
**5856**
166:24
**5858**
172:3
**5861**
172:12,14
**5862**
176:6
**5863**
178:13
**5867**
172:3
**5884**
160:8
**5887**
164:19
**5888**
160:9
**5895**
49:18
**5932-33**
169:1
**5948-5949**
45:15
**5:00**
96:1,11 115:6
**5:53**
213:5

**6**

**6**
46:7,8 63:20

**6012**
194:3
**6013**
194:4
**6014**
194:5
**6016-17**
194:5
**6023**
195:7 196:2,4,6,8,14
**6023-26**
194:7
**6024**
197:12,20
**6025**
195:6,9,12,24
**6027**
195:9
**6029**
195:9,12 196:9,14
**61**
172:15
**64**
178:13
**6:00**
38:1
**6:30**
15:6,17,21

**7**

**77**
45:17 185:16 187:9
190:1
**7:35**
140:15
**7th**
197:18 202:20

**8**

**8**
34:5,21 113:8
**81**
185:11,14 187:18
**87**
164:20
**8:00**
33:2 53:24 60:4
180:2
**8:30**
34:5,21 112:19
113:2,8

**9**

**9**
92:10,11,17
**9:00**
54:17,20 93:3
104:10,17 105:15
201:13

**A**

**a.m.**
105:15
**abdomen**
150:24
**ability**
144:17
**absolutely**
161:6
**abundantly**
112:5
**abuse**
83:15,24
**abused**
81:13,19

**abusive**
87:10
**accident**
37:6
**accidentally**
19:14 206:7
**accidently**
200:6
**accompanied**
75:7 120:21
**accordance**
6:20
**accurate**
10:22 64:4 107:24
173:22 174:1,15
175:10 176:11,17
178:1,14,17 198:5
**accurately**
97:20
**acting**
50:14
**activities**
185:20 188:3
**actual**
137:8
**addressed**
80:24
**admit**
88:5
**admitted**
68:1
**advance**
194:24
**advised**
119:22
**afternoon**
5:1 14:17 36:2,4,5
69:18 79:9 81:7
84:17,19 96:1 100:6
114:23 115:7 116:9
162:9 172:6 184:2,
20
**afterward**
129:4 130:7
**agree**
41:18 42:19 90:13
120:19 123:4,5
142:3 188:23
**agreed**
73:24 119:23 120:5
138:8 142:3 143:17
144:18 146:9,10
149:3,7
**ahead**
18:23 22:3 46:9
66:19 68:8 70:16
76:1 132:18 160:3
169:23
**aide**
212:2
**alcohol**
170:18,20
**allegations**
207:18
**alleged**
185:11
**allegedly**
189:21
**allotted**
8:17
**allowed**
70:1 191:4
**allowing**
61:18
**altercation**
126:2 200:14
**ambiguous**
173:10
**analysis**
188:10



Johnnie Lee Savory 02/17/2023

**Andrews**
211:5
**angry**
210:3
**Ann**
163:7,10,17 164:7,
11,17 211:9 212:8
**answering**
105:21
**answers**
8:3 141:16 148:3
194:9
**anymore**
124:10
**apartment**
25:20 37:19 164:2,8
**apologize**
99:16
**appeared**
127:5
**applicable**
6:20
**apply**
206:24
**approach**
189:3
**approximately**
75:23 93:2 113:2
114:10,22 128:23
**April**
202:20
**area**
80:17 82:14 106:10
185:10 186:17
191:21
**argue**
173:9
**arm**
175:8
**arrangements**
52:10
**arrested**
114:6 119:22 120:1
121:16
**arrived**
14:20 16:6 182:18
**arriving**
16:12
**article**
126:12,21 127:8
133:19 134:1,2
135:9,21 137:2,9
194:15
**arts**
50:14
**artwork**
29:17
**asks**
131:16
**aspect**
71:1
**assaulted**
209:20,23 210:7
**assist**
149:18
**assume**
7:23 28:19 97:19
98:2,9 187:8 193:14
201:1 208:17
**assuming**
86:7
**ate**
60:19
**attached**
21:22
**attended**
14:13 15:6,16
**attending**
14:17

**attorneys**
134:14 208:18
**authored**
169:2
**Avenue**
62:2 164:1
**avoid**
133:4
**aware**
6:9 54:7 56:2 211:1
**awhile**
8:9 18:21 100:21
106:13 109:15
126:24 127:3

**B**

**babies**
119:12
**baby**
201:18 202:2
**baby's**
119:12
**babysit**
106:12
**back**
28:7,17 29:1,5,8
39:11,11 58:9,17
59:4,5,9 66:8 70:7
76:21 80:12 81:4
86:16,19 100:17
110:19,22 138:22
139:17 152:10,24
153:1 154:6 158:3
164:2,5 176:6,8,12
182:16 189:9 195:16
196:24 197:13,14,23
198:6,10 202:23
209:21
**backs**
45:1
**backtrack**
156:10
**backtracking**
154:21 155:6 156:20
158:5
**bad**
74:15 167:5 168:1
**Baker**
71:15,21 74:3,6
77:3,12 92:21 93:4,
5,8,13,19 94:16
100:24 101:9,22
107:5 119:22 120:4,
10 152:16,17 153:3,
20
**Barbara**
161:21 162:8
**barrage**
143:20
**based**
194:8 209:21
**Bates**
9:18 49:13 92:17
166:17
**bathroom**
24:22 83:19
**beat**
210:8,9
**beaten**
210:11
**bed**
94:12
**bedroom**
21:21 176:9 202:3
**beer**
47:18
**began**
29:16 61:22 125:16,
18,19 126:1 131:7
132:21 137:16

141:17,18,22 142:2
154:20
**beginning**
5:15
**behalf**
5:21,23,24 6:2,4
**being's**
146:22
**believed**
167:4
**bent**
145:14
**bet**
108:7,12
**big**
171:2,20
**bigger**
45:5
**bit**
44:20 50:4 171:14
179:23 182:15
**black**
21:21 109:23 160:7,
11,13 177:4
**Blagojevich**
134:11 135:7
**blank**
146:15
**Block**
134:14 135:1
**blue**
157:19,21 158:7,18
**boarded**
15:8,18,19
**body**
82:11 83:20 210:15,
17
**book**
114:9,22
**bottom**
33:18 47:8,18 95:8,
23 98:12,19 104:16
111:21 140:5 164:22
171:11 175:2 178:8,
13 179:4 181:7
**bought**
164:1
**Boulevard**
5:8
**Bower**
155:19
**Bowers**
42:16 121:7,15,20
131:7 155:14
**Bowman**
5:20 9:9 10:6 11:24
12:12,15 25:14 27:8,
12,14,18 28:9,14
30:2 34:11 40:5 41:2
44:10 45:16,21,24
46:5,8,12 48:20
58:19,22 66:7,11,20
67:15 76:21,24
79:10 80:4 91:10
93:22 100:11 107:21
111:8,14 124:7
134:17 135:13 138:5
148:16 160:18,24
165:7 166:22 168:2
171:5 172:23 173:2,
8,17,21 174:1,4
182:12 185:7,17
186:2,15 187:3,14,
19,22 188:21 189:2
193:11 194:11,13
195:7,13 196:1,6
202:13 203:17 213:3
**boy**
52:7 110:7
**boys**
21:13 106:11

**Brad**
5:24
**braid**
161:22 162:9
**braided**
162:15
**braids**
162:11
**break**
7:24 8:2 50:5 69:16,
20 80:5 138:13
189:14
**breakfast**
60:19 62:5,6,8,9
**breath**
132:5
**briefed**
93:8
**Briefly**
73:23
**bring**
23:8 86:16 128:15
**broad**
189:18
**broke**
81:5 123:18
**broken**
19:20
**brought**
9:8 10:2 74:24 86:19
209:21
**brown**
47:10 75:17 76:9,19
77:5,14,20 78:20
79:9 81:24 82:1
83:14 100:16,23
101:10,16 102:9
103:6 104:4 110:12
111:22 112:3,18
113:1,10 115:1,22
121:19,21 131:9
132:11 133:8 136:6
137:14 154:10
157:19 169:2,3
186:4
**Buck**
187:17 208:2,13
**bump**
19:14 21:17
**bunch**
78:23 91:15 141:14
**Burchett**
211:18,19
**Bureau**
152:16,24
**bus**
15:8,18,19 16:2
37:16 58:9,12,14
116:1 184:6,8
198:12
**buying**
24:18

**C**

**call**
32:5,10 39:19 41:1
72:9 98:22 99:7
117:2,5 176:20
**called**
32:20 40:20 93:5
98:15 120:20 122:2
177:23 179:6
**calling**
41:10 122:15 131:7
**Cannon**
5:10 9:20 10:4 22:21
36:13 44:16 91:14
92:13 93:4 95:12
98:13,14 187:18
195:20 197:17

202:19 208:1
**capacity**
73:11
**car**
152:23
**card**
108:7,12
**care**
183:17
**Carl**
211:9 212:9
**carried**
109:23 180:15
**carry**
24:2,5
**carrying**
180:13
**cars**
39:3 55:7 115:13
**case**
5:13 68:24 91:13
93:9 101:2,17
102:16 121:17 122:5
123:6 148:14 149:19
156:13,19 188:3
207:13 208:4
209:10,12,16 212:1
**catch**
58:8
**caught**
37:15
**caused**
209:9
**Center**
62:3
**Chad's**
52:7
**chain**
21:23
**chair**
17:19 50:3 123:19
175:9
**chance**
62:10 87:23
**change**
154:24
**changed**
11:9 119:9 136:16
**changing**
119:12
**chaotic**
40:12 70:5 78:24
**Charles**
92:13
**chased**
26:12 177:24
**chasing**
52:6 110:7
**checked**
39:18 40:4,20
**chest**
150:21
**Chicago**
5:4,8 182:19
**chicken**
26:7,11 52:7 109:22
118:2
**Chief**
211:5
**child**
29:15
**children**
103:24 106:11
113:16
**Chris**
134:14
**Christie**
6:4 49:15,18 194:12
196:23 197:6

