# Exhibit %

-2-

Mr. Gibson will then question the first witness.

MR. GIBSON:  People would call George Pinckney.

GEORGE PINCKNEY,

      called as a witness and, having been
previously sworn, testified as follows
in answer to:

DIRECT EXAMINATION BY MR. GIBSON:

Q    Please state, for the record, your name and

occupation?

A    George Pinckney, I am a patrolman with the City

of Peoria police department.

Q    Was this your occupation on June 20th, of this

year?

A    Yes, sir, it was.

Q    And, what duties were assigned to you on that

date?

A    I was working through the juvenile bureau

trying to consult various witnesses or information

regarding the murder on Garden Street.

Q    Would you tell the Court whether at that time

you were seeking any specific witness?

A    Yes, I was.  I had information pertaining to a

youth by the name of Johnny.

Q    And, how did the name of Johnny come to your

attention during the investigation?

SAVORY-LL-000094

R-42

-3-

1    A    On January the 20th, approximately 12:15 I had

2         talked to a girl by the name of Juanita

3         Hanson.  She stated she had --

4    MR. VIELEY:    I am going to object as to what she

5         stated.  That is hearsay, Your Honor,

6         unless she is going to testify.

7    THE COURT:    Sustained.  The question is how did

8         that name come to him and he answered

9         that.  We won't go into her conver-

10        sation.

11   BY MR. GIBSON:

12   Q    Did you proceed, then, to look for Johnny?

13   A    I tried to develop names.  The information was

14        that it was possibly a cousin of the victim

15        and, also, checked schools in district 150.

16   Q    And, in the course of your search for Johnny

17        that day did you find someone by that name

18        who would speak with you?

19   A    Yes, sir, I did.

20   Q    And, what was his full name?

21   A    Johnny Lee Savory.

22   Q    Where did you see him?

23   A    I contacted him at the late afternoon high school.

24   Q    And, under what circumstances did you meet with

SAVORY-LL-000095

R-43

-4-

1          Johnny?

2      A   I entered the school at approximately 3:30 and

3          we had asked prior to his arrival through the

4          principal to speak with him when he did arrive.

5      Q   When he arrived and you met with Johnny Lee

6          Savory who else, if anyone, was present?

7      A   Officer Hines and myself.

8      Q   Officer Hines is, also, from the juvenile divi-

9          sion, is that correct?

10     A   That's correct.

11     Q   And, where in the late afternoon school did you

12         meet with him?

13     A   It would be the teacher's lounge at the left

14         hand side of the office.

15     Q   About what time was this?

16     A   This was approximately 3:30 P.M.

17     Q   And, when he entered the room what did you say

18         to him?

19     A   We told him that we were investigating this

20         offense, that we understood that he had been

21         with the victim prior to the day of the murder

22         and that we would like to talk to him pertaining

23         to their activities from the night before.

24     Q   What did he say to you?

SAVORY-LL-000096

Q - 444

-5-

A    He stated at that time I don't want to talk
     to you.  I don't want to make any statements.

Q    What, if anything, did you do then?

A    Officer Hines and myself explained to him
     that it was very important that we talk to
     him.  That as far as we knew he was the last
     person to have seen the victim alive and
     that maybe he could help us pertaining to
     something that happened the night before,
     or give us some information in regards to
     why this had happened.

Q    What was his response?

A    Okay, I will talk to you now.

Q    Would you relate to us, please, the conversation
     you then had with Johnny Lee Savory?

A    He stated that the night prior to the murder
     that he had met the victim at the late afternoon
     high school at approximately 3:30.

Q    How long?

A    That they departed the school together at 6:30,
     that they took a bus to 33 Garden to the victim's
     home, arriving there at approximately 7:00 P.M.
     He stated they went in the house by way of the
     front door and that the victim took the keys

SAVORY-LL-000097

-6-

1          out of the mailbox, upon entering the house

2          they stated they were hungry, that they

3          prepared some food.  Johnny stated he had

4          taken hot dogs out of the refrigerator and

5          some corn and placed it in the skillet, it

6          was mixed together and heated.

7     Q    You have mentioned the victim several times.

8          Which victim are you referring to?

9     A    This would be the Robinson youth.

10    THE COURT:    What's the full name?

11    BY MR. GIBSON:

12    Q    What is the full name of the victim, Officer?

13    THE COURT:    If you know.

14    A    I am sorry.  I don't recall the first name.

15    BY MR. GIBSON:

16    Q    And, would you go on with what he then told you.

17    A    He stated that they ate the food, that they both

18         drank from the same cup, upon finishing the meal

19         they cleaned up the dishes and started practicing

20         Kung Fu.  Apparently this practicing took place

21         throughout the house, that the T.V. set was off

22         the stand and on the floor so as not to be

23         broken.  He stated that he used the chug, they

24         are two sticks with a chain in between and that

SAVORY-LL-000098

R - 46

-7-

1       the victim had used a night stick and they

2       played around like this for a while, then

3       straightened up the house and left.

4   Q   Now, clarify for us once more, Officer, when

5       did Johnny say this activity took place?

6   A   This would be after having arrived there at

7       7:00 after eating supper, and they left the

8       house at approximately 8:00.

9   Q   Now, when he referred to the victim what name

10      did he use?

11  A   Scopie.

12  Q   And, when he finished with his narration what

13      did you do then.

14  THE COURT:    What was the date of this?

15  A   The date?

16  THE COURT:    The incident.  Not the date that you

17      are talking to him but the time that

18      they had the Kung Fu and ate the

19      dinner?

20  A   This would be the evening of the 17th.

21  BY MR. GIBSON:

22  Q   Officer, after he had finished with his narra-

23      tion what did you do then?

24  A   There was more to this.  After leaving the house,

SAVORY-LL-000099

R - 47

-8-

is this where you want me to pick up?

Q   Yes.

A   He stated that Scopie and him left, they went
up the street to the residence of a Martha
Jones, that Martha gave him $4.00, they were
there for a short period of time and that
they left.  After they left the house Johnny
gave Scopie $2.00.  He stated they went up
the hill to that chicken place and went
inside, that both Scopie and him had ate
three pieces of chicken, a roll, that Scopie
had a Sprite and Johnny had a rootbeer, said
they took their time, were there a while and
at approximately 9:00 a young man yelled
something at him, they couldn't understand
exactly what it was but thought it to be of a
dirty nature, they both left and chased after
the kid and ran over the hill, he ran in his
front door, and that ended the chase.  From
there they proceeded on to Garden Street to
the home address again.  The first time they
were there nobody was there.  The second time
when they arrived the stepfather, the mother,
the sister and the baby were all in the house.

