Exhibit &

1    MR. GAUBAS:  Your Honor, People would call next,

2  George Pinkney.  I believe Mr. Gibson will examine him.

3              OFFICER GEORGE PINKNEY

4  called as a witness in behalf of the People, and after having

5  been first duly sworn, testified as follows in answer to

6  DIRECT EXAMINATION by Mr. Gibson:

7              THE COURT:  Do we need the diagram of the house

8  up for any reason?

9              MR. GIBSON:  I don't believe so, at this time.

10              THE COURT:  All right.  I will ask the officer as

11  he answers the questions to be sure and speak up so that

12  everybody can hear you and also I will instruct you, you are

13  not to discuss your testimony with anyone, excuse me, after

14  you leave the Courtroom.

15      A  Okay.

16              THE COURT:  Go ahead, Mr. Gibson.

17              MR. GIBSON:  Judge, may I have just a minute.

18  I would like the Court Reporter to assist me in marking some

19  of the exhibits.

20              THE COURT:  Go ahead and have the exhibits

21  marked.

22  (WHEREUPON, PEOPLE'S EXHIBITS 55 THROUGH 60 WERE SO MARKED

23  FOR IDENTIFICATION)

24              MR. GIBSON:  Thank you, the Court, for its

SAVORY-LL-000764

212

R-725

1  indulgence in allowing us those few seconds.

2      Q  I will ask the witness to give his name, please,

3  and spell it for the Court Reporter, but the other reporters

4  present in Court.

5      A  George Pinkney, P I N K N E.Y.

6      Q  And what is your occupation, Mr. Pinkney?

7      A  I am a patrolman with the City of Peoria Police

8  Department.

9      Q  Was that your occupation on the 20th of January of

10  this year?

11      A  Yes, sir, it was.

12      Q  On that date did you have occasion to speak to a

13  Quanita Hanson?

14      A  Yes, sir, I did.

15      Q  Where was that conversation?

16      A  At Treewind Junior High School.

17      Q  And when?

18      A  It was at 1:15 p.m.

19      Q  As a result of that conversation what did you do?

20      A  We started looking for a youth by the name of

21  Johnny.

22          MR. VIELEY:  Objection to the term, we.

23          THE COURT:  Sustained.  Tell what you did.

24      A  I started looking for a youth by the name of Johnny.

SAVORY-LL-000765

213

7-26   R-726

1    Q   Now can you tell us how you went about the task of

2    looking for this youth by the name of Johnny?

3    A   I proceeded to check different schools, talked to

4    different people trying to gain information as to the identity

5    of this youth.

6    Q   Were you successful in finding the youth by the name

7    of Johnny?

8    A   Yes, sir, I was.

9    Q   And where did you find him?

10   A   At the Late Afternoon High School.

11   Q   Now in what circumstances did you find him?

12   A   I went to the Late Afternoon High School and talked

13   to the principal there, found that there was a student

14   enrolled at the high school by the name of Johnny Lee Savory.

15   Q   At this point, officer, I will ask you to speak to

16   the jury, if you please.  Now when  you found he was enrolled

17   at Late Afternoon High School what did you do then?

18   A   At 3:30 p.m. that afternoon, Mr. Savory came in,

19   we had talked to the principal, I had talked to the principal

20   and Mr. Savory was brought into the room by Officer Haines

21   and myself.

22   Q   Now when you say he was brought into the room, who

23   brought him into the room?

24   A   It wasn't really that, he was brought in, he was


214
R-727

1  directed into the conference room or teacher's break room

2  by the principal.

3      Q  Did anyone come with him?

4      A  No, sir.

5      Q  When you met with Johnny Lee Savory, who else was

6  present?

7      A  It was Officer Haines, Johnny Savory and myself.

8      Q  And when you met with him do you know approximately

9  what time of day it would have been then?

10     A  Yes, sir, that was approximately 3:30.

11     Q  And when you met with him what did you say to him?

12     A  I told him that we were doing an investigation in

13  regard to the incident on Garden Street.  We understood that

14  he had been with the victim the night prior and that we

15  wanted to talk to him in regard to this.

16     Q  What did he do then?

17     A  He stated, I don't want to talk to you, I don't

18  want to make any statements.

19     Q  What did you do in response to that?

20     A  I tried to explain how important this was that he

21  was the only person we knew of at that time that had seen

22  the victim the night prior, that he might have had information

23  leading to the apprehension of this person that did this

24  act.

215

R-728

SAVORY-LL-000767

1    Q  Did you say anything else to him?

2    A  Not at that time.

3    Q  What did he say in response to your explanation of

4 the importance of the case?

5    A  Okay, I will talk to you now.

6    Q  After he responded in that manner did he speak with

7 you?

8    A  Yes, sir, he did.

9    Q  And this is still you and Officer Haines, is that

10 correct?

11    A  That is correct.

12    Q  And what did he say to you?

13    A  He stated--

14    MR. VIELEY:  Excuse me, could we have the date of

15 this conversation and the time, please.

16    THE COURT:  Certainly.

17 MR. GIBSON:

18    Q  What was the date of this conversation, officer?

19    A  This would be the 25th of January at approximately

20 3:30 p.m.

21    Q  Will you please now relate what he said to you.

22    A  He stated that he had met the victim on this date

23 at the Late Afternoon High School, that at approximately

24 6:30 they had left the school together.  He stated they

SAVORY-LL-000768

216

R-729

grabbed the bus arriving at the Garden Street address at

7 p.m.  That would be 3033 Garden, the victim's residence.

He stated that they entered the house by way of the

front door, that the keys were removed from the mail box.

He made a statement at that time to the victim that that was

a dumb place to keep the keys.  They entered the house,

stated that they were hungry, that the victim opened a can

of corn, poured it in a skillet on the stove, that he,

Johnny, took the hot dogs out of the refrigerator and cut

them up with his kinfe.

