Exhibit +

LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA



# KENTUCKIANA
## — COURT REPORTERS —

**CASE NO. 17-CV-00204**

**JOHNNIE LEE SAVORY**

**V.**

**CHARLES CANNON, ET AL.**

**DEPONENT:**

**ANN YEAGLE**

**DATE:**

**February 06, 2023**





schedule@kentuckianareporters.com

877.808.5856   502.589.2273

www.kentuckianareporters.com

1  IN THE UNITED STATES DISTRICT COURT FOR THE

2    NORTHERN DISTRICT OF ILLINOIS

3      EASTERN DIVISION

4    CASE NO. 17-CV-00204

5

6    JOHNNIE LEE SAVORY,

7      Plaintiff

8

9      V.

10

11   CHARLES CANNON, ET AL.,

12     Defendants

13

14

15

16

17

18

19

20

21

22

23 DEPONENT:  ANN YEAGLE

24 DATE:      FEBRUARY 6, 2023

25 REPORTER:  EMILIA LOPEZ



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of ANN YEAGLE, taken on February 06, 2023                    2..5

Page 2

APPEARANCES

1
2
3   ON BEHALF OF THE PLAINTIFF, JOHNNIE LEE SAVORY:
4   Lindsay Hagy, Esquire
5   Megan Pierce, Esquire
6   Loevy & Loevy
7   311 North Aberdeen Street
8   Third Floor
9   Chicago, Illinois 60607
10  Telephone No.: (312) 243-5900
11  E-mail: lindsay@loevy.com
12  (Appeared via videoconference)
13
14  ON BEHALF OF THE WITNESS, ANN YEAGLE:
15  Robert Hogue, Esquire
16  Illinois Attorney General
17  500 South Second Street
18  Springfield, Illinois 62701
19  Telephone No.: (217) 782-1090
20  E-mail: robert.hogue@ilag.gov
21  (Appeared via videoconference)
22
23
24
25

Page 3

APPEARANCES (CONTINUED)

1
2
3   ON BEHALF OF THE DEFENDANTS, WILLIAM CANNON, SR. AS
4   SPECIAL REPRESENTATIVE OF THE ESTATE OF CHARLES CANNON,
5   MARCELLA BROWN TEPLITZ, BETH BELL, AS SPECIAL
6   REPRESENTATIVE OF RUSSEL BUCK, PETER GERONTES, JOHN
7   STENSON, GEORGE PINKNEY, E. HAYNES, WALTER JATKOWSKI,
8   GLEN PERKINS, ALLEN ANDREWS, HAROLD MARTENESS, MARY ANN
9   DUNLAVEY, CARL TIARKS, AND CITY OF PEORIA, ILLINOIS:
10  John J. Timbo, Esquire
11  The Sotos Law Firm, P.C.
12  141 West Jackson Boulevard
13  Suite 1240A
14  Chicago, Illinois 60604
15  Telephone No.: (630) 735-3300
16  E-mail: jtimbo@sotos.com
17  (Appeared via videoconference)

Page 4

INDEX

                                                        Page
PROCEEDINGS                                              7
DIRECT EXAMINATION BY MS. HAGY                           8
CROSS EXAMINATION BY MR. TIMBO                           101
REDIRECT EXAMINATION BY MS. HAGY                         117
RECROSS EXAMINATION BY MR. TIMBO                         118

                 EXHIBITS
Exhibit                                                 Page
1 - Lab Report - January 17, 2014                       19
2 - Case Notes - Swabs from Connie Cooper               22
      December 17, 2013 - SDT-BOI000945-947
3 - Quantification Sheet - SDT-BOI000485                27
4 - Case Notes - Folding Knife - December 11, 2013      32
      STD-BOI000956
5 - Case Notes - Blue Pants - December 9, 2013          34
      SDT-BOI000959-962
6 - Case Notes - Stain Removed From Pants               56
      February 10, 2013 - SDT-BOI000541
7 - Lab Report - March 20, 2014                         62
      PEORIA_SAVORY1918-1921
8 - Amended Lab Report - October 29, 2018               65
      SDT-ISP547-549

Page 5

EXHIBITS (CONTINUED)
Exhibit                                                 Page
9 - Case Notes - Connie Cooper Underwear                68
      August/September 10, 2018 SDT-ISP560-561
10 - Case Notes - James Robinson Underwear              74
      March 31, 2018-August 27, 2018
      SDT-ISP567-568
11 - DNA Lab Report - October 3, 2018                   77
      PEORIA_SAVORY12380-12388
12 - Lab Report - November 29, 2018                     99
      PEORIA_SAVORY 12704-12705



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 6

                    STIPULATION

    The VIDEO deposition of ANN YEAGLE was taken at
    KENTUCKIANA COURT REPORTERS, 730 WEST MAIN STREET, SUITE
    101, LOUISVILLE, KENTUCKY 40202, via videoconference in
    which all participants attended remotely, on MONDAY the
    6th day of FEBRUARY 2023 at 10:06 a.m. (CT); said
    deposition was taken pursuant to the FEDERAL Rules of
    Civil Procedure.  The oath in this matter was sworn
    remotely pursuant to FRCP 30.

    It is agreed that EMILIA LOPEZ, being a Notary Public
    and Court Reporter, may swear the witness and that the
    reading and signing of the completed transcript by the
    witness is not waived.

Page 7

                    PROCEEDINGS

        COURT REPORTER:  Okay, we're now on the record.
    My name is Emilia Lopez.  I'm the online video
    technician and court reporter today representing
    Kentuckiana Court Reporters located at 730 West Main
    Street, Suite 101, Louisville, Kentucky 40202.
    Today is the 6th day of February 2023 and the time
    is 10:06 a.m. Central Time.  We are convened by
    videoconference to take the deposition of Ann Yeagle
    in the matter of Johnnie Lee Savory v. Charles
    Cannon, et al., pending in the US District Court for
    the Northern District of Illinois, Eastern Division,
    Case number 12-CV-00204.  Will everyone but the
    witness please state your appearance, how you're
    attending, and your location, starting with the
    plaintiff's counsel?
        MS. HAGY:  This is Lindsay Hagy on behalf of
    Plaintiff Johnnie Lee Savory, appearing via Zoom
    from Oak Park, Illinois.
        MS. PIERCE:  This is Megan Pierce on behalf of
    the plaintiff as well, attending remotely from
    Portland, Oregon.
        MR. TIMBO:  Good morning, John Timbo on behalf
    of all defendants appearing from my residence in

Page 8

    Bowling Brook, Illinois.
        MS. HAGY:  Assistant Attorney General Robert
    Hogue here from Springfield, Illinois on behalf of
    Ann Yeagle.
        COURT REPORTER:  All righty.  Thank you.
    Ms. Yeagle, will please state your full name and
    hold your ID up to the camera?
        THE WITNESS:  My name is Ann Maria Yeagle.
        COURT REPORTER:  Thank you so much.  Do all
    parties agree that the witnesses, in fact, Ann
    Yeagle?
        MS. HAGY:  Yes.
        COURT REPORTER:  Thank you.
        MR. TIMBO:  So stipulated.
        COURT REPORTER:  Thank you.  Ms. Yeagle, will
    you please raise your right hand?  Do you solemnly
    swear or affirm that the testimony you're about to
    give will be the truth, the whole truth, and nothing
    but the truth?
        THE WITNESS:  Yes, I do.
        COURT REPORTER:  Thank you.  Counsel, you may
    proceed.
                    DIRECT EXAMINATION
    BY MS. HAGY:
        Q    Ms. Yeagle, have you already spelled your name

Page 9

    for the record?
        A    No, I have not.
        Q    Okay, why don't you go ahead and do that so we
    have that?
        A    So it's Ann, A-N-N, last name, Yeagle,
    Y-E-A-G-L-E.
        Q    And let the record reflect this is a
    videotaped deposition of Ann Yeagle taken pursuant to
    notice and the Federal Rules of Civil Procedure.
    Ms. Yeagle, have you ever been deposed before?
        A    Yes, I have.
        Q    And have you been deposed via Zoom before?
        A    No, I have not.
        Q    Okay.  So you're probably familiar with a lot
    of the rules, but I'm just going to go over them really
    quickly, especially because they're a little different
    over Zoom.  So it's important to keep your voice loud
    and to answer verbally rather than with gestures or by
    saying, "Uh-huh," so that it's easier for the court
    reporter to write it down.  I'm sure you're also
    familiar with that from your courtroom testimony.  And
    I'll try to ask questions that make sense, but if they
    don't make sense, please let me know so that I can
    restate them; is that fair?
        A    Yes, thank you.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1:23-cv-01184-CRL-JEH # 318-9 Filed: 04/22/24 Page 6 of 199
The Deposition of ANN YEAGLE, taken on February 06, 2023
10..13

Page 10

1    Q    And if they -- if you do answer, then I'll
2  assume that you -- that the question did make sense to
3  you; is that fair?
4    A    Yes, thank you.
5    Q    And because there's no judge, there's no one
6  to rule on objections.  So once -- Mr. Timbo might
7  object to my questions and then just let him make his
8  objections, and then unless Mr. Hogue instructs you not
9  to answer, then you can answer the question.
10   A    Yes, thank you.
11   Q    Okay.  And if you need a break, just let me
12  know.  I would just ask that you finish answering the
13  question that's before you, or maybe if you can see if
14  there's a good stopping point, but you can basically
15  take a break anytime that you need to.
16   A    Thank you.
17   Q    So do you have any conditions that might
18  affect your ability to provide truthful and accurate
19  testimony today?
20   A    No.
21   Q    Do you have any conditions that affect your
22  memory?
23   A    No.
24   Q    And are you on any medications that might
25  affect your ability to provide truthful and accurate

Page 11

1  testimony today?
2    A    No, I'm not.
3    Q    And are you on any medications that affect
4  your memory?
5    A    No, I'm not.
6    Q    Is there anything else that might affect your
7  ability to provide accurate testimony or affect your
8  memory today?
9    A    No, not to my -- best of my knowledge.
10   Q    Okay.  Did you do anything to prepare for this
11  deposition today?
12   A    Yes, I did.
13   Q    Okay.  What did you do?
14   A    I reviewed my case notes as well as prior to
15  today, I have had conversations with you as well as
16  conversation with individuals from the Sotos Law Firm.
17   Q    Okay.  And who did you talk to from the Sotos
18  Law Firm?
19   A    I don't recall exactly.
20   Q    Okay.  And did you review your 2015 testimony
21  in the criminal case?
22   A    I did not.
23   Q    Okay.
24   A    A few pages of it, but I did not review it in
25  totality.

Page 12

1    Q    Okay.  And do you believe that in 2015, you
2  would've given accurate and truthful testimony to the
3  best of your ability?
4    A    Yes.
5    Q    Okay.  And do you remember any other documents
6  that you reviewed?
7    A    Solely case file notes, reports, however some
8  conversation logs, that type of information.
9    Q    Did you look at some of the photos that you
10  took of the evidence?
11   A    Yes, I did.  Those are included in my case
12  file notes.
13   Q    And is it accurate to say there's a case file
14  note that goes with each of the reports that you issued
15  in this case?
16   A    Yes, that is correct.
17   Q    So you issued four reports; is that right?
18   A    Correct, two forensic biology reports, two DNA
19  reports, and then there was an amended report, so that
20  counts kind of in that same.  There was one additional
21  report, I believe, in regards to the combined DNA
22  indexing system.
23   Q    And that's what's known as CODIS, correct?
24   A    Yes.
25   Q    Okay.  And that was the last report that you

Page 13

1  issued in this case, correct?
2    A    Yes, I believe so.
3    Q    Okay.  And you're right, I am -- I was going
4  to talk about that amended report when we get to that
5  one, but it's basically the same.  It's basically the
6  same as October 1st report, right?  You were just fixing
7  kind of, like, a typo?
8    A    Yes, that's correct.
9    Q    Okay.  And do you have an independent memory
10  of your work in the Johnnie Lee Savory case?
11   A    I have some, yes.
12   Q    Okay.
13   A    Just general recollection of my work and of
14  what was done, yes.
15   Q    And your work in this case began in 2013; is
16  that accurate?
17   A    Yes, I believe that's when my work started.
18   Q    And then you finished in 2018, right?
19   A    Correct, I believe that's when the last report
20  was issued was in 2018.
21   Q    Okay.  But you didn't do any of the work in
22  this case in the original proceedings in 1977 and 1981,
23  right?
24   A    Correct.
25   Q    And you did some testing on items that had

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1:23-cv-01184-CRL-JEH # 318-9 Filed: 04/22/24 Page 7 of 199
The Deposition of ANN YEAGLE, taken on February 06, 2023
14..17

Page 14

1  been found at the crime scene, right?
2      Q    Yes, I believe there were items that were
3  found at the crime scene, yes.
4      Q    And then you also did testing on items that
5  were found at the home of Johnnie Lee Savory, right?  Or
6  were -- or did you not really have information on where
7  the items were recovered from?
8      A    I did not have complete information as to
9  where the items were recovered from.  There were some
10 items that were reported to have been obtained from, or
11 that they were from a bedroom or from a bedroom floor or
12 from autopsy, but I didn't have complete information on
13 each item as to whether, right, that was from the
14 original crime scene or where those items were recovered
15 from specifically.
16     Q    Okay.  And I want to go into your background a
17 little bit.  Do you have a college degree?
18     A    I have a Bachelor's of Science degree from the
19 University of Illinois in Urbana-Champaign.
20     Q    And what did you major in?
21     A    I majored in animal science and took
22 additional coursework in biology, microbiology,
23 molecular genetics, and genetics in general.  So an
24 animal science degree with supporting science
25 background.

Page 15

1      Q    And then did you -- was it after that that you
2  took additional classes at the University of Illinois
3  Springfield?
4      A    Yes, it was after I graduated from University
5  of Illinois in Urbana-Champaign in 1995.  And then in
6  1996, I took coursework from the University of Illinois
7  in Springfield.
8      Q    Okay.  And what coursework -- was that the
9  coursework you just described?
10     A    That was genetics class as well as -- it was
11 teacher education prep was what I was looking for.
12     Q    Okay.
13     A    In education.
14     Q    And when did you first start working at the
15 Illinois -- at -- for Illinois State Police?
16     A    I began working for the Illinois State Police
17 in November of 1996.
18     Q    So was that pretty soon after you graduated
19 from college?
20     A    Yes, I graduated in May of '95 and started
21 with the Illinois State Police in November of 1996, so
22 about a year-and-a-half.
23     Q    And so have you been at the state police since
24 that time?
25     A    Yes, I have.

Page 16

1      Q    And what was your first position there?
2      A    I was a state police evidence technician II at
3  the Springfield laboratory.
4      Q    And when did you first start doing DNA
5  testing?
6      A    I became a -- I was hired as a forensic
7  scientist trainee in the areas of forensic biology and
8  DNA analysis in November of 2000, so I began my training
9  at that time and completed my training in
10 2002.
11     Q    Okay.  Sorry, I don't want to try it.  Sorry,
12 my kid is standing here with a cup of ramen.  I don't
13 know why.  Okay.  Okay, I'm sorry about that.  So what
14 was the role that you had in 2014?
15     A    2014, I was with forensic biology and DNA
16 analyst, so working as a forensic scientist, and I
17 received evidence from law enforcement agencies,
18 examined that evidence, both for biological material as
19 well as obtaining DNA profiles from that evidence and
20 reporting those findings as well as testifying in court
21 as needed.  At that time, I was employed and working in
22 the Morton Forensic Science Laboratory for the Illinois
23 State Police.
24     Q    Okay.  And what type of training did you have
25 from the Illinois State Police to do DNA testing?

Page 17

1      A    I had completed the Illinois State Police's
2  training program in both forensic biology and DNA
3  analysis.  That training program involved hands-on
4  application, so actually the performing the DNA tests
5  and having that work checked to ensure those were
6  obtaining the correct profiles.  That -- that training
7  program, I was in -- in training for approximately a
8  year-and-a-half, that included both the forensic biology
9  screening portion, which was about six months of
10 training and then the DNA analysis training.  So there
11 was classroom material presentations with reading
12 exercises, lectures, quizzes, and tests that I had to
13 take to show that I understood the theory and the
14 science behind the DNA analysis itself as well as the
15 protocols as set up by the Illinois State Police.  I
16 completed that training program, and then I finished
17 with oral exams and a mock trial to show that I could
18 relay that information back verbally and explain right
19 what I was doing; as well as then annually, I take and
20 pass proficiency examinations to show that I'm retaining
21 proficiency in that forensic biology and DNA analysis.
22     Q    And when you were talking about the ISP
23 protocols, does ISP have its own interpretation
24 guidelines for DNA?
25     A    Yes, it does.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1:23-cv-01184-CRL-JEH # 318-9 Filed: 04/22/24 Page 8 of 199
The Deposition of ANN YEAGLE, taken on February 06, 2023
18..21

Page 18

```
 1      Q    And are those based on any national standards
 2 or any standards that are adopted by other laboratories?
 3      A    Our -- the Illinois State Police
 4 interpretation guidelines are following our validation
 5 studies that were done within the Illinois State Police
 6 as well as utilizing those developmental validations
 7 that are available from the companies that provide the
 8 DNA kits that we utilize, the chemistries as well as
 9 then following the guidelines from the quality assurance
10 standards, which are set up by the FBI, and as well as
11 our other accrediting bodies, ensuring that those are --
12 we're following those standards.
13      Q    And is that similar processes for your
14 standard operating procedures?
15      A    Yes.
16      Q    And so those are also somewhat derived from
17 the QAS developed by the FBI, right, and reflect similar
18 procedures that are used by other accredited
19 laboratories?
20      A    Yes, that is correct.
21      Q    Okay.  And in this case, you also coordinated
22 some of the testing with representatives from Bode
23 Cellmark, right?
24      A    Yes, that is correct.
25      Q    And all of the testing that was undertaken in
```

Page 19

```
 1 this case was done with input from both the defendant
 2 and the State; is that fair?
 3      A    Yes, that is correct.  There was a court order
 4 for -- right, for the processing, for the testing as
 5 well as, right, discussions with both the prosecution
 6 and defense in regards to approval for testing as well
 7 as, right, the individuals from Bode Cellmark all coming
 8 together to facilitate the testing and ensure everyone
 9 agreed to the testing and I agreed with the path -- path
10 forward with the items of evidence.
11      Q    Okay.  And was this the first time that you
12 did testing in an older case like this?
13      A    No, I have done a few older cases.
14      Q    Okay.  So I'm going to start with the first
15 report that you did in this case, the January 17, 2014
16 report.  And I'm going to bring this up on the screen as
17 Exhibit 1, and then please let me know if you can see
18 this.  I can make it bigger.  Okay.  Are you able to see
19 this?
20           (EXHIBIT 1 MARKED FOR IDENTIFICATION)
21      A    Yes, I can see a portion of that report you're
22 describing.
23      Q    Okay.  And so this was issued on January 17,
24 2014, right?
25      A    Yes, that is correct.
```

Page 20

```
 1      Q    And then I'm going to scroll down.  Oh, this
 2 one is not signed, but this is your report, right?
 3      A    Yes, it appears to be, yes.
 4      Q    Okay.  So is it fair to say that this report
 5 lays out some of the -- well, not some of, but the for
 6 -- sorry, let's just strike that.  Is it fair to say
 7 that this report lays out your forensic and biology
 8 examination of the items in this case that you were
 9 asked to test in 2014?
10      A    Yes, I believe it does.
11      Q    Okay.  So I'm going to stop sharing.  And some
12 of the items you didn't do any forensic examination or
13 biology examination of, right?
14      A    Yes, that is correct.
15      Q    So the vaginal swabs, which was 1A1, you
16 didn't do any forensic examination on, right?
17      A    I did not do any testing, correct.  I
18 preserved that for future testing for DNA analysis.
19      Q    Okay.  And why didn't you do any biology
20 testing on those?
21      A    Number one reasoning was to preserve the
22 sample for the DNA analysis.  The process of forensic
23 biology screening uses up sample but is not able to
24 identify a source as in an individual, so it was
25 determined to solely preserve the sample.  There was
```

Page 21

```
 1 prior information provided to me from a prior report by
 2 a prior analyst that there was seminal material
 3 indicated on the item and it was preserved and passed on
 4 for DNA analysis.
 5      Q    And that, you have no independent knowledge of
 6 that testing or opinion on that testing, you just have
 7 the fact of what that testing was reported, right?
 8      A    Correct.
 9      Q    And in some of the prior testing, all you had
10 was the reports, right?  None of the underlying
11 worksheets for some of them, you just had that report,
12 correct?
13      A    That is correct.
14      Q    And so you were just reading what the prior
15 analysts, what they said their findings were, right?
16      A    Yes, that is correct.
17      Q    Okay.  And as you said, with the swabs, the
18 goal was to try to get DNA from that item, right?
19      A    Yes.
20      Q    And when you got the swabs, they were already
21 partially consumed; is that right?
22      A    I believe so, yes.  There had been testing
23 done prior.  They appeared to have testing done on them.
24      Q    Would it be fair to say that it -- they were
25 about halfway consumed?
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 22

1    A    Possibly. I don't recall exactly how much was
2 consumed.
3    Q    Okay. I can show you this, which this is
4 your --
5        MS. HAGY: -- so Emilia, I hope I marked that
6 last item as Exhibit 1? Okay.
7    Q    So this is going to be Exhibit 2. Okay, can
8 you see this?
9        (EXHIBIT 2 MARKED FOR IDENTIFICATION)
10    A    Yes, I can.
11    Q    And this -- well, what is this document?
12    A    This appears to be a copy of my case notes
13 from the examination of item 1A, the -- the vaginal
14 swabs.
15    Q    Okay. And I'll show you here. I don't know
16 if you can see it from -- I'll make it smaller for a
17 second. These are your initials here, right?
18    A    Yes, those are.
19    Q    Okay. And so here, you can see the picture of
20 the swabs. And then you had said here, about half of
21 each swab tip appeared to have been previously removed?
22    A    Yes, that is correct.
23    Q    Okay. And then you were working to preserve
24 -- to extract the DNA and then preserve it?
25    A    Yes, correct.

Page 23

1    Q    I'm sorry --
2    A    Right.
3    Q    You can answer.
4    A    I -- yes, I preserved the swab material, and
5 that was then, right, for DNA testing.
6    Q    And you were extracting the DNA, and is it
7 accurate that you were also quantifying how much DNA was
8 there?
9    A    Yes, that is correct.
10    Q    And the quantities that you were taking, was
11 that for autosomal testing?
12    A    I would need to see that quant sheet, but yes,
13 that's -- that's the goal of my analysis is autosomal
14 STR analysis. The quantification is looking at human
15 DNA as well as can be looking at how much male DNA is
16 present or is detected, and that information can also be
17 utilized for other types of testing. But for myself,
18 when I'm quantitating, I'm, right, looking at how much
19 DNA is present and its ability to be used for autosomal
20 STR analysis.
21    Q    And can you give just a quick overview of what
22 autosomal DNA analysis is?
23    A    So autosomal STR analysis is just a simplified
24 process of DNA extraction and processing and looking at
25 specific locations on the DNA. So in the first round of

Page 24

1 testing, I utilized IdentiFiler Plus, which is a
2 commercial kit available that looks at 15 locations on
3 the DNA as well as amelogenin, which is a sex typing
4 marker. So looking at those locations, looking at
5 specific regions of those on that DNA to determine a DNA
6 profiler, a DNA type at each one of those locations as
7 well as for that totality of those 15 locations on the
8 DNA, plus the amelogenin, so that's sex typing marker.
9 In future testing, I utilized a different kit that is
10 larger, a larger multiplex, and has 23 locations plus
11 amelogenin, but they're both utilizing the same science
12 and short tandem repeat technology. So looking at your
13 DNA, looking at specific locations on specific
14 chromosomes for that genetic information.
15    Q    And when you do the quantitative portion of
16 the autosomal DNA, is it fair to say that sometimes you
17 determine that a different type of testing might be best
18 for that particular item?
19    A    Yes, that is true.
20    Q    And is that what happened in this case, that
21 you determined that the swab would be better suited for
22 Y-STR or MiniFiler testing?
23    A    Yes.
24    Q    Okay. And then you ultimately had that --
25 passed this on to Mr. Frank, Mr. William Frank, so that

Page 25

1 he could do the more specified testing on this item?
2    A    Yes, that is correct.
3    Q    Okay. And then in January 2014, another item
4 that you reported on was the light switch, the light
5 switch panel, right?
6    A    The light switch cover, yes.
7    Q    And you extracted DNA from the cover?
8    A    Yes, that is correct.
9    Q    Okay. So actually, I'm going to put that
10 Exhibit 2 back up. Okay. Ms. Yeagle, is this the light
11 switch cover that you tested?
12    A    Yes, that is my -- that appears to be my
13 notes. And yes, appears to be the image of the light
14 switch cover that I tested.
15    Q    And then did you -- here on the side, can you
16 see where I have the little hand?
17    A    Yes, I can.
18    Q    Are those your notes or are those somebody
19 else's notes?
20    A    To the best of my ability, seeing those, those
21 appear -- appear to be mine, case number, date and my
22 initials.
23    Q    Okay. And then --
24    A    It's just difficult to see.
25    Q    Sorry?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1:23-cv-01184-CRL-JEH # 318-9 Filed: 04/22/24 Page 10 of 199
The Deposition of ANN YEAGLE, taken on February 06, 2023
26..29

Page 26

```
 1      A    It's just difficult to see.  It -- it's a
 2  little fuzzy.
 3      Q    Okay.  And this marker outline here, is this
 4  where you swabbed your DNA samples from?
 5      A    Yes, that is where I tested from and that is
 6  one of the two areas that I swabbed.
 7      Q    Okay.  And up here where it has a little "1"
 8  by it, is this the other one where you swabbed from?
 9      A    Yes, it is.
10      Q    Okay.  And here you -- it says, the front
11  before the testing and the swabbing and so you marked
12  it, and then this was before you took the sample from
13  it?
14      A    Yes, that is correct.
15      Q    And then you didn't do any testing on the
16  backside?
17      A    No.
18      Q    Okay.  And the light switch was called -- for
19  your testing, it was called Exhibit 15, right?
20      A    Yes, that is correct.
21      Q    Okay.  And then I'm going to stop sharing
22  this.  And then you also looked at the knife, right?
23  The -- a knife that was labeled Exhibit 44?
24      A    Yes, a folding pocket-style knife, yes.
25      Q    And on the knife, you also didn't do any -- do
```

Page 27

```
 1  you say it -- or biology testing, I'm just going to say?
 2      A    No, I did not do any screening, so I didn't do
 3  any testing to determine the possible source of the
 4  biological material or of the staining present.  I
 5  solely preserved the stains I observed.
 6      Q    And why was that?
 7      A    Again, that was to preserve sample for DNA
 8  testing versus using up the small stains in the
 9  biological screening.  So determining whether or not
10  blood might be present on those stains based on its
11  visual appearance, I preserve the stains to preserve as
12  much as possible for DNA testing.
13      Q    Okay.  And ultimately, there were some parts
14  of the knife where you didn't detect any quantities of
15  autosomal DNA; is that fair?
16      A    I believe so, yes.
17      Q    Okay.  Would it help if I showed you the
18  quantification sheet?
19      A    Yes, that would help.
20      Q    Okay.  Okay.  Well, I'm going to mark this as
21  Exhibit 3.
22          MS. HAGY:  And John, I realize I haven't been
23      saying the Bates numbers aloud, which I did mean to
24      say that, so if you need me to go back to any of the
25      other ones, I can do that.
```

Page 28

```
 1          (EXHIBIT 3 MARKED FOR IDENTIFICATION)
 2          MR. TIMBO:  I did actually need Exhibit 2.  I
 3      did actually need the Exhibit 2 Bates numbers.
 4          MS. HAGY:  Okay.  So for Exhibit 2, the Bates
 5      numbers are SDT-BOI000945 to 947.
 6          MR. TIMBO:  Got it.  Okay, good.  Thank you.
 7      And then what's Exhibit 3?
 8          MS. HAGY:  So Exhibit 3 it's -- I'm only going
 9      to be looking at this one page right now, but it's a
10      big chunk of documents.  It's the lab worksheets
11      from the January report.  But I actually -- because
12      of how big the documents is, I had to break it up
13      into two parts.  So I'm -- what I'm going to be
14      looking at right now is SDT-BOI000485.
15          MR. TIMBO:  Got it.  Go ahead.  Thanks.
16  BY MS. HAGY:
17      Q    Okay.  So Ms. Yeagle, the -- it's pretty
18  small, but let me know if you need me to make it bigger?
19      A    No, it's fine.
20      Q    Okay.  So here, for the knife we said was
21  Exhibit 44, right?
22      A    Correct.
23      Q    And so 44A is the blade of the knife, right?
24  Or I can go to another document to refresh.
25      A    Yes.  I believe the -- the blade was 44A, and
```

Page 29

```
 1  the inside portion of the folding area of the knife was
 2  44B.
 3      Q    And so when we talk about the inside portion
 4  of the knife, that's where the blade goes when the knife
 5  is closed, right?
 6      A    Yes.  Yes.  That is what I mean by what a --
 7  by that.
 8      Q    Okay.  And so both of these, for autosomal
 9  DNA, it says, "ND."  And what does ND mean?
10      A    ND indicates not detected.
11      Q    So you didn't detect any DNA on the blade of
12  the knife or the inside pocket of the knife, right?
13      A    Correct.  Based on this -- this quantitation,
14  no human DNA was identified or in -- was detected on
15  44A1 or 44B1.  Correct.
16      Q    And then here, where it says the little -- the
17  last column doesn't have a label, but is it fair to say
18  that it's indicating what kind of testing might work for
19  that item?
20      A    Correct.  This is a -- a summary sheet in my
21  notes that is describing all of the items tested and
22  their quantitation results as well as then that last
23  column is describing the process moving forward with
24  that item, whether it would -- potentially could be
25  forwarded for Y-STR analysis or MiniFiler, whether
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1:23-cv-01184-CRI-JEH #:318-9 Filed: 04/22/24 Page 11 of 199
The Deposition of ANN YEAGLE, taken on February 06, 2019
30..33

Page 30

1  nothing else would be done, whether it was consumed.  So
2  just that -- a compilation of all that information.  But
3  that final column is, right, what would be going on next
4  with that item or what processing could be conducted on
5  that item.
6      Q   Okay.  And when -- you mention the word
7  "consumed;" and what does that mean?
8      A   Consumed in this context is in regards to the
9  extracted DNA that -- in regards to, say, this reagent
10 blank where it says, "Consumed for 1-22MRB1," the
11 notation off to the side is, "Consumed."  I utilized all
12 of that extracted DNA in my DNA analysis, and so there's
13 none left for additional testing.
14     Q   And in this case, there were a lot of
15 procedures around consumption, right, meaning that both
16 parties agreed that that might happen and agreed -- when
17 an item was going to be consumed, all parties agreed to
18 that consumption; is that accurate?
19     A   Yes, that is correct.
20     Q   And that's part of why Cellmark was involved,
21 right?  So that there could be another accredited
22 analyst input into whether consumption was needed, or
23 just to make sure that the right testing was done before
24 something was consumed?
25     A   Correct.  I -- I was functioning based on ISP

Page 31

1  policies, protocols, our procedures manual.  And then
2  right.  Even, I believe, before I was involved, Bode
3  Cellmark was involved with this.  So right, there was
4  information from myself in regards to the other events
5  and then as well, right, the additional input from Bode
6  Cellmark to give all sides, I believe, fair and accurate
7  information in making those determinations of processing
8  the DNA and ensuring that each item of evidence was
9  following the best path it could at the time.
10     Q   Thank you.  And so when you mentioned 22,
11 those were the fingernail scrapings from victim Connie
12 Cooper, right?
13     A   I believe so, yes.
14     Q   And we can look at your report again in
15 a minute.  So here -- we'll start here on the pants,
16 which were blue pants that were given the number 59,
17 right?
18     A   Yes, that's correct.
19     Q   And here, we'll come back to this, but you
20 also did quantitative testing on several different parts
21 of the blue pants, right?
22     A   Correct.  I cut out areas of the blue pants as
23 well as I swabbed from the waistband of the blue pants.
24     Q   And the pants, you also did biology testing
25 on, right?

Page 32

1      A   Yes, that is correct.
2      Q   And do you know -- I need to take this down.
3  Why were you able to do the biology testing on the
4  pants?
5      A   The stained areas on the pants were much
6  larger.  And the coloring of the stains on the pants
7  were not exactly -- they -- they appeared aged, but they
8  didn't have an exact appearance of -- of true blood-like
9  staining in some areas.  And so I wanted to attempt to
10 use the testing chemicals to better guide me into
11 whether, right, this is -- is there -- is this testing
12 positive for blood or not?  And they're dark blue pants,
13 and trying to look at that as well as on, then, on the
14 inside of the pockets.  So it was just a different item.
15 You know, a knife is a small, compact item and had a
16 small amount of visible staining present.  So I felt the
17 need to preserve that for solely DNA testing, whereas on
18 these pants, there was a lot more surface area, a lot
19 more potential for testing.
20     Q   Okay.  Thank you.  So first, I'm going to
21 bring up Exhibit 4.  And this is going to be ISP 956.
22 I'm sorry.  It's -- I did not mean -- I meant to say
23 SDT-BOI000956.  Okay.  And Ms. Yeagle, is this the knife
24 that was designated Exhibit 44?
25          (EXHIBIT 4 MARKED FOR IDENTIFICATION)

Page 33

1      A   Yes.
2      Q   Okay.  And so we see here that 44A was the
3  sharp edge of the knife, the blade edge of the knife.
4  And you can kind of see it here in this -- you took a
5  picture where my -- where the hand is.  You took a
6  picture of the blade?
7      A   Yes, that is correct.
8      Q   And that's where you took the 44A testing
9  from?
10     A   Yes, that is correct.
11     Q   And this is where -- and you came up with not
12 detected for the autosomal DNA quantity?
13     A   Correct.  Not detected for the human autosomal
14 DNA, correct.
15     Q   Human.  So there could have been animal?
16     A   Correct.  I -- right.  My testing is solely
17 for human DNA.
18     Q   Okay.  And then here, it's -- for 44B, right
19 in the first picture on the left, this is where the
20 blade is inside of, that -- the inside area of the
21 folding knife?
22     A   Yes, that is correct.
23     Q   And then you swabbed inside of -- like,
24 there's a crevice there, and you swabbed inside of that?
25     A   Yes, that's correct.



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 34

1    Q    And there, you also had not detected for human
2  DNA on -- in the inside of that crevice?
3    A    Yes, that's correct, on the swab that I took.
4    Q    Okay.  Just going to -- this was Exhibit 4,
5  and I'm going to take this down.  Okay.  And now, I'm
6  going to bring up Exhibit 5.  Okay.  And Ms. Yeagle, do
7  you -- oh, sorry.  I'm going to say the Bates number for
8  a minute.  This is SDT-BOI000959, and it's going to go
9  to 962.  Ms. Yeagle, do you see this initial down here?
10          (EXHIBIT 5 MARKED FOR IDENTIFICATION)
11    A    Yes, I do.  Well --
12    Q    And whose initial is that?
13    A    Moment -- I need to move.
14    Q    Oh.
15    A    Yes, I do.  Those are --
16    Q    Okay.
17    A    That is my initials.
18    Q    I'm glad that you know how to move the
19  pictures because it's harder when the witness doesn't
20  know how to do it.  And do you recognize this document?
21    A    Yes.  This appears to be a copy of my work
22  notes from Item 59 --
23    Q    Okay.
24    A    -- the blue pants.
25    Q    Okay.  And here -- you mentioned earlier that

Page 35

1  you swabbed this whole waistband?
2    A    That is correct.  I swabbed the inside of the
3  waistband with one moist swab.  I tried to avoid any
4  areas with markings that were present before.  But it
5  was about three-quarters of an inch of the waistband
6  width was swabbed all the way around.
7    Q    Okay.  And where -- if I zoom into this, are
8  you able to tell me where the testing was done
9  previously, where you tried to avoid?
10    A    It's difficult for me to tell from -- from the
11  pictures.  But I was just trying to avoid any markings,
12  anything like that that was present beforehand.  But the
13  -- the outline, you know, dotted area is where I was
14  swabbing.  So in -- in the image I'm looking at, right,
15  it appears discolored next to that, kind of to the right
16  of my tag.  And I believe that was one of the areas,
17  right, I was avoiding in my swab.
18    Q    Right here?
19    A    Yes, I believe so.
20    Q    Like, to -- like, for the yellow tag up, like
21  you said, to the right corner of it?
22    A    Yes.
23    Q    And so you can kind of see your dots are to
24  the left of it, and then your dots are again to the
25  right of it?

Page 36

1    A    Yes, that's correct.
2    Q    So you mostly -- you swabbed the large
3  majority of the waistband?
4    A    Yes, that is correct.
5    Q    Okay.  And we're going to come back here for a
6  minute in a minute.  But first, I want to go back to
7  Exhibit 1, which is the -- I have too many things open
8  now.  The -- your report.  So coming back down, this is
9  where your report talked about the biology testing.  And
10  as we discussed -- just go back up here -- you -- for
11  1A, it says that you didn't do any testing on -- no
12  biology testing on the vaginal swab, right?
13    A    Yes, that's correct.
14    Q    And then it says blood was indicated on the
15  light switch.  So what kind of blood testing did you do
16  on the light switch?
17    A    I utilized the Kastle-Myer test, which is just
18  a color indication test.  It detects, basically,
19  hemoglobin in the blood.  So a positive color reaction
20  indicates that blood is indicated.
21    Q    Okay.  And so for the light switch plate, you
22  -- blood was indicated on it?
23    A    Yes, that is correct.
24    Q    Okay.  And then here, the -- we discussed that
25  you did some -- you examined scrapings that had been

Page 37

1  taken from victim Connie Cooper, right?
2    A    Yes.  I did a visual examination of the wooden
3  sticks and preserved a portion of those sticks that
4  would've been used to scrape underneath the fingernails.
5    Q    And here -- is it accurate that you basically
6  just did visual testing or visual examination of that
7  item?
8    A    Yes, correct.  I used -- I believe I used a
9  stereomicroscope, which is just basically a -- a
10  powerful magnifying glass, to look more closely at the
11  end of that, observed apparent debris, and just
12  preserved that.  I did not do any additional testing to
13  preserve that material for DNA analysis.
14    Q    Okay.  And here, another thing that you were
15  trying to do was get standards of the victims and their
16  parents in this case, right?
17    A    Yes, that is correct.
18    Q    And they've all passed away, obviously, so --
19  well, obviously for the victims, but also, Noyalee
20  Douglas and William Douglas have passed away.  So you
21  were getting -- trying to get DNA standards from them
22  from preserved material, right?
23    A    Yes, that is correct.
24    Q    And you also developed a profile from
25  Johnnie Lee Savory, right?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 38

1    A    Yes, that is correct.
2    Q    And he was still alive, so you did -- you
3    collected a buccal swab from Mr. Savory, right?
4    A    A buccal swab was collected from him, yes, and
5    submitted to the laboratory.  I was able to process that
6    for a DNA profile.
7    Q    And can you explain what a buccal swab is?
8    A    So a buccal, or some people will say buccal,
9    it is just a swabbing of the inside lining of your
10   mouth.  Those skin cells are readily available when the
11   inside of your mouth is swabbed with a cotton swab.  And
12   that cotton swab then collects that cellular material
13   and is dried and is available for analysis.
14   Q    And were you able to get a profile from
15   Mr. Savory's buccal swab?
16   A    Yes, I was.
17   Q    And was that a full profile?
18   A    Yes, I believe it was.
19   Q    And that's pretty typical for a fresher DNA
20   collection; is that right?
21   A    Yes.  The collection of a known DNA standard
22   from an individual, whether it is a blood standard or a
23   buccal swab, normally, there is large amounts of DNA
24   present in a good or suitable format in good condition
25   because of how they're collected and normally preserved.

Page 39

1    So in regards to his buccal swab standard, that did
2    yield sufficient DNA.  And there is still sample
3    remaining that could be retested if others want --
4    needed to utilize it for a DNA standard for any other
5    type of DNA testing.
6    Q    And for the people who have passed away, you
7    were looking at -- here, I'll scroll down.  This was
8    evidence that was collected in 1977, correct?
9    A    Yes.  That's my understanding.
10   Q    This is a little more challenging, right?
11   A    Yes, that is correct.
12   Q    And for -- going back up here.  The blood
13   tubes, those did not stay preserved very well, right?
14   A    That is correct.  A -- a blood -- the blood
15   tubes were not -- excuse me.  The blood tubes, to my
16   knowledge, were not stored frozen or in any way to
17   preserve the quality of the DNA in those tubes.  So they
18   basically were still blood tubes that had been around
19   since 1977.  And that leads me to believe, and the
20   information I have from them, right, is that is degraded
21   and is not necessarily suitable anymore for use for DNA
22   analysis.
23   Q    So you weren't able to use these, this
24   preserved blood, from either Connie Cooper or victim
25   James Robinson as standards for their DNA, right?

Page 40

1    A    Correct.  I attempted to swab the outside of
2    the blood tubes, so that top stopper, in an attempt to
3    utilize that because that -- any blood present on the
4    outside of that stopper would've at least air dried and
5    -- and been in a dried format versus liquid blood, which
6    is a much more -- dried blood is much more stable for
7    the DNA.  So I did attempt swabbing the blood-like
8    crusts from the top and around the lower edge of the
9    stopper of the tubes, but that was not completely
10   successful.
11   Q    Okay.  And so you ended up moving on to trying
12   to use their hair as standards?
13   A    That is correct, whether it was head hairs or
14   pubic hairs.  Yes.
15   Q    And when you say here that for Ms. Cooper, you
16   had some of the hair ends -- well, for hair, is it
17   better if you have some of the hair follicle attached to
18   it?
19   A    At -- at this time in DNA processing and when
20   I was doing this, right, what I was looking for was,
21   right, the -- the follicle or that -- that root tag kind
22   of where, when hair is pulled out, there is DNA attached
23   to that as it's being pulled from the individual's
24   scalp.  So that is -- when they were -- when hair
25   standards were collected, whether it was from victims or

Page 41

1    suspects in cases, they were supposed to be pulled.  And
2    so those, that follicular material or that root tag, is
3    the best source of DNA.  And so when I say apparent --
4    portion of apparent hair ends preserved, right, I was
5    looking for the ends of the hair.  And I preserved more
6    than just those that I was looking at and would see
7    apparent tag material, taking both ends, and just trying
8    to get any of that material that I could from those to
9    obtain, right, the genetic information and develop a DNA
10   profile for Connie Cooper or James Robinson.
11   Q    Okay.  And so is it accurate that if you are
12   able to get some of the follicle, then you're going to
13   be able to get a better profile than if you don't have
14   any of the follicle?
15   A    Correct.
16   Q    And we'll talk about this in a little bit, but
17   for James, it was more challenging to get a DNA profile
18   for him, right?
19   A    Yes.  It just -- it was -- it was, right,
20   different for each sample as to how well they worked and
21   the totality of the profiles obtained.
22   Q    Okay.  And so here, when we go down to the
23   pants, it says the pants are 59, right?
24   A    Yes, that is correct.
25   Q    And it says, "No blood indicated on areas



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 42

1    tested at this time," right?
2        A    Yes, that is correct.
3        Q    So all of the testing that you did on the
4    pants, no blood was indicated?
5        A    That is correct at -- based on my testing,
6    yes.
7        Q    Okay.  And that was the Kastle-Myer testing?
8        A    Yes, that is correct.
9        Q    Okay.  And I'm going to go through -- back to
10   the other document.  And there were quite a few
11   different areas that you tested.  And so as we discussed
12   previously, 59A was the waistband, right?
13       A    Yes, that is correct.
14       Q    And so you didn't find any blood -- actually,
15   you know, strike that.  I'm going to go -- I think it
16   will be easier if we go back to the other exhibit.
17           MS. HAGY:  So Emilia, did I mark this as -- was
18       this Exhibit 4, the pants picture?
19           COURT REPORTER:  The pants was 5.
20   BY MS. HAGY:
21       Q    Okay.  Thank you.  So here, you took these
22   really helpful pictures of the different areas that you
23   swabbed.  And actually, the -- is it accurate that for
24   the waistband, you didn't actually do any blood testing
25   on the waistbands?

Page 43

1        A    I believe that's correct, yes.
2        Q    Because that was to try to determine who wore
3    the pants?
4        A    Yes.  That was the goal of that swabbing.
5        Q    Okay.  And then here, it says, "Q1."  And it
6    says -- well, what does -- can you read that sentence,
7    and then also say what it means?
8        A    Okay.  So "Q1."  And then "It's
9    V-I-S-M-E-D-R-B-S on pocket outside of WT material."  So
10   basically, that's saying that Q1 is a visible medium
11   red-brown stain on the pocket outside of the white
12   material, or it's colored at that point, but I was
13   presuming was white material.  Kastle-Myer testing of
14   the Q1 swab of the stain was negative.  I tested two
15   small portions of a swab, or tried that twice.  And then
16   I took cuttings twice on each side to -- and those were
17   also negative for Kastle-Myer.  So it -- it's a large,
18   you know, a relatively good-sized stain there.  But I
19   was unable to get the Kastle-Myer test to give me a
20   positive result, so it was negative based on my testing.
21       Q    And this -- oh, sorry.
22       A    Oh, I was going to say I didn't know -- did
23   you want me to talk about the rest of the results, or
24   just Q1?
25       Q    Yeah.  For now, just Q1, because I want to try

Page 44

1    to line that up to the report, like, how you called
2    that.  I -- so, this was the right-front pocket, right?
3        A    Yes, that's the right-front pocket.
4        Q    And we can go back to your report, but I think
5    that ended up being called 59C?
6        A    I believe so, yes.  And I think it would be on
7    a following page of my notes as well, should clarify.  I
8    guess -- I guess the report delineates it well.
9        Q    Yeah.  And maybe it's -- maybe I don't --
10       A    So it could be, right, in the report more
11   clearly.
12       Q    Yeah.  So let's go back.
13       A    I do write that 59C is from the right pocket.
14       Q    And here, where you outlined the stains here,
15   is this then the cutting?  Well, this is the area from
16   which you took cuttings for the blood.  And then did you
17   take different cuttings for the DNA, or did you use the
18   same cuttings for blood and then use those also for
19   DNA?
20       A    I took separate cuttings for the Kastle-Myer
21   testing, very small cuttings.  And so first, I swabbed
22   the area and tested that in an attempt to leave as much
23   material on the fabric as possible.  And then I took
24   small cuttings of the fabric, the stain on the fabric,
25   and tested those with a Kastle-Myer reagent to see if

Page 45

1    those would come up positive with a more concentrated
2    stain.  And so the testing for DNA analysis was a
3    separate cutting.
4        Q    Okay.  And so when you say you took a very
5    small portion for the Kastle-Myer, can you describe
6    about how small?
7        A    It depends item to item, but it could be as
8    small as just a millimeter squared.  Like, so it could
9    be -- and in this, I think I took a slightly large area.
10   But it can just be, you know, a -- teasing off a thread
11   from the fabric that -- that has that stain present on
12   it, up to half a centimeter by half a centimeter stain.
13   But the -- my goal is to use as little as possible to
14   get an accurate test result.
15       Q    And is the Kastle-Myer test pretty sensitive?
16       A    Yes, it is.  But it has to -- that hemoglobin
17   has to be available for the chemicals to -- to bind to
18   it to give the positive test result.  So it is possible
19   in certain stains, whether they're degraded or have
20   other chemicals present, it is possible that something
21   is a blood stain, but I won't be able to detect that with
22   the test.  The Kastle-Myer is very sensitive.  I mean,
23   it can dilute -- it can detect very dilute stains.  And
24   in my training, we had stains that were older than this,
25   you know, more than 50 years old that were available for



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 46

1  testing.  But of course, those stains were pristine.  So
2  they're on -- they're on clean cotton material.  They've
3  been kept in a laboratory setting for -- for that time,
4  so they're maintain to maintain the integrity of that
5  sample.  But with the age of this, it -- it is quite
6  possible it may have been blood, but I can't say that --
7  my testing doesn't say that blood is indicated.
8       Q    Okay.  And you -- as we discussed, and will
9  continue to discuss, you tested quite a few areas to try
10 to find the blood on the pants, right?
11      A    Yes, that is correct.
12      Q    And here, when we look at this pocket, you
13 were looking at several different areas of the pocket,
14 right?  You looked -- sample one here, and then you had
15 sample two, right?  And so then we talked about the
16 testing of Q1, but then you also tested Q2, which was
17 from the pocket, right?
18      A    Yes, that's correct.
19      Q    And what was that Kastle-Myer -- can you read
20 that next line, what your Kastle-Myer results were, and
21 then go ahead and read the line under that as well,
22 please.
23      A    So Q2, same pocket swab, equals NEG; cutting
24 equals NEG; inside Q1 swab times 2 equals NEG; two
25 cuttings inside seam equal NEG.  So again, Q2 is

Page 47

1  relating to Question Stain Number 2 -- you see the 2 on
2  the document is the same pocket as Number 1.  So I
3  swabbed, which was -- had a negative Kastle-Myer result;
4  had a cutting, again, a negative Kastle-Myer result
5  inside Q1.  So looking at the inside right swabbed two
6  more times, both negative cuttings from the inside seam
7  as well, negative for Kastle-Myer.  So no, I was unable
8  to detect blood in those -- in those stained areas.
9       Q    And these pants were preserved in a paper bag;
10 is that right?
11      A    Yes.  When I obtained them, I believe they
12 were in a paper bag.
13      Q    And is that a proper way to store an item of
14 clothing?
15      A    Yes.  At the time, and currently, dried-items
16 evidence should be packaged in a paper bag, or brown
17 paper, so that they're -- they're able to dry, and they
18 remain dry, and no moisture is trapped on those items of
19 evidence.
20      Q    And --
21      A    So it should stay on the page above this, or
22 in the page -- the first page of my notes -- right -- it
23 should describe the packaging as I received it, so that
24 it was received in a brown paper bag, filled with clear
25 box tape, and then on the brown paper bag it gave me a

Page 48

1  description of what I would find inside.
2       Q    Okay.
3       A    But I don't know otherwise how they were
4  maintained before that, other than -- right -- how I --
5  how I received them in that ground paper bag.
6       Q    And you swabbed both the outside of the
7  pocket, and the inside of the pocket -- right?
8       A    Testing for Kastle-Myer, yes.
9       Q    Okay.  And -- going back here -- and you can
10 see there, there was, like, a visible kind of brown
11 area, and that is where you circled it, and then you
12 took the -- your samples from those two circled areas,
13 right?
14      A    Yes.
15      Q    And were you able to tell in your examination
16 whether any prior testing had been done on this pocket?
17      A    I don't believe I was able to see any areas
18 that were tested, no obvious areas that I recall
19 outlined or cut out of that.
20      Q    Okay.  And so within, you did Q3.  It was --
21 it says it was an apparent burn hole on the front leg of
22 the pants, right?
23      A    Yes.
24      Q    And that was negative for Kastle-Myer, right?
25      A    Yes, that is correct.

Page 49

1       Q    And then you did a -- Q4 was a yellowish stain
2  around the edge of the tag.  So do you see this little
3  picture here where I have my cursor and there's a ruler,
4  is that where you did the Q3?  And do you want me to
5  zoom in?
6       A    I believe that is where I did Q3, yes.
7       Q    Okay -- or I'm sorry about that.
8       A    Okay.
9       Q    Q4, I meant to say.
10      A    My apologies, yes.  Q4, the yellowish stain
11 around the edge of the tag, and then Q5 was the
12 yellow-brown stain above.
13      Q    Okay.
14      A    Above the tag.
15      Q    And both of those were negative on the
16 Kastle-Myer test, right?
17      A    Yes, that is correct.
18      Q    Okay.  And then -- and this is from the
19 inside-back of the pants, right?
20      A    I believe so, yes.
21      Q    Okay.  And then here you continue to do
22 testing on the pants.  And you did testing on Q5, the
23 stain inside the back of pants below the tag, and that
24 was also negative for Kastle-Myer, right?
25      A    Correct.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 50

1    Q    And then Q7 was the outside of the apparent
2  burn hole that was Q3, and then that you cut and you
3  swabbed for Q7?
4    A    Yes.  And that was also --
5    Q    And then what was the result there?
6    A    That was also negative for Kastle-Myer.
7    Q    Okay.  And then Q8 was -- it said, "Visible
8  dirt on the left front leg."  And what was the result of
9  the swab from that?
10   A    Negative as well for Kastle-Myer.
11   Q    Okay.  And then Q9, do you know what that is,
12 Q9?
13   A    I don't recall exactly where that was from.
14   Q    Okay.  But that was also negative?
15   A    Yes, that's correct.
16   Q    And then Q10 was the zipper -- a stain from
17 the zipper, right?
18   A    Correct.  The zipper/fly area, yes.
19   Q    Okay.  And then here it's -- you described
20 that you preserved these areas for DNA analysis, and so
21 you took -- for the DNA you took pretty sizable stains,
22 right?  You took -- for what ended up being 59B, you
23 took a stain, and that was the area from the burn hole.
24 You took one cutting that was .4 of a centimeter in
25 diameter, right?

Page 51

1    A    So the -- the burn hole itself was
2  approximately 0.4 centimeters in diameter, so I took a
3  cutting from around that apparent burn hole.  And so the
4  area cut out was approximately half-a-centimeter by
5  0.8 centimeters, so that hole was in the center of that
6  fabric.  And then that was placed in one tube for DNA
7  testing.
8    Q    Oh, I see.  So you took the burn hole out?
9    A    Correct.  They cut around the -- the apparent
10 burn hole.
11   Q    Okay.  And then for 59C, which was the sample
12 from the pocket, you took a few different cuttings,
13 right?
14   A    Yes, that is correct.
15   Q    And that ended up being pretty big -- right --
16 like, one was 0.5 centimeters times about 0.8
17 centimeters?
18   A    Yes, that's correct.
19   Q    And then you took another sample from the
20 washing tag, right?
21   A    Correct.  From -- right.  From stained area 5
22 -- Q5, yes.  That was another -- another relatively
23 large cutting.
24   Q    And that became 59D, right?
25   A    Yes, that is correct.

Page 52

1    Q    And -- right.  You say that was relatively
2  large.  It was about 1.4 centimeters times 0.9
3  centimeters, right?
4    A    Yes, that's approximate size.
5    Q    So that's a pretty big chunk of material,
6  right?
7    A    Yes.  That is about the -- depending on the
8  type of fabric, about the maximum size I would want to
9  put in one tube for processing.  Obviously, still the --
10 you know, the paint -- the pants still exist, and -- and
11 some of those items, there's still stained area present
12 on the pants that could be gone back to.  But yes,
13 that's about in the range of how much material toward a
14 maximum size that I would want to be putting in a tube.
15   Q    Okay.  And then here we have what became 59E.
16 So here you did Q11, and that was a swabbing from area
17 right around the pocket here -- right around -- and that
18 -- what was the result for Kastle-Myer testing there?
19   A    Q11 as well as swabbing from that area, was
20 negative.
21   Q    And you said here -- well, can you read --
22 above the Q11, can you read what you wrote there?
23   A    So "Visual dirty areas surrounding, but no
24 blood-like stains observed."  Q11 was a swabbing from
25 the area around the right pocket, outside.  Kastle-Myer

Page 53

1  testing was negative.  And so there is just -- right.
2  There was a small -- what appeared to be a small
3  cutting.
4    Q    Okay.
5    A    And so --
6    Q    And so --
7    A    Go ahead.
8    Q    This -- when you were talking about the small
9  cutting, that's that little square right there under the
10 belt loop?
11   A    Yes, that is correct.
12   Q    And so that -- you observed that that was a
13 prior cutting from the pants, right?
14   A    That is what I believed it to be, yes.
15   Q    And did you ever find a preserved cutting from
16 the pants?
17   A    No, not to my knowledge.
18   Q    Did you look for that?
19   A    I believe we did, and -- but I asked -- there
20 were many items that I asked the Peoria Police
21 Department to look for as well as other vendors to look
22 for.  But to my knowledge, that was never located.
23   Q    Okay.  And some of those other items that they
24 were looking for was also two hairs, right?
25   A    Yes, I believe so, yes.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1:23-cv-01184-CRL-JEH # 318-9 Filed: 04/22/24 Page 17 of 199
The Deposition of ANN YEAGLE, taken on February 06, 2023
54..57

Page 54

1    Q   And one was a hair that was found in victim
2 Connie Cooper's hand, right?
3    A   Correct. There was an apparent hair reported,
4 right. There was an item reported as apparent hair from
5 the hand of Connie Cooper, yes.
6    Q   And similarly, there was an item reported as
7 an apparent hair from the hand of James Robinson, right?
8    A   Yes.
9    Q   And you were looking for those hairs, right?
10    A   Yes, that is correct.
11    Q   And there were -- I'm going to stop sharing
12 for a minute. There were bags that said they were --
13 contained those hairs, right?
14    A   Yes, that is correct.
15    Q   And you opened those bags, right?
16    A   I believe I did. I remember looking at them.
17 I remember not seeing any apparent hairs. There was --
18    Q   And they --
19    A   There was no apparent hair present for me that
20 -- I was unable to find it.
21    Q   And I think that you -- and I can show you the
22 notes, but it -- do you remember opening them also with
23 William Frank to see if he could help you find the
24 hairs?
25    A   I remember showing William, yes, the packages

Page 55

1 to look at them -- trying our best to determine what had
2 gone wrong with them, what might have happened with the
3 hairs, where they might be, if they're there, yes.
4    Q   And you guys couldn't find any hairs in those
5 bags, right?
6    A   Correct.
7    Q   And like you said, you asked the Peoria Police
8 Department if they could find those hairs?
9    A   Yes, that is correct.
10    Q   And they weren't able to find them either,
11 right?
12    A   Correct.
13    Q   Okay. So we can go back to that, but we could
14 also -- we've been going for more than an hour, so I
15 don't know if you want to take a quick five-minute
16 break?
17    A   I -- I could use that. That would be good.
18    MS. HAGY: Okay. So let's come back at 11:30.
19    THE WITNESS: Thank you.
20    COURT REPORTER: Okay. We're going off the
21 record. The time is 11:24 a.m.
22    (OFF THE RECORD)
23    COURT REPORTER: We're back on the record, and
24 the time is 11:34 a.m.
25    MS. HAGY: Okay. So Ms. Yeagle, I'm going to

Page 56

1 go back to -- and Emilia, I'm sorry, I'm going to
2 need your help on the -- what was the extract from
3 the pants called? Was that Exhibit 6?
4    COURT REPORTER: The work -- the blue pants was
5 Exhibit 5.
6 BY MS. HAGY:
7    Q   Oh, Exhibit 5? Okay. Thank you. I'm going
8 to put that back. Okay. So here we have the cutting,
9 and then did you test from around that area for -- with
10 the Kastle-Myer test?
11    A   So there was a --
12    MR. HOGUE: Objection to the form. I don't
13 know what you mean by "that area."
14    Q   Oh, I'm sorry. The previously cut area.
15    A   So I cut out -- so I swabbed the area -- so in
16 that Q11 swabbing -- right? -- swabbing around that
17 area. And so that would be around the area cut out as
18 well as in that area, to get that negative Kastle-Myer
19 result. But then what I cut out was, I cut out the
20 inside layer from under, so approximately
21 half-a-centimeter square. So that 0.4 by 0.5 was cut
22 out and placed into a tube for DNA analysis. So it's
23 that -- not the area around that square cutting, but
24 that next layer in.
25    Q   Oh, I see. So like, where we see there's

Page 57

1 still a blue material under it?
2    A   Correct.
3    Q   That's the part that you cut out?
4    A   Yes.
5    Q   And did you cut bigger than that area too, or
6 just that underlayer?
7    A   I believe I just cut the underlayer.
8    Q   Okay. And is it correct to say that you did
9 quite a lot of work to try to understand where
10 Mr. Gonsowski had done his previous testing, right?
11    A   Yes. I didn't have any information as to what
12 exactly was tested in the prior -- prior analysis --
13 just that -- just the reporting, so I was looking very
14 closely at the evidence in an attempt to determine what
15 was possibly tested before me. And I didn't have
16 knowledge as to what area was tested, or what area might
17 have been used as a control, so I didn't have notes to
18 look at for that. So I was looking at -- at the item,
19 and the items in totality, to determine what I could
20 view as the best areas to test.
21    Q   And you also -- in trying to determine what he
22 had tested, you even looked at his testimony from both
23 the criminal trials, right?
24    A   I looked at parts of it, yes.
25    Q   And from -- as we discussed, from the area

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1:23-cv-01184-CRL-JEH #318-9 Filed: 04/22/24 Page 18 of 199
The Deposition of ANN YEAGLE, taken on February 06, 2019
58..61

Page 58

that you swabbed around 59E, you didn't detect any blood
with the Kastle-Myer tests, right?

A    That is correct.

Q    Okay.  And -- okay.  So now I'm going to move
on to your next report, which was issued in March 20,
2014.  And that was more of a DNA result report, right?

A    Yes, that is correct.

Q    Okay.  You know what?  I'm also -- I'm going
to go back for a minute to what was Exhibit 3.  And so
this was -- the DNA quantifications here, with the 59,
these were the DNA quantifications from the pants,
correct?

A    Yes.  That is a summary of information, yes,
from the pants.

Q    And so -- oops.  For 59A1, which was the
waistband, you did have some -- you detected some DNA
from the waistband, correct?

A    Yes, that is correct.

Q    And then for the pocket, the right pocket
where you took quite big cuttings, you didn't detect any
autosomal DNA, right?

A    Are you looking at 59B or 59D, as in --

Q    Sorry, B as in boy.

A    Okay.  B as in boy, I believe -- was that the
apparent burn hole?

Page 59

Q    Oh, yes.  I apologize.  You're right.  Okay.
So that, you didn't detect any DNA, right?

A    Correct.  No human DNA detected.

Q    And then D was by the stain, right?

A    Correct.  By the inside back tag, I believe.

Q    And there you also didn't have any DNA, right?

A    Correct.  No human DNA detected.

Q    And for 59E, that was the portion by the belt
loop where the previous testing had been done, right?

A    Yes.

Q    And no DNA was detected by that, right?

A    Correct, yes.

Q    And then the 59C was the pocket, and you --
this is where you did quite a bit of testing, right --
quite a bit of sampling?

A    Yes.  I did additional extractions, with
concern that the blue dye from the pants might be
affecting the DNA extractions themselves.  So yes, I did
multiple extractions, and I was unable to detect human
DNA from that as well.

Q    Okay.  And here, going back up, we have the
light switch, 59A, and you did detect DNA on the light
switch, right?

A    Yes, that is correct.  The light switch did
have human DNA detected.

Page 60

Q    And why did you determine that some of that
should go to MiniFiler testing?

A    There was a low quantity of DNA present, and
MiniFiler worked better with low quantities of input DNA
than IdentiFiler Plus, which was the kit I was using at
the time.  It -- it -- MiniFiler looks at less spots on
the DNA, so it is -- was manufactured to look at lower
quantity of DNA.

Q    Okay.  Okay.  All right.  So I'd like to mark
this as Exhibit 6, and this is SDTBOY000541, and
Ms. Yeagle, is this your signature here -- or your --
sorry, your initials?

     (EXHIBIT 6 MARKED FOR IDENTIFICATION)

A    Yes.  It appears to be my initials, yes.

Q    And this is some of the additional -- well,
this is the additional extraction that you did from the
pants pocket, right?

A    I believe so, yes.

Q    And so this shows -- I think it -- what it
shows is what you had first extracted -- right -- where
it's cut out?

A    I believe so.

Q    And then you did an additional cutting, right?

A    Yes.  So there were -- right.  There was the
-- the cutting from the edge by the corner, and then --

Page 61

went ahead, right?  And so -- right.  The cuttings --
then the additional cuttings were taken and combined for
that extraction Number 2.

Q    Oh, I see.  So the first picture shows the
cutting before, and then the second picture shows the
additional cutting that you did?

A    Correct.  So this is actually -- sorry, as I
use the pointer -- the area cut out from that length,
along with the 1AY with the marker next to it.  I
believe that is the second portion.

     MS. HAGY:  Okay.  Great.  And Emilia, when
you're recording it, is it recording at this point
Ms. Yeagle and the exhibit, or does it just record
Ms. Yeagle?

     COURT REPORTER:  It's both.

BY MS. HAGY:

Q    Okay.  And so I will put on the record that I
am the one controlling the mouse, so that it doesn't get
put on Ms. Yeagle later.  But Ms. Yeagle, so where I'm
circling right now, that is what you first extracted,
and then this long portion, that is what you extracted
second, right?

A    I believe so, yes.

Q    Okay.  And so you were taking quite a bit of
material to try to find the DNA from this pocket, right?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1:23-cv-01184-CRL-JEH # 318-9   Filed: 04/22/24   Page 19 of 199
The Deposition of ANN YEAGLE, taken on February 06, 2019
62..65

Page 62

1    A    Yes, that is correct.
2    Q    Okay. Let's take that down, and then -- okay.
3  So this is -- I'm going to mark this as Exhibit 7. And
4  Counsel, this is Peoria Savory 1918 to 1921. So let's
5  go back down here. So is -- this is your report, right?
6         (EXHIBIT 7 MARKED FOR IDENTIFICATION)
7    A    Yes, it appears to be.
8    Q    And this was on March 20, 2014, right?
9    A    Yes, that is correct.
10   Q    Okay. And here -- we'll go down -- you made
11 an exhibit, an attachment 1, and that provides the
12 findings at each of the loci that you tested from each
13 item, right?
14   A    Yes. That is the alleles, or the DNA types,
15 detected at each one of those locations above my
16 detection threshold, and following the Illinois State
17 Police guidelines.
18   Q    Okay. And so here for Mr. Savory, you can see
19 there is a pretty robust profile, right?
20   A    Yes. Complete DNA profile information at all
21 15 locations, plus amelogenin.
22   Q    And actually, for the decedents where
23 you had the root ends, you also had fairly complete
24 profiles, right? Some loci were missing, but you had
25 quite a few loci where you had DNA results, right?

Page 63

1    A    Yes. Quite a bit of information was detected,
2  and DNA profiles were developed for those three
3  individuals.
4    Q    And can partial profiles be compared to an
5  unknown sample?
6    A    Yes, they can.
7    Q    And if you get a result from an unknown sample
8  that is a partial profile, can that be compared?
9    A    As long as it's interpretable results, yes,
10 those can be compared. At the same location on the DNA,
11 those can be compared.
12   Q    Okay. And what do you -- how many -- sorry,
13 strike that. When you make an exclusion from a sample,
14 with what degree of certainty is that exclusion?
15   A    An exclusion is that an individual -- so the
16 DNA profile obtained from the standard -- is not present
17 in the unknown DNA profile. So based on the information
18 I have, that is exactly that, an exclusion, that that
19 individual could not have contributed the DNA types
20 present in the unknown DNA profile.
21   Q    Okay. And once an exclusion is determined,
22 then you know that that person did not contribute the
23 DNA sample, right?
24   A    Correct. They're excluded as being able to
25 contribute that DNA type, yes.

Page 64

1    Q    Okay. And here where you took the sample from
2  15B, we can see that in the first column, but ultimately
3  you weren't able to compare that to the known standards,
4  right?
5    A    Correct. I was unable to make that comparison
6  based on the numbers of contributors that were present
7  in that mixed sample. There was more -- more than one,
8  potentially more than two present in that sample.
9    Q    Okay. And then, so you had Mr. Frank do more
10 testing on the light switch so that it could be done
11 with a more sensitive testing that would allow you to
12 determine the number of contributors, right?
13   A    Correct. In that the MiniFiler testing is and
14 was at the time better suited for degraded samples,
15 samples of low DNA quantity and would be better suited
16 for the ability to interpret that mixture and make a
17 comparison, yes.
18   Q    Okay. And so in that report that we labeled
19 Exhibit 7, is it fair to say you were laying out what
20 you had found in the standards and then that you weren't
21 able to make a conclusion on the 15B light switch plate?
22   A    Yes, that is correct.
23   Q    Okay. And so the next time that you did new
24 testing in this case was in 2018; is that fair?
25   A    Yes.

Page 65

1    Q    Okay. And so the next report was another
2  biology report, right?
3    A    Yes, that is correct.
4    Q    And so this is what we talked about before
5  with the amended report, right?
6    A    Yes, that is correct.
7    Q    So there was a, originally there was a report,
8  a biology report issued on October 1, 2018, right?
9    A    I believe so, yes.
10   Q    And then the amended report was October 29,
11 2018?
12   A    That sounds correct.
13   Q    Okay. So I'm going to show you this report
14 and we can look at how you explained the differences,
15 but essentially they were the same, right? Except for
16 one correction?
17   A    Yes. The -- the findings, the results and
18 findings are the same. There was basically a typo.
19   Q    Okay. And so this we'll label Exhibit 8, and
20 then this is your October 29, 2018 report, right?
21         (EXHIBIT 8 MARKED FOR IDENTIFICATION)
22   A    Yes, that is my amended report that superseded
23 the prior report.
24   Q    Okay. And so down here we wave --
25         MR. TIMBO: Can I have the Bates number on that



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1:23-cv-01184-CRL-JEH # 318-9   Filed: 04/22/24   Page 20 of 199
The Deposition of ANN YEAGLE, taken on February 06, 2019
66..69

Page 66

1    one?
2         MS. HAGY:  Sorry?
3         MR. TIMBO:  Can I have the Bates numbers on
4    that one?
5         MS. HAGY:  Yes.  So it's S-T-D-I-S-P, sorry,
6    549.
7         MR. TIMBO:  What's the first page of that
8    document?
9         MS. HAGY:  Yes, sorry.  547.
10        MR. TIMBO:  Got it.  Okay.
11   BY MS. HAGY:
12        Q    Okay.  And so Ms. Yeagle, this is your
13   signature here, right?
14        A    Yes, it is.
15        Q    And so this is your report, right?
16        A    Yes, it is.
17        Q    Okay.  And then if we go up, again, you were
18   testing a number of items from the victims and from the
19   crime scene, right?
20        A    Yes, that is the -- that is the information I
21   had, yes.
22        Q    Okay.  And so item three was the underwear of
23   victim, Connie Cooper, right?
24        A    Yes, that is correct.
25        Q    Okay.  And here, what did you find on the

Page 67

1    underwear?
2         A    I identified semen on the underwear and
3    observed blood-like stains on the underwear.
4         Q    Okay.  And what does it mean when you say that
5    semen was identified?
6         A    In regards to this item of evidence, I was
7    able to identify one spermatozoa, so one sperm cell on
8    one of the cuttings from the underwear.  And as
9    spermatozoa are a component of seminal fluid or semen, I
10   reported that semen was identified in one area of the
11   underwear and I preserved that area -- a cutting from
12   that area for DNA testing.
13        Q    Okay.  And to your knowledge, was DNA testing
14   ever done on that area that you preserved?
15        A    DNA testing?  No, not that I know of.
16        Q    Okay.  And that was from, like, the middle
17   part, the crotch part of the underwear, right?
18        A    Yes.  I believe it was the front just above
19   what we call the, or just -- in the front of the crotch
20   area of the underwear, yes.
21        Q    Okay.  So we'll -- actually, I'm going to show
22   you the picture from your worksheets here.  So I'm going
23   to come back to this.  I need to take this down for a
24   minute.  And then --
25        MS. HAGY:  -- sorry, Emilia, what number am I

Page 68

1    on now if I show you something new?
2         COURT REPORTER:  This will be 9.
3         MS. HAGY:  Okay, thank you.  So this is
4    Exhibit 9.  And Mr. Timbo, this is S-P-D-I-S-P 562,
5    561.
6    BY MS. HAGY:
7         Q    And then, Ms. Yeagle, here this is your
8    picture and label, right?
9         (EXHIBIT 9 MARKED FOR IDENTIFICATION)
10        A    Yes, that is correct.
11        Q    And we have here on this tag your initials,
12   right?
13        A    Yes, that is correct.
14        Q    And then on the bottom of this is also your
15   initials, right?
16        A    Yes, that is correct.
17        Q    And so you showed here how you found the
18   underwear, right?  In a brown paper bag?
19        A    Yes, that is correct.
20        Q    And then here, this is both sides of the bag,
21   right?
22        A    That is, I believe the inner brown paper bag.
23   Were there two kind of --
24        Q    Oh, I see.
25        A    Yes.  So there was an outer brown paper bag

Page 69

1    that was packaged and sealed, and then inside this brown
2    paper bag was present with more of that crumbling
3    evidence tape, and the underwear was then inside of
4    that.
5         Q    Okay.  And so then this down here where it
6    says, "Exhibit 3 as submitted," that's kind of just what
7    you pulled out, right?
8         A    Yes, that's correct.
9         Q    And then here in the bigger picture, you laid
10   it out so that it's easier to see it?
11        A    Yes, that's correct.
12        Q    And then here where you have a little pink
13   square, it says, "Cut out as Exhibit 3A," right?
14        A    Yes, that is correct.
15        Q    And so if you look here, it says that you cut
16   that out and labeled it as Exhibit 3A.  And if you go up
17   here where it says, "Area seven," and then this is where
18   it says, "Positive one sperm," right?
19        A    Yes, that's correct.
20        Q    And the sperm stands for spermatozoa?
21        A    Correct, that I identified one spermatozoa.
22        Q    Okay.  And that is a little hard to see, but
23   where you have the -- let me zoom in here.  The -- oops.
24   Where you have the pink square, is that -- that's the
25   seven next to it?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1:23-cv-01184-CRL-JEH # 318-9 Filed: 04/22/24 Page 21 of 199
The Deposition of ANN TEAGLE, taken on February 06, 2019
70..73

Page 70

1    A    Yes, that's correct.
2    Q    So that's where you got -- where you found the
3  spermatozoa, right?
4    A    Yes, that is correct.
5    Q    Okay.  And you can't always put material on
6  the slide like that because if you do, and there's not a
7  lot of DNA, it could cause you to lose some of the DNA,
8  right?
9    A    Correct.  I mean, in -- in that process it is
10  -- it is used, it is on the slide.  There are -- there
11  are processes that can be used to remove that and
12  extract it later, but it has been stained, it has been
13  heat fixed, so it is there.  So right, it's -- it's --
14  it is a type of consumptive testing in that, right, that
15  one sperm cell is no longer on the underwear.  That
16  cutting and that material is now on that slide,
17  microscope slide.
18    Q    Okay.  So if you don't have a lot of material,
19  you can't necessarily do something like that, right?
20    A    Correct.
21    Q    But here you had quite a few places that you
22  could sample from for DNA, so you felt comfortable doing
23  forensic examination on this item, right?
24    A    Yes.  And it was a -- in the -- a relatively
25  large item of evidence and that it's a whole pair of

Page 71

1  underwear versus one swab or something that had been
2  prior processed.  So a small cutting like an -- you
3  know, an inch of fabric or something.  In -- in this
4  instance, right, I'm looking at the totality of the
5  underwear and looking to determine what might be of
6  probative informative value from this underwear.  So in
7  this case, right, I looked at them visually, I looked at
8  them using an alternate light source, I utilized
9  different testing techniques to try to aid in where I
10  could do those -- look, do that microscopic sperm
11  search.  And the one area I detected a sperm cell was
12  from this area marked seven.
13    Q    Okay.  And you didn't search the entire
14  underwear for sperm, just these small areas that you cut
15  out, right?
16    A    Yes, that is correct.
17    Q    And could you tell if any prior testing had
18  been done on the underwear?  Were you able to tell that?
19    A    There were prior tags on the underwear, so
20  there was a people exhibit label, as you can see in this
21  picture.  I believe there was evidence tape that was
22  attached to the underwear in the other picture kind of
23  showing --
24    Q    Oh, here.
25    A    Other markings.  So that, right, led me to

Page 72

1  believe, right, there had been prior testing.  In area
2  seven, there was an apparent cut there.  I don't know if
3  that was prior testing or if it was just a defect in the
4  underwear, but that is what I was able to do.  But I
5  didn't have, right, testing information and notes for
6  the prior processing of the underwear.
7    Q    Okay.  And here, could you tell -- but what --
8  did you say there was prior markings on the underwear?
9    A    I just mean the tag.
10    Q    Oh.
11    A    Attaching.
12    Q    Okay.  So this was the, when we're looking at
13  this picture of the back of the underwear, the -- all of
14  these markings and also on the front, these are all your
15  markings where you have the dots and the -- these are
16  all markings that you made?
17    A    I believe so, yes.
18    Q    Okay.  And up here in this bigger picture, can
19  you read what that says?  You might not be able to.
20  Where --
21    A    It does look like my note possibly for
22  previous, P-R-E-V, which would've been me noting most
23  likely if there was -- if that was there before me.
24    Q    Okay.  So that one might have been there
25  before you as well?

Page 73

1    A    Yes.
2    Q    And then here in the seven, it's kind of hard
3  to see, but there's a little marker there too, right?
4  Under the pink square?
5    A    There is, yes.
6
7    Q    Do you know what that says?
8    A    I don't remember.
9    Q    Okay, no worries.  Okay.  Let me take that
10  down.  And then go back to your report.  I'm sorry,
11  to your October 29th report.  Okay.  And so Exhibit 7
12  was James Robinson's underwear, right?
13    A    Yes, that is correct.
14    Q    Okay.  And here you wrote that there were
15  blood-like stains observed there, right?
16    A    Yes, that is correct.
17    Q    Okay.  And go to -- and when you say that
18  blood was indicated in one of the stain areas, were you
19  doing that Kastle-Myer testing again?
20    A    Yes, I was.
21    Q    And so you did the Kastle-Myer testing on 7A
22  and then you cut out different areas 7B and 7C to
23  preserve for DNA testing, right?
24    A    Yes.  I preserved 7A, 7B and C -- 7C for DNA
25  testing.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 74

1    Q    Oh, all three of them?
2    A    Yes.
3    Q    Okay.  And when you do the blood testing and
4  then you do the DNA testing, you don't necessarily know
5  where the -- that the DNA is, like, what item,
6  biological item or fluid that the DNA is coming from,
7  right?
8    A    Correct.
9    Q    Okay.  So Counsel, this is S-D-T-I-S-P, 567 to
10 568.  And Ms. Yeagle, can you tell me what this document
11 seems to be?
12   A    It appears to be --
13        MR. TIMBO:  What exhibit are we on?
14        MS. HAGY:  Oh, 10, please.
15        MR. TIMBO:  Thank you.
16        (EXHIBIT 10 MARKED FOR IDENTIFICATION)
17   A    This appears to be a copy of my work notes for
18 item seven, the items from James Robinson.
19 BY MS. HAGY:
20   Q    Okay.  And here we have your initials down in
21 the bottom, right?
22   A    Yes, that is correct.
23   Q    Okay.  And then here we have what we just
24 discussed.  So you took -- we have the 7A here, right?
25 And it looks to be like a kind of a big cutout from the

Page 75

1  front of the underwear -- or no, the back of the
2  underwear.  Sorry.
3    A    Can I see a zoom out of this note, please?
4  Okay, I just wanted to double-check.  Correct.  Stained
5  area that's delineated is the two.  I -- I cut out a
6  portion for DNA testing and that became correct items
7  Exhibit 7A from that A portion of Q stain number two.
8    Q    Okay.  And here where you did the Kastle-Myer,
9  you had -- in the sample one you had negative for the
10 Kastle-Myer.  And then in two, which is this long stain
11 from kind of the middle of the back, you had one area A
12 was positive and then B and C were negative, right?
13   A    Yes, that is correct.
14   Q    Okay.  And then when we go up to this, what
15 was this little square here up by the waistband?  Do you
16 need me to zoom out?
17   A    That would be helpful.  I -- I believe that
18 was already cut out when I opened the item, so it had
19 already been previously removed.
20   Q    Okay.  And was there anything that could
21 indicate that to you or was there any writing by it or
22 anything?
23   A    There was writing on the waistband and then
24 there's an evidence tag, evidence tape, I believe, that
25 was stapled, I believe stapled or adhered to the

Page 76

1  underwear right by that.
2    Q    Okay.  And so what does it say on the
3  waistband there?
4    A    Could you zoom in a little for me, please?
5    Q    Yeah, yeah.
6    A    It's still, and even at the time it was
7  difficult for me to read.  So it appears to be January,
8  1-18-77, I believe.  And the rest of it -- it looks like
9  a W, but I was thinking it's upside down and I couldn't
10 tell if it was an M, so it's just a little difficult for
11 me to read.  There are also write -- there is also
12 writing on the -- that evidence tag as well, but it's
13 really light and at this time it's hard for me to read.
14   Q    Okay.  But by the cutout there's not really
15 any marker or anything right by the cutout the way that
16 there are with your cutouts, right?
17   A    Correct.  No, there's nothing.  And then I
18 remember there was nothing to delineate a -- like a -- a
19 Q stain or an A, B, or a C.  Nothing of that sort. Just
20 a rectangular cut, rectangle cut out of the underwear.
21   Q    Okay.  And then I think we can keep going for
22 a little bit, but I just wanted to see if you guys
23 wanted a lunch break at some point?  I probably have
24 like another hour, hour-and-a-half.
25   A    All right.  I am okay to -- to go through for

Page 77

1  that.  I may need a break if then there's any additional
2  questions after that.
3    Q    Okay.  Okay.  So Ms. Yeagle, this report is
4  October 3, 2018, that's right?
5    A    Yes, that's correct.
6    Q    Okay.  And actually, I'm just going to go back
7  and I'm going to have this marked as Exhibit --
8        COURT REPORTER:  11.
9        (EXHIBIT 11 MARKED FOR IDENTIFICATION)
10       MS. HAGY:  11.  Thank you.
11 BY MS. HAGY:
12   Q    But I'm going to go back to Exhibit 10 for
13 just a minute because I want to go to the part we
14 discuss at the bottom.  So here where it says, "This
15 report has been amended to indicate that Exhibits 10A
16 through 10F were preserved from Exhibit 10, not Exhibits
17 10A through 1F as previously listed on the October 1,
18 2018 biology report;" is that right?
19   A    Yes, that is correct.
20   Q    So the biology report was -- basically, it was
21 completed on October 1st, right?
22   A    Yes, correct.
23   Q    Before the DNA report, right?
24   A    Yes, that's correct.
25   Q    But then you just had to fix the one that said



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 78

1  1F instead of 10F, right?

2       A    Yes, that is correct.

3       Q    Okay, so I just want to clarify that because
4  then we get Exhibit 11 and that is a DNA report related
5  to the October 29th report, right?

6       A    Yes, that is correct.

7       Q    Okay.  So here I'm going to go down to
8  Exhibit 7.  Okay.  And so here, actually I'm going to go
9  back up for a minute.  We're just going to kind of lay
10 it out because here, where you have the exhibits and the
11 description, this is where you explain what each item
12 was, correct?

13      A    Correct.  This is from the DNA report showing
14 what the items were coming from the biology screening,
15 yes.

16      Q    Yes.  So 7A is the blood indicated stain from
17 the lower back panel, inside panel of the underwear from
18 James Robinson, right?

19      A    Yes, that is correct.

20      Q    Okay.  And then 7B was the portion of the
21 underwear around that previous, the apparent previous
22 cut that we had looked at, right?

23      A    Yes, that is correct.

24      Q    And then 7C was blood-like streaks from the
25 inside back of James Robinson's underwear, right?

Page 79

1       A    That is correct.

2       Q    Okay.  So when then we go down.  And --

3       MS. HAGY:  -- you know, John, I'm sorry, this
4  is Peoria Savory 12380.

5       MR. TIMBO:  Sure, I have that one.

6  BY MS. HAGY:

7       Q    Okay.  And then it goes down to 12388.  And
8  then Ms. Yeagle, is this your signature here?

9       A    Yes, it is.

10      Q    And so this was your report?

11      A    Yes, it was.

12      Q    And again, just like all of the testing that
13 you did in this case, this was done pursuant to ISP
14 standard operating procedures and DNA interpretation
15 guidelines, right?

16      A    Yes, that is correct.

17      Q    And ISP also had standard operating procedures
18 for forensic testing, right?

19      A    Yes, that is correct.

20      Q    And those were all followed in all of your
21 work, right?

22      A    Yes, that is correct.

23      Q    And do you have interpretation guidelines for
24 the biology and forensic testing?

25      A    The biology testing, there are protocols,

Page 80

1  procedures, and guidelines for how to interpret each one
2  of the tests, as in what indicates a positive or a
3  negative test results.  So yes, those are delineated
4  within the protocols.

5       Q    Okay.  Okay.  Okay.  So here we are back at
6  Exhibit -- the results for 7A, right?

7       A    Yes, that is correct.

8       Q    Okay.  And here you found one major DNA
9  profile, right?

10      A    Correct.  One major male DNA profile was
11 identified at 13 of the locations tested from which
12 James Robinson could not be excluded.

13      Q    Okay.  And here, sometimes you have, like, a
14 probability for a finding like that, right?

15      A    Yeah.  Sometimes I -- I will associate a
16 statistical frequency with how often you might expect a
17 profile to occur in the general population on probative
18 profiles.  So in this case, the one major male profile
19 was linked back to James Robinson, this was his
20 underwear.  So I did not provide any statistical
21 frequency in regards to that association because he
22 would be -- his DNA would be expected on his own item of
23 clothing.

24      Q    Okay, that makes sense.  And then -- so then
25 you found a minor profile, right, at nine of the 24

Page 81

1  loci, right?

2       A    Yes, that is correct.

3       Q    And at this time when you did the testing in
4  2018, you were working with testing that did 23 loci and
5  the --

6       A    Amelogenin.

7       Q    Amelogenin, which is telling you that gender,
8  right?

9       A    Yes.

10      Q    If it's --

11      A    That is correct.

12      Q    And previously when you did the testing in
13 2014, you were using the testing that gave you 15 loci
14 because that was what was used at that time?

15      A    Correct.  IdentiFiler Plus was used at that
16 time and that was 15 locations plus amelogenin.  So 16
17 total locations on the DNA.

18      Q    Okay.  And here, where you have the minor
19 profile at nine of the loci, that gives you enough to
20 run the profile through CODIS, right?

21      A    It potentially could, depending on how
22 complete it is and how much information there is.  So
23 it's -- it's -- it's frequency by which it is expected
24 to occur.  So they just have guidelines for CODIS,
25 right, as to how discerning a profile must be before

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



1:23-cv-01184-CRL-JEH #318-9  Filed: 04/22/24  Page 24 of 199
The Deposition of ANN TEAGUE, taken on February 04, 2019
82..85

Page 82

1  it's entered.  And then it needs to be, they just have
2  set rules for searching partial profiles in the CODIS
3  database.
4     Q    Okay.  And -- but partial profiles, as we
5  discussed, an exclusion can be made from a partial
6  profile, right?
7     A    That is correct.
8     Q    And even an inclusion can be made from a
9  partial profile, right?
10    A    Yes, that is correct.
11    Q    And as long as you're following the standard
12  operating procedures and the interpretation guidelines,
13  you can also interpret results from a mixed sample,
14  right?
15    A    Yes, that is correct.  Following the
16  guideline --
17    Q    And here -- sorry, go ahead.
18    A    Sorry.  I was going to say yes, following the
19  guidelines that we had set up at the time in regards to
20  the number of contributors and levels of detection.
21  Yes.
22    Q    Okay.  And here, you even -- you found a third
23  DNA profile, right?
24    A    Correct.  I had a -- a minor DNA profile was
25  identified at nine of the locations, and a low level

Page 83

1  third DNA profile was also identified at three
2  locations.
3     Q    Okay.  And so Mr. Savory was excluded from all
4  three of the profiles on James Robinson's underwear,
5  correct?
6     A    Yes, that is correct.
7     Q    And so he could not have been the minor
8  profile, the owner of the material at the minor profile,
9  right?
10    A    Correct.
11    Q    And he could not have been the contributor to
12  the DNA at -- that was the low level third profile,
13  right?
14    A    Correct.  He was excluded as having
15  contributed to the mixture of DNA profiles.
16  (Inaudible) --
17    Q    And in excluding -- sorry, go ahead.
18    A    I was just saying, right, he was excluded,
19  right, from all as being one of those three contributors
20  to that mixture, correct.
21    Q    Okay.  And is that -- what's the certainty of
22  that exclusion?
23    A    That is, he's excluded.  He -- the profile
24  type for his standard is not present in those mixture
25  profiles, so he could not have contributed them.

Page 84

1     Q    Okay.  And you don't necessarily know what
2  those -- what the biological fluids were for any of
3  those three profiles, right?  It's just difficult to
4  know exactly what -- where the DNA came from, right?
5     A    Correct.  I cannot say how -- where the DNA
6  came from, just the DNA profiles were there, detected,
7  interpreted, and compared.
8     Q    Okay.  And then in this case, you also
9  excluded Connie Cooper, Noyalee Robinson, and Peter
10  Douglas from all three of those profiles, right?
11    A    Yes, that is correct.
12    Q    Okay.  And actually, here, even though you did
13  have the nine loci, but you determined that the minor
14  DNA profiles were not eligible for the DNA index, right?
15    A    Correct.  At that time, yes.
16    Q    Okay.  And that is -- means CODIS, right?
17    A    Yes, that is correct.  For the combined DNA
18  indexing system.
19    Q    And then later, did you determine that one of
20  them was eligible?
21    A    I believe there was a search of a profile, and
22  I'm trying to -- it may have been court-ordered.  I
23  don't remember the path by which, but we did do a -- I
24  did do a CODIS search.
25    Q    Okay.  So we'll get to that.  Within here,

Page 85

1  with that 7B, which was, I believe, the area up by the
2  waistband, right?
3     A    Yes, that is correct.  7B is the area around
4  the cutout near the waistband.
5     Q    And what did you find there?
6     A    That was -- a human DNA profile was identified
7  at just five locations on the DNA.  It was interpreted
8  as being contributed by at least one person, and so
9  potentially incomplete.  And I was unable to make any
10  comparisons to known standards in regards to that
11  profile.
12    Q    Okay.  And -- but sometimes you can compare
13  incomplete profile, right?  So what -- was it here that
14  you weren't able to determine the number of
15  contributors?
16    A    Yes, that was the issue, and that it was low
17  level.  So there was at least one contributor present
18  and then additional information present below my level
19  of absolute detection to be able to call it a true peak.
20  And at that point, then, I am unable, based on my
21  protocols, to interpret that, because there could be two
22  people present and that could cause problems with how
23  they assorted above my detection threshold versus below.
24  And to keep from possibly making an erroneous inclusion
25  where two people's DNA has come together and just looks



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 86

1    like one above the threshold, right, I am unable to make
2    any comparisons because I can't identify that there were
3    two contributors present or just one.
4        Q    Okay.  Thank you.  And so when we come down
5    here, we have 7C, which was the blood streaks from the
6    inside back of the underwear, right?
7        A    Right.  The streaks from the inside of the
8    back of the underwear.  I don't believe they were
9    Kastle-Myer positive, but they were blood -- possible
10   blood-like in appearance.
11       Q    Okay.  But it didn't -- it tested negative for
12   the Kastle-Myer?
13       A    Yes, that is correct.
14       Q    So again, we don't know exactly what bodily
15   fluid this DNA profile came from, right?
16       A    Yes, that is correct.
17       Q    And so you had a profile at eight of the loci,
18   right?
19       A    Yes, that's correct.
20       Q    And again, there were -- it was a mixture of
21   at least three people, right?
22       A    Yes, that is correct.
23       Q    And for the two major DNA profiles, you were
24   able to compare those, right?
25       A    Yes, I was.

Page 87

1        Q    And the third profile, what it said at the
2    bottom here that it was unsuitable for comparison.  Did
3    you just not have enough DNA for that one?
4        A    Right.  So the -- the minor contributors are
5    potentially incomplete and unsuitable for comparison,
6    right, to known standards.  So that -- that's --
7    exactly, there's just not enough information there about
8    that additional contributor to be able to make a
9    comparison.
10       Q    Okay.  But here, you had two major DNA
11   profiles at four of the 24 loci, and for that, James
12   Robinson and the contributor of the minor DNA profile in
13   Exhibit 7A couldn't be excluded, right?
14       A    Yes, that is correct.
15       Q    And Johnnie Lee Savory, was he included or
16   excluded?
17       A    He was excluded as having contributed to those
18   major DNA profiles.
19       Q    So could he have been the contributor of those
20   two profiles?
21       A    Not those two major profiles, no.
22       Q    And similarly, Connie Cooper, Noyalee
23   Robinson, and William Peter Douglas were all also
24   excluded from those two major profiles, right?
25       A    Yes, that is correct.

Page 88

1        Q    Okay.  And then here -- let me go down to --
2    sorry.  You -- so towards the bottom of your report, you
3    were talking about whether or not you could compare
4    these profiles to the light switch, right, to the light
5    switch profile?
6        A    That's correct.
7        Q    And were you able to do that?
8        MR. TIMBO:  Objection as to form because you're
9    not referring to which specific test from the light
10   switch.  Can you be more specific?
11       MS. HAGY:  Sure.
12   BY MS. HAGY:
13       Q    Were you able to compare the results of the --
14   from 7A specifically to the DNA profile -- the MiniFiler
15   DNA profile that William Frank derived from 15A1, the
16   light switch plate?
17       A    There -- there were comparisons that -- that
18   could be done and there were comparisons that couldn't,
19   so they needed to have the coinciding loci present to be
20   able to compare them.  So it's -- it's a much bigger
21   statement than that.
22       Q    Okay.  So which ones could you make?
23       A    Can I read through this?
24       Q    Yes.
25       A    What's -- what's in there, just so that for me

Page 89

1    it's clearer, and then we can talk about that.
2        Q    Okay.
3        A    That work for you?
4        Q    Yes.
5        A    So -- so right, so there was a mixture of
6    human DNA profiles and from Exhibit 15A1, the edge of
7    the light switch cover, which was processed by DNA
8    research coordinator William Frank, he reported.  An
9    open minor DNA profile was identified at three of the
10   nine locations that he profiled on Exhibit 15A1, and
11   thus, then, at those three location compared to the
12   other -- to the exhibits that I was processing.  So the
13   contributors of the low level -- so there were -- there
14   were multiple profiles, right, that -- that I was
15   looking at, and so they contributed to the low level
16   third DNA profile from Exhibit 7A that we just discussed
17   and the minor DNA profile from Exhibit 12A, but we
18   hadn't discussed that one, are -- cannot be excluded as
19   having potentially contributed to the minor DNA profile
20   on that light switch, okay?  So you've got the third
21   from 7A and the minor DNA profile from 12A cannot be
22   excluded as having potentially contributed to what's on
23   the light switch.  So then, there were, right,
24   additional comparisons done.  So the contributors of the
25   minor DNA profiles identified in Exhibit 7A and 13A, the



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 90

1  major DNA profile in 7C and -- and 9B, and then
2  additional items there couldn't be compared to the minor
3  profile because the loci detected were not the same.  So
4  part could be compared, some could be compared, some
5  could not.  We -- I just had to have the same loci
6  information at the same loci.  So when looking at item
7  -- the DNA profile obtained by research coordinator
8  William Frank in Exhibit 15A1, the contributors of the
9  low level third DNA profile from 7A could not be
10 excluded as having contributed to that minor DNA
11 profile, so I -- I couldn't exclude them.  I could make
12 the comparison but I couldn't exclude them.  The
13 contributor of the minor DNA profile in the mixed
14 fraction of 10H was excluded.  The contributors of the
15 minor DNA profiles -- and then I went on to describe,
16 right, what couldn't be -- just couldn't be compared.
17     Q    Okay.  And so for 7A and 7C, the major unknown
18 profile, you just weren't able to compare those to the
19 light switch profile?
20     A    Correct.
21     Q    Okay.  I'm just going to grab a soda real
22 quick.  Okay.  Sorry.  Okay.  So the fitted sheet was
23 12A, right?  So I go back up to our list.  The fitted
24 sheet was here, 10A, one of the blood-like stains from
25 the flat sheet, right?

Page 91

1     A    Okay.  So your -- the flat sheet?
2     Q    Uh-huh.
3     A    Yes.  10A is from the flat sheet.
4     Q    Okay.  And then 12A, that was from -- and
5  blood-indicated stain from a pillowcase on the floor,
6  right?
7     A    Yes, that's correct.
8     Q    Okay.  And were you ever asked to do any
9  standards for YT Savory?
10    A    I don't remember.
11    Q    Okay.
12    A    I know I processed all of the standards and
13 did comparisons with all of them that I had.
14    Q    Okay.  And he wasn't one of the ones that what
15 was listed on the report or in the chart that we looked
16 at, right?
17    A    Right.  And I -- I believe in regards to the
18 blue pants, that might have been the item that I was
19 wanting a standard from him.  So I don't remember exact
20 conversations, but I believe there were conversations
21 asking about and looking for his standards for
22 comparison sake.
23    Q    Okay.
24    A    But I don't recall processing any.
25    Q    Okay.  Okay.  So if we go down to sample 10A.

Page 92

1     Sorry, here.  Okay.  So there were two profiles on the
2  flat sheet stain that was called 10A, right?
3     A    Correct.  There was a female -- it was a
4  mixture of two people.
5     Q    Okay.
6     A    No major DNA profile was identified.
7     Q    And what did you -- what were your results
8  when you compared that profile to the standards?
9     A    So right, so a mixture of human DNA profiles
10 was identified in item 10A.  At eight locations on the
11 DNA was interpreted as a mixture of two people.  A
12 female major DNA profile was identified from which
13 Connie Cooper could not be excluded, so she was
14 included.  So to that female profile, she was included.
15 Noyalee Robinson, James Robinson, William Peter Douglas,
16 and Johnnie Lee Savory were excluded as having
17 contributed to that major DNA profile.  So the second
18 profile, an additional DNA type was identified at one
19 location on the DNA from which William Peter Douglas and
20 Johnnie Lee Savory could not be excluded.  And I did a
21 statistical frequency on this because, right, we were
22 looking -- I was looking at one location on the DNA.
23 And so the statistical frequency by which that DNA type,
24 that additional DNA type, would be expected in the
25 general population is -- is one out of two unrelated

Page 93

1  individuals.  So -- so the way it reads in the report,
2  the expected frequency of occurrence for this DNA type
3  at that one location was calculated for the African
4  American, Caucasian, and Hispanic population groups and
5  was found to be no more common than approximately one in
6  two unrelated individuals.
7     Q    And so that's a -- the probability for
8  basically every racial group, right?
9     A    Every main racial group and that we -- that
10 was used in setting up our databases in the beginning of
11 DNA analysis.  Yes.
12    Q    And like, sometimes the probabilities are
13 different, right, for the different groups?
14    A    That is correct.  And in reporting that, I
15 report the most common frequency of those populations,
16 so -- so it -- I'm looking at African-American
17 population, the Caucasian population as well as Hispanic
18 population can be divided into southeast and
19 southwestern Hispanic population groups.  And so the
20 most common of all of those is what I'm reporting, which
21 is approximately one in two.
22    Q    And so that's very common, right?  Is that
23 fair to say?
24    A    Yes, very common.  And that is one of the
25 reasons it's included in the report is to show the



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 94

1  weight of that non-exclusion are included.
2      Q    And so would you say that this inclusion
3  should be given a lot of weight?
4      A    It -- it is an inclusion, but it is -- the
5  statistical weight says it's -- it's very common.  And
6  right, one in two unrelated individuals is also going to
7  be included.
8      Q    So you could say almost half the population
9  could be included in this?
10     A    Possibly, yes.  In that statistical frequency,
11 right, it is -- it is one in two, so it is not
12 discerning.
13     Q    It doesn't give you a lot of information about
14 who was likely to be the contributor, right?
15     A    Correct.  It -- just like you said, there's a
16 possibility that every time you come right to another
17 person, the first person you come to could be excluded;
18 the next person potentially wouldn't be, so it's just
19 very common.
20     Q    So it's not particularly helpful for
21 identifying a contributor, right?
22     A    No, there just isn't a lot of information
23 there.
24     Q    And so is it fair to say that apart from this
25 very high probability, very common profile, that

Page 95

1  Mr. Savory was excluded from all other identifiable
2  profiles that you discern?
3      A    Yes, I believe so.
4      Q    Okay.  And you tested quite a few different
5  items from the crime scene, right?  Here we had -- let's
6  go up.  One, two, three, four, five, six, seven, eight,
7  nine different items, right?  And you tested also the
8  light switch and the vaginal swab, and Mr. Savory was
9  not included -- besides for the one common profile, he
10 wasn't included in any of the other profiles that you
11 found, right?
12     A    Correct.  That is what I remember.
13     Q    Okay.  And this included the victim's
14 clothing, right?
15     A    Correct.  It -- it everything I was able to
16 profile --
17     Q    Okay.
18     A    -- from those items of evidence where we had
19 human DNA detected and able to identify DNA profiles,
20 yes.
21     Q    And some of those items were the bedding from
22 the scene, right?  From the scene of the crime?
23     A    Yes, that's correct.
24     Q    And he was -- besides the 50 -- the one out of
25 two profile from the fitted sheet, he was excluded from

Page 96

1  all of the profiles that you developed, right?
2      A    And I believe that was the flat sheet.
3      Q    Oh, yes.
4      A    So I believe it was 10A, which was the flat
5  sheet.  So yes, that is correct.
6      Q    Okay.  And then for the bedspread, which was
7  11A -- we'll go down here.  You had a mixture of DNA
8  profiles, and then you extracted a sperm fraction from
9  Exhibit 11A, right?
10     A    Correct.  I did a differential extraction on
11 the stain, 11A, so a non -- a non -- a non-sperm and a
12 sperm fraction, correct.  As well as that third
13 fraction, the mixed fraction.  So yes, I did the
14 differential extraction process and different
15 information was obtained from each.
16     Q    Okay.  And when you do the sperm fraction
17 here, you found loci at seven of the 24 loci, right?
18     A    Correct.  The mixture was identified in the
19 sperm fraction at seven of those 24 loci.
20     Q    And you interpreted that that could be at
21 least three people?
22     A    Yes, that's correct.
23     Q    And there was a major profile identified at
24 four of the 24 loci, right?
25     A    Yes, that's correct.

Page 97

1      Q    And Mr. William Douglas and the contributor of
2  the major DNA profile on the non-sperm fraction of 9F,
3  which we'll get there, but they were both included in
4  this profile, right?
5      A    Yes, that's correct.
6      Q    And here, the frequency was about 1 in 2,000
7  unrelated individuals?
8      A    Yes, that is correct.
9      Q    So it -- how -- do you consider that to be
10 fairly common?
11     A    It is still common, but it is more discerning
12 than one in two.
13     Q    Okay.
14     A    But it is --
15     Q    And again -- oh, sorry.
16     A    I'm sorry.  It is still, right, 1 in 2,000
17 unrelated individuals.
18     Q    And again, Mr. Savory was excluded from that
19 profile, right?
20     A    Yes, that is correct.
21     Q    Okay.  And then -- and 9F was the stain from
22 the fitted sheet, right?  We can go back.
23     A    I don't believe nine was the fitted sheet.  I
24 think it may have been -- oh, it was.  Okay.
25     Q    That's okay.  I wrote myself a cheat.  It's



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 98

1  hard when you get --
2      A    That's quite a few items, yeah.
3      Q    Yeah.  And you get farther down in the report,
4  I'm always scrolling back up.  Yes, there were a lot,
5  and I think I don't actually know the difference between
6  a fitted and a flat sheet.  So the fitted is one that
7  has the elastic, right?
8      A    Yes, that is correct.
9      Q    And then the flat is just that one without the
10 elastic?
11     A    Yes, that is correct.
12         MS. HAGY:  Okay.  So we've now gone for another
13     hour.  Should we take another, maybe a ten-minute
14     break?  And then I don't have too much left.
15         THE WITNESS:  I am -- I am good with that.
16         MS. HAGY:  Okay.  So we'll come back at 1:00.
17         THE WITNESS:  Thank you.
18         COURT REPORTER:  All righty, the time is
19     12:49 p.m.  We're going off record.
20             (OFF THE RECORD)
21         COURT REPORTER:  We're back on the record.  The
22     time is 1:09 p.m.
23 BY MS. HAGY:
24     Q    Okay.  So now I'm going to show you your last
25 report in this case.  Okay.  And so Ms. Yeagle, this is

Page 99

1  dated November 29, 2018, right?
2      A    Yes, that is correct.
3         MS. HAGY:  And Emilia, are we on -- is this
4     Exhibit 12?
5         COURT REPORTER:  Yes.
6         MS. HAGY:  Okay.
7  BY MS. HAGY:
8      Q    And so this is Peoria Savory 12704 and 12705.
9  So this is where you ran it the minor DNA profile from
10 Exhibit 7A.  You ran it into the Illinois -- what is the
11 Illinois CODIS database, right?
12             (EXHIBIT 12 MARKED FOR IDENTIFICATION)
13     A    Correct.  The Illinois -- we call it SDIS, so
14 the State DNA Indexing System from Illinois.
15     Q    And like you referenced earlier, this was by
16 the order of the judge, right?
17     A    Yes, that was correct.  Judge Gilfillan
18 ordered this to be searched and the result of that
19 search to be reported.
20     Q    Okay.  And here, the profile had been at nine
21 of the loci, right?
22     A    Correct.  The minor profile was identified at
23 nine of the 24 loci, and it was those -- that's what was
24 searched was that nine-locus profile.
25     Q    Okay.  And so you -- in the search, there were

Page 100

1  three people whose profiles were consistent with that
2  profile?
3      A    There were -- the search -- the computer
4  search detected three possible associations, so to three
5  individuals in the state of Illinois DNA indexing system
6  database.
7      Q    Okay.  And did you do anything else with this
8  after you issued this report?
9      A    No, not to my recollection.
10     Q    Okay.  And similarly, here, the third level
11 DNA profile, you didn't do anything to run through
12 CODIS, right?
13     A    No.  Three -- that was identified at only
14 three locations of the 24 and would not be discerning
15 enough to run through even the state database to look
16 for associations.
17     Q    Okay.  And when we talked earlier, with your
18 October 3rd report, you didn't do anything additional
19 with those profiles comparing them to the light switch
20 than what we discussed today, right?
21     A    No, that was, what was in that report was the
22 -- the end of the associations and comparisons that I
23 conducted.
24     Q    Okay.  Okay.  And besides what we discussed
25 today and the reports that we discussed today, was there

Page 101

1  any other testing that you did in this case?
2      A    Not other than what was in the reports we've
3  discussed and the notes associated with those reports,
4  yeah.
5         MS. HAGY:  Okay.  So I am done with my initial
6     questioning.
7             CROSS EXAMINATION
8  BY MR. TIMBO:
9      Q    All right, Ms. Yeagle, good afternoon.
10     A    Hello.
11     Q    Can you hear me okay?
12     A    Yes, I can.
13     Q    Okay.  Let's start with, then, working
14 backwards a little from your November 29, 2018 report.
15 Do you actually have copies of the reports in front of
16 you?
17     A    No, I do not.
18     Q    Okay.  That'll make it a little bit longer.  I
19 was hoping that you had a set in front of you that I can
20 just reference.
21     A    I can access -- I do have copies here that I
22 could access.  I just didn't have them out.  I wasn't
23 sure if that was okay.
24     Q    Sure.  Yeah.  If you can or if your counsel
25 could get those for you when I ask you a couple



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 102

1  questions and -- I think it'll be a lot easier that way.
2      A    Can I have the other folder as well, just to
3  be (Inaudible)?  Thank you.  And which report were you
4  referencing first?
5      Q    Sure.  Let's start then with the
6  November 29, 2018 report.
7      A    Okay.  I do not -- I do not have a copy of
8  that one with me, but I do recall a report.
9      Q    Okay.  All right.  Do you know whether or not
10 there is a DNA profile sheet associated with that
11 particular report?
12     A    There is.  That is the totality of that
13 report, the profile from the nine -- the interpretation
14 that was used to enter those -- those nine loci that is
15 included in -- in the packet of notes that are
16 associated with that report.  So the exact alleles, the
17 exact search specification and the exact allele at each
18 location on the DNA that was searched is in that notes
19 packet.
20     Q    Yeah.  I see.  Okay.  So as of -- as you sit
21 there now, you can't identify exactly -- when you're
22 saying the search detected possible associations, what
23 would that mean, you know, in layman's terms?
24     A    That means that when those nine loci were
25 searched in the database, so the information from that

Page 103

1  minor profile was searched in the computer database,
2  Illinois's computer database, that those three
3  individuals could not be excluded as having contributed
4  the DNA profile.  So they're consistent at those nine
5  locations on the DNA.  So they can't be excluded as
6  having contributed.  So they're basically a computer
7  match.
8      Q    Sure.  Okay.  And then is there any way that
9  you're able to identify the percentage of frequency for
10 those nine loci in the general population as you had in
11 other instances throughout your reports today?
12     A    That statistical frequency can be calculated
13 but is only -- I would only calculate, have calculated
14 that, if I had a standard from one of those three
15 individuals to compare to the unknown profile.  So the
16 nine --
17     Q    And you weren't provided that?
18     A    We were not.  To my knowledge, we were never
19 provided with standards from those three individuals.
20     Q    I understand.
21     A    I'm -- I'm not able --
22     Q    Thank you.
23     A    Okay.
24     Q    All right.  So let me go to the March 20, 2014
25 report.

Page 104

1      A    Yes.
2      Q    If you go to page 2 --
3      A    Yes.
4      Q    And again, under the results, I'm looking at
5  the second full paragraph, which starts, "A mixture of
6  human DNA."  You see that?
7      A    Yes.
8      Q    Is my understanding with respect to Exhibit
9  15B that Johnnie Savory could not be excluded as a
10 possible source for that?
11     MS. HAGY:  Objection.  Form, foundation.
12     A    All right.  So let me ask -- let me ask you a
13 question a different way.  Ms. Yeagle, when you said
14 earlier that Johnnie Savory's unknown standard was
15 attempted to be matched against all of the evidence and
16 all of the exhibits that you tested, correct?
17     A    All of the comparable profiles.  So there were
18 profiles --
19     Q    Yeah, comparable.
20     A    Right.  So interpretable, comparable profiles.
21 So there were partial profiles and incomplete profiles
22 that were unsuitable for comparison.  So those were not
23 compared.
24     Q    Okay.  So I guess that's what I'm just trying
25 to understand, then.  So for Exhibit 15B, which would be

Page 105

1  the center part of the light switch cover, correct?
2      A    That is correct.
3      Q    There was an insufficient amount of DNA to be
4  able to test against any of the known standards?
5      A    Correct.  The mixed DNA profile was
6  potentially incomplete and unsuitable for comparison to
7  known standards.
8      Q    And those known standards would also include
9  Johnnie Savory, correct?
10     MS. HAGY:  Objection.  Form.  Go ahead.
11     MR. TIMBO:  You can answer, ma'am.
12     A    That is correct, that I was not able to
13 compare to any standards, including Mr. Savory's
14 standard.
15     Q    Okay.  Thank you.  Going to your October --
16 well, no, let's -- I did have a couple questions here.
17 Can you tell I love Zoom deps?
18     A    I am -- I had to find a computer that had a
19 video capability, so --
20     Q    Going to your October 3, 2018 report, which I
21 just misplaced -- do you have that there in front of
22 you?
23     A    Just one moment.  I'm looking.  October 3,
24 2018?  Yes.
25     Q    Yes.  Turning to page 7 --



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 106

1    A    Yes, I have page 7.

2    Q    The last paragraph on that page.

3    A    Yes, I see that.

4    Q    Okay. So I just want to understand, what does
5    that paragraph mean? That you yourself found sperm on
6    exhibits not only 3A but 9F and 10G?

7         MS. HAGY: Objection. Form.

8    A    Are you ready? So -- so I just want to make
9    sure I'm looking at the correct portion. So you're
10   referring to the entry in the report DNA was extracted
11   from the sperm and mixed fractions of Exhibits 3A, 9F,
12   10G, and the sperm fractions of Exhibits 9G and 10H, but
13   not profiled?

14   Q    Right. That's that area. (Inaudible) --

15   A    That does not -- does not mean that there was
16   sperm identified on those items. That is just the
17   description for that fraction of the DNA differential
18   extraction process. So in the DNA extraction process
19   and looking at items that could potentially have seminal
20   fluid or sperm cells present, utilize a differential
21   extraction protocol, and those are the names of the
22   fractions. So the F1 are the non-sperm fraction, the F2
23   are the sperm fraction, and then the F3-4, that third
24   fraction, which is considered a mixed fraction. That
25   does not mean that there were sperm cells identified

Page 107

1    there, just that's the name of the fraction of the DNA
2    extraction itself.

3    Q    Okay. Because earlier in the deposition, we
4    were talking about the one sperm cell that you actually
5    did find on Exhibit 3A, correct?

6    A    That is correct. Exhibit 3A, the underwear
7    from -- I believe that's the item number. The underwear
8    from Connie Cooper had one sperm cell identified on
9    that, and I did extract the area surrounding that
10   cutting. Yes. On the other items, no, I do not believe
11   that I identified any sperm.

12   Q    Okay. So from your recollection of your work
13   in this case, you yourself only identified one sperm
14   cell on all of the exhibits that were given to you?

15        MS. HAGY: Objection. Form, foundation.

16   A    I believe so, yes.

17   Q    Okay. You talked earlier about having to
18   review or having reviewed Robert Gonsowski's report with
19   respect to the blue pants that you tested. Do you
20   remember that testimony earlier today?

21   A    Yes.

22   Q    Did you also review Mr. Gonsowski's reports
23   from 1977 concerning what he found in Exhibit 3A?

24   A    I did review Robert Gonsowski's March 17, 1977
25   report and used that information in my -- for my testing

Page 108

1    and my processing of multiple items of evidence.

2    Q    In your review of Mr. Gonsowski's March 17,
3    1977 report, is it your understanding that he identifies
4    seminal fluid was present?

5         MS. HAGY: Objection. Form. Foundation.

6    A    May I ask in which item of evidence?

7    Q    In item 3A.

8    A    I would need to refer back to the report. I
9    remember in regards to the vaginal swabs, but I don't
10   remember specifically, in regards to the underwear, what
11   his findings were. I could look to refresh my
12   recollection, but I don't remember exactly.

13   Q    Okay. Well, maybe I can ask you that in this
14   way, then. Would it be inconsistent, or would it be an
15   incorrect statement for Mr. Gonsowski to testify that he
16   was only able to find seminal fluid in the underwear?

17        MS. HAGY: Objection. Form, foundation.

18   A    If his -- if his testing and his results were
19   that he solely indicated seminal material or seminal
20   material and did not identify sperm cells, that would be
21   in regards to his testing in the areas he tested. So am
22   I -- am I answering your question fully?

23   Q    I think so. I guess --

24   A    Trying to make sure I understand.

25   Q    All right. So then can you maybe give me a

Page 109

1    little, just, understanding of the difference between a
2    sperm cell and seminal fluid?

3         MS. HAGY: John, I also want to say, I think
4         you've misrepresented that document as well.

5         MR. TIMBO: Okay. Well, again, I'm going to
6         clear that up here, then.

7         MS. HAGY: Okay.

8    BY MR. TIMBO:

9    Q    Or I'm trying to. Can you identify for me,
10   then, what the difference is between a sperm cell and
11   seminal fluid? Let's start with that.

12   A    So a sperm cell, or spermatozoa, are exactly
13   that. A sperm cell, the -- it's present. It's the
14   genetic material. But a sperm cell, right, is present
15   and transported in seminal fluid or semen, and is a
16   portion of seminal material, but it's just one portion
17   of the seminal material.

18   Q    Okay.

19   A    So I can identify --

20   Q    So if Mr. --

21   A    I was going to say we can identify --

22   Q    Go ahead.

23   A    I can identify one sperm cell, and that
24   identifies semen, because for one sperm cell to be
25   present, there's semen there. And then you could

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1:23-cv-01184-CRI-JEH #: 318-9 Filed: 04/22/24 Page 31 of 199
The Deposition of ANN YEAGLE, taken on February 08, 2023
110..113

**Page 110**

1 identify or indicate or detect other components of
2 seminal fluid and just be, right, indicating or
3 identifying that seminal material itself, not
4 necessarily sperm cells.
5    Q.   Okay.  So you cut out a little bit due to
6 Zoom, but what I understand is that if somebody
7 identifies the presence of semen, that doesn't
8 necessarily mean that there has to be a sperm cell
9 present.
10       MS. HAGY:  Objection.  Form.  Foundation.  I
11   don't think you're actually looking at the report.
12       MR. TIMBO:  Okay.  Can we go on a break, then?
13   I'm going to -- I'm going to pull it up.  I got to
14   understand exactly then.  Let's take a -- let's take
15   a four-minute break.  I'm not going to leave.  I'm
16   just putting -- Ann, I'm going to put myself on
17   'stop video' because I think my Internet connection
18   here in the Zoom is horrible when I have both on.
19   I'll let you know when I'm back, and then I'm going
20   to turn it off for additional questioning.
21       THE WITNESS:  Thank you so much.
22       COURT REPORTER:  Going off the record.
23       MR. TIMBO:  Nobody go nowhere.  I'm going off
24   the record.
25       COURT REPORTER:  Okay.  The time is 1:29 p.m.

**Page 111**

1        (OFF THE RECORD)
2        COURT REPORTER:  We're back on the record.  The
3   time is 1:31 p.m.
4 BY MR. TIMBO:
5    Q.   Okay.  So Ms. Yeagle, yeah, had me refresh my
6 recollection that Mr. Gonsowski's results actually says
7 he did not indicate the presence of seminal material in
8 his March 17, 1977 report.  So from what I understand
9 then, Ms. Yeagle, is it possible that, depending upon
10 the location of an item tested, either seminal fluid or
11 a sperm may or may not be found?
12       MS. HAGY:  Objection.
13    Q.   Such as the underwear in Exhibit 3.
14    A.   You're cutting out a little bit still.  Could
15 you repeat the question for me?
16    Q.   Sure.  I guess -- before we took our break
17 here, I just wanted to understand that just because a
18 particular item may be tested at one point in time and
19 either no semen is found or semen is found without
20 sperm, is that a possibility?
21       MS. HAGY:  Objection.  Form.
22    A.   So my testing, in regards to the underwear, I
23 detected a sperm cell.  And so my findings are that I
24 identified semen in the underwear because of finding
25 that sperm cell.  The testing is different per person.

**Page 112**

1 So Mr. Gonsowski's findings are based on what he tested.
2 My findings are based on what I tested.
3    Q.   Okay.  Fair enough.  Thank you.  You said that
4 you had worked on a couple other cases that had evidence
5 that had existed for a long period of time similar to
6 the Savory case; is that true?
7       MS. HAGY:  Objection.  Form.  Go ahead.
8    A.   My apologies.  I have worked some older cases
9 and cases that are of this type going back to older
10 evidence as well as in training.  We utilize old samples
11 that have been kept around in research and development
12 and in the training protocol.
13    Q.   Is -- in your training and education, is there
14 a life -- is there an age in which sperm no longer can
15 exist on a particular, you know, item?
16       MS. HAGY:  Objection.  Form.  And I don't know
17   if I cut John off, but I didn't really understand
18   that question or I didn't --
19 BY MR. TIMBO:
20    Q.   Like I said, I hate Zoom.  Maybe the question
21 is: What is the life expectancy of a one sperm cell? You
22 know, is there a range that you're taught?
23    A.   In regards to an item of evidence where
24 seminal material or a sperm cell is deposited onto an
25 item of evidence, per se cloth or something of that

**Page 113**

1 nature, there is not necessarily a life span there.  If
2 the spermatozoa remains on that item and is detected or
3 tested, it could still be identified and still utilized
4 to identify as sperm if all of the landmarks are still
5 present morphology-wise to identify that sperm cell.
6 There are differences in -- based on the media or how
7 that seminal material was deposited or the matrix it's
8 on.
9    Q.   Okay.  For the sperm cell that you found on
10 Exhibit 3A in this case, are you able to identify its
11 origin, meaning when it was deposited there?  Are you
12 able to give it a date?
13       MS. HAGY:  Objection.  Form.
14    A.   No, I am not.
15    Q.   So it's possible that particular sperm cell
16 could have been there prior to 1977?
17       MS. HAGY:  Objection.  Form.
18    A.   I am unable to say when the sperm cell or the
19 semen was deposited on the item, other than it was there
20 when I tested it.
21    Q.   Fair enough.  Thank you.  I'm just going
22 through my notes still.  Give me a second here.
23 Ms. Yeagle, you were asked questions about trying to
24 determine whether the cutout on the blue pants was still
25 in existence.  Do you remember that questioning?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1:23-cv-01184-CRL-JEH # 318-9 Filed: 04/22/24 Page 32 of 199
The Deposition of ANN YEAGLE, taken on February 06, 2019
114..117

Page 114

1   A   Yes, I do.
2   Q   And can you identify for me then what steps
3 you took to try to determine whether that cutout still
4 existed in any of the evidence?
5   A   I looked in the packaging that I had with the
6 blue pants. I requested from Peoria Police Department
7 if there was any additional evidence in their care and
8 custody that would have that cutting or portions from
9 multiple items of evidence. And I looked through our
10 custody records at the laboratory and the reports and
11 notes to attempt to locate the additional items that I
12 did not have access to.
13   Q   Okay. Were you able to find any notation from
14 1977 or 1981 from Robert Gonsowski specific to that
15 cutout on the blue pants?
16      MS. HAGY: Objection. Form. Foundation.
17   A   Not that I remember.
18   Q   Okay. And the same question with respect to
19 the two slides containing possible hairs taken from the
20 two victims in this case. Do you recall seeing any
21 specific notes from the ISP lab back in 1977 identifying
22 what could have happened to those two slides?
23      MS. HAGY: Objection. Form, foundation.
24   A   Again, I asked the Peoria Police Department if
25 they had them and looked through the items he -- our

Page 115

1 items of evidence as well, and asked questions of
2 statewide DNA -- I believe he's called -- William Frank.
3 I'm trying to remember the title that he was at the
4 time. But talked with him about protocols and
5 procedures at the time in trying to determine what might
6 have been done with those. I know I was not able to
7 find them, and I didn't find any information as to what
8 their disposition was or where they went to.
9   Q   So you -- so meaning that you couldn't find
10 out whether or not those items were, in fact, sent back
11 to the Peoria Police Department or consumed in its
12 testing?
13      MS. HAGY: Objection. Form. Foundation.
14   A   Correct. I don't recall.
15   Q   Okay. Again, I'm just going through my notes.
16 Does the Illinois State Police have a set protocol for
17 how long the Kastle-Myer test is good for in terms of
18 identifying blood?
19      MS. HAGY: Objection. Form.
20   Q   Does that make any sense? Or maybe I can ask
21 it in a different way. I'll withdraw that question.
22 Does the Kastle-Myer test for the identification of
23 blood have a life span to it?
24      MS. HAGY: Objection. Form, foundation.
25   A   Do you mean -- can you clarify as to what you

Page 116

1 mean by its life span?
2   Q   Sure. Meaning that, is there a point, is
3 there an age of dried blood that the Kastle-Myer test is
4 no longer valid for?
5      MS. HAGY: Objection. Form.
6   A   Not to my recollection. I have been able to
7 test old samples and I've had it obtain a Kastle-Myer
8 positive result in regards to training samples. And it
9 is a sensitive test. But I do not know a -- a term of
10 that.
11      MR. TIMBO: Thank you. I just have a couple
12 more here. Looking through my notes once more. No,
13 I asked that question already. Ms. Yeagle, I have
14 no further questions. Thank you.
15      THE WITNESS: Thank you.
16      MS. HAGY: I will just have a couple more
17 questions, but I was hoping we could take, like, a
18 five-minute break before that. But then I'll have
19 very few questions once we come back. But maybe we
20 could come back at 1:50?
21      THE WITNESS: I'm okay with that.
22      MS. HAGY: Thank you.
23      COURT REPORTER: Okay. Going off record. The
24 time is 1:43 p.m.
25      (OFF THE RECORD)

Page 117

1      COURT REPORTER: We're back on the record. The
2 time is 1:55 p.m.
3      REDIRECT EXAMINATION
4 BY MS. HAGY:
5   Q   So Ms. Yeagle, for 15B, the sample that you
6 did autosomal testing from -- for the light switch, you
7 weren't able to compare that to any profiles, right?
8   A   Correct.
9   Q   And so then you had YSTR testing done to the
10 other sample from the light switch plate, right?
11   A   Was that MiniFiler testing that was done?
12   Q   Yes, it was. Oh, I'm sorry. You're right.
13 It was MiniFiler testing.
14   A   Yes. The other sample had additional testing
15 done to look at those, that low level -- the low level
16 sample. Correct.
17   Q   And that testing was done by Mr. William
18 Frank, right?
19   A   Yes, that's correct.
20   Q   Okay. And when you were doing your testing
21 here, you reviewed Mr. Gonsowski's 1977 report, right?
22   A   Yes, that is correct.
23   Q   But you didn't come to any opinions about that
24 report, right?
25   A   Correct. I solely reviewed his report and



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1:23-cv-01184-CRL-JEH # 318-9 Filed: 04/22/24 Page 23 of 199
The Deposition of ANN YEAGLE, taken on February 08, 2023
118..121

Page 118

1  used that information to assist in my decision-making
2  process.
3     Q    Okay.  But you don't have any assessment of
4  the work that he did or how he did it or what his
5  conclusions were?  You just read it, but you have no
6  opinions about his work, right?
7     A    Correct.
8     Q    And you had never had the worksheets that
9  accompanied his report, right?
10    A    Correct.  Just the report.
11    Q    And so since you didn't have the worksheets,
12  you didn't know some of the information that underlied
13  his report, correct, the way that we looked at your
14  worksheets here?
15    A    Correct.  Solely the -- solely the findings
16  and results that were present in the report.
17          MS. HAGY:  Okay.  So that's all I have.
18                RECROSS EXAMINATION
19  BY MR. TIMBO:
20    Q    Okay.  I did have just a couple then from
21  that.  So Ms. Yeagle, with respect then to that
22  Exhibit 3, the underwear of Connie Cooper, you don't
23  know where Mr. Gonsowski had performed his chemical test
24  to come up with his conclusion in 1977 that he did not
25  -- it did not indicate the presence of seminal material?

Page 119

1     A    Correct.  I didn't have his notes to know
2  exactly right the areas tested.  I just had the item of
3  underwear itself and the markings present.
4     Q    Understood.  Okay.  Can you then just explain
5  to me then how -- what test do you use to identify where
6  you wanted to cut out from the underwear?
7          MS. HAGY:  Objection.  Form.
8     A    So I utilize first a visual examination.  Then
9  I utilize an alternate light source to look at the item
10  of evidence, in this case, the underwear.  Determine any
11  areas of fluorescence, and that guides me in my areas to
12  test, so the markings I placed on the underwear.  And
13  from the alternate life source and the fluorescence,
14  testing with chemical tests to determine and indicate
15  any seminal fluid.  And then the area where the one
16  sperm cell was identified, I cut out the area around
17  that one, around that location.
18    Q    Do you know historically what the chemical
19  testing was that would identify seminal fluid in 1977?
20    A    No, I don't.
21    Q    All right.  Then I have no further questions.
22  Thank you.
23    A    Thank you.
24          COURT REPORTER:  Okay.  Nothing further?
25  Ms. Yeagle, did you want to read or waive the

Page 120

1  transcript reading today?
2          THE WITNESS:  I'm not sure what that means.
3          MR. HOGUE:  Can we have a moment to discuss?
4          COURT REPORTER:  Yeah.  Do you want to go off
5  the record or --
6          MR. HOGUE:  Yes.
7          THE WITNESS:  Yes, please.
8          COURT REPORTER:  Okay.  Going off the record.
9  The time is 2:00 p.m.
10         (OFF THE RECORD)
11         COURT REPORTER:  We're back on.  The time is
12  2:01 p.m.
13         THE WITNESS:  I would like to review.
14         COURT REPORTER:  Okay.  And then before we go,
15  I'll just get orders of the transcript.  Ms. Hagy,
16  did you need one right now?
17         MS. HAGY:  Not yet.  Thank you.
18         COURT REPORTER:  Okay.  For you, Mr. Timbo?
19         MR. TIMBO:  I will hold off right now.  We'll
20  let you know.
21         COURT REPORTER:  Okay.  And then for you,
22  Mr. Hogue, did you need a copy of the transcript?
23         MR. HOGUE:  Yes.  I'll go ahead and place an
24  order, please.
25         COURT REPORTER:  Okay.  Do you want electronic

Page 121

1  or --
2          MR. HOGUE:  Electronic, please.
3          COURT REPORTER:  Electronic.  Okay.  Did you
4  need the video at this point?
5          MR. HOGUE:  I just want the transcript, please.
6          COURT REPORTER:  Okay.  All righty.  Then that
7  concludes the depo.  We are off the record at
8  2:02 p.m.
9          (DEPOSITION CONCLUDED AT 2:02 P.M. (CT))

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 122

1          CERTIFICATE OF REPORTER

2

3    I do hereby certify that the witness in the foregoing

4    transcript was taken on the date, and at the time and

5    place set out on the Title page hereof by me after

6    first being duly sworn to testify the truth, the whole

7    truth, and nothing but the truth; and that the said

8    matter was recorded digitally by me and then reduced to

9    typewritten form under my direction, and constitutes a

10   true record of the transcript as taken, all to the best

11   of my skills and ability. I certify that I am not a

12   relative or employee of either counsel, and that I am

13   in no way interested financially, directly or

14   indirectly, in this action.

15

16

17

18

19

20

21

22   EMILIA LOPEZ,

23   COURT REPORTER / NOTARY

24   COMMISSION EXPIRES ON: 03/16/2026

25   SUBMITTED ON: 02/15/2023

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

# ILLINOIS STATE POLICE

Division of Forensic Services
Morton Forensic Science Laboratory
1810 South Main Street
Morton, Illinois 61550-2983
(309) 284-6500 (Voice) * 1-(800) 255-3323 (TDD)

*Bowers*

**EXHIBIT**

**1**

Pat Quinn
*Governor*

January 17, 2014
## LABORATORY REPORT

Hiram Grau
*Director*

CRIME SCENE UNIT
PEORIA PD
600 SOUTH WEST ADAMS STREET
PEORIA, IL 61602

Laboratory Case #M77-000197
Agency Case #  77-1588

OFFENSE   Murder
SUSPECT   Johnnie Lee Savory
VICTIMS   Connie Cooper/James Robinson

The following evidence was submitted to the Morton Forensic Science Laboratory by Officer Scott
Bowers on November 7, 2013:

| EXHIBIT | DESCRIPTION | FINDINGS |
|---|---|---|
| 1A | Vaginal swabs reported to be from Connie Cooper | Not tested at this time. Preserved as Exhibit 1A1. |
| 15 | Light switch cover from bathroom | Blood indicated on two areas of cover. Portions preserved as Exhibits 15A and 15B. |
| 21 | Fingernail scraping reported to be from right index finger of Connie Cooper | Miscellaneous debris observed on wooden stick. Portion of stick preserved as Exhibit 21A. |
| 22 | Fingernail scraping reported to be from right ring finger of Connie Cooper | Miscellaneous debris observed on wooden stick. Portion of stick preserved as Exhibit 22A. |

The following evidence was submitted to the Morton Forensic Science Laboratory by Officer Scott
Bowers on November 8, 2013:

| EXHIBIT | DESCRIPTION | FINDINGS |
|---|---|---|
| 24 | Blood tube reported to be from Connie Cooper | Swabbed blood like crusts from top and around lower edge of stopper of tube. Swabbing preserved as Exhibit 24A. |
| 26 | Blood tube reported to be from James Robinson | Swabbed blood like crusts from top and around lower edge of stopper of tube. Swabbing preserved as Exhibit 26A. |

**CONFIDENTIAL -**
**PURSUANT TO PROTECTIVE ORDER**
**ENTERED IN 17-CV-0204**

PEORIA PD
Laboratory Case #M77-000197                    -2-                    January 17, 2014

The following evidence was submitted to the Morton Forensic Science Laboratory by Officer Scott
Bowers on November 7, 2013:

| EXHIBIT | DESCRIPTION | FINDINGS |
|---|---|---|
| 27 | Head hair standard reported to be from Connie Cooper | Apparent hairs observed through package. Not examined at this time. |
| 28 | Pubic hair standard reported to be from Connie Cooper | No blood indicated on visible staining on outside and inside bottom seam edge of package. Swabbing of brown stain from inside seam edge preserved as Exhibit 28A. Apparent hairs observed. Portion of apparent hair ends preserved as Exhibit 28B. May be used as a DNA standard. |
| 29 | Head hair standard reported to be from James Robinson | Apparent hairs observed. Portion of apparent hair ends preserved as Exhibit 29A. May be used as a DNA standard. Apparent fiber observed. |
| 30 | Pubic hair standard reported to be from James Robinson | Apparent hairs observed through package. No further exam at this time. |
| 31 | Package reported to contain hair from Connie Cooper's right hand | No apparent hairs observed on inside of package. No blood indicated on stain on outside of package. One apparent hair observed on outside of package. No further exam at this time. |
| 35 | Anal swabs reported to be from Connie Cooper | Not tested at this time. Swabs and liquid contents preserved as Exhibit 35A. |
| 36 | Vaginal swabs reported to be from Connie Cooper | Not tested at this time. Swabs and liquid contents preserved as Exhibit 36A. |
| 44 | Black Normark folding knife reported to be from Johnnie Lee Savory | Small blood-like stains observed on blade and inside folding portion of knife. Swabbings conducted of both areas and preserved as Exhibit 44A and 44B respectively. No testing conducted at this time to preserve sample. |
| 49 | Head hair standard reported to be from Johnnie Lee Savory | Not examined. |
| 50 | Head hair standard reported to be from Johnnie Lee Savory | Not examined. |

CONFIDENTIAL -
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 17-CV-0204

PEORIA PD
Laboratory Case #M77-000197                    -3-                    January 17, 2014

| EXHIBIT | DESCRIPTION | FINDINGS |
|---------|-------------|----------|
| 51 | Head hair standard reported to be from Johnnie Lee Savory | Not examined. |
| 52 | Head hair standard reported to be from Johnnie Lee Savory | Not examined. |
| 53 | Head hair standard reported to be from Johnnie Lee Savory | Not examined. |
| 54 | Pubic hair standard reported to be from Johnnie Lee Savory | Not examined. |
| 59 | Blue pants | No blood indicated on areas tested at this time. Swabbing from inside waist band of pants conducted and preserved as Exhibit 59A. Area cut around apparent burn hole and preserved as Exhibit 59B. Portion of blood-like stain from inside right front pocket preserved as Exhibit 59C. Portion of stained area from inside back of pants near tag preserved as Exhibit 59D. Portion of material cut out below belt loop next to right front pocket (possible prior testing area) preserved as Exhibit 59E. Apparent hairs, fibers and miscellaneous debris collected. |
| 69 | Package reported to contain hair from James Robinson's left hand | No apparent hairs observed on inside of package. |
| 84 | Blood tube reported to be from Johnnie Lee Savory | Not examined. |
| 85 | Blood tube reported to be from Johnnie Lee Savory | Not examined. |
| 88 | Mustache hair standard reported to be from William Douglas | Not examined. |
| 89 | Head hair standard reported to be from William Douglas | Not examined. |
| 90 | Head hair standard reported to be from William Douglas | Not examined. |

CONFIDENTIAL -
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 17-CV-0204

PEORIA PD
Laboratory Case #M77-000197                    -4-                        January 17, 2014

| EXHIBIT | DESCRIPTION | FINDINGS |
|---------|-------------|----------|
| 91 | Head hair standard reported to be from William Douglas | Not examined. |
| 92 | Head hair standard reported to be from William Douglas | Not examined. |
| 93 | Head hair standard reported to be from William Douglas | Apparent hairs observed. Portion of apparent hair ends preserved as Exhibit 93A. May be used as a DNA standard. |
| 94 | Pubic hair standard reported to be from William Douglas | Not examined. |
| 95 | Head hair standard reported to be from Noyalee Robinson | Not examined. |
| 96 | Head hair standard reported to be from Noyalee Robinson | Apparent hairs observed. Portion of apparent hair ends preserved as Exhibit 96A. May be used as a DNA standard. |
| 97 | Head hair standard reported to be from Noyalee Robinson | Not examined. |
| 98 | Head hair standard reported to be from Noyalee Robinson | Apparent hairs observed. Portion of apparent hair ends preserved and combined with Exhibit 96A. May be used as a DNA standard. |
| 99 | Head hair standard reported to be from Noyalee Robinson | Not examined. |
| 100 | Pubic hair standard reported to be from Noyalee Robinson | Apparent hairs observed through package. Not examined at this time. |
| 110 | Buccal standard from Johnnie Lee Savory | Preserved. |

**REQUESTS:**
Exhibits 1A1, 21A, 22A, 35A, 36A, 44A, 44B, 59A, 59B, 59D and 59E will need to be consumed in DNA analysis due to limited sample size.

Please note that some items have not been examined at this time. If, at a later date, it is determined that the value of this evidence can significantly aid the case, please advise.

CONFIDENTIAL -
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 17-CV-0204

PEORIA_SAVORY 1926

PEORIA PD
Laboratory Case #M77-000197                    -5-                    January 17, 2014

**REQUESTS:** (continued)
For results of previous biological examinations, refer to the laboratory reports by Forensic Scientists
Robert Gonsowski and Judith Kienzler.

Microscopy evidence (apparent hairs, fiber, debris) was observed and collected in this case.

**EVIDENCE DISPOSITION:**
Exhibits 1A1, 15A, 15B, 21A, 22A, 24A, 26A, 28A, 28B, 29A, 35A, 36A, 44A, 44B, 59A, 59B, 59C,
59D, 59E, 93A, 96A and 110 have been transferred to the DNA section of the Morton Forensic Science
Laboratory for further analysis and may be the subject of a separate report.

The evidence will be returned to your agency at a later date.

If you have any questions regarding this report, please feel free to contact me.

Any analysis conducted is accredited under the laboratory's ISO/IEC 17025 accreditation issued by
ANSI-ASQ National Accreditation Board/FQS. Refer to certificate #AT-1700 and associated Scope of
Accreditation.

Respectfully submitted,

Ann Maria Yeagle
Forensic Scientist

cc: PEORIA CO SA
    Joshua A. Tepfer-Center on Wrongful Convictions of Youth

**CONFIDENTIAL -
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 17-CV-0204**

**PEORIA_SAVORY 1927**

**ILLINOIS STATE POLICE**
**Division of Forensic Services**
**Forensic Sciences Command**
**Morton Forensic Science Laboratory**

EXHIBIT
2

| Exhibit / Item | 1A | Date Examined | 12/17/2013 | Case # | M77-197 |
|---|---|---|---|---|---|

**Description of Package and Markings:**
Small BPB sld clear tape "SB 10-22-13 AMY"

      on BPB "Swab from Connie Cooper Labeled 1A"

contains:

plastic tube w/ blue lid contains glass vial with white et seal "RFG"

unwound seal tape, opened glass vial, contains 2 swabs

      both swabs covered in lt brown stain and part of stick

      ~1/2 of each swab tip appeared to have been previously removed.

      both remaining swab tips into 1 SET

      SET into zl pl into man env sld BET 12-17-13 AMY as **1A1**.

no testing at this time to preserve sample. (Previous report - semen indicated, no sperm id'd)

As submitted



Swabs



| Turned over to DNA: | Repackaging: | Seal Date: | Analyst: |
|---|---|---|---|
| 1A1 | orig bpb sld BET | 12/17/2013 | AMY |

Revision Date (01/13)

SDT-BOI 000945

**ILLINOIS STATE POLICE**
**Division of Forensic Services**
**Forensic Sciences Command**
**Morton Forensic Science Laboratory**

Exhibit / Item _____ 15 _____ Date Examined __ 12/16/2013 __ Case # _____ M77-197 _____

**Description of Package and Markings:**

man env sld clear tape "...#982 10-22-13..."
"Light switch cover from bathroom ex 17" on env

Envelope opened to observe

env sealed with brown tape "RFG" also "WTJ", circuit clerk stamp on env, env recv'd sliced open

on env "Light switch cover from bathroom 15 1-18-77 ..."       people's exhibit label #17

contains a light switch plate cover and 2 screws

cover ~4 1/2" X ~ 2 3/4" "RFG 1/25/77" top left as oriented

on plate 2 people's exhibit labels on top of each other, on top #17A, below #15A

Back side, vis dirty/ grimy.

Cover is light beige, very dirty vis.  Has 2 screw holes and switch opening.
On front surface 2 large areas of lt to med RBS, 1 smaller area near initials "RFG"

Difficult to visualize any un stained area b/c of dirt and stains

Small lt RBS by RFG markings at top  not tested ATT

back side no testing

Front
before
testing/
swabbing




Turned over to DNA:          Repackaging:          Seal Date:          Analyst:

continued on next pg     AMY

Revision Date (01/13)

SDT-BOI 000946

**ILLINOIS STATE POLICE**
**Division of Forensic Services**
**Forensic Sciences Command**
**Morton Forensic Science Laboratory**

Exhibit / Item _____ 15 cont. _____ Date Examined __ 12/16/2013 __ Case # _____ M77-197 _____

**Description of Package and Markings:**

Q1 - stain upper on front and smooth side. Lt to med RBS ~1.3cm X ~2.5cm removed ~1/2 of stain - smooth side of stain
    moist fine tip swab removed ~0.6cm X ~2.5cm of stain on smooth side
    swab air dried. Remaining stain intact on cover
    Q1 = 15A 1 swabbing into 1 SET into zl pl into man env sld BET 12-17-13 AMY

Q2 - stain towards middle of plate, on and around switch hole. Stain lt to med RBS, thin stain.
    ~1.4cm X ~1.8cm from middle of stain swabbed off
    entire stain ~2cm X ~4cm, more than half of stain remains on cover.
    moist fine tipped swab - air dried.
    Q2 = 15B 1 swabbing into 1 SET into zl pl into man env sld BET 12-17-13 AMY
    After swabbings

KM



Q1 = pos
Q2 = pos
blank = neg
known blood = pos

** did not swab for touch DNA.

Turned over to DNA:      Repackaging:      Seal Date:      Analyst:
15A, 15B      orig man env sld BET      12/17/2013      AMY

Revision Date (01/13)

ILLINOIS STATE POLICE
Division of Forensic Services
Morton Forensic Science Laboratory
1810 South Main Street
Morton, Illinois 61550-2983
(309) 284-6500 (Voice) * 1-(800) 255-3323 (TDD)

**EXHIBIT**
**3**

Pat Quinn
*Governor*

March 20, 2014
**LABORATORY REPORT**

Hiram Grau
*Director*

CRIME SCENE UNIT
PEORIA PD
600 SOUTH WEST ADAMS STREET
PEORIA IL 61602

Laboratory Case #M77-000197
Agency Case #77-1588

OFFENSE:   Murder
SUSPECT:   Johnnie Lee Savory
VICTIMS:   Connie Cooper/James Robinson

The following evidence was submitted to the Morton Forensic Science Laboratory by Officer Scott
Bowers on November 7, 2013:

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 1A1 | Vaginal swabs from Connie Cooper |
| 1A1A | Extracted DNA from vaginal swabs |
| 15A | Swabbing from stain on edge of light switch cover (blood indicated) |
| 15A1 | Extracted DNA from edge of light switch cover |
| 15B | Swabbing from stain near center of light switch cover (blood indicated) |
| 21A | Fingernail scraping from Connie Cooper |
| 21A1 | Extracted DNA from fingernail scraping |
| 22A | Fingernail scraping from Connie Cooper |
| 22A1 | Extracted DNA from fingernail scraping |

The following evidence was submitted to the Morton Forensic Science Laboratory by Officer Scott
Bowers on November 8, 2013:

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 26A | Swabbing from top and sides of lavender blood tube stopper from James Robinson |

The following evidence was submitted to the Morton Forensic Science Laboratory by Officer Scott
Bowers on November 7, 2013:

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 28B | Apparent root ends from pubic hair standard of Connie Cooper |
| 28B1 | Extracted DNA from pubic hair standard of Connie Cooper |
| 29A | Apparent root ends from head hair standard of James Robinson |
| 29A1 | Extracted DNA from hair standard of James Robinson |
| 44A | Swabbing from sharp edge of knife blade |

PEORIA PD
Laboratory Case #M77-000197                   -2-                   March 20, 2014

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 44A1 | Extracted DNA from swabbing from sharp edge of knife blade |
| 44B | Swabbing from inside of folding handle of knife |
| 44B1 | Extracted DNA from swabbing from inside folding handle of knife |
| 59A | Swabbing from inside waistband of blue pants |
| 59A1 | Extracted DNA from swabbing of inside waistband |
| 59B | Portion of blue pants from around apparent burn hole on pants leg |
| 59B1 | Extracted DNA from portion of pants leg around apparent burn hole |
| 59C | Portion of blood-like stain from inside right front pocket |
| 59C1 | Extracted DNA from portion of stain inside right front pocket |
| 59D | Portion of pants from inside back by tag |
| 59D1 | Extracted DNA from stain inside back of pants by tag |
| 59E | Portion of pants from apparent prior testing area below belt loop |
| 59E1 | Extracted DNA from area on pants below belt loop |
| 93A | Apparent root ends from head hair standard of William "Peter" Douglas |
| 93A1 | Extracted DNA from hair standard of William "Peter" Douglas |
| 96A | Apparent root ends from head hair standard of Noyalee Robinson |
| 96A1 | Extracted DNA from hair standard of Noyalee Robinson |
| 110 | Buccal swab standard from Johnnie Lee Savory |
| 110A | Extracted DNA from buccal standard of Johnnie Lee Savory |

## RESULTS

DNA from Exhibits 15B, 26A, 28B, 93A, 96A and 110 was amplified using the Polymerase Chain Reaction (PCR) and profiled at the loci listed on the attached table.

A mixture of human DNA profiles was identified in Exhibit 15B at the D8S1179, D3S1358, D19S433, vWA and Amelogenin loci that was interpreted as a mixture of at least two people. This mixed profile is potentially incomplete and unsuitable for comparison to known standards. It is not suitable for entry into the DNA Index.

A mixture of human DNA profiles was identified in Exhibit 26A that has been interpreted as a mixture of at least three people. This mixed profile is not suitable for use as a DNA standard.

DNA profiles were identified in Exhibit 110; in Exhibit 28B at the D8S1179, D21S11, D3S1358, TH01, D13S317, D16S539, D19S433, vWA, TPOX, D18S51, D5S818, FGA and Amelogenin loci; in Exhibit 93A at the D8S1179, D21S11, D3S1358, TH01, D13S317, D16S539, D19S433, vWA, TPOX, D5S818, FGA and Amelogenin loci; and in Exhibit 96A at the D8S1179, D21S11, D7S820, CSF1PO, D3S1358, TH01, D13S317, D16S539, D19S433, vWA, TPOX, D18S51, D5S818, FGA and Amelogenin loci. These profiles were not used for comparisons at this time.

DNA was extracted from Exhibits 1A1, 15A, 21A, 22A, 29A, 44A, 44B, 59A, 59B, 59C, 59D and 59E, but not profiled.  Quantitative PCR indicates these samples should be directed for Y-STR and Minifiler analysis.

SDT-BOI 000481

PEORIA PD
Laboratory Case #M77-000197                    -3-                    March 20, 2014

**RESULTS** (continued)
Exhibits 1A1A, 15A1, 21A1, 22A1, 28B1, 29A1, 44A1, 44B1, 59A1, 59B1, 59C1, 59D1, 59E1, 93A1, 96A1 and 110A will be forwarded to the Research and Development Laboratory for further analysis and will be the subject of a separate report.

See the attached table for a summary of observed alleles.

Additional exhibits were received in this case, but were not analyzed.

**REQUESTS**
For results of previous biological examinations, refer to my laboratory report dated January 17, 2014 and to the laboratory reports by Forensic Scientists Robert Gonsowski and Judith Kienzler.

**EVIDENCE DISPOSITION**
Please note that Exhibits 1A1, 15A, 15B, 21A, 22A, 26A, 28B, 29A, 44A, 44B, 59A, 59B, 59C, 59D, 59E, 93A and 96A were consumed in analysis. Sample remains in Exhibits 15, 28, 29, 59, 93 and 96 for further testing if needed.

The evidence will be available for return at a later date.

If you have any questions regarding this report, please feel free to contact me.

Any analysis conducted is accredited under the laboratory's ISO/IEC 17025 accreditation issued by ANSI-ASQ National Accreditation Board/FQS.  Refer to certificate #AT-1700 and associated Scope of Accreditation.

Respectfully submitted,

Ann Maria Yeagle
Forensic Scientist

Attachment (s)

cc:  Joshua A. Tepfer-Center on Wrongful Convictions of Youth ✓
     PEORIA CO SA ✓

**SDT-BOI 000482**

## Summary of DNA ID+ Analytical Results

### M77-000197

### Exhibit Attachment - 1

| | Sub 15B<br>Swabbing from stain near center of light switch cover (blood indicated) | Sub 26A<br>Swabbing from top and sides of lavender blood tube stopper from James Robinson | Sub 28B<br>Apparent root ends from head hair standard of Connie Cooper | Sub 93A<br>Apparent root ends from head hair standard of William "Peter" Douglas | Sub 96A<br>Apparent root ends from head hair standard of Noyalee Robinson | Exb 110<br>Buccal swab standard from Johnnie Lee Savory | | | |
|---|---|---|---|---|---|---|---|---|---|
| D8S1179 | 13,14 | 13,14,15,16 | 13,15 | 12,16 | 14,15 | 13,14 | | | |
| D21S11 | ND | 29,30,31 | 29,30 | 28,32.2 | 29,30 | 28,32.2 | | | |
| D7S820 | ND | 10 | ND | ND | 6,10 | 10,11 | | | |
| CSF1PO | ND | 12 | ND | ND | 10 | 8,12 | | | |
| D3S1358 | 14,16,18 | 14,15,16,17,18 | 16 | 15,17 | 16,18 | 16,17 | | | |
| TH01 | ND | 6,7,8,9 | 7,9 | 8,9.3 | 6,9 | 7,8 | | | |
| D13S317 | ND | 9,12,13 | 13 | 13 | 12,13 | 12 | | | |
| D16S539 | ND | 10,11,12 | 9,11 | 9 | 9,11 | 11 | | | |
| D2S1338 | ND | 16,17 | ND | ND | ND | 23 | | | |
| D19S433 | 11,13,14.2,15 | 11,13,14.2,15 | 13,15 | 12.2,13 | 14.2,15 | 12,12.2 | | | |
| vWA | 17 | 17,18,19 | 14,15 | 16,17 | 14,17 | 15,19 | | | |
| TPOX | ND | 8,9 | 8,9 | 8 | 8,9 | 8 | | | |
| D18S51 | ND | 13,15 | 14 | ND | 15,20 | 14,22 | | | |
| Amelogenin | X,Y | X,Y | X | X,Y | X | X,Y | | | |
| D5S818 | ND | 11,13 | 11,13 | 11,13 | 13 | 8,13 | | | |
| FGA | ND | 21,22,23 | 21 | 19,22 | 21,24 | 25,27 | | | |

NT = Not Tested    ND = Not Detected
This is a summary of the observed alleles only. Interpretations are made according to established guidelines.

SDT-BOI 000483

Stapled packet 1of2 tg

# ILLINOIS STATE POLICE
Division of Forensic Services
Forensic Sciences Command

## DNA Cover Sheet

Technical Review

By [signature]

Date 3-20-14

Case # M77-197

Analyst AMJ

Completed Date 3-20-14

P.99 added info 6-25-14 zy

Cell 214-548-7776

Laura Gahn, Ph.D., D-ABC
Director of Operations
Laboratory Director

13988 Diplomat Drive
Suite 100
Dallas, TX 75234
Direct: 214-271-8406
Fax: 214-271-8322
Laura.Gahn@labcorp.com

Cellmark FORENSICS
LabCorp Specialty Testing Group

M77-197 tg

Pipettes

| Size | Extraction | Amp | Phenol | Post |
|---|---|---|---|---|
| 2 | | 372145 | | 358525 |
| 10 | 342998 | 307263 | | 349368 |
| 20 | 355991 | 349389 | | |
| 100 | 343002 | 349371 | | 307267 |
| 200 | 343005 | | | 349375 |
| 1000 | 349376 | | 343008 | 343007 |

| | |
|---|---|
| 3130 | 356772 |
| ThermalCycler A | 307475 |

| | | |
|---|---|---|
| Dilutions: | 1:10 = | ~~2 ul neat / 18 ul water~~ tg 3ul neat / 27ul water tg |
| | 1:100 = | ~~2 ul 1:10 / 18 ul water~~ or |
| | | (2 ul neat / 198 ul water) tg |
| | 1:1000 = | 2 ul 1:100 / 18 ul water or |
| | | 2 ul 1:10 / 198 ul water |

Exceptions will be noted.

Total # Pages 124 +1A tg ~~+69A~~ tg

1 tg

M77-197-ty

| Ex to R&D | Exhibit | Resol vol | volume remaining | human quant | total human | male quant | total male | |
|---|---|---|---|---|---|---|---|---|
| 1A1A | 1A1 F1 | 50 | 46 | 7.449 | 342.654 | ND | ND | Y and Mini |
| | F2 | 50 | 46 | 0.025 | 1.15 | ND | ND | Y and Mini |
| | F3 | 50 | 46 | 1.54 | 70.84 | ND | ND | Y and Mini |
| | 1-21 DRB 1 F1 | 50 | 46 | ND | | ND | ND | |
| | 1-21 DRB 2 F1 | 50 | 46 | ND | | ND | ND | ** |
| | 1-21 DRB 3 F1 | 50 | 46 | ND | | ND | ND | Y & Mini combined cases call |
| | 1-21 DRB 4 F1 | 50 | 46 | ND | | ND | ND | Attorney Josh Tepfer |
| | 1-21 DRB 1 F2 | 50 | 46 | ND | | ND | ND | before analysis if can't do |
| | 1-21 DRB 2 F2 | 50 | 46 | ND | | ND | ND | both on samples. He will |
| | 1-21 DRB 3 F2 | 50 | 46 | ND | | ND | ND | need to discuss with |
| | 1-21 DRB 4 F2 | 50 | 46 | ND | | ND | ND | Client. |
| 21A1 | 21A | 50 | 46 | ND | | ND | | Y and Mini |
| | 1-22 MRB 2 | 50 | 46 | ND | | ND | | |
| 22A1 | 22A | 50 | 46 | ND | | ND | | Y and Mini |
| 44A1 | 44A | 50 | 46 | ND | | ND | | Minifiler |
| 44B1 | 44B | 50 | 46 | ND | | ND | | Minifiler |
| 59A1 | 59A | 50 | 46 | 0.012 | 0.552 | ND | | Non reproducible- Minifiler |
| 59B1 | 59B | 50 | 46 | ND | | ND | | Minifiler |
| 59D1 | 59D | 50 | 46 | ND | | ND | | Minifiler |
| 59E1 | 59E | 50 | 46 | ND | | ND | | Minifiler |
| 15A1 | 15A | 50 | 46 | 0.005 | 0.23 | ND | | Minifiler |
| | 1-22 MRB 3 | 50 | 46 | ND | | ND | | |
| | 1-22 MRB 4 | 50 | 46 | ND | | NO | | |
| | 1-22 MRB 1 | 50 | 0 | ND | | ND | | consumed |
| 28B1 | 28B+ 1:10 dil | 20 | 13 | 1.922 | 24.986 | ND | | std |
| | SRB-2 HAIR | 20 | 16 | ND | | ND | | |
| 29A1 | 29A | 20 | 16 | 0.005 | 0.08 | 0.009 | 0.144 | std |
| 93A1 | 93A | 20 | 13.4 | 0.588 | 7.6792 | 1.259 | 16.87 | std |
| | SRB-1 HAIR | 20 | 13 | ND | | ND | | |
| 96A1 | 96A | 20 | 13.3 | 0.564 | 7.5012 | ND | | std |
| 59C1 | | | | | | | | |
| 59C1 | 59C ext 1 | 50 | 46 | ND | | ND | | Minifiler ? |
| | 59C EXT 2 | 30 | 23 | ND | | | | inhibited - minifiler? |
| | 59C Ext 2 1:10 | 30 | 23 | ND | | | | |
| | 59C Ext 2 1:100 | 30 | 26 | ND | | | | |
| | 2-11 RB-1 (ext 2) | 30 | 26 | 0.003 | | | | non -reproducible |
| | 2-11 RB-2 (ext 2) | 30 | 26 | | | | | |
| 110A | 110 | 50 | 44 | 18.533 | | 15.451 | | |
| | 1:100 dil | 200 | 195.5 | | | | | |
| | 3-5 SRB 1 | 50 | 21 | ND | | ND | | |

SDT-BOI 000485

EVH Appendix 8

## Receipt of Analysis Observed During Laboratory Visit

The following analysis was observed when ___Laura Gahn.___

(name of the expert)

visited the ___Morton___ Laboratory on ___1-21-14___ in order to review materials relating

(location of lab)     (date)

to ___M 77-197___.          1-22-14 (?)

(case name and number)    1-23-14 (?)

| Analysis Observed | Time | Defense | Analyst |
|---|---|---|---|
| 1. Extraction - Diff. | 8:20-12:15 | | Hy |
| 2. Clean up (IHI) | 1:00-4:15 | | Hy |
| 3. Maxwell Extraction + Quant (Maxet Review) | 8:15-11:55 | | LU |
| 4. Dry Down 15B + AMP | 2:00-4:50 | | LU |
| 5. Prep & Run Ex 15B. | 9:15-10:00 | | Hy |
| 6. View epg's | 12:55-1:00 | | Hy |
| 7. | | | |
| 8. | | | |
| 9. | | | |
| 10. | | | |

1-21-14, 1-22-14, 1-23-14 (dates in left margin)

I ___Laura Gahn___, do hereby acknowledge that the above listed

(name of expert)

analysis were observed and results obtained when I visited the ___Morton___

(location of lab)

Laboratory on ___1-21-14___ to ___1-23-14___

(date)

(signed by the expert)

1 of 1

The materials contained in this document are protected under federal law and may not be disseminated or reproduced without the express written permission of the Illinois State Police

SDT-BOI 000486



**ILLINOIS STATE POLICE**
**DIVISION OF FORENSIC SERVICES**

**FORENSIC SCIENCES COMMAND**
**MORTON FORENSIC SCIENCE LABORATORY**

CASE #   M77-179

INITIALS   AMY

DATE   01-16-2014

## CONVERSATION RECORD

| Date/Time | Individual/Agency | Notes | Initials |
|-----------|-------------------|-------|----------|

1-15-14
Call from Josh Tepfer

Moving forward with DNA analysis, expert from Cellmark will be observing DNA testing.
Still on schedule for January 21 for start - yes.
Will only be watching consumptive testing of questioned stains to decrease time expert needs to be present, ok.
Please be aware that additional amplifications in Y-STRs or mini STRs would be done at a different time and place, to be arranged later if needed, this is just for Autosomal ID+ processing. Ok.
Jennifer Smith is not available.
Laura Gahn from Orchid Cellmark will be doing observation.

Ok, will process 1A1, vaginal swabs, 21A and 22A fingernail scrapings, 44A and 44B from knife and  59A, B, D and E from pants. At this time deferring wet, putrid vaginal and anal swabs. These can be done later. Most likely will not yield any information. I will process 15A and B from light switch cover and 59C from pants on my own since ample sample remains for retesting. Standards will be processed on my own after this testing.

We will need CV from Laura Gahn, and she will need to contact me to schedule observation and time to meet at lab to begin.

1-15-14 call from Laura Gahn,
She sent Tepfer her CV. Offered her DNA profile, I said not needed at this time.
She asked for SOPs. Please have Tepfer request.
Meeting at lab 1-21-14 at 8:30am to begin differential testing of 1A1. Day 2 will extract non-diffs and quant. Day 3 hopefully amping and running, She hopes to be available Friday morning if needed before flying out.
Gave her my cellphone number for off hours contact.



Fwd: Next week
Joshua A Tepfer
to:
ann_yeagle@isp.state.il.us
01/15/2014 03:31 PM
Hide Details
From: Joshua A Tepfer <j-tepfer@law.northwestern.edu>
To: "ann_yeagle@isp.state.il.us" <ann_yeagle@isp.state.il.us>,

2 Attachments

 

2013 Gahn.pdf ATT00001.htm

Ann -     ↳ CV in binder (Experts) in DNA office ty
                                    (12 pg) try

Please go ahead and contact Laura if this is sufficient. She is aware of the plan as you laid it out to me.

Thanks,
Josh

---

Sent from my iPhone

Begin forwarded message:

> **From:** "Gahn, Laura" <Laura.Gahn@LabCorp.com>
> **Date:** January 15, 2014 at 2:29:25 PM MST
> **To:** Joshua A Tepfer <j-tepfer@law.northwestern.edu>
> **Subject: RE: Next week**
>
> Josh,
>
> Attached is my CV. Please confirm your permission to speak with Ann Yeagle regarding this case. My contact information is listed below. Additionally, while travelling I can be reached through my Blackberry via email laura.gahn@labcorp.com or phone number 214-548-7776.
>
>
> Laura Gahn, Ph.D., D-ABC
> Director of Operations
> Laboratory Director
> Cellmark Forensics
> 13988 Diplomat Drive, Suite 100
> Dallas, TX  75234
> 214.271.8406
> 800.752.2774 toll free
> laura.gahn@labcorp.com
>
>
> -----Original Message-----

m77-A7
4 pg

From: Gahn, Laura
Sent: Wednesday, January 15, 2014 8:37 AM
To: 'Joshua A Tepfer'
Subject: RE: Next week

Joshua,

Here is the form to be completed. It is not necessary to have the exact dates figured out in order to complete the form; however if there is a maximum number of days you want to "authorize" feel free to do so on the form or via email.

Laura Gahn, Ph.D., D-ABC
Director of Operations
Laboratory Director
Cellmark Forensics
13988 Diplomat Drive, Suite 100
Dallas, TX 75234
214.271.8406
800.752.2774 toll free
laura.gahn@labcorp.com

-----Original Message-----
From: Joshua A Tepfer [mailto:j-tepfer@law.northwestern.edu]
Sent: Tuesday, January 14, 2014 9:13 PM
To: Gahn, Laura; Lankford, Deanna; Smith, Jennifer
Subject: Next week

I know we have gone back and forth and I apologize, but we have reconsidered our desire to have our own agent at the johnnie lee savory testing at the Morton crime lab. Specifically we now desire to have you present for any consumption testing.

Laura or Deanna - would you happen to still have availability next week? Testing is scheduled to commence Tuesday.

My apologies for writing this on my phone but I'm traveling and my laptop isn't functioning well.

Josh

Sent from my iPhone
-This e-mail and any attachments may contain CONFIDENTIAL information, including PROTECTED HEALTH INFORMATION. If you are not the intended recipient, any use or disclosure of this information is STRICTLY PROHIBITED; you are requested to delete this e-mail and any attachments, notify the sender immediately, and notify the LabCorp Privacy Officer at privacyofficer@labcorp.com or call (877) 23-HIPAA / (877) 234-4722.

M7H97
5 /by

**SDT-BOI 000489**



**RE: SOPs to Laura Gahn**
Joshua A Tepfer
to:
Ann_Yeagle@isp.state.il.us
01/17/2014 08:22 AM
Hide Details
From: Joshua A Tepfer <j-tepfer@law.northwestern.edu>
To: "Ann_Yeagle@isp.state.il.us" <Ann_Yeagle@isp.state.il.us>,

History: This message has been replied to.

Great, thanks. I believe Laura's ticket is booked and things should be pretty much all set.

It is Noyalee (no "N").

Best,
Josh

**From:** Ann_Yeagle@isp.state.il.us [mailto:Ann_Yeagle@isp.state.il.us]
**Sent:** Friday, January 17, 2014 7:39 AM
**To:** Joshua A Tepfer
**Subject:** Re: SOPs to Laura Gahn

Thank you, I have a copy of our procedure's manual on disk for her.
Also, one question as I am proofing my biology report, Is it Noyalee Robinson or Noyaleen Robinson. I preserved
a portion of her hair standard for use as a DNA standard and need to properly report her name.
Thank you for your help,

Ann Yeagle
Forensic Scientist III
Illinois State Police, Morton Crime Lab
309-284-6500
fax: 309-284-6504
yeaglea@isp.state.il.us

From:     Joshua A Tepfer <j-tepfer@law.northwestern.edu>
To:       "ann_yeagle@isp.state.il.us" <ann_yeagle@isp.state.il.us>,
Date:     01/16/2014 06:20 AM
Subject:  SOPs to Laura Gahn

Ann –

Laura Gahn told me that you have requested that I authorized you providing her with your SOPs, which I believe stands for
Standard Operating Procedures. If I have that correct, yes, you may send them directly to her.

Thanks,
Josh

Joshua A. Tepfer

M77-197
lety

SDT-BOI 000490



**Fw: Post Conviction testing case M77-197**
Ann Yeagle   to: William Frank

01/16/2014 12:04 PM

resending thanks.

Ann Yeagle
Forensic Scientist III
Illinois State Police, Morton Crime Lab
309-284-6500
fax: 309-284-6504
yeaglea@isp.state.il.us
----- Forwarded by Ann Yeagle/IlStPolice on 01/16/2014 12:04 PM -----

| | |
|---|---|
| From: | Ann Yeagle/IlStPolice |
| To: | William Frank/IlStPolice@IlStPolice, |
| Date: | 01/15/2014 05:32 PM |
| Subject: | Post Conviction testing case M77-197 |

Hi Bill,
Laura Gahn from Orchid Cellmark is coming in next week to watch me do some consumptive testing on this case. I hope to quant my samples Wednesday the 23rd. Will you be around if I have any questions about possibly doing minis on some of my samples versus amping in autosomal or doing both or considering Y-STRs? I have fingernail scrapings from the female victim and vaginal swabs (semen indicated) as well as some small blood stains that I will be extracting.

Thanks in advance,

Ann Yeagle
Forensic Scientist III
Illinois State Police, Morton Crime Lab
309-284-6500
fax: 309-284-6504
yeaglea@isp.state.il.us

SDT-BOI 000491

M77-197-xy



**attached is the forensic biology report**
Ann Yeagle   to: j-tepfer, gbrady                                      01/17/2014 03:30 PM
Cc:  Cari Sandberg



Bio report 1-17-14 AMY.pdf
Please forward this report to Judge Kouri and any other individuals needing copies.
Also, please note that the Body swabs from Connie Cooper are discussed in this report.

Next week, January 21, 2014 Laura Gahn from Cellmark will be in to observe my consumptive testing in
this case.

Samples to be tested and consumed next week include:
1A1 - vaginal swabs from Connie Cooper
21A and 22A - fingernail scrapings from Connie Cooper
44A and 44B - swabbings from knife
59A, - swabbing from waist band of pants
59B - cutting from apparent burn hole in pants leg
59D - portion of stain from inside back of pants
59E - cutting from below belt loop previously tested

Exhibits 35A and 36A will be deferred at this time. {Putrid vaginal and anal swabs)

If you have any questions please let me know,
Thank you,
Ann Yeagle
Forensic Scientist III
Illinois State Police, Morton Crime Lab
309-284-6500
fax: 309-284-6504
yeaglea@isp.state.il.us

**SDT-BOI 000492** B xy



RE: attached is the forensic biology report
Joshua A Tepfer
to:
Jerry Brady, 'Ann_Yeagle@isp.state.il.us'
01/20/2014 11:28 AM
Cc:
"Cari_Sandberg@isp.state.il.us"
Hide Details
From: Joshua A Tepfer <j-tepfer@law.northwestern.edu>
To: Jerry Brady <gbrady@peoriacounty.org>, "'Ann_Yeagle@isp.state.il.us'"
<Ann_Yeagle@isp.state.il.us>,
Cc: "Cari_Sandberg@isp.state.il.us" <Cari_Sandberg@isp.state.il.us>
History: This message has been replied to.

I can do it. I'll copy you on the letter I send him.

Thanks,
Josh

**From:** Jerry Brady [gbrady@peoriacounty.org]
**Sent:** Monday, January 20, 2014 11:22 AM
**To:** 'Ann_Yeagle@isp.state.il.us'; Joshua A Tepfer
**Cc:** Cari_Sandberg@isp.state.il.us
**Subject:** RE: attached is the forensic biology report

Josh,  Do you intend to forward to Judge Kouri or do you wish for me to forward?

**From:** Ann_Yeagle@isp.state.il.us [mailto:Ann_Yeagle@isp.state.il.us]
**Sent:** Friday, January 17, 2014 3:31 PM
**To:** j-tepfer@law.northwestern.edu; Jerry Brady
**Cc:** Cari_Sandberg@isp.state.il.us
**Subject:** attached is the forensic biology report

Please forward this report to Judge Kouri and any other individuals needing copies.
Also, please note that the Body swabs from Connie Cooper are discussed in this report.

Next week, January 21, 2014 Laura Gahn from Cellmark will be in to observe my consumptive testing in this case.

Samples to be tested and consumed next week include:
1A1 - vaginal swabs from Connie Cooper
21A and 22A - fingernail scrapings from Connie Cooper
44A and 44B - swabbings from knife
59A, - swabbing from waist band of pants
59B - cutting from apparent burn hole in pants leg
59D - portion of stain from inside back of pants
59E - cutting from below belt loop previously tested

Exhibits 35A and 36A will be deferred at this time. (Putrid vaginal and anal swabs)

If you have any questions please let me know,
Thank you,
Ann Yeagle
Forensic Scientist III
Illinois State Police, Morton Crime Lab
309-284-6500
fax: 309-284-6504
yeaglea@isp.state.il.us

M77-197
9 uy

SDT-BOI 000493

 **M77-197 question ASAP**
Ann Yeagle   to: William Frank

01/22/2014 02:10 PM


Rt 1-22-14.xls

all are in 50 ul

Should I dry down and requant?

Should anything be amped. I think not in ID+. This is a 40 year old case.
Help please call me thanks,

Ann Yeagle
Forensic Scientist III
Illinois State Police, Morton Crime Lab
309-284-6500
fax: 309-284-6504
yeaglea@isp.state.il.us

M77-197
10 dy
**SDT-BOI 000494**



**ILLINOIS STATE POLICE**
**DIVISION OF FORENSIC SERVICES**

**FORENSIC SCIENCES COMMAND**
**MORTON FORENSIC SCIENCE LABORATORY**

CASE #   M77-197

INITIALS   AMY

DATE   P. log# 2+y

### CONVERSATION RECORD

| Date/Time | Individual/Agency | Notes | Initials |
|---|---|---|---|

**M77-197   1-22-14**
Called William Frank to discuss quant data from this case and how he would recommend proceeding and to discuss future testing possibilities. Laura Gahn from Cellmark also present for conversation.
Sent Bill quant data in an email so he could see it first hand.

Discussed samples and that I did a Maxwell extraction due tot he nature of the samples. Maxwell samples eluted in 50ul, this is the volume we normally see the best DNA recovery. I also did a differential extraction also resol'd in 50ul. I quanted in duplicate 2ul per well. Std curve worked.

Seeing inhibition and also some low level results.
These are all questioned samples.

We went through all of the samples one by one, discussing prior biology results and probative value of evidence and what would be the best analysis path. It will be a long shot, but bill is willing to try the analysis as the Judge has ordered it tested. Will need to verify Consumption is ok with all of the items going to Bill for Y's and or mini's. Bill agreed that he would do both Ys and Minifiler testing there. He would like to wait for Y23 as it will have a better chance of yielding something than the current kit.

**Exhibits 21A and 22A** are fingernail scrapings from the victim Connie Cooper. She had broken fingernails. I examined the orange sticks and their was apparent debris obs'd, but I didn't see any blood like staining. No prior testing was done. Both have slight elevation of IPC, so could be inhibition. Sample also most likely degraded due to age and nature of sample. Would it be better to try in Y's? Hadn't discussed Ys with attorney or judge yet, really wanting mini results. They are really looking for information that might point to assailant and possible CODIS entry. We also discussed that Ys could be very informative and compare to William Peter Douglas and Johnnie Lee Savory. Bill recommends to clean up sample then amp in Ys. Will have to discuss with Attorney.  Could try minis but Ys have a better chance.

**Exhibits 44A and 44B** are swabbings from pocket knife. Pocket knife was recovered from Suspect: Johnnie Lee Savory (in his back pack I believe). Proposed to be murder weapon. I never got a good answer if the stab holes were consistent with the knife (small). Prior testing Robert Gonsowski indicated blood on the knife. I observed a very small blood like stain on blade (Exhibit 44A) and swabbed inside the handle (reddish brown stains, very small Exhibit 44B). Both passed on to Bill. Exhibit 44A, better chance, visible blood like stain. Slightly elevated IPC, 30.14. Clean up sample and amp all in Minifiler. Defer 44B at this time, more likely stain on blade was blood. Exhibit 44B may have just been dirty.

**Exhibit 59A** swabbing from inside waistband of pants to determine wearers DNA. Police claimed pants belonged to Johnnie Lee Savory and were worn when he stabbed and killed both victims. Johnnie Lee states the pants were his fathers, YT Savory. So, very important to determine whose DNA on waistband. Quant - non- reproducible human reading. Apprehensive about mixtures and Minis do not do well with mixtures. Hoping the problem with quant is fragment size. Will send for Minis.

Prior testing of pants, "Chemical and serological testing of this item indicated the presence of Group A, human blood."
Exhibit 59B Apparent Burn hole area
Exhibit 59C Blood like stain from right front pocket (Current KM was negative, but visually consistent under stereo scope)
Exhibit 59D Portion of stained area from inside back of pants
Exhibit 59E Cutting from area believed to be tested by Gonsowski
All 4 of these areas have elevated IPC readings and ND on quant.
Discussed clean up then amp in minis. Send for Minifiler analysis. Look at Exhibits and see if anything else can be done.

**SDT-BOI 000495**

M77 -1972
P.2 of 2
ly

Exhibit 15A and 15B- 2 blood indicated stains from light switch cover
IPCs in both are fairly elevated.
15A human reading only 0.005ng/ul, no male detected. - preserve for minifiler
15B Non reproducible human reading, but male reading is reproducible. Male is ~0.4ng total DNA in 46ul.
Amp 15B in ID+. Will consume - ok. Dry down and amp, try it, Won't be cleaning it up before amp, ok.

1A1 Vaginal swabs from Victim - Connie Cooper
Extracted and quanted F1, F2 and F3
Elevated IPCs in F1, F2 and F3 are in normal range. No male detected. Human DNA detected in all 3 fractions, Could be due to degradation.
Original biology screening indicated seminal fluid on the swabs, but no sperm were identified.
Extracted both swabs.
At first look Bill would not recommend Y testing. But, probative value was discussed, could give information to case if male DNA is found. Compare to standards in case.
For doing Ys would need to wait a while for Y23 to come on board. The Y23 system has 2 more rapidly mutating loci and is a more sensitive kit, it could give better information for the smaller fragment range. It has more of a chance to get more loci since it targets a smaller range, but doesn't have great diversity at 2 of those 4 loci. It could be a few months before he would be able to do this, waiting on the commodities.
**But, Bill would be willing to do both the Y testing and Minifiler testing on this case.**
Laura wants to see all fractions tried in Ys and Minifiler.

I will dry down and amp Exhibit 15B, consuming all of the extracted DNA.

Laura is going to check with her lab about their clean up methods. She thinks they use the Zymo columns and get a fairly good recovery after clean up. We will also look at Data in the morning to see results from 15B.


1-22-14
PM
Talked with Laura Gahn before she left for Day.
Cellmark uses Zymo columns from Epigenetics for clean up and have seen74-100% recovery.
She is ok with Bill doing or her lab doing, but that would be up to Judge and attorneys.
She is thinking clean up and minis, 1 amp for each. Vaginal swabs looking at Ys and minis.

These would all be consumptive tests. Really needing autosomal information.

No touch DNA on light switch cover at this time. No processing of putrid vaginal and rectal swabs from Connie Cooper.
No touch DNA on the knife at this time. Possible analysis if victims DNA is found on knife blade.
Will run on CE tomorrow.

1-23-14
Spoke with Laura Gahn
She had spoken with Josh Tepfer - vaginal swabs could give information to case, William Peter Douglas was Stepfather of Connie Cooper. Question exists if he was sexually assaulting her? He was a potential suspect discussed early on in the investigation of this murder.

Before William Frank moves on with analysis, he will need permission to do this consumptive testing and clear direction on if Ys are requested or not.

1-23-14 PM
Showed EPGs to Laura Gahn when she returned to the lab.
15B is a partial profile, mixture, low level Too low for comparisons to known standards, potentially incomplete at the loci I have information at, will send 15A on for minifiler testing.

Wait for official word from Josh Tepfer, but want to move forward with Bill doing the testing. Please extract standards and

1-23-14  Conv  w/ WEF
During hair extractions IF LOOKS GRAY - need to re extract
Samples. ok. ly

**SDT-BOI 000496** 12ly 1/99



**ILLINOIS STATE POLICE**
**DIVISION OF FORENSIC SERVICES**

**FORENSIC SCIENCES COMMAND**
**MORTON FORENSIC SCIENCE LABORATORY**

CASE #     M77-197

INITIALS     AMY

DATE

## CONVERSATION RECORD

| Date/Time | Individual/Agency | Notes | Initials |
|-----------|-------------------|-------|----------|

M77-197
Call from Josh Tepfer
1-29-14 ~11:30am

called to check on progress and if I could issue a summary of some kind with recommendations about proceeding with analysis. We discussed all of the findings so far.

Discussed 15B that I amped and that I don't think it is interpretable, too low and probably inconclusive, but I am waiting to hear back from Bill Frank about the samples and future processing.

SDT-BOI 000497



P. 184 dy



**Re: more questions about M77-197 before proceeding**
Ann Yeagle  to: William Frank                                                01/30/2014 12:04 PM

Thanks, I will call Laura and then go ahead with extracting more of the stain from the pants pocket as you have described below. This will end up being a multi tube extraction, most likely 6 to 10 tubes into 1. Should I combine all into 1 tube through microcon before quant or would you recommend keeping them separate? I normally would combine and quant as one, but I wanted to double check. Also, I will do this extraction by itself, should I still do 4 blanks or could I decrease this to 2 or 3 final blank tubes for this extraction.

Also, I should know tomorrow or early next week if I have a good profile for William "Peter" Douglas, I am currently extracting his hair standard. Would you recommend any modifications to the extraction procedure with these hairs? I have done 2 overnights per the procedure. I have not yet done the PCI/CI clean up this morning.

Thank you so much for the guidance.

Ann Yeagle
Forensic Scientist III
Illinois State Police, Morton Crime Lab
309-284-6500
~~fax: 309-284-6504~~
yeaglea@isp.state.il.us

William Frank             Comments/discussion noted below in blue font. ...              01/30/2014 10:49:40 AM

From:        William Frank/IlStPolice
To:          Ann Yeagle/IlStPolice@IlStPolice,
Date:        01/30/2014 10:49 AM
Subject:     Re: more questions about M77-197 before proceeding

Comments/discussion noted below in blue font.        wef

Bill,
Sorry this is a long email. but I just wanted to get your opinion/ approval for doing further testing on the items in M77-197, since you would probably be doing the mini's and possibly the Ys if they decide to move forward with Y testing. This is the case I sent you the quant data for and we discussed on the phone with Laura Gahn from Orchid Cellmark. This post conviction testing was court ordered. I used the prior biology screening results as a guide to move forward with collection of DNA evidence.

Laura would like to see further analysis done on all of the samples either in Ys or mini's. Whether this be by ISP, or by her lab, of course that is a big added expense and would need be re-addressed by court order since the original court order states the work will be done by ISP. (This point will need to be confirmed prior to ISP moving forward with the samples as consumption will be necessary in most instances.) I just wanted to give you back ground on the items and verify that you would be willing to try these items for them before I agree to move forward or discuss further with the attorneys or judge. I have a feeling there will be a lot of discussions before moving forward with more amps.

SDT-BOI 000498 14 Fy

M77-197
P. 2004/ty

I am extracting the hair standards this week to see if I can get profiles for all of the individuals potentially involved and have those extracts available for typing in the additional systems if needed. (We will need to confirm that all relevant/probative standards are available before proceeding with mini-STR/Y-STR analysis. The samples will at least need to have been quantified by qPCR to demonstrate that we can obtain profile/haplotype results.)

All samples were quanted 2ul in duplicate out of the 50ul resol volume)
15A and 15B and 1A1 fractions were the only samples that had a positive quant result. and you have those results already.

Potential Y analysis
1A1 Vaginal swabs from victim Connie Cooper
21A and 22A - Fingernail scrapings from victim Connie Cooper

Request for further typing in mini's
15A blood indicated swab from light switch cover from bathroom
44A and B swabbings from knife
59A - waistband swabbing
59B - stained area around burn hole on leg
59C - portion of inside right front pocket (visually blood like)
59D - portion of stained area from inside back of pants
59E - cutting from below belt loop and above rt front pocket

Importance of items and history
1A1 - Vaginal swabs from female victim - Connie Cooper
originally Semen indicated. No sperm Id'd. Differential extraction on 2 swabs. F1, F2 and F3
Quant data shows increased IPC value for the F1, but F2 and F3 appear ok to me.
No male DNA was identified. (Quanted 2ul in duplicate of a 50ul resol volume).
This could be very informative if they are willing to do Ys if any male DNA is present and can be amp'd. I know you had mentioned possibly waiting for Y23.
Defendant says his DNA should not be on her. Also an initial suspect in the case was William Douglas, I think he was her step father. It is proposed that he may have been sexually assaulting her, this was a prior defense theory. (Will this standard be available as well?) – yes uy
Laura Gahn had requested we do mini's on this exhibit if Ys are not done.
I believe Ys could be more informative. (Given the MTFR value I would expect from this sample Y-STR analysis is probably the best choice given the resolution we see with the miniFiler assay)
21A and 22A - Fingernail scrapings from victim Connie Cooper
She did have defensive wounds and was believed to have fought back. At autopsy they scraped under two of her fingernails and kept separate. These were not examined back in 1977, but I was able to look at them under the stereoscope, I did see apparent debris, but I did not do any testing to preserve sample.
Defendant states there would be no reason for his DNA to be under her fingernails.
Ys could be informative if any male is present and just to degraded to be showing up on quant.
I am wondering if Y23 would be a better option for this as well? (Also dependent on the MTFR value. We did obtain resolution from a fingernail scraping samples using mini-STRs on another

M77-197
15 uy

SDT-BOI 000499

M77-197
P 384 ty

extremely old case - but in general these samples are best suited for Y-STRs with mini-STRs being a better fit for more degraded single source samples)

Moving on to mini's

15A - swabbing from light switch cover in bathroom. It is believed that the assailant would have cleaned up after in this bathroom and possibly cut them self in the stabbing.
I ran 15B in ID+. I was able to get information at 4 loci and Amelogenin. But, it looks like at least two people and its all below Stochastic Threshold. So, I don't think I am going to be able to make any comparisons to known standards.
Would you try mini's on 15A to see if it is a better stain, possibly single source or at least interpretable? Hoping to find assailants DNA.

44A and B
stained areas from the folding knife recovered from the suspect, possible murder weapon. Suspect claims knife was his fathers and that his father had used the knife to remove stiches from his own hand, so source of blood is important. Original biology screening said blood indicated on knife , but insufficient for further testing. I saw blood like staining on the edge of the blade and on the inside of the knife. Both areas were swabbed separately. I am wondering if they could be combined for amp, I have plenty of clean blank available. (I would keep the samples separate as pooling them may also create a mixture) Would you be willing to try mini's on these? It would be very informative to see if the blood is consistent with the father of the suspect or anyone else in the case. It could link the knife to the crime, or possibly back up the defense theory. So, is it victim blood on the knife? (yes we could try a mini-STR amp)

59 Pants thought to have been worn by suspect at time of assault.
Defense theory is that the pants belonged to the suspects father and that the blood on the pants was from his father(cut on hand with stitches). Prosecution proposed that pants were worn when crime was committed and blood is from victim Connie Cooper. (Blood was reported as Type A)
59A is from waistband, swabbed for wearers DNA
- unsure where blood testing was originally conducted.
59B stain from front of pants with apparent burn hole
59C stain from inside rt front pocket. Plenty of stain remains. I am wondering if I should go back and extract a larger portion of this stain o/n organic and see if I get better results. There is a very large stain on the inside of the jeans pocket. What do you think? (I would go back and extract a larger portion; keeping the cutting size at approximately 5mm$^2$ per tube, using the SDS/P'aseK extraction procedure and extracting the samples overnight. In the morning prior to purification add a second volume of P'aseK to each tube and incubate for approx 4 hours prior to purification. After a PCI purification proceed to a CI purification step prior to isolating the sample using a microcon filter.) This stain was visually the best blood like stain, but I couldn't get it to come up positive with KM. Just not sure if it is worth trying. But, I am leaning towards trying it. (I would proceed with the sample. At this point the peroxidase activity in the stain may be completely degraded while DNA in the sample may be at least partially intact.)The only problem is that I started the hairs for DNA standards extracting last night, so I would be re-extracting the Q stain after I have started extracting the standards. What do you think? (I would proceed with the extraction; first following all clean technique procedure to make your work area ready for extraction of the unknowns. As you have a defense expert involved in this case I would call

per WCF

SDT-BOI 000500

M77-197
p.40g4
18



Laura, explain that you have started the standards and what steps you are planning prior to extracting the unknowns. Having a second analyst at MFSL extract the unknowns would be another possibility .)

59D stain from inside back of pants
59E portion of fabric under area that appears to have been previously tested. I did not see any visual stain. But, was hoping there was residual stain I couldn't see.
So, basically would you be willing to try these in Minis and/ or Ys?

Also, do you agree I should go back and try re-extracting the large stain from the pants pocket 59C? I really think it is worth a shot and plenty of stain remains, I could try extracting half the stained area, I had previously extracted ~0.8cm X ~0.5cm piece and it looked heavily coated in stain. I could go back and do 2 or three times that amount and still leave ½ of stain for retesting if needed. (Yes and follow the extraction protocol as described above for 59C.)

Also additional stain remains on Exhibit 15, but it is approximately half of the stain, so I don't necessarily think it will improve results to go back and consume the sample, using same amount again, (also might mean having the expert come back to watch the consumptive extraction). (Hold on this sample until we see how the second extraction performs for the other two samples.)

Thanks for your help with this Bill, I just wanted to make sure what I can tell the attorneys and how best to move forward. I know this all is a long shot, but I would really like to try and get some more information from this evidence. The attorneys and judge do understand the limitations, but are very interested in exhausting all options to try and get answers. Thanks so much for the help.

William Frank
DNA Research Coordinator/Technical Leader
Illinois State Police
Research & Development Laboratory
2060 Hill Meadows Drive
Springfield, IL 62702

phone: 217-785-8186
fax:     217-557-3989

    LIVESTRONG

    Ann Yeagle          Bill, Sorry this is a long email, but I just wanted t...          01/29/2014 10:35:21 AM



**ILLINOIS STATE POLICE**
**DIVISION OF FORENSIC SERVICES**

**FORENSIC SCIENCES COMMAND**
**MORTON FORENSIC SCIENCE LABORATORY**

CASE #    M77-197

INITIALS   AMY

DATE

### CONVERSATION RECORD

| Date/Time | Individual/Agency | Notes | Initials |
|-----------|-------------------|-------|----------|

1-30-2014

I called to speak with Laura Gahn from Cellmark

We discussed the idea of extracting more stain from the pocket of the pants.

The blood like stain in the pocket is large. I can go back and extract more of it. I will do an overnight extraction with an additional ProK addition and incubation, then PCI followed by CI clean up.

This procedure was recommended by SWTL William Frank.

I have already started the extraction of the apparent hair roots from the hair standards from people in the case. Are you ok with me doing this Question stain extraction even though I have started working with the apparent hairs?

Yes, she is ok with my going back and doing this processing.

Different time and place for extractions, they are separate.

Still plenty, more than half of stain remains in pocket to be re extracted by someone else if needed.

She agrees it's a good idea to try it.

She also advised in future I can contact Jennifer Smith or her for case questions. She just stepped in for Jennifer for the observation. But, is always more than willing to talk about the case and help in any way.

1-30-2014   Spoke w/ WEF
Discussed Sac extraction protocol

**SDT-BOI 000502** 18 /99



**Re: more questions about M77-197 before proceeding**
Ann Yeagle   to: William Frank                                    02/04/2014 11:13 AM

Hi Bill, sorry about the confusion, I don't think I was clear enough with my question.
We have a little confusion here about blanks and what is considered an extraction set.

When setting up an extraction, it is not often that we only extract 1 sample, but it does happen. The procedures manual is a little unclear when it comes to this situation. do we just need **1 Rb** for this Q extraction?

Scenario
Exhibit
M14-13 #1 (in 1 extraction tube) only item being extracted. Do we only need 1 blank tube or must we do 4 RBs?

under the same type of scenario
M14-13 #2 only item being extracted (in 5 extraction tubes to be brought into 1) do we need just 1 final blank or 4 final blanks

Extraction work sheet set up example:
M14-13 #2 5 tubes into 1 (20ul final volume)

RB-1 5 tubes into 1 (20ul final volume) so only 1 RB for the extraction
or
RB-1 5 tubes into 1 (20ul final volume)
RB-2 5 tubes into 1 (20ul final volume)
RB-3 5 tubes into 1 (20ul final volume)
RB-4 5 tubes into 1 (20ul final volume) end up with 4 RBs from the extraction.

I hope this clarifies this question, i understand the Q and RB must be treated the same with the same stringency, but I was trying to find out if 1 Exhibit is considered an "extraction set"? Or would 1 Exhibit with multiple tubes be considered an extraction set? Or is an extraction set more than 1 exhibit?
Thanks for the clarification. I was hoping in this case since I am going back to extract just one exhibit to decrease the number of total tube manipulations. Since it will be Exhibit 59C, 10 tubes extracted and into 1 tube in 20ul. For my RBs can I do just an RB1, this would be RB1 (10 tubes into 1 in 20ul)?  this way I would remove 30 extra tubes worth of manipulations for unneccesary blanks.

Thanks for the clarification.

** Side note, I was able to get good quants for 3 of the 4 hair standards I extracted on this case. And the fourth was very low, maybe enough for minis. But, I do have 1 more sample I can try as a standard for this male victim before relying on minis for the profile.
I plan to try an amp of ~2ng for 28B, 93A and 96A and see my results then decide if I need to do any additional amps. The samples do not look inhibited at this stage.

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| B5 | M77-197 28B Victim Connie C. | Duo Human | Unk | 29.32 | 29.43 | 2.068 | 1.922 | | | |
| B5 | | Duo IPC | Unk | 29.56 | 29.64 | | | | | |
| B5 | | Duo Male | Unk | Undet | | | | | | |
| B6 | M77-197 28B | Duo Human | Unk | 29.53 | 29.43 | 1.777 | 1.922 | | | |
| B6 | | Duo IPC | Unk | 29.72 | 29.64 | | | | | |
| B6 | | Duo Male | Unk | Undet | | | | | | |
| B7 | M77-197 29A Victim James R. | Duo Human | Unk | 38.23 | 37.92 | 0.004 | 0.005 | | | tn ~ 16ul |
| B7 | | Duo IPC | Unk | 29.64 | 29.69 | | | | | |
| B7 | | Duo Male | Unk | 37.93 | 37.61 | 0.007 | 0.009 | | | ~0.075 ng human |
| B8 | M77-197 29A | Duo Human | Unk | 37.60 | 37.92 | 0.006 | 0.005 | | | |
| B8 | | Duo IPC | Unk | 29.73 | 29.69 | | | | | ~0.143 ng male |
| B8 | | Duo Male | Unk | 37.30 | 37.61 | 0.011 | 0.009 | | | |
| B9 | M77-197 93A possible Suspect William Dougels | Duo Human | Unk | 31.09 | 31.09 | 0.588 | 0.588 | | | |
| B9 | | Duo IPC | Unk | 29.60 | 29.56 | | | | | |
| B9 | | Duo Male | Unk | 30.49 | 30.42 | 1.196 | 1.259 | | | |
| B10 | M77-197 93A | Duo Human | Unk | 31.09 | 31.09 | 0.588 | 0.588 | | | |
| B10 | | Duo IPC | Unk | 29.52 | 29.56 | | | | | |
| B10 | | Duo Male | Unk | 30.34 | 30.42 | 1.321 | 1.259 | | | |
| B11 | M77-197 96A mother of victims | Duo Human | Unk | 31.32 | 31.16 | 0.497 | 0.564 | | | |
| B11 | | Duo IPC | Unk | 29.51 | 29.42 | | | | | |
| B11 | | Duo Male | Unk | Undet | | | | | | |
| B12 | M77-197 96A | Duo Human | Unk | 30.99 | 31.16 | 0.632 | 0.564 | | | |
| B12 | | Duo IPC | Unk | 29.34 | 29.42 | | | | | |
| B12 | | Duo Male | Unk | Undet | | | | | | |
| C1 | M77-197 SRB-1 HAIR | Duo Human | Unk | Undet | | | | | | |
| C1 | | Duo IPC | Unk | 29.80 | 29.82 | | | | | |
| C1 | | Duo Male | Unk | Undet | | | | | | |
| C2 | M77-197 SRB-1 HAIR | Duo Human | Unk | Undet | | | | | | |
| C2 | | Duo IPC | Unk | 29.83 | 29.82 | | | | | |
| C2 | | Duo Male | Unk | Undet | | | | | | |

Thanks for all of your help,

Ann Yeagle
Forensic Scientist III
Illinois State Police, Morton Crime Lab
309-284-6500
fax: 309-284-6504
yeaglea@isp.state.il.us

| William Frank | If you are focusing 10 - 500 ul aliquots of extract... | 01/30/2014 04:18:01 PM |

From:     William Frank/IIStPolice
To:       Ann Yeagle/IIStPolice@IISTPolice,
Date:     01/30/2014 04:18 PM
Subject:  Re: more questions about M77-197 before proceeding

If you are focusing 10 - 500 ul aliquots of extraction reagents into a single unknown you will need to treat the reagent blank which tracks that sample in the same. way. The reasoning for this is that if you have

SDT-BOI 000504 20 xy

M77-197
P. 3y 3ly

for example 10 pg of a laboratory contaminant in each 500 ul aliquot of reagent blank then if you focus 10 of those volumes into a single tube you would move 100 pg into the recovery volume. So only using 1 or even four reagent blank tubes would not be an appropriate way to track 10 extractions.      wef

William Frank
DNA Research Coordinator/Technical Leader
Illinois State Police
Research & Development Laboratory
2060 Hill Meadows Drive
Springfield, IL  62702

phone:  217-785-8186
fax:       217-557-3989

    LIVESTRONG

Ann Yeagle              Thanks Bill. I just want to verify that since it is o...        01/30/2014 04:03:10 PM

I sample is not an extraction set. ty
i need to make sure blank mirrors
sample. Sample 10into/tube, Blank is
treated the same 10 into/tube. ty

 **RE: Savory**
Ann Yeagle  to: Joshua A Tepfer                          02/10/2014 09:43 AM

The fingernail scrapings were the other samples that were best suited for Y-STR testing, other than the non putrid vaginal swabs.

William believes it would be best to do both of these samples in Y-STRs first and see what information is obtained if you all will agree to that. Minis are much better suited to single source samples. And in all three of these samples we expect the majority of the DNA to be female and the Y testing will eliminate the female from the possible mixture of DNA.

I need to finish my analysis and get the standard profiles before anything can be sent to William Frank.

He will also need verification when the samples are sent to him that it is ok for him to do this consumptive testing.

Otherwise, once I am done the samples will be ready for his testing.

Ann Yeagle
Forensic Scientist III
Illinois State Police, Morton Crime Lab
309-284-6500
fax: 309-284-6504
yeaglea@isp.state.il.us

| Joshua A Tepfer | Okay. Thanks. Hope you are feeling better. So, j... | 02/10/2014 09:33:50 AM |

| | |
|---|---|
| From: | Joshua A Tepfer <j-tepfer@law.northwestern.edu> |
| To: | "Ann_Yeagle@isp.state.il.us" <Ann_Yeagle@isp.state.il.us>, |
| Cc: | Steven A Drizin <s-drizin@law.northwestern.edu>, Laura H Nirider <l-nirider@law.northwestern.edu> |
| Date: | 02/10/2014 09:33 AM |
| Subject: | RE: Savory |

Okay. Thanks. Hope you are feeling better.

So, just to make sure I understand completely, the only final answer you need on the question of Y-STR v. minifiler is on the "non-putrid" vaginal swab? Is that correct?

I believe you told me last time we spoke that you believed you could take a portion of the vaginal swab and try for minifiler, and leave enough intact that it would not affect your ability to do Y-STR on the remaining portion. Is that correct?

Is there any other decision we need to make in the interim before William Frank is able to get started?

Josh

**From:** Ann_Yeagle@isp.state.il.us [mailto:Ann_Yeagle@isp.state.il.us]
**Sent:** Monday, February 10, 2014 9:27 AM
**To:** Joshua A Tepfer
**Subject:** Re: Savory

M77-197
SDT-BOI 000506

Hi Josh,

I have had a few delays on my part. I have been sick and then I was off most of last week with sick kids and weather issues, sorry.

Today I am extracting the stain from the pants pocket, using a different protocol that will hopefully help DNA recovery. I spoke to Laura about this and she agreed with the plan.

I did obtain DNA from the hair standards of Connie Cooper, William Douglas and Noyalee Robinson I will amplify them and see how full of a profile I can obtain. The hair standard from James Robinson did not yield sufficient DNA for me to amplify from the hairs. So, I will need to extract the swab from his blood tube to see if I can get a usable profile from it.

I should have information for you by the end of this week.

William Frank is also willing to try the Y analysis and/ or mini STR testing of the samples based on your decision and the judges orders as well as how these standards work. I need to have standard profiles for him before he can move forward with his testing. But, he has agreed to do the testing.

Please feel free to call or email if you need additional information or clarification. I apologize for the delay. This has been a tough winter.

But, I should have good information for you by Friday.

Ann Yeagle
Forensic Scientist III
Illinois State Police, Morton Crime Lab
309-284-6500
fax: 309-284-6504
yeaglea@isp.state.il.us

From:    Joshua A Tepfer <j-tepfer@law.northwestern.edu>
To:      "ann_yeagle@isp.state.il.us" <ann_yeagle@isp.state.il.us>,
Date:    02/10/2014 08:54 AM
Subject: Savory

Hi Ann ~

Just checking in to see where we are at.

Thanks,
Josh

Joshua A. Tepfer
Clinical Assistant Professor
Center on Wrongful Convictions of Youth
Northwestern University School of Law

M77-197
SDT-BOI 000507 23ty



RE: Savory
Joshua A Tepfer
to:
Ann_Yeagle@isp.state.il.us
02/10/2014 04:12 PM
Cc:
Steven A Drizin, Laura H Nirider
Hide Details
From: Joshua A Tepfer <j-tepfer@law.northwestern.edu>
To: "Ann_Yeagle@isp.state.il.us" <Ann_Yeagle@isp.state.il.us>,
Cc: Steven A Drizin <s-drizin@law.northwestern.edu>, Laura H Nirider <l-nirider@law.northwestern.edu>
History: This message has been replied to.

Okay, let's circle back when you complete all the standards and it is in Mr. Frank's hands. But as long as some sample can be left for minifiler for both the non-putrid vaginal and the fingernail scrapings, I think we are fine with doing the Y-STR first. If that is not the case, I may need to talk to my client to give the final go-ahead for Y-STR testing.

The Judge set a status conference for the 18th, so I will try and update him on that day. So maybe we can talk Monday the 17th so I know exactly where we are at for all of this going into the hearing on the 18th.

Thanks,
Josh

**From:** Ann_Yeagle@isp.state.il.us [mailto:Ann_Yeagle@isp.state.il.us]
**Sent:** Monday, February 10, 2014 9:43 AM
**To:** Joshua A Tepfer
**Subject:** RE: Savory

The fingernail scrapings were the other samples that were best suited for Y-STR testing, other than the non putrid vaginal swabs.

William believes it would be best to do both of these samples in Y-STRs first and see what information is obtained if you all will agree to that. Minis are much better suited to single source samples. And in all three of these samples we expect the majority of the DNA to be female and the Y testing will eliminate the female from the possible mixture of DNA.

I need to finish my analysis and get the standard profiles before anything can be sent to William Frank.

He will also need verification when the samples are sent to him that it is ok for him to do this consumptive testing.

Otherwise, once I am done the samples will be ready for his testing.

Ann Yeagle
Forensic Scientist III
Illinois State Police, Morton Crime Lab
309-284-6500
fax: 309-284-6504
yeaglea@isp.state.il.us

m77-197
24 ay

SDT-BOI 000508

| | |
|---|---|
| From: | Joshua A Tepfer <j-tepfer@law.northwestern.edu> |
| To: | "Ann_Yeagle@isp.state.il.us" <Ann_Yeagle@isp.state.il.us>, |
| Cc: | Steven A Drizin <s-drizin@law.northwestern.edu>, Laura H Nirider <l-nirider@law.northwestern.edu> |
| Date: | 02/10/2014 09:33 AM |
| Subject: | RE: Savory |

Okay. Thanks. Hope you are feeling better.

So, just to make sure I understand completely, the only final answer you need on the question of Y-STR v. minifiler is on the "non-putrid" vaginal swab? Is that correct?

I believe you told me last time we spoke that you believed you could take a portion of the vaginal swab and try for minifiler, and leave enough intact that it would not affect your ability to do Y-STR on the remaining portion. Is that correct?

Is there any other decision we need to make in the interim before William Frank is able to get started?

Josh

**From:** Ann_Yeagle@isp.state.il.us [mailto:Ann_Yeagle@isp.state.il.us]
**Sent:** Monday, February 10, 2014 9:27 AM
**To:** Joshua A Tepfer
**Subject:** Re: Savory

Hi Josh,
I have had a few delays on my part. I have been sick and then I was off most of last week with sick kids and weather issues, sorry.
Today I am extracting the stain from the pants pocket, using a different protocol that will hopefully help DNA recovery. I spoke to Laura about this and she agreed with the plan.

I did obtain DNA from the hair standards of Connie Cooper, William Douglas and Noyalee Robinson I will amplify them and see how full of a profile I can obtain. The hair standard from James Robinson did not yield sufficient DNA for me to amplify from the hairs. So, I will need to extract the swab from his blood tube to see if I can get a usable profile from it.

I should have information for you by the end of this week.

William Frank is also willing to try the Y analysis and/ or mini STR testing of the samples based on your decision and the judges orders as well as how these standards work. I need to have standard profiles for him before he can move forward with his testing. But, he has agreed to do the testing.

Please feel free to call or email if you need additional information or clarification. I apologize for the delay. This has been a tough winter.
But, I should have good information for you by Friday.
Ann Yeagle
Forensic Scientist III
Illinois State Police, Morton Crime Lab
309-284-6500
fax: 309-284-6504
yeaglea@isp.state.il.us

| | |
|---|---|
| From | Joshua A Tepfer <j-tepfer@law.northwestern.edu> |
| To: | "ann_yeagle@isp.state.il.us" <ann_yeagle@isp.state.il.us>, |

M77-197
25.0y

SDT-BOI 000509

Date:     02/10/2014 08:54 AM
Subject:   **Savory**

Hi Ann —

Just checking in to see where we are at.

Thanks,
Josh

Joshua A. Tepfer
Clinical Assistant Professor
Center on Wrongful Convictions of Youth
Northwestern University School of Law
375 E. Chicago Ave., 8th Floor
Chicago, IL 60611
Telephone: (312) 503-6298
Fax: (312) 503-8977
www.cwcy.org



M77-147
26 tly

SDT-BOI 000510



Savory
Joshua A Tepfer
to:
ann_yeagle@isp.state.il.us
02/17/2014 10:45 AM
Hide Details
From: Joshua A Tepfer <j-tepfer@law.northwestern.edu>
To: "ann_yeagle@isp.state.il.us" <ann_yeagle@isp.state.il.us>,

Hi Ann --

I left you a message at your office. I'm going to avoid trying your cell phone until this afternoon.

I'm at home today due to weather. If you have the chance to give me an update, please call me at 773-575-4424.

Thanks,
Josh

2-18-14

Called Josh Tepfer - gave update.
Snowday yesterday and I didn't get his voice mail till
this morning.
Gave an update for judge, if any questions call me.
ay

M77-197
27 ay

SDT-BOI 000511



**RE: Savory**
Ann Yeagle  to: Joshua A Tepfer                                          02/18/2014 09:30 AM

Thank you, I will get my work completed and get this report to you as soon as possible. I will pass this court date information on to William Frank at the Research and Development Laboratory in Springfield. If you have any further questions, please let me know.

Ann Yeagle
Forensic Scientist III
Illinois State Police, Morton Crime Lab
309-284-6500
fax: 309-284-6504
yeaglea@isp.state.il.us

---

Joshua A Tepfer        Hi Ann - I just got off the phone with the Judge....        02/18/2014 09:26:39 AM

From:      Joshua A Tepfer <j-tepfer@law.northwestern.edu>
To:        "Ann_Yeagle@isp.state.il.us" <Ann_Yeagle@isp.state.il.us>,
Date:      02/18/2014 09:26 AM
Subject:   RE: Savory

---

Hi Ann –

I just got off the phone with the Judge. Upon my representation that you believed it was the next appropriate step, no one objected to transferring the evidence to Springfield after you completed your testing. The Judge set the next court date/status for 3/17/14. Please feel free to pass that along to Mr. Frank.

I will look for your subsequent report.

Thank you,
Josh

**From:** Ann_Yeagle@isp.state.il.us [mailto:Ann_Yeagle@isp.state.il.us]
**Sent:** Monday, February 10, 2014 4:21 PM
**To:** Joshua A Tepfer
**Subject:** RE: Savory

That sounds good. I should be in the office on the 17th, if I am out, please feel free to call me on my Cell Phone 309-642-9810 and I can give you a full update.
Thank you for your patience.

Ann Yeagle
Forensic Scientist III
Illinois State Police, Morton Crime Lab
309-284-6500
fax: 309-284-6504
yeaglea@isp.state.il.us

WITT-A?
28-y

**SDT-BOI 000512**

From:     Joshua A Tepfer <j-tepfer@law.northwestern.edu>
To:       "Ann_Yeagle@isp.state.il.us" <Ann_Yeagle@isp.state.il.us>,
Cc:       Steven A Drizin <s-drizin@law.northwestern.edu>, Laura H Nirider <l-nirider@law.northwestern.edu>
Date:     02/10/2014 04:12 PM
Subject:  RE: Savory

Okay, let's circle back when you complete all the standards and it is in Mr. Frank's hands. But as long as some sample can be left for minifiler for both the non-putrid vaginal and the fingernail scrapings, I think we are fine with doing the Y-STR first. If that is not the case, I may need to talk to my client to give the final go-ahead for Y-STR testing.

The Judge set a status conference for the 18th, so I will try and update him on that day. So maybe we can talk Monday the 17th so I know exactly where we are at for all of this going into the hearing on the 18th.

Thanks,
Josh

**From:** Ann_Yeagle@isp.state.il.us [mailto:Ann_Yeagle@isp.state.il.us]
**Sent:** Monday, February 10, 2014 9:43 AM
**To:** Joshua A Tepfer
**Subject:** RE: Savory

The fingernail scrapings were the other samples that were best suited for Y-STR testing, other than the non putrid vaginal swabs.

William believes it would be best to do both of these samples in Y-STRs first and see what information is obtained if you all will agree to that. Minis are much better suited to single source samples. And in all three of these samples we expect the majority of the DNA to be female and the Y testing will eliminate the female from the possible mixture of DNA.

I need to finish my analysis and get the standard profiles before anything can be sent to William Frank.

He will also need verification when the samples are sent to him that it is ok for him to do this consumptive testing.

Otherwise, once I am done the samples will be ready for his testing.

Ann Yeagle
Forensic Scientist III
Illinois State Police, Morton Crime Lab
309-284-6500
fax: 309-284-6504
yeaglea@isp.state.il.us

M77-197
29AY
SDT-BOI 000513

From:     Joshua A Tepfer <j-tepfer@law.northwestern.edu>
To:       "Ann_Yeagle@isp.state.il.us" <Ann_Yeagle@isp.state.il.us>,
Cc:       Steven A Drizin <s-drizin@law.northwestern.edu>, Laura H Nirider <l-nirider@law.northwestern.edu>
Date:     02/10/2014 09:33 AM
Subject:  RE: Savory

Okay. Thanks. Hope you are feeling better.

So, just to make sure I understand completely, the only final answer you need on the question of Y-STR v. minifiler is on the "non-putrid" vaginal swab? Is that correct?

I believe you told me last time we spoke that you believed you could take a portion of the vaginal swab and try for minifiler, and leave enough intact that it would not affect your ability to do Y-STR on the remaining portion. Is that correct?

Is there any other decision we need to make in the interim before William Frank is able to get started?

Josh

**From:** Ann_Yeagle@isp.state.il.us [mailto:Ann_Yeagle@isp.state.il.us]
**Sent:** Monday, February 10, 2014 9:27 AM
**To:** Joshua A Tepfer
**Subject:** Re: Savory

Hi Josh,
I have had a few delays on my part. I have been sick and then I was off most of last week with sick kids and weather issues, sorry.
Today I am extracting the stain from the pants pocket, using a different protocol that will hopefully help DNA recovery. I spoke to Laura about this and she agreed with the plan.

I did obtain DNA from the hair standards of Connie Cooper, William Douglas and Noyalee Robinson I will amplify them and see how full of a profile I can obtain. The hair standard from James Robinson did not yield sufficient DNA for me to amplify from the hairs. So, I will need to extract the swab from his blood tube to see if I can get a usable profile from it.

I should have information for you by the end of this week.

William Frank is also willing to try the Y analysis and/ or mini STR testing of the samples based on your decision and the judges orders as well as how these standards work. I need to have standard profiles for him before he can move forward with his testing. But, he has agreed to do the testing.

Please feel free to call or email if you need additional information or clarification. I apologize for the delay. This has been a tough winter.
But, I should have good information for you by Friday.
Ann Yeagle
Forensic Scientist III
Illinois State Police, Morton Crime Lab
309-284-6500

SDT-BOI 000514

fax: 309-284-6504
veaglea@isp.state.il.us

From:    Joshua A Tepfer <j-tepfer@law.northwestern.edu>
To:      "ann_veagle@isp.state.il.us" <ann_veagle@isp.state.il.us>,
Date:    02/10/2014 08:54 AM
Subject: Savory


Hi Ann –

Just checking in to see where we are at.

Thanks,
Josh

Joshua A. Tepfer
Clinical Assistant Professor
Center on Wrongful Convictions of Youth
Northwestern University School of Law
375 E. Chicago Ave., 8th Floor
Chicago, IL 60611
Telephone: (312) 503-6298
Fax: (312) 503-8977
www.cwcy.org

SDT-BOI 000515



RE: Savory
Joshua A Tepfer
to:
Ann_Yeagle@isp.state.il.us
02/18/2014 01:53 PM
Cc:
"Cari_Sandberg@isp.state.il.us"
Hide Details
From: Joshua A Tepfer <j-tepfer@law.northwestern.edu>
To: "Ann_Yeagle@isp.state.il.us" <Ann_Yeagle@isp.state.il.us>,
Cc: "Cari_Sandberg@isp.state.il.us" <Cari_Sandberg@isp.state.il.us>

I'm so sorry to hear of this sudden loss. It was thoughtful of you to alert me. Please take care.

Warm Regards,
Josh

**From:** Ann_Yeagle@isp.state.il.us [mailto:Ann_Yeagle@isp.state.il.us]
**Sent:** Tuesday, February 18, 2014 1:37 PM
**To:** Joshua A Tepfer
**Cc:** Cari_Sandberg@isp.state.il.us
**Subject:** RE: Savory

Good afternoon,
I just had an unexpected death in the family and need to leave work today. I am sorry this will delay me getting things tied up as quickly as we discussed earlier. I hope to be back in the office later this week, but it could be next week. so, it may be an extra week to get my portion completed and then mailed to William Frank.

If you have any questions or need further updates, my supervisor Cari Sandberg will be in the office all week.

Ann Yeagle
Forensic Scientist III
Illinois State Police, Morton Crime Lab
309-284-6500
fax: 309-284-6504
yeaglea@isp.state.il.us

From:      Joshua A Tepfer <j-tepfer@law.northwestern.edu>
To:        "Ann_Yeagle@isp.state.il.us" <Ann_Yeagle@isp.state.il.us>.
Date:      02/18/2014 09:28 AM
Subject:   RE: Savory

Hi Ann –

I just got off the phone with the Judge. Upon my representation that you believed it was the next appropriate step, no one objected to transferring the evidence to Springfield after you completed your testing. The Judge set the next court date/status for 3/17/14. Please feel free to pass that along to Mr. Frank.

I will look for your subsequent report.

M-77-197

32 cy

SDT-BOI 000516



RE: Savory
Joshua A Tepfer
to:
Ann_Yeagle@isp.state.il.us
03/03/2014 02:11 PM
Cc:
"Cari_Sandberg@isp.state.il.us"
Hide Details
From: Joshua A Tepfer <j-tepfer@law.northwestern.edu>
To: "Ann_Yeagle@isp.state.il.us" <Ann_Yeagle@isp.state.il.us>,
Cc: "Cari_Sandberg@isp.state.il.us" <Cari_Sandberg@isp.state.il.us>
History: This message has been replied to.

Hello –

Ann, again, I express my condolences and I wish you and your family the best.

In the hopes I am not being insensitive, I did, however, want to inquire on the Savory matter to check in to see if there is an additional report and/or if the evidence has been transferred to Mr. Frank. Just to let you know, the judge asked to move up the next court hearing to 3/14/14.

Thank you,
Josh

**From:** Ann_Yeagle@isp.state.il.us [mailto:Ann_Yeagle@isp.state.il.us]
**Sent:** Tuesday, February 18, 2014 1:37 PM
**To:** Joshua A Tepfer
**Cc:** Cari_Sandberg@isp.state.il.us
**Subject:** RE: Savory

Good afternoon,
I just had an unexpected death in the family and need to leave work today. I am sorry this will delay me getting things tied up as quickly as we discussed earlier. I hope to be back in the office later this week, but it could be next week. so, it may be an extra week to get my portion completed and then mailed to William Frank.

If you have any questions or need further updates, my supervisor Cari Sandberg will be in the office all week.

Ann Yeagle
Forensic Scientist III
Illinois State Police, Morton Crime Lab
309-284-6500
fax: 309-284-6504
yeaglea@isp.state.il.us

From     Joshua A Tepfer <j-tepfer@law.northwestern.edu>
To:      "Ann_Yeagle@isp.state.il.us" <Ann_Yeagle@isp.state.il.us>,
Date     02/18/2014 09:26 AM
Subject  RE: Savory

M-17-197
33 xy

SDT-BOI 000517

 **Re: M77-197 quick question before I amp standards**
Ann Yeagle  to: William Frank                                    03/06/2014 02:53 PM

Thanks so much for your help with this and the information.

Ann Yeagle
Forensic Scientist III
Illinois State Police, Morton Crime Lab
309-284-6500
fax: 309-284-6504
yeaglea@isp.state.il.us

| William Frank | Ann, the quant results for 26A look reproducible... | 03/06/2014 02:41:34 PM |

| | |
|---|---|
| From: | William Frank/IIStPolice |
| To: | Ann Yeagle/IIStPolice@IIStPolice, |
| Date: | 03/06/2014 02:41 PM |
| Subject: | Re: M77-197 quick question before I amp standards |

Ann, the quant results for 26A look reproducible for both the Duo H and Y values. I expect you will see some impact of degradation in the sample and could therefore increase the amount of DNA amplified over what you would normally select. From your laboratories sensitivity data I would select approximately 50% more than you might normally amplify.  I expect this will be pretty close to the 1.5 ng amplification you had described.       wef

William Frank
DNA Research Coordinator/Technical Leader
Illinois State Police
Research & Development Laboratory
2060 Hill Meadows Drive
Springfield, IL  62702

phone:  217-785-8186
fax:      217-557-3989

     LIVESTRONG

| Ann Yeagle | I apologize I meant to attach this file.  I ran a qP... | 03/05/2014 04:05:57 PM |

Ann Yeagle/IIStPolice
03/05/2014 04:05 PM

To   William Frank/IIStPolice@IIStPolice,

cc

Subject  Re: M77-197 quick question before I amp standards

[attachment "M77-197 stds.xls" deleted by William Frank/IIStPolice]
I apologize I meant to attach this file.
I ran a qPCR plate on 2/3/14 and on 3/5/14, I also included my proposed amp sheet.
If you need anything else, please let me know.

Ann Yeagle

M-77-197
34 Ny

SDT-BOI 000518

Forensic Scientist III
Illinois State Police, Morton Crime Lab
309-284-6500
fax: 309-284-6504
yeaglea@isp.state.il.us

| William Frank | Please forward qPCR data for the samples.   we... | 03/05/2014 04:01:38 PM |

| | |
|---|---|
| From: | William Frank/IIStPolice |
| To: | Ann Yeagle/IIStPolice@IIStPolice, |
| Date: | 03/05/2014 04:01 PM |
| Subject: | Re: M77-197 quick question before I amp standards |

Please forward qPCR data for the samples.   wef

William Frank
DNA Research Coordinator/Technical Leader
Illinois State Police
Research & Development Laboratory
2060 Hill Meadows Drive
Springfield, IL  62702

phone: 217-785-8186
fax:     217-557-3989

LIVESTRONG

| Ann Yeagle | Hi Bill, This is my post conviction case that will b... | 03/05/2014 03:17:48 PM |

Ann Yeagle/IIStPolice
03/05/2014 03:17 PM

To  William Frank/IIStPolice@IIStPolice,

cc

Subject  M77-197 quick question before I amp standards

Hi Bill,
This is my post conviction case that will be coming your way. I was able to get human DNA from the hair standards and blood tubes of the parties involved from 1977.

I am thinking about doing 2 amps of most of them, but one of the victims, I was only able to get about 2.7ng of DNA and I want to make a good shot at this amp in IDplus. What would you recommend. It is Exhibit 26A, which is a swabbing of blood crusts on the tube stopper from the blood standard from victim James Robinson.

I was thinking about amping 25ul which would be ~1.5ng or doing 30ul which would be ~1.8ng. I know it will be degraded as it is over 35 years old, but I wasn't sure if it would be safe to go that high. I figure I have one shot at an ID+ profile and then need to leave you sufficient for minis and or Ys.

I have included my quant information and my proposed amp.
Could you please give me your opinion, I would like to amp tomorrow morning 3-6-14 if possible. I am trying to finish up this case and get it to you as they have decided to move forward with Mini's and Ys as appropriate.

SDT-BOI 000519

Thanks for your input, I really appreciate it.

Ann Yeagle
Forensic Scientist III
Illinois State Police, Morton Crime Lab
309-284-6500
fax: 309-284-6504
yeaglea@isp.state.il.us

SDT-BOI 000520

**To:** William Frank/IlStPolice,
**Cc:**
**Bcc:**
**Subject:** M77-197 request to use quant information

Good afternoon Bill,
on 2-14-14 I ran a quant on this case. I quanted an extraction of a possible blood stain from the pants pocket in this case. Exhibit 59C 2 nd extraction. I had gone back and extracted a larger portion of this stain and followed a modified procedure as recommended by you. I did an overnight extraction, then an additional ProK addition and 4 hour incubation, then PCI, then CI clean up. And then I combined 20 cuttings into 1 volume.

When I did the quant, I ran neat and the human curve was in, but the male curve was not.
I reran dilutions of the sample and at 1:10 and 1:100 it was not inhibited, but was ND.

I realized I did not re-quant the neat or the reagent blanks for this extraction. May I have permission to use this quant data for my RBs or do I need to go back and requant. (Extracted 1 sample and did 2 blanks with it, all were 20 tubes into 1)

M77-197 2-14-14 Info.pdf  ← *quant data.*

Thanks.

Ann Yeagle
Forensic Scientist III
Illinois State Police, Morton Crime Lab
309-284-6500
fax: 309-284-6504
yeaglea@isp.state.il.us

SDT-BOI 000521



To:      William Frank/IlStPolice,
Cc:
Bcc:
Subject:   Re: M77-197 request to use quant information

Thank you so much, that was my hope to conserve the blank.

I am finishing my report and getting the evidence all packaged to send on to you for Mini's and Y-STR testing. I will make sure I send the conversation logs, testing requests and court order information.

The judge has set the next date for a hearing on May 29th

The attorney in charge of this post conviction testing is Josh Tepfer from the Center for wrongful convictions of minors.
He sent me this message this morning "We had the court hearing this morning. I updated everyone, including to expect your final report by early next week  and for the evidence to be shipped to Mr. Frank thereafter. We set a date several months out (May 29) for the next court date in hopes that all would be completed by that date. If you wouldn't mind passing that along to Mr. Frank, and perhaps seeing if he anticipated whether he could complete his work by that date and letting me know, I would appreciate it."

I have previously let Mr. Tepfer know that you would be waiting to use Y23 on this case and that we were in a holding pattern because of this and that this testing can take time.  He is anxious to get the Minifiler analysis moving forward as well. They are definitely more interested in Minifiler analysis trying to find a profile that might be CODIS eligible. I let him know I would ask you to see when you might be able to get to this case. I will send his contact information to you with the case copies and evidence next week. It looks like I will be sending you 9 samples with blanks for Minifiler and possibly 5 samples for both Minis and Ys, even though I have impressed to them that Ys could be much more informative for the Vaginal Swabs (semen indicated) and Fingernail scrapings from victim. Many of these samples were inhibited and we had discussed that you might be doing a clean up step before amping (this had been discussed with Laura Gahn when she was in from Cellmark to observe my testing). I just wanted to give you a heads up of what is coming your way.

Thanks so much for your help with all of this case.

Ann Yeagle
Forensic Scientist III
Illinois State Police, Morton Crime Lab
309-284-6500
fax: 309-284-6504
yeaglea@isp.state.il.us

William Frank          As long as the RB was quantified with the first ru...          03/14/2014 08:51:41 AM

From:      William Frank/IlStPolice
To:        Ann Yeagle/IlStPolice@IlStPolice,
Date:      03/14/2014 08:51 AM
Subject:   Re: M77-197 request to use quant information

As long as the RB was quantified with the first run I would still use the blank.  I would not recommend going back and using additional volume to quant the blank another time.   wef

William Frank
DNA Research Coordinator/Technical Leader
Illinois State Police

SDT-BOI 000522

# ILLINOIS STATE POLICE
## Division of Forensic Services
## Forensic Sciences Command
## Morton Forensic Science Laboratory

| Exhibit / Item | 1A | Date Examined | 12/17/2013 | Case # | M77-197 |
|---|---|---|---|---|---|

**Description of Package and Markings:**

Small BPB sld clear tape "SB 10-22-13 AMY"

on BPB "Swab from Connie Cooper Labeled 1A"

contains:

plastic tube w/ blue lid contains glass vial with white et seal "RFG"

unwound seal tape, opened glass vial, contains 2 swabs

both swabs covered in lt brown stain and part of stick

~1/2 of each swab tip appeared to have been previously removed.

both remaining swab tips into 1 SET

SET into zl pl into man env sld BET 12-17-13 AMY as 1A1.

no testing at this time to preserve sample. (Previous report - semen indicated, no sperm id'd)

As submitted



Swabs



| Turned over to DNA: | Repackaging: | Seal Date: | Analyst: |
|---|---|---|---|
| 1A1 | orig bpb sld BET | 12/17/2013 | AMY |

Revision Date (01/13)

SDT-BOI 000523

ILLINOIS STATE POLICE

**Division of Forensic Services**

**Forensic Sciences Command**

Case   **M77-197**

Date   1/21/2014

## DIFFERENTIALS EXTRACTION WORKSHEET

Revision Date (01/13)

**Extraction Order**

| Case # | Ex # | # tubes | Fractions, resol vol |
|--------|------|---------|----------------------|
| M77-197 | 1A1 | 1 | F1: 50 ul  F2: 50 ul  F3: 50ul |
| 1-21 RB-1 → RB-4 | | 1 | F1: 50 ul  F2: 50 ul |

Extraction observed by Laura Gahn

---

| | |
|---|---|
| **Exhibit** | **1A1** |
| **Packaging** | Manilla env std BET "Portion of vaginal swabs from Connie Cooper. (prev. tested) |
| **Contents** | zl pl bag containing 1 SET |
| | contains 2 swabs |
| **Extract** | 1 tube |

**For Y/ Minifiler analysis**

1A1A    Extracted DNA from the Exhibit 1A1 labeled 1A1A.  Extracted DNA dried and packaged in
plastic bag. 1-21 RBs F1 and F2 dried and packaged in a plastic bag.
Plastic bags sealed in new manila envelope on 3-20-14.

**Repackaging:**

DNA substrate in mc tube into pl bag in Ex 1A1

Extracted DNA into pl bag in Ex 1A1A

**RBs packaged with:**

F1, F2: RB-1, RB-2, RB-3, RB-4 → 1A1A

Seal Date: 3-20-14

Analyst: _JY_

**ILLINOIS STATE POLICE**
**Division of Forensic Services**
**Forensic Sciences Command**
**Morton Forensic Science Laboratory**

Exhibit / Item _____ 21, 22 _____ Date Examined ____ 12/17/2013 ___ Case # _____ M77-197 _____

**Description of Package and Markings:**

man env sld clear tape "...#982 10-22-13..."
"Fingernail clippings from Connie Cooper" on env

Envelope opened to observe 2 small envelopes

    21 - small man env sld brown tape "WTJ" as appears and cellmark purple ET "JY 021113"

    22 - small man env sld brown tape "WTJ" as appears and cellmark purple ET "JY 021113"

21- one small env "21 fingernail scraping .... Rt..." opp side "...#21 RFG M-77-197 1-19-77..."

    contains a broken orange stick. ~3.1 cm in length.

    exam w/ stereo microscope - misc debris obs'd on stick

    cut off pointed end ~1.5cm Into 1 SET

        SET into zl pl into man env sld BET 12-17-13 AMY as 21A.

 

22 - on small env "22 fingernail scraping ... " opp side "...#22 RFG M-77-197 1-19-77..." "op'd 02-11-13JY"

    contains a broken orange stick. ~3.9 cm in length.

    exam w/ stereo microscope - misc debris obs'd on stick

    cut off pointed end ~1.5cm into 1 SET

        SET into zl pl into man env sld BET 12-17-13 AMY as 22A.

 

| Turned over to DNA: | Repackaging: | Seal Date: | Analyst: |
|---|---|---|---|
| 21A, 22A | orig man env sld BET | 12/17/2013 | AMY |

Revision Date (01/13)

**SDT-BOI 000525** 42

### ILLINOIS STATE POLICE
### Division of Forensic Services
### Forensic Sciences Command
### Morton Forensic Science Laboratory

Exhibit / Item _____ 44 _____ Date Examined _12/11/2013_ Case # _____ M77-197 _____

**Description of Package and Markings:**
   man env sld clear tape "...#982 10-22-13..."
   "Black Normark Folding Knife ex. 32A" on env

Envelope opened to observe

Folding knife - "People's Exhibit #32A" Red label on handle
       INITIALS AND DATE SCRIBED ON HANDLE BY STICKER "...2/1/77"
       "Normark" brand on handle   blade "EKA Sweden Stainless"
       knife ~18cm long unfolded       blade ~7.5cm

Exam with stereo microscope
       observed very small RBS on blade of knife, sharp edge (< ~ 1/2mm by ~3mm)
       not tested b/c so small to preserve

12-12-13 continue exam

44A - 1 swabbing into 1 SET into zl into man env sld BET 12-17-13 AMY
       fine tip swab moistened w/ ddi water - blade edge of knife
       swabbed both sides of sharp edge at stain
       air dried and preserved as Exhibit 44A



Vis small amount of reddish stain inside area blade folds into
       not tested b/c so small to preserve

44B - 1 swabbing into 1 SET into zl into man env sld BET 12-17-13 AMY
       fine tip swab moistened w/ ddi water - inside area of folding knife
       air dried and preserved as Exhibit 44B





M77-197 #44
12-11-13

**KM controls**
known blood = pos
blank = neg

Turned over to DNA:          Repackaging:              Seal Date:           Analyst:
44A, 44B                     orig man env sld BET       12/12/2013           AMY

Revision Date (01/13)

SDT-BOI 000526

**ILLINOIS STATE POLICE**
**Division of Forensic Services**
**Forensic Sciences Command**
**Morton Forensic Science Laboratory**

Exhibit / Item _____ 59 _____   Date Examined ____ 12/9/2013 ____   Case # _____ M77-197 _____

**Description of Package and Markings:**

BPB sld clear box tape "SB #982 10-22-13"
on BPB "Paper sack with blue pants Ex #34"

BPB opened to obs: open BPB inside "#59...from sheet in main room... blue pants..."

    Red people's exhibit label "#34"

    White and Red Evidence tape seal at top fold of bag "...1-26-77" appears intact

    brown tape seal at bottom "RFG" appear to be initials on tape in black

    Bag appears ripped open - observe blue work style pants    No size label observed in pants.

    Removed pants from bag to examine.    Tag inside back "Koratron...Machine washable...permanent press"

Blue Pants - Navy blue work pants, visually dirty    Also "People's Exhibit #34A" label inside back

    button missing at waist. Pants are zipped. Zipper is metal and corroded. Unzipped pants - zipper works.

    swabbed inside of waistband with 1 moist swab. Avoided areas with markings.

    Also swabbed small area around thread where button would have been attached.    Swab air dried.

    Markings on inside waist difficult to read initials

    ~3/4" of waistband width swabbed- area swabbed - dotted outline.

Front




inside front view

Two tapings made to remove and preserve apparent hairs, fibers and debris.

Front and back pockets empty, button intact left rear pocket, front right small coin pocket empty

Debris observed in front pocket, into paper packet. Packet and tapings into man env and into Ex 59 pkg.

Left front leg appears to have a small burn hole - exam w/ stereo microscope - melted fibers vis around edge

Swabbing from waist area - 1 swab

into 1 SET into zl pl into man env sld BET 12-11-13 AMY as Ex 59A

continue on next page

Turned over to DNA:    Repackaging:    Seal Date:    Analyst:

59A    n/a    n/a    AMY

    53

Revision Date (01/13)

**SDT-BOI 000527** 43ty

**ILLINOIS STATE POLICE**
**Division of Forensic Services**
**Forensic Sciences Command**
**Morton Forensic Science Laboratory**

Exhibit / Item ___59___  Date Examined ___12/10/2013___  Case # ___M77-197___

**Description of Package and Markings:**
continued exam
Visual exam of pants - dirty and worn.
Right front pocket inside -





Q1 - vis med rbs on pocket outside of wt material
KM Q1 swab of stain = neg X2, cutting neg X2 on each side
Q2 same pocket swab = neg, cutting = neg
inside Q1 - swab X 2 = neg, 2 cuttings inside seam = neg
Q3 around inside appt burn hole on front left leg KM = neg
Q4 yellowish stain around edge of tag swab = neg, cutting = neg
Q5 yellow- brown stain above tag swab = neg, cutting = neg



**KM controls**
known blood = pos
blank =neg

continued on next page

Turned over to DNA:       Repackaging:       Seal Date:       Analyst:
n/a                       n/a                n/a              AMY

Revision Date (01/13)

**SDT-BOI 000528**

**ILLINOIS STATE POLICE**
**Division of Forensic Services**
**Forensic Sciences Command**
**Morton Forensic Science Laboratory**

| Exhibit / Item | 59 | Date Examined | 12/11/2013 | Case # | M77-197 |
|---|---|---|---|---|---|

**Description of Package and Markings:**

continued exam on 12-11-13

Examine pants with stereo microscope - inside right front pocket stain vis blood like KM

Q6 - stain inside back of pants below tag. Cutting = neg

Q7(outside of appt burn hole) same stain as Q3, cutting and swab of Q7 = neg

Q8 - vis dirt from left front leg - swab = neg

Q9 = neg

Q10 at zipper fly - swab = neg

12/11/2013
KM controls
known blood = pos
blank =neg

Preserve stains/ areas of pants for DNA analysis

Q3/7 - apparent burn hole ~0.4cm in diameter.

cutting from around apparent burn hole ~0.6cm X ~0.8cm - hole in center

into 1 SET into zl pl into man env sld BET 12-11-13 AMY as Ex 59B

Q1 - cutting from right front pocket. Portion of seam and pocket into 1 SET, additional portion from pocket into glyc fold.

Cut out area ~0.9cm X ~1cm from seam into SET, Cut out ~2.3cm X ~ 1.7cm from Q1 RBS stain

From Q1 stain cut out ~0.5cm X ~0.8cm into same SET, remaining stain in glyc fold.

SET into zl pl. glyc fold and zl pl into man env sld BET 12-11-13 AMY as Ex 59C

More than 1/2 of stain remains intact on pants

Q5 - lt yellowish/ lt brownish cutting from vis stain above washing tag

~1.4cm X ~0.9cm cut out of stained area- diffuse appearance

into 1 SET into zl pl into man env sld BET 12-11-13 AMY as Ex 59D

Pants wrapped in white paper and back into Ex 59 sld BET 12-11-13

continued on next page

| Turned over to DNA: | Repackaging: | Seal Date: | Analyst: |
|---|---|---|---|
| 59B, 59C, 59D | orig BPB sld BET | 12/11/2013 | AMY |

Revision Date (01/13)

**SDT-BOI 000529**

## ILLINOIS STATE POLICE
### Division of Forensic Services
### Forensic Sciences Command
### Morton Forensic Science Laboratory

| Exhibit / Item | 59 | Date Examined | 12/12/2013 | Case # | M77-197 |
|---|---|---|---|---|---|

**Description of Package and Markings:**
exam continued

12-12-13 reopened pants

looked at area around rt front pocket again with stereo microscope

observed small cut out area ~0.5cm X ~0.6cm

will cut out under layer of blue fabric remaining.

Vis dirty areas surrounding but no blood like stains observed.

Q11 - swabbing from area around rt pocket outside KM = neg          KM controls 12-12-13
                                                                    known blood = pos

                                                                    blank =neg

Cut out inside layer from prior appt testing cut out area. ~0.5cm X ~0.6cm was previously removed.

Cut out ~0.4cm X~0.5cm and into 1 SET.

SET into zl pl into man env sld BET 12-12-13 AMY as Ex 59E



Ex 59A, 59B, 59D and 59E will need to be consumed in DNA

| Turned over to DNA: | Repackaging: | Seal Date: | Analyst: |
|---|---|---|---|
| | reseled in orig bpb sld BET | 12-12-13 AMY | AMY |

Revision Date (01/13)

**ILLINOIS STATE POLICE**
**Division of Forensic Services**
**Forensic Sciences Command**
**Morton Forensic Science Laboratory**

Exhibit / Item _____ 15 _____ Date Examined _12/16/2013_ Case # _____ M77-197 _____

**Description of Package and Markings:**

man env sld clear tape "...#982 10-22-13..."
"Light switch cover from bathroom ex 17" on env

Envelope opened to observe

env sealed with brown tape "RFG" also "WTJ", circuit clerk stamp on env, env recv'd sliced open

on env "Light switch cover from bathroom 15  1-18-77 ..."        people's exhibit label #17

contains a light switch plate cover and 2 screws

cover ~4 1/2" X ~ 2 3/4" "RFG 1/25/77" top left as oriented

on plate 2 people's exhibit labels on top of each other, on top #17A, below #15A

Back side, vis dirty/ grimy.

Cover is light beige, very dirty vis.  Has 2 screw holes and switch opening.

On front surface 2 large areas of lt to med RBS, 1 smaller area near initials "RFG"

Difficult to visualize any un stained area b/c of dirt and stains

Small lt RBS by RFG markings at top  not tested ATT

back side no testing



Front
before
testing/
swabbing



Turned over to DNA:                Repackaging:            Seal Date:          Analyst:

continued on next pg      AMY

Revision Date (01/13)

SDT-BOI 000531

**ILLINOIS STATE POLICE**
**Division of Forensic Services**
**Forensic Sciences Command**
**Morton Forensic Science Laboratory**

Exhibit / Item _____ 15 cont. _____ Date Examined ____ 12/16/2013 __ Case # _____ M77-197 _____

**Description of Package and Markings:**

Q1 - stain upper on front and smooth side. Lt to med RBS ~1.3cm X ~2.5cm removed ~1/2 of stain - smooth side of stain
    moist fine tip swab removed ~0.6cm X ~2.5cm of stain on smooth side
    swab air dried. Remaining stain intact on cover
    Q1 = **15A** 1 swabbing into 1 SET into zl pl into man env sld BET 12-17-13 AMY

Q2 - stain towards middle of plate, on and around switch hole. Stain lt to med RBS, thin stain.
    ~1.4cm X ~1.8cm from middle of stain swabbed off
    entire stain ~2cm X ~4cm, more than half of stain remains on cover.
    moist fine tipped swab – air dried.
    Q2 = **15B** 1 swabbing into 1 SET into zl pl into man env sld BET 12-17-13 AMY
    After swabbings



KM

Q1 = pos
Q2 = pos
blank = neg
known blood = pos

** did not swab for touch DNA.

Turned over to DNA:      Repackaging:      Seal Date:      Analyst:
15A, 15B      orig man env sld BET      12/17/2013      AMY

Revision Date (01/13)



SDT-BOI 000532 41

**ILLINOIS STATE POLICE**
**Division of Forensic Services**
**Forensic Sciences Command**

Case   **M77-197**

Date   1/22/2014

**MAXWELL EXTRACTION WORKSHEET**

Revision Date (01/13)

P 1 of 3

| Extraction Order | | | Extraction Order | | | |
|---|---|---|---|---|---|---|
| Maxwell Tray 1 | | | Maxwell Tray 1 continued | | | |
| Case # | Ex # | # tubes | Case # | Ex # | # tubes | Resol Volume: |
| M77-197 | 21A | 1 | M77-197 | 15A | 1 | 50 ul each |
| | 22A | 1 | | 15B | 1 | |
| | 44A | 1 | | 59C | 1 | |
| | 44B | 1 | 1-22 MRB-1, MRB-2 | | 1 | |
| | 59A | 1 | 1-22 MRB-3, MRB-4 | | 1 | |
| | 59B | 1 | | | | |
| | 59D | 1 | | | | |
| | 59E | 1 | | | | |

Extraction observed by Laura Gahn

| | |
|---|---|
| **Exhibit** | 21A |
| **Packaging** | Manilla env skd BET "Portion of orange stick tip - fingernail scraping from Connie Cooper" |
| **Contents** | zl pl bag containing 1 SET, containing pointy end of org stick |
| **Extract** | 1 tube |

| | |
|---|---|
| **Exhibit** | 22A |
| **Packaging** | Manilla env skd BET "Portion of orange stick tip fingernail scraping from Connie Cooper" |
| **Contents** | zl pl bag containing 1 SET, containing pointy end of org stick |
| **Extract** | 1 tube |

| | |
|---|---|
| **Exhibit** | 44A |
| **Packaging** | Manilla env skd BET "Swabbing from blade of knife (edge)" |
| **Contents** | zl pl bag containing 1 SET containing 1 swab lt grey stain vis |
| **Extract** | 1 tube |

Repackaging:

RBs packaged with:

Seal Date:

Analyst:

**SDT-BOI 000533**

**ILLINOIS STATE POLICE**
**Division of Forensic Services**
**Forensic Sciences Command**

Case  **M77-197**

Date   1/22/2014

**MAXWELL EXTRACTION WORKSHEET**
continued p 2 of 3

Revision Date (01/13)

| | |
|---|---|
| **Exhibit** | 44B |
| **Packaging** | Manilla env sld BET "Swabbing from inside of folding knife " |
| **Contents** | zl pl bag containing 1 SET containing 1 swab dk grey - dirty vis stain |
| **Extract** | 1 tube |

| | |
|---|---|
| **Exhibit** | 59A     from blue pants |
| **Packaging** | Manilla env sld BET "Swabbing from inside waistband. #59A..." |
| **Contents** | zl pl bag containing 1 SET containing 1 swab  vis dirty |
| **Extract** | 1 tube |

| | |
|---|---|
| **Exhibit** | 59B |
| **Packaging** | Manilla env sld BET "Cutting from around apparent burn hole (Q7army)..." |
| **Contents** | zl pl bag containing 1 SET, containing piece of dark fabric |
| **Extract** | 1 tube |

| | |
|---|---|
| **Exhibit** | 59D |
| **Packaging** | Manilla env sld BET  "Cutting from inside back of pants by washing tag. (Q5) ..." |
| **Contents** | zl pl bag containing 1 SET, containing piece of light fabric |
| **Extract** | 1 tube |

| | |
|---|---|
| **Exhibit** | 59E |
| **Packaging** | Manilla env sld BET  "Cutting from below Rt belt loop above rt pocket ..." |
| **Contents** | zl pl bag containing 1 SET, containing piece of dk blue fabric |
| **Extract** | 1 tube |

Repackaging:

RBs packaged with:

Seal Date:

Analyst:

ILLINOIS STATE POLICE
**Division of Forensic Services**
**Forensic Sciences Command**

Case   **M77-197**

Date   1/22/2014

## MAXWELL EXTRACTION WORKSHEET
continued p 3 of 3

Revision Date (01/13)

| | |
|---|---|
| Exhibit | 15A |
| Packaging | Manilla env skd BET "Swabbing from edge of switch plate cover" |
| Contents | zl pl bag containing 1 SET, contains 1 swab |
| Extract | 1 tube |

| | |
|---|---|
| Exhibit | 15B |
| Packaging | Manilla env skd BET "Swabbing from near center of switch plate cover" |
| Contents | zl pl bag containing 1 SET, contains 1 swab |
| Extract | 1 tube        * Extracted DNA consumed, sample remains on Exhibit 15. |

| | |
|---|---|
| Exhibit | 59C |
| Packaging | Manilla env skd BET "cutting from Rt front pocket. (Q1) amy..." |
| Contents | zl pl bag containing 1 SET and glyc fold containing light fabric cutting with vis red brown stain |
| Extract | 1 tube |

**For Y/ Minifiler analysis**

**21A1**   Extracted DNA from Exhibit 21A labeled 21A1.  Extracted DNA dried and packaged in pl bag.
1-22 MRB-2 dried and packaged in same pl bag and skd in man env 3-20-14.

**22A1**   Extracted DNA from Exhibit 22A labeled 22A1.  Extracted DNA dried and packaged in pl bag.
Pl bag skd in man env 3-20-14.

**For Minifiler analysis**

**15A1**   Extracted DNA from Exhibit 15A labeled 15A1.  Extracted DNA dried and packaged in
pl bag. 1-22 MRB-3 and 4 dried and packaged in same pl bag. Pl bag into skd Man env 3-20-14.

**44A1 & 44B1**   Extracted DNA from Exhibits 44A labeled 44A1 and 44B lableled 44B1.  Extracted DNA dried
and packaged in sep. pl bags. Pl bags respectively pkg'd in man envs skd 3-20-14.

**59A1, 59B1, 59D1, 59E1**   Extracted DNA from Exhibit 59A, 59B, 59D and 59E labled Exhibits 59A1, 59B1, 59D1 and 59E1
respectively into sep. pl bags. Pl bags respectively pkg'd in man envs skd 3-20-14.

**59C1**   Extracted DNA from 1-22 and 2-11 extractions of Exhibit 59C were labeled 59C1.  Extracted DNA
dried and separately pck'd in pl bags. pl bag with 2-11 extracted DNA also contains  RB-1 and 2.
Both pl bags into a skd man env as Exhibit 59C1 on 3-20-14.

| Repackaging: | RBs packaged with: | Seal Date: |
|---|---|---|
| DNA substrate in mc tube into pl bag | MRB-1 consumed | 3-20-14 |
| Pl bag into original exhibits | MRB-2 → 21A1 | Analyst: |
| | MRB-3, MRB-4 → 15A1 | |

**SDT-BOI 000535**  51 bf

**ILLINOIS STATE POLICE**
**Division of Forensic Services**
**Forensic Sciences Command**
**Morton Forensic Science Laboratory**

Exhibit / Item _____ 27 & 28 _____  Date Examined _____ 12/20/2013 _____ Case # _____ M77-197 _____

Description of Package and Markings:

Man env skd clear tape "SB #982 10-22-13"

on env "Girl Hair Standards- from Connie Cooper"

Env contains - 2 plastic bags.

27 –      plastic bag w/ white evid tape seal 'WTJ' on markings

         "#27 RFG M-77-197  1-19-77" "27"

         on bag "Girl head  hair standard" smal amt of brown stain on bag vis, not tested at this time.

         Clump of appt hair vis through b Scotch tape "RFG"

         Not examined at this time. Preserve portion of pubic hair standard.

28-

plastic bag w/ white evid tape seal 'WTJ 1-18-77' on markings

"#28 RFG M-77-197  1-19-77" "28"                                          28

on bag "Girl pubic  hair standard"

contains small clump of appt hair

Vis lt to dark brown stain on outside and inside of bag Q1 ~5

1/2cm X ~7 cm at widest, Q2 ~7 1/2cm  X ~8 1/2 cm

KM 1 = neg

KM 1 inside bottom edge of bag below seam = neg

KM 2 =neg

because of vis appr of stains will preserve a portion to test as

Std for Connie Cooper if others fail

1 moist swab used to remove small portion of brown stain on inside of bag ~2cm X ~4cm inside seam

allowed to air dry   swab into 1 SET into zl pl into man env skd BET 1-14-14 AMY

as **Exhibit 28A.**

Cut side of bag near RFG tape, removed clump of apparent hairs, small clump remains in pkg untouched

Examined under stereoscope, root tag material present on many apparent hairs

Cut off appt root tag end of ~20 apparent hairs. All examined apparent hairs into glyc fold back into Ex 28.

Cut off ends placed into 1 SET (range in length from ~1/2cm to ~2cm appt hairs broke easily when handling)

SET into zl pl into man env skd BET as **Ex 28B** 1-14-14 AMY

close up of
appt hairs

**KM controls**

blank = neg

known blood = pos                   28 pl bag skd BET 1-14-14 AMY back into 27/28 man env.

Turned over to DNA:          Repackaging:                      Seal Date:          Analyst:

28A, 28B                      man env orig pkg skd BET          1/14/2014          AMY

                                                          Revision Date (01/13)          45

**SDT-BOI 000536**

**ILLINOIS STATE POLICE**
**Division of Forensic Services**
**Forensic Sciences Command**
**Morton Forensic Science Laboratory**

| Exhibit / Item | 29 & 30 | Date Examined | 1/14/2014 | Case # | M77-197 |
|---|---|---|---|---|---|



**Description of Package and Markings:**
Man env sld clear tape "SB #982 10-22-13"
on env "Boy Hair Standards- from James Robinson"
Env opened contains - 2 plastic bags.
29 - plastic bag w/ white evid tape seal 'WTJ 1-18-77" on markings
"#29 RFG M-77-197  1-19-77" "29"        Scotch tape "RFG"
on bag "Head hair standards Boy"
Clump of appt hair vis through bag.
Cut side of bag near RFG tape, removed clump of apparent hairs
small amount remain in pkg untouched
Examined under stereoscope, appt root material present on at least 1 appt hair
1 appt red fiber obs'd into glyc fold - back into pl bag

1/15/2014
~10 apparent hair ends cut off and placed into SET into zl pl into man env sld BET 1-15-14 AMY as Exhibit 29A
looked through ~1/2 of appt hair clump.   Majority of appt hairs looked like fragments
Appt hairs examined into glyc fold. Hairs removed from bag not examined put into sep. glyc fold.
Both glyc folds back into pl bag.

close up
of appt hairs



Ex 29 pl bag sld BET 1-15-14 AMY

30- plastic bag w/ white evid tape seal 'WTJ 1-18-77" on markings
"#30 RFG M-77-197  1-19-77" "30"        Scotch tape "RFG"
on bag "Boy pubic  hair standard"
a small amount of appt hairs obs'd through bag
   not opened at this time - remains intact

| Turned over to DNA: | Repackaging: | Seal Date: | Analyst: |
|---|---|---|---|
| 29A | orig man env sld BET | 1/15/2014 | AMY |

Revision Date (01/13)

**SDT-BOI 000537** 

**ILLINOIS STATE POLICE**
**Division of Forensic Services**
**Forensic Sciences Command**
**Morton Forensic Science Laboratory**

| Exhibit / Item | 88 thru 94 | Date Examined | 1/15/2014 | Case # | M77-197 |
| --- | --- | --- | --- | --- | --- |

**Description of Package and Markings:**
Man env sld clear tape "SB #982 10-22-13"
on env "Hair Standards William Douglas"
envelope contains 7 small pl bags with White evid tape "6-27-77" and RET "RFG"
88 - "Wm Douglas Mustache"   not examined.
89 - "Wm Douglas Hd front"   not examined.
90 - "Wm Douglas Hd top"   not examined.
91 - "Wm Douglas Hd rear"   not examined.
92 - "Wm Douglas Hd Rt."   not examined.
93 - "Wm Douglas Hd Lt."   see below
94 - "Wm Douglas Pubic"   not examined.

93- plastic bag opened- removed clump of apparent dark curly hair
examined with stereo microscope
removed 7 apparent root ends with apparent follicular tag material
into 1 SET
remaining appt hairs into glyc fold back into bag sld BET 1-15-14

1 SET with cuttings into zl pl into man env sld BET as Exhibit 93A 1-15-14 AMY

All orig pkgs back into orig man env.

| Turned over to DNA: | Repackaging: | Seal Date: | Analyst: |
| --- | --- | --- | --- |
| 93A | orig man env sld BET | 1/15/2014 | AMY |

Revision Date (01/13)
59

**SDT-BOI 000538** 54

**ILLINOIS STATE POLICE**
**Division of Forensic Services**
**Forensic Sciences Command**
**Morton Forensic Science Laboratory**

Exhibit / Item _____ 95 thru 99 _____  Date Examined _ 1/15/2014 _ Case # _____ M77-197 _____

**Description of Package and Markings:**
Man env sld clear tape "SB #982 10-22-13"
on env "Head hair stds Noyalee Robinson"
envelope contains 5 small pl bags with White evid tape "6-27-77" and RET "RFG"
95 - "Noyaleen Robinson Hd. Front 95"    not examined
96 - "Noyaleen Robinson Hd.Top 96"    see below
97 - "Noyaleen Robinson Hd. Rear 97"    not examined
98 - "Noyaleen Robinson Hd. Rt. 98"    see below
99 - "Noyaleen Robinson Hd. Lt. 99"    not examined

96- plastic bag opened- removed clump of apparent dark hair
examined under stereo microscope
removed 3 apparent root ends with apparent follicular tag material
into 1 SET as Exhibit 96A    remaining hairs into glyc fold back into bag

98- plastic bag opened- removed clump of apparent dark hair
examined under stereo microscope
removed 6 apparent root ends with apparent follicular tag material
into same SET as Exhibit 96 hairs, all from Noyaleen Robinson
    remaining apparent hairs into glyc fold back into bag
SET into zl pl bag into man env sld BET 1-15-14 AMY as Exhibit 96A.

Turned over to DNA:    Repackaging:    Seal Date:    Analyst:
96A    back into orig man env sld BET    1/15/2014    AMY

Revision Date (01/13)

SDT-BOI 000539

**ILLINOIS STATE POLICE**
**Division of Forensic Services**
**Forensic Sciences Command**

Case  **M77-197**

Date  1/28/2014

Revision Date (01/13)

**OVERNIGHT EXTRACTION WORKSHEET**
**"Hair Standards" 2 overnights**

| Extraction Order | | | Extraction Order (cont.) | | | |
|---|---|---|---|---|---|---|
| Case # | Ex # | # tubes | Case # | Ex # | # tubes | Resol Volume: |
| M77-197 | 28B | 1 | N/A | | | 20ul |
| | 29A | 1 | | | | |
| | 93A | 1 | | | | |
| | 96A | 1 | | | | |
| SRB-1, SRB-2 | | 1 | | | | |

| | | |
|---|---|---|
| **Exhibit** | **28B** | (Connie Cooper) |
| **Packaging** | man env sld BET "1-14-14 " "appt. hairs - root tag ends..." on env | |
| **Contents** | zl pl containing 1 SET containing appt.hair root.ends | |
| **Extract** | tube | For **Minifiler** Analysis Extracted DNA labeled 28B1 and dried and packaged in pl bag. |
| | | SRB- 2 dried and pkg'd in same pl bag. All sld in man env 3-20-14. |
| | | |
| **Exhibit** | **29A** | |
| **Packaging** | man env sld BET "1-15-14 " "appt. hairs - appt root ends from James Robinson..." on env | |
| **Contents** | zl pl containing 1 SET containing appt hair root ends | |
| **Extract** | tube | For **Y** and  **Minifiler** Analysis Extracted DNA labeled 29A1 and dried and pkg'd in pl bag. |
| | | Pl bag sld in man env 3-20-14. |
| **Exhibit** | **93A** | |
| **Packaging** | man env sld BET "1-15-14 " "appt. hair root ends from William Douglas hair standard..." on env | |
| **Contents** | zl pl containing 1 SET containing appt hair root ends | |
| **Extract** | tube | For **Y** and **Minifiler** Analysis Extracted DNA labeled 93A1 and dried and pkg'd in pl bag. |
| | | SRB-1 dried and pkg'd in same pl bag. All sld in man env 3-20-14. |
| | | |
| **Exhibit** | **96A** | |
| **Packaging** | man env sld BET "1-15-14 " "... of appt hairs from hair standard of Noyalee Robinson..." on env | |
| **Contents** | zl pl containing 1 SET containing appt hair root ends | |
| **Extract** | tube | For **Minifiler** Analysis Extracted DNA labeled 96A1 and dried and packaged in pl bag. |
| | | Pl bag sld in man env 3-20-14. |

| Repackaging: | RBs packaged with: | Seal Date: 3-20-14 |
|---|---|---|
| DNA substrate in rre tube/ptepl bag | SRB-2 → 28B1 | |
| Pl bag into original | SRB-1 → 93A1 | Analyst: tly |

SDT-BOI 000549

*Stapled packet 2 of 2 my*

**ILLINOIS STATE POLICE**
**Division of Forensic Services**
**Forensic Sciences Command**
**Morton Forensic Science Laboratory**

| Exhibit / Item | 59 | Date Examined | 2/10/2013 | Case # | M77-197 |
|---|---|---|---|---|---|

re opened to remove additonal stain from pocket

**Description of Package and Markings:**
BPB opened to remove wpp marked "M77-197 #59..."
opened BPB to remove blue pants
unfolded blue pants and pulled open right front pocket, Q1 and Q2

Cut out ~4cm X ~0.7cm strip from Q1 edge by corner of pocket and ~0.5cm square piece from below prior tested area
into glyc fold. Will extract with remaining cutting inExhibit 59C. More than ~1/2 of stained area remains on pants.

glyc fold into 59C for extraction.

These cuttings will be combined with prior
cuttings subexhibited as Exhibit 59C
extraction #2.





Pants wrapped in white paper and back into Ex 59 sld BET 2-10-13

| Turned over to DNA: | Repackaging: | Seal Date: | Analyst: |
|---|---|---|---|
| 59C | orig BPB sld BET | 2/10/2014 | AMY |

Revision Date (01/13)

SDT-BOI 000541

ILLINOIS STATE POLICE
Division of Forensic Services
Forensic Sciences Command

Case  **M77-197**

Date  2/11/2014

### OVERNIGHT EXTRACTION WORKSHEET
### 2nd extraction - pants pocket

Revision Date (01/13)

| Extraction Order | | | Extraction Order (cont.) | | | |
|---|---|---|---|---|---|---|
| Case # | Ex # | # tubes | Case # | Ex # | # tubes | Resol Volume: |
| M77-197 | 59C | 20 | n/a | | | 30ul |
| | RB-1, RB-2 | 20 each | | | | |

2-11-14 set up o/n

2-12-14 extra Pro K addition and incubation, PCI

2-13-14 CI and microcon see SWTL WEF email 1-30-14 for change to extraction procedure

---

| | |
|---|---|
| **Exhibit** | **59C** |
| **Packaging** | Manilla env  "cutting from Rt front pocket. (Q1) amy..." |
| **Contents** | empty zl bag and 2 glyc folds containing light fabric cuttings with vis RBS. |
| | cuttings from new  fold contains ~4cm X ~0.7cm cutting and ~0.5cm sq cutting into 11 tubes |
| | cuttings from old fold ~2.3cm X ~1.7cm into 9 tubes |
| **Extract** | 20 SETs |

**For Minifiler Analysis**

59C1    Extracted DNA from 1-22 and 2-11 extractions of Exhibit 59C were labeled 59C1.  Extracted DNA dried and separately pck'd in pl bags. pl bag with 2-11 ext DNA also contains  2-11 RB-1 and 2. Both pl bags into a sld man env as Exhibit 59C1 on 3-20-14.

| | | |
|---|---|---|
| **Repackaging:** | **RBs packaged with:** | **Seal Date:** |
| DNA substrate in mc tube into pl bag | RB-1, RB-2 → w/59C extraction 2 | 3-20-14 |
| Pl bag into original | inside 59C1 | Analyst: _ly_ |

SDT-BOI 000542

**ILLINOIS STATE POLICE**
**Division of Forensic Services**
**Forensic Sciences Command**
**Morton Forensic Science Laboratory**

Exhibit / Item _____ 26 _____   Date Examined __12/20/2013__  Case # _____ M77-197 _____

Description of Package and Markings:

Small BPB sld clear tape "SB 982"

        on BPB "Tube containing blood #26 "

contains:  plastic tube w/ blue cap

        contains blood tube w/ purple top ~4.2" long, ~1.5cm diameter, ~10.5 cm long containing appt liquid blood

        on tube "BOY" "#26 1-19-77 RFG M-77-197 " w/ WET at top

        used moist swab to remove vis small appt blood crusts on top of tube stopper and sides

        airdried

        swab into 1 SET into zl pl into man env sld BETas Exhibit 26A 1-15-14AMY

        small piece of BET on WET to secure 12-20-13 on stopper

Turned over to DNA:          Repackaging:              Seal Date:          Analyst:
26A                          orig bpb sld BET          1/15/2014          AMY

Revision Date (01/13)

SDT-BOI 000543

**ILLINOIS STATE POLICE**
**Division of Forensic Services**
**Forensic Sciences Command**

**Case**  **M77-197**

**Date**   3/5/2014

**STANDARDS EXTRACTION WORKSHEET**

Revision Date (01/13)

| Extraction Order Maxwell Tray | | Extraction Order Maxwell Tray (cont.) | | |
|---|---|---|---|---|
| Case # | Ex # | Case # | Ex # | Resol Volume: |
| M77-197 | 26A | Not used | | 50 ul each |
| | 110 | | | |
| 3-5 | SRB-1 | | | |
| 3-5 | SRB-2 | | | |

| | | |
|---|---|---|
| **Exhibit** | **26A** | |
| **Packaging** | manilla env sld BET AMY on env "James Robinson swabs from blood tube" | |
| **Contents** | 2l pl containing 1 SET with 2 small swabs inside | |
| **Extract** | 1 SET | Extracted DNA dried along with S-RB 2 into pl bag and into orig pkg sld 3-20-14 AMY. |

| | | |
|---|---|---|
| **Exhibit** | **110** | |
| **Packaging** | Manila env sld Clear tape "SB #982 10-23-13" | |
| **Contents** | Swab box "Johnnie Lee Savory..." contains 2 swabs | |
| **Extract** | 1 swab in 1 SET | |

**For Minis's and Y analysis**

**110A**   Extracted DNA from Exhibit 110 labeled 110A.  Extracted DNA dried and packaged in
plastic bag.  3-5 S-RB 1 dried and packaged in same plastic bag.
Plastic bag sealed in new manila envelope 3-20-14.

| **Repackaging:** | **RBs packaged with:** | **Seal Date:** 3-20-14 |
|---|---|---|
| original resld. | S-RB 1 w/ Exhibit 110 in 110A | |
| | S-RB 2 w/ Exhibit 26A | **Analyst:** AM |

SDT-BOI 000544

Experiment: AMY 1-22-14      Experiment Results Report      Applied Biosystems 7500
Instrument

# QC Summary

*M77-197.ty*

| Total Wells | 96 | Processed Wells | 68 | Targets Used | 3 |
| Well Setup | 68 | Flagged Wells | 9 | Samples Used | 34 |

| Flag | Name | Frequency | Locations |
|------|------|-----------|-----------|
| AMPNC | Amplification in negative control | 0 | |
| BADROX | Bad passive reference signal | 0 | |
| BLFAIL | Baseline algorithm failed | 0 | |
| CTFAIL | CT algorithm failed | 0 | |
| EXPFAIL | Exponential algorithm failed | 0 | |
| HIGHQT | High Quantity of DNA | 0 | |
| HIGHSD | High standard deviation in replicate group | 0 | |
| IPCCT | Internal PCR Control CT value | 3 | A1, B3, E1 |
| LOWQT | Low Quantity of DNA | 6 | C1, C2, C9, C10, C11, C12 |
| MTFR | Ratio of Male to Female DNA quantities | 0 | |
| NOAMP | No amplification | 0 | |
| NOISE | Noise higher than others in plate | 0 | |
| NOSIGNAL | No signal in well | 0 | |
| NTCCT | Non-Template Control sample amplification | 0 | |
| OFFSCALE | Fluorescence is offscale | 0 | |
| OUTLIERRG | Outlier in replicate group | 0 | |
| R² | Low Standard curve R² value | 0 | |
| SLOPE | Non-optimal slope of the Standard curve | 0 | |
| SPIKE | Noise spikes | 0 | |
| THOLDFAIL | Thresholding algorithm failed | 0 | |
| YINT | Y-Intercept | 0 | |

*only case on plate ty*

*Lo! ty*

SDT-BOI 000545

| | | | | M77-197 | | 1-22-14 |
|---|---|---|---|---|---|---|
| Well | Sample Name | Target Name | Task | $C_T$ | $C_T$ Mean | Quantity |
| A1 | Duo Std 1 | Duo Human | Std | 25.98 | 25.93 | 50.000 |
| A1 | Duo Std 1 | Duo IPC | Unk | 31.09 | 30.84 | |
| A1 | Duo Std 1 | Duo Male | Std | 25.62 | 25.56 | 50.000 |
| A2 | Duo Std 1 | Duo Human | Std | 25.88 | 25.93 | 50.000 |
| A2 | Duo Std 1 | Duo IPC | Unk | 30.60 | 30.84 | |
| A2 | Duo Std 1 | Duo Male | Std | 25.50 | 25.56 | 50.000 |
| A3 | Duo Std 2 | Duo Human | Std | 27.37 | 27.32 | 16.700 |
| A3 | Duo Std 2 | Duo IPC | Unk | 30.14 | 30.12 | |
| A3 | Duo Std 2 | Duo Male | Std | 27.20 | 27.09 | 16.700 |
| A4 | Duo Std 2 | Duo Human | Std | 27.26 | 27.32 | 16.700 |
| A4 | Duo Std 2 | Duo IPC | Unk | 30.10 | 30.12 | |
| A4 | Duo Std 2 | Duo Male | Std | 26.97 | 27.09 | 16.700 |
| A5 | Duo Std 3 | Duo Human | Std | 28.85 | 28.81 | 5.600 |
| A5 | Duo Std 3 | Duo IPC | Unk | 29.97 | 30.00 | |
| A5 | Duo Std 3 | Duo Male | Std | 28.72 | 28.65 | 5.600 |
| A6 | Duo Std 3 | Duo Human | Std | 28.76 | 28.81 | 5.600 |
| A6 | Duo Std 3 | Duo IPC | Unk | 30.02 | 30.00 | |
| A6 | Duo Std 3 | Duo Male | Std | 28.59 | 28.65 | 5.600 |
| A7 | Duo Std 4 | Duo Human | Std | 30.81 | 30.69 | 1.850 |
| A7 | Duo Std 4 | Duo IPC | Unk | 30.12 | 30.04 | |
| A7 | Duo Std 4 | Duo Male | Std | 30.62 | 30.56 | 1.850 |
| A8 | Duo Std 4 | Duo Human | Std | 30.57 | 30.69 | 1.850 |
| A8 | Duo Std 4 | Duo IPC | Unk | 29.97 | 30.04 | |
| A8 | Duo Std 4 | Duo Male | Std | 30.49 | 30.56 | 1.850 |
| A9 | Duo Std 5 | Duo Human | Std | 31.64 | 32.30 | 0.620 |
| A9 | Duo Std 5 | Duo IPC | Unk | 29.79 | 29.99 | |
| A9 | Duo Std 5 | Duo Male | Std | 31.77 | 32.13 | 0.620 |
| A10 | Duo Std 5 | Duo Human | Std | 32.96 | 32.30 | 0.620 |
| A10 | Duo Std 5 | Duo IPC | Unk | 30.20 | 29.99 | |
| A10 | Duo Std 5 | Duo Male | Std | 32.48 | 32.13 | 0.620 |
| A11 | Duo Std 6 | Duo Human | Std | 34.10 | 33.92 | 0.210 |
| A11 | Duo Std 6 | Duo IPC | Unk | 29.85 | 29.92 | |
| A11 | Duo Std 6 | Duo Male | Std | 34.37 | 33.91 | 0.210 |
| A12 | Duo Std 6 | Duo Human | Std | 33.74 | 33.92 | 0.210 |
| A12 | Duo Std 6 | Duo IPC | Unk | 29.98 | 29.92 | |
| A12 | Duo Std 6 | Duo Male | Std | 33.45 | 33.91 | 0.210 |
| B1 | Duo Std 7 | Duo Human | Std | 34.81 | 34.91 | 0.068 |
| B1 | Duo Std 7 | Duo IPC | Unk | 30.10 | 30.03 | |
| B1 | Duo Std 7 | Duo Male | Std | 35.54 | 35.62 | 0.068 |
| B2 | Duo Std 7 | Duo Human | Std | 35.02 | 34.91 | 0.068 |
| B2 | Duo Std 7 | Duo IPC | Unk | 29.96 | 30.03 | |
| B2 | Duo Std 7 | Duo Male | Std | 35.70 | 35.62 | 0.068 |
| B3 | Duo Std 8 | Duo Human | Std | 38.39 | 37.50 | 0.023 |
| B3 | Duo Std 8 | Duo IPC | Unk | 31.32 | 30.79 | |
| B3 | Duo Std 8 | Duo Male | Std | 37.63 | 37.55 | 0.023 |
| B4 | Duo Std 8 | Duo Human | Std | 36.60 | 37.50 | 0.023 |
| B4 | Duo Std 8 | Duo IPC | Unk | 30.27 | 30.79 | |
| B4 | Duo Std 8 | Duo Male | Std | 37.47 | 37.55 | 0.023 |

SDT-BOI 000546

| Well | Sample Name | Target Name | Task | C$_T$ | C$_T$ Mean | Quantity | Quantity Mean | M:F Ratio | Mean M:F |
|------|-------------|-------------|------|-------|------------|----------|---------------|-----------|----------|
| | | | | | **M77-197** | | **1-22-14** | | |
| B5 | | Duo Human | Unk | Undet | | | | | |
| B5 | M77-197 21A | Duo IPC | Unk | 30.89 | 31.28 | | | | |
| B5 | | Duo Male | Unk | Undet | | | | | *see note |
| B6 | | Duo Human | Unk | Undet | | | | | |
| B6 | M77-197 21A | Duo IPC | Unk | 31.68 | 31.28 | | | | |
| B6 | | Duo Male | Unk | Undet | | | | | |
| B7 | | Duo Human | Unk | Undet | | | | | |
| B7 | M77-197 22A | Duo IPC | Unk | 30.25 | 30.18 | | | | |
| B7 | | Duo Male | Unk | Undet | | | | | *see note |
| B8 | | Duo Human | Unk | Undet | | | | | |
| B8 | M77-197 22A | Duo IPC | Unk | 30.10 | 30.18 | | | | |
| B8 | | Duo Male | Unk | Undet | | | | | |
| B9 | | Duo Human | Unk | Undet | | | | | |
| B9 | M77-197 44A | Duo IPC | Unk | 30.20 | 30.14 | | | | |
| B9 | | Duo Male | Unk | Undet | | | | | ** |
| B10 | | Duo Human | Unk | Undet | | | | | |
| B10 | M77-197 44A | Duo IPC | Unk | 30.08 | 30.14 | | | | |
| B10 | | Duo Male | Unk | Undet | | | | | |
| B11 | | Duo Human | Unk | Undet | | | | | |
| B11 | M77-197 44B | Duo IPC | Unk | 30.10 | 30.01 | | | | |
| B11 | | Duo Male | Unk | Undet | | | | | ** |
| B12 | | Duo Human | Unk | Undet | | | | | |
| B12 | M77-197 44B | Duo IPC | Unk | 29.92 | 30.01 | | | | |
| B12 | | Duo Male | Unk | Undet | | | | | |
| C1 | | Duo Human | Unk | Undet | 38.03 | | | | |
| C1 | M77-197 59A | Duo IPC | Unk | 30.28 | 30.29 | | | | |
| C1 | | Duo Male | Unk | Undet | | | | | non-reproducible |
| C2 | | Duo Human | Unk | 38.03 | 38.03 | 0.012 | 0.012 | | human reading |
| C2 | M77-197 59A | Duo IPC | Unk | 30.29 | 30.29 | | | | ** |
| C2 | | Duo Male | Unk | Undet | | | | | |
| C3 | | Duo Human | Unk | Undet | | | | | |
| C3 | M77-197 59B | Duo IPC | Unk | 32.08 | 31.19 | | | | |
| C3 | | Duo Male | Unk | Undet | | | | | ** |
| C4 | | Duo Human | Unk | Undet | | | | | |
| C4 | M77-197 59B | Duo IPC | Unk | 30.29 | 31.19 | | | | |
| C4 | | Duo Male | Unk | Undet | | | | | |
| C5 | | Duo Human | Unk | Undet | | | | | |
| C5 | M77-197 59D | Duo IPC | Unk | 31.71 | 31.12 | | | | |
| C5 | | Duo Male | Unk | Undet | | | | | ** |
| C6 | | Duo Human | Unk | Undet | | | | | |
| C6 | M77-197 59D | Duo IPC | Unk | 30.53 | 31.12 | | | | |
| C6 | | Duo Male | Unk | Undet | | | | | |

**SDT-BOI 000547**

| Well | Sample Name | Target Name | Task | $C_T$ | $C_T$ Mean | Quantity | Quantity Mean | M:F Ratio | Mean M:F |
|------|-------------|-------------|------|-------|-----------|----------|---------------|-----------|----------|
| | | | | | **M77-197** | | 1-22-14 | | |
| C7 | | Duo Human | Unk | Undet | | | | | |
| C7 | M77-197 59E | Duo IPC | Unk | 30.34 | 30.30 | | | | |
| C7 | | Duo Male | Unk | Undet | | | | | ** |
| C8 | | Duo Human | Unk | Undet | | | | | |
| C8 | M77-197 59E | Duo IPC | Unk | 30.26 | 30.30 | | | | |
| C8 | | Duo Male | Unk | Undet | | | | | |
| C9 | | Duo Human | Unk | 38.97 | 39.27 | 0.006 | 0.005 | | |
| C9 | M77-197 15A | Duo IPC | Unk | 30.00 | 30.44 | | | | |
| C9 | | Duo Male | Unk | Undet | | | | | 46 ul = 0.25 ng |
| C10 | | Duo Human | Unk | 39.56 | 39.27 | 0.004 | 0.005 | | |
| C10 | M77-197 15A | Duo IPC | Unk | 30.87 | 30.44 | | | | |
| C10 | | Duo Male | Unk | Undet | | | | | |
| C11 | | Duo Human | Unk | Undet | 38.61 | | | | non-reproducible |
| C11 | M77-197 15B | Duo IPC | Unk | 31.04 | 30.46 | | | | human reading |
| C11 | | Duo Male | Unk | 38.71 | 38.86 | 0.010 | 0.009 | | Male 46 ul = 0.4 ng |
| C12 | | Duo Human | Unk | 38.61 | 38.61 | 0.008 | 0.008 | | Amp this sample |
| C12 | M77-197 15B | Duo IPC | Unk | 29.87 | 30.46 | | | | per SWTL WEF |
| C12 | | Duo Male | Unk | 39.02 | 38.86 | 0.008 | 0.009 | | |
| D1 | | Duo Human | Unk | Undet | | | | | |
| D1 | M77-197 59C | Duo IPC | Unk | 30.39 | 30.50 | | | | Extract more of |
| D1 | | Duo Male | Unk | Undet | | | | | this sample w/ |
| D2 | | Duo Human | Unk | Undet | | | | | additional ProK |
| D2 | M77-197 59C | Duo IPC | Unk | 30.61 | 30.50 | | | | step and PCI, CI |
| D2 | | Duo Male | Unk | Undet | | | | | cleanup. |
| D3 | | Duo Human | Unk | Undet | | | | | |
| D3 | 1-22 MRB-1 | Duo IPC | Unk | 30.37 | 30.45 | | | | |
| D3 | | Duo Male | Unk | Undet | | | | | |
| D4 | | Duo Human | Unk | Undet | | | | | |
| D4 | 1-22 MRB-1 | Duo IPC | Unk | 30.53 | 30.45 | | | | |
| D4 | | Duo Male | Unk | Undet | | | | | |
| D5 | | Duo Human | Unk | Undet | | | | | |
| D5 | 1-22 MRB-2 | Duo IPC | Unk | 30.31 | 30.63 | | | | |
| D5 | | Duo Male | Unk | Undet | | | | | |
| D6 | | Duo Human | Unk | Undet | | | | | |
| D6 | 1-22 MRB-2 | Duo IPC | Unk | 30.95 | 30.63 | | | | |
| D6 | | Duo Male | Unk | Undet | | | | | |
| D7 | | Duo Human | Unk | Undet | | | | | |
| D7 | 1-22 MRB-3 | Duo IPC | Unk | 30.23 | 30.46 | | | | |
| D7 | | Duo Male | Unk | Undet | | | | | |
| D8 | | Duo Human | Unk | Undet | | | | | |
| D8 | 1-22 MRB-3 | Duo IPC | Unk | 30.69 | 30.46 | | | | |
| D8 | | Duo Male | Unk | Undet | | | | | |

SDT-BOI 000548

| Well | Sample Name | Target Name | Task | $C_T$ | $C_T$ Mean | Quantity | Quantity Mean | M:F Ratio | Mean M:F | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | **M77-197** | | **1-22-14** | | | |
| D9 | 1-22 MRB-4 | Duo Human | Unk | Undet | | | | | | |
| D9 | | Duo IPC | Unk | 31.45 | 30.72 | | | | | |
| D9 | | Duo Male | Unk | Undet | | | | | | |
| D10 | 1-22 MRB-4 | Duo Human | Unk | Undet | | | | | | |
| D10 | | Duo IPC | Unk | 29.98 | 30.72 | | | | | |
| D10 | | Duo Male | Unk | Undet | | | | | | |
| E1 | M77-197 1A1 F1 | Duo Human | Unk | 29.17 | 28.65 | 4.955 | 7.449 | | | |
| E1 | | Duo IPC | Unk | 32.55 | 31.90 | | | | | duplicate readings ratio >1.5 |
| E1 | | Duo Male | Unk | Undet | | | | | | |
| E2 | M77-197 1A1 F1 | Duo Human | Unk | 28.14 | 28.65 | 9.944 | 7.449 | | | Elevated IPC |
| E2 | | Duo IPC | Unk | 31.26 | 31.90 | | | | | |
| E2 | | Duo Male | Unk | Undet | | | | | | |
| E3 | 1-21 DRB 1 F1 | Duo Human | Unk | Undet | | | | | | |
| E3 | | Duo IPC | Unk | 30.25 | 30.32 | | | | | |
| E3 | | Duo Male | Unk | Undet | | | | | | |
| E4 | 1-21 DRB 1 F1 | Duo Human | Unk | Undet | | | | | | |
| E4 | | Duo IPC | Unk | 30.39 | 30.32 | | | | | |
| E4 | | Duo Male | Unk | Undet | | | | | | |
| E5 | 1-21 DRB 2 F1 | Duo Human | Unk | Undet | | | | | | |
| E5 | | Duo IPC | Unk | 30.75 | 30.52 | | | | | |
| E5 | | Duo Male | Unk | Undet | | | | | | |
| E6 | 1-21 DRB 2 F1 | Duo Human | Unk | Undet | | | | | | |
| E6 | | Duo IPC | Unk | 30.28 | 30.52 | | | | | |
| E6 | | Duo Male | Unk | Undet | | | | | | |
| E7 | 1-21 DRB 3 F1 | Duo Human | Unk | Undet | | | | | | |
| E7 | | Duo IPC | Unk | 30.78 | 30.42 | | | | | |
| E7 | | Duo Male | Unk | Undet | | | | | | |
| E8 | 1-21 DRB 3 F1 | Duo Human | Unk | Undet | | | | | | |
| E8 | | Duo IPC | Unk | 30.06 | 30.42 | | | | | |
| E8 | | Duo Male | Unk | Undet | | | | | | |
| E9 | 1-21 DRB 4 F1 | Duo Human | Unk | Undet | | | | | | |
| E9 | | Duo IPC | Unk | 30.44 | 30.17 | | | | | |
| E9 | | Duo Male | Unk | Undet | | | | | | |
| E10 | 1-21 DRB 4 F1 | Duo Human | Unk | Undet | | | | | | |
| E10 | | Duo IPC | Unk | 29.90 | 30.17 | | | | | |
| E10 | | Duo Male | Unk | Undet | | | | | | |
| E11 | M77-197 1A1 F2 | Duo Human | Unk | 36.93 | 36.93 | 0.026 | 0.025 | | | Female only detected |
| E11 | | Duo IPC | Unk | 29.97 | 29.87 | | | | | |
| E11 | | Duo Male | Unk | Undet | | | | | | |
| E12 | M77-197 1A1 F2 | Duo Human | Unk | 36.94 | 36.93 | 0.025 | 0.025 | | | Requested Y-STR analysis due to biology screening |
| E12 | | Duo IPC | Unk | 29.76 | 29.87 | | | | | |
| E12 | | Duo Male | Unk | Undet | | | | | | |

| Well | Sample Name | Target Name | Task | Cт | Cт Mean | Quantity | Quantity Mean | M:F Ratio | Mean M:F | |
|------|-------------|-------------|------|------|---------|----------|---------------|-----------|----------|---|
| | | | | | **M77-197** | | **1-22-14** | | | |
| F1 | M77-197 1A1 F3 | Duo Human | Unk | 30.78 | 30.89 | 1.658 | 1.540 | | | Female only detected |
| F1 | | Duo IPC | Unk | 30.18 | 30.33 | | | | | |
| F1 | | Duo Male | Unk | Undet | | | | | | Requested Y-STR analysis due to biology screening |
| F2 | M77-197 1A1 F3 | Duo Human | Unk | 31.01 | 30.89 | 1.421 | 1.540 | | | |
| F2 | | Duo IPC | Unk | 30.48 | 30.33 | | | | | |
| F2 | | Duo Male | Unk | Undet | | | | | | |
| F3 | 1-21 DRB 1 F2 | Duo Human | Unk | Undet | | | | | | |
| F3 | | Duo IPC | Unk | 30.88 | 30.43 | | | | | |
| F3 | | Duo Male | Unk | Undet | | | | | | |
| F4 | 1-21 DRB 1 F2 | Duo Human | Unk | Undet | | | | | | |
| F4 | | Duo IPC | Unk | 29.98 | 30.43 | | | | | |
| F4 | | Duo Male | Unk | Undet | | | | | | |
| F5 | 1-21 DRB 2 F2 | Duo Human | Unk | Undet | | | | | | |
| F5 | | Duo IPC | Unk | 30.08 | 30.07 | | | | | |
| F5 | | Duo Male | Unk | Undet | | | | | | |
| F6 | 1-21 DRB 2 F2 | Duo Human | Unk | Undet | | | | | | |
| F6 | | Duo IPC | Unk | 30.06 | 30.07 | | | | | |
| F6 | | Duo Male | Unk | Undet | | | | | | |
| F7 | 1-21 DRB 3 F2 | Duo Human | Unk | Undet | | | | | | |
| F7 | | Duo IPC | Unk | 30.14 | 30.13 | | | | | |
| F7 | | Duo Male | Unk | Undet | | | | | | |
| F8 | 1-21 DRB 3 F2 | Duo Human | Unk | Undet | | | | | | |
| F8 | | Duo IPC | Unk | 30.11 | 30.13 | | | | | |
| F8 | | Duo Male | Unk | Undet | | | | | | |
| F9 | 1-21 DRB 4 F2 | Duo Human | Unk | Undet | | | | | | |
| F9 | | Duo IPC | Unk | 29.91 | 29.91 | | | | | |
| F9 | | Duo Male | Unk | Undet | | | | | | |
| F10 | 1-21 DRB 4 F2 | Duo Human | Unk | Undet | | | | | | |
| F10 | | Duo IPC | Unk | 29.92 | 29.91 | | | | | |
| F10 | | Duo Male | Unk | Undet | | | | | | |

*inhibited, will need post extraction clean-up

Y-STR analysis being requested

Minifiler also requested.

**inhibited, will need post extraction clean-up

Minifiler requested.

SDT-BOI 000550

Experiment:M77-197 2-3-14 AMY        Experiment Results Report        Applied Biosystems 7500
Instrument

# QC Summary

| Total Wells | 96 | Processed Wells | 28 | Targets Used | 3 |
| Well Setup | 28 | Flagged Wells | 2 | Samples Used | 14 |

| Flag | Name | Frequency | Locations |
|------|------|-----------|-----------|
| AMPNC | Amplification in negative control | 0 | |
| BADROX | Bad passive reference signal | 0 | |
| BLFAIL | Baseline algorithm failed | 0 | |
| CTFAIL | Cᴛ algorithm failed | 0 | |
| EXPFAIL | Exponential algorithm failed | 0 | |
| HIGHQT | High Quantity of DNA | 0 | |
| HIGHSD | High standard deviation in replicate group | 0 | |
| IPCCT | Internal PCR Control Cᴛ value | 0 | |
| LOWQT | Low Quantity of DNA | 2 | B7, B8 |
| MTFR | Ratio of Male to Female DNA quantities | 0 | |
| NOAMP | No amplification | 0 | |
| NOISE | Noise higher than others in plate | 0 | |
| NOSIGNAL | No signal in well | 0 | |
| NTCCT | Non-Template Control sample amplification | 0 | |
| OFFSCALE | Fluorescence is offscale | 0 | |
| OUTLIERRG | Outlier in replicate group | 0 | |
| R² | Low Standard curve R² value | 0 | |
| SLOPE | Non-optimal slope of the Standard curve | 0 | |
| SPIKE | Noise spikes | 0 | |
| THOLDFAIL | Thresholding algorithm failed | 0 | |
| YINT | Y-Intercept | 0 | |

only case on plate ty

SDT-BOI 000551

| Well | Sample Name | Target Name | Task | C$_T$ | C$_T$ Mean | Quantity |
|------|-------------|-------------|------|-------|------------|----------|
| | | | | **M77-197** | | **2-3-14 AMY** |
| A1 | Duo Std 1 | Duo Human | Std | 24.74 | 24.66 | 50 |
| A1 | Duo Std 1 | Duo IPC | Unk | 30.49 | 30.27 | |
| A1 | Duo Std 1 | Duo Male | Std | 24.77 | 24.77 | 50 |
| A2 | Duo Std 1 | Duo Human | Std | 24.58 | 24.66 | 50 |
| A2 | Duo Std 1 | Duo IPC | Unk | 30.06 | 30.27 | |
| A2 | Duo Std 1 | Duo Male | Std | 24.76 | 24.77 | 50 |
| A3 | Duo Std 2 | Duo Human | Std | 26.27 | 26.76 | 16.7 |
| A3 | Duo Std 2 | Duo IPC | Unk | 29.62 | 29.68 | |
| A3 | Duo Std 2 | Duo Male | Std | 26.50 | 26.92 | 16.7 |
| A4 | Duo Std 2 | Duo Human | Std | 27.24 | 26.76 | 16.7 |
| A4 | Duo Std 2 | Duo IPC | Unk | 29.75 | 29.68 | |
| A4 | Duo Std 2 | Duo Male | Std | 27.34 | 26.92 | 16.7 |
| A5 | Duo Std 3 | Duo Human | Std | 27.99 | 27.96 | 5.6 |
| A5 | Duo Std 3 | Duo IPC | Unk | 29.59 | 29.55 | |
| A5 | Duo Std 3 | Duo Male | Std | 28.27 | 28.23 | 5.6 |
| A6 | Duo Std 3 | Duo Human | Std | 27.92 | 27.96 | 5.6 |
| A6 | Duo Std 3 | Duo IPC | Unk | 29.51 | 29.55 | |
| A6 | Duo Std 3 | Duo Male | Std | 28.18 | 28.23 | 5.6 |
| A7 | Duo Std 4 | Duo Human | Std | 29.47 | 29.34 | 1.85 |
| A7 | Duo Std 4 | Duo IPC | Unk | 29.53 | 29.43 | |
| A7 | Duo Std 4 | Duo Male | Std | 30.10 | 29.92 | 1.85 |
| A8 | Duo Std 4 | Duo Human | Std | 29.21 | 29.34 | 1.85 |
| A8 | Duo Std 4 | Duo IPC | Unk | 29.34 | 29.43 | |
| A8 | Duo Std 4 | Duo Male | Std | 29.75 | 29.92 | 1.85 |
| A9 | Duo Std 5 | Duo Human | Std | 30.62 | 30.78 | 0.62 |
| A9 | Duo Std 5 | Duo IPC | Unk | 29.39 | 29.37 | |
| A9 | Duo Std 5 | Duo Male | Std | 31.58 | 31.55 | 0.62 |
| A10 | Duo Std 5 | Duo Human | Std | 30.75 | 30.78 | 0.62 |
| A10 | Duo Std 5 | Duo IPC | Unk | 29.34 | 29.37 | |
| A10 | Duo Std 5 | Duo Male | Std | 31.52 | 31.55 | 0.62 |
| A11 | Duo Std 6 | Duo Human | Std | 32.58 | 32.58 | 0.21 |
| A11 | Duo Std 6 | Duo IPC | Unk | 29.34 | 29.38 | |
| A11 | Duo Std 6 | Duo Male | Std | 32.82 | 33.15 | 0.21 |
| A12 | Duo Std 6 | Duo Human | Std | 32.58 | 32.58 | 0.21 |
| A12 | Duo Std 6 | Duo IPC | Unk | 29.43 | 29.38 | |
| A12 | Duo Std 6 | Duo Male | Std | 33.48 | 33.15 | 0.21 |
| B1 | Duo Std 7 | Duo Human | Std | 34.21 | 34.13 | 0.068 |
| B1 | Duo Std 7 | Duo IPC | Unk | 29.64 | 29.62 | |
| B1 | Duo Std 7 | Duo Male | Std | 34.92 | 34.55 | 0.068 |
| B2 | Duo Std 7 | Duo Human | Std | 34.04 | 34.13 | 0.068 |
| B2 | Duo Std 7 | Duo IPC | Unk | 29.61 | 29.62 | |
| B2 | Duo Std 7 | Duo Male | Std | 34.17 | 34.55 | 0.068 |
| B3 | Duo Std 8 | Duo Human | Std | 35.52 | 35.73 | 0.023 |
| B3 | Duo Std 8 | Duo IPC | Unk | 29.60 | 29.60 | |
| B3 | Duo Std 8 | Duo Male | Std | 36.50 | 36.08 | 0.023 |
| B4 | Duo Std 8 | Duo Human | Std | 35.94 | 35.73 | 0.023 |
| B4 | Duo Std 8 | Duo IPC | Unk | 29.59 | 29.60 | |
| B4 | Duo Std 8 | Duo Male | Std | 35.66 | 36.08 | 0.023 |

| Well | Sample Name | Target Name | Task | $C_T$ | $C_T$ Mean | Quantity | Quantity Mean | M:F Ratio | Mean M:F | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | **M77-197** | **2-3-14 AMY** | | | | |
| B5 | M77-197 28B Victim Connie Cooper | Duo Human | Unk | 29.32 | 29.43 | 2.068 | 1.922 | | | |
| B5 | | Duo IPC | Unk | 29.56 | 29.64 | | | | | |
| B5 | | Duo Male | Unk | Undet | | | | | | amp ID+ |
| B6 | M77-197 28B | Duo Human | Unk | 29.53 | 29.43 | 1.777 | 1.922 | | | |
| B6 | | Duo IPC | Unk | 29.72 | 29.64 | | | | | |
| B6 | | Duo Male | Unk | Undet | | | | | | |
| B7 | M77-197 29A Victim James Robinson | Duo Human | Unk | 38.23 | 37.92 | 0.004 | 0.005 | | | In ~ 16ul ~0.075 ng human ~0.143 ng male Send for minifiler or YSTR standard |
| B7 | | Duo IPC | Unk | 29.64 | 29.69 | | | | | |
| B7 | | Duo Male | Unk | 37.93 | 37.61 | 0.007 | 0.009 | | | |
| B8 | M77-197 29A | Duo Human | Unk | 37.60 | 37.92 | 0.006 | 0.005 | | | |
| B8 | | Duo IPC | Unk | 29.73 | 29.69 | | | | | |
| B8 | | Duo Male | Unk | 37.30 | 37.61 | 0.011 | 0.009 | | | |
| B9 | M77-197 93A William Douglas | Duo Human | Unk | 31.09 | 31.09 | 0.588 | 0.588 | | | |
| B9 | | Duo IPC | Unk | 29.60 | 29.56 | | | | | |
| B9 | | Duo Male | Unk | 30.49 | 30.42 | 1.196 | 1.259 | | | amp ID+ |
| B10 | M77-197 93A | Duo Human | Unk | 31.09 | 31.09 | 0.588 | 0.588 | | | |
| B10 | | Duo IPC | Unk | 29.52 | 29.56 | | | | | |
| B10 | | Duo Male | Unk | 30.34 | 30.42 | 1.321 | 1.259 | | | |
| B11 | M77-197 96A Noyalee Robinson | Duo Human | Unk | 31.32 | 31.16 | 0.497 | 0.564 | | | |
| B11 | | Duo IPC | Unk | 29.51 | 29.42 | | | | | |
| B11 | | Duo Male | Unk | Undet | | | | | | amp ID+ |
| B12 | M77-197 96A | Duo Human | Unk | 30.99 | 31.16 | 0.632 | 0.564 | | | |
| B12 | | Duo IPC | Unk | 29.34 | 29.42 | | | | | |
| B12 | | Duo Male | Unk | Undet | | | | | | |
| C1 | M77-197 SRB-1 HAIR | Duo Human | Unk | Undet | | | | | | |
| C1 | | Duo IPC | Unk | 29.60 | 29.82 | | | | | |
| C1 | | Duo Male | Unk | Undet | | | | | | |
| C2 | M77-197 SRB-1 HAIR | Duo Human | Unk | Undet | | | | | | |
| C2 | | Duo IPC | Unk | 29.83 | 29.82 | | | | | |
| C2 | | Duo Male | Unk | Undet | | | | | | |
| C3 | M77-197 SRB-2 HAIR | Duo Human | Unk | Undet | | | | | | |
| C3 | | Duo IPC | Unk | 29.88 | 29.89 | | | | | |
| C3 | | Duo Male | Unk | Undet | | | | | | |
| C4 | M77-197 SRB-2 HAIR | Duo Human | Unk | Undet | | | | | | |
| C4 | | Duo IPC | Unk | 29.90 | 29.89 | | | | | |
| C4 | | Duo Male | Unk | Undet | | | | | | |

SDT-BOI 000553

Experiment:M77-197 2-14-14 *ty*
AMY
Experiment Results Report
Applied Biosystems 7500
Instrument

# QC Summary

| Total Wells | 96 | Processed Wells | 22 | Targets Used | 3 |
| Well Setup | 22 | Flagged Wells | 17 | Samples Used | 11 |

| Flag | Name | Frequency | Locations |
|------|------|-----------|-----------|
| AMPNC | Amplification in negative control | 0 | |
| BADROX | Bad passive reference signal | 0 | |
| BLFAIL | Baseline algorithm failed | 0 | |
| CTFAIL | Cт algorithm failed | 0 | |
| EXPFAIL | Exponential algorithm failed | 0 | |
| HIGHQT | High Quantity of DNA | 0 | |
| HIGHSD | High standard deviation in replicate group | 0 | |
| IPCCT | Internal PCR Control Cт value | 2 | B5, B6 |
| LOWQT | Low Quantity of DNA | 2 | B7, B8 |
| MTFR | Ratio of Male to Female DNA quantities | 0 | |
| NOAMP | No amplification | 0 | |
| NOISE | Noise higher than others in plate | 0 | |
| NOSIGNAL | No signal in well | 0 | |
| NTCCT | Non-Template Control sample amplification | 0 | |
| OFFSCALE | Fluorescence is offscale | 0 | |
| OUTLIERRG | Outlier in replicate group | 0 | |
| R² | Low Standard curve R² value | 0 | |
| SLOPE | Non-optimal slope of the Standard curve | 13 | A1, A2, A3, A5, A6, A7, A8, A9, A10, A12, B1, B2, B3 |
| SPIKE | Noise spikes | 0 | |
| THOLDFAIL | Thresholding algorithm failed | 0 | |
| YINT | Y-Intercept | 0 | |

only case on plate.
male std curve out. Human OK.ty
Will run dilutions of sample blc of inhibition.ty
per WEF email ok to use quant for blanks. ty

SDT-BOI 000554

Experiment:M77-197 2-14-14
AMY

Experiment Results Report

Applied Biosystems 7500
Instrument



# Standard Curve



slope:-3.591                    Y-Intercept:30.662                    R²:0.993

SDT-BOI 000555

Experiment Results Report

Applied Biosystems 7500
Instrument

## Standard Curve (Target: Duo Male)



**Legend**

■ Standard

slope:-3.714  *not passed by*  Y-Intercept:31.086  R²:0.999

4
Printed:2014 Mar 13 9:45:43 AM

SDT-BOI 000556

| Well | Sample Name | Target Name | Task | M77-197 | | 2-14-14 AMY |
| | | | | C<sub>T</sub> | C<sub>T</sub> Mean | Quantity |
|---|---|---|---|---|---|---|
| | | | | $C_T$ | $C_T$ Mean | Quantity |
| A1 | Duo Std 1 | Duo Human | Std | 24.89 | 24.61 | 50 |
| A1 | Duo Std 1 | Duo IPC | Unk | 30.81 | 30.51 | |
| A1 | Duo Std 1 | Duo Male | Std | 24.96 | 24.75 | 50 |
| A2 | Duo Std 1 | Duo Human | Std | 24.33 | 24.61 | 50 |
| A2 | Duo Std 1 | Duo IPC | Unk | 30.22 | 30.51 | |
| A2 | Duo Std 1 | Duo Male | Std | 24.53 | 24.75 | 50 |
| A3 | Duo Std 2 | Duo Human | Std | 26.14 | 26.14 | 16.7 |
| A3 | Duo Std 2 | Duo IPC | Unk | 29.67 | 29.67 | |
| A3 | Duo Std 2 | Duo Male | Std | 26.52 | 26.52 | 16.7 |
| A4 | Duo Std 2 | Duo Human | Std | | | |
| A4 | Duo Std 2 | Duo IPC | Unk | | | |
| A4 | Duo Std 2 | Duo Male | Std | | | |
| A5 | Duo Std 3 | Duo Human | Std | 28.15 | 27.99 | 5.6 |
| A5 | Duo Std 3 | Duo IPC | Unk | 29.64 | 29.62 | |
| A5 | Duo Std 3 | Duo Male | Std | 28.47 | 28.34 | 5.6 |
| A6 | Duo Std 3 | Duo Human | Std | 27.84 | 27.99 | 5.6 |
| A6 | Duo Std 3 | Duo IPC | Unk | 29.60 | 29.62 | |
| A6 | Duo Std 3 | Duo Male | Std | 28.20 | 28.34 | 5.6 |
| A7 | Duo Std 4 | Duo Human | Std | 29.42 | 29.61 | 1.85 |
| A7 | Duo Std 4 | Duo IPC | Unk | 29.46 | 29.51 | |
| A7 | Duo Std 4 | Duo Male | Std | 30.10 | 30.11 | 1.85 |
| A8 | Duo Std 4 | Duo Human | Std | 29.79 | 29.61 | 1.85 |
| A8 | Duo Std 4 | Duo IPC | Unk | 29.55 | 29.51 | |
| A8 | Duo Std 4 | Duo Male | Std | 30.13 | 30.11 | 1.85 |
| A9 | Duo Std 5 | Duo Human | Std | 31.36 | 31.30 | 0.62 |
| A9 | Duo Std 5 | Duo IPC | Unk | 29.47 | 29.44 | |
| A9 | Duo Std 5 | Duo Male | Std | 31.78 | 31.87 | 0.62 |
| A10 | Duo Std 5 | Duo Human | Std | 31.25 | 31.30 | 0.62 |
| A10 | Duo Std 5 | Duo IPC | Unk | 29.41 | 29.44 | |
| A10 | Duo Std 5 | Duo Male | Std | 31.96 | 31.87 | 0.62 |
| A11 | Duo Std 6 | Duo Human | Std | | | |
| A11 | Duo Std 6 | Duo IPC | Unk | | | |
| A11 | Duo Std 6 | Duo Male | Std | | | |
| A12 | Duo Std 6 | Duo Human | Std | 33.29 | 33.29 | 0.21 |
| A12 | Duo Std 6 | Duo IPC | Unk | 29.50 | 29.50 | |
| A12 | Duo Std 6 | Duo Male | Std | 33.79 | 33.79 | 0.21 |
| B1 | Duo Std 7 | Duo Human | Std | 35.35 | 35.32 | 0.068 |
| B1 | Duo Std 7 | Duo IPC | Unk | 29.73 | 29.68 | |
| B1 | Duo Std 7 | Duo Male | Std | 35.32 | 35.28 | 0.068 |
| B2 | Duo Std 7 | Duo Human | Std | 35.30 | 35.32 | 0.068 |
| B2 | Duo Std 7 | Duo IPC | Unk | 29.62 | 29.68 | |
| B2 | Duo Std 7 | Duo Male | Std | 35.25 | 35.28 | 0.068 |
| B3 | Duo Std 8 | Duo Human | Std | 35.82 | 35.82 | 0.023 |
| B3 | Duo Std 8 | Duo IPC | Unk | 29.73 | 29.73 | |
| B3 | Duo Std 8 | Duo Male | Std | 37.24 | 37.24 | 0.023 |
| B4 | Duo Std 8 | Duo Human | Std | | | |
| B4 | Duo Std 8 | Duo IPC | Unk | | | |
| B4 | Duo Std 8 | Duo Male | Std | | | |

SDT-BOI 000557

| Well | Sample Name | Target Name | Task | C$_T$ | C$_T$ Mean | Quantity | Quantity Mean | M:F Ratio | Mean M:F | |
|------|-------------|-------------|------|-------|------------|----------|---------------|-----------|----------|--|
| | | | | | **M77-197** | **2-14-14 AMY** | | | | |
| B5 | M77-197 59C ext 2 | Duo Human | Unk | Undet | | | | | | Inhibited |
| B5 | | Duo IPC | Unk | Undet | | | | | | |
| B5 | | Duo Male | Unk | Undet | | | | | | dilute and rerun |
| B6 | M77-197 59C ext 2 | Duo Human | Unk | Undet | | | | | | (extract lightly |
| B6 | | Duo IPC | Unk | Undet | | | | | | colored) |
| B6 | | Duo Male | Unk | Undet | | | | | | |
| B7 | RB-1 2-11-14 | Duo Human | Unk | Undet | 39.73 | | | | | non-reproducible |
| B7 | | Duo IPC | Unk | 29.72 | 29.69 | | | | | reading |
| B7 | | Duo Male | Unk | Undet | | | | | | *send for |
| B8 | RB-1 2-11-14 | Duo Human | Unk | 39.73 | 39.73 | 0.003 | 0.003 | | | minifiler with 59C |
| B8 | | Duo IPC | Unk | 29.66 | 29.69 | | | | | Extraction 2 |
| B8 | | Duo Male | Unk | Undet | | | | | | |
| B9 | RB-2 2-11-14 | Duo Human | Unk | Undet | | | | | | |
| B9 | | Duo IPC | Unk | 29.76 | 29.74 | | | | | |
| B9 | | Duo Male | Unk | Undet | | | | | | |
| B10 | RB-2 2-11-14 | Duo Human | Unk | Undet | | | | | | |
| B10 | | Duo IPC | Unk | 29.72 | 29.74 | | | | | |
| B10 | | Duo Male | Unk | Undet | | | | | | |

SDT-BOI 000558

Experiment Results Report

Applied Biosystems 7500
Instrument

# QC Summary

**M77- 197**

| Total Wells | 96 | Processed Wells | 66 | Targets Used | 3 |
| Well Setup | 66 | Flagged Wells | 8 | Samples Used | 33 |

| Flag | Name | Frequency | Locations |
|---|---|---|---|
| AMPNC | Amplification in negative control | 0 | |
| BADROX | Bad passive reference signal | 0 | |
| BLFAIL | Baseline algorithm failed | 0 | |
| CTFAIL | CT algorithm failed | 0 | |
| EXPFAIL | Exponential algorithm failed | 0 | |
| HIGHQT | High Quantity of DNA | 2 | D11, D12 |
| HIGHSD | High standard deviation in replicate group | 0 | |
| IPCCT | Internal PCR Control CT value | 0 | |
| LOWQT | Low Quantity of DNA | 6 | B5, B6, B7, B8, B11, B12 |
| MTFR | Ratio of Male to Female DNA quantities | 0 | |
| NOAMP | No amplification | 0 | |
| NOISE | Noise higher than others in plate | 0 | |
| NOSIGNAL | No signal in well | 0 | |
| NTCCT | Non-Template Control sample amplification | 0 | |
| OFFSCALE | Fluorescence is offscale | 0 | |
| OUTLIERRG | Outlier in replicate group | 0 | |
| R² | Low Standard curve R² value | 0 | |
| SLOPE | Non-optimal slope of the Standard curve | 0 | |
| SPIKE | Noise spikes | 0 | |
| THOLDFAIL | Thresholding algorithm failed | 0 | |
| YINT | Y-Intercept | 0 | |

All samples run on this plate:

| | | | | | |
|---|---|---|---|---|---|
| M13-2845 | 2A | M12-4398 | 2 | M77-197 | 59C |
| M13-3787 | 2, 3 | M13-208 | 3 | | |
| M14-017 | 8 | M13-3355 | 3 | | |
| M14-097 | 1 | M13-3787 | 1, 4 | | |
| M14-143 | 3A, 3B | M14-097 | 5 | | |
| M14-178 | 4A | M14-178 | 5A, 5B | | |
| M14-387 | 1A | M14-387 | 2 | | |
| 2-14 RB-1 -- RB-4 | | 2-14 S-RB | | | |

SDT-BOI 000559

| | | | | M77-197 | | 2-18-14 |
|---|---|---|---|---|---|---|
| Well | Sample Name | Target Name | Task | $C_T$ | $C_T$ Mean | Quantity |
| A1 | Duo Std 1 | Duo Human | Std | | | |
| A1 | Duo Std 1 | Duo IPC | Unk | | | |
| A1 | Duo Std 1 | Duo Male | Std | | | |
| A2 | Duo Std 1 | Duo Human | Std | 24.75 | 24.75 | 50.000 |
| A2 | Duo Std 1 | Duo IPC | Unk | 30.25 | 30.25 | |
| A2 | Duo Std 1 | Duo Male | Std | 24.88 | 24.88 | 50.000 |
| A3 | Duo Std 2 | Duo Human | Std | 26.60 | 26.79 | 16.700 |
| A3 | Duo Std 2 | Duo IPC | Unk | 29.97 | 29.94 | |
| A3 | Duo Std 2 | Duo Male | Std | 26.76 | 26.80 | 16.700 |
| A4 | Duo Std 2 | Duo Human | Std | 26.97 | 26.79 | 16.700 |
| A4 | Duo Std 2 | Duo IPC | Unk | 29.92 | 29.94 | |
| A4 | Duo Std 2 | Duo Male | Std | 26.84 | 26.80 | 16.700 |
| A5 | Duo Std 3 | Duo Human | Std | 28.14 | 28.22 | 5.600 |
| A5 | Duo Std 3 | Duo IPC | Unk | 29.72 | 29.81 | |
| A5 | Duo Std 3 | Duo Male | Std | 28.38 | 28.38 | 5.600 |
| A6 | Duo Std 3 | Duo Human | Std | 28.31 | 28.22 | 5.600 |
| A6 | Duo Std 3 | Duo IPC | Unk | 29.90 | 29.81 | |
| A6 | Duo Std 3 | Duo Male | Std | 28.38 | 28.38 | 5.600 |
| A7 | Duo Std 4 | Duo Human | Std | 29.45 | 29.50 | 1.850 |
| A7 | Duo Std 4 | Duo IPC | Unk | 29.71 | 29.68 | |
| A7 | Duo Std 4 | Duo Male | Std | 29.68 | 29.79 | 1.850 |
| A8 | Duo Std 4 | Duo Human | Std | 29.56 | 29.50 | 1.850 |
| A8 | Duo Std 4 | Duo IPC | Unk | 29.64 | 29.68 | |
| A8 | Duo Std 4 | Duo Male | Std | 29.90 | 29.79 | 1.850 |
| A9 | Duo Std 5 | Duo Human | Std | 31.06 | 30.99 | 0.620 |
| A9 | Duo Std 5 | Duo IPC | Unk | 29.65 | 29.61 | |
| A9 | Duo Std 5 | Duo Male | Std | 31.28 | 31.24 | 0.620 |
| A10 | Duo Std 5 | Duo Human | Std | 30.93 | 30.99 | 0.620 |
| A10 | Duo Std 5 | Duo IPC | Unk | 29.57 | 29.61 | |
| A10 | Duo Std 5 | Duo Male | Std | 31.19 | 31.24 | 0.620 |
| A11 | Duo Std 6 | Duo Human | Std | 32.32 | 32.28 | 0.210 |
| A11 | Duo Std 6 | Duo IPC | Unk | 29.61 | 29.60 | |
| A11 | Duo Std 6 | Duo Male | Std | 33.01 | 33.11 | 0.210 |
| A12 | Duo Std 6 | Duo Human | Std | 32.25 | 32.28 | 0.210 |
| A12 | Duo Std 6 | Duo IPC | Unk | 29.59 | 29.60 | |
| A12 | Duo Std 6 | Duo Male | Std | 33.22 | 33.11 | 0.210 |
| B1 | Duo Std 7 | Duo Human | Std | 34.18 | 33.94 | 0.068 |
| B1 | Duo Std 7 | Duo IPC | Unk | 29.84 | 29.84 | |
| B1 | Duo Std 7 | Duo Male | Std | 34.85 | 34.75 | 0.068 |
| B2 | Duo Std 7 | Duo Human | Std | 33.70 | 33.94 | 0.068 |
| B2 | Duo Std 7 | Duo IPC | Unk | 29.84 | 29.84 | |
| B2 | Duo Std 7 | Duo Male | Std | 34.64 | 34.75 | 0.068 |
| B3 | Duo Std 8 | Duo Human | Std | 35.76 | 35.42 | 0.023 |
| B3 | Duo Std 8 | Duo IPC | Unk | 29.84 | 29.81 | |
| B3 | Duo Std 8 | Duo Male | Std | 35.74 | 35.65 | 0.023 |
| B4 | Duo Std 8 | Duo Human | Std | 35.08 | 35.42 | 0.023 |
| B4 | Duo Std 8 | Duo IPC | Unk | 29.77 | 29.81 | |
| B4 | Duo Std 8 | Duo Male | Std | 35.57 | 35.65 | 0.023 |

SDT-BOI 000560

| Well | Sample Name | Target Name | Task | C$_T$ | M77-197 C$_T$ Mean | Quantity | 2-18-14 Quantity Mean | M:F Ratio | Mean M:F | |
|------|-------------|-------------|------|-------|---------|----------|----------------|-----------|----------|---|
| F3 | M77-197 59C 2ND 1:10 | Duo Human | Unk | Undet | | | | | | |
| F3 | | Duo IPC | Unk | 29.96 | 29.96 | | | | | |
| F3 | | Duo Male | Unk | Undet | | | | | | |
| F4 | M77-197 59C 2ND 1:10 | Duo Human | Unk | Undet | | | | | | |
| F4 | | Duo IPC | Unk | 29.96 | 29.96 | | | | | |
| F4 | | Duo Male | Unk | Undet | | | | | | |
| F5 | M77-197 59C 2ND 1:100 | Duo Human | Unk | Undet | | | | | | |
| F5 | | Duo IPC | Unk | 29.99 | 30.03 | | | | | |
| F5 | | Duo Male | Unk | Undet | | | | | | |
| F6 | M77-197 59C 2ND 1:100 | Duo Human | Unk | Undet | | | | | | |
| F6 | | Duo IPC | Unk | 30.07 | 30.03 | | | | | |
| F6 | | Duo Male | Unk | Undet | | | | | | |

*Send both to WEF possible mini's. py*

• Experiment: AMY M77-197 3-5-14    Experiment Results Report    Applied Biosystems 7500
Instrument

# QC Summary

| Total Wells | 96 | Processed Wells | 24 | Targets Used | 3 |
| Well Setup | 24 | Flagged Wells | 0 | Samples Used | 12 |

| Flag | Name | Frequency | Locations |
|------|------|-----------|-----------|
| AMPNC | Amplification in negative control | 0 | |
| BADROX | Bad passive reference signal | 0 | |
| BLFAIL | Baseline algorithm failed | 0 | |
| CTFAIL | CT algorithm failed | 0 | |
| EXPFAIL | Exponential algorithm failed | 0 | |
| HIGHQT | High Quantity of DNA | 0 | |
| HIGHSD | High standard deviation in replicate group | 0 | |
| IPCCT | Internal PCR Control CT value | 0 | |
| LOWQT | Low Quantity of DNA | 0 | |
| MTFR | Ratio of Male to Female DNA quantities | 0 | |
| NOAMP | No amplification | 0 | |
| NOISE | Noise higher than others in plate | 0 | |
| NOSIGNAL | No signal in well | 0 | |
| NTCCT | Non-Template Control sample amplification | 0 | |
| OFFSCALE | Fluorescence is offscale | 0 | |
| OUTLIERRG | Outlier in replicate group | 0 | |
| R² | Low Standard curve R² value | 0 | |
| SLOPE | Non-optimal slope of the Standard curve | 0 | |
| SPIKE | Noise spikes | 0 | |
| THOLDFAIL | Thresholding algorithm failed | 0 | |
| YINT | Y-Intercept | 0 | |

only case on plate try

SDT-BOI 000562

| | | | | M77-197 | | 3-5-14 AMY |
|---|---|---|---|---|---|---|
| Well | Sample Name | Target Name | Task | $C_T$ | $C_T$ Mean | Quantity |
| A1 | Duo Std 1 | Duo Human | Std | 24.56 | 24.51 | 50 |
| A1 | Duo Std 1 | Duo IPC | Unk | 30.62 | 30.31 | |
| A1 | Duo Std 1 | Duo Male | Std | 24.78 | 24.75 | 50 |
| A2 | Duo Std 1 | Duo Human | Std | 24.46 | 24.51 | 50 |
| A2 | Duo Std 1 | Duo IPC | Unk | 30.00 | 30.31 | |
| A2 | Duo Std 1 | Duo Male | Std | 24.71 | 24.75 | 50 |
| A3 | Duo Std 2 | Duo Human | Std | 26.11 | 26.19 | 16.7 |
| A3 | Duo Std 2 | Duo IPC | Unk | 29.72 | 29.72 | |
| A3 | Duo Std 2 | Duo Male | Std | 26.48 | 26.53 | 16.7 |
| A4 | Duo Std 2 | Duo Human | Std | 26.28 | 26.19 | 16.7 |
| A4 | Duo Std 2 | Duo IPC | Unk | 29.72 | 29.72 | |
| A4 | Duo Std 2 | Duo Male | Std | 26.58 | 26.53 | 16.7 |
| A5 | Duo Std 3 | Duo Human | Std | 28.14 | 27.98 | 5.6 |
| A5 | Duo Std 3 | Duo IPC | Unk | 29.71 | 29.61 | |
| A5 | Duo Std 3 | Duo Male | Std | 28.30 | 28.30 | 5.6 |
| A6 | Duo Std 3 | Duo Human | Std | 27.83 | 27.98 | 5.6 |
| A6 | Duo Std 3 | Duo IPC | Unk | 29.51 | 29.61 | |
| A6 | Duo Std 3 | Duo Male | Std | 28.31 | 28.30 | 5.6 |
| A7 | Duo Std 4 | Duo Human | Std | 29.50 | 29.61 | 1.85 |
| A7 | Duo Std 4 | Duo IPC | Unk | 29.62 | 29.61 | |
| A7 | Duo Std 4 | Duo Male | Std | 29.92 | 30.01 | 1.85 |
| A8 | Duo Std 4 | Duo Human | Std | 29.72 | 29.61 | 1.85 |
| A8 | Duo Std 4 | Duo IPC | Unk | 29.59 | 29.61 | |
| A8 | Duo Std 4 | Duo Male | Std | 30.11 | 30.01 | 1.85 |
| A9 | Duo Std 5 | Duo Human | Std | 31.20 | 31.08 | 0.62 |
| A9 | Duo Std 5 | Duo IPC | Unk | 29.55 | 29.51 | |
| A9 | Duo Std 5 | Duo Male | Std | 31.73 | 31.57 | 0.62 |
| A10 | Duo Std 5 | Duo Human | Std | 30.95 | 31.08 | 0.62 |
| A10 | Duo Std 5 | Duo IPC | Unk | 29.47 | 29.51 | |
| A10 | Duo Std 5 | Duo Male | Std | 31.41 | 31.57 | 0.62 |
| A11 | Duo Std 6 | Duo Human | Std | 32.22 | 32.45 | 0.21 |
| A11 | Duo Std 6 | Duo IPC | Unk | 29.38 | 29.45 | |
| A11 | Duo Std 6 | Duo Male | Std | 32.94 | 33.03 | 0.21 |
| A12 | Duo Std 6 | Duo Human | Std | 32.69 | 32.45 | 0.21 |
| A12 | Duo Std 6 | Duo IPC | Unk | 29.52 | 29.45 | |
| A12 | Duo Std 6 | Duo Male | Std | 33.11 | 33.03 | 0.21 |
| B1 | Duo Std 7 | Duo Human | Std | 33.58 | 34.05 | 0.068 |
| B1 | Duo Std 7 | Duo IPC | Unk | 29.66 | 29.65 | |
| B1 | Duo Std 7 | Duo Male | Std | 34.25 | 34.90 | 0.068 |
| B2 | Duo Std 7 | Duo Human | Std | 34.52 | 34.05 | 0.068 |
| B2 | Duo Std 7 | Duo IPC | Unk | 29.64 | 29.65 | |
| B2 | Duo Std 7 | Duo Male | Std | 35.54 | 34.90 | 0.068 |
| B3 | Duo Std 8 | Duo Human | Std | 34.83 | 35.45 | 0.023 |
| B3 | Duo Std 8 | Duo IPC | Unk | 29.70 | 29.59 | |
| B3 | Duo Std 8 | Duo Male | Std | 36.70 | 36.15 | 0.023 |
| B4 | Duo Std 8 | Duo Human | Std | 36.08 | 35.45 | 0.023 |
| B4 | Duo Std 8 | Duo IPC | Unk | 29.48 | 29.59 | |
| B4 | Duo Std 8 | Duo Male | Std | 35.59 | 36.15 | 0.023 |

SDT-BOI 000563

3-5-14MX
2-3-4 AMY

| Well | Sample Name | Target Name | Task | Cт | Cт Mean | Quantity | Quantity Mean | M:F Ratio | Mean M:F | |
|------|-------------|-------------|------|------|---------|----------|---------------|-----------|----------|---|
| | | | | | M77-197 | | | | | |
| B5 | | Duo Human | Unk | 34.14 | 34.28 | 0.065 | 0.059 | | | |
| B5 | M77-197 26A | Duo IPC | Unk | 29.70 | 29.76 | | | | | |
| B5 | | Duo Male | Unk | 33.80 | 34.06 | 0.130 | 0.111 | | | 2.72ng human DNA in 46ul |
| B6 | | Duo Human | Unk | 34.42 | 34.28 | 0.053 | 0.059 | | | |
| B6 | M77-197 26A | Duo IPC | Unk | 29.82 | 29.76 | | | | | |
| B6 | | Duo Male | Unk | 34.31 | 34.06 | 0.092 | 0.111 | | | |
| B7 | | Duo Human | Unk | 26.12 | 26.13 | 18.700 | 18.533 | | | |
| B7 | M77-197 110 | Duo IPC | Unk | 29.66 | 29.66 | | | | | |
| B7 | | Duo Male | Unk | 26.67 | 26.68 | 15.626 | 15.451 | | | dilute 1:100 for amp |
| B8 | | Duo Human | Unk | 26.14 | 26.13 | 18.367 | 18.533 | | | |
| B8 | M77-197 110 | Duo IPC | Unk | 29.67 | 29.66 | | | | | |
| B8 | | Duo Male | Unk | 26.70 | 26.68 | 15.276 | 15.451 | | | |
| B9 | | Duo Human | Unk | Undet | | | | | | |
| B9 | S-RB1 3-5-14 | Duo IPC | Unk | 29.56 | 29.52 | | | | | |
| B9 | | Duo Male | Unk | Undet | | | | | | |
| B10 | | Duo Human | Unk | Undet | | | | | | |
| B10 | S-RB1 3-5-14 | Duo IPC | Unk | 29.48 | 29.52 | | | | | |
| B10 | | Duo Male | Unk | Undet | | | | | | |
| B11 | | Duo Human | Unk | Undet | | | | | | |
| B11 | S-RB2 3-5-14 | Duo IPC | Unk | 29.61 | 29.49 | | | | | |
| B11 | | Duo Male | Unk | Undet | | | | | | |
| B12 | | Duo Human | Unk | Undet | | | | | | |
| B12 | S-RB2 3-5-14 | Duo IPC | Unk | 29.37 | 29.49 | | | | | |
| B12 | | Duo Male | Unk | Undet | | | | | | |

SDT-BOI 000564

# ILLINOIS STATE POLICE
### Division of Forensic Services
### Forensic Sciences Command

Case #  M77-197

Initials  AMY

Date  1/22/2014

## Identifiler Plus AMPLIFICATION FORM

DNA 13 (11/11)

Each amplification set (different date and/or time of set up) requires its own worksheet.  Mark column(s) for kit

| Sample | | ID+ | | [DNA] (ng/µl) | Dil'n for Amp | Amount of DNA (µl) | Amount of H2O (µl) | Estimated Amount of DNA (ng) |
|---|---|---|---|---|---|---|---|---|
| M77-197 | 15B | 1 | org | 0.009 | 46ul to 10ul | 10 | 0 | 0.4 |
| MRB-1 | 1-22 | 2 | blue | ---- ---- | 46ul to 10ul | 10 | 0 | 0 |
| positive control | | 3 | pink | ---- ---- | n/a | 5 | 5 | 0.5 |
| negative control | | 4 | green | ---- ---- | n/a | 0 | 10 | 0 |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

*consumed*



**ILLINOIS STATE POLICE**
Division of Forensic Services
Forensic Sciences Command

Case # __M77-197__

Initials ___ AMY

**Identifiler Plus AMPLIFICATION FORM**

Date ___ 3/7/2014

DNA 13 (11/11)

Each amplification set (different date and/or time of set up) requires its own worksheet. Mark column(s) for kit

| Sample | | ID+ | | [DNA] (ng/µl) | Dil'n for Amp | Amount of DNA (µl) | Amount of H2O (µl) | Estimated Amount of DNA (ng) |
|---|---|---|---|---|---|---|---|---|
| M77-197 | 28B | 1 | org | 1.9 | 1:10 | 8 | 2 | 1.5 |
| | 93A | 2 | blue | 0.59 | n/a | 2.6 | 7.4 | 1.5 |
| | 96A | 3 | pink | 0.56 | n/a | 2.7 | 7.3 | 1.5 |
| SRB-1 hair | | 4 | green | ND | n/a | 3 | 7 | 0 |
| M77-197 | 26A | 8 | org | 0.06 | 25-->10 | 10 | 0 | 1.5 |
| | 110 | 9 | blue | 18.5 | 1:100 | 4.5 | 5.5 | 0.8 |
| S-RB1 3-5-14 | | 10 | pink | ND | 25-->10 | 10 | 0 | 0 |
| positive control | | 11 | green | —— | ---- | n/a | 5 | 5 | 0.5 |
| negative control | | 12 | org | ---- | —— | n/a | 0 | 10 | 0 |

* more than 1/2 of extracted DNA consumed, additional blanks and sample remains

**SDT-BOI 000566**





SDT-BOI 000567

M77-197 Run 1-23-14 AMY







M77-197 3-7-14 AMY

A·B· Applied
Biosystems
GeneMapper ID v3.2





Wed Mar 12,2014 10:27AM, CST          Printed by: gmid

SDT-BOI 000569



SDT-BOI 000570



M77-197  3-12-14

GeneMapper ID v3.2







Wed Mar 12, 2014 02:55PM, CST          Printed by: gmid          **SDT-BOI 000571** Page 1 of 2

M77-197  3-12-14

GeneMapper ID v3.2









SDT-BOI 000574

M77-197 3-7-14 AMY



SDT-BOI 000575



SDT-BOI 000576

Applied
Biosystems

M77-197 Run 1-23-14 AMY

GeneMapper ID v3.2



| Sample File | Sample Name |
|---|---|
| ANC_1-22-14-A02.fsa | ANC_1-22-14 |

D8S1179    D21S11    D7S820    CSF1PO

ANC_1-22-14-A02.fsa    ANC_1-22-14

D3S1358    TH01    D13S317    D16S539    D2S1338

ANC_1-22-14-A02.fsa    ANC_1-22-14

D19S433    vWA    TPOX    D18S51

ANC_1-22-14-A02.fsa    ANC_1-22-14

D5S818    FGA

ANC_1-22-14-A02.fsa    ANC_1-22-14

75.0  100.0  139.0  160.0  200.0  246.65  300.0  340.0  400.0
150.0                                              350.0

* dye artifact

93 HJ

SDT-BOI 000577



SDT-BOI 000578



‡ dye artifact

SDT-BOI 000579

**A·B** Applied
Biosystems

GeneMapper ID v3.2

M77-197 Run 1-23-14 AMY 



M77-197 3-7-14 AMY

Applied Biosystems
GeneMapper ID v3.2



SDT-BOI 000581



M77-197 3-7-14 AMY

Reprup.

98 14

SDT-BOI 000582



GeneMapper ID v3.2

M77-197 3-7-14 AMY



| Sample File | Sample Name |
|---|---|
| SRB-1-3-5-14-E12.fsa | SRB-1-3-5-14 |

on 3-11-14 R^tty
Attempted to reinject SRB-1-3-5-14 in E12. This was
injected 2x s and did not work.
sample must be reprepped.
Run failed - no sizing available.

Plate - run
A11 - MM only
B11 - Ladder
E12 - SRB-1-3-5-14
C11 - MM only
F12 - APC-3-7-14
D11 - MM only
G12 - ANC-3-7-14
H12 - Ladder   - Nothing usable from run. - not printed

Reprepped + ran 3-12-14 OK. tty 6.25.14 tty

Dr
6.25.14

99 tty

SDT-BOI 000583

M77-197 3-12-14

S RB-1 3-5-14 ty



100 ty



Applied
Biosystems

GeneMapper ID v3.2

M77-197 Run 1-23-14 AMY





SDT-BOI 000586





SDT-BOI 000588



SDT-BOI 000589 Page 1 of 2

M77-197 3-7-14 AMY

**A∙B** *Applied Biosystems*
GeneMapper ID v3.2





SDT-BOI 000590

M77-197 3-7-14 AMY

GeneMapper ID v3.2



SDT-BOI 000591

GeneMapper ID v3.2

M77-197 3-7-14 AMY





**SDT-BOI 000592**



**AB** Applied Biosystems

GeneMapper ID v3.2

M77-197 3-7-14 AMY



| Sample File | Sample Name |
|---|---|
| M77-197-96A-A12.fsa | M77-197-96A |

D5S818          FGA

X
106.40
7523

13
159.58
2583

21
230.32
530

24
242.45
641

| M77-197-96A-A12.fsa | M77-197-96A |
|---|---|

75.0   100.0   139.0   160.0   200.0   246.52   300.0   340.0   400.0

106.4   150.0   350.0

M77-197 3-7-14 AMY

**Applied Biosystems**
GeneMapper ID v3.2









mixture of at least 3 people
swabbing from outside of blood tube stopper
from James Robinson. ty

Not suitable for use as a standard.







M77-197 3-7-14 AMY

GeneMapper ID v3.2







SDT-BOI 000600

Applied Biosystems
GeneMapper ID v3.2

M77-197 3-7-14 AMY





**ILLINOIS STATE POLICE**
Division of Forensic Services
Forensic Sciences Command

Case # __M77-197__

Initials __AMY__

DNA 14 (11/11)

**ID+ STR SUMMARY FORM**

Date __1/23/2014__

Pos/Neg Control(s) Verified ☒   Blank(s) Verified ☒   Allelic Ladder(s) Verified ☒

| Locus | 15B - blood indicated stain from light switch cover all obs'd alleles (mix of at least 2)* | SAMPLE | | | | |
|---|---|---|---|---|---|---|
| D8S1179 | 13, 14 | | | | | |
| D21S11 | ND | | | | | |
| D7S820 | ND | | | | | |
| CSF1PO | ND | | | | | |
| D3S1358 | 14, 16, 18 | | | | | |
| TH01 | ND | | | | | |
| D13S317 | ND | | | | | |
| D16S539 | ND | | | | | |
| D2S1338 | ND | | | | | |
| D19S433 | 11, 13, 14.2, 15 | | | | | |
| vWA | 17 | | | | | |
| TPOX | ND | | | | | |
| D18S51 | ND | | | | | |
| Amelogenin | X, Y | | | | | |
| D5S818 | ND | | | | | |
| FGA | ND | | | | | |

ND: not detected        *Degraded and potentially incomplete cannot be used for comparisons

CODIS Exhibits: __N/A__

Reviewer Initials: _____ Date _____

SDT-BOI 000602

**ILLINOIS STATE POLICE**
Division of Forensic Services
Forensic Sciences Command

Case # M77-197
Initials AMY
Date 3/11/2014

DNA 14 (11/11)   **ID+ STR SUMMARY FORM**

Pos/Neg Control(s) Verified ☒   Blank(s) Verified ☒   Allelic Ladder(s) Verified ☒

SDT-BOT000603

| Locus | 26A Swabbing of blood tube top James Robinson all obs'd alleles (mix of at least 3) | 28B Connie Cooper std from appt hair roots | | 93A William Douglas std from appt hair roots | | 96A Noyalee Robinson std from appt hair roots | | 110 - Buccal swabs from Johnnie Lee Savory | | |
|---|---|---|---|---|---|---|---|---|---|---|
| D8S1179 | 13, 14, 15, 16 | 13 | 15 | 12 | 16 | 14 | 15 | 13 | 14 | |
| D21S11 | 29, 30, 31 | 29 | 30 | 28 | 32.2 | 29 | 30 | 28 | 32.2 | |
| D7S820 | 10 | ND | | ND | | 6 | 10 | 10 | 11 | |
| CSF1PO | 12 | ND | | ND | | 10 | inc. | 8 | 12 | |
| D3S1358 | 14, 15, 16, 17, 18 | 16 | 16 | 15 | 17 | 16 | 18 | 16 | 17 | |
| TH01 | 6, 7, 8, 9 | 7 | 9 | 8 | 9.3 | 6 | 9 | 7 | 8 | |
| D13S317 | 9, 12, 13 | 13 | 13 | 13 | inc. | 12 | 13 | 12 | 12 | |
| D16S539 | 10, 11, 12 | 9 | 11 | 9 | inc. | 9 | 11 | 11 | 11 | |
| D2S1338 | 16, 17 | ND | | ND | | ND | | 23 | 23 | |
| D19S433 | 11, 13, 14.2, 15 | 13 | 15 | 12.2 | 13 | 14.2 | 15 | 12 | 12.2 | |
| vWA | 17, 18, 19 | 14 | 15 | 16 | 17 | 14 | 17 | 15 | 19 | |
| TPOX | 8, 9 | 8 | 9 | 8 | inc. | 8 | 9 | 8 | 8 | |
| D18S51 | 13, 15 | 14 | inc. | ND | | 15 | 20 | 14 | 22 | |
| Amelogenin | X, Y | X | X | X | Y | X | X | X | Y | |
| D5S818 | 11, 13 | 11 | 13 | 11 | 13 | 13 | 13 | 8 | 13 | |
| FGA | 21, 22, 23 | 21 | inc. | 19 | 22 | 21 | 24 | 25 | 27 | |

ND: not detected   26A not suitable for use as a standard-ty

CODIS Exhibits: N/A post conviction testing
Reviewer Initials:

# ILLINOIS STATE POLICE
Division of Forensic Services
Morton Forensic Science Laboratory
1810 South Main Street
Morton, Illinois 61550-2983
(309) 284-6500 (Voice) * 1-(800) 255-3323 (TDD)

Pat Quinn
*Governor*

Hiram Grau
*Director*

January 17, 2014
## LABORATORY REPORT

CRIME SCENE UNIT
PEORIA PD
600 SOUTH WEST ADAMS STREET
PEORIA IL 61602

Laboratory Case #M77-000197
Agency Case #77-1588

OFFENSE: Murder
SUSPECT: Johnnie Lee Savory
VICTIMS: Connie Cooper/James Robinson

The following evidence was submitted to the Morton Forensic Science Laboratory by Officer Scott
Bowers on November 7, 2013:

| EXHIBIT | DESCRIPTION | FINDINGS |
|---|---|---|
| 1A | Vaginal swabs reported to be from Connie Cooper | Not tested at this time. Preserved as Exhibit 1A1. |
| 15 | Light switch cover from bathroom | Blood indicated on two areas of cover. Portions preserved as Exhibits 15A and 15B. |
| 21 | Fingernail scraping reported to be from right index finger of Connie Cooper | Miscellaneous debris observed on wooden stick. Portion of stick preserved as Exhibit 21A. |
| 22 | Fingernail scraping reported to be from right ring finger of Connie Cooper | Miscellaneous debris observed on wooden stick. Portion of stick preserved as Exhibit 22A. |

The following evidence was submitted to the Morton Forensic Science Laboratory by Officer Scott
Bowers on November 8, 2013:

| EXHIBIT | DESCRIPTION | FINDINGS |
|---|---|---|
| 24 | Blood tube reported to be from Connie Cooper | Swabbed blood like crusts from top and around lower edge of stopper of tube. Swabbing preserved as Exhibit 24A. |
| 26 | Blood tube reported to be from James Robinson | Swabbed blood like crusts from top and around lower edge of stopper of tube. Swabbing preserved as Exhibit 26A. |

SDT-BOI 000604

PEORIA PD
Laboratory Case #M77-000197                    -2-                    January 17, 2014

The following evidence was submitted to the Morton Forensic Science Laboratory by Officer Scott
Bowers on November 7, 2013:

| EXHIBIT | DESCRIPTION | FINDINGS |
|---|---|---|
| 27 | Head hair standard reported to be from Connie Cooper | Apparent hairs observed through package. Not examined at this time. |
| 28 | Pubic hair standard reported to be from Connie Cooper | No blood indicated on visible staining on outside and inside bottom seam edge of package. Swabbing of brown stain from inside seam edge preserved as Exhibit 28A. Apparent hairs observed. Portion of apparent hair ends preserved as Exhibit 28B. May be used as a DNA standard. |
| 29 | Head hair standard reported to be from James Robinson | Apparent hairs observed. Portion of apparent hair ends preserved as Exhibit 29A. May be used as a DNA standard. Apparent fiber observed. |
| 30 | Pubic hair standard reported to be from James Robinson | Apparent hairs observed through package. No further exam at this time. |
| 31 | Package reported to contain hair from Connie Cooper's right hand | No apparent hairs observed on inside of package. No blood indicated on stain on outside of package. One apparent hair observed on outside of package. No further exam at this time. |
| 35 | Anal swabs reported to be from Connie Cooper | Not tested at this time. Swabs and liquid contents preserved as Exhibit 35A. |
| 36 | Vaginal swabs reported to be from Connie Cooper | Not tested at this time. Swabs and liquid contents preserved as Exhibit 36A. |
| 44 | Black Normark folding knife reported to be from Johnnie Lee Savory | Small blood-like stains observed on blade and inside folding portion of knife. Swabbings conducted of both areas and preserved as Exhibit 44A and 44B respectively. No testing conducted at this time to preserve sample. |
| 49 | Head hair standard reported to be from Johnnie Lee Savory | Not examined. |
| 50 | Head hair standard reported to be from Johnnie Lee Savory | Not examined. |

PEORIA PD
Laboratory Case #M77-000197                    -3-                    January 17, 2014

| EXHIBIT | DESCRIPTION | FINDINGS |
|---------|-------------|----------|
| 51 | Head hair standard reported to be from Johnnie Lee Savory | Not examined. |
| 52 | Head hair standard reported to be from Johnnie Lee Savory | Not examined. |
| 53 | Head hair standard reported to be from Johnnie Lee Savory | Not examined. |
| 54 | Pubic hair standard reported to be from Johnnie Lee Savory | Not examined. |
| 59 | Blue pants | No blood indicated on areas tested at this time. Swabbing from inside waist band of pants conducted and preserved as Exhibit 59A. Area cut around apparent burn hole and preserved as Exhibit 59B. Portion of blood-like stain from inside right front pocket preserved as Exhibit 59C. Portion of stained area from inside back of pants near tag preserved as Exhibit 59D. Portion of material cut out below belt loop next to right front pocket (possible prior testing area) preserved as Exhibit 59E. Apparent hairs, fibers and miscellaneous debris collected. |
| 69 | Package reported to contain hair from James Robinson's left hand | No apparent hairs observed on inside of package. |
| 84 | Blood tube reported to be from Johnnie Lee Savory | Not examined. |
| 85 | Blood tube reported to be from Johnnie Lee Savory | Not examined. |
| 88 | Mustache hair standard reported to be from William Douglas | Not examined. |
| 89 | Head hair standard reported to be from William Douglas | Not examined. |
| 90 | Head hair standard reported to be from William Douglas | Not examined. |

SDT-BOI 000606

PEORIA PD
Laboratory Case #M77-000197                    -4-                    January 17, 2014

| EXHIBIT | DESCRIPTION | FINDINGS |
|---------|-------------|----------|
| 91 | Head hair standard reported to be from William Douglas | Not examined. |
| 92 | Head hair standard reported to be from William Douglas | Not examined. |
| 93 | Head hair standard reported to be from William Douglas | Apparent hairs observed. Portion of apparent hair ends preserved as Exhibit 93A. May be used as a DNA standard. |
| 94 | Pubic hair standard reported to be from William Douglas | Not examined. |
| 95 | Head hair standard reported to be from Noyalee Robinson | Not examined. |
| 96 | Head hair standard reported to be from Noyalee Robinson | Apparent hairs observed. Portion of apparent hair ends preserved as Exhibit 96A. May be used as a DNA standard. |
| 97 | Head hair standard reported to be from Noyalee Robinson | Not examined. |
| 98 | Head hair standard reported to be from Noyalee Robinson | Apparent hairs observed. Portion of apparent hair ends preserved and combined with Exhibit 96A. May be used as a DNA standard. |
| 99 | Head hair standard reported to be from Noyalee Robinson | Not examined. |
| 100 | Pubic hair standard reported to be from Noyalee Robinson | Apparent hairs observed through package. Not examined at this time. |
| 110 | Buccal standard from Johnnie Lee Savory | Preserved. |

**REQUESTS:**
Exhibits 1A1, 21A, 22A, 35A, 36A, 44A, 44B, 59A, 59B, 59D and 59E will need to be consumed in DNA analysis due to limited sample size.

Please note that some items have not been examined at this time. If, at a later date, it is determined that the value of this evidence can significantly aid the case, please advise.

**SDT-BOI 000607**

PEORIA PD
Laboratory Case #M77-000197                    -5-                    January 17, 2014

**REQUESTS:** (continued)
For results of previous biological examinations, refer to the laboratory reports by Forensic Scientists
Robert Gonsowski and Judith Kienzler.

Microscopy evidence (apparent hairs, fiber, debris) was observed and collected in this case.

**EVIDENCE DISPOSITION:**
Exhibits 1A1, 15A, 15B, 21A, 22A, 24A, 26A, 28A, 28B, 29A, 35A, 36A, 44A, 44B, 59A, 59B, 59C,
59D, 59E, 93A, 96A and 110 have been transferred to the DNA section of the Morton Forensic Science
Laboratory for further analysis and may be the subject of a separate report.

The evidence will be returned to your agency at a later date.

If you have any questions regarding this report, please feel free to contact me.

Any analysis conducted is accredited under the laboratory's ISO/IEC 17025 accreditation issued by
ANSI-ASQ National Accreditation Board/FQS. Refer to certificate #AT-1700 and associated Scope of
Accreditation.

                                        Respectfully submitted,

                                        Ann Maria Yeagle
                                        Forensic Scientist

cc:  PEORIA CO SA
     Joshua A. Tepfer-Center on Wrongful Convictions of Youth

**SDT-BOI 000608**

EXHIBIT
4

**ILLINOIS STATE POLICE**
**Division of Forensic Services**
**Forensic Sciences Command**
**Morton Forensic Science Laboratory**

Exhibit / Item _____ 44 _____  Date Examined _____ 12/11/2013 _____ Case # _____ M77-197 _____

**Description of Package and Markings:**

   man env sld clear tape "...#982 10-22-13..."
   "Black Normark Folding Knife ex. 32A" on env

Envelope opened to observe

Folding knife - "People's Exhibit #32A" Red label on handle

   INITIALS AND DATE SCRIBED ON HANDLE BY STICKER "...2/1/77"

   "Normark" brand on handle   blade "EKA Sweden Stainless"

   knife ~18cm long unfolded       blade ~7.5cm

Exam with stereo microscope

   observed very small RBS on blade of knife, sharp edge (< ~ 1/2mm by ~3mm)

   not tested b/c so small to preserve

12-12-13 continue exam

44A - 1 swabbing into 1 SET into zl into man env sld BET 12-17-13 AMY

   fine tip swab moistened w/ ddi water - blade edge of knife

   swabbed both sides of sharp edge at stain

   air dried and preserved as Exhibit 44A



Vis small amount of reddish stain inside area blade folds into

   not tested b/c so small to preserve

44B - 1 swabbing into 1 SET into zl into man env sld BET 12-17-13 AMY

   fine tip swab moistened w/ ddi water - inside area of folding knife

   air dried and preserved as Exhibit 44B



**KM controls**

known blood = pos

blank =neg

**Turned over to DNA:**       Repackaging:       Seal Date:       Analyst:

44A, 44B                      orig man env sld BET    12/12/2013       AMY

                                                                        Revision Date (01/13)

EXHIBIT
5

**ILLINOIS STATE POLICE**
**Division of Forensic Services**
**Forensic Sciences Command**
**Morton Forensic Science Laboratory**

Exhibit / Item _____ 59 _____ Date Examined _____ 12/9/2013 _____ Case # _____ M77-197 _____

**Description of Package and Markings:**

BPB sld clear box tape "SB #982 10-22-13"
on BPB "Paper sack with blue pants Ex #34"

BPB opened to obs: open BPB inside "#59...from sheet in main room... blue pants..."

    Red people's exhibit label "#34"

    White and Red Evidence tape seal at top fold of bag "...1-26-77" appears intact

    brown tape seal at bottom "RFG" appear to be initials on tape in black

    Bag appears ripped open - observe blue work style pants    No size label observed in pants.

    Removed pants from bag to examine.    Tag inside back "Koratron...Machine washable...permanent press"

Blue Pants - Navy blue work pants, visually dirty    Also "People's Exhibit #34A" label inside back

    button missing at waist. Pants are zipped. Zipper is metal and corroded. Unzipped pants - zipper works.

    swabbed inside of waistband with 1 moist swab. Avoided areas with markings.

    Also swabbed small area around thread where button would have been attached.    Swab air dried.

    Markings on inside waist difficult to read initials

    ~3/4" of waistband width swabbed- area swabbed - dotted outline.

Front



inside front view



Two tapings made to remove and preserve apparent hairs, fibers and debris.

Front and back pockets empty, button intact left rear pocket, front right small coin pocket empty

Debris observed in front pocket, into paper packet. Packet and tapings into man env and into Ex 59 pkg.

Left front leg appears to have a small burn hole - exam w/ stereo microscope - melted fibers vis around edge

Swabbing from waist area - 1 swab

into 1 SET into zt pl into man env sld BET 12-11-13 AMY as Ex 59A

<div align="right">continue on next page</div>

**Turned over to DNA:**      **Repackaging:**      **Seal Date:**      **Analyst:**

59A      n/a      n/a      AMY  53

Revision Date (01/13)

**ILLINOIS STATE POLICE**
**Division of Forensic Services**
**Forensic Sciences Command**
**Morton Forensic Science Laboratory**

| Exhibit / Item | 59 | Date Examined | 12/10/2013 | Case # | M77-197 |
|---|---|---|---|---|---|

**Description of Package and Markings:**
continued exam
Visual exam of pants - dirty and worn.
Right front pocket inside -







Q1 - vis med rbs on pocket outside of wt material
KM Q1 swab of stain = neg X2, cutting neg X2 on each side
Q2 same pocket swab = neg, cutting = neg
inside Q1 - swab X 2 = neg, 2 cuttings inside seam = neg
Q3 around inside appt burn hole on front left leg KM = neg
Q4 yellowish stain around edge of tag swab = neg, cutting = neg
Q5 yellow- brown stain above tag swab = neg, cutting = neg



**KM controls**
known blood = pos
blank =neg

continued on next page

| Turned over to DNA: | Repackaging: | Seal Date: | Analyst: |
|---|---|---|---|
| n/a | n/a | n/a | AMY |

Revision Date (01/13)

**ILLINOIS STATE POLICE**
**Division of Forensic Services**
**Forensic Sciences Command**
**Morton Forensic Science Laboratory**

Exhibit / Item _____ 59 _____ Date Examined _12/11/2013_ Case # _____ M77-197

**Description of Package and Markings:**

continued exam on 12-11-13

Examine pants with stereo microscope - inside right front pocket stain vis blood like
KM

Q6 - stain inside back of pants below tag. Cutting = neg

Q7(outside of appt burn hole) same stain as Q3, cutting and swab of Q7 = neg

Q8 - vis dirt from left front leg - swab = neg

Q9 = neg

Q10 at zipper fly - swab = neg

12/11/2013
**KM controls**
known blood = pos
blank =neg

Preserve stains/ areas of pants for DNA analysis

Q3/7 - apparent burn hole ~0.4cm in diameter.
cutting from around apparent  burn hole ~0.6cm X ~0.8cm - hole in center
into 1 SET into zl pl into man env sld BET 12-11-13 AMY as **Ex 59B**

Q1 - cutting from right front pocket. Portion of seam and pocket into 1 SET, additional portion from pocket into glyc fold.
Cut out area ~0.9cm X ~1cm from seam into SET, Cut out ~2.3cm X ~ 1.7cm from Q1 RBS stain
From Q1 stain cut out ~0.5cm X ~0.8cm into same SET, remaining stain in glyc fold.
SET into zl pl. glyc fold and zl pl into man env sld BET 12-11-13 AMY as **Ex 59C**
More than 1/2 of stain remains intact on pants

Q5 - lt yellowish/ lt brownish cutting from vis stain above washing tag
~1.4cm X ~0.9cm cut out of stained area- diffuse appearance
into 1 SET into zl pl into man env sld BET 12-11-13 AMY as **Ex 59D**

Pants wrapped in white paper and back into Ex 59 sld BET 12-11-13

continued on next page

Turned over to DNA:
59B, 59C, 59D

Repackaging:
orig BPB sld BET

Seal Date:
12/11/2013

Analyst:
AMY

Revision Date (01/13)

**SDT-BOI 000961**

**ILLINOIS STATE POLICE**
**Division of Forensic Services**
**Forensic Sciences Command**
**Morton Forensic Science Laboratory**

| Exhibit / Item | 59 | Date Examined | 12/12/2013 | Case # | M77-197 |
|---|---|---|---|---|---|

**Description of Package and Markings:**
exam continued

12-12-13 reopened pants

looked at area around rt front pocket again with stereo microscope

observed small cut out area ~0.5cm X ~0.6cm

will cut out under layer of blue fabric remaining.

Vis dirty areas surrounding but no blood like stains observed.

Q11 - swabbing from area around rt pocket outside KM = neg     **KM controls 12-12-13**
                                                              known blood = pos
                                                              blank =neg

Cut out inside layer from prior appt testing cut out area. ~0.5cm X ~0.6cm was previously removed.

Cut out ~0.4cm X~0.5cm and into 1 SET.     *below cut + cut*

SET into zl pl into man env sld BET 12-12-13 AMY as Ex 59E



Ex 59A, 59B, 59D and 59E will need to be consumed in DNA

| Turned over to DNA: | Repackaging: | Seal Date: | Analyst: |
|---|---|---|---|
| | reseled in orig bpb sld BET | 12-12-13 AMY | AMY |

Revision Date (01/13)   56

SDT-BOI 000962

*Stapled packet 2 of 2 my*

# ILLINOIS STATE POLICE
## Division of Forensic Services
## Forensic Sciences Command
## Morton Forensic Science Laboratory



EXHIBIT
**6**

| Exhibit / Item | 59 | Date Examined | 2/10/2013 | Case # | M77-197 |
|---|---|---|---|---|---|

*re opened to remove additonal stain from pocket*

**Description of Package and Markings:**

BPB opened to remove wpp marked "M77-197 #59..."

opened BPB to remove blue pants

unfolded blue pants and pulled open right front pocket, Q1 and Q2

Cut out ~4cm X ~0.7cm strip from Q1 edge by corner of pocket and ~0.5cm square piece from below prior tested area into glyc fold. Will extract with remaining cutting inExhibit 59C. More than ~1/2 of stained area remains on pants.

glyc fold into 59C for extraction.

These cuttings will be combined with prior cuttings subexhibited as Exhibit 59C extraction #2.





Pants wrapped in white paper and back into Ex 59 sld BET 2-10-13

| Turned over to DNA: | Repackaging: | Seal Date: | Analyst: |
|---|---|---|---|
| 59C | orig BPB sld BET | 2/10/2014 | AMY *tg* |

Revision Date (01/13)

EXHIBIT
**7**

Bowers

**ILLINOIS STATE POLICE**
Division of Forensic Services
Morton Forensic Science Laboratory
1810 South Main Street
Morton, Illinois 61550-2983
(309) 284-6500 (Voice) * 1-(800) 255-3323 (TDD)

Pat Quinn
*Governor*

Hiram Grau
*Director*

March 20, 2014
**LABORATORY REPORT**

CRIME SCENE UNIT
PEORIA PD
600 SOUTH WEST ADAMS STREET
PEORIA, IL 61602

Laboratory Case #M77-000197
Agency Case # 77-1588

OFFENSE    Murder
SUSPECT    Johnnie Lee Savory
VICTIMS    Connie Cooper/James Robinson

The following evidence was submitted to the Morton Forensic Science Laboratory by Officer Scott
Bowers on November 7, 2013:

| EXHIBIT | DESCRIPTION |
|---|---|
| 1A1 | Vaginal swabs from Connie Cooper |
| 1A1A | Extracted DNA from vaginal swabs |
| 15A | Swabbing from stain on edge of light switch cover (blood indicated) |
| 15A1 | Extracted DNA from edge of light switch cover |
| 15B | Swabbing from stain near center of light switch cover (blood indicated) |
| 21A | Fingernail scraping from Connie Cooper |
| 21A1 | Extracted DNA from fingernail scraping |
| 22A | Fingernail scraping from Connie Cooper |
| 22A1 | Extracted DNA from fingernail scraping |

The following evidence was submitted to the Morton Forensic Science Laboratory by Officer Scott
Bowers on November 8, 2013:

| EXHIBIT | DESCRIPTION |
|---|---|
| 26A | Swabbing from top and sides of lavender blood tube stopper from James Robinson |

The following evidence was submitted to the Morton Forensic Science Laboratory by Officer Scott
Bowers on November 7, 2013:

| EXHIBIT | DESCRIPTION |
|---|---|
| 28B | Apparent root ends from pubic hair standard of Connie Cooper |
| 28B1 | Extracted DNA from pubic hair standard of Connie Cooper |
| 29A | Apparent root ends from head hair standard of James Robinson |
| 29A1 | Extracted DNA from hair standard of James Robinson |
| 44A | Swabbing from sharp edge of knife blade |

CONFIDENTIAL -
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 17-CV-0204

**PEORIA_SAVORY 1918**

PEORIA PD
Laboratory Case #M77-000197                 -2-                        March 20, 2014

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 44A1 | Extracted DNA from swabbing from sharp edge of knife blade |
| 44B | Swabbing from inside of folding handle of knife |
| 44B1 | Extracted DNA from swabbing from inside folding handle of knife |
| 59A | Swabbing from inside waistband of blue pants |
| 59A1 | Extracted DNA from swabbing of inside waistband |
| 59B | Portion of blue pants from around apparent burn hole on pants leg |
| 59B1 | Extracted DNA from portion of pants leg around apparent burn hole |
| 59C | Portion of blood-like stain from inside right front pocket |
| 59C1 | Extracted DNA from portion of stain inside right front pocket |
| 59D | Portion of pants from inside back by tag |
| 59D1 | Extracted DNA from stain inside back of pants by tag |
| 59E | Portion of pants from apparent prior testing area below belt loop |
| 59E1 | Extracted DNA from area on pants below belt loop |
| 93A | Apparent root ends from head hair standard of William "Peter" Douglas |
| 93A1 | Extracted DNA from hair standard of William "Peter" Douglas |
| 96A | Apparent root ends from head hair standard of Noyalee Robinson |
| 96A1 | Extracted DNA from hair standard of Noyalee Robinson |
| 110 | Buccal swab standard from Johnnie Lee Savory |
| 110A | Extracted DNA from buccal standard of Johnnie Lee Savory |

**RESULTS**

DNA from Exhibits 15B, 26A, 28B, 93A, 96A and 110 was amplified using the Polymerase Chain
Reaction (PCR) and profiled at the loci listed on the attached table.

A mixture of human DNA profiles was identified in Exhibit 15B at the D8S1179, D3S1358, D19S433,
vWA and Amelogenin loci that was interpreted as a mixture of at least two people. This mixed profile is
potentially incomplete and unsuitable for comparison to known standards. It is not suitable for entry into
the DNA Index.

A mixture of human DNA profiles was identified in Exhibit 26A that has been interpreted as a mixture of
at least three people. This mixed profile is not suitable for use as a DNA standard.

DNA profiles were identified in Exhibit 110; in Exhibit 28B at the D8S1179, D21S11, D3S1358, TH01,
D13S317, D16S539, D19S433, vWA, TPOX, D18S51, D5S818, FGA and Amelogenin loci; in Exhibit
93A at the D8S1179, D21S11, D3S1358, TH01, D13S317, D16S539, D19S433, vWA, TPOX, D5S818,
FGA and Amelogenin loci; and in Exhibit 96A at the D8S1179, D21S11, D7S820, CSF1PO, D3S1358,
TH01, D13S317, D16S539, D19S433, vWA, TPOX, D18S51, D5S818, FGA and Amelogenin loci. These
profiles were not used for comparisons at this time.

DNA was extracted from Exhibits 1A1, 15A, 21A, 22A, 29A, 44A, 44B, 59A, 59B, 59C, 59D and 59E,
but not profiled. Quantitative PCR indicates these samples should be directed for Y-STR and Minifiler
analysis.

CONFIDENTIAL -
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 17-CV-0204

PEORIA PD
Laboratory Case #M77-000197                    -3-                    March 20, 2014

**RESULTS** (continued)
Exhibits 1A1A, 15A1, 21A1, 22A1, 28B1, 29A1, 44A1, 44B1, 59A1, 59B1, 59C1, 59D1, 59E1, 93A1, 96A1 and 110A will be forwarded to the Research and Development Laboratory for further analysis and will be the subject of a separate report.

See the attached table for a summary of observed alleles.

Additional exhibits were received in this case, but were not analyzed.

**REQUESTS**
For results of previous biological examinations, refer to my laboratory report dated January 17, 2014 and to the laboratory reports by Forensic Scientists Robert Gonsowski and Judith Kienzler.

**EVIDENCE DISPOSITION**
Please note that Exhibits 1A1, 15A, 15B, 21A, 22A, 26A, 28B, 29A, 44A, 44B, 59A, 59B, 59C, 59D, 59E, 93A and 96A were consumed in analysis. Sample remains in Exhibits 15, 28, 29, 59, 93 and 96 for further testing if needed.

The evidence will be available for return at a later date.

If you have any questions regarding this report, please feel free to contact me.

Any analysis conducted is accredited under the laboratory's ISO/IEC 17025 accreditation issued by ANSI-ASQ National Accreditation Board/FQS. Refer to certificate #AT-1700 and associated Scope of Accreditation.

Respectfully submitted,


Ann Maria Yeagle
Forensic Scientist

Attachment (s)

cc: PEORIA CO SA
    Joshua A. Tepfer-Center on Wrongful Convictions of Youth

**CONFIDENTIAL -
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 17-CV-0204**

**PEORIA_SAVORY 1920**

# Summary of DNA ID+ Analytical Results

## M77-000197

### Exhibit Attachment - 1

| | Sub 15B<br>Swabbing from stain near center of light switch cover (blood indicated) | Sub 26A<br>Swabbing from top and sides of lavender blood tube stopper from James Robinson | Sub 28B<br>Apparent root ends from pubic hair standard of Connie Cooper | Sub 93A<br>Apparent root ends from head hair standard of William "Peter" Douglas | Sub 96A<br>Apparent root ends from head hair standard of Noyalee Robinson | Exb 110<br>Buccal swab standard from Johnnie Lee Savory | | | |
|---|---|---|---|---|---|---|---|---|---|
| D8S1179 | 13,14 | 13,14,15,16 | 13,15 | 12,16 | 14,15 | 13,14 | | | |
| D21S11 | ND | 29,30,31 | 29,30 | 28,32.2 | 29,30 | 28,32.2 | | | |
| D7S820 | ND | 10 | ND | ND | 6,10 | 10,11 | | | |
| CSF1PO | ND | 12 | ND | ND | 10 | 8,12 | | | |
| D3S1358 | 14,16,18 | 14,15,16,17,18 | 16 | 15,17 | 16,18 | 16,17 | | | |
| TH01 | ND | 6,7,8,9 | 7,9 | 8,9.3 | 6,9 | 7,8 | | | |
| D13S317 | ND | 9,12,13 | 13 | 13 | 12,13 | 12 | | | |
| D16S539 | ND | 10,11,12 | 9,11 | 9 | 9,11 | 11 | | | |
| D2S1338 | ND | 16,17 | ND | ND | ND | 23 | | | |
| D19S433 | 11,13,14.2,15 | 11,13,14.2,15 | 13,15 | 12.2,13 | 14.2,15 | 12,12.2 | | | |
| vWA | 17 | 17,18,19 | 14,15 | 16,17 | 14,17 | 15,19 | | | |
| TPOX | ND | 8,9 | 8,9 | 8 | 8,9 | 8 | | | |
| D18S51 | ND | 13,15 | 14 | ND | 15,20 | 14,22 | | | |
| Amelogenin | X,Y | X,Y | X | X,Y | X | X,Y | | | |
| D5S818 | ND | 11,13 | 11,13 | 11,13 | 13 | 8,13 | | | |
| FGA | ND | 21,22,23 | 21 | 19,22 | 21,24 | 25,27 | | | |

NT = Not Tested     ND = Not Detected

This is a summary of the observed alleles only.  Interpretations are made according to established guidelines.

PEORIA SAVORY 1921

CONFIDENTIAL -
PURSUANT TO PROTECTIVE ORDER
ENTERED IN 17-CV-0204

**EXHIBIT**
**8**

**ILLINOIS STATE POLICE**
Division of Forensic Services
Morton Forensic Science Laboratory
1810 South Main Street
Morton, Illinois 61550-2983
(309) 284-6500 (Voice) * 1-(800) 255-3323 (TDD)

Bruce Rauner
*Governor*

October 29, 2018
**LABORATORY REPORT**

Leo P. Schmitz
*Director*

CRIME SCENE UNIT
PEORIA PD
600 SOUTH WEST ADAMS STREET
PEORIA IL 61602

Laboratory Case #M77-000197
Agency Case #77-1588
AMENDED REPORT

OFFENSE: Murder
SUSPECT: Johnnie Lee Savory
VICTIMS: Connie Cooper/James Robinson

The following evidence was submitted to the Morton Forensic Science Laboratory by Officer Scott
Bowers on February 2, 2017:

| EXHIBIT | DESCRIPTION | FINDINGS |
|---|---|---|
| 1 | Sealed brown paper bag containing white and red bathrobe worn by Connie Cooper | Blood-like stains observed on robe. No blood indicated at this time. Seven blood-like stains cutout and preserved as Exhibits 1B through 1H. |
| 2 | Sealed brown paper bag said to contain bra from Connie Cooper | Not examined at this time. |
| 3 | Sealed brown paper bag containing underwear worn by Connie Cooper | Semen identified in one area of underwear crotch cut out and preserved as Exhibit 3A. Blood like stains observed over majority of underwear. |
| 4 | Sealed brown paper bag containing nightgown worn by Connie Cooper | Majority of nightgown covered in blood like staining. Blood indicated in one stained area.Two areas from left shoulder cut out and preserved as Exhibits 4A and 4B. Nightgown appears cut at top and missing portion of sleeve area. |
| 5 | Sealed brown paper bag containing yellow shirt worn by James Robinson | Blood-like stains observed over more than half of shirt. No stains preserved at this time. No testing at this time. Apparent fibers preserved, no further testing at this time. |

**SDT-ISP 547**

PEORIA PD
Laboratory Case #M77-000197    -2-    October 29, 2018

| **EXHIBIT** | **DESCRIPTION** | **FINDINGS** |
|---|---|---|
| 6 | Sealed brown paper bag said to contain blue jeans from James Robinson | Not examined at this time. |
| 7 | Sealed brown paper bag containing underwear worn by James Robinson | Blood-like stains observed. Blood indicated in one stained area, cut out and preserved as Exhibit 7A. Additional stained areas cut out and preserved as Exhibit 7B and 7C. |
| 9 | Sealed brown paper bag containing blue and white bottom fitted bed sheet from bed | Blood-like stains observed on bedsheet. Blood indicated on three areas of sheet. Areas of fluorescence observed. One stained area inconclusive for semen, no confirmatory testing at this time. Blood indicated and preserved as Exhibit 9A, a blood like stain preserved as Exhibit 9B, a blood like stain with fluorescence observed preserved as Exhibit 9C and blood indicated stains with fluorescence observed preserved as Exhibits 9D and 9E. Also, areas of fluorescence observed and preserved as Exhibits 9F and 9G. Apparent hair preserved, no further testing at this time. |
| 10 | Sealed brown paper bag containing blue and white top flat sheet from bed | Blood-like stains and areas of fluorescence observed. No blood indicated at this time. No semen indicated, no confirmatory testing at this time. *Blood-like stains preserved as Exhibits 10A through 10F, blood like stain with fluorescence observed preserved as Exhibit 10G, and an area of fluorescence preserved as Exhibit 10H. |
| 11 | Sealed brown paper bag containing red brocade bedspread from bed | Blood-like stains and areas of fluorescence observed. Apparent hair, fibers, and miscellaneous debris collected. No further testing at this time. Representative area of fluorescence cut out and preserved as Exhibit 11A. |
| 12 | Sealed brown paper bag containing blue and white pillow case from pillow on floor | Blood indicated in one small stained area, cut out and preserved as Exhibit 12A. Areas of fluorescence observed, no further testing at this time. |

**SDT-ISP 548**

PEORIA PD
Laboratory Case #M77-000197                    -3-                    October 29, 2018

| EXHIBIT | DESCRIPTION | FINDINGS |
|---------|-------------|----------|
| 13 | Sealed brown paper bag containing blue and white pillow case from pillow on bed | No blood or semen indicated at this time. Areas of fluorescence and blood like staining observed. Blood like stains cut out and preserved as Exhibit 13A. |
| 34 | Sealed brown paper bag said to contain armpit area of nightgown worn by Connie Cooper | Not examined at this time. |

**REQUESTS:**
Exhibits 1C, 1D, 1F, 1G, 3A, 7B, 10B, 10C, 10D, 10E, 11A and 12A will need to be consumed in DNA analysis due to limited sample size.

No examination of Exhibits 2, 6 and 34 were performed at this time.

For results of previous biological examinations, refer to the laboratory reports by Forensic Scientists Robert Gonsowski, Judith Kienzler and myself. For results of previous DNA analysis, refer to the laboratory reports by DNA Research Coordinator William Frank and myself.

**EVIDENCE DISPOSITION:**
Exhibits 1B through 1H, 3A, 4A, 4B, 7A, 7B, 7C, 9A through 9G, 10A through 10H, 11A, 12A and 13A were forwarded to the DNA Section and will be the subject of a separate report.

The remaining evidence will be held in the laboratory vault and should be picked up within thirty days.

If you have any questions regarding this report, please feel free to contact me.

*Note: This report has been amended to indicate that Exhibits 10A through 10F were preserved from Exhibit 10, not Exhibits 10A through 1F as previously listed in my October 1, 2018 Biology report. All other information remains the same.

Any analysis conducted is accredited under the laboratory's ISO/IEC 17025 accreditation issued by ANSI-ASQ National Accreditation Board (ANAB). Refer to certificate #AT-1700 and associated Scope of Accreditation.

Respectfully submitted,

*Ann Maria Yeagle*

Ann Maria Yeagle
Forensic Scientist

cc:  PEORIA CO SA

SDT-ISP 549

**EXHIBIT**
**9**

## ILLINOIS STATE POLICE
### Division of Forensic Services
### Forensic Sciences Command
### Morton Forensic Science Laboratory

| Exhibit / Item | 3 | Date Examined | 8/9-10/2018 | Case # | M77-197 |
|---|---|---|---|---|---|

**Description of Package and Markings:**

BPB sld clear tape "SB 982"

on BPB "panties of Connie Cooper #3"

BPB Opened & observed:

BPB- appears open(sliced open)- brown seal crumbling

    "#3 1-19-77 RFG"    opened to examine

vis Bloody underwear- no tag- nylon - no cotton gusset

low rise style    see next page for image

Not testing with KM, underwear appears to be covered in lt to dark RBS

examine with ALS    many areas of fluorescence observed on underwear

test rep areas w/ AP

| | AP | P30 8-10-18 | KPIC 8-10-18 | areas: |
|---|---|---|---|---|
| | | | | 1-10 front and crotch area |
| 1 | +/- | neg | neg | 11-20 back inside |
| 2 | +/- | neg | NT | 21 next to prev cut out area back hip |
| 3 | +/- | neg | neg | |
| 4 | neg | NT | NT | |
| 5 | +/- | neg | neg | |
| 6 | +/- | neg | neg | |
| 7 | +/- | neg |  pos 1 sperm ~140 X 12.8 Olympus BX40 - preserve Q7 |  |
| 8 | +/- | neg | neg | |
| 9 | neg | NT | NT | inner package |
| 10 | +/- | neg | neg | |
| 11 | +/- | neg | neg | |
| 12 | +/- | neg | neg | |
| 13 | neg | NT | NT | |
| 14 | +/- | neg | neg | |
| 15 | neg | NT | NT | |
| 16 | +/- | neg | neg | |
| 17 | neg | NT | NT | |
| 18 | +/- | neg | neg | |
| 19 | neg | NT | NT | |
| 20 | +/- | neg | neg | |
| 21 | +/- | neg | neg | |

known semen = pos +4 Seratec

blank= neg    Lot # 161012  Exp 2018-11 9-24-18 by

\*\* difficulty detecting phosphatase activity, will test based on appearance and location

| Turned over to DNA: | Repackaging: | Seal Date: | Analyst: |
|---|---|---|---|
| 3A see next pg | orig sld clear tape and BET | 9/20/2018 | AMY |

Revision Date (01/13)

SDT-ISP 560

**ILLINOIS STATE POLICE**
**Division of Forensic Services**
**Forensic Sciences Command**
**Morton Forensic Science Laboratory**
**Evidence Image Worksheet**

| Exhibit / Item | 3 | Date Examined | 8/9/2018 | Case # | M77-197 |
|---|---|---|---|---|---|

inside front



only stained area with pos KPIC results          image shows cut in Q7- previous

Q7- cut out area around apparent cut in underwear vis RBS- Fluorescence obs'd

cut out ~1.8cm X ~2cm area- all into 1 SET for differential extraction
(fabric very thin)

1 SET into zl pl and into man env as **Exhibit 3A,**
(not sealed -TOT DNA

KPIC slides into 3 plastic holders into Exhibit 3.



Back  of underwear



AMY

SDT-ISP 561



# ILLINOIS STATE POLICE
## Division of Forensic Services
## Forensic Sciences Command
## Morton Forensic Science Laboratory

**EXHIBIT**
**10**

| Exhibit / Item | 7 | Date Examined | 3/31/2018 | Case # | M77-197 |
|---|---|---|---|---|---|

## Description of Package and Markings:

Received in a Cardboard box closed with clear box tape "SB 982"

Peoria PD Label on box " 263450 … case # 77-1588 … Clothing items of James Robinson - yellow shirt (#5) - blue jeans (#6) - underwear (#7) …"

Box contains sealed exhibits - 5,6 and 7

Exhibit 7:

BPB sld clear box tape "SB 982"

on bag " underpants of James Robinson (#7)"

BPB Opened & observed:

received open BPB sliced open across front top- white/red ET across top, brown tape across bottom

contains one pair of mens underwear- worn,thin

lt to med rbs observed.







| Turned over to DNA: | Repackaging: | Seal Date: | Analyst: |
|---|---|---|---|
| see next pg | see next pg | see next pg | AMY |

continued on next page
Revision Date (01/13)

SDT-ISP 567

## ILLINOIS STATE POLICE
### Division of Forensic Services
### Forensic Sciences Command
### Morton Forensic Science Laboratory

| Exhibit / Item | 7 continued | Date Examined | 3/31/2018 | Case # | M77-197 |
|---|---|---|---|---|---|
| | | | 8/27/2018 | | |

**Description of Package and Markings:**

Q1 small cutting from edge of hole.

Q2-mid ~3cm X ~13cm lower back - inside  (a,b,c)

Q3- streaky, thin med rbs - not soaked thru

KM
_____

1    neg

2    a= lt pos, b= neg, c= neg

3    neg

known blood = pos

blank = neg

Q2-A cut out ~3.5cm X ~1cm of lt rbs - brownish

cut ~1  X ~1.5cm into 1 SET

SET into zl pl, remaining cloth into glyc fold, both
into man env sld BET as Exhibit 7A.

8/27/2018 reopen inner pkg

Q1- prev cut out area shown above near E.T tag

will cut out area around this cut out to extract.

no vis rbs around hole, but will extract edges since

previously tested.

Cut out ~0.2cm around entire edge of hole

into 1 SET as Exhibit 7B. 8-27-18 AMY

into man env - not sealed - to DNA

8/27/2018

Q3- cut out ~9cm X ~4.5cm

stain on surface, med RBS, streaky

extract 2 stripes toward waist band

~2.3cm X ~3cm from stain into 2 tubes

both SETs in zl pl, reamaining stain in glyc fold

both into man env as **Exhibit 7C.**

not sealed - to DNA



underwear back into BPB into BPB

| Turned over to DNA: | Repackaging: | Seal Date: | Analyst: |
|---|---|---|---|
| 7A, 7B, 7C | 7- orig inner bpb sld clear tape and BET | 3/31/2018 | AMY |
| | 7- inner and outer pkg sld | | |
| | clear tape and BET | 9/21/2018 | Revision Date (01/13) |

SDT-ISP 568

# ILLINOIS STATE POLICE

Division of Forensic Services
Morton Forensic Science Laboratory
1810 South Main Street
Morton, Illinois 61550-2983
(309) 284-6500 (Voice) * 1-(800) 255-3323 (TDD)

**EXHIBIT**

**11**

Bruce Rauner
*Governor*

October 3, 2018
**LABORATORY REPORT**

Leo P. Schmitz
*Director*

CRIME SCENE UNIT
PEORIA PD
600 SOUTH WEST ADAMS STREET
PEORIA IL 61602

Laboratory Case #M77-000197
Agency Case #77-1588

OFFENSE:    Murder
SUSPECT:    Johnnie Lee Savory
VICTIMS:    Connie Cooper/James Robinson

The following evidence was submitted to the Morton Forensic Science Laboratory by Officer Scott
Bowers on February 2, 2017:

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 1B | Blood-like stain from front of robe left side between buttons |
| 1C | Blood-like stain from front left sleeve of robe |
| 1D | Blood-like stain from front left sleeve of robe |
| 1E | Blood-like stain from front right sleeve of robe |
| 1F | Blood-like stain from front right sleeve of robe |
| 1G | Blood-like stain from back of left sleeve of robe |
| 1H | Blood-like stain from back bottom hem of robe |
| 3A | Portion of underwear crotch around hole in front |
| 4A | Blood-like stain from armpit area of left portion of nightgown |
| 4B | Blood indicated stain from sleeve area of nightgown near trim |
| 7A | Blood indicated stain from lower back inside panel of underwear from James Robinson |
| 7B | Portion of underwear around previously cut out area near waistband of underwear from James Robinson |
| 7C | Blood-like streaks from inside back of underwear of James Robinson |
| 9A | Blood indicated stain from fitted sheet |
| 9B | Blood-like stain from fitted sheet |
| 9C | Blood-like stain from fitted sheet |
| 9D | Blood indicated stain from fitted sheet (different visual appearance) |
| 9E | Blood indicated stain from fitted sheet |
| 9F | Stain from fitted sheet |
| 9G | Stain from fitted sheet |
| 10A | Blood-like stain from flat sheet |
| 10B | Blood-like stain from flat sheet |
| 10C | Blood-like stain from flat sheet |
| 10D | Blood-like stain from flat sheet |

PEORIA_SAVORY 12380

PEORIA PD
Laboratory Case #M77-000197                    -2-                                   October 3, 2018

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 10E | Blood-like stain from flat sheet |
| 10F | Blood-like stain from flat sheet |
| 10G | Blood-like stain from flat sheet |
| 10H | Stain from flat sheet |
| 11A | Stain from red brocade bedspread (orange tint to stain) |
| 12A | Blood indicated stain from pillow case from floor |
| 13A | Blood like stains from corner of pillow case from bed |

## RESULTS

DNA from Exhibits 1B, 1C, 1D, 1E, 1F, 1G, 1H, 4A, 4B, 7A, 7B, 7C, 9A, 9B, 9D, 10A, 10B, 10C, 10D, 10E, 10F, 11A, 12A, 13A and the non sperm fractions of Exhibits 3A, 9F, 9G, 10G, and 10H as well as the mixed fractions of Exhibits 9G and 10H were amplified using the Polymerase Chain Reaction (PCR) and profiled at the twenty-four loci characterized by the PowerPlex® Fusion System (23 loci plus Amelogenin).

Human DNA profiles were previously identified in Exhibits 28B (Pubic hair standard from Connie Cooper), 93A (Head hair standard from William "Peter" Douglas), 96A (Head hair standard from Noyalee Robinson) and 110 (Buccal standard from Johnnie Lee Savory) and reported on March 20, 2014. These Exhibits were profiled at the 16 loci characterized by the Identifiler Plus System (15 loci plus Amelogenin). The eight additional loci in the PowerPlex® Fusion System were not used for comparisons to these exhibits.

Human DNA profiles were previously identified in Exhibits 15A1 (edge of light switch cover), 28B1, 93A1, 96A1 and 110A and reported on May 30, 2014 by DNA Research Coordinator William Frank. A human DNA profile was also previously identified in Exhibit 29A1 (Head hair standard from James Robinson) and reported on August 18, 2014 by DNA Research Coordinator William Frank. All of these Exhibits were profiled at the 9 loci characterized by the Minifiler System (8 loci plus Amelogenin). This information was used for comparison to the current Exhibits profiled by the PowerPlex® Fusion System.

A human female DNA profile was identified in Exhibit 1B at 8 of 24 loci from which Connie Cooper cannot be excluded (is included). Noyalee Robinson, James Robinson, William "Peter" Douglas and Johnnie Lee Savory can be excluded as having contributed to this partial profile.

A human female DNA profile was identified in Exhibit 1C at 5 of 24 loci from which Connie Cooper cannot be excluded (is included). Noyalee Robinson, James Robinson, William "Peter" Douglas and Johnnie Lee Savory can be excluded as having contributed to this partial profile.

A human DNA profile was identified in Exhibit 1D at 6 of 24 loci that was interpreted as having been contributed by at least one person. A major DNA profile was identified from which Connie Cooper cannot be excluded (is included). Noyalee Robinson, James Robinson, William "Peter" Douglas and Johnnie Lee Savory can be excluded as having contributed to this partial DNA profile. Any additional minor contributor was interpreted as being potentially incomplete.

PEORIA_SAVORY 12381

PEORIA PD
Laboratory Case #M77-000197                    -3-                    October 3, 2018

**RESULTS** (continued)

A mixture of human DNA profiles was identified in Exhibit 1E at 7 of 24 loci and was interpreted as a mixture of 2 people. A major female DNA profile was identified at 5 of 24 loci from which Connie Cooper cannot be excluded (is included). Noyalee Robinson, James Robinson, William "Peter" Douglas and Johnnie Lee Savory can be excluded as having contributed to this major profile. A male minor DNA profile was identified at 1 of 24 loci. This profile is incomplete and unsuitable for comparisons to known standards.

A human female DNA profile was identified in Exhibit 1F at 2 of 24 loci from which Connie Cooper cannot be excluded (is included). Noyalee Robinson, James Robinson, William "Peter" Douglas and Johnnie Lee Savory can be excluded as having contributed to this partial profile.

No human DNA profile was identified in Exhibit 1G.

A human female DNA profile was identified in Exhibit 1H at 8 of 24 loci from which Connie Cooper cannot be excluded (is included). Noyalee Robinson, James Robinson, William "Peter" Douglas and Johnnie Lee Savory can be excluded as having contributed to this partial profile.

A human female DNA profile was identified in Exhibit 4A at 10 of 24 loci from which Connie Cooper cannot be excluded (is included). Noyalee Robinson, James Robinson, William "Peter" Douglas and Johnnie Lee Savory can be excluded as having contributed to this partial profile.

A human female DNA profile was identified in Exhibit 4B at 4 of 24 loci from which Connie Cooper cannot be excluded (is included). Noyalee Robinson, James Robinson, William "Peter" Douglas and Johnnie Lee Savory can be excluded as having contributed to this partial profile.

A mixture of human DNA profiles was identified in Exhibit 7A at 16 of 24 loci that was interpreted as a mixture of 3 people. One major male DNA profile was identified at 13 of those 24 loci from which James Robinson cannot be excluded (is included). A minor DNA profile was identified at 9 of those 24 loci and a low level third DNA profile was also identified at 3 of those 24 loci. Connie Cooper, Noyalee Robinson, William "Peter" Douglas and Johnnie Lee Savory can be excluded as having contributed to this mixture of DNA profiles. The minor DNA profiles are not eligible for entry into the DNA Index.

The major male DNA profile identified in Exhibit 7A will be used in conjunction with the male DNA profile previously obtained from Exhibit 29A1 as the DNA standard profile for James Robinson.

A human DNA profile was identified in Exhibit 7B at 5 of 24 loci that was interpreted as having been contributed by at least one person. This profile was interpreted as potentially incomplete and is therefore unsuitable for comparison to known standards.

PEORIA_SAVORY 12382

PEORIA PD
Laboratory Case #M77-000197                    -4-                         October 3, 2018

**RESULTS** (continued)
A mixture of human DNA profiles was identified in Exhibit 7C at 8 of 24 loci that was interpreted a mixture of at least 3 people. Two major DNA profiles were identified at 4 of those 24 loci from which James Robinson and the contributor of the minor DNA profile identified in Exhibit 7A cannot be excluded (are included). Connie Cooper, Noyalee Robinson, William "Peter" Douglas, Johnnie Lee Savory and the contributor of the low level third DNA profile can be excluded as having contributed to these major DNA profiles. The minor contributor(s) are potentially incomplete and unsuitable for comparison to known standards.

A human female DNA profile was identified in Exhibit 9A at 8 of 24 loci from which Connie Cooper cannot be excluded (is included). Noyalee Robinson, James Robinson, William "Peter" Douglas and Johnnie Lee Savory can be excluded as having contributed to this partial profile.

A mixture of human DNA profiles was identified in Exhibit 9B at 8 of 24 loci that was interpreted as a mixture of at least 3 people. Two major female DNA profiles were identified at 4 of those 24 loci from which Connie Cooper cannot be excluded (is included). Noyalee Robinson, James Robinson, William "Peter" Douglas, Johnnie Lee Savory and the contributor of the minor DNA profile identified in Exhibit 7A can be excluded as having contributed to these major DNA profiles. The minor contributor(s) are potentially incomplete and unsuitable for comparison to known standards.

A mixture of human DNA profiles was identified in Exhibit 9D at 10 of 24 loci that was interpreted as a mixture of 2 people. A female major DNA profile was identified at 8 of those 24 loci from which Connie Cooper cannot be excluded (is included). Noyalee Robinson, James Robinson, William "Peter" Douglas and Johnnie Lee Savory can be excluded as having contributed to this major DNA profile. A minor DNA type was identified at the D12S391 locus from which James Robinson can be excluded. This locus is not included in the Identifiler Plus or Minifiler Systems, therefore this DNA type cannot be compared to the other Exhibits previously profiled.

A mixture of human DNA profiles was identified in Exhibit 10A at 8 of 24 loci that was interpreted as a mixture of 2 people. A female major DNA profile was identified from which Connie Cooper cannot be excluded (is included). Noyalee Robinson, James Robinson, William "Peter" Douglas and Johnnie Lee Savory can be excluded as having contributed to this major DNA profile. An additional DNA type was identified at the TH01 locus from which William "Peter" Douglas and Johnnie Lee Savory cannot be excluded (are included). The expected frequency of occurrence for this DNA type was calculated for the African American, Caucasian, and Hispanic population groups and was found to be no more common than approximately 1 in 2 unrelated individuals. Connie Cooper, Noyalee Robinson, James Robinson and the contributors of the major DNA profiles identified in Exhibit 9B can be excluded as having contributed to this additional DNA type.

No human DNA profiles were identified in Exhibits 10B or 10C.

A human female DNA profile was identified in Exhibit 10D at 4 of 24 loci from which Connie Cooper cannot be excluded (is included). Noyalee Robinson, James Robinson, William "Peter" Douglas and Johnnie Lee Savory can be excluded as having contributed to this partial profile.

PEORIA_SAVORY 12383

PEORIA PD
Laboratory Case #M77-000197                    -5-                          October 3, 2018

**RESULTS** (continued)
A human female DNA profile was identified in Exhibit 10E at 8 of 24 loci from which Connie Cooper
cannot be excluded (is included). Noyalee Robinson, James Robinson, William "Peter" Douglas and
Johnnie Lee Savory can be excluded as having contributed to this partial profile.

A human female DNA profile was identified in Exhibit 10F at 11 of 24 loci from which Connie Cooper
cannot be excluded (is included). Noyalee Robinson, James Robinson, William "Peter" Douglas and
Johnnie Lee Savory can be excluded as having contributed to this partial profile.

A mixture of human DNA profiles was identified in Exhibit 12A at 8 of 24 loci that was interpreted as a
mixture of 2 people. One major female DNA profile was identified from which Connie Cooper cannot be
excluded (is included). Noyalee Robinson, James Robinson, William "Peter" Douglas and Johnnie Lee
Savory can be excluded as having contributed to this major DNA profile. A minor DNA profile was
identified at 3 of those 24 loci from which Connie Cooper, Noyalee Robinson, James Robinson, William
"Peter" Douglas, Johnnie Lee Savory and the contributors of the major DNA profiles identified in Exhibit
9B can be excluded. This minor profile is not suitable for entry into the DNA Index.

A mixture of human DNA profiles was identified in Exhibit 13A at 8 of 24 loci that was interpreted as a
mixture of 2 people. One major female DNA profile was identified from which Connie Cooper cannot be
excluded (is included). Noyalee Robinson, James Robinson, William "Peter" Douglas and Johnnie Lee
Savory can be excluded as having contributed to this major DNA profile. A minor DNA profile was
identified at 2 of those 24 loci from which Connie Cooper, Noyalee Robinson, James Robinson, William
"Peter" Douglas, Johnnie Lee Savory, the contributors of the major DNA profiles identified in Exhibit 9B
and the contributor of the low level third profile identified in Exhibit 7A can be excluded. The contributors
of the minor DNA profile identified in Exhibit 7A and of the minor DNA profile identified in Exhibit 12A
cannot be excluded (are included) as potential contributors of the minor DNA profile in Exhibit 13A. This
minor profile is not suitable for entry into the DNA Index.

A human female DNA profile was identified in the non sperm fraction of Exhibit 3A at 10 of 24 loci from
which Connie Cooper cannot be excluded (is included). Noyalee Robinson, James Robinson, William
"Peter" Douglas and Johnnie Lee Savory can be excluded as having contributed to this partial profile.

A mixture of human DNA profiles was identified in the non sperm fraction of Exhibit 9F at 5 of 24 loci
that was interpreted as a mixture of at least 2 people. One major DNA profile was identified at 4 of those
24 loci from which Connie Cooper, Noyalee Robinson, James Robinson, William "Peter" Douglas,
Johnnie Lee Savory, the contributors of the minor DNA profile and low level third profile identified in
Exhibit 7A, the contributors of the major DNA profiles identified in Exhibit 9B and the contributors of the
minor DNA profiles identified in Exhibits 12A and 13A can be excluded. The contributor of the minor
DNA profile identified in Exhibit 10A cannot be excluded (is included) as a potential contributor of this
major DNA profile. The minor contributor(s) are potentially incomplete and unsuitable for comparison to
known standards.

A mixture of human DNA profiles was identified in the non sperm fraction of Exhibit 9G at 4 of 24 loci
that was interpreted as a mixture of at least 3 people. This mixture is potentially incomplete and unsuitable
for comparison to known standards.

PEORIA_SAVORY 12384

309 284 6504

12:55:36 p.m  10-03-2018          6 /9

PEORIA PD
Laboratory Case #M77-000197                    -6-                    October 3, 2018

**RESULTS** (continued)

A mixture of human DNA profiles was identified in the mixed fraction of Exhibit 9G at 20 of 24 loci that was interpreted as a mixture of 2 people. One major male DNA profile was identified from which James Robinson cannot be excluded (is included). Connie Cooper, Noyalee Robinson, William "Peter" Douglas and Johnnie Lee Savory can be excluded as having contributed to this major male profile. An additional minor DNA type was identified at the D16S539 locus. Connie Cooper, Noyalee Robinson, James Robinson, William "Peter" Douglas, Johnnie Lee Savory, the contributor of the minor DNA profile identified in Exhibit 7A and the contributors of the major DNA profiles identified in Exhibit 9B can be excluded as having contributed to this additional DNA type.

A mixture of human DNA profiles was identified in the non sperm fraction of Exhibit 10G at 5 of 24 loci that was interpreted as a mixture of 2 people. Connie Cooper, Noyalee Robinson, James Robinson, Johnnie Lee Savory, the contributors of the minor DNA profiles identified in Exhibits 7A, 12A and 13A , the contributors of the major DNA profiles identified in Exhibit 9B and the contributor of the low level third DNA profile identified in Exhibit 7A cannot be excluded (are included) as having contributed to this mixture of DNA profiles at 3 of those 24 loci. The expected frequency of occurrence for this mixture of DNA profiles was calculated at 2 of 24 loci for the African American, Caucasian, and Hispanic population groups and was found to be no more common than approximately 1 in 2 unrelated individuals. (Statistics are not calculated at the Amelogenin locus). William "Peter" Douglas and the contributor of the major DNA profile identified in the non sperm fraction of Exhibit 9F can be excluded as having contributed to this mixture of DNA profiles.

A mixture of human DNA profiles was identified in the non sperm fraction of Exhibit 10H at 4 of 24 loci that was interpreted as a mixture of at least 3 people. This profile was interpreted as potentially incomplete and is therefore unsuitable for comparison to known standards.

A mixture of human DNA profiles was identified in the mixed fraction of Exhibit 10H at 17 of 24 loci that was interpreted as a mixture of 2 people. One major male DNA profile was identified from which James Robinson cannot be excluded (is included). Connie Cooper, Noyalee Robinson, William "Peter" Douglas and Johnnie Lee Savory can be excluded as having contributed to this major DNA profile.

An additional minor DNA profile was identified in the mixed fraction of Exhibit 10H at 3 of those 24 loci. The contributor of the minor DNA type identified in the mixed fraction of Exhibit 9G cannot be excluded (is included) as having contributed to this minor DNA profile. Connie Cooper, Noyalee Robinson, James Robinson, William "Peter" Douglas, Johnnie Lee Savory, the contributors of the minor and low level DNA profiles identified in Exhibit 7A, the contributors of the major DNA profiles identified in Exhibit 9B and the contributor of the minor DNA profile identified in Exhibit 12A can be excluded as having contributed to this minor DNA profile.

A mixture of human DNA profiles was identified in the non sperm fraction of Exhibit 11A at 18 of 24 loci that was interpreted as a mixture of at least 4 people. This profile was interpreted as potentially incomplete and is therefore unsuitable for comparison to known standards.

PEORIA_SAVORY 12385

309 284 6504

PEORIA PD
Laboratory Case #M77-000197                    -7-                    October 3, 2018

**RESULTS** (continued)

A mixture of human DNA profiles was identified in the sperm fraction of Exhibit 11A at 7 of 24 loci that was interpreted as a mixture of at least 3 people. One major DNA profile was identified at 4 of those 24 loci from which William "Peter" Douglas and the contributor of the major DNA profile identified in the non sperm fraction of Exhibit 9F cannot be excluded (are included). The expected frequency of occurrence for this major DNA profile was calculated at 3 of those 24 loci for the African American, Caucasian, and Hispanic population groups and was found to be no more common than approximately 1 in 2,000 unrelated individuals. (Statistics are not calculated at the Amelogenin locus). Connie Cooper, Noyalee Robinson, James Robinson, Johnnie Lee Savory and the contributors of the DNA profiles identified in the minor DNA profile identified in Exhibit 7A, the major DNA profiles identified in Exhibit 7C, the major female DNA profiles identified in Exhibit 9B, the minor DNA profile identified in Exhibit 12A, the minor DNA profile identified in Exhibit 13A and the mixture of DNA profiles identified in the non sperm fraction of Exhibit 10G can be excluded as having contributed to this major DNA profile. The minor contributors were interpreted as potentially incomplete and are therefore unsuitable for comparison to known standards.

A human DNA type was identified in the mixed fraction of Exhibit 11A at the TH01 locus from which William "Peter" Douglas, Johnnie Lee Savory and the contributors of the minor DNA type identified in Exhibit 10A, the major DNA profile identified in the non sperm fraction of Exhibit 9F, and the major DNA profile identified in the sperm fraction of Exhibit 11A cannot be excluded (are included). The expected frequency of occurrence for this DNA type was calculated for the African American, Caucasian, and Hispanic population groups and was found to be no more common than approximately 1 in 2 unrelated individuals. Connie Cooper, Noyalee Robinson and James Robinson can be excluded as having contributed to this DNA type.

DNA was extracted from Exhibits 9C and 9E, but not profiled. The proportion of male and female DNA identified by quantitative PCR indicates these samples may be suitable for Y STR analysis only. No further analysis will be conducted on these samples at this time.

DNA was extracted from the sperm and mixed fractions of Exhibits 3A, 9F, 10G and the sperm fractions of Exhibits 9G and 10H, but not profiled. Quantitative PCR indicates there is insufficient male DNA in these Exhibits for autosomal STR analysis and may be suitable for Y STR analysis only. No further analysis will be conducted on these samples at this time.

PEORIA_SAVORY 12386

PEORIA PD
Laboratory Case #M77-000197                          -8-                          October 3, 2018

**RESULTS** (continued)
A mixture of human DNA profiles was previously identified in Exhibit 15A1 (edge of light switch cover) by DNA Research Coordinator William Frank and reported on May 30, 2014. An open minor DNA profile was identified at 3 of the 9 loci profiled in Exhibit 15A1 and was compared to the open DNA profiles in Exhibits 7A, 7C, 9B, 9D, 9F, 9G, 10A, 10G, 10H, 11A, 12A and 13A. The contributors of the low level third DNA profile from Exhibit 7A and the minor DNA profile from Exhibit 12A cannot be excluded (are included) as having potentially contributed to this minor DNA profile. The contributor of the minor DNA profile in the mixed fraction of Exhibit 10H can be excluded from having contributed to this minor DNA profile. The contributors of the minor DNA profiles identified in Exhibits 7A and 13A, the contributors of the major DNA profiles in Exhibits 7C and 9B, in the non sperm fraction of Exhibit 9F, the minor DNA types identified in Exhibit 9D, Exhibit 10A, and the mixed fractions of Exhibits 9G and 11A and the mixture of DNA profiles in the non sperm fraction of Exhibit 10G cannot be compared to this minor profile because the loci detected are not the same between these partial profiles and the DNA profile identified in Exhibit 15A1 minor.

**REQUESTS**
For results of previous biological examinations, refer to the laboratory reports by Forensic Scientists Robert Gonsowski, Judith Kienzler and myself.

For results of previous DNA analysis, refer to the laboratory reports by DNA Research Coordinator William Frank and myself.

Upon submission of appropriate standards, further analysis can be conducted to resolve the source of the open profiles identified in: the minor and low level third DNA profiles identified in Exhibit 7A, the major DNA profiles identified in Exhibit 7C, the major female DNA profiles identified in Exhibit 9B, the minor DNA type identified in Exhibit 9D, the minor DNA type identified in Exhibit 10A, the minor DNA profile identified in Exhibit 12A, the minor DNA profile identified in Exhibit 13A, the major DNA profile identified in the non sperm fraction of Exhibit 9F, the minor DNA type identified in the mixed fraction of Exhibit 9G, the minor DNA profile identified in the mixed fraction of Exhibit 10H, and the minor DNA type identified in the mixed fraction of Exhibit 11A.

No DNA profiles were eligible for entry into the DNA Index at this time.

Please note that some items were not been examined at this time.

**EVIDENCE DISPOSITION**
Please note that Exhibits 1C, 1D, 1F, 1G, 3A, 7B, 10B through 10E, 11A and 12A were consumed in analysis (extracted DNA remains in Exhibits 1G, 3A and 11A).

The evidence will be held in the laboratory vault and should be picked up within thirty days.

If you have any questions regarding this report, please feel free to contact me.

PEORIA_SAVORY 12387

PEORIA PD
Laboratory Case #M77-000197                    -9-                              October 3, 2018

Any analysis conducted is accredited under the laboratory's ISO/IEC 17025 accreditation issued by
ANSI-ASQ National Accreditation Board (ANAB). Refer to certificate #AT-1700 and associated Scope of
Accreditation.

                                                      Respectfully submitted,

                                                      *Ann Maria Yeagle*

                                                      Ann Maria Yeagle
                                                      Forensic Scientist

cc: PEORIA CO SA
    Attorney Joshua Tepfer-Exoneration Project

**PEORIA_SAVORY 12388**

EXHIBIT
12

ILLINOIS STATE POLICE
Division of Forensic Services
Morton Forensic Science Laboratory
1810 South Main Street
Morton, Illinois 61550-2983
(309) 284-6500 (Voice) * 1-(800) 255-3323 (TDD)

Bruce Rauner
*Governor*

November 29, 2018
**LABORATORY REPORT**

Leo P. Schmitz
*Director*

CRIME SCENE UNIT
PEORIA PD
600 SOUTH WEST ADAMS STREET
PEORIA IL 61602

Laboratory Case #M77-000197
Agency Case #77-1588
SUPPLEMENTAL REPORT

OFFENSE:   Murder
SUSPECT:   Johnnie Lee Savory
VICTIMS:   Connie Cooper/James Robinson

The following evidence was submitted to the Morton Forensic Science Laboratory by Officer Scott
Bowers on February 2, 2017:

**EXHIBIT**      **DESCRIPTION**
7A               Blood indicated stain from lower back inside panel of underwear from James Robinson

**RESULTS**
A mixture of human DNA profiles was previously identified in Exhibit 7A at 16 of 24 loci and interpreted
as a mixture of 3 people. This mixture was reported on October 3, 2018. One major male DNA profile
was identified at 13 of those 24 loci from which James Robinson could not be excluded (is included). A
minor DNA profile was identified at 9 of those 24 loci and an additional low level third DNA profile was
also identified at 3 of those 24 loci.

In response to the court order issued October 4, 2018 by Judge Gilfillan in regards to court case number
77-CF-565 the minor DNA profile from Exhibit 7A was searched against the Illinois SDIS database on
October 10, 2018. The search detected possible associations to three Convicted Offender profiles: Jawanza
Lark (DOB ███████ DOC# K68057, SID# IL41986090), Dawna Sawyers (DOB ██████ DOC#
R82000, SID# IL46161850), and Eaddie Ahumeen (DOB ██████ DOC# K67637, SID#
IL36407760). These individuals demonstrate DNA profiles that are consistent with the evidence profile
and could be the possible donor of the partial minor DNA profile identified.

This information can be used for investigative purposes only. Please submit standard samples from
Jawanza Lark, Dawna Sawyers, and Eaddie Ahumeen for confirmatory forensic analysis if needed.

**EVIDENCE DISPOSITION**
The evidence has been returned to your agency.

PEORIA PD
Laboratory Case #M77-000197                    -2-                    November 29, 2018

**EVIDENCE DISPOSITION** (continued)
If you have any questions regarding this report, please feel free to contact me.

Any analysis conducted is accredited under the laboratory's ISO/IEC 17025 accreditation issued by
ANSI-ASQ National Accreditation Board (ANAB).  Refer to certificate #AT-1700 and associated Scope of
Accreditation.

Respectfully submitted,

Ann Maria Yeagle
Forensic Scientist

cc: PEORIA CO SA
    Attorney Joshua Tepfer-Exoneration Project

PEORIA_SAVORY 12705