# Exhibit #S

Statement of:   WILLIAM ELLIS DOUGLAS

Q. William Ellis Douglas, do you understand that I am questioning you concerning a homicide which occurred at approximately 9:00 a.m. on 1-18-77 at 3033 W. Garden in the City of Peoria, Illinois?

A. Yes.

Q. Do you understand that you have an absolute right to remain silent and that you do not have to talk to me or answer any questions, unless you voluntarily choose to do so?
A. Yes I do.

Q. Do you understand that anything you say can, and will, be used against you in a criminal prosecution in a court of law?
A. Yes.

Q. Do you understand that you have the right to have an attorney present at this time, and that if you cannot afford one, one will be appointed to you at no cost?
A. Yes.

Q. Do you want to have an attorney present at this time?
A. No.

Q. Is it your desire to give this written statement and answer any questions without an attorney being present?
A. Yes it is.

Q. Do you understand that if you choose to give this written statement and answer my questions you may excercise any of these rights at anytime before the statement is completed?
A. Yes.

Q. Do you understand that you may stop answering any questions at anytime, and that you may have an attorney present at anytime?
A. Yes.

Q. Is it your wish and desire to give this written statement and answer my questions voluntarily and of your own free will?
A. Yes.

Q. Have you been struck, beaten, abused, threatened by any police officer, including myself, or any person, at anytime or place to obtain this written statement?
A. No.

Q. Have you been promised immunity from prosecution or leniency of any kind by any police officer including myself, or any person, in order to obtain this statement?
A. No.

Q. While you have been in custody have you been allowed to smoke, go to the bathroom, eat and drink, if you so desired?
A. Yes.

Q. Can you read and write the English language?
A. Yes.

Q. Will you state your name, age, date of birth, residence and telephone number?
A. William Ellis Douglas, 29, [REDACTED], 1317 W. Martin, 674-1447.

*William Douglas*   *Earl Hopkins*

PEORIA_SAVORY_1617

Page Two - Statement of: William Ellis Douglas

Q. Do you know a Connie Cooper and a James Robinson?
A. Yes I do.

Q. How did you know them?
A. They were my step-children.

Q. Are you at this time married to their mother?
A. No.

Q. How long had you been married to the mother?
A. Six years.

Q. Had you obtained a divorce from this marriage?
A. Yes.

Q. When was this divorce obtained?
A. August of 1976.

Q. Was this divorce obtained by you or by the mother?
A. By the mother.

Q. After obtaining the divorce, had you stayed away from her and if so, for how long a period of time?
A. That's really hard to answer because we seen each other on numerous occasions. We seen each other numerous times in between the time of the divorce and getting back together.

Q. When did you decide to start getting back together?
A. I guess it was around Thanksgiving of 1976.

Q. How long had your ex-wife lived at 3033 W. Garden?
A. Around September or October of 76.

Q. Where did she live prior to moving to the Garden St. address?
A. On Apple St.

Q. Is that in the City of Peoria?
A. Yes it is.

Q. When did she move to the Garden St. address?
A. September or October, the exact date I don't remember.

Q. Did you reside with her on Apple St.?
A. No.

Q. What was the address where you both lived as man and wife?
A. 1110 W. Rice.

Q. Had you ever spent an evening with her on Garden St.?
A. Yes.

Q. When she moved on Garden St. in September or October, on how many occasions would you say you spent the evening there?
A. At the house, maybe four or five.

*William Douglas* *Earl C Hepler* *JT*

PEORIA_SAVO... 63

Page Three - Statement of:  William Ellis Douglas

Q. When I say spending the evening, I mean all night so you spent four or five nights all night at the house on Garden?
A. Yes.

Q. Did you spend last night, the 17th of January and the morning of the 18th, at your ex-wife's home?
A. Yes.

Q. Where have you normally been staying?
A. 1317 W. Martin.

Q. Who lives at that address?
A. James Mills.

Q. What time did you leave the house on Garden this morning?
A. Approximately 6:30 a.m.

Q. Who was with you?
A. My ex-wife.

Q. Had you said anything to either Connie or James before leaving?
A. No, they were both asleep.

Q. Did anyone else reside at the Garden St. address?
A. No, just my ex-wife, step-daughter, step-son and grandson.

Q. Did you say grandson?
A. Yes.

Q. How old is your grandson?
A. Two years.

Q. Are there any pets living at the house?
A. Two simaese cats and a German Shepherd dog.

Q. When you left this morning, where were the pets at?
A. I believe the dog was in my son's room, he usually sleeps there, and the cat, I really don't know.

Q. Does your son sleep with his bedroom door closed?
A. There is no door there.

Q. Then the dog would have the run of the house?
A. Yes, if he wasn't in the garage.

Q. Did you park your car in the garage last night?
A. No, in the driveway.

Q. You said earlier that you left the house at approximately 6:30. Where did you go then?
A. On Martin to pick up James Mills. From there, we went to Ike and Swanies to have coffee. From there, I dropped Mr. Mills off at work and then took my wife to work.

