# Exhibit 1*

**SUPPLEMENTARY REPORT – / PEORIA POLICE DEPARTMENT**
**CONTINUATION SHEET**

1.2... # 318-18 Filed 04/22/24 Page 2 of 7

77-01588



| OFFENSE CLASSIFICATION | INC. CODE | DATE OF THIS REPORT | CLASSIFICATION | INCIDENT CODE CHANGE | REL. CASE NO'S |
|---|---|---|---|---|---|
| MURDER "B" | 0112 | 1-19-77 | Y N U CHANGE NEEDED | FROM TO | |

| NO. | SEC. A | SEC. B | SEC. C | SEC. D | SLC E | NAME AND/OR ALIAS | ADDRESS (NO., CITY, STATE, ZIP) | PHONE(S) | D.O.B. | S.S., D.L. NO., ETC. | REF. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | C P | | | | | DOUGLAS, William E. | 3033 W. Garden | RES BUS | | | |
| 2 | P | | | | | DOUGLAS, Noyal L. | 3033 W. Garden | | | | |
| 3 | O | O | S | N | NA F | McDONALD, Myrtle M. | 1321 W. Seventh | 674-1730 | REDACTED | | |

SEC. A: A—Arrested · B—Business, Firm, Agency · C—Complainant · T—Bartender · M—Missing, Runaway · P—Parent, Guardian · S—Suspect · V—Victim · W—Witness · O—Other (Narr.)

SEC. B: K—Dead Before Report · O—No Indication of Injury · A—Bleeding, Carried from Scene · B—Visible Injury · C—No Visible Injury, Momentary Unconscious, Complain of Pain

SEC. C: S—Sober · D—Been Drinking · I—Intoxicated/Under Influence · O—Other (Describe in Narr.)

SEC. D: M—Male, F—Female X—Unknown / W—White N—Negro M—Mexican J—Japanese I—Indian P—Puerto Rican C—Chinese O—Other   SEC. E: POL—On Duty Police · OD—Off Duty Police

| NO. | HGT. | WGT. | HAIR (DESC) | EYES | GLASSES (DESC) | COMPLEXION | PANTS/SKIRT | SHIRT/BLOUSE | COAT | HAT/CAP | IDENTIFIABLE PHYSICAL CHARACTERISTICS |
|---|---|---|---|---|---|---|---|---|---|---|---|

| V.I.N. NO. | VICTIM SUSPECT OTHER | YR. | MAKE | MODEL | STYLE | COLOR TOP/BOTTOM | LIC. NO. | ST. | YR. | OTHER DESC. DATA | VALUE | CODE | OLIS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| TYPE PROPERTY | CODE T B / I D O | MRF | MODEL NO. | SER. NO. | COLOR | VALUE | OTHER DESC. DATA | OLIS |
|---|---|---|---|---|---|---|---|---|

| LAB | CID | PHOTO | PATROL SGT. | CORONER | OTHER |
|---|---|---|---|---|---|

| CONTINUATION SHEET ONLY. | ☐ | NARRATIVE | 1-18-77 |
|---|---|---|---|

In regards to this investigation this officer received a telephone call from Myrtle McDonald. She stated that she was a friend of the victims' mother. She further stated that she had been trying to call the house that morning and had placed the first call at approximately 10:45 a.m. She stated that she kept getting a busy signal. McDonald further stated that she had received a call from Renetta Williams. She stated that Renetta told her that she had been trying to reach the victim's home by telephone and had placed a telephone call at approximately 0900 hours on this date, 1-18-77, and she had also gotten a busy signal. McDonald stated that Renetta Williams had told her that she was supposed to go to the victim's home at 12 noon on this date, 1-18-77, but stated that she did not go. This officer then asked McDonald if she knew why Renetta did not go to the victim's home at noon. She stated that Renetta had not told her why she did not go. This officer asked McDonald if she knew of anything else about the victims or the victims' relatives that would aid these officers in this investigation. McDonald stated that she had heard from a friend named Rose Armstrong whose address she did not know but believed she lived somewhere on Millman Street. She stated that Rose Armstrong told her that on the date of this incident she had seen a brown and white station wagon parked in the driveway of the victim's residence before 11 a.m. on the date of this incident. McDonald stated that she had no further description of the station wagon or any information as to who the station wagon might belong to. McDonald stated that she would contact her daughter and try and obtain the home address of Rose Armstrong and also her telephone number and contact this officer with the information at a later time. At this point the telephone conversation with McDonald was concluded.

