# Exhibit 24

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOHNNIE LEE SAVORY, | ) | |
| | ) | Case No. 23-cv-01184 |
| *Plaintiff*, | ) | |
| | ) | The Hon. Judge Colleen R. Lawless |
| *v.* | ) | |
| | ) | Mag. Judge Jonathan E. Hawley |
| WILLIAM CANNON, as Special | ) | |
| Representative of the Estate of CHARLES | ) | **JURY TRIAL DEMANDED** |
| CANNON, et al., | ) | |
| *Defendants.* | | |

## <u>DECLARATION OF THOMAS TIDERINGTON</u>

I, Thomas Tiderington, hereby declare as follows:

1. I have been retained by Plaintiff in this matter to give expert opinion testimony.

2. Attached to this declaration as Exhibit A is a true and accurate copy of a report, which contains opinions that I offer in this case, as well as attachments incorporated as part of that report. The contents of this report and its attachments are true and accurate to the best of my knowledge and belief, and I hold the opinions stated within the report to a reasonable degree of professional certainty.

3. My qualifications for rendering expert opinions in this case are summarized in my report and in my CV, which is attached to this declaration as Exhibit B. My CV is true and accurate as of the date of my report in this case to the best of my knowledge and belief.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:        April 18, 2024



Thomas Tiderington

# Exhibit A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

JOHNNIE LEE SAVORY,

     *Plaintiff.*

v.

CHARLES CANNON, MARCELLA
BROWN TEPLITZ, RUSSELL BUCK,
JOHN FIERS, CHARLES EDWARD
BOWERS, JOHN STENSON, GEORGE
PINKNEY, E. HAYNES, WALTER
JATKOWSKI, GLEN PERKINS, ALLEN
ANDREWS, HAROLD MARTENESS,
MARY ANN DUNLAVEY, CARL
TIARKS,
PETER GERONTES, JOHN TIMMES,
UNKNOWN OFFICERS OF THE
PEORIA
POLICE DEPARTMENT, and the CITY
OF PEORIA,
Illinois,
     *Defendants.*

**Case No. 23-cv-01184**

**EXPERT REPORT OF**

**THOMAS J. TIDERINGTON**
(Thomas J. Tiderington & Associates-LLC)

06-09-2023

1

**SUMMARY OF QUALIFICATIONS**

For the past forty-four years, twenty years as Chief of Police (retired June 2022), I have served as a full-time law enforcement officer with three different police departments and as a Group Supervisor for the United States Drug Enforcement Administration's South Florida Regional Task Force.  I have trained over 10,000 federal, state, and local law enforcement officers on police practices and criminal investigations.  For over 30 years, I have been an instructor at numerous regional, national, and international law enforcement training events and have lectured on a wide variety of police practices and criminal investigations.

Over the last five years, I have been engaged as a criminal justice consultant, trainer, case reviewer, and expert witness in law enforcement related matters.  As a recently retired Police Chief of twenty-plus years, I have reviewed and approved policies and procedures relating to every aspect of police operations, including criminal investigations, case development, report writing, maintenance and retention of police records, complaints against police officers, training, supervision, and employee discipline.   I am currently an active life member of the International Association of Chiefs of Police (IACP), a member of the Police Executive Research Forum (PERF), and a life member of the Michigan Association of Chiefs of Police (MACP).

Throughout my law enforcement career, I have frequently worked and interacted with federal agencies such as the Federal Bureau of Investigation (FBI), the Department of Homeland Security Investigations (HSI), the Internal Revenue Service (IRS), the Secret Service, the United States Marshalls Service (USMS), the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), the Office of the Inspector General (DOJ-OIG), and the Drug Enforcement Administration (DEA).  I have also worked cooperatively with numerous state and local police agencies including the Peoria Police Department.  As a result of my many decades of working extensively with many federal, state, and local agencies, I am familiar with the many similarities of investigative methods and strategies, as well as nationally accepted best practices and protocols. I also have many years of extensive practical experience in investigating and supervising complex criminal investigations, including violent crimes and homicide investigations.

During my 44-plus year law enforcement career, I have been responsible for reviewing and processing hundreds of disciplinary actions up to and including suspensions and terminations.  I also managed and supervised the accreditation process for both the Fort Lauderdale and Plymouth Township Police Departments.   The accreditation process furthers an agency's professional development and ensures that their methods, policies, procedures, and daily operations follow the best practices or "professional standards" in the law enforcement arena.

As a Police Chief for over twenty years, I have reviewed and approved policies and procedures of every kind, including (but not limited to) criminal investigations, retention, and maintenance of police records, complaints against police officers, training, supervision, and discipline. Further details of my training, experience, knowledge, and qualifications are contained in my Curriculum Vitae, which is attached as Attachment D of this report.

My role in presenting this report and any subsequent depositions and trial testimony is to assist the trier of facts in reaching its conclusions. Any and all opinions expressed herein are held to a reasonable degree of professional certainty.  The information that I relied on consists of the type of information that is reasonably relied upon in my field of expertise.  All my opinions are rendered to a reasonable degree of professional certainty in the field of police practices, law enforcement training, administration, and discipline-based upon my education, training, and employment as a law enforcement officer, as well as my work as a law enforcement trainer, and my experience as a consultant in the field.

The method I used in reaching my conclusions included a review of materials provided by Plaintiffs' counsel and vetted against what I have come to know through my years of specialized education, training, and experience as generally accepted practices in the field of law enforcement. These standards have also been established in model policies promulgated by professional organizations such as the International Association of Chiefs of Police (IACP),[1] and the Commission on Accreditation for Law Enforcement (CALEA). These practices have also been consistently reinforced by research-based organizations such as the Police Executive Resource Forum (PERF).[2]  Lastly, these practices have been vetted through our courts included in decisions of the United States Supreme Court, some of which are cited within this report. I mention these important court decisions not to invade the province of the fact finder, but because these decisions provide the guiding principles on which law enforcement policy and practices are based.

---

[1] IACP-The International Association of Chiefs of Police (IACP) is the world's largest and most influential professional association for police leaders. With more than 32,000 members in over 170 countries, the IACP is a recognized leader in global policing, committed to advancing safer communities through thoughtful, progressive police leadership. Since 1893, the association has been serving communities by speaking out on behalf of law enforcement and advancing leadership and professionalism in policing worldwide.

[2] CALEA-The Commission on Accreditation for Law Enforcement Agencies, Inc. (CALEA®), was created in 1979 as a credentialing authority through the joint efforts of law enforcement's major executive associations: International Association of Chiefs of Police (IACP), National Organization of Black Law Enforcement Executives (NOBLE), National Sheriffs' Association (NSA), Police Executive Research Forum (PERF).  The CALEA Accreditation programs provide public safety agencies with an opportunity to voluntarily meet an established set of professional standards, which require: Comprehensive and uniform written directives that clearly define authority, performance, and responsibilities Reports and analyses to make fact-based and informed management decisions.

There is a substantial body of knowledge and literature about the practices and standards that reasonably managed and administered police agencies across the United States should follow and apply to their operations. These generally accepted practices have developed over time to encourage and assist police agencies to deliver police services to communities serviced which are professional, reasonable, effective, and legal. Many of these generally accepted practices have been developed from law enforcement's critical analysis of field incidents and examinations of incidents reported to cause police liability, deficiencies, and employee misconduct.

My analysis and report avoid determining the credibility of the various parties and witnesses, or choosing between disputed accounts, as that is outside the purview of my work and remains within the province of the fact finder.

Opinions that I present in this report may use terminology that resembles legal terms or standards. Use of specific/similar legal terminology is not intended to draw legal conclusions or to subvert the function of the court or to inappropriately influence triers of the fact. The use of certain terms such as "reasonable", "reckless", "negligent", "unreasonable", "foreseeable",  and "gross deviation" are commonly used in my field of expertise, and I used them often as a Police Chief, and when I train or communicate with law enforcement officers.  These terms and others form the basis of my understanding of the subject matter and are commonly used by law enforcement officials in the field.

**Attachments to this report include the following:**
Attachment A - Litigation support experience-Listing of testimony and publications.
Attachment B - List of materials reviewed.
Attachment C - My rate of compensation.
Attachment D - Complete and detailed curriculum vitae.

Of course, if any new material is provided to me related to this matter, or my opinions set forth here, I will consider it.  I reserve the right to alter my opinions and/or form additional opinions regarding this case upon disclosure to me of further information or documentation related to this case.

## INTRODUCTION

I have been retained by attorneys representing Plaintiff Johnnie Lee Savory. I was asked to assess whether there were deviations from generally accepted police practices in the investigation into the sexual assault and murder of Connie Cooper and the murder of her brother James Robinson that was conducted by various Peoria Police officers.

As a result of my review of the materials provided to me related to the Cooper and Robinson homicides, I conclude to a reasonable degree of professional certainty that the investigation conducted in this case grossly deviated from generally accepted police practices, as explained further below.

Based on my many decades of law enforcement experience I have concluded that the defendants in this case unreasonably failed to consider alternative suspects, as well as facts and evidence that clearly undermined their theory that Johnnie Lee Savory was responsible for the murders.

In addition, there is substantial evidence in the record that the defendants coerced a false confession from Johnnie Lee Savory using improper interviewing and interrogation tactics. The investigation reflected a primary goal of closing the case with charges, rather than finding the truth about who was responsible for the murders of Connie Cooper and James Robinson.

To further summarize my opinions:

a) Defendants applied tunnel vision to create a case against Johnnie Lee Savory, ignoring (1) evidence pointing to other suspects with a motive to sexually assault and kill Connie Cooper; and (2) a lack of evidence connecting Savory to the murders or otherwise suggesting he was involved. Defendants carried out an investigation aimed at proving what they had already decided based on speculation—that Savory was guilty—and to close the case quickly.

b) Defendants failed to pursue other likely suspects or follow up on strong evidence of their guilt. This is especially true with regard to William Douglas (the victims' stepfather): there was evidence known to the investigators to support that he had a history of violence, including a history of physical and sexual violence against Connie Cooper, and he was available and able to commit the crimes.

c) Despite ample evidence pointing to other suspects (including Douglas), and a lack of any evidence to suggest Savory committed the murders, the defendants subjected Savory to a grueling, 2-day interrogation with circumstances and tactics that the defendants would have known were likely to lead to involuntary statements, *not* a reliable confession. Defendants also failed to accurately and fully document Savory's interrogation, further supporting that they intended to build a case against Savory regardless of what the evidence showed.

d) Defendants ignored multiple statements in Savory's purported confession that firmly undermined his guilt; instead, defendants took steps to cover up those contradictions.

e)  Defendants failed to properly document and turn over exculpatory information to the prosecutors, including evidence that there was no blood on the purported murder weapon and evidence confirming a theory that Connie Cooper was sexually assaulted.

f)  When a new trial was ordered because Savory's statements to investigators were found to be involuntary, the defendants should have reconsidered their case against Savory and his innocence. Instead, the defendants dug in their heels and maintained their focus on creating a case against him. The defendants turned to young witnesses, including members of the Ivy family, that they knew to be unreliable, and used techniques and tactics to interrogate them that they knew were likely to result in unreliable and false statements. Moreover, defendants obtained statements that contradicted other evidence that they had gathered in the case, without investigating those contradictions. In addition, according to testimony and sworn statements from the Ivy family members, the defendants did not disclose the techniques and tactics that they used to obtain the Ivy family statements, and documented statements that the Ivy family members never made. Rather than view these statements with skepticism, the defendants relied heavily on these statements to prove what they had already decided: that Savory was guilty.

**Summary of Facts Related to the Connie Cooper and James Robinson Investigation.**

This incident summary of this report is based upon various written documents and other materials noted in Attachment B - List of materials reviewed section of this report. Of course, if any new material is provided to me related to this matter, or my opinions set forth here, I will consider it. I, therefore, reserve the right to alter my opinions and/or form additional opinions regarding this case upon disclosure to me of further information or documentation related to this case.

Without attempting a comprehensive recitation, but rather to give a brief summary of the matter sufficient to allow the reader to place the rest of this report in context, the following is provided:

**THE INITIAL INVESTIGATION SUMMARY:**

1.  Connie Cooper and James Robinson were siblings living with their mother Noyalee Robinson and stepfather William Douglas at 3033 Garden Street. The parents left for work on the morning of January 18, 1977 around 6:30am. At approximately 4:30pm Noyalee and William Douglas returned to the home to find Noyalee's nineteen-year-old daughter Connie Cooper and 14-year-old son James Robinson dead on the floor of a bedroom (Peoria_Savory 1679-1681). Both had been stabbed multiple times. Connie Cooper had suffered a number of defensive wounds to her hands during the attack, a white substance was collected from her vagina, and semen and sperm were later found on Connie Cooper and her clothing (Peoria_Savory 918-925) (Peoria_Savory 86).

2.  Connie Cooper's two-year-old son William was found alive and unharmed in a separate bedroom of the home that was rarely used, and the family's German Shepard named Trouble Man was loose in the house.

3.  The initial Peoria Police report was prepared by <u>Officer G. Perkins</u>, who was the first officer to arrive on the scene. Perkins entered the home with William Douglas who directed the Officer to the bedroom where the deceased were located. Perkins documented in his report that Pat Adair, an employee from the car business next door, had been inside the home with William Douglas prior to the police arriving. Perkins wrote in his report that he spoke with Renetta Williams, who was a friend of the family, and learned that she had been calling Connie since 9:00 am and had received "busy signals all day." Perkins also noted that both of the victims appeared to have stomach wounds Perkins along with Sergeant Voegele secured the scene. (Peoria_Savory 20)

4.  <u>Sergeant Voegele</u> arrived on the scene shortly after Officer Perkins.  Voegele completed a supplemental report detailing his actions and observations.  Voegele noted in his report that after checking the victims, he "went back to the living room and #1 (Williams) was on the phone."  Voegele wrote in his report that Williams had been on the phone with Park's Mortuary and was arranging for the victims to be picked up.  Voegele described William Douglas as "slightly upset but was not real emotional or excited". Note: At this point in the investigation officers were well aware that they were investigating a gruesome double murder. Allowing Williams into the crime scene and to use the telephone was a serious deviation from acceptable police practices and standards.

    Voegele documented in his supplemental report that the family German Shepard, which was roaming free in the house, was vicious and would attack anyone that "wasn't supposed to be there."  Voegele stated in his report: "Therefore whoever had been in the house must have known the kids."  (Peoria_Savory 21-22)

5.  <u>Officer Layman</u> responded to the scene and assisted in securing the scene. Layman prepared a supplemental police report detailing his involvement in the investigation. Layman documented that he spoke with Harland Adair who was the owner of the home located at 3033 Garden and that he rented the home to the victims' mother. Layman also documented that Adair had called 911 after William "came running into the office. He shouted, there's blood all over call the police, call an ambulance." Adair and a second employee, John Nizzia, accompanied William back to the home and went into the bedroom. Nizzia told police that he checked the victims and noticed that the phone in the room was "not hung up." Layman also documented that Adair described a Black 1969 Cougar w/crager Mag wheels parked in front of 3033 Garden, but could not recall if he had seen it

there the day of the murders. (Peoria_Savory 26)

6. <u>Officer Fiers</u> responded to the homicide scene at the request of Sgt. Gillespie. Fiers's supplemental report provides specific details of the condition of the crime scene, including his observations of blood markings throughout the home. Fiers noted and detailed various wounds on each of the victims and his report concluded that "these wounds were caused by a smooth-bladed knife. The majority of these wounds were puncture wounds and the others appeared to be slashing wounds." (Peoria_Savory 36)

7. <u>Officer Steinhauser</u> documented that he brought Harland Adair and John Nizzia to the police station following the murders and conducted interviews with them. Nizzia provided additional details about his actions and told police that when he came out of the bedroom, after checking the victims, that William was attempting to make a phone call and instructed Nizzia to hang up the phone in the bedroom, which was lying on the floor next to the victims. Steinhauser also interviewed Adair who described a black 1969 Cougar that may have frequented the home and may have been parked in the driveway on the day of the murders.  (Peoria_Savory 39)

8. <u>Officer Steinhauser</u> documented in his supplemental report that he interviewed and spoke with Austin Erving, who was Noyalee's former boyfriend.  Erving told police that although he had stopped seeing Noyalee, on January 14, 1977, he had given Connie and her baby a ride to the home of Renetta Williams. Erving told police that he "has never had a personal relationship with Connie, stating that he is only a friend of hers and that he had a relationship with her mother." Erving provided information about Connie's old boyfriend Charles Watts, telling police that Watts had "repeatedly hit Connie" and that Connie's brother James had intervened and warned Watts "not to hit his sister." Erving also told police that Watts told Erving "I'm going crazy" and showed Erving a gun, telling Erving "I know what to do now." (Peoria_Savory 41)

Steinhauser also documented that Erving felt the "murders occurred in retribution for the sinful life that Noyalee had been leading. Erving states that Noyalee had been dating many men and has now taken up with her ex-husband and Austin Erving felt that this type of sinful life has possibly led to some type of retribution by a jealous ex-lover in the form of killing her daughter and son James." Erving also told police that "…if he had been instructed by god to kill Connie Cooper and her brother James, that he would have done so but he stated that he had not been so instructed by God and did not believe that God acts in such a way."

> setting himself up for a motive in that he had a relationship with Mrs. Douglas which had been terminated shortly before the incident because Mrs. Douglas had gone back with her ex-husband. Austin Erving stated that if he had been instructed by God to kill Connie Cooper and her brother James, that he would have done so but he stated that he had not been so instructed by God and did not believe that God acts in such ways. Erving appeared to be very religious in his conversation with this officer but Erving denied having anything to do with the murders this case. In regards to this line of questioning, Erving stated that he had just gotten his car out of the shop last night at approximately midnight and had gone home and fallen asleep on the couch and was awakened this morning by his girlfriend, Romona Reddick, calling him at 7:00 a.m. to wake him up for work. Erving stated he went back to sleep and Romona called him again at 7:30 and at this time, he got up and got dressed and went to work at 8:00 a.m. at J.A. Fritch at 1016 N. Adams St. Erving stated that he works from 8:00 a.m. until 4:30 in the evening and that today, he was working on Detweiller St. with another employee. Erving stated that he did drive his car out to the job on Detweiler St. today and that at 4:30, he drove home arriving at his house at approximately 1650 hours.
>
> It should be noted at this time that Erving does own a 1970 black Cougar but stated that it has been in the repair shop all weekend and that this repair shop is on First St. between State and Sanford Streets and owned by Earl Ellis. Erving states he did have the car today but that it was out on the job on Detweiller St. all day and that he has not been to the residence at 3033 W. Garden since last Friday, 1-14-77. Erving stated that after arriving home at 1650 hours, he received a call from Ken Parker who informed him of the deaths of Connie and James and he stated that at this time he left the house and picked up Ken Parker and the two of them went to 3033 W. Garden arriving at approximately 1730 hours.

