# Exhibit S

1   to be brief and I will try and be through with them by

2   1:30.   If I am not finished just come into the Courtroom

3   and go directly into the jury room.

4       I may find another judge also that can take these

5   hearings.   I am going to try.

6   (RECESS)

7           THE COURT:  All right, bring in the jury, please.

8   (WHEREUPON, THE JURY WAS BROUGHT BACK INTO THE COURTROOM)

9           THE COURT:  All right, the State may call its

10  next witness.

11          MR. GAUBAS:  Thank you, Your Honor.  The People

12  would call Walter Jatkowski.

13                  OFFICER WALTER JATKOWSKI

14  called as a witness in behalf of the People, and after

15  having been first duly sworn, testified as follows in answer

16  to DIRECT EXAMINATION by MR. GAUBAS:

17          THE COURT:  All right, I want to instruct the

18  witness to please speak up and speak towards the jury so

19  they may hear you and also I will instruct the witness that

20  you are not to discuss your testimony with anyone after you

21  leave the Courtroom.

22      A  Yes, sir.

23          THE COURT:  You may proceed, Mr. Gaubas.

24          MR. GAUBAS:  Thank you, Your Honor.

63

1    Q   Please state your name, spelling your last name for

2  the record.

3    A   Walter J. Jatkowski, Jr., J A T K O W S K I.

4    Q   What is your occupation, Mr. Jatkowski?

5    A   I am a patrolman within the City of Peoria Police

6  Department, attached to the crime scene unit.

7    Q   How long have you been so employed by the

8  Peoria Police Department?

9    A   I have been employed by the Peoria Police Department

10  for 5 and a half years and attached to the crime scene unit

11  for 3 and a half years.

12    Q   What particular duties are you assigned to as a crime

13  scene unit officer?

14    A   We are requested to process felony crime scenes,

15  generally felony crime scenes which include homocide, rapes,

16  armed robbery, burglaries and other felonies.

17    Q   What particular duties were you assigned to on the

18  date of January 18th, 1977?

19    A   I was assigned to the duties that are performed by

20  the crime scene unit.

21    Q   H 've you worked on homocide cases before?

22    A   Yes, sir, I have.

23    Q   Approximately how many homocides have you worked on?

24    A   Approximately 15.

SAVORY-LL-000616





1      Q.  What particular type of training have you had,

2  Officer Jatkowski, to qualify your work in the crime scene

3  unit with the Peoria Police Department?

4      A.  I was required to take 10 weeks of basic law

5  enforcement courses taught at the University of Illinois

6  for 6 weeks and the Peoria Police Department for 4 weeks.

7      I then took criminal law course at ICC, criminal

8  investigation course at ICC, basic fingerprint classifications

9  and advanced fingerprint identification at the University

10  of Illinois taught by the FBI personnel.

11      I completed the Institute of Applied Science course

12  in Civil and Criminal Identification and Investigation.

13  I took a crime scene investigation course at the Chicago

14  Police Department for one week, an additional crime scene

15  investigation course at Serly(sp.) Laboratory in Morristown,

16  New York, and I have been, during the first year I was in

17  the crime scene unit I took in-service training through my

18  sergeant and supervisor, Sergeant Peter Gerrones and at

19  that time Lieutenant Anthony Barry.

20      Q.  What kinds of in-service training have you been

21  involved in?

22      A.  During the first year I was in the crime scene

23  unit, I assisted investigations on cases that had come about

24  that we had to investigate.  After the period of time when

SAVORY-LL-000617




1   I was doing the, assisting in the investigation, my investi-

2   gations were then supervised by those 2 individuals.

3       From that point on I have done my investigations on my

4   own.

5       Q   All right.   Officer Jatkowski, have you received any

6   specific training in the area of fingerprint identification?

7       A   Yes, I have.

8       Q   You mentioned 2 courses which you have taken at the

9   University of Illinois.

10      A   The University of Illinois, I took the 2 courses and

11  also part of the course, studied in the Institute of Applied

12  Science course was fingerprinting.

13      I have also testified in Court as to identifications

14  and during that first year when I had my in-service training

15  all my identifications were confirmed by experts within

16  the Peoria Police Department.

17      Q   Have you also qualified, been qualified in Court

18  as a witness to compare fingerprint identifications?

19      A   Yes, I have.

20      Q   And you are thoroughly familiar with the process

21  and of lifting fingerprints?

22      A   Yes, I am.

23      Q   And then making the actual comparisons where you

24  took the suspected fingerprint and compared it to a then

PENGAD CO., BAYONNE, N.J., 07002 - FORM IL 24A



66
R-579

1  known fingerprint?

2      A  Yes, I have.

3      Q  You say you have worked on cases that have been gone

4  to criminal Court in the past 3 and a half years, you have

5  been in the crime scene unit?

6      A  Yes, sir, I have.  I have testified not only in the

7  Circuit Court in Peoria County as to my expertise, but also

8  in DeWitt County.

9      Q  Have you qualified before in criminal Court in this

10  County and in other counties in the area as an expert witness

11  in the area of crime scene investigation?

12      A  Yes, I have.

13      Q  Now, Officer Jatkowski, I would like to direct your

14  attention to the date of January 18th, 1977, and ask you if

15  you received a call to go to the location of 3033 West Garden

16  Street, City of Peoria, Illinois?

17      A  Yes, I had.  Approximately 1700 hours or 5 p.m.  I

18  was requested to go to that address and process a possible

19  homocide crime scene.

20      At that--

21      Q  Excuse me.  Do you recall approximately what time

22  you arrived at that scene?

23      A  I arrived at the scene at approximately 20 minutes

24  after I had received the call.

PENGAD CO., BAYONNE, N.J. 07002 · FORM IL 24A

67
RS80

1       I am first obligated to call my supervisor and advise

2   him of the homocide crime scene and then it is his responsibil-

3   ity to determine whether additional assistance will be needed

4   at the crime scene.

5       Q   Did you then proceed to that address?

6       A   Yes, I did.

7       Q   And approximately what time did you arrive?

8       A   Approximately 20 minutes after I got the call or

9   approximately 1720 or 5:20 p.m.

10      Q   Were you the first crime scene unit officer at the

11  scene?

12      A   Yes, I was.

13      Q   Did you take charge of the crime scene investigation

14  upon your arrival?

15      A   Yes, we were responsible for the collection of

16  preservation of physical evidence at the crime scene.

17  And I was performing those duties when I arrived there.

18      Q   What did you do when you arrived, Officer Jatkowski?

19      A   Initially we deployed a rope over the front yard

20  of the house, the back yard was enclosed in a chain link

21  fence.  I employed officers to protect that area of the

22  exterior of the home and not to allow any unwanted visitors

23  through there or individuals that would not be normally

24  connected to the investigation of the crime scene.

SAVORY-LL-000620

68

R-581



1    Q.  Did you then proceed inside?

2    A   Then I proceeded into the house and I was met there

3 by Charlie Cannon, attached to the detective bureau.

4    Q   All right.  Where did you go first, once inside the

5 house?

6    A   Officer Cannon had showed, had informed me that there

7 were 2 bodies in a bedroom in the rear of the home.  I

8 proceeded to that bedroom.

9    Q   Now, Officer Jatkowski, if you need to refer to this

10 diagram that has been previously admitted into Court exhibits

11 as an evidence aid during the course, please refer to it

12 indicating which rooms you were in.

13    This diagram has been previously admitted indicating

14 that it truly and accurately portrays the floor plan of 3033

15 West Garden on the date of January 18th, 1977.

16    Q   Where did you go first then once inside the house?

17    A   When I first got into the

18 the front door that led into the living room.  That is the

19 door that swings into the house, right above the address

20 at the base of your drawing.

21    I   en proceeded down the hallway into bedroom number

22 1 and appeared inside the room.  There were no lights inside

23 the room at the time that I had arrived.

24    All lights were extinguished and I had my flashlight,

SAVORY-LL-000621


69


1  and I appeared at the 2 bodies.  I then went back into the

2  livingroom.

3      Q   What did you do next?

4      A   Then I set up my equipment so that I could take

5  crime scene photographs of the house.

6      Q   Did you proceed to take photographs of the house?

7      A   Yes,  I took the crime scene photographs, taken

8  color slide film and some taken in color print.

9  I took the photographs first in the livingroom because

10 this was the room that would be the easiest to disturb.

11 All the individuals were, that were in charge of the

12 investigation had to go inside this room.  So I began by

13 clearing everyone out of the room and taking the photographs

14 of the crime scene so that I could process that room and

15 protect that evidence initially.

16     Q   Did you proceed to photograph the other rooms in

17 the house?

18     A   Yes, I did.  I photographed the kitchen area first.

19 Not in detail, but in a general shot to show the position

20 of all the evidence that may be collected in that room.

21     I then proceeded to the bathroom and took photographs

22 of the interior of the bathroom.  I then proceeded to bedroom

23 number 2 and took examined the room to see if any physical

24 evidence was apparent and took some general photographs

SAVORY-LL-000622

PENGAD CO., BAYONNE, N.J., 07002 · FORM IL 24A

70
R-S-83



1   of bedroom number 2.

2       After I had taken detailed photographs of the living room,

3   general photographs of the bedroom number 2, and the bathroom,

4   Officer John Bennett and Sergeant Peter Gerrones arrived on

5   the scene.

6       I then informed them what kind of situation I had at

7   the crime scene and I had them take possession of the kitchen

8   and the livingroom areas, so that done of the evidence in

9   those areas would be disturbed.

10      Q   Where did you proceed next?

11      A   I then proceeded to bedroom number 1 to start searching

12  for physical evidence.

13      Q   Were you able to gather certain items of physical

14  evidence in bedroom number 1?

15      A   Yes, I was.

16      Q   Brifely, to the best of your knowledge, what items

17  of physical evidence did you gather there, officer?

18      A   Well, I began by, after I had taken detailed photo-

19  graphs of the 2 bodies that were in the bedroom and general

20  photographs of the areas of the site  I then began to

21  proceed with the bodies because they were to be removed by

22  mortuary personnel.

23      I examined the bodies as thoroughly as I could examine

24  the hands, the face, any areas where trace evidence could

71

SAVORY-LL-000623




1  have been taken from the suspect and placed on the victims.

2  After I made a thorough examination of the 2 bodies and

3  collected the physical evidence off of them I left their

4  clothing on them since they were going to be transported in

5  plastic bags to the mortuary.

6      And none of the physical evidence would have been

7  disturbed.  Officer aslo followed the mortuary personnel

8  to Parks Mortuary.

9      Q  Did you later remove the clothing from both the victims

10  or were you present when it was removed?

11      A  Yes, I was present just prior to the autopsy.  I

12  had personally removed the clothing from the 2 victims.

13      Q  Did you gather that and placed it in physical

14  evidence?

15      A  Yes, I did.

16      Q  What other items of evidence or what items, if any,

17  did you take from the bedroom directly while you were still

18  there at the scene?

19      A  Initially I processed signs we were dealing with

20  blood evidence and possibly our fingerprint powder would

21  interfere with any future analysis, I began to process

22  for the blood evidence and any other trace material evidence

23  initially.

24      But I also kept in mind that there maybe at, latent

72

SAVORY-LL-000624





1  impressions in these areas so I made certain that my, I

2  reserved these areas where I was collecting physical evidence.

3      Q  Excuse me, did you in fact dust the entire area for

4  fingerprints?

5      A  Yes, I did.  I will get into the exact pieces of

6  physical evidence and the blood evidence that I collected

7  that day and then I will get into detail the latent impression.

8  that I developed after I processed it.

9      Q  All right, please proceed.

10      A  Initially, we had found blood on the, or red substance

11  that appeared to be blood on the right wing of the dresser

12  which is positioned just as you come in the doorway to the

13  bedroom.

14      We also found specs of that red substance on the closet

15  door and on the door handle and the exterior of the bedroom

16  door that opens into the bedroom.

17      Q  This would be the same closet as portrayed in bedroom

18  number 1 on the diagram?

19      A  Yes, it is.

20      Q  Is that closet several feet from the location of

21  the body or how would you describe that location to the

22  body of the victim of Connie Cooper?

23      A  It was directly adjacent to the body of the victim,

24  Connie Cooper.  Connie Cooper was approximately 6 inches to

SAVORY-LL-000625



73



1    a foot away from the doors of that closet, laying next to

2    the bed.

3         Q   Would the door to that closet be closed when you

4    saw the--

5         A   Yes, the doors to that closet--

6         Q   What, if anything, did you do then, officer?

7         A   All right, after we had successfully collected all

8    the evidence--

9              MR. VIELEY:  Excuse me a minute.  I want to make

10   an objection to the use of the term, we.  I think--

11             THE COURT:  I agree with you.

12             MR. VIELEY:  I think he testified to what--

13             THE COURT:  He done.  What he means, either, is

14   it you or is it--

15        A   I collected the evidence in this particular room.

16   But there were other officers that were at the crime scene wi

17   me.

18             THE COURT:  Okay.  Would you tell us if you did it

19   or if one of the other officers did it as best you can.

20        A   All right.  I had collected all the evidence from

21   this particular room.  I had collected the blood from the

22   mirror, the right mirror or the red substance, the red

23   substance from the closet and the red substance from the

24   door handle and the exterior of the bedroom door.

