## IN THE UNITED STATES DISTRICT COURT FOR THE
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JOHNNIE LEE SAVORY, | ) | |
| | ) | No. 23 C 1184 |
| *Plaintiff,* | ) | |
| | ) | Hon. Colleen R. Lawless, |
| *v.* | ) | District Judge |
| | ) | |
| WILLIAM CANNON, as Special | ) | Hon. Jonathan E. Hawley, |
| Representative for the Estate of CHARLES | ) | Magistrate Judge |
| CANNON, *et al.,* | ) | |
| | ) | JURY TRIAL DEMANDED |
| *Defendants.* | ) | |

## PLAINTIFF JOHNNIE LEE SAVORY'S RESPONSE IN OPPOSITION
## TO POLICE OFFICER DEFENDANTS' SUMMARY JUDGMENT MOTION

Jon Loevy
Steve Art
Locke Bowman
Megan Pierce
**LOEVY + LOEVY**
311 N. Aberdeen St.
Chicago, IL 60607
(312) 243-5900
steve@loevy.com

Brad J. Thompson
G. Flint Taylor
**PEOPLE'S LAW OFFICE**
1180 N. Milwaukee Ave.
Chicago, IL 60642
(773) 235-0700
brad@peopleslawoffice.com

## TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS.................................................................................................... i

TABLE OF AUTHORITIES ......................................................................................... vi

INTRODUCTION ........................................................................................................1

STATEMENT OF DISPUTED MATERIAL FACTS ...................................................3

    I.      SAVORY IS INNOCENT OF THE COOPER-ROBINSON MURDERS ................................................................................................3

    II.    THE KILLER SEXUALLY ASSAULTS COOPER AND STABS COOPER AND ROBINSON TO DEATH.............................................4

          A.      The Day of the Murders..................................................4

          B.      The Scene of the Crime...................................................5

          C.      Evidence Shows Connie Cooper Was Sexually Assaulted................................6

    III.   DEFENDANTS IDENTIFY LIKELY SUSPECTS WHO ARE NOT SAVORY ........................................................................................8

    IV.   DEFENDANTS INEXPLICABLY TURN THEIR ATTENTION TO SAVORY ..................................................................................10

    V.    DEFENDANTS FORCE SAVORY TO INCRIMINATE HIMSELF AND FABRICATE A CONFESSION ........................................12

          A.      Defendants Conduct a Brutal Interrogation of Savory .................12

          B.      Savory's Confession Is Facially Implausible................................23

          C.      Defendants Fabricate and Suppress Evidence Relating to Savory's Interrogation and Confession............................24

    VI.   DEFENDANTS FABRICATE, SUPPRESS, AND DESTROY CRITICAL FORENSIC EVIDENCE ........................................................29

          A.      Defendants Fabricate the Murder Weapon ....................................29

          B.      Defendants Suppress Evidence That the Knife Has No Blood On It ......................30

          C.      Defendants Fabricate Evidence That the Knife Had Blood On It ......................32

          D.      Defendants Suppress Evidence That Cooper Was Sexually Assaulted......................33

          E.      Defendants Fabricate Evidence That No Sperm Was Found.........................36

          F.      Defendants Fabricate Evidence That Savory's Pants Were Bloody and Destroy the Supposedly Bloody Part of the Pants ......................37

i

**TABLE OF CONTENTS (cont.)**

Page

    G.    Defendants Suppress and Destroy Other Exculpatory Physical Evidence .................................................................39

VII.    SAVORY IS CONVICTED, HIS CONVICTION IS REVERSED, AND PROSECUTORS SAY THEY CANNOT PROCEED WITH CHARGES ................................................................................40

VIII.    DEFENDANTS FABRICATE AND SUPPRESS EVIDENCE RELATING TO THE IVY CHILDREN TO ENSURE SAVORY'S CONTINUED PROSECUTION AND SECOND CONVICTION ............................42

IX.    DEFENDANTS FABRICATED AND SUPPRESSED OTHER EVIDENCE RELATING TO THIRD-PARTY WITNESS STATEMENTS.......................................................................49

X.    SAVORY IS CONVICTED A SECOND TIME.........................................52

XI.    DEFENDANTS' SUPPRESSION AND DESTRUCTION OF CRITICAL EVIDENCE CONTINUED THROUGHOUT SAVORY'S CRIMINAL CASE.................................................53

XII.    DEFENDANTS GERONTES, ANDREWS, DUNLAVEY, AND TIARKS, PARTICIPATED DIRECTLY IN THE MISCONDUCT AND PARTICIPATED AS SUPERVISORS.......................................55

XIII.    SAVORY FIGHTS TO PROVE HIS INNOCENCE AND IS EXONERATED...........................................................................56

XIV.    SAVORY'S BRINGS THIS CIVIL SUIT .................................................57

RESPONSE TO DEFENDANTS' STATEMENT OF FACTS ....................................59

ARGUMENT ................................................................................................113

I.    DEFENDANTS' HAVE WAIVED AND FORFEITED ANY ARGUMENT FOR SUMMARY JUDGMENT ON MANY OF SAVORY'S CLAIMS ................................................................114

    A.    Defendants' Frame Their Summary Judgment Brief In A Way That Artificially Limits Savory's Claims and Contradicts the En Banc Seventh Circuit's Mandate In This Case................................................................................116

    B.    Defendants' Have Waived and Forfeited Arguments At Summary Judgment, and So A Trial Will Occur No Matter What........................................................................120

II.    THE SEVENTH CIRCUIT DICTATES THAT THIS COURT NEED NOT PARSE THEORIES OF LIABILITY AT SUMMARY JUDGMENT IN A FAIR TRIAL CASE.................................122

**TABLE OF CONTENTS (cont.)**

Page

III.    DEFENDANTS' ARGUMENTS FOR JUDGMENT ON SAVORY'S FIFTH AND FOURTEENTH AMENDMENT CONFESSION CLAIMS LACK MERIT ................................123

A.    Defendants Forfeit Arguments Relating to Parts of Savory's Confession Claims ............................................................124

B.    Defendants Concede Their Extraction of Incriminating Statements and Fabrication of a Confession Violated Savory's Fifth and Fourteenth Amendment Rights ......................125

C.    Defendants Are Not Entitled to Qualified Immunity on the Fifth Amendment Confession Claim ........................................127

1.    Police Officers Are Not Entitled to Qualified Immunity.........................128

2.    It Was Clearly Established In 1977 That the Tactics Used to Coerce Savory's Confession Were Unconstitutional...........................130

3.    The Illegality of Defendants' Conduct Was Obvious.............................137

D.    Defendants Are Not Entitled to Absolute Immunity on the Fourteenth Amendment Fabricated Confession Claim...................138

E.    Savory Is Not Precluded from Arguing That Defendants' Fabrication of His Confession Violated the Fourteenth Amendment....................................................141

IV.    A REASONABLE JURY COULD CONCLUDE THAT DEFENDANTS VIOLATED SAVORY'S FOURTEENTH AMENDMENT TO DUE PROCESS WHEN THEY SUPPRESSED, FABRICATED, AND DESTROYED EVIDENCE ....................................................145

A.    A Reasonable Jury Could Conclude That Defendants Suppressed Material Exculpatory and Impeachment Evidence....................................................146

1.    Defendants Suppressed Their Fabrication of Savory's Confession....................................................148

2.    Defendants Teplitz, Haynes, Cannon, and Buck Suppressed Impeachment Evidence Relating to the Ivys' Statements Implicating Savory ................................151

3.    All Defendants Suppressed Evidence Implicating William Douglas and Their Own Report Stating He Was A Suspect ................................154

4.    All Defendants Suppressed Critical Forensic Evidence .........................156

**TABLE OF CONTENTS (cont.)**

Page

B.  Independently, A Reasonable Jury Could Conclude That Defendants Fabricated False Evidence ............................................164

    1.  The Fabrication of False Incriminating Statements Attributed to Savory Means Teplitz, Cannon, Fiers, and Pinkney Are Not Entitled to Summary Judgment...................................165

    2.  Defendants Teplitz, Cannon, Jatkowski, Fiers, Pinkney, Dunlavey, and Bowers Fabricated Forensic Evidence Connecting Savory to the Crime............................................165

    3.  Defendants Cannon, Buck, Teplitz, and Haynes Fabricated Incriminating Statements Attributed to the Ivys..................................................................................167

C.  Independently, A Reasonable Jury Could Conclude That Defendants Destroyed Exculpatory Evidence in Bad Faith.........................174

    1.  A Jury Must Decide If Defendants Teplitz, Jatkowski, and Cannon Are Liable for Destroying the Cutting from the Blue Pants ......................................................................175

    2.  A Jury Must Decide If Defendants Teplitz, Jatkowski, and Cannon Are Liable for Destroying the Hairs Found in the Victims' Hands ..............................................................176

    3.  Defendants Are Not Entitled To Qualified Immunity on the Destruction of Evidence Theory ........................................177

    4.  Defendants Remaining Arguments Lack Merit .......................................178

V.   A JURY MUST DECIDE SAVORY'S FOURTH AMENDMENT ILLEGAL SEIZURE CLAIM ......................................................178

A.  Defendants Lacked Probable Cause to Prosecute Savory.............................179

B.  Defendants Are Not Entitled to Qualified Immunity on the Fourth Amendment Claim ............................................................182

VI.  DEFENDANTS GERONTES, ANDREWS, DUNLAVEY, AND TIARKS PARTICIPATED IN THE MISCONDUCT AND ARE NOT ENTITLED TO SUMMARY JUDGMENT ........................................184

VII. A JURY MUST DECIDE THE FAILURE-TO-INTERVENE CLAIMS ..........................................................................187

VIII. A JURY MUST DECIDE THE SECTION 1983 CONSPIRACY CLAIMS ..........................................................................188

IX.  THE INDEMNIFICATION CLAIM SURVIVES SUMMARY JUDGMENT ...................................................................190

iv

**TABLE OF CONTENTS (cont.)**

**Page**

CONCLUSION.................................................................................................................190

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)..............................................118, 120, 166,182

*Alexander v. United States,* 721 F.3d 418 (7th Cir. 2013).........................................179

*Anderson v. City of Rockford,* 932 F.3d 494 (7th Cir. 2019)......................................140, 153, 173

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)..............................................113

*Arizona v. Youngblood,* 488 U.S. 51 (1988).............................................................174

*Armstrong v. Daily,* 786 F.3d 529 (2015)................................................................ *passim*

*Avery v. City of Milwaukee,* 847 F.3d 433 (7th Cir. 2017)........................................ *passim*

*Barbee v. Warden,* 331 F.2d 842 (4th Cir.1964) .....................................................164

*Beam v. IPCO Corp.,* 838 F.2d 242 (7th Cir. 1988).................................................120

*Beaman v. Freesmeyer,* 776 F.3d 500 (7th Cir. 2015).............................................156

*Bell v. City of Milwaukee,* 746 F.2d 1205 (7th Cir. 1984).......................................188

*Blackburn v. Alabama,* 361 U.S 199 (1960)..............................................................132, 133, 137

*Brady v. Maryland,* 373 U.S. 83 (1963) ................................................................177

*Bram v. United States,* 168 U.S. 532 (1897)...........................................................132

*Branion v. Gramly,* 855 F.2d 1256 (7th Cir. 1988) ................................................172

*Brown v. City of Chicago,* 633 F. Supp. 3d 1122 (N.D. Ill. 2022) .............................140

*Brown v. Mississippi,* 297 U.S. 278 (1936) ............................................................132

*Bryant v. Whalen,* 759 F. Supp. 410 (N.D. Ill. 1991) ...............................................179

*Buckley v. Fitzsimmons,* 509 U.S. 259 (1993)..........................................................139, 167

*Byrd v. Brishke,* 466 F.2d 6 (7th Cir. 1972).............................................................187

*California v. Trombetta,* 467 U.S. 479 (1984)..........................................................174

# TABLE OF AUTHORITIES (cont.)

**Cases**                                                                                                    **Page(s)**

*Camm v. Faith,* 937 F.3d 1096 (7th Cir. 2019) ................................................................. *passim*

*Carmichael v. Village of Palatine,* 605 F.3d 451 (7th Cir. 2010) ............................... 122

*Carrillo v. Los Angeles,* 798 F.3d 1210 (9th Cir. 2015) ............................................... 164

*Cartwright v. City of Chicago,* 450 Fed. App'x 539 (7th Cir. 2011) ........................... 184

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ................................................... 119, 121

*Chelios v. Heavener,* 520 F.3d 678 (7th Cir. 2008) ...................................................... 184

*Collier v. City of Chicago,* 2015 WL 50814408 (N.D. Ill. Aug. 26, 2015) ................... 179

*Costello v. Grundon,* 651 F.3d 614 (7th Cir. 2011) .......................... 118, 122, 124, 146

*Culombe v. Connecticut,* 367 U.S. 568 (1961) ............................................................. 134

*Currie v. Chhabra,* 728 F.3d 626 (7th Cir. 2013) ........................................................ 183

*Dominguez v. Hendley,* 545 F.3d 585 (7th Cir. 2008) .................................................. 147

*Eastman Kodak Co. v. Image Technical Services, Inc.,* 504 U.S. 451 (1992) ............. 171

*Engel v. Buchan,* 710 F.3d 698 (7th Cir. 2013) ................................................... 150, 164

*Evans v. Katalinic,* 445 F.3d 953 (7th Cir.2006) ......................................................... 142

*Fields v. Wharrie,* 672 F.3d 505 (7th Cir. 2012) ................................................. 148, 149

*Fields v. Wharrie,* 740 F.3d 1107 (7th Cir. 2014) ....................................................... 172

*Fikes v. Alabama,* 352 U.S. 191 (1957) ........................................................................ 135

*Fox v. Hayes,* 600 F.3d 819 (7th Cir. 2010) ................................................................. 184

*Franks v. Delaware,* 438 U.S. 154 (1978) .................................................................... 179

*Gallegos v. Colorado,* 370 U.S. 49 (1962) ................................................................... 136

*Gauger v. Hendle,* 349 F.3d 354 (7th Cir. 2003) ................................................. 150, 151

## TABLE OF AUTHORITIES (cont.)

**Cases**                                                                                          **Page(s)**

*Gerstein v. Pugh,* 420 U.S. 103 (1975)..................................................................................178

*Giglio v. United States,* 405 U.S. 150 (1972) ...................................................... *passim*

*Goudy v. Basinger,* 604 F.3d 394 (7th Cir. 2010)........................................................156

*Goudy v. Cummings,* 922 F.3d 834 (7th Cir. 2019)............................................. *passim*

*Haley v. City of Boston,* 657 F.3d 39 (1st Cir. 2011)....................................................164

*Haley v. Ohio,* 332 U.S. 596 (1948) ........................................................133. 134, 137

*Hampton v. Hanrahan,* 600 F.2d 600 (7th Cir. 1979) ......................................188, 190

*Haywood v. Hathaway,* 842 F.3d 1026 (7th Cir. 2016)...............................................141

*Heck v. Humphrey,* 512 U.S. 477 (1994).....................................................................141

*Heidelberg v. Hammer,* 577 F.2d 429 (7th Cir. 1978)................................................178

*Hill v. City of Chicago,* No. 06 C 6772, 2009 WL 174994 (N.D. Ill. Jan. 26, 2009).................142

*Hoggard v. Rhodes,* 141 S. Ct. 2421 (2021)................................................................128

*Holland v. City of Chicago,* 643 F.3d 248 (7th Cir. 2011) ........................................146

*Hope v. Pelzer,* 536 U.S. 730 (2002) ...............................................................138, 184

*Hurt v. Wise,* 880 F.3d 831 (7th Cir. 2018) ..................................................125, 130, 131

*In re Gault,* 387 U.S. 1 (1967)....................................................................................136

*Jones v. City of Chicago,* 856 F.2d 985 (7th Cir. 1988) ............................................147

*Kailin v. Gurnee,* 77 F.4th 476 (7th Cir. 2023).........................................................163

*Kerr v. City of Chicago,* 424 F.2d 1134 (7th Cir. 1970)............................................132

*Killian v. United States,* 368 U.S. 231 (1961) ...........................................................177

*Kingdomware Techs., Inc. v. United States,* 579 U.S. 162 (2016) ............................128

## TABLE OF AUTHORITIES (cont.)

**Cases**                                                                                     **Page(s)**

*Kislea v. Hughes,* 138 S. Ct. 1148 (2018).................................................................129

*Kyles v. Whitley,* 514 U.S. 419 (1995).............................................................146, 156

*Lac du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse,* 991 F.2d 1249

    (7th Cir. 1993)..................................................................................................160

*Lawson v. Veruchi,* 637 F.3d 699 (7th Cir. 2011)........................................................179

*Lewis v. City of Chicago,* 914 F.3d 472 (7th Cir. 2019)................................................150

*Lopez v. Davis,* 531 U.S. 230 (2001) ........................................................................128

*Malley v. Briggs,* 475 U.S. 335 (1986) ......................................................................183

*Malloy v. Hogan,* 378 U.S. 1 (1964)..........................................................................132

*Manuel v. Joliet,* 580 U.S. 357 (2017)................................................................178, 183

*Maxwell v. City of Indianapolis,* 998 F.2d 431 (7th Cir. 1993)...........................179, 183

*Maxwell v. KPMG LLP,* 520 F.3d 713 (7th Cir. 2008)..................................................143

*McCottrell v. White,* 933 F.3d 651 (7th Cir. 2019).............................................161, 176

*McDonough v. Smith,* 139 S. Ct. 2149 (2019)....................................................139, 173

*Miller v. Pate,* 386 U.S. 1 (1967)..............................................................................151

*Mincey v. Arizona,* 437 U.S. 385 (1978).....................................................................134

*Mooney v. Hollohan,* 294 U.S. 103 (1935)...........................................124, 164, 165

*Mwangangi v. Nielsen,* 48 F.4th 816 (7th Cir. 2022) .................................................187

*Napue v. Illinois,* 360 U.S. 264 (1959) ......................................................................147

*Newsome v. McCabe,* 256 F.3d 747 (7th Cir. 2001)...........................................147, 164

*Newsome v. McCabe,* 319 F.3d 301 (7th Cir. 2003).................................148, 149, 153

# TABLE OF AUTHORITIES (cont.)

**Cases**                                                                                                                    **Page(s)**

*Olson v. Tyler,* 771 F.2d 277 (7th Cir. 1985).............................................................179

*Otto v. Variable Annuity Life Ins. Co.,* 134 F.3d 841 (7th Cir. 1998) .........................166

*P.H. Glatfelter Co. v. Voith,* 784 F.2d 770 (7th Cir. 1986) .........................................160

*Patrick v. City of Chicago,* 974 F.3d 824 (7th Cir. 2020).............................140, 143, 173

*Payne v. Arkansas,* 356 U.S. 560 (1958) ..............................................................133, 134

*People v. Campbell,* 359 Ill. 286 (1935)......................................................................135

*People v. Koesterer,* 358 N.E.2d 295 (Ill. App. Ct. 1976)...........................................135

*People v. Peck,* 309 N.E.2d 356 (Ill. App. Ct. 1974)...................................................135

*People v. Savory,* 435 N.E.2d 226 (Ill. App. Ct. 1982) ........................52, 101, 142, 143

*People v. Schwartz,* 3 Ill.2d 520 (1954)......................................................................134

*Petty v. City of Chicago,* 754 F.3d 416 (7th Cir. 2014)...............................12, 165, 172

*Pierson v. Ray,* 386 U.S. 547 (1967) ..........................................................................129

*Proffitt v. Ridgway,* 279 F.3d 503 (7th Cir. 2002)......................................................188

*Reed v. Illinois,* 808 F.3d 1103 (7th Cir. 2015) ..........................................................142

*Rehberg v. Paulk,* 566 U.S. 356 (2012) .......................................................................139

*Richardson v. McKnight,* 521 U.S. 399 (1997)............................................................130

*Rogers v. Jarrett,* 63 F.4th 971 (5th Cir. 2023) ..........................................................129

*Ross v. Blake,* 578 U.S. 632 (2016) .............................................................................128

*Saunders-El v. Rohde,* 778 F.3d 556 (7th Cir. 2015)...................................................151

Savory v. Cannon, 947 F.3d 409 (7th Cir. 2020)................................................. *passim*

*Schneckloth v. Bustamonte,* 412 U.S. 218 (1973)...........................................124, 132, 137

## TABLE OF AUTHORITIES (cont.)

**Cases**                                                                                                     **Page(s)**

*Serrano v. Guevara,* 2020 WL 3000284.................................................................190

*Smith v. Cain,* 132 S. Ct. 627 (2012) ....................................................................147

*Smith v. Northeastern Illinois Univ.,* 388 F.3d 559 (7th Cir. 2004) ...................................... *passim*

*Sornberger v. City of Knoxville,* 434 F.3d 1006 (7th Cir. 2006) ................................124, 142, 144

*Spano v. New York,* 360 U.S. 315 (1959) ...........................................132, 133, 134, 135

*Standard Ins. Co. v. VanLanduit,* 551 F. Supp. 3d 854 (N.D. Ill. 2021) ....................................160

*Steidl v. Fermon,* 494 F.3d 623 (7th Cir. 2007)........................................................186

*Sterk v. Redbox Automated Retail, LLC,* 770 F.3d 618 (7th Cir. 2014) ....................................118

*Stinson v. Gauger,* 868 F.3d 516 (7th Cir. 2017)........................................140, 149, 167

*Stockton v. Milwaukee County,* 44 F.4th 605 (7th Cir. 2022)....................................138

*Sublett v. John Wiley & Sons, Inc.,* 463 F.3d 731 (7th Cir. 2006)................................122

*Taylor v. City of Chicago,* 2021 WL 4401528 (N.D. Ill. Sept. 27, 2021) ...................................140

*Taylor v. Riojas,* 141 S. Ct. 52 (2020) ...................................................................138

*Thompson v. Clark,* 596 U.S. 36 (2022) ...........................................................130, 178

*Thompson v. Boggs,* 33 F.3d 847 (7th Cir. 1994)................................................146, 178

*Titran v. Ackman,* 893 F.2d 145 (7th Cir. 1990)........................................................121

*Tolan v. Cotton,* 572 U.S. 650 (2014)....................................................3, 113,130, 163

*U.S. ex re. Williams v. Fay,* 323 F.2d 65 (2d Cir. 1963)..........................................133, 135

*United States v. Agurs,* 427 U.S. 97 (1976)............................................................147

*United States v. Bagley,* 473 U.S. 667 (1985) ...........................................149, 151, 153

*United States v. Jackson,* 546 F.3d 801 (7th Cir. 2008) ...........................................189

## TABLE OF AUTHORITIES (cont.)

**Cases**                                                                                         **Page(s)**

*Waid v. Merrill Area Pub. Sch.,* 130 F.3d 1268 (7th Cir. 1997).........................................119, 142

*Washington v. Boudreau,* 2022 WL 4599708...........................................................................190

*Washington v. City of Chicago*, No. 22-2467, 2024 WL 1615022 (7th Cir. Apr. 15, 2024).......182

*Wearry v. Cain,* 577 U.S. 385 (2016) ...............................................................................147, 153

*Whitlock v. Brueggemann,* 682 F.3d 567 (7th Cir. 2012)................................................... *passim*

*Whren v. United States,* 517 U.S. 806 (1996)...........................................................................184

*Williams v. City of Chicago,* 733 F.3d 749 (7th Cir. 2013) ......................................................179

*Yang v. Hardin,* 37 F.3d 282 (7th Cir. 1994)............................................................................187

*Ziglar v. Abbasi,* 137 S. Ct. 1843 (2017) .................................................................................129

**Other Authorities**

42 U.S.C. § 1983......................................................................................................................59, 128

Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 CAL. L. REV. 201 (2023) .

    Civil Rights Act of 1871 (1871) ......................................................................................129

William Baude, *Is Qualified Immunity Unlawful?*, 106 Calif. L. Rev. 45 (2018)......................129

Wright & Miller, Federal Practice & Procedure.......................................................................118

## INTRODUCTION

Beginning when he was just 14 years old, Plaintiff Johnnie Lee Savory was wrongly arrested, prosecuted, and twice convicted of the 1977 double murder of Connie Cooper and James Robinson. Savory is innocent. His conviction was based entirely on evidence fabricated by Defendants, including a false confession invented by Defendants and forced upon Savory after 31 hours of illegal interrogation, fabricated forensic evidence, and manufactured false statements provided by Defendants to third-party witnesses, which implicated Savory in the crime.

No real evidence ever implicated Savory. There was no reason to suspect him. In fact, all of the physical evidence firmly establishes that he is innocent of the crime. There can be no reasonable dispute that Savory is innocent, and Defendants do not and cannot contest that fact at summary judgment.

To ensure Savory's conviction, throughout the criminal proceedings, Defendants suppressed and destroyed key evidence that would have shown Savory was innocent and that Defendants had framed him, and that could have been used to impeach witnesses who testified against Savory in his criminal proceedings. That suppressed and destroyed evidence included critical forensic evidence and testing results, evidence relating to Savory's confession and interrogation, documentary evidence contained in Defendants' investigative files, evidence about third-party witnesses who implicated Savory, and information about the likely perpetrator.

As the result of Defendants' misconduct, though he was a child, Savory was twice tried as an adult, convicted, and sentenced to decades in prison for a crime he had not committed. Throughout, Savory maintained his innocence and fought to clear his name. In 2015, based on a huge volume of exonerating evidence assembled during his post-conviction proceedings, the Governor of Illinois pardoned Savory.

In 2017, Savory brought this § 1983 lawsuit to hold the Defendants accountable for violating his constitutional rights and for causing his wrongful conviction. Defendants concede that a reasonable jury could conclude that they violated Savory's Fifth and Fourteenth Amendment rights when they extracted incriminating statements and concocted a false confession that they used against Savory in criminal proceedings. Despite that concession, they argue for immunity on those claims, raising meritless arguments; and they contend that Savory is precluded from raising an argument about his 1981 conviction because that conviction is still intact, a position that directly contradicts the Seventh Circuit's *en banc* opinion in this case, which held that Savory's pardon vacated his conviction.

Moreover, Defendants do not move for summary judgment on a large number of Savory's due process theories that Defendants violated his right to a fair trial, meaning those claims must be tried. Defendants' arguments otherwise lack merit and are made in the face of overwhelming evidence that the Defendants violated Savory's clearly established rights protected by the U.S. Constitution. Summary judgment is inappropriate, and this Court should deny Defendants' motions.[1]

---

[1] Savory is not pursuing his claims against Stenson, Timmes, and Marteness. Those Defendants should be dismissed from the case. Savory's complaint included a claim that Defendants violated Savory's substantive due process rights under the Fourteenth Amendment by their interrogation. Savory is also not pursuing that claim.

## STATEMENT OF DISPUTED MATERIAL FACTS

Defendants' motions depend on a factual account that impermissibly construes the evidence for the moving Defendants and improperly draws inferences for them. *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014).[2] Pursuant to Local Rule 7.1(D)(2)(b)(5), Savory provides the following disputed material facts.

## I.    SAVORY IS INNOCENT OF THE COOPER-ROBINSON MURDERS

1.    Savory is innocent of the Cooper-Robinson murders. Ex. 1 at 100:8-10, 127:1-128:17 (JLS Dep); Ex. 2 at 149:10-21 (JLS Dep); Ex. 1 at 186:22-24 (JLS Dep).

2.    He was just a child when he was arrested, interrogated for two days, coerced to incriminate himself, and prosecuted for the crime. Ex. 1 at 100:8-10, 127:1-128:17 (JLS Dep); Ex. 2 at 149:10-21 (JLS Dep); Ex. 1 at 186:22-24 (JLS Dep); Ex. 3 at SAVORY-LL-000125 (Pinkney testimony); Ex. 4 at SAVORY-LL-000795 (Pinkney testimony); Ex. 5 at 1; Ex. 6 at PS-748 (Pinkney/Haynes interrogation report); Ex. 7 at PS-791 (Teplitz confession report). For hours during Defendants' interrogation, Savory professed his innocence, but he was ignored by Defendants. Ex. 7 at PS-787-788, PS-791. At the first possible moment following the confession extracted by Defendants, Savory again proclaimed his innocence. Ex. 7 at 789.

3.    Savory has maintained his innocence continually from that moment more than four decades ago until the present day. Ex. 1 at 34:4-6; Ex. 2 at 127:7-13; *id.* at 149:13-19.

4.    Savory had no motive to commit the crime. Ex. 1 at 150:2-151:15 (Savory discussing his friendship with James Robinson). As discussed below, Savory also had a solid alibi supported by multiple witnesses. See Statement of Disputed Material Facts ("Statement") IV *infra*.

---

[2] The Defendant Officers' brief (Dkt. 294) is cited "OB," and Bowers's brief (Dkt. 310) is cited "BB."

5.      Forensic testing of items at the crime scene conclusively excludes Savory as the perpetrator. Ex. 8 at 15-16; Ex. 9 at 83:3-25. There is zero forensic evidence that connects him to the crime. *Id.*

6.      In 2015, based on a large volume of evidence adduced during post-conviction proceedings, the Governor of Illinois pardoned Savory. Ex. 10. The pardon declared that Savory was "acquitted and discharged of any from all further imprisonment and restored to all the rights of citizenship which may have been forfeited by the conviction." Ex. 10. The *en banc* Seventh Circuit held in this case that the pardon vacated Savory's conviction. Savory v. Cannon, 947 F.3d 409, 430 (7th Cir. 2020) (en banc) ("Savory's conviction was set aside with this pardon").

7.      Savory's innocence is an established fact at summary judgment that cannot be contested at this stage.

## II.     THE KILLER SEXUALLY ASSAULTS COOPER AND STABS COOPER AND ROBINSON TO DEATH

### A.      The Day of the Murders

8.      On January 18, 1977, 19-year-old Connie Cooper and 14-year-old James Robinson were brutally murdered at their home at 3033 W. Garden Street in Peoria. Ex. 11 at PS-21-22. Cooper and Robinson lived there with their mother, Noyalee Robinson, their stepfather William Douglas, Cooper's two-year-old son, and a family dog. Ex. 12 at PS-1619.

9.      According to Douglas, on the day of the crime, he and Noyalee Robinson left the house between 6:15 and 6:30 a.m., and they arrived home at 4:30 p.m., finding the children dead. Ex. 13 at Savory-LL 432-439; Ex. 14 at PS-13113-13115. On the day of the crime, neighbors saw a black man (not a boy) leaving the house at 8:40 a.m. Ex. 15 at PS-453; Ex. 16 at PS-100. A person working at the shop next door noticed around 9 a.m. that the dog was not tied up outside like usual. Ex. 17 at PS-409. Friends Renetta Williams and Myrtle McDonald each attempted to

call the house, at 9 a.m. and 10:45 a.m., respectively, and got busy signals. Ex. 18 at PS-113; PS-110.

10.     When Douglas and Noyalee Robinson arrived home and found the children dead, they called the Peoria Police Department. Defendant Perkins arrived at the scene within 10 minutes, at 4:40 p.m. Ex. 19 at PS-13122. Defendants Cannon, Fiers, Jatkowski, Buck, and Tiarks arrived along with the coroner shortly thereafter. Ex. 20 at PS-31; Ex. 21 at PS-54-56.

**B.     The Scene of the Crime**

11.     The gruesome crime scene was rich in forensic evidence. Ex. 8 at 8-9, 12. Cooper and Robinson had each been stabbed numerous times, and there was great deal of blood on the bed and around the bedroom where the bodies were found on the floor. Ex. 22; Ex. 20 at PS-35; Ex. 21 at PS-55.

12.     Cooper had multiple defensive wounds on her hands, showing she had tried to fight off the killer. Ex. 30 at 5; Ex. 8 at 3-4. Defendant Jatkowski collected hairs from the hands of the victim, which were not their own hairs. Ex. 24 at 9, 42-43.

13.     The killer lingered and cleaned up in the bathroom following the murders, and there was blood in the bathroom as well. Ex. 20 at PS-35; Ex. 21 at PS-57; Ex. 23.

14.     Latent fingerprints were found at the house. Ex. 24 at 9. None matched Savory. *Id.*

15.     No blood was found in any other room besides the bedroom where the bodies were found and the bathroom. Specifically, no blood was found in the living room, the kitchen, or the second bedroom where Connie Cooper's young son was found after the murders. Ex. 20 at PS-34-35; Ex. 23; Ex. 25 at SAVORY-LL 000675-677.

16.     There was no sign of forced entry, and the family dog, who was known to be very protective of the family and aggressive toward people he did not know, was found roaming free in

the house after the attack, suggesting a known perpetrator. Ex. 11 at PS-22; Ex. 26 at PS-65; Ex. 27 at PS-119; Ex. 28 at PS-432; Ex. 29 at PS-375.

17.    None of the forensic evidence at the crime scene implicated Savory at the time of the investigation. Ex. 24; at 9; Ex. 8 at 15-16. After years of testing dozens of items of forensic evidence at the crime scene, none of the evidence implicates Savory. *Id.* In fact, all of the testing has conclusively excluded Savory. *Id.*

**C.    Evidence Shows Connie Cooper Was Sexually Assaulted**

18.    Evidence at the crime scene showed that Connie Cooper was the target of a sexually motivated attack, and that she was sexually assaulted before she was killed. Ex. 30. That evidence included the following:

   a.   Cooper was found in her robe, underwear, and nightgown; her nightgown was pulled up over her waist; and there was a tear in her underwear. Ex. 20 at PS-35; Ex. 21 at PS-55.

   a.   Significant amounts of blood were found on Cooper's bed and bedding. Ex. 21 at PS-55.

   b.   Cooper suffered stab wounds to the lower abdomen, buttocks, genitalia, and inner thigh, in addition to a number of other stab wounds on her body. Ex. 32 at PS-924; Ex. 30 at 2. One of the stab wounds was in Cooper's right labium majora and went deep to the underlying pubic bone. Ex. 30 at 4. (Robinson meanwhile did not have any stab wounds to his lower abdomen, buttocks or genitalia. Ex. 32 at PS-920-922.)

   c.   Cooper had multiple defensive wounds on her hands, showing that she had fought off the perpetrator. Ex. 32 at PS-924; Ex. 30 at 4. Robinson did not. Ex. 30 at 5

     d.   Cooper's young son was found in a second bedroom with the door closed. He was unharmed and there was no blood on him. Ex. 26 at PS-64; Ex. 33 at SAVORY-LL-000354.

19.    At autopsy, the coroner took vaginal swabs of a visible white substance found in Cooper's vagina. Ex. 34 at PS-86; Ex. 32 at PS-925.

20.    The substance was sent to the crime lab for testing for the presence of sperm. Ex. 32 at PS-919, 925. That testing revealed the presence of sperm and semen. Ex. 30 at 3; Ex. 35 at PS-12974; Ex. 36 at PS-13141; Ex. 37 at PS-13166; Ex. 38.[3]

21.    The Defendants' documents reflected that they were actively investigating whether the crime was a sexually motivated attack. Ex. 37 at PS-13166 (questioning whether the semen "Was there before attack").

22.    Moreover, testing of evidence revealed that Cooper's blood was found on Robinson, but that Robinson's blood was not found on Cooper, demonstrating that Cooper was attacked before Robinson. Ex. 30 at 7; Ex. 35 at PS-12975; Ex. 36 at PS-13141.

23.    Savory's experts concur that this evidence demonstrates that Cooper was sexually assaulted. Ex. 30 at 2; Ex. 8 at 11; Ex. 24 at 32. Defendants' experts do not rebut these opinions, saying instead that this evidence is "compatible with sexual activity" but does not definitely establish sexual assault. Ex. 39 at 6.

24.    Despite this evidence, Defendants in this lawsuit deny to this day that Cooper was sexually assaulted. Ex. 40.

---

[3] Decades later, post-conviction testing of evidence from the crime scene confirmed the presence of sperm on Cooper's underwear. Ex. 41 at SDT 560-561; Ex. 42 at SAVORY-LL-009887; Ex. 8 AT 11.

25.     The reason for those denials and Defendants' suppression of evidence of sexual assault is discussed below. See Statement VI(D) & VI(E) *infra*.

## III.    DEFENDANTS IDENTIFY LIKELY SUSPECTS WHO ARE NOT SAVORY

26.     Defendants immediately identified potential suspects, who had troubled past relationships with Cooper and had abused her. Ex. 24 at 27-29.

27.     Defendants learned that Cooper had dumped her boyfriend Charles Watts to date a man named Kenny Parker. Ex. 43 at PS-41. They learned Parker was dating Cooper at the time of her death, but he was also living with another girlfriend. Ex. 28 at PS-431-432. In addition, they learned that the night before Cooper was murdered, Cooper asked Parker what he would do if he knew that someone had raped her. Ex. 28 at PS-431.

28.     Moreover, Defendants discovered that despite their breakup, Cooper and Watts remained romantically involved. Ex. 44 at PS-1626; Ex. 27 at PS-118-119. A week prior to the murders, Cooper received a threatening phone call from a Black male who told Cooper to break off her relationship with Watts, but she refused. Ex. 27 at PS-118. At the same time, Cooper was having sexual relationships with other men as well. Ex. 45 at PS-648; Ex. 27 at PS-118-119. Defendants uncovered evidence that Watts was very possessive and jealous. Ex. 18 at PS-113. Watts had violently attacked Cooper in the past, choking her and giving her a black eye. Ex. 43 at PS-41; Ex. 46 at PS-58-59. And he had made statements suggesting he might attack Cooper again. Ex. 43 at PS-41. The family dog had been Watts's dog originally. Ex. 47 at PS-473.

29.     Most importantly, however, a huge volume of evidence pointed to William Douglas, Cooper's stepfather, as the likely suspect. Defendants determined that Douglas had a past sexual relationship with Cooper that was not consensual, and they uncovered evidence that Douglas might be the father of Cooper's young son. Ex. 48; Ex. 49 at 482.

30.     Douglas has previously hit Cooper and had a history of violence. Ex. 50 at PS-1696. Noyalee Robinson was afraid of Douglas, and Douglas had problems with James Robinson as well. Ex. 6 at PS-747; Ex. 18 at PS-114; Ex. 15; Ex. 51; Ex. 52. Cooper had told her best friend Renetta Williams that Cooper would move out of the house if Douglas moved in. Ex. 18 at PS-114.

31.     Douglas worked at the funeral home and liked to cut up bodies. Ex. 49 at PS-481. He had access to extremely sharp knives. Ex. 53 at PS-78-79; Ex. 18 at PS-111. Moreover, he lied about having a key, and thus access, to the funeral home. Ex. 18 at PS-111; Ex. 49 at PS-482. Douglas called the funeral home right after he "found" the bodies. Ex. 11 at PS-22.

32.     On the day of the crime, neighbors reported seeing a Black adult male, about 5' 10" tall and wearing a brown coat, leaving the house at 8:40 a.m. Ex. 16 at PS-100; Ex. 54 at PS-453. That description matched Douglas, Ex. 55, PS-1265, and Douglas was wearing a brown coat on the day of the murders, Ex. 56 at PS-500.

33.     In addition, Douglas either moved the bodies at the crime scene or lied about where he found Cooper's body—Douglas said that when he arrived home he found Cooper laying across the bed, but she was on the floor when police arrived. Ex. 11 at PS-21-22; Ex. 26 at PS-64.

34.     On the date of the incident, Douglas had a welt under his eye. Ex. 18 at PS-111.

35.     Numerous people who knew Douglas told Defendants he had committed the murders. Ex. 27 at PS-118-119; Ex. 57; Ex. 48; Ex. 49; Ex. 57.

36.     Defendant Bowers and others conducted multiple polygraphs of Douglas, concluding first that he was telling the truth, then amending that conclusion to "inconclusive," before conducting another exam in which they determined that Douglas was telling the truth. Ex. 58 at PS-128, Ex. 59 at PS-529, Ex. 60 at PS-1146-49.

9

37.    Douglas had threatened to kill Cooper's mother, Noyalee Robinson, just a few months before the Cooper-Robinson murders. Ex. 50 at PS-1696. That death threat was recorded in a Peoria Police Department report. *Id.* But it was not turned over to prosecutors. See Ex. 62 (the State's Attorney's file does not include Ex. 50).

38.    On January 21, just four days before Defendants turned their attention to Savory, Gerontes wrote a report listing Douglas as the sole suspect in the Cooper-Robinson murders. Ex. 63. This document was also not turned over to prosecutors. See Ex. 62 (the State's Attorney's file does not include Ex. 63).

39.    All of this was "remarkably strong" evidence that should have made Douglas the chief suspect in the crime. Ex. 24 at 27-28. Nonetheless, Douglas was never investigated as the suspect, or so it seemed from Defendants' reports. *Id.*

40.    But the record of Defendants' investigation into Douglas ends on January 26, 1977, the same day that Defendants manufactured Savory's confession. Defendants did not report or did not preserve reports or documents pertaining to their exclusion of Douglas as a suspect or explaining: (1) his lie about access to the funeral home, (2) the evidence that Douglas had an abusive sexual relationship with Cooper and was the father of her young child; or (3) how he got the welt under his eye. Ex. 18 at PEORIA_SAVORY 111; Ex. 61; Ex. 24 at 27-28.

## IV.    DEFENDANTS INEXPLICABLY TURN THEIR ATTENTION TO SAVORY

41.    Despite this likely suspect, Defendants inexplicably turned their attention to Savory. Ex. 24 at 28-29. When Defendants did so, there was no evidence implicating Savory at all. *Id.* No physical evidence or witness suggested he was involved in the crime. *Id.*

42.    Moreover, Savory had a solid alibi for the time of the crime, supported by multiple witnesses. Ex. 2 at 263:17-301:10; 303:18-310:13; 319:8-321:2. Around 8:30 a.m. on the day of

the crime, he went from his father's house to Georgia Smolley's house for breakfast, and he played there with Smolley's daughter Darlene Harris. Ex. 1 at 265:12-15; 277:5-7; Ex. 64 at PS-1592. Savory then left the Smolley house with Junior Smolley to run errands, staying with him the entire time and returning to the Smolley house before 10:30. Ex. 2 at 276:8-280:10. After that, Savory went to Lillie Williams' house from approximately 10:30 to 11:30 a.m. Ex. 2 at 280:16-286:7. Savory then left the Williams' house to go to the Ivys' house, where he arrived around noon and stayed for a few minutes. Ex. 1 at 286:8-289:10. Savory then returned home, where he stayed from shortly after noon to approximately 2:00 p.m. Ex. 1 289:11-291:8. At approximately 2:30 p.m., Savory took a bus downtown with Tina Ivy, and Savory got out at the courthouse to meet his probation officers, Percy Baker and Sherman Jones. Ex. 1 at 291:9-295:6. After a short meeting, Savory walked with Sherman Jones, who was completing an errand, and continued on his way to Late Afternoon High School. Ex. 1 at 295:7-12. Savory arrived at approximately 3:30 p.m., and he was subsequently disciplined and suspended for an interaction involving another student. Ex. 1 at 295:20-296:10, 303:18-305:2. Following his suspension, Savory left via bus. Ex. 1 at 305:3-4. Defendants documented that Savory did not leave Late Afternoon High School, at least 30 minutes by bus from the crime scene, until sometime between 4:30 p.m. and 4:55 p.m., Ex. 65 at PS-1492, meaning that he could not have traveled from there to the crime scene before the police had already arrived.

43.    Nonetheless, Defendants focused on Savory because they learned that a boy named Johnnie had been playing with James Robinson in the afternoon and evening *on the day before* the murders. Ex. 6 at PS-745.

44.    After that moment, Defendants never investigated any other suspect or any other evidence. Ex. 24 at 28-29. Instead, they focused exclusively on Savory. *Id.*

## V.    DEFENDANTS FORCE SAVORY TO INCRIMINATE HIMSELF AND FABRICATE A CONFESSION

### A.    Defendants Conduct a Brutal Interrogation of Savory

45.    On January 25, 1977, at approximately 3:30 p.m., Peoria Police Department Youth Officers George Pinkney and Edgar Haynes interviewed the Principal of the Late Afternoon School and students at the School and determined that Plaintiff was the "Johnnie" with whom Scopey Robinson had reportedly been seen on January 17, the day prior to Scopey's murder. Scopey and Plaintiff were both in the seventh grade at the Late Afternoon School. Ex. 6 at PS-746. Plaintiff had been placed in Late Afternoon School because of behavioral problems and poor academic performance. Ex. 1 at 144:15-146:9.

46.    On January 25 and 26, 1977, Plaintiff was 14 years old. He was five feet  tall and weighed approximately 110 pounds. Ex. 1 at 128:8-17, 188:22-24.

47.    Plaintiff's father, Y.T. Savory, was an alcoholic. Months prior to January 25 and 26, 1977, Joseph Johnson, the Director of Juvenile Court Services, had been appointed Guardian for Plaintiff because of Mr. Savory's inability to care for Plaintiff. Ex. 66 at PS-25551. Records reflect that Plaintiff had previously had encounters with the Peoria Police, many of them because he had run away from home. Plaintiff also had received a number of "street adjustments" and "station adjustments" following police contacts for petty offenses. He was twice adjudicated delinquent for non-violent offenses. Ex. 67.  The street and station adjustments essentially involved being admonished by a police officer for alleged behavior and released. Ex. 68 at 152:23-153:14. As Defendants' police practices expert, Richard Brown, acknowledged, there is no evidence in the records that, prior to the interrogation in this case, Plaintiff had ever been held in police custody, subjected to a police interrogation of any length, or received the Miranda warnings. Ex. 68 at 162:24-165:24.

48.    Officers Pinkney and Haynes began the two-day interrogation of Plaintiff at Late Afternoon School. Plaintiff was taken out of class and sent to the teachers' lounge, where Pinkney and Haynes were waiting to speak with him. Plaintiff told the officers he did not wish to speak with them. Pinkney and Haynes persisted, telling Plaintiff that he might have information that would help the investigation into the murders of Cooper and Robinson. Plaintiff agreed to help the investigators. He described his interactions with Scopey Robinson (his classmate) at Scopey's home on the day before the murders, even though he "really didn't remember too much." Ex. 1 at 330.

49.    Pinkney and Haynes told Plaintiff they wished to question him further at the Peoria Police station. Plaintiff did not want to accompany them. But the officers convinced Plaintiff to get in their car by telling him that he could be helpful in their investigation. Plaintiff agreed to help, but he was reluctant to accompany the officers, because he did not believe there was any way in which he could further assist them. Ex. 1 at 330-32. He had never been taken from school to the police station before. *Id.* at 331. There is no record that the officers made any attempt to notify Plaintiff's father that Plaintiff was being taken from school.

50.    After arrival at the Peoria Police headquarters, at approximately 4:00 p.m., Plaintiff was placed in an interrogation room. The door was closed. Plaintiff was seated at a table. The two officers sat across from him and began to ask him questions. Defendants Cannon and Fiers also questioned Plaintiff. The interrogators accused Plaintiff of lying as Plaintiff struggled to answer simultaneous questions from multiple interrogators. The questioning was confusing and chaotic. Ex. 2 at 39-40; Ex. 69 at 27.

51.     Over time, the questioning became hostile and angry. The defendant interrogators, in Plaintiff's perception, were no longer interested in his help solving the crime; they were accusing him of committing the crime. In Plaintiff's words:

> I didn't know, like everything changed when they told me that first that this may be something you can help us with. Maybe you can help us remember what you saw or what you heard that day. But that went from me helping them, to them hurting me. And I didn't understand why. So, I began to reach a point where I didn't want to talk to any of them, and I began to express that. And that didn't make them happy. That made them angry with me or telling me I was backtracking, you sure you're not confused? And I didn't understand, and to this day I really don't understand.

Ex. 1 at 126.

52.     After a couple of hours of questioning, at approximately 6:00 p.m., Plaintiff was given a candy bar and a soft drink, which was the first food Plaintiff had eaten on that day. Ex. 1 at 381:17–19; Ex. 70 at 162:19–163:7. Plaintiff would not consume any other food until approximately noon on the following day, January 26, at about noon, when Plaintiff was given a hamburger. Ex. 2 at 69:5-14.

53.     That evening, Plaintiff asked the officers if he could go home. They ignored that question. Instead, Fiers and Cannon began to show Plaintiff photographs from the crime scene. In Plaintiff's recollection, Defendant Cannon and Defendant Fiers showed him "tons" of photographs. Ex. 2 at 41, 42, 44.

54.     The interrogation continued until approximately 9:30, when Plaintiff was asked to take a polygraph. Plaintiff's probation officer, Percy Baker, spoke with Plaintiff briefly at this point, their first contact that day. Plaintiff asked to go home and was told that if he took the polygraph, he would be allowed to go home. Ex. 2 at 41-42. By this time, Plaintiff's "will was just destroyed. He "just wanted to go home." *Id.* at 382**.** Defendants did not notify or try to notify Plaintiff's father before subjecting Plaintiff to the polygraph exam. Ex. 71 at PS-713.

14

55.    At approximately 10:00 p.m., Plaintiff was transported to the off-site offices of polygraph examiner Dennis Jenkins. There he was questioned further and submitted to a polygraph examination that Jenkins conducted. Ex. 71 at PS-713; Ex. 72 at SAVORY-LL-00153

56.    Defendants considered the polygraph not only to be an "investigative tool," but also an interrogation technique and strategy used to elicit a confession of guilt; Ex. 31 (Fiers Dep. of October 13, 2021) at 56-57; Ex. 137 (Tiarks Dep.) at 81-83,175-178; Ex. 69 (Leo Report) at 60. Defendant Tiarks, who was in charge of the investigation, conceded that the common use of polygraphs in 1977 was an interrogation tool to intimidate suspects, making them believe that there was some magic box that could tell whether they were being truthful or not. Ex. 137 at 83.

57.    Officers informed Plaintiff that he had failed the polygraph; when he had denied all involvement in the murders, he was being untruthful. But the test that Jenkins administered to Plaintiff used the "relevant/irrelevant" question format ("RIT"), comparing the subject's physiological responses to irrelevant questions with his responses to questions concerning the crime. This methodology had long before been discredited. The accuracy of the RIT polygraphing method is no better than a coin flip; the test is incapable of detecting deception. For this reason, police investigators around the country had stopped using the RIT method. The deficiencies of the RIT method were so well known in 1977, that Charles Honts, Plaintiff's nationally recognized expert in polygraphy, questions whether the polygraph tests administered to Plaintiff on January 25 and January 26 were nothing more than a false evidence ploy, designed to convey to Plaintiff that he was deceptive when the test provided no data to support that conclusion. Ex. 73 at 10-11; Ex. 73 at 13-68.

58.     Plaintiff's false confessions expert, Richard Leo concluded that "the representation by Mr. Jenkins and/or Mr. Bowers that the polygraph indicated that Mr. Savory was lying or was involved in the double murder and rape was a false evidence ploy because the polygraph is an inherent, if psychologically powerful, false evidence ploy." Ex. 69 at 36. This is "because it can never be a valid or reliable instrument of human lie detection or truth verification, but is highly effective at eliciting confessions as an adjunct to psychologically manipulative, if not coercive interrogation." *Id.* at 36. Leo further concluded that "the polygraph here was explicitly used as an interrogation technique, not as an attempt at behavioral lie detection, and the polygraph false evidence ploy exerted a profound impact by inducing feelings of hopelessness and despair and moving [Savory] from denial to admission." *Id.* at 36.

59.     Defendant Tiarks conceded in his deposition that polygraph results were "nonsense." Ex. 137 at 81, 176.

60.     Following transmission of the polygraph results to Plaintiff, at approximately 11:30 p.m., Plaintiff was given the Miranda warnings. This was Plaintiff's first time receiving Miranda. After receiving his rights, Plaintiff, by the officers' own report, responded, "I don't know nothing to tell you. I don't want to talk." Ex. 71 at PS-713.

61.     Following the polygraph, Plaintiff again asked if he could go home. The officers responded that he was going to be held overnight at the Gift Avenue Detention Center because he was in violation of the terms of the juvenile probation by not living at his approved residence. Ex. 70 at 201:22-23..

62.     It was not until after midnight in the early morning of January 26 that Defendants first notified Plaintiff's father, Y.T. Savory, that Plaintiff was in police custody and had been interrogated. Ex. 74 at PS-714.

16

63.     Plaintiff was transported, in custody, to the Gift Avenue Detention Center. Plaintiff was not able to sleep until about 1:30 a.m. Plaintiff described the bed on which he slept at the Detention Center as "2 inches of Styrofoam on top of 15 inches of concrete." Ex. 2 at 190-91; Ex. 1 at 381.

64.     The next morning, January 26, the investigators arrived at the Gift Avenue Detention Center at about 8:00 a.m. to take Plaintiff back to the Peoria Police Department for further interrogation. Although breakfast was available to children detained at the Detention Center, Plaintiff was not given the opportunity to eat before he was returned to Police headquarters. Ex. 1 at 381; Ex. 2 at 60-62.

65.     The interrogation resumed shortly after Plaintiff was returned to the Police headquarters. Ex. 2 at 60. Defendants read Plaintiff his Miranda rights, and Plaintiff responded that he wanted to go home. Contrary to the Police report (Ex. 75 at PS-1426), Plaintiff did not say that he understood his rights or that he was willing to talk with the officers. Ex. 2 at 63-64.

66.     After the rights were given, Defendants Fiers, Haynes, and Teplitz, along with others, resumed interrogating Plaintiff. Ex. 75 at PS-1426. Once again, Defendants asked Plaintiff rapid-fire, confusing questions in groups of two or three officers at a time. Ex. 2 at 60:15-61:3; Ex. 1 at 355:23-356:7-12; Ex. 75.

67.     At about 10:00 a.m., Plaintiff was permitted to meet with his father. For Plaintiff, the meeting was traumatic. In Plaintiff's words:

> They finally allowed me to see my dad. … I don't know what truly happened. But I know for the first time I could not—we [could not] communicate with each other because he was so angry. I don't know what the police said to him. I don't know what was done. But we could not communicate whatsoever. I don't—I don't really remember what was said. All I know is that it was some yelling. … I don't know what he understood or what he didn't understand 'cause we couldn't communicate whatsoever.

Ex. 1 at 360-61.

68.     Plaintiff's father then left the Police headquarters abruptly and Plaintiff faced interrogation without an adult advocate for the remainder of day and evening. Percy Baker was Plaintiff's assigned juvenile probation officer, but Mr. Baker was not present during any portion of the interrogation of Plaintiff on either of the two days. Ex. 2 at 71-72. Mr. Baker's only role was to consent on Plaintiff's behalf to the polygraph examinations that Plaintiff was subjected to in the evening of January 25 and 26. Ex. 76 at PS-3326; Ex. 2 at 74-77.

69.     At some point following his father's departure, Defendants Jatkowski and Fiers escorted Plaintiff to a bathroom. There, Defendant Jatkowski instructed Plaintiff to remove all of his clothing so that Jatkowski could pluck hairs from Plaintiff's head, from points on Plaintiff's torso and from Plaintiff's pubic region. Ex. 75 at PS-1427, Ex. 2 at 82-86. Plaintiff described the experience as "traumatic." Ex. 2 at 210. He had never had a similar experience. Ex. 2 at 82:16-20.

70.     In the bathroom, Jatkowski initiated a discussion about the murders and asked Plaintiff questions about his alleged involvement and the clothes he was wearing on January 18, 1977. TS6 at SAVORY-LL-1500-1502. Plaintiff's clothing was taken from him. Ex. 2 at 82-86.

71.     At noon, Plaintiff was provided new clothes and a hamburger to eat, the first food he had eaten since the candy bar and soft drink from the afternoon before and the only food he would be offered that day prior to his acquiescence in the confession statements that Defendant Teplitz eventually forced Plaintiff to adopt. Ex. 75 at PS-1427, Ex. 2 at 69-70.

72.     Plaintiff was then interrogated continuously from about 1 p.m. until about 5:30 p.m. Ex. 75 at PS-1427, Ex. 7 at PS-789. The questioning was done by multiple officers. As on the evening of the prior day, the questioning confused and disoriented Plaintiff. In his words:

When I was in the station being questioned with two and three officers at a time, none of
them seemed to care. None of them really seemed to want the truth, and every time I would
say something, they would tell me that I was wrong, and could it be something else. Could
it be this? Could it be that? And I was never equipped to sit down and talk to two and three
people at the same time. And she was one of those people. And I could not understand why
adults would be sitting there, and they say Officer Friendly would help you. Officer
Friendly would not lie to you or hurt you or do any of that, and I feel like they did not want
the truth, and I feel like I became—as my will slowly left me, it's like I had no voice, no
one who was listening to me, and she was one of those people. And I just felt overwhelmed
by their questioning. It made it hard for me to remember things. It made it hard for me to
answer.  I just didn't know how.

Ex. 1 at 125.

73.    Contrary to the Police reports, Plaintiff did not request to speak with Defendant

Teplitz; he was convinced to do so. Teplitz refused to accept his denials. Plaintiff began to feel

that the questioning would never end unless he agreed that he had committed the murders.

Defendants led Plaintiff to believe that, if he were to confess to the murders, he would be

allowed to go home. He described the process in these terms:

[I was willing to tell anything that they wanted me to say, do anything they wanted me] to
do for it to stop. Since they didn't want to honor my didn't want to talk to you, don't want
to continue to talk to you, so you just continue to bombard me with questions, and I'm not
trying to talk to you. I'm not trying to—I see I cannot—nothing I say matters. So they made
me feel all you want me to say is, Just say you did it, and we'll be through, and you go
home. That's how they made me feel. I just feel like I didn't have a voice. He wasn't
listening to me. So when they convinced me to sit down and talk to Marcella Teplitz, she
began just telling me about the crime and telling about, Well, you know, you don't have to,
I guess, feel this way or whatever she was saying to me. But it didn't make much sense.
But it—it—it's like they telling me, you know, We believe you did it, and we want you to
tell us that.

Ex. 1 at 362-63.

74.    Defendants repeatedly accused Plaintiff of committing the murders. He denied the

accusations. Every time Plaintiff said something, the Defendants would tell him he was wrong

and ask him if the answer should be something else. Plaintiff was made to feel "like the worst

19

human being on this planet." Ex. 1 at 30. He reached a point in the interrogation where he did not

wish to speak with any of the interrogators, and he told them that. Ex. 1 at 124-126.

75.     At approximately 5:30, Plaintiff asked again if he could go home. The defendants

did not answer. They told Plaintiff there were inconsistencies in his account and asked him if he

would be willing to take a polygraph examination. Plaintiff responded that he would take the

polygraph if he would be permitted to go home after the test. Defendants responded, "We'll see."

Plaintiff perceived that he would be allowed to go home after the polygraph.

76.     Plaintiff was again transported to the office of a different polygrapher, defendant

Charles Bowers. Ex. 77 at PS-1457-1458.

77.     Plaintiff was placed in a room alone with Defendant Bowers, who questioned

Plaintiff and connected Plaintiff to the instruments that measure physiological responses. After a

short time, Bowers stopped the test and began to accuse Plaintiff of being a murderer, raising his

voice and positioning himself very close to Plaintiff. Ex. 1 at 346:3-20. Bowers's loud, angry

accusations were overwhelming to Plaintiff; he testified he was "decimated" by Bowers and that

the effect of Bowers's actions overcame Plaintiff's will. *Id.* at 346:3-20. In his deposition,

Plaintiff described the experience in these terms:

> In the middle of the polygraph examination, he just got up, called me a liar, murderer,
> everything he could think of. And he broke my will because it left me with no choice. They
> wasn't listening to me. They wasn't honoring what I said. Didn't want to talk to you. I'm
> tired of talking to you. And I couldn't understand how I became from helping to becoming
> a suspect in something that I had nothing to do with. So it broke my will to make me say
> something that I did not mean. And you gave me the words to say in my mouth because
> when I said I didn't do something, they said I did. When I say I didn't want to talk to you,
> even after all that, you didn't stop.

*Id.* at 346:3-20.

78.     By Bowers' account, Bowers had been briefed by Teplitz, who told him that

Savory had changed his story, the particulars of the changes, and that he had been polygraphed

by Jenkins within the past 24 hours. Ex. 144 at 202:11-203:2; 208:14-209:5; 220:18-23. Jenkins, who was also present, told Bowers that he had previously concluded that Savory was not "telling the complete truth." Ex. 144 at 255:17-20; 206:3-9. Bowers was aware of the circumstances of the case, in terms of the two victims being killed and some of the information he had obtained previously from talking to the detectives working on the case, and some polygraphs he had previously administered. Ex. 144 at 202:11-21; 200:5-8.

79.    Bowers conceded that he did not advise Savory of his *Miranda* rights. Ex. 144 at 216:22-217:9. By his own admission, Bowers questioned Savory for about 45 minutes, concluded that he was not being truthful, and he became confrontational after Savory continued to deny involvement. Ex. 144 at 238:9-13; 239:14-23; 266:25-267:23. pp. 239-240; 266-270; Ex. 77 at PS-1458. In his own words, after administering the polygraph, Bowers "confronted" Savory with the findings of deception that Bowers said the polygrams reflected, and Savory was "interrogated [by Bowers] to obtain some explanation." Ex. 77 at PS-1458. Bowers acknowledged that his questioning and confrontation of Savory would be defined as an "interrogation" in the "police world." Ex. 144 at 268:9-269:6. Bowers further wrote in his report to Marteness and Tiarks that "during the interrogation that followed, Savory acknowledged that he had been lying and he had been involved in the crime under investigation." Ex. 77 at PS-1458. Bowers claimed that he then reported to Defendant Teplitz that Savory admitted that "he did it," although this claim does not appear in his Report. Ex. 144 at 273:5-19; 289:21-25. He then returned Savory to Teplitz for further questioning. Ex. 144 at 271:21-272:12.

80.    Savory's account is that, after he was unhooked from the polygraph instruments, he stood by a window and began to cry. He felt "empty inside." Ex. 1 at 362:2-8. Plaintiff did not

confess to Bowers. He asked for Defendant Teplitz to intervene and make Bowers stop

questioning him.

81.     Teplitz then fed Plaintiff his confession:

[Then] Marcella came in, it was just the two of us. She asked me to sit down and talk to her, tell her what happened. I said, I don't know what happened. But then she began to tell me what happened; you know, your friends were murdered and they were stabbed and so on, so on. And I didn't know what to tell her, you know. She -- so she start making suggestions that, Could you have possibly done this? · Or --just questions that didn't make no sense to me. But I tried to just comply and just do what she asked me 'cause I'm still asking her, When can I go home?

*Id.* at 368:2-369:3.

82.     Plaintiff testified in his deposition that his "confession" came about as a result of

Teplitz "wording him along." He explained what that meant:

So they gave me what they wanted me to say, and I gave them what they wanted to hear because I wanted it to end and stop. When I answered her questions, I didn't get it right. She prompt me and guided me to where, You may have forgot, you don't remember. Yes [these are things she was saying to me]. I don't remember exactly [where I pointed on my body that I stabbed Connie that wasn't right]. Maybe she has her arms -- something. I don't remember exactly. You sure it couldn't have been her stomach? You sure it couldn't have been this or that? I don't -- I remember some of this conversation. I don't remember all of it. But I do remember some of it. And I just don't – it was never just voluntarily. It was -- I was guided along. But I didn't understand. All I wanted was to -- for it to end. And no one respected when I invoked not to talk to you or -- I just wanted to quit and just go home. I believed I was going home because I knew I had did nothing wrong.

*Id.* at 378:24-80:16.

83.     Plaintiff was returned to the Peoria Police headquarters. There, he again denied

involvement in the murders. He refused to sign a statement. Once again, Defendant Teplitz

"worded [Plaintiff] along." Plaintiff's purported "confession" is documented in Teplitz's report

(Ex. 7).

**B.    Savory's Confession Is Facially Implausible**

84.    The confession that Teplitz documented did not fit the facts of the crime, by Teplitz's own admission. Ex. 78 at Savory-LL-880:8-11 ("Q. Did Johnny Savory's confession fit precisely with the facts of the case, that you knew them to be on that date? A. Not totally.").

85.    The Teplitz report of Savory's confession statement includes the following details: Savory and Scopey Robinson were practicing karate in the living room of the Robinson-Cooper home when Savory accidentally stabbed Scopey in the chest. He stabbed Scopey "once or twice." Connie Cooper then came out of the bathroom, saw what happened and charged toward Savory, who hit her in the mouth. Connie fell to the floor and Savory picked her up and carried her into the bedroom and put her on the floor. Connie woke up and kicked Savory who then stabbed her in the middle of her chest, her vaginal area and her midsection. Savory stated that the murder was a knife the police had confiscated from his home. He said that he did not clean the knife after the stabbings, but transported the knife to his home and wiped it off there. Savory stated he was wearing blue pants that were at his home and that he was also wearing a sweatshirt that police had confiscated during the interrogation. Ex. 7 at PS-788-790.

86.    This confession does not conform to the objective evidence from the crime scene and from subsequent testing:

    a.    Although the confession asserts that Savory stabbed Scopey "once or twice," Scopey had in fact received many more stab wounds. Ex. 34 at PS-85.

    b.    The confession asserts that Scopey was stabbed in the living room, but the only blood found in the investigation was in the bedroom and a small amount in the bathroom. Scopey's body was discovered in the bedroom rather than the living room. Ex. 11 at PS-21; Ex. 20 at PS-35; Ex. 21 at PS-54; Ex. 30 at 2.

23

c.  The confession says that Savory stabbed Scopey first, and then Connie. But analysis of the blood found on each victim showed that, while Scopey had Connie's blood on his body, Connie did not have Scopey's blood on hers—an indication that Connie was the first to be stabbed, followed by Scopey. Ex. 30 at 7; Ex. 8 at 7; Ex. 35 at PS-12974-12975; Ex. 36 at PS-1870; Ex. 24 at 32, 37.

d.  The finding of a large amount of blood on Connie's bed is not consistent with the confession account that Savory stabbed Connie on the floor of her bedroom. Ex. 24 at 37.

e.  The confession contains no mention of a sexual assault upon Connie. But the evidence from the scene strongly suggests that she was sexually assaulted, including the finding of semen on swabs taken from her vaginal cavity; the fact that she was found on her bed and her clothing was partially removed; and the fact that she had stab wounds to her lower abdomen and genital area. Ex. 30 at 4-5; Ex. 24 at 6, 37; Ex. 34 at PS-86; Ex. 35 at PS-12974.

f.  The confession says that Savory was wearing a sweatshirt that police confiscated during the interrogation. But that sweatshirt was tested and found to have no blood on it. Ex. 79 at PS-1425.

**C.  Defendants Fabricate and Suppress Evidence Relating to Savory's Interrogation and Confession**

87.  Reports prepared by interrogating Defendants attribute numerous statements to Savory that Defendants fabricated; that are untrue; and that Savory did not make at any point in the interrogation–before or after his will was overborne. The report of Defendant Charles Cannon (describing the interrogation of Savory at the Peoria Police Department in the late afternoon and evening of January 25) includes the following fabricated statements falsely attributed to Savory:

a.  The Cannon Report fabricates that Savory told interrogators that he had known Scopey and Connie all his life and that Connie had changed his diapers. Ex. 71 at PS-710; Ex. 2 at 11:7-19.

b.  The Cannon Report fabricates that Savory said he had been to Scopey's house "on numerous occasions. Ex. 71 at PS-710; Ex. 2 at 13:11-17; 14:1-7.

c.  The Cannon Report fabricates that Savory told interrogators that, following their arrival at Scopey's house on January 17, Scopey went to his bedroom and got a black nightstick and karate sticks attached by a chain. Ex. 71 at PS-711; Ex. 2 at 21:18-22:16.

d.  The Cannon Report fabricates that Savory said that he and Scopey had identical knives that they had purchased from Murray's. Ex. 71 at PS-711; Ex. 2 at 23:21-24:20.

e.  The Cannon Report fabricates that Savory said that, after getting chicken on the evening of January 17, he and Scopey chased a boy named Melvin Hoskins. Ex. 71 at PS-711; Ex. 2 at 26:10-27:13.

f.  The Cannon Report fabricates that Savory said that Scopey told him that Scopey was seeing a 25 year-old white female. Ex. 71 at PS-711; Ex. 2 at 27:21-28:6.

g.  The Cannon Report fabricates that Savory said that on the morning of January 18 he got up at 10:00 a.m. and went to visit his grandmother at Methodist Hospital. Ex. 71 at PS-711; Ex. 2 at 34:15-36:1.

88.  The report of George Pinkney (describing the interrogation of Savory at Late Afternoon School) includes the following fabricated statements falsely attributed to Savory:

25

    a.   The Pinkney report fabricates that Savory said that Scopey went to his bedroom and got a nightstick and sticks for practicing karate. Ex. 6 at PS-749; Ex. 2 at 176:5-177:20.

    b.   The Pinkney report fabricates that Savory said that he and Scopey practiced karate using the sticks. Ex. 6 at PS-749; Ex. 2 at 178:8-21.

    c.   The Pinkney report fabricates that Savory said that he and Scopey chased Melvin Hoskins. Ex. 6 at PS-750; Ex. 2 at 177:21-178:6.

    d.   The Pinkney report fabricates that Savory said that he called Scopey after he returned home on the night of January 17. Ex. 6 at PS-751; Ex. 2 at 179:4-19.

    e.   The Pinkney report fabricates that Savory said that he made an arrangement to return to Scopey's house on the morning of January 18, but did not do so. Ex. 6 at PS-752; Ex. 2 at 179:23-180:7.

89.    The report of John Fiers (describing the interrogation of Savory on the morning of January 26) includes the following fabricated statements falsely attributed to Savory:

    a.   The Fiers report fabricates that Savory said he heard about an incident on Garden Street while he was in the principal's office at Late Afternoon School at approximately 4:30. Ex. 75 at PS-1426; Ex. 2 at 37:4-13.

    b.   The Fiers report fabricates that Savory said he talked with Marva Jones about the murders telling her "he split her stomach wide open, Marva, you should have seen it. You just don't know." Ex. 75 at PS-1427; Ex. 2 at 67:4-68:24; 99:18-23.

90.    The report of Marcella Teplitz (describing the interrogation during the afternoon and evening of January 26 as well as Savory's coerced confession) includes the following fabricated statements falsely attributed to Savory:

26

a.   The Teplitz report fabricates that Savory said he ran into Connie Cooper at a Kroger food store on January 16 while he was in the company of Ray Mason and Rosemary Hamilton. Ex. 7 at PS-785; Ex. 2 at 102:21-103:10.

b.   The Teplitz report fabricates that Savory said he was turned on by Connie's rear end when he ran into her in the store. Ex. 7 at PS-786; Ex. 2 at 118:23-119:7.

c.   The Teplitz report fabricates that Savory said that, on the evening of January 17, he wanted to wait around until Connie came home so he could rap with her, but instead went with Scopey to get chicken. Ex. 7 at PS-786; Ex. 2 at 117:20-118:8.

d.   The Teplitz report fabricates that Savory said that he was at Ray Mason's home between 11 a.m. and 1:30 p.m. on January 18. Ex. 7 at PS-786; Ex. 2 at 162:7-163:5.

91.    Defendants fabricated the false statements listed in the four preceding paragraphs and attributed them to Savory in order to script and fabricate a confession scenario in which Savory: (a) had supplied false and conflicting accounts of his whereabouts on the day of the murders; (b) had provided possible motives for the murders (attraction to Connie and knife play with Scopey); (c) had identified the murder weapon; and (d) had cast himself and Scopey in a negative light.

92.    The Fiers Report fabricates that Defendant Haynes gave Savory the Miranda warnings on the morning of January 26 and that Savory responded that he understood his rights and was willing to talk. Ex. 75 at PS-1426. In fact, when Haynes read the rights, Savory responded that he wanted to go home. Ex. 2 at 63:15-64:16.

93.    The Cannon Report (Ex. 71 at PS-712) and the Fiers Report (Ex. 75 at PS 1426-28) fabricate that Savory admitted to repeatedly lying to officers about his whereabouts, his knowledge

of the murders and other details during Defendants' questioning of Savory on January 25 and the morning of January 26. In fact, Savory never acknowledged lying to any questioner (Ex. 2 at 88:5-15) and, as detailed above in paragraphs 87 to 90, had not made the statements the reports say he later retracted as lies.

94.     The Fiers Report (Ex. 75 at PS-1427) and the Teplitz report (Ex. 7 at PS-785) fabricate that, after being interrogated from the afternoon of January 25 and through the morning of January 26, Savory said that he was "willing to tell everything," and would do so in the presence of Teplitz alone. In fact, Savory never requested to speak with Teplitz and was never interrogated by just a single officer. Ex. 2 at 76:6-20; 100:23-102:1.

95.     The Teplitz report fabricates that, at the beginning of her questioning of Savory, Savory requested that she write down everything as he told his story. Ex. 7 at PS-785; Ex. 2 at 102:7-19. In fact, Savory made no such statement. Ex. 2 at 102:7-19.

96.     Teplitz's report fabricates that Savory initially confessed to polygraph examiner Charles Bowers at the conclusion of a polygraph that Bowers administered. Ex. 7 at PS-788. In fact, Savory first made inculpatory statements to Teplitz after Bowers interrupted the polygraph and called Savory a liar and a murderer. At that point, Savory broke down and Teplitz began to feed him his confession word by word. See *supra* ¶¶ 81, 82.

97.     Teplitz's report contains a Q and A section (Ex. 7 at PS-788) and a further record of Savory's "confession" (Ex. 7 at PS-789-790) to make it appear that Savory volunteered an account of the crime. In fact, Savory never offered an account; he merely assented to what Teplitz fed him as she "worded him along." See *supra* ¶¶ 81-83.

28

98.    Teplitz asked Savory to sign a statement acknowledging he committed the murders and describing how they were committed, but Savory refused to do so. Ex. 2 at 154:12-24. Teplitz omitted this fact from her report. *See* Ex. 7 at PS-785-791.

99.    Teplitz made detailed notes during her interrogation of Savory. Teplitz has admitted that she destroyed those notes. Ex. 80 at 375:1-21, 386:22-388:8. The notes contained exculpatory information, including the number of times that Savory "backtracked" from his confession, the fact that Savory told Teplitz that he "ought to jump out of this window," and other information that was not exactly reflected in the Teplitz report. Ex. 80 at 380:10-381:15; 387:16-388:9; 373:3-13; 353:18-24; 373:3-13.

## VI.    DEFENDANTS FABRICATE, SUPPRESS, AND DESTROY CRITICAL FORENSIC EVIDENCE

### A.    Defendants Fabricate the Murder Weapon

100.    During Savory's interrogation, Defendants claimed that they observed a substance that looked like blood on Savory's clothes and hat, and they tested the clothes they had taken from Savory—his cap, jacket, sweatshirt, and pants—for blood. Ex. 81 at PS-793; Ex. 7 at PS-787; Ex. 79 at PS-1425. The lab analyst on the scene of the interrogation told Defendant Jatkowski that none of the items tested positive for blood. Ex. 79 at PS-1425. There was still no physical evidence connecting Savory to the crime.

101.    So, Defendants fabricated a murder weapon to connect Savory to the crime. While Savory was being interrogated, Defendants Cannon, Jatkowski, Fiers, Pinkney, and Dunlavey went to Y.T Savory's (Savory's father) home and collected a folding knife with a 3.5" blade, which

Y.T. told them was his and not his son's. Ex. 82 at PS-704; Ex. 83 at PS-718.[4] Jatkowski took

custody of the knife at the station. Ex. 83 at PS-718.

102.    After these Defendants collected Y.T. Savory's knife, Defendants Teplitz, Fiers,

Bowers, and Tiarks wrote the knife into the confession as the weapon Savory had used in the

murder, falsely saying that Savory had told them the knife they had collected was his and had been

used in the crime. See Ex. 7 at PS-788 ("1. Was it your knife? A. Yes. 2. Do the police have the

knife? A. Yes.").

103.    Jatkowski never tagged the knife or logged it in as evidence, in violation of Peoria

Police Department policy. Instead, on January 26, Jatkowski falsely reported that it was Savory's

knife and sent it to the lab for forensic testing (the knife was assigned item #44 for testing). Ex. 84

at PS-1432; Ex. 85 at PS-1907.[5]

**B.    Defendants Suppress Evidence That the Knife Has No Blood On It**

104.    Forensic analyst Robert Gonsowski tested the knife for blood at the crime lab. The

test revealed that the knife was negative for blood—the supposed murder weapon was negative for

blood. Ex. 36 at PS-1870; Ex. 8 at 12-13; Ex. 86 at ¶¶3-4; Ex. 87 at 132:-21-133:6. Gonsowski

provided the results over the phone to Jatkowski, who documented that the knife was negative for

blood in his notes, which were placed in what the Peoria Police Department called its Crime Scene

Unit File for the Cooper-Robinson investigation. *Id.*[6]

---

[4] The timing of these Defendants' visit to Y.T. Savory's house is unclear. The reports just cited suggest that it was on January 25. *Id.* However, the consent to search forms that these Defendants asked Y.T. to sign are both dated January 26.

[5] Savory's expert Dr. Daniel Spitz opines that the knife that Defendants falsely claimed was Savory's and wrote into Savory's confession could not have been used to inflict the injuries observed on the bodies of Cooper and Robinson. Ex. 30 at 4-7.

[6] This result demonstrating that the knife in fact had no blood on it was confirmed decades later during post-conviction testing, which also showed that the knife had no blood on it. Ex. 8 at 12-13; Ex. 89 at PS-1911.

105.     Jatkowski's notes say next to item #44, the knife, "Neg for blood." Ex. 36 at PS-1870.[7]

106.     Jatkowski's conversation with Gonsowski memorialized in the notes occurred between January 31, 1977, when the knife was received at the lab, Ex. 85 at PS-1907, and February 15, 1977, when Teplitz testified about the testing and results before the grand jury, Ex. 88 - Teplitz Grand Jury Testimony at Savory-LL-41-42.

107.     But Defendants had already falsely written the knife into Savory's false confession as the murder weapon. See Statement V(C) *supra*. Evidence that the knife was blood free and thus could not have been used in the murder would have conclusively undermined Savory's false confession. Ex. 24 at 41-42; Ex. 69 at 44, 62-63.

108.     To ensure this exculpatory evidence was never discovered, Gonsowski's separate notes and lab worksheets, which were created contemporaneously with his forensic testing relating to the Cooper-Robinson homicides, including his testing of the knife, and which reflected the details of that testing, were destroyed. Ex. 87 at 99:14-102:3. 110:20-24, 130:18-132:15; Ex. 91 at SAVORY-LL 010550-SAVORY-LL 0010551. Those notes and worksheets should have gone into the Illinois Bureau of Identification's casefile, where they would have been preserved for 74 years (well beyond today's date), pursuant to the Illinois Bureau of Identification's policies. Ex. 87 at 111:3-23, 130:10-17; Ex. 8 at 15.

109.     Jatkowski testified that he never put the contents of the notes into an official report. Ex. 90 (Defendant Jatkowski Deposition Part 2) at 18:10-12. He testified that he shared the notes with Gerontes. *Id.* at 16:8-12.

---

[7] Next to the phrase "neg for blood" in different handwriting the notes say "two spots slight reaction *if* blood was present." *Id.* Jatkowski was not able to explain when he wrote this additional phrase in different handwriting or why. Ex. 90 at 26:11-27:15, 29:21-30:16.

110.    Jatkowski placed his notes in the Peoria Police Department's crime scene unit file, Ex. 90 at 40:9-15, 59:5-10, where each of the Defendants working the investigation had access to them, *id.* at 41:9-42:12.[8] Jatkowski testified in this case, "I don't think there was any . . . obligation to turn over my notes because they're unofficial."

111.    Defendants suppressed Jatkowski's notes and the testing results in them, hiding the notes from the Peoria County State's Attorney's Office and Savory's criminal defense attorneys. Jatkowski's notes (Ex. 36) and two other sets of notes reflecting forensic testing results (Ex. 37 and Ex. 38) were all part of the crime scene unit file (Ex. 92). None of those notes was turned over to prosecutors. See Ex. 62 (Peoria County State's Attorney's file, which doesn't contain Ex. 36, Ex. 37, or Ex. 38); Ex. 24 at 41-42; Ex. 93 at 40:4-17, 50:13-58:8; Ex. 94 at 120:12-122:10, 124:3-125:8, 134:6-135:7; Ex. 95 at 4-8; Ex. 96 (Defendant Teplitz's response; all individual defendants provide the same response) at 4-8; Ex. 97 at 189:21-193:8.

## C.    Defendants Fabricate Evidence That the Knife Had Blood On It

112.    Making matters worse, Defendants not only fabricated that the knife was Savory and suppressed that the knife tested negative for blood, but they fabricated false evidence that blood had been found on the knife.

113.    After his call with Gonsowski in which he learned the knife was negative for blood, Jatkowski had Gonsowski prepare a false report documenting the evidence testing, which Gonsowski sent to Jatkowski, Ex. 35, and which Jatkowski made part of the official case file and sent to state prosecutors, Ex. 62 at SDT-SAO 742-749.

---

[8] As discussed in more detail below, the crime scene unit file in which the notes were placed was one of Defendants' central repositories of investigative material pertaining to the Cooper-Robinson investigation; each investigating officer had access to the investigative files; as the liaison with the State's Attorney's Office, Teplitz was responsible for reviewing the files and ensuring that all documents had been turned over. See Statement XI *infra*.

114.    The false report documented the testing of the knife, but exactly opposite the truth documented in Jatkowski's notes, the false report said, "Chemical testing of this item [44] indicated *the presence of blood*, however, due to insufficient sample quantity, *further testing could not be attempted*." Ex. 35 at PS-12977 (emphases added). Not only did the report falsely state that testing showed that blood was present on the knife, but it falsely said that the sample was so insufficient that no further testing could be conducted, which prevented anyone from disproving that Defendants had fabricated this evidence. *Id.*

115.    After Defendants fabricated the murder weapon and the forensic testing results, Defendants ensured that false evidence was presented throughout Savory's criminal proceedings–at the grand jury, Ex. 88 at Savory-LL-42 (Teplitz testimony that "[t]here was blood found inside Johnny Savory's knife"), at the motion to suppress hearing, Ex. 99 at Savory-LL-240-241 (Teplitz testimony that Savory "told me that he used his own knife and that the knife at that time was in police custody"), at the first trial, Ex. 100 at Savory-LL-732:23-734:4 (Gonsowski testimony that the knife tested positive for blood); Ex. 78 at Savory-LL-858 (Teplitz testimony that Savory said it was his knife he used in the crime and that police had the knife), and at the second trial, Ex. 101 at Savory-LL-1510 (Gonsowski testimony that there was possibly blood present on the knife and that no other testing could be performed).

### D.    Defendants Suppress Evidence That Cooper Was Sexually Assaulted

116.    Separately, Defendants suppressed evidence that Cooper was sexually assaulted.

117.    As discussed, at autopsy the coroner collected vaginal swabs of a white substance from Cooper's vagina. See Statement II(C) *supra*. Those swabs were sent directly from the coroner to Gonsowski at the lab on January 19, 1977. Ex. 22.

118.    In the meantime, Defendants interrogated Savory, extracted his involuntary confession, and fabricated incriminating statements that they attributed to him. See Statement V *supra*. None of the false statements extracted or fabricated mentioned a sexual assault on Cooper. Ex. 6, Ex. 7, Ex. 71, Ex. 75. Defendants' false confession did not include any confession to sexual assault. *Id.*

119.    On January 27, 1977–the day after Savory's confession was finalized–Defendants received autopsy and toxicology reports from the coroner, Ex. 32, which highlighted for them for the first time that the coroner had taken two vaginal swabs from Cooper and had asked the lab to determine whether sperm was present on those swabs, *id.* at 919.

120.    The problem for Defendants was that they had already manufactured a confession to murder and not sexual assault, but at the same time the coroner was investigating whether sexual assault had occurred. From that moment on, Defendants decided that they would simply deny that Cooper had been assaulted. Ex. 102 at 124-125 (Teplitz testifying in her deposition in this case that no one on the investigative team ever considered the attack on Cooper a sexual assault); Ex. 40 (all defendants denying that Cooper was sexually assaulted).

121.    But again the forensic testing told a different story. Jatkowski's notes of his phone call with Gonsowski discussed above begin with the handwritten text: "Sperm - slight positive (poss false positive) 1st time neg 2nd pos. (no sperm but pos seminal). Ex. 36. Officer Ganda's notes dated February 4, 1977, reflecting forensic testing results, said "vaginal swabs - slight pos - her blood type only A not a quick reaction feeling that it was there before attack." Ex. 37. A third handwritten note reflected the name "Walt" (Jatkowski's first name) and the word "sperm." Ex. 38.

34

122.    As Savory's expert Dr. Karl Reich opines, based on these notes, "[t]he inference of sexual assault correlated with the homicide is clear." Ex. 8 at 4. The notes reflect that sperm was observed, and the notes use the word "sperm" multiple times. *Id.* The notes reflect mixed results for the presence of sperm and semen–stating in some tests that they were observed and in others not. *Id.* The notes "could indicate that the results of microscopical sperm search were positive," and "[t]his conclusion is possibly repeated in the white notes where "a slight pos" was recorded with no specification of whether that was for sperm, seminal fluid, or both." *Id.*; Ex. 37. "The prominence and repeated notation of 'sperm' in the notes imply the investigators' interest and the importance of determining if a sexual assault was compounded with the homicidal assault: was sperm present in the vagina of the female victim? Was the semen indicative of a prior contact or linked to the homicide?" Ex. 8 at 4. Moreover, that the Defendants were exploring whether the attack was a sexual assault is confirmed by the notes' reflecting a "feeling" that sperm or semen "was there before attack." Ex. 37; Ex. 24 at 42.[9]

123.    Evidence that sperm had been found, that Cooper had been sexually assaulted, and that Defendants were investigating the murder as one combined with a sexual assault would have conclusively undermined Savory's false confession and the testimony of Defendants and other state's witnesses in the criminal case. Ex. 24 at 42; Ex. 69 at 46, 64.

124.    Like the Jatkowski notes, all of these other notes were placed in the crime scene unit file, where they were available to all investigating officers, but they were never disclosed to prosecutors or to Savory. See Statement VI(B) *supra*. Again, these notes were first uncovered

---

[9] Defendants' notes confirming the presence of sperm in 1977 are consistent with post-conviction testing of Cooper's underwear, which also confirmed the presence of sperm. Ex. 41 at SDT 560-561; Ex. 42 at SAVORY-LL-009887; Ex. 8 AT 11.

during this civil lawsuit. See Statement VI(B) *supra*. Again, Gonsowski's own notes and lab worksheets were destroyed. See Statement VI(B) *supra*.

E.  **Defendants Fabricate Evidence That No Sperm Was Found**

125.  Not only did Defendants suppress evidence that sperm had been found, that Cooper had been sexually assaulted, and that Defendants were investigating the murder as one combined with a sexual assault, but they fabricated false evidence that no sperm had been observed and that the crime was not a sexual assault.

126.  Again, Gonsowski's false report documenting the evidence testing stated that microscopic examination of the vaginal swabs and the vial containing them (items 1A and 36) "did not reveal the presence of spermatozoa." Ex. 35 at PS-12974 (item 1A result), PS-12976 (item 36 result). Gonsowski reported only that "[c]hemical and immunoelectrophoretic analysis of [the vial] indicated the presence of seminal material." *Id.* at PS-12974 (item 1A result).

127.  As Savory's expert Dr. Reich describes, "All three notes [discussed above] demonstrate considerable ambiguity in contrast to the unequivocal conclusions stated in the [Gonsowski] report. If the notes had been made available to the defense at the time of trial, they would certainly have provided foundation for cross examination."

128.  But because the notes were suppressed, during the criminal proceedings, Defendants and other state's witnesses testified consistent with Defendants' false story that sperm had not been found and that the crime was not a sexual assault: Ex. 88 at Savory-LL-13 (Fiers testifying at the grand jury that "the preliminary report is that there was not any sperm present. However, there was some seminal fluid present in her vagina."); Ex. 100 at Savory-LL-725 (Gonsowski testifying at the first trial that his "testing indicated that the seminal material was not present on the item"); Ex. 103 at Savory-LL-527 (coroner physician Dr. Immesoete testifying at

the first trial that swabs were taken to examine for sperm, but without providing testimony that sperm was found); Ex. 103 at Savory -LL-558 (Immesoete testifying at the first trial that he did not know the results of testing); Ex. 104 at Savory–LL-1634 (Immesoete testifying at the second trial that he did not know the results of testing for seminal fluid because "I do not have a report on the fluids and scrapings I did take on the vagina" and that "I don't believe that there was sexual intercourse during that time").

129.     In fact, Dr. Immesoete told the jury at the first criminal trial that the fluid collected from Cooper's vagina was not evidence of sexual activity, testifying, "No, there are a lot of fluids that occur in the vagina, possibly with infection, possibly with intercourse that look similar." Ex. 103 at Savory-LL-558.

   **F.    Defendants Fabricate Evidence That Savory's Pants Were Bloody and Destroy the Supposedly Bloody Part of the Pants**

130.     During the interrogation, Defendants Fiers, Pinkney, and Jatkowski also collected a pair of blue pants from Savory's house. Ex. 74 at PS-714-15. They observed that "it is not probable that Johnnie would be wearing his father's pants due to the considerable size difference." *Id.*

131.     Nonetheless, Jatkowski submitted the pants to the lab for analysis. Ex. 81 at PS-793. He reported falsely that they were Savory's pants. Ex. 105 at PS-1433; Ex. 106 at 218:5-7.

132.     Given the violent nature of the crime, any pants that had been worn by the killer would be covered in blood. Ex. 24 at 31. In addition, the confession documented that Savory had supposedly placed the knife in his pocket without cleaning it, which would have left blood on the pocket of the pants. Ex. 24 at 31; PS-790; Ex. 146 at Savory-LL-1448; Ex. 101 at Savory-LL-1511; Ex. 147 at Savory-LL-1582, Ex. 148 at Savory-LL-1741-42).

133.    Gonsowski reported that "chemical and serological testing of this item indicated the presence of group A, human blood." Ex. 35 at PS-12977; see also Ex. 106 at 184:13-16 (Jatkowski testifying in this civil case that the pants tested positive for blood).

134.    During the criminal proceedings, Teplitz testified that "there was blood found inside the trouser pocket of a pair of dark blue pants." Ex. 88 at Savory-LL-42. Jatkowski testified that he collected the pants because they appeared to have blood on them. Ex. 25 at Savory-LL-659, Ex. 107 at Savory-LL-1476. Gonsowski testified that the blue pants had type A human blood on them "right to the right and below the belt to the rear of the right front pocket" Savory-LL-728-729; see also Ex. 101 at Savory-LL-1510-11

135.    In fact, there was no blood on the pants. The pants were thoroughly tested following Savory's convictions, and none of the tests revealed any blood or any DNA profile of the victims. Ex. 8 at 11-12. These findings mean that the pants could not have been worn by the killer. Ex. 8 at 12.

136.    Cannon and Jatkowski were responsible for the preservation of physical evidence following Savory's prosecutions. Ex. 108 at PS-1611; Ex. 109 at PS-1613-14. The area of the blue pants that supposedly had tested positive for blood was cut and removed from the pants. Ex. 110 at Savory-LL-3761, 3779; Ex. 25 at Savory-LL-658; Ex. 107 at Savory-LL-1476. At the time that post-conviction testing of evidence was requested, the cutting from the blue pants was gone. Ex. 111 at Savory-LL-2535-2537, 2550-2552; Ex. 24 at 25-26, 42-43.

137.    If Savory could have tested this cutting, he could have shown that the cutting had no blood on it, like the rest of the pants. Ex. 24 at 42-43. The cutting was "critical to proving that Johnnie did not kill Connie Cooper and James Robinson, as well as identifying the true perpetrator." Ex. 24 at 42-43.

### G.    Defendants Suppress and Destroy Other Exculpatory Physical Evidence

138.    Defendants suppressed and destroyed additional physical evidence as well.

139.    Jatkowski's notes of the forensic testing made clear that Cooper's blood was found on Robinson's underwear, Ex. 36 at PS-1870 (item #7 "Cooper on Robinsons underwear"). That result was not reported in Gonsowski's official report. Ex. 98 at PS-12975 (discussing only the presence of blood for item #7, not whose blood). That Cooper's blood was found on Robinson's underwear supported the view that Cooper had been killed first, followed by Robinson. Ex. 30 at 7; Ex. 8 at 7. But that contradicted the confession as well, which said that Robinson had been attacked before Cooper. Ex. 7 at PS-788. As discussed, this exculpatory evidence in Jatkowski's notes was suppressed and never provided to prosecutors or the criminal defense. See Statement VI(B) *supra*.

140.    Defendants also destroyed hairs found in the victims' hands so that Savory could not test them to prove his innocence. Cooper had defense wounds, showing that she had attempted to fight off the victims. See Statement II(C) *supra*.  Jatkowski collected hairs from the victims' hands. See Statement II(B) *supra*. Gonsowski reported that the hairs collected from the victims' hands did not appear similar to Savory's. Ex. 35 at PS-12973 (item 31), PS-12976 (results from item 31), PS-12974 (item 69), PS-12978 (results from item 69); Ex. 8 at 5. Visual analysis of the hairs is not a scientifically legitimate approach to determine identity–forensic testing is necessary. Ex. 8 at 5. The suppressed notes already discussed said that the hairs were "fine" and speculated that they might be face or arm hair. Ex. 37 at PS-13165 (item 69), PS-13168 (item 31), PS-13173 (item 69); see also Ex. 8 at 5. Again, Cannon and Jatkowski were responsible for the preservation of physical evidence following Savory's prosecutions. Ex. 108 at PS-1611; Ex. 109 at PS-1613-14. At the time that post-conviction testing of evidence was requested, the hairs were gone. Ex.

145 at PS-2033; Ex. 110 at Savory-LL-3761; Ex. 111 at Savory-LL-2538-2539, 2549-2550, 2673;

Ex. 8 at 12-13. Without the hair, it is impossible to test to determine whose hair was in the hands

of the victim. Ex. 8 at 13. The hairs were "critical to proving that Johnnie did not kill Connie

Cooper and James Robinson, as well as identifying the true perpetrator." Ex. 24 at 42-43.

## VII.    SAVORY IS CONVICTED, HIS CONVICTION IS REVERSED, AND PROSECUTORS SAY THEY CANNOT PROCEED WITH CHARGES

141.    Based solely on Defendants' fabricated evidence, Savory was detained, Ex. 112 at

PS-759; Ex. 7 at PS-791, indicted based on the testimony of Teplitz, Perkins, Pinkney, Fiers, Ex.

88 at Savory-LL-2, and then prosecuted for the Cooper-Robinson homicides.

142.    At no point did prosecutors conduct any independent investigation of the Cooper-

Robinson homicides. Instead, they relied exclusively on the evidence developed by and the

investigation conducted by Defendants. Ex. 94 at 41:17-43:13; Ex. 93 at  36:14-25.

143.    At the grand jury, when asked if there was evidence of sexual assault, Fiers testified

that testing revealed no sperm present when the vaginal swabs were tested. Ex. 88 at Savory-LL-

13. Fiers testified before the grand jury that Marva Jones reported that Savory had said he had split

open Cooper's stomach. Ex. 88 at Savory-LL-15-16; see also Statement IX *infra*. Fiers testified

that Savory had supposedly made incriminating statements. Ex. 88 at Savory-LL-16-21. Pinkney

also testified about supposedly incriminating statements attributed to Savory, and about the

collection of the supposed murder weapon. Ex. 88 at Savory-LL-21-33. Teplitz testified about

Savory's supposed confession, consistent with her report of that confession, Ex. 88 at Savory-LL-

33-41; she testified that the knife used in the murder had tested positive for blood, Ex. 88 at Savory-

LL-41-42; she testified she was not sure whether Mason was contacted by Savory on the day of

the crime, but they had confirmed that Mason spoke with Savory after the crime, Ex. 88 at Savory-

LL-43, ; see also Statement IX *infra*; and she provided a fabricated account of what, in her words,

40

the Ivys heard Savory say (without mentioning the Ivys by name), Ex. 88 at Savory-LL-44; *see* Statement X *infra* (discussing Teplitz's 1977 report on the Ivys).

144.    In June 1977, Savory was tried as an adult. *People v. Savory*, No. 77-CF-565, 1977 WL 370309 (Ill. Cir. Ct. 1977). Gaubas and Gibson were the prosecutors, and Teplitz acted as the liaison to the Peoria Police Department, sitting at the prosecution table throughout trial and coordinating what documents were given to the prosecution. Ex. 113 at Savory-LL-2045-2046; Ex. 102 at 119-121.

145.    Savory's fabricated confession was introduced through the testimony of Teplitz. Ex. 78 at Savory-LL 855-859. As discussed, Teplitz and Gonsowski introduced the false evidence that Savory's knife was used in the murder and tested positive for blood. See Statement VI(A)-(C) *supra*. As discussed, Teplitz, Jatkowski, and Gonsowski testified that Savory's pants were bloody. See Statement VI(F) *supra*. Fiers, Gonsowski, and Dr. Immesoete testified that sperm had not been observed and contended that the crime was not a sexual assault. See Statement VI(D)-(E) *supra*. In addition, Douglas was called to testify for the State. Ex. 13 at Savory-LL 421-464. Otherwise, no evidence implicating Savory independent of Defendants' fabricated evidence was introduced at trial.

146.    None of the Ivys testified at Savory's first criminal trial. Ex. 24 at 19-20. According to later testimony from the prosecutors, the Ivys were not called because their testimony was "too shaky" and none of them could recall whether Savory had provided statements about the crime before the crime had been described publicly by the media. *Id.* In the words of Gibson, "My recollection is that our joint opinion was that if we were to call those individuals they could not recall specifically enough when the statements were made, and we feared that they would take away from the quality of the rest of the testimony in the case." Ex. 113 at Savory-LL 2049-2050.

41

147.    Savory was convicted and he was sentenced to 50-100 years in prison. *Peoria v. Savory*, 403 N.E.2d 118, 124 (Ill. App. Ct. 1980).

148.    On direct appeal, the Illinois appellate court reversed, finding that Savory's confession extracted by the police was involuntary and should have been suppressed. *Peoria v. Savory*, 403 N.E.2d 118, 124 (Ill. App. Ct. 1980).

149.    Following the reversal, the elected Peoria County State's Attorney (and now-Judge) Michael Mihm stated publicly, "We can't retry him [Savory] without his statements. . . . So that's it; he won't be retried again." Ex. 114 at PS-26900. This statement makes clear that there was no evidence independent of the fabricated confession that would support criminal charges, including any evidence the Ivys might have provided. Ex. 24 at 20.

## VIII.    DEFENDANTS FABRICATE AND SUPPRESS EVIDENCE RELATING TO THE IVY CHILDREN TO ENSURE SAVORY'S CONTINUED PROSECUTION AND SECOND CONVICTION

150.    Hearing that they had no evidence to prosecute Savory independent of their false confession, Defendants quickly set about fabricating additional false evidence to implicate Savory.

151.    There is only one police report, written by Teplitz and Haynes, that documents an interaction between the Peoria Police Department and the Ivy family prior to the reversal of Savory's first criminal conviction. Ex. 115; Ex. 24 at 45.

152.    According to this report, on either February 4 or 7, 1977, on a school day, in the week following Savory's confession, Teplitz and Haynes met with Willie Ivy (the father), Ella Ivy (age 19), Tina Ivy (age 16), Frank Ivy (age 14), James Ivy (age 14), and Ruby Ivy (age 13), together at the Ivy family home. Ex. 115 at PS-1510.

153.    The Ivy children were young and susceptible to suggestion. Ex. 24 at 6. According to the report, Tina Ivy told Teplitz and Haynes that Savory came to the Ivy household at 1:00 p.m.

on the day of the murder to take her to school. Tina said she and Savory left the Ivy household for the bus stop at 2:25 p.m. and boarded the bus at approximately 3 p.m. Tina Ivy and other family members said that Savory arrived back at the house at 5:15 or 5:20 p.m. Savory watched the 5:30 p.m. news with the Ivys, and during the program the Cooper and Robinson murders were discussed. Ex. 89. That information was consistent with and supported Savory's alibi. See Statement IV *supra*.

154.    Also, according to the report, the Ivy family said that Savory had said he was at the house where the crimes occurred when the police arrived on the scene. Frank and James Ivy said that Savory said that he had been in the victims' house after the murder, that James Robinson was lying near a big knife, and that the baby at the crime scene was in the oven. Ella Ivy said that Savory told her that "the two victims were cut up real bad and that whoever did it must have known the victims to be able to get into the house past the dog." Ella Ivy also said that Savory "pulled his wallet out of his pants pocket and a black handled knife came out of it." Tina Ivy said that she and Savory went to a laundromat the day after the murder, where Savory told Tina "that the girl was cut and her stomach was split open" and "that the girl had struggled and whoever killed her had a terrible time doing it." Ex. 89, PS-1510-1513.

155.    Many of these incriminating statements in the report were fabricated by Teplitz and Haynes and were not statements that the Ivys ever provided to Defendants. For example, Ella Ivy says she did not tell investigators that Savory had told her that he had been present at the crime scene when police arrived, Ex. 116 at Savory-LL-2870, or that Savory had told her that the Coopers were cut up really badly, Ex. 117 at 190-193, or that Savory had pulled a wallet from his pants and that a black handled knife fell out, Ex. 116 at Savory-LL 2869; Ex. 117 at 185-186, or that Savory had talked about the location of the baby at the crime scene. Ex. 116 at Savory-LL 2870; Ex. 117

at 195-196. Frank Ivy said in a recorded statement that Savory had not made any statements about the kids who had been killed or being at the victims' house. Ex. 24 at 22-23 (discussing SDT-J&B 6331-36). He testified that he had never told Cannon that Savory had said those things, and that he told Cannon that it was not true that Savory had said those things. Ex. 118 at 245-246. Moreover, Ella Ivy stated that she did not recall ever being interviewed with other Ivy family members. Ex. 119 at Savory-LL-3519.

156.    As discussed, the Ivys were not called at Savory's first trial because their statements were deemed unreliable and their memories unclear. See Statement VII *supra*. Teplitz did not memorialize any information about the Ivys' unreliability as witnesses in her February 1977 report or in any other report. Ex. 120 at 27:14-18.

157.    Following the reversal of Savory's conviction and prosecutors' statements that they could not retry Savory without his confession, Teplitz, Buck, and Cannon reinitiated contact with the Ivy children. Ex. 121; Ex. 122; Ex. 123; Ex. 124; Ex. 125; Ex. 126. It was now four years after the crime, and the Ivy's already unreliable memories were even worse. Ex. 24 at 44.

158.    Teplitz and Buck reported that they spoke with Tina Ivy on January 21, 1981, who said only that "she did not have anything she could tell [the investigators] in regards to [Savory] or anything else" and gave no additional information. Ex. 121. Tina's statements that she supposedly gave Teplitz and Haynes in 1977 were not repeated. *Id.*

159.    Similarly, Ella Ivy testified that when she first met with Cannon in January 1981 at a tavern called Charlene's Lounge she told him she was not sure about what she remembered. Ex. 127 at PS-11951-11952.

160.    That did not stop Defendants. They met with the Ivys repeatedly. For example, Teplitz testified that she had multiple interviews with the Ivys prior to Savory's first criminal trial,

including an interview with Ella at the Peoria Police Department. Ex. 120 at 6-20. Ella testified

that she met with Cannon four to five times in 1981 to talk about the case. Ex. 127 at PS-11951.

Teplitz and Cannon did not document those interviews, in violation of Peoria Police Department

policy and accepted police practices. Ex. 24 at 45; Ex. 97 at 89-90.

    161.    Ultimately, on two days in April 1981, Defendants obtained additional statements

from Tina, Ella, and Frank Ivy incriminating Savory, including statements that contradicted what

Teplitz and Haynes wrote in their 1977 report and statements that were not included in Teplitz and

Haynes's 1977 report. Ex. 24 at 18-25, 43-46.

        a.    Contrary to Tina Ivy's January 1981 statement that she knew nothing, Cannon and

            Buck reported that, on April 7, 1981, Tina Ivy said that Savory told her that he and

            Scopey (Robinson's nickname) had been practicing karate, and that Savory said

            that he had cut Scopey accidentally, Ex. 123 at Savory-LL-006022, a statement that

            is not in the February 1977 report, see Ex. 115. Contrary to accepted police

            practices, the report does not explain why there are changes in Tina's statements,

            changes to the timeline of events on the day of the murder, or addition of new

            incriminating information attributed to Savory that was not previously reported. Ex.

            24 at 20.

        b.    Contrary to Ella Ivy's January 1981 statement to Cannon that she was not sure what

            she remembered, Cannon and Buck reported that on April 8, 1981—the day after

            Tina's statement—Ella Ivy said that Savory told her that he and Scopey had been

            practicing karate, and that Savory said that he had cut Scopey accidentally but that

            Scopey was alright when Savory left, Ex. 124 at Savory-LL-006024, a statement

            that is not in the February 1977 report, see Ex. 115, and that is the same as the

statement attributed to Tina, discussed in the previous paragraph. In addition, the April 1981 report states that Ella said that Savory first arrived at the Ivy family home before 12 p.m. on the day of the murder, Ex. 124 at Savory-LL-006024, at least an hour earlier than the 1 p.m. or later time in February 1977 police report, Ex. 115 at PS-1510, and that Savory had returned to the Ivy home *before 3 p.m. that day*, Ex. 124 at Savory-LL-006024, which was more than two hours earlier than the 5:15 p.m. or later time in the February 1977 report, Ex. 115 at PS-1510. Again, contrary to accepted police practices, the report does not explain the changes to the timeline of events or the addition of new incriminating information. Ex. 24 at 21.

c.  Cannon and Buck reported that on April 8, 1981—the same day as Ella's statement—Frank Ivy said that Savory told him that he and Scopey had been practicing karate, and that Savory said that he had cut Scopey accidentally but that Scopey was alright when Savory left, Ex. 125 at Savory-LL-006028, a statement that is not in the February 1977 report, see Ex. 115, and that is identical to the statements attributed to Tina and Ella, discussed in the previous paragraphs. Again, contrary to accepted police practices, the report does not explain the changes. Ex. 24 at 22.

162.  The statements in these reports were fabricated by Defendants, who knew they were false, as demonstrated by record evidence that (1) the statements attributed to the same witnesses in Teplitz and Haynes's 1977 report were knowingly fabricated (those Defendants wrote down things the witnesses had not said), see *supra* ¶ 155; (2) the Ivys' statements had been deemed unreliable and their memories inaccurate in 1977, information Defendants suppressed, but now

46

four years later the Defendants' reports contained statements attributed to the Ivys that were different than those they made previously, without any explanation for the change, see *supra* ¶¶ 156, 161; (3) the new statements documented in Defendants' reports were made directly after the same witnesses said they knew nothing and could not remember anything, see *supra* ¶¶ 158-60; (4) all three new statements contained the same false account, previously not provided by any of the witnesses, that Savory and Robinson had been practicing karate and Savory had stabbed Robinson accidentally, see *supra* ¶¶ 161, which was language taken directly from Teplitz's report of Savory's confession, which Teplitz herself had fabricated, see Statement V(C) *supra*;[10] (5) Defendants suppressed ample information about their interactions with the Ivys, see *supra* ¶¶ 165-67; and (6) the Ivys testified that these statements were false and that Defendants knew they were false: (a) Frank Ivy testified that he never told Cannon that Savory provided these incriminating statements, that he told Cannon that Savory had not said these things, and that Cannon told him to provide the false statements anyway, Ex. 118 at 245-246; he also testified that he never spoke with Savory on the day of the murder, Ex. 118 at 77:20-78:21, that Savory never said he cut or killed Robinson or Cooper, Ex. 118 at 245:7-15, and that none of the information in the statements he provided came from Savory, Ex. 118 at 81:11-82:6; see also Ex. 128 at Savory-LL 3473-3474; (b) Ella Ivy testified that she never told investigators that Savory had told her details about the crime or victims, as discussed above, see *supra* ¶¶ 155; and (c) Tina Ivy testified that the statement that Savory told her he had been doing karate with James Robinson and had accidentally cut him was not true, Ex. 24 at 21 (discussing Savory-LL 7056-7059).

---

[10] Defendants took the fabricated account of a karate practice gone wrong that was included in Savory's confession, which had been suppressed by the Illinois appellate court, and they inserted it in the mouths of the Ivy siblings. *Id.* Making matters worse, Defendants also elicited the same story from other witnesses. Ex. 24 at 45-46. Savory's expert, Mr. Tiderington, opines that it is very unusual in police investigation for witnesses to all give the same story, and that standard police practice would be to investigate how the same story came to be provided, but there was no such investigation in this case. *Id.*

163.    The false statements not only included new incriminating statements attributed to Savory, but they changed the timeline of events on the day of the murder in a material fashion. In particular, Cannon's report on Ella Ivy's new statement states that Ella interacted with Savory between approximately 3 p.m. and 4:15 p.m. on the day of the murders, Ex. 124 at Savory-LL-006025, significantly *before* the 5:15 p.m. time that Ivy family members said that Savory had arrived at their house reported in the February 1977 report, Ex. 115 at PS-1510. As Savory's expert observes, the "effect of the shift in time was that the time window for Savory's alibi was eliminated and explanations that Savory could have learned about the murders from news media were eliminated." Ex. 24 at 21.

164.    Nonetheless, at Savory's second criminal trial, Tina Ivy, Ella Ivy, and Frank Ivy testified consistent with the fabricated statements included in Defendants' February 1977 and April 1981 reports, Ex. 129; Ex. 127; Ex. 130. In addition, Defendants testified about their interactions with the Ivys and the Ivys' false statements.

165.    Throughout Savory's criminal prosecution, Defendants suppressed that they had fabricated the Ivys' 1977 and 1981 statements. See *supra* ¶¶ 155, 162. They suppressed what the Ivys had actually said to them, including that those statements were not true. *Id.* They suppressed that the Ivys' testimony was deemed unreliable and their memories poor. See *supra* ¶¶ 156. They suppressed that Ella told Cannon that she was not sure about what she remembered. See *supra* ¶¶ 159. They suppressed that they had multiple interviews with the Ivys that they did not report. See *supra* ¶¶ 160.

166.    They also suppressed that Teplitz and Cannon detained and put pressure on Ivy family members to give statements incriminating Savory that the Defendants knew were false. Ex. 24 at 45. Ella Ivy testified that she was taken to the police station involuntarily by investigators,

including Teplitz, that she had no choice but to provide a statement, and that she felt afraid. Ex.
117 at 198-212; Ex. 120 at 20:13-16. Frank Ivy has testified repeatedly since Savory's conviction
that he felt pressured by Cannon in 1981 to tell Cannon what he wanted to hear, Ex. 118 at 78-79;
SA8105 at 6056-57; Ex. 128 at Savory-LL 3474, that Cannon wanted him to testify falsely, Ex.
118 at 245-246, that he told Cannon that the statements Cannon wanted him to provide were not
true, id., and that he was afraid that if he did not provide the testimony that Cannon wanted, then
Cannon would charge him with a crime, Ex. 118 at 248-249. Tiny Ivy testified that she discussed
the homicides with Cannon in both 1977 and 1981, Ex. 131 at 7070-7071, and that in 1981 before
Savory's trial she "felt pressured and told Mr. Cannon what he wanted to hear based on rumors
that I had heard about the murders," Ex. 24 at 21 (discussing Savory-LL 3467).

167.    Finally, they suppressed that James Ivy was offered a deal on his burglary case in
1981 if he was willing to testify against Savory. Ex. 24 at 23-24 (discussing SDT-J&B 6291). And
they suppressed that Tiny Ivy was on probation for forgery and was in a drug program recovering
from heroin addiction when she testified against Savory. Ex. 131 at 7054-7055, 7059.

IX.    **DEFENDANTS FABRICATED AND SUPPRESSED OTHER EVIDENCE RELATING TO THIRD-PARTY WITNESS STATEMENTS**

168.    Defendants fabricated and suppressed evidence relating to other third-party witness
statements as well. For instance, on April 9, 1981, the day after the Ivys' false statements were
obtained Cannon fabricated false statements that he attributed to Winnell "Wendy" Sankey. Ex.
138. Like the Ivys, Cannon's report documenting his interview with Sankey contained numerous
false statements that Sankey never made, including that Sankey told Cannon: (a) that she had seen
Savory and Robinson playing karate outside on the day before the murders, and (b) that Robinson
gave Savory his address and told him to come over the next day (the day of the murder). *Id.* at PS-
1106. Sankey never said this. Indeed, she testified that she had never seen Robinson until she went

49

to his funeral, she had never seen Savory and Robinson playing karate, and she had never told Cannon these things. Ex. 139 at 21:4-9, 59:21-60:16, 62:2-9, 74:1-75:8, 83:1-85:5. Notably, these false statements–like the Ivys' new accounts–mimicked almost perfectly the false incriminating statements attributed to Savory that the Illinois appellate court had just held could not be introduced against Savory at his criminal retrial. Ex. 138. Moreover, these new incriminating statements were absent from the report that Teplitz had made documenting a February 8, 1977 interview with Sankey. Ex. 140. Moreover, many statements in Teplitz's report were fabricated as well. For example, Teplitz's report had said that Savory told Sankey that he had been at the scene of the murders at 11 a.m. on the day of the murders, and that Savory had called her on the night of the murders while drunk, saying he did not know what to do. Ex. 140 at PS-1517. Again, Sankey denied ever telling Cannon or Teplitz these things. Ex. 139 at 12:10-22; 13:17-22; 21:25-22:15; 71:8-72:3; 131:6-17. Finally, Cannon also claimed that Sankey told him that she had a letter from Savory stating that Savory "had accidentally cut his friend but stated that he had not killed them." Ex. 24 at 45-46. In fact, Sankey testified that no one ever asked her to locate or provide any letter from Savory. *Id.* Sankey's statements reported by Cannon and Teplitz incriminating Savory were invented by Cannon and Teplitz. Sankey did not testify during Savory's criminal proceedings, further indicating that these statements were fabricated. Ex. 139 at 11:16-25.

169.    The same is true of statements attributed to Ray Mason and Marva Jones during Defendants' investigation. Ex. 24 at 16-17; At 1:45 a.m. on the morning of January 26, 1977, the middle of the night and in the midst of Savory's interrogation, Fiers, Pinkney, and Jatkowski went to Marva Jones's house for an interview. Their report asserted that she had talked with Savory at some point after the Cooper-Robinson homicides and that Savory had purportedly told her: "He slit her stomach wide open Jones, you should have seen it. You just don't know, you just don't

know." Ex. 74 at PS-715. Jones could not recall when this conversation occurred. *Id.* The officers knew and documented in their report that Jones was not able to think clearly because they were interviewing her in the middle of the night. *Id.* These Defendants added the same statement to Savory's false confession, and as discussed above, it was fabricated–Savory never said it. See *supra* ¶ 89. Jones was never called to testify during Savory's criminal proceedings, further indicating that these statements were fabricated. Jones is deceased and could not be deposed in this litigation.

170.    Finally, Cannon and Haynes fabricated a statement attributed to Ray Mason. They reported that they had visited Mason at his home on January 25, 1977, that they spoke with Mason in the presence of his mother, and due to "repeated interruptions by Mason's mother," they took Mason to the police station for further questioning. Ex. 141 at PS-809. Cannon claimed that he read Mason *Miranda* warnings at 2 a.m., and that Mason then said that Savory had called him on the morning of the murder to say "some of my friends got killed." Ex. 141 at PS-770. Just a few days later, Mason told investigators that he had not talked to Savory on January 18, and that he had said this only because he was confused by "Officer Cannon's accusations and the tone of his voice." Ex. 143 at PS-1489. Moreover, like the Jones statement, this supposed account was a thing that Savory testified never occurred. See *supra* ¶ 90. Again, like Jones, Mason was never called to testify during Savory's criminal proceedings, further indicating that these statements were fabricated. Moreover, Teplitz testified she was not sure whether Mason was contacted by Savory on the day of the crime, and that they only had confirmed that Mason spoke with Savory after the crime. See *supra* ¶ 143. The statement that Cannon attributed to Mason incriminating Savory was made up, and the other Defendants quickly learned that it was made up. Like Jones, Mason is deceased and could not be deposed in this litigation.

51

## X.    SAVORY IS CONVICTED A SECOND TIME

171.    Savory was tried a second time in April 1981. Again, incriminating statements fabricated by Defendants and attributed to Savory were introduced against him at trial, this time through the testimony of Cannon and Pinkney. Ex. 132 at Savory-LL at 1565-1579; Ex. 133 at Savory-LL at 1588-1599. As discussed, at the second trial Ella Ivy, Frank Ivy, and Tina Ivy all testified and provided false incriminating statements. See *supra* ¶ 164. Again, Teplitz and Gonsowski introduced the false evidence that Savory's knife was used in the murder and tested positive for blood. See Statement VI(C) *supra*. Again, Jatkowski and Gonsowski introduced evidence that Savory's pants were bloody. See Statement VI(F) *supra*. Again, Dr. Immesoete testified that sperm had not been observed and contended that the crime was not a sexual assault. See Statement VI(E) *supra*. Again, Douglas testified for the state. Ex. 98.

172.    Savory was convicted and sentenced to 40 to 80 years in prison. *People v. Savory*, 435 N.E.2d 226 (1982).

173.    Savory's second conviction was affirmed on direct appeal. *People v. Savory*, 435 N.E.2d 226 (1982). The appellate court noted again that it was error for the trial court to have admitted Savory's incriminating statements from January 25. *Id.* at 230-32. But it concluded that the error was harmless, "[i]n view of the testimony of the three witnesses [the Ivys] who related defendants' admissions to them of his presence and complicity in the killings[.]" *Id.* at 231-32. In other words, Defendants' fabrication of the Ivy testimony rendered the introduction of their fabricated incriminating statements harmless.

## XI.    DEFENDANTS' SUPPRESSION AND DESTRUCTION OF CRITICAL EVIDENCE CONTINUED THROUGHOUT SAVORY'S CRIMINAL CASE

174.    As discussed above, throughout the criminal proceedings, Defendants suppressed and destroyed critical evidence, preventing Savory from proving that he was innocent and from impeaching the prosecution's witnesses at trial, including Defendants' own testimony, including:

a.    All Defendants suppressed exculpatory police files and documents. Defendants kept a so-called "investigative file," a "detectives' unit file," and a "crime scene unit file". Ex. 24 at 41-42. Defendants worked on a small investigative team, briefed one another about developments, and each had access to the investigative file. Ex. 134 at 176:25-177:3; Ex. 70 at 151:18-23; Ex. 80 at 327:11-331:7; Ex. 106 at 65:21-73:24; Ex. 135 at  126:2-7; Ex. 136 at 60:12-18; Ex. 137 at 176:4-16. The detectives' unit file contained documents not present in the other two files but it has been destroyed. *Id.*; Ex. 97 at 243-44. The investigative file and crime scene unit file were produced in this litigation. Ex. 61 (investigative file); Ex. 92 (crime scene unit file). The Peoria County State's Attorney also produced its file in the Savory prosecution in this litigation. Ex. 62 (PCSAO File). Many documents from the Defendants' police files were not turned over to prosecutors and do not appear in their files. Ex. 24 at 41. Including among the documents not turned over were Jatkowski's and Ganda's notes documenting forensic testing, Ex. 36, Ex. 37, Ex. 38; the report documenting that Douglas had threatened to kill Noyalee Robinson, Ex. 50 at PS-1696; and Gerontes report listing Douglas as the sole suspect, Ex. 63.

b.    All Defendants suppressed that Douglas was considered their sole suspect just days before they interrogated Savory, and they suppressed that he had threatened to kill Noyalee Robinson close in time to the murders. See Statement III *supra*.

53

c.  Defendants Pinkney, Fiers, Cannon and Teplitz suppressed that they fabricated false incriminating statements and attributed them to Savory, and suppressed that Savory had never given those statements. See Statement V(C) *supra*.

d.  Defendants Teplitz suppressed documentary evidence that would have corroborated Savory's account of his interrogation and confession and that would have impeached Defendants' account. See Statement V(C) *supra*.

e.  All Defendants suppressed that they had fabricated the murder weapon, that the weapon tested negative for blood, and that they fabricated a false-positive testing result. See Statement VI(A)-(C) *supra*.

f.  All Defendants suppressed evidence that the crime was a sexual assault–that sperm had been found on the vaginal swabs, that Cooper had been sexually assaulted, and that Defendants were investigating the murder as one combined with a sexual assault. See Statement VI(D)-(E) *supra*.

g.  Defendants Teplitz, Jatkowski, and Cannon suppressed that the pants they confiscated from Savory's father had no blood on them and then they destroyed the part of the pants they had supposedly tested to cover their tracks. See Statement VI(F)-(G) *supra*.

h.  Defendants Cannon and Jatkowski destroyed the hairs that were found in the victims' hands. See Statement VI(F)-(G) *supra*.

i.  Defendants Cannon, Buck, Teplitz, and Haynes suppressed numerous items of evidence that could have used to impeach the Ivys' false statements incriminating Savory. See Statement VIII *supra*.

## XII.  DEFENDANTS GERONTES, ANDREWS, DUNLAVEY, AND TIARKS, PARTICIPATED DIRECTLY IN THE MISCONDUCT AND PARTICIPATED AS SUPERVISORS

175.    Gerontes was Jatkowski's supervisor in the crime scene unit of the Peoria Police Department. Ex. 90 at 16:13-17. He was the point person in the Peoria Police Department for information about the physical evidence collected during the Cooper-Robinson investigation. Ex. 90 at 69:2-24. Jatkowski shared the testing results memorialized in his notes (Ex. 36) with Gerontes. Ex. 90 at 16:4-17. Those notes and the information in them–about the lack of blood on the knife, about the evidence of sperm and sexual assault, about the order in which Cooper and Robinson were attacked–were not disclosed to prosecutors or criminal defense. See Statement VI(B) *supra*. Moreover, Gerontes was the author of the undisclosed report that listed Douglas as the sole suspect on January 21, 1977, Ex. 63; see Statement III *supra*, which also was not disclosed.

176.    Defendant Tiarks was the Peoria Police Department's Violent Crimes Sergeant and the person who was in overall charge of the investigation from the time he visited the scene on January 18 until Savory was charged on January 26. Ex. 137, 11/12/21 Tiarks Dep. at 51-53, 113-114. The questioning of Savory on January 25 by Pinkney and Haynes and then Fiers and Cannon was under Tiarks's supervision and with his approval. Ex. 137 at 135, 144-46, 154. Tiarks authorized questioning Savory without a parent or youth officer in the room. Ex. 137 at 162.  Even though Tiarks thought the January 25 polygraph results were "nonsense," he authorized Savory's detention on the evening of January 25 and the further questioning on January 26. Ex. 137 at 175, 177-78. Tiarks was supervising and present when Savory was taken for further polygraphing on January 26, and allowed that polygraphing to occur even though he could conceive of no purpose for it other than to intimidate Savory. Ex. 149 at 67, 68, 70, 73. Tiarks was "generally aware" of the progress of interrogating Savory on January 26. Tiarks Dep. 2 at 50-52, 58. Tiarks approved

the purchase of new clothes for Savory after Savory was stripped naked and had hairs plucked from his body. Ex. 137 at 90-91; Ex. 149 at 54-65. Tiarks signed the report authored by Teplitz documenting Savory's interrogation and confession. Ex. 7. Finally, Tiarks participated in the fabrication of the knife that Defendants dubbed the murder weapon, and he helped write that knife into Savory's confession. See Statement VI(A)-(C) *supra*.

177.    Defendant Andrews was the Superintendent of the Peoria Police Department. He communicated with the media regarding the Cooper/Robinson homicide investigation. Ex. 136 at 37-38, 56, 59-60. He marshaled a special task force to investigate the murders and assigned Tiarks and the violent crime unit to be part of that task force. Ex. 136 at 47, 49. He was apprised of significant development in the investigation and "assumes" that he monitored progress to ensure it was being done properly. Ex. 150 at 19, 39. He was present on the floor where Savory was being questioned on January 26 and was made aware of at least some developments in the interrogation. Ex. 150 at 43-45, 47. Moreover, like Tiarks, he participated in fabricating the knife as the murder weapon. See Statement VI(A)-(C) *supra*.

178.    Defendant Dunlavey was the Lieutenant in charge of the Peoria Police Department Juvenile Division in January 1977. Defendants Teplitz, Pinkney and Haynes worked under her supervision. Dunlavey pushed the investigation in the direction of Savory, "insisting" that juvenile officers identify and locate Savory for questioning.  Ex. 151 at Exhibit 1. Dunlavey wrote out, signed, swore to and personally filed violation of probation petitions against Savory, which alleged that Savory committed the Robinson and Cooper murders.  Ex. 151 at Exhibit 4.

## XIII.   SAVORY FIGHTS TO PROVE HIS INNOCENCE AND IS EXONERATED

179.    Defendants' misconduct ripped Savory from his family when he was 14 years old. Ex. 2 at 147:1-9. He spent decades of the most formative and important years of his life

incarcerated for something he had not done in the harsh conditions of maximum-security prisons. Ex. 1 at 83:1-84:11; Ex. 2 at 149:10-21. During his decades of wrongful incarceration, Savory always maintained his innocence as he fought for his freedom. Ex. 1 at 83:1-84:11; 99:15-105:10; 127:1-128:7. On January 12, 2015, based on evidence developed during Savory's post-conviction case, the Governor of Illinois pardoned Savory. Ex. 10.

## XIV.  SAVORY'S BRINGS THIS CIVIL SUIT

180.    Savory brought this lawsuit against Defendants who had framed him, alleging violations of his federal constitutional rights. Dkt. 1. At the motion-to-dismiss stage, the Court dismissed Savory's claims as untimely, Dkt. 95; the *en banc* Seventh Circuit reversed, concluding that the federal claims were timely, having been filed within two years of the governor's pardon, which vacated Savory's conviction, *Savory v. Cannon*, 947 F.3d 409 (2020) (*en banc*); and on remand the Court denied Defendants' renewed motion to dismiss in all respects, except that it dismissed Savory's Fourteenth Amendment malicious prosecution claim theory, his Thirteenth Amendment claim, and his *respondeat superior* claim. Dkt. 171 at 18.[11]

181.    The following claims remain in the case: (1) Savory's Fifth and Fourteenth Amendment claims for coercing a false confession, Dkt. 171 at 6-11; (2) his Fourteenth Amendment claims for suppression of evidence, fabrication of evidence, and destruction of evidence, *id.* at 13; (3) his Fourth Amendment unlawful detention claim, *id.* at 11-12; (4) his failure to intervene claim, *id.* at 14; (5) his conspiracy claim, Dkt. 1 ¶¶ 89, 95, 100, 105, 140;[12] (5) his

---

[11] The state law claims were dismissed at the start of the case, Dkt. 95, and that dismissal was not appealed, see Dkt. 137 at 1 n.1.

[12] The federal conspiracy claim is not pleaded as a separate count in the complaint, but instead is pleaded within each of the substantive counts. See *id.* That pleading approach does not change the fact that Savory asserts a conspiracy claim against all Defendants, particularly so given that parties are not required to plead legal theories at all in a complaint. *McDonald v. Household International*, 425 F.3d 424, 427 (7th Cir. 2005) ("This court has repeatedly held that pleaders in a notice system do not have any obligation to plead legal theories."). Defendants were fairly on notice of this claim.

indemnification claim against the City of Peoria, *id.* at 17-18; and (6) his *Monell* claims against Peoria, *id.* at 14-17. The Court bifurcated and stayed the *Monell* claims pending resolution of the claims against the individual Defendants. Dkt. 204. The case was transferred to this Court on May 9, 2023. Dkt. 282 & 283. The individual Defendants have moved for summary judgment. Dkts. 294 & 310.

## RESPONSE TO DEFENDANTS' STATEMENT OF FACTS

1.     This Court has jurisdiction over Savory's claims, brought under 42 U.S.C. § 1983, pursuant to 28 U.S.C. § 1331. (Dkt. 172, Defs.' Ans. to Compl. ("Answer") at ¶¶ 10–11.)

**RESPONSE:**  This fact is material and undisputed.

2.     Venue is proper under 28 U.S.C. § 1391(b) because the events giving rise to Plaintiff's claims occurred in this judicial district. (Dkt. 282, 5-9-23 Op. and Order Granting Defs.' Mot. to Transfer Venue at 3.)

**RESPONSE:**  This fact is material and undisputed.

3.     Plaintiff Johnnie Lee Savory was arrested, prosecuted, and twice convicted of the murders of James and Connie, which occurred at the victims' home at 3033 West Garden Street, Peoria, Illinois, on January 18, 1977. (Dkt. 172, Ans. at ¶¶ 1, 20–21, 76, 78.)

**RESPONSE:**  This fact is material and undisputed.

4.     When the murders occurred, Savory was fourteen years old and resided with his father, Y.T. Savory, in Peoria, Illinois. (Dkt. 172, Ans. at ¶ 27.)

**RESPONSE:**  This fact is material and undisputed.

5.     A month before the murders, Savory was adjudged a delinquent minor for theft, placed under the legal guardianship of the Director of Juvenile Court Services, and ordered to be placed at Victory Hall School for Boys. (Ex. 1, 12-8-76 Order of Disposition.) The adjudication was supported by a Social History Report that noted one of Savory's "major problem[] areas" was "his tendency to constantly fight," and from 1975–76, it listed Savory's arrests for carrying a gun and burglary, as well as several other crimes where he was a suspect, including burglary, strong armed robbery, battery, and aggravated assault. (Ex. 2, 11-22-76 Soc. Hist. Rpt. at 2.)

59

**RESPONSE:** The facts in this paragraph are material. These facts are disputed because this paragraph describes and characterizes only a portion of the Social History Report, which speaks for itself. Savory objects to the report on the ground that it is hearsay.

6.    Defendant Allen Andrews ("Superintendent Andrews") was the Superintendent of the Peoria Police Department ("PPD") from 1973 to 1982. (Ex. 3, Andrews 3-21-22 Dep. at 26:21–28:1.)

**RESPONSE:**  This fact is material and undisputed.

7.    In 1977, Defendant Harold Marteness ("Capt. Marteness") was the Captain of the PPD Criminal Investigations Divisions ("CID"), which oversaw the Detective and Juvenile Bureaus, and his direct supervisor was Superintendent Andrews. (Ex. 4, Marteness Dep. at 24:4–27:13.)

**RESPONSE:**  This fact is material and undisputed.

8.    In 1977, Defendant Carl Tiarks ("Sgt. Tiarks") was Sergeant of the Violent Crimes Unit ("VCU") within the PPD's Detective Bureau. (Ex. 5, Tiarks 11-12-21 Dep. at 46:8–16, 92:17–20.)

**RESPONSE:** This fact is material and undisputed.

9.    From January to June of 1977, Defendant John Fiers ("Det. Fiers") was a detective in the VCU. (Ex. 5, Tiarks 11-12-21 Dep. at 49:5–20; Ex. 6, Fiers 10-13-21 Dep. at 86:23–87:21.)

**RESPONSE:**  This fact is material and undisputed.

10.    From 1977 through 1981, deceased Defendant Charles Cannon ("Det. Cannon") was a detective in the VCU. (Ex. 5, Tiarks 11-12-21 Dep. at 49:5–20.)

**RESPONSE:**  This fact is material and undisputed.

11.    From 1977 through 1981, Defendant Russell Buck ("Det. Buck") was a PPD

detective. (Ex. 6, Fiers 10-13-21 Dep. at 82:1–4; Ex. 7, Cannon 4-7-81 Rpt.)

**RESPONSE:** This fact is material and undisputed.

12.    In 1977, Defendant Mary Ann Dunlavey ("Lt. Dunlavey") was a lieutenant within the PPD's Juvenile Bureau and reported to Capt. Marteness. (Ex. 8, Dunlavey 4-21-22 Dep. at 18:2–15; Ex. 4, Marteness Dep. at 28:23–29:7.)

**RESPONSE:** This fact is material and undisputed.

13.    In 1977, deceased Defendant John Timmes ("Sgt. Timmes") was a sergeant within the PPD's Juvenile Bureau. (Ex. 9, Haynes Dep. at 58:21–23.)

**RESPONSE:** This fact is immaterial and undisputed. It is immaterial because Savory is no longer pursuing his claims against Timmes.

14.    In 1977, Defendants Edgar Haynes ("Officer Haynes") and George Pinkney ("Officer Pinkney") were Juvenile School Liaison Officers in PPD's Juvenile Bureau who reported to Lt. Dunlavey. (Ex. 9, Haynes Dep. at 57:17–18, 58:18–20; Ex. 10, Pinkney Dep. at 26:10–25, 54:24–55:5.)

**RESPONSE:** This fact is material and undisputed.

15.    In 1977, Defendant Marcella Teplitz ("Officer Teplitz")—née Marcella Brown— was a police officer within PPD's Juvenile Bureau who reported to Lt. Dunlavey until about 1981, when Teplitz was promoted to sergeant. (Ex. 11, Teplitz 10-5-22 Dep. at 28:19–30:7; Ex. 12, Teplitz 10-6-22 Dep. at 331:9–14, 324:15–22.)

**RESPONSE:** This fact is material and undisputed.

16.    In 1977, Defendant Officer Walter Jatkowski ("CSU Officer Jatkowski") was an officer within PPD's Crime Scene Unit ("CSU"), who reported to deceased Defendant CSU Sergeant Peter Gerontes ("Sgt. Gerontes"). (Ex. 13, Jatkowski 10-20-21 Dep. at 23:23–24:1,

26:8–16, 53:11–14.) At the time, Jatkowski had collected and processed evidence at about fifteen homicide crime scenes during the three-and-a-half years he had been assigned to the CSU. (Ex. 14, 06-29-1977 Trial Tr. Test. of Jatkowski at 64:7–24.)

**RESPONSE:** This fact is material and undisputed.

17.    In 1977, Defendant Glen Perkins ("Patrol Officer Perkins") was a PPD patrol officer who reported to the second shift patrol division Lieutenant who, on January 18, 1977, was Defendant John Stenson ("Patrol Lt. Stenson"). (Ex. 15, Perkins Dep. at 48:17–49:19, 58:16–22; Ex. 16, Stenson Dep. at 24:16–25:6.)

**RESPONSE:** This fact is material and undisputed.

18.    Det. Buck, Sgt. Gerontes, and Sgt. Timmes predeceased this litigation, and Peoria City Clerks—initially Beth Ball, currently Stefanie Tarr—were appointed as their Special Representatives. (Dkts. 29-31, 2-8-17 Suggestions of Death for Buck, Gerontes, & Timmes, respectively; Dkt. 41, 3-9-17 Order on Special Representative; Dkt. 178, 5-13-21 Order Substituting Tarr for Ball.)

**RESPONSE:** This fact is material and undisputed.

19.    Det. Cannon died in 2017, and his son, William Cannon, Sr., was substituted as his special representative. (Dkt. 117, 3-9-20 Order to Substitute Party.)

**RESPONSE:** This fact is material and undisputed.

20.    Defendant City of Peoria is a municipal corporation doing business under the laws of the State of Illinois that employed Defendants Cannon, Teplitz, Buck, Fiers, Stenson, Pinkney, Haynes, Jatkowski, Perkins, Andrews, Marteness, Dunlavey, Tiarks, Gerontes, and Timmes during their investigation of the Robinson-Cooper homicides. (Dkt. 172, Ans. at ¶ 16.)

**RESPONSE:** This fact is material and undisputed.

21.    On the morning of January 18, 1977, at around 6:45 AM, Noyalee Robinson and her ex-husband William "Pete" Douglas left their family home at 3033 West Garden Street, Peoria, Illinois, to go to work. When they left, Noyalee's children and Douglas's stepchildren, James (14) and Connie (19), were both alive and healthy. (Ex. 17, 06-28-77 Trial Tr. Test. of Noyalee Douglas at 35:17–44:9.)

**RESPONSE:**  This fact is material and undisputed.

22.    That afternoon, at about 4:15 PM, Noyalee and Douglas returned home and found James and Connie dead in their home. (Ex. 18, 2-15-77 Grand Jury Tr. Test. of Officer Perkins at 3:8–4:6; Ex. 17, 6-28-77 Trial Tr. Test. of William Douglas at 137:6–138:22.)

**RESPONSE:**  This fact is material and undisputed.

23.    Defendant Officer Perkins responded and was escorted into the home by Douglas, where Perkins observed James and Connie deceased on the northeast bedroom floor. (Ex. 19, Perkins 1-18-77 Rpt; Ex. 17, 6-28-77 Trial Tr. Test. of Officer Perkins at 189:18–191:6.)

**RESPONSE:**  This fact is material and undisputed.

24.    Personnel from PPD's patrol division, CSU, and CID responded to the scene. (Ex. 16, Stenson Dep. at 30:5–32:6.)

**RESPONSE:**  This fact is material and undisputed.

25.    Defendant Dets. Cannon and Fiers were assigned as lead detectives by VCU Sgt. Tiarks, under the command of CID Lt. Harry Fidler and CID Cpt. Marteness. (Ex. 5, Tiarks 11-12-21 Dep. at 49:5–20, 92:17–20, 93:20–94:22.)

**RESPONSE:**  This fact is material and undisputed.

26.    Dets. Cannon and Fiers documented their observations of the scene, which included no signs of forced entry, a television set in the living room on the floor with the screen

facing the wall, and a black nightstick and crackers scattered on the kitchen floor. (Ex. 6, Fiers 10-13-21 Dep. at 80:16–81:7; Ex. 20, Fiers 1-18-77 Rpt. at 2–3; Ex. 21, Cannon 1-18-77 Rpt. at 1; Ex. 22, photo of television; Ex. 23, photo of black nightstick.)

**RESPONSE:** This fact is material. It is disputed only to the extent that the best evidence of what was observed at the scene is the photographs crime scene investigators took at the scene.

27.     Dets. Fiers and Cannon further documented that the victims were located in the northeast bedroom where Noyalee and Connie typically slept, with James' body—dressed in jeans and a t-shirt—lying by the foot of the bed next to a brown metal pole, and Connie lying to the left of the entrance alongside the bed wearing a pink and white robe, a yellow nightgown, and panties with rollers in her hair. (Ex. 20, Fiers 1-18-77 Rpt. at 4–5; Ex. 21, Cannon 1-18-77 Rpt. at 2; Ex. 24, photo of James' body; Ex. 25, photo of Connie's body.)

**RESPONSE:** This fact is material. It is disputed to the extent that the best evidence of what was observed at the scene is the photographs CSU investigators took at the scene and to the extent it is incomplete. *See* Savory's Statement of Additional Disputed Facts, ¶¶ 11-17.

28.     Dets. Fiers and Cannon reported that both victims were badly cut and bloody, with Connie sustaining multiple knife wounds to her chest, face, legs, and vagina, cuts on her fingers, and a long laceration across her stomach from which her intestines protruded, while James sustained a couple of knife wounds to his face and chest. (Ex. 20, Fiers 1-18-77 Rpt. at 4–5; Ex. 21, Cannon 1-18-77 Rpt. at 2; Ex. 24, photo of James' body; Ex. 25, photo of Connie's body.)

**RESPONSE:** This fact is material. It is disputed to the extent that the best evidence of the nature of the wounds sustained by the two victims is the autopsy reports as to each. Ex. 32.

29.     PPD Officer Earl Hopkins interviewed Douglas, who stated that the victims were asleep when he and Noyalee left for work around 6:30 AM that morning (Ex. 26, Douglas 1-18-

64

77 Statement at 3, 6.) When Douglas and Noyalee arrived home that afternoon around 4:30 PM, he first saw that the house was cluttered up before he found the victims (*Id.* at 6.)

**RESPONSE:** This fact is material. Savory does not dispute this characterization of the Hopkins report, but states that the report speaks for itself.

30.     PPD CSU Officers Jatkowski and John Bennett, under the supervision of CSU Sgt. Gerontes, photographed the scene and collected evidence, including the black nightstick from the kitchen floor, the pipe next to James' body, scraps of blood spatter from items near the victims' bodies, hairs from the victims' hands, and hairs from the bathroom sink and tub. (Ex. 13, Jatkowski 10-20-21 Dep. at 81:5–22, 98:14–19, 103:6–13, 106:7–109:18; Ex. 27, Jatkowski 1-21-77 Rpt.; Ex. 23, photo of black nightstick.)

**RESPONSE:** This fact is material and undisputed.

31.     CSU Officer Jatkowski's procedure for collecting evidence was to package the evidence, note on the package where the evidence was collected from, and draft a report documenting the evidence collected and its initial location. (Ex. 13, Jatkowski 10-20-21 Dep. at 42:7–45:22; Ex. 27, Jatkowski 1-21-77 Rpt.)

**RESPONSE:** This fact is material and undisputed. *But see* Savory's Statement of Additional Disputed Facts, ¶ 103 (regarding Jatkowski's failure to adhere to his procedure with respect to the knife Defendants took from Y.T. Savory.

32.     PPD Patrol Lt. Stenson responded to the scene to ensure patrol resources were being utilized properly, Det. Buck responded to provide additional assistance, and VCU Sgt. Tiarks also responded. (Ex. 16, Stenson Dep. at 34:24–35:5; Ex. 28, Buck 1-19-77 Rpt. at 1–3; Ex. 5, Tiarks 11-12-21 Dep. at 113:20–114:10.)

**RESPONSE:** This fact is material and undisputed.

65

33.     The victims were transported to a funeral home where autopsies were conducted that same day by Dr. Phillip Immesoete in the presence of Peoria County Coroner Herbert Buzbee ("Coroner Buzbee"), CSU Officers Jatkowski and Bennett, and Det. Buck. (Ex. 29, James 1-18-77 Autopsy Rpt.; Ex. 30, Connie 1-18-77 Autopsy Rpt.; Ex. 28, Buck 1-19-77 Rpt. at 1–3; Ex. 27, Jatkowski 1-21-77 Rpt. at 6.)

**RESPONSE:**  This fact is material and undisputed.

34.     Dr. Immesoete's autopsy reports documented the victims' many wounds, including Connie' slash across the abdomen and James' fatal stab wound that pierced his heart. (Ex. 29, James 1-18-77 Autopsy Rpt.; Ex. 30, Connie 1-18-77 Autopsy Rpt.)

**RESPONSE:**  This fact is material and undisputed.

35.     Dr. Immesoete collected blood from the victims, Coroner Buzbee collected samples of the stomach contents and swabs from Connie's vagina, and CSU Officers Jatkowski and Bennett collected the victims' clothes and "scrapings" from Connie's right index and ring fingernails, as Connie had visible defensive wounds. (Ex. 28, Buck 1-19-77 Rpt. at 1–3; Ex. 27, Jatkowski 1-21-77 Rpt. at 1–2, 6; Ex. 13, Jatkowski 10-20-21 Dep. at 109:13–18, 119:24–120:22.) Scrapings were not collected from James because he did not have visible defensive wounds and no substance appeared to be under his fingernails. (Ex. 13, Jatkowski 10-20-21 Dep. at 120:4–22.)]

**RESPONSE:**  This fact is material and undisputed.

36.     Over the next several days, PPD "set into motion a large scale investigation," and "[m]any witnesses and suspects were interviewed and several were given lie detector tests." (*Savory I,* 403 N.E.2d at 120.)

66

**RESPONSE:** Plaintiff objects to this paragraph because the Illinois Appellate Court's characterizations of the investigation are admissible hearsay that the Court should not consider on summary judgment.

37.    On January 19, 1977, the evidence collected at the crime scene and autopsy was hand delivered by Coroner Buzbee and CSU Officer Jatkowski to the Illinois Bureau of Identification ("BOI")—including the vaginal swabs (Buzbee) and the hairs from the victims' hands and Connie's fingernail scrapings (Jatkowski)—or placed in the PPD evidence locker. (Ex. 27, Jatkowski 1-21-77 Rpt. at 8; Ex. 31, Gonsowski 1-17-77 BOI Rpt. at 1–4.)

**RESPONSE:** This fact is material and undisputed.

38.    Also on the 19th, Det. Fiers interviewed both Douglas and Noyalee (Det. Cannon was also present for Noyalee's interview), and both described the disarray they observed upon arriving home on the 18th, including that the TV that had been on the table when they left that morning was now on the floor. (Ex. 32, Fiers 1-19-77 Rpt. at 3, 6.)

**RESPONSE:** This fact is material. It is undisputed that the Fiers report describes the interviews with Douglas and Noyalee as recited in this paragraph.

39.    On January 22, PPD Officer Koenig reported that he interviewed Kenneth Parker, who stated that he last saw Cooper on January 15 and last had intercourse with her on January 13. (Ex. 33, Koenig 1-22-77 Rpt.)

**RESPONSE:** This fact is material and not disputed.

40.    On January 21, Officer Pinkney reported that he interviewed James' acquaintance Earl Mabry, who said that, on January 17, he saw James carrying a black nightstick with "Johnny"—later identified as Savory—at Marva Jones' home. (Ex. 34, Pinkney 1-21-77 Rpt.)

67

**RESPONSE:** This fact is material. It is undisputed that the Pinkney report describes the interview with Mabry as recited in this paragraph.

41.    The following day, January 22, Officer Hilst reported that he interviewed Marva Jones, who confirmed that her "foster son" "Johnny" came to her house on January 17 with James and that "Johnny" probably could relate information about what they did that day. (Ex. 35, Hilst 1-22-77 Rpt.)

**RESPONSE:** This fact is material. It is undisputed that the Hilst report describes the interview with Marva Jones as recited in this paragraph.

42.    Marva added that "Johnny" also came to her house on January 20, was quite upset and crying over the deaths of his "very good friends" James and Connie, and said Connie and James' stepfather had been mean to and did not like the victims. (Ex. 35, Hilst 1-22-77 Rpt.)

**RESPONSE:** This fact is material. It is undisputed that the Hilst report describes the interview with Marva Jones as recited in this paragraph.

43.    Also on January 22, Dets. Cannon and Fiers took a statement from Noyalee, who stated that the night before the murders, she was watching television with Douglas and Connie when James "came home" with another individual—later identified as Savory—who James was wrestling with until Noyalee told them to stop because they might get too rough. (Ex. 36, Noyalee 1-22-77 Statement at 2, 5, 10; Ex. 17, 6-28-77 Trial Tr. Test. of Noyalee at 69:20-70:21.)

**RESPONSE:** This fact is material and disputed. The January 22 statement reports that Noyalee said that on the evening of January 16 "the other child played around with my boy and then he left." The additional statements are only reported in the June 28 transcript.

44.    On January 25, Officers Haynes and Pinkney learned that the person named

"Johnny" who was with James on January 17 was Savory, a student who attended the Late Afternoon School ("LAS") and had prior interactions with Haynes and Pinkney. (Ex. 37, Pinkney and Haynes 1-26-77 Rpt. at 1–2; Ex. 9, Haynes Dep. at 70:12–17, 76:14–77:10, 94:8–16 147:25–148:4; Ex. 10, Pinkney Dep. at 23:23–24:21.)

**RESPONSE:** This fact is material and undisputed.

45.    At 3:30 PM on January 25, Officers Haynes and Pinkney met with Savory at LAS to seek information about James' murder. (Ex. 37, Pinkney and Haynes 1-26-77 Rpt. at 4; Ex. 38, Savory 6-15-22 Dep. at 312:17–23, 315:9–11, 323:12–14; Ex. 9, Haynes Dep. at 95:22–96:10; Ex. 10, Pinkney Dep. at 26:1–3, 144:2–7, 148:24–10.)

**RESPONSE:** This fact is material and undisputed.

46.    Savory initially said he did not want to talk but then agreed to speak with the officers at his school. (Ex. 38, Savory 6-15-22 Dep. at 314:14–18, 322:24–325:5; 328:18–329:10; Ex. 9, Haynes Dep. at 96:21–97:23; Ex. 10, Pinkney Dep. at 26:1–3, 148:24–150:4.)

**RESPONSE:** This fact is material and undisputed.

47.    Savory told Pinkney and Haynes that he was at James' home twice on January 17, and during the first visit, they were alone and moved the coffee table and television so they would not bump into it while wrestling. (Ex. 37, Pinkney and Haynes 1-26-77 Rpt. at 4–5; Ex. 38, Savory 6-15-22 Dep. at 163:21–164:24; Ex. 39 Savory 2-17-23 Dep. at 18:16–19:15.)

**RESPONSE:** This fact is material and undisputed.

48.    After about thirty minutes of questioning, around 4:00 PM, Savory reluctantly agreed to leave LAS and accompany Officers Haynes and Pinkney to PPD. (Ex. 38, Savory 6-15-22 Dep. at 330:18–333:14; Ex. 9, Haynes Dep. at 117:17–119:2; Ex. 10, Pinkney Dep. at 150:5–13, 172:15–20, 173:24–174:2.)

**RESPONSE:** This fact is material and undisputed.

49.    During the drive to the PPD, Savory suggested that they stop at his father's house so that he could show the officers a knife similar to the one James owned. (Ex. 9, Haynes Dep. at 122:18–123:23; Ex. 10, Pinkney Dep. at 155:22–156:9.)

**RESPONSE:** This fact is material and disputed. Savory has no recollection of stopping at his father's house or discussing a knife with Pinkney and Haynes en route to the police station. Savory did not have a knife similar to one that James owned. Ex. 1 at 333:9-334:19.

50.    When they arrived at the house, Savory could not get inside because his father was not home. (Ex. 9, Haynes Dep. at 123:24–124:4; Ex. 10, Pinkney Dep. at 156:102–157:2.)

**RESPONSE:** This fact is material and disputed. Savory has no recollection of stopping at his father's house or discussing a knife with Pinkney and Haynes en route to the police station. Savory did not have a knife similar to one that James owned. Ex. 1 at 333:9-334:19.

51.    During the ride to the PPD, the officers did not specifically question Savory, but rather engaged him in general conversation. (Ex. 9, Haynes' Dep. at 164:3–20; Ex. 10, Pinkney's Dep. at 128:11–13.)

**RESPONSE:** This fact is material and undisputed, though the cited testimony does not support that Pinkney and Haynes engaged in "general conversation" with Savory on the ride.

52.    When they arrived at PPD around 4:30 PM, Savory and Officer Pinkney sat in the detective juvenile bureau area, while Officer Haynes took Dets. Cannon and Fiers into an interview room to explain the information he and Officer Pinkney had obtained. (Ex. 40, 5-20-77 Mot. to Suppress Confession Tr. Test. of Pinkney at 17:19–23.)

**RESPONSE:** This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶¶ 50-55.

70

53.     Around 5:00 PM, Savory was brought to an interview room, (Ex. 38, Savory 6-15-22 Dep. at 332:2–333:14, 334:20–335:4, 337:22–338:15, 339:10–24), where Officers Haynes and Pinkney, as well as Dets. Cannon and Fiers, questioned him in two separate sessions lasting about thirty and forty-five minutes, respectively. (Ex. 9, Haynes Dep. at 118:25–119:7, 120:17–19, 124:5–12, 125:19–128:10, 134:14–21; Ex. 10, Pinkney Dep. at 170:23–172:14, 176:9–177:3, 182:8–11, 214:12–19, 222:12–14; Ex. 40, 5-20-77 Mot. to Suppress Confession Tr. Test. of Pinkney at 18:21–20:6, 22:24–24:20.)

**RESPONSE:** This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶¶ 50-55.

54.     Between the two sessions, officers identified discrepancies in Savory's statements. (Ex. 40, 5-20-77 Mot. to Suppress Confession Tr. Test. of Pinkney at 23:3–19.)

**RESPONSE:**  This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶¶ 50-55.

55.     Around 5:30 PM, Officer Haynes provided Savory with soda pop and a candy bar. (Ex. 38, Savory's 6-15-22 Dep. at 381:17–19; Ex. 9, Haynes Dep. at 162:19–163:7.)

**RESPONSE:**  This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶ 52.

56.     At no time during these interviews did officers raise their voices, accuse, touch, or restrain Savory, or make any threats or promises to him. (Ex. 40, 5-20-77 Mot. to Suppress Confession Tr. Test. of Pinkney at 29:11–30:20, 32:5–10; Ex. 38, Savory 6-15-22 Dep. at 324:20–325:5, 352:12–353:7.)

**RESPONSE:** This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶¶ 50-55.

57.    At some point during the afternoon of January 25, VCU Sgt. Tiarks facilitated communications between PPD Legal Advisor James Murphy and Officers Pinkney and Haynes about their questioning of Savory. (Ex. 5, Tiarks 11-12-21 Dep. at 144:9–24, 145:13–146:24.)

**RESPONSE:**  This fact is material and undisputed.

58.    Savory agreed to sit for a polygraph, which his Legal Guardian, Percy Baker ("Legal Guardian Baker"), approved, and at 10:00 PM, Baker, Det. Cannon, and Officer Haynes drove Savory to polygrapher Dennis Jenkins' ("Polygrapher Jenkins") office. (Ex. 39, Savory 2-17-23 Dep. at 42:11–20; Ex. 9, Haynes Dep. at 173:11–18, 177:12–178:3, 179:23–180:1; Ex. 10, Pinkney Dep. at 227:13–228:9, 228:23–231:16.)

**RESPONSE:**  This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶¶ 54-57.

59.    Before agreeing to the polygraph, Savory asked an unknown officer if he could go home, which officer responded that Savory could go home after the polygraph because he was just a witness and not a suspect. (Ex. 39, Savory 2-17-23 Dep. at 42:18–43:11.)

**RESPONSE:**  This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶ 54.

60.    Polygrapher Jenkins examined Savory for about fifteen to thirty minutes between 10:00 and 11:00 PM. (Ex. 39, Savory 2-17-23 Dep. at 48:9–23; Ex. 40, 5-20-77 Mot. To Suppress Confession Tr. Test. of Jenkins. at 180:8–19.)

**RESPONSE:**  This fact is material and undisputed.

61.    Following the polygraph, Polygrapher Jenkins informed Det. Cannon of Savory's polygraph results, which were documented in Jenkins' January 29, 1977 report, including that "Savory did not tell the complete truth during the examination" and showed "very specific

deception reactions" when asked whether he killed James, knew who did, or had lied to the police. (Ex. 40, 5-20-77 Mot. to Suppress Confession Tr. Test. of Cannon at 64:13–65:19; Ex. 41 Jenkins's 1-29-77 Polygraph Rpt. at 3.)

**RESPONSE:**  This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶¶ 56-59.

62.    Det. Cannon telephoned his supervisor Sgt. Tiarks as well as Det. Fiers to inform them of Jenkins' findings, and, in turn, Sgt. Tiarks instructed Cannon to cease any further "testing" beyond 11:30 PM. (Ex. 6, Fiers 10-13-21 Dep. at 165:6–18; Ex. 42, Cannon 1-25-77 Rpt. at 5; Ex. 5, Tiarks 11-12-21 Dep. at 150:17–151:7, 154:12–155:3, 174:9–176:13.) Det. Cannon then telephoned Peoria County Assistant State's Attorney Robert Gaubas ("ASA Gaubas"), who instructed Det. Cannon to read Savory his *Miranda* rights. (Ex. 40, 5-20-77 Mot. to Suppress Confession Tr. Test. of Cannon at 65:20–66:22; Ex. 43, Gaubas Dep. at 57:18–58:14; Ex. 42, Cannon 1-25-77 Rpt. at 5.)

**RESPONSE:**  This fact is material and undisputed.

63.    At about 11:00 PM, Det. Cannon read Savory his *Miranda* rights, and Savory stated he did not want to talk, at which point he was arrested for a probation violation, returned to PPD, and then transported to the Gift Juvenile Detention Center, where he slept for about six-and-a-half hours. (Ex. 38, Savory 6-15-22 Dep. at 381:20–24; Ex. 39, Savory 2-17-23 Dep. at 60:2–5; Ex. 6, Fiers 10-13-21 Dep. at 108:15–109:7; Ex. 9, Haynes Dep. at 194:4–19, 195:6–17; Ex. 40, 5-20-77 Mot. to Suppress Confession Tr. Test. of Cannon at 77:11–79:5; Ex. 42, Cannon 1-25-77 Rpt. at 4.)

**RESPONSE:**  This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶¶ 60-61, 63.

73

64.    Sgt. Tiarks was not present during any of Savory's questioning. (Ex. 5, Tiarks 11-12-21 Dep. at 85:23–86:10, 137:15–141:5.)

**RESPONSE:** This fact is material and undisputed.

65.    Beginning around 10:30 AM the following morning of January 26, Savory was Mirandized and questioned for about ninety minutes by Det. Fiers and Officer Haynes. (Ex. 39, Savory 2-17-23 Dep. at 63:10–64:5; Ex. 44, Fiers 10-14-21 Dep. at 46:17–22, 47:6–12, 50:2–17, 75:6–14; Ex. 9, Haynes Dep. at 197:4–198:6, 204:23–205:6.) Savory did not indicate that he wanted to answer questions, nor did he refuse to answer questions; instead, he asked if he could go home. (Ex. 39, Savory 2-17-23 Dep. at 64:5–64:16.)

**RESPONSE:** This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶¶ 64-68.

66.    Around noon, Det. Fiers and Officer Haynes stopped the questioning for a thirty-minute lunch break during which they provided Savory a hamburger. (Ex. 39, Savory 2-17-23 Dep. at 69:5–14; Ex. 44, Fiers 10-14-21 Dep. at 50:6–17, 75:6–14, 76:3–15; Ex. 45, Fiers 1-26-77 Rpt. at 3.)

**RESPONSE:** This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶¶ 69-71.

67.    At some point prior to this lunch break, Savory saw his father at the station. (Ex. 39, Savory 2-17-23 Dep. at 69:15–70:8.)

**RESPONSE:** This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶¶ 67-68.

68.    After lunch, around 12:30 PM, Savory was again questioned by Det. Fiers and Officer Haynes for no more than twenty minutes. (Ex. 40, 5-20-77 Mot. to Suppress Confession

Tr. Test. of Fiers at 103:21–104:14; Ex. 44, Fiers 10-14-21 Dep. at 76:10–77:23, 78:6–10.)

**RESPONSE:**  This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶¶ 72-74.

69.    Around 12:50 PM, Officer Teplitz, who had prior interactions with Savory, commenced questioning Savory until about 5:00 PM while other officers were also present. (Ex. 39, Savory 2-17-23 Dep. at 77:8–79:18; Ex. 44, Fiers 10-14-21 Dep. at 81:19–82:14; Ex. 9, Haynes Dep. at 227:20–24; Ex. 11, Teplitz 10-5-22 Dep. at 93:18–94:16; Ex. 46, Teplitz 1-26-77 Rpt. at 1.)

**RESPONSE:**  This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶¶ 72-74.

70.    During this questioning, Savory stated: (1) in the late morning or early afternoon of the day of the murders, January 18, he went to the Ivy family's residence for a short period of time; (2) around 2:00–2:30 PM, he met Tina Ivy at the bus stop; (3) at 5:00 PM, he went to Marva Jones' house; (4) he then went to the victims' house; and (5) that evening he returned to the Ivy residence where he learned of the murders on the news. (Ex. 46, Teplitz 1-26-77 Rpt. at 2; Ex. 38, Savory 6-15-22 Dep. at 286:8–15, 291:9–292:23, 296:11–24, 311:2–14; 319:11–19.) Savory was unable to provide details of his whereabouts on the day after the murders, January 19. (Ex. 46, Teplitz 1-26-77 Rpt. at 2; Ex. 39, Savory 2-17-23 Dep. at 167:18–21.)

**RESPONSE:**  This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶¶ 72-74, 90.

71.    At approximately 5:00 PM, Det. Fiers and CSU Officer Jatkowski walked Savory to a nearby bathroom, where Jatkowski had Savory strip, collected his clothes, plucked hair samples from his head, body, and pubic area with tweezers for evidence collection, and then

promptly provided Savory with replacement clothes that PPD had purchased. (Ex. 38, Savory 6-15-22 Dep. at 28:23–29:17; Ex. 39, Savory 2-17-23 Dep. at 82:3–83:24, 210:13–18; Ex. 44, Fiers 10-14-21 Dep. at 90:22–91:9; Ex. 13, Jatkowski 10-20-21 Dep. at 135:15–24, 139:3–141:2; Ex. 44, Fiers 10-14-21 Dep. at 91:10–24.) CSU Officers Jatkowski and Bennett then collected a blue pair of pants from Savory's residence, (Ex. 47, Jatkowski and Bennett 1-26-77 Rpt.), after which the evidence was sent to the BOI via registered mail for testing. (Ex. 31, Gonsowski 3-17-77 BOI Rpt. at 3–4.)

**RESPONSE:**  This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶¶ 69-71.

72.    Officer Teplitz, Det. Fiers, and Legal Guardian Baker then transported Savory to Jenkins' office for a second polygraph. (Ex. 44, Fiers 10-14-21 Dep. at 93:24–94:7, 95:2–10; Ex. 45, 1-26-77 Fiers Rpt. at 2.)

**RESPONSE:**  This fact is material and undisputed except that Baker was Savory's probation officer, not his Legal Guardian.

73.    At approximately 6:00 PM, Savory participated in a second polygraph—this time with Defendant Polygrapher Ed Bowers ("Polygrapher Bowes")—after being told by an unknown officer that there were "inconsistencies" in the first polygraph. (Ex. 38, Savory 6-15-22 Dep. at 346:24–347:10, 353:12–20; Ex. 48, Bowers Dep. at 197:4–9, 198:9–16.) Specifically, officers told Savory that his statement that he and James had prepared food when he was at the victims' house on the evening of January 17 was inconsistent with the officers' knowledge that Noyalee prepared the food. (Ex. 38, Savory 6-15-22 Dep. at 353:21–354:4.)

**RESPONSE:**  This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶¶ 75-82.

74.     During this second polygraph, Polygrapher Bowers allegedly yelled at Savory and called him a murderer and a liar. (Ex. 38, Savory 6-15-22 Dep. at 352:8–11, 361:14–22.)

**RESPONSE:**  This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶¶ 75-82.

75.     Around 7:30 PM, Savory told Polygrapher Bowers that he "didn't want to talk to him anymore," and instead, he "would like to speak with Marcella [Teplitz]." (Ex. 38, Savory 6-15-22 Dep. at 346:21–347:10, 356:14–21; 361:14–362:1, 372:9–22; Ex. 39, Savory 2-17-23 Dep. at 123:3–13; Ex. 40, 5-20-77 Mot. to Suppress Tr. Test. of Fiers at 108:16–109:6.)

**RESPONSE:**  This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶¶ 75-82.

76.     Immediately, Polygrapher Bowers ceased the polygraph examination, unhooked Savory, and left the examination room. (Ex. 38, Savory 6-15-22 Dep. at 362:2–11, 363:24–364:10; Ex. 39, Savory 2-17-23 Dep. at 123:10–20.)

**RESPONSE:**  This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶¶ 75-82.

77.     At about 7:35 PM, Officer Teplitz entered the polygraph examination room, and over the next fifteen minutes, Savory told Teplitz that he murdered James and Connie. (Ex. 39, Savory 2-17-23 Dep. at 125:12–126:6; Ex. 11, Teplitz 10-5-22 Dep. at 51:12–14, 218:5–219:9; Ex. 12, Teplitz 10-6-22 Dep. at 346:8–348:15; Ex. 46, Teplitz 1-26-77 Rpt. at 4.)

**RESPONSE:**  This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶¶ 80-82.

78.     During this confession, Teplitz allegedly "gave [Savory] the answers to her own questions," and when Savory answered a question incorrectly, she would "prompt" and "guide"

him to the correct answers, including the locations of Connie's stab wounds. (Ex. 38, Savory 6-15-22 Dep. at 375:8–376:23, 377:15–378:1, 378:15–380:16; Ex. 39, Savory 2-17-23 Dep. at 125:12–126:6, 141:9–23, 146:2–13.)

**RESPONSE:** This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶¶ 80-82.

79.    Savory then said he wanted to leave, so Teplitz ended the discussion. (Ex. 11, Teplitz 10-5-22 Dep. at 218:5-13; Ex. 12, Teplitz 10-6-22 Dep. at 346:8–348:15.)

**RESPONSE:** This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶ 83.

80.    Savory was returned to PPD, where he denied involvement in the murders. (Ex. 39, Savory 2-17-23 Dep. at 152:8–153:1, 154:5–155:8; Ex. 11, Teplitz 10-5-22 Dep. at 218:5–218:18.) Teplitz told Savory that he was "backtracking," and she asked him to describe the crimes in detail. (Ex. 39, Savory 2-17-23 Dep. at 155:9–11, 156:9–157:1; Ex. 11, Teplitz 10-5-22 Dep. at 218:5–218:18; Ex. 46, Teplitz 1-26-77 Rpt. at 5–6.) Savory allegedly went "along with" whatever details Teplitz told him. (Ex. 39, Savory 2-17-23 Dep. at 158:3–159:1.)

**RESPONSE:** This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶¶ 83, 96-98.

81.    Teplitz only had "limited time" to talk with Savory at this point, due to a pre-scheduled emergency detention hearing on his case at the juvenile detention center. (Ex. 11, Teplitz 10-5-22 Dep. at 218:19–219:9; Ex. 12, Teplitz 10-6-22 Dep. at 367:1–15.) Because Savory's statements were having diminishing returns—he would say he did not kill the victims, only to then answer crime-scene-specific questions—and to avoid missing the hearing, Teplitz concluded the questioning. (Ex. 11, Teplitz 10-5-22 Dep. at 218:15–219:9.)

**RESPONSE:** This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶¶ 83, 96-98.

82.    VCU Sgt. Tiarks signed Teplitz' January 26, 1977 report documenting Teplitz' conversations with Savory. (Ex. 46, Teplitz 1-26-77 Rpt.)

**RESPONSE:** This fact is material and undisputed.

83.    At points during the January 25 and 26 interrogations, unidentified officers allegedly "put words in [Savory's] mouth" and told him that he "need[ed] to say this or…that." (Ex. 38, Savory 6-15-22 Dep. at 359:9–360:19.)

**RESPONSE:** This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶¶ 50-51, 72-74, 77, 81-83.

84.    Although Baker—Savory's legal guardian—was at the police station for some of the time during Savory's interrogations, Savory contends Baker was never present in any of the rooms while Savory was undergoing questioning. (Ex. 39, Savory 2-17-23 Dep. at 71:20–72:11, 73:3–74:5, 75:2–13, 77:3–12.)

**RESPONSE:** This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶¶ 47, 49, 54, 62, 67-68.

85.    On January 25, at about 5:30 PM, after Savory's first interview at PPD, Officer Pinkney returned to Savory's residence and obtained from Savory's father the knife that Savory had earlier mentioned to Officers Pinkney and Haynes. (Ex. 49, Pinkney 1-25-77 Rpt.)

**RESPONSE:** This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶¶ 101-103.

86.    The knife was given to CSU Officer Jatkowski and sent via registered mail to the BOI for testing. (Ex. 49, Pinkney 1-25-77 Rpt.; Ex. 31, Gonsowski 3-17-77 BOI Rpt. at 3.)

**RESPONSE:** This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶¶ 101-103.

87.     Around 1:45 AM on January 26, Det. Fiers, Officer Pinkney, and CSU Officer Jatkowski interviewed Marva Jones at her home. She stated that sometime after she learned of the homicides, Savory came to her home in a very emotional state and told her that the killer "slit her stomach wide open, Marva, you should have seen it. You just don't know, you just don't know." Marva repeated these statements and told the officers she was "positive that [Savory] made these statements." (Ex. 45, Fiers 1-26-77 Rpt. at 2; Ex. 6, Fiers 10-13-21 Dep. at 184:13- 194:5–18.) The following day, January 27, Officer Koenig reported that Marva told him that this conversation with Savory occurred on January 18. (Ex. 50, Koenig 1-27-77 Rpt.)

**RESPONSE:** This fact is material and disputed. This paragraph accurately summarizes the cited reports, but Savory disputes that Ms. Jones reported Savory's purported admissions during this middle-of-the-night interview. Marva Jones is deceased. Savory did not make these statements to her. *See* Savory Statement of Disputed Facts, ¶ 89.

88.     Also on the morning of January 26, Det. Cannon and Officer Haynes interviewed Ray Mason at his mother's house around 1:30 AM and again at the PPD at 10:00 AM, after Legal Guardian Baker told Cannon that Savory said Mason may have information about the murders. (Ex. 51, Cannon 1-26-77 Rpt.) Mason reportedly told the officers that on the morning of the murders—before the bodies were found—Savory called him and said, "Man, something sad just happened." When Mason inquired, Savory said, "Some of my friends got killed.'" (*Id.*)

**RESPONSE:** This fact is material and disputed. The paragraph accurately summarizes the cited reports, but Savory disputes that Ray Mason reported Savory's purported admissions

during this middle-of-the-night interview. Mr. Mason is deceased. Savory did not make these statements to him. Ex. 2 at 69:1-4.

89.     On January 28, 1977, Officer Teplitz, Det. Fiers, and Det. Cannon reviewed news footage at a local television studio that depicted Savory at the scene of the murders. They learned from news photographer Ken Falls that Savory was already on the scene when the news crew arrived at roughly 6:20 PM, until Savory was seen boarding a bus around 7:00 PM—prior to the victims' bodies being removed from the home. (Ex. 52, Brown 1-28-77 Rpt. at 2.) Falls told the officers that he overheard news reporter Jerry Geisler talking with Savory at the scene. (*Id.*)

**RESPONSE:**   This fact is material. It is undisputed that this paragraph accurately summarizes the cited report. Savory disputes that he spoke with any news reporter at the scene. Ex. 2 at 55:1-58:13.

90.     On February 1, 1977, Officer Teplitz interviewed Geisler, who stated that Savory appeared at the crime scene and asked Geisler and PPD officers whether James was dead. (Ex. 54, Teplitz 2-1-77 Rpt. at 1–2.)

**RESPONSE:**   This fact is material. It is undisputed that this paragraph accurately summarizes the cited report. Savory disputes that he spoke with any news reporter at the scene. Ex. 2 at 55:1-58:13.

91.     Savory's presence at the crime scene between 5:00 and 6:00 PM was also documented by Patrol Officer Perkins. (Ex. 53, Perkins 1-27-77 Rpt. at 1.)

**RESPONSE:**   This fact is material. It is undisputed that this paragraph accurately summarizes the cited report.

92.     On February 7, 1977, Officers Teplitz and Haynes interviewed members of the Ivy family, including Tina, Ella, Ruby, and James Ivy. (Ex. 55, Teplitz and Haynes 2-7-77 Rpt.;

81

Ex. 56, Teplitz 2-21-23 Dep. at 34:4–8, 37:12–19, 39:12–40:5.)

**RESPONSE:** This fact is material and undisputed.

93.    Ruby Ivy told the Officers that on the day of the murders, Savory told her that he and James were "planning on going out pimping" that morning, and that he was at James' house that day but left before the murders. (Ex. 55, Teplitz and Haynes 2-7-77 Rpt. at 1–2; Ex. 56, Teplitz 2-21-23 Dep. at 42:1–22.)

**RESPONSE:** This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶¶ 156-61, 170.

94.    James Ivy told the Officers that, on the day of the murders, Savory told him that Connie and James were dead, and that Savory was supposed to visit James that morning but had forgotten. (Ex. 55, Teplitz and Haynes 2-7-77 Rpt. at 1–2; Ex. 56, Teplitz 2-21-23 Dep. at 42:1–22.)

**RESPONSE:** This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶¶ 152-56.

95.    Ella Ivy told the officers that, on the day of the murders, Savory told her that "the two victims were cut up real bad and that whoever did it must have known the victims to be able to get into the house past the dog." (Ex. 55, Teplitz and Haynes 2-7-77 Rpt. at 1–2; Ex. 56, Teplitz 2-21-23 Dep. at 42:1–22.)

**RESPONSE:** This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶¶ 152-56.

96.    Tina Ivy told officers that, on the morning after the murders, Savory told her "the girl was cut and her stomach was split open...that the girl had struggled and whoever killed her had a terrible time doing it," and that James "thought he was faster with a knife tha[n] Savory."

(Ex. 55, Teplitz and Haynes 2-7-77 Rpt. at 1–2; Ex. 56, Teplitz 2-21-23 Dep. at 42:1–22.)

**RESPONSE:** This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶¶ 152-56.

97. On January 26 and 27, 1977, Lt. Dunlavey filed two petitions before the Circuit Court for temporary detention of Savory, which were granted. (Ex. 57, 1-26-77 Petition for Temporary Detention; Ex. 58, 1-26-77 Order for Temporary Detention; Ex. 59, 1-27-77 Petition for Temporary Detention; Ex. 60, 1-27-77 Order for Temporary Detention.)

**RESPONSE:** This fact is material and undisputed.

98. The January 27, 1977 order for temporary detention indicated that Public Defender Richard Burgess appeared on behalf of Savory. (Ex. 60, 1-27-77 Order for Temporary Detention.)

**RESPONSE:** This fact is material and undisputed.

99. On February 4, a hearing was held on a Peoria County State's Attorney's Office (PCSAO) motion to remove Savory's prosecution from juvenile to adult court where Coroner Buzbee, and Officers Perkins, Jatkowski, Pinkney, Haynes, and Teplitz testified. (*See generally* Ex. 61, 02-04-77 Removal Hearing Tr.) The removal order was granted on February 7. (Ex. 62, 02-07-77 Hearing Granting Order to Remove Prosecution Tr. at 10:8–11:12.)

**RESPONSE:** This fact is material and undisputed.

100. On February 15, 1977, a Peoria Grand Jury was convened where Det. Fiers, Coroner Buzbee, and Officers Perkins, Pinkney, and Teplitz testified. (*See generally* Ex. 18, 2-15-77 Grand Jury Hearing Tr.)

**RESPONSE:** This fact is material and undisputed.

101. Teplitz testified "the hair found in the sink at the crime scene was -- matched to be

83

similar to that of Johnny Savory." (Ex. 18, 2-15-77 Grand Jury Hearing Tr. at 44:11–17.)

**RESPONSE:** This fact is material. It is undisputed that Teplitz so testified, but it is disputed that Teplitz's testimony was either truthful or supported by valid science. Ex. 8 at 5.

102.    Coroner Buzbee testified about the victims' wounds, including that Connie was "slashed across the abdomen, her intestines were protruding," and James sustained a fatal stab wound that "pierced his heart." (Ex. 18, 2-15-77 Grand Jury Hearing Tr. 53:19–54:24.)

**RESPONSE:** This fact is material and undisputed.

103.    Following the hearing, a true bill was returned, and Savory was indicted for the first-degree murders of James and Connie under 720 ILCS 5/9–1(a)(2). (Ex. 63, Grand Jury True Bill of Indictment.)

**RESPONSE:** This fact is material and undisputed.

104.    On March 17, 1977, BOI Scientist Gonsowski submitted to the PPD his findings of testing of (1) the knife collected from Savory's residence, (2) the pants collected from his residence, (3) the hairs found in the bathroom sink at the crime scene, (4) Connie's fingernail scrapings, (5) the hairs found in the victims' hands, and (6) the vaginal swabs collected from Connie. (Ex. 31, Gonsowski 3-17-77 BOI Rpt.)

**RESPONSE:** This fact is material. It is undisputed that Gonsowski submitted a report to the PPD with purported findings as to this evidence, but it is disputed that the report reflects the findings that Gonsowski actually made. *See* Savory's Statement of Disputed Facts, ¶¶ 100-140.

105.    Chemical testing of the knife—itemized as #44—indicated "presence of blood, however, due to insufficient sample quantity, further testing could not be attempted." (Ex. 31, Gonsowski 3-17-77 BOI Rpt. at 7; Ex. 14, 6-29-77 Trial Tr. Test. of Gonsowski at 180:19–182:4.)

**RESPONSE:** This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶¶ 100-115.

106.    Chemical testing of the pants—itemized as #59—indicated Type A blood in the rear of the front right pocket just below the beltloop, which is the same blood type as Connie and Savory's father. (Ex. 31, Gonsowski 3-17-77 BOI Rpt. at 2, 4, 6–7; Ex. 14, 6-29-77 Trial Test. of Gonsowski at 175:3-177:6; Ex. 64, 7-1-77 Trial. Tr. Stipulation, at 462:10–17.)

**RESPONSE:** This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶¶ 130-137.

107.    A microscopic analysis of the hairs collected from the bathroom sink—itemized as #70—indicated that one hair was similar in color and characteristic to head hair standards collected from Savory. (Ex. 31, Gonsowski 3-17-77 BOI Rpt. at 4, 8.)

**RESPONSE:** This fact is material. It is disputed that the finding as to microscopic hair comparison has any scientific validity. Ex. 8 at 5.

108.    An examination of Connie's fingernail scrapings—itemized as #21 and #22—indicated that "nothing of apparent evidential value was found on [these] item[s]." (Ex. 31, Gonsowski 3-17-77 BOI Rpt. at 2, 6.)

**RESPONSE:** This fact is material and undisputed.

109.    A microscopic analysis of the hairs collected from James' and Connie's hands—itemized as #69 and #31, respectively—were examined and found not similar to Savory's. (Ex. 31, Gonsowski 3-17-77 BOI Rpt. at 3–4, 6, 8.)

**RESPONSE:** This fact is material and disputed. The hairs collected from James's and Connie's hands were destroyed, making it impossible to perform DNA testing on the hairs. *See* Savory's Statement of Disputed Facts, ¶ 140.

110.    Chemical testing of the vaginal swabs collected from Connie—itemized as #1A—indicated the presence of seminal material, but a microscopic examination did not reveal sperm. (Ex. 31, Gonsowski 3-17-77 BOI Rpt. at 1, 4; Ex. 65, Gonsowski Dep. at 45:9–47:13.)

**RESPONSE:**  This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶¶ 116-129.

111.    At some point before Gonsowski completed his March 17 final lab report, CSU Officer Jatkowski spoke with him about preliminary results of the evidence testing and jotted down notes from the conversation on a yellow legal pad. (Ex. 66, Jatkowski 2-23-23 Dep. at 9:4–14:11; Ex. 67, Jatkowski's Yellow Legal Pad Notes.)

**RESPONSE:**   This fact is material and disputed to the extent that this paragraph characterizes the results that Gonsowski discussed with Jatkowski as "preliminary." *See* Savory's Statement of Disputed Facts, ¶¶ 104-109.

112.    As to the vaginal swabs, the notes stated, "Sperm – slight positive (poss false pos) 1st time neg [¶] 2nd pos. (No sperm but pos seminal)." (Ex. 67, Jatkowski's Notes.)

**RESPONSE:**  This fact is material and disputed. The writings on Jatkowski's yellow pad speak for themselves and must be observed as aid to interpretation.

113.    As to the knife, the notes stated, "44 Neg. for blood two spots slight reaction if blood was present." (Ex. 67, Jatkowski's Notes.)

**RESPONSE:**  This fact is material and disputed. The writings on Jatkowski's yellow pad speak for themselves and must be observed as an aid to interpretation.

114.  Jatkowski does not recall what he did with the notes, but it was his general procedure to share the contents of his notes with his supervisor and/or a detective working on the investigation. (Ex. 66, Jatkowski 2-23-2023 Dep. at 16:4–12, 40:4–41:8.)

86

**RESPONSE:** This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶¶ 108-111.

115.    Jatkowski does not recall what PPD's procedures were regarding disclosure of notes or if the notes were disclosed to prosecutors in this case, as they were merely notes that did not represent the final results to be submitted by Gonsowski, who was conducting the testing. (Ex. 66, Jatkowski 2-23-2023 Dep. at 17:5–11, 55:8–15, 59:21–60:6.)

**RESPONSE:** This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶¶ 104-111.

116.    Determining what information was provided to prosecutors was not one of Jatkowski's obligations. (Ex. 66, Jatkowski 2-23-23 Dep. at 59:21–60:3.) Non-Defendant PPD Officer Janet Metzger was responsible for maintaining the CSU file during the Robinson-Cooper homicide investigation. (*Id.* at 78:6–9.)

**RESPONSE:** This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶¶ 109-111.

117.    At some point before Gonsowski completed his March 17 report—likely February 4, 1977—deceased non-Defendant CSU Officer Craig Ganda presumably spoke with Gonsowski about preliminary results of his testing and made notations about the vaginal swabs and the knife from that discussion. (Ex. 11, Teplitz 10-5-22 Dep. at 166:23–168:5; Ex. 68, Ganda's Notes.)

**RESPONSE:** This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶¶ 104-11, 121; Ex. 37.

118.    Ganda's notes stated, "vaginal swabs – slight pos – her blood type only A" and "not a quick reaction feeling that it was there before attack." (Ex. 68, Ganda's Notes at

PEORIA_SAVORY 1874.)

**RESPONSE:**  This fact is material and disputed. Officer Ganda's writings speak for themselves and must be observed as an aid to interpretation.

119.   As to the knife, Ganda's notes stated, "#44 knife…something…slight little…possible—general reaction." (Ex. 68, Ganda's Notes at PEORIA_SAVORY 1878.)

**RESPONSE:**  This fact is material and disputed. Officer Ganda's writings speak for themselves and must be observed as an aid to interpretation.

120.   Jatkowski's and Ganda's notes were located with the CSU file on the Robinson-Cooper homicide. (Ex. 69, Ind. Defs.' Second Supp. Ans. to Pl's. 2nd Set Interrogs. at No. 1.)

**RESPONSE:**  This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶¶ 110-111.

121.   Teplitz never saw Gonsowski's lab report, Jatkowski's notes, or Ganda's notes before this civil litigation. (Ex. 11, Teplitz 10-5-22 Dep. at 168:16–169:2, 171:9–23, 177:8–17.)

**RESPONSE:**  This fact is material and disputed. *See* Savory Statement of Disputed Facts, ¶¶ 110-111, including footnote 7.

122.   Jatkowski never saw Ganda's notes before this civil litigation. (Ex. 66, Jatkowski 2-23-23 Dep. at 76:23–77:5.)

**RESPONSE:**  This fact is material and undisputed.

123.   Neither Teplitz nor Jatkowski, nor any other Defendant, were present when Gonsowski tested the evidence, and Gonsowski tested the evidence under standard methods used by the scientific community at that time. (Ex. 65, Gonsowski Dep. at 51:7–52:3; 60:5–14; 62:7–64:16; 91:23–92:2; 167:10–22.)

**RESPONSE:** This fact is material. It is undisputed that no police officer was present when Gonsowski tested the evidence. It is undisputed that Gonsowski's testing used methods, techniques, procedures, and reagents that were in force at the time. Standard procedure was for Gonsowski's notes and lab worksheets to be preserved. This was not done and this paragraph is disputed to that extent. *See* Savory Statement of Disputed Facts, ¶ 108.

124.   Jatkowski has no knowledge as to whether the tiny sample cut-out from the blue pants, the hairs from the victims' hands, or the fingernail scrapings were ever destroyed (Ex. 13, Jatkowski 10-20-21 Dep. at 242:18–23.)

**RESPONSE:** This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶ 136.

125.   On June 16, 1977, after Gonsowski's testing was completed, Jatkowski received the evidence from the State BOI lab—which was sealed in a box—labeled it with a property tag, and then submitted it to the PPD property room, where it remained sealed until the PCSAO requested it for Savory's 1977 trial. There is no evidence that after Gonsowski's testing, Jatkowski received the sample cut-out from the pants or the hairs from the victims' hands. (Ex. 66, Jatkowski 2-23-23 Dep. at 61:19–62:18; Ex. 70, Jatkowski 6-16-77 Rpt.)

**RESPONSE:** This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶ 136.

126.   From his appearance on January 27 to April 5, 1977, Savory was represented by Public Defendant Robert Burgess, at which time he was substituted for private attorney Jack Vieley. (Ex. 71, 4-5-77 Rpt. of Proc. at 2:2–12; Ex. 72, Vieley Dep. at 15:17–16:4.)

**RESPONSE:** This fact is material and undisputed.

127.   Throughout the 1977 criminal proceedings, the State was represented by ASAs

Robert Gaubas and Joseph Gibson under State's Attorney Michael Mihm, and Judge Stephen Covey presided. (Ex. 43, Gaubas Dep. at 11:12–23, 26:15–17, 73:23–74:4, 146:18–147:1.)

**RESPONSE:** This fact is material and undisputed.

128. On April 15, 1977, Vieley moved to suppress Savory's confession for various reasons, including a *Miranda* violation, and a hearing was held on May 20, 1977, where Officers Pinkney and Teplitz, Detectives Cannon and Fiers, and Polygrapher Jenkins testified. (Ex. 40, 5- 20-77 Mot. to Suppress Tr.; Ex. 73, Mot. to Suppress; *Savory I*, 403 N.E.2d 118, 122.)

**RESPONSE:** This fact is material and undisputed.

129. Judge Covey denied the motion on June 3. (Ex. 74, Order on Mot. to Suppress.)

**RESPONSE:** This fact is material and undisputed.

130. On or before April 12, 1977, ASA Gaubas tendered to Vieley "approximately 1100 pages of police reports," while "remaining reports will be provided upon request," along with a list of witnesses. (Ex. 75, PCSAO 4-12-77 Ans. to Discovery.)

**RESPONSE:** This fact is material and disputed. The State's Answer to Discovery stated that there was a total of 1100 pages of reports; that the reports specifically relating to Savory were being provided and that the remaining reports would be made available upon request. *See* Def. Ex. 75.

131. A few days later, on April 18, ASA Gaubas tendered supplemental discovery to Vieley, including the autopsy reports and BOI Scientist Gonsowski's March 17, 1977 final lab report. (Ex. 76, PCSAO 4-18-77 Ans. to Discovery.)

**RESPONSE:** This fact is material and undisputed.

132. Vieley testified that discovery was occasionally disclosed informally, and it was uncommon for police to turn over their notes if the information was contained within a report.

(Ex. 72, Vieley Dep. at 87:9–88:12, 170:21–172:2, 201:4–15.)

**RESPONSE:** This fact is material and disputed. The cited testimony provides that Mr. Vieley has no recollection of ever receiving handwritten notes in discovery. Vieley testified that the notes are "sanitized" into a report. Def. Ex. 72, at 172:3-10.

133.   City of Peoria Rule 30(b)(6) witness Martha Hammer testified at her deposition that PPD officers were not expected to retain notes from communications regarding preliminary opinions about a forthcoming final report because the final report would be considered the official record. (Ex. 77, Hammer Dep. at 234:22–235:20.)

**RESPONSE:** This fact is material and disputed. The cited passage from the Hammer deposition does not support the characterization of Hammer's testimony in this paragraph. To the extent the implication of this paragraph is that notes would not be produced because they would be fully and accurately reflected in a subsequent report, the paragraph is immaterial, since that is not what happened in this case.

134.   Vieley does not recall what records were tendered, nor did he have possession of Savory's criminal defense file at the time of his deposition. (Ex. 72, Vieley Dep. at 65:12–25.)

**RESPONSE:** This fact is material and undisputed.

135.   Throughout the investigation, Superintendent Andrews never sought specific details of the investigation or Savory's questioning, as he would obtain updates from CID Capt. Marteness or Lt. Fidler, and he left it to his detectives to conduct themselves within constitutional standards. (Ex. 78, Andrews 3-25-22 Dep. at 19:7–19, 28:10–29:10, 35:11–19, 39:21–40:3, 44:17–47:9.) At some point, Andrews was briefed about Savory's questioning, but his memory was faint some forty-five years later. (*Id.* at 19:7–19, 28:10–29:10, 35:11–19.)

**RESPONSE:** This fact is material and disputed to the extent that Andrews admitted that he was aware of Savory's interrogation as it was happening. His office was on the same floor where Savory was being interrogated and he recalls receiving at least one update while the interrogation was ongoing. *See* Savory's Statement of Disputed Facts, ¶ 177.

136.   Defendant CID Capt. Marteness's role in Savory's questioning was to submit requests for his polygraph exams. (Ex. 4, Marteness Dep. at 48:12–52:23.)

**RESPONSE:** This fact is undisputed and immaterial, since Savory is no longer pursuing any claims against Marteness.

137.   Defendant Lt. Dunlavey, who oversaw the juvenile division officers, signed off on several reports. (*See, e.g.*, Ex. 34, Pinkney 1-21-77 Rpt.; Ex. 49, Pinkney 1-25-77 Rpt.; Ex. 53, Teplitz 2-1-77 Rpt.)

**RESPONSE:** This fact is material and undisputed.

138.   Presentation of evidence in Savory's criminal trial commenced on June 28 and concluded on July 1 with a total of twenty-six witnesses called to testify. (*See generally,* Ex. 17, 6-28-77 Trial Tr.; Ex. 14, 6-29-77 Trial Tr.; Ex. 79, 6-30-77 Trial Tr.; Ex. 64, 7-1-77 Trial Tr.)

**RESPONSE:** This fact is material and undisputed.

139.   On the first day of trial, Noyalee and Douglas testified to their observations of James and Connie on January 17, the condition of the house and victims when they left for work the morning of January 18, and their discovery of the victims when they returned home that afternoon. (Ex. 17, 6-28-77 Trial Tr. Test. of Noyalee at 41:22–43:21, 47:19–51:24; Test. of Douglas at 70:3–21, 125:11–127:4, 135:15–138:17.)

**RESPONSE:** This fact is material and undisputed.

140.   On day two, June 29, Jatkowski testified about the pants and the hairs collected

from the victims' hands. (Ex. 14, 6-29-77 Trial Tr. Test. of Jatkowski at 106:14–22, 109:8–111:10.) He noted that the blue pants were in substantially the same condition as when he last saw them, but that a small area where there was a blood-like substance was removed, and the hairs collected at the crime scene were no longer in their evidence bags. (*Id*.)

**RESPONSE:** This fact is material and undisputed.

141.   BOI Scientist Gonsowski testified about his findings of the evidence on which he conducted serological testing and microscopic analysis. (Ex. 14, 6-29-77 Trial Tr. Test. of Gonsowski at 164:22–199:23.)

**RESPONSE:** This fact is material and undisputed.

142.   As to the knife collected from Savory's residence, Gonsowski testified that "my testing only indicated possible presence of blood" on two of the ten spots tested on the knife, but because of an insufficient quantity of material, he could not conduct further testing. (Ex. 14, 6-29-77 Trial Tr. Test. of Gonsowski at 180:19–182:4; Ex. 79, 6-30-77 Trial Tr. Test. of Gonsowski at 205:21–211:18.)

**RESPONSE:** This fact is material and undisputed.

143.   Gonsowski also testified that he cut a small area below the belt loop near the rear of the right pocket from the blue pants where a red stain was located, and testing showed that this stain contained Type A blood, the same blood type as Savory's father, Y.T, as well as Connie. (Ex. 14, 6-29-77 Trial Tr. Test. of Gonsowski at 170:9–10, 176:3–177:6; Ex. 64, 7-1-77 Trial Tr. Test. of Gonsowski at 462:10–21.)

**RESPONSE:** This fact is material and undisputed.

144.   Gonsowski explained at his deposition the four-step testing process he conducted that allowed him to identify blood type. (Ex. 65, Gonsowski Dep. at 62:7–64:16.)

**RESPONSE:** This fact is material and undisputed.

145.   Gonsowski further explained at his deposition that depending on the size of a sample he might take from evidence to conduct blood tests, "you might consume all of the sample to get a result," and if that was the case, the sample would be discarded "because there was nothing left to test." (Ex. 65, Gonsowski Dep. at 64:18–66:24.)

**RESPONSE:** This fact is material and undisputed.

146.   On June 30, 1977, the State called Gonsowski back to the stand, and he testified that two of the hairs collected from Connie's hand were animal hairs and one was an apparent body hair, while the hairs collected from James' hands were a body hair, a hair fragment of African origin, and a fiber. (Ex. 79, 6-30-77 Trial Tr. at 208:5–18.)

**RESPONSE:** This fact is material and undisputed.

147.   Gonsowski explained that upon receiving hair evidence, his testing procedure was to remove the hairs from the evidence bags, affix them to a microscope slide with an adhesive, and utilize a microscope to analyze the hairs for similarities to and differences from a comparison subject's hair standard. (Ex. 14, 6-29-77 Trial Tr. at 171:23–172:7.)

**RESPONSE:** This fact is material and undisputed.

148.   Gonsowski explained at his deposition that, after completing his testing, he did not remove the hair from the slides and place them back into their original bags, but rather, he placed the slides in CD cardholders. (Ex. 65, Gonsowski Dep. at 54:3–56:23.)

**RESPONSE:** This fact is material and undisputed.

149.   On the third day of trial, the State rested after Officer Pinkney, Det. Fiers, and Officer Teplitz testified about their investigation, specifically the statements Savory made to them on January 25 and 26. (Ex. 79, 6-30-77 Trial Tr. at 214:6–339:7.)

**RESPONSE:** This fact is material and undisputed.

150. Other than Det. Fiers and Officers Perkins, Jatkowski, Pinkney, and Teplitz, no other PPD officer testified at Savory's 1977 trial. (*See generally* Ex. 17, 6-28-77 Trial Tr.; Ex. 14, 6-29-77 Trial Tr.; Ex. 79; 6-30-77 Trial Tr.; Ex. 64, 7-1-77 Trial Tr.)

**RESPONSE:** This fact is material. It is disputed to the extent that Cannon also testified at that trial.

151. On June 30, Savory's attorney, Vieley, called witnesses in support of Savory's alibi defense and alternate suspect theory. (*See generally* Ex. 79; 6-30-77 Trial Tr.)

**RESPONSE:** This fact is material and undisputed.

152. On July 1, prosecutors argued at closing that Connie's blood was on Savory's pants, while Vieley countered that it was Savory's father's blood. (Ex. 64, 7-1-77 Trial Tr. at 512:13–18, 532:4–10.)

**RESPONSE:** This fact is material and undisputed.

153. On July 1, the jury returned a verdict finding Savory guilty of the murders. (Ex. 64, 7-1-77 Trial Tr. at 538:19–539:4.)

**RESPONSE:** This fact is material and undisputed.

154. Savory appealed his conviction and argued that Judge Covey's order denying his motion to suppress was in error because "the evidence is insufficient to show his knowing and voluntary waiver of his *Miranda* rights," which he asserted the evening of January 25 after the first polygraph. (*Savory I*, 403 N.E.2d at 122.)

**RESPONSE:** This fact is material and undisputed.

155. On April 4, 1980, in a two-to-one decision, the Illinois Appellate Court reversed and remanded for retrial, holding that the State did not carry its burden to show that the

95

reinterrogation of Savory on the morning of January 26, over eleven hours after he invoked his right to silence the evening before, constituted a voluntary waiver of that right by Savory, and as such, Savory's confession should have been suppressed. (*Savory I*, 403 N.E. 2d at 123–24.)

**RESPONSE:** This fact is material and undisputed.

156. On February 10, 1981, Savory was rearraigned and pled not guilty. (Ex. 80, 2-10-81 Rpt. of Proc. Tr. at 3:14–20.)

**RESPONSE:** This fact is material and undisputed.

157. During the 1981 pre-trial and trial proceedings, Savory was represented by Vieley, the State was represented by ASAs Gaubas and Knauss under State's Attorney John Barra, and Judge Covey again presided. (*See, e.g.*, Ex. 80, 2-10-81 Rpt. of Proc. Tr.; Ex. 71, Vieley Dep. at 15:17–16:4.)

**RESPONSE:** This fact is material and undisputed.

158. On April 7, 1981, Dets. Cannon and Buck interviewed Tina Ivy and reported that Tina told them that she was with Savory at a bus stop around 2:25 PM on the day of the murders, and with him again that evening. (Ex. 7, Cannon 4-7-81 Rpt.) At that time, Savory told Tina that he and James were practicing karate and playing with a knife at James' home earlier that day when Savory accidentally cut James, but that James was okay when he left. (*Id*.)

**RESPONSE:** This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶¶ 157-163.

159. Tina reportedly added that on the following morning, January 19, Savory told her at a laundromat that he went to the crime scene the evening of January 18 when police were at the scene and "got a glance" at James, who "was just all cut up," and Connie, who "was split wide open." (Ex. 7, Cannon 4-7-81 Rpt.)

**RESPONSE:** This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶¶ 157-163.

160.   On April 8, Det. Cannon interviewed Ella Ivy and reported that she stated that Savory came to the Ivy residence on the afternoon of January 18 to show Tina Ivy the bus routes, and then returned to their home around 3:00 PM. (Ex. 81, Cannon 4-8-81 Rpt. at 2.) At that time, Savory told Ella that he was at James' house earlier that day practicing karate with "sticks" and a knife when he accidentally stabbed James, who was fine when he left. (*Id.*)

**RESPONSE:** This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶¶ 157-163.

161.   Ella added that Savory left her residence at some point but returned that same day and told her that James and Connie were dead, even though Ella could not find any news that the murders occurred. (Ex. 81, Cannon 4-8-81 Rpt. at 2–3.) Savory then left again. (*Id.*)

**RESPONSE:** This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶¶ 157-163.

162.   According to Ella, Savory again returned to her home and told her that he went to James' house—which was surrounded by police—that James was cut up real bad and died, and that "the baby was in a bedroom with the dog." (Ex. 81, Cannon 4-8-81 Rpt. at 3.)]

**RESPONSE:** This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶¶ 157-163.

163.   Finally, Savory left again before returning to the Ivy residence around 9:30 PM to spend the night, at which point he told Ella that he was going to give money to James' mother. (Ex. 81, Cannon 4-8-81 Rpt. at 3–4.) Savory then pulled cash out of his pocket, which caused a black-handled knife to slip out and hit the floor. (*Id.*)

**RESPONSE:** This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶¶ 157-163.

164.    Dets. Cannon and Buck also interviewed Frank Ivy on April 8, who said that he and his family were watching the evening news on January 18 with Savory when the murders were reported, and that Savory told Frank that he was at James' house that day practicing karate when he accidentally stabbed James with a knife. (Ex. 81, Cannon 4-8-81 Rpt. at 4.)

**RESPONSE:** This fact is material and disputed. *See* Savory's Statement of Disputed Facts, ¶¶ 157-163.

165.    Evidence in Savory's second criminal trial commenced on April 28, 1981, and concluded on May 1, with a total of thirty witnesses having testified. (Ex. 82, 4-28-81 Trial Tr.; Ex. 83, 4-29-81 Trial Tr.; Ex. 84, 4-30-81 Trial Tr.; Ex. 85, 5-1-81 Trial Tr.)

**RESPONSE:** This fact is material and undisputed.

166.    On day one, Noyalee, Douglas, and Officer Perkins testified consistent with their 1977 testimony. (*See* Ex. 82, 4-28-81 Trial Tr. Test. of Noyalee at 28:3–113:6; Test. of Douglas at 116:16–165:17; Test. of Perkins at 174:23–181:18.)

**RESPONSE:** This fact is material and undisputed.

167.    Det. Fiers also testified to his January 25, 1977 interviews with Savory, but he did not testify to his conversations with Savory on January 26, 1977. (*See* Ex. 82, 4-28-81 Trial Tr. Test. of Fiers at 181:23–201:19.)

**RESPONSE:** This fact is material and undisputed (although Defendants incorrectly cite the 1981 trial transcript as support for this paragraph).

168.    CSU Officer Jatkowski and BOI Scientist Gonsowski also testified similarly to their 1977 trial testimony, including Gonsowski's testimony that "there was possibly blood

present on [the knife]." (*See generally* Ex. 82, 4-28-81 Trial Tr. Test. of Jatkowski, at 203:5–247:10, 251:11–268:24; Trial Tr. Test. of Gonsowski, at 258:8–10.)

**RESPONSE:** This fact is material and undisputed.

169.   On day two, Ella Ivy testified that, on the afternoon of January 18, 1977, Savory told her that he and James were playing karate at James' house when "he accidentally cut him or something, by accident. But [James] was all right when [Savory] left." (Ex. 83, 4-29-81 Trial Tr. Test. of Ella at 273:15–274:3.)

**RESPONSE:** It is material and undisputed that Ella Ivy so testified. *But see* Savory's Statement of Disputed Facts, ¶¶ 164-66.

170.   Ella further testified that, sometime before 4:00 PM, Savory was again at her house and asked if she remembered their earlier conversation about James, at which point he told her that James and Connie were dead. (Ex. 83, 4-29-81 Trial Tr. Test. of Ella at 274:7–22.)

**RESPONSE:** It is material and undisputed that Ella Ivy so testified. *But see* Savory's Statement of Disputed Facts, ¶¶ 164-66.

171.   Ella further testified that Savory spent the night at her home that evening and that at one point Savory "took his wallet out of his pocket. A knife fell out, but he put it back in." (Ex. 83, 4-29-81 Trial Tr. Test. of Ella at 276:3–22.)

**RESPONSE:** It is material and undisputed that Ella Ivy so testified. *But see* Savory's Statement of Disputed Facts, ¶¶ 164-66.

172.   Frank Ivy testified that on January 18, while at the Ivy residence, Savory told him that while "practicing Karate" in the bedroom "[Savory] accidentally stabbed [James]," and that Connie then "came in the room and he stabbed her, I guess." (Ex. 83, 4-29-81 Trial Tr. Test. of Frank at 285:23–286:13.)

99

**RESPONSE:**  It is material and undisputed that Frank Ivy so testified. *But see* Savory's Statement of Disputed Facts, ¶¶ 164-66.

173.    Tina Ivy testified that on the afternoon of January 18, while waiting with her at a bus stop, Savory left twice to change his clothes, and he came to her residence that evening and said that "him and [James] had been together earlier that day doing Karate. And that he had accidentally cut [James]." (Ex. 83, 4-29-81 Trial Tr. Test. of Tina, at 304:3–305:11.)

**RESPONSE:**  It is material and undisputed that Tina Ivy so testified. *But see* Savory's Statement of Disputed Facts, ¶¶ 164-66.

174.    Tina further testified that the next morning, January 19, Savory told her at a laundromat that Connie "had been split wide open. And that [James] was brutally stabbed, too." (Ex. 83, 4-29-81 Trial Tr. Test. of Tina at 305:12–306:5.)

**RESPONSE:**  It is material and undisputed that Tina Ivy so testified. *But see* Savory's Statement of Disputed Facts, ¶¶ 164-66.

175.    On April 30, Det. Cannon and Officers Pinkney and Haynes testified to their conversations with Savory on January 25, 1977. (*See generally* Ex. 84, 4-30-81 Trial Tr.)

**RESPONSE:**  This fact is material and undisputed, although the Cannon and Haynes testimony occurred on April 29.

176.    On May 1, following closing arguments, the jury returned a verdict finding Savory guilty of the murders. (Ex. 85, 5-1-81 Trial Tr. at 101:16–20.)

**RESPONSE:**  This fact is material and undisputed.

177.    Vieley filed a motion for new trial on May 7, 1981, which was amended on June 12, 1981, contending that the State did not disclose former ASA Gibson, who was part of the 1977 trial team and would have testified that the Ivys "could remember little and were

100

considered to be useless as witnesses for the State in 1977." (*See generally* Ex. 86, 5-7-81 Mot. for New Trial; Ex. 87, 6-12-81 Addendum to Mot. for New Trial at ¶ C.)

**RESPONSE:** This fact is material and undisputed.

178.    Judge Covey denied the motion after a hearing that included the testimony of former ASA Gibson, ASA Gaubas, Vieley's private investigator Charles Peters, and Det. Cannon. (Ex. 88, 6-12-81 Mot. for New Trial Tr.)

**RESPONSE:** This fact is material and undisputed.

179.    On May 5, 1982, the Illinois Appellate Court affirmed. (*Savory II*, 435 N.E.2d at 234.) The appeals court addressed Savory's contention that the trial court erroneously admitted Savory's statements from January 25, 1977, which included an "exculpatory narrative of events of the day prior to the murders and subsequent[t] admi[ssions that] he had lied regarding three collateral facts: who had cooked the evening meal, whether [Savory] and [James] were very good friends who had known each other for years and whether [Savory] telephoned [James] later the evening before the latter's death." (*Id.* at 231.) The appellate court agreed that the trial court should not have admitted those statements but found their admission to be "harmless error beyond a reasonable doubt" in light of the Ivys' testimony. (*Id.* at 231–32.)

**RESPONSE:** This fact is material. It is disputed because the opinion speaks for itself. Savory addresses Defendants' contentions regarding the legal effect of the Illinois Appellate Court's *Savory II* decision below in Argument Section III(E).

180.    In 1983, Tina signed an affidavit recanting her testimony that she saw Savory and spoke with him at her residence the evening of January 18 and that he told her the next morning that Connie was "split wide open" or that James was stabbed. (Ex. 89, Tina Ivy 11-9-83 Aff. at PEORIA SAVORY 3734–36.) Instead, she claimed that Savory only told her at the laundromat

that "he didn't know who could do something like that to his friends." (*Id.*)

**RESPONSE:** This fact is material and undisputed.

181.   Frank Ivy also signed an affidavit stating that his prior statements and testimony that Savory told him on the night of the murders that he had "accidentally stabbed [James]" were incorrect, that his 1981 testimony was information he "heard in the streets," and at the time of the trial, he was "confused" and busy with "schoolwork." (Ex. 90, Frank Ivy 12-18-83 Aff. at SAVORY-LL-04364–65.)

**RESPONSE:** This fact is material. It is disputed because Frank Ivy's three page, partially handwritten affidavit explained more about the circumstances leading to his false testimony, including that he was "young at the time," "didn't know what was going on," and that he "felt like [he] was being push [sic] by Officer Cannon," among other things.

182.   Savory thereafter filed a post-conviction petition in 1983 arguing that he was entitled to a new trial because Tina "recanted her testimony and give [sic] another statement." (Ex. 91, 06-07-83 PC Petition at ¶¶ 6–8.)

**RESPONSE:** This fact is material and undisputed.

183.   At the ensuing hearing, Tina Ivy testified that while she did see Savory on January 18 and 19 at her house and at a laundromat where they discussed the murders, he did not tell her that he was "playing with [James] or doing karate with [James]" or that he "accidentally cut[] [James]." (Ex. 92, 11-22-83 PC Tr. at 8:4–9:8.)

**RESPONSE:** This fact is material and undisputed.

184.   When asked why she previously testified falsely, Tina stated, "Well, at the time I was in a drug program and I didn't--Had a case on my mind. I had to sit down and thought about really what had took place by being so long. All I knew was that I was going to Court. I took a

rumor that was locked in my mind and gave it as a testimony which was false, and at the time I had no recognition of it." (Ex. 92, 11-22-83 PC Tr. at 9:13–23.)

**RESPONSE:** This fact is material and it is undisputed that Tina Ivy provided the cited testimony at the hearing. Tina provided further information concerning her reasons for recanting, including that she wished to clear her conscience. Def. Ex. 92 at 25:8-13.

185.    On cross, Tina testified that she told Officer Teplitz and Det. Cannon what she testified to at trial in 1981. (Ex. 92, 11-22-83 PC Tr. at 14:6–17:7.)

**RESPONSE:** This fact is material. It is disputed because the transcript attached as Def. Ex. 92 does not include testimony consistent with the assertions in this paragraph.

186.    Tina explained that she did not intentionally repeat rumors or make false statements, but that "at the time I was wild and free and I was doing a lot of things and just didn't have my mind picked on what this case meant." (Ex. 92, 11-22-83 PC Tr. at 21:6–9; 25:14–17.)

**RESPONSE:** This fact is material and undisputed.

187.    Frank Ivy did not testify at Savory's 1983 post-conviction hearing. Arthur Inman, Savory's attorney, told the court that Frank told him in the presence of an ASA "that he does not want to admit that he was lying either time. That is, when he talked to me or when he testified, and accordingly, I do not think that he could add any credible evidence one way or the other in this matter." (Ex. 93, 12-02-83 PC Tr. at 3:8–17.) After making this representation, Inman spoke to Frank Ivy alone and then informed the court, "I have taken a few moments to further interview [Frank Ivy], and I am convinced that he doesn't have anything credible to add one way or the other, so my position is as I have earlier announced." (*Id*. at 3:18–4:10.)

**RESPONSE:** This fact is material and undisputed.

188.    The court denied Savory's petition, which was affirmed on appeal. (Ex. 94, 12-

06-83 Cir. Ct. Order Denying PC Pet.; Ex. 95, 8-1-84 Ill. App. Ct. Order.)

**RESPONSE:** This fact is material and undisputed.

189.    In 1984, Savory filed a petition for a federal writ of habeas corpus contending the
Illinois Appellate Court's finding of harmlessness violated due process. (*U.S. ex rel. Savory v.
Lane*, No. 84 C 8112, 1985 WL 2108, at *1 (N.D. Ill. July 25, 1985), *aff'd*, 832 F.2d 1011 (7th
Cir. 1987).) The district court rejected the petition, finding that "evidence of [Savory's] pre-
arrest silence and his post-arrest statements did not taint the trial nor render it fundamentally
unfair" and that "the strength of [the Ivy family members'] direct evidence outweighs the
circumstantial evidence of the claimed error." (*Id.* at *2.) The Seventh Circuit affirmed, finding
that "in light of the state's otherwise strong case, the relatively limited use of [Savory's
statements], and the lack of probative value the tainted evidence had, we conclude that there is
no reasonable possibility that its use contributed to the verdict." (*U.S ex rel. Savory v. Lane*, 832
F.2d 1011, 1020 (7th Cir. 1987).)

**RESPONSE:** This fact is material and undisputed. *But see* Savory's demonstration in
Argument Section III(E) below that the finding of "harmlessness" was predicated on fabricated
evidence.

190.    In 2003, Frank Ivy signed a second affidavit stating that his 1981 testimony—that
Savory told him that he accidentally stabbed James while practicing karate and then stabbed
Connie—was incorrect, and that "[t]he only thing Johnnie Savory ever told me about the
murders was that he had heard about the murders." (Ex. 96, Frank Ivy 5-14-03 Aff. at ¶ 5.)

**RESPONSE:** This fact is material and undisputed.

191.    Frank's affidavit added that during an interview with Det. Cannon prior to his
1981 testimony, Frank "felt pressured and told Mr[.] Cannon what he wanted to hear." (Ex. 96,

Frank Ivy 5-14-03 Aff. at ¶ 6.) Like Tina, Frank added, "I was young and confused at the time. None of the information I provided came from Johnnie Savory. I told him what I knew based on rumors I had heard about the case." (*Id*.)

**RESPONSE:** This fact is material and undisputed.

192.    In 2012, Ella Ivy wrote a statement that confirmed that Savory told her on the afternoon of the murders that he accidentally stabbed James while playing karate, and that James had nun-chucks and Savory had a knife. (Ex. 97, Ella Ivy 10-27-12 Aff. at SAVORY-LL-5135–36.) Ella denied that she saw Savory with a knife. (*Id.* at SAVORY-LL-5135.)

**RESPONSE:** This fact is material. It is disputed because the three-page handwritten statement that Ella Ivy signed on September 29, 2012 disavowed almost the entirety of her 1981 trial testimony and described the circumstances of Cannon's interactions with in that year. *See* Savory's Statement of Disputed Facts, ¶¶ 162-66.

193.    Tina Ivy predeceased this civil litigation, but in 2022, during this case, Ella and Frank were deposed. (Ex. 98, Frank Ivy Dep.; Ex. 99, Ella Ivy Dep.)

**RESPONSE:** This fact is material and undisputed.

194.    When Ella Ivy was asked at her deposition if she "believe[d] that [she was] testifying to the truth as [she] knew it in 1981," Ella responded, "Yes." (Ex. 99, Ella Ivy Dep. at 137:17-21.) When asked again, "in reviewing this testimony do you believe that you told -- or testified -- to the truth as you knew it in 1981," Ella again responded, "Yes." (*Id.* at 149:9–12.)

**RESPONSE:** This fact is material. It is disputed because it does not reflect the full content of Ella's deposition testimony in 2022. *See, e.g.,* Def. Ex. 93 at 184:23-204:11 (in which Ella recounts that she did not make statements the police reports attribute to her and that

105

Defendant Cannon confined her against her will in 1981 for questioning about Savory); *and see* Savory's Statement of Disputed Facts, ¶¶ 162-66.

195.   Ella testified that she will "always remember" Savory telling her that he was at James' house, they were playing Karate, and that he accidentally cut James, who was fine when he left. (Ex. 99, Ella Ivy Dep. at 49:3–50:18.) When Savory's counsel asked Ella if she was continuing to state *her* "truth as you have always recollected it and as you know it to be," Ella responded that "it was Johnnie Lee Savory's truth, I just repeated it." (*Id.* at 212:7–11.)

**RESPONSE:**   This fact is material. It is disputed because it does not reflect the full content of Ella's deposition testimony in 2022. *See, e.g.,* Def. Ex. 93 at 184:23-204:11 (in which Ella recounts that she did not make statements the police reports attribute to her and that Defendant Cannon confined her against her will in 1981 for questioning about Savory); *and see* Savory's Statement of Disputed Facts, ¶¶ 162-66.

196.   When asked at her deposition, "[d]id you ever have any Peoria police officer tell you what they wanted you to say on the witness stand when you testified at Johnnie Savory's criminal trial," Ella answered, "No." (Ex. 99, Ella Ivy Dep. at 148:17–23.) When asked more broadly if "anyone" told Ella "these are the words we want you to say and these are the words we want you to testify to," Ella exclaimed, "No. No." (*Id.* at 136:1–6.)

**RESPONSE:**   This fact is material. It is disputed because it does not reflect the full content of Ella's deposition testimony in 2022. *See, e.g.,* Def. Ex. 93 at 184:23-204:11 (in which Ella recounts that she did not make statements the police reports attribute to her and that Defendant Cannon confined her against her will in 1981 for questioning about Savory); *and see* Savory's Statement of Disputed Facts, ¶¶ 162-66.

197.   During Frank Ivy's deposition, when asked if "anyone ever g[a]ve you facts about

106

the crime or the crime scene in order to testify about it at Johnnie Lee Savory's criminal trial," Frank answered "No." (Ex. 98, Frank Ivy Dep. at 191:14–24.) When asked if Detective Cannon or any police officer gave him information "about Johnnie and [James] playing karate," or "Connie walk[ing] in when Savory stabbed [James]," or that "Savory stabbed [James] but it was an accident," Frank answered "no" to each question. (*Id.* at 192:1–193:17.) And when asked by Savory's counsel if Officer Cannon told "you to testify that…Johnnie said he cut [James]," Frank answered, "No." (*Id.* at 263:8–15.)

**RESPONSE:** This fact is material, and it is disputed because it does not reflect the full content of Frank's deposition testimony in 2022. *See, e.g.,* Def. Ex. 98, at 245:7-265:14 (in which Frank describes that his testimony regarding Savory's purported statements to him was false; that those statements did not originate from him; and that he felt intimidated and pressured by Cannon to stick with the false statements).

198.   When asked twice whether, when he testified in 1981, Frank knew that he was lying, Frank twice answered, "No." (Ex. 98, Frank Ivy Dep. at 50:18–23; 52:4–6.) On cross, Frank answered "yes" when asked if he was afraid that if he did not testify, he may be charged with a crime or get in trouble with the police. (*Id.* at 249:18–250:10.)

**RESPONSE:** This fact is material, and it is disputed because it does not reflect the full content of Frank's deposition testimony in 2022. *See, e.g.,* Def. Ex. 98, at 245:7-265:14 (in which Frank describes that his testimony regarding Savory's purported statements to him was false; that those statements did not originate from him; and that he felt intimidated and pressured by Cannon to stick with the false statements).

199.   In 2006, Savory was released on parole. (Ex. 100, Pl.'s Ans. to Def. John Fiers's First Set of Interrogs. at No. 4.)

**RESPONSE:** This fact is material and undisputed.

200.    In 2012, Savory filed a motion for post-conviction DNA testing pursuant to 725 ILCS 5/116-3, under the representation of lawyers from Northwestern University's Center of Wrongful Convictions. (*See generally* Ex. 101, 11-14-12 Mot. for PC DNA Testing.)

**RESPONSE:** This fact is material and undisputed.

201.    The petition requested DNA testing on the knife, the hairs collected from James' and Connie's hands, the fingernail scrapings, the vaginal swabs, and the blue pants, among other items of evidence. (Ex. 101, 11-14-12 Mot. for PC DNA Testing, at 2–3, n.4.)

**RESPONSE:** This fact is material and undisputed.

202.    During oral arguments in March 2013, Savory's attorney, Joshua Tepfer, argued that DNA testing did not exist in 1977 when the evidence, such as the fingernail scrapings, was collected, nor did the Combined DNA Index System (a.k.a. "CODIS"), which could be used to compare potential DNA results to individuals within CODIS. (Ex. 102, 3-14-13 Mot. for PC DNA Testing Tr. at 15:6–10, 62:22–63:4, 67:9–15.)

**RESPONSE:** This fact is material and undisputed.

203.    Tepfer further argued that a DNA profile from the vaginal swabs could yield further evidence that Connie was sexually assaulted—which would contradict Savory's confession—beyond BOI Scientist Gonsowski's March 17 final lab report indicating the presence of seminal material on the swabs. (Ex. 102, 3-14-13 Mot. for PC DNA Testing Tr., at 17:8–16, 67:16–68:2.)

**RESPONSE:** This fact is material and undisputed.

204.    Tepfer also argued that DNA testing should be conducted on Connie's "fingernail clippings," but he was corrected by ASA Jerry Brady who explained that "there are no fingernail

108

clippings…. [T]here are [scrapings]," "toothpicks that may or may not contain DNA evidence." (Ex. 102, 3-14-13 Mot. for PC DNA Testing Tr., at 62:22–63:4, 72:11–18.)

**RESPONSE:** This fact is undisputed, but it is immaterial. Mr. Tepfer's unintentional misstatement is not relevant to any fact in issue in this case.

205.    In August 2013, Savory's motion for DNA testing was granted. (*See generally* Ex. 103, 8-6-13 Order on Mot. for PC DNA Testing.)

**RESPONSE:** This fact is material and undisputed.

206.    On November 7, 2013, Illinois State Police lab scientist Ann Yeagle ("ISP Scientist Yeagle") received evidence from the PPD, (Ex. 104, Yeagle's 1-17-14 ISP Lab Rpt., at 1), including the blue pants that, according to Yeagle's testimony, were packaged properly for preservation purposes. (Ex. 105, Yeagle's Dep. at 47:9–19.)

**RESPONSE:** This fact is material and undisputed.

207.    Upon inspection, Yeagle saw that the pants were "visually dirty" and observed the location where Gonsowski took the tiny cut-out in 1977 from the pants as depicted in photos taken around the time of DNA testing, along with potential blood-like stains on the right pocket, but Yeagle could not locate the cut-out. (Ex. 106, 4-2-2015 PC Tr. at 40:13–41:24, 52:21–24; Ex. 107, photograph of pants from Yeagle's notes.)

**RESPONSE:** This fact is material and disputed to the extent that it does not fully describe Yeagle's testimony at the cited pages, in which she describes that the cutout was approximately half the size of a fingernail; and that she tested around the perimeter of the cutout for blood and no blood was located.

208.    Yeagle tested the pants for blood, which were negative. (Ex. 106, 4-2-2015 PC Tr. at 40:13–41:24.)

**RESPONSE:** This fact is material and undisputed.

209.    Yeagle cut out additional samples from the pants for DNA testing to be conducted by ISP Scientist William Frank ("ISP Scientist Frank"), but that DNA testing was also negative, which ISP Scientist Frank explained was due to degradation presumably caused by the evidence being dirty and/or by bacteria. (Ex. 106, 4-2-2015 PC Tr. Test. of Yeagle at 40:13–41:24; Test. of Frank at 165:2–21; Ex. 107, photograph of pants from Yeagle's notes.)

**RESPONSE:** This fact is material and disputed. Mr. Frank's testimony does not suggest that the pants were stored in conditions that would have caused the degradation that he describes in general terms in his testimony. To the contrary, it can be observed from pictures of the evidence and the storage containers that the conditions for appropriate and secure storage of evidence were met. Ex. 8 (Report of Karl Reich) at 8.

210.    Yeagle did not receive the hairs from James' and Connie's hands and was unable to determine any information as to their disposition including whether they were ever returned to the PPD or consumed in testing. (Ex. 106, 4-2-2015 PC Tr. at 28:5–29:24, 114:18–115:14.)

**RESPONSE:** This fact is material and undisputed (although not supported by the transcript cited). *And see* Savory's Statement of Disputed Facts, ¶ 140.

211.    As to the fingernail scrapings from Connie's right ring and index fingers, Yeagle stated that there was "[m]iscellaneous debris observed on wooden stick[s]," and that after further examination, she "preserved a portion of those sticks that would've been used to scrape underneath [Connie's] fingernails" for DNA testing. (Ex. 104, Yeagle's 1-17-14 ISP Lab Rpt., at 1; Ex. 105, Yeagle Dep. at 36:24–37:4.) DNA testing was conducted by ISP Scientist Frank on the preserved portion of those sticks containing debris, but it did not obtain any results. (Ex. 108, Frank's Dep. at 51:12-17.)

**RESPONSE:** This fact is material and undisputed.

212.    On December 22, 2014, Savory filed a motion for new trial, contending that "the new DNA evidence he has produced…would probably lead a new jury to reach a different result." (Ex. 109, 12-22-14 Mot. for New Trial at 2.)

**RESPONSE:** This fact is material and undisputed. The DNA evidence that supported Savory's motion for a new trial is fully described in the motion, which speaks for itself.

213.    In support of his motion for new trial, Savory attached as an exhibit a December 14, 2014 affidavit of his retained expert witness, Greg McCrary, (*id*. at 25–28), who theorized, based on BOI scientist Gonsowski's finding of seminal fluid, that Connie was sexually assaulted. (Ex. 110, Greg McCrary 12-14-14 Aff. at ¶ 15.)

**RESPONSE:**  This fact is material and undisputed.

214.    While Savory's motion for new trial was pending, on January 12, 2015, Illinois Governor Pat Quinn granted Savory a general pardon on his last day in office, (Ex. 111, 1-12-15 Quinn Pardon; Dkt. 234, 11-7-22 Minute Entry), which was not based on innocence and left Savory's conviction intact. (Dkt. 234, 11-7-22 Minute Entry (finding Savory's general pardon inadmissible on issue of innocence).)

**RESPONSE:**  It is material and undisputed that Savory was pardoned by the Governor of Illinois. It is immaterial that Governor Quinn pardoned Savory on Governor Quinn's last day in office. The meaning and significance of the pardon are disputed. *See* Savory's Statement of Disputed Facts, ¶ 6.

215.    On May 4, 2016, Savory's motion for new trial was denied. (Ex. 112, 5-4-16 Op. and Order on Mot. for New Trial at 8.) Part of the court's rationale in denying Savory a new trial in 2016 was Savory's failure to produce Ella Ivy to testify. (*Id*. at 6–7.)

111

**RESPONSE:** This fact is material and undisputed.

216.    During this litigation, on February 21, 2023, Savory served supplemental responses to Teplitz' Third Set of Interrogatories delineating his contentions in support of various allegations. (Ex. 113, Pl.'s Supp. Ans. to Teplitz' Third Set of Interrogs. at No. 2.)

**RESPONSE:**  This fact is material and undisputed.

217.    During this litigation, on February 21, 2023, Savory served supplemental responses to Jatkowski's Second Set of Interrogatories delineating his contentions in support of various allegations. (Ex. 114, Pl.'s Supp. Ans. to Jatkowski's Second Set of Interrogs. at No. 2.)

**RESPONSE:**  This fact is material and undisputed.

218.    During this litigation, on November 9, 2021, Savory served initial responses to Jatkowski's Second Set of Interrogatories delineating his contentions in support of various allegations. (Ex. 115, Pl.'s Ans. To Jatkowski's Second Set of Interrogs. at No. 2.)

**RESPONSE:**  This fact is material and undisputed.

## ARGUMENT

This is not a summary judgment case. Indeed, Defendants concede and do not challenge many of Savory's theories that their misconduct violated his constitutional rights and caused his wrongful conviction. The record properly construed for Savory unambiguously supports the conclusion that Defendants coerced a false confession from a child, fabricated all of the evidence used to arrest, charge, prosecute, and twice convict Savory of the Cooper-Robinson murders, hid from prosecutors and from Savory and his attorneys a large volume of exculpatory and impeachment evidence that would have halted Savory's prosecution and shown his innocence, and destroyed evidence in bad faith that would have exonerated Savory. All material facts are disputed, and Defendants' legal arguments lack merit. This Court should deny Defendants' motions.

Though Defendants ignore the legal standard throughout their motions, this Court must examine the evidence in the light most favorable to Savory and draw all inferences in his favor. *Tolan*, 572 U.S. at 656-57. Summary judgment is warranted only if Defendants demonstrate that there is no genuine issue of fact on any of Savory's claims such that they are entitled to judgment as a matter of law. *Id.* "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

This brief proceeds in nine parts. First, it explains how Defendants have conceded, waived, and forfeited any argument on many of Savory's constitutional claims, requiring a trial on those claims. Second, the brief explains the Seventh Circuit law holding that this Court need not parse each and every theory of liability at summary judgment in a fair trial case like this one, where it is clear the case will proceed to trial on at least some fair trial claims against the Defendants. Third, it explains why Defendants' immunity and preclusion arguments on Savory's Fifth and Fourteenth

Amendment false confession claims—constitutional violations about which Defendants concede that disputes of fact preclude summary judgment—lack merit. Fourth, it sets out the hotly disputed facts that preclude summary judgment on Savory's clearly established due process theories that Defendants suppressed, fabricated, and destroyed evidence. Fifth, it explains how the record construed for Savory demonstrates that all of the evidence that gave rise to charges against Savory was fabricated or illegal obtained by Defendants, which means Defendants cannot claim they had probable cause to suspect Savory, and so Savory's Fourth Amendment claim survives summary judgment. Sixth, it explains how Defendants Gerontes, Andrews, Dunlavey, and Tiarks participated in the misconduct and are liable as supervisors, such that they are not entitled to summary judgment. Seventh, it explains how a reasonable jury could conclude that each of the Defendants is liable for failing to intervene to prevent the violation of Savory's rights. Eighth, it explains that disputes of fact preclude summary judgment on Savory's conspiracy claim against each Defendants. And ninth, an indemnification claim against Peoria remains in the case for trial, which Peoria does not challenge.

Examining the record in the light most favorable to Savory and drawing inferences in his favor, this Court should deny summary judgment on all claims and theories on which Defendants have moved. No material factual issues are undisputed. Instead, the facts are hotly contested and must be resolved by a jury. Moreover, Defendants' immunity and other legal arguments lack merit and contradict deeply established Supreme Court and Seventh Circuit cases.

## I.    DEFENDANTS' HAVE WAIVED AND FORFEITED ANY ARGUMENT FOR SUMMARY JUDGMENT ON MANY OF SAVORY'S CLAIMS

Defendants egregiously misstate and mischaracterize the scope and nature of the claims Savory brings in this case—presumably in an effort to make it appear that this matter can be all

but resolved on summary judgment. A reset of what claims are actually at issue in this case is therefore necessary.

Plaintiff pursues seven claims. First, he brings claims against Defendants under the Fifth Amendment for their coercion of his involuntary and false confession, and, second, he claims under the Fourteenth Amendment that Defendants fabricated false incriminating statements that they attributed to him. These coerced and false statements were used against Savory throughout his criminal proceedings, including all pretrial proceedings and both criminal trials, and not just at one or the other of Savory's 1977 and 1981 criminal trials. Third, Savory brings a claim that Defendants violated his right to due process and a fair criminal trial throughout his criminal case, when they suppressed exculpatory and impeachment evidence, fabricated false evidence other than his confession, and destroyed evidence. Fourth, Savory claims that Defendants caused him to be seized pursuant to judicial process and without probable cause to suspect him of murder, when they obtained charges against him, causing his prosecution and detention, based solely on evidence they had fabricated. Fifth, Savory brings a claim that Defendants failed to intervene to prevent the violation of his rights. Sixth, he claims that Defendants conspired with one another and with third parties to violate his constitutional rights. And seventh, he brings an indemnification claim against Peoria.

Defendants concede that the record construed for Savory precludes summary judgment on the first and second claims involving his coerced and false confession, waiving that issue. Moreover, Defendants make no argument for summary judgment on a number of Savory's suppression and fabrication theories supporting his third claim, that they violated his right to a fair trial, or on his claim that they conspired to violate his rights, forfeiting those issues.

Without explanation, Defendants purport to recast Savory's claims as limited to one or the other of Savory's two criminal trials, suggesting that some of his claims pertain only to his 1977 conviction and others only to his 1981 conviction. In addition, they argue that Savory's 1981 conviction is intact in a manner that affects Savory's claims. None of that is true. All of Savory's claims pertain to his entire criminal case, including both trials. Defendants' unexplained and arbitrary limitation of Savory's claims mean that Defendants do not challenge Savory's theories that Defendants violated his Fifth Amendment rights when they used involuntary statements extracted from him in his criminal case before and after his 1977 criminal trial; nor do they challenge that statements they fabricated and attributed to Savory were used prior to his 1981 criminal trial; meaning that Defendants have forfeited those arguments as well. Moreover, Defendants' argument that Savory's conviction is still intact contradicts the *en banc* Seventh Circuit's mandate in this case.

At the end of the day, Defendants have waived and forfeited any argument for summary judgment on most of Savory's claims and theories. As a result, a trial must occur on those claims and theories, Defendants have waived and forfeited any argument otherwise, and they cannot raise new arguments for the first time in reply.

## A.    Defendants' Frame Their Summary Judgment Brief In A Way That Artificially Limits Savory's Claims and Contradicts the En Banc Seventh Circuit's Mandate In This Case

Defendants have structured their summary judgment brief in a manner that itself contests the material facts and legal theories, and that contradicts the Seventh Circuit's mandate in this case. In particular, Defendants' brief starts by addressing what Defendants say are claims relating to Savory's "still intact 1981 conviction," which they limit to one argument about their fabrication of the Ivys' statements, and another asserting that Savory is precluded from arguing that the

116

incriminating statements they fabricated caused his 1981 conviction. See Part I of Defendants'
brief, OB-42-54. Then, Defendants discuss their suppression of critical evidence and their
destruction of evidence, without tying those theories to any particular criminal trial. See Part II of
Defendants' brief, OB-54-68. After that, Defendants address what they say are "claims relating to
[Savory's] 1977 conviction," in which they discuss Savory's Fifth Amendment claim relating to
his interrogation and confession, and his Fourth Amendment unlawful detention claim. See Part
III of Defendants' brief, OB-68-82. This parsing of Savory's claims is at odds with Savory's
complaint and misses much of the heart of Savory's actual claims in the case.

*First*, Defendants ignore that Savory does assert different claims relating to his different
criminal trials. Defendants have decided to treat Savory's Fifth Amendment false confession and
Fourth Amendment illegal detention claims as if they were connected only to Savory's 1977
conviction, OB-68-82, and his Fourteenth Amendment fabrication claims as if they concerned only
Savory's 1981 conviction, which in their view remains intact, OB-42-54. But in reality, all of the
constitutional claims that Savory has raised concern his entire criminal case, from the initial charge
to the ultimate pardon and including both convictions, and his conviction has been conclusively
set aside. Savory contends that the confession Defendants fabricated, the statements they extracted
using coercive and illegal techniques, and the evidence they suppressed, fabricated, and destroyed
directly caused his detention, his prosecution, and *both* of his wrongful convictions, in violation
of his Fourth, Fifth, and Fourteenth Amendment rights. To the extent that Defendants frame their
arguments to limit particular claims and theories to particular criminal trials, they simply disregard
Savory's legal theories as actually pleaded. The effect is to contest the facts that give rise to
Savory's theories, and to ignore the law that governs those theories. Defendants fail to provide this
Court any argument anywhere in their briefs explaining *why* Savory's particular constitutional

117

claims would be limited to particular underlying criminal trials, forfeiting their opportunity to do so. *Smith v. Northeastern Illinois Univ.*, 388 F.3d 559, 569 (7th Cir. 2004) (holding that an undeveloped argument is forfeited). It will be too late for the City to raise arguments for the first time in reply, *Costello v. Grundon*, 651 F.3d 614, 635 (7th Cir. 2011) (reversing summary judgment granted on issue raised in a reply).

Defendants' decision to challenge a limited theory of recovery that Savory does not actually assert leaves Defendants unable to satisfy their burden at summary judgment. At this stage, the moving party bears the initial burden of establishing the absence of genuine disputes of material fact for trial. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); 10A Wright & Miller, Federal Practice & Procedure §2727.1, at 455-56 (4th ed. 2016) ("The movant is held to a stringent standard."). The movant "cannot sustain its burden merely by denying the allegations in the opponent's pleadings, or merely by asserting that the nonmovant lacks evidence to support its claim." *Id.* If the moving party neither offers evidence to negate an element of the nonmovant's claim, nor points to evidence establishing that the nonmovant cannot satisfy its trial burden, then the moving party fails to satisfy its initial burden, the burden does not shift to the non-moving party, and summary judgment must be denied, even without a responsive brief. *Adickes*, 398 U.S. at 160 ("Because respondent did not meet its initial burden of establishing the absence of a policeman in the store, petitioner here was not required to come forward with suitable opposing affidavits."); *Sterk*, 770 F.3d at 627.

These bedrock principles apply here. Defendants have recast Savory's theories in an arbitrary manner that suits their summary judgment arguments. In particular, they have not addressed the claim that they violated Savory's Fifth Amendment rights when the involuntary statements they extracted were used during Savory's criminal proceedings other than at his 1977

trial; and they have not addressed the claim that they violated Savory's Fourteenth Amendment rights when statements that they fabricated and attributed to him were used in his criminal case other than at his 1981 trial. Moreover, and importantly, Defendants do not explain anywhere *why* they have limited their arguments this way. As a consequence, they have not met their initial burden of negating an element of Savory's claims or of showing that there is no material fact disputed. *Celotex*, 477 U.S. at 323.

*Second*, to the extent Defendants suggest Savory's 1981 conviction is "still intact," OB-42, and make arguments based on that assertion, OB-49-54 (discussing preclusion), their position must be rejected because it contradicts the *en banc* Seventh Circuit's mandate in this case. This Court "is required to comply with the express or implied rulings of the appellate court." *Waid v. Merrill Area Public Schools*, 130 F.3d 1268, 1272 (7th Cir.1997). Before the *en banc* Seventh Circuit, Defendants argued that Savory's pardon did not set aside his 1981 conviction, see *Savory*, 947 F.3d at 417-18 & n.5, 428-30, and the Seventh Circuit expressly rejected that argument, holding that "Savory's conviction was set aside with this pardon," *id.* at 430. The *en banc* Court also chided Defendants for taking a position at argument inconsistent with their own briefs, noting that "the defendants conceded on page one of their brief on appeal that the pardon set aside Savory's conviction;" To foreclose any doubt—and the arguments Defendants advance here—the Court emphasized that the issue "is not open to relitigation on remand." *Id.*

Defendants argue throughout their summary judgment motion, beginning by repeatedly emphasizing the point in the introduction, that Savory's conviction is intact and has preclusive effect—as if the *en banc* Seventh Circuit had not already rejected their position—and they do so without even alerting this Court to the fact that the Seventh Circuit expressly directed them not to make the argument they now make on remand. That is inconsistent with Defendants' duty of

candor to the Court. *Beam v. IPCO Corp.*, 838 F.2d 242, 249 (7th Cir. 1988). This Court must reject Defendants' invitation to decide summary judgment in a manner that contradicts the *en banc* Seventh Circuit's holding in this case—Savory's 1981 conviction *has* been set aside and can have no collateral effect in this case, as discussed in more detail below. See Argument III(E) *infra*.

Defendants have offered no argument for summary judgment that addresses the true breadth of Savory's claims, their limitation of the claims means they cannot meet their summary judgment burden, and the arguments they do make contradict the Seventh Circuit's mandate. It is Defendants' responsibility as the moving party to explain why summary judgment is warranted on all claims against each of them, and they have not done so. *Adickes*, 398 U.S. at 160. This Court should deny summary judgment for that reason alone.

**B.    Defendants' Have Waived and Forfeited Arguments At Summary Judgment, and So A Trial Will Occur No Matter What**

In addition, Defendants have waived and forfeited arguments on a number of Savory's claims and theories in the case, such that the case must proceed to trial on those theories. With respect to waiver, Defendants expressly conceded in their summary judgment brief that material disputes of fact preclude summary judgment on Savory's claim that Defendants fabricated his confession, in violation of the Fourteenth Amendment, OB-68 (excluding Savory's "fabricated confession claim" from the arguments), and Savory's separate claim that they coerced an involuntary confession from Savory, which was used in criminal proceedings, in violation of the Fifth Amendment, OB-69 ("Defendants do not dispute that [Savory's] confession was involuntary"). See Argument III *infra*.[13]

---

[13] While Defendants untimely raised a meritless absolute immunity argument relating to the claim that they fabricated Savory's confession, Dkt. 315, which Savory contends is waived, see Argument III(D) *infra*, and while they argue contrary to law that they are entitled to qualified immunity on the Fifth Amendment claim, see Argument III(C) *infra*, those immunity arguments do not change the fact that Defendants have conceded

In addition, Defendants do not include any argument in their motions regarding a number of Savory's theories that they violated his right to a fair trial, in violation of the Fourteenth Amendment. They do not make any argument for summary judgment on Savory's theories that:

- Defendants suppressed evidence regarding their fabrication of Savory's confession and extrinsic evidence regarding Savory's interrogation and confession, see Argument IV(A)(1) *infra*;
- Defendants fabricated the murder weapon used in the crime and fabricated that blood was found on that murder weapon, see Argument IV(B)(2) *infra*;
- Defendants fabricated evidence that Savory's pants had blood on them, see Argument IV(B)(2) *infra*;
- Defendants suppressed evidence that alternative suspect William Douglas had threatened to kill Cooper and Robinson's mother and was considered the sole suspect in the murders until just a few days before Defendants inexplicably turned their attention to Savory, see Argument IV(A)(3) *infra*;
- Defendants suppressed evidence regarding statements provided by the Ivys incriminating Savory, including information that could have been used to impeach the Ivys and Defendants and tactics that Defendants had used on the Ivys, see Argument IV(A)(2) *infra*; and
- Defendants conspired with one another and with third parties to violate Savory's rights, see Argument VIII *infra*.[14]

Because Defendants do not move for summary judgment on the claims and theories listed above, they are not entitled to summary judgment on those claims and theories. Defendants *each* bear the burden of showing that there is no evidence on which a reasonable jury could find for Savory on *any of* his claims against *each* of them. *Celotex Corp. v. Catrett*, 477 U.S. 317, 331-32 (1986). In other words, the fact that Defendants have not moved for summary judgment on certain theories means those theories must be tried. *Id.* at 332 ("Plainly, a conclusory assertion that the nonmoving party has no evidence in insufficient….[A] party who moves for summary judgment . . . must affirmatively show the absence of evidence in the record."); *Titran v. Ackman*, 893 F.2d

---

that material disputes of fact preclude summary judgment on the question whether they violated Savory's Fifth and Fourteenth Amendment rights when they manufactured and extracted a false confession.

[14] Defendants were plainly on notice of each of these theories, because they were pleaded in Savory's complaint and set out in detail in Savory's responses to their interrogatories.

145, 148 (7th Cir. 1990) ("When a party moves for summary judgment on ground A, the opposing party need not address grounds B, C, and so on; the number of potential grounds for (and arguments against) summary judgment may be large, and litigation is costly enough without requiring parties to respond to issues that have not been raised[.]"); see also *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th Cir. 2006).

Any arguments Defendants might have made for summary judgment on the above theories are now forfeited, and it will be too late for Defendants to raise them in reply. *Costello v. Grundon*, 651 F.3d 614, 635 (7th Cir. 2011) (reversing summary judgment granted on issue raised in a reply). This Court should deny summary judgment on the claims and theories that Defendants have waived and forfeited.

## II.    THE SEVENTH CIRCUIT DICTATES THAT THIS COURT NEED NOT PARSE THEORIES OF LIABILITY AT SUMMARY JUDGMENT IN A FAIR TRIAL CASE

Defendants' decision to concede and not to contest Savory's fair trial constitutional theories set out above has an additional consequence. The Seventh Circuit has directed that courts at summary judgment need not weed through theories of liability nor parse items of evidence once it has been established that there is a material dispute of fact about whether a Defendant contributed to violating a plaintiff's right to a fair trial. See *Goudy v. Cummings*, 922 F.3d 834, 844 (7th Cir. 2019) (holding that once it is established at summary judgment that a trial is required on due process theories, the court "need not and do[es] not address [the plaintiff's] allegation that the alleged [additional theory of liability] independently constituted a basis for liability"); see also *Camm v. Faith*, 937 F.3d 1096, 1108–09 (7th Cir. 2019) ("It's worth noting that while the parties sometimes refer to three '*Brady* claims,' it's more accurate to say that [the plaintiff] has a single

*Brady* claim alleging the suppression of three baskets of evidence."); *Goudy*, 922 F.3d at 838 (stating that "[i]t is important to clarify that although the parties occasionally refer to [the plaintiff's] '*Brady* claims' or 'identification procedure claim,' his allegations do not give rise to separate *claims* under section 1983. [The plaintiff] has presented a single claim: that the defendants are liable for causing him to receive an unfair trial in violation of his due process rights"); *id.* (holding that "all defendants who can be shown to have 'suppressed' evidence in violation of *Brady* . . . should be liable for the aggregate impact on the outcome of the trial [the plaintiff] ultimately received.")

As a result, once this Court decides Savory has shown a genuine dispute of fact on any of his fair trial theories against a Defendant, it can move forward with a trial on Savory's fair trial claims without exploring every argument made by Defendants in their motion, and it can deny summary judgment on that basis. This Court need not parse every theory addressed in Defendants' motion and below to conclude that a trial against each Defendant is necessary and to deny summary judgment. Given that Defendants waive and forfeit a number of fair trial theories, this Court need not belabor the analysis of Savory's different theories and their supporting evidence. In light of these Seventh Circuit precedents, this Court should simply deny the motions and proceed to trial.

## III.   DEFENDANTS' ARGUMENTS FOR JUDGMENT ON SAVORY'S FIFTH AND FOURTEENTH AMENDMENT CONFESSION CLAIMS LACK MERIT

Savory contends that Defendants coerced involuntary statements from him, which were used throughout Savory's criminal prosecution, in violation of the Fifth Amendment. Separately, he contends that Defendants fabricated the confession used throughout his criminal proceedings, in violation of the Fourteenth Amendment. These are two independent constitutional theories of liability. The Fifth Amendment theory provides that police who coerce a criminal defendant to provide an involuntary statement that is used in criminal proceedings violate the right to be free of

123

compelled self-incrimination. *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973). The Fourteenth Amendment theory holds that "a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of [his] liberty in some way.'" *Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017) (citing *Mooney v. Hollohan*, 294 U.S. 103, 112 (1935); *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012)). Both claims must be tried.[15]

A.    **Defendants Forfeit Arguments Relating to Parts of Savory's Confession Claims**

As discussed, Defendants chose to limit their arguments regarding Savory's Fifth Amendment claim to his 1977 conviction and their arguments about Savory's Fourteenth Amendment claim to his 1981 conviction, when in reality Savory's Fifth and Fourteenth Amendment claims each concern all of Savory's criminal proceedings, including both of his convictions. See Argument I(A) *supra*. Defendants do not explain anywhere why they have limited their arguments, and therefore they have forfeited any argument about why Savory's claims should be so limited. See Argument I(A) *supra*.

Because Defendants have forfeited any argument about why Savory's claims would be limited to particular convictions, Savory does not address the issue in detail—Defendants must be held to their forfeiture. *Smith*, 388 F.3d at 569; *Costello*, 651 F.3d at 635. Nonetheless, for the sake of completeness, an involuntary confession extracted by police violates the Fifth Amendment whenever it is used in any way in criminal proceedings, not only at trial. *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1026-27 (7th Cir. 2006) (finding that a confession is "used" in a criminal

---

[15] Savory's separate substantive due process claim pleaded in his complaint, still a different Fourteenth Amendment theory, related solely to the brutality of his interrogation—and not to the use of his confession or the fabrication of statements introduced in the criminal case. As mentioned in the first footnote, Savory is no longer pursuing that claim, and so this Court need not address Defendants' arguments on that claim on pages 74-77 of their brief, OB-74-77.

case when it is introduced in early stages to kick off the criminal case); *Hurt v. Wise*, 880 F.3d 831, 845 (7th Cir. 2018) ("It is enough that the statement was used against [the plaintiff] in a probable cause affidavit and in a pre-trial hearing."). Similarly, on Savory's claim that Defendants fabricated a confession, in violation of the Fourteenth Amendment, "a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty *in some way*." *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012) (emphasis added). As a factual matter, the summary judgment record contains evidence, set out above, that Defendants used Savory's false confession at all stages of his criminal case—to obtain charges against him, to indict him, to hold him pending trial, to convict him the first time, and to convict him the second time. See Statement V, VII, X *supra*.

### B. Defendants Concede Their Extraction of Incriminating Statements and Fabrication of a Confession Violated Savory's Fifth and Fourteenth Amendment Rights

As discussed, Defendants concede that genuine disputes of fact preclude summary judgment on the question whether their conduct violated Savory's constitutional rights on both the Fifth Amendment claim that they extracted an involuntary confession and on the Fourteenth Amendment claim that they fabricated the confession. See Argument I(B) *supra*.

Defendants correctly concede that a jury must decide whether Defendants fabricated Savory's confession and whether they coerced him to provide involuntary statements that were used against him in criminal proceedings. There is no question that the record, construed for Savory and drawing inferences for him, demonstrates that Defendants used extraordinarily abusive and illegal interrogation tactics on a profoundly vulnerable child, resulting in involuntary statements, and that they fabricated false statements that they attributed to him though they knew those statements were false.

Defendants conducted a custodial interrogation of Savory at the Peoria Police Department based on non-existent evidence and despite compelling evidence pointing to another person as the perpetrator. The interrogation process lasted for over 30 hours. Defendants, who were experienced, sophisticated police officers, questioned Savory, tag-team style and relentlessly, over many of those 30-plus hours. They refused to accept his repeated denials of any involvement in the deaths of his friend and his friend's sister. Savory repeatedly asked to go home, but Defendants ignored those requests. Defendants made Savory believe that the only way the questioning would stop would be if he would admit guilt and that he would be allowed to go home if admitted guilt. They watched as Savory became tearful and grew desperate. They subjected Savory to two bogus polygraph examinations and falsely told him the polygraphs proved him to be a murderer and liar. (Defendants had falsely told Savory he could go home if he agreed to submit to the polygraphs.) Defendants forced Savory to strip naked and plucked hair samples from his torso, including his pubic region, even as they continued to question him. They deprived him of sufficient sleep and nourishment. The confession they eventually extracted from Savory was elicited via leading questions to which Savory assented; Savory was never capable of providing a narrative confession. See Statement V *supra*.

Savory was just 14 years old. His mother had died when he was an infant and Savory was being raised by his chronically alcoholic father. He was enrolled in Peoria's Late Afternoon School because of his behavioral issues and his poor academic performance. Savory's father made a brief visit to the Peoria Police Department during the early stages of Savory's interrogation, but that visit ended with the father exploding in anger and walking out. No "friendly adult" was at Savory's side for any portion of the interrogation. See Statement V *supra*.

126

Defendants' concession that the record shows a dispute of facts about whether they violated Savory's Fifth and Fourteenth Amendment rights has a critical effect at this stage of the case: Defendants admit for purposes of summary judgment that their conduct violated the constitution, and so a trial must occur on those claims unless there is some other legal reason those claims cannot proceed. Defendants offer just three such legal arguments: (1) they argue contrary to all applicable law that they are entitled to qualified immunity on the claim that the use of Savory's confession at his 1977 trial violated the Fifth Amendment because the law was not clearly established at that time, OB-69-74; (2) they untimely assert they are entitled to absolute testimonial immunity on the claim that the use of Savory's confession at his 1977 trial violated Savory's Fifth Amendment rights, an argument that is waived and that conflicts with Seventh Circuit law, Dkt. 315; and (3) they argue Savory is precluded from arguing that their fabricated incriminating statements caused his 1981 conviction because, in their view, that conviction remains intact, an argument that the *en banc* Seventh Circuit has rejected already in this case and ordered Defendants not to make again on remand, OB-49-54. This Court should reject Defendants' immunity and preclusion arguments on these claims.

### C.    Defendants Are Not Entitled to Qualified Immunity on the Fifth Amendment Confession Claim

Defendants are not entitled to qualified immunity on Savory's Fifth Amendment claim. First, Savory preserves the argument that police officers are not entitled to immunity under § 1983. Second, it was clearly established in 1977 that police could not use the tactics Defendants used here to extract a confession from a child—both as a general proposition and considering the particular tactics and susceptibilities at issue in this case. Third, even if there were some ambiguity in the law, it was beyond obvious to Defendants that their conduct was illegal.

127

## 1. Police Officers Are Not Entitled to Qualified Immunity

Defendants are not entitled to qualified immunity on any of Savory's claims because there is no statutory or common law basis to afford immunity to police officers who are sued under § 1983 for violations of the constitutional rights of civilians. This Court should reject Defendants' immunity arguments for that reason alone.

The Supreme Court has said that "statutory interpretation, as we always say, begins with the text," *Ross v. Blake*, 578 U.S. 632, 638 (2016), and the U.S. code version of the text of § 1983 is clear: "Every person who, under color of any statute . . . subjects . . . any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities . . . shall be liable to the party injured in an action at law." 42 U.S.C. § 1983 (emphasis added). The word "shall" typically means "must." *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171, (2016) ("Unlike the word "may," which implies discretion, the word "shall" usually connotes a requirement."); *Lopez v. Davis*, 531 U.S. 230, 241 (2001) (explaining that "shall" connotes a mandatory duty is used by Congress "to impose discretionless obligations"). The statutory text does not permit a construction where the statute says that the officer *must* be liable, but courts read that to mean *may* be liable only if the law was "clearly established" at the time of the conduct. In fact, Congress does not mention immunity in the statute at all, and the judicially created two-step qualified immunity test "cannot be located in § 1983's text and may have little basis in history." *Hoggard v. Rhodes*, 141 S. Ct. 2421, 2421 (2021) (Thomas, J., respecting denial of certiorari). Qualified immunity thus contradicts the text of § 1983.

But making matters worse, qualified immunity is actually expressly foreclosed by the actual text of § 1983 that did not make it into the U.S. Code. Qualified immunity arises from the premise that Congress did not intend to abrogate existing common-law immunities when it first

passed § 1983 in 1871. *E.g.*, *Pierson v. Ray*, 386 U.S. 547, 556-57 (1967). But it turns out that

premise is wrong. See Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 CAL.

L. REV. 201 (2023). As passed by the Reconstruction Congress, Section 1 of the Civil Rights Act

of 1871—now known as § 1983—provided:

> [A]ny person who, under color of any law, statute, ordinance, regulation, custom, or usage
> of any State, shall subject, or cause to be subjected, any person within the jurisdiction of
> the United States to the deprivation of any rights, privileges, or immunities secured by the
> Constitution of the United States, shall, **any such law, statute, ordinance, regulation,
> custom, or usage of the State to the contrary notwithstanding**, be liable to the party
> injured in any action at law, suit in equity, or other proper proceeding for redress.

Civil Rights Act of 1871, ch. 22, § 1, 17 Stat. 13 (1871) (emphasis added).

The italicized notwithstanding clause in Congress's originally promulgated text of § 1983

expressly displaces common-law defenses—it states that common law immunities will *not* protect

state actors from suit under § 1983. Reinert, *supra* at 235 & n.230. But the notwithstanding clause

was accidentally omitted from the first compilation of the law in 1874, and it has been missing—

but never amended—from then until 2023. Reinert, *supra* at 207, 236-37, 244. Today, we know

that "the Supreme Court's original justification for qualified immunity—that Congress wouldn't

have abrogated common-law immunities absent explicit language—is faulty because the 1871

Civil Rights Act *expressly included such language*." *Rogers v. Jarrett*, 63 F.4th 971, 980 (5th Cir.

2023) (Willett, J., concurring). As a result, "modern immunity jurisprudence is not just atextual

but *counter*textual." *Id.*

Lastly, even if there were no textual argument against qualified immunity, there is nothing

in the common law of 1871 that would permit the conclusion that police officers who violated the

constitutional rights of civilians enjoy immunity from suit. See *Ziglar v. Abbasi*, 137 S. Ct. 1843,

1871-72 (2017) (Thomas, J., concurring) (citing William Baude, *Is Qualified Immunity Unlawful?*,

106 CALIF. L. REV. 45 (2018)); *Kislea v. Hughes*, 138 S. Ct. 1148 (2018) (Sotomayor, J.,

dissenting); *Richardson v. McKnight*, 521 U.S. 399 (1997). An officer who maliciously prosecuted an innocent individual based on false evidence would certainly have been subject to suit at common law in 1871. See generally *Thompson v. Clark*, 596 U.S. 36, 43-44 (2022). A fiction that Congress afforded common-law immunity to officers who commit such misconduct without saying so stretches the judge-made conception of qualified immunity far beyond its breaking point.

This Court is bound to apply the statutory text of § 1983. Based on that text, Defendants are not entitled to qualified immunity.

### 2.    It Was Clearly Established In 1977 That the Tactics Used to Coerce Savory's Confession Were Unconstitutional

Regardless, Defendants are not entitled to qualified immunity on Savory's Fifth Amendment claim. At this stage of the case, Defendants are entitled to immunity only if they show (1) that the facts construed for Savory do not establish a constitutional violation, or (2) that Savory's Fifth Amendment rights were not clearly established. *Hurt v. Wise*, 880 F.3d 831, 840-41 (7th Cir. 2018). As discussed, Defendants have conceded question (1)—that there is evidence in the summary judgment record on which a reasonable jury could decide that Defendants violated Savory's Fifth Amendment rights when they extracted an involuntary confession from him that was used against him in his criminal case. See Argument I(B) *supra*. Accordingly, Defendants' only argument is on question (2)—that the law governing Savory's Fifth Amendment claim was not clearly established.

On that point, "the salient question is whether the state of the law at the time of an incident provided 'fair warning' to the defendants that their alleged conduct was unconstitutional." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (cleaned up). The Supreme Court's "cases illustrate the importance of drawing inferences in favor of the nonmovant [Savory], even when, as here, a court decides only the clearly-established prong of the standard. ... Accordingly, courts must take care

not to define a case's 'context' in a manner that imports genuinely disputed factual propositions." *Id.* at 657.

In other words, Savory gets the benefit of every inference and to have the record construed in his favor as the Court assesses whether Defendants' conduct violated clearly established law and should be immunized. The Court must presume that Savory was an innocent 14-year-old; that he was kept in custody for over 30 hours and was interrogated more or less continuously during the afternoon and evening of January 25 and throughout the day and evening of January 26; that his protestations of innocence were ignored; that he was reduced to tears; forced to strip naked as Defendants continued their questioning; led to believe questioning would only stop if he confessed; led to believe he could go home if he confessed; that he was relentlessly questioned by multiple interrogators; and that he faced all of this brutality and more while alone with no friend, relative or counselor.

Defendants would like the Court to assume the contrary: that their interrogation was cabined into neat segments that conform to their self-serving reports and testimony. *See* OB at 70-71. This the Court may not do. Savory has his own account of what happened, and the Court must view the record in *Savory's* favor at this stage. But just as clearly, the treatment and interrogation of this 14-year-old is deeply disturbing by any account, making particularly apt in this case the Seventh Circuit's admonition that "when the facts must be taken in the light most favorable to the plaintiffs, and when an interrogation is infected with numerous problems, a full trial may be necessary before a final characterization of the process is possible." *Hurt v. Wise,* 880 F.3d 831, 847 (7th Cir. 2018).

The Supreme Court made clear as early as 1936 that the Constitution is violated when involuntary statements compelled by state actors are used against a defendant in criminal

proceedings. *Brown v. Mississippi*, 297 U.S. 278 (1936). Accordingly, by the time of Savory's interrogation, Supreme Court cases stretching back more than half a century put Defendants on notice that compulsory self-incrimination violates the Fifth and Fourteenth Amendments. *E.g.*, *Malloy v. Hogan*, 378 U.S. 1, 6 (1964) (13 years earlier); *Brown*, 297 U.S. 278 (40 years earlier) *Bram v. United States*, 168 U.S. 532, 542 (1897) (80 years earlier).

Moreover, well before 1977, the Supreme Court held that the voluntariness of a confession must be assessed considering the totality of the circumstances, including not just the specific interrogation techniques employed, but the specific characteristics and vulnerabilities of the interrogation subject. *Schneckloth v. Bustamonte,* 412 U.S. 218, 227 (1973) ("In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.") No single factor, standing alone, is determinative. *Id.* at 228; see also *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960) (holding before Savory's interrogation that the voluntariness inquiry "must be broad"); *Kerr v. City of Chicago*, 424 F.2d 1134, 1138 (7th Cir. 1970) ("To consider whether the confession was voluntary, it is necessary for the jury to be allowed to consider all relevant facts regarding the circumstances under which a confession from the plaintiff was obtained.").

In this case Defendants employed multiple interrogation tactics that the Supreme Court and lower courts had found coercive well before Savory's 1977 interrogation:

*First,* Savory is innocent, and Defendants had no meaningful evidence that he committed the murders. To the contrary, Defendants possessed a significant body of evidence that another person, William Douglas, was the perpetrator. In 1977, it was clearly established that interrogators should not undertake a relentless interrogation with the single aim of securing a confession. *Spano*

*v. New York*, 360 U.S. 315, 324 (1959) ("The police were not therefore merely trying to solve a crime, or even to absolve a suspect. They were rather concerned primarily with securing a statement from defendant on which they could convict him. The undeviating intent of the officers to extract a confession from petitioner is therefore patent. When such an intent is shown, this Court has held that the confession obtained must be examined with the most careful scrutiny.")

*Second,* Defendants held Savory in custody from the afternoon of January 25 until he confessed in the evening of January 26, a total of over 30 hours, and, by Savory's telling, questioned him continuously through the late afternoon and evening of January 25 (except for a trip to the Jenkins polygraph office) and throughout the day on January 26 (with a break for lunch and a trip to and from the polygraph office). In 1977, many Supreme Court cases had clearly established that such protracted custody and interrogation can render a confession involuntary. *See, e.g., Spano*, 360 U.S. at 324 (custody and interrogation from 7 p.m. until 4 a.m. the following morning contributed to involuntariness of the confession; "slowly mounting fatigue does, and is calculated to, play its part"); *Haley v. Ohio,* 332 U.S. 596, 599–601 (1948) (confession that resulted from interrogation from midnight till dawn was involuntary); *Blackburn v. Alabama,* 361 U.S. 199 (1960) ("A prolonged interrogation of an accused who is ignorant of his rights and who has been cut off from the moral support of friends and relatives Is not infrequently an effective technique of terror."); *Payne v. Arkansas,* 356 U.S. 560, 563 (1958) (rejecting a confession that resulted from approximately 36 hours of incommunicado detention without charging, from 11 a.m. on October 5 until the afternoon of October 7); *U.S. ex re. Williams v. Fay*, 323 F.2d 65, 66 (2d Cir. 1963) (confession involuntary where confession resulted from nearly eighteen hours of virtually continuous interrogation).

*Third,* Defendants deprived Savory of adequate nourishment and sufficient sleep. His dinner on January 25 consisted of a soda and a candy bar; lunch on January 26 was a hamburger; the night of January 25 Savory attempted sleep for no more than six hours on a concrete slab covered by a 2" Styrofoam mattress. It was established in 1977, that deprivation of sleep and food could contribute to an involuntary confession. *See Payne v. Arkansas,* 356 U.S. 560, 563 (1958) (in finding a confession involuntary, the Court noted that the interrogation subject had been given just two sandwiches after 25 hours followed by breakfast the next morning); *Haley v. Ohio,* 332 U.S. 596, 599, 601 (1948) (interrogation "through the night" produced an involuntary confession); *Spano,* 360 U.S. at 322 ("slowly mounting fatigue" contributed to involuntariness as the arrested person was interrogated from 7 p.m. to 4 a.m.).

*Fourth,* multiple Defendants questioned Savory in rapid-fire, tag team fashion, refusing to accept Savory's denials of culpability, accusing him of lying and leaving Savory evidently confused and unable to think clearly. It was established in 1977 that this style of questioning could coerce a confession. *See Culombe v. Connecticut,* 367 U.S. 568, 602 (1961). (whether a confession is voluntary turns on "the duration and conditions of detention…, the manifest attitude of the police toward [the subject], his physical and mental state, the diverse pressures which sap or sustain his powers of resistance and self-control"); *Haley,* 332 U.S. at 598 (confession involuntary were the subject was interrogated by "five or six" police working "in relays of one or two each"); *Mincey v. Arizona,* 437 U.S. 385, 398 (1978) (confession involuntary where the suspect "was evidently confused and unable to think clearly"); *People v. Schwartz*, 3 Ill.2d 520, 522 (1954) (suppressing a confession based on the dispositive fact that the defendant "did not understand the terms used, and [] '[interrogator] was throwing the questions too fast at me and he got me all confused'").

134

*Fifth,* Defendants made Savory believe that the only way he could make the interrogation stop would be to confess and that, if he were to confess, he would be permitted to go home. It was established before 1977 that such a promise of leniency in combination with the threat of endless interrogation would render the resulting confession involuntary. *See People v. Peck,* 309 N.E.2d 356, 348 (Ill. App. Ct. 1974) (Where the interrogation subject was told he would be allowed to go home if he gave a statement, the court held: "A statement which is given in consideration of promises of leniency or immunity is not voluntary and not admissible in evidence."); *People v. Koesterer*, 358 N.E.2d 295, 297 (Ill. App. Ct. 1976) (confessions made after "inducement or promises of any kind, *no matter how slight*," are not voluntary) (emphasis added); *People v. Campbell*, 359 Ill. 286, 291 (1935) ("It is an established rule that a confession obtained by promise or hope of reward is not admissible in evidence."); *U.S. ex rel. Williams v. Fay*, 323 F.2d 65, 66 (2d Cir. 1963) (interrogators "intimation … that they would allow [the subject] to see his mother, for whom he had already asked several times, and a chaplain, if he confessed" contributed to a finding of involuntariness).

*Sixth,* Savory was incapable of providing a narrative account of his supposed commission of the murders; instead, he had to be "worded along," assenting to the facts and details that Defendants provided him. It was established before 1977 that the need to elicit a confession in this manner is a sign of coercion. *See Fikes v. Alabama,* 352 U.S. 191, 195 (1957) (the fact that defendant had "responded chiefly in yes-or-no answers to [the police] questions, some of which were quite leading or suggestive" was a factor supporting the Court's finding that the confession was involuntary); *Spano,* 360 U.S. at 322 (relevant factor in voluntariness analysis was that defendant "did not make a narrative statement, but was subject to the leading questions of a skillful prosecutor in a question and answer confession").

135

*Seventh,* and of great importance, Defendants employed all these tactics *against a 14-year-old boy who faced his interrogators alone with no parent, guardian, friend, relative or other supportive adult.* It was clearly established before 1977 that the age and vulnerability of the interrogation subject bear on the voluntariness of a confession. The Supreme Court observed in 1967 that "special caution" must be taken when assessing the voluntariness of a juvenile confession, particularly when there is prolonged or repeated questioning or where the interrogation occurs in the absence of a parent, lawyer, or other friendly adult. *In re Gault,* 387 U.S. 1, 45 (1967) ("If counsel was not present for some permissible reason when an admission was obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair."); *Gallegos v. Colorado,* 370 U.S. 49, 53–55 (1962) (confession suppressed because it was taken in the absence of "an adult relative or friend." "Adult advice would have put him on a less unequal footing with his interrogators. Without some adult protection against this inequality, a 14-year-old boy would not be able to know, let alone assert, such constitutional rights as he had.")

The observations of the Supreme Court in its 1948 decision reversing the conviction of a 15-year-old and finding his confession involuntary apply with full force to Defendants' interrogation of Savory:

> What transpired would make us pause for careful inquiry if a mature man were involved. And when, as here, a mere child—an easy victim of the law—is before us, special care in scrutinizing the record must be used. Age 15 is a tender and difficult age for a boy of any race. He cannot be judged by the more exacting standards of maturity. That which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens. This is the period of great instability which the crisis of adolescence produces. A 15-year-old lad, questioned through the dead of night by relays of police, is a ready victim of the inquisition. Mature men possibly might stand the ordeal from midnight to 5 a.m. But we cannot believe that a lad of tender years is a match for the police in such a contest. He

136

> needs counsel and support if he is not to become the victim first of fear, then of panic. He needs someone on whom to lean lest the overpowering presence of the law, as he knows it, crush him. No friend stood at the side of this 15-year-old boy as the police, working in relays, questioned him hour after hour, from midnight until dawn. No lawyer stood guard to make sure that the police went so far and no farther, to see to it that they stopped short of the point where he became the victim of coercion. No counsel or friend was called during the critical hours of questioning.

*Haley,* 332 U.S. at 599–601.

Defendants seem to believe that they are entitled to immunity because Savory was not physically abused or threatened with physical violence during his many hours of interrogation. *See* OB at 71-72. To the contrary, as the Supreme Court held in 1960, coercion "can be mental as well as physical…the blood of the accused is not the only hallmark of an unconstitutional inquisition." *Blackburn v. Alabama*, 361 U.S 199, 206 (1960). Each interrogation must be assessed for coerciveness based on the totality of the circumstances—*i.e.,* "length of detention, repeated or prolonged use of questioning, and … psychological impact on the accused"—as the Court's decision in *Schneckloth* made clear in 1973. 412 U.S. at 225-26.

The totality of the interrogation abuse perpetrated against Savory is appalling—judged by the standards already established at the time. Savory was, in his words, "decimated," by prolonged, hostile, and relentless questioning; Defendants intimated he could go home if he confessed; Defendant Bowers called Savory a murderer and liar to his face, reducing him to tears; exhausted and hungry and nearing 30 hours of custody, this innocent 14-year-old child assented to whatever "facts" his questioners presented. Defendants cannot claim they lacked notice that the process, viewed in its entirety, was coercive and a violation of clearly established constitutional standards.

### 3.  The Illegality of Defendants' Conduct Was Obvious

Even if the law governing Savory's Fifth Amendment had not been clearly established in 1977, it was patently obvious that Defendants' use of extreme interrogation tactics to extract

incriminating statements from a child violated the constitution, which independently defeats the application of qualified immunity. The Supreme Court has long held that "official can still be on notice that their conduct violates established law . . . in novel factual circumstances", *Hope v. Pelzer*, 536 U.S. 730, 739-741 (2002), and it has recently reminded that "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question," *Taylor v. Riojas*, 141 S. Ct. 52, 53-54 (2020). The Seventh Circuit has reversed district courts who grant qualified immunity at summary judgment where the illegality of state actors' conduct is obvious. *Stockton v. Milwaukee County*, 44 F.4th 605, 621 (7th Cir. 2022).

Here, Defendants interrogated a 14-year-old for 31 hours. Savory's interrogation cannot be characterized as anything other than a relentless assault on a child, replete with false promises of leniency, the physical humiliation of striping naked in front of one of his interrogators, a barrage of confusing and rapid-fire questions, accusations that Savory was lying, a lack of adequate food and sleep, utter isolation with no adult present to protect Savory, culminating in spoon-fed answers and closed-ended questions. No reasonable police officer in 1977 would think that conduct was lawful. It obviously was not, and Defendants are not entitled to qualified immunity in any circumstance.

### D.    Defendants Are Not Entitled to Absolute Immunity on the Fourteenth Amendment Fabricated Confession Claim

Separately, Defendants argue they are entitled to absolute immunity on Savory's claim that their fabrication of his confession violated the Fourteenth Amendment. Dkt. 315. The argument was not made in Defendants' initial summary judgment motion, even though Defendants admitted that they could have made the argument but neglected to, and so it is waived at this stage of the case. *Smith*, 388 F.3d at 569.

Even if the Court reaches the argument, it is frivolous and can be quickly rejected. Defendants contend that they cannot be liable for fabricating false incriminating statements and attributing them to Savory before his criminal proceedings began because those fabricated incriminating statements were introduced at trial through the oral testimony of Defendants. In other words, Defendants contend that they immunized their own admittedly unconstitutional conduct before trial by also testifying falsely at trial. Dkt. 315. The argument is meritless, and it has been firmly rejected by the Supreme Court and Seventh Circuit.

Defendants cite to *Avery v. City of Milwaukee*, but that case firmly supports Savory's position. There, the Seventh Circuit recognized that evidence often comes in at trial through oral testimony, and it categorically rejected the proposition that witness testimonial immunity shields a state actor for a pretrial act of fabrication. 847 F.3d at 441-42. The Court expressly rejected exactly the argument Defendants make here, noting that "[i]f an officer who fabricates evidence can immunize himself from liability by authenticating falsified documentary or physical evidence and then repeating the false 'facts' in his trial testimony, wrongful-conviction claims premised on evidence fabrication would be a dead letter." *Id.*

These principles discussed in *Avery* were set out in a long line of Supreme Court and Seventh Circuit cases, which have made clear for decades that testimonial immunity does not cloak pre-trial acts of evidence fabrication in immunity simply because those fabrications were later presented by way of oral testimony at trial. *Rehberg*, 566 U.S. at 370 n.1; see also *McDonough v. Smith*, 139 S. Ct. 2149, 2154 (2019) (where the Court recognized that a claim that falsified affidavits, witness coaching, and a bogus DNA analysis fabricated before trial violated the Constitution when that evidence was later introduced though witness testimony); *Buckley v. Fitzsimmons*, 509 U.S. 259, 262-64, 272-76 (1993) (approving a fabrication claim where physical

evidence of a boot print was fabricated before trial and then introduced through the testimony of a witness at trial); *Patrick v. City of Chicago*, 974 F.3d 824, 835-36 (7th Cir. 2020) (affirming a due process fabrication verdict against multiple defendants where a plaintiff's coerced confession and a fabricated lineup report were introduced at the criminal trial in the form of oral testimony); *Anderson v. City of Rockford*, 932 F.3d 494 (7th Cir. 2019) (holding that summary judgment not available where police officer fabricated witness statements before trial and then instructed witnesses to testify consistent with those fabricated statements at trial); *Stinson v. Gauger*, 868 F.3d 516, 528 (7th Cir. 2017) (*en banc*) (due process violated when police collude with a witness to fabricate expert testimony before a criminal trial and the fabrication is later introduced as trial testimony); *Whitlock*, 682 F.3d at 582-84 (due process violated when witness testimony fabricated by police before trial is introduced at trial by an immune prosecutor).

To the extent Defendants contend that they are not liable because they testified orally about the statements they fabricated, rather than having their reports documenting those fabricated statements introduced at trial, that distinction makes no difference. Courts have expressly rejected this argument. *Taylor v. City of Chicago*, 2021 WL 4401528, at *7 (N.D. Ill. Sept. 27, 2021) ("Although the report itself was not admitted into evidence, as the Court has previously noted, the contents of the fabricated report certainly were."). During criminal proceedings, Defendants regurgitated the fabricated statements contained in their reports written before trial into the record via their own oral testimony. A jury must consider the claim that Defendants' pre-trial fabrication of false incriminating statements violated Savory's due process rights when the fabrications were used against Savory during his criminal proceedings.[16]

---

[16] Defendants rely on *Brown v. City of Chicago*, 633 F. Supp. 3d 1122, 1159-60 (N.D. Ill. 2022), which is wrongly decided. There, police officers testified about evidence outlined in fabricated reports on the stand at trial, but the district court held that these fabrication claims could not proceed because the witnesses

### E.    Savory Is Not Precluded from Arguing That Defendants' Fabrication of His Confession Violated the Fourteenth Amendment

Finally, this Court should reject Defendants' argument that Savory is precluded from arguing that their fabrication of his confession violated his Fourteenth Amendment right to due process. The argument is premised on the contention that Savory's 1981 conviction remains intact, which directly contradicts the *en banc* Seventh Circuit's mandate and its admonition to Defendants that this issue was not open to re-litigation on remand—holdings Defendants do not even mention. Savory's conviction was vacated by the pardon. Without an intact judgment in the state criminal judgment in the case, there is no judgment that might have preclusive effect. Moreover, even if that were not the case, Defendants are incorrect on the law and the facts.

During the oral argument in the Seventh Circuit, Defendants argued, just as they argue now, that the judgment of conviction in Plaintiff's criminal case remains intact. *Savory v. Cannon*, 947 F.3d 409, 428 (7th Cir. 2020) (*en banc*). They hoped to establish that Plaintiff's entire suit, if not untimely, remains barred by the rule of *Heck v. Humphrey*, 512 U.S. 477 (1994), which prohibits civil claims that conflict with an extant conviction. *Savory*, 947 F.3d at 428. The *Heck* rule is itself a preclusion rule. *Id.* at 419 ("The *Heck* bar accounts for the preclusive effect of state court criminal judgments on civil litigation by lifting the bar only when the plaintiff has achieved a favorable termination of the criminal proceeding."); *see also Haywood v. Hathaway*, 842 F.3d 1026, 1029 (7th Cir. 2016) (*Heck* rule "is a version of issue preclusion (collateral estoppel), under which the outstanding criminal judgment or disciplinary sanction, as long as it stands, blocks any inconsistent civil judgment").

---

"testified to a version of evidence consistent with the reports" and were "entitled to absolute immunity" for that testimony. *Id.* That logic directly contradicts the binding Seventh Circuit law just discussed, which has repeatedly recognized that a pre-trial fabrication of evidence is actionable even though it is only introduced through witness testimony at trial, and those holdings bind this Court. The Seventh Circuit has never approved a grant of summary judgment on the grounds discussed in *Brown*.

The Seventh Circuit flatly rejected Defendants' argument that Plaintiff's conviction remains intact. *Savory*, 947 F.3d at 430 ("Savory's conviction was set aside with this pardon."). The court also rejected Defendants' argument that Plaintiff's suit could have proceeded before he was pardoned, noting that pre-pardon, his suit would have been barred by preclusion rules that do not apply post-pardon. *Id.* at 419. These holdings reflect the established rule that collateral estoppel is applicable only when a prior judicial finding is supported by an intact final judgment. *See Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1021-23 (7th Cir. 2006); *see also Evans v. Katalinic*, 445 F.3d 953, 955–56 (7th Cir.2006) (estoppel argument based on state-court decision "absurd" when there is no extant criminal judgment against the plaintiff); *Hill v. City of Chicago*, No. 06 C 6772, 2009 WL 174994, at *11-12 (N.D. Ill. Jan. 26, 2009) (collecting cases and concluding that state court denial of motion to suppress did not estop civil rights plaintiff from re-litigating the legality of his confession).

The Seventh Circuit's *en banc* holding that Plaintiff's conviction was set aside defeats Defendants' current preclusion argument. This Court must follow the Seventh Circuit's mandate on remand. *Waid v. Merrill Area Pub. Sch.*, 130 F.3d 1268, 1272 (7th Cir. 1997) ("[T]he district court is required to comply with the express or implied rulings of the appellate court."). No further analysis need be conducted. See Argument I(A) *supra*.

But even absent the Seventh Circuit's holdings, issue preclusion would not apply in this case. One reason is that collateral estoppel requires "the issue decided in the prior adjudication [to be] identical with the one presented in the suit in question," *Reed v. Illinois*, 808 F.3d 1103, 1107 (7th Cir. 2015), as amended (Dec. 11, 2015) (citation omitted). This requirement is not met here because the issue decided by Illinois Appellate Court in *People v. Savory*, 435 N.E.2d 226, 231 (Ill. App. Ct. 1982) ("*Savory* II") is far from identical to the one jury in this case will decide.

142

In *Savory II*, the appellate court was tasked with deciding whether Plaintiff still would have been convicted without the admission of his fabricated statements. In conducting that analysis, the appellate court presumed that the other evidence against Plaintiff, including the Ivys' testimony, was completely credible. *See Savory*, 435 N.E.2d at 229 ("These admissions by defendant were made at a time when the bodies had not yet been discovered and included descriptions of the victims' multiple stab wounds consistent with those depicted in photographic and other evidence of the crime scene."). The appellate court had no occasion to consider the impact on the jury of Plaintiff's fabricated statements without presuming the Ivys to be credible.

The jurors in this civil case, by contrast, will view the evidence from the criminal trial afresh when they decide whether "there is a reasonable likelihood the [fabricated] evidence affected the judgment of the [criminal case] jury." *Patrick v. City of Chicago*, 974 F.3d 824, 835 (7th Cir. 2020). Far from being stuck with a presumption that the Ivys were credible, the jurors will hear evidence that the Ivys' testimony was just as fabricated as Plaintiff's statements, and they will consider whether all of the fabricated evidence worked together to secure Plaintiff's wrongful conviction.

Moreover, even if the jurors were to conclude that the Ivys' fabricated statements were sufficient on their own to cause his conviction, they still would have the opportunity to consider how Plaintiff's fabricated statements would have impacted the criminal jury. They will be permitted to do so because, unlike in a harmless-error analysis, traditional tort principles of causation apply in Section 1983 cases. *See Whitlock v. Brueggemann*, 682 F.3d 567, 582 (7th Cir. 2012). Tort law, as every first-year law student learns, recognizes that two events which were both sufficient to cause an injury both are legal causes of the injury. *See Maxwell v. KPMG LLP*, 520 F.3d 713, 716 (7th Cir. 2008) ("There are also cases in which a condition that is not necessary, but

143

is sufficient, is deemed the cause of an injury, as when two fires join and destroy the plaintiff's property and each one would have destroyed it by itself and so was not a necessary condition; yet each of the firemakers (if negligent) is liable to the plaintiff for having 'caused' the injury."). The appellate court's harmless-error analysis was concerned only with what would have happened if Plaintiff's fabricated statements had not been admitted, meaning the issue decided and the one presented now are materially different.

Defendants' simplistic but-for causation argument ignores these tort principles and posits the disturbing argument that multiple pieces of fabricated evidence can cancel each other out and defeat causation. (Dkt. 294 at 51-52.) If Defendants' view were the law, a police officer who decides to frame someone could simply fabricate multiple damning pieces of evidence to ensure that no single act of fabrication would be a but-for cause of the conviction. The officer would thereby evade liability for acts of evidence fabrication by committing others. But fabricating two pieces of evidence violates the Constitution twice, rather than not at all, and such wrongdoing must not be incentivized.

Finally, even if Defendants were correct that the threshold elements of collateral estoppel are met here (they are not for the reasons above), this equitable doctrine still would not apply because its application would be unfair. *Sornberger*, 434 F.3d at 1022-23 ("Collateral estoppel is an equitable doctrine. Even when the technical conditions of the doctrine are met, collateral estoppel must not be applied to preclude an issue unless it is clear that no unfairness results to the party being estopped.") (citations and internal quotations marks omitted). Limiting Plaintiff's civil claims on the strength of a decision that upheld his conviction based on the Ivys' fabricated testimony would be grossly inequitable. *See Reed*, 808 F.3d at 1108 (explaining that "to deny, without a good reason, a party's right to press a potentially winning argument" is "unfair" and is

an improper application of collateral estoppel). Equity requires that a jury decide whether Defendants' fabrication of evidence against Plaintiff contributed to his wrongful conviction.

## IV.    A REASONABLE JURY COULD CONCLUDE THAT DEFENDANTS VIOLATED SAVORY'S FOURTEENTH AMENDMENT TO DUE PROCESS WHEN THEY SUPPRESSED, FABRICATED, AND DESTROYED EVIDENCE

Defendants move for summary judgment on limited portions of Savory's due process fair trial claim. But the evidence in the record supports Savory's due process claim on each of three, independent theories of liability—suppression of evidence, fabrication of evidence, and destruction of evidence.

On suppression of evidence, Defendants do not address the disputes of fact that preclude summary judgment on *any* of Savory's theories, except for the theories that they suppressed highly relevant investigative information relating to forensic evidence testing of the purported murder weapon and vaginal swabs taken from Cooper. Any arguments on suppression theories not addressed are forfeited, and Defendants' arguments on the single theory they do address fail in the face of disputed facts and get the law completely wrong. The law prohibiting Defendants' suppressions of evidence was firmly established long before 1977.

With respect to Savory's fabrication theories, Savory contends Defendants fabricated incriminating statements attributed to him, forensic evidence that supposedly connected him to the crime, and statements from the Ivys implicating Savory. Defendants discuss only the last of these three theories, again forfeiting any argument about the others. And Defendants' argument that they did not knowingly fabricate the Ivys' statements is based on a version of the facts that impermissibly construes the record untenably in Defendants' own favor.

Finally, on his destruction of evidence theories, Savory has amassed evidence that Defendants destroyed a piece of blue pants that they falsely said had tested positive for blood and

145

that they used to implicate Savory in the crime, and hairs found in the victims' hands. Defendants did so in bad faith, and the evidence they destroyed was plainly exculpatory. Defendants are not entitled to immunity on this theory, and it must be tried as well.

A.     **A Reasonable Jury Could Conclude That Defendants Suppressed Material Exculpatory and Impeachment Evidence**

This Court should deny summary judgment on Savory's evidence suppression due process theories. As discussed at the outset, in their motion, Defendants discuss only their suppression of documents revealing that the knife tested negative for blood and that sperm was found on the vaginal swabs take from Cooper, and they ignore every one of Savory's other suppression theories. See OB-54-60. As a result, Defendants have forfeited any argument on all of Savory's other suppression theories: that Defendants suppressed evidence regarding the fabricated confession and documentary evidence relating to Savory's confession and interrogation; that they suppressed a large volume of evidence that could have been used to impeach the Ivys' false testimony; that they suppressed key evidence that Douglas was the likely suspect and that they had considered him the sole suspect before they obtained a confession from Savory; that they suppressed that they made up that the knife was a murder weapon and that they knew it did not belong to Savory; and that they suppressed that Cooper had been attacked before Robinson, which contradicted Savory's confession as well. It will be too late for Defendants to raise an argument on any of these theories for the first in reply. *Thompson*, 33 F.3d at 854; *Costello*, 651 F.3d at 635.

*Brady* requires that exculpatory and impeachment evidence material to the criminal case be disclosed to the prosecution and defense, "[a]nd police officers can be held liable under *Brady* and its progeny when they withhold exculpatory evidence from prosecutors[.]" *Holland v. City of Chicago*, 643 F.3d 248, 255 (7th Cir. 2011); see also *Kyles v. Whitley*, 514 U.S. 419, 438 (1995). The Seventh Circuit has long recognized that section 1983 due process claims may be brought

146

against police who withhold evidence, causing wrongful convictions. *Whitlock*, 682 F.3d at 572; *Dominguez v. Hendley*, 545 F.3d 585 (7th Cir. 2008); *Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001); *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988).

The Supreme Court holds that "[e]vidence qualifies as material when there is any reasonable likelihood it could have affected the judgment of the jury." *Wearry v. Cain*, 577 U.S. 385, 392 (2016) (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972); *Napue v. Illinois*, 360 U.S. 264, 271 (1959)) (cleaned up). A litigant "need not show that he 'more likely than not' would have been acquitted had the new evidence been admitted. . . . He must show only that the new evidence is sufficient to 'undermine confidence' in the verdict." *Id.* (citing *Smith v. Cain*, 132 S. Ct. 627, 629-31 (2012)); see also *Kyles*, 514 U.S. at 434.

The question whether suppressed evidence was material must be answered considering all the suppressed evidence together in the aggregate, and not by assessing evidence piece by piece. *Wearry*, 577 U.S. at 394. Whether evidence is material also depends on the strength of other evidence used in the criminal proceedings—it might take only a little evidence to disturb an already-weak conviction. *United States v. Agurs*, 427 U.S. 97, 113 (1976).

A group of defendants who each suppress different items of evidence that are material, considered in the aggregate, are each liable for the resulting due process violation, even if one defendant may have an argument that the item of evidence they suppressed was not material standing alone. *Goudy*, 922 F.3d at 843 ("[A]ll defendants who can be shown to have suppressed evidence in violation of *Brady* . . . should be liable for the aggregate impact on the outcome of the trial [the plaintiff] ultimately received.") (internal quotations and citations omitted).

It is firmly established that evidence that would impeach a key eyewitness is material. *Giglio*, 405 U.S. at 153-54; *see also Smith*, 565 U.S. at 75 (impeachment evidence regarding

147

eyewitness material when eyewitness was the only evidence connecting defendant to the crime); *Fields v. Wharrie*, 672 F.3d 505, 517 (7th Cir. 2012) (*Fields I*) ("The constitutional violation occurs when the means by which the testimony was acquired are not disclosed at trial—or when other information that impeach the testimony's reliability are not shared with the defense."); *Newsome v. McCabe*, 319 F.3d 301, 302-05 (7th Cir. 2003) (holding that "the details about how [the police] induced the witnesses to finger Newsome" was "information vital to probe whether manipulation occurred").

The case against Savory could not have been thinner. There was no evidence implicating him other than that fabricated by the Defendants. Any one of the pieces of exculpatory evidence suppressed by Defendants would have undermined confidence in his prosecution and convictions. Any piece of it would have impeached key witnesses at trial—the witnesses and Defendants. When the suppressed evidence is considered collectively, there is no chance any Defendant is entitled to summary judgment on the suppression claim.

### 1. Defendants Suppressed Their Fabrication of Savory's Confession

First, Defendants suppressed the fact that they had fabricated a false confession and they suppressed evidence regarding their interrogation of Savory and the resulting confession that was not available to Savory. They suppressed that they had fabricated out of whole cloth a false alibi that Savory never offered; that they had fabricated an account of the play between Savory and Scopey on January 17 that Savory never related; and they fabricated that Savory acknowledged making incriminating statements to Marva Jones and Ray Mason, when he had done so or said that he had. They fabricated an account of Savory's confession that omitted Savory's inability to provide an account of the murders other than by assenting to information Teplitz fed to him, as well as omitting Savory's refusal to sign a written confession. Defendants did not disclose this

evidence to state prosecutors, to Savory, or to his criminal defense attorneys. Defendants do not make any argument about the theory, forfeiting the issue. *Smith*, 388 F.3d at 569.

Had Defendants disclosed this evidence, it would have immediately halted the criminal prosecution and conclusively shown Savory's innocence. The suppression of the fact that items of incriminating evidence were invented by police is precisely the sort of impeachment evidence that is material as a matter of law, within the meaning of *United States v. Bagley*, 473 U.S. 667, 676 (1985), and *Giglio*, 405 U.S. at 154-55. It could have been used to cross-examine literally every state's witness at trial—including Defendants themselves, who testified that Savory voluntarily incriminated himself—in a manner that would have left the state without any evidence to prosecute or convict. *Smith*, 565 U.S. at 75; *Fields I*, 672 F.3d at 517; *Newsome*, 319 F.3d at 302-05. Had the evidence been disclosed, Teplitz would have faced a withering cross examination demonstrating that she, not Savory, was the author of Savory's supposed confession, a confession Savory refused to put in writing.

The Seventh Circuit has recognized in numerous cases that police officers who fabricate evidence are also liable for violating due process when they suppress the fact and circumstances of their fabrications. The *en banc* Seventh Circuit in *Stinson* endorsed due process claims brought against defendants who violated due process by "(1) fabricating the principal evidence of [the plaintiff]'s guilt (the opinions that his detention matched the bite marks on [the victim]), and (2) failing to disclose, as required by *Brady*, the defendants' agreement to fabricate this evidence." 868 F.3d at 524-25. Similarly, *Avery* explained that a claim regarding fabricated informant statements used in a criminal case gave rise not only to a fabrication due process theory but also a *Brady* theory because, although the plaintiff "knew that the informants' statements were false, . . . he did *not* know about the pressure tactics and inducements the detectives used to obtain them. . .

. In other words, he did not have the evidence that could help him *prove* that the informants' statements were false." 847 F.3d at 443-44. In *Engel v. Buchan*, the Court recognized a *Bivens* claim where "[the plaintiff] claim[ed] that [the defendant] framed him by fabricating evidence and manipulating witnesses, then suppressed this evidence in violation of *Brady*." 710 F.3d 698, 699 (7th Cir. 2013). And in *Lewis v. City of Chicago*, the court said expressly that when fabricated evidence causes a conviction, it gives rise to liability for a due process violation for fabrication of evidence, and that "misconduct of this type that results in a conviction might also violate the accused's right to due process under the rubric of *Brady* . . . , if government officials suppressed evidence of the fabrication." 914 F.3d 472, 480 (7th Cir. 2019).

The Supreme Court has for decades made clear that *Brady* imposes an affirmative duty on the government "to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police," and then to disclose all of that exculpatory and impeachment evidence, even if it has not been requested, if the evidence considered collectively had a reasonable probability of impacting the criminal case. *Kyles*, 514 U.S. at 432-38.

The evidence Defendants suppressed certainly would have been material within the meaning of *Brady*, considering that Savory's statements were the central feature of the criminal case and considering the lack of other evidence implicating him. *Goudy*, 922 F.3d at 843. None of Defendants involved in Savory's interrogation or confession—Pinkney, Haynes, Cannon, Fiers, Teplitz and Tiarks—is entitled to summary judgment on his suppression theories, without the need for further analysis.[17]

---

[17] Savory is not arguing that Defendants are liable for suppressing circumstances of his interrogation of which Savory was aware. That argument would be foreclosed by *Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir. 2003), which held that police are not required under *Brady* to disclose the true circumstances of an interrogation of a criminal defendant because the criminal defendant was present for and knows the true circumstances of the interrogation and false confession. Instead, Savory argues that Defendants suppressed that they fabricated statements that Savory never said to them, and suppressed documentary evidence about

### 2. Defendants Teplitz, Haynes, Cannon, and Buck Suppressed Impeachment Evidence Relating to the Ivys' Statements Implicating Savory

Defendants also suppressed critical evidence that could have been used to impeach the Ivys' false statements implicating Savory, and which could have been used to impeach Defendants' theory of Savory's guilt. While Defendants' make a baseless argument for summary judgment on Savory's theory that they knowingly fabricated the Ivys' statements, OB-42-49, which is discussed below, see Argument IV(B)(3) *infra*, they make no argument regarding their suppression of evidence relating to the Ivys, and they have therefore forfeited any argument for summary judgment on this theory. *Smith*, 388 F.3d at 569.

According to Defendants' reports, the Ivys gave statements implicating Savory in the Cooper-Robinson murders. See Statement VIII *supra*. Those statements, described in detail above, were all accounts in which Savory had purportedly said or done things in the Ivys' presence

---

their interrogation that would have exculpated Savory and impeached them. The suppression of that information, which Savory did not possess, violates due process, and the *Gauger* holding does not apply, as the Seventh Circuit held in *Avery*. 847 F.3d at 443-44 (*Gauger*'s rule does not apply where police are aware of exculpatory or impeachment evidence that the criminal defendant/civil plaintiff does not possess). Savory preserves for appeal the argument that *Gauger* is wrongly decided, to the extent that it is improperly applied in this case. *Gauger* conflicts with Supreme Court precedents. It contains dubious language that state actors are not required "to create truthful exculpatory evidence," 349 F.3d at 360, and *Saunders-El* parlayed that into an assertion that police are not required "to accurately disclose the circumstances of their investigations to the prosecution," 778 F.3d at 562. The notion that police may remain silent after fabricating evidence, without disclosing what they have done, is incompatible with the Supreme Court's longstanding admonition that police officers may not remain silent when they fabricate evidence in criminal cases. *Miller v. Pate*, 386 U.S. 1, 7 (1967). It is also wrong because the premise that Brady does not require an officer to truthfully corroborate a criminal defendant's account of an interrogation resulting in a false confession cannot be squared with cases that require the government to disclose information known to the state that would impeach a government witness, including a police officer. *United States v. Bagley*, 473 U.S. 667, 677 (1985); *Giglio*, 405 U.S. 150. If *Gauger* were right and police did not have to disclose under Brady that they had coerced the criminal defendant to sign a fabricated confession, then the police could take the stand in the criminal case and testify falsely that the coercion and fabrication had not occurred, all the while withholding the truthful evidence that might be used to impeach their own testimony. This is not compatible with the Supreme Court's *Brady* case line.

implicating himself in the crime. See Statement VIII *supra*. Teplitz introduced these statements at the grand jury in Savory's case, the Ivys were not called at the first trial, between the first and second trial their statements changed, and then Ella, Tina, and Frank Ivy testified for the state at Savory's second trial. See Statement VIII *supra*. The Ivy's testimony was the evidence that was the basis for upholding Savory's conviction when it was appealed a second time. See Statement X *supra*.

But Defendants suppressed key exculpatory and impeachment evidence relating to the Ivys throughout Savory's criminal proceedings: they suppressed that the Ivys were not called at the first trial because their testimony was deemed unreliable and their memories poor, see Statement VIII *supra*; that they had multiple unreported meetings with the Ivys, *id.*; that Ella Ivy told Cannon that she was not sure about what she remembered, *id.*; that Cannon pressured Frank Ivy to testify falsely and threatened to charge him with a crime, even though Frank told Cannon the statements wanted him to provide were not true, *id.*; that Teplitz took Ella Ivy to the police station against her will, where she felt afraid and as if she had no choice but to provide a statement, *id.*; and that Cannon pressured Tina Ivy to tell him what he wanted to hear, that Teplitz took Ella Ivy to the police station against her will, where she felt afraid and as if she had no choice but to provide a statement, *id.*; that Tina Ivy was on probation for forgery and was in a drug treatment program when she testified against Savory, *id.*; that James Ivy was offered a deal on his burglary case if he testified against Savory, *id.*; and that they fabricated the Ivys' 1977 and 1981 statements, which became the Ivys' testimony at Savory's second criminal trial, *id.*; see also Argument IV(B)(3) *infra*.

Each piece of this evidence was material to Savory's criminal proceedings, and considering the evidence together—as this Court must—there is no question it would have affected the judgment of the jury. *Wearry*, 577 U.S. at 392-96. It could have been used to conclusively

undermine the Ivys' fabricated accounts that Savory had made incriminating statements, which would have deprived the state of the only evidence available to it at the second criminal trial. Indeed, this is precisely the theory that the Seventh Circuit approved in *Avery*, where the Seventh Circuit held that a suppression due process theory should have gone to trial where investigating officers "failed to disclose material impeachment evidence regarding their interrogations of the three jailhouse informants." 847 F.3d at 443-44. The material impeachment evidence suppressed in that case—feeding witnesses statements, making them promises for their testimony, coaching and pressure—are the same as the evidence suppressed here. *Id.* at 436-37.

The Supreme Court and Seventh Circuit have reaffirmed that suppression of evidence that would impeach a key third-party witness violates due process in countless cases. See *Wearry*, 577 U.S. at 392-96 (holding that suppression of police and other records that could have been used to impeach a state's witness were material in a case that depended on the jury crediting "[the witness]'s account rather than [the defendant]'s alibi"); *Smith*, 565 U.S. at 74-75 (police records of statements by witness that contradicted that witness's later identification of the defendant at trial were material); *Kyles*, 514 U.S. at 441-42 (contemporaneous witness statement, in which he described the perpetrator differently than the way the suspect looked); *Bagley*, 473 U.S. at 683-84 (evidence that could have been used to impeach the testimony of state law enforcement officers at trial is material); *Anderson v. City of Rockford*, 932 F.3d 494, 507 (7th Cir. 2019) ("Due process entitled the plaintiffs to learn before their trial" that witness's statement "was the product of police coercion or fabrication"); *Newsome v. McCabe*, 319 F.3d 301, 304 (7th Cir. 2003) (affirming judgment where police officers were held liable "under the due process clause because they concealed exculpatory evidence—the details of how they induced the witnesses to finger [plaintiff]"); *Jones*, 856 F.2d 985; *Whitlock*, 682 F.3d at 574.

Moreover, this evidence impeached not only the testimony of the Ivys, but also the Defendants—Teplitz, Haynes, Cannon, and Buck—who interacted with the Ivys as well. The Seventh Circuit held in *Camm v. Faith*, that a police officer's lie about evidence in an investigation is itself actionable under *Brady*, regardless of the exculpatory value of the evidence being lied about, because "exposing the lie . . . would have eroded the jury's trust in both the prosecutor and the lead case investigator," and "it would have set up an argument that they were hiding crucial evidence because they thought it might undermine their case," both of which "can help create reasonable doubt." 937 F.3d 1096, 1110 (7th Cir. 2019). Defendants have no argument—and they have made no argument—for summary judgment on the theory that the suppressed material exculpatory and impeachment evidence about the Ivys.

### 3. All Defendants Suppressed Evidence Implicating William Douglas and Their Own Report Stating He Was A Suspect

Defendants have also made no argument that they are entitled to summary judgment on Savory's theory that the suppressed exculpatory and impeachment information about William Douglas's likely role in the crime, forfeiting any argument on this due process theory as well. *Smith*, 388 F.3d at 569. Regardless, Defendants' suppression of this evidence, independently, violated Savory's right to due process.

Initial evidence implicated Douglas in the crime. Evidence revealed that he had a past sexual relationship with Cooper, his stepdaughter, and may he been the father of her young son; he had previously hit Cooper; his work meant that he had access to sharp knives and knew how to cut up bodies; a person matching his description was seen leaving the house on the morning of the murder after he said he had gone to work; multiple witnesses suspected he might have been involved in the murder; polygraphs conducted with him were inconclusive; and he had a welt under his eye. See Statement III *supra*. This was "remarkably strong" evidence that Douglas should be

the chief suspect in the crime. *Id.* Nonetheless, Douglas was never investigated as the suspect, or so it seemed from Defendants' reports. *Id.*

Defendants suppressed or destroyed all evidence regarding their investigation of Douglas after Savory became their suspect—there is nothing in the file explaining how the incriminating evidence discussed above was explained, or how Defendants excluded Douglas as a suspect. See Statement III & IV *supra*. Moreover, Defendants suppressed key documents regarding Douglas in their investigative file, to which all Defendants had access and which all Defendants used during their investigation. See Statement XI *supra* (discussing the suppression of police files). These key documents were not provided to prosecutors. *Id.* In particular, Defendants suppressed in their file a report that Douglas had threatened to kill Cooper's mother just a few months before the Cooper-Robinson murders. See Statement III & XI *supra*. In addition, they suppressed a report written by Gerontes just days before Savory's interrogation, in which Gerontes reported that Douglas was the sole suspect in the Cooper-Robinson murders. See Statement III & XI *supra*. Neither of these critical documents was turned over to prosecutors. See Statement III & XI *supra*.

These documents could have been used to impeach Defendants' entire account of their investigation, in which they testified that only Savory was a suspect, by showing that they had suspected Douglas of the crime. They could have been used to impeach the testimony of Douglas himself, with evidence that he had threatened to kill the victims' mother and could not be trust because he himself was a suspect. And they would have exculpated Savory by showing that someone else likely committed the crime. Information implicating an alternative suspect is material within the meaning of *Brady* as a matter of law. See, e.g., *Kyles v. Whitley*, 514 U.S. 419, 441–42 (1995) (undisclosed contradictory statements by a key witness that pointed to alternative suspect were material); *Goudy v. Cummings*, 922 F.3d 834, 842-43 (7th Cir. 2019) (videotape of

lineup in which witnesses identified alternative suspect "alone [was] enough" for jury to find materiality); *Beaman v. Freesmeyer*, 776 F.3d 500, 508 (7th Cir. 2015) (evidence was material because it presented a viable alternative suspect); *Goudy v. Basinger*, 604 F.3d 394, 400–01 (7th Cir. 2010) (evidence inculpating another suspect was material, even when that evidence did not necessarily point to the defendant's innocence). Defendants are not entitled to summary judgment on this theory.

### 4.   All Defendants Suppressed Critical Forensic Evidence

Lastly, Defendants suppressed critical exculpatory physical and forensic evidence that would have exonerated Savory, impeached the false confession that Defendants had extracted and invented, and impeached the testimony of state's witnesses, including Defendants. See Statement VI *supra*. Defendants suppressed that the knife they said was Savory's and wrote into his false confession, which in their theory of the case had been used to commit a brutal double-murder, was not Savory's knife and had tested negative for blood during lab testing. See Statement VI(A)-(C) *supra* Defendants' findings regarding the knife were documented in police notes, which admittedly were not made into official reports, and which were placed in Defendants' crime scene unit investigative file in the Cooper-Robinson investigation, to which all Defendants had access and which all Defendants reviewed. See Statement VI(A)-(C) & XI *supra*.[18] These documents were not disclosed to state prosecutors, or to Savory and his criminal defense team. *Id.* Contrary to the truth, Defendants fabricated a report in conspiracy with Gonsowski the lab analyst that the knife had tested positive for blood, but there was not sufficient biological evidence to confirm that result with further testing. See Statement VI(A)-(C) *supra*. Throughout the criminal proceedings

---

[18] Defendants do not contest in their summary judgment filings that the information contained in the crime scene unit file was available only to some Defendants. There is ample evidence in the record that Defendants worked on a small investigative team, briefed one another about developments, and each had access to the investigative file. See Statement XI *supra*.

Defendants and other state's witnesses testified that Savory's knife that he confessed to using had tested positive for blood, when the opposite was true. Savory and his attorneys were unable to impeach them and to show that the supposed murder weapon was blood free. See Statement VI(A)-(C) *supra*.

In addition, Defendants suppressed evidence that Cooper had been sexual assaulted—that sperm had been observed on the vaginal swabs taken from her body—and that they were investigating Cooper's killing as a sexual assault. See Statement VI(D)-(E) *supra*. There was strong evidence of sexual assault, and the coroner took vaginal swabs from Cooper at autopsy. See Statement II(C) *supra*. Before Defendants knew that those swabs had been sent by the coroner to the lab for testing, they extracted and fabricated Savory's confession, which did not mention sexual assault. See Statement V & VI(D)-(E) *supra*. The next day, they learned that the vaginal swabs were being tested, and from that moment until the present day, they have denied that Cooper was sexually assaulted. See Statement VI(D)-(E) *supra*. The forensic examination of the vaginal swabs revealed the presence of sperm, a finding that was documented multiple times in Defendants' notes, which demonstrated that the crime ad been a sexual assault. See Statement VI(D)-(E) *supra*. Indeed, Defendants made clear in their notes that they were investigating the crime as a sexual assault, posing a question in those notes about whether the sperm had been in Cooper's vagina for some time before the assault. See Statement VI(D)-(E) *supra*. Again, the notes were suppressed in a file available to all Defendants and were not provided to prosecutors. See Statement VI(D)-(E) *supra*. During Savory's criminal proceedings, Defendants and other state's witnesses told the false story that there had not been a sexual assault, that sperm was not present, and they explained away evidence suggesting that there had been a sexual assault, saying that it was explained by normal phenomena—e.g., Dr. Immesoete explaining at trial that what appeared to be seminal fluid was

157

the result of an infection, which he could only do because the evidence of sperm was suppressed. See Statement VI(D)-(E) *supra*. Again, Savory and his attorneys were unable to impeach this evidence—they could not show that Defendants had found clear evidence of sexual assault, which would have contradicted the confession, and they could not impeach Defendants' testimony and the testimony of other state's witnesses with evidence that Defendants themselves had investigated Cooper's death as a sexual assault. See Statement VI(D)-(E) *supra*.

Finally, Defendants suppressed in the same notes that they knew that Cooper had been attacked first, and Robinson second. See Statement VI(G) *supra*. The forensic testing of Robinson's underwear revealed that Cooper's blood had been found on Robinson's underwear, meaning that Cooper had been attacked first, and that the killer had transferred blood from her body to Robinson's underwear when the killer attacked Robinson. *Id.* Like the evidence discussed above, this evidence was hidden from prosecutors and the criminal justice system. See Statement VI(G) & XI *supra*. If Savory and his attorney had this evidence, they again could have used it to impeach the false confession, which stated that Robinson had been attacked first, before Cooper was attacked. See Statement V & VI(G) *supra*.

The suppression of such powerfully exculpatory and impeaching evidence to which all Defendants had access justifies denying summary judgment to all Defendants. Any piece of this evidence would justify denying summary judgment. See *Camm v. Faith*, 937 F.3d 1096, 1108 (7th Cir. 2019) (denying summary judgment on *Brady* theory that the defendants suppressed that they did *not* conduct forensic testing and then lied about it). Collectively the evidence is overwhelmingly exculpatory.

### (a)    Defendants' Arguments for Summary Judgment Lack Merit

Defendants do not move for summary judgment on the theory that the suppressed evidence demonstrating that Cooper had been killed before Robinson, directly contradicting the confession, which said that Robinson had been filled first. See OB-54; Statement VI(G) *supra*. They also do not make any argument about their suppression of the fact that the knife was not Savory's. See OB-54; Statement VI(A) *supra*. Instead, Defendants argue they cannot be held liable for suppressing evidence that supposed murder weapon knife tested negative for blood or for suppressing evidence about the discovery of sperm and the fact that they were investigating the crime as a sexual assault. OB-54-55. In their view, the evidence was not suppressed or was not material to the criminal case. *Id.* These arguments do not pass the straight-face test.

First, Savory has ample evidence that Defendants Jatkowski's notes and other notes documenting these forensic findings were suppressed. Exs. 36, 37, 38. Jatkowski testified that those notes were never made into an official report, and that he was not under any obligation to turn them over because they were "unofficial." See Statement VI(B)&(D) *supra*. Jankowski shared his notes with Gerontes, and all three sets of notes were placed in the crime scene unit file, to which all Defendants had access. See Statement VI(B) *supra*. The notes were never provided to prosecutors—they do not appear in the prosecutors' file, the prosecutors testified they did not receive them, and even the Defendants could not say they had been turned over. See Statement VI(B) & XI *supra*. Moreover, the Defendants and others testified at trial in a manner that directly contradicted the suppressed evidence, and no one ever used the suppressed evidence to cross-examine any of these witnesses. See Statement VII & X *supra*. That, too, indicates that the evidence was suppressed. Defendants do not point to any document or testimony that rebuts any of these points. They do not point to anything that demonstrates that they disclosed this evidence

to prosecutors.[19] Defendants' argument that the notes were not suppressed depends entirely on Defendants' own say-so, and a view of the record that inverts the summary judgment standard. At this stage, based on the evidence just discussed, a reasonable just could conclude that this evidence was suppressed.

Second, Savory has ample evidence that Defendants suppressed this evidence intentionally. The Seventh Circuit long has reminded that "[d]ue to the difficulty of proving a subjective state of mind, cases involving motivation and intent are usually not appropriate for summary judgment." *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse*, 991 F.2d 1249, 1258 (7th Cir. 1993); see also *P.H. Glatfelter Co. v. Voith*, 784 F.2d 770, 774 (7th Cir. 1986) (noting that, "as a general principle, questions of motive and intent are particularly inappropriate for summary adjudication and that resolution by summary judgment of the issues raised by an allegation of fraud is often difficult or impossible") (internal quotation marks and citations omitted). "There is especially good reason to follow the general rule where, as here, evaluating whether a party had an actual intent to deceive requires credibility determinations." *Standard Ins. Co. v. VanLanduit*, 551 F. Supp. 3d 854, 868 (N.D. Ill. 2021) (internal quotation marks omitted).

Defendants suppressed documents showing that the knife tested negative for blood, but their official report and testimony in the case said exactly the opposite. See Statement VI(B) *supra*. In fact, their official report said that the knife had tested positive for blood but there was no way

---

[19] Defendants contend that Savory cannot show the notes were suppressed because he did not ask Teplitz at her deposition if she spoke with Jatkowski about the lab testing results. OB-56. Even if he hadn't, it would not undermine all of the evidence just discussed. But Savory did ask Teplitz: She testified that she received information from the lab or the lab officer in order to testify at the grand jury, and when asked if it could have come from Jatkowski or Ganda, she said it did not come from Ganda. SA5001 at 172:21-173:8. And she confirmed this multiple times in her deposition: "Q. So in preparation for your testimony at the grand jury on February 15, 1977, you would have looked at documentation that allowed you to provide this testimony about the testing of forensic evidence, correct? A. It could have been report. It could have been direct conversation, but I can't say exactly what it would be. I would have got it from someone more knowledgeable in that area than I certainly would be." *Id.* at 135:7-16.

to verify that result because the testing had consumed the sample. See Statement VI(C) *supra*. Similarly, Defendants suppressed documents showing that sperm was found and that they were investigating the crime as a sexual assault, but their official reports said the opposite—that sperm had not been found—and they have consistently taken the position, including in this litigation, that the crime was not a sexual assault. See Statement II(C) & VI(D)-(E) *supra*. Based on this alone a jury could easily infer that Defendants acted with intent. But Savory has also pointed to evidence of a clear motive Defendants had to suppress this evidence: they had written the knife into the confession, and evidence that it was blood-free would have fatally undermined the case; they had written a confession with no mention of sexual assault, but the suppressed evidence made clear that Cooper had been sexual assaulted; and the false confession said Savory had killed Robinson first, which was contradicted by the suppressed forensic evidence. See Statement VI(G) *supra*. Defendants had to suppress this evidence for Savory's false confession to hold up, and so they did so intentionally. Based on much less evidence the Seventh Circuit decided that "[a] jury would not be compelled to find that the officers acted with that intent, but it could so find." *McCottrell v. White*, 933 F.3d 651, 670-71 (7th Cir. 2019). This Court should reject Defendants' intent argument.

Third, the evidence was material to the criminal case as a matter of law. Defendants' suggestion that this evidence was immaterial and the same as what appeared in official reports is completely untenable. The official report said the knife tested positive for blood, the suppressed notes said the knife tested negative for blood. The official report said that the vaginal swabs revealed no sperm, the suppressed notes documented the observation of sperm. The official report made no mention of the fact that Cooper had been attacked before Robinson, the suppressed notes made that fact clear. Defendants' argument that they were permitted to suppress this evidence because it was not material to Savory's criminal case is almost sanctionable. OB-57-59. This

161

forensic evidence established that the murder weapon written could not have been used in the crime; that Defendants' confession stating otherwise was bogus; that Defendants' and state's witnesses testimony that blood was found on the knife was a lie; that Defendants were investigating the crime as a sexual assault, despite their consistent denials from 1977 to the present day; that sperm and been found on the vaginal swabs, contradicting testimony that the fluid found in Cooper's vagina was the result of some innocent investigation, that sperm had not been found, and that Cooper had not been sexual assaulted; this evidence, too, would have conclusively impeached the false account in Savory's confession; and the evidence that Cooper was attacked before Robinson would have impeached the confession as well. All of this evidence collectively would have halted Savory's prosecution—it would have led to the immediate suppression of his confession, the impeachment of Defendants' entire account of the investigation, and it would have exonerated Savory.

Defendants are not permitted to point to evidence in the record and contend that the additional evidence they suppressed was not material and need not have been disclosed. Long before Savory's conviction, the Supreme Court had held that all exculpatory and impeaching information must be disclosed, not just some of it. *Giglio v. United States*, 405 U.S. 150 (1972). Moreover, to show materiality, Savory need only "demonstrate that there is a 'reasonable probability' that the result would have been different had the suppressed evidence been put before the jury. . . . [T]he reasonable probability standard for materiality . . . is less rigorous than a preponderance of the evidence standard." Goudy, 922 F.3d at 842 (cleaned up). Defendants' cannot contest that this standard has been met, particularly given the summary judgment standard, which prohibits Defendants from taking the approach that they do here, of construing the record in their own favor and attempting to discount the value of the evidence they suppressed. *Kailin v.*

*Gurnee*, 77 F.4th 476, 483 (7th Cir. 2023) ("A court's job on summary judgment is not to resolve swearing contests or decide which party's facts are more likely true."). The disclosure of any one party of this evidence would have been material to Sierra's criminal case, within the meaning of *Brady*. The Seventh Circuit reached that conclusion based on much less important evidence in *Camm*, 937 F.3d at 1108. Collectively this evidence was certainly material, particularly when considered in the context of all of the other suppressed items of evidence, which Defendants do not challenge. *Camm*, 937 F.3d at 1109 (citing *Kyles*, 514 U.S. at 436).

### (b)    Defendants Are Not Entitled To Qualified Immunity

Finally, Defendants are not entitled to qualified immunity on the evidence suppression theory. OB-59-60. Defendants' two-paragraph argument on this point depends largely on mischaracterizing the evidence suppressed and defining it much too narrowly, see *id.* contrary to the Supreme Court's repeated reminders that the summary judgment record must still be construed for the non-moving party when the question is whether the law was clearly established. *Tolan*, 572 U.S. at 657. Moreover, this argument is insufficiently developed to justify granting summary judgment on such a substantial suppression due process claim. *Smith*, 388 F.3d at 569. Indeed, Defendants do not cite a single case in their brief discussing whether the law governing suppression claims was clearly established at the time of Savory's criminal case, not to mention one casting doubt on the idea that the law was clearly established. See OB-59-60 (citing a single case *Fallon*, which is about materiality).

That said, the law was clearly established at the time of Savory's criminal trials. The Seventh Circuit concluded in *Newsome v. McCabe* that it was "clearly established in 1979 and 1980 that police could not withhold from prosecutors exculpatory information about fingerprints" and other evidence, explaining that "[t]he *Brady* principle was announced in 1963, and we applied

163

it in *Jones* to affirm a hefty award of damages against officers who withheld exculpatory information in 1981." 256 F.3d 747, 752-53 (7th Cir. 2001). There is no reason to think that the conclusion would have been different a couple of years earlier, and regardless the time period discussed in *Newsome* encompasses Savory's criminal trials, such that *Newsome* controls here. *Newsome* concerned the suppression of much tamer forensic evidence than this case, and there the Seventh Circuit easily disposed of the same qualified immunity argument that Defendants make here. *Id.* Ample cases supporting the same conclusion.[20] This Court should reject Defendants' qualified immunity argument.

### B.    Independently, A Reasonable Jury Could Conclude That Defendants Fabricated False Evidence

The Supreme Court and Seventh Circuit "'have consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of [his] liberty in some way.'" *Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017) (citing *Mooney v. Hollohan*, 294 U.S. 103, 112 (1935); *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012)). This due process theory is entirely distinct from the due process theory based on suppression of evidence, discussed above. *Petty v. City of Chicago*, 754 F.3d 416, 421-24 (7th Cir. 2014). The prohibition on the use of knowingly false evidence is deeply established,  *Mooney v. Holohan*, 294 U.S. 103, 112 (1935), and Defendants do not suggest

---

[20] See *Engel v. Buchan*, 710 F.3d 698, 708-09 (7th Cir. 2013) ("It is beyond dispute that the *Brady* right was well established [by 1984]"); *Armstrong v. Daily*, 786 F.3d 529, 549-50 (7th Cir. 2015) (holding that it was clearly established by 1980 that police could not destroy exculpatory evidence); see also *Carrillo v. Los Angeles*, 798 F.3d 1210, 1219 (9th Cir. 2015) (holding that it was "clearly established that police officers were bound by Brady at least as far back as 1978"); *Haley v. City of Boston*, 657 F.3d 39, 48-51 (1st Cir. 2011) (explaining that "in 1972 , it was not clearly established that *Brady*'s no-fault disclosure obligation applied to police officers as opposed to prosecutors," but holding that it was clearly established then that "[d]eliberate concealment of material evidence by the police, designed to grease the skids for false testimony and encourage wrongful conviction, unarguably implicates a defendant's due process rights."); *Barbee v. Warden*, 331 F.2d 842, 846 (4th Cir.1964) (holding one year after *Brady* that police must disclosed material exculpatory and impeachment evidence).

they are entitled to qualified immunity on this due process theory. In fact, Defendants do not move for summary judgment on the majority of Savory's fabrication theories, forfeiting any argument for summary judgment. The argument Defendants' do make about their fabrication of the Ivys' statements incriminating Savory take liberties with the record that are not permissible for a moving party at this stage of the case.

1. **The Fabrication of False Incriminating Statements Attributed to Savory Means Teplitz, Cannon, Fiers, and Pinkney Are Not Entitled to Summary Judgment**

Savory is pursuing multiple fabrication theories, any one of which independently justifies denying summary judgment. As discussed, Defendants concede that material disputes of fact foreclose summary judgment on Savory's theory that Defendants' fabricated incriminating statements that they attributed to Savory and used those statements in his criminal case to deprive Savory of his liberty, see Argument I(B) *supra*, Defendants are not entitled immunity on that theory, see Argument III *supra*, and so a trial is necessary on that due process theory against Defendants Teplitz, Cannon, Fiers, and Pinkney. *Avery v. City of Milwaukee*, 847 F.3d 433, 441-42 (7th Cir. 2017) (due process violated when fabricated confession of the plaintiff was introduced at trial through police testimony). Again, given that the Court need not parse every theory of liability and every piece of evidence in a case concerning violations of the right to a fair trial, once it has determined that the fair trial claims must be considered by a jury, see Argument II *supra*, this Court can simply hold that these Defendants are not entitled to summary judgment on the due process theory and move to trial.

2. **Defendants Teplitz, Cannon, Jatkowski, Fiers, Pinkney, Dunlavey, and Bowers Fabricated Forensic Evidence Connecting Savory to the Crime**

Next, Savory contends that Defendants fabricated forensic evidence implicating him in the murder. Defendants do not even mention these due process theories in their summary judgment

motion, meaning that they have failed to shift the burden to Savory at summary judgment. *Adickes*, 398 U.S. at 160. Defendants have forfeited and argument, and they cannot raise an argument for the first time in reply. *Otto v. Variable Annuity Life Ins. Co.*, 134 F.3d 841, 854 (7th Cir. 1998) (refusing to consider unsupported or cursory arguments)

Specifically, Cannon, Jatkowski, Fiers, Pinkney, Dunlavey, Bowers, and Teplitz fabricated a murder weapon—a knife that could not have been used in the crime that did not belong to Savory—writing it into the false confession and writing reports that it was Savory's. See Statement VI(A)-(C) *supra*. Then, Jatkowski and Teplitz, in conspiracy with Gonsowski, fabricated false reports and statements saying that blood had been found on the murder weapon, when all Defendants knew that the knife had tested negative for blood, a fact that was memorialized and suppressed in notes in their investigative file. See *id.* To further cover their tracks, these Defendants also fabricated that there was no biological material remaining on the knife for testing, so no one could disprove their fabrication. See *id.* This evidence corroborated Defendants' false confession, which included an express admission that the fabricated murder weapon had been used in the crime. See *id.*; see also Statement V *supra*.

In addition, Jatkowski, Teplitz, and Fiers, in conspiracy with Gonsowski, fabricated evidence that no sperm was found on the vaginal swabs taken from Cooper. See Statement VI(D)-(E) *supra*. That permitted Gonsowski and Dr. Immesoete to testify throughout the criminal proceedings that there was no evidence of sexual assault and that any evidence of sexual assault that existed could be explained by other phenomena, like infection. See *id.* In addition, it let Defendants proffer Savory's false confession at trial as legitimate, even though it contained no confession to a sexual assault. In fact, Cooper had been sexually assaulted and sperm had been found on the vaginal swabs taken from her at autopsy. See *id.*

166

Moreover, Fiers, Pinkney, Jatkowski, and Teplitz fabricated evidence that Savory had been wearing a pair of blue pants at the time of the crime that he had not been wearing. See Statement VI(F) *supra*. Again, in conspiracy with Gonsowski, these Defendants fabricated that there was blood on the pants, even though the pants had no blood on them. See *id.* Testing of the pants post-conviction confirmed there was no blood on them, and as discussed in more detail below, by that time Defendants had destroyed the cutting of the pants that they claimed had revealed blood. See *id.*[21]

Fabricating false forensic evidence to implicate a person in a crime violates due process. See, *e.g.*, *Buckley v. Fitzsimmons*, 509 U.S. 259, 262-64 (1993) (due process violated where physical evidence of a boot print implicating the suspect was fabricated before trial); *Stinson v. Gauger*, 868 F.3d 516, 528 (7th Cir. 2017) (*en banc*) (due process violated when police collude with a witness to fabricate expert testimony regarding forensic evidence). Defendants make no argument for summary judgment on these forensic evidence fabrication theories, and a jury must consider those theories as well.

### 3. Defendants Cannon, Buck, Teplitz, and Haynes Fabricated Incriminating Statements Attributed to the Ivys

In addition, Defendants' suppression of evidence relating to the Ivys, see Argument IV(A)(2) *supra*, Defendants Cannon, Buck, Teplitz, and Haynes also fabricated statements they attributed to the Ivys incriminating Savory. Defendants' argument that they did not knowingly fabricate this evidence depends entirely on a reading of the record that turns the summary judgment

---

[21] To the extent that Defendants suggest in reply that their testing of this particular item of evidence was legitimate, and that they merely lost the cutting that tested positive for blood, and this stage of the case any such suggestion would be construing the record impermissibly against Savory. Moreover, Savory is entitled to the inference from the other fabrications of forensic evidence connecting him to the crime that Defendants fabricated this testing result as well—if these Defendants did so with the murder weapon and evidence of sexual assault, then a reasonable jury could infer they did so with the blue pants as well.

standard upside down—they cherry pick snippets of testimony from the Ivys and contend the Ivys have always told the truth, and they assert there is no evidence that they knew the Ivys' incriminating statements were false. OB-42-48. This Court cannot at this stage credit Defendants' version of events or draw inferences for them; nor can it judge the credibility of witnesses or decide what parts of witness testimony to believe. *Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."). Defendants' argument flies in the face of strong direct and circumstantial evidence that Cannon, Buck, Teplitz, and Haynes fabricated statements and attributed them to the Ivys, knowing that those statements were false.

Consider the direct evidence first: Savory made no incriminating statements to the Ivys at any time. See Statement VIII *supra*. In the single police report documenting any interaction with the Ivys before Savory's first conviction was reversed, Teplitz and Haynes themselves fabricated statements that they knew with certainty were false *because the Ivys had never said to Teplitz and Haynes the things that Teplitz and Haynes reported*. See *id.* The statements that Teplitz and Haynes knew the Ivys had not told them but reported them as saying anyway included that: Savory told Ella that he was present at the scene when police arrived; Savory told Ella the Coopers were cut up really badly; Savory pulled a wallet from his pocket in front of Ella and a black-handled knife fell out; Savory talked to Ella about where the baby has been found at the crime scene; and Savory told Frank about the kids who had been killed and about being at the victim's house. See Statement VIII *supra*. Indeed, Ella did not even recall having such an interview with her family, Teplitz, and Haynes. See Statement VIII *supra*. Other than the fabricated incriminating statements in the report, the account included in the report corroborated Savory's alibi. See Statement VIII *supra*.

168

Moreover, in the three 1981 reports written by Cannon and Buck, they claimed that Frank Ivy, Ella Ivy, and Tina Ivy had each told them that Savory had told them he had been practicing karate with Scopey and had cut him accidentally. See Statement VIII *supra*. Again, it is clear that Cannon and Buck fabricated these statements and knew they were not true because Frank, Ella, and Tina never gave such statements. See Statement VIII *supra*. Frank Ivy testified that he never told Cannon that Savory provided these incriminating statements, that he told Cannon he had not said those things, and that Cannon told him to provide the false statements anyway. See Statement VIII *supra*. Ella Ivy testified that she never told investigators that Savory told her details about the crime or victims. See Statement VIII *supra*. And Tina Ivy testified that this statement was not true. See Statement VIII *supra*. Any one piece of this testimony would be sufficient to conclude that Cannon and Buck fabricated these statements and knew they were false; together they make the conclusion unavoidable at summary judgment, particularly in light of the fabricated 1977 statements.

But there is more. Add to this direct evidence that the Ivys' incriminating statements were fabricated the huge volume of circumstantial evidence supporting the same conclusion. Savory never made incriminating statements to the Ivys at any time. See Statement VIII *supra*. The Ivys were children, between the ages of 14 and 19, susceptible to suggestion. See Statement VIII *supra*. They were not called as witnesses at Savory's first trial—despite having supposedly given Teplitz and Haynes statements incriminating Savory—because they were deemed unreliable witnesses with poor memories. See Statement VIII *supra*. Only after Savory's first conviction was reversed and prosecutors said they could not retry him if the confession was suppressed, Teplitz, Buck, and Cannon reinitiated contact with the Ivys. See Statement VIII *supra*. It was then four years after the crime, and their memories were necessarily even worse. See Statement VIII *supra*. Tina and Ella

169

told Cannon and Buck that they could not tell them anything and that they were not sure what they remembered. See Statement VIII *supra*. Still Defendants continued their efforts to obtain statements from the Ivys, meeting with them repeatedly without documenting those meetings. See Statement VIII *supra*. Then on April 7 and 8, 1981, these Defendants suddenly obtained new statements from all of the Ivys. See Statement VIII *supra*. The new statements included information never given by the witnesses before, as well as some information that materially contradicted Teplitz and Haynes's 1977 report. See Statement VIII *supra*. Moreover, the new statements all parroted the same language about a karate practice gone wrong, which had been ripped directly from Savory's confession, which the Illinois appellate court had held must be suppressed. See Statement VIII *supra*. Moreover, the new statements solved a problem for Defendants' theory of the case, eliminating Savory's alibi, and creating a window of time in the afternoon of the crime where it was now possible that Savory had committed the crime. See Statement VIII *supra*. Throughout the proceedings, Defendants suppressed evidence that the Ivys were unreliable and had poor memories. See Statement VIII *supra*. They suppressed that they repeated meetings with the Ivys. See Statement VIII *supra*. They suppressed what the Ivys had said to them, including that the Ivys had told them that the statements attributed to them were not true. See Statement VIII *supra*. They suppressed that Teplitz and Cannon had detained and put pressure on Ella, Frank, and Tina Ivy to give statements incriminating Savory. See Statement VIII *supra*. They suppressed that they offered James Ivy a deal on his own case if he were willing to testify against Savory. See Statement VIII *supra*. And they suppressed information about Tina Ivy's criminal history and ongoing drug treatment. See Statement VIII *supra*.

A reasonable jury could hear the direct evidence without the circumstantial evidence, or it could hear the circumstantial evidence without the direct evidence, and easily conclude either way

that these Defendants fabricated the Ivy's statements and knew they were false. When the direct and circumstantial evidence are considered together, there can be no question that Defendants are not entitled to summary judgment on this theory. At this stage, Savory's "version of any disputed issue of fact . . . is presumed correct[.]" *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 456 (1992).

In arguing otherwise, Defendants are asking this Court to disregard or to disbelieve facts in the record. To the extent they contest the facts above or pick and choose from the Ivys' testimony, they must present those factual arguments at trial. For instance, Defendants selectively excerpt Ella Ivy's deposition, OB-44-45, ignoring the parts of her testimony that Savory cites above. Defendants will perhaps be able to impeach Ella Ivy's testimony at trial with this testimony, but this Court cannot credit this view or draw conclusions about Ella Ivy's credibility at this stage. *Anderson*, 477 U.S. at 255. Defendants also quote from testimony that Tina Ivy gave at Savory's criminal trial in support of their argument, OB-46, but Savory's theory and the evidence supporting it demonstrates that Tina's trial testimony was nothing more than the statement Defendants had fabricated for Tina to provide. They do exactly the same thing with Frank Ivy, pointing to his testimony about karate at trial and noting it is consistent with Cannon and Buck's report that invented that statement. OB-47. But they ignore all of the testimony from Frank Ivy, discussed above, explaining that the statement was false, that he told Cannon it was, and that Cannon told him to give it anyway. Defendants' factual arguments based on selective excerpts of testimony contradict the record, and this Court cannot credit the parts of conflicting testimony Defendants cite at this stage—that is a job for a jury. See *Branion v. Gramly*, 855 F.2d 1256, 1263 (7th Cir. 1988) (noting that "selective disbelief"—crediting part of conflicting evidence—"is an ordinary incident of trial").

171

Moreover, to the extent Defendants suggest in their briefs that Savory's theories concern not the fabrication of false witness statements but the coercion of truthful ones, OB-42-44, their argument again depends on an improper view of the facts in their own favor—and one that is not sustainable. Where a due process violation concerns witness statements, the Seventh Circuit has been careful to distinguish between coerced evidence and fabricated evidence. Police coercion of witnesses that produces truthful testimony does not by itself violate due process, absent a violation of the *Brady* duty to disclose facts about the police coercion that was used to obtain the testimony, which Savory discussed above. *Avery*, 847 F.3d at 439 (citing *Fields v. Wharrie*, 740 F.3d 1107, 1123 (7th Cir. 2014) (*Fields II*)). Police fabrication of witness testimony that the officers know to be false, however, violates due process without need for further analysis. *Id.* at 439-40 (citing *Petty*, 754 F.3d at 423).

All of the Ivy fabrication theories in the case concern the creation of evidence that Defendants knew was false at the time they created it. Savory does not assert that Defendants coerced truthful testimony. This is not a close case in which Defendants used rough tactics and it is not clear whether witnesses were telling the truth. Instead, when the facts are construed properly for Savory, this is a case where Defendants attributed to witnesses statements those witnesses had never given. Any other conclusion requires construing facts for the Defendants, at minimum, which is inappropriate at this stage.

Finally, there can be no doubt that the fabricated Ivy evidence was material to the criminal case, and Defendants do not appear to suggest otherwise. OB-42-48. At Savory's second trial, the Ivys testified consistent with the fabricated 1977 and 1981 statements. Savory was convicted based on that testimony, and the Illinois appellate court held that other constitutional errors at trial were harmless beyond a reasonable doubt because of the incriminating testimony of the Ivys. As the

172

Seventh Circuit put it in *Whitlock v. Brueggemann*, "We have consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty *in some way*." *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012) (emphasis added). The Supreme Court and Seventh Circuit have held that precisely the type of fabrication of witness statements at issue here violates the Constitution, *McDonough v. Smith*, 139 S. Ct. 2149, 2154 (2019) (permitting claim to proceed where falsified affidavits and witness coaching led to a prosecution); *Patrick v. City of Chicago*, 974 F.3d 824, 835-36 (7th Cir. 2020) (affirming a due process fabrication verdict against multiple defendants where a plaintiff's coerced confession and a fabricated lineup report were introduced at the criminal trial in the form of oral testimony); *Whitlock*, 682 F.3d at 582-84, and it has held that evidence far less voluminous than that at issue here requires a jury trial on this issue, *Anderson v. City of Rockford*, 932 F.3d 494 (7th Cir. 2019) (holding that summary judgment not available where police officer fabricated witness statements before trial and then instructed witnesses to testify consistent with those fabricated statements at trial). This Court should reject Defendants' argument that they are entitled to summary judgment on Savory's claims that they fabricated the Ivys' statements.

* * *

A jury must consider Savory's claim that Defendants knowingly fabricated evidence that was used in his criminal case, in violation his right to due process and a fair trial protected by the Fourteenth Amendment. Defendants do not challenge most of Savory's fabrication theories, and they have forfeited any argument for summary judgment. Defendants' arguments on the Ivy's false incriminating statements depend on a version of facts that Defendants must advance at trial.

### C.     Independently, A Reasonable Jury Could Conclude That Defendants Destroyed Exculpatory Evidence in Bad Faith

Independent of the suppression and fabrication theories discussed above, a reasonably jury could find for Savory on his claims that Defendants destroyed powerfully exculpatory physical evidence—the cutting from the blue pants that purportedly tested positive for blood and the hairs found in the victims' hands—and that they did so in bad faith, though a showing of bad faith is not necessary to deny summary judgment.

Police officers can be liable for violating due process when they destroy physical evidence. Where officers destroy evidence that "possess[ed] an exculpatory value that was apparent before the evidence was destroyed, and are of such a nature that the [criminal] defendant would be unable to obtain comparable evidence by other reasonably available means," then they are liable for violating due process, without the need to show that the acted in bad faith. *California v. Trombetta*, 467 U.S. 479 (1984). Where the evidence destroyed is only "potentially useful," however, then evidence of bad faith is required. *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).

Construing the summary judgment record properly for Savory, a reasonable jury could conclude that Defendants destroyed obviously, highly exculpatory evidence, and so a showing of bad faith is not required at this stage. That said, Savory has ample evidence that the evidence was destroyed in bad faith, so he can proceed on that theory as well, and in that even needs only show that the record construed for him demonstrates that the evidence destroyed was potentially useful. The Seventh Circuit has held that claims for destruction of evidence supported by evidence just the evidence that Savory's has should proceed, and that qualified immunity is not available. *Armstrong v. Daily*, 786 F.3d 529 (2015).

### 1.  A Jury Must Decide If Defendants Teplitz, Jatkowski, and Cannon Are Liable for Destroying the Cutting from the Blue Pants

Defendants Fiers, Pinkney, and Jatkowski collected a pair of pants that were Savory's father's pants and that plainly could not have been worn by Savory. *See* Statement VI(F) *supra*. Jatkowski submitted the pants to Gonsowski for analysis, falsely reporting that they were Savory's pants. *See* Statement VI(F) *supra*. If the pants had been worn during the commission of a murder, they would have been drenched in blood, and the confession documented that Savory supposedly placed the knife in his pocket without cleaning it, which would have left blood. *See* Statement VI(F) *supra*. Gonsowski reported that "chemical and serological testing of [the pants] indicated the presence of group A, human blood." During criminal proceedings, Teplitz, Jatkowski, and Gonsowski testified that the pants had been collected because they had blood on them and that testing shoed blood inside the pocket, consistent with the confession. *See* Statement VI(F) *supra*.

But there was no blood anywhere on the pants. Post-conviction testing eventually confirmed this was true—it showed there was no blood anywhere on the pants. *See* Statement VI(F) *supra*. But to prevent Savory from proving that there was no blood on the pants during his criminal proceedings, Defendants did two things: First, they claimed that the part of the pants that had tested positive for blood was a small cutting taken from a part of the pants close the belt and pocket. *See* Statement VI(F) *supra*. And second, they destroyed that cutting after reporting that they had found blood on it, to prevent further testing. *See* Statement VI(F) *supra*. Cannon and Jatkowski were responsible for the preservation of physical evidence during and after Savory's criminal prosecution, and Savory is entitled to the inference at this stage that they made the cutting disappear. *See* Statement VI(F) *supra*.

Construing the record for Savory, if Savory could have tested this cutting, he could have shown that the cutting had no blood on it, like the rest of the pants, and that Defendants had

175

fabricated this blood evidence to help convict him. The cutting was "critical to proving that Johnnie did not kill Connie Cooper and James Robinson." Ex. 24 at 42-43. But because Defendants had destroyed it, there was nothing Savory could do to show that those pants had not been present at the scene of the crime. Defendants Teplitz, Jatkowski, and Cannon are liable under *Trombetta* for destroying obviously exculpatory evidence, which would have shown that Savory was innocent.

Moreover, Savory has a huge volume of evidence that these three Defendants acted in bad faith. Separate and apart from their destruction of evidence, these Defendants fabricated and suppressed numerous items of evidence already discussed, in a tunnel-vision effort to frame Savory. See Arguments IV(A)-(B) *supra*. Just as Defendants are not entitled to summary judgment by disclaiming intent on Savory's suppression claims, they are not entitled to judgment by disclaiming bad faith on Savory's destruction claims. See *id.*; *McCottrell*, 933 F.3d at 670-71. Moreover, *Armstrong* holds that where officers pursue a suspect single-mindedly, where they do not follow court orders that require them to maintain evidence, and where they lie during criminal proceedings (even if they are immune for those lies), bad faith is established. 786 F.3d at 547& n.5. Because Savory can show bad faith, he need only establish that the evidence destroyed was "potentially useful," and so even if this Court were to conclude that Savory cannot pursue with a *Trombetta* claim, Savory's destruction claims would still go to trial under *Youngblood*.

### 2. A Jury Must Decide If Defendants Teplitz, Jatkowski, and Cannon Are Liable for Destroying the Hairs Found in the Victims' Hands

The same analysis applies to the destruction of the hairs found in the victims' hands. Cooper had defense wounds on her hands. See Statement VI(G) *supra*. She and Robinson both had hairs that were not their own in their hands. See Statement VI(G) *supra*. Defendants and Gonsowski examined those hairs, they concluded that they were not similar to Savory's hair, and then conducted no additional testing, even though visual analysis of hairs was widely discredited

at the time. See Statement VI(G) *supra*. Like the cutting from the pants, Cannon and Jatkowski were responsible for the preservation of physical evidence during and after Savory's criminal prosecution, and Savory is entitled to the inference at this stage that they made the hairs disappear. See Statement VI(G) *supra*. Without the hair, Savory could not run forensic tests to determine whose hair was in the hands of the victim. See Statement VI(G) *supra*. The hairs were "critical to proving that Johnnie did not kill Connie Cooper and James Robinson, as well as identifying the true perpetrator." Ex. 24 at 42-43.

Again, *Armstrong* squarely holds that the destruction of evidence that if tested might point to an alternative perpetrator violates due process and renders officers liable under *Trombetta*. *Armstrong*, 786 F.3d at 548. The hairs in the victims hands left by the real killer fit that bill. And again, Savory can proceed on a theory under *Youngblood* as well, given the evidence of bad faith in the record.

### 3.   Defendants Are Not Entitled To Qualified Immunity on the Destruction of Evidence Theory

Defendants' argument that they are entitled to qualified immunity is conclusively foreclosed by the Seventh Circuit's decision in *Armstrong*, where the Court held that law was clearly established in the 1960s that police officers could not destroy evidence. *Armstrong*, 786 F.3d at 532 ("[I]it was clearly established under *Killian v. United States*, 368 U.S. 231 (1961), and then *Brady v. Maryland*, 373 U.S. 83 (1963), that bad-faith destruction or loss of exculpatory evidence would violate a suspect's due process rights. *Brady* made clear that the police and prosecution could not suppress exculpatory evidence. A reasonable police officer or prosecutor would not have concluded that he could instead destroy evidence to avoid disclosing it to the defense."); see also *id.* at 549-50 (holding that "law enforcement officials were on notice long before 1980 that the duty to preserve was not limited to obviously exculpatory evidence"). The

Court went on to say, "And even if all this were not enough, this court had ruled expressly in 1978 that destroying and falsifying evidence was unlawful." *Armstrong*, 786 F.3d at 550 (citing *Heidelberg v. Hammer*, 577 F.2d 429, 432 (7th Cir. 1978)). *Armstrong* involved the destruction of similarly valuable forensic evidence in 1980, and Defendants cannot credibly argue they are entitled to qualified immunity given the Seventh Circuit's express rejection of the immunity argument in that case.

### 4. Defendants Remaining Arguments Lack Merit

Defendants' remaining arguments for summary judgment lack merit. They argue that they did not destroy the cutting or the hairs. OB-63-65.[22] But again their argument depends entirely on impermissibly construing the facts in their own favor, and it should be rejected for the reasons discussed above. See Argument IV(A)(4)(a) *supra*. So, too, for their argument that they did not act in bad faith. *Id.* As Savory just outlined, there is ample evidence in the record from which a jury could draw the inference that they acted in bad faith. See Argument IV(C)(1) *supra*.

## V.     A JURY MUST DECIDE SAVORY'S FOURTH AMENDMENT ILLEGAL SEIZURE CLAIM

Savory also brings a § 1983 claim for illegal detention without probable cause. The Supreme Court held in *Manuel v. Joliet*, 580 U.S. 357, 363-64 (2017), and *Thompson v. Clark*, 596 U.S. 36, 42 (2022), that it has long recognized a Fourth Amendment claim for illegal seizure pursuant to legal process where the detention is without probable cause. That claim requires proof of a (1) a seizure, (2) without probable cause. *Gerstein v. Pugh*, 420 U.S. 103, 114-16 (1975).

---

[22] They focus also on fingernail scrapings, OB-62-63, but Savory is not rely on the destruction of fingernail evidence to support his destruction of evidence due process claim.

## A.     Defendants Lacked Probable Cause to Prosecute Savory

Defendants first argue that there is no genuine dispute about whether there was probable cause to suspect that Savory committed the Cooper-Robinson murders. OB-77-81. Again, Defendants' argument is based on utterly disputed facts and inapplicable case law.

"[P]robable cause is defined as a state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged." *Williams v. City of Chicago*, 733 F.3d 749, 759 (7th Cir. 2013). It is firmly established that knowingly fabricated evidence and false statements never support probable cause. *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978); *Alexander*, 721 F.3d at 423; *Lawson v. Veruchi*, 637 F.3d 699 (7th Cir. 2011) (reversing grant of summary judgment where false statements precluded finding probable cause); *Olson v. Tyler*, 771 F.2d 277, 281 & n.5 (7th Cir. 1985) (holding that when officer includes false facts or omits facts in the probable cause analysis, "he cannot be said to have acted in an objectively reasonable manner"). Along the same lines, police cannot manufacture their own probable cause. *Collier v. City of Chicago*, 2015 WL 50814408, *4 (N.D. Ill. Aug. 26, 2015).

Moreover, probable cause is a quintessential question of fact. The Seventh Circuit holds that a court cannot decide the probable cause question "if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." *Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993); *see also Bryant v. Whalen*, 759 F. Supp. 410, 417 (N.D. Ill. 1991). "Accordingly, a conclusion that probable cause existed as a matter of law is appropriate only when no reasonable jury could find that the officers did not have probable cause[.]" *Maxwell*, 998 F.2d at 434.

179

As discussed at length already, there is a huge factual dispute about whether Defendants had any evidence whatsoever to entertain an "honest and sound" suspicion that Savory had killed Cooper and Robinson. When the record is viewed in Savory's favor, Defendants wholly fabricated all the evidence against Savory on which Defendants' probable cause argument is based. The entire grand jury transcript is in the record. See Statement ¶ 143 *supra*. Other than the coroner, the only testimony presented at the grand jury was from Defendants Perkins, Fiers, Pinkney, and Teplitz. See Statement ¶ 143 *supra*. There is no evidence in the record that prosecutors did any investigation independent of Defendants before charging Savory or at any point later. See Statement VII & X *supra*. Savory's indictment was based on Defendants' testimony that Savory confessed to the crime and made incriminating statements, that he possessed the murder weapon on which blood was found, that there was no sperm present on the vaginal swabs, and that the Ivys, Jones, and Mason had heard Savory provide incriminating statements. See Statement ¶ 143 *supra*. This evidence was all fabricated by Defendants, and at the same time that the grand jury proceeded, they were suppressing the exculpatory and impeachment evidence discussed already. See Argument IV(A)-(C) *supra*. Given these facts, Defendants cannot credibly contend that, viewing the record for Savory and drawing inferences in their favor, an objectively reasonable officer in their position would have entertained an honest and sound suspicion that Savory had committed the murders.

Defendants' arguments otherwise lack merit. Defendants contend they reasonably believed at the time that Savory had committed the killing based on: (a) the fact that Savory had been with his friend James *the evening before* the killings (items 1 through 3 on Defendants' list of evidence on pages 80-81 of their brief); (b) information Savory purported told Ray Mason (item 4); (c) information that Defendants supposedly obtained from the Ivys (items 5 through 7); (d)

information that Savory purportedly told Marva Jones (item 7); (e) information contained in Savory's false confession (item 8); and (f) the fact that, in Defendants' words, "Savory, though only fourteen years old, had an extensive criminal history and major problem with fighting" (item 9). OB-80-81.

These items of evidence do not support probable cause. Savory's confession was fabricated—a theory on which Defendants concede that factual disputes preclude summary judgment—and so it cannot provide probable cause. See Argument I *supra*. Moreover, the Ivys' statements were fabricated and known to be false, and thus did not supply probable cause. See Argument IV(B)(3) *supra*.[23] The fact that Savory had been with James the day before the murder does not suggest that he is a murderer. Nor does the fact that Savory had been in fights in the past.[24] That leaves information Savory purported told Ray Mason (item 4) and Marva Jones (item

---

[23] Astoundingly, Defendants assert that "[p]erhaps the strongest evidence of probable cause is the Illinois Appellate Court's finding that the testimony of the Ivy family members was sufficient to establish guilt beyond a reasonable doubt." OB-81. But the Illinois appellate court was never told by Defendants that they had *fabricated that evidence*. Had the Illinois appellate court known that, it would have reversed Savory's conviction outright. Defendants' suggestion that the Ivy evidence is legitimate demonstrates that they are construing the facts in their own favor—untenably so—and not applying the correct summary judgment standard.

[24] Defendants' argument on this point is revealing. They contend that because a 14-year-old was playing with a friend the day before a crime occurred and because that 14-year-old had been in fights in the past, they were correct to suspect that he was a murderer. The argument reflects the same baseless rush to judgment that animated Defendants' initial decision to make Savory a suspect. These are not reasons to suspect a person of murder, and the case that Defendants cite does not suggest otherwise.

In fact, Defendants provide a longer list of meaningless evidence in the same section of the brief. OB-78-80. It is not clear whether Defendants are contending that these items of evidence gave them probable cause to suspect Savory of murder. But none adds to probable cause. The items Defendants list that are not included already in the discussion of probable cause in the text above are: the fact that Noyalee Robinson and William Douglas found the children dead; that the autopsies showed they died by stabbing; that the crime scene photos showed a home in disarray, contrary to how it had been left in the morning; that Savory was a ward of the state and had prior arrests; and that media had seen Savory at the scene after the murders asking if James was dead. None of these facts remotely supports probable cause, and the fact that Defendants include them in their brief highlight that they had no reason to suspect Savory.

It bears special mention that Defendants also list that they collected hairs from the bathroom sink, "which were consistent in color and characteristics with Savory's head hair standards." OB-80 (item 15 in list). That is a lie, and Defendants know it. Defendants' own testing revealed that the hairs recovered from the bathroom sink were *not* consistent with Savory's hair. See Ex. 8 at 5.

7). But both of those items of evidence were fabricated by Defendants as well—Savory is entitled to that inference at this stage—or at minimum were demonstrably false. See Statement IX *supra*.

Putting a finer point on it, Defendants state that probable cause for Savory's claim should be measured at the time the legal process is initiated. OB-78. Assuming that is true, at the grand jury the asserted bases for probable cause were all evidence fabricated by Defendants. At the same time, there is ample evidence that at the time of the grand jury and beyond, Defendants were hiding evidence that demonstrated Savory was innocent and that would have impeached the evidence they now say adds up to probable cause. See Argument IV(A) *supra*. In other words, Defendants went after a young child who had no connection to the crime, fabricated the evidence implicating him, and suppressed exculpatory evidence proving they were wrong at the same time.

Defendants cannot point to any basis to suspect Savory independent of their own misconduct. Prosecutors relied solely on Defendants' false evidence to prosecute Savory, without conducting any independent investigation. See Statement VII & X *supra*. In that context, Defendants' fabrications and suppressions are the but for cause of Savory's prosecution, and Savory's Fourth Amendment claim must go to trial. *Washington v. City of Chicago*, No. 22-2467, 2024 WL 1615022 (7th Cir. Apr. 15, 2024).

**B.    Defendants Are Not Entitled to Qualified Immunity on the Fourth Amendment Claim**

Defendants also assert that they are entitled to qualified immunity on Savory's Fourth Amendment claim, asserting that if they did not have probable cause, then they had so-called "arguable probable cause" to suspect Savory of murder. OB-82. There are a number of problems with this argument. First, Defendants' argument contains just one sentence of conclusory analysis, which is insufficient to establish an entitlement to immunity at summary judgment, *Adickes*, 398 U.S. at 160, and so the argument is forfeited, *Otto*, 134 F.3d at 854.

182

Second, qualified immunity considers whether state actors were on notice that their conduct was unlawful according to established law, and not whether a prior case gave notice that particular pieces of evidence added up to probable cause. *Armstrong v. Daily*, 786 F.3d 529, 556 (7th Cir. 2015) ("The issue is not whether issues concerning the availability of a remedy are settled. The qualified immunity defense focuses instead on whether the official defendant's conduct violated a clearly established constitutional right."); see also *Currie v. Chhabra*, 728 F.3d 626, 632 (7th Cir. 2013) (Fourth Amendment rights are well established "even in the absence of earlier cases involving fundamentally similar or materially similar facts"). It was clearly established, as discussed already, that the coercion of an involuntary confession, and the fabrications, suppressions, and destruction of evidence at issue was illegal in 1977. See Argument III(C) *supra*. Moreover, it was established that officers who submit false evidence to secure charges violate the constitution and are not entitled to immunity. *Malley v. Briggs*, 475 U.S. 335, 345 (1986). The Supreme Court held recently that the right to be free of prosecution without probable cause has been established for decades. *Manuel v. City of Joliet*, 580 U.S. 357, 364-65 (2017). That is enough to defeat immunity.

Third, arguable probable cause does not add any protection for Defendants at this stage of the case. The Seventh Circuit has held that, in evaluating at summary judgment whether an officer is entitled to immunity from a Fourth Amendment claim, there is "substantial, if not complete, overlap of the issue of immunity and the principal issue on the merits." *Maxwell v. City of Indianapolis*, 998 F.2d 431, 435-36 (7th Cir. 1993); *see also id.* ("The . . . officers attempt to draw a distinction by contending that the relevant inquiry is into 'arguable probable cause,' which is another way of asking whether they had probable cause to think they had probable cause."). Indeed, the Supreme Court held unambiguously in *Malley* that an officer is not entitled to qualified

immunity when a reasonable official in his position would have known that the facts did not establish probable cause. 475 U.S. at 345. The probable cause and arguable probable cause standards are objective, based on the facts known to the officer. *Fox v. Hayes*, 600 F.3d 819, 833 (7th Cir. 2010). The officer's subjective state of mind is irrelevant to this analysis. *Whren v. United States*, 517 U.S. 806, 812-13 (1996).

Just as a jury must decide whether Defendants had probable cause to suspect Savory, it must decide whether a reasonable officer would have believed that there was probable cause, to the extent there is any difference. *Chelios v. Heavener*, 520 F.3d 678, 686 (7th Cir. 2008) (jury must make probable cause determination "if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them"). The Seventh Circuit has reversed grants of summary judgment where defendants did not establish conclusively that there was no fact issue on probable cause. *Cartwright v. City of Chicago*, 450 Fed. App'x 539, 540-42 (7th Cir. 2011). Moreover, a claim of qualified immunity can be defeated even if the precise conduct in question had not previously been held unlawful. *Hope v. Pelzer*, 536 U.S. 730, 739-741 (2002) ("[O]fficials can still be on notice that their conduct violates established law . . . in novel factual circumstances."). Defendant Officers are not entitled to qualified immunity on this claim.

## VI.    DEFENDANTS GERONTES, ANDREWS, DUNLAVEY, AND TIARKS PARTICIPATED IN THE MISCONDUCT AND ARE NOT ENTITLED TO SUMMARY JUDGMENT

Defendants Gerontes, Andrews, Dunlavey, and Tiarks separately assert they are entitled to summary judgment because, in their view, they had minimal involvement in the Cooper-Robinson investigation. OB-82-86. But these Defendants were each involved in the misconduct described above. None of them is entitled to summary judgment.

It is worth pausing to note how peculiar it is that a subset of Defendants argue in a separate section of their motion that they are entitled to summary judgment on the ground that the record shows they were uninvolved in the misconduct. Of course, each of the Defendants must show that they undisputedly were not involved in misconduct to obtain summary judgment. The fact that a subset of Defendants argue separately that they were not involved in the constitutional violations asserted is tantamount to an admission that there is no hope of summary judgment for the others— Defendants Cannon, Teplitz, Buck, Fiers, Bowers, Pinkney, Haynes, Jatkowski, and Perkins.

Gerontes contends that he was not involved in Savory's interrogation and is thus entitled to summary judgment. OB-83. But Gerontes was intimately involved in other misconduct. Contrary to Defendants' suggestion, OB-86, Gerontes was the supervisor of Jatkowski, with whom Jatkowski testified that he shared his suppressed notes regarding forensic testing of the knife and vaginal swabs. See Statement VI(A)-(C) *supra* (discussing Ex. 107 at 16:8-12). Gerontes knew of this highly exculpatory evidence, which would have impeached Defendants' entire theory of the case, shown Savory's confession to be false, and exonerated Savory, and he did not ensure that information was turned over. That is enough to deny his separate request for summary judgment. But Gerontes was also the author of the undisclosed report listing Douglas as the sole suspect in the crime on January 21, 1977. See Statement XI *supra* (discussing Ex. 63); Argument IV(A)(3) *supra*. That report was not turned over either, and so Savory was never afforded the opportunity to impeach Defendants' and Douglas's testimony at trial with evidence that they considered Douglas the sole suspect just before they began Savory's interrogation.

Defendant Tiarks was in charge of the interrogation of Savory and the investigation generally. He authorized interrogating Savory without a parent or guardian present. He authorized the administration of both the January 25 and the January 26 polygraphs on Savory, even though

185

he knew polygraph results were "nonsense" and understood that the January 26 polygraph of Savory in particular would have no conceivable purpose other than to intimidate Savory. He authorized the purchase of the clothes that replaced clothing taken from Savory when officers plucked hair from throughout Savory's body. He signed off on the fabricated report that Teplitz prepared sanitizing the events that led to Savory's false confession and setting out the fabricated confession itself. He participated in the fabrication of the knife that Defendants dubbed the murder weapon.

Defendant Superintendent Andrews and Defendant Lieutenant of Juvenile Investigations Dunlavey were the supervisors in charge of Tiarks and his operatives on January 26. Both were present on the floor while Savory's interrogation was ongoing on January 26, and both had command responsibility to monitor the interrogation and ensure it was being conducted properly. Dunlavey signed the petition for violation of parole against Savory at the conclusion of the events of that day. Neither Andrews nor Dunlavey took any supervisory action to redirect the interrogating Defendants, even as developments in the interrogation process were brought to their attention.

Andrews, Dunlavey (along with Gerontes and Tiarks) are liable merely given their supervisory role in the investigation. Supervisors are liable under § 1983 "for their subordinates' violation of others' constitutional rights when they 'know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Steidl v. Fermon*, 494 F.3d 623, 631-32 (7th Cir. 2007). As discussed above, the summary judgment record supports the conclusion that each of these Defendants directly participated in violating Savory's rights, and so reference to supervisory liability is not necessary. Nonetheless, the record would also permit a reasonable jury to conclude that the constitutional violations Savory suffered were caused by the

deliberate indifference of these Defendants. They were the direct supervisors of the other Defendants, had direct knowledge of the Cooper-Robinson investigation, made assignments, and approved reports, thereby ratifying the misconduct contained in those reports. Their participation as supervisors enabled the scheme. *Id.* They are liable on that basis. To the extent Defendants wish to contest these facts, they must do so at trial.

## VII.     A JURY MUST DECIDE THE FAILURE-TO-INTERVENE CLAIMS

Defendants also argue for summary judgment on Savory's failure-to-intervene claim. First, they argue that Savory's failure-to-intervene claims fail because they are entitled to summary judgment on all of Savory's other constitutional claims. OB-87. This Court should reject this argument because Defendants do not move for summary judgment on all of Savory's other constitutional claims, and regardless material disputes of fact require a trial on those claims.

Second, Defendants argue that such a claim is not viable under § 1983, a position they admit is incompatible with Seventh Circuit law. OB-87. As the Seventh Circuit reaffirmed in the very case Defendants cite for the proposition that a failure-to-intervene claim is not viable, defendant who has a realistic opportunity to step forward and prevent a fellow officer from violating the constitutional rights of another but who fails to do so is liable. *Mwangangi v. Nielsen*, 48 F.4th 816, 832 (7th Cir. 2022); *Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir. 1972); *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994).

"Whether a bystander officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact[.]" *Mwangangi*, 48 F.4th at 832. The discussion of Savory's due process claims above demonstrates that a reasonable jury could find that each of these Defendants had the opportunity to intervene to halt his interrogation, to make clear that the confession was involuntary, to expose the fabrication of

187

evidence, or to reveal suppressed evidence that caused Savory's wrongful conviction. See Argument III & IV *supra*. Indeed, Defendants had *decades* to so intervene while Savory was languishing in prison and did not. Summary judgment is not appropriate on this claim.

## VIII.   A JURY MUST DECIDE THE SECTION 1983 CONSPIRACY CLAIMS

Defendants do not address Savory's allegations that they conspired to violate his other constitutional rights, forfeiting any argument relating to Savory's conspiracy claims. See Argument I(B) *supra*.

To prove a section 1983 conspiracy, Savory must point to evidence from which a jury could infer an agreement among two or more people acting in concert to commit an unlawful act, or a lawful act by unlawful means. *Hampton v. Hanrahan*, 600 F.2d 600 (7th Cir. 1979), *rev'd in part*, 446 U.S. 754. "To be liable as a conspirator you must be a voluntary participant in a common venture," the Seventh Circuit has explained, "although you need not have agreed on the details of the conspiratorial scheme or even know who the other conspirators are. It is enough if you understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do your part to further them." *Jones*, 856 F.2d at 992. Conspirators are liable "for the wrongful acts of the other conspirators committed within the scope of the conspiracy." *Proffitt v. Ridgway*, 279 F.3d 503, 507 (7th Cir. 2002). "Rarely in a conspiracy case will there be direct evidence of an express agreement among all the conspirators to conspire," and so "circumstantial evidence may provide adequate proof of conspiracy." *Bell v. City of Milwaukee*, 746 F.2d 1205, 1256 (7th Cir. 1984).

There is ample evidence on which a jury could infer an agreement among the Defendants and between them and others, including the Ivys and Gonsowski, and Savory's conspiracy claims against each of them should proceed to trial. The facts viewed in Savory's favor show Defendants

all worked together on the Cooper-Robinson homicide investigation in a small group, deciding

that Savory was a suspect without any evidence implicating him, and working from there to

fabricate evidence implicating him in the crime, even though there was no evidence to speak of

otherwise. See Statement IV *supra*. Where evidence contradicted Defendants' official version, it

was hidden from sight. See Statement XI *supra*. As discussed, each Defendant including Bowers

participated in efforts to obtain a confession by coercion, to fabricate incriminating statements

attributed to Savory to fabricate, suppress, and destroy forensic evidence and the testing of that

evidence, along with Gonsowski, to fabricate incriminating statements attributed to the Ivys and

to suppress exculpatory and impeachment evidence relating to the Ivys, and to suppress

information regarding alternative suspects. See Statement V-VI *supra*.

By the time of Savory's first trial, each of the Defendants had engaged in a scheme to

fabricate evidence to frame Savory for a crime they had no evidence he committed. *Id.*; *see Jones*,

856 F.2d at 992 ("We cannot say that the jury acted unreasonably in finding that all of the

individual defendants were voluntary participants in a common venture to railroad [the

plaintiff]."). The conspiracy continued with the fabrication of additional Ivy evidence after Savory

was first convicted, but its object and scope remained the same. *See United States v. Jackson*, 546

F.3d 801, 815-16 (7th Cir. 2008) ("[C]o-schemers are jointly responsible for one another's acts in

furtherance in the scheme," and a "participant in conspiracy is liable for foreseeable acts of his co-

conspirators in furtherance of the conspiracy[.]").

The Seventh Circuit has warned that "[t]he question whether an agreement exists should

not be taken from the jury in a civil conspiracy case so long as there is a possibility that the jury

can infer from the circumstances (that the alleged conspirators) had a meeting of the minds and

thus reached an understanding to achieve the conspiracy's objectives." *Hampton*, 600 F.2d at 621;

*Serrano*, 2020 WL 3000284, at *21 ("Who actually was in the conspiracy, if one existed, its aims, and its extent are for the jury to decide."); *Washington v. Boudreau*, 2022 WL 4599708, at *23 (denying officers summary judgment on conspiracy claim there was a material dispute of fact as to whether they fabricated or withheld evidence). The summary judgment record reveals a genuine dispute of fact about whether each of the Defendants reached an agreement with the others, and a reasonable jury could find for Savory on his conspiracy claims.

## IX.    THE INDEMNIFICATION CLAIM SURVIVES SUMMARY JUDGMENT

Finally, there is an indemnification claim against the City of Peoria, Dkt. 171 at 17-18, on which the City has not moved for summary judgment, and so the City has forfeited any argument on that claim, *Smith*, 388 F.3d at 569. Regardless, because Savory's claims against the individual Defendants discussed above survive summary judgment, so too should his indemnification claim against the City, which is based on those individual claims. See 745 ILCS 10/9-102.

## CONCLUSION

Construing the record in the light most favorable to Savory and drawing inferences in his favor, none of Defendants is entitled to summary judgment on any of the theories on which they have moved for summary judgment. Savory is entitled to a trial against Defendants on all of his claims. For all of these reasons, Defendants' motions for summary judgment should be denied.

Respectfully submitted,

**JOHNNIE LEE SAVORY**

By: /s/ Steve Art
*One of Plaintiff's Attorneys*

Jon Loevy
Steve Art
Locke Bowman
Megan Pierce
**LOEVY + LOEVY**
311 N. Aberdeen St.
Chicago, IL 60607
(312) 243-5900
steve@loevy.com

Brad J. Thompson
G. Flint Taylor
**PEOPLE'S LAW OFFICE**
1180 N. Milwaukee Ave.
Chicago, IL 60642
(773) 235-0700
brad@peopleslawoffice.com

## CERTIFICATE OF SERVICE

I, Steve Art, an attorney, hereby certify that, on April 22, 2024, I filed the foregoing PLAINTIFF JOHNNIE LEE SAVORY'S CONSOLIDATED RESPONSE IN OPPOSITION TO DEFENDANTS' SUMMARY JUDGMENT MOTIONS using the Court's CM/ECF system, which effected service on all counsel of record.

/s/ Steve Art
*One of Plaintiff's Attorneys*

Jon Loevy
Steve Art
Locke Bowman
Megan Pierce
**LOEVY + LOEVY**
311 N. Aberdeen St.
Chicago, IL 60607
(312) 243-5900
steve@loevy.com

Brad J. Thompson
G. Flint Taylor
**PEOPLE'S LAW OFFICE**
1180 N. Milwaukee Ave.
Chicago, IL 60642
(773) 235-0700
brad@peopleslawoffice.com