**Christopher**
134:21
**chuga**
176:10,21
**chuks**
176:21
**circuit**
152:4
**claim**
65:22 151:21
**claimed**
68:1
**claiming**
39:12
**claims**
145:12 187:7
**clarification**
18:9 44:20 69:23
**class**
36:9,22
**clear**
14:4 16:20 36:11
61:17 68:10 73:3
112:5 113:14 149:5
**cleared**
196:13
**Clemency**
135:6
**close**
24:8 137:24 212:4
**closer**
184:19
**clothes**
82:6 84:4,7,10,11,19
85:6,7,8,11 86:11,12
**co-authors**
127:15,16
**coerced**
185:13
**coffee**
17:18 18:6,17 19:4,
11 89:9 90:4,8,18
91:1
**coffin**
118:12
**color**
47:10
**combed**
24:23
**combing**
25:7
**comment**
19:3
**commit**
149:20
**committed**
146:12 208:4 209:9
**communicate**
8:5 71:11
**community**
212:2
**Complaint**
207:8,9,13
**completed**
122:7
**comply**
171:16
**compound**
67:15
**comprehend**
87:18
**concern**
189:20
**concerned**
133:5
**concluded**
213:5
**concrete**
191:13



confessed
143:12
confinement
191:3,8,11
confines
111:17
confirm
47:24
confirmatory
66:24
confirmed
46:21 47:10 67:19
conflict
193:13
confront
39:11
confuse
42:3,12
confusing
34:11 40:1,12 79:3
87:3 133:5
conjunction
45:13
Connie
11:8,19 68:18 69:2
96:23 102:24 117:22
118:18 143:12
148:20 149:1 150:20
157:18,20 158:6
163:2 190:23 201:8
204:12 206:17
Connie's
118:24
considered
24:10
construe
87:10
contact
52:12,22 208:17
209:11
contacts
78:4
contends
202:20
context
161:10 175:4
continue
50:7 61:17
continued
6:9,18 144:19
156:12
control
147:10
conversation
12:10 25:6 34:15
36:12 39:9 41:14
57:19 68:20,21
72:11 73:21 74:21
100:5 118:15 125:1,
19 137:2 141:6,9
142:5 147:17 167:9
168:5 169:3 170:2,9
184:13,21 200:17
203:6 206:16,20,22
conversations
67:24 78:24 176:16
187:7 208:12
convince
181:22 182:1
convinced
181:24
Cooper
163:8,10,18 164:7,
12,17 165:3
copies
128:5
copy
49:14 196:20 213:1,
3
corner
46:22 47:19 140:5

correct
7:8 25:16,22 28:8
31:12,20 32:2 41:14
43:13,16 45:18
48:12 56:4 59:21
71:13 78:21 86:7
87:14 91:9 92:6,22
100:2 101:11,17,20
102:1,19 104:19
105:8 106:5 112:20
124:15 135:3 138:9
154:7 155:7 169:13
174:19 183:4 190:1
201:10
corrected
80:15
correctly
184:4
counsel
5:14,16 8:14 9:15
45:14 49:11 63:20
92:15 100:10,14
126:10 128:1 160:5
166:16 168:23 172:2
189:15 212:21,24
County
209:14,20
couple
21:8 81:23 106:11
142:14 144:12
court
5:11,16 6:10 8:6
43:23 44:3 64:21
80:24 93:7 111:15
153:19,20 196:20
202:16 212:21,24
cover
17:14 71:9
covered
55:19 70:20 78:7
111:12 173:4 185:21
188:5,24 189:1
crime
22:22 120:10,14
141:20 146:12,13
149:20 182:4
crowd
57:12,13
crying
122:9 124:23 132:20
cut
18:23 148:20,24
150:20 167:6,24
168:1 169:19 201:17
204:23 206:7
cutting
144:12 150:24
CV
5:13

D

D'ANDREA
5:2,16
dad
70:1,6,18 71:10
209:21,23 210:4
Darlene
106:18 113:11,18
114:7
date
97:9 100:17 104:19,
20,22 112:5 114:16
dated
45:16 92:12 93:1
169:1
dates
169:15
daughter
106:18 113:18,19

day
13:16 14:24 15:2
30:19 31:3 36:6
65:14 74:24 99:4,5
103:15 104:6 106:24
137:5 143:8 146:21
165:23,24 167:3,4
170:12,17 183:2,7,
13 187:12 191:7,17
198:13 204:3 205:13
days
111:10,11 150:6
161:11,12 170:5
dead
206:15
deal
17:14 180:3 193:18
decided
70:8
declined
164:24
Defendant
6:3 9:20 63:21
195:20 197:17
Defendant's
92:16
Defendants
6:5 10:3,4 81:1
95:11 207:15
delineated
6:11
demeanor
154:24
demonstrate
145:15
demonstrating
145:23
denied
65:3
dep
80:2 173:16 188:22
Department
10:1,2,11 34:16 35:1
36:19 154:6
depicted
48:1
deposition
5:7 6:10,18 7:8 8:22
9:18 11:3 19:16 34:4
44:5 48:11 55:20
60:3 70:2 71:9 79:16
89:12 106:1 120:24
121:6 122:23 125:15
188:2,5 194:17
199:11 202:10
204:20 209:4 213:5
depression
78:7
describe
46:19 73:12 74:18
83:14 102:22 103:13
177:3
describes
103:13 140:13
169:20
describing
83:18
detained
189:22 190:1 193:8
detective
44:16 93:5 202:19
detectives
181:5
detention
59:20 62:2
determined
39:19 208:18
diapers
11:9 119:9,12

directed
172:18
dirty
177:24
disconnected
123:12
discuss
203:13
discussed
139:15
discussing
36:5
discussion
65:5 140:13 142:22
162:24 176:2 178:2
180:5
discussions
193:3 208:24
distinct
173:2
distinction
32:15 58:23 205:8
District
5:11,12
division
5:12 93:5
document
9:16 89:17 126:14
166:12 172:12 195:3
documents
58:19 96:20 111:10
128:7 133:21 193:24
dog
202:3
dollar
24:15
doormat
17:2,3
downstairs
179:16
downtown
107:4
draw
32:14
drawing
31:11 108:7,12
179:3
drunk
150:2,5 169:10
170:5,11
duly
6:6 7:2
Dunlavey
211:9 212:8

E

earlier
34:19 55:16 65:14
201:7
early
60:18
easier
111:18
Eastern
5:12
eat
62:11 69:6 70:4
Ed
121:7
edited
127:19 128:2 129:7
133:17 134:1
editor
133:24
effect
162:21
elbows
145:14

Ella
113:24 116:22
195:20 196:7
197:17,22 198:20
200:5,13,17,19
201:16 202:7
end
85:16 122:1 144:8
ended
53:24 59:19 123:16
125:20 183:22
ends
132:4
enforcement
201:3
engaging
72:10
entered
18:7 20:9 78:1 136:7
140:15 203:3
entering
17:16
entire
17:14 30:11,17
149:16
entitled
126:12
essentially
95:9
estimate
84:14
et al
5:10
evening
23:8 44:8,13 121:15
event
33:17
events
78:21 111:11
eventually
146:17 191:17
evidently
125:24
ex-wife
199:11
exact
58:13
exam
73:17
examination
7:4 41:19 120:22
130:17 132:5 142:23
examined
7:2
examiner
130:16
examiner's
130:15
exchange
92:21
excuse
13:19 30:6 50:1 57:2
104:4 138:12
exercising
191:20
exhibit
8:22 9:17 43:19
44:5,20 45:8,15
46:20 49:12 63:20
89:11,13,17 92:10,
16 100:10,14 126:7,
11 139:3,10,17,19
159:14,16 160:6
166:6,17,22 168:18,
24 171:19 172:3
189:15 194:3,4,5,6,
18 195:4,8 196:13
202:11,17 207:6,12
exhibited
121:15

exhibits
8:14 193:24 196:7
expecting
78:12,15
explain
55:14 61:11 125:17
157:14
explained
70:1,4 79:15
explaining
103:14
express
144:22
extent
83:24 135:15

F

F-I-E-R-S
63:22
F-L-I-N-T
5:19
fabricated
185:13
face
131:9
faced
21:2
facilitates
111:18
fact
66:16 95:17 161:2
198:19
fair
28:4 34:13 47:23
56:19 112:7 187:16
fairly
182:15
fall
126:20 127:5
false
173:5,11,12,20
familiar
6:12 190:16
family
28:24 29:4 30:11,17
31:12 149:16
182:15,21 203:2
204:18 206:18 207:1
fashion
91:8
father
113:22 164:24
203:3,7 209:4,15
February
5:6 45:17 169:1
197:18
feel
59:1 74:13 136:10,
13 187:16
feet
191:12
Feinerman
185:20 188:6
Feinerman's
187:23 188:10
felt
83:22,23
female
27:23
fence
38:2
Fiers
10:4 60:11 63:21
152:16
fighting
50:15
figure
72:22 188:16



Johnnie Lee Savory 02/17/2023

filed
5:10 207:13
finally
69:5
find
61:12 145:10
166:12,20
finding
45:19
fine
32:13,14 49:2 80:7
148:10 159:24 160:3
finger
144:1
finish
7:18,19 61:18
finished
42:5,6 90:22 142:4
144:14,15
finishes
144:13
firsthand
207:23 208:3
Fixing
50:3
Flint
5:18
floor
19:20 46:24 51:19
52:1 175:8,17
focusing
36:12
folks
9:10,11
follow
9:11
food
31:3
forget
171:12 192:8
form
10:6,23 11:24 13:3
14:23 15:10 17:20
19:21 20:4 21:24
22:11 23:17 24:3,9
25:2,14 26:3 27:1
28:15 29:2,22 30:2,
23 31:7 33:3 34:10
35:6,18 37:7 38:4,10
39:5,14 41:3,15,20
44:9,10 47:2,12
48:3,20 49:7 50:16
51:20 52:14 53:2
54:3,11 56:5,16
57:5,16 62:13 63:8
65:8 66:3,20 68:4
69:8 71:18 73:14
74:16 75:18 77:6
78:6,22 79:11 81:15
83:16 85:9 87:12
88:8,21 89:21 90:23
91:10,21 95:3 96:8
97:4,13,23 98:23
99:11,21 101:5,18
102:12 103:8,18
104:11 105:5 106:21
108:16 109:4,17
110:2,14 111:3
112:4,12 113:12
114:2,12 115:17
116:3,10 117:16
118:3 119:1 120:7
121:22 125:7 126:17
127:18 130:23
131:19 134:17
136:12,24 137:19
138:5 140:18 142:24
143:14 144:3 145:20
146:5 147:11
148:16,21 150:15
151:2,11 152:19
153:9,23 155:16