SAVORY-LL-000100

R-48

-9-

Q    Whose home are you referring to?

A    This would be Scopie's home.  He stated that
     the sister was talking on the phone, the
     mother and father were sitting on the couch
     embraced, that they proceeded to a backroom
     practicing Kung Fu again for a few minutes
     then listened to some music.

Q    Do you know the address Johnny was referring
     to when he said the victim's address?

A    This would be 3033 Garden Street.  He stated
     that at approximately 11:00 he left, walked
     home, took him about an hour, arriving home
     at approximately 12:00.  He called the victim
     Scopie from his residence on Holbert Street,
     that they didn't have a phone, he used the
     neighbor's phone downstairs, he talked to
     Scopie until at least 1:00, maybe even later,
     until 1:30 or 2:00, and I asked him if he heard
     any background noises, if there was any trouble,
     or yelling.  He stated, no, that at approx-
     imately 1:00 A.M. the stepfather had said good
     by to Scopie and that Scopie had returned
     the greeting with a goodby and that it was kind
     of strange because the father and son didn't get

R - 49

-10-

along that well.  He stated they talked
about general things, what they were going
to do and then Scopie made mention of having
something big to do the following day and he
wanted Johnny to come over at 8:00.  I asked
him if he went over at 8:00 and he said, no,
he had forgotten to.

Q    In your testimony so far you have said that
Johnny said that the sister was on the phone.
Did he use the words, the sister, or did he
identify the sister more specifically?

A    I believe he stated just that it was Scopie's
sister.

Q    Now, was that the end of his narration to you?

A    At the school, yes, it was.

Q    After he finished his narrative what did you do
then?

A    Officer Hines and myself did not have all the
facts pertaining to the case and we felt that
other detectives at the station might have
pertinent questions to ask trying to develop
information and we asked Johnny if he would
be willing to go down to the station with us
and talk with the other detectives.

R-50

-11-

Q    What was his response?

THE COURT:    What time was that?

A    This would be at approximately 4:00.

Q    And, what date again?

A    This would be on the 25th.

BY MR. GIBSON:

Q    Now, the individual that you stated you had talked to so far at the late afternoon school is he in the Courtroom here today?

A    Yes, he is.

Q    And, would you point him out for us, please.

A    It's the young man in the blue suit.

Q    Is this individual that you have stated Johnny Savory that you spoke with?

A    Yes, sir, it is.

Q    When you asked Johnny to proceed to the station with you what was his response?

A    He stated he would.

Q    Did you tell Johnny why you wanted him to go to the station?

A    Yes, we explained that other detectives might have other pertinent questions to ask him pertaining to this case.

Q    Did you place him under arrest at that time?

SAVORY-LL-000103

R - 51

-12-

A    No, he was not under arrest.

Q    What was his status with regard to the case?

A    The witness that had seen the victim Scopie,

     the last one we knew that had seen the victim

     Scopie.

Q    While you were talking in this interview at

     the late afternoon school did Johnny Lee

     Savory exhibit an awareness that people had

     been killed on Garden Street?

MR. VIELEY:    I am going to object to the leading

               questions.

THE COURT:    I will overrule it at this time.

BY MR. GIBSON:

Q    Did he exhibit an awareness?

A    Yes, he knew that there had been two people killed

     in the Garden Street.

MR. VIELEY:    I am going to object as to what he knew

               unless he recites conversation.

THE COURT:    I agree.  You have got to show how.

MR. GIBSON:    I move that the answer be stricken, then,

               Your Honor.

THE COURT:    I will leave it at this time and if they

               don't elicit information as to how, and

               why, then, I will just strike the answer.

SAVORY-LL-000104

R- 52

-13-

1          I will give the State a chance to develop

2          that.

3    BY MR. GIBSON:

4    Q    In the conversation when you started the conver-

5          sation did you explain to him what incidents

6          you were interviewing about?

7    A    Yes, sir, I did.

8    Q    Which incident was that?

9    A    We told him that two people had been killed and

10         that this was a serious offense and the reason

11         we wanted him to talk to us after refusing to

12         at the start was because he was the only witness

13         we knew, other than the family that had seen

14         him last.  He could play a very important part

15         in the case.

16   Q    What, if anything, was his reply when you

17         explained that these two people had been killed?

18   A    He stated I will talk to you now.

19   Q    Now, I already asked you.  Was he under arrest

20         at this time or rather where did you go next

21         with Johnny Savory?

22   A    We started to leave the conference room from the

23         late afternoon school, Johnny made mention of the

24         knife that Scopie had and the fact that we probably

SAVORY-LL-000105



-14-

1   would never find it.  He stated that he had

2   one exactly like it, that they had both

3   bought them at the same time at Murray's.

4   He stated that they paid not more than three

5   or four dollars apiece for them.  He stated

6   that the knife he had was down at his father's

7   house and that if we wanted to we could look

8   at it for comparison purposes and that he

9   would take us down and show us the knife.

10  Q   While he was saying this and while you were

11      proceeding from the conference room was he

12      restrained in any way?

13  A   No, he was not.

14  Q   Were you holding him in any way?

15  A   No, sir, Officer Hines and I were in front,

16      Johnny was three or four steps to the rear

17      of us.

18  Q   Now, Officer, is there a department policy with

19      regard to the transportation of suspects or

20      arrested from one area to another?

21  A   Yes, there is.

22  Q   How would you do that?

23  A   The arrested suspect would be in cuffs and would

24      be controlled by the officers at the scene.

SAVORY-LL-000106

R- 54

-15-

Q    After he suggested that this knife might be
at his father's house, what did you do then?

A    We proceeded to his father's house on Holbert.
Officer Hines and myself were in the front
of the car.  Johnny was in the rear.  We got
to his house at approximately ten minutes
after four.

Q    Going back to the conversation at the late
afternoon school how long did that conversation
between yourself and Johnny Savory last?

A    Approximately thirty minutes.

Q    When you arrived at the father's house what
happened then?

A    Johnny left our car, walked into the apartment
house, was gone from our sight for approximately
sixty seconds, exited the house, walked back
to the car, stated at that time his father
was not home, the door was locked, his father
had the knife with him anyway and that his
father was getting medical attention at St.
Marks.

Q    Officer, is there an department policy with
regard to transportation of suspects or any
intermediate stops that might be made between

R - 55

-16-

1     place of arrest and the place of incarceration?

2    A   Yes, there is.

3    Q   What would you do if there was such an inter-

4     mediate stop with regard to a suspect or one

5     who is under arrest?