Stated that they drank from the same cup, at the end

of their meal, cleaned up the dishes and that they proceded

to practice Kung Fu, stated that the victim pulled out a

night stick and that a pair of chuga sticks which were used

in this practicing and that they went all over the house

doing this.

The tv was removed from the stand, placed on the floor

facing the wall so as not to knock it off or damage it,

the table was picked up and laid across the arms of the

chair, that one would be a coffee table in the front room.

Stated this lasted 'til approximately 8 o'clock.  They

straightened up the house and left.  They proceeded up on

Ann Street and talked to a woman for a few minutes.

She gave them Four Dollars, they left.  On the way  up

1  towards, as he stated, that chicken place, he took Two

2  Dollars and gave it to the victim and him, himself, kept

3  Two Dollars.

4  At the chicken place both youths had 3 pieces of chicken,

5  a roll, the victim had a Sprite, Mr. Savory had a root beer.

6  He stated they took their time from approximately 8:15 'til

7  9 o'clock. They sat and ate and talked and then somebody

8  yelled something at them from outside the building, they

9  thought it to be of a dirty nature.

10  They took off after this youth. They chased him over

11  the hill all the way to his front door and then proceeded

12  there back down to the Garden Street.

13  They arrived at the Garden Street address, approximately

14  10 o'clock. They walked in, the stepfather, the mother,

15  the sister, the child were home at that time. He stated

16  the sister was on the phone, a conversation with a girlfriend,

17  that the mother and father were embraced on the couch

18  watching a basketball game.

19  They went into the back room, again practiced Kung Fu

20  for a little while in the bedroom and then listened to some

21  music.

22  He stated that at that time approximately 11 o'clock,

23  he left. He stated he went home arriving home about midnight,

24  placed a call back to the victim and talked to him for an

218

SAVORY-LL-000770

731   R-731

PENGAD CO., BAYONNE, N.J. 07002 - FORM IL 24A

1  hour, somewhere between 1 and 2 o'clock he hung up the phone.

2  I asked him in regards to any trouble that the victim

3  might have had and he said that at that time there was no

4  trouble, no sounds of anything bad in the background.

5  The father had said good-bye to the son and the son had

6  replied good-bye to his father, that would be the victim

7  and his father.

8  He also made mention that the victim wanted him to come

9  over the following day, that he had something big he wanted

10  to do and that Johnny was suppose to be over there at 8

11  o'clock.

12  Q   Was that the extent of the conversation?

13  A   Yes, sir.

14  Q   When it was over what did you do then?

15  A   As we were getting ready to leave, Mr. Savory made

16  mention of a knife that the victim was suppose to have had

17  and in questioning him he stated he had a knife exactly the

18  same, they had both bought knives at Murray's.

19  He stated it was a dollar 49, but not more than 3 or

20  4 Dollars.  He said, I have got a knife like this at home.

21  If you want to take me there I will get mine so you can see

22  what the victim's knife looked like.

23  Q   Now when you then referred to the victim or when

24  you were referring to Mr. Savory's conversation, as referred

R-732

219

PENGAD CO., BAYONNE, N.J.  07002 · FORM IL 24A

1  to the victim, to whom, if you know, was he referring?

2      A   James Robison.

3      Q   Now on Johnny's reference, if you want to take him

4  to his home, you can obtain this knife for you, what did you

5  do then?

6      A   We walked out of Late Afternoon High School, Officer

7  Haines and myself were in the front. Johnny was at the

8  rear. We walked out to the squad car. Johnny got in the

9  back.

10     I was driving, Officer Haines was in the passenger

11 seat and proceeded to 1011 Hulbert Street. Upon getting

12 in front of Johnny's house the car was parked, Johnny left

13 the car, walked into the house.

14     Approximately 60 seconds later he came back, stated

15 his father was not home, that he could not gain access to

16 the house. He also made the comment that he felt his

17 father had the knife with him at that time, that he was at

18 the St. Mark's Court Medical Building for some type of

19 treatment and that that is where the knife was at that time.

20     Q   Now, Officer Pinkney, as a Peoria Police Officer,

21 are you familiar with the procedures that are to be used by

22 the Peoria Policemen in transporting suspects from one

23 location to another?

24     A   Yes, I am.

1    Q   What are those procedures?

2    A   A suspect would be cuffed and if there were 2

3   officers in the car, one officer would sit with the suspect

4   in the back seat of the car.

5    Q   When would he be cuffed?

6    A   Prior to being removed from the location.

7    Q   When you left the Late Afternoon High School,

8   Johnny Lee Savory, where were your handcuffs?

9    A   My handcuffs were in my belt.

10    Q   Where were Officer Haines' handcuff-s, if you know?

11    A   In his belt also.

12    Q   Where were your weapons?

13    A   In our holsters on our belts.

14    Q   Did you at any time make any physical contact with

15   Johnny Lee Savory as you were leaving the Late Afternoon

16   High School?

17    A   No, sir, I did not.

18    Q   Now could you also relate to us the procedure that

19   is to be followed if you know by Peoria Policemen when

20   allowing a suspect to leave squad cars and go to his residence

21   or to any other locations outside of the squad car?

22    A   He would always be accompanied by an officer.

23    Q   And also the procedure while riding in a squad

24   car with a subject or another suspect?

1     A   Again, if it is a 2-man car, one officer sits in the

2  back with the suspect.  If it is a 1-man car the suspect

3  would be sitting in the front seat retained by a seat belt.

4     Q  When you arrived at the house, who, if anyone,

5  accompanied Johnny Lee Savory to the front door?

6     A  Johnny exited the car and entered the house by

7  himself.

8     Q  How long was he outside the automobile?

9     A  Approximately 1 minute.

10     Q  And for that period of time how much of that period

11  of time was he in your field of vision?

12     A  From the time he entered the door 'til the time he

13  came back out of the door, approximately 60 seconds.

14  We had no visual contact.

15     Q  Officer Pinkney, at the Late Afternoon High School,

16  from your point of view, what was Johnny Lee Savory's status?