Q. Approximately what time did you arrive at Ike & Swannies?
A. About approximately 10 minutes till 6:00.

Q. What time did Mr. Mills have to be at work?
A. 7:15.

PEORIA_SAVOR 19

Page Four - Statement of: William Ellis Douglas

Q. Where does Mr. Mills work?
A. Keifer Electric.

Q. Where does your wife work?
A. Fostor & Jacob.

Q. What time does your wife have to be at work?
A. 7:30.

Q. Did you drop your wife off early?
A. Yes.

Q. After dropping your wife off, where did you go?
A. Stopped at the store on Jefferson for gas, then to the Martin St. address.

Q. Why did you go back to the Martin St. address?
A. To change clothes for work.

Q. Where are you employed?
A. I wouldn't call it employed. I work down at T.W. Parks Funeral Home.

Q. Do you just do odd jobs there?
A. Yes.

Q. Where did you go after leaving the Martin St. address?
A. Back to Keifer's to get Jimmy to take him to get his car started.

Q. About what time did you get back from Keifer's?
A. A few minutes after 8:00.

Q. How long did you remain there?
A. A few minutes, long enough to have a cup of coffee.

Q. Where was Jimmy's car located?
A. On N. Jefferson, approximately the 2300 block.

Q. Why was his car there?
A. His ex-wife had had it the night before and it wouldn't start.

Q. Had you made arrangements that morning when you picked Jimmy up to attempt to get the car started?
A. Yes.

Q. Had you made an attempt earlier to get this car started?
A. Yes.

Q. When was this?
A. The night before.

Q. That would have been the evening of the 17th?
A. Yes.

Q. Approximately what time was that?
A. Approximately 10:30 when I left the house.

Q. Approximately what time did you get back to the house?
A. I would say somewhere between 11:30 and 12:00.

PEORIA_SAVOR

Page Five - Statement of: William Ellis Douglas

Q. Did you stop anywhere prior to going back on Garden St.?
A. Yes.

Q. Where did you stop?
A. At Jimmy Mills' house.

Q. Why did you stop there?
A. To let him know that his ex-wife and myself couldn't get the car started, and that I would be at the Garden St. address the next morning.

Q. Then you arrived back at the Garden St. address approximately midnight?
A. Yes.

Q. Did you have anything to drink after arriving back on Garden St.?
A. Yes.

Q. How much did you drink?
A. A shot of scotch and a can of beer.

Q. Approximately what time did you go to bed?
A. I don't know. I laid on the couch and that's where I stayed the night.

Q. After leaving Keifer Electric with Jimmy to get his car started, about what time would you say you arrived at N. Jefferson?
A. I don't know, maybe 8:20, 8:25, somewhere in there.

Q. After getting the car started, did you and Jimmy go separate ways?
A. Yes, he said he was going back to work and I was on my way to work.

Q. Which way did you go?
A. Out Jefferson to Second.

Q. What time did you arrive at work?
A. Between 20 minutes till 9:00 and a quarter till 9:00.

Q. Did you stop anywhere first?
A. Yes.

Q. Where did you stop?
A. On the corner of Second and Fisher to pick up a friend and drop him off at the Jefferson Building.

Q. Was this stop pre-arranged or did you just happen by him?
A. I just seen him walking down the street and stopped to give him a left.

Q. And you still arrived at the mortuary at about 20 minutes till 9:00?
A. Yes.

Q. Who was at the mortuary when you got there?
A. Mr. Parks.

Q. How long was Mr. Parks there?
A. After I arrived, about 15 or 20 minutes.

Q. If you arrived at about 20 till 9:00, then he would have left between 5 till and 9:00?
A. Yes.

Page Six - Statement of: William Ellis Douglas

Q. Do you know where he was going?
A. No I don't.

Q. Would he have been going on a mortuary call?
A. No, I don't think so. He wasn't going to pick up a body I know.

Q. After he left at approximately 9:00, what did you do?
A. I sat down and read the newspaper and answered the telephone.