1-19-77 — This officer, along with Off. Fiers, was requested by Sgt. Tiarks to take the mother of the two murder victims

| CAN OFFENDER BE IDENTIFIED | Y ☐ N ☑ | BY WHOM | REPORTING OFFICER (PRINT, TYPE) | I.D. NO. | REPORTING OFFICER (PRINT, TYPE) CHARLES H. CANNON | I.D. NO. 691 | DIVISION 431 | CAR NO. | SUPERVISOR APPROVING | I.D. NO. |
|---|---|---|---|---|---|---|---|---|---|---|

| EXTRA COPIES TO | SIGNATURE | SIGNATURE *Charles H. Cannon* | RPT. RVW. | CLR. | REF. | EXTENSION Y ☐ N ☑ | FILE PAGE NO. |
|---|---|---|---|---|---|---|---|

1:23-cv-01184-CRL-JEH  # 318-18   Filed: 04/22/24   Page 3 of 7

ATTACH PROPERTY TAG HERE

☐ Flash Message
☐ LEADS/NCIC Inquiry
☐ LEADS/NCIC Entry
☐ License Inquiry
☐ Inter-Dept. Requests
☐ Other Communication
☐ Cancellation Made

back to the residence at 3033 W. Garden and have her go through the crime scene and point out anything that would be out of the ordinary or any articles that might be missing.

1-19-77, 1805 hours

This officer, along with Off. Fiers, went to 213 Seventh Street where we picked up the mother of the two murder victims and a friend of hers. These officers, along with the mother and the friend, arrived at the residence at 3033 W. Garden at approximately 1825 hours. The mother was taken into the kitchen of the residence and the friend was left in the car. Immediately upon these officers' arrival at the residence we were met by the step-father, William Douglas. This officer, along with Off. Fiers, interviewed the mother in regards to this incident. The mother of the victims stated that the red bandana found in the bedroom did belong to her daughter and that her daughter usually wore the bandana after she had rolled her hair. The mother of the victims stated that she did not remember any holes at all in the screen door prior to the incident. She further stated that when she and William Douglas left to go to work that morning the TV set was on the coffee table. She stated that this TV set was left on the coffee table that night prior to this incident. The mother stated that she could remember having only one key to the residence and that morning when she and William left she left the key inside the house because the two victims were still in the house. The mother further stated that the only time the key is left in the mailbox is when no one is at home so that if one of the kids come home they would be able to find the key and let themselves in. The mother further stated that no one knew about leaving the key in the mailbox except her two kids and William Douglas. The mother further stated that the garage door is usually locked but sometimes her son, James, comes home and forgets to lock the door.

William Douglas was present during part of the interview of the mother. Off. Fiers asked William how he got the welt that was noticed under his left eye the date of this incident. Douglas replied by stating that he was not aware of any welt under his eye. The mother then interrupted the conversation and stated, "Do you remember that I asked you about what was wrong with your eye?" At this time there was no more conversation about the welt under William Douglas' eye.

The mother was then asked if she took a newspaper. She stated that she did not take a morning or an afternoon paper. These officers then asked the mother about her sleeping habits. The mother stated that she usually sleeps with her daughter because she did not have any bedroom furniture in her bedroom. The mother further stated that she did not know of anyone that Connie may have had an argument with.

Off. Fiers then asked William Douglas if he had a key to Parks Funeral Home. At first William replied that he did not have a key to the building but stated he had keys to the cars and then hesitated and stated, "Yea, I've got a key to the building".