Investigators obtained a written statement from Erving and a polygraph examination was later conducted by Dennis Jenkins. According to Steinhauser's police report, Jenkins concluded that Erving was "telling the truth and that he had no knowledge about the murders." (Peoria_Savory 43)

9. <u>Officer Ulrich</u> wrote a supplemental report indicating that he was assigned to conduct a canvass of the area. Ulrich spoke to a neighbor Josephine Peterson who told the police "….that there were many cars and people in and out of the place all night, and the victim James Robinson (Scopey) was out all night much of the time also." (Peoria_Savory 27)

10. <u>Officer Cannon</u> responded to the scene and documented his investigative actions in a supplemental police report. Cannon worked with Officer Fiers in processing the crime scene and reported that they "were unable to locate a possible murder weapon." (Peoria_Savory 35)

11. <u>Officer Jatkowski</u> processed the crime scene with assistance from Sergeant Gerontes and Officer Bennet. Jatkowski collected significant physical evidence, including hairs from the hands of the victims, numerous latent fingerprints and bedding that was covered in blood. (Peoria_Savory 463-470) This physical evidence all excluded Johnnie as the perpetrator of the murders. (Peoria_Savory 1554-1561) (Jatkowski Deposition p.117-118)

12. <u>Officer Wolland</u> transported Noyalee Robinson to the police station and interviewed her about specific details of the crime scene and any possible suspects. Noyalee told Officer Wolland about her daughter's ex-boyfriend Charles Watts and described how Watts had "choked her (Connie) and then slugged her in the eye causing her to have a black eye. She stated that after the fight Watts kept her from using the telephone to call her mother and that

after several minutes her daughter got to the telephone and called her at work.  She stated that she then talked to her daughter who was crying and then talked to Watts  and told him to leave the house immediately." Wolland further documented in his report that Noyalee stated that her son James was home at the time of the fight and attempted to "break up the fight."

Officer Wolland's supplemental report details his interview with Charles Garnett Watts, Jr. Watts admitted that he had hit and struck Connie during a fight between the two of them, but denied choking Connie. Watts told Wolland he "had not choked her but grabbed her around the neck and pushed her."  When asked about last seeing the victim,  Watts stated that he saw the victim the night before the murders at approximately 5:30 pm at the Stanford Williams residence located at 1701 Lydia. Watts provided an accounting of his whereabouts and agreed to take a polygraph test.

Wolland also documented that he spoke with Renetta Williams who described Connie's interaction with a white male who was offering to sell a portrait to the victim.  Renetta believed that Connie had provided this white male with her home address and scheduled an appointment. The white male was driving a blue Chevrolet and his name was possibly Ken Snodie. (Peoria_Savory 59)

13. <u>Officer E Hopkins</u> completed a supplemental report detailing his interview with William E. Douglas, who was the stepfather of two victims. William provided an accounting of his whereabouts and reported that the family dog was very protective of family members. Hopkins completed a seven-page statement that was made available to polygraph operator Dennis Jenkins. (Peoria_Savory 62-66)

14. <u>Officer Dean Dearborn</u> completed a supplemental report detailing his investigative actions including his interview with Kenneth Parker. Parker was Connie's boyfriend at the time of her murder. Parker told Officer Dearborn that he had attempted to call Connie at 11:45am and received a busy signal. Parker told Dearborn that he called Connie again at 4:45 – 4:50pm and the call was answered by Connie's stepfather, who told Parker to call "Ranetta Williams, saying she will tell you all about it." Parker learned of the deaths after calling and talking with his sister Renetta. Parker told police that he had no idea of anyone that would want to harm either Cooper or Robinson.

Officer Dearborn also interviewed Kenneth Parker's brother Floyd. Floyd told police that Robinson "has a dog, and the dog is a fairly constant companion to him. The dog will not let anyone in the house unless Robinson says it is all right. Parker said that once inside the house, the dog would not let anyone approach Robinson unless Robinson let them. Parker seemed to think it was very strange that the dog was not hurt because of its protective nature. He did say the dog was an inside-outside animal and was not inside the house at all

times." (Peoria_Savory 69)

15. <u>Officer R. Horton</u> reported that while providing crime scene security he was approached by Jim Adams, a cab driver employed by Yellow Checker Cab # 12.  Horton reported that Adams told the officer that he had taken a black male from the 3000 Block of Medrith St to the victims' home on several occasions. Adam's told the officer that the "b/m always dressed as a pimp and the last time told Jim Adams 'that  woman is fucking over him.'" (Peoria_Savory 74)

16. <u>Lt. M. Dunlavey and Sgt.Timmes</u> documented their interview of Mr. T. W. Parks, the owner of the funeral home located at 201 N. Macarthur Highway. When the officers arrived at the funeral home Parks was "working on the bodies of the two victims" in this case. Police determined that William Douglas had worked for Parks on "01/18/1977 and he (Parks) stated he had been working with him from ten minutes to nine when Douglas arrived there until ten minutes to four. 0850 to 1550 hours."  Police asked Parks if "Douglas had access to any scalpels or other cutting tools that might have made the wounds in the victims and he showed the only two tools ever used there. One is scalpel with a very small blade and a fragile plastic handle the blade being only approximately 1 inch in depth, and the other is a special needle they use that has a very distinctive point that curves down into a square that is approximately ½ inch or less on each side."  Parks showed the officers the wounds on the deceased bodies and explained that a "heavy blade with a strong handle would have been necessary to make the wounds." (Peoria_Savory 79)

17. <u>Detective Russell Buck</u> documented that he was responsible for following Coroner Buzbee to St. Francis Hospital where the deceased bodies were x-rayed. Following the x-rays the bodies were turned over to T.W. Parks for autopsy purposes. Dr. Immesoete performed autopsies on both of the deceased. Detective Buck documented that a white substance was collected from Connie's vagina and turned over to Coroner Buzbee, who transferred it to the Illinois Bureau of Identification Maywood lab for testing by Mr.Gonsowski. (Peoria_Savory 85-86) (Peoria_Savory 1554)

18. <u>Officer Laymen</u> interviewed Susan Schwark, a neighbor who lived at 3033 W. Garden. Schwark told Laymen that she left her residence at 0840hrs. on January 18, 1977, and recalled seeing a b/m coming out of the victims' house. She also noted that the victims' dog was vicious with strangers but was not barking. (Peoria_Savory 100)

Mrs. Schwark and her family were reinterviewed two days later, and they confirmed they had seen a black man, who was about 5' 10" and was wearing a brown coat, leave the 3033 W. Garden Street residence around 8:40am on the day of the murders. (PEORIA_SAVORY 453)

19.  <u>Captain Harold Marteness</u>- On January 19, 1977, Marteness received a letter from Dennis Jenkins & Associates indicating that a polygraph exam was conducted on Austin Erving (Noyalee's ex-boyfriend). The results indicated that Erving "did not indicate specific deception reaction to the relevant questions." In other words, the polygrapher concluded that Erving was telling the truth when questioned about his involvement in the murders. (Peoria_Savory 95)

20.  On January 19, 1977, Detectives Cannon and Fiers interviewed Noyalee and William Douglas at 3033 W. Garden. Detective Cannon wrote in supplemental report that he along with Officer Fiers met with Noyalee and drove her back to her residence. Upon arriving at 3033 W. Garden, they were met by William Douglas. As they walked through the crime scene Officer Fiers asked Douglas about a "welt that was noticed under his left eye the date of the incident. Douglas replied by stating that he was not aware of any welt under his eye. The mother (Noyalee) then interrupted the conversation and stated, do you remember that I asked you what was wrong with your eye?"  No additional questions were asked about the injury.  Douglas was also asked if he had a key to Parks Funeral Home. "At first William replied that he did not have a key to the building but stated he had keys to the cars and then hesitated and stated, yea I've got a key to the building." (Peoria_Savory 110-115)

21.  <u>Detective Cannon</u> also documented an interview that he had with Renetta Williams. Williams described an incident involving Connie's stepfather Douglas hitting Connie and telling her to get out of the house. Connie told Renetta that she would move out of the house if Douglas moved back in. (Peoria_Savory 114)

22.  <u>Officer E.C. Johnson</u> documented information that he received from a high school senior (Rudd), a cousin of William Douglas.  Rudd told the officer that a week prior to the murders he saw Connie Cooper and she told him about "threatening telephone calls from an Afro-American male whose name is not known as of this reporting.  This unknown male wanted Cooper to break off her relationship with Charles Watts and she refused.  Cooper at this point advised Rudd that the caller informed her that he would get her and she would be sorry to which Cooper replied that she was not worried about him." Rudd told the Officer that "she (Connie Cooper) felt Watts was aware as to who this individual might be" and of the threat to her. Johnson further documented that Rudd told him that from talking to "other family members, this incident (the murders of Connie and James), they felt that William Douglas was responsible for committing this act."   (Peoria_Savory 118-119)

23.  <u>Edward Bowers</u> conducted a polygraph exam of Douglas on January 20, 1977 and concluded that Douglas "told the complete truth during his examination and interrogation." (Peoria_Savory 127-128). Dennis Jenkins, a colleague of Bowers, reevaluated the polygraph exam results the next day and concluded that the results of the exam were actually

inconclusive. (Peoria_Savory 529). Jenkins then conducted additional polygraph exams of Douglas on January 26, after Johnnie Savory had become the suspect. Jenkins concluded that Douglas "continued to indicate a general nervous tension" but did not "indicate consistent specific deception-type reactions at the relevant questions." Jenkins ultimately reported that he found that Douglas had been truthful in the January 26 polygraph exams. (Peoria_Savory 1146-1149) Note: There is not an explanation as to why two exams were given or if the results of the two examinations were the same or conflicting. (Peoria_Savory 128)

24.  Dennis K. Jenkins conducted two polygraph examinations of Charles Watts. Jenkins reported the following: "The subject's first examination indicated an extremely rapid pulse and very erratic cardio tracing. The subject reacted very specifically at irrelevant, as well as, relevant questions. After the first tracing, the subject was questioned concerning the cause of the reactions, and he could offer no explanation." Jenkins concluded that Watts "was not a valid testable subject." A second examination was agreed to and Watts returned the following day. Prior to the actual polygraph examination Jenkins documented that Watts admitted to striking and hitting Connie during an argument over another man, Watts told Jenkins that after the fight he "helped her (Connie) clean the blood off of her nose."

Jenkins wrote in his report the following: "An examination was made of the subjects six tracings and it was noted that during the last three tracings, after efforts were made to stabilize the subject, specific reactions did not occur significantly at relevant questions. It should be noted that this subject's polygram are not to be considered ideal, however, it is the opinion of this examiner that they are stable enough to draw a reasonable conclusion." Jenkins concluded, "After careful analysis of this subjects polygrams, it is the opinion of this examiner that the subject told the truth during his examination and interrogation." (Peoria_Savory 133)

25. January 20, 1977, Officer Wollan stated in a supplemental police report that he received a phone call from a B/F identified as Johnnie Toombs. Toombs told the officer William Douglas was having an affair with Connie Cooper and believed that Douglas was the father of Cooper's two-year-old son. According to the report, Toombs told the officer that Douglas was a "heavy drinker and a very violent person" and that his military discharge records would reflect that he was discharged from the military as "a result of his violent temper and sexual hangups." Wollan also documented a phone conversation with "Donna" who reported that she had observed William Douglas and Connie Cooper "engaging in romantic activity in the back yard while Connie's mother was not home." Peoria_Savory 393)

26. January 20, 1977, Officer R. Sarnes documented an interview with Edward Shay. Shay admitted to dating Connie and provided an alibi for his whereabout during the time of the

13

murders.  (Peoria_Savory 418)

27. January 21. 1977, Officer W. Koenie documented an interview of Kenneth Parker.  Parker told the officer of a phone call that he had with Connie on 1-17-77, the night before her murder. Connie asked Parker what he would do if he found out that Connie had been raped. Parker told the officer the conversation "did not make any sense to him."  (Peoria_Savory 431)

28. January 21, 1977, Detective Hoffman documented a call that he received from an informant who told Hoffman that Charles Watts was the original owner of the dog that was found at the residence at 3033 W. Garden St. and that Watts had helped train the dog. (Peoria_Savory 473)

29. January 22, 1977, Detective Cannon documented an interview with Al Martin. Martin told the officer that he was certain that William Douglas committed the murders. Martin claimed that Douglas told him that "he loved to cut up bodies" and that he was aware that Douglas was having sex with Cooper. Martin described a time at a lounge when Douglas was there with Connie. According to Martin, Douglas told him "she (Connie) thinks she's smart, she is my bitch and I'm going to have her one way or the other."

Cannon also documented a phone call that Martin made to Douglas accusing Douglas of committing the murders. Douglas reportedly arranged to meet Martin later that night at the Eldorado Club. Douglas called Martin and canceled the meeting, telling Martin to meet him the following day at the funeral home where Douglas worked. (Peoria_Savory 483)

30. January 24, 1977, Officer Nelson reported that he interviewed Michael Vann, Vann claimed to be a friend or acquaintance of William Douglas and believed that Douglas was responsible for the murders. (Peoria_Savory 540)

31. January 24, 1977, Officer R. Howotte reported that he spoke with "an unidentified citizen" that heard Connie Cooper was concerned about her stepfather because he had been making sexual advances towards her. (Peoria_Savory 546)

32. January 24, 1977, Kenneth Parker was once again interviewed and provided both written and oral statements to Officer William Koenig.  (Peoria_Savory 651)

33. January 25, 1977, 1300 hrs. – Detectives Pickney and Haynes went to Central High School to follow-up on information relating to a subject identified only as "Johnny." The detectives were attempting to verify the identity of "Johnny" and wanted to determine if "Johnny" had been with victim Robinson the night before he was murdered.  Mr. Richardson, the principal

of the high school, identified "Johnny" as Johnny Savory. At 1530 hrs. Mr. Richardson brought Johnny Savory to the teacher break room where he met with the Detectives. Savory reportedly told the Detectives "I don't want to talk about it. I won't make any statements." Despite this, Haynes and Pickney pressured Johnnie to talk to them. Johnnie then began to answer their questions. A short time later Savory was taken to the police station where he was questioned for hours by the following officers:  Fiers, Cannon, Haynes, and Pinkney. (Peoria_Savory 753)

34. During this interrogation, Officer Haynes showed Savory a number of photos of the crime scene, including photos of the condition of the living room and bedroom following the murders, information that had not been shared to the public. (Peoria_Savory 1502-1503)

35. January 25, 1977 @ 1645 hrs. – Detective Cannon reported that Johnnie Savory was brought to the Detective Division by Juvenile Officers Pickney and Haynes. According to Cannon, Johnnie told investigators that he was friends with both Connie and James and described James (Scopey) as being his best friend. According to Cannon's report Johnnie described being with Scopey on Monday the night before the murders and described in detail what he and Scopey did while together.  Detective Cannon also wrote in his report that Johnnie told them that, on the day of the murder, Johnnie visited his grandmother at Methodist Hospital and had a meeting with Percy Baker (Probation Officer) at the Peoria County Court House, among other things. At some point, Percy Baker arrived at the police station while Johnnie was being interrogated. Baker reportedly was informed by Cannon that Johnnie agreed to a polygraph examination. Baker told the officers, according to the police report, that if "Johnnie agreed to take the polygraph examination that it was okay with him". (Peoria_Savory 713)

Around 10pm, Officers Cannon and Haynes transported Johnnie along with his probation officer Percy Baker to the polygraph operator's office located in the Lehman Building, where Johnnie was introduced to the polygraph examiner Dennis Jenkins. At some point during the examination Jenkins told Cannon that "he was getting positive reactions in regards to pertinent questions pertaining to this case. Mr. Jenkins then informed me (Cannon) that he wanted to test Johnnie further at which time they went back into the polygraph room." (Peoria_Savory 713) (Savory-LL153)

Cannon telephoned the Peoria Detective Division and informed Officer Fiers and Sgt. Tiarks of Mr. Jenkins' findings. Cannon documented in his report that at "2300 hrs., this officer received a telephone call from Sgt. Tiarks informing this officer to cease any further testing beyond 11:30pm." Cannon reported that he "talked with Assistant State Attorney Robert Gaubas who informed me that at this point, Johnnie Savory should be given his rights per the Miranda Decision. At 2325 this officer advised Johnnie of his rights per the Miranda

Decision.  At this time this officer read Johnnie his rights, Officer Haynes and Mr. Percy Baker were present.  Johnnie stated that he understood his rights.  This officer then asked Johnnie if he wished to talk to me in regard to this case and he replied, 'I don't know nothing to tell you.   I don't want to talk.'  At this time, no further questioning or polygraph examinations were given to Johnnie Savory."  At 2358 hrs. Johnnie was transported back to the Peoria Police Detective Division.  (Peoria_Savory 713) He was transferred to a juvenile detention center, where he arrived around 1am and was able to finally go to bed around 1:30am (Johnnie Lee Savory Deposition p.381)

36. January 25, 1977, 1815 hrs. – Kenneth Parker was once again at the Peoria Police Department.  Detective Koenig was asking Parker to clarify the phone calls that he made to Connie Cooper on 1-18-1977.  Koenig asked Parker if he would be willing to take a polygraph examination. Parker told Koenig that he would not submit to a polygraph examination, explaining that he had "bad nerves and also does not trust polygram exams because of a bad incident his brother had in taking one". (Peoria_Savory 702)

37. January 25, 1977 – Officer Cannon documented that he learned from Percy Baker that Johnny had spent the night (1-17-77) at the home of Ray Mason. Cannon along with another officer went to Mason's home and spoke with Ray in the presence of Ray's mother.  After initial questioning, and due to "repeated interruptions by Mason's Mother," the officers took Mason to the police station for further questioning.  Cannon claims that he read Mason the "Miranda warning from a department issued card carried by this officer at 0210hrs." (Peoria_Savory 809) Mason allegedly told investigators that on the morning of the murder Johnny had called and told him "some of my friends got killed."   Mason told investigators that his mother Jessie Mason picked up the extension phone during this call and asked Johnny what had happened.  (Peoria_Savory 770) Ray Mason later told Officers Fondriest and Black that he did not talk by telephone with Savory on January 18, and that he had told Cannon this only because he was confused by "Officer Cannon's accusations and the tone of his voice." (Peoria_Savory 1488-1490)

38. Later that day Officer Hammer interviewed Jessie Mae Mason and when asked about the phone conversation with Johnnie on the morning of the murders, Mason told the officers "she did not have any conversation on the phone with Johnny Savory."  (Peoria_Savory 763)

   A polygraph examination was conducted of Mason and the results were considered to be inconclusive.  (Peoria_Savory 781)

39. January 26, 1977, 0007 hrs. – At 12:07am, Officer Fiers reported that he along with Officers Pinkney and Jatkowski went to 1011 W. Hurlburt and talked with Johnnie Savory's father Y. T. Savory. Mr. Savory was told for the first time that his son was in police custody and had

been interrogated, and that Johnny was being detained in regard to inconsistent statements relating to his interactions with James Robinson. The officers requested a consent search of his apartment, informing Mr. Savory they "would be looking for any articles of clothing belonging to Johnnie that might have blood on them."  The officers also told Mr. Savory that they would be looking for a knife that may have been used in the murders. Mr. Savory signed a consent to search form. The officers reported that they found several articles of clothing which appeared to have blood on them. One of the items was a torn dress which Mr. Savory claimed belonged to his daughter. Officers also located a pair of pants that allegedly appeared to have blood on them. Fiers reported that Mr. Savory told the officers that the pants belonged to him and "showed the officers a sutured laceration on the inner portion of his left thigh. Mr. Savory stated that approximately two weeks ago he cut his leg this being the reason for the blood on his pants and the blood on the torn dress which he used as a wrap for support under his leg." The officers reported and concluded that it would not be probable that Johnnie would be wearing his father's pants due to the considerable size difference.  The search of the home "proved negative in regards to Johnnie's clothing and possible knives." (Peoria_Savory 714-715)

40. January 26, 1977 – At 1:45am, Investigators went to the home of, Johnny Savory's friend Marva Jones to question her. Marva told investigators that she recalled talking to Johnnie at some point after the homicides and Johnny told her the perpetrator "slit her stomach wide open Marva, you should have seen it. You just don't know, you just don't know."  Marva could not recall exactly when this conversation occurred. The officers knew and documented in their report that Marva was not able to think clearly because they were interviewing her in the middle of the night. (Peoria_Savory 715)

41. On January 26, 1977 –Fiers and Brown Teplitz each completed a supplemental report regarding the continued interrogation of Johnnie Lee Savory. Savory was picked up at the juvenile detention center in the morning and brought back to the police station. Officers Fiers, Haynes and Brown Teplitz again questioned him for hours about the murders and his interactions with James Robinson and his family. The officers repeatedly told Savory that he was lying to them. The only food Savory was given that day was a hamburger. (Peoria_Savory 785-791, 1426-1427).