PENGAD CO., BAYONNE, N.J.   07002 · FORM IL 24A

74

SAVORY-LL-000626

R-587

MR. GAUBAS:

Q   You indicated you found the substance that appeared to be blood on the bedroom door,is that correct?

A   Yes, I am.

Q   Where was that located, officer?

A   There was part of this red substance that was on the door handle and swipes of that red substance were also or in the area surrounding the door handle to that bedroom.

Q   And where on the closet doors did you find blood appeared to be blood?

A   Approximately in the middle of the closet door, where the 2 joined.

Q   And were were these mirrors located or this mirror you indicated, this mirror that had red substance on it that appeared to be blood?

A   The mirror was just above the dresser.  It would be on the wall, the wall adjacent to the door entering into the bedroom.

Q   Where on the mirror did you collect this substance?

A   It was a spray of red droplets surrounding an impression that we later had developed.  I collected as many of the red droplets as I possibly could from that mirror It was sprayed in a general area on the mirror.

Q   How did you go about collecting these samples of



75
R-588

what substance appeared to be blood?

    A   We have a scalpel which we use.

        MR. VIELEY:  Objection, gain.

        THE COURT:  We?

    A   I am sorry.

        THE COURT:  Sustained.

    A   I have a scalpel that I use to scrape off materials from objects.

MR. GAUBAS:

    Q   All samples that you collected, were they from wet blood or dry blood?

    A   Dry blood.

    Q   Now, officer, did you recall, do you recall at this time collecting, yourself, any other items of possible red substance which might have been blood from that bedroom?

    A   We collected other items from that--

        MR. VIELEY:  Same objection.

    A   I am sorry, I am doing this from my knowledge.

        THE COURT:  Just get back to what you did now.

    A   I collected some items that had a red substance adhering to them.

MR. GAUBAS:

    Q   Did you remove any physical items from the bedroom?

    A   Yes, I did.



SAVORY-LL-000628

1    Q   What?

2    A   A bed spread, a top sheet, 2 pillow cases, a pair

3    of red pants.

4    Q   Anything else that you recall at this time?

5    A   As far as items that had a red substance clinging

6    to them, no.

7    Q   Now, officer, when you completed that work in bedroom

8    number 1, did youproceed to fingerprint it then or check for

9    possible fingerprints in that bedroom?

10   A   Yes, I did.

11   Q   Where did you look for possible fingerprints in the

12   bedroom?

13   A   Officer Bennett then entered the room and assisted

14   me in processing any surfaces that would yield latent

15   impressions.

16   Q   Did you process any surface areas in youropinion

17   would, that would have left a--

18   A   Yes, we both processed all the walls within a

19   reasonable space.  Officer Bennett is 5 foot 11.  He processed

20   everything as far as within his reach and I processed

21   everything within my reach.

22   And any smooth surfaces that would yield a latent

23   impression including walls, the surface of the dresser, the

24   mirrors, the closet doors, any objects that were laying out

77





1   such as the cosmetics, anything that was, that would possibly

2   yield a latent impression was processed.

3   Q   Officer, did you gather any latent fingerprints

4   in that bedroom?

5   A   We gathered latent impressions and palm prints from

6   the interior of that bedroom.

7   Q   From where did you gather these?

8   A   The latent palm and prints we developed to the right

9   mirror, the same mirror that we had collected the red

10  substance.

11  We developed a latent palm impression on the closet

12  door adjacent to where the victim Cooper's body was found

13  and latent fingerprints off of a picture that had, that was

14  in several pieces on top of the dresser.

15  Q   Those are the only locations you recall at this

16  time as you recall gathering fingerprints from?

17  A   From that room?

18  Q   Yes.  And did you compare these latent fingerprints

19  that were found in that bedroom, the known fingerprints that

20  you had with victims and other persons who may have lived in

21  the house?

22  A   We, I had compared the latent impressions to the

23  impressions of the victims, the victim's parents, William

24  Douglas and Noyal Robison or Douglas, the baby, and other

SAVORY-LL-000630

78

R-591

1   individuals that were given to us to compare those latent

2   impressions to.

3       Q   Were you able to identify him, the latent impressions

4   that were developed in the--

5       A   The latent impressions developed from the mirror

6   was identified as the left palm and the number 10 or left

7   little finger on victim Robison's hand.

8       The latent impressions developed on the picture that

9   was in several pieces were identified as the baby's.

10      The other latent impressions that were developed were

11  unidentifiable.

12      Q   Is there any particular reason for that?

13      A   The impressions did not have enough characteristics

14  which are necessary for an identification to be made.

15      Q   And what, is there any particular reason that they

16  simply didn't have enough characteristics?

17      A   There are many reasons, there was a smear, it was on

18  a bad surface, a surface that does not yield a good latent

19  impression, generally there were other surfaces in the

20  bedroom such as the top of the dresser.

21      It was covered with a greasy film which we later found

22  to be a hair processing ointment.  Other areas were too

23  porous as not to give a good distinctive ridge that was

24  unbroken, necessary for a comparison.

SAVORY-LL-000631

1     Q  Were these the only fingerprints that you were able

2  to find in bedroom number 1?

3     A  Yes, they were.

4     Q  Were you or any of the other officers that were

5  working on the crime scene on that date at that location

6  able to find any other fingerprints in any other room that

7  you thought were particularly relevant.

8     A  Latent impressions were developed and at the time

9  we thought were relevant in the bathroom.

10     Q  Where were these latent impressions found?

11     A  They were found just above the toilet on the tile.

12  We later identified that latent impression as being Noyal

13  E. Robison Douglas'.

14     Q  Any other latent impressions that were found any

15  where in the house, officer, that you thought were particularly

16  relevant to what had happened there that day?

17     A  Not as far as being particularly relevant there only

18  2 other latent impressions developed.

19     Q  And who were they?

20     A  They were on drinking glasses that were in the sink.

21  One was in the sink and one was in a cabinet.

22     THE COURT:  I am going to ask the bailiff to stand

23  on the outside.  We have got problems, too many people in

24  here now, so you will have to tell people that--Don't let

80

SAVORY-LL-000632

 

1    anybody else in.  I just assume you keep everyone out until

2    everyone has a seat and then you let, so you have got plenty

3    to go.  They can stay here now.

4         Go ahead, Mr. Gaubas.

5         MR. GAUBAS:  Thank you, Your Honor.

6    Q  Officer Jatkowski, in your experience as a crime

7    scene investigator, is there any particular, did you find it

8    particularly unusual that you were not able to develop  and

9    find more latent prints in that house?

10   A  No, I did not.  Latent impressions are very fragile

11   and they must be developed on certain surfaces.  There were

12   not a great quantity of those type of surfaces, clean surfaces

13   where latent impressions are usually developed.

14        The areas that we processed, we did yield latent

15   impressions and we identified most of them.

16   Q  Did you find in bedroom number 1 a metal pipe?

17   A  Yes, I did.

18   Q  Did you process that for latent fingerprints?

19   A  Yes, I did.

20   Q  Did you find any?

21   A  No, I did not.

22   Q  Was there found in the kitchen area a black night

23   stick?

24   A  Yes, there was found.

SAVORY-LL-000633



81


1    Q  Did you observe that?

2    A  Yes, I had collected that.

3    Q  And was that processed for latent fingerprints?

4    A  Yes, it was.

5    Q  Were any found?

6    A  No, there were not any latent prints on that object.

7    Q  In the bathroom area otherthan the particular latents

8  you have already testified about, did you have occasion to

9  collect a light switch plate?

10    A  Yes, I did.

11    Q  Were any latents developed or were you able to develop

12  any latent impressions on tha t light switch plate?

13    A  No, I was not.

14    Q  Did you collect any other items of physical evidence

15  at the fingerprints, these areas in the house attempting to

16  find certain fingerprints that you recall at this time,

17  Officer Jatkowski?

18    A  We did not develop any other latent impressions.

19  Other surfaces were dusted in the same detail as we had

20  dusted in the one bedroom.  And I must add that we did not

21  just process that one bedroom for latent impressions as

22  thoroughly as I described, we continued that process throughou

23  the home.

24    Q  Did you process every room in that house?

PENGAD CO., BAYONNE, N.J. 07002 · FORM IL 24A

82
R-595

1    A   Yes, we did.

2    Q   For latent fingerprints?

3    A   Yes.

4    Q   And none other than those that you testified to at

5    this point were found, is that correct?

6    A   There were latent impressions developed on the beer

7    can in the kitchen and they were identified as the baby's.

8    Q   Officer Jatkowski, did you collect any other items

9    of physical evidence from a residence that you recall at

10   this time?

11   A   Yes, I had collected the plate from the bathroom

12   light switch.  It had a red substance clinging to it.

13   I also collected a sample of a red substance that was on the

14   door, the outside door of the front door of the home.

15   I also collected hairs from the bathroom sink and the

16   bathtub, collected several towels from the bathroom, fibers

17   from the rugs.

18   Q   Anything else that you recall at this time?

19   A   At the point of the initial crime scene on January

20   18th, no, not anymore that I can recall.  There were other

21   pieces of evidence that had not been submitted to the State

22   Crime Lab, a great quantity of evidence, and I would have

23   to refer to my report to get a complete list of that.

24   Q   And in the bedroom marked bedroom number 1, did you

SAVORY-LL-000635

83



1   find any murder weapon or any possible murder weapons?

2       A   No, we made a search through the whole home.   That

3   is all the officers that were assigned to the crime scene

4   unit.

5       I did not see any weapons within the bedroom or any

6   of the other house outside of the kitchen knife found in a

7   drawer in the kitchen.

8       Q   Where did you find that at?

9       A   That knife was found in one of the kitchen drawers

10  in the kitchen.

11      Q   Did you collect that?

12      A   Yes, I collected it.

13      Q   Was it submitted to the lab along with the other

14  items?

15      A   Yes, it was.

16      Q   Any other possible murder weapons that was seen

17  throughout the house?

18      A   No.

19      Q   Did that basically conclude the gathering of physical

20  evidence that took place at the residence itself?

21      A   On January 18th, yes.

22      Q   And did you gather other evidence at the funeral

23  home?

24      A   Yes.

SAVORY-LL-000636

R-597

Q   And briefly what evidence did you gather there?

A   Briefly, in general we collected the clothing. I collected the clothing from the 2 victims.   Certain items of that clothing were submitted to the Bureau of Identification Lab in Maywood, Illinois, for a later analysis.

Q   Did you gather anything else other than items of clothing?

A   Collected a tube of blood which were drawn from the body by Dr. Immesote and I also collected hair standards from the head and pubic region of both the victims.

Q   Any other items that you recall at this time?

A   No.

Q   Officer Jatkowski, what did you do with the items of physical evidence that were collected by you from the house and from the bodies?

A   Well, as a general procedure, when evidence is collected we also place the, we always--

MR. VIELEY:  Objection as to we.

THE COURT:  He is not asking you--He is asking you what you did, not as a general procedure, but what you did in this case.

A   All right.  I collected the pieces of physical evidence and placed them in separate containers and sealed those containers.

PENGAD CO., BAYONNE, N.J., 07002 - FORM IL 24A




MR. GAUBAS:

Q   And eventually, what, if anything, did you do with those items?

A   I gave each one of those items an exhibit number and made out a case data sheet and hand carried the first 34 exhibits that I had collected to the State Crime Lab in Maywood, Illinois.

Q   And the other exhibits that you have collected what, if anything, did you do with them?

A   The other exhibits were retained in the Peoria Police Station in a locked evidence vault.

Q   You subsequently have occasion to send some of the exhibits that you collected to the Maywood Laboratory for identification?

A   Yes, I did.

Q   How did you transport that, those to the Maywood Lab?

A   I transported the items inside a sealed container, a box, to the, which was wrapped twice to the Peoria Post Office.  And sending them registered mail to the Maywood Laboratory.

Q   Officer Jatkowski, I would like to show you some items for identification here that were previously marked, beginning initially with this item previously marked for

86



1  identification as People's Exhibit Number 2.  Please tell

2  us what that is.

3      A  People's Exhibit Number 2 is the sack that I used

4  to place Connie Cooper's bra.

5      Q  Was there any particular reason you collected that

6  item of evidence?

7      A  It was on the victim and one of the wounds to the

8  victim had penetrated the bra strap that joins the 2 cups.

9      Q  Was there anything else on the bra itself?

10     A  Yes, there was a quantity of red substance on the bra.

11     Q  Would you please remove the contents from People's

12  Number 2.  Would you identify that object previously marked

13  for identification, I believe 2 A, People's Exhibit 2 A for

14  Identification.  Can you identify that object?

15     A  That is the same bra I collected from the victim,

16  Cooper.

17     Q  Does it appear to be in the same condition as on the

18  date you collected it?

19     A  Other than the People's tag and additional writing

20  on this tag here, yes it does.

21     Q  All right.  Is People's Number 2 and People's Number

22  2 A, both appear to be in the same physical condition as on

23  the date that you first saw them and collected them, placed

24  them into evidence?



87



1    A   People's 2 has been opened at the base and resealed.

2   And I had made this opening a couple of days ago when I was

3   reviewing the evidence.

4        But other than the additional writing here on the package

5   this is in the same condition as when I submitted it.

6        Q   Any other differences in these 2 exhibits?

7        A   No.

8        Q   Officer Jatkowski, I hand you what has previously

9   been marked as People's 3 and ask you if you can identify

10   that.