157:4 158:9 159:3
160:18 161:4 162:3
163:3,19 164:9
165:12 167:12 168:2
170:6,21 171:5
174:20 175:12
176:13 177:6 178:3,
15 179:8,17 180:10,
17 182:17 184:22
190:24 192:9 198:7,
22 199:7,21 200:8,
21 201:19 202:4
203:8,23 205:16,23
206:9 208:6
formulated
127:24
forward
151:17
foster
106:10
found
201:18 202:3
foundation
12:12 27:8,12 30:23
31:7 35:7 37:8 41:2
44:10 47:3,13 48:4
50:17 51:21 52:15
53:3 66:4 68:4 75:19
77:7 88:9 89:22
90:23 91:11,20
93:22 94:7 95:4 96:8
97:5,14,24 98:24
99:12,22 101:6,19
102:13 103:9,19
104:12 105:6 106:22
108:16 109:18
110:3,15 111:3
112:4,13 113:13
114:13 115:18
116:4,11 117:17
118:4 119:2 120:8
121:23 125:8 127:19
131:20 133:12
135:14 140:19
143:1,15 144:4
145:21 146:6 147:12
150:16 151:3,12
152:20 153:24
155:17 157:5 158:10
161:5 162:2 163:4,
14 164:10 165:13
167:13 170:7,22
175:13 176:14 177:7
178:4,16 179:9,18
180:10,18 191:1
193:11 198:8,23
199:8,22 200:9,22
201:20 202:5 203:9,
24 205:17 208:7
fourth
75:24 76:6 108:11
139:19 140:4 157:17
Frankie
116:22 182:20,21
183:19,20
Freddie
151:22 190:15
Friday
5:5 169:7
friend
14:9 162:22 182:24
198:3
friends
24:8 98:18 116:23
167:6,24
front
8:15,23 9:16 43:22
45:9 49:11 63:20
89:16 92:9,16
100:10,14 126:8,11
159:23 160:6 166:7,
17 168:19,24 172:2

175:7 184:6,7
189:15 193:24 194:2
195:3 202:16 207:7,
12
Fu
178:11,20
full
17:15,23 64:18
96:14 121:12 128:19
funeral
118:10,15,18

G

game
182:12
Garden
12:23 13:13 14:2
16:2 37:6 93:15
94:18 95:2
gave
62:9,14 70:3 83:3
86:7 94:24
97:12 103:1 126:5
129:21 141:15
199:11
general
63:13
generally
10:22 145:9
Georgia
104:1
Georgia's
104:20
Georgie
103:22
Georgie's
103:16 104:5 105:11
106:17 116:1,15
Gerontes
211:9 212:9
Gift
62:2,5 151:21
189:21 190:1,22
191:10,22 192:14
girl
52:12,18
give
7:18 8:21,24 18:18
45:24 46:5 69:23
81:9 82:6,15 105:23
184:8 189:18 196:20
197:4
giving
79:1,8
glad
188:15
glasses
9:6,14
Glen
211:2
God
43:7 60:8
Godmother
211:11,16,21,24
good
5:1 6:16 17:14 46:14
74:13 83:22 121:4
170:24 171:2
gotcha
113:23 189:4
Governor
134:11 135:6
grade
11:4,5
grandmother
35:5,12 54:1 103:24
ground
7:11

grounds
12:5
guess
29:15 85:13 154:19
182:19 193:14 194:1
209:1 211:12
guide
137:16
guy
210:16
guys
40:7 52:22 66:21
70:19 88:20 179:1

H

H-A-G-Y
5:23
Hagy
5:22,23
hair
24:23 25:7 161:22
162:9,12,15 210:15
hairs
82:10,12,13 83:20
85:7,21 86:6,10
210:16
hamburger
69:12
Hamilton
96:23 97:11
Hammer
167:1
hand
45:14 46:13 154:18
hands
144:1,10 145:14,18,
23
happen
8:8 16:21 25:11,22
26:15,17,18 32:16
33:9 82:19 97:3 98:2
99:10 108:15 141:19
150:10 151:1,10
155:9 167:16 169:12
180:16 199:13,17
205:7
happened
55:13,15 70:11,18
85:15,21 93:15
94:18 95:1 98:16
103:2 105:4 107:22
111:6 115:15 120:24
125:16,17,18 130:4
132:23,24 133:6
148:7 149:6 150:2,
14 152:9 158:1,20
165:11 167:6 168:9
185:16 201:8 205:6
212:1
happening
16:16 59:12 79:14
82:20 129:13 208:8
happy
154:23 157:1,7
hard
58:24 87:17 186:13
harder
166:12
harm
146:21 157:8
harmed
156:16
Harold
211:8 212:8
Harris
106:18 113:18
Harris'
113:11 114:7
Harrison
37:16 52:13,19

hat
82:2,3 83:14
Haynes
10:3 45:17,18 60:11
95:12 169:4 172:5,
19 174:11
head
82:14,17,18 83:8
187:24
hear
17:12 54:14 76:21
88:1 116:2 133:14
144:7
heard
28:6 37:5 54:8 56:3,
14,15 116:8 117:9
174:23 182:2
hearing
67:23
held
191:14
hell
79:19
helping
200:1
high
14:17 191:12
hill
177:24
hold
107:17 144:10 165:6
holding
26:1
home
22:22 26:12 31:23
32:5,20 39:20 40:21
41:1,22 42:20,23,24
43:6,10 52:7 58:16,
17 59:20 64:8,10
74:1 93:11 96:1,24
97:12 103:1 106:9
112:10,11 113:15,21
116:5 117:12,24
118:18 120:18
121:24 126:6 129:4,
16 130:6 132:6
133:3 142:5,6
143:10 146:18,19
147:2,4,5,20 150:2,6
151:21 161:16 178:1
179:5,15 184:18
185:6 189:21 190:1,
22 191:10,22 192:14
193:15
Homes
52:13,19
honest
171:8
honestly
187:22
horribly
209:18
Hoskins
26:12,19
hospital
35:4,13,16 54:2
hour
8:17 80:5 174:5
191:6,17
hours
70:15 79:20,21 93:3
128:14 138:16
148:1,3 182:7
212:16
house
12:22,23 13:12,13,
22 14:1 16:6,12,24
17:17 18:7 20:9,14
21:16 22:15 23:8,16
25:20,24 28:7 29:1,
5,9 30:7 31:11 33:1

37:24 38:3,14,17
39:2 53:17,18,23
54:21,23 55:1 58:5
89:24 90:9 93:20
94:6,10 103:16
104:5,10,17,21
105:11,15,20 106:3
108:2 110:10,20,22
111:23 112:17
113:11,24 114:7
115:6,13 116:1,15,
16,19 117:5,12,15,
24 120:5 150:3
160:14 161:3,12,21,
24 162:17 165:20,24
167:3,10 169:6
170:4,17 175:5
179:6 183:3,13,16
184:7,15 198:3,6,11,
14,20 201:20 203:3
205:12,21,22 206:13
human
146:22
hundreds
92:2
hungry
43:7
hurt
55:10

I

idea
11:20 27:6,10 63:13
82:15 119:15 200:24
identical
24:14
identification
89:14 194:19 202:12
identify
5:14 9:10
II
127:15
Illinois
5:4,8,12
imagine
21:9
immediately
85:23 152:15 162:15
172:21
inaccurate
175:16 176:19
inch
191:12
inches
21:5,8 191:13
include
11:22
including
12:23 13:13 188:3
inconsistent
39:10,13 40:13 41:9
87:15
incorrect
192:24
independently
190:19
indicating
176:10 179:24
individuals
189:20
information
11:21 12:9 27:7
187:8 207:23
informed
121:16 203:3
initially
65:3
injury
9:4



Johnnie Lee Savory 02/17/2023

**innocence**
127:11 149:17
**innocent**
211:14 212:4
**instance**
145:13
**interact**
193:21
**interacting**
49:5 75:5,12
**interaction**
74:3,23
**interactions**
187:11 188:4 202:21
207:17 208:14
209:5,8
**intercourse**
164:24
**interpretation**
188:9
**interrogated**
85:21 86:20 149:14
**interrogation**
72:8,16 73:7,16 75:4
77:12 84:22 85:3,16
86:20 87:1 100:6
128:22
**interrupt**
30:22
**interview**
10:1,11,15 13:2 35:1
36:16 60:10,14 61:9,
10 63:7 75:3 152:8
160:7,11 172:6
173:18 195:20
197:16 202:19
**interviewed**
10:4 34:8 59:10 63:3
65:14 95:12 151:20
208:1
**interviewing**
10:18
**interviews**
186:11 194:24
**introduced**
29:13,21 30:6,11
130:16 182:20
**investigation**
185:11
**involvement**
93:9 208:19
**issues**
59:7 67:1
**Ivy**
106:5 117:5 182:15
185:13 195:21 196:7
197:17 202:20 203:7
204:17 206:18 207:1
**Ivy's**
54:22,23 113:24
117:2,12,15 182:14
186:5,12 187:18
188:4 194:24 201:2,
9 203:14 204:7,12
205:22 206:17

**J**

**Jackson**
5:8
**jail**
83:3 209:14,20
**James**
108:13 109:23 118:2
119:24
**January**
9:19 10:12 14:2,21
15:2 20:15 22:18
23:16,23 24:2 25:8
34:8,17,24 35:13,16,
24 36:17 44:8,13

**K**

**karate**
21:22 22:15,18

46:24 89:20 92:13
93:11 94:6,11 96:15
100:18 103:3,14
113:3 160:12,14
161:8,17 163:18
165:23 166:2 167:2,
21 169:8 170:4
175:4 197:23 202:22
**Jatkowski**
210:13
**Jefferson**
15:7,17 37:16
**Jenkins**
42:15 48:10 49:4,21
50:13 51:16 52:3,6,
21 53:16,22 54:7
56:7
**Jenner**
134:14 135:1
**Jessie**
99:8 159:5 160:8,11
161:19 163:1 167:2,
10,20 168:5
**Jim**
6:2,8 18:9 36:10
44:19 46:14 61:17
78:7 80:14 139:6
142:20 144:11
166:20 169:13
172:23 185:7
**jog**
167:8
**John**
5:2 209:4,8 211:10,
12,17 212:3
**Johnnie**
5:7,9 6:10,19 7:1
12:15,21 13:8,11,18
15:16 23:22 24:22
26:8 27:14 29:21
30:6 46:1,8 76:7
93:6,10,13 126:13
127:14 165:4
188:11,13 197:23
198:2
**Johnnie's**
93:8 173:11
**Jones**
65:3,7,14,21 66:1
67:20 68:2,15,17
99:19 170:16 171:1
**Jones'**
23:7 25:20 37:18
115:6
**journalist**
57:18,19,20
**journalists**
57:3
**Journey**
126:13
**Judge**
6:11 58:23 166:3
185:20 186:9,20
188:5 191:16
**Judge's**
171:15
**Judges**
127:9
**jump**
59:6 171:14
**jumpsuit**
83:3,4 85:20
**Justice**
126:13,21
**Juvenile**
152:15,24