6   MR. VIELEY:   I am going to object to that.  I think

7           he can testify as to whatever policy

8           there is in writing and what the rule

9           is.

10  THE COURT:   I will sustain the objection.  I will

11          just allow him to testify what the

12          policy is.  I assume he would follow

13          the policy anyway.

14  BY MR. GIBSON:

15  Q   Tell us what the policy is.

16  A   The policy would be that of if there were two

17     people in the car one will be with the suspect

18     or arrested at all times.

19  Q   Did any officer accompany Johnny Lee Savory when

20     he went to the door of his father's house?

21  A   No, sir.

22  Q   After you were stopped at the father's house what

23     did you do then?

24  A   We proceeded to the police station.

SAVORY-LL-000108

R - 56

-17-

Q   Where did you go in the police station?

A   We went to the detective juvenile bureau

area and Officer Hines took Officer Fires

and Officer Cannon into a conference room

and explained what we had developed up

until this time and what Johnny had told

us.

Q   Going back to when you were in the car pro-

ceeding first to the father's house and then

to the police station what were your respec-

tive positions in the police car?

A   I was driving the vehicle.  Officer Hines was

a passenger.

Q   And, Johnny Savory, where was he?

A   He was in the back seat, I believe, on the

right rear.

Q   What time did you arrive at the police station?

A   That would be at approximately 4:30.

Q   What happened when you arrived?

A   Johnny and I sat in the detective juvenile bureau

area.  Officer Hines took Fires and Cannon into

a conference room and explained to them the

information we developed up to this time.

Q   How large an area are we talking about here --

SAVORY-LL-000109

R - 51

-18-

1          the detective juvenile area?

2     A    It would be about two thirds of this room.

3     Q    Now, after Officer Hines met with these other

4          officers what happened then?

5     A    At approximately 5:00 Johnny was taken into a

6          conference room to tell the story for a second

7          time to Officer Fires and Officer Cannon.

8     Q    Who were those officers again?

9     A    Fires and Cannon.

10    Q    Why did these particular officers enter into the

11         meeting with Johnny Lee Savory?

12    A    The information we had was of a limited nature

13         because we were also dealing with the juvenile

14         program and we did not have full access to every-

15         thing that had developed up until this time.

16    Q    What was the status of Detectives Fires and Cannon

17         with regard to this investigation at this time?

18    A    They were also seeking information witnesses in

19         regards to what had happened on the Garden street

20         address.

21    Q    And, when you, Officer Hines, Detective Fires,

22         Detective Cannon and Johnny met what happened?

23    A    He proceeded with the story that he had told us

24         at the late afternoon high school and almost

Q-58

-19-

duplicated word for word what he told us.

THE COURT:    How many officers were in this
conference room?

A    There would be four at this time.

BY MR. GIBSON:

Q    Who were they again?

A    It would be Officer Hines, Officer Fires,
Officer Cannon and myself.

Q    Do you recall where the interview with these
four officers and Johnny Savory took place?

A    It's an interview room behind the secretaries
work area.

Q    How large was that interview area?

A    Approximately ten by six.

Q    Now, was Johnny allowed to eat and drink during
the interview?

A    Yes, he was.

Q    Did he eat and drink anything?

A    Yes, he was asked if he wanted to drink and he
said he would like to have a soda, a rootbeer,
and Officer Hines went down to put money in
the machine and the machine malfunctioned and
gave two sodas and he was given both sodas.
He also had a candy bar in his pocket and he ate

R - 59

-20-

part of that.

Q  At this time did Johnny ask that anyone else
be present?

A  No, sir, he did not.

Q  How long did this particular interview last?

A  Again this would be approximately thirty minutes.

Q  How did it terminate?

A  Him coming to the end of the story and the officers
leaving the room.

Q  Did he ask you to leave the room?

A  No, sir, he did not.

Q  When it ended what happened then?

A  This would be at approximately 5:30.  At this time
I left the station and went back down on Holbert
Street to try to obtain this knife that Johnny
had talked about.

Q  When you went down to Holbert Street what happened
there?

A  I talked to Mr. Savory, told him that Johnny had
stated he had a knife similar to the one that the
victim was supposed to have, that Johnny stated
I could pick the knife up for comparison purposes.

Q  This Mr. Savory that you talked to at Holbert
Street what relation, if any, did he bear to Johnny

SAVORY-LL-000112

R-60

-21-

1    Lee Savory?

2    A    He is the father of Johnny Savory.

3    Q    What's his full name, do you know?

4    A    Y.T. Savory.

5    Q    Now, when you explained this to Y.T. Savory

6         did he reply?

7    A    Yes, he did.  He stated --

8    MR. VIELEY:    I am going to have to object as to

9                   what he stated, Judge.  That would be

10                  hearsay.

11   THE COURT:    Sustained, unless you have got some

12                 reason why it would be an exception.

13   MR. GIBSON:    I don't think that we are introducing

14                  this testimony for the purposes of

15                  the truth or untruth of any of the

16                  matters.  I think, this is merely by

17                  way of background to offer the facts.

18   MR. VIELEY:    I don't know whether it's material to

19                  this confession.

20   THE COURT:    I don't know.  If it's not material we

21                 can strike it.  I will overrule the

22                 objection.  He can answer.

23   A    He stated that the knife was not Johnny's, that

24        it was, in fact, his knife and that the knife

SAVORY-LL-000113

12 - 61

-22-

1        was in a drawer, he walked over, opened the

2        drawer and handed it to me and stated that

3        Johnny hasn't done it, that it would be a

4        big man that would do something like that.

5   Q    Was that the end of your conversation with

6        Mr. Savory?

7   A    I replied to him that Johnny was in no way

8        under suspicion for this.

9   MR. VIELEY:    I am going to object to this.  That's

10                 self serving, Judge.

11  THE COURT:     Overruled.  He can state what he said

12                 and what he did.

13  A    That we are talking to him because he had been

14       with Scopie the night prior to the murder and

15       that he was the only witness we knew of to have

16       seen him other than the family after this.

17  Q    After that conversation what happened then?

18  A    I proceeded back to the station with this knife

19       and I turned it over myself to Officer Jatkowski

20       from the lab and he took it at this time.

21  Q    Did you ever present that knife to Johnny Lee

22       Savory?

23  A    No, sir, I did not.

24  Q    After you had returned to the station and presented

SAVORY-LL-000114

-23-

1    the knife to Officer Jatkowski what did you

2    do then?