17        MR. VIELEY:  I am going to object as to his point

18  of view, Your Honor.

19        THE COURT:  Sustained.  I will sustain the

20  objection.

21  MR. GIBSON:

22     Q  Now when you had the information with regard to the

23  knife what did you do then?

24     A  I asked Johnny at Late Afternoon High School if he

222

R-735

SAVORY-LL-000774

1  would be willing to accompany us down to the station to talk

2  with other officers that were more familiar with the case

3  who might have other knowledge of what had happened and he

4  stated he would.

5      We upon leaving the Hulbert Street address went to the

6  police station to the Detective Bureau.

7      Q  As you rode to the police station what were the

8  respective positions of the occupants in the car?

9      A  I was driving the vehicle, Officer Haines was in

10  the front seat, passenger side, Johnny was in the rear.

11     Q  And what time did you arrive at the station?

12     A  We arrived at the station at approximately 4:30.

13     Q  As you entered the station what was Johnny Lee

14  Savory's status?

15     A  That of a witness.

16         MR. VIELEY:  I am going to object to that, again.

17         THE COURT:  Sustained.  Sustained.

18         MR. VIELEY:  Motion to strike.

19         THE COURT:  I will grant the motion and strike

20  the answer and instruct the jury to disregard the answer.

21  MR. GIBSON:

22     Q  Once you entered the station what, if anything,

23  did you do then?

24     A  Mr. Savory and I sat in the Detective area while

PENGAD CO., BAYONNE, N.J. 07002 · FORM IL 24A

223

R-736

1  Officer Haines took Officer Fiers and Officer Cannon into

2  the, an interview room and told them what we had obtained

3  up until this time in the way of information.

4      Q   And after this conversation what did you do then?

5      A   At approximately 5 o'clock Officer Haines, Officer

6  Fiers, Officer Cannon and myself accompanied by Johnny, we

7  went into an interview room, requested that Johnny go over

8  what he had told us at the Late Afternoon High School,

9  pertaining to the night before, the incident on Garden Street.

10     Q   Now what was the form of this first interview with

11 Johnny Lee Savory at the police station?

12     A   Was that of a narrative talk regarding what took

13 place between the victim and Johnny the night prior to this

14 incident.

15     Q   How many questions, if you know, were asked of him

16 during his narrative.

17     A   I don't believe he was interrupted with any questions.

18 It was that of what happened next, go on, similar to that.

19     Q   What happened when his narrative ended?

20     A   We exited the room and we were out of Johnny's

21 range of hearing.  We had talked about certain discrepancies.

22         MR. VIELEY:  I am going to object to that and move

23 to strike that.

24         THE COURT:  Sustained.

R-237 224

1        Motion to strike the answer, if it was done outside the

2   presence of the defendant.

3   MR. GIBSON:

4        Q   Also, Officer, I would want you to clarify who left

5   the room when you say we left the room.

6        A   All the officers, Officer Fiers, Officer Cannon,

7   Officer Haines and myself.

8        Q   Who, if anyone, was left in the room with Johnny

9   Lee Savory?

10       A   No one.

11       Q   How long were you out of the room?

12       A   A total time of approximately 30 minutes.

13       Q   What was the condition of the door of the interview

14   room when you left it?

15       A   It was standing open.

16       Q   Now would you go back to the first interview at the

17   police station, the beginning of that for a moment, officer.

18   What is the procedure when you begin an interview with a

19   suspect?

20       A   He would be read his Miranda Warning.

21       Q   Did you or any other officers read Johnny Lee Savory

22   his Miranda Warnings?

23       A   No, sir, we did not.

24       Q   Why not?

225

R-258

SAVORY-LL-000777

PENGAD CO., BAYONNE, N.J.  07002 - FORM IL 24A

1          MR. VIELEY:  Objection to that.

2          THE COURT:  Sustained.

3   MR. GIBSON:

4       Q   Did you ever enter that interview room again?

5       A   Yes, sir, I did.

6       Q   When was the next time you entered it?

7       A   At approximately 6 o'clock.

8       Q   And for what purpose?

9       A   To discuss certain information that Johnny had given

10  to me that differed from information that had been received--

11         MR. VIELEY:  Objection to that and motion to

12  strike.

13         THE COURT:  Let him finish the answer.  Go ahead,

14  continue.

15      A   This information differed from information that

16  was given by other people prior to having interviewed Johnny.

17         MR. VIELEY:  Motion to strike, hearsay, and a

18  conclusion, judge.

19         THE COURT:  All right, I am going to strike that.

20  I will direct the jury to disregard what was done outside

21  the presence of the defendant.

22  MR. GIBSON:

23      Q   Was there another interview held with Johnny Lee

24  Savory?

PENGAD CO., BAYONNE, N.J.  07002 · FORM IL 24A

SAVORY-LL-000778

239   R-739

1    A   Yes, sir, there was.

2    Q   At what time was that?

3    A   At approximately 6 o'clock.

4    Q   Who was present?

5    A   Officer Cannon and myself.

6    Q   Is this in the same interview room?

7    A   Yes, sir, it was.

8    Q   And at that time did you read Johnny Lee Savory his

9  rights?

10   A   No, sir, I did not.

11   Q   Did anyone else?

12   A   No, sir.

13   Q   At that time did you have a conversation with him?

14   A   Yes, sir, I did.

15   Q   What did he say to you and what did you say to him?

16   A   I talked to Johnny in regards to the information

17 that he had given me, talked to him directly regarding

18 certain things that were not the same as other information.

19       MR. VIELEY: I am going to object to that.

20       THE COURT: All right, I will sustain that.  You

21 are not answering the question, officer.  The question

22 was, what did he say and what did you say.

23   A   I told Johnny I had information regarding the food

24 that he stated he prepared, that he stated the victim poured

227

SAVORY-LL-000779

1  the corn in the skillet and Johnny had cut up the hot dogs.

2  The information I had was that the food was already prepared.

3         MR. VIELEY:  I am going to object to that and move

4  to strike.