Q. Did you get any calls?
A. One.

Q. Do you remember who it was?
A. Yes. A friend of Mr. Parks called.

Q. Do you remember what time Mr. Parks got back?
A. Approximately 9:30, maybe a little longer.

Q. While he was gone, did you leave to go anywhere?
A. No.

Q. Were you at the mortuary all day?
A. All day except when Mr. Parks and I went out to his house and had lunch.

Q. Approximately what time was that?
A. About 11:30.

Q. Approximately what time did you get back?
A. About a quarter till one.

Q. From a quarter till one, what time did you pick your wife up?
A. I left the funeral home around 8 minutes till 4:00.

Q. How long did it take you then to get down to 3033 W. Garden where she lives?
A. Approximately a half hour.

Q. After arriving, what did you do?
A. We both got out of the car and walked up to the front door. The front door was locked. So we both knocked on it, she knocked on it for awhile and then I knocked on it. We couldn't get her daughter to come to the door and knew her son was in school so she then walked around to the back door to try and see if it was locked. It was. She went next door to try to call a friend of our daughter's to see if she was over there. She came back and the friend said she hadn't seen her. When we looked closer in the window looking around, we seen the house all messed up. My ex-wife then went to the garage door and pulled on it and it opened. We went into the house and in the kitchen, there was some stuff all on the floor. The living room was cluttered up so I went on to the bedroom door. I think maybe my daughter was laying across the bed sleeping or something so I opened the door and found them laying on the floor. I closed the door back. I don't remember saying anything but I must have because my ex-wife came running through the living room. I remember grabbing her. My grandson called out my name. I went to the other bedroom door and there he was standing there. I sat both of them at the kitchen table and tried to call the police but the phone wasn't working. My wife was trying to get in the bedroom. I didn't want her to get in there so I put both of them in the car and started the motor up so they could stay warm. My grandson didn't have a coat on, he just had his pajamas on. That's when I ran next door and tried to call the police through the emergency number and I couldn't. I picked the phone up and tried to dial 911 but I couldn't get the number. It didn't ring or do anything. So the man that was standing there, I asked him if he could help PEORIA_SAVORY

Page Seven - Statement of William Ellis Douglas

A. had happened. He dialed and I heard him ask for a policeman and an ambulance to be sent to that address. I ran back to the house. The two men were there. They came over to see if they could help me. The phone was off the hook in the bedroom. One of the men who came over from the auto thing hung the phone up. That was all that happened until the police got there.

Q. Mr. Douglas, do you know of anyone who frequents the home or anyone who would have a grudge against your daughter?
A. There is a lot of people who come by visiting, male and female. I wouldn't know anyone that would have a grudge against her.

Q. Who is the father of her baby?
A. His name, I don't know. They went to school together out in Massachusetts, when she became pregnant, she moved to Peoria.

Q. Has she ever been married?
A. No.

Q. Had your ex-wife been married twice before?
A. Just once, before I married her.

Q. Why did your step-daughter use the last name of Cooper?
A. She was born before my ex-wife was married to her first husband.

Q. So that would be your ex-wife's maiden name?
A. Yes., Cooper is.

Q. Did your step-daughter have any boyfriends?
A. None that you would call steady. She had quite a few friends.

Q. Did she date any particular boy more than another one?
A. Yes.

Q. What was his name?
A. Charles Watts, they call him "Chuckie".

Q. How did she get along with Charles Watts?
A. When my wife and I were together, he was at the house on Rice St. nearly every day. She felt that he was trying to get to serious and she didn't want to settle down so they broke up.

Q. To your knowledge, had Charles Watts ever physically injured your step-daughter?
A. Yes.

Q. Approximately how long ago was that?
A. Seemed like it was August, I can't remember exactly. It happened while they was still living on Apple.

Q. Was this after she wanted to call off the relationship?
A. Yes.

Q. To your knowledge, did she take any police action against him?
A. As far as I know, she didn't.

Q. What did your step-daugher call you?
A. Numerous. She called me "Pete" which is a nickname. She called me Pop, Dad

PEORIA_SAVORY 0263

Page Eight - Statement of: William Ellis Douglas

Q. What was your daughter's age?
A. 19.

Q. Was she living with your wife when you were married?
A. She lived with her grandmother in Georgia and then she got a scholarship to go to that school by Boston. Then on becoming pregnant, she moved to Peoria, which was about two and a half, maybe three years ago.

Q. Would that be some time in 1974?
A. I would say it was 75.

Q. When was the first time you met her?
A. In 74.

Q. You were married to her mother approximately three years then?
A. Yes.

Q. Have you had any trouble with her since she moved back to Peoria?
A. None whatsoever.

Q. Can you tell me why your wife sought a divorce from you?
A. She caught me messing around with another woman.

Q. Have you ever made an advance towards your step-daughter?
A. No.

Q. Mr. Douglas, before I close this statement, is there anything that you would care to say that we might have over-looked?
A. No, I don't think so. There's really nothing to say. Both of them were just normal kids.

This statement consisting of eight typewritten pages, this page included, was given by the undersigned WILLIAM ELLIS DOUGLAS in room 215 of the Detective Bureau at the Peoria Police Department, 542 S.W. Adams St., Peoria, Ill., at approximately 8:10 p.m. and concluded at 9:15 p.m. on 1-18-77 in the presence of the undersigned witnesses. This statement was taken by Officer Earl Hopkins and typed by Joyce Tucker.

I, WILLIAM ELLIS DOUGLAS, have read this statement in its entirety, and it is a true and correct written statement.

WITNESSES: _Earl Hopkins_         (SIGNED) _William Douglas_
            _Joyce Tucker_

PEORIA_SAVOR