These officers then asked the victims' mother about the beer and soda mixture found in the freezer in the kitchen. She stated that William had bought the beer to the house on Monday night and put it in the freezer. She stated that there was water in the soda bottle and that they were normally kept in the top of the refrigerator because the bottom did not work. These officers then asked the mother about the conditions of James' room. She replied by stating that James room looked typical because it is normally unkept. The mother further stated that the elephant stand located in the living room of the residence was already broken prior to this incident. At this point this

SUPERVISOR APPROVING               I.D. NO.

Page 3 of 6 Pages
# UTILITY EXTENSION SHEET / PEORIA POLICE DEPARTMENT
1:23-cv-01184-CRL-JEH # 318-18 Filed: 04/22/24 Page 4 of 7

77-01588

| NO. | SEC. A | SEC. B | SEC. C | SEC. D | SEC. E | 2. NAME AND/OR ALIAS | ADDRESS, NO., CITY, STATE, ZIP | PHONE(S) RES BUS | D.O.B./AGE | S.S., D.L. NO., ETC. | REF. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 4 | 0 | | | | | WILLIAMS, Renetta (nmi) | 1701 S. Lydia | | | | |
| 5 | 0 | 0 | S | M/N | NA | PARKER, Floyd C. | 1531 S. Lydia | 637-4201 | | REDACTED | |
| 6 | 0 | 0 | 0 | M/W | NA | SHAY, Ed | Pekin, Illinois | 348-3766 | apx. 25 | UNK | |
| 7 | 0 | 0 | 0 | F/N | NA | ARMSTRONG, Rose | Millman Street | UNK | UNK | UNK | |

| NO. | HGT. | WGT. | HAIR (DESCRIBE) | EYES | GLASSES (DESC) | COMPLEXION | PANTS/SKIRT | SHIRT/BLOUSE | COAT | HAT/CAP | OTHER DESCRIPTIVE DATA | OLIS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

| 3. TYPE PROPERTY | CODE | | MFR. | MODEL NO. | SER. NO. | COLOR | VALUE | OTHER DESCRIPTIVE DATA | OLIS |
|---|---|---|---|---|---|---|---|---|---|

| 4. REPORTING OFFICER | I.D. NO. | 5. REPORTING OFFICER | I.D. NO. | 6. SUPERVISOR APPROVING | I.D. NO. |
|---|---|---|---|---|---|
| | | C. CANNON / Charles H. Cannon | 691 | | |

1:23-cv-01184-CRL-JEH  # 318-18  Filed: 04/22/24  Page 5 of 7.

ATTACH PROPERTY TAG HERE

☐ Flash Message
☐ LEADS/NCIC Inquiry
☐ LEADS/NCIC Entry
☐ License Inquiry
☐ Inter-Dept. Requests
☐ Other Communication
☐ Cancellation Made

investigation these officers separated the two subjects and this officer (Cannon) remained in the kitchen with the mother and Off. Fiers took the ex-husband to a back bedroom to interview him. This officer then asked the mother if to her knowledge did she know how her daugher, Connie, got along with her boyfriends. She stated that as far as she knew Connie got along fine with her boyfriends. This officer then asked the mother about Connie's boyfriend, Charles Watt. The mother stated that she did not know about Charles Watt but that she knew he was very possessive. The mother then recalled one incident between Charles Watt and her daughter, Connie. She stated that there had been a fight quite some months ago. She stated that Charles had hit her daughter and that her daughter had called her at work on the telephone. She stated that she talked to both her daughter and Charles and had gotten the matter settled. She stated she did not know of any other physical fights between her daughter and Charles Watt other than she believed Charles to be extremely jealous. This officer then asked the mother if she had any boyfriends that Connie could have possibly had problems with. She replied by stating that she had no boyfriends and that she had not been out with another man since getting her divorce this past August. This officer then asked the mother if she knew of any other information that could possibly aid these officers in this investigation. She stated that approximately two months ago two black Cadillacs pulled up in front of her house. The mother stated that she was in one of the bedrooms located on the east side of the house and looked out the window and observed several black males in the two cars. She stated one black male got out of the car and came to the door and asked Connie to use the telephone. She stated Connie allowed the black male to come into the house and use the phone. She stated that she did not get a good look at the black male subject as she was in the bedroom and could not see him clearly. But she further stated that after the black male left the residence she and her daughter, Connie, began laughing because the black male subject appeared to be a sissy. At this point this officer concluded the interview of the victims' mother.