At 5pm, three officers took Savory to the bathroom of the police station, where they told him to remove his clothes and hairs were plucked from all over his body, including his pubic region. The officers asked him questions about the murders while this was happening. (Peoria_Savory 793-794) (Johnnie Lee Savory dep 1 p. 29)

42. January 26, 1977 – Officer Brown Teplitz completed a supplemental report regarding statements allegedly made to her by Johnnie Savory. According to Brown Teplitz's

supplemental report, Johnnie detailed his interactions with the victims and provided a detailed accounting of his actions. (Peoria_Savory 787)

1800 hrs. - Following the interview Johnnie was transported to Dennis Jenkins's Polygraph Office and an examination was administered by Eddie Bowers.  According to Brown Teplitz's supplemental report, Johnnie confessed to killing the victims. According to Mr. Savory, Bowers screamed at Johnnie, called him a liar, and ignored Johnnie's statements that he did not want to speak with Bowers. Brown Teplitz took over the interrogation from Bowers. According to Johnnie, his will had finally been overborn, and he just repeated back to Brown Teplitz as his confession the fact she was suggesting or providing to him. When Savory answered a question in a way that was inconsistent to the facts of the crime known to Brown Teplitz at the time, she suggested different facts to him.  (Peoria_Savory 715)

Johnnie was transported by police to the Juvenile Bureau where questioning resumed by Officer Brown Teplitz and Probation Officer Percy Baker.  (Peoria_Savory 785-790) Johnnie immediately recanted his statements that he had been involved in the murders and professed his innocence. Brown Teplitz's report does not contain statements by Johnnie that he had not committed the crime. (Peoria_Savory 785-791) (Teplitz dep 2 10/6/22 p.386--407)

43. January 26, 1977 at 2300hrs. was transported to the juvenile detention center where a temporary detention order was signed by Judge Whitney.

44. February 4 or 7, 1977, Officers Brown Teplitz and Haynes created a supplementary report documenting their interactions with the Ivy family (Willie, Tina, Frank, James, and Ruby Ivy). That police report contains information about the Ivys interactions with Savory on the day of the murder and the following day, including:

- Tina Ivy told Brown Teplitz and Haynes that Savory came to the Ivy household at 1:00 p.m. on the date of the murders to take her to school.
- All of the Ivy family members said that Savory had not been there before 1 p.m.
- Tina Ivy said that she and Savory left the Ivy household for the bus stop at 2:25 p.m. and boarded the bus at approximately 3 p.m.
- Savory told Ivy family members that he had left school at approximately 4 p.m.
- Tina Ivy and other family members said that Savory arrived back at the house at 5:15 or 5:20 p.m.
- Savory watched the 5:30 p.m. news with the Ivys, and during the program the Cooper and Robinson murders were discussed.

The police report also contains the following statements allegedly provided by the Ivys:

- The Ivy family said that Savory had said he was at the house where the crimes occurred when the police arrived on the scene.

- Frank and James Ivy reported that Savory said that he had been in the victims' house after the murder, that James Robinson was lying near a big knife, and that the baby at the crime scene was in the oven.
- Ella Ivy said that Savory told her that "the two victims were cut up real bad and that whoever did it must have known the victims to be able to get into the house past the dog."
- Ella Ivy also said that Savory "pulled his wallet out of his pants pocket and a black handled knife came out of it."
- Savory and Tina Ivy went to a laundromat the day after the murder, where Savory told Tina "that the girl was cut and her stomach was split open" and "that the girl had struggled and whoever killed her had a terrible time doing it."

(PEORIA_SAVORY 1511-1513).

45. I have not seen other reports documenting investigator's interactions with the Ivy family members in the investigation before Savory's first criminal trial.

46. February 8, 1977, Officer Brown Teplitz created a supplementary report regarding her interview with Winnell "Wendy" Sankey at her home, alongside her family members. Sankey described attending the victims' funeral with Johnnie. Brown Teplitz wrote that Johnnie told Sankey he had been at the scene of the murders at 11 a.m. and that he had called her the evening of the murders while drunk and did not know what to do.

**JOHNNIE LEE SAVORY'S FIRST CRIMINAL TRIAL, CONVICTION, AND APPEAL**

47. Savory was prosecuted as an adult for capital murder first in June of 1977. His confession was introduced as evidence through the testimony of Brown Teplitz (Savory-LL 855-859), as well as evidence of the knife allegedly used in the murder, additional forensic findings, and the testimony of witnesses, including investigating personnel and Douglas. Savory was convicted. A jury spared Savory from the death penalty. His conviction was reversed on appeal because the appeals court concluded that his confession should have been suppressed as involuntary. (People v. Savory, Appellate Court of Illinois, Third District (April 4, 1980))

48. None of the members of the Ivy family testified at Johnnie's first criminal trial. Savory's first criminal trial was conducted by Robert Gaubas, assisted by Joseph Gibson, with Brown Teplitz acting as the liaison to the Peoria Police Department. (Savory-LL 2045-2046) The Ivy family members were not called during the first criminal trial. (Savory-LL 2049) Gibson later testified that the Ivy family members were not called because "The opinion at the time was that they could not recall sufficiently when certain statements were made by Mr. Savory as to the condition of the bodies. Whether it was before the media described the condition of the bodies, or after the media described the condition of the bodies. We conferred on that, and my recollection is that our opinion was that the testimony was too shaky with regard to

when that happened. My recollection is that our joint opinion was that if we were to call those individuals they could not recall specifically enough when the statements were made, and we feared that they would take away from the quality of the rest of the testimony in the case." (Savory-LL 2049-2050) Gibson testified that this information was not included in Brown Teplitz's February 1977 report of her interview with the Ivys. (Savory-LL 2060-2061)

49. After the reversal of Savory's first conviction and suppression of his confession the elected state's attorney Mihm said publicly "We can't retry him without his statements…. So that's it; he won't be retried again." (Peoria_Savory 26900) The statement implies that the Ivy family statements were not considered sufficient to sustain a prosecution.

## SUMMARY OF FOLLOW-UP INVESTIGATION AND SECOND CRIMINAL TRIAL AND CONVICTION

50. Prior to Johnnie's second trial, the defendants conducted additional investigation focused on obtaining statements from third-party witnesses. There are no documents I have seen memorializing interactions between the Ivy family and investigators between February 1977 and January 1981. Investigators reinitiated contact with the Ivy family members in 1981, four years after the crime occurred. Brown Teplitz, Buck, and Cannon, reported that in 1981 the Ivy family members gave them information incriminating Savory that the Ivy family members had not provided previously. Ella Ivy, Frank Ivy, and Tina Ivy then testified at Savory's second criminal trial in 1981. Since then, the Ivy family members have provided statements and testified that their testimony and statements implicating Savory were false and that they did not provide investigators with statements that were attributed to them.

51. **Tina Ivy**: In a report dated January 21, 1981, Brown Teplitz and Buck report that they spoke with Tina Ivy, who said "she did not have anything she could tell us in regards to [Savory] or anything else" and nothing more. (Peoria_Savory 1111). Nothing else of substance is reported. None of Tina Ivy's alleged statements documented in Brown Teplitz and Haynes's February 1977 report are repeated.

52. A few weeks later and three weeks before the second criminal trial, in a report dated April 7, 1981, Cannon and Buck interviewed Tina Ivy again. The report states that Tina Ivy provided statements not included in prior police reports, including that Savory heard about the murders on the 6 p.m. news (changed from 5:30 p.m. in the February 1977 report), that Savory said he and James Robinson ("Scopey") had been practicing karate (absent from February 1977 report), and that Savory said that he had cut Scopey accidentally (absent from February 1977 report). There is no indication in the report explaining why there are changes in Tina Ivy's statements, changes to the timeline of events on the day of the murder, or the additions of new incriminating information attributed to Savory that was not previously reported. (Savory-LL 6021-6022)

53. Tina Ivy testified consistent with the February 1977 and April 1981 report during Savory's second criminal trial. (Peoria_Savory 11964-11986).

54. In an October 1981 affidavit, Tiny Ivy wrote a statement that said that her testimony about what Savory had said to her "Were really words of rumor, about Johnny, that I had heard from other people in my community after Johnny had been arrested for the murders." (Savory-LL 6045). In a May 2003 affidavit, Tiny Ivy said, "In April of 1981, prior to [] Johnnie Savory's trial, I was interviewed by Detective Charles Cannon of the Peoria Police Department. I felt pressured and told Mr. Cannon what he wanted to hear based on rumors that I had heard about the murders." (Savory-LL 3467).

55. In 1983, Tina Ivy testified that she was on probation for forgery when she testified against Savory. (Savory-LL 7054). She also testified that she was addicted to heroin and cocaine through the end of 1979 and was in a drug program at the time that she testified against Savory. (Savory-LL 7054-7055, 7059). Tina Ivy testified that the testimony she had given at the second trial that Savory told her he had been doing karate with James Robinson and had accidentally cut him was not true. (Savory-LL 7056-7059). Tina Ivy testified that she discussed the homicides with Cannon in 1997 and in 1981. (Savory-LL 7070-7071).

56. **Ella Ivy**: On April 8, 1981, the day after Tina Ivy was interviewed by investigators, Cannon reported interviewing Ella Ivy. The report states that Ella Ivy provided statements not included in prior police reports, including that Savory arrived at the Ivy family home before 12 p.m. on the day of the murder (changed from 1 p.m. or later in the February 1977 report), that Savory had returned to the Ivy family home before 3 p.m. that day (changed from 5:15 p.m. or later in the February 1977 report), that Savory said he and Scopey had been practicing karate (absent from February 1977 report, same as Tiny Ivy April 1981 report), that Savory said that Robinson was using sticks and Savory had a knife (absent from February 1977 report), that Savory said "that he accidentally stabbed SCOPEY but told her that SCOPEY was alright when he left" (absent from February 1977 report), that Savory told her that his friend and his friend's sister were dead, and that she looked and could not find any information about the murders on the television news or in the newspaper at the time. The report states that these things happened between approximately 3 p.m. and 4:15 p.m. on the day of the murders, significantly before the 5:15 p.m. time that Ivy family members said that Savory had arrived at their house reported in the February 1977 report, and during the period of time that Tiny Ivy said that she and Savory had been riding the bus to school reported in the February 1977 report. The effect of the shift in time was that the time window for Savory's alibi was eliminated and explanations that Savory could have learned about the murders from news media were eliminated. There is no indication in the report explaining why there are changes in Ella Ivy's statements, changes to the timeline of events on the day of the murder, or the additions of new incriminating information attributed to Savory that was not previously reported. (Savory-LL 6023-6026)

57. Ella Ivy testified consistent with the February 1977 and April 1981 report during Savory's second criminal trial. (Peoria_Savory 11194-11956).

58. In a September/October 2012 affidavit and statement, Ella Ivy stated:

- She was interviewed "a couple of days after the Cooper murder" by investigators who picked her up and took her to the police station, where they interviewed her "for approximately one to two hours." (Savory-LL 3519);
- She did not recall being interviewed with other Ivy family members, as described in the 1977 police report (Savory-LL 3519);
- That she was "interviewed multiple times and felt pressure." (Savory-LL 3520);
- "I never saw Johnny Savory with a knife" and "At no time did I ever see Johnny Savory with a knife or did one drop out of his wallet. I never seen anything drop out of his wallet" (Savory-LL 3520);
- "I know if I would have seen a knife I would have remembered a knife" (Savory-LL 3520);
- "I never heard Johnny Savory state how the Coopers were killed," "I never heard Johnny Savory make any comments about Connie Cooper or how she died," and "I never heard Johnny Savory make any comments about the Coopers being cut up real bad," (Savory-LL 3520);
- "I never heard Johnny Savory state anything about the baby being found in the oven," (Savory-LL 3520);

59. Ella Ivy was asked about her 2012 affidavit and statements during her testimony in Savory's postconviction proceedings and during deposition in this case and reaffirmed a number of the statements again. (Savory-LL 2856-2870, Ella Ivy Dep p.160-196)

60. She also testified that she did not tell investigators that Savory had pulled a wallet from his pants and that a black handled knife fell out (Savory-LL 2869, Ella Ivy Dep p.185-186); or that Savory had told her that the Coopers were cut up really badly, (Ella Ivy Dep p. 190-193); or that Savory had told her that he had been present at the crime scene when police arrived (Savory-LL 2870); or that Savory had talked about the location of the baby at the crime scene (Savory-LL 2870, Ella Ivy Dep p.195-196). Ella Ivy also testified that her interview with police occurred at the police station, that the police took her there, that she had no choice about whether to speak with investigators, and that she felt afraid. (Ella Ivy Dep p. 198-212).

61. **Frank Ivy**: On April 8, 1981, the same day that Ella Ivy was interviewed by investigators, Cannon reported interviewing Frank Ivy. Savory-LL 6027-6028. The report states that Frank Ivy provided statements not included in prior police reports, including "that Johnny told him that he and Scopey had been practicing karate and that he had accidentally stabbed Scopey with a knife but told him that Scopey was alright when he left the house" (absent from February 1977 report, same as Tiny Ivy and Ella Ivy April 1981 reports), and that Savory told Frank Ivy that Connie Cooper had entered the room when Savory stabbed James Robinson (absent from February 1977 report). There is no indication in the report explaining why there are changes in Frank Ivy's statements, or the additions of new incriminating information attributed to Savory that was not previously reported.

62. In a recorded statement given to Savory's defense attorney on April 21, 1981, Frank Ivy said that on the day of the murders Savory had not made any statements about the two kids who

had been killed, Savory did not say he had been at the victims' house, that he did not remember whether Savory or someone else had said that they had been playing around with a knife with James Robinson. SDT-J&B 6331-6336

63. Eight days later, on April 29, 1981, Frank Ivy testified consistent with the February 1977 and April 1981 police reports and contrary to the recorded statement during Savory's second criminal trial. PEORIA_SAVORY 11956-11963.

64. In a November 1983 statement, Frank Ivy stated that he felt like he was being pushed by Cannon and that he felt like Cannon wanted him (Frank Ivy) to tell Savory's attorneys what he had told Cannon. Savory-LL 6056-6057.

65. On December 1, 1983, after the second criminal trial, Cannon reported interviewing Frank Ivy a second time, and reported that Frank Ivy had reviewed his criminal trial testimony and "after reading his testimony, Frank Ivy stated that his memory was refreshed and that the testimony was true and accurate, and we would testify to this in court." Savory-LL 6058-6059. Frank Ivy did not testify at the 1983 Post-Conviction Hearing.

66. In a May 2003 affidavit, Frank Ivy stated that Savory never told him that he was practicing karate with James Robinson and accidentally stabbed him, and that Savory never told him that he stabbed Connie Cooper. Savory-LL 3473-3474. Frank Ivy also said, "In April of 1981, prior to the Johnnie Savory's trial, I was interviewed by Detective Charles Cannon of the Peoria Police Department. I felt pressured and told Mr. Cannon what he wanted to hear." Savory-LL 3474.

67. Frank Ivy testified that he did not have a conversation with Savory on the day of the murder (Frank Ivy deposition, pages 77-78); that he felt pressure from Cannon in 1981 and told him what he wanted to hear (Frank Ivy deposition, pages 78-79); that none of the information that he provided to Cannon came from Savory (Frank Ivy deposition, pages 81-82); that Savory never told Frank Ivy that he cut or killed James Robinson or Connie Cooper (Frank Ivy deposition, page 245); that Frank Ivy never told Cannon that Savory those things and that he told Cannon it was not true that Savory had said those things (Frank Ivy deposition, pages 245-246); that Cannon wanted Frank Ivy to testify falsely (Frank Ivy deposition, pages 245-246); and that he was afraid that if he did not testify the way that Cannon wanted then Cannon would charge him with a crime (Frank Ivy deposition, pages 248-249).

68. **James Ivy**: On February 19, 1981, Brown Teplitz spoke with James Ivy at the Peoria police department. According to the report James Ivy "stated that he recalled that Savory spent the night of the murder at his home. He stated that Savory told him he had been to the victims home the date of the murders. Interview was terminated." (Savory-LL 6014). There is no indication in the report of why Brown Teplitz terminated the interview and no indication why follow-up questions were not asked.