11        A   This is the same container that I had used to

12   package victim Cooper's underpants.

13        Q   And does that appear to be in the same condition as

14   on the date that you originally placed the items into?

15        MR. VIELEY:  Excuse me.  Please the Court, I want

16   to make an objection.  I would rather make it outside the

17   presence of the jury.

18        THE COURT:  All right, I will excuse the jury for

19   a few minutes.

20   (WHEREUPON, THE JURY WAS TAKEN OUT OF THE COURTROOM)

21        THE COURT:  All right, do you want to state the

22   nature of your objection?  I assume it is in regard to the

23   clothing and--

24        .  MR. VIELEY:  Yes, sir.

SAVORY-LL-000640




88

1          THE COURT:  The blood on the clothing.

2          MR. VIELEY:  It appears to me that the State is in

3     the initial process of beginning to parade various items

4     of clothing and other pieces of garments that are soaked with

5     blood and it appears to me that there may be no real value

6     in doing this other than to excite and impassion the jury.

7          I question the probative value of these items and I

8     would therefore, ask the Court to rule that the State not

9     pursue any further with the undoing of these items from the

10    bag because it is obvious that every time an item is pulled

11    from a container or package the jury can see it.

12         Even though these items may not be introduced into

13    evidence, the damage is done.  We would ask the Court to

14    rule accordingly.

15         THE COURT:  Let me have your Hunter's Book there,

16    would you please, Mr. Gaubas.

17         MR. GAUBAS:  Surely, Your Honor.

18         THE COURT:  Thanks.  Mr. Gaubas, do you want to

19    respond to that?

20         MR. GAUBAS:  Yes  Your Honor.  We are now in the

21    process of admitting items that were physical evidence

22    collected at the scene that I think are very relevant to this

23    crime.

24         The very least these items we are going to admit will

89



SAVORY-LL-000641

1    show the location of the wounds on the body.  No pictures

2    have been allowed at this point and I am not clear as to

3    whether any lab, as to showing the exact location of the

4    wounds--

5         I think the piece of clothing is at least generous

6    way to demonstrate to a jury the location of the wounds on

7    the body of the victim.

8         Certainly the items of physical evidence that we attempt,

9    are attempting to introduce at this time will show that.

10   I think they are also relevant to show again the amount of

11   force used on each of these victims, any amount of bleeding

12   that occurred as a result of the force used on their bodies.

13        We are not going to waive or parade any items before

14   this jury.  I have doubts myself as to whether these items

15   will actually and actually go into the jury room.  I am

16   allowing that decision to be made by the Court, but whether

17   the jury actually handles these items of physical evidence or

18   not, it will be our position that the lab officer of the

19   crime scene unit investigator who appeared at the scene

20   and took them and actually physically observed them as he

21   took them, placed them into evidence, certainly should have

22   the right to testify to these items.

23        They are relevant for many purposes. It is our position--

24             THE COURT:  All right, the general rule is that an

SAVORY-LL-000642

90



1   object which has no value in explaining any fact in issue in

2   which is used solely to excite, emotion or  pity, rather

3   than aid the jury is not admissible.

4       However, if it tends to prove some fact in issue even

5   though accumulative with other evidence, it is admissible

6   despite the fact it may arouse feelings of horror or

7   indignation or as gruesome.

8       It says here for example, a uterus in an abortion case

9   has been held admissible.

10          MR. VIELEY:  Your Honor, if it please the Court,

11  if the Court ruled this morning that he was not going to

12  allow any more evidence concerning the position of the stabs

13  and the slashings because they had been adequately covered

14  by A, of the coroner and B, the coroner's physician, and it

15  seems to me that unless these items are in fact admitted

16  and then passed on to the jury so they can see where the

17  exact wounds were, that thing--

18          THE COURT:  No point in--

19          MR. VIELEY:  No point.

20          MR. GAUBAS:  It seems items of this kind, Your

21  Honor, are overused in cases as the Court is well aware, at

22  least very less demonstrative evidence that can be used

23  to show to the jury they are certainly relevant for certain

24  purposes.

SAVORY-LL-000643




91

1      Possibly perhaps one or two pieces of clothing here,

2  Your Honor, I don't think there is anything that we intend

3  to show.

4          THE COURT:  I was going to ask you that, what do

5  you have in mind?

6          MR. GAUBAS:  We have some items of the victim's

7  shirt that the victim Robison had on that night, again the

8  victim Cooper was wearing, the position shows the exact

9  location of the stab wounds.

10          THE COURT:  Yes.

11          MR. GAUBAS:  We have, I believe, that is basically

12  the only items of clothing that we are interested in.

13  The pillow case from a bed indicating certain items or droplets

14  of blood that were found on that pillow case which is not

15  at all inflammatory which did indicate by blood type, perhaps,

16  evidence of the fact that the violence and force used and

17  that droplets of blood from the victim Cooper were found upon

18  the bed.

19      We did--

20          THE COURT:  All right, now what issue do they prove

21  other than to excite the jury?

22          MR. GAUBAS:  It is, I suggest to the Court, at

23  this point and time that of allegations in the indictment

24  is still at issue here.

SAVORY-LL-000644



92
Z-605

1      Mr. Vieley has been admitted or confessed anything.

2 Until we rest, I think every allegation that we have to

3 prove in that indictment of those 2 counts--

4      THE COURT: What does this help prove?   This helps,

5 this proves a stabbing.

6      MR. GAUBAS:  Yes, it shows the course of violence.

7      THE COURT:  What?

8      MR. GAUBAS:  It shows the course of violence used.

9      THE COURT:  It shows the force and violence used.

10      MR. VIELEY:  That is already in the record though

11 by the doctor's testimony of the coroner's testimony, and

12 the pictures.

13      THE COURT:  All right, it says here, the fact that

14 it is cumulative doesn't make any difference.

15      MR. VIELEY:  But it has no real probative value

16 other than to excite emotions, Your Honor.

17      THE COURT:  If it didn't go to prove some fact in

18 issue even though cumulative with other evidence, it is

19 admissible despite the fact that it may arouse feelings of

20 horror or indignation.

21   Now does this seem, does this prove any of the issues

22 in the case?  It proves a violent attack by, with a knife

23 or with a sharp object because there are holes in the thing.

24      MR. VIELEY:  That has already been proved though.

93

1          THE COURT:  This is cumulative of that.

2          MR. VIELEY:  But the Court has ruled this morning

3    we are not going to have any more of that.

4          THE COURT:   Not my discretion of the body which

5    I ruled this morning.

6          MR. GAUBAS:  Officer Jatkowski is offering nobody.

7          MR. VIELEY:  You are doing it in another way which

8    is really more vivid and damaging.  I would rather him sit

9    here all day and tell us what he saw rather than just to

10   parade these, open them up and not admit them into evidence,

11   because once the jury sees them the damage is done.

12          THE COURT:  That is true.  Let me see what you

13   have got there.

14   (WHEREUPON, THERE WAS A FURTHER CONFERENCE AMONG THE COURT

15   AND COUNSEL ABOUT THE CLOTHING OUT OF THE HEARING OF THE

16   COURT REPORTER)

17          THE COURT:  Again, I will ask you what happened

18   with the defendant's stipulation.

19          MR. GAUBAS:  We prefer to have the officer--

20          MR. VIELEY:  We will stipulate there was a violent

21   death.  I have been willing to do that from day one.

22          MR. GAUBAS:  I want to stipulate to the admissibilit

23   We will accept that.

24          MR. VIELEY:  We couldn't do that.

1    THE COURT:  What if he stipulates to the

2  admissibility of the items and we don't send them to the

3  jury?  What--

4    MR. GAUBAS:  As long as the officer, if he stipulates

5  to the admissibility of them and this Officer would remove

6  them from the packages and I would ask him to tell what they

7  are.

8    MR. VIELEY:  The trouble is the jury sees this.

9    THE COURT:  What if he doesn't--

10    MR. GAUBAS:  If they are not going--

11    THE COURT:  He looks in the bag and he says this

12  is, he describes it.  Would that be sufficient to--

13    MR. GAUBAS:  I don't think so, Your Honor.

14    THE COURT:  I have difficulty seeing what elements

15  these items prove in the case if they are willing to

16  agree that the victims died because of a violent attack.

17    MR. GAUBAS:  I think it certainly shows the nature

18  of the offense, Your Honor, and that is the part of the

19  mental intent we must show in any indictment, any count.

20    It, also the degree of mental intent that we have

21  alleged in the indictment that he did the acts knowingly,

22  that they created a strong probability of death or great

23  bodily harm.

24    THE COURT:  Anyone who would have cut the bodies,

SAVORY-LL-000647





95

R-608

1   and there was that much blood--

2         MR. VIELEY: That is what he is showing, a lot of

3   gore, a ton of gore.

4         THE COURT:  A lot of blood to the jury.

5         MR. GAUBAS:  It is nature, usually--

6         THE COURT:  I think they are too.

7         MR. GAUBAS:  They are not pleasant to look at, I

8   agree.  But we brought in nothing that is clearly bloody

9   as some of the items we could have brought in, but what you

10  have before is with the exception of 2 other items, I

11  believe are all the clothing and we intend to use.

12        THE COURT:  A pillow case?

13        MR. GAUBAS:  Pillow case and there is a pair of

14  blue pants and if need of them--To my knowledge those

15  are the only items of clothing that we have knowledge

16  that--

17        THE COURT:  All obtained at the scene?

18        MR. GAUBAS:  That is correct, or one particular

19  item I think was obtained later, but by the same officer.

20        MR. VIELEY:  But what do they prove?

21  We already know there was a violent death, that has been

22  proved a hundred times.  The death came from stabbings and

23  that has been proved a hundred times.

24        And we stipulate that all this, all this blood can do

96
R-609

1   is just--

2       THE COURT:  Problem is that maybe it has been

3   proved to you that there was a violent death, maybe it has

4   been proved to me that there has been a violent death,

5   we don't know what has been proved to the jury.

6       They have got a burden beyond a reasonable doubt which

7   is a heavy burden.

8       MR. VIELEY:  They have seen the pictures that has

9   been passed thus far.

10      THE COURT: Yes.

11      MR. VIELEY:  Which we admitted, I think, the first

12  day of evidence.

13      THE COURT:  Which is today.

14      MR. GAUBAS:  If I may make 2 other points, Your

15  Honor.

16      THE COURT:  Go ahead.

17      MR. GAUBAS:  We would represent too, in concluding

18  in this testimony and case in chief will be testimony from

19  Officer Brown that the defendant has confessed to the crimes

20  in question.

21      We feel that this evidence that is before the Court

22  now will very frankly corroborate the confessions of the

23  defendant.

24      THE COURT:  Fine, it is clear to me that if these

97

R-610

SAVORY-LL-000649

1   exhibits show who did it or tend to show who did it instead

2   of what happened, they are admissible.

3        MR. GAUBAS:  Representation I am making to the

4   Court is that those, if not all of those items of clothing

5   that are right before the Court right now will corroborate

6   statements of the defendant.

7        THE COURT:  They do corroborate, I can admit them

8   after the confession.  I don't know what is contained in

9   the confession.

10       I think what we will do at this time is just to have

11  him identify the brown bags, open them up, peer into them--He

12  doesn't have to take the items out and describe what they

13  are.

14       Now I feel also that if they are admissible in evidence

15  they should go into the jury room.  Now let's wait and see

16  when we have heard the confession and see if there isn't a

17  stronger evidence for admitting them into evidence other

18  than that they are evidence of what happened, because

19  Mr. Vieley states, we have overwhelming evidence of what

20  happened.

21       MR. GAUBAS:  I also have 3 tubes of blood, Your

22  Honor, to have identified simply for the purpose of later on

23  having Officer Jatkowski for the purpose of having him

24  testify to the groupings he was able to make.

98

R-61

SAVORY-LL-000650

1          THE COURT:  That goes to the question--No, that

2     goes to the question of who did it.

3          MR. GAUBAS:  These are tubes of actual blood.

4     Surely they are not going to be any more or less provoking

5     or choking to the jury tha-n a piece of clothing you are

6     ruling on now.

7          THE COURT:  Actual--

8          MR. GAUBAS:  The probative.

9          THE COURT:  Actual blood taken from who?

10         MR. GAUBAS:  From the victims and the defendant.

11         THE COURT:  All right.  Now why do you have to

12    have those in the Courtroom?

13         MR. GAUBAS: Well, we feel that it is relevant to

14    show that on certain items of clothing certain types of

15    blood were found.

16         THE COURT:  Right, you can do that without the

17    vials of blood in the Courtroom, can't you?

18         MR. GAUBAS:  We have to have the lab expert

19    identify the fact that he took vials of blood Officer Jatkowsk

20    had taken from the people in question, and sampled them

21    and--

22         MR. VIELEY:  We would stipulate though that we

23    will stipulate to the chain, we will do that.

24         MR. GAUBAS: I can prepare a stipulation on that.

99

2-612

1            THE COURT:  Sure you want to stipulate.

2            MR. GAUBAS:  I still think we will spend more time

3    doing that and presenting physical evidence.