50:14 109:15 125:4
142:17 143:4,7
176:11 198:4,15,21
206:6
**Kettle**
135:10
**key**
16:7,14 17:3,4,9
108:24 109:6
**kicked**
36:8,21 114:9,21
**kids**
203:4
**kill**
155:4
**killed**
15:3 55:2,5 68:18
69:3 98:18 162:21,
22 167:7 168:1
203:4 204:18
**killing**
54:8,14 56:2 99:9
143:12
**kind**
7:10 26:1 53:8 72:9
78:15 171:13 173:10
176:24 180:13
187:24
**kitchen**
29:16 179:2
**knew**
24:6 39:13 63:10
74:6 78:10,11,16
93:14 94:17 95:17
146:11 182:15
204:12 211:14 212:4
**knife**
23:16,23 24:2,5,18,
19 146:3 150:9,13
151:9 180:14,15
199:6 206:7
**knives**
24:14 177:1
**knowing**
27:3 83:20 95:20
**knowledge**
22:20 23:2 33:10
34:21 51:2 72:18,19
204:13 208:3
**kosher**
80:18
**Kroger**
30:19 31:3 96:20,22
97:10 103:1
**Kung**
178:11,20
**Kyle**
6:4

**L**

**L-I-N-D-S-A-Y**
5:22
**L-O-C-K-E**
5:20
**L-o-u-c-k's**
14:14
**lady**
163:7
**laid**
136:15
**large**
191:2
**lasted**
48:15 130:17
**late**
14:17 116:9 172:6
174:5 184:2
**law**
201:3

**lawyer**
9:15 153:18,19
190:8,10 207:11
**lawyers**
67:24 127:9 134:21,
24 135:10 139:13
193:4,6 207:21
208:12
**leading**
195:1
**learned**
93:10
**leave**
139:9 181:22
**leaving**
53:18 111:23 116:16
117:12
**Lee**
5:7,10 7:1 13:18
126:13 127:14
**left**
25:19 31:18 36:17
37:14 55:4 59:11,13
62:2 106:8,17
107:14 108:1 112:10
115:5,12 154:5
161:20 162:14
171:22 183:15
184:17 200:7 206:8
**left-hand**
46:22 47:19 140:5
**Legal**
5:2
**legs**
150:22
**length**
133:1
**liar**
122:16 131:7
**liars**
41:10 122:2
**lie**
95:20 171:4
**lied**
51:17 81:1 88:6,13
**lieutenant**
209:17
**life**
10:20 13:20 146:22
149:16,17 161:16
170:14
**limits**
188:14
**Lindsay**
5:22
**lines**
13:2 77:5 95:22
109:21 110:11
160:15 164:22
**list**
127:15 134:5,13
**listen**
148:5 178:22 179:1
**listened**
178:11
**lists**
134:21 196:6
**Litigation**
5:3
**live**
106:10
**lived**
13:19 16:3 52:12,19
164:15
**lives**
93:11 183:16
**living**
17:17 21:5,7 30:12
89:19 141:20
**LL**
100:15

**LL005893**
49:18
**located**
5:3 17:19
**location**
85:12 172:18
**Locke**
5:20 36:11 80:3,15
213:2
**long**
48:14,16 58:7,8,11,
13 69:19,22 84:10
127:1 130:18,20
138:15 147:16 152:5
163:12 175:8 176:3
184:15,17 191:14
**longer**
126:18
**looked**
118:11
**lost**
147:10 149:16
**lot**
55:7 70:11 92:1
103:24 113:6 142:13
187:11 199:24
204:24
**lots**
144:5
**Loucks**
14:13
**lounge**
191:21 192:7
**lunch**
69:19,20 70:12
71:13 75:15 77:9
**lying**
52:3 87:16 170:19
193:1

**M**

**mad**
209:19
**made**
19:3 33:1 39:12
58:23 65:2,7 67:9
68:11 76:7,10 98:9
149:4 150:23 173:5
188:9 189:21 193:17
206:14,20 207:1
**Mae**
113:24 159:5 160:8,
11 161:19 163:1
167:2,10 198:20
200:13 201:16
**magazine**
36:9,22 126:18,22
127:5
**mail**
16:13
**mailbox**
16:7,14,22 109:1,7
**majority**
191:7
**make**
8:3 16:19 18:16 20:7
39:19 41:7 42:12
52:10 61:16 66:23
67:19 68:10 76:15
79:13 97:22 98:22
99:16 117:21 123:9
125:3 131:21 144:13
158:14 172:22
174:14 193:9
**makes**
63:1 79:20
**making**
39:10 65:4 87:14
158:15 205:8

**man**
144:21
**manipulated**
185:13
**manner**
6:14 129:7
**Marcella**
75:17 76:9,19 77:5,
14,20 78:20 79:9
85:16 100:7,16
101:10,16 103:6
104:3 105:3 106:19
107:6 112:1,3,9
115:1 116:14 117:22
121:19,21 123:5,24
124:15 140:12
142:22 148:24 152:6
154:10 157:19 158:8
186:4,23
**mark**
43:24 89:10,11
197:3 202:8
**marked**
9:17 44:1 89:13,17
166:14 194:18
196:21 202:11,17
**marking**
166:21 197:4
**marshall**
127:12 168:15 169:4
170:3
**martial**
50:13
**Martinez**
211:8 212:8
**Marva**
23:7 25:20 37:18
65:3,7,14,21,23
66:1,16,17 67:5,6,20
68:2,15,17 99:19
109:22 115:6 170:16
171:1
**Marva's**
37:24 38:14
**Mary**
211:9 212:8
**Mason**
31:5 53:11 69:1,2
93:11,14 94:17,24
95:12,17,19,23
96:15,19,22 97:10,
21,22 98:13 102:23
159:5,10,11 160:8,
12 161:19 163:1
165:20 167:2,20
**Mason's**
53:17 93:20 94:6,10
99:7 111:23 112:11
161:3,24 162:17
165:24 167:10 169:6
170:4
**mat**
109:3,7
**matter**
5:9 91:8
**Matthew**
134:15,22
**mattress**
191:13
**Mccorkle**
5:3
**Mea**
5:16
**meant**
52:24 54:18 154:20
186:9
**meet**
30:18 31:2 184:6
**Melvin**
26:12,18,23 27:4
52:7 110:8 177:23



178:6
**member**
206:18 207:1
**memory**
58:20 72:3 88:10
111:10 120:9 145:23
161:7,17 162:5
166:1,5 167:8,18
177:8 180:24
**mention**
209:3
**mentioned**
43:16 46:23 83:13
158:20 190:8 212:8
**mentioning**
152:1
**merge**
136:18
**mess**
211:15
**met**
14:22 30:14,16
119:7 182:20
**metal**
109:24
**Methodist**
35:4,12,16
**mid**
150:23
**middle**
21:6 47:9 65:15
114:15 122:7 140:12
142:21 177:21
197:20
**mind**
119:7 146:15 147:18
**mine**
9:8
**mine's**
166:14
**minute**
12:16 18:19 60:10
69:16 120:20 134:6
159:22
**minutes**
48:18 58:10,11
69:21 80:6 130:17,
22 138:17 174:7
182:8,10 188:20
**Miranda**
59:23 63:6,10 64:2,7
**misconduct**
185:11 186:10
188:12 207:24 208:4
209:10
**misheard**
29:24
**mistaken**
153:17 210:15
**moment**
84:1,2 124:19
**Monday**
14:21 93:10 117:23
180:16
**money**
109:22
**morning**
33:2,20,21 34:3
35:13 52:11 53:24
60:4,7,12,16 61:14
63:3,7,16 65:6 69:17
79:4 95:13 98:14,15
104:5 105:1,11
112:19,20 113:2
119:24 120:6
**mother**
29:12,13 90:17 99:8
103:23 110:23
113:22 159:10
**motion**
150:24

**mouth**
86:8 201:14
**move**
20:18 21:11,14
28:13 68:6 70:23
95:21
**moved**
17:18 19:12 20:13
21:8 51:8,10 90:21
**movement**
200:3
**moving**
18:6,17 36:2 54:6
114:5 151:17
**multiple**
15:10
**murder**
163:2
**murderer**
122:15 131:7
**murderers**
122:2
**murders**
36:6 93:14 94:17
95:1,18 98:15 99:19
103:15 104:6 112:20
116:8 117:23 119:24
120:6 121:17
155:15,23 161:13
165:21,22,23 167:4
183:3,8,13 190:23
203:13 205:13
**Murray's**
24:15
**music**
178:11,23 179:1
**mutual**
74:14

**N**

**N-E-I-M-E-I-E-R**
134:16
**naked**
70:8 82:8,19 83:3,19
210:14
**named**
26:12,23 27:4 45:17
52:7,12,18 110:7
133:24 163:7 190:3
**names**
207:15
**Natalie**
128:2 133:24
**nature**
26:2 106:15
**NBA**
182:12
**neglected**
120:1
**neighbor's**
179:15,21
**nephew**
29:15
**Neumeier**
134:15,22
**news**
38:1 54:9,15 56:3
116:2,8 117:9 201:8,
10 203:20 205:20
207:3
**newspaper**
56:22
**night**
27:22 30:8 32:20
39:20 40:21 42:15
54:15 59:20 62:11,
12 65:15 73:9 93:10,
20 94:5 111:24
112:10 161:14,15
201:13 203:21

**nightgown**
157:19,21 158:7,19
**nights**
161:16 169:9,10
**nightstick**
21:21 22:14,17
109:23 177:3
**nightsticks**
176:9,20
**noon**
69:6
**north**
17:19
**Northern**
5:12
**notice**
6:20 154:23
**number**
39:2,3 166:18
207:15
**numbered**
49:13
**numerous**
12:22 13:12
**nunchucks**
199:13
**nunchunks**
176:23