3    A    Officer Fires and I had some discrepancies from

4         what the witness had told us as compared to

5         what information had been developed prior to

6         this.  Officer Fires made a phone call to

7         check in regards to the food that was prepared,

8         as to whether it was already sitting in the

9         skillet or was prepared by Johnny and Scopie.

10   Q    Let me interrupt you and ask you, did you

11        take any specific steps as to ascertain

12        whether they were discrepancies?

13   A    Yes, I did.

14   Q    What steps did you take?

15   A    I phoned the man downstairs at 1011 Holbert

16        and asked him in regards to the phone call

17        that was supposed to be placed whether Johnny

18        had used the phone, if it had been a two hour

19        period of time and at what time it took place.

20   Q    What was the discrepancy?

21   MR. VIELEY:    I am going to object to that.  He is

22                  just trying to get hearsay in, Judge,

23                  by a roundabout way.

24   THE COURT:    I will sustain that as to what the

SAVORY-LL-000115

R - 63

-24-

1       neighbor told him.

2   BY MR. GIBSON:

3   Q   After you made the phone call did you take

4       any other steps as to ascertain any other

5       possible discrepancies?

6   A   At this time we just decided to go back in

7       and talk to Johnny.

8   Q   About what?

9   A   It would be in regards to the discrepancies

10      from his first statement and the statements

11      we had developed prior to this time.

12  Q   Now, where did this new interview take place?

13  A   Again this would be in the same room.

14  Q   Who else besides Johnny Lee Savory was there?

15  A   Officer Fires and myself.

16  Q   During this interview did Johnny ask for anyone

17      else to be present?

18  A   No, sir, he did not.

19  Q   How long did this new interview last?

20  A   Approximately 30 to 45 minutes.

21  Q   And, during this interview what did you say to

22      him and what did he say to you?

23  A   I questioned him pertaining to the food, he

24      stated that the mother had left it on the stove,

PENGAD CO., BAYONNE, N.J. 07002 - FORM 1L 24A

R-64

-25-

he had said something in regards to Scopie
putting the dog in a closet off the bed-
room.   I knew the door that led off the
bedroom went to a garage not to a closet.
He had made statements that he had been
with the family, known the family for years
and years, that Scopie and him had gone to
school together, the sister changed his
diapers, he was very close to them and yet
the information I developed in talking to
him was that of not having been there very
many times, if more than just the one time
that he spoke of.   I questioned him directly
in regards to the phone call and finally he
admitted that the food was prepared, that
he had not made the phone call, that he, in
fact, had only been there the one time and
that would be on the evening of the 17th.

Q    Now, when he revealed those facts to you,
     Officer, how did you respond to him?

A    ``e told him that we now had two different
     stories and we couldn't really understand why
     he had not told us the truth or, in fact, which
     time he had told us the truth.

SAVORY-LL-000117

R-65

-26-

Q    During this interview or any of the other
     interviews that were conducted at the police
     station or at the late afternoon high school
     did you question him with regard to the actual
     date of the murder itself?

A    No, sir, I did not.

Q    When this interview ended how did it end?

A    Officer Hines came in, Officer Fires left,
     Hines had several pictures and for clarification
     purposes to find out if these were the changes
     that Johnny had talked about and if he could
     identify and he was shown a series of pictures.

Q    Did these pictures include any pictures or
     purported pictures of the bodies of the victims?

A    No, sir, they did not.

Q    What was in these particular pictures?

A    Pictures of the night stick, pictures of the
     chug, pictures of the T.V. set sitting on the
     floor, a picture of the stand and when he
     looked at the stand he stated that this is
     my bottle of fingernail polish that was
     sitting on the floor at the base of it, and,
     also, a picture of the victim, Scopie's bedroom,
     which showed the bed and the stereo off of the

SAVORY-LL-000118

R-606

-28-

1  left hand side.

2  Q   Were any of these pictures introduced prior

3      to interviews at the police station?

4  A   No, sir, they were not.

5  THE COURT:   About what time are we at now?

6  A   This would be at approximately quarter to seven.

7  BY MR. GIBSON:

8  Q   How much time had elapsed between the time when

9      Johnny first accompanied you from the late

10     afternoon school to the time that we are talking

11     about right now?

12 A   From the time we left the school until this time

13     approximately three hours.

14 Q   How much of that time had been expended in inter-

15     views?

16 A   Approximately at the station an hour to an hour

17     and 15 minutes.

18 Q   When the interview was concluded what did you do

19     then?

20 A   At this time I had no more active part such as

21     questioning or talking to him.  There was talk

22     of taking Johnny to another location.  To Mr.

23     Jenkins office.

24 Q   Do you know what happened after the interview

R-607

-28-

1     was concluded?

2  A   Yes, Officer Hines had contacted Percy Baker

3     and requested that he come to the station,

4     which he did.

5  Q   Why was Percy Baker summoned?

6  A   He was the Court appointed representative for

7     his guardianship.

8  Q   Did Johnny ask for Percy Baker?

9  A   No, he did not.

10  Q   At this time that we are talking about when there

11     is discussion about taking a polygraph and the

12     second interview at the police station had just

13     ended did Johnny ask for counsel or for his father?

14  A   No, sir, he did not.

15  Q   Now, do you know after Mr. Baker arrived what

16     transpired then?

17  A   Again I did not take an active part in this.  I

18     know that he was told that they wanted to take

19     Johnny to another location to be interviewed by

20     Mr. Jenkins, that Mr. Baker stated it was okay

21     with him if Johnny agreed and at this time Johnny

22     had stated that he would go and they left the

23     station at this time.

24  Q   Do you know why he was asked to interview with

SAVORY-LL-000120

R-68

-29-

1      Mr. Jenkins?

2   A   Because we had two stories pertaining to what

3      had happened and we ourselves did not have the

4      power to ascertain whether he told the truth

5      the first time or the second time and this

6      was to determine which time he had told the

7      truth.

8   Q   You state that you had never asked Johnny

9      Savory about the day of the killing itself?

10  A   Right.

11  Q   During the course of the interviews so far

12     at the police station did Johnny admit to

13     being involved in any way with the victims

14     on the date of the killing itself?

15  A   The only thing I recall Johnny having to say

16     about that was that he was there the following

17     night to see the cars and thought that some-

18     thing had happened.  This would be well after

19     this offense had taken place.

20  Q   Now, after Johnny and Mr. Baker had agreed to

21     this polygraph what happened then?

22  A   They left the station.

23  Q   You didn't accompany Mr. Baker or the others to

24     the polygraph?

SAVORY-LL-000121

R-69

-30-

A   No, sir, I did not.

Q   Now, in each of these interviews and let's clarify for everybody how many interviews there were at the police station?