5         THE COURT:  No, this is--I asked the officer--You

6  are stating to us now what you stated to the defendant, is

7  that right?

8      A   Yes, sir.

9         THE COURT:  All right, you may state it.

10         MR. VIELEY:  But he is getting hearsay in and

11  in a round about way.

12         THE COURT:  No, I overruled the objection.

13  Go ahead.  You can state what you stated to the defendant.

14  Go ahead, officer.

15      A   I stated that the food was prepared, it was already

16  there.  I talked to him in regards to--

17         THE COURT:  Don't tell us what you talked to him

18  in regard, tell us what you said.

19      A   Johnny had earlier stated to me that he had made

20  a phone call from a downstairs apartment.  I told Johnny

21  that I had checked, that no phone call was placed from that

22  downstairs--

23         MR. VIELEY:  Excuse me.  I am going to object to

24  earlier statements because that is unresponsive.  I move to

228

SAVORY-LL-000780

1  strike.  He is saying what Johnny said earlier.  He is not

2  responding to the State's Attorney's question.

3       MR. GIBSON:  I believe once again, judge, the

4  officer is narrating what he said to Johnny.

5       MR. VIELEY:  No, he is talking about what he

6  said earlier.

7       THE COURT:  Earlier, when?  I don't know when he

8  means earlier, when officer?

9     A  This conversation that I am involved in right now

10  with Johnny at this time was all going back to a previous

11  conversation.

12       THE COURT:  All right.  We want to know what was

13  stated by you, by him at this conversation.

14     A  This is what I am trying to say at this time.

15       THE COURT:  Go ahead.  I will overrule the

16  objection.

17     A  The phone call that we were talking about at that

18  time Johnny stated he placed at 11 o'clock, talking to the

19  victim for over an hour.

20     I told Johnny I knew the phone call had not been placed

21  by him to the victim.  Johnny and I talked about the fact

22  that he stated Scopie had put the dog in a closet off the

23  bedroom.  I told Johnny that is not a closet.

24     Johnny stated he had been a friend for a long time with

229

SAVORY-LL-000781

R-742

1  Scopie.  My reply was, you were not a friend, you didn't

2  know the sister's name.  You are not familiar with the

3  house, you in fact broken in down there prior to Monday

4  night.

5      After going over this and Johnny continuing to state

6  that this is the way that it happened, this is the way it

7  was, he finally stated he didn't make the food, the food

8  was prepared, the dog, he still thought was put in a closet

9  but it was not the closet.

10      He stated he had not made the phone call, he stated

11  that he had not been to the house prior to that Monday night,

12  that that was the first time that he had gone to the victim's

13  house.

14  MR. GIBSON:

15      Q  Now that is during the second interview at the--

16          MR. VIELEY:  Excuse me.  I want to make a motion

17  out of the presence of the jury on this line of testimony,

18  Your Honor.

19          THE COURT:  Overruled.  Go ahead with your

20  questions.

21          MR. VIELEY:  Motion to strike and I will ask

22  that the jury be instructed to disregard this hearsay on

23  hearsay.

24          THE COURT: Denied.

230

R-243

1  MR. GIBSON:

2      Q  That was the second interivew at the police station,

3  is that correct?

4      A  Yes, sir.

5      Q  How long had you been at the police station with

6  Johnny Lee Savory at the conclusion of the second interview?

7      A  Approximately 2 hours.

8      Q  During that 2 hours how long had you other officers

9  and Johnny Lee Savory, been talking to Johnny Lee Savory, if

10  you know?

11      A  Approximately an hour to an hour and 15 minutes.

12      Q  When did the second interview end?

13      A  Approximately 6:30, 6:45.

14      Q  And when it ended what did you do?

15      A  We again, Officer Cannon and myself, exited the

16  room and went out into the office area.

17      Q  When was the next time you went back into that

18  room?

19      A  I didn't go back into the room after that.

20      Q  Where did you go?

21      A  I proceeded with other forms of investigation in

22  regard to this case.

23      Q  And what forms of investigation are those?

24      A  I did make a trip back down to the Hulbert Street

231

SAVORY-LL-000783

1   address, be 1011 Hulbert where I talked to Mr. Savory,

2   regards to any knife that again this knife that Johnny

3   had mentioned.

4       Q   When was that trip to Hulbert Street made?

5       A   Approximately 5:35.

6       Q   And when you talked to Mr. Savory, what happened

7   then?

8       A   Mr. Savory got the knife and handed it to me.

9       Q   And when he handed it to you what, if anything, happened

10  then?

11      A   I told Mr. Savory that we were talking to Johnny.

12          MR. VIELEY:   Objection as to that.   That would

13  be hearsay, Your Honor.

14          MR. GIBSON:   Judge, I don't really see how it can

15  be hearsay.   The witness is merely stating what he said.

16          THE COURT:   Overruled.   He can state what he said.

17  He cannot state what Mr. Savory said.

18      A   Stated we had Johnny at the station, that was, had

19  been with the victim the night before and was a very important

20  witness in regard to this case.

21  MR. GIBSON:

22      Q   And what happened at that time?

23      A   Mr. Savory requested--

24          THE COURT:   No, we don't want to know what

SAVORY-LL-000784

232
R-745
745

1   Mr. Savory said.

2   MR. GIBSON:

3       Q   What did you do at that time?

4       A   I gave Mr. Savory a receipt for the knife.

5       Q   Do you remember how that receipt was phrased?

6       A   Yes, sir.

7           MR. VIELEY:  Objection, hearsay.

8           THE COURT:  This is what he did.  He may answer.

9   MR. GIBSON:

10      Q   What did you write in that receipt?

11      A   I printed on a piece of yellow legal pad, I, George

12  Pinkney, receive--

13          MR. VIELEY: Objection.  Best evidence rule is the

14  receipt would be the best evidence.

15          THE COURT:  Overruled.

16      A   I, George Pinkney, received from Y. T. Savory,

17  one single blade knife, black in color, and I signed it with

18  my name, George Pinkney.