While this officer was still at the scene Off. Siebenthal came by with some information he had obtained from the R & G Tavern located at 3041 W. Starr. See his supplementary report in regards to this information.

1-19-77, 2015 hours

This officer, along with Off. Fiers, went to Renetta Williams' house at 1701 Lydia. Upon arrival we were met by Renetta Williams and her husband. Renetta Williams stated the following: She stated that on the date of this incident she had tried to telephone the victim Connie, who is her best friend. She stated that she had tried first at 0900 hours and had tried several times after that. She stated that each time she tried to make telephone contact she got a busy signal. This officer then asked Renetta why she had been trying to contact the victim Connie. She stated that the night prior to this incident she and Connie had been doing some physical exercises. She stated that she wanted to call Connie to let her know how she felt after the exercises and to tell her that her legs were real sore. Renetta stated that she was supposed to go to her friend Connie's house at 12 noon on the date of this incident but had changed her mind because of the soreness in her legs after doing the exercises the night prior to this incident. Renetta stated that the last time that she had saw the victim Connie was on 1-17-77 at 1320 hours. She stated that Connie had come to her home for the purpose of doing exercises and also babysitting for her and her husband. She stated that Connie left her home that night between the hours of 2130 hours and 2200 hours. She stated that Connie was picked up by her mother and her step-father.

This officer then asked Renetta who had been present during Connie's presence at her home. Renetta stated that she, her husband, a girlfriend and Charles Watt had been present. She stated that Charles Watt left approximately an hour and a half before Connie was picked up by her mother and step-father.

SUPERVISOR APPROVING

I.D. NO.

SUPPLEMENTARY REPORT – / **PEORIA POLICE DEPARTMENT**
CONTINUATION SHEET

77-01588

1-2~~01588~~ # 318-18   Filed: 04/22/24   Page 6 of 7

| OFFENSE CLASSIFICATION | INC CODE | DATE OF THIS REPORT | CLASSIFICATION | INCIDENT CODE CHANGE | | REL. CASE NO.S |
|---|---|---|---|---|---|---|
| MURDER "B" | 0112 | 1-19-77 | Y N U CHANGE NEEDED | FROM | TO | |

| NO. | SEC A | SEC. B | SEC. C | SEC. D | SLC.1 | NAME AND/OR ALIAS | ADDRESS (NO., CITY, STATE, ZIP) | PHONE(S) RES. BUS. | D.O.B. | S.S. D.L. NO., ETC. | REF. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | C P | | | | | DOUGLAS, William | 3033 W. Garden | | | | |
| 2 | P | | | | | DOUGLAS, Noyal | 3033 W. Garden | | | | |
| | | | | | | | | | | | |

SEC. A:  A—Arrested   B—Business, Firm, Agency   C—Complainant   T—Bartender   M—Missing, Runaway   P—Parent, Guardian   S—Suspect   V—Victim   W—Witness   O—Other (Narr.)

SEC. B:  K—Dead Before Report   O—No Indication of Injury   A—Bleeding, Carried from Scene   B—Visible Injury   C—No Visible Injury, Momentary Unconscious, Complain of Pain

SEC. C:  S—Sober   D—Been Drinking   I—Intoxicated/Under Influence   O—Other (Describe in Narr.)