69. A letter written to Savory's criminal defense attorney and signed by James Ivy in April 1981 states "I am in jail for burglary and at the time of my arrest I was offered a deal by certain

police officials trying to get me to testify for the state against Johnny and I will be willing to talk to you at your convenience at the Peoria County Jail." (SDT-J&B 6291)

70. James Ivy did not testify at Savory's second criminal trial.

71. On February 10, 1981, Defendant Brown Teplitz completed a report stating that she and Detective Buck brought Tom Thompson to the police station after Detective Buck learned he "might have some valuable information." Brown Teplitz reported that Thompson said when he was detained at Gift Avenue Home with Savory in 1977, Savory told a group of people that he did the stabbings but it was an accident. Arrangements were made for Thompson to return for a polygraph on February 12, 1981. (Peoria_Savory 1098) Thompson returned for a polygraph on March 6, 1981. The polygraph examiner wrote that Thompson told him that Thompson was not sure of the truthfulness of his prior statement. He could not remember if Savory had made the statements about the stabbings and remembered that it was a third party who had made those statements. He said William Poole was also part of the group at Gift Avenue Home. (Peoria_Savory 5503-5504) I have not seen any Peoria Police Department reports noting Thompson's doubts in his previous statements or otherwise documenting the serious concerns about the reliability of those statements that the polygraph report raised.

72. On April 8, 1981, Detective Cannon drafted a report stating that on April 7 he interviewed William Poole in the prosecutor's office. Cannon noted that Thompson was supposed to join the interview, but failed to show up. This creates additional significant doubts about the reliability of Thompson's previous statements. Detective Cannon told Poole about Thompson's prior statements and had Poole read the February 10, 1981 report about Thompson's statements. Cannon reported that Poole stated that Savory "said that he and his friends were just 'goofing' around and he stabbed them by accident. He stated that [Savory] also mentioned that he and his friend was practicing karate at the time of the accident." In the same report, Cannon wrote that Ella Ivy said that Savory told her that that he and James were practicing karate and that "he accidentally stabbed" Robinson. (Peoria_Savory 1648-1651)

73. On April 9, 1981, Detective Cannon interviewed Winnell Sankey at the police station. He reported that Sankey said that the Monday before the murders, she saw Savory and James Robinson at the corner of Charlton and Second Streets and they were "playing around like they were doing karate." She said that she overheard Scopey give Savory his address and tell him to come over the next day. Sankey said that Savory called her the night of the murders while drunk and that he had been at their house at 11 on the day of the murders and his friends were alive when he left. Sankey stated that Savory had written her a letter from prison stating that he had been at the victims' house the day of the murders and "had accidentally cut his friend but stated that he had not killed them." (Peoria_Savory 1106-1107)

74. In her deposition, Sankey denied making many of the statements reflected in Cannon's report. For example, she denied telling anyone that she ever saw James Robinson before she accompanied Savory to his funeral. Sankey stated that she never saw Savory and James playing karate and that she never told Cannon or anyone else that she had. She also stated that she never told anyone that Savory called her the night of the crime while he was drunk and said he did not know what to do. She also stated that Savory had not told her that he was at the Robinsons' home on the day of the murders and she had not said that to Cannon or Brown. She also stated that Savory never wrote her a letter stating that he accidentally cut James Robinson. She did not remember ever telling any police officer anything about seeing Savory and James playing karate, Savory calling her the night of the murders, Savory saying he was at the house at 11, or Savory writing to her about accidental stabbings. (Sankey Dep p. 21, 26-27)

75. After the additional investigation in 1981, described above, Savory was prosecuted again in April of 1981. At his second criminal trial, statements that Savory allegedly made to investigators on January 25, 1977 were admitted as evidence through the testimony of Charles Cannon and George Pinkney (Savory-LL 1565-1599). In addition, three Ivy family members testified: Ella Ivy, Frank Ivy, and Tina Ivy (Savory-LL 1524-1528, 1536-1538, and 1555-1557). Savory was convicted for a second time. The appeals court concluded that Savory's statements from January 25 should have been suppressed, but it upheld the conviction based on its evaluation that the admission of Savory's statements was "harmless error beyond a reasonable doubt" given "the testimony of the three [Ivy] witnesses who related defendant's admissions them...." (People v. Savory, Appellate Court of Illinois, Second District (May 5, 1982))

## POST-CONVICTION PROCEEDINGS SEEKING FORENSIC TESTING

During post-conviction proceedings and following significant scientific developments in forensic testing, Mr. Savory sought DNA and other forensic testing of numerous items of evidence from the Cooper/Robinson homicide investigation. Among other things, Mr. Savory sought testing of hairs that had been found in the hands of the victims. He also sought testing of the blue pants that, pursuant to the prosecution's theory at trial, he had been wearing at the time of the murders and into a pocket of which he had placed a bloody knife without cleaning it (and which had allegedly tested positive for blood). The hairs from the hands and the cutting from near the right belt loop of the pants – the cutting that had supposedly tested positive for blood - were supposed to be in the possession of the Peoria Police Department and preserved until ordered otherwise by the State's Attorney's Office. But when the forensic lab requested and tried to test the items, it was discovered that these critical pieces of evidence had disappeared and could not be located. (Savory-LL-2538-2539, 2550-2551) (Hammer Deposition p.219-222)

The evidence that was able to be tested during postconviction proceedings and that yielded comparable DNA profiles uniformly excluded Johnnie Lee Savory. These items include:

- Male DNA on vaginal swabs collected from Connie Cooper after her death;
- A minor profile, alongside James Robinson's profile, on blood-like stains on the bathroom light switch cover, and from which the other residents of the home were excluded;
- Blood-like stains on the robe Connie Cooper was wearing at the time of her murder;
- Blood-like stains on the nightgown Connie Cooper was wearing at the time of her murder;
- A second and third DNA profile, alongside James Robinson's DNA profile, on blood-like stains on underwear worn by James Robinson at the time of the murders, and from which the other household residents were excluded; and
- Blood-like stains on the pillowcase and bedding from the bedroom where the murders occurred.

(Peoria_Savory 12380-12388) (Peoria_Savory 1910-1912).

In addition, post-conviction testing detected no blood on the blue pants and also detected no biological material on the blade of the knife that was the supposed murder weapon. (Peoria_Savory 1910-1912).

Additionally, semen and sperm were identified on the underwear that Connie Cooper was wearing at the time of her death (Savory-LL-9887) (SDT-ISP 560).


## OPINIONS AND ANALYSIS

Homicide cases and investigations in police agencies across the United States are given priority and resources not normally provided to other types of investigations. More experienced, trained and knowledgeable detectives are assigned. Their investigations result in detailed documentation, commonly referred to as "murder books" in some jurisdictions. These investigative records provide a step-by-step record of all evidence gathered, all witnesses interviewed, statements taken, leads followed (whether productive or not), medical records, autopsy photographs and reports, photographs of the crime scene, wound descriptions, weapon (gun, bullet, shell, knife, vehicle, objects, etc.) analysis, chain of custody and evidence logs, vehicle impounds, search warrant applications and returns. It is not uncommon for a typical murder investigation to contain hundreds (and often times thousands) of pages – even if there is thought to be a "known" suspect. There are well-established criteria and a broad range of literature for these practices.

Based on my review of the record in this case, including many thousands of pages of reports and transcripts of testimony and other materials, it is my opinion that the investigation into the murder of Connie Cooper and James Robinson by the Peoria Police Department violated many commonly accepted police practices, and had many flaws and irregularities.

Some specific and important examples of the failure to conduct a thorough and professional investigation to either bolster or eliminate suspects include, but are not limited to:

**Opinion 1 - Investigative "Tunnel Vision" by the Defendants.**

Police Detectives investigating crimes have an obligation under accepted practices to follow all leads to bring the true perpetrator(s) to justice, rather than just close a case.  Under generally accepted police practices going back decades to well before 1977, that requires following all leads wherever they take you, rather than where you want them to take you. Reasonably trained police officers know and understand that they must have more than a subjective hunch to make an arrest or get an arrest warrant. They need to have objective evidence that indicates the suspect's responsibility for the crime. "Probable Cause exists when articulable facts and circumstances within an officer's knowledge are sufficient to warrant a prudent person or one of reasonable caution to believe that the suspect has committed, is committing, or is about to commit an offense".[3] It is not an acceptable practice—either now or in 1977—to focus on developing evidence that implicates the investigator's chosen suspect and excluding evidence that implicates other suspects ("tunnel vision" or confirmation bias).

Tunnel vision is apparent in the investigative materials relating to this matter. The following are examples of "tunnel vision" in the investigation of the murders of Connie Cooper and James Robinson and the prosecution of Johnnie Lee Savory for that crime:

First and foremost, the defendants failed to go where the evidence took them: which was to William (Peter) Douglas and other suspects.  The defendants ignored remarkably strong evidence that William Douglas or another individual who had a romantic relationship with Connie Cooper had committed the crime.

- William (Peter) Douglas – Douglas was the stepfather of the decedents. Cannon and Fiers noticed that Douglas had a welt under his eye on the date of incident that he couldn't explain (Peoria_Savory 111); He also had keys to funeral home building and access to sharp tools used to prepare bodies for funerals (Peoria_Savory 78-79, 111). Despite this, he initially lied to police and told them that he did not have access to the building at the funeral home and then admitted that he did (Peoria_Savory 111); In addition, there were reports that he liked to cut up bodies (Peoria_Savory 481), yet the  defendants did not ask about his access to tools or allegations that he liked to cut up bodies (Fiers 10-14-21 Dep. 154:10-155:18);  The detectives received statements from multiple known sources and numerous anonymous tips that the kids had a bad relationship with Douglas and that Connie was being sexually abused by him (or having consensual sexual relationship with him) (Peoria_Savory 114, 118-119, 262 395, 453, 481, 511); Connie told her friend Renetta that she would move out if Douglas moved back in to their house (Peoria_Savory 114); Douglas had previously hit Connie, and had fought with and threatened Noyalee Robinson; In fact, Noyalee was afraid of Douglas. (Peoria_Savory 453, 479, 1142, 1696) (Savory-LL 1604-1605)
- Kenny Parker – Parker was Connie's boyfriend at the time of the murder. She had recently dumped Charles Watts to be with Parker, though there was evidence she was still

---

[3] E.g., The IACP Law Enforcement Policy Center -Arrests and Investigatory Stops (September 2019)

romantically engaged with Watts at the time of her death. (Peoria_Savory 41, 60, 1625). The investigators also received information that Connie was having sexual relations with other men in addition to Parker and Watts (Peoria_Savory 648, 650). Parker refused to submit to a polygraph exam (Peoria_Savory 702-703). Parker's nightstick was found at the house after the murders and he did not know how it got there (Peoria_Savory 432). He told police that the night before the attack, Connie asked him what he would do if he knew she was raped (Peoria_Savory 431).

- <u>Charles Watts</u> – Watts was Connie's ex-boyfriend (Peoria_Savory 58). He had previously physically attacked Connie, choking her and giving her a black eye; James was present during this attack and tried to stop Watts from attacking his sister (Peoria_Savory 58-59). Watts was known to be very possessive (Peoria_Savory 113). Watts hung out with Connie the night before the murders (Peoria_Savory 113). Watts had also given James and Connie their dog, and had helped train him (Peoria_Savory 473); Watts had made concerning comments to Erving suggesting he might attack Connie (Peoria_Savory 41).

- <u>Austin Erving</u> – Erving was the ex-boyfriend of Noyalee Robinson (the decedents' mother) - he made a statement that he would have killed the kids if God told him to, but that God did not. He also told detectives that the killings were punishment for Noyalee dating multiple men (Peoria_Savory 40-43)

- <u>Curtis Spence</u> – Spence was supposedly the father of Connie's child, although there were rumors that Connie's stepfather was the father of her son (Peoria_Savory 395) (Peoria_Savory 131, 267-268)

- <u>Ken Snodie</u> - had appointments to take photos of Connie on the day of murder, and Connie's baby reacted to his photo when it was shown to him by officers following the murders. (Peoria_Savory 61, 137)

- <u>"Greg"</u> – Witnesses told police that Connie was having a sexual relationship with Greg at the time of her death. (Peoria_Savory 131, 276)

- <u>Edward Shay</u> - Witnesses also told police that Connie was romantically involved and seeing Shay. (Peoria_Savory 418, 648)

- A cab driver told police that he repeatedly took a Black male to the Cooper/Robinson home who told him that the woman who lives there was "fucking over him". (Peoria_Savory 282)

- At least one man threatened Connie and told her to break off her relationship with Watts.

- Neighbors reported seeing a Black adult man leaving the house the morning of the murders. One neighbor stated that she believed the person she saw leaving the house was someone she had seen there before. Other neighbors said the man was about 5' 10" and wearing a brown coat. Douglas was also wearing a brown coat on the day of the murders. (PEORIA_SAVORY 100, 453, 500)

Investigators had every reason to conduct a thorough and comprehensive investigation into all of the known suspects, including those discussed above with clear motivations and opportunity to commit the crime. Yet inexplicably, once they turned their focus on to Johnnie Lee Savory, they

stopped or discontinued investigating the other known suspects. This is a deviation of acceptable police standards. This is especially true given that there has never been any physical evidence connecting Johnnie to the crime.

Nothing in the investigative file suggested that Johnnie Lee Savory had any involvement in the murders, yet the defendants focused their investigative efforts almost exclusively on Savory. Several days after the murders, defendants learned that Johnnie Savory and James were friends and that Johnnie had been at the victims' house the night before the murders. (Peoria_Savory 401, 442).

Based solely on this information the defendants held Savory for over 30 hours and subjected him to more than 20 hours of interrogation using techniques and circumstances designed to get inculpatory statements, rather than the truth:

**Time Line of Events that Occurred on January 25th & 26th, 1977:**

| January 25, 1977 | |
|---|---|
| 3:30pm | Officers Pinkney and Haynes went to Johnnie's school (PEORIA_SAVORY 745-755) and began their interrogation of him at approximately 3:30pm. (PEORIA_SAVORY 748).<br><br>They asked Johnnie if he would be willing to talk about the murder of his friend Scopey (James's nickname).  Johnny told officers that he didn't want to talk to them and would not make any statements. (PEORIA_SAVORY 748)   Pinkney/Haynes ignored Johnny's invocation of his rights and pressured him to talk.  The interrogation at the school lasted for approximately one hour. (PEORIA_SAVORY 748) |
| 4:30pm | Pinkney/Haynes took Johnnie from the school to the police station, where Defendants Cannon and Fiers continued to interrogate him for several more hours. (PEORIA_SAVORY 753) (PEORIA_SAVORY 710-713) |
| 5:30pm | Haynes shows Johnnie photographs of the crime scene, thereby supplying Johnnie with details about the crime that were not known to the general public (PEORIA_SAVORY 1502-1503) |
| 10:00pm | Cannon and Haynes transported Johnnie to Dennis Jenkins's Office to be polygraphed.  (PEORIA_SAVORY 713) (Savory-LL-153-154) |
| 11:00pm | Sergeant Tiarks calls and tells Cannon to cease any further testing beyond 11:30pm. (PEORIA_SAVORY 713) |
| 11:25pm | Cannon advised Johnnie of his Miranda Rights and Johnnie replied "I don't know nothing to tell you. I don't want to talk."    (PEORIA_SAVORY 713) |

| 11:58pm | Officers and Percy Baker transported Johnnie Savory back to the police station.  (PEORIA_SAVORY 713) |
|---|---|
| **January 26, 1977** | |
| 1:00am | Savory was transported to juvenile detention center by police unit #A-29. (PEORIA_SAVORY 713) |
| 1:30am | He arrived at detention and was processed.  Did not get to sleep until after 1:30am.   (Savory First Deposition p.381) |
| 8:00am | Johnnie was taken from the detention center to the police station where officers resumed their interrogations for additional questioning.  (Savory First Deposition p. 381) |
| 10:23am | Officers Fiers and Haynes conducted an interview of Johnnie in the Juvenile LT.'s Officer of the police station.  Haynes read Johnnie his Miranda Rights. (PEORIA_SAVORY 1426) |
| 12:00pm | Johnnie was allowed to have lunch, the only meal he was given over the two-day interrogation.  (PEORIA_SAVORY 1427) |
| 12:30pm | Interview of Johnnie continues. (PEORIA_SAVORY 1427) |
| 12:50pm | Officer Brown Teplitz took over the interrogation, and Johnnie gave a detailed accounting of his whereabouts and denied involvement in the murders. (PEORIA_SAVORY 785) |
| 5:00pm | Officer Fiers took Johnnie to the police station bathroom, where Jatkowski, in the presence of Bennett, instructed Johnnie to remove all of his clothes and plucked hairs from all over his body, including his pubic region. Jatkowski asked Johnnie questions about the murders while this was occurring. (PEORIA_SAVORY 1426) |
| 6:00pm | Officers Cannon, Fiers and Probation Officer Percy Baker transported "the arrested" to Dennis Jenkins office where Eddie Bowers administered a second polygraph examination.  (PEORIA_SAVORY 788) |
| 7:35pm[4] | Bowers exited the polygraph room and told the officers that "the arrested" wanted to talk to Officer Brown Teplitz. Bowers told the officers that "the arrested told him that he had killed the two victims in this case". (PEORIA_SAVORY 788) |

---

[4] The police report states the time was 1975 hrs., which appears to be a typographical mistake.

| 7:35pm | Officer Brown Teplitz entered the polygraph room continued interrogating Johnnie, who allegedly confessed to stabbing the victims. (PEORIA_SAVORY 788) |
| Between 7:35 and 11pm | At some point, Brown Teplitz transported Johnnie to the police station, where she continued interrogating him (PEORIA_SAVORY 789) |
| 11:00pm | Brown Teplitz brought Johnnie back to the detention center |

Following the two-day interrogation, the only evidence defendants had to build their case against Johnnie were his alleged inculpatory statements made to defendants on the evening of January 26. As discussed in greater detail below, officers were instructed and trained to understand that criminal cases based on purported confessions should be corroborated wherever possible, especially if there is any question about the voluntariness of those statements. Reasonable officers would also understand that they should fully consider and conduct follow-up investigation of any evidence suggesting that a suspect did not commit the crime in question.