4            THE COURT:  But when you start parading the blood

5    into the Courtroom in vials I don't think you need to do

6    that.  To have the officer's testimony that he compared the

7    blood or I don't know what he did, but he can testify if it

8    becomes material to have the actual blood in the Courtroom,

9    I will allow you to do it.

10       You are entitled to get the blood comparisons into

11   evidence, of course, and there won't be any problem with

12   that.  But at this time I would instruct you, don't bring

13   the blood in the Courtroom unless it is the only way to get

14   it into evidence and if you can, get his conclusions as to

15   what he did, I don't think you need the vials of blood in the

16   Courtroom.

17       All right, let's go ahead and you can just have him

18   identify these items and I will reserve my ruling on this

19   until I have heard the confession and see whether they are,

20   anything is material after he reads the confession.

21       All right, let me ask you how much additional question

22   do you have of this witness?

23            MR. GAUBAS:  I think the number of additional

24   questions I have for Officer Jatkowski is just about, there



SAVORY-LL-000652

1  won't be too much more.  I would say at the most 15 to 20

2  minutes.

3        THE COURT:  All right, let's go ahead and finish

4  up with the direct examination of this witness before we--

5        Now what about the stipulation as to the chain of

6  evidence on the blood?

7        MR. GAUBAS:  I am willing to accept that now.

8        MR. VIELEY:  Yes, we will make that agreement.

9        THE COURT:  All right, state for the record,

10  Mr. Vieley, what you are going to stipulate.

11        MR. VIELEY:  We will stipulate that there is in

12  fact a chain of evidence for the blood samples taken and

13  that the State need not prove any thorough chain as normally

14  would be required in a case of this nature and magnitude.

15        THE COURT:  What samples are you talking about,

16  taken from who?

17        MR. VIELEY:  The defendant and the 2 deceased

18  children.

19        THE COURT:  All right.

20        MR. VIELEY:  We ought to make that stipulation

21  for Y. T. Savory, too.  That was done I believe.

22        THE COURT:  The defendant's father?

23        MR. VIELEY:  Right.

24        MR. GAUBAS:  I didn't intend to present testimony

101

1  concerning that at the moment, but I think it may become

2  relevant in rebuttal, but I don't see it.

3  THE COURT:  All right, the chain of evidence has

4  been stipulated to in regard to the blood samples.

5  MR. GAUBAS:  I will accept that stipulation, Your

6  Honor.

7  THE COURT:  All right.

8  MR. GAUBAS:  Now presume the officer will be allowed

9  then to simply testify that he did collect samples from each

10  of the victims and the defendant and took them to the Maywood

11  Laboratory for testing?

12  MR. VIELEY:  Absolutely.

13  MR. GAUBAS:  From there I will have Officer

14  Jatkowski--

15  THE COURT:  Which were of, and this is what they

16  should--

17  MR. GAUBAS:  The result he achieved from testing

18  them.

19  THE COURT:  Keep it short.  We won't argue over

20  the chain.  All right, now, let's bring back in the jury.

21  (WHEREUP' ', THE JURY WAS BROUGHT BACK INTO THE COURTROOM)

22  THE COURT:  All right.

23  MR. GAUBAS:

24  Q  Officer, without removing from the bag these items

SAVORY-LL-000654

1    would you please look at People's 3 and the contents and tell

2    us what you see there.

3            THE COURT:  I will examine that also.  The Court's

4    ruling for the benefit of the jury, so they know what is

5    going on, I am just going to allow this witness to identify

6    the items in the brown bags.

7        I will rule after I have heard all of the State's

8    evidence on whether they should be admitted into evidence and

9    go before the jury.  That is why I am reserving my ruling

10   on that question at this time so that is why he isn't taking

11   them out of the bag at this time.

12   MR. GAUBAS:

13       Q   Can you identify the contents of People's 3, officer?

14       A   It is marked People's Exhibit 3 A.  I mean--

15       Q   What is it?

16       A   These are the panties, the underpants of the victim

17   Cooper.

18       Q   You collected them?

19       A   Yes, I did.

20       Q   Do they appear to be in the same condition today as

21   they did on the date you collected them?

22       A   There is additional writing and some areas that have

23   been removed, but other than that, yes.

24       Q   Any other differences?

SAVORY-LL-000655

1       A   No.   Now on the People's Exhibit 3, as I indicated

2    on prior packages, the same differences apply, that additional

3    writing, another seal on here and I had opened this myself.

4       Q   Officer, I hand you what has been previously marked

5    for identification as People's 4 and its contents.   Would you

6    please look at it and tell us if you can, identify that.

7       A   This is People's Exhibit 4, is the container that

8    I placed the victim, Cooper's night gown inside.   Again,

9    noting the same differences that I noted to the prior

10   package.

11      Q   The night gown is marked 4 A?

12      A   The night gown is marked People's 4 A.

13      Q   Do you notice any differences from it from the date

14   you collected it and placed it in evidence?

15      A   Yes, there are additional areas that have been cut

16   out of the night gown and of People's Exhibit Number 4 A

17   has been affixed to it, there is additional writing.

18      Q   Any other differences?

19      A   No.

20      Q   Officer, I also hand you what has been previously

21   marked for identification as People's Number 5, ask you if

22   you can identify it and the contents.

23      A   People's Exhibit Number 5 is the container which I

24   had placed victim Robison's shirt inside.   Again, noting

SAVORY-LL-000656

104

R-617

1    the same differences as in the prior containers, and the

2    People's Exhibit Number, the contents as marked People's

3    Exhibit 5 A and there are additional holes in this particular

4    exhibit and have had tape affixed to it which I had not

5    affixed to it.

6          Q    Any other differences?

7          A    No.

8          Q    And Officer, People's Exhibit Number 13 previously

9    marked for identification, would you examine it and I ask you

10   if you can identify it and the contents.

11         A    Okay.   Thirteen is the container which I had placed

12   the pillow case from the bed inside.   Again, noting the same

13   differences that I had explained in the prior containers.

14         And there is 13 A which is the contents of this package

15   and the only differnce is that there are again areas that

16   have been removed from the items, additional writing on a

17   piece of tape and the People's Exhibits Number on it.

18         Q    Any other differences?

19         A    No.

20         Q    Officer, the only other item of clothing I believe

21   I wanted you to look at, People's, previously marked

22   identification number 54, and its contents.   Please examine

23   that item carefully and tell us if you can, identify it and

24   its contents.

SAVORY-LL-000657



2-618

195

1    A  People's Exhibit Number 54 is a container which I

2  had placed a pair of blue pants, collected from the bedroom

3  of the upstairs bedroom of 1011 West Hurlburt.

4    Q  Officer, on what date did you collect that piece of

5  evidence?

6    A  On January 26th of this year.

7    Q  That was not collected from the scene at 3033 West

8  Garden?

9    A  No, it was not.

10    Q  Is there any specific reason you were looking at

11  the 1011 West Hurlburt?

12    A  This is the residence of a Y. T. Savory, the defendant's

13  father.

14    Q  Those particular pants were collected by you on that

15  date, is that correct?

16    A  Yes, they were.

17    Q  And are they in the same condition except for the

18  evidence tags as on the date that you collected them?

19    A  They are.  Again, **there** is additional writing on

20  this particular piece of evidence and an area has been

21  removed, a small area.  But again, this or 54 A is a,

22  substantially same condition as when I collected it.

23    Q  Why did you take that piece of evidence from that

24  residence, officer?

SAVORY-LL-000658



106

R-619

1    A   I was told--

2          MR. VIELEY:   Objection, hearsay.

3          THE COURT:   Sustained.

4    MR. GAUBAS:

5    Q   Not telling us what you were told, why did you take

6    that piece of evidence?

7    A   I searched the residence for any clothing that may

8    have any trace evidence adhering to it, trace evidence which

9    may have been taken from the scene at 3033 West Garden or

10   from the victims.

11   Q   Was there any particular reason you decided to

12   collect that pair of pants?

13   A   Yes, on this particular pair of pants there was a

14   red globular type stain.  It wasn't penetrated into the

15   fabric, but it was also adhering the fabric like as much

16   as it wasn't completely soaked into it.

17       I collected it for that purpose.  I felt that this may

18   have, that red substance may have been blood so I submitted

19   it to the Maywood Lab.

20   Q   What size pair of pants do you have, officer?

21   A   There is no size on this pair of pants.

22   Q   Could you describe them by having looked at them

23   as to whether they would be for a large man, small man,

24   medium size person?

PENGAD CO., BAYONNE, N.J.  07002 · FORM IL 24A

SAVORY-LL-000659

107



1    A  They would be for a small to medium sized person,

2  describing myself as in approximately that same area as

3  being medium, but on the small end of it, I would say that

4  these particular pants would be small for me.

5    Q  All right.  Thank you.  Any other differences in

6  this item that you recall at this time?

7    A  No.

8    Q  And on the date you collected it.

9    A  Exhibit 54 which is the container, as I stated is

10  the same differences as the prior containers.

11    Q  Okay.  Officer Jatkowski, I would like to show you

12  People's Exhibit 15 which has been previously, excuse me,

13  yes, it is 15, previously marked for identification and

14  ask you if you can identify those.

15    A  People's Exhibit Number 15 is the container which I

16  placed the light switch plate from the bathroom at 3033

17  West Garden.  I had collected it on the intial day that I

18  was searching the crime scene, January 18th.

19    Q  Please remove the contents of 15 and see if you

20  can identify that.

21    A  What has been marked as People's Exhibit Number 15 A

22  is that same light switch plate.

23    Q  Does that plate appear to be in the same condition

24  as on the date as you collected it?

SAVORY-LL-000660

108



1     A   There is an additional writing on the plate and we

2 had affixed the People's Exhibit Number to it, but other

3 than those differences, yes, it is.

4     Q   Do you notice any other differences at all?

5     A   No.

6     Q   Would you please replace the item in the package.

7 Thank you.

8     Officer Jatkowski, I show you what has been previously

9 marked as People's Exhibit Number 37 and ask if you can

10 identify that.

11     A   People's Exhibit Number 37 is the container which I

12 had placed the hairs that I had taken from the bath tub in

13 the bathroom at 3033 West Garden.

14     Q   Where did you find these hairs in the bath tub,

15 officer?

16     A   They were in the base of the bath tub.  You have

17 your side and then the base of the bath tub and I found it

18 at the base near the drain.

19     Q   Why did you collect those hairs from that location?

20     A   They looked particularly unusual to me, that these

21 particular hairs were sitting in the area where they were

22 inside the bath tub.

23     If they had been, you know, fallen from your hair,

24 would have been more concentrated towards the ring or in

SAVORY-LL-000661

R-622

1  the drain.  These hairs were not concentrated in that

2  manner.  They were spread out into the base of the bath tub.

3      Q  And placed the contents of the hairs you found in

4  the bath tub in that particular item, is that correct?

5      A  Yes, I did.

6      Q  They are not there now, is that right?

7      A  No, they are not.  In addition to that--

8      Q  Is there any other difference?

9      A  There is writing, the seals have been broken on both

10  the top and the bottom of the package.

11      Q  Do you notice any other differences?

12      A  No.

13      Q  And I show you what has been previously marked for

14  identification as People's Exhibit Number 48 and ask you if

15  you can identify that.

16      A  This is the container which I had placed the hairs

17  from the sink in the bathroom at 3033 West Garden.

18      Q  Where did you find those hairs?

19      A  I found them in the base of the sink, sink basin.

20  They were not near the drain, but rather spread out throughou

21  the sink and on the upper portion of the lip.

22      Q  Any particular reason for collecting those items of

23  hairs?

24      A  Again, it appeared to be unusual to me that the hairs




110

1       would be in that area, so I had collected them.

2           Q   Any other difference in that package as you observe

3       it today as the day you originally marked it?

4           A   Yes, the seals have been broken on it. There is

5       additional writing and I had affixed an exhibit number to

6       this item.   It has been scratched out and a different

7       exhibit number has been placed on here.

8           Q   Any other differences?

9           A   Other than the hairs not being inside the package,

10      any more, no.

11          Q   Officer, I would also like to show you what has

12      been previously marked as People's Exhibit Number 48 through

13      53 and ask you if you can identify them just briefly.

14          A   Okay, 49 is the head hair standard which I removed

15      from or Mr. Savory, the defendant had removed from his head

16      and placed in this container on January 26th.

17          This was done at the Peoria Police Station.

18          Q   This was done pursuant to Court order?

19          A   Yes.

20          Q   Samples were being collected from the defendant.

21          A   These particular hair standards were not.

22          Q   Were they given voluntarily?

23          A   They were given voluntarily.   Additional writing

24      again and the seal has been broken, some of the contents

111




1   of the standards are still in here.

2       People's Exhibit 49 is the head hair, front, from

3   this area on the head.

4       People's Exhibit 50 is the head hair, top of this area

5   of the head.

6       People's Exhibit Number 51 is the head hair, back, which

7   is from the nape of the neck.

8       People's Exhibit Number 52 is the head hair from the

9   right side, right over here on the temporal.

10      And People's Exhibit 53 is the head hair, left, which

11  is from this area.  These hairs were removed directly from

12  the defendant's head and placed by the defendant into these

13  sacks.  These sacks were then sealed.

14      Q  Do you notice any differences in those items as you

15  have just identified them now as when you first collected

16  the items of evidence?

17      A  There is additional writing, seals have been broken

18  and People's Exhibit Numbers are affixed to each one of

19  these exhibits.