**O**

**oath**
34:20
**object**
10:6 12:4 15:9 47:11
61:17 68:3 71:3
108:16 134:17 138:5
148:16 160:18
**objected**
80:17
**objecting**
70:19
**objection**
10:23 11:10,24 12:1,
12,16 13:3 14:23
17:20 18:8 19:21
20:4 21:24 22:10,11
23:17 24:3,9 25:2,14
26:3 27:1,8,12,15
28:9,14 29:2,22
30:2,9,20 33:3 34:10
35:6,18 36:10 37:7
38:4,10 39:5,14,21
41:2,15,20 44:9
47:2,12,20 48:3,20
49:7 50:16 51:20
52:14 53:2 54:3,11
56:5,9,16 57:5,16
59:15 62:13 63:8
65:8 66:3,19 67:8,15
69:8 71:5,18 72:24
73:14 74:16 75:18
76:13 77:6 78:6,22
79:10,11 80:1 81:15
83:16 85:9,19 87:12
88:8,21 89:21 90:23
91:10,20 93:21 94:7,
13,19 95:3 96:5
97:4,13,23 98:7,23
99:11,21 101:5,13,
18,24 102:12,18
105:16 106:21 107:17
109:4,17 110:2,14
112:2,12 113:12
114:2,12 115:17
116:3,10,20 117:16
118:3,13,19 119:1,
10 120:7 121:22
123:1 124:5 125:7
127:18 130:23
131:19 133:10

135:12,13 136:12,24
137:19 140:18,23
141:4 142:24 143:14
144:3 145:20 146:5
147:11 148:21
150:15 151:2,11
152:19 153:6,9,23
155:16,24 156:5
157:4,23 158:9
159:2 160:24 161:4
162:2 163:3,20
164:9 165:12
167:12,17 168:2
170:6,21 171:5
174:20 175:12
176:13 177:6 178:3,
15 179:8,17 180:9,
17 182:17 184:22
190:24 192:9,20
193:11 198:7,16,22
199:7,14,21 200:8,
15,21 201:19 202:4
203:8,15,23 205:16,
23 206:9 208:6
**objections**
44:14 66:22
**objects**
48:1
**occasion**
203:13,14
**occasionally**
24:1
**occasions**
12:23 13:13
**occurred**
103:7
**Octavia**
211:18
**office**
37:2,5,15 130:15
141:24 142:1 152:14
**officer**
14:6,10,12 18:10,13
19:4,11 20:2,13
21:20 22:21 23:22
24:17 25:1,6 27:11
39:4,9 40:3 43:9
44:16 45:17 51:24
57:24 58:1 60:11
63:5 64:2,19 65:1,
13,20 67:13,18
68:11 74:12 76:9
81:11,24 82:1,4,6,7
83:13 86:14,23
87:21 91:14 93:4
102:9 107:4 109:24
112:18 113:1 114:8
115:19,22 116:7,14
118:23 119:8,15,21
120:2 121:16,19
131:9 132:11 133:8
136:6 137:14 160:7,
11,13 167:1 169:2
174:9 177:11
**officer's**
46:19
**officers**
10:10,18 11:13,21
12:8 13:1,15 15:23
16:1,5 17:7 18:5
19:1,18,23 20:8
22:8,13 23:14,15
24:13,24 25:19
26:11,15 27:7,21
28:20 29:8,18 30:5
31:20 32:1,9,19,24
33:19 34:7,16,24
35:23 36:3,5,7,17,23
38:16,22 39:3,23
42:22 47:24 59:10
62:19 63:2,16 64:4,
15 65:6,13,24 66:15

67:5 68:1 69:17,18
71:12,16 75:16
76:18 77:16,17,18
78:20 79:23 81:24
84:23 85:4 86:15
88:5,6 95:9,17,24
96:19 97:20 100:5
102:15,16 151:20
169:3 172:5,7,18
173:5 174:16 178:2
179:7 180:6,22
181:11,19 189:19
194:23 208:16
**officers'**
173:12
**online**
136:2
**open**
65:23 66:17 67:6
**Order**
6:11 171:15 173:10
187:23 188:18
**ordered**
191:16
**ordering**
212:22
**oven**
201:18
**overnight**
117:15 161:19
**oversized**
83:3

**P**

**p.m.**
38:1 128:23 213:5
**packet**
166:20
**pages**
128:11,15 195:9,10,
14,17 196:8
**paragraph**
10:19 12:19 15:15
17:15,23 24:21
50:20 52:6 54:6 56:1
64:18 75:22 76:2,5
92:19,24 93:2,16
95:7,8,10 96:14,18
97:20 98:12 100:23
102:8,22 103:4,12
104:16 108:16 110:11
111:21 112:17 113:4
114:5,15 117:20
119:21 121:12
128:20 136:5
137:11,12,14 155:3
160:16
**Parra**
128:2 134:1
**part**
56:3 126:18 155:12
176:19 187:23 191:3
**participate**
191:18
**partner**
162:22
**parts**
82:18
**party**
169:9
**passes**
184:9
**peace**
173:9
**pending**
82:9 91:8
**pension**
211:15
**people**
57:12,22 60:22

79:16 99:9 115:22
127:12 128:7 151:20
189:21 190:18
207:24 208:21,23
**Peoria**
10:1,11 34:16 36:18
89:18 126:11 151:19
154:6 209:14
**Peoria-savory**
44:5 128:17
**Pepe's**
163:24 164:4
**Pepper**
62:15
**percent**
181:17
**Percy**
71:15,20 74:3,6
77:3,11 92:21 94:3,
18 94:16 100:24
101:9 107:4 119:22
120:3,4,10 152:16,
17 153:3,20
**period**
85:5 120:11 132:3
164:17 168:6 169:16
170:15 200:17
**Perkins**
211:2
**permit**
135:17
**permitted**
169:15
**person**
58:4 137:8 190:3
**personal**
207:16 208:3
**personally**
193:7 207:22 208:2
209:7
**persuaded**
174:19
**Peter**
211:9 212:9
**Petition**
135:6
**phone**
41:7 99:7,8 179:11,
16,22 210:4
**photo**
91:6,19
**photos**
43:16,20 44:7,12,16
48:2 91:13,15,24
92:1
**physical**
83:15,18,24
**physically**
20:16 81:13,19
209:20,23 210:6
**pick**
20:22
**picture**
44:22 46:22 47:18
89:8
**pictured**
47:8
**pictures**
22:22 44:22 45:1,5,
13 46:20
**pieces**
15:10
**pimp**
53:9,11
**pimps**
53:1
**Pinkney**
10:3 172:5
**place**
8:15 12:8 43:21
49:11 63:20 79:3,4,



Johnnie Lee Savory 02/17/2023

18 80:24 82:11
89:16 97:17 100:10
101:4 114:24 115:2,
3 125:23 126:7
141:20 147:17 149:7
156:24 168:18 207:6
**Plaintiff**
6:19 166:7 168:19
**Plaintiff's**
5:15
**plan**
6:15 53:9
**plans**
33:1
**play**
23:4 31:16
**played**
109:14
**players**
52:23,24
**playing**
19:12 21:6,12 23:6
151:8 192:7 206:6
**pleased**
17:12
**plucked**
82:13 83:20 85:6
210:14,16
**pocket**
180:15
**point**
13:19 19:3 22:14
23:21 25:19 34:13
39:8 50:5 66:16
71:20 72:17,18
73:22 75:4 77:15,20
79:7,23 81:7,8,11,
14,20 82:8 94:11
98:16 106:3 116:8
121:4 143:19 148:4,
12 151:24 152:13
183:22 200:13
**pointed**
36:11 128:1 150:22
**pointing**
59:7 113:5
**Polaroid**
45:1
**pole**
109:24
**police**
10:1,11 18:14 20:8
34:7,16 35:1,23
36:16,18 39:3,4
51:17,24 55:7 56:23
57:2,9,14,23 59:14
60:7,15 61:13 62:18,
19 63:21 72:8 93:6
115:13 119:15 128:5
131:24 150:13
151:19 152:11 153:1
154:6 158:3 172:7
177:4 180:22 181:1
185:13 189:19
**policeman**
54:10 56:12
**policemen**
111:14
**polygraph**
41:13,19,23 42:8,15,
19 43:5,13 48:9,15
49:4,13,21 59:11,12,
13,16,19 73:17,19,
24 74:1,22 75:8 77:9
84:16 85:5,18 86:18
92:22 120:17,19,21,
23 121:3,7,15 122:6
129:3,15,18,21,22
130:3,15,16 132:4
140:14,15 141:24
142:1,23 152:6,14,

18 154:5 158:4
**pool**
192:3,7
**Poolle**
151:23 190:4
**pop**
62:15
**portable**
19:19
**position**
146:23
**possibly**
127:10 182:3 208:22
**practice**
50:13 151:9
**practiced**
178:11
**practicing**
24:22 125:4 142:17
143:4,6,7 176:11
178:20 198:4,15,21
206:6
**predicate**
185:18
**prepared**
172:4
**presence**
120:4
**present**
28:24 29:4 49:22
50:9 72:16 73:5
75:3,16 76:18 77:4,
12 102:5 153:15
163:1 203:1
**pretty**
41:8 79:1 173:2
186:13
**previously**
88:7
**principal's**
37:2,5,15
**prior**
14:2 24:2 61:14 78:4
80:2 209:8
**prison**
149:16
**private**
82:18
**privileged**
135:16
**probation**
74:11 107:4
**problem**
185:19
**problems**
49:3
**proceed**
6:13
**proceeded**
29:16
**process**
61:1,2
**prove**
127:10 149:17
**pubic**
82:14
**published**
135:22
**pull**
16:7 82:22 160:16
**pulled**
82:12
**punching**
143:24
**purchased**
24:14
**purports**
9:24 46:18 49:12
160:10 169:2 172:4
195:19 197:16

202:18
**purpose**
185:18
**pursuant**
6:10,19
**push**
21:4
**pushed**
20:21,23
**put**
8:23 45:8 84:7 86:8
92:9 133:21 136:18,
22 145:13 157:11
159:23 161:10
166:6,11 175:7
201:13 207:9,21
210:3
**putting**
145:17,23