A   There were two interviews at the police station.

Q   In these interviews did you or any of the other officers shout at Johnny Savory?

A   No, we did not.

Q   Strike Johnny Savory?

A   No, sir, we did not.

Q   Threaten Johnny Savory?

A   No, sir, we did not.

Q   Did you or any of the officers make any promises or representations to Johnny Savory as far as any benefits that might come from talking?

A   No, sir, we did not.

Q   At any time was Johnny Savory locked in any of the facilities or in the juvenile detective area?

A   No, sir.

Q   Are there any locked facilities up there in the juvenile detective area?

A   There are two cells that lock but we do not detain juveniles in these cells.

SAVORY-LL-000122

R-70

-31-

Q    Now, at any time on the 20th during or in
between these two interviews at the police
station did Johnny Savory ask to go to the
bathroom?

A    Yes, sir, he did.

Q    And, did you allow him to do so?

A    Yes, sir, I did.

Q    What is the department policy, if you know, with
regard to suspects or those under arrest using
the bathroom facilities on that floor of the
police station?

A    They can use the facilities.  They will be
accompanied by an officer.

Q    When Johnny asked to go to these particular
facilities did you accompany him?

A    I showed him the doorway to the restroom but I
did not accompany him.

Q    Perhaps you should clarify that for us, if you
would please, when you say accompany him what
do you mean?

A    I would enter the restroom area with an arrested
person and I would be in the facility just in
case something should happen.

Q    Did you do this with Johnny Savory?

SAVORY-LL-000123

R-71

-32-

1    A    No, I did not.

2    Q    What did you do?

3    A    I proceeded a few steps down the hall, got a

4         drink of water and sat down in the chair.

5    Q    Did you or any of the officers ever accuse

6         Johnny Savory of the murder of the two victims?

7    A    No, sir, we did not.

8    Q    Did anyone accuse him of any crime during

9         those two interviews at the police station?

10   A    No, sir.

11   Q    Did Johnny prior to the trip to the polygraph

12        station ask for counsel?

13   A    No.

14   Q    His parents?

15   A    No.

16   Q    Did Johnny refuse to talk to any other officers?

17   A    He made the statement when we first started to

18        talk and this would be away from this particular

19        officer he stated I don't want to talk to that

20        nigger.

21   Q    Did Johnny ever speak with that particular officer

22        alone?

23   A    He was not alone but, yes, he did speak with that

24        officer.

SAVORY-LL-000124

R-72

-33-

1    Q   When he did speak with the officer who else

2          was there?

3    A   Officer Fires, Officer Hines and myself.

4    Q   Who was that particular officer?

5    A   He was speaking of Officer King.

6    Q   Where was Johnny and where was Officer Cannon

7          when he made the statement I don't want to

8          talk to that nigger?

9    A   We were in the detective bureau area.

10   Q   When confronted with Officer Cannon did Johnny

11         say anything at that time with regard to his

12         not wanting to speak with him?

13   A   No, he did not.

14   Q   During any of these interviews did Johnny ask

15         the meaning of any words that you employed in

16         interviewing him?

17   A   No, sir.

18   Q   Did he ask you to clarify any of the questions

19         that you asked?

20   A   Not that I recall.

21   Q   And, all of these locations that we have discussed

22         in the testimony thus far these were in Peoria

23         County and State of Illinois?

24   A   Yes, sir.

SAVORY-LL-000125

R-73

PENGAD CO., BAYONNE N.J. 07002 · FORM IL 24A

-34-

MR. GIBSON:   That's all the questions of this witness.

CROSS EXAMINATION BY MR. VIELEY:

Q    Now, Officer Pinckney, you testified that you
     interviewed Johnny Savory on January 20, 1977,
     is that correct?

A    Yes, sir.

Q    Is that the first time you ever discussed or
     met Johnny Savory?

A    No, sir.

Q    You were familiar with Johnny Savory prior to
     January 20, 1977, is that correct?

A    Yes, sir.

Q    What was his approximate age on that date?

A    Approximately 14.

Q    And, what grade of school was he in at that time?

A    To the best of my knowledge, seventh grade.

Q    Now, would you characterize his intelligence on
     that date as that of being superior or as that
     of being below average?

MR. GIBSON:   Objection.  It's asking for a speculation,
              particularly speculation on which there
              has been no foundation laid for the
              officers qualifications to make such a
              judgment.

R-74

-35-

THE COURT:     Overruled.

A     I would have to say that it would be on an
average basis below average.

Q     Do you know if he reads and writes the English
language?

A     I believe so, yes.

Q     But, he is the seventh grade or he was at that
time, is that correct?

A     To the best of my knowledge, yes, sir.

Q     And, do you know where a normal child would be
of the age of 14 -- what grade that child would
be in?

A     Probably ninth grade.

Q     He would be in high school, would he not?

A     Yes, sir.

Q     Now, I believe, you testified that on January
20, you went to the school, is that correct, about 3:30?

A     Yes, sir.

Q     And, were you in an uniform on that date at that
particular time?

A     No, sir, I was not.

Q     You were in civilian clothes?

A     Yes, sir.

Q     And, you mentioned that you went there with another

SAVORY-LL-000127

R-75

-36-

1        officer -- an Officer Hines, is that correct?

2    A   Yes, sir.

3    Q   And, was that officer in uniform?

4    A   No, sir, he was not.

5    Q   He was in civilian clothes, also?

6    A   Yes.

7    Q   Or street clothes?

8    A   Yes, sir.

9    Q   Now, when you first went to the school did you
10       contact the principal or any school officials?

11   A   Yes, sir, we did.

12   Q   And, I assume, that the official allowed you
13       to interview Johnny Savory, is that correct?

14   A   Yes, sir, that's correct.

15   Q   Now, when you first met Johnny Savory on that
16       afternoon did you show him a badge?

17   A   No, sir, I did not.

18   Q   Did you introduce yourself as an police officer?

19   A   Yes, sir, I did.

20   Q   And, in fact, Johnny knew you to be a police
21       officer because he had met you before on other
22       occasions, had he not?

23   A   Yes, sir, that's correct.

24   Q   So he knew that both you and Officer Hines were

R-716

-37-

1      police officers even though you were dressed

2      in civilian clothes?

3   A   Yes, sir.

4   Q   Now, I believe, you testified on direct

5      examination that you told Johnny Savory words

6      to the effect that we would like to talk to

7      you about Scopie, is that correct?

8   A   Yes, sir.

9   Q   Those were your initial remarks?

10  A   Yes, sir.

11  Q   And, his initial remarks were I don't want to

12     talk about, I won't make any statements?