19  MR. GIBSON:

20      Q   Officer, I show you now what has been marked previously

21  for identification as People's Exhibit Number 44 and ask you

22  if you recognize that.

23      A   Yes, sir, I do.

24      Q   What is that?

1      A   This is the knife that I received from Mr. Savory.

2      Q   After you received that knife what, if anything, did

3   you do with it?

4      A   I returned to the station.   Upon entering the station

5   . I saw Officer Jatkowski from the lab and I personally handed

6   the knife to Officer Jatkowski.

7      Q   After you gave the knife to Officer Jatkowski, what

8   did you do then?

9      A   I proceeded back into the interview room, I am sorry,

10   at this time Officer Fiers and myself called, made a couple

11   of phone calls pertaining to information that was--

12          MR. VIELEY:   Objection as to the substance of the

13   call.

14          THE COURT:   Sustained.   Well, I will sustain what

15   the information was.   He can state again what he did.

16      A   Again, we made calls pertaining to--

17          MR. VIELEY:   Objection as to what they pertain

18   to.   I think that is a way of getting what the conversation

19   was.

20          THE COURT:   He can state what he did.

21      A   Differences in the information that we had and

22   information that Johnny gave.

23          MR. VIELEY:   Objection, and I move to strike that.

24   That is hearsay.

234

R-747

SAVORY-LL-000786

PENGAD CO., BAYONNE, N.J.   07002 · FORM IL 24A

1        THE COURT:  Overruled.

2   MR. GIBSON:

3       Q   After those phone calls were finished, what did you

4   do then?

5       A   This would be when Officer Cannon and myself entered

6   the interview room for the second time.

7       Q   And when you entered the interview room, the second

8   time, what, if anything, did you do then?

9       A   Again, this would be, this would be pertaining to the

10  conversation where Johnny was, talked to directly about what

11  he had stated and the information that I had.

12      Q   Are you saying you talked to Johnny Lee Savory?

13      A   Yes, sir.

14      Q   What did you say to him?

15          MR. VIELEY:  Coud we have the time of this meeting.

16          THE COURT:  Certainly.

17      A   This would be the 6 o'clock interview.

18          THE COURT:  Is this a third interview now?

19      A   No, sir, we have covered this now.  This would be the

20  last interview I talked about, will be going over that again,

21  about this testimony.

22  MR. GIBSON:

23      Excuse me, Judge, excuse me.  Okay, when you brought

24  the knife back then and handed it to Officer Jatkowski, then

SAVORY-LL-000787

PENGAD CO., BAYONNE, N.J.  07002 · FORM IL 24A

235

748  R-748

1    you went back into the interview room, is that correct?

2    A  Yes, sir.

3    Q  When you went throgh this interview you have previously

4    described, that correct?

5    A  Yes, sir.

6    Q  When that interview was finished what did you do

7    then?

8    A  Officer Cannon and myself exited the room and there

9    was conversation in regards to what to do next.

10    Q  What did you decide to do next?

11    Now excuse me, what did you do next?

12    A  I, myself, took no active part in the next steps

13    that took place.  I have knowledge of what happened.

14    Q  Now, officer, I want to show you what has been

15    previously marked for identification as People's Exhibit

16    Number 60 and ask you do you recognize that?

17    A  Yes, sir, I do.

18    Q  And when was the first time you saw that?

19    A  This would be on the evening of the 25th at

20    approximately 5:30, p.m.

21    Q  What is that?

22    A  It is a picture of a night stick with a cord strap

23    protruding from the handle area.

24    Q  Okay.  And you say you first saw it on the night of

236

R-249

SAVORY-LL-000788

the 25th, is that correct?

A  Yes, sir.

Q  When you saw it where was it?

A  It was collected from a number of pictures that were taken at the scene on Garden and it was pulled out to be presented to Johnny.

Q  Let me repeat my last question.  When you saw it where was it?

A  At the police station.

Q  Okay.  Did you have custody of it?

A  Yes, sir, I did.

Q  What did you do with it after you first took possession of it?

A  I entered the room, presented the pictures to Mr. Savory.

Q  I show you now, officer, what has been marked for identificatin purposes as People's Exhibit Number 59 and ask if you recognize that.

A  Yes, sir, I do.

Q  And what is that?

A  Again, this is a picture showing a tv sitting on the floor at the Garden Street address.

Q  When was the first time you saw that?

A  The evening of the 25th.

237

1   Q   And what did you do with that picture on the evening

2   of the 25th?

3   A   I had it in my possession, took it in, showed it to

4   Mr. Savory.

5   Q   And People's Exhibit Number 58, here officer, would

6   you take a look at that please.

7   A   Yes.  This again is a picture that I had and showed

8   to Mr. Savory.

9   Q   Officer, if I may save us a bit of time, let me

10  show you 3 exhibits at the same time, Exhibits Numbers 55,

11  56 and 57, and ask you if you recognize those?

12  A   Yes, sir, I do.

13  Q   And what are those?

14  A   Again, these are pictures that were selected that

15  I took into my possession and walked in and handed to

16  Mr. Savory in the interview room.

17  Q   And would you tell us what does People's Exhibits

18  Number 55 portray?

19  A   It shows an Oly Beer Can on the floor, apparently

20  in the kitchen area.

21  Q   And number 56?

22  A   This depicts from a floor level the left end of

23  the couch as you are facing it with a stand that of an

24  elephant, flat top, with a phone on top and a child's toy

238

R-751

1   at the front of it.

2       Q   And number 57?

3       A   57 would be a close up top to bottom view of this

4   stand and it depicts as bottle of nail polish or nail hardener

5   laying on the floor by the base of the stand.

6       Q   And all these exhibits that you have viewed today

7   have they been changed in any way?

8       A   No, sir, they have not.

9       Q   Now with regard to People's Exhibit Number 60, you

10  that you have viewed and identified as photographed, night

11  stick, when in point of time or let's put it this way, at

12  what point and time in relation to the 2 interviews you had

13  had with Mr. Savory on the 25th did you show him a picture

14  of a night stick?