SEC. D:  M—Male  F—Female  X—Unknown / W—White  N—Negro  M—Mexican  J—Japanese  I—Indian, P—Puerto Rican  C—Chinese  O—Other      SEC. E:   POL—On Duty Police      OD—Off Duty Police

| NO. | HGT. | WGT. | HAIR (DESC.) | EYES | GLASSES (DESC.) | COMPLEXION | PANTS/SKIRT | SHIRT/BLOUSE | COAT | HAT/CAP | IDENTIFIABLE PHYSICAL CHARACTERISTICS | | OLIS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| V.I.N. NO. | VICTIM SUSPECT OTHER | YR. | MAKE | MODEL | STYLE | COLOR TOP BOTTOM | LIC. NO. | ST. | YR. | OTHER DESC. DATA | VALUE | CODE | OLIS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| TYPE PROPERTY | | CODE | T B L D O | MFR. | MODEL NO. | SER. NO. | COLOR | VALUE | OTHER DESC. DATA | OLIS |
|---|---|---|---|---|---|---|---|---|---|---|

| LAB | CID | PHOTO | PATROL SGT. | CORONER | OTHER |
|---|---|---|---|---|---|

| CONTINUATION SHEET ONLY ☐ | NARRATIVE: |
|---|---|

This officer then asked Renetta if she knew of any other boyfriends that Connie could have possibly have had. She stated that she knew of a white male, Ed Shay, whose street address she did not know but knew that he lived in Pekin, Illinois and supplied these officers with a telephone number which is listed in the heading of this report. She stated that she knew Connie had seen Ed Shay last on Wednesday, 1-12-77. She stated that Connie had went to Pekin for the purpose of having dinner with Ed Shay. Renetta stated that the only thing between Connie and Ed Shay was friendship. She stated that as to her knowledge Connie had never had sexual intercourse and that their relationship had not become that involved.

This officer then asked Renetta if she knew anything about the relationship between Connie and her step-father. Renetta stated that the only incident that she knew about happened last summer when Connie told her that she had been struck by her step-father and told to get out of the house. She stated since this incident she did not know of any other physical confrontation Connie had had with her step-father, but went on to say that Connie had told her if her mother reconciled with her step-father she was going to move out and find another place to stay.. During the interview of Renetta Williams she received a telephone call from her brother, Floyd Parker. She stated that Floyd Parker was requesting to talk to these officers. This officer (Cannon) took the telephone receiver and talked to a person who stated that his name was Floyd Parker. He stated that he was a brother of Renetta Williams and a good friend of the victim Connie and stated to this officer that he intended to be at his sister's house, Renetta Williams, at 1630 hours on 1-20-77 because that was when the man selling the portraits was supposed to come by. This officer then asked Parker if he had anything else to tell these officers that would aid in this investigation. He stated that he did not have other than the victim Connie was just like "a sister to me". The telephone conversation with Parker was concluded at this time.

| CAN OFFENDER BE IDENTIFIED Y N | BY WHOM | REPORTING OFFICER (PRINT, TYPE) | I.D. NO. | REPORTING OFFICER (PRINT, TYPE) CHARLES CANNON | I.D. NO. 691 | DIVISION 431 | CAR NO | DIST. | SUPERVISOR APPROVING | I.D. NO. |
|---|---|---|---|---|---|---|---|---|---|---|
| EXTRA COPIES TO | | SIGNATURE | | SIGNATURE *Charles H. Cannon* | | RPT. RVW. | CLR. | REF. | EXTENSION Y N UTILITY SHEET | FILE PAGE NO. |

☐ Flash Message
☐ LEADS/NCIC Inquiry
☐ LEADS/NCIC Entry
☐ License Inquiry
☐ Inter-Dept. Requests
☐ Other Communication
☐ Cancellation Made

ATTACH PROPERTY TAG HERE

This officer then questioned Renetta Williams in regards to the man selling the portraits. She stated that she had been with the victim, Connie, when the man selling the portraits had made an appointment to see them both on 1-20-77 at 1630 hours and wanted to know if these officers or any police officers would be present when the man selling the portraits arrived. These officers informed Renetta Williams that we would be present at her home at 1630 hours on 1-20-77. At this point the interview of Renetta Williams was concluded.

INVESTIGATION IN PROGRESS.....

SUPERVISOR APPROVING

I.D. NO.