Here, the record shows that the defendants failed to meaningfully consider evidence that undermined their foregone conclusion that Johnnie killed Connie Cooper and James Robinson and failed to develop any corroborating evidence of the purported confession. For example:

- The purported murder weapon was collected from YT Savory, who stated that the knife was his and did not belong to his son. There is nothing in the record to suggest that the knife was ever shown to Johnnie to determine whether the knife belonged to him or whether it was the knife he allegedly confessed to using to kill Connie Cooper and James Robinson. I also considered the fact that the knife was never tagged or logged into evidence. A failure to properly log and track physical evidence, especially an alleged murder weapon, is highly unusual and violates both Peoria's own policies and accepted practices at the time. (Peoria_Savory 704, 718-719) (Peoria_Savory 23537-25399, 26815-26828) (Hammer dep p.163-170) (Peoria_Savory 1768) I also noted that Jatkowski created evidence testing request referring to the knife as Johnnie's knife, without investigation or evidence to support that the knife was in fact Johnnie's knife, suggesting the defendants decided this knife must be Johnnie's and must be the murder weapon without meaningful investigation or consideration. (Peoria_Savory 1768) (Peoria_Savory 1556)
- The blue pants that were allegedly worn by Johnnie at the time of the murders were much too large for Johnnie and were never alleged to have more than a tiny spot of possible blood on the pocket. Given the incredibly violent and bloody nature of the crime, pants worn by the attacker would have had a great deal of blood on them. Moreover, Johnnie allegedly stated that he put the bloody knife back in his pocket without cleaning it. If this were true, there would likely be significant blood in the pocket. (Savory-LL-1448, 1511, 1582, 1741-42) (Peoria_Savory 790)

- The clothes that Johnnie told Jatkowski and Brown Teplitz that he was wearing on the day of the murder tested negative for blood. (Savory-LL-10565-10585) This contradiction undermines the reliability of Johnnie's confession, and a reasonable officer would have understood that additional investigation was necessary.
- The detectives never located any clothes or other items belonging to Johnnie Lee Savory that had the victims' blood on them.
- There were numerous contradictions between Johnnie's allegedly inculpatory statements and the facts known by the defendants about the crime and crime scene, as discussed below.
- Another fact that investigators appear to have ignored is the presence of the dog in the Robinson's home at the time of the murder. By many accounts the dog was very protective of James and Connie and would not let any stranger in the Robinson home. Statements and testimony from the victims' mother, stepfather, relatives, and family friends, all affirm the fact that the German Shepherd was ferocious, and affirm that the dog had to be locked away from people whom he did not know. William Douglas told the dog was loose in the home when he arrived and found the bodies. When interviewed Douglas told police that the dog would bite a stranger, therefore the murderer would have had to been known by the dog to enter the house. Johnnie's first visit to the Robinson home was the night before the murders took place. At that time, the dog had to be locked in another room for the duration of the time Johnnie was in the home. While police were at the crime scene the dog had to be segregated and was locked in the garage.  (Johnnie Lee Savory Deposition 2/17/2023 p.29-31) (Peoria_Savory 21-22)
- The crime scene evidence strongly suggests that the attack against Connie Cooper was a sexual assault, as her nightgown was pulled over her waist; her underwear was torn; she had been stabbed in the lower abdomen and genital area; her blood was found all over her bed sheets; and seminal fluid was discovered during her autopsy. The crime scene evidence also indicated that Connie Cooper was killed before James Robinson, because her blood was found on James but James's blood was not found on Connie. (PEORIA_SAVORY 1558) (Peoria_Savory 1870) This evidence directly contradicts Johnnie's alleged confession, which does not mention sexual assault and indicates that James was killed first.

**Opinion 2 - Defendants Conducted a Coercive Interrogation of a Child and Failed to Employ Safeguards to Obtain Reliable Statements**

Reasonably trained officers know and understand that special care must be taken when dealing with the rights of juvenile suspects. When a juvenile is arrested, detained or transported for questioning, there are typically police department policies in place regarding parental notification. The policies typically require police to contact a parent or guardian before, among

other things, bringing a child to the police station for questioning or taking him out of school. This has been true for decades, including in 1977.

Police officers know and are trained to understand that they must conduct interviews and interrogations that are aimed at learning the truth, and must use practices that focus on the rights of the accused person, and minimize any physical or mental anguish that might cause a false confession. The phenomenon of false confessions has been well known in policing for many decades (including in 1977), and officers were trained that specific coercive tactics were therefore prohibited (e.g., physical abuse; prolonged questioning; deprivation of adequate rest, food or water; yelling or cursing at a suspect; threats and promises), and tactics that increased the risk of false confessions. Officers were also trained to take particular care when interrogating or interviewing juveniles, including ensuring that a parent, guardian or other appropriate advocate was present for questioning of the juvenile. Officers were instructed that this special care weas necessary because juveniles were particularly susceptible to pressure and false confessions. This weakness has long been recognized by law enforcement, and the need for rigorous safeguards to ensure against false confessions has been part of police training for decades.

For many decades now police officers throughout the country have been trained to understand that statements made by a defendant while he was in "custodial interrogation" may not be used against him at trial, unless before making those statements he was given various warnings—that he had the right to remain silent; that if he spoke, what he said could be used against him; that he had the right to a lawyer and that if he could not afford a lawyer one would be provided for him.

Officers are trained to understand that, simply stated, custodial interrogation is defined as questioning that is initiated by law enforcement officials after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. Police officers are trained to know that such warnings are necessary to protect the defendant's Fifth Amendment right not to be forced to incriminate himself.

Additionally, for many decades officers have been trained to know and understand that, when dealing with juvenile offenders, reading young suspects the standard Miranda warning is not enough. Age-appropriate Miranda warnings should be used.  As an example, the IACP suggest the following questions should be used when questioning or interrogating a juvenile suspect:

    a.  You have the right to remain silent. That means you do not have to say anything.
    b.  Anything you say can be used against you in court.
    c.  You have the right to get help from a lawyer right now.
    d.  If you cannot pay a lawyer, the court will get you one for free.
    e.  Do you want to have a lawyer with you while you talk to me?
    f.  (If required by local or state law) You have the right to have one or both of your parents here.
    g.  (If required by local or state law or departmental policy) Do you want your mother, father, or the person who takes care of you here while you talk to me?
    h.  You have the right to stop this interview at any time.

i. Do you want to talk to me?
j. To ensure that the *Miranda* warnings are understood, the juvenile should be asked to explain each warning in his or her own words. Ask the juvenile to sign a juvenile Miranda acknowledgement and rights waiver.
k. If the parent or legal guardian is present, he or she should also sign the waiver.[5]

It is understood in police practice that an interrogation does not end with a confession or implicating statement. Instead, detectives are trained to assess whether the suspect's statement contains indicia of reliability. So, for example, if the suspect volunteer's information about how the crime was conducted that is confirmed by the physical evidence and information only known to the perpetrator, that is strong evidence that the confession is truthful.

The evidence in this case indicates that generally accepted police practices related to the interrogation of juvenile suspects were violated in numerous ways during the interviews and interrogations conducted in this case. Among other things, the detectives used guilt-presumptive and accusatory questioning and ignored the types of safeguards detectives were trained to employ so as to avoid false confessions. Below are just some examples of the way these practices were violated during the interrogation of Johnnie Lee Savory:

- According to police practices that have been in place for decades, a child should be informed of their Miranda Rights when they are held for questioning and not free to leave or would reasonably believe that they are not free to leave. Here, Johnnie testified that on January 25, he asked to go home and was told that he could go home *if* he took a polygraph exam—in other words, the defendants would not allow Johnnie to freely leave the interrogation. (Savory 2/17/23 Dep p.41-43) Even if a jury does not credit Johnnie's testimony, Cannon testified that he would not have allowed Savory to leave the police station during his interrogation on January 25 without, at a minimum, getting the okay from a supervisor. Given this and the other circumstances present during Johnnie's interrogation, the defendant officers' failure to inform Johnnie of his Miranda Rights until 11:25pm on January 25, 1977 (which was done by Defendant Cannon only after being instructed to do so by Assistant State Attorney Robert Gaubas) deviated from standard practices at the time. (PEORIA_SAVORY 713) Cannon also failed to provide age-appropriate explanation of Johnnie's Miranda Rights, and instead just read from the Miranda card and asked if he understood. This not only violated accepted practices, but Peoria Police Department policy, which required officers to take special care to ensure that juveniles understood their Miranda Rights. (Savory-LL-158-159) (Hammer Dep p.184-185)
- Defendants also deviated from accepted police practices by repeatedly ignoring Johnnie's statements that he did not wish to speak with them. Johnnie first told Haynes and Pinkney that he did not wish to speak to them about the murders of Cooper and Robinson when they pulled him from his class at school, but Haynes and Pinkney ignored this statement

---

[5] IACO National Law Enforcement Policy Center – Interviewing and Interrogating Juveniles (2012).

34

and pressured Johnnie to answer their questions before transporting him to the police
station. Johnnie next told Cannon that he did not wish to speak to the officers after
Cannon read him the Miranda Rights card. Despite this, the defendants began questioning
him about the murders again the next morning. Officers have understood for decades that
continuing to question a suspect after he invokes his right to silence will lead to
involuntary and inadmissible statements, and that this behavior communicates to an
individual that they are powerless and have no choice but to comply with the officers'
demands and answer their questions.

- In addition, defendants took Johnnie out of school, and questioned and held Johnnie for
  more than 8 hours before contacting his father, whom he lived with and who was
  responsible for caring for Johnnie. Nor did defendants take any steps to provide Johnnie
  with someone to advocate for his rights during his interrogation.



The following are additional examples of tactics that were used during the interrogation that
deviated from accepted interrogation practices in 1977:

- Johnnie was interrogated for more than 20 hours over two days. Officers have understood
  for decades that prolonged detention and interrogation is likely to overcome an
  individual's free will, especially if that individual is a child.
- Johnnie was questioned by multiple adult officers at a time in a small room for hours,
  without any parent or advocate present.
- Over the course of Johnnie's 30+ hours of detention and questioning, he was given only a
  candy bar, a soda, and a hamburger to eat. From the time his questioning began at
  3:30pm on January 25, until noon on January 26, Johnnie was given only a candy bar and
  soda.
- Johnnie was repeatedly told that he was lying to defendants throughout the interrogation.
- Johnnie was not given an opportunity to sleep until 1am on January 26, and was not
  given adequate time to sleep and rest before he was questioned again.
- Johnnie alleges that Bowers screamed at him and called him a liar while interrogating
  him during a polygraph exam. (Savory 6/15/22 Dep p.355) Even if a jury does not credit
  this as true, defendants did not ensure that an officer was present when Johnnie was being

polygraphed, discuss what questions would be asked or how Johnnie would be treated during the polygraph exam, or otherwise take any steps to make sure that Johnnie's rights were protected while he was being polygraphed. This represents a significant deviation from accepted practices to let civilians with financial interests in the polygraph exam conduct a polygraph exam and question a suspect about a murder with no oversight.

- Johnnie was made to strip down naked in front of multiple officers in the bathroom of the police station, had hairs pulled from his pubic region, and was questioned about the murders while this was happening. Johnnie's clothes were taken from him and he was given a jumpsuit to wear. Johnnie alleges these hairs were forcibly pulled by Jatkowski, while Jatkowski contends Johnnie pulled the hairs voluntarily. (Savory 2/17/23 Dep p.81-83) Even if a jury does not credit this evidence, defendants failed to ask Johnnie if he consented before collecting the hairs and document this consent in a report. The failure to do so deviates from accepted police practices and Peoria policy, which required consent to be documented or a warrant obtained, special care to be taken to ensure that a child understood he could refuse to give hair samples, and for hair samples from areas other than the head to be taken in a medical facility. (Hammer Dep p.176-184)

It also appears that defendants did not make any effort to assess the reliability of the statements taken from Johnnie Savory, an especially egregious deviation from police practices given the physically and psychologically coercive tactics that were allegedly used to obtain the statements in the first place. None of the detectives documented, or testified to, taking any steps to assess whether the confessions were reliable. If they had, they would have found ample evidence that the statements and confessions were unreliable and contradicted by other objective evidence.

Examples of contradicting evidence includes the following:

- According to the officer's reports, Johnnie stated that he did not clean the knife he used to stab Connie and James before putting it in his pocket, yet there was never alleged to be anything more than a very small spot of blood on the pants he allegedly wore during the murders. (Savory-LL-1511) (Peoria_Savory 790)
- According to the officer's reports, Johnnie stated that he was practicing karate with James in the living room when he stabbed him, but James was found in the bedroom and testing showed that there was no blood in the living room. (Peoria_Savory 644) (Savory-LL 675-677)
- According to the officer's reports, Johnnie stated that, at the time of the murders, he was wearing the sweatshirt taken by Jatkowski, but there was no blood on this item. (Savory-LL-10581) (Peoria_Savory 788)
- According to the officer's reports, Johnnie stated that he stabbed James only once or twice, but James had many more stab wounds. (Peoria_Savory 790) (Peoria_Savory 920-923)

- According to the officer's reports, Johnnie stated he did not put the baby in another room, but the baby was found in a cold, unheated room that was hardly ever used. (Peoria_Savory 790) (Peoria_Savory 80)
- According to the officer's reports, Johnnie stated that he knocked Connie out and put her on the floor before stabbing her, but there was a large amount of blood on the bed and bedding. (Peoria_Savory 918-925) (Peoria_Savory 790)
- According to the officer's reports, Johnnie stated that he stabbed James first, and then stabbed Connie. But the forensic evidence strongly suggests that Connie was killed first and James second, because Connie's blood was found on James but testing did not find any of James's blood on Connie. (Peoria_Savory 790)
- According to the officer's reports, Johnnie did not mention ever sexually assaulting Connie Cooper, but the evidence strongly suggests that Connie was sexually assaulted. For example, Connie had multiple stab wounds to the lower abdomen and genital area (including her labia); semen was discovered during testing of a rape kit conducted on Connie Cooper; there were no stab sounds to James's abdomen or genital area; Connie's nightgown was lifted above her waist; and there were significant amounts of blood on Connie's bed. (Peoria_Savory 924) (Peoria_Savory 1557) (Peoria_Savory 920-923)

Instead of trying to assess the reliability of Johnnie's statements, the reports show that the defendants actually provided him with non-public information. For example, Hayes showed Johnnie pictures of the crime scene on January 25, well before he made any allegedly incriminating statements. (Peoria_Savory 1502-1503) Additionally, Brown Teplitz posed questions in a way that suggested to Johnnie his answers were "wrong" and provided him with the "correct" answers that matched information the officers believed about the crime scene. For example, Brown Teplitz asked Johnnie if he was sure that he had stabbed victim James in the living room and if he possibly could have done it in the bedroom where the bodies were found. Johnnie then changed his answers to agree with the facts Brown Teplitz was providing him. (Peoria_Savory 790). This conduct grossly deviates from standard police practices at the time. In fact, Johnnie alleges that he just repeated back to Teplitz the facts she provided to him because his will had been overborn. If true, a reasonable officer would fully understand that such statements were totally unreliable.


Defendants conduct with regard to the polygraph examinations of Johnnie also deviated from standard practices, and reasonably trained officers would have understood that defendants' conduct had a significant likelihood of resulting in involuntary statements by Johnnie.


Prior to taking Johnnie for his first polygraph examination, the defendants did not seek the approval of Johnnie's parents or guardian, but they did get Probation Officer Percy Baker's authorization, (Peoria_Savory 713) which in my opinion is highly unusual and a deviation from

acceptable police standards and practices. This is especially true in this case given that, according to Peoria Police Department policy, probation officers were used during questioning because they would not interfere with an investigation and would instead encourage a suspect to speak; they were not used to protect a suspect's rights or advocate for the suspect. (Hammer dep p.53-58) I also considered that the defendants took Johnnie for a polygraph exam at 10pm at night, and Johnnie's testimony that defendants told him he could go home if he took a polygraph exam.

Additionally, the defendants violated their own department policies, which required that once a juvenile was identified as an offender, it was the police department's policy and procedure to have a juvenile officer present during interviews.  The department policy was in place to "comply with the Juvenile Court Act, which required that a juvenile officer be made—be available to make sure that the – Court Act was followed.  And there's a lot of reasons for that, and that are listed in the Court Act."  (Deposition of Martha Hammer, pg. 59)

I also considered that both Jenkins and Bowers were paid contractors for the police department and had a financial interest in the outcome of this and other matters involving the Peoria Police Department. Bowers testified that "Mr. Jenkins billed the Peoria Police Department.  I had nothing to do with the billing."  Bowers would receive "half of whatever the billing was for the test."  (Bowers Deposition, pg. 97)

In my many decades of investigative experience I found it highly unusual and inconsistent with acceptable police practices and standards to allow civilians such as Jenkins and Bowers to essentially conduct investigative interviews and interrogations of a murder suspect outside the presence of the investigating officers. The officers, who were waiting in the office lobby, had no way of knowing what was being said or told to Johnnie by Jenkins or Bowers during their interrogations. As civilians they were not required to abide by Peoria Police Department rules or regulations, nor was there any authoritative oversight over their actions. In addition, both Jenkins and Bowers had a financial interest in ensuring that the police officers that they were working for were happy with their results and findings.

I have not seen any detailed documentation as to the questions asked by Jenkins and Bowers during their many hours of questioning, nor any notes of responses by Johnnie to any of the questions being asked of him; including any exculpatory statements that Johnnie may have made during the many hours of interrogation by Jenkins and Bowers.

I also considered Bower's deposition testimony that he was unaware that Johnnie had been subjected to many hours of interrogations prior to Bowers's examination of him and if he had known that the "detectives had just completed their interview interrogation of the individual, I would have delayed giving the test."  (Bowers Deposition, pg. 263) When asked why he would

delay the testing Bowers replied "Well, one would be my ethics. I'm not going to jump into a test just because a detective wants me to, and two, I would be concerned that if they – if the detective was continually questioning the sub – the subject and being accusatory. From a physiological standpoint, if that subject was continuing obviously to deny the accusations of the detective, that – that would hamp -- or potentially hamper their ability to react during a polygraph test. Therefore, I -- I would delay doing the test."  (Bowers Dep p. 87)

Bowers also testified that he did not advise Johnnie of his Miranda rights prior to his questioning.  Bowers acknowledged that while employed as a police officer by the Peoria Police Department that in all criminal cases he would ensure the suspect had been provided Miranda warnings prior to conducting a polygraph examination of the suspect. Bowers admitted and acknowledged that he did not do so in this case.  (Bowers Dep p. 156)

The evidence in this case further demonstrates that extensive and lengthy interrogations and polygraph testing of Johnnie Savory occurred prior to the reading of any Miranda Rights; (Peoria_Savory 713) which in my opinion is a gross deviation from acceptable police standards and practices.

## Opinion 3 - Defendants Failed to Adequately and Accurately Record Johnnie's Interrogation and Statements

Report writing is a critical task in police investigations. Officers are trained and instructed about the importance of timely, accurately, and thoroughly documenting information learned during an investigation, especially witness and suspect statements, in a report. The importance of creating complete and accurate reports has been understood for decades.