20      Q  Any other differences?

21      A  ¬n some of these exhibits there has been hair removed

22  because this one especially, head hair, back, there is nothing

23  that I can see in here, so there has been hair that has been

24  removed from this package.

 

1   Q   Any other differences?

2   A   No.

3   Q   Officer Jatkowski, would you please look at People's

4   Exhibits 17, 18, 19 and 20 and ask you if you can identify

5   them and tell the Court and jury what they are.

6   A   People's Exhibit Number 17 is the container which I

7   had placed blood flakes which had been scratched off the

8   bedroom closet door.

9   Q   That was taken from which bedroom?

10   A   The bedroom number 1, the closet door nearest to

11   the door into the bedroom that enters into the bedroom.

12   I placed these in this container on the 18th of January.

13   Q   Any differences from that item as it appears now in

14   Court from the date that you collected it?

15   A   Yes, there is additional writing, the seal has been

16   broken and resealed and People's Exhibit Number has been

17   affixed to it.

18   Q   Please proceed to the next number.

19   A   Exhibit 18, People's Exhibit 18 is the container

20   which I had placed the blood flakes from the mirror in here.

21   I had scraped it with a scalpel from the mirror into this

22   container and then sealed it.

23   The same differences appear on this People's Exhibit as

24   in the prior exhibit.

113

1    Q   Any other differences?

2    A   No.

3    Q   Please proceed to the next exhibit number.

4    A   Exhibit Number 19 is the container which I had

5    placed scrapings of red substance from the bedroom door knob.

6    Again, the same differences are apparent on this package

7    as in the prior 2 packages and this was also collected on

8    the 18th of January.

9    Q   Please proceed to the next exhibit number.

10   A   Exhibit Number 20 is the container which I had placed

11   the blood flakes which I had scraped from the front door knob

12   of the residence at 3033 West Garden.

13   Q   Had you found blood on the front door to the residence,

14   officer?

15   A   I had found a substance that appeared to be blood on

16   the door, yes.

17   Q   And from where did you collect it on that front

18   door?

19   A   I collected this scraping from the front door knob.

20   And again, this container is in the same condition as the

21   prior containers and they, it has been kept in the manner

22   that I previously stated.

23   Q   Were those the only locations as just described

24   here by People's Exhibit 17 through 20 that you took, made

114

SAVORY-LL-000666



2-627

1  scrapings from locations in the residence where it appeared

2  that a substance that looked like blood was found.   There

3  was only one other area that I had taken the scrapings and

4  that was on the telephone.

5      Q   Okay.   Officer, I would show you what has been marked,

6  previously marked for identification as People's Exhibit

7  Number 44 and ask you to identify it and the contents, if

8  you would.

9      A   People's Exhibit 44 is the container which I had

10  placed a N O R M A R K, Normark Pocket Knife, folding pocket

11  knife that I had received from George Pinkney, Officer of

12  Peoria Police Station.

13      Q   What date you had, had you received this particular

14  item from George Pinkney?

15      A   On January 25th of this year.

16      Q   Would you please remove the contents and see if you

17  can identify it.

18      A   People's Exhibit Number 44 A is the same knife which

19  I had received from Officer Pinkney.   On the side of the

20  knife is marked N O R M A R K.

21      Q   What does that marking delineate, if anything?

22      A   This marking is the brand name of the knife.

23      Q   And on what date did you get that item from George

24  Pinkney?   I got it on the 25th of this year, January.

PENGAD CO., BAYONNE, N.J. 07002 - FORM IL 24A

 

1    Q   Is this knife in substantially the same condition

2  as on the date when you received it from Officer Pinkney?

3    A   The knife is much cleaner than when I had received

4  it from Officer Pinkney.  There is additional writing on the

5  knife and the People's Exhibit Number has been attached to

6  it.

7    Q   Any other differences?

8    A   No.

9    Q   Officer, I would like to show you what has been

10  marked for identification as People's Exhibit Number 43 and

11  ask if you can identify that.

12    A   Yes.  This is a strong and glossy protective acrylic

13  nail hardner.  It is a bottle of thatsame substance which

14  was collected from 3033 West Garden, in the livingroom at

15  the foot of a telephone stand that was in the shape of an

16  elephant.

17    I collected this on the 27th of January of this year.

18    Q   You collected it from the residence at 3033 West

19  Garden?

20    A   Yes, I had.

21    Q   Does that item appear to be in the same condition as

22  when you collected it?

23    A   Yes, it is, other than the People's Exhibit Number

24  being affixed to it.

116

SAVORY-LL-000668

PENGAD CO., BAYONNE, N.J.  07002 · FORM IL 24A

1      Q  Any other differences?

2      A  No.

3      MR. GAUBAS:  May I have just a minute, Your Honor.

4      THE COURT: Yes.

5  MR. GAUBAS:

6      Q  Officer, I would also ask you to look at People's

7  Exhibit Number 39 for identification and ask you if you

8  can identify that.

9      A  Yes, this is the photograph of the--I am going to

10  give directions on this particular diagram that will not

11  be exact directions as far as the north, south, east and

12  west of the house as it is positioned in the City, but I

13  am going to indicate as the north as being the top of the

14  diagram and south as being where 3033 West Garden is and

15  east as being where the end of the house, where People's

16  Group 1 is and west is where the garage is.

17      In this photograph depicts the corner of the bedroom,

18  the southeast corner of the bedroom as you see it if you are

19  using my directions.  This also depicts the corner of the

20  dresser that was on the south wall of bedroom number 1.

21      Any particular reason you took a picture of that location

22      A  Yes, depicted in the photograph on the south wall

23  is flick of a red substance which I believed to be blood.

24      Q  Does this picture truly and accurately portray the

SAVORY-LL-000669

117




1   scene as you recall it on that date?

2       A   Yes, it does.

3       Q   Would you look at People's 41 briefly and explain to

4   us what that is.  Excuse me, before you look at this one

5   I believe there is another one, and would you look at People's

6   Exhibit Number 38 first and tell us what that picture is.

7       A   All right, this photograph depicts the right dresser

8   mirror as you are facing the dresser, would be on the right

9   side.  There are twin mirrors and that dresser was positioned

10  again on the south wall of the bedroom number 1.

11      It depicts the area where I had an adult latent palm

12  impression and finger impression and a latent nose and 2

13  lip impressions on the mirror.

14      Q   You indicated that you were able to identify that

15  latent impression or the palm print impression.

16      A   I was able to identify the latent palm and the

17  latent fingerprint.

18      Q   Whose impressions were those?

19      A   Those were the victim's, Robison.

20      Q   James Robison?

21      A   James Robison, Jr.

22      Q   Does that picture accurately and truly portray the

23  mirror as you recall it on that date?

24      A   Yes, it does.  It also depicts the red substance

SAVORY-LL-000670

 

1   that surrounds the area where the palm impression was.

2       Q   Officer, I would ask you to look at People's Exhibit

3   Number 9 and tell us if you can, identify that.

4       A   This is a photograph of the front door and it

5   depicts the front door knob which I had collected the blood

6   flakes and placed in the prior exhibit.

7       Q   Did you get the flakes from above or below the front

8   door knob?

9       A   Above.

10      Q   Does that picture truly and accurately depict the

11  scene as you recall it on the date in question?

12      A   Yes, it does.

13      Q   Any differences?

14      A   Officer standing here shining a spotlight on the

15  door.  He is the only thing that is additional in the

16  photograph.

17      Q   And People's Exhibit Number 28 for identification.

18  Would you please look at that and tell us, if you can identify

19  that.

20      A   This depicts the doorway leading into the bedroom,

21  the east wall of the bedroom and also the west wall or the

22  south wall and the dresser that is on the south wall.

23      It depicts both of the mirrors upon the dresser and

24  the contents of the top of the dresser.

SAVORY-LL-000671

  119

1    Q   Is there any particular reason you took the pictures,

2    officer?

3    A   Yes, I wanted to get a general view of what an

4    individual would be seeing if he was standing inside the hall-

5    way looking in to the bedroom.

6    Q   And can you tell from that picture depicting that

7    door of the bedroom, the area from which you collected the

8    items that you thought was a substance that appeared to be

9    blood?

10   A   Yes, I do.   It is the area that is surrounding the

11   door knob and the door knob of the door.

12   Q   Does the picture truly and accurately portray the

13   scene as you recall it on the date in question?

14   A   Yes, it does.

15   Q   Officer, I would like you to look at what has

16   been previously marked for identification as People's

17   Exhibit Number 33 for identification and ask you if you can

18   identify that.

19   A   That is a photograph that I had taken of the ceiling

20   of the bedroom number 1 which I had seen a red, a spot of

21   a red substance on the ceiling of the bedroom, right above

22   the bed.

23   The angle of this photograph was taken from the south

24   going to the north and it also depicts the top of the

SAVORY-LL-000672





120

1  curtain rod of the north window.

2      Q  Does that picture truly and accurately portray that

3  area as you recall it from taking a picture?

4      A  Yes, it does.

5      Q  Officer, People's Exhibit 27 previously marked for

6  identification, can you identify that.

7      A  This is a photograph, a close up photograph of the

8  bedroom door and the area which I had scraped the red

9  substance from that door.

10     Q  Is that a close up shot of that area?

11     A  Yes.

12     Q  Is there any difference from the date you collected

13  the evidence and took the picture?

14     A  No, there is not.

15     Q  Does that picture truly and accurately portray the

16  scene as it attempted?

17     A  Yes, it does.  This door was in fact--In fact, it

18  is, you can see in prior photographs that this particular

19  plant was right up against this door.

20         MR. GAUBAS:  Your Honor, may the record indicate

21  I am tendering these exhibits to defense counsel.

22         THE COURT:  It will so indicate.

23  MR. GAUBAS:

24     Q  Officer Jatkowski, did you perform any other tests



1    at the residence other than what you have already indicated

2    in your testimony?

3        A   Yes, I did.

4        Q   What other tests, if any?

5        A   One additional test was performed.  I performed a

6    Luminol preliminary blood test on certain areas and walls

7    inside the residence.

8        Q   What training have you had to perform such a test?

9        A   I was sent to the manufacturer of that product

10   in Morristown, New York, Serly Laboratories and I was given

11   detailed instruction during a week long school on how to

12   administer the test, mix the chemicals and determine a

13   positive reaction from the chemical reaction with blood.

14       Q   What is the purpose of that test, officer?

15       A   It is a, used as an investigative aid as a preliminary

16   indication as to the surfaces that contain blood or areas

17   that had been sprayed with a substance that contained blood.

18       Q   How was it performed?

19       A   Initially you must mix 2 reagents which are inactive

20   in their present form, a powder and a liquid formula.

21   They are mixed thoroughly until both the powder is completely

22   dissolved in the liquid formula.

23       This test must be performed in complete darkness because

24   the reaction to the blood hemoglobins is a luminescence

SAVORY-LL-000674



122

1    or white luminescence.  After the test or after the chemical

2    is completely dissolved in the liqid we affix, I affixed

3    this chemical to an aerosol can.

4        This aerosol can is completely cleaned out with water

5    after each cause and prior to each cause.  This aerosol

6    can is just a propellant.  It propels the Luminol chemical

7    on a surface that possibly contains a blood.

8        Q   Did you perform this test in any of the rooms and

9    residence at 3033 West Garden?

10       A   Yes, I did.

11       Q   Which rooms?

12       A   I performed the test in the livingroom, kitchen,

13   bathroom, bedroom number 1 and bedroom number 2.

14       Q   What dates were these tests performed?

15       A   The initial test that was performed in the bathroom

16   was the first day of the crime scene.

17       Q   What were the results of the Luminol test you

18   performed there in the bathroom?

19       A   The initial result was that I had got a positive

20   reaction from the Luminol as to a substance that was not

21   visible to the human eye, had been sprayed on the wall.

22       This substance contained blood.

23       Q   What areas in the bathroom did you observe the spray,

24   in fact?

SAVORY-LL-000675

123



R-636

1       A   The spray effect was on, as you are looking into

2   the bathroom using my directions again, it would be on the

3   west wall right above the toilet and up to where the medicine

4   cabinet came above the sink.

5       Q   Did you notice any other effects in that particular

6   room?

7       A   Yes, there was another general reaction for blood on

8   the tiles.

9       Q   And what area of the bathroom?

10      A   In the same area.

11      Q   Any other effects in that particular room from the

12  Luminol tests?

13      A   No.

14      Q   Did you perform a test of bedroom number 1, the

15  murder bedroom?

16      A   Yes, I did.

17      Q   What effects did you achieve there?

18      A   I received the same effects on areas which I had

19  seen this red substance, this dried red substance that I

20  believed to be blood.

21      I got a definite, positive reaction for blood.

22      Q   And what areas specifically in the bedroom were you

23  getting this reaction from?

24      A   I had prayed it on the walls.  I had also sprayed

SAVORY-LL-000676

1   it on the door which I had, from an area where I had scraped

2   some of that red substance from the door.  Just so it maybe

3   clearer, about this test, I had taken standard areas where

4   I saw that there was no evidence of any blood, areas that

5   were in the same surface as areas where I had got positive

6   reactions and I had got negative reactions in those areas,

7   so I had double checked my work throughout the home.

8       Q   And any other rooms that you performed this test,

9   officer, did you get any positive results from the Luminol

10  tests?