**Q**

**qualifying**
33:12
**question**
7:16,20,23 8:2 10:7
12:3 15:11,13 20:11
22:1 28:15 30:3
32:18 48:21 66:7,20
69:24 76:11,12
86:17 87:19,20,21
92:18 98:21 105:6,
22 131:16 134:18
135:15,18 138:6
143:17 148:5,6,17
149:24 160:19 161:5
165:8 168:3 169:15
171:6 175:3 177:2,
22 178:9 179:5,14
183:14 205:2,3,5
212:18
**questioned**
81:23 132:22
**questioning**
61:21 70:7 86:15
132:4 143:21 154:11
156:19
**questions**
7:17,18,22 10:15
39:24 46:19 60:23,
24 63:23 70:24
100:4,20 111:9,19
141:14,15 142:11
147:6 148:2,9
165:19 180:13
181:5,13,21 194:8,
22 202:21
**quick**
207:7
**quit**
123:9
**quoting**
65:20

**R**

**radio**
37:6 116:9
**raised**
144:1 157:2
**ran**
96:23 97:11 102:24
150:2
**rap**
118:1
**Ray**
31:5 53:11,17 69:1,2
93:11,20 94:6,10,16,
24 95:12,23 97:10
102:23 112:11
159:10,11 165:20

170:3
**reach**
16:7,22
**reaching**
16:13
**read**
49:14 59:23 64:2,7,
24 66:9 75:24 76:22
128:12,13 133:20
135:21,24 136:3
147:14 171:15 173:15
187:23 188:24
199:24
**reading**
13:9 36:9,22 63:6,16
159:24
**ready**
9:15 139:3 189:12
**real**
200:17 207:7
**realize**
58:24
**realm**
151:16 173:9
**rear-end**
118:24
**rearranged**
90:11
**reason**
52:2 70:23 97:22
98:5 120:2 123:7
171:3 193:2,7
208:15
**reasons**
208:24
**recall**
7:10 11:12,15 16:8,
11 19:23 26:15
28:23 29:7 32:13,19
33:18 47:1 50:12,19,
20 64:6 65:5,12,18,20,
24 66:13 67:4 221:23
69:7,24 71:15,20,22,
23 72:5,6,13,20
74:3,23 75:5,11,14
76:17 77:3,18 78:23
84:13 86:18 88:13
89:5,24 90:12 91:1,
3,5,15,18,23 92:5
93:18 99:7 102:4,11
105:21 107:1,2
108:13,17,21 109:6
118:14,17 122:8,10
124:22,24 125:1,9,
13 126:3,20,23,24
127:7,24 128:3
129:5,8,13,14
130:12 131:2,21
132:3,13 141:11
145:6,7,17 146:16
147:1,13,15 148:10
149:2 150:14
151:18,23 152:1,2,
17,21,22,24 153:1,
14,16,18 154:3,8,9
162:7 163:23 165:17
168:5,8 170:8 172:8
175:21 176:15
177:17,18 181:19
183:7 184:4,12
189:24 190:3,5,7,8,
10,14,17,19 191:21
192:4,5,15,19
199:23 201:14
204:1,7,14 208:16,
20 211:3,4,6,7,11
212:10
**remembrance**
88:23
**remotely**
146:23
**remove**
20:17

107:24 157:17 175:4
187:24 197:23
**reflect**
6:17
**reflected**
18:11 51:23
**reflects**
60:10 61:15
**refresh**
162:8
**regard**
18:6
**reinvestigation**
186:11 187:4,6
**relate**
187:8
**relating**
186:11 188:11
**relationship**
74:9,14,15,19
170:24
**released**
15:6,17,20
**remains**
188:3
**remember**
10:5,10 16:9,12,16,
20,23 18:20 19:1,7,
10 24:24 25:5,11,17,
18 27:3,21 28:1,5
29:11 30:5 31:21
32:16 34:22,23
35:19 36:3,7 39:8,
17,22 40:3,18,21
41:4 43:3,9 44:15
48:14,16,19 49:3
51:3,11,12 53:13
58:13 60:17 61:13,
24 62:22 63:2,5,15
64:6 65:5,12,18,20,
24 66:13 67:4 221:23
69:7,24 71:15,20,22,
23 72:5,6,13,20
74:3,23 75:5,11,14
76:17 77:3,18 78:23
84:13 86:18 88:13
89:5,24 90:12 91:1,
3,5,15,18,23 92:5
93:18 99:7 102:4,11
105:21 107:1,2
108:13,17,21 109:6
118:14,17 122:8,10
124:22,24 125:1,9,
13 126:3,20,23,24
127:7,24 128:3
129:5,8,13,14
130:12 131:2,21
132:3,13 141:11
145:6,7,17 146:16
147:1,13,15 148:10
149:2 150:14
151:18,23 152:1,2,
17,21,22,24 153:1,
14,16,18 154:3,8,9
162:7 163:23 165:17
168:5,8 170:8 172:8
175:21 176:15
177:17,18 181:19
183:7 184:4,12
189:24 190:3,5,7,8,
10,14,17,19 191:21
192:4,5,15,19
199:23 201:14
204:1,7,14 208:16,
20 211:3,4,6,7,11
212:10
**reporter**
5:16 8:6 43:24 44:3
64:21 196:21 202:16
212:21,24
**reporters**
56:23 57:2,3 136:19
**reports**
128:6 129:12 131:1,
24 133:17 151:19,23
152:2 189:19 194:22
196:11 199:24
**represent**
127:4 139:13
**requested**
66:10 76:23
**requesting**
121:17
**residence**
12:24 13:14 25:7
162:15 197:24 203:1
**residents**
191:5 192:16,18
193:13
**respect**
99:20
**respond**
64:11
**responded**
209:13
**responding**
129:17
**rest**
203:2
**resumed**
128:23
**rethink**
90:19
**retire**
211:14
**retiring**
212:5
**return**
33:1 139:2 162:16

**repeat**
7:13 13:6 158:12
**repeatedly**
125:21
**replace**
84:11 85:8
**replied**
172:21 174:13
**report**
9:19,24 10:17 11:7,
22 12:20 13:7,8,11
14:8 17:14 18:3,11
21:18,19 23:19
28:10 36:19 45:13,
16 46:17,18 49:13
50:12 51:23 60:10,
13 61:15 63:21,24
64:1,18 65:1 67:17,
21 75:21 92:12 93:1
95:11,19,23 98:12
100:8,16,17,21
102:7 103:2 104:9
107:13,24 109:13
112:16,22,24 114:20
123:4 124:10,13
125:3 129:8 131:23
132:7 136:14,17
139:21 146:2 147:3
150:8 151:7 152:12
156:3,5 160:6,12
161:18 162:20
164:18 166:10,24
169:1 172:4 173:6
174:10 180:14
186:1,21,23 195:19,
23 196:21 202:18
205:11
**recess**
60:10 138:20 189:7
**recognize**
26:21 126:14
163:15,16
**recognized**
38:2 47:17 48:1
**recollection**
23:24 25:9 32:11
33:5,7 87:14 90:2
97:16 145:16
158:11,15 162:8
167:19 173:3
**record**
5:15 6:17 9:11 49:16
65:1 66:9 76:22
80:9,13 81:5 100:13
119:6 138:19,23
170:11 173:23 174:2
189:6,10 193:23
212:20
**recording**
5:6
**recount**
169:3 202:18
**recounting**
97:21
**refer**
196:17
**reference**
133:23 134:3
158:17,18
**referring**
15:14 23:18 42:8



returned
110:10 152:15
161:20
review
135:10
reviewed
139:13
Rice
12:24 13:14,20,22
Richardson
172:19
ride
96:24 97:12 103:1
rights
59:24 63:6,10 64:2,
7,14
rod
47:8 134:11
rode
152:23
rolled
88:19
rolling
51:9,10 131:8
room
17:18 21:5,7 30:12
72:8,9,16 75:4
77:15,19 78:2 86:20
89:3,19 114:10,22
121:15 124:1,15
136:7 140:15 141:21
175:7 178:10 191:12
Rosemary
31:6 96:23 97:11
102:24
rough
111:1
roundabout
80:21
row
47:8
rules
6:21 7:11
run
8:16 58:12 186:18
run-ins
201:3
running
132:19
runs
38:2
rush
172:13
Russell
208:2,13

S

sad
98:16
Sara's
188:5
sat
141:13 153:3 179:2
Saturday
160:14
Savory
5:7,10,19,21,23 6:1,
10,19 7:1,6 9:4,18
45:15 46:18 49:18
63:22 81:5 89:12,16,
18 92:15,17 93:6
100:15 126:10,11,13
127:15 139:2 142:23
160:5,8 162:14
165:4 166:16,18,24
168:23,24 172:3,12
187:6 188:2 189:14
194:3,4,5,6,17,21
195:6,12 196:14
202:10 207:11

scene
22:23 56:22
school
14:13,14,17,21 15:6,
16,19,20 36:8,18,21
38:20,21 55:17 96:9
107:14,15 108:1
114:9,21 115:5
116:3 168:16 172:6,
9 176:3 183:23
184:2,10 191:20
Schroeder
7:11
Scopey
10:20 13:8,9,19
14:9,13,18,22 15:8
16:3,7,13 17:17,18
19:18 20:14 21:20
22:14,17 23:11,15,
23 24:1,5,13,18
25:19 26:8 27:22
28:1,4 30:6 32:5,10,
20,24 39:19 40:20
46:23 50:13 51:10
52:10 68:17 69:2
96:24 102:24 107:15
108:1,2,8,24 109:14
110:12,23 115:12
125:5 142:17 143:4,
12,24 145:15 146:3
163:2 172:20 174:12
176:24 179:23
180:13 190:23 199:5
200:6,14 201:8,17
204:12 205:13
206:5,17
Scopey's
12:22 13:12 25:7
28:7,18,24 29:4 31:2
38:2,14,17 39:2
53:18,23 55:1 90:16
110:23 111:23
112:10 116:16 120:5
150:3 161:12 175:5
178:10 179:6 198:3,
14,20 205:12
scratching
187:24
screaming
157:18,20 158:7
scrub
70:8 82:8
scrubbed
83:19
section
150:23
seeking
135:6
send
128:6
sense
41:7 63:1 79:20
sentence
15:15 17:23 19:17
21:19 51:4 75:24
107:5 112:17 137:13
143:23 162:14
separate
45:1
sergeant
211:12
series
43:19 180:12
Services
5:3
session
7:16 34:12
sessions
72:1
set
19:19 20:9,13,19