13  A   Yes, sir.

14  Q   And, yet after these remarks of Johnny Savory

15     indicating his reluctance to talk about this

16     matter you continued your conversation, did you

17     not?

18  A   Yes, sir.

19  Q   Now, after Johnny Savory made those reluctant

20     remarks that he didn't want to talk about it.

21  MR. GIBSON:    Objection, Judge.  I will object to

22              the characterization of these remarks.

23  THE COURT:    We will strike the word reluctant.

24  BY MR. VIELEY:

SAVORY-LL-000129

R-77

-38-

1    Q    Did you give Johnny his Miranda warning?

2    A    No, sir.

3    Q    Now, at that time you had your Miranda card,

4         did you not?

5    A    Yes, sir.

6    Q    And, yet you didn't offer to give this young

7         man any legal rights, did you?

8    A    No, sir.

9    Q    Did Officer Hines read him the Miranda warning

10        at that time?

11   A    No, sir.

12   Q    Did you tell Johnny Savory that he had a right

13        to have an attorney present during the questions

14        that you asked him?

15   A    No, sir.

16   Q    Now, was the principal present during this first

17        interrogation at the school?

18   A    No, sir.

19   Q    So, it was just you three -- Officer Hines, your-

20        self and Johnny Savory, is that correct?

21   A    Yes, sir.

22   Q    Now, for the sake of the record I want you to

23        tell us, Officer, to your knowledge what was

24        the approximate date and approximate time of the

SAVORY-LL-000130

R-78

-39-

death of the two victims?

A   It would be the 18th of January.   The only
information I know is that it was in the
morning, around 9:00.

Q   About 9:00 A.M. on January 18 of 1977?

A   Yes, sir.

Q   Now, you testified on direct examination that
this last conversation lasted how long at
the school?

A   Approximately thirty minutes.

Q   And, this took place in one of the teachers
lounges, is that correct?

A   Yes, sir.

Q   Now, at any time during this conversation did
you tell Johnny Savory that he was free to go
and could leave at any time?

A   No, sir, I did not.

Q   Now, after this thirty minutes of questioning,
I believe, you testified that you took him
down to the police station, is that correct?

A   Yes, sir.

Q   And, did you take him in a swuad car -- a marked
police car?

A   It's considered an unmarked car.   It's the light

SAVORY-LL-000131

R - 79

-40-

Q  And, you told him to sit in the back seat
did you not?

A  He wasn't told.  He entered the back seat and
we entered the front.

Q  As you left the school you requested that he
come along with you, did you not?

A  We asked him if he would go and he said, yes.

Q  Did you, also, tell him that he was free not
to go if he so elected?

A  No, sir.

Q  As you were requesting that he accompany you
to the police station did you tell him that
he would have a right to have an attorney go
along and be present at the police station?

A  No, sir.

Q  Did you tell him that he would have the right
to have his father or a parent present at the
police station?

A  No, sir.

Q  Now, what floor of the police station did the
three of you enter?

A  We entered by way of the side door and proceeded
to the second floor.

SAVORY-LL-000132

R - 80

-41-

1    Q   To the juvenile detention area, is that

2          what you stated?

3    A   Yes.

4    Q   Are there bars on the window?

5    A   There are screens on the interview windows,

6          yes.

7    Q   They are not the usual type of screens that

8          a person would have in his house, is that

9          correct?

10   A   That is correct.

11   Q   Screens that are designed to prevent one from

12        leaving those premises, is that correct?

13   A   By way of the windows, yes, sir.

14   Q   In other words, the screens restrain a person

15        from leaving via the windows?

16   A   Yes, sir.

17   Q   And, those screens are on every window at the

18        juvenile detective floor, is that correct?

19   A   Yes, sir, that's correct.

20   Q   And, there is a door on the juvenile detective

21        area, is there not?

22   A   Yes, sir, there is.

23   Q   So, I take it, that one being up at the juvenile

24        detective area would rapidly gain the impression

SAVORY-LL-000133

R-81

-42-

1        that you couldn't just simply stroll away if

2        · you wanted to, is that a fair statement?

3   A    The door itself is always left open for the

4        most part.  The window would be visible to

5        the normal person walking in.

6   Q    Now, when you arrived at the station how many

7        officers were present at the juvenile detective

8        area?

9   A    The only ones that were actively involved with

10       Johnny upon entering the situation were Officer

11       Hines and myself.  As I recall, there were no

12       other juvenile officers there.  The lieutenant

13       was there in her office because we had called

14       her stating we were coming in.

15  Q    Who else was there?

16  A    Officer Fires, Officer Cannon, I believe, Sargeant

17       Tarks, and, at this time, I do not recall anybody

18       else being there.

19  Q    So, there were about six police people there, is

20       that correct?

21  A    In different parts of the facility, yes.

22  Q    And, they would be visible to Johnny Savory, is

23       that correct?

24  A    On again, off again.  For the most part, yes.

SAVORY-LL-000134

R - 82

-43-

1    Q    Now, upon arriving at the police station were

2         the Miranda warnings read to Johnny Savory?

3    A    No, sir, they were not.

4    Q    Did you call his father and tell the father that

5         we have your son down at the police station?

6    A    No, sir, they don't have a phone.

7    Q    At that time did you call the juvenile authority

8         and Mr. Baker and indicate to him that you had

9         Johnny down there?

10   A    No, sir, we did not.

11   Q    Now, before you arrived at the station, I believe,

12        you testified that you stopped by the father's

13        home?

14   A    Yes, sir.

15   Q    And, you allowed Johnny to enter the home for the

16        purpose of getting the knife, is that correct?

17   A    Yes, sir.

18   Q    Now, did you warn him at that time that the knife

19        could possibly be used as a piece of evidence

20        against him in a criminal proceeding?

21   A    No, sir.

22   Q    At any time during the course of the day that you

23        have just described did you warn this young man

24        that he could possibly be tried in a Court of law

SAVORY-LL-000135

R-83

-44-

1        as an adult and not a juvenile?

2    A   No, sir.

3    Q   Did anyone, to your knowledge, warn this young

4        man on that date in question that he could be

5        tried as an adult in a criminal Court of law?

6    A   Yes, sir.

7    Q   Who did that?

8    A   To the best of my knowledge, Officer Cannon.

9    Q   And, when was that made?

10   A   To the best of my knowledge, approximately 10:00

11       or 10:30 on the night of the 25th.

12   Q   And, this is well after the events that you have

13       just described, is that correct?