15      A   At the end of the second conversation.

16      Q   And at what point and time did you show him a picture

17  of this television set turned to the wall with regard to the

18  2 conversations you had?

19      A   Again, this would be at the end of the second inter-

20  view.

21      Q   With regard to the pole or stick here in People's

22  Exhibit Number 58, at what point and time with relation to

23  the 2 conversations you had with Mr. Savory did you show

24  him that photograph?

PENGAD CO., BAYONNE, N.J. 07002 · FORM IL 24A



239

1    A   At the end of the second conversation.

2    Q   And when you showed him those photographs what did

3  he say?

4    A   He gave information pertaining to yes, this is the

5  stick we were using.

6         MR. VIELEY:   Objection, unless he recites exactly

7  the conversation.

8         THE COURT: I will sustain the objection.

9  Don't say he gave information or he talked in regard--Just

10  tell us what he said.   Just use his words as best you can.

11    A   He identified the stick as the one that was used.

12         MR. VIELEY:   That is a conclusion.

13         THE COURT:   Same thing, you are doing the same

14  thing.   I want to know his words. What did he say?

15    A   This is the night stick we used in Kung Fu, okay.

16  A   This is my fingernail polish at the base here.   This is

17  the tv that was set on the floor by Scopie so it wouldn't

18  get broken.

19  MR. GIBSON:

20    Q   Were those the only 3 he had identified, officer?

21    A   Yes.

22    Q   Where are those photographs, been between the 25th

23  and yesterday?

24    A   Locked up in the evidence room at the police station.

PENGAD CO., BAYONNE, N.J. 07002 · FORM IL 24A

240
R-753
753

1    Q   Who took possession of them yesterday?

2    A   I did.

3    Q   When if at all had you relinquished possession of

4  those photographs?

5    A   Last night.

6    Q   What happened to them then, if you know?

7    A   The Assistant State's Attorney, Mr. Gaubas, took

8  possession of them, put them in the vault.

9    Q   And where had they been until this morning?

10   A   In that vault.

11   Q   Once your second interview was concluded, what, if

12  you know, happened to Johnny Lee Savory?

13   A   He left the building with Mr. Baker, Officer Haines,

14  Officer Cannon to go to another location.

15   Q   Now what requests, if any, did Johnny make to you at

16  the Late Afternoon High School?

17   A   I cannot recall any requests other than he stated

18  he would go to his house on Hulbert Street with us.

19   Q   What requests, if any, did he make during the first

20  interview?

21   A   Again there would be no request.

22   Q   And what requests, if any, did he make the second

23  interview?

24   A   Prior to the second interview he was given 2 soft

SAVORY-LL-000793

R-754   241

754

1  drinks, allowed to go to the rest room.  He requested that

2  his father not be brought back to the station when I came

3  back with the knife and that is all.

4  .           MR. GIBSON:   Your Honor, if I may have a moment,

5  . please.

6             THE COURT:  Certainly.

7             MR. GIBSON:  No further questions, judge.

8             THE COURT:  Thank you, Mr. Gibson.

9  Mr. Vieley, you may inquire.

10            MR. VIELEY:  Thank you.

11 CROSS EXAMINATION by Mr. Vieley:

12    Q  Officer Pinkney, didn't you tell the defendant on

13 that night that he could go home after talking to you?

14    A  As I, I don't recall ever saying anything to the

15 witness pertaining to him going home.

16    Q  You never said words to the effect, if you tell me

17 all about it then you can go home tonight?

18    A  I don't recall any conversation pertaining to that.

19    Q  Could you have said that, officer?

20    A  I don't believe so, but I guess there is possibility.

21    Q  All right.  Now let's go back to the afternoon of

22 the 25th.  What time did you come on duty?

23    A  At 8 o'clock that morning.

24    Q  And you arrived at the school about 3:30 that afternoon

R-755  242

1  is that correct?

2      A   I arrived at the school prior to that.  3:30

3  Mr. Savory came in.

4      Q   About what time did you arrive at the school?

5      A   Approximately 2, 5 minutes after 2.

6      Q   And Officer Haines was with you at that time, is

7  that correct?

8      A   Yes, sir.

9      Q   Now on the date in question on January 25th of 1977,

10  how old was Johnny Savory?

11      A   I believe he was 14 years old.

12      Q   What grade of school was he in?

13      A   I believe he was in the special ed program, 7th

14  grade.

15      Q  And is it a fair statement to say that he had below

16  average intelligence in your opinion?

17      A   I would say that was safe, yes.

18      Q   Al, right.  Now he was taken from class and brought

19  to you and Officer Haines, about 3:30 p.m., is that correct?

20      A   He was  not taken from class as soon as he entered

21  he was told that there were 2 officers that wanted to talk

22  to him.

23      Q   And you were in uniform, were you not?

24      A   No, sir, I was not.

243

SAVORY-LL-000795

Q   You were in plain clothes?

A   Yes, sir.

Q   He was told that you were police officers, is that correct?

A   Johnny knew me prior to this.

Q   Judge, I am going to make an objection to his answer as being unresponsive, move to strike.

THE COURT:   Overruled.

MR. VIELEY:

Q   Did any other officers have a uniform on?

A   No, sir, he did not.

Q   Now where did you talk to the defendant?

A   The way the building is set up, it would be the back of the building being the east side from the office area, it would be to the left or the north side.  It is a teacher's eating room, conference room.

There are no desks or classes held in this room.

Q   And at that time he said words to the effect, that I don't want to talk to you about it, is that correct?

A   That is correct.

Q   Now at that time did you give him any Miranda Warnings?

A   No, sir, I did not.

Q   At that time was any attorney present to represent him?