Here, Defendant Brown Tepltiz's report of Johnnie's allegedly inculpatory statements deviated from accepted standards in a number of ways. First, Brown Teplitz wrote down only parts of Johnnie's alleged statements in her report. Importantly, she left out exculpatory statements made by Johnnie that he did not commit the crime. (Peoria_Savory 785-791) (Teplitz dep 2 10/6/22 p.386-407). Although she included some of the questions she asked Johnnie, she did not include all those questions. This is especially important because Johnnie has alleged that Brown Teplitz supplied him with the facts about the crime that she wanted him to admit to. These allegations are supported by Brown Teplitz's report itself, which reflects that Brown Teplitz asked him, among other things, questions suggesting that he touched the light switch for the bathroom, that he put Connie on the bed, that he cleaned up after the stabbings, that he put the baby in another room, that he made a call from the victims' house after the stabbings, that he saw a vacuum cleaner in the house, and that he stabbed the victims in the bedroom. (Peoria_Savory 789-790) These questions all reflected facts about the crime and the crime scene known to the officers but not necessarily to the public. Brown Teplitz also included alleged statements by Johnnie in her report using quotation marks, although those statements were not recorded verbatim. (Teplitz Dep 10/6 p. 390-395)

The inaccuracies in Brown Teplitz's report are especially concerning given that the defendants obtained typed verbatim statements from a significant number of witnesses in this case, including the vast majority of the likely perpetrators identified above. Specifically, the defendants obtained typed, verbatim statements from Kenny Parker, Charles Watts, several of Charles's friends and family members, Opal Mae Patton (a woman alleged to be having a relationship with James Robinson), Ray Mason, Noyalee Robinson, Freddie Yarborough, and William Douglas. (Peoria_Savory 1617-1639) (Peoria_Savory 1671-1673) (Peoria_Savory 1679) And Brown Teplitz acknowledged that she had taken many typed verbatim statements in her time as an officer, and that this happened daily at the police department. Given that Brown Teplitz had the resources and option to have Johnnie's statements typed verbatim, her failure to accurately and completely document Johnnie's purported confession seriously violates accepted practices. (Peoria_Savory 1617-1639) (Peoria_Savory 1671-1673) (Peoria_Savory 1679) (Hammer Dep p.84)

There is also evidence that defendants created reports that contain statements that Johnnie never made. For example, Detective Cannon created a report stating that Johnnie told him that on the day of the murders, Johnnie woke up around 10am and went to the Methodist Hospital to visit his grandmother. (Peoria_Savory 711) Johnnie testifies that he never told Cannon or anyone else that he went to visit his grandmother on January 18, 1977. (Savory Second Dep p.35-36) If the jury credits Johnnie's testimony, Cannon's insertion of statements that were never made into a report grossly deviates from accepted police practices.

## Opinion 4 -Exculpatory Evidence Was Not Disclosed

For many decades police officers throughout the United States have been trained to understand that suspects will often times confess to crimes that they did not commit, falsely confessing to end the interrogation due to coercive or aggressive pressure by the interrogators. Exculpatory evidence is evidence that is favorable to the accused; is material to the guilt, innocence, or punishment of the accused; and/or may impact the credibility of a government witness, including a law enforcement officer or other agency employee. Impeachment material is included in the disclosure requirements. In other words, the term exculpatory is generally understood to refer to any kind of information that would cast doubt on the guilt of the defendant. In its simplest form, this would include any evidence pointing directly to the innocence of the defendant or the guilt of another. For example, if another person has confessed to committing the crime with which the defendant is charged, this would be exculpatory information that would bear directly upon the issue of the defendant's guilt or innocence and, therefore must be disclosed to the defense. Material that is exculpatory can also be germane to sentencing. The failure to disclose exculpatory evidence is a violation of an individual's right to due process of law.[6]   Since at least 1963 reasonably trained officers have understood that they have a duty and responsibility to

---

[6] IACP Duty To Disclose Evidence – May 2020.

document and turn over evidence that is favorable to the accused; is material to the guilt, innocence, or punishment of the accused; and/or may impact the credibility of a government witness, including a law enforcement officer or other agency employee.

Additional examples of materials that are potentially exculpatory and may require disclosing include but are not limited to the following:

- Information that would directly negate the defendant's guilt concerning any count in an indictment.
- Information that would cast doubt on the admissibility of evidence that the government plans to offer that could be subject to a motion to suppress or exclude.
- Any criminal record or criminal case pending against any witness whom the prosecution anticipates calling.
- The failure of any proposed witness to make a positive identification of a defendant. Information that casts doubt on the credibility or accuracy of a witness or evidence.
- An inconsistent statement made orally or in writing by any proposed witness.
- Statements made orally or in writing by any person that are inconsistent with any statement of a proposed government witness regarding the alleged criminal conduct of the defendant.
- Information regarding any mental or physical impairment of any governmental witness that would cast doubt on their ability to testify accurately and truthfully at trial.

The evidence in this case shows that defendants were in possession of evidence relevant to Johnnie's innocence and failed to turn over that evidence. Such conduct violates standard police practices.

In reviewing the materials in this case, I examined the Peoria Police Department "investigative file", including the index of the file, and the "the criminal lab" or "crime scene unit" file, using the Bates numbers provided by defendants in their interrogatory responses. I then compared these files with the Cooper/Robinson homicide file produced by the State's Attorney's Office. I noted that there were numerous documents contained in the investigative file and/or the crime scene unit/crime lab file that contained pertinent and exculpatory information and that were absent from the State's Attorney's file.

For example, defendants were in possession of information that testing of the alleged murder weapon, a knife collected from YT Savory, was tested negative for the presence of blood. Specifically, Defendant Jatkowski had a phone call with Robert Gonsowski, the lab analyst who tested the majority of the physical evidence in the Cooper/Robinson homicide investigation, and made notes from the call that the knife had tested negative for blood. At the grand jury proceedings and at trial, evidence was introduced that there was in fact blood on this knife, and that it was used to stab Connie Cooper and James Robinson. (Savory-LL-42, 733, 734, 1510) (Peoria_Savory 1544-1561) A report from the lab analyst also stated that testing of the knife indicated the presence of blood.

41

The evidence in this case supports that these notes were not contained in the official investigative file for the Cooper Robinson case or turned over to the prosecution or criminal defense. (Hammer Dep p.138-139, 189-193, 244-255) (Mihm Dep p. 40, 50-58) (Gaubas Dep p. 121, 124-125, 135) The failure to properly document this information in a police report and provide this information, which would have called into question Johnnie's guilt and the prosecution's theory of the case, to the prosecution and/or defense grossly deviates from accepted police practices.

These notes also reference the presence of sperm found on the vaginal swab of Connie Cooper. This information is also exculpatory as it suggests that Connie Cooper was sexually assaulted at the time of her murder, which was inconsistent with the purported confession obtained by Johnnie Lee Savory. Because Johnnie's alleged inculpatory statements were obtained before the detectives received the results of the testing of Connie Cooper's rape kit, the notes further suggest that they understood this clear inconsistency and the exculpatory value of evidence of sperm on Connie Cooper. For example, notes by Officer Ganda state that there was a "feeling" that the semen or sperm were "there before the attack." The failure to properly document in a police report and turn over this information supporting that Connie was sexually assaulted at the time of her attack grossly deviated from accepted police practices regarding the treatment of exculpatory information. (Peoria_Savory 1874) (Peoria_Savory 1870) (Peoria_Savory 1872)

In addition to failing to turn over relevant and exculpatory information, defendants destroyed reports and relevant documents. For the Cooper/Robinson investigation, the Peoria Police Department had at least three separate files: an investigative file; a detectives' unit file; and a crime scene unit or crime lab file. The detectives' unit file, which contained documents not present in the other two files, has been destroyed and all exculpatory information has therefore been lost. (Hammer Dep p.243-44) The destruction of evidence and reports in a homicide investigation grossly deviates from standard practices and suggests efforts to conceal information.


**<u>Opinion 5 – Physical Evidence Found at the Crime Scene was Not Preserved</u>**

In a homicide investigation, it has long been understood that physical evidence should be preserved. Convictions are frequently overturned and developments in DNA testing have led to the exonerations of many individuals who were convicted of crimes they did not commit. Peoria's own policies required that all physical evidence collected during a homicide investigation be preserved unless and until the District Attorney's office issued an order that the particular evidence could be destroyed or returned to the owner. (Hammer Dep p.215-216) The evidence from the Cooper/Robinson homicide investigation was returned to the Peoria Police Department following Johnnie's criminal trials. (PEORIA_SAVORY 1611, 1613) When Johnnie sought postconviction testing of evidence to provide his innocence, the hairs from the hands of the victims and the cutting from the blue pants Johnnie had allegedly been wearing at the time of the murders could not be found.

Assuming Johnnie's innocence, the hairs from the hands of the victims and the cutting from the pair of blue pants would have been critical for proving that Johnnie did not kill Connie Cooper and James Robinson, as well as identifying the true perpetrator. Connie Cooper had a number of defensive wounds on her hands following her death, and reasonable police officers would have understood that hairs in the hands of victims of a violent stabbing would very likely to belong to the perpetrator. The handwritten notes in this case indicated that both hairs were characterized as "fine" and that someone suggested pulling hairs from other places on Johnnie's body like his arm, leg, and face to compare to these hairs. Ultimately, the comparisons of these hairs conducted by Mr. Gonsowski during the underlying criminal investigation concluded that the hairs were not similar to hair samples taken from Johnnie Lee Savory, but testing capabilities at the time did not allow for DNA testing of those items. DNA testing could now definitively exclude Savory as the source of those hairs and identify the true perpetrator if that individual's DNA was available for comparison. The DNA from the hairs could also be compared to DNA on other items from the crime scene, such as the bloody light switch, to confirm that the hairs were left by the perpetrator. Because this evidence was destroyed or discarded in violation of Peoria policy and accepted law enforcement standards, Johnnie Lee Savory was deprived of critical evidence to prove his innocence.

Similarly, one of the few items introduced at trial that purportedly linked Johnnie Lee Savory to the murders was the pair of blue pants taken from the home of Johnnie Lee Savory and his family. Testing conducted by Mr. Gonsowski in 1977 on the pants purportedly found that a small area of the pants above the right front pocket allegedly indicated the presence of Group A blood, the same blood type as Connie Cooper. (Peoria_Savory 1554-1561) When Savory sought post-conviction testing of these pants, the small cutting where the presence of blood had allegedly been indicated was missing, and so could not be tested for the presence of blood and/or DNA. The remainder of the pants was examined and tested during postconviction proceedings, and testing confirmed that there was no blood anywhere on the remainder of the pants, including the area around the missing cutting. (Savory-LL—2550-2551). If Savory had been able to test the small cutting, he would have been able to show that either (1) there was no blood on the pants or, (2) if blood was present, that the source of the blood was not Connie Cooper. Such evidence would have strongly undermined Mr. Savory's conviction and any belief in his guilt.

Officers for decades have understood that innocent individuals are sometimes convicted of crimes they did not commit. Reasonable officers therefore would know the importance of preserving critical evidence from a homicide investigation. The destruction, disposal, or removal of physical evidence related to a homicide investigation, especially critical evidence such as that described above, grossly deviates from standard practices. This is especially true given the lack of any report, order or other documentation relating to the destruction, disposal or removal of this evidence.

### Opinion 6 – Defendants Obtained Unreliable Third-Party Statements and Suppressed the Falsity of Those Statements Circumstances In Which Those Statements Were Taken

For decades, officers have been trained and instructed to employ safeguards to ensure that third-party witness statements are reliable. As discussed above, this is especially true with juvenile

witnesses, who are particularly susceptible to influence and pressure. Reasonable officers would have known in 1977 that if there were indications that a witness statement was unreliable, it was essential to conduct additional investigation to corroborate or confirm these statements, and that officers should view unreliable statements with skepticism.

According to prosecutor statements, the Ivy family members and their 1977 statements were known to be unreliable. According to the statements of prosecutors, the Ivy family members were unsure about their 1977 statements and when they heard Johnnie make alleged statements. Reasonable officers would understand that the 1981 statements from the Ivy family members were even more unreliable. These statements were made four years after the murders and the family members' initial statements, meaning their memory was even further degraded and untrustworthy. The 1981 statements contained new information that was either conspicuously absent from the 1977 statements, or directly contradicted the 1977 statements, which again calls into question the trustworthiness of all of the Ivy family members' statements. The decision to rely on these statements to build a case against Johnnie Lee Savory was a serious deviation from accepted police practices at the time.

The 1977 statements from the Ivy family members created a timeline of Johnnie's activities on the day of the murders that accorded with his alibi for that morning. The 1981 statements drastically changed that timeline, thereby undermining Johnnie's alibi. Standard practices at the time would have required the officers to ask follow-up questions about these changes in the substance of the Ivy's statements, and conduct follow-up investigation. This is especially true given that reasonable officers would have known a witness's memory would be much less reliable and more susceptible to suggestion four years after an event. I have not seen any police reports documenting any follow-up or any explanation for the change in the statements regarding the timeline of Johnnie's activities. This failure is a serious deviation from accepted police practices in 1977 and 1981.

The 1981 statements contained inculpatory information about Johnnie that was conspicuously absent from the 1977 statements. Reasonable officers would have looked at this with skepticism, and asked follow-up questions or done follow-up investigation to determine why this new inculpatory information was not provided in 1977. I have seen no police reports suggesting that such follow-up was undertaken. This is especially concerning where some of the 1981 inculpatory statements directly contradicted earlier statements from the witnesses, including statements that they had no pertinent information. The failure to investigate and provide any explanation for this new and contradictory information seriously deviates from accepted police practices.

According to the Ivy's postconviction and deposition testimony, the defendants' reports contain statements that the Ivys never made. Winnell Sankey also testified during her deposition that numerous of the statements that were attributed to her in defendants' reports were never made. Recording information as a witness statement in a police report that was never provided to police by that witness is a gross deviation from accepted police practices.

44

The evidence in this case shows that defendants interviewed members of the Ivy family numerous times, but failed to document many of these interviews. For example, Ella Ivy testified at trial that she met with Cannon four or five times in 1981 to talk about the case. She testified that she first spoke to Cannon about the case in January 1981 at a tavern called Charlene's lounge, where she told him she was not sure about what she remembered. (Savory-LL-1527-1529) Even if the jury does not credit Ella Ivy's testimony, Brown Teplitz herself testified that she interviewed the Ivy family at least twice prior to the 1977 trial. (Brown Teplitz Third Dep. P.15-19) I have seen only a single report documenting any meeting between officers and the Ivys prior to the 1977 trial. Failure to document witness interviews in a report is a significant deviation from accepted police practices, as well as a violation of Peoria's own policies. (Hammer Dep p. 89-90)

There is evidence in the record that defendants detained and put pressure on the Ivy family members to give them statements about Johnnie. For example, Ella Ivy testified that she was taken to the police station involuntarily to be questioned about Johnnie, was not given a choice about whether to speak, and was pressured and felt afraid. Another example is that Frank Ivy informed Cannon that the statements Cannon wanted him to provide testimony about were not true, but Cannon pressured him to provide them anyway. If true, the circumstances of this interrogation should have been documented, at the very least. As discussed above, officers are trained and instructed on the importance of ensuring that a witness's rights are protected and that all statements are voluntary. Documenting the circumstances in which statements were made is crucial, especially because circumstances that call into question the voluntariness or reliability of the statement are exculpatory. Exculpatory information must be turned over to the prosecutor and defense. The defendants should also have taken care to employ safeguards, including interrogating the Ivy family members in a pressure-free setting, to ensure that their statements were voluntary and reliable. This is especially true given the known serious concerns about the reliability of these witnesses. The defendants' conduct with regard to these interrogations seriously deviated from accepted police practices.

According to Cannon, in 1981 he elicited statements from three of the Ivy family members that Savory told them that he was practicing karate with James and accidentally cut him – language that also appeared in Brown Teplitz's report of Savory's alleged confession. In 1981, defendants interviewed two other young witnesses, Thompson and Poole, who also allegedly said that Johnnie told them the same thing. According to Cannon, Winnell Sankey told him that she had a letter from Savory stating that he "had accidentally cut his friend but stated that he had not killed them." Cannon also documented in a report that Sankey told him that the day before the murders, she saw Savory and James playing karate in the street.

It is unusual in a criminal investigation for witnesses to make statements that all contain the same or very similar information like this, especially when several of those witnesses had made earlier statements that omitted or contradicted that information. Officers would be trained and instructed to conduct investigation to make sure that those witnesses had not been corrupted by, among

other things, being told what to say or supplied with the information in advance of making their statements. There is nothing in the record to suggest that defendants conducted any such investigation, which suggests that no such investigation occurred. In fact, Sankey testified that no one asked her to locate or provide any letters from Johnnie.

Rather, it appears that defendants contaminated the witness statements themselves. For example, Cannon provided Poole with Thompson's highly questionable statement about Johnnie's alleged inculpatory statements before Poole was asked to make a statement himself. This conduct grossly deviates from accepted police practices.

## CONCLUDING STATEMENT

I have provided my opinions based upon my training, experience, and my review of thousands of pages of records in this case. I applied generally accepted police management principles and methods. I hold the opinions set forth above to a reasonable degree of professional certainty and based on longstanding and well-accepted law enforcement practices.

If additional information is presented to me, I am happy to consider it. I reserve the right to supplement or modify this report and my opinions expressed in the report.