11      A   Yes, I did.  Now I initially went to the bathroom

12  on the day of the crime or of the day, of the crime scene.

13  I then went back and got more reagent.

14      I only had a small limit supply of reagent.  I came

15  back with again with more of the chemical, sprayed the walls

16  in the bathroom, the walls in the livingroom and the floor

17  of the hallway.

18      Q   Did you discover any effects or results from the

19  Luminol tests in those locations, if any?

20      A   Yes.  I got again a better reaction in the bathroom

21  because I was able to spray a larger area.  I got the same

22  reactions to the bedroom door, bedroom, the door going to

23  bedroom number 1, and I got negative reactions in all the

24  other rooms that I had processed.

all material to the offense charged.  The photographs
tend to establish these facts and conditions, and under
such circumstances there production is evidence is a legitimate
mode of proof.

In People v. Tilley 411 473, that is the uterus or
abortion case, states, even though the jury may have a full
description of the injury by the testimony of physicians,
it is not an abuse of discretion to admit into evidence
the uterus to aid the jury in understanding the nature and
extent of the injury in determining how the offense was
committed.

It is at least, it at least tends to prove a circumstance
to be considered by the jury along with all the other evidence.

Now those 2 cases would seem to indicate and support
the position of the State.  I want to bring those to the
attention of defense counsel.  And I would ask you to
submit to the Court any decisions which state that the type
of evidence is not admissible, I haven't found any.

I just wanted to bring that to everybody's attention
but these 2 cases seem to clearly support the position that
Mr. Gaubas has taken in regard to these items of clothing.

All right, with that then you can bring back in the
jury for cross examination.

(WHEREUPON, THE JURY WAS BROUGHT BACK INTO THE COURTROOM)




127
R-639

1  Q  Were there any other tests that you performed as

2  crime scene investigator in charge of the crime scene that

3  you recall at this time?

4  A  None that I recall at this time.

5  MR. GAUBAS:  May I have just a moment, Your Honor.

6  Your Honor, at this point and time I would tender the

7  exhibits that the officer has identified, as items into

8  evidence, particularly thephotographs defense has had an

9  opportunity to observe and offer Officer Jatkowski for

10  cross examination.

11  THE COURT:  All right, thank you.

12  Before we get into the cross examination of Officer Jatkowski,

13  we will take a recess for about 10 minutes, reconvene in

14  about 5 minutes.

15  (RECESS)

16  THE COURT:  On the record.  During the recess I

17  have read several of the cases about what can be admitted and

18  what cannot be admitted in People v. Jenko, they are talking

19  about explicit photographs.  That is 401 1478 and that case

20  says that inflammatory and gruesome photographs can be

21  admitted

22  It says that the fact and because of the death, the

23  number and the location of wounds, the manner in which they

24  were inflicted, the willfulness of the acts in which are

SAVORY-LL-000679

126

 

1          THE COURT:  All right, Mr. Vieley, you may proceed,

2     sir.

3          MR. VIELEY:  Thank you, Your Honor.

4     CROSS EXAMINATION by Mr. Vieley:

5          Q   Now you testified on direct examination, officer,

6     that you took several latent fingerprints from the homocide

7     residence known as 3033 West Garden, is that correct, sir?

8          A   Yes, latent fingerprints and latent palm prints.

9          Q   And none of those were of the Defendant, Johnny

10    Savory, is that correct?

11         A   That is correct, sir.

12         Q   Now I believe you testified also on direct examination

13    that you took certain samples of hair from the defendant?

14         A   Yes, sir.

15         Q   And also you took certain samples of hair, I believe,

16    from the sink and the tub, is that correct?

17         A   Yes, sir.  The hair that was removed or volunteered

18    by the defendant was taken at 2 different occasions.  The first

19    occasion was on the 26th of January, and in which he had

20    given the hair voluntarily.

21         Q   What time of the day was that?

22         A   That was in the afternoon, sir.

23         Q   Was that after the arrest?

24         A   I believe it was, sir, yes.

R-641

128

1    Q   When was the other occasion?

2    A   The other occasion was on March 1st at St. Francis

3    Hospital.   It was on the same day that we had drawn the

4    blood from him.

5    Q   Now did you take any samples of hair from a man

6    named Kenny Parker?

7    A   No, sir.

8    Q   Did you take any samples of hair from a man named

9    Charles Watts?

10   A   No, sir.

11   MR. GAUBAS:   Your Honor, I am going to object to

12   this line of testimony.   I think it is totally irrelevant.

13   THE COURT:   Overruled at this time.   It may get

14   to that point.   I will let him proceed at this time.

15   MR. VIELEY:

16   Q   Now when you arrived at the murder scene did you

17   notice any hair in the hands of Connie Cooper or James

18   Robison?

19   A   I had removed a single hair from Connie Cooper and

20   James Robison.

21   Q   And isn't it true that those hairs did not resemble

22   the hairs of Johnny Savory?

23   A   Yes, it is true.

24   Q   In other words, their hairs were dissimilar to those

129

SAVORY-LL-000681

R-642

1    of the defendant?

2        A   I believe the lab report and the officer or the

3    individual that will testify as to that analysis, I am not

4    qualified to testify as far as the analysis on those hairs,

5    but I am led to believe they did not match Mr. Savory.

6        Q   All right.  Now isn't it also true, officer, that you

7    checked under the fingernails of each victim at the scene of

8    the crime?

9        A   Yes, it is very true.

10       Q   And what, if anything, did you find under the finger-

11   nails of each victim?

12       A   When I had submitted the scrapings which I had taken

13   routinely I take fingernail scrapings in a case of this

14   magnitude and when I submit these fingernail scrapings, the

15   individual that was doing the analysis, Mr. Gonsowski, had

16   indicated there was not sufficient samples to determine

17   any findings at all.

18       Q   Well, let me ask you this.  Were these fingernail

19   scrapings containing human flesh?

20       A   Sir, I don t know whether they did or they didn't.

21   The report that I had received was that there wasn't anything

22   of evidentry value, from that indication I would imagine that

23   there wasn't anything at all in those fingernail scrapings

24   that I had taken.

130




1      But, again, Mr. Gonsowski did the analysis on those

2   exhibits and when he can tell you what he meant by no

3   evidentry value.

4      Q   Now isn't it true that you took some fibers of the

5   rug from the home at 3033 West Garden?

6      A   Yes, I did, sir.

7      Q   And those fibers were compared to the shoes of

8   Johnny Lee Savory, were they not?

9      A   Yes, yes, they were.

10     Q   And isn't it true that those fibers taken from this

11  home did not match the fibers taken from Johnny Savory's

12  shoes?

13     A   Yes.

14        MR. GAUBAS:  Your Honor, at this point I am going

15  to object.  I think defense is asking this witness about

16  a comparison he did not make.

17     Mr. Gonsowski made the comparisons.

18        THE COURT:  Right, I think that is a good objection.

19  He is stating what he has been told by Gonsowski, not what

20  he did.

21        MR. GAUBAS:  Mr. Gonsowski will be our next

22  witness if Mr. Vieley wishes to question him.

23        THE COURT:   I think those questions should be put

24  to Mr. Gonsowski, so I will sustain the objection unless he

131



1   is the one that made the scientific investigation.

2   MR. VIELEY:

3       Q   Now you testified on direct that you made a Luminol

4   test, is that correct?

5       A   Yes, sir, I did.

6       Q   Now that test, and as I understand your testimony,

7   would show where blood had been on a wall or at any other

8   place even though you couldn't see it with your eye?

9       A   Yes. sir, the sensitivity of that particular test

10  is one part of blood to 100,000,000 parts of another

11  substance.

12      Q   So in other words the way you do that test is as I

13  understand it, is that a person could walk for example here

14  to the Courtroom and we cannot see any blood on the wall

15  today, can we?

16      A   No, sir.

17      Q   But you could put your Luminol on there and then

18  turn the lights out and if blood had been there recently,

19  I assume it would glow and that is what the test is all

20  about?   Is that a fair statement?

21      A   Well, let me tell you the results of the test.

22  If blood had been in a substance which had been sprayed on a

23  wall or had been on a certain ob ect and I performed my

24  test and got a positive reaction for blood, yes, that object

132

1   as indicated by the test had contained blood at one time.

2   Q   All right, now did you do that test then for the

3   livingroom?

4   A   Yes, I did.

5   Q   Now did that test indicate anything that blood had

6   been there?

7   A   No.

8   Q   So you reach the conclusion that there was no blood

9   in the livingroom?

10  A   Yes, sir.

11  Q   Nor had there been any blood in the livingroom at

12  any time, say, during the day of January 18th, 1977?

13  A   As far as the indications of that test, yes, there

14  was, there was no indication of any blood in the livingroom

15  at any time.

16  Q   And you believe that test to be accurate, did you

17  not?

18  A   Yes, the test results that I performed on the door and

19  on in the bathroom were confirmed by later testing by the

20  Illinois Bureau of Identification.

21  Q   That in turn led you to conclude, did it not, that

22  the individuals were knifed or killed in bedroom number 1

23  as opposed to the livingroom?

24  A   It led me to believe that blood was on the walls

SAVORY-LL-000685

PENGAD CO., BAYONNE, N.J. 07002 · FORM IL 24A

133



1    in the bedrooms.  But that there was no blood on the walls

2    in the livingroom.

3        I did not give any indication of any blood on the walls

4    in the livingroom.  But it is not necessarily the fact that

5    something couldn't have happened in the livingroom in which

6    blood would not have been on to the walls.

7        Q  All right, now if they were standing in the living-

8    room there would be blood on the floor, would there not?

9        A  There would have been that possibility of it, but

10   because so many people had tracked in and out of the house

11   by the time I had a chance to do my testing I had got an

12   indication as I placed in one of my reports a general

13   indication of blood on the floor, but not on the walls.

14       There was a trail that led from the bedroom out to

15   the front door, but nowhere else in the livingroom was there

16   a positive reaction for blood.

17       The hallway in the, a trial ging directly to the front

18   door, there was an indication of blood.  But there was no

19   blood in any droplets or any kind of general spots as you

20   would get from an indication of blood dropping on to it,

21   but rather a general indication where it had been tracked

22   from one area into another.

23       In fact, there were indications of shoe and footprints

24   going out the door.

SAVORY-LL-000686



134


1    Q   Now didn't you find a footprint outside?

2    A   Yes, sir.

3    Q   What size shoe was that?

4    A   Approximately a 11 and a half inches long.   Now

5    size of a shoe varies a great deal.   I can only attest to the

6    exact measurment of the shoe.

7    From personal experience I have found that more than

8    one size will fall within a certain length of shoe, depending

9    upon the interior construction of that shoe.

10   There were additional prints in the snow, but there

11   was only one individual shoeprint that I could say that this

12   is exactly the length and it was a recent shoeprint.

13   Q   All right, and it was 11 and a half inches long so

14   that would be fairly good size shoe, would it not?

15   A   Yes, it would.

16   Q   An adult shoe?

17   A   I believe, but as I indicated because of the interior

18   construction of the shoe and not knowing whether the person

19   wearing a shoe wore the correct size, you know, the individual,

20   I couldn't really say that it would be an adult shoe.

21   It was a shoe of that proportion, 11 and a half inches

22   long.

23   Q   More probably it was an adult shoe, then would that

24   be a fair statment?

SAVORY-LL-000687



135


1    A   Well, I cannot really make that statement.   I have

2    got a younger brother and he has got boats for shoes, and he

3    is much younger.   He is like 13 or 14 years old, and I

4    cannot really say honestly on the stand under oath that it

5    was definitely an adult shoe.   Probably an adult shoe.

6    Q   Let me ask you specifically, would that 11 and a

7    half inch print that you just described match a size 7 and

8    a half shoe?

9    A   I don't believe it would.

10   Q   Thank you.   Now in your investigation of this alleged

11   crime and the aftermath of that, did you learn that the

12   defendant, Johnny Savory wore a size 7 and a half shoe?

13   A   I was never told the exact shoe size of the defendant.

14   Q   Now returning once again to the Luminol test, did

15   you do any tests that would pick up the presence of bare

16   feet in the livingroom or the hallway?

17   A   Yes, I did.

18   Q   Now would you share with us what those results were,

19   please.

20   A   Again, sir, in the hallway and the path that led out

21   from the front door to the bedroom, I got a general reaction.

22   There were some heel and toe type shoes meaning, you know,

23   a sole and a heel on a shoe, something similar to what the

24   alternate juror is wearing over here, the man pictured in

SAVORY-LL-000688




136

1    the white shirt and the blue, the black pants.

2        I got a general indication.  Those were the only

3    particular prints that I had seen that I could possibly say,

4    yes, this is the heel and toe shoe.

5        The other was a general reaction where many people just

6    like if a fingerprint is placed on top of another fingerprint

7    it forms a general smear.  The same indication is what I

8    got with the Luminol test.  It determined a general smear

9    over that area.

10   Q  So?

11   A  I, in answer to your question, I cannot get any

12   positive analysis that showed that there was a bare foot

13   walking on that particular area.

14   Q  So you are unable to tell us then whether or not

15   there were bare feet in the livingroom?

16   A  That is correct, sir.

17   Q  Now I believe you told us also on direct examination

18   that you went to the home of the defendant's father, Y. T.