28:12 45:6 46:21,24
51:5,9,18 90:8,17,20
sexual
164:23
Shake
69:12
share
9:2
sharp
180:2
shoes
188:15
shook
83:8
short
76:7 80:10 138:20
152:4 189:7 197:22
shortly
174:18
shoulders
8:4
show
43:18 184:9 186:1
showed
22:22 44:8,16,17
91:15,24 92:6 136:1
170:17
showing
78:16 183:23
shown
194:15
shrug
8:4
shrunk
50:3
siblings
117:3
side
20:21 58:9 197:14
202:23
sides
82:17 195:11
sign
154:12,15,16
156:15,21
signed
63:21
sin
99:9
single
87:19
sir
7:9 8:11 10:15,16
11:6,23 12:11 13:17
14:7 23:10,12 26:4,
13,20,22,24 27:5,24
28:3,22 29:19 31:4,
8,13,15,17,24 32:3,
6,8,11 33:10,16,22
34:1 35:2 43:17
48:5,8,13 51:15
52:4,8,16,20 53:4,7,
10,15,19,21 54:4,24
55:3,6,23 56:17,20
57:6 58:6 62:7,21,24
63:14,18 65:19 66:5
67:14 69:4 76:16
77:1,22,24 78:3,18
79:22 86:13 94:8,14,
20,23 95:5 100:3,22
104:2 105:9 115:10,
23 116:5 130:8
139:4,16 140:11
147:23 159:1 160:23
162:4,19 163:21
164:3,6 165:18
167:11 178:5 190:2,
20 191:2 197:19
198:24 199:3,9
200:10,16 201:6,21
202:1,6 203:10,16

205:18,24 206:10,23
207:4
sister
29:14,21 30:7,15
31:2,6 162:23 171:2
205:14
sister-in-law
96:22 97:10
sit
15:23 17:6 124:24
125:15 132:21
153:12 208:13
sitting
25:12 30:12 71:24
89:7 90:18 175:17
190:19 192:5
sleeping
53:24
slept
60:3
sliced
203:5
small
21:16 85:12
smelled
170:17
smelling
170:20
Smith
128:2 134:1
Smolley
104:1
Smolley's
106:8 113:15,20
Snickers
62:14
solitary
191:3,8,10
solve
149:18 182:4
209:12,16
son
209:13,19
Sotos
6:2,15,17 7:5 8:20
9:3,12,13 10:8 11:1,
11 12:2,6,13,18 13:4
15:1,12 17:21 18:12,
15 19:22 20:6 22:2,
5,12 23:20 24:4,11
25:4,15 26:6 27:2,9,
16,19,20 28:12,16
29:3,23 30:4,13,21
31:1,9 33:6 34:13,14
35:9,21 36:14 37:10
38:6,12 39:7,16
40:2,7,10,17 41:12,
17 42:1,10 43:21
44:1,4,11,24 45:4,8,
11,18,23 46:3,15,16
48:1,9,17,19 50:18
51:22 52:17 53:5
54:5,13 56:6,10,18
57:7,17 58:20 59:3,
8,17,18 61:6,8,19,23
62:16 63:9 64:23
65:11 66:6,12,21,24
67:3,11,16 68:5,7
69:11 71:7,19 73:2,
7,10 76:12,14 77:2,8,13
78:8,9 79:6,12 80:7,
19 81:3,16 83:9,12
84:3 85:14 86:1
88:4,12 89:1,8,15
90:3 91:2,17 92:4,9,
12,14 94:1,9,15,21
95:6 96:6,10 97:7,18
98:4,10 99:2,14
100:1,9,13,19 101:8,
14,21 102:2,15,20

103:11,21 104:14
105:7 106:23
107:18,23 108:4,19
109:8,20 110:5,17
111:5,13,15,20
112:3,7,8,15,23
113:9,17 114:4,14
115:20 116:6,13
117:1,19 118:6,16,
22 119:4,14 120:12
121:4,5 122:13
123:2 124:11,14
125:11 126:7,9
127:20,21 131:3,17
132:8 133:13 134:19
135:19,20 136:20
137:3,21 138:7,15
139:1,7,8,24 140:2,
3,20,24 141:1,8
142:21 143:2,22
144:9 145:1 146:1,
14 147:21 148:18,23
150:18 151:5,15
153:2,7,13 154:2
155:20 156:2,7,8
157:15 158:2,16,23
159:4,15,18,22
160:3,4,20 161:1,9
162:6 163:6,10,14,
22 164:13 165:10,15
166:6,9,13,15,23
167:14,22 168:7,18,
22 169:17 170:1,13,
23 171:9,13,21,24
172:1 173:4,15,18,
24 174:3,6,9 175:1,
5 176:18 177:10,14
178:7,18 179:12,20
180:11,21 181:10,
16,18 182:6,9,11,13,
23 185:1,9,24 186:3,
16,23 187:2,5,15,20
188:20,22 189:4,11
191:9 192:11,22
193:16,23 194:15,20
195:8,15,18,24
196:5,8,12,16,22
197:3,7,9,12,15
198:9,18 199:11,16
18 200:3,11,18,23
201:22 202:8,15
203:11,18,19 204:6,
21 205:3,9,10,19
206:1,11 207:6,10
208:9,10 210:22
212:12,17,23
sound
48:18 69:6 130:18
sounds
131:11 190:16
speak
122:3,4 124:20
209:15
speaks
156:6
Specialist
5:2
specific
70:24 148:8,9 210:2
specifically
91:3 121:18 169:17
180:16 186:11 188:6
194:8 210:5
speculate
98:8
speculating
193:17
speeding
70:11
spending
59:20

spent
93:10,19 94:5
149:15 161:15
split
65:23 66:17 67:5
stabbed
200:6
stabbing
200:13
stack
8:13,23 45:20 46:6,
11
staff
127:23 192:16
stage
28:13
stamped
9:18 92:17
stand
20:17,19,20 88:17,
18 89:3 90:20 91:3,
6,19 92:6 175:22
standing
57:12 122:9 124:22
125:2 132:16,20
stapler
197:7
start
156:18 159:24
171:16 187:17 196:3
started
39:9 60:20 61:13
70:19 71:3 127:2
132:23 137:12
141:6,13 142:12
150:21 151:8 157:18
158:6 175:9 176:9
starting
81:6,8 141:9 184:3
191:16
starts
64:19 75:22 96:15
114:6 119:21 128:22
165:3 196:1
state
9:15 13:15 37:14
49:15 125:14 149:7
161:12
stated
11:7 20:16 36:20
77:11 91:22 93:9,13
96:15 131:24 132:6
141:18 165:4 197:22
198:1
statement
10:22 18:16 19:4
20:7 22:6,7 40:14
65:21 67:10,19
68:11 76:7,10,15
87:15 90:19 98:9
154:13,15,17
156:15,21 158:15
204:22 206:14,20
207:2
statements
39:11,12 65:2,4,7
117:21 145:10
153:22 172:22
173:6,11,12,19
174:14 185:14
189:20
states
5:11 12:21 13:8,11
15:16 17:16,22 95:9
100:23 107:3 108:6
112:24 121:12,13
132:10 162:14 169:5
197:21 202:24
stating
11:12 117:22 180:15



**station**
18:14 34:8 59:14
60:8,21 61:21 62:1,
18,20 93:6 152:11
153:1 158:3 181:4,
12,20
**stay**
111:16 152:14 161:2
184:15 186:13
**stayed**
106:12 117:15 150:5
160:13 161:19
**Steak**
69:12
**Stenson**
209:4,9,18
**step**
29:12
**stepfather**
29:13
**stick**
22:18 26:2
**sticks**
21:22 22:15,21 23:1,
8,11 109:15 176:10,
21 177:1 199:5
**stomach**
65:23 66:17 67:6
**stood**
57:11
**stop**
110:24 122:5,11
123:8 144:7,20,21
147:5 184:6
**stopped**
85:22 123:14
**store**
30:19 31:3
**story**
97:22 102:10 126:14
128:8 136:18
**straight**
31:23 169:9
**stray**
111:9
**Street**
12:24 13:14,20,23
15:7,18 16:3 37:6,16
93:12,15 94:18 95:2
**strike**
69:19 95:20
**string**
177:5
**strip**
210:14
**strokes**
189:18
**struck**
188:1
**stuck**
146:3
**stuff**
143:21
**Styrofoam**
191:13
**submitted**
135:11
**substance**
138:1
**sued**
194:23 208:24
**suggested**
82:1 146:8 149:4,5,6
151:14
**suggests**
67:1
**summarize**
9:24
**suppose**
169:18

**supposed**
53:23 157:24
**suspect**
43:2
**swear**
5:17
**sworn**
6:7 7:2

---
**T**
---
**T-O-M-P-K-I-N-S**
134:15
**table**
17:18 18:6,17 19:5,
11,14,19 51:9,10
89:9 90:4,8,13,18
91:1 175:8 179:2
192:3
**Taco**
164:1,4
**tacos**
164:1
**takes**
183:17
**taking**
120:18
**talk**
57:1,8 60:7 64:4,14
68:17 69:2 71:12
77:5 81:6 101:1,3,
10,23 120:13
121:17,18,21 122:4
123:6 132:22 164:23
172:20,22 174:12,
13,19 182:11,14
187:10,11 188:11
190:22 192:18 202:6
203:21
**talked**
18:13 39:4 49:6 54:9
56:1,12 59:11 60:15
68:15 71:16 78:19
80:14 93:4 99:19
102:23 120:23 121:6
139:11 167:2,23
172:7 187:18 193:6
204:17
**talking**
18:9 19:2 34:12 40:6
42:14 59:16 61:13
62:19 69:16,18
76:18 77:8,9 79:8
84:23 93:18 102:4
107:19 114:19
120:10,16 121:2
122:5 137:12 152:6
160:21 167:19
183:22 185:4 186:22
190:10 192:6,13,15
208:20
**tan**
47:10
**Taylor**
5:18,19 6:8,16 9:2
10:23 11:10 12:1,5
13:3 14:23 15:9
17:20 18:8 19:21
20:4 21:24 22:12,23
23:17 24:3,9 25:2
26:3 27:1 29:2,22
30:9,20,22 31:7 33:3
34:10 35:6,18 36:10
37:7 38:4,10 39:5,
14,21 40:8 41:15,20
42:4 43:23 44:2,9,
14,19 45:3,7,10,19,
22 46:2,7,10 47:2,
12,20 48:3 49:7
50:16 51:20 52:14
53:2 54:3,11 56:5,9,
16 57:5,16 59:15