14   A   Yes, sir, it is.

15   Q   Now, I believe, you stated that the Defendant,

16       Johnny Savory, was taken to the juvenile detective

17       area but it was an area ten by six and, I assume,

18       you mean ten feet by six feet, approximately?

19   A   This would be the interview room, yes, sir.

20   Q   And, are there windows in that interview room?

21   A   There is one, yes, sir.

22   Q   Does it have a screen on it?

23   A   Yes, sir, it does.

24   Q   And, is that the kind of screen that keeps people

SAVORY-LL-000136

R - 84

-45-

1          from leaving?

2     A    Or falling out, yes, sir.

3     Q    And, how many police were in this ten by six

4          area with the Defendant, Johnny Savory?

5     A    On the first interview there were four.

6     Q    So, is it fair to say it was rather crowded in

7          this small room, I assume, it's like a cubicle?

8     A    I wouldn't say it was crowded.

9     Q    Was it hot in this room?

10    A    No, sir, it was winter out.

11    Q    Now, I believe, you indicated that it was after

12         the first interview at the police station you

13         left to talk to this young man's father?

14    A    Yes, sir.

15    Q    You went out to the father's home on Holbert Street?

16    A    Yes, sir.

17    Q    And, you had a conversation with the father, namely,

18         Y.T. Savory?

19    A    Yes, sir.

20    Q    Now, did you bring the father back to the police

21         station so that he could counsel with and be with

22         his son during this interrogation?

23    A    No, sir.

24    Q    Did that thought ever enter your mind?

SAVORY-LL-000137

R-85

-46-

1   A   We don't do that usually with a witness.

2   Q   You didn't think that the boy might like to

3       have his dad there or someone there for moral

4       support?

5   A   The boy didn't want his father there.

6   Q   At any rate Y.T. Savory told you that his son

7       did not commit this crime and that it was done

8       by a big man, is that correct?

9   A   That is correct.

10  Q   But, the father did give you a knife, is that

11      correct?

12  A   Yes, sir.

13  Q   And, you took that back to the station?

14  A   Yes, sir.

15  Q   And, you turned that over to the evidence detective,

16      did you not?

17  A   The lab man.

18  Q   So, in the back of your mind you had a thought or

19      a suspicion that perhaps this knife could have

20      been used in this crime, isn't that correct?

21  A   No, sir.

22  Q   Then, why did you bring it back for?

23  A   Johnny had stated it was exactly the same type of

24      knife that Scopie had.  It was brought back for

SAVORY-LL-000138

R-86

-47-

1     purposes of identification for brand name and

2     what it looked like.

3   Q   And, for possible use as evidence, isn't that true?

4   A   Not at this time.

5   Q   Now, was this knife tagged and placed in the

6     evidence locker?

7   A   I have no idea.

8   Q   Isn't it normal practice of the police department

9     to always tag an item that's brought in and placed

10     in the evidence locker?

11   A   It really depends upon the situation.  If it was

12     brought in as evidence it would probably be placed

13     in an evidence locker with a copy of the report

14     for processing at a later date but on this occasion

15     the only thing I know for sure was that I turned

16     it over because it was exactly the same type of

17     knife the victim supposedly had also.

18   Q   It's marked as evidence now, is it not?

19   A   Again I have no knowledge of that.

20   Q   You have no knowledge of that.  Now, then, after

21     you returned to the police  department with the

22     knife was there another interview with Johnny

23     Savory?

24   A   Yes, sir, there was.

SAVORY-LL-000139

R-87

-48-

Q     And, how many officers were present for that
      interview or was it once again in this cubicle?

A     Yes, sir, it was in the interview room and there
      were two officers present.

Q     And, at that time you became rather curious or
      aware of the discrepancies in the two stories,
      is that correct?

A     Yes, sir.

Q     In other words, you were concerned about who
      fixed the hot dogs and corn, is that correct?

A     That's right.

Q     And, why would that concern you in a murder case
      such as this?

A     Because I was trying to find out how much
      information Johnny really knew, what kind of a
      witness he was, whether he was just trying to
      get himself involved because he enjoyed the
      attention, being in the limelight, having been
      the last person to see him alive, other than
      his family.

Q     All that was left to do was to pursue this issue
      of who fixed the corn and who cut up the hot
      dogs?

A     Among the other discrepancies, yes, sir.

SAVORY-LL-000140

R-88

-49-

1     Q     What other discrepancies were there?

2     A     He stated that Scopie had put the dog in the

3            closet off the bedroom.  This is after having

4            been there numerous times and knowing the

5            family very well.  It was not a closet but it

6            was a door to the garage.  There was talk

7            about the T.V. being placed on the floor.  We

8            did know the T.V. was on the floor, so that

9            was accurate.  He had made a phone call, that

10           he had talked for at least an hour and possibly

11           even as long as two hours.  That was not correct.

12     Q     So, because of this doubt that you decided it

13           was time for a polygraph, is that correct?

14     A     No, sir, I did not make this decision.

15     Q     Someone made that decision?

16     A     Yes, sir.

17     Q     Who made that decision?

18     A     The only person I know for sure that was involved

19           in that was Officer Hines.

20     Q     Is it your normal police procedure that you give

21           everybody who is not even a suspect, in your

22           words, a polygraph examination when you interview

23           them at the police station?

24     A     Quite often, yes, sir.

SAVORY-LL-000141

K-89

-50-

Q    How often does that happen?  Does it happen
     on a daily basis when you are involved?

A    I would say for the normal rate per sexual
     assault and rape.

Q    You are talking about sexual assault?

A    I am talking about my daily cases.  In other
     words, if we have a question as to whether or
     not the witness is telling the truth, it's a
     pursuable case and we want to make sure we
     are doing everything we can.  Yes, sir, we do
     use it.

Q    So, really, what you are telling me is that
     he was really more than a witness.  He was, in
     fact, material to this case, was he not,
     because he was the last person to see
     these alleged victims alive, isn't that true?

A    I don't know if I would say material.

Q    He was material enough that you were going to
     pursue it with a polygraph, isn't that true?

A    Yes.  We wanted to know why his story was differing
     now as compared to the first time.

Q    Isn't it true that the things he lied to you about
     weren't material at that point to the murder?  How
     can who fixed the corn be material to a murder case?

Q-90

-51-

MR. GIBSON:    Objection.  That's calling for a

speculation on the part of the

witness.

THE COURT:    Overruled.   He can answer.

BY MR. VIELEY:

Q    Now, was the Defendant then taken to Mr. Jenkins

office?

A    As far as I know, yes, he was.

Q    You weren't present for that?

A    No, sir, I was not.