SAVORY-LL-000796

R-757²⁴⁴

1    A  No, sir, there was not.

2    Q  Was his father present at that first interivew?

3    A  No, sir, he was not.

4    Q  Was his guardian present there at the first interview?

5    A  No, sir.

6    Q  Now even though he told you that he didn't want to

7  talk about the matter you pursued it, did you not?

8    A  Yes, sir.

9    Q  And how long did you talk to Johnny Savory at the

10  school?

11   A  Approximately 30 minutes.

12   Q  And from there he accompanied you to the squad car,

13  is that right?

14   A  Yes, sir, that is correct.

15   Q  And about what time did you leave the school?

16   A  At approximately 4 o'clock, shortly after 4.

17   Q  Now where did you go at that time?

18   A  To 1011 Hulbert.Street.

19   Q  And he cooperated by trying to go to the house and

20  get the knife, is that correct?

21   A  Yes, sir, that is correct.

22   Q  The house was locked, is that correct?

23   A  He stated his father was not home, that he could not

24  gain access to the house, apparently the door was locked.

245

SAVORY-LL-000797

R-758

1     Q   Did he tell you that the father had the knife with

2  him?

3     A   He said he believed the father to have the knife

4  with him at that time.

5     Q   And that the father was at the hospital?

6     A   It would be St. Mark's Court for medical treatment.

7     Q   Did he say why the father was there at St. Mark's

8  Court?

9     A   No, sir.

10    Q   Do you have any knowledge of that, sir, why the

11  father was there?

12    A   I have a speculation or a guess.

13         MR. GIBSON:  Objection, judge.

14         THE COURT:  He is answering the question.

15  MR.VIELEY:

16    Q   Has anyone told you why he was there?

17    A   Specifically why he was there, no.

18    Q   Has anyone told you the circumstances as to why

19  father Savory was there?

20    A   Again, I can make a speculation, but I don't have

21  any direct knowledge.

22    Q   Now from there where did you go?

23    A   To the police department.

24    Q   And did the defendant, Johnny Savory accompany you?

789   R-759   246

A   Yes, sir, he did.

Q   Now what part of the police station did you take Johnny Savory to?

A   We entered the station by way of the side door, up the stairs that would be the general area of the detective bureau on juvenile bureau.  We were seated in the juvenile area.

Q   Now there is screens on the windows or bars, is there not?

A   Yes, sir, there are.

Q   And there were other police officers there in uniform were there not?

A   I don't recall any one being in uniform upstairs at that time.

Q   But there were other officers there, is that correct?

A   Plain clothes officers, yes.

Q   Now at that time did you give the defendant any Miranda Warning?

A   No, sir, I did not.

Q   Did you tell the defendant that he had a right to have a lawyer with him during this time?

A   No, sir, I did not.

Q   Was his guardian there?

A   No, sir, he was not.

247

1     Q   Was his father there?

2     A   No, sir, he was not.

3     Q   How many police officers were there on this particular

4     floor at that time?

5     A   I don't have an accurate count.  I would say there

6     were probably 6, maybe 7 officers.

7     Q   And where was the defendant initially seated?

8     A   He took a chair next to the second desk on the

9     juvenile side, very near the area that I sat down at.

10    Q   And how large is the interview room?

11    A   Are we talking about the area now where he is

12    sitting or the area we took him to later on?

13    Q   The area you ultimately took him to later on,

14    please.

15    A   I would say it is approximately 8 foot, maybe 10

16    foot wide by 10 feet, maybe 12 feet deep.

17    Q   And when was he taken into the interview room?

18    A   At approximately 5 o'clock.

19    Q   That would be 5 o'clock p.m.?

20    A   Yes, sir.

21    Q   Now who was present in the interview rooms during

22    the first interview?

23    A   Officer Fiers, Officer Cannon, Officer Haines and

24    myself.

R-761   248

1      Q  Who asked the questions during this interview?

2      A  There were no questions asked for questions asked

3  or responses.  It was a narrative form of the talk, and

4  the only proding or questions if you want to call them that

5  would be, okay, go on, or what did you do next.

6      Q  Now, isn't it true, that occasionally the defendant

7  would stare when you asked him a question?

8      A  There were no questions asked.

9      Q  At that time.

10     A  And he was not facing me at that time.

11     Q  Where was he facing?

12     A  He was facing towards Officer Fiers and Officer Cannon.

13     Q  How long was the defendant kept in this interview

14  room?

15     A  The initial time, initial conversation lasted for

16  30 minutes.  Then everybody left, but he still remained

17  seated in there.

18     Q  Now isn t it true that the defendant was not free

19  to leave during this time?

20     A  The defendant never asked to leave at that time.

21     Q  But isn't it true he was not free to leave, sir?

22     A  If Mr. Savory had wanted to leave at that time I

23  would have had to consult with my superior officers and ask

24  them what I should do at that time.

SAVORY-LL-000801

R-762 249

1  Q  So if he said during this interivew, well I think

2  I have had enough of this, I am going to leave, you wouldn't

3  have said bye, you would have said, sit down, I have to

4  check on whether or not you can leave, isn't that correct?

5  A  You are wanting me to come up with a situation and

6  answer for a situation that wasn't put to me, I don't know.

7  Q  Well, I want you to tell us what you would have done

8  if Mr. Savory would have stopped and said, I am going to

9  leave.

10  MR. GIBSON:  Objection, Your Honor.  We are

11  entering the field of speculation.

12  THE COURT:  I will sustain the objection on the

13  grounds it has been asked and answered.

14  MR. VIELEY:

15  Q  Now when did the second interview begin?

16  A  At approximately 6 o'clock.

17  Q  6 o'clock?

18  A  P.M.

19  Q  On the same afternoon?

20  A  Yes, sir.

21  Q  And was any attorney present for that interview?

22  A  No, sir, there was not.

23  Q  Was the guardian there?

24  A  No, sir, he was not.

PENGAD CO., BAYONNE, N.J. 07002 · FORM IL 24A

763  R-763 250

1    Q   Was the father there?

2    A   He had specifically asked for the father not to be

3    there.