*Thomas J. Tiderington*


/s/Thomas J. Tiderington

**Thomas J. Tiderington & Associates-LLC**

Phone: 734 231-2305

E-mail: ttiderington@aol.com

# ATTACHMENT A

Listing of Testimony and Publications

**Thomas J. Tiderington & Associates, LLC**

**Deposition and Trial Testimony**
As of June 2023

| Case: | Location: | Date | Case Number: | Attorney |
|---|---|---|---|---|
| | | | | |
| Deposition Testimony Police Practices | United States District Court Northern Illinois | April 2023 | 18-cv-2342 | Bonjean Law Group Jennifer Bonjean Ashley Cohen |
| Deposition Testimony Police Practices | United States District Court Eastern District of Arkansas | March 2023 | 4:21-cv-00879-JM | Laux Law Group Mike J. Laux |
| Trial Testimony – Retail Store Security Practices & Policies | Broward County FL 17th Judicial Circuit | March 2023 | 18-006079 | Hamilton, Miller Jerry Hamilton Derrick Kelley |
| Deposition Testimony Police Practices | United States District Court Northern Illinois | Feb. 2023 | 1:19-cv-6508 | Loevy & Loevy Rachal Brady Anand Swaminathan |
| Deposition Testimony Police Practices | United States District Court Eastern District of Arkansas | Feb. 2023 | 4:21-cv-00763 | Laux Law Group Mike J. Laux |
| Deposition Testimony Use of Force | United States District Court Western Wisconsin | Jan. 2023 | 3:21-cv-00565-wmc | Meshbesher and Associates Richard Student |
| Deposition testimony – Police Practices | United States District Court Northern Illinois | Dec. 2022 | 1:18-cv-03029 | Loevy & Loevy Anand Swaminathan |
| Deposition testimony – Police Practices | United States District Court Northern Illinois | Oct. 2022 | 1:18-cv-1028, 1:18-cv-2312 | Loevy & Loevy Anand Swaminathan |

| | | | | |
|---|---|---|---|---|
| Trial testimony – Use of Force & Procedures (E) | United States District Court Northern Georgia | Aug. 2022 | 1:19-cv-02047-SCJ | Johnson Law Ven Johnson |
| Deposition Testimony Use of Force | United States District Court Western District of Texas | May 2022 | SA-20-CV00466-XR | Grable Grimshaw Mora PLLC Brandon Grable |
| Deposition/Hearing Testimony - Use of Force | Fifth Judicial Circuit Citrus County, Florida | April 2022 | 21-CF-253 | Law Offices of Michael Graves Alexei V. Lizanich |
| Deposition Testimony - Human Trafficking | United States District Court Southern District of Florida | Jan. 2022 | 9:21-CV-80873-DMM | Newsome-Melton Law Firm Maegen Peek-Luka |
| Deposition Testimony – Marijuana Industry | United States District Court Arizona | Oct. 2021 | CV-19-05216-PHX-MTL | Goodwin Law BRETT M. SCHUMAN |
| Deposition Testimony - Human Trafficking | United States District Court Southern District of Florida | Jan. 2022 | 9:21-CV-80873-DMM | Newsome-Melton Law Firm Maegen Peek-Luka |
| Hearing Testimony International Investigations (E) | United States District Court Southern District of Florida | Jan. 2016 | 15-20299-CR-Cooke | Dave Macey |

**Thomas J. Tiderington & Associates-LLC**

Phone:  734 231-2305

E-mail:  ttiderington@aol.com

# ATTACHMENT B
(Materials Reviewed)

1. Cooper/Robinson Investigative File (PEORIA_SAVORY 1-1740, 12361-78)
2. Crime Lab/Crime Scene Unit File (PEORIA_SAVORY 1767-2034, 12380-91, 12897-13218, 28228-28339)
3. Robert Gaubas Deposition
4. Marcella Brown-Teplitz Deposition (Parts I, II, and III)
5. Frankie Ivy Deposition
6. Ella Ivy Deposition
7. Johnnie Lee Savory Deposition (Parts I and II)
8. Robert Gonsowski Deposition
9. Jack Viely Deposition
10. Allen Andrews Deposition (Parts I and II)
11. Carl Tiarks Deposition (Parts I and II)
12. Charles Edward Bowers Deposition
13. Darilynn Knauss Deposition
14. George Pinkney Deposition
15. Edgar Haynes Deposition
16. John Fiers Deposition (Parts I and II)
17. Harold Marteness Deposition
18. Martha Hammer Deposition
19. Mary Ann Dunlavey Deposition

20. Walter Jatkowski Deposition (Parts I and II)
21. John Barra Deposition
22. Judge Michael Mihm Deposition
23. Winnell Sankey Deposition
24. Illan Peress Depostion
25. Crime Scene and Autopsy Photos (PEORIA_SAVORY 12706-12803)
26. Pictures of Knife from Evidence Inspection (PEORIA_SAVORY 28762-28774)
27. Log Book Photos (PEORIA_SAVORY 23537-23599)
28. PPD Property Logs (PEORIA_SAVORY 26815-26828)
29. Sarah Schroeder email identifying policies for each 30(b)(6) topic
30. Transcripts (Savory-LL 1-2945)
    a. Grand Jury Transcript (Savory-LL-000001-53)
    b. 1st Trial Transcript (Savory-LL-000300-1098)
    c. 2nd Trial Transcript (Savory-LL-001239-2034)
    d. Post-Conviction Transcripts (Savory-LL 002136-2325)
31. Podlecki Affidavit and Reports (Savory-LL 10552-10564)
32. Judith Eckstein Declaration (Savory-LL 10565-10585)
33. Sam Richardson Declaration (Savory-LL 10586-10587)
34. PPD Policy Procedure and Training Documents
    a. General Orders (PEORIA_SAVORY 17687-19827)
    b. Information Orders (PEORIA_SAVORY 19828-20086)
    c. Information Bulletins (PEORIA_SAVORY 20087-21680)
    d. Training Bulletins (PEORIA_SAVORY 21681-21938)
    e. Training Bulletins Indexes (PEORIA_SAVORY 21939-21964)
    f. Retention Policies (PEORIA_SAVORY 21965-22005)
    g. Property and Evidence General Order (PEORIA_SAVORY 23640-23677)
    h. Illinois Juvenile Court Act (operative in 1977) (PEORIA_SAVORY 26914-26931)
    i. General Order 500.01 (PEORIA_SAVORY 27421-27437)
35. October 2018 ISP Forensic Report (SDT-ISP 560-561)
36. October 2018 ISP Laboratory Report (SAVORY-LL 00988-009889)
37. October 3, 2018, ISP Lab Report (PEORIA_SAVORY 12380-12388)
38. 01.20.1977 Police Report (JLS 406-407)
39. 01.21.2977 Case Data Sheet (JLS 01503)
40. 01.26.1977 Police Report (PEORIA_SAVORY 2316-2318)
41. 02.16.1981 Police Report re: James Ivy (Savory-LL-006014)
42. 04.07.1981 Police Report re: Tina Ivy (Savory-LL-006021-006022)
43. 04.08.1981 Police Report re: Ella Ivy (Savory-LL-006023-006026)
44. 04.08.1981 Police Report re: Willie and Frank Ivy (Savory-LL-006027-006028)
45. 04.29.1981 Tina Ivy Testimony (Peoria_Savory 11964-11986)

46. 10.22.1981 First Affidavit of Tina Ivy (Savory-LL-006041-006051)
47. 11.09.1983 Second Affidavit of Tina Ivy (Savory-LL-006053-006055)
48. 11.17.1983 First Affidavit of Frank Ivy (Savory-LL-006056-006057)
49. 12.01.1983 Police Report re: Frank Ivy (Savory-LL-006058-006059)
50. 5.13.2003 Tina Ivy Third Affidavit (Savory-LL-03467-03468)
51. 5.14.2003 Frank Ivy Second Affidavit (Savory-LL-03473-03474)
52. 10.17.2012 Ella Ivy Affidavit (Savory-LL-03518-03521)
53. 11.08.2012 Kathryn Shepard re Tina Ivy Affidavit (Savory-LL-005138-005139)
54. 12.16.2016 Post Conviction Hearing Testimony re: Ella Ivy (Savory-LL-002853-002900)
55. "Prosecutor Says No Proof Without Confession" (Savory-LL-006980-006981)
56. "Feature on Johnnie Lee Savory with Frank Ivy" (Peoria_Savory 0026859-0026865)
57. "No Retrial Without Confession" (Peoria_Savory 26900)
58. March 10, 1981 Polygraph Report of Thomas Joseph Thompson (PEORIA_SAVORY 5503-5504)
59. Note to Mr. Vieley from James Ivy (SDT J&B 06291)
60. State's Attorney's File (SDT-SAO 1-1969)
61. People v. Savory 1980 Appellate Opinion
62. People v. Savory 1982 Appellate Opinion
63. Expert Report of Dr. Spitz
64. Expert Report of Dr. Riech

**Resource Material:**

65. UNC School of Law, "The Problem of False Confessions in the Post-DNA World"
66. Police Practice and Procedure, Cornelius F. Cahalane
67. Practical Police Work, Skehan
68. IACP Arrests and Investigatory Stops Article
69. IACP Interrogations_Confessions_Policy_1.04
70. IACP - Brady Disclosure Requirements (2009)
71. IACP Model Policy - Brady Disclosure Requirements (2008)
72. New Jersey Division of Criminal Justice - The Property and Evidence Function (1989)
73. Guidance for Prosecutors Regarding Criminal Discovery, David W. Ogden
74. Police Records, Their Installation and Use, O.W. Wilson
75. Cold Case Homicides Practical Investigative Techniques, Richard H. Walton
76. Crime Scene Investigation A Guide – DOJ
77. Crime Scene Search and Physical Evidence Handbook, Fox & Cunningham
78. Death Investigation A Guide for the Scene Investigator, DOJ
79. Death Scene Investigation A Field Guide, Scott A. Wagner
80. On the "Third Degree" Robert H. Gault

81. The "Progress Number" Robert H. Gault
82. Homicide Investigation Practical Information, LeMoyne Snyder
83. Homicide Investigation Standard Operating Procedures, Howell
84. Homicide Process Mapping - Best Practices for Increasing Homicide Clearances, Bureau of Justice Assistance
85. Homicide Scene Investigation a Manual For Public Prosecutors, Hussain Abu Assi
86. IACP Homicide Guide
87. Investigation Standards - DeLaduranty & Sullivan
88. Inside the Tape Death Scene Checklist & Investigative Obligations (2011)
89. Law of Belligerent Occupation
90. Practical Homicide Investigation – Geberth
91. Promoting Effective Homicide Investigations – PERF
92. Homicide Investigation Standard Operating Procedures – PERF
93. U.S. Department of Justice /Office of Justice Programs / National Institute of Justice Crime Scene Investigation: A Guide for Law Enforcement
94. Techniques of Crime Scene Investigation - Fisher

**Thomas J. Tiderington & Associates-LLC**

Phone:  734 231-2305

E-mail:  ttiderington@aol.com

# ATTACHMENT C

Rate of Compensation

**Thomas J. Tiderington & Associates-LLC**

Phone:  734 231-2305

E-mail:  ttiderington@aol.com

**Fee Schedule:**

Case review and expert report…………..$325.00 per hour.

Deposition Testimony…………………..$500.00 per hour with a three (3) hour minimum.

Trial Testimony…………………………$4,500.00 per day.

**Thomas J. Tiderington & Associates-LLC**

Phone:  734 231-2305

E-mail:  ttiderington@aol.com

# ATTACHMENT D
CV



**Thomas J. Tiderington - Chief of Police**

Law Enforcement Training / Practices & Procedures Expert
ttiderington@aol.com  -  734 231-2305
Fort Lauderdale, Florida  /  Ann Arbor, Michigan

**EXPERIENCE OVERVIEW:**

- Recently retired Chief of Police with over forty-four years of experience with four different law enforcement agencies.   Responsible for personnel, budgeting, crime reduction, internal affairs, training and overall department leadership.
- Police Training Instructor and Adjunct College Instructor-Criminal Justice Courses.
- Commissioner – Michigan's Human Trafficking Commission 2015 – 2019.
- Graduate of the Southern Police Institute (SPI).
- Bachelor's Degree in Police Administration.
- Police practices and procedures expert witness.
- Criminal Justice Consultant.

**EXPERT WITNESS/CRIMINAL JUSTICE CONSULTANT:**

- Law Enforcement Training Specialist
- Police Use of Force
- Premises Liability / Security
- Human Trafficking
- Negligent Management Practices

**Chief Thomas J. Tiderington** is an internationally recognized law enforcement instructor who is one of the foremost experts in the field of criminal investigations, use of force, undercover operations and drug related police shootings.   He developed and is the lead instructor in the UNDERCOVER SURVIVAL TRAINING/NARC RAIDS SCHOOLS & STRATEGIC VICE INVESTIGATIONS.

Over 10,000 police officers have attended his training classes.   He retired from the Fort Lauderdale Police Department as Commander in Charge of the Special Investigations Division (SID).  During his forty year law enforcement career he served eight years as an undercover agent assigned to the department's Organized Crime Division where he was an undercover

operative in hundreds of cases.  As an undercover agent he infiltrated and investigated  Colombia based,  international cocaine smuggling cartels.    One investigation resulted in the seizure of over 3000 kilograms of cocaine and the arrest and conviction of notorious drug smuggler George Jung.   The long-term undercover investigation was the basis for the book and major motion picture ***BLOW.***   He is featured in the recently released true crime documentary ***Boston George-Fame Without the Fortune*** (2022).

   For over five years he was assigned to the United States Drug Enforcement Administration as the Supervisor-in-Charge of the South Florida Regional Drug Task Force.  Under his leadership the "Task Force" conducted one of the most sophisticated and successful international money laundering investigations (Operation Princess) to date.  Seizing in excess of $100 million dollars in cash (world-wide) and over 5 tons of cocaine.  Chief Tiderington is featured in a second book, written by New York Times bestselling author Bruce Porter, detailing this global investigation and the kidnapping of his informant.  The true story ***SNATCHED*** was released by St. Martin's Press - April of 2016.

   From 2001-2022 he served as the Chief of Police in Plymouth Township, Michigan.  Duties included the overall operation and management of the Plymouth Township Police Department and the joint Plymouth Communications Center (PCC).

| **Training Locations and Topics Taught/Attended by Chief Tiderington.** |
| --- |
| Undercover Survival/Raids/Informants-developed and presented training since 1987-over 10,000 state, local & federal officers have attended this training. |
| Instructor- DEA-State & Local Training Programs – (since 1987). |
| Lead Instructor – Nevada HIDTA Training – Undercover Operations/Informants/Raids. |
| Schoolcraft College – Criminal Justice / Adjunct Instructor (since 2005). |
| Key Note Speaker - Entrepreneurs' Organization – Detroit Chapter (2011) |
| United States Coast Guard – Criminal Investigators. |
| Young Presidents Organization (YPO), Barcelona, Spain - Speaker (2010) |
| Michigan State Police – Lead Instructor, Drug Unit Commanders School, Detroit, MI. |
| Michigan State Police – Undercover Survival Training – Houghton Lake, MI. |

NATIONAL ALLIANCE OF STATE DRUG ENFORCEMENT AGENCIES (NASDEA), MACKINAW ISLAND- Lead Instructor .

Strategic Vice Investigations – Lead Instructor

Broward Intelligence Group, Money Laundering Investigations,  Key West, Florida.

International Money Laundering Investigations Conference – Presenter on behalf of the Department of Justice - Rome, Italy.

Florida Department of Law Enforcement , Money Laundering Investigations.

NARC RAIDS – Developed and presented training since 1990-over 10,000 officers have attended.

Narcotics Instructor. Broward Criminal Justice Institute (since 1985).

International Narcotics Enforcement – Speaker  – Madrid, Spain (1992).

Gwinett Georgia – Undercover Survival & Police Raids

Narcotics Instructor, Investigators Drug School (since 1985)

Director and lead instructor, Drug Enforcement Seminars,  Ft. Lauderdale, FL (since 1984)

Drug Interdiction Instructor, United States Coast Guard, Tactical Law Enforcement Team (smuggling investigations).

Indiana Drug Enforcement Association Annual Conference,     (1998).

Minnesota State Association of Narcotics Investigators (M.S.A.N.I.) - Undercover Survival

Southeastern Public Safety Institute-St. Petersburg Junior College,

Tallahassee Police Department-In-Service Training- Informant Handling/ Raids

International Association of Chiefs of Police (IACP)- Orlando, Florida  - Use of Force.

National Intelligence Academy, Coral Springs, FL

Michigan State Police, Street Level Lieutenant's Conference – Undercover Operations / Raids/Search Warrants/Informants/VICE.

Presenter Department of Defense (DOD), United States Navy,  USS Theodore Roosevelt, Atlantic Ocean-while underway.

| |
|---|
| In-Service Police Training Instructor, Rio Rancho Department of Public Safety, New Mexico. |
| Charlotte-Mecklenberg Police Institute, Charlotte, NC (since 1997). |
| Lead Presenter – Human Trafficking Investigations-  Ft. Lauderdale, FL   (2014). |
| Michigan Association of Chiefs of Police – 2015 Winter Training Conference<br><br>Police Policy and Practices – Presenter. |
| Undercover Survival & NARC Raid – Raleigh, NC . |
| National Summit on Human Trafficking and the State Courts- New York City (2015)- PARTICIPANT. |
| St. Louis County and Municipal Police Academy, St. Louis, MO- Police Raids/Undercover. |
| Michigan Association of Chiefs of Police – Human Trafficking & Prostitution Investigations 2017 Summer Conference- Presenter |
| Columbus Ohio Regional Police Academy – Undercover Survival & Narc Raids Training. |
| Young Presidents Organization (YPO) - International Drug Trafficking (2019). |
| Broward Crime Commission – Presenter (2020). |
| Certified Law Enforcement  Instructor (MCOLES, FDLE). |
| 2022 Polaris Training – Human Trafficking / Attendee |
| 2022 Statewide Human Trafficking Summit / Attendee |

**Areas of Instruction Provided by Thomas J. Tiderington:**

| | |
|---|---|
| Police Policies & Procedures | VICE Investigations |
| Undercover Operations | Human Trafficking |
| Use and Management of Confidential Informants. | Prostitution Investigations-Hotel/Motel Investigations |
| Deadly Force | Internet Predator Investigations-Sting Operations |
| High Risk Warrant Service | "Sneak & Peek" Warrants" |

| | |
|---|---|
| Coercive Deception | Use of Hidden Cameras |
| Alternatives to Dynamic Entries. | International Cartels and Criminal Organizations |
| Search Warrants | Conspiracy Investigations |
| Dangers of using "boiler plate" affidavits | Money Laundering |
| Narcotics Investigations | High Risk Police Tactics |
| Wrong Door Raids | Developing Probable Cause |
| Controlled Drug Deliveries | Kidnapping Investigations |
| Drug Identification | SWAT- use and policies. |
| Drug Interdiction and Smuggling Operations | Medical Marijuana and the use of force |
| Task Force Operations | Risk and Threat Assessment |
| Use of Force Policy and Procedures | Police Ethics |
| Firearms Use and Policy | Vehicle Pursuit Procedures |
| Less than lethal options (CEW/TASER) | Mistaken Identity Shootings |
| Concepts of Evidence/rules of evidence | Traffic Stop and Procedures |
| Community Policing and Crime Statistics | Handcuffing policy and procedures |
| SWAT Operations | Internal Investigations |

**Law Enforcement Experience Summary:**

**Plymouth Township Police Department (2001 – 2022)**

**Chief of Police**

- A "seasoned" executive experienced in all aspects of police operations, criminal investigations, use of force reviews,  policy development/implementation, labor relations, internal affairs and community involvement.
- One of the longest serving police chiefs in the country.
- Effective leadership skills in personnel selections, training, and reorganizing staff into cohesive motivated teams.
- Introduced and managed community policing strategies to address strengthening police-community relations.

**Fort Lauderdale Police Department (1981 – 2001) :**

- Broward Police Academy (comparative compliance program).
- Patrol Division – highly diverse population of 250,000 residents and millions of visitors each year.  Assigned to all areas of the city in every patrol assignment.
- Organized Crime Bureau (OCB) – Narcotics Detective charged with investigating international crime cartels.
- Group Supervisor in Charge of the South Florida Regional Task Force Initiative – HIDTA Task Force charged with the responsibility of identifying and dismantling international criminal cartels.   Supervised and managed one of the most sophisticated and successful world-wide money laundering investigations (Operation Princess).  Seizing in excess of $100 million dollars in cash and over 5 tons of cocaine.
- Supervisor and Management Positions –  Served in a variety of progressively responsible leadership executive positions.
- Administrative Services Captain – Budget, Purchasing, CALEA Manager. Accreditation Management, Grants and Planning, Training.
- Patrol Captain – In charge of crime prevention initiatives as well as the delivery of police uniformed patrol services.
- Captain / Special Investigations Division – Management and oversight of over fifty detectives charged with conducting specialized investigations targeting criminal organization.  Units included: VICE/Human Trafficking, Narcotics, Task Force Operations, Technical Support, Nuisance Abatement Board, Street Crimes, Major Narcotics, K-9, Criminal Investigations.