19   Savory, is that correct?

20   A  Yes, I did, sir.

21   Q  'nd what date was that?

22   A  On the 26th of January.

23   Q  What time of day did you go to that home?

24   A  In the late evening.

SAVORY-LL-000689




137

1      Q  About what time?

2      A  Oh, it was approximately 9 or 10 o'clock.

3      Q  And who was there when you arrived?

4      A  Mr. Savory.

5      Q  That would be the father Savory?

6      A  Yes, Y. T.

7      Q  Y. T., not my--

8      A  Not the defendant, Johnny.

9      Q  All right.  And was there anyone else there besides

10 you and Y. T. Savory?

11     A  Officer John Bennett.

12     Q  And he accompanied you to the father's home, is that

13 correct?

14     A  Yes, he did, sir.

15     Q  Now when you arrived did you have a conversation with

16 Y. T. Savory?

17     A  Yes, sir, I did.

18     Q  All right.  Would you tell us what you said and what

19 he said.

20     A  I cannot give you, you know, it has been approximately

21 5 months since I talked to him.  I cannot give you the exact

22 conversation that went back and forth.

23     Q  Give us the best you can.

24        MR. GAUBAS:  Your Honor, at this point, I am



138

SAVORY-LL-000690

1   questioning the relevance of this testimony.  I think pretty

2   clearly it is hearsay.  I have no idea what he is seeking,

3   but I don't see any relevance to test it.  We have just

4   discussed that.

5        MR. VIELEY:  I thought he testified that he went

6   to the home and got a pair of pants which--

7        THE COURT:  Well, you can ask him about that, but

8   any conversations he had would be hearsay.  If you want to

9   know what Mr. Savory had to say, why you can call him.

10       MR. VIELEY:  Well, the police officer is there and

11  he is an agent of the state in this case, so I think it

12  wouldn't be hearsay if it would please the Court.

13       It would be a conversation in the presence of this man

14  who was a witness here today subject to my examination and

15  Mr. Gaubas' examination.

16       THE COURT:  It is hearsay as I understand it.

17  I will sustain the objection on the basis of what Y. T. Savory

18  was hearsay.  You want to examine him about the pants that he

19  obtained, why you can go ahead.

20       MR. VIELEY:  That is the purpose of my question,

21  if I may, Your Honor.

22  MR. VIELEY:

23       Q  Did you have a conversation about the pants with

24  Y. T. Savory?

SAVORY-LL-000691




139

1    A   Yes, I did.

2    Q   All right, now what did you say to him and what did he

3  say to you?

4    A   Again, I cannot exactly remember what I had said to

5  him, but generally I had told Mr. Savory that we were coming

6  to the apartment to collect a pair of blue pants that I had

7  been told that Johnny was wearing.

8    Q   And what did he say to you?

9    A   He said, well be my guest.

10   Q   And then what happened?

11   A   Then I searched an area of the home and I found these

12  pants rolled up in a sheet.

13   Q   What else did you find besides the pants?

14   A   I found a pair of green pants, this pair of blue

15  pants, another pair of blue pants, a yellow comb and we had

16  collected all the garbage from the house.

17   Q   Was there a girls dress that you found also?

18   A   There was a night gown that I had found earlier.

19  It was in another, or many bags inside the house, approximately

20  20 bags that contained, well they are larger garbage size

21  bags that stood about this high and each bag was contained

22  a quantity of clothing.

23   One of the bags had a night gown from a woman and it

24  had washed out stains on it.

PENGAD CO. · BAYONNE, N.J. · 07002 · FORM IL 24A

SAVORY-LL-000692

140




1     Q  Now did Mr. Savory tell you how those stains got

2  there?

3     A  Yes, he did.

4     Q  Would you tell us what you said and what he said.

5     MR. GAUBAS:  Again, Your Honor, I am going to

6  object.  I think this is clearly hearsay.

7     THE COURT:  Sustained.

8     MR. VIELEY:  Judge, I think I would like to make

9  an offer of proof out of the presence of the jury.

10     THE COURT:  Certainly.  I will excuse the jury.

11  (WHEREUPON, THE JURY WAS TAKEN OUT OF THE COURTROOM)

12     THE COURT:  You can just state for the record

13  what you feel his testimony would be.  I am certain you know

14  it.

15     MR. VIELEY:  I don't want to mis-state it.

16     THE COURT:  Go ahead and ask your questions.

17     MR. VIELEY:  First of all I want to renew my

18  objection.  I don't think, if it please the Court, that this

19  is hearsay.  Now this man was, no doubt about it, is an agent

20  of the police force and was a representative of the police

21  office in question.

22     Now it is true that the defendant wasn't there, but we

23  are the ones that are asking for the response, not the State,

24  to this question.  I think the State were trying to get this

SAVORY-LL-000693

 

141

and I objected it would be objectionable.   But my point is
that there is a police agent there having a conversation.
I want that in the record.

And I don't think it is hearsay because this man can
be asked and cross examined as to what was said and also
could be examined by Mr. Gaubas on redirect.

THE COURT:  Yes.

MR. VIELEY:  So first of all, I don't think it is
hearsay, Your Honor.

THE COURT:  Go ahead.

MR. VIELEY:

Q   All right, tell us for the sake of the record what
was said by you and what Mr. Y. T. Savory said.

A   Okay, I had asked Mr. Savory out at the house how
the stains got on the night gown and Mr. Savory told me he
had cut himself and that he had used that night gown to wrap
around the wound.   That is the extent of the conversation.

Q   What, if anything, was said with respect to the pants,
the blue pants that have been marked as exhibits?

A   He never directly said anything as far as the blue
pants that are marked as evidence.   The only time that he
had indicated anything about cutting his leg was when I
pulled out, I pulled out a night gown and there was one other
piece of clothing inside the house that I--It had been

SAVORY-LL-000694




142

1   obviously washed.  It had stans and obviously had been

2   washed and I had asked him about this and he said that he

3   had cut himself and he was bleeding pretty badly and he

4   just wrapped this around the wound.

5       Q  Did Mr. Savory, Y. T. Savory show you the wound at

6   any time?

7       A  No, he didn't.

8       Q  Did you have any reason to doubt him as to what he

9   had said?

10      A  No, I didn't have any reason to doubt him.

11      Q  Was there any other conversation that took place

12  on the day that I am asking you about?

13      A  Well, we had asked him about the garbage.  We were

14  searching for any kind of evidence that had trace material

15  on it.  So we had said, do you mind if we go through your

16  garbage.  And he said, no, go right ahead.

17      He says, it hasn't been emptied since 3 weeks ago.  He

18  said nobody has come to pick it up.  You are welcome to go

19  out to the cans in the alley and go through them and go throug

20  the garbage I have in the house.

21      So we had colleced all the garbage and went through it.

22      Q  Was the knife taken at that point and time, Exhibit

23  Number 44 A?

24      A  No.  The knife I received from George, Officer George

1  Pinkney at the Peoria Police Station.

2      Q  All right.

3          MR. VIELEY:  If it please the Court, that would

4  conclude our offer of proof.

5          THE COURT:  All right, is there any objections to

6  that evidence?

7          MR. GAUBAS:  Certainly, Your Honor, on two bases.

8          THE COURT:  Go ahead.

9          MR. GAUBAS:  First, it isn't clearly hearsay because

10  it is offered for no other reason than to show the truth

11  of the matter stated therein.  The statement by Y. T. Savory,

12  the individual for whose credibility we are not prepared to

13  vouch, particularly in form of hearsay that he gave

14  Officer Jatkowski.  It is clearly hearsay.

15      Point number 2, that it is not relevant to this case.

16  I would be the first to agree that apparently a bloody night

17  gown might be interesting evidence in some other case, has

18  absolutely no relevance to this case, since was not identified

19  as being the night gown belonging to anybody in this case.

20      The testimony just offered which, again, would serve as

21  hearsay, pertains not at all to any item that is in evidence

22  in this case, particularly those blue pants, so it is not

23  relevant.

24      For those 2 reasons we would strongly object to any



144

1    further testimony along these lines.

2        THECOURT:    Hunter's says on page 601, in that,

3        "There is some confusion about the hearsay rule in

4        that there seems to be a common conception that an

5        out-of-court statement offered in court for its truth

6        becomes admissible if the party against whom it is

7        offered was present at the time the statement was

8        made.

9        His presence at that time does not make a hearsay

10        statement admissible in evidence unless the doctrine

11        of admission by silence would be applicable",

12    which we don't have here.

13        All right, here is some inapplicability of the hearsay

14    rule.  States here again,

15        "An extrajudicial statement is not deprived of its

16        hearsay nature by the fact that the opposing party

17        was present", the opposing party in this case being

18    the State,

19        "And the presence of the opposing party when the

20        statement was made does not, in itself, make such

21        statement admissible, although it might be admissible."

22        MR. VIELEY:    If it please the Court, I don't mean

23    to argue or belabor the point, but it seems to me the

24    State did get some hearsay in, I believe, it was yesterday,



145

1   concerning what Mr. and Mrs. Douglas said to each other.

2       I think that was hearsay and I did object and it did

3   go in and then there was some hearsay.

4       THE COURT:  That was an exception as it is other-

5   wise.  That was the basis of that.

6       MR. GAUBAS:  Because the one point, Your Honor,

7   Oh My God--

8       MR. VIELEY:  There was more than, Oh My God, went

9   into the record.  I am sure there are some conversations.

10      MR. GAUBAS:  The only point I recall it was

11  objected to.

12      THE COURT:  Yes, I don't recall.  I am going to

13  sustain the objection on both grounds.  If it is hearsay

14  and also that based upon what he says he is going to testify

15  to doesn't have anything to do with this case.

16      I think it is a collateral issue, a side issue.

17  You know, if he was going to testify, well, yes, Johnny brought

18  that home, a boy on the street brought that home, something,

19  you know, if there is any kind of excerpts in this case

20  then it would still be material, but I think it is hearsy.

21      MR. VIELEY:  Well, the trouble with this is, is

22  that the State now has got us in a bind because they put

23  these bloody pants at the house and now the burden is on us

24  to explain how they got that way and I, I cannot do it with

SAVORY-LL-000698

146

1     this man's testimony.

2          MR. GAUBAS:  Well, the bind is very easily resolved,

3     Your Honor.  If in fact what Mr. Y. T. Savory is the truth,

4     Mr. Y. T. Savory is very accessible and can be brought to

5     this Courtroom as a defense witness.

6          MR. VIELEY:  He cannot be brought here today,--

7          MR. GAUBAS:  Well, when your side of the case is

8     presented.

9          THE COURT:  You cannot put on everthing.on.

10         MR. VIELEY:  That is the problem

11         THE COURT:  Mr. Y. T. Savory is still in the

12    County Jail isn't he?

13         MR. GAUBAS:  The last I heard he is, Your Honor.

14         THE COURT:  He hasn't been transported to the

15    Department of Corrections.

16         MR. GAUBAS:  I don't believe he has been sentenced.

17         THE COURT:  Has not been sentenced, so he is

18    available, readily available to testify as counsel says.

19      All right, you can bring the jury back in.

20    (WHEREUPON, THE JURY WAS BROUGHT BACK INTO THE COURTROOM)

21         THE COURT:  All right, the Court did sustain the

22    objection of the State to the question.

23    MR. VIELEY:

24      Q  Now you told us, officer, that you had a conver

7

with Y. T. Savory, the father, did you not?

A   Yes, I did.

Q   And that conversation concerned how the blood got into these garments, did it not?

A   The night gown?

Q   Yes.

A   And the other garment.

MR. GAUBAS:  Your Honor, I am going to object. This was the very material the Court sustained my objection on.

MR. VIELEY:  I am not asking for what they said. I am asking what the conversation was.

MR. GAUBAS:  Merely asking for a hearsay conclusion based on that conversation.

THE COURT:  I will sustain the objection.

MR. GAUBAS:  There is a proper way to present that evidence and I think the Court--

THE COURT:  Certainly.

MR. VIELEY:

Q   Now at the close of this conversation did you believe what Mr. Y. T. Savory told you?

MR. GAUBAS:  I object, Your Honor.  That is asking for a conclusion.

THE COURT: Sustained.

148

MR. VIELEY:

Q  Did you remove any of these documents at the conclusion of the conversation?

THE COURT:  Documents?  Documents?

MR. VIELEY:

Q  I am sorry, any garments?

A  I removed the blue pants, but that wasn't what we were talking about, the night gown and the other garment, no, I did not remove.

Q  You did not?

A  No.

Q  So you placed no evidentry value on them at that time?

A  No, I did not.

Q  And they are not evidence in this case, is that correct?

A  That is true.

Q  Now did Mr. Savory, Senior, show you a sutured laceration on his left thigh?

A  No.

MR. GAUBAS:  Objection, Your Honor.  We have been through this.  It is thoroughly not relevant.

THE COURT:  It has been asked and answered. I will let the answer stand.

MR. VIELEY:  Please the Court, I would like to

 

1  show this officer a copy of his police report if I may to

2  refresh his recollection.

3          MR. GAUBAS:  Your Honor, I don't believe--

4          THE COURT:  On this issue?

5          MR. VIELEY:  Yes.

6          MR. GAUBAS:  I don't believe there is any showing

7  of the exhaustion.

8          THE COURT:  I will sustain the objection.  I don't--

9  we are talking about a cut on the father's leg, aren't you?