61:5,16 62:13 63:8
65:8 66:3,15,19 67:8
68:3 69:8 71:5,18
72:24 73:14 74:16
75:18 76:11,13 77:6
78:6,22 79:11 80:1,
14 81:2,15 83:8,16
85:9,19 87:12 88:8,
21 89:21 90:22
91:20 92:11 93:21
94:7,13,19 95:3
96:5,8 97:4,13,23
98:7,23 99:11,21
100:12 101:5,13,18,
24 102:12,18 103:8,
18 104:11 105:5
106:21 107:17
108:16 109:4,17
110:2,14 111:3
112:2,4,12,21
113:12 114:2,12
115:17 116:3,10,20
117:16 118:3,13,19
119:1,10 120:7
121:2,22 123:1
124:5,9 125:7
127:18 130:23
131:15,19 133:10,12
135:12 136:12,24
137:19 139:6,23
140:1,18,23 141:4
142:20,24 143:14
144:3,11 145:20
146:5 147:11 148:21
150:15 151:2,11
152:19 153:6,9,23
155:16,24 156:5
157:4,23 158:9,22
159:2,13,17,20
160:1 161:4 162:2
163:3,9,11,19 164:9
165:6,8,12 166:8,11,
19 167:12,17 168:20
169:13,22 170:6,21
171:20 173:1 174:20
175:12 176:13
177:6,13 178:3,15
179:8,17 180:9,17
181:9,14,17 182:10,
17 184:22 186:21
187:1 190:24 192:9,
20 195:22 196:3,10,
15,19 197:1,8,10,14
198:7,16,22 199:7,
14,21 200:8,15,21
201:19 202:4 203:8,
15,23 204:19 205:1,
5,16,23 206:9 208:6
210:21 212:15,18
213:2
**tears**
123:18 131:8
**technically**
169:18
**television**
20:9,17 38:1 46:21
51:5,9,18 88:17
90:17,20
**telling**
19:23 24:24 25:18
26:15 27:21 28:1,23
29:11 30:5 32:12,19
33:19 34:23 36:3,7
50:12 65:13 66:1
75:15 87:13,15,16
93:19 95:19 107:2
108:18 125:10
132:23 145:17 147:1
149:2 153:19,20
179:10 180:24
181:1,19 211:11
**temporary**
74:10

**tendency**
8:4
**Teplitz**
84:23 85:4,16 86:14
100:7,17 104:3
110:1 112:1,9 114:8
116:15 117:22
118:23 140:13
152:16 154:10
186:24 208:2
**terms**
49:5 80:15,18
139:12 174:15
175:10 176:11 178:1
**test**
41:23 42:8 43:5 74:1
75:8 84:16 120:19
129:3,15,18,21,22
130:3
**testified**
7:3 34:19,20 55:16
59:2 60:2 88:16
90:17 102:3 109:2
175:22 185:19
199:12,20 201:7
**testify**
122:22 187:13
**testifying**
153:16
**testimony**
14:5 33:8,23 34:6
56:13 90:7 99:18
105:2 143:11
**thing**
6:8 40:9 102:22
127:2 146:20 193:19
204:1
**things**
32:15,16 40:13,18
41:5,10 70:11 80:23
105:3 132:1 136:16
142:13 145:4 146:10
148:9 151:14 157:12
158:5 186:4,7
187:10
**thinking**
53:13 79:8 80:16
118:17
**Thompson**
151:22 168:15
169:4,20 170:3
171:11 190:6
**Thomsen**
5:24
**thought**
47:9 118:21 156:9
**thoughts**
157:11
**throwing**
114:9,22
**Tiarks**
211:9 212:9
**time**
5:9 7:10 8:16,24
12:4 15:7 18:10,14
19:2 20:3 22:24
23:18,21 25:1 27:3
30:14,16 31:21 34:2
35:16,20 38:17
39:24 48:16 53:8,14
58:13 60:17 61:3,24
62:22 63:11 67:22,
23 68:16,18 69:10
70:2,20 74:7 75:11,
14 76:7 78:13 80:8,
13 84:21,24 85:23
90:1 94:11,12 99:20
104:4 106:7 111:9
114:18 119:7 132:1
133:1 135:3,7
138:18,23 147:18
149:11 154:10,23

162:12 163:12,23
164:5 168:6 170:10
171:21 172:7,24
179:14 182:6 183:12
184:12,16 186:18
189:5,10 197:22
198:2 205:15 212:19
**timeframe**
35:17 85:18 86:5
**times**
79:13 144:12
**Timmes**
211:10,12,17 212:3
**Tina**
52:12,19,22 106:5
116:22 183:23 185:4
202:19,24 205:14
206:5
**Tina's**
104:10,17 105:15,19
106:2 116:19 203:1
**today**
10:21 16:23 17:6
25:12 67:18 136:1
**told**
10:18 17:6 19:18
20:2 22:8 27:22
28:20 29:7,18,20
31:20 32:1 34:7
38:22 41:5,9 42:24
43:9 50:19 51:17,24
65:10,22 66:1 67:12
70:19 82:5,7 90:16
93:13 94:5 95:24
96:19 98:13 100:24
101:9,15 102:10
108:24 109:3,5,9
113:1 114:8 119:8,
23 125:17,24 132:16
133:6 136:21 144:16
146:7,8,10 147:2
149:3 154:21 155:5,
6,13,14,18,22 156:9,
20 158:4 167:24
168:10 169:6
174:11,21 176:1
180:22 184:2,5,11
198:2 199:12,19
200:1 203:4 209:22
211:13,16,17 212:3
**Tommy**
151:22 190:6
**Tompkins**
134:14,21
**tons**
44:17
**top**
17:19 36:19 46:22
50:11,20 82:13 93:1
98:20 108:6,11
113:4 134:11 152:13
155:3 157:16
166:11,21 168:20
178:13 207:14
**topic**
185:10 186:17 188:2
**topics**
6:11,12
**town**
58:9
**traumatic**
210:24
**treated**
49:6
**trial**
151:18 152:2 153:4,
5,8,11,15 186:6,8
187:7 191:15 195:1
**trouble**
180:1

**truancy**
74:11
**true**
27:10 37:21 56:3
81:17 88:2 90:1 96:4
98:6 107:15 131:10
182:16
**truth**
87:16,24 144:17,18
**truthful**
57:21 129:23
**Tuesday**
36:21 93:3 113:3
**turn**
17:11 21:1 50:11
64:17 176:6
**turned**
118:24 125:5 131:13
132:11,14 133:9
136:7 142:18 143:5
147:7 209:17
**TV**
19:19 20:13,19 45:6
57:3 90:7 125:5
142:18 143:5 175:7,
17,19,22 176:7
192:1
**tweezer**
82:9
**tweezers**
82:22
**types**
199:5

---
**U**
---
**ugh-ugh**
8:5
**uh-huh**
8:5
**Um-hm**
64:20 96:17
**unacceptable**
156:17
**unclear**
157:24
**understand**
7:17,21 15:13 18:21
40:14 42:13 58:21
61:4 72:21 79:17
83:9,11 86:9 88:3
106:2 111:13,19
127:1 145:8 147:24
148:6 149:21,23
207:17
**understanding**
89:4 97:16
**understood**
7:23 64:3,14
**underwear**
83:5
**uniforms**
57:23
**United**
5:11
**untrue**
145:11
**upset**
156:14 157:8

---
**V**
---
**vagina**
150:22
**verbal**
8:3,10
**version**
45:5
**versus**
5:10



Johnnie Lee Savory  02/17/2023

**victim**
108:12 119:23
**victims**
155:4
**Video**
5:2
**view**
136:15 185:12
**violated**
83:23
**visit**
35:4,24 119:23
**visiting**
54:1
**voice**
154:24 157:2

---

**W**

**wait**
12:15 76:1 117:24
131:15 134:6 144:13
160:1 165:6,8
195:10
**wake**
35:5
**walked**
15:7,17 124:1
**wall**
17:19 21:2 51:6,14
90:5 125:5 142:18
143:5
**Walter**
210:13
**wanted**
38:21 43:6 101:3,23
102:9 116:2 117:23
121:18,20,24 122:11
124:18 126:4 140:16
141:2 144:6,8,21
146:18 147:4,19
151:9 154:16 180:3
193:14 207:20
**wanting**
77:5 83:14
**ward**
93:7
**washroom**
82:5 138:14
**watch**
192:1
**watching**
201:10 205:20
**weapon**
180:14,20 181:1,2
**weapons**
50:14
**wearing**
82:1 157:18,21
158:7
**Wednesday**
167:5 169:7
**West**
5:8 16:2
**Western**
164:1
**wheels**
20:20 88:18 89:3
90:14,20 91:4,7,19
92:6 175:23
**white**
27:23
**whomever**
36:13
**wide**
65:23 66:17 67:6
**wife**
199:17,19
**William**
5:10 151:22 190:3

**Williams'**
106:9 183:16
**window**
8:17 122:9 124:23
125:2 132:20
**witnesses**
196:7
**woke**
33:19 34:17,18,20
94:11 112:19 113:1
**woman**
133:24
**won**
108:8,13
**wonderful**
103:23
**word**
125:18 138:3 144:19
176:10 210:6
**worded**
126:3 147:15
**words**
86:8 113:6 128:10
137:16 201:14
**worked**
139:12
**working**
137:9
**world**
157:13
**wrestle**
31:14 88:20
**wrestling**
19:13 21:12,15 23:4
31:16 110:12,19,24
143:8 175:9
**write**
102:9 127:16,22
130:21 131:18
132:10 133:7,11,16,
18 137:17
**writes**
108:23 110:12
111:22 140:14
160:13
**writing**
126:21 127:9 129:5,
11 195:11,16 209:11
**written**
112:6 131:22 132:2
135:10 160:6 167:1
**wrong**
12:3 13:10 86:7
104:18,20 125:24
141:21 169:14
209:18
**wrote**
21:20 127:8,11
129:6 130:24 132:1
133:18 136:11 138:8
140:14 142:2,15
145:4 156:3 158:5

---

**Y**

**Yarburaugh**
151:22 190:15
**year**
27:23
**years**
18:18,19 24:6 33:14
61:2 62:23 91:7,12
118:11 141:12
147:7,8 161:7
**yell**
48:11
**yelled**
79:24 81:11
**yelling**
87:5 122:14

**yesterday**
204:3
**young**
163:7
**youths**
192:1,6

---

**Z**

**zoom**
9:10