Q    Is it true that Percy Baker didn't appear on the

scene until at least after three separate inter-

views by the police officers with this young man?

A    Yes, sir, that is correct.

Q    Now, at the time you took the Defendant, Johnny

Savory, from the school to the police department

did you notify his father or obtain any permission

from the father?

A    We went to his house.  The father was not there

and we had no knowledge for sure where he was at.

Q    So, your answer would be, no, you did not obtain

the permission of the father, is that correct?

A    That is correct.

Q    Now, Officer, are you familiar with Section 703-2,

SAVORY-LL-000143

𝕟 - 𝟿𝟷

-52-

1          of the Juvenile Court Act?

2     A    By the numbers, no, sir, I am not.

3     Q    Let me read part of it to you and ask you --

4     MR. GIBSON:    I will object to the introduction of

5                    the words of the statute and questioning.

6     THE COURT:    What section of the statute is that?

7     MR. VIELEY:    703-2, Your Honor, subsection one, chapter

8                    37 of the Juvenile Court Act.

9     THE COURT:    I will sustain the objection as to

10                    whether he knows that statute or not.

11                    The law is the law.

12    BY MR. VIELEY:

13    Q    How many hours had Johnny Savory been with you

14         before you contacted his father?

15    A    Approximately two hours, or two hours and fifteen

16         minutes.

17    Q    And, how many hours had he been with you before

18         you contacted Percy Baker?

19    A    I believe Percy was contacted at about 9:00, so,

20         that would make it about 5½ hours.

21    Q    Now, at one time, during the interrogation, I

22         believe, you indicated that Johnny said that he

23         didn't want to talk to Officer Cannon, is that

24         correct?

SAVORY-LL-000144

R-92

-53-

1    A    Yes, sir.

2    Q    And, yet, the interrogation continued, did it not?

3    A    This statement he made was prior to ever getting

4         in the interrogation room.  He did talk to him

5         stating that we all worked together.  We were a

6         unit, that we were trying to come up with a suspect

7         who had committed this act and that it was very

8         important that we talk to him and he agreed with

9         this.

10   Q    But, isn't it true that you asked him questions

11        after he indicated he didn't want to talk to

12        Officer Cannon?

13   A    After he agreed to go ahead and interview, yes, he

14        did talk to this officer.

15   Q    Now, any time during this period you have just

16        explained did you ever tell him that he was a

17        possible suspect in this case?

18   A    No, sir, I did not.

19   Q    Did you ever tell him it was possible that he might

20        be charged with a crime of murder?

21   A    ', sir, I did not.

22   THE COURT:    Any re-direct?

23   RE-DIRECT EXAMINATION BY MR. GIBSON:

24   Q.   Officer, Pinckney, why did you not advise Johnny

SAVORY-LL-000145

R-93

-54-

1    Savory at any time during the day that he was

2    a suspect?

3    A    In my own mind he was nothing more than a witness.

4    Q    And, why did you not advise him of his rights

5         that he could have a parent or a guardian present?

6    A    Again he was on the status of a witness.  He, in

7         fact, stated prior to my going down to pick up

8         the knife that he didn't want his father there.

9    Q    At any time when Johnny was accompanied by police

10        officers was a juvenile officer absent or were

11        there no juvenile officers in the room?

12   A    As far as I can recall, no.

13   Q    What floor is the juvenile detective bureau on

14        at the police station?

15   A    The second floor.

16   Q    Now, how long have you been a police officer?

17   A    I am in my seventh year.

18   Q    And, in the course of your duty you interview many

19        witnesses, isn't that correct?

20   A    Yes, sir.

21   Q    Isn't it your practice to interview witnesses at

22        the location where you initially meet?

23   A    Yes, sir.  I should say that varies with the

24        situation.  It's quite common to do it like that, yes.

SAVORY-LL-000146

R-94

-55-

Q    When do you vary from that practice?

MR. VIELEY:    I am going to object unless he stays
               with this case.  I think he is getting
               far afield.

THE COURT:    Overruled.  I will let him answer.

BY MR. GIBSON:

Q    When do you vary from the practice of interviewing
     the witnesses at the location?

A    If it would be like at work place.  It wouldn't
     be convenient to try to talk to him over the
     noise.  If the situation is such that it's
     comfortable for the person to talk.  If they
     can't talk to me and they want to meet later we
     would set up an interview at the police depart-
     ment.

MR. GIBSON:    That's all the re-direct I have.

THE COURT:    Anything else, Mr. Vieley?

MR. VIELEY:    No questions.

THE COURT:    It's your testimony that Johnny Savory
              was at any time free to leave?

A    Yes.

Q    And, what would you do if he said I want to leave,
     I want to go home?

A    He had not exercised that option.  Had he done

SAVORY-LL-000147

R-95

-56-

that we would have had to have contacted our
superiors and asked them what to do.

Q    And, who would that be?

A    Lieutenant Dunlap.

Q    So far as you were concerned he wasn't free
to leave at any time?

A    I just never had that option to make at that
time.

Q    I know we are speculating here.

A    I don't know.  I really don't know.  It would
be up to the lieutenant.

Q    Who would that have been?

A    Lieutenant Dunlap.

THE COURT:    That's all I have.

RE-DIRECT EXAMINATION BY MR. GIBSON:

Q    At any time were you presented with the situation
where Johnny had a desire to leave?

A    No, sir.

RE-CROSS EXAMINATION BY MR. VIELEY:

Q    I want to ask one question.  We are back during
the interrogation and let's assume that Johnny
Savory stands up and says I am going to leave
and starts to walk out the door, isn't it true
that you will say, now, just a minute, I have to

SAVORY-LL-000148

R-96

-57-

1    check with my superior?

2    MR. GIBSON:    I think that question has been asked

3               and answered.

4    THE COURT:    I will sustain the objection.  That's

5               just what I asked him.

6    MR. VIELEY:    That's all I have.

7    THE COURT:    The State may call its next witness.

8    MR. GAUBAS:    Your Honor, the People would next call

9               to the stand Officer Charles Cannon.

10   DIRECT EXAMINATION BY MR. GAUBAS:

11   Q    Please state your name and occupation, for

12        the Court.

13   A    Officer Charles Cannon, police officer for the

14        City of Peoria, and the County of Peoria, State

15        of Illinois.

16   Q    Officer Cannon, how long have you been so

17        employed?

18   A    Seven years.

19   Q    Directing your attention to the date of January 25,

20        1977, were you so employed on that date?

21   A    Yes, I was.

22   Q    Up until and proceeding that date for the approximate

23        time period of one week had you been working

24        on any particular case for the Peoria police department?

R-97