4    Q   Who was present for the second interview?

5    A   Officer Cannon and myself.

6    Q   Were questions asked by you and Officer Cannon?

7    A   The questions were asked by me.

8    Q   And did the defendant sometimes state when you

9    asked him a question?

10   A   I don't think there was much in the way of eye contact

11   and I really cannot remember him ever staring at me or fixing

12   his eyes on my eyes.

13   Q   Did he ever hesitate when you asked him these

14   questions?

15   A   At times there were pauses, yes.

16   Q   Now at this point and time had you been down to the

17   father's house, Y. T. Savory's house to get the knife yet?

18   A   Yes, sir, I had.

19   Q   You had been there.  Now what time did you go there?

20   A   I left the station at approximately 25 minutes 'til

21   6.

22   Q   And did anyone accompany you to go to the father's

23   home?

24   A   No, sir.

SAVORY-LL-000803

R-764  251

1    Q   You were by yourself?

2    A   Yes, sir.

3    Q   While you were at the father's house did the father

4  show you any wounds on his leg?

5    A   No, sir.

6    Q   Did you ever have any conversation about any kind of

7  woulds he may have had?

8    A   No, sir.

9    Q   Did the father say anything about being treated at

10  St. Mark's Court?

11    A   No, sir, not as I recall.

12    Q   So then you came back, I assume, from the father's

13  home and began the second interivew which we have just covered,

14  is that correct?

15    A   After my phone call was placed, after Officer Fiers'

16  phone call was placed, yes.

17    Q   Now did you participate in any further interviews

18  after the second interview?

19    A   No, sir, I did not.

20    Q   When you were at the father's home, the home of

21  Y. T. Savory, did he tell you that a big man had done these

22  murders?

23        MR. GIBSON:  Objection, judge.  The question is

24  calling for hearsay.

765   R-765 252

1          THE COURT:  Sustained.

2  MR. VIELEY:

3      Q  Now is it your testimony that the defendant, Johnny

4  Savory was shown a group of photographs during the second

5  interview?

6      A  It would be prior to the second interview.

7      Q  Prior to the second interview, and these photographs

8  showed the generaly outlay of the home, didn't they?

9      A  No, sir.

10     Q  They showed specific items?

11     A  Yes, sir.

12     Q  Such as the tv, the elephant stand, and anything

13 else?

14     A  A night stick.

15     Q  A night stick.  Anything else?

16     A  If you look at the photo I suppose you can say that

17 it shows a color of a wall or a color of a carpet, but that

18 was not the purpose of showing these.

19     Q  Now there were further interviews that night with the

20 defendant, but I take it that you did not participate in

21 those, did you?

22     A  No, sir, I did not.

23     Q  During the second interview did the defendant at

24 any time tell you he did not want to talk about this case?

R-766 253

1     A   This would be the second interview at the station,

2  is that correct?

3     Q   Yes.

4     A   No, sir, he did not.

5     Q   Did he tell anyone he did not want to talk about

6  this?

7     A   My direct knowledge, no, he did not tell anybody

8  that.

9         MR. VIELEY:  That is all we have.  Thank you.

10        THE COURT:  Anything else, Mr. Gibson?

11        MR. GIBSON:  Redirect judge.

12 REDIRECT EXAMINATION by Mr. Gibson:

13    Q   Is it your testimony on cross examination, officer

14 was that you did not tell him that he might have an attorney

15 present, is that correct?

16    A   Yes, sir, that is correct.

17    Q   Why did you not tell him that?

18    A   This is not a policy with the witness advising

19 that he could have or would need an attorney.

20        MR. VIELEY:  I am going to object and move to

21 strike that.

22        THE COURT:  Overruled.

23 MR. GIBSON:

24    Q   During these interviews did Johnny Lee Savory have

PENGAD CO., BAYONNE, N.J.   07002 · FORM IL 24A

254

1   any trouble understanding you?

2        A   No, sir, he did not.

3        Q   On the day of the 25th, did you see Johnny Lee Savory's

4   legal guardian, representative?

5        A   Yes, sir, I did.

6        Q   Where was that?

7        A   At the station.

8        Q   At what time?

9        A   At approximately 9, 9:30.

10       Q   What was the circumstances, if you know, caused him

11   to be there?

12       A   He was requested to come to the station by Officer

13   Haines.

14       Q   With regard now to the time of day, at what time of

15   day did you show Johnny Lee Savory those pictures?

16       A   This would be at approximately 25 minutes 'til 6.

17   I should correct that.  It would be between 5:30 and 25

18   minutes 'til 6.

19            MR. GIBSON:  Judge, those are all the questions

20   we have of this witness as far as redirect at this time.

21   If there is no further cross examination I would move for

22   introduction of the People's Exhibits shown  to the officer.

23            THE COURT:  Do you want to hand those to me?

24            MR. GIBSON:  Yes.

255

SAVORY-LL-000807

R-768

1          THE COURT:  Any further cross examination first,

2     Mr. Vieley?

3          MR. VIELEY:  None, Your Honor.

4          THE COURT:  Any objection to these exhibits?

5          MR. VIELEY:  May I see them.

6          THE COURT:  All right, I will give them to you one

7     at a time.

8          People's Exhibit Number 55, People's Number 56,

9     People's Number 57, People's Number 58, People's Number 59

10    and People's Number 60.

11         MR. VIELEY:  No objection to those, Your Honor.

12         THE COURT:  Those exhibits are admitted into

13    evidence and the knife is People's 44 A, any objection to

14    that?

15         MR. VIELEY:  Yes, that I don't think we will

16    allow in.  We will object to it.  It doesn't have any

17    probative value at this point.

18         THE COURT:  I will reserve my ruling on People's

19    44 A.

20         I will pass these among the jury.  I don t know whether

21    it is really necessary or not, but I think we will.

22         MR. GIBSON:  Judge, if I am not mistaken, we can

23    excuse Officer Pinkney at this time.

24         THE COURT:  All right, thank you, officer.

SAVORY-LL-000808