**Detroit Police Department (1978 -1980) :**

- Detroit Police Academy.
- Patrol Experience
- Community Policing – Detroit Police Sub-Station Program.
- Motorcycle Training
- Pistol Team

*1980 – One of 1500 police officer laid-off due to budget reductions.*

**Education:**

- Mercy College of Detroit – Criminal Justice / Associates Degree
- Florida Atlantic University – Police Administration / Bachelor's Degree
- University of Louisville/Southern Police Institute – Command Officers Development Course (CODC)
- Detroit Police Academy
- In-Service Police Training - over 2000 hours of advanced police training and leadership classes.


**Expert Witness and Consulting Experience:**

Provide consulting and expert witness services on a wide range of law enforcement issues including human trafficking, search warrants, informant management, undercover operations, misconduct, corruption, use of force, workplace harassment, pursuits, police administration, training, police operations, criminal and administrative investigations, interviews and interrogations, civil rights violations, police procedures, police misconduct, and criminal investigations.

- Police Use of Force.
- Standard operating procedures, policies, and rules and regulations of police agencies.
- Internal Investigations.
- Police Arbitration Cases.
- Police recognition of and reaction to emotionally disturbed persons.
- Immigration Issues.
- Accidental Police Shootings.
- Negligent selection, retention, supervision, discipline and training of law enforcement officers.
- Handcuffing Techniques.
- Pursuits by undercover officers.
- Narcotics Raids and Policies.
- Raid Planning and Execution.
- "Wrong Door"  Raids & Search Warrants.

- Controlled delivery Investigations (UPS, Fed-Ex., US Mail).
- Narcotic Investigations - Field Testing.
- Use of Confidential Informants.
- 911 and dispatch operations.
- Crime Prevention.
- Drug values & street pricing.
- Domestic and International Narcotics Trafficking and Enforcement.
- Human Trafficking
- Prostitution Investigations
- Police Shootings
- Search Warrants
- Informant Management
- Controlled Buys
- Use of Hidden Cameras
- Extradition issues
- Prostitution cases
- TASER Use
- Police K-9
- Premises Liability

*Chief Tiderington is a renowned law enforcement trainer and nationally recognized expert in police practices and procedures.   His primary focus are matters relating to Use of Force, Police Misconduct, Human Trafficking, VICE & Narcotics Investigations; including the use of confidential informants, police use of force, police shootings, raids and sting operations.*

**Recent Professional Activities:**

**Human Trafficking Commissioner (2015 – 2019)**
**Appointed by Michigan Governor Rick Snyder.**

The mission of the Commission:

1) Designed to identify sources for grants that will assist in examining and countering human trafficking.
2) Fund research programs to determine the extent and nature of human trafficking in the state of Michigan, provide information and training to police officers, prosecutors, court personnel, social services personnel, and other individuals.
3) Collect and analyze information regarding human trafficking in this state, identify state and local agencies within this state and other states, as well as, within the federal government, that are involved with issues relating to human trafficking.

4) Coordinate the dissemination of information regarding human trafficking in the state of Michigan to those agencies, review the existing services available to assist victims of human trafficking, including crime victim assistance, health care, and legal assistance, and establish a program to make those victims better aware of the services that are available to them.

5) Establish a program to improve public awareness of human trafficking, and review existing state laws and administrative rules relating to human trafficking and make recommendations to the legislature to improve those laws and rules to address human trafficking violations in this state.

**Western Wayne Criminal Investigations:  Board of Director / Chairman**

A Multi-Agency Task Force consortium (Federal, State & Local Agencies) designed to provide the benefit of regional criminal investigative teams.

**Western Wayne Special Operations Team (SWAT):**
Former Board of Director / Chairman

**Professional Affiliations:**

Wayne County Chiefs Association
Western Wayne Chiefs Association
Southeast Michigan Chiefs of Police Association
Fraternal Order of Police/Florida
Police Executive Research Forum (PERF)
International Narcotics Enforcement Officers Association
State Certified Law Enforcement Instructor (Florida)
Southern Police Institute-Alumnus
International Association of Chiefs of Police-Life Time Member
National Drug Enforcement Officers Association
Michigan Association of Chiefs of Police
Western Wayne Special Operation Team – Board of Director
National Tactical Officers Association (NTOA)
National Fraternal Order of Police – Active Member
Commission on Accreditation for Law Enforcement Agencies, Inc. (CALEA)
American Society of Industrial Security (ASIS)

# Exhibit B



### Thomas J. Tiderington - Chief of Police

Law Enforcement Training / Practices & Procedures Expert
ttiderington@aol.com  -  734 231-2305
Fort Lauderdale, Florida  /  Ann Arbor, Michigan

**EXPERIENCE OVERVIEW:**

- Recently retired Chief of Police with over forty-four years of experience with four different law enforcement agencies.   Responsible for personnel, budgeting, crime reduction, internal affairs, training and overall department leadership.
- Police Training Instructor and Adjunct College Instructor-Criminal Justice Courses.
- Commissioner – Michigan's Human Trafficking Commission 2015 – 2019.
- Graduate of the Southern Police Institute (SPI).
- Bachelor's Degree in Police Administration.
- Police practices and procedures expert witness.
- Criminal Justice Consultant.

**EXPERT WITNESS/CRIMINAL JUSTICE CONSULTANT:**

- Law Enforcement Training Specialist
- Police Use of Force
- Premises Liability / Security
- Human Trafficking
- Negligent Management Practices

**Chief Thomas J. Tiderington** is an internationally recognized law enforcement instructor who is one of the foremost experts in the field of criminal investigations, use of force, undercover operations and drug related police shootings.   He developed and is the lead instructor in the UNDERCOVER SURVIVAL TRAINING/NARC RAIDS SCHOOLS & STRATEGIC VICE INVESTIGATIONS.

Over 10,000 police officers have attended his training classes.   He retired from the Fort Lauderdale Police Department as Commander in Charge of the Special Investigations Division (SID).  During his forty year law enforcement career he served eight years as an undercover agent assigned to the department's Organized Crime Division where he was an undercover

operative in hundreds of cases.  As an undercover agent he infiltrated and investigated  Colombia based,  international cocaine smuggling cartels.    One investigation resulted in the seizure of over 3000 kilograms of cocaine and the arrest and conviction of notorious drug smuggler George Jung.   The long-term undercover investigation was the basis for the book and major motion picture ***BLOW.***   He is featured in the recently released true crime documentary ***Boston George-Fame Without the Fortune*** (2022).

For over five years he was assigned to the United States Drug Enforcement Administration as the Supervisor-in-Charge of the South Florida Regional Drug Task Force.  Under his leadership the "Task Force" conducted one of the most sophisticated and successful international money laundering investigations (Operation Princess) to date.  Seizing in excess of $100 million dollars in cash (world-wide) and over 5 tons of cocaine.  Chief Tiderington is featured in a second book, written by New York Times bestselling author Bruce Porter, detailing this global investigation and the kidnapping of his informant.  The true story ***SNATCHED*** was released by St. Martin's Press - April of 2016.

From 2001-2022 he served as the Chief of Police in Plymouth Township, Michigan.  Duties included the overall operation and management of the Plymouth Township Police Department and the joint Plymouth Communications Center (PCC).

| **Training Locations and Topics Taught/Attended by Chief Tiderington.** |
| --- |
| Undercover Survival/Raids/Informants-developed and presented training since 1987- over 10,000 state, local & federal officers have attended this training. |
| Instructor- DEA-State & Local Training Programs – (since 1987). |
| Lead Instructor – Nevada HIDTA Training – Undercover Operations/Informants/Raids. |
| Schoolcraft College – Criminal Justice / Adjunct Instructor (since 2005). |
| Key Note Speaker - Entrepreneurs' Organization – Detroit Chapter (2011) |
| United States Coast Guard – Criminal Investigators. |
| Young Presidents Organization (YPO), Barcelona, Spain - Speaker (2010) |
| Michigan State Police – Lead Instructor, Drug Unit Commanders School, Detroit, MI. |
| Michigan State Police – Undercover Survival Training – Houghton Lake, MI. |

| |
|---|
| NATIONAL ALLIANCE OF STATE DRUG ENFORCEMENT AGENCIES (NASDEA), MACKINAW ISLAND- Lead Instructor . |
| Strategic Vice Investigations – Lead Instructor |
| Broward Intelligence Group, Money Laundering Investigations,  Key West, Florida. |
| International Money Laundering Investigations Conference – Presenter on behalf of the Department of Justice - Rome, Italy. |
| Florida Department of Law Enforcement , Money Laundering Investigations. |
| NARC RAIDS – Developed and presented training since 1990-over 10,000 officers have attended. |
| Narcotics Instructor. Broward Criminal Justice Institute (since 1985). |
| International Narcotics Enforcement – Speaker  – Madrid, Spain (1992). |
| Gwinett Georgia – Undercover Survival & Police Raids |
| Narcotics Instructor, Investigators Drug School (since 1985) |
| Director and lead instructor, Drug Enforcement Seminars,  Ft. Lauderdale, FL (since 1984) |
| Drug Interdiction Instructor, United States Coast Guard, Tactical Law Enforcement Team (smuggling investigations). |
| Indiana Drug Enforcement Association Annual Conference,    (1998). |
| Minnesota State Association of Narcotics Investigators (M.S.A.N.I.) - Undercover Survival |
| Southeastern Public Safety Institute-St. Petersburg Junior College, |
| Tallahassee Police Department-In-Service Training- Informant Handling/ Raids |
| International Association of Chiefs of Police (IACP)- Orlando, Florida  - Use of Force. |
| National Intelligence Academy, Coral Springs, FL |
| Michigan State Police, Street Level Lieutenant's Conference – Undercover Operations / Raids/Search Warrants/Informants/VICE. |
| Presenter Department of Defense (DOD), United States Navy,  USS Theodore Roosevelt, Atlantic Ocean-while underway. |

| |
|---|
| In-Service Police Training Instructor, Rio Rancho Department of Public Safety, New Mexico. |
| Charlotte-Mecklenberg Police Institute, Charlotte, NC (since 1997). |
| Lead Presenter – Human Trafficking Investigations-  Ft. Lauderdale, FL   (2014). |
| Michigan Association of Chiefs of Police – 2015 Winter Training Conference<br><br>Police Policy and Practices – Presenter. |
| Undercover Survival & NARC Raid – Raleigh, NC . |
| National Summit on Human Trafficking and the State Courts- New York City (2015)-PARTICIPANT. |
| St. Louis County and Municipal Police Academy, St. Louis, MO- Police Raids/Undercover. |
| Michigan Association of Chiefs of Police – Human Trafficking & Prostitution Investigations 2017 Summer Conference- Presenter |
| Columbus Ohio Regional Police Academy – Undercover Survival & Narc Raids Training. |
| Young Presidents Organization (YPO) - International Drug Trafficking (2019). |
| Broward Crime Commission – Presenter (2020). |
| Certified Law Enforcement  Instructor (MCOLES, FDLE). |
| 2022 Polaris Training – Human Trafficking / Attendee |
| 2022 Statewide Human Trafficking Summit / Attendee |

**Areas of Instruction Provided by Thomas J. Tiderington:**

| | |
|---|---|
| Police Policies & Procedures | VICE Investigations |
| Undercover Operations | Human Trafficking |
| Use and Management of Confidential Informants. | Prostitution Investigations-Hotel/Motel Investigations |
| Deadly Force | Internet Predator Investigations-Sting Operations |
| High Risk Warrant Service | "Sneak & Peek" Warrants" |

| | |
|---|---|
| Coercive Deception | Use of Hidden Cameras |
| Alternatives to Dynamic Entries. | International Cartels and Criminal Organizations |
| Search Warrants | Conspiracy Investigations |
| Dangers of using "boiler plate" affidavits | Money Laundering |
| Narcotics Investigations | High Risk Police Tactics |
| Wrong Door Raids | Developing Probable Cause |
| Controlled Drug Deliveries | Kidnapping Investigations |
| Drug Identification | SWAT- use and policies. |
| Drug Interdiction and Smuggling Operations | Medical Marijuana and the use of force |
| Task Force Operations | Risk and Threat Assessment |
| Use of Force Policy and Procedures | Police Ethics |
| Firearms Use and Policy | Vehicle Pursuit Procedures |
| Less than lethal options (CEW/TASER) | Mistaken Identity Shootings |
| Concepts of Evidence/rules of evidence | Traffic Stop and Procedures |
| Community Policing and Crime Statistics | Handcuffing policy and procedures |
| SWAT Operations | Internal Investigations |

**Law Enforcement Experience Summary:**

**Plymouth Township Police Department (2001 – 2022)**

**Chief of Police**

- A "seasoned" executive experienced in all aspects of police operations, criminal investigations, use of force reviews,  policy development/implementation, labor relations, internal affairs and community involvement.
- One of the longest serving police chiefs in the country.
- Effective leadership skills in personnel selections, training, and reorganizing staff into cohesive motivated teams.
- Introduced and managed community policing strategies to address strengthening police-community relations.

**Fort Lauderdale Police Department (1981 – 2001) :**

- Broward Police Academy (comparative compliance program).
- Patrol Division – highly diverse population of 250,000 residents and millions of visitors each year.  Assigned to all areas of the city in every patrol assignment.
- Organized Crime Bureau (OCB) – Narcotics Detective charged with investigating international crime cartels.
- Group Supervisor in Charge of the South Florida Regional Task Force Initiative – HIDTA Task Force charged with the responsibility of identifying and dismantling international criminal cartels.   Supervised and managed one of the most sophisticated and successful world-wide money laundering investigations (Operation Princess). Seizing in excess of $100 million dollars in cash and over 5 tons of cocaine.
- Supervisor and Management Positions –  Served in a variety of progressively responsible leadership executive positions.
- Administrative Services Captain – Budget, Purchasing, CALEA Manager. Accreditation Management, Grants and Planning, Training.
- Patrol Captain – In charge of crime prevention initiatives as well as the delivery of police uniformed patrol services.
- Captain / Special Investigations Division – Management and oversight of over fifty detectives charged with conducting specialized investigations targeting criminal organization.  Units included: VICE/Human Trafficking, Narcotics, Task Force Operations, Technical Support, Nuisance Abatement Board, Street Crimes, Major Narcotics, K-9, Criminal Investigations.

**Detroit Police Department (1978 -1980) :**

- Detroit Police Academy.
- Patrol Experience
- Community Policing – Detroit Police Sub-Station Program.
- Motorcycle Training
- Pistol Team

*1980 – One of 1500 police officer laid-off due to budget reductions.*

**Education:**

- Mercy College of Detroit – Criminal Justice / Associates Degree
- Florida Atlantic University – Police Administration / Bachelor's Degree
- University of Louisville/Southern Police Institute – Command Officers Development Course (CODC)
- Detroit Police Academy
- In-Service Police Training - over 2000 hours of advanced police training and leadership classes.


**Expert Witness and Consulting Experience:**

Provide consulting and expert witness services on a wide range of law enforcement issues including human trafficking, search warrants, informant management, undercover operations, misconduct, corruption, use of force, workplace harassment, pursuits, police administration, training, police operations, criminal and administrative investigations, interviews and interrogations, civil rights violations, police procedures, police misconduct, and criminal investigations.

- Police Use of Force.
- Standard operating procedures, policies, and rules and regulations of police agencies.
- Internal Investigations.
- Police Arbitration Cases.
- Police recognition of and reaction to emotionally disturbed persons.
- Immigration Issues.
- Accidental Police Shootings.
- Negligent selection, retention, supervision, discipline and training of law enforcement officers.
- Handcuffing Techniques.
- Pursuits by undercover officers.
- Narcotics Raids and Policies.
- Raid Planning and Execution.
- "Wrong Door"  Raids & Search Warrants.

- Controlled delivery Investigations (UPS, Fed-Ex., US Mail).
- Narcotic Investigations - Field Testing.
- Use of Confidential Informants.
- 911 and dispatch operations.
- Crime Prevention.
- Drug values & street pricing.
- Domestic and International Narcotics Trafficking and Enforcement.
- Human Trafficking
- Prostitution Investigations
- Police Shootings
- Search Warrants
- Informant Management
- Controlled Buys
- Use of Hidden Cameras
- Extradition issues
- Prostitution cases
- TASER Use
- Police K-9
- Premises Liability

*Chief Tiderington is a renowned law enforcement trainer and nationally recognized expert in police practices and procedures.   His primary focus are matters relating to Use of Force, Police Misconduct, Human Trafficking, VICE & Narcotics Investigations; including the use of confidential informants, police use of force, police shootings, raids and sting operations.*

**Recent Professional Activities:**

**Human Trafficking Commissioner (2015 – 2019)**
**Appointed by Michigan Governor Rick Snyder.**

The mission of the Commission:

1) Designed to identify sources for grants that will assist in examining and countering human trafficking.
2) Fund research programs to determine the extent and nature of human trafficking in the state of Michigan, provide information and training to police officers, prosecutors, court personnel, social services personnel, and other individuals.
3) Collect and analyze information regarding human trafficking in this state, identify state and local agencies within this state and other states, as well as, within the federal government, that are involved with issues relating to human trafficking.

4) Coordinate the dissemination of information regarding human trafficking in the state of Michigan to those agencies, review the existing services available to assist victims of human trafficking, including crime victim assistance, health care, and legal assistance, and establish a program to make those victims better aware of the services that are available to them.

5) Establish a program to improve public awareness of human trafficking, and review existing state laws and administrative rules relating to human trafficking and make recommendations to the legislature to improve those laws and rules to address human trafficking violations in this state.

**Western Wayne Criminal Investigations:  Board of Director / Chairman**

A Multi-Agency Task Force consortium (Federal, State & Local Agencies) designed to provide the benefit of regional criminal investigative teams.

**Western Wayne Special Operations Team (SWAT):**
Former Board of Director / Chairman

**Professional Affiliations:**

Wayne County Chiefs Association
Western Wayne Chiefs Association
Southeast Michigan Chiefs of Police Association
Fraternal Order of Police/Florida
Police Executive Research Forum (PERF)
International Narcotics Enforcement Officers Association
State Certified Law Enforcement Instructor (Florida)
Southern Police Institute-Alumnus
International Association of Chiefs of Police-Life Time Member
National Drug Enforcement Officers Association
Michigan Association of Chiefs of Police
Western Wayne Special Operation Team – Board of Director
National Tactical Officers Association (NTOA)
National Fraternal Order of Police – Active Member
Commission on Accreditation for Law Enforcement Agencies, Inc. (CALEA)
American Society of Industrial Security (ASIS)