10         MR. VIELEY:  On the thigh.

11         THE COURT:  On the thigh.

12         MR. VIELEY:  The father's thigh, Your Honor.

13         THE COURT:  Yes.  I will sustain the objection

14  on the grounds that it is not material.

15  MR. VIELEY:

16      Q  You and Officer Pinkney were the only officers at

17  the home of Y. T. Savory, is that correct?

18      A  No, I had gone previously to the house prior on the

19  day with Officer Pinkney and Officer Fiers.  But at that

20  time he had not indicated to me personally any sutured mark

21  on his leg.

22      Q  Could he have indicated that to Officer Fiers?

23      A  I don't know what he had indicated, but he personally

24  did not indicate anything to me.

1    Q   All right.  But you are telling me that Officer

2    Fiers went in at another time?

3    A   Yes, he did.  It was earlier in the day.

4    Q   All right.  Now did you do any tests on the clothing

5    of the Defendant, Johnny Savory, such as the cap or the

6    maroon trousers?

7    A   Those items--Are you talking with the items of

8    clothing that were taken off of the defendant at the time of

9    his arrest?

10   Q   Yes.

11   A   Those items of clothing were submitted to the Pekin

12   Bureau of Identification Laboratory?

13   That night that we had collected the clothing, collected

14   them in individual containers, we had arranged for the

15   criminalist at the Pekin Laboratory, Judith Keinzler to

16   analyze those items.

17   I had, Officer Bennett and myself picked up Miss Keinzler

18   and took her to the Pekin Laboratory where she performed

19   the examination.

20   Q   And do you know if the test was negative for blood

21   on those items?

22   MR. GAUBAS:  Your Honor, I think there is a

23   proper way to present this evidence.  This Officer did not

24   conduct the tests.

SAVORY-LL-000703




151

1        THE COURT:  I will sustain it on the grounds that

2   he is not the one that made the test.  The only thing he

3   can testify to would again be what somebody told him and

4   therefore it is hearsay.

5   MR. VIELEY :

6        Q   Were you present when the test was made?

7        A   Yes, I was.

8            MR. VIELEY:  That is all we have.  Thank you.

9            THE COURT:  Thank you, Mr. Vieley.  Anything else,

10  Mr. Gaubas?

11           MR. GAUBAS:  Just a few questions, Your Honor, on

12  redirect.

13  REDIRECT EXAMINATION by Mr. Gaubas:

14       Q   Officer, this shoe print that was mentioned by defense

15  counsel on cross examination, do you recall where that was

16  found?

17       A   Yes, I do.

18       Q   Where was it, if you can tell us by referring

19  perhaps to the diagram.

20       A   As far as the diagram, if I could get down I could

21  show you approximately where we are talking about.

22       Q   Please do so.

23       A   As far as this diagram is concerned, the picture,

24  shrubbery in this area here and here.  There is a sidewalk

SAVORY-LL-000704

 

152

1    that comes from the front door and over to the driveway

2    in front of the garage.  The shoe print, the one shoe print

3    that had distinct characteristics to it, not as much as

4    identifiable characteristics, but they, they were distinct,

5    you could see the pattern of the shoe was approximately in

6    this area here, pointed in an area as to go to the street

7    and towards Western.

8         Western Avenue would be on this side of the house.

9    Laramie Avenue would be on the other side.  The shoe was

10   pointed in the direction of Western Avenue and Garden Streets.

11        Q   Did you see anything at all around the shoe print?

12        A   Yes, on several other shoe prints, the yard was

13   covered with shoe prints.

14        Q   Did that particular shoe print ever have any

15   particular significance for you in any way?

16        A   Inasmuch as it came from the front of the house

17   and was going towards Eestern and was the only shoe print

18   that I could possibly see a good shape to and I c ould give,

19   you know, give a class characteristic on that particular

20   type of shoe.

21        It wasn't anything distinct about it at all.

22        Q   Would you please take the stand.  Could that have

23   been an older shoe print, a boot or,--

24        A   No.



153

SAVORY-LL-000705

1      Q   --Or something else?  It was definitely a shoe?

2      A   It was definitely a shoe print.

3      Q   And you say you found no other items of evidence

4   around that particular shoe print?

5      A   No.  In fact, though, the whole yard, both the

6   front and back yard and the side areas of the house, the

7   yard was examined and no pieces of evidence were found in

8   the yards.

9      We found some pieces of garbage in the back that we

10   had collected, processed, you know, possible connections to

11   the offense, but nothing turned up.

12      Q   Pure speculation at this point?

13      A   It would be, yes.

14      Q   Did you attach any personal significance to that

15   print?

16      A   Well, the only thing, like I said, the only

17   significance I had placed on that print, the only reason

18   I had placed that information in my police report was that

19   it was the only print that I could see in the front yard

20   that had any characteristics that I could place in my police

21   report.

22      Q   But as far as you know that print could have been

23   made by another officer?

24      A   It could have been.

SAVORY-LL-000706



154

1      MR. VIELEY:  Objection.  It has been asked and

2  answered.  He is leading the witness.

3      THE COURT:  Sustained.

4  MR. GAUBAS:

5      Q  Now, officer, you testified just now on cross

6  examination collecting certain clothing from the defendant

7  on the day of his arrest, is that true?

8      A  Yes, that would be January 26th.

9      Q  Is that the first time you saw the defendant after

10  you knew that he was arrested?

11      A  Yes, sir.

12      Q  What items of clothing did you take from him,

13  then?

14      A  I took a blue hat, sweatshirt, jacket, pair of

15  pants, and a knit T. shirt with, it was tan in color with

16  stripes going across it.

17      Q  What time was this, approximately?

18      A  It was in the late afternoon or early evening about

19  5 o'clock, in that vicinity.  I would have to refresh my

20  memory with my report.

21      Q  Where did you take these items of evidence, officer?

22      A  Well, we took him into the bathroom, men's room of

23  the Peoria Police Station, detective division floor.

24      Q  Who was present at that time?

SAVORY-LL-000707



155

1       A   Officer John Bennett and myself.

2       Q   And the defendant?

3       A   And the defendant.

4       Q   Any one else?

5       A   No.

6       Q   Did you have any conversation with the defendant at

7   that time?

8       A   Yes, I did.

9       Q   What did you say and what did the defendant say?

10          MR. VIELEY:   Objection as to the conversation.

11          THE COURT:   Overruled.

12   MR. GAUBAS:

13      Q   Proceed, officer.

14      A   Again, it has been 5 months since I had this

15   conversation.  I have the exact conversation in my police

16   report. I can give you an overview of what the conversation

17   concerned, but I would rather read it from my police report.

18      Q   You are saying you don't recall exactly what was

19   said at this time?

20      A   I don't recall the exact words.

21      Q   Did you prepare a report that represents--

22      A   I prepared a report that very day after the evidence

23   was collected.

24      Q   Was that report detailed to the conversation?

1    A   Yes, it does.

2    Q   Would that refresh your memory?

3    A   Yes, it would.

4    Q   Could I ask permission of the Court, Your Honor, to

5  have the officer look at the report for the purpose of

6  refreshing his recollection?

7           THE COURT:   He may look at the report.

8  MR. GAUBAS:

9    Q   Do you have that report with you, officer?

10    A   Yes, I do.

11    Q   Please refer to it and let us know when your memory

12  is refreshed.

13           MR. VIELEY: I want to object again.   This is

14  beyond the scope of my cross examination, Your Honor.

15           MR. GAUBAS:   It is directly related to cross

16  examination, Your Honor.

17           THE COURT:   In what regard?

18           MR. GAUBAS:   Pertains to the taking of the

19  defendant's clothes.   Mr Vieley, himself, brought it up.

20           THE COURT:   All right, overruled.

21  MR. GAUBAS:

22    Q   Officer, is your memory now refreshed?

23    A   Yes, it is.

24    Q   What was that conversation?   What did you say to the

SAVORY-LL-000709



157

1    defendant and what did he say to you?

2         A   Well, initially we had been taking the hair standards

3    from Mr. Savory, the defendant.   And Mr. Savory had asked

4    us, he said, what are you taking these for.

5         And we had replied, Officer Bennett and myself, that

6    we were taking these hairs to be compared or we were going

7    to send them to the Chicago Laboratory for analysis.

8         Then we began examining his clothing.

9              MR. VIELEY:   Objection to we, again, Judge.

10        A   Well, Officer Bennett was with me.   He was also

11   examining the clothing with me in this particular instance.

12   MR. GAUBAS:

13        Q   What happened then, officer?

14        A   As we were going through the clothing I had found

15   a red stain on a sweatshirt.   And as I was looking at the

16   stain on the wall, Mr. Savory had stated, that is not my

17   shirt, that is Ray's.

18        So we had just collected the evidence and placed it off

19   to the side.   Then we asked him to remove his heavy night

20   shirt, this tan shirt.   And he stated that that is not the

21   shirt you want.

22        Q   Did he state that to you without any problem?

23        A   Yes, just right out, he said, that is not the shirt

24   you want.





158

1       Q   What, if anything, was your response?

2       A   And I had said, well what shirt do we want or why.

3   No, let's see.  Yeah, I said to him, what shirt do we want

4   and he said, a blue one.

5       And   I said, why would we want that shirt.  And he

6   says, that is the shirt that I was wearing Tuesday.

7   Prior to this I had, he had asked, why we were looking at it.

8   We had been examining for blood.

9       Q   Was that the nature and extent of the conversation

10  you had with the defendant at that time?

11      A   We asked him several other times why we would want

12  that thirt, you know, the blue shirt that he was wearing

13  Tuesday.  And he responded, I guess, I just thought you

14  might want it, several times.  That was the extent of the

15  conversation.

16      Q   And officer, this person that you just indicated

17  you had the conversation with, the defendant, Johnny Savory,

18  is he present in the Courtroom today?

19      A   Yes, he is.

20      Q   Would you please point him out and describe him

21  for the Court.

22      A   He is sitting next to Mr. Vieley in the gray shirt

23  and tie.

24      Q   Is that the person that I am now standing behind?

1    A   Yes, it is.

2         MR. GAUBAS:   Your Honor, may the record reflect

3    that this officer has identified the defendant in this case.

4         THE COURT:   The record will so reflect.

5         MR. GAUBAS:   If I may have just a second.   I don't

6    believe we have any further questions for Officer Jatkowski,

7    Your Honor.

8         THE COURT:   You may--Any further cross?

9         MR. VIELEY:   Yes, sir.

10   RE-CROSS EXAMINATION BY Mr. Vieley:

11   Q   What was the date of this conversation you just

12   alleged?

13   A   The 26th of--Well, let me see.   Do you want me to

14   look at my report?   I can give it to you.   The 26th of

15   January.

16   Q   What time of day, please.

17   A   It was in the afternoon, or like I said, the late

18   afternoon or early evening.   I couldn't give you a specific

19   time, exact time.

20        As I remember that particular day it was in the late

21   afternoon or eearly evening.

22   Q   Was this after the arrest?

23   A   Yes, sir, it was.

24   Q   And did you make him strip down to the nude to take

 

160

1   his clothing?

2       A   No, not to the nude.

3       Q   To the shorts?

4       A   Yes, sir, when we had other clothing for him to step

5   into.

6       Q   And this upset the defendant, did it not?

7       A   The--No, he was very cooperative.  He had, at first,

8   you know, we had asked him for the hair and he said, here.

9   I will pull it and he was pulling the hair for us.

10      Q   Were any Miranda Warnings given to him prior to the

11  conversation?

12          MR. GAUBAS:   Your Honor, I am going to object to

13  that question.

14          THE COURT:   Overruled.

15  MR. VIELEY:

16      Q   Before the pulling of the hair?

17      A   There was no Miranda Warnings, he volunteered.  He

18  was asking us questions.  We were answering the questions up

19  to the point where he was talking about the blue shirt.

20      I had asked him why we wanted the blue shirt.  That is

21  the only thing I had asked him.

22      Q   When was the Miranda Warning given?

23      It was given the night before, wasn't it?

24      A   I don't know when the Miranda was given.

 

161

SAVORY-LL-000713

1          MR. GAUBAS:  I object.  This officer doesn't

2    know when.

3          THE COURT:  That is his answer.

4    MR. VIELEY:

5        Q  You don't know when it was given then?

6        A  No, sir.  I knew the man was arrested and that is

7    all.

8        Q  But you didn't read the card before you had this

9    conversation about the clothes?

10       A  No, sir, no, sir.  I had told Johnny before we

11   collected the hairs that he didn't have to give us the hairs.

12       Q  But he gave them voluntarily?

13       A  Yes, he voluntarily gave them.  He was very cooperative.

14       Q  He wasn't mean to you or anything like that?

15       A  No.

16       Q  MR. VIELEY:  I believe I have a motion out of the

17   presence of the jury, Your Honor.

18          THE COURT:  All right.  I will excuse the jury.

19   (WHEREUPON, THE JURY WAS TAKEN OUT OF THE COURTROOM)

20          THE COURT:  Okay, go ahead, Mr. Vieley.

21          MR. VIELEY:  Your Honor, I am going to have to

22   move to strike at this time any conversations that was just

23   elicited and the reason is that it appears that this officer

24   failed to give any warnings in the form of the Miranda Warning




162

SAVORY